# EXHIBIT 19

 INTERNATIONAL INSTITUTE FOR THE UNIFICATION OF PRIVATE LAW
INSTITUT INTERNATIONAL POUR L'UNIFICATION DU DROIT PRIVE

| | |
|---|---|
| UNIDROIT COMMITTEE OF GOVERNMENTAL EXPERTS FOR THE PREPARATION OF A DRAFT CONVENTION ON HARMONISED SUBSTANTIVE RULES REGARDING INTERMEDIATED SECURITIES<br>Second session<br>Rome, 6/14 March 2006 | UNIDROIT 2006<br>Study LXXVIII – Doc. 35<br>Original: English<br>February 2006 |

*COMMENTS BY GOVERNMENTS*
*AND INTERNATIONAL ORGANISATIONS*

(Comments by the Government of the United States of America)

***FIRST PRINCIPLES FOR THE UNIDROIT CONVENTION ON INTERMEDIATED SECURITIES***

As we discuss the details of the draft UNIDROIT Convention it may be useful to have in mind some first principles to guide our consideration of the substantive provisions. These "first principles" do not refer to preamble-like statements of goals or underlying needs. Instead, they mean substantive principles of law which should guide and be incorporated in the Convention—a "term sheet" or template to guide the process and test its results. The following list of first principles takes into account the relative importance of the substantive matters addressed but certainly is not exhaustive.

1. **Attributes and Effects of a Credit to a Securities Account.**

    a. **Conceptual Framework.** The Convention should not undertake the unreasonably ambitious goal of harmonization of the underlying doctrine and principles of property law of contracting states. Nor need it seek to harmonize the relationship between that law and existing and future clearing and settlement systems. That approach would be doomed to fail. For example, the Convention should specify the rights and benefits that an account holder is to receive upon a credit to its securities account but should leave to contract and the applicable domestic non-Convention law the mechanisms of how the intermediary causes the account holder to realize those rights and benefits. A so-called "direct" system could allow an intermediary to connect the account holder with the issuer or an "upper tier" CSD, for example, and a so-called "indirect" system could achieve the mandated results in another way.

    b. **Substantive Results.** The Convention should specify the rights and benefits that accrue to an account holder upon the credit to a securities account as well as the duties of an intermediary that arise upon a credit. These rights and duties must be subject to variation and derogation under, *inter alia*, the account agreement, clearing and settlement system rules, and the varying rights and duties of issuers and adjusted to accommodate reasonable commercial standards and limitations on the power of an intermediary. A rigid, mandatory system of "one size fits all" would not be workable. (*See*, *e.g.*, Arts. 4, 5, 7, 8, 15, and 16, for current formulations. (*See also* Study LXXVIII, Doc. 23 – rev., Appendix 8. United States suggestions for Art. 16 bis dealing with limitations of duties of intermediary).

**2. Innocent Acquisition and Immunity.**

**a. Drafting and Structure.** The Convention should be revised to incorporate all innocent acquisition and related (*e.g.*, immunity) rules in one provision instead of the bifurcated and overlapping approach of the current draft (*See* Arts. 7 and 11).

**b. Immunity.** In addition to innocent acquisition rules, the Convention should include a rule of immunity protecting those who innocently receive a credit to a securities account and intermediaries through which intermediated securities flow. In a system of intermediated holdings an innocent person will not always fit the model of an "acquirer."

**c. Standard of Innocence.** The Convention should adopt a standard of innocence that is compatible with both common law and civil law concepts. (*See* Art. 1(i), defining "adverse claim" and Art. 11(3), explaining "knowledge of an adverse claim" for the current formulation).

**3. Security Interests and Priority.**

**a. Security Interests.** The Convention should provide for the creation of effective security interests both by credit to a securities account of a collateral taker and by non-credit arrangements among an intermediary, an account holder, and a collateral taker. (*See* Arts. 5 and 6 for the current formulations).

**b. Priority.** The Convention should adopt those principles of priority among competing claims which are reflected by the majority view of the September 2005 Berne Working Group on Effectiveness of Book-Entries, Priority And Loss Sharing, Study LXXVIII - SEM. 1, Appendix 9. In particular, the first-in-time priority rule of Article 10 would apply only to priority contests among collateral takers who have security interests in intermediated securities credited to the securities account of a collateral provider. Priority among these collateral takers would not be covered by the innocent acquisition (last-in-time) rules. Article 10 would not apply to security interests when the collateral taker itself receives a credit to a securities account under Article 5.

**4. Loss Allocation Upon Shortfall of Securities Held by Intermediary.**

The Convention should provide a baseline *pro-rata* sharing structure applicable in the insolvency of an intermediary. (*See* Art. 18 for the current formulation). This default rule would apply in the event of a shortfall in securities of a type held (or required to be held) by an intermediary for its account holders. The rule would be subject to any different insolvency distributional rule under the domestic non-Convention law. In the alternative, a contracting state might be afforded the opportunity, by declaration, to elect to apply instead the distributional rules applicable in insolvency proceedings under the domestic non-Convention law.

**5. Upper-Tier Attachment.**

The Convention generally should prohibit upper-tier attachment on a tier other than that of a debtor-account holder's intermediary. It is highly unlikely that the problems posed by upper-tier attachment could be adequately addressed, even in a so-called "direct" system. These problems include, but are not limited to (i) the accommodation of security interests made effective by an arrangement with an intermediary on a lower tier and (ii) addressing concerns of market participants that an upper-tier attachment could exacerbate systemic risks. If the Convention were to accommodate a form of upper-tier attachment, it should be permitted only based on a satisfactory declaration of a contracting state with respect to security accounts governed by the law of that state with respect to securities accounts governed by the law of that state where the systems identify at the top tier, interests held at a lower tier.

### 6. Relations Between Account Holder and Issuer.

The Convention should address the manner by which and the extent to which an account holder receives the benefits *vis-à-vis* an issuer that would be received in a direct holding relationship. (*See* Art. 19 for the current formulation). Matters addressed should include voting, notices, proxies, permissibility of holding through intermediaries, dematerialized securities, discrimination against holding through intermediaries, and other matters. For additional suggestions, *see* Study LXXVIII, Doc. 23 – rev., Appendix 9. (United States suggestions for drafting changes).

### 7. Definition of Securities

The definition of "securities" should remain identical to the definition of the term in the Hague Securities Convention, to harmonize laws governing interests in financial assets credited to securities accounts. Different definitions in the two Conventions could lead to different (and thus undesirable) results. This would be especially true if an adjective such as "tradeable" were included in the UNIDROIT Convention's definition. The domestic non-Convention law can continue to determine and limit what assets can properly be credited to a securities account (and thus covered by both Conventions).

However, there are articles such as Chapter VI "Relations with Issuers of Securities," which have no counterpart in the Hague Securities Convention and in which the term "securities" standing alone is used. In this chapter there may be concerns about the extent to which the UNIDROIT Convention may require adaptation of domestic law to accommodate intermediation and these concerns can - and should - be addressed. Chapter VI may be an appropriate place to address those concerns by narrowing the type of securities to which the requirements of this chapter apply. This targeted approach is preferable to addressing the concerns by narrowing in the definition of securities in a manner inconsistent with the Hague Securities Convention.

### 8. Clearing and Settlement Systems.

The Convention should contain a workable definition of clearing and settlement systems, for purposes of the Convention, to the end that rules of these systems can be accommodated. (*See*, *e.g.*, item 1.b., above). The difficulty of the task should not be underestimated. One approach would be to include a list of qualifying characteristics (any one of which would be sufficient) coupled with a declaration by a contracting state that generally or specifically identifies systems that operate under the domestic non-Convention law of that state.

### 9. Collateral Transactions and Netting.

The Convention should contain special provisions dealing with collateral transactions along the lines of Chapter VII of the current draft. Chapter VII or another chapter also should address and legitimize netting in the financial markets to include collateral netting, closeout netting, and central counterparty netting. (*See* Study LXXVIII, Doc. 23 – rev., para. 173 (discussing netting)). Contracting states should be permitted by declaration to opt out of these provisions in whole or in part. (*See* Art. 25 for the current formulation).