# EXHIBIT 21

# Arendt & Medernach

Avocats a la cour

Luxembourg – Bruxelles

14, RUE ERASME • L-1468 LUXEMBOURG • B.P. 39 • L – 2010 LUXEMBOURG
TELEPHONE: (352) 40 78 78 • FACSIMILE: (352) 40 78 04
www.arendt-medernach.com

_____

in alliance with dillon **eustace** dublin, ireland

## <u>MEMORANDUM</u>

| | | |
|---|---|---|
| To | : | White & Case LLP<br>Mr. Frank Panopoulos |
| From | : | Philippe Dupont / Glenn Meyer / Marc Mouton |
| Date | : | 19 August 2008 |
| Subject | : | Luxembourg bank secrecy and discovery |

---

**CONFIDENTIAL AND PRIVILEGED**

We understand that you wish us to advise on the circumstances under which information protected by Luxembourg banking secrecy laws may be disclosed in foreign judicial proceedings, including discovery, without infringing the professional secrecy obligations imposed upon banks licensed in Luxembourg.

Article 41, paragraph 1 of the law of 5 April 1993 on the financial sector, as amended (hereinafter, the "Law of 1993"), provides that: "*All directors, members of managing and supervisory bodies, managers, employees and other persons employed by credit institutions, other financial sector professionals, settlement entities, central counterparties, clearing houses and foreign operators of systems authorised in Luxembourg as referred to in Part 1 of this law, shall be required to keep secret any information confided to them in the context of their professional activities. Disclosure of such information shall be punishable by the penalties laid down in Article 458 of the Penal Code*".

Article 458 of the Criminal Code provides that: "*Physicians, surgeons, medical officers, pharmacists, midwifes and all other persons who are, by virtue of their situation or profession, depository of the secrets confided to them and who reveal such secrets, to the exception of the cases where they have to testify in Court or are under a legal disclosure obligation, are punishable by eight days' to six months' imprisonment and by a fine of EUR 500.- to EUR 5.000.-*". Under Luxembourg law, criminal sanctions do currently only apply to natural persons and not to corporate entities. A person committing a criminal offence in the course of its professional activity at the service of a corporate entity will thus be held personally responsible.



Bank secrecy is unanimously considered as a key element of the Luxembourg financial sector and constitutes alike any obligation protected by criminal sanctions an important principle under Luxembourg law. This obligation is also regularly enforced before the Luxembourg courts (See e.g. District Court, Luxembourg, 26 June 1981, Bull. Droit & Banque, 1983, n°2, p.35 ; District Court, Luxembourg, 27 October 1989, Bull. Droit & Banque, 1990, n°15, p.58 ; District Court, Luxembourg, 12 July 1989, 1990, Bull. Droit & Banque, n°15, p.68 ; District Court, Luxembourg, 24 April 1991, Pasicrisie, n°28, p.173 ; Court of Appeal (*chambre du conseil*), 2nd July 1993, Bull. Droit & Banque, 1994, n°21, p.29 ; District Court, Luxembourg, 18 May 2000, Bull. Droit & Banque, 2001, n°31, p.16 ; District Court, Luxembourg, 13 July 2001, Bull. Droit & Banque, 2002, n°32, p. 21 ; Court of Appeal, 13 March 2002, Bull. Droit & Banque, 2002, n° 33, p. 40 ; Court of Appeal 30 March 2004, Bull. Droit & Banque, 2004, n°35, p.57 and the references below).

Case law has recently clarified the nature of the obligation to professional secrecy and confirmed that such obligation is to be considered as a public policy provision (Court of Appeal, 2nd April 2003, Bull. Droit & Banque, 2003, n° 34, p. 52; Court of Appeal, 30 March 2004, n° 105/04 V). The Luxembourg supreme court, the *Cour de Cassation,* has also held that it is an absolute obligation (*obligation de résultat*) i.e. obligations to obtain a specific result - here to maintain secrecy over protected information. (Cour de Cassation, 18 March 2004, Bull. Droit & Banque, 2004, n° 35, p. 46. confirming Court of Appeal, 2nd April 2003, Bull. Droit & Banque 2003, n° 34, p. 52) Accordingly, from a civil law perspective, by authorising or even by tolerating a disclosure of protected information to occur, the confidant exposes itself to liability. If such disclosure occurs, the professional secrecy obligation is *ipso jure* considered to be breached, irrespective of the fact that best endeavours to ensure the confidentiality of such data have been used by the concerned credit institution or that the disclosure of information was not deliberate.

Luxembourg banks are thus subject to an absolute legal obligation to professional secrecy pursuant to which they must ensure the confidentiality of any information confided to them by clients during the course of their business relations. This obligation thus basically covers i.a. all data enabling, directly or indirectly, an identification of the clients. Therefore, as a matter of principle, disclosure by a bank of information concerning its clients to any third party, is prohibited.

However, Article 41, paragraph 2 of the Law of 1993 adds that: "*The obligation to maintain secrecy shall cease to exist where disclosure of information is authorised or required by or pursuant to any legal provision, even where the provision in question predates this Law*". Therefore, a credit institution can be released from its obligation to banking secrecy where expressly provided so by law. Article 458 of the Criminal Code contains such an exemption for cases where a person subject to professional secrecy obligations has to testify in court. When ordered to testify in court, a credit institution may, at its discretion, decide to testify in court or not, but if it testifies, it will not be considered to breach its bank secrecy duties (Court of Appeal, 30 March 2004, n° 105/04 V).

Accordingly, information protected by bank secrecy may be revealed by a credit institution via testimony before a Luxembourg court.

The legal exemptions from bank secrecy cover, as a matter of principle, purely domestic situations. The exemption from bank secrecy must indeed derive from a Luxembourg legal provision. It is an open question whether a Luxembourg legal provision providing for an exemption to bank secrecy has extraterritorial effects, as no legal provision addresses this situation. For example, it is not



certain whether the exemption for testimony in court does exclusively apply for testimony before a Luxembourg court or whether it may also allow for testimony before foreign courts.

This conclusion may, however, be balanced since a judgement of the European Court of Justice of 10 December 2002 in the case C-153/00 (Criminal proceedings against Paul der Weduwe). In the proceedings which lead to such judgement, the Luxembourg government intervened and the European Court of Justice summarised the position of the Luxembourg government as follows: "*The Luxembourg Government explains in that regard that factual situations giving rise to the type of dispute in question are too rare and too atypical to have come before the Luxembourg courts, which explains why the question of the extra-territorial scope of the Luxembourg provisions on banking secrecy has not yet been resolved by those courts. According to the Luxembourg Government those provisions do have extra-territorial scope. Moreover, the exemption from criminal liability for witnesses giving evidence in judicial proceedings, provided for in the Luxembourg legal system, also has extra-territorial scope. According to that government, the concept of judicial authority in Article 458 of the Luxembourg Criminal Code covers not only Luxembourg judicial authorities but also those of other Member States. Likewise, a defendant is always entitled to disclose information covered by banking secrecy where that disclosure is made in judicial proceedings.*" We wish to draw your attention to the fact that the opinion of the Luxembourg government has not yet been tested before a court and that the final decision of the European Court of Justice does not contain a decision on this point.

We are, however, of the considered opinion, on the basis of the aforementioned precedent, that if a Luxembourg bank testifies as a witness in a foreign country, it could be argued that it may reveal information covered by its professional secrecy duty without being in breach of the above mentioned laws. The information provided to the foreign court must, however, be strictly limited to what is necessary for the resolution of the case in which the Luxembourg bank is called upon to testify.

The situation is different if a Luxembourg credit institution is confronted with a discovery order issued by a U.S. court. The delivery of confidential documents further to a discovery order issued by a foreign court could indeed result in an infringement by a Bank of its criminally sanctioned professional secrecy duties as (i) such delivery of documents may not be construed as oral testimony and does not fall under another legal exemption from bank secrecy and (ii) a discovery order constitutes a unilateral measure aiming at obtaining evidence whilst there are treaty based channels of international cooperation among U.S. and Luxembourg judicial authorities in place for this same purpose.

Both the United States of America and the Grand Duchy of Luxembourg are indeed parties to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (hereinafter, the "Hague Convention").

If a U.S. court would formulate a request for evidence in a letter rogatory via the channels provided for in the Hague Convention, a Bank would be invited by the Luxembourg central authority, the *Parquet Général* (the General State Prosecutor) to comply with such request. As the Bank would be legally bound to comply with the request under Luxembourg law, it would be able to testify and disclose  the requested documents without infringing its bank secrecy duties.



Please note, however, that Luxembourg has used the faculty granted by Article 23 of the Hague Convention to declare that it will not execute letters rogatory issued for the purpose of obtaining "pre-trial discovery" of documents as known in common law countries. In the Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of The Hague Apostille, Evidence and Service Conventions of 28 October to 4 November 2003, it is specified that pre-trial discovery means evidence requests submitted after the filing of a claim but before the final hearing on the merits. A letter rogatory containing a discovery order will thus only be executed by Luxembourg authorities if such discovery order does not qualify as "pre-trial discovery" in the sense of the Hague Convention.

# ATTACHMENT A

# Loi du 5 avril 1993 relative au secteur financier telle qu'elle a été modifiée

## Sommaire

Art. 1er.   Définitions.   10

**PARTIE I: L'accès aux activités professionnelles du secteur financier**   13
**Chapitre 1: L'agrément des banques ou établissements de crédit de droit luxembourgeois.**   13
*Section 1: Dispositions d'application générale.*   13
Art. 1-1.   Champ d'application.   13
Art. 2.   La nécessité d'un agrément.   13
Art. 3.   La procédure d'agrément.   13
Art. 4.   La forme juridique de l'établissement.   14
Art. 5.   L'administration centrale et l'infrastructure.   14
Art. 6.   L'actionnariat.   15
Art. 7.   L'honorabilité et l'expérience professionnelles.   16
Art. 8.   Les assises financières.   17
Art. 10.   La révision externe.   17
Art. 10-1.   La participation à un système de garantie des dépôts.   17
Art. 10-2.   La participation à un système d'indemnisation des investisseurs.   17
Art. 11.   Le retrait de l'agrément.   17
*Section 2: Dispositions particulières aux caisses rurales.*   18
Art. 12.   Dispositions particulières aux caisses rurales.   18
*Section 3: Dispositions particulières aux banques d'émission de lettres de gage.*   18
Art. 12-1.   Définition - Activité principale.   18
Art. 12-2.   Activités accessoires et auxiliaires.   19
Art. 12-3.   Plafond des lettres de gage en circulation.   20
Art. 12-4.   Protection de la dénomination.   20
Art. 12-5.   Valeurs de couverture.   21
Art. 12-6.   Registre des gages.   21
Art. 12-7.   Réviseur spécial.   22
Art. 12-8.   Privilège des porteurs de lettres de gage.   22
Art. 12-9.   Surveillance spéciale par la Commission.   24
*Section 4: Dispositions particulières aux établissements de monnaie électronique.*   24
Art. 12-10.   Définition - Activité principale.   24
Art. 12-11.   Les dispositions légales applicables.   25
Art. 12-12.   Les exigences en matière de remboursabilité des fonds reçus par l'émetteur.   25
Art. 12-13.   Les assises financières.   25
Art. 12-14.   Les limitations aux placements.   26
Art. 12-15.   Les exemptions.   27
**Chapitre 2: L'agrément des autres professionnels du secteur financier.**   28
*Section 1: Dispositions générales.*   28
Art. 13.   Champ d'application.   28
Art. 14.   La nécessité d'un agrément.   29
Art. 15.   La procédure d'agrément.   29
Art. 16.   La forme juridique de l'établissement.   31
Art. 17.   L'administration centrale et l'infrastructure.   31
Art. 18.   L'actionnariat.   31
Art. 19.   L'honorabilité et l'expérience professionnelles.   33
Art. 20.   Les assises financières.   33
Art. 22.   La révision externe.   33
Art. 22-1.   La participation à un système d'indemnisation des investisseurs.   34
Art. 23.   Le retrait de l'agrément.   34
*Section 2: Dispositions particulières à certaines catégories de PSF.*   34
*Sous-section 1: Les entreprises d'investissement.*   34
Art. 24.   Les conseillers en investissement.   34
Art. 24-1.   Les courtiers en instruments financiers.   35
Art. 24-2.   Les commissionnaires.   36
Art. 24-3.   Les gérants de fortunes.   36
Art. 24-4.   Les professionnels intervenant pour compte propre.   36

- 2 -

| | | |
|---|---|---|
| Art. 24-5. | Les teneurs de marché. | 36 |
| Art. 24-6. | Les preneurs d'instruments financiers. | 37 |
| Art. 24-7. | Les distributeurs de parts d'OPC. | 37 |
| Art. 24-8. | Les sociétés d'intermédiation financière. | 37 |
| Art. 24-9. | Les entreprises d'investissement exploitant un MTF au Luxembourg. | 38 |
| Sous-section 2: Certains PSF autres que les entreprises d'investissement. | | 38 |
| Art. 25. | Les agents teneurs de registre. | 38 |
| Art. 26. | Les dépositaires professionnels d'instruments financiers. | 38 |
| Art. 27. | Les opérateurs d'un marché réglementé agréé au Luxembourg. | 38 |
| Art. 28-1. | Les opérateurs de systèmes de paiement ou de systèmes de règlement des opérations sur titres. | 38 |
| Art. 28-2. | Les personnes effectuant des opérations de change-espèces. | 39 |
| Art. 28-3. | Le recouvrement de créances. | 39 |
| Art. 28-4. | Les professionnels effectuant des opérations de prêt. | 39 |
| Art. 28-5. | Les professionnels effectuant du prêt de titres. | 39 |
| Art. 28-6. | Les professionnels effectuant des services de transfert de fonds. | 40 |
| Art. 28-7. | Les administrateurs de fonds communs d'épargne. | 40 |
| Art. 28-8. | Les gestionnaires d'OPC non coordonnés | 41 |
| Sous-section 3: Les PSF exerçant une activité connexe ou complémentaire à une activité du secteur financier. | | 41 |
| Art. 29. | Les domiciliataires de sociétés. | 41 |
| Art. 29-1. | Les agents de communication à la clientèle. | 41 |
| Art. 29-2. | Les agents administratifs du secteur financier. | 42 |
| Art. 29-3. | Les opérateurs de systèmes informatiques primaires du secteur financier. | 42 |
| Art. 29-4. | Les opérateurs de systèmes informatiques secondaires et de réseaux de communication du secteur financier. | 43 |
| Art. 29-5. | Les professionnels effectuant des services de constitution et de gestion de sociétés. | 43 |

**Chapitre 3: L'agrément pour l'établissement de succursales et pour la libre prestation de services au Luxembourg par des établissements de crédit ou des PSF, de droit étranger.  44**

| | | |
|---|---|---|
| Art. 30. | Etablissements de crédit et entreprises d'investissement d'origine communautaire. | 44 |
| Art. 31. | Etablissements financiers d'origine communautaire. | 44 |
| Art. 32. | Etablissements de crédit et entreprises d'investissement d'origine non communautaire; PSF autres que les entreprises d'investissement, d'origine communautaire ou non communautaire. | 45 |

**Chapitre 4: L'agrément pour l'établissement de succursales et pour la prestation de services dans un autre Etat membre par des établissements de crédit, des entreprises d'investissement ou certains établissements financiers de droit luxembourgeois.  45**

| | | |
|---|---|---|
| Art. 33. | L'établissement de succursales dans un autre Etat membre. | 45 |
| Art. 34. | La prestation de services dans l'Union européenne. | 46 |

**Chapitre 5: L'agrément des systèmes de paiement et des systèmes de règlement des opérations sur titres.  47**

| | | |
|---|---|---|
| Art. 34-2. | Définitions. | 47 |
| Art. 34-3. | Le champ d'application. | 49 |
| Art. 34-4. | La demande d'agrément. | 49 |
| Art. 34-5. | La procédure d'agrément. | 50 |
| Art. 34-6. | Les conditions d'agrément. | 50 |
| Art. 34-7. | Le retrait de l'agrément. | 51 |

**PARTIE II: Les obligations professionnelles, les règles prudentielles et les règles de conduite dans le secteur financier  52**

| | | |
|---|---|---|
| Art. 35. | Champ d'application. | 52 |

**Chapitre 1: Disposition applicable aux institutions luxembourgeoises participant à des systèmes de paiement ou à des systèmes de règlement des opérations sur titres.  52**

| | | |
|---|---|---|
| Art. 35-1. | Le droit à l'information à l'égard des institutions luxembourgeoises participant à des systèmes de paiement ou à des systèmes de règlement des opérations sur titres. | 52 |

**Chapitre 2: Dispositions applicables aux PSF autres que les entreprises d'investissement.  52**

| | | |
|---|---|---|
| Art. 36. | Les règles prudentielles. | 52 |
| Art. 36-1. | Les règles de conduite. | 53 |

**Chapitre 3: Disposition applicable à certains PSF.  54**

| | | |
|---|---|---|
| Art. 37. | Règles prudentielles spécifiques à certains PSF. | 54 |

**Chapitre 4: Dispositions applicables aux établissements de crédit et aux entreprises d'investissement.  54**

| | | |
|---|---|---|
| Art. 37-1. | Les exigences organisationnelles. | 54 |
| Art. 37-2. | Les conflits d'intérêts. | 55 |
| Art. 37-3. | Les règles de conduite pour la fourniture de services d'investissement à des clients. | 55 |

- 3 -

| Art. 37-4. | La fourniture de services par l'intermédiaire d'un autre établissement de crédit ou d'une autre entreprise d'investissement. | 57 |
| Art. 37-5. | L'obligation d'exécuter les ordres aux conditions les plus favorables pour le client. | 57 |
| Art. 37-6. | Les règles de traitement des ordres des clients. | 58 |
| Art. 37-7. | Les transactions avec des contreparties éligibles. | 58 |
| Art. 37-8. | Obligations incombant aux établissements de crédit et aux entreprises d'investissement qui font appel à des agents liés. | 59 |

**Chapitre 5: Dispositions applicables aux établissements de crédit et aux PSF.** — **60**

| Art. 39. | Les obligations professionnelles du secteur financier en matière de lutte contre le blanchiment et le financement du terrorisme. | 60 |
| Art. 40. | L'obligation de coopérer avec les autorités. | 60 |
| Art. 41. | L'obligation au secret professionnel. | 60 |

**PARTIE IIbis: Les obligations en matière de virements transfrontaliers** — **62**

**Chapitre 1: Définitions et champ d'application.** — **62**

| Art. 41-1. | Définitions. | 62 |
| Art. 41-2. | Champ d'application. | 63 |

**Chapitre 2: Transparence des conditions applicables aux virements transfrontaliers.** — **63**

| Art. 41-3. | Informations préalables sur les conditions applicables aux virements transfrontaliers. | 63 |
| Art. 41-4. | Informations postérieures à un virement transfrontalier. | 63 |

**Chapitre 3: Obligations des établissements concernant les virements transfrontaliers.** — **64**

| Art. 41-5. | Engagements spécifiques de l'établissement. | 64 |
| Art. 41-6. | Obligations concernant les délais. | 64 |
| Art. 41-7. | Obligation d'effectuer le virement transfrontalier conformément aux instructions. | 65 |
| Art. 41-8. | Obligation de remboursement faite aux établissements en cas de virements non menés à bonne fin. | 65 |
| Art. 41-9. | Cas de force majeure. | 66 |
| Art. 41-10. | Règlement des différends. | 66 |

**PARTIE III: La surveillance prudentielle sur le secteur financier** — **67**

**Chapitre 1: L'autorité compétente pour la surveillance et sa mission.** — **67**

| Art. 42. | L'autorité compétente. | 67 |
| Art. 43. | La finalité de la surveillance. | 67 |
| Art. 44. | Le secret professionnel de la Commission. | 67 |
| Art. 44-1. | La coopération de la Commission avec les autorités compétentes des Etats membres. | 69 |
| Art. 44-2. | L'échange d'informations de la Commission à l'intérieur de l'Union européenne. | 70 |
| Art. 44-3. | L'échange d'informations de la Commission avec les pays tiers. | 71 |

**Chapitre 2: La surveillance des établissements de crédit, de certains établissements financiers et des entreprises d'investissement exerçant leurs activités dans plusieurs Etats membres.** — **72**

| Art. 45. | La compétence pour la surveillance des établissements de crédit et des entreprises d'investissement exerçant leurs activités dans plusieurs Etats membres. | 72 |
| Art. 46. | Mesures conservatoires à disposition de la Commission en tant qu'Etat membre d'accueil. | 73 |
| Art. 47. | La surveillance de certains établissements financiers d'origine communautaire. | 75 |

**Chapitre 2bis: La surveillance prudentielle des systèmes de paiement et des systèmes de règlement des opérations sur titres agréés au Luxembourg.** — **75**

| Art. 47-1. | La surveillance prudentielle des systèmes de paiement et des systèmes de règlement des opérations sur titres agréés au Luxembourg. | 75 |

**Chapitre 3: La surveillance des établissements de crédit sur une base consolidée.** — **75**

| Art. 48. | Définitions. | 75 |
| Art. 49. | Le champ d'application et le périmètre de la surveillance sur une base consolidée. | 76 |
| Art. 50. | La forme et l'étendue de la consolidation. | 77 |
| Art. 50-1 | Coopération avec les autres autorités de surveillance prudentielle en matière de surveillance consolidée | 78 |
| Art. 51. | Le contenu de la surveillance sur une base consolidée. | 80 |
| Art. 51-1. | Les moyens de la surveillance sur une base consolidée. | 83 |
| Art. 51-1bis. Entreprises mères ayant leur siège social dans un pays tiers. | 85 |

**Chapitre 3bis: La surveillance des entreprises d'investissement sur une base consolidée.** — **86**

| Art. 51-2. | Définitions. | 86 |
| *Section I: Entreprises d'investissement mères au Luxembourg n'ayant pas pour filiale un établissement de crédit ou ne détenant pas de participation dans un établissement de crédit, et entreprises d'investissement dont l'entreprise mère est une compagnie financière holding mère au Luxembourg ou dans l'UE n'ayant pas comme filiale un établissement de crédit ou ne détenant pas de participation dans un établissement de crédit.* | 87 |
| Art. 51-3. | Le champ d'application et le périmètre de la surveillance sur une base consolidée. | 87 |
| Art. 51-4. | La forme et l'étendue de la consolidation. | 89 |
| Art. 51-5. | Le contenu de la surveillance sur une base consolidée. | 90 |

- 4 -

Art. 51-6.    Les moyens de la surveillance sur une base consolidée.    93
Art. 51-6bis. Entreprises mères ayant leur siège social dans un pays tiers.    95
Art. 51-6ter. Coopération avec les autres autorités de surveillance prudentielle en matière de surveillance consolidée.    96
*Section II: Entreprises d'investissement mères au Luxembourg ayant pour filiale un établissement de crédit agréé en dehors du Luxembourg ou détenant une participation dans un tel établissement de crédit et entreprises d'investissement dont l'entreprise mère est une compagnie financière holding mère au Luxembourg ayant comme filiale un établissement de crédit agréé en dehors du Luxembourg ou détenant une participation dans un tel établissement de crédit.*    98
Art. 51-7.    Le champ d'application et le contenu de la surveillance sur une base consolidée.    98
*Section III: Entreprises d'investissement mères au Luxembourg ayant pour filiale un établissement de crédit agréé au Luxembourg ou détenant une participation dans un tel établissement de crédit, et entreprises d'investissement dont l'entreprise mère est une compagnie financière holding mère au Luxembourg ayant comme filiale un établissement de crédit agréé au Luxembourg ou détenant une participation dans un tel établissement de crédit.*    98
Art. 51-8.    Le champ d'application et le contenu de la surveillance sur une base consolidée.    98

**Chapitre 3 ter: La surveillance complémentaire des établissements de crédit et des entreprises d'investissement appartenant à un conglomérat financier.**    99
*Section 1: Définitions*    99
Art. 51-9.    Définitions.    99
Art. 51-10.    Seuils déterminant la notion de conglomérat financier.    101
Art. 51-11.    Identification d'un conglomérat financier.    103
*Section 2: Champ d'application*    103
Art. 51-12.    Champ d'application de la surveillance complémentaire des établissements de crédit ou des entreprises d'investissement.    103
*Section 3: Situation financière*    104
Art. 51-13.    Adéquation des fonds propres.    104
Art. 51-14.    Concentration de risques.    105
Art. 51-15.    Transactions intragroupe.    106
Art. 51-16.    Dispositifs de contrôle interne et procédures de gestion des risques.    107
*Section 4: Mesures visant à faciliter la surveillance complémentaire*    108
Art. 51-17.    Autorité compétente chargée de la surveillance complémentaire (coordinateur).    108
Art. 51-18.    Missions du coordinateur.    109
Art. 51-19.    Coopération et échange d'informations entre les autorités compétentes.    110
Art. 51-20.    Responsables de la direction des compagnies financières holdings mixtes.    111
Art. 51-21.    Accès à l'information.    111
Art. 51-22.    Vérification.    111
Art. 51-23.    Mesures d'exécution.    111
Art. 51-24.    Pouvoirs complémentaires des autorités compétentes.    112
*Section 5: Pays tiers*    112
Art. 51-25.    Entreprises mères ayant leur siège social dans un pays tiers.    112
Art. 51-26.    Coopération avec les autorités compétentes de pays tiers.    113

**Chapitre 4: Les moyens de la surveillance prudentielle.**    113
Art. 52.    Les tableaux officiels et la protection des titres.    113
Art. 53.    Les pouvoirs de la Commission.    113
Art. 54.    Les relations entre la Commission et les réviseurs d'entreprises.    114
Art. 55.    Les documents comptables.    115
Art. 56.    Les coefficients.    115
Art. 57.    L'agrément des participations.    116
Art. 58.    Les réclamations de la clientèle.    116
Art. 59.    Le droit d'injonction et de suspension de la Commission.    116

**PARTIE IV L'assainissement et la liquidation de certains professionnels du secteur financier**    117
Art. 60.    Définitions.    117
Art. 60-1.    Champ d'application.    118
**Chapitre 1: Le sursis de paiement**    119
*Section 1: Dispositions régissant l'ouverture de la procédure du sursis de paiement d'établissements de droit luxembourgeois*    119
Art. 60-2.    Ouverture de la procédure du sursis de paiement.    119
Art. 60-3.    Juridiction compétente et loi applicable.    121
Art. 60-4.    Informations à fournir par la Commission aux autorités compétentes étrangères.    121
*Section 2: Dispositions particulières applicables aux succursales luxembourgeoises d'établissements d'origine communautaire*    121
Art. 60-5.    Juridiction compétente et loi applicable.    121
*Section 3: Dispositions particulières applicables aux succursales luxembourgeoises d'établissements d'origine non communautaire*    122
Art. 60-6.    Juridiction compétente et loi applicable.    122
Art. 60-7.    Mesures d'assainissement concernant des établissements de crédit d'origine non communautaire disposant de présences multiples dans l'Union européenne.    122

**Chapitre 2: La liquidation** 122

*Section 1: Les liquidations volontaires* 122
Art. 60-8.   Les liquidations volontaires. 122
*Section 2: Dispositions régissant la procédure de liquidation judiciaire des établissements de droit luxembourgeois* 123
Art. 61.   Procédure de liquidation. 123
Art. 61-1.   Juridiction compétente. 125
Art. 61-2.   Loi applicable. 125
Art. 61-3.   Retrait de l'agrément d'un établissement. 125
Art. 61-4.   Informations à fournir aux créanciers connus. 126
Art. 61-5.   Production des créances. 126
*Section 3: Dispositions particulières applicables aux succursales luxembourgeoises d'établissements d'origine communautaire* 126
Art. 61-6.   Juridiction compétente et loi applicable. 126
*Section 4: Dispositions particulières applicables aux succursales luxembourgeoises d'établissements d'origine non communautaire* 127
Art. 61-7.   Juridiction compétente et loi applicable. 127
Art. 61-8.   Cas des établissements de crédit d'origine non communautaire disposant de présences multiples dans l'Union
européenne. 127

**Chapitre 3: Dispositions communes aux mesures d'assainissement et aux procédures de liquidation**
127
Art. 61-9.   Effets sur certains contrats et sur certains droits. 127
Art. 61-10.   Droits réels des tiers. 128
Art. 61-11.   Réserve de propriété. 128
Art. 61-12.   Compensation. 128
Art. 61-13.   Lex rei sitae. 129
Art. 61-14.   Conventions de compensation et de novation. 129
Art. 61-15.   Conventions de mise en pension. 129
Art. 61-16.   Marché réglementé. 129
Art. 61-17.   Preuve de la nomination et pouvoirs des administrateurs ou des liquidateurs. 129
Art. 61-18.   Inscription dans un registre public. 129
Art. 61-19.   Actes préjudiciables. 130
Art. 61-20.   Protection des tiers. 130
Art. 61-21.   Instances en cours. 130
Art. 61-22.   Secret professionnel. 130

**Chapitre 4: Dispositions particulières applicables aux systèmes de paiement et aux systèmes de
règlement des opérations sur titres** 130
Art. 61-24.   Les dispositions spécifiques au caractère définitif du règlement dans les systèmes de paiement et de règlement des
opérations sur titres agréés au Luxembourg. 130
Art. 61-25.   Les dispositions spécifiques à la préservation des droits du titulaire de garanties constituées dans le cadre de systèmes
communautaires de paiement ou de règlement d'opérations sur titres ou dans le cadre d'opérations des banques
centrales des Etats membres ou de la Banque centrale européenne contre les effets de l'insolvabilité de la partie ayant
constitué les garanties. 131
Art. 61-26.   Les dispositions spécifiques à l'ouverture d'une procédure d'insolvabilité à l'encontre d'un participant à un système de
paiement ou à un système de règlement des opérations sur titres. 132

**PARTIE IVbis: Les systèmes de garantie des dépôts auprès des établissements de crédit** 133
**Chapitre 1: Couverture des déposants auprès d'établissements de crédit de droit luxembourgeois
et de succursales luxembourgeoises d'établissements de crédit ayant leur siège social dans un
pays tiers.** 133
Art. 62-1.   Objet de la garantie. 133
Art. 62-2.   Niveau et étendue de la garantie. 134
Art. 62-3.   Modalités et délais d'indemnisation. 135
Art. 62-4.   Obligation d'information de la clientèle. 136
Art. 62-5.   Intervention de la Commission. 137
Art. 62-6.   Couverture complémentaire des déposants auprès de succursales établies par des établissements de crédit de droit
luxembourgeois dans d'autres Etats membres. 138

**Chapitre 2: Couverture des déposants auprès de succursales luxembourgeoises d'établissements de
crédit relevant du droit d'un autre Etat membre.** 138
Art. 62-7.   Objet de la garantie. 138
Art. 62-8.   Principes régissant la couverture complémentaire. 139
Art. 62-9.   Relations des systèmes de garantie des dépôts luxembourgeois avec les systèmes établis et reconnus officiellement dans
d'autres Etats membres. 139
Art. 62-10.   Obligation d'information de la clientèle. 140

**PARTIE IVter: Les systèmes d'indemnisation des investisseurs auprès des établissements de crédit et des entreprises d'investissement**    141

  **Chapitre I: Couverture des investisseurs auprès d'établissements de crédit et d'entreprises d'investissement de droit luxembourgeois et de succursales luxembourgeoises d'établissements de crédit et d'entreprises d'investissement ayant leur siège social dans un pays tiers.**    141

    Art. 62-11.  Objet de la garantie.    141
    Art. 62-12.  Niveau et étendue de la garantie.    142
    Art. 62-13.  Modalités et délais d'indemnisation.    143
    Art. 62-14.  Obligation d'information de la clientèle.    145
    Art. 62-15.  Intervention de la Commission.    145
    Art. 62-16.  Couverture complémentaire des investisseurs auprès de succursales établies par des établissements de crédit ou des entreprises d'investissement de droit luxembourgeois dans un autre Etat membre.    146

  **Chapitre 2: Couverture des investisseurs auprès de succursales luxembourgeoises d'établissements de crédit ou d'entreprises d'investissement relevant du droit d'un autre Etat membre.**    146

    Art. 62-17.  Objet de la garantie.    146
    Art. 62-18.  Principes régissant la couverture complémentaire.    147
    Art. 62-19.  Relations des systèmes d'indemnisation des investisseurs luxembourgeois avec les systèmes institués et reconnus dans d'autres Etats membres.    148
    Art. 62-20.  Obligation d'information de la clientèle.    148

**PARTIE V: Sanctions**    150

    Art. 63.    Amendes d'ordre.    150
    Art. 64.    Sanctions pénales.    150

**PARTIE VI: Dispositions modificatives, abrogatoires et transitoires**    152

**ANNEXE I**    152

**ANNEXE II**    152

  *Section A: Services et activités d'investissement*    152
  *Section B: Instruments financiers*    153
  *Section C: Services auxiliaires*    153

**ANNEXE III**    154

Critères à remplir par les clients professionnels    154
  *Section A: Catégories de clients qui sont considérés être des clients professionnels*    154
  *Section B: Clients qui peuvent être traités comme des professionnels à leur propre demande*    155

- 60 -

L'immatriculation au registre tenu par la Commission est subordonnée à la condition que les agents liés jouissent d'une honorabilité professionnelle suffisante et qu'ils possèdent les connaissances générales, commerciales et professionnelles adéquates pour communiquer avec précision aux clients ou clients potentiels toutes les informations pertinentes sur le service proposé. L'honorabilité s'apprécie sur base des antécédents judiciaires et de tous les éléments susceptibles d'établir que les agents liés jouissent d'une bonne réputation et présentent toutes les garanties d'une activité irréprochable.

Les établissements de crédit et les entreprises d'investissement qui font appel à des agents liés établis dans un autre Etat membre sont tenus de vérifier que les agents liés qu'ils envisagent d'engager jouissent d'une honorabilité professionnelle suffisante et possèdent les connaissances requises au titre de l'alinéa précédent et de confirmer par écrit à la Commission que les conditions d'immatriculation au registre sont remplies. La Commission peut requérir toutes les informations nécessaires pour apprécier si les conditions d'immatriculation au registre sont remplies dans le chef des agents liés visés.

La Commission tient le registre des agents liés régulièrement à jour. Ce registre est publié sur le site Internet de la Commission de sorte qu'il est accessible au public.

(6) Les établissements de crédit et les entreprises d'investissement qui font appel à des agents liés prennent les mesures adéquates afin d'éviter que les activités des agents liés qui ne constituent pas des activités du secteur financier au sens de la présente loi aient un impact négatif sur les activités exercées par les agents liés pour le compte de l'établissement de crédit ou de l'entreprise d'investissement.

(7) Les établissements de crédit et les entreprises d'investissement ne sont autorisés à engager que des agents liés immatriculés dans un registre public tenu par une autorité administrative d'un Etat membre.»

**Art. 38.**   (abrogé par la loi du 12 novembre 2004)

**«Chapitre 5: Dispositions applicables aux établissements de crédit et aux PSF.»**[116]

**Art. 39.   Les obligations professionnelles du secteur financier en matière de lutte contre le blanchiment et le financement du terrorisme.**

(Loi du 12 novembre 2004)

«Les établissements de crédit et les PSF sont soumis aux obligations professionnelles suivantes telles que définies par la loi du 12 novembre 2004 relative à la lutte contre le blanchiment et contre le financement du terrorisme:

- l'obligation de connaître les clients conformément à l'article 3 de cette loi,

- l'obligation de disposer d'une organisation interne adéquate conformément à l'article 4 de cette loi et

- l'obligation de coopérer avec les autorités conformément à l'article 5 de cette loi.

En outre les établissements de crédit et les PSF sont obligés d'incorporer aux virements et transferts de fonds ainsi qu'aux messages s'y rapportant, le nom ou le numéro de compte du donneur d'ordre.»

**Art. 40.   L'obligation de coopérer avec les autorités.**

Les établissements de crédit et les autres professionnels du secteur financier sont obligés de fournir une réponse et une coopération aussi complètes que possible à toute demande légale que les autorités chargées de l'application des lois leur adressent dans l'exercice de leurs compétences.

«...»[117]

**Art. 41.   L'obligation au secret professionnel.**

(1) (Loi du 12 janvier 2001) «Les administrateurs, les membres des organes directeurs et de surveillance, les dirigeants, les employés et les autres personnes qui sont au service des établissements de crédit, des autres professionnels du secteur financier, des organes de règlement, des contreparties centrales, des chambres de compensation et des opérateurs étrangers de systèmes agréés au Luxembourg visés à la

---

116   Loi du 13 juillet 2007
117   abrogé par la loi du 12 novembre 2004

- 61 -

partie I de la présente loi, sont obligés de garder secrets les renseignements confiés à eux dans le cadre de leur activité professionnelle. La révélation de tels renseignements est punie des peines prévues à l'article 458 du Code pénal.»

(2)   L'obligation au secret cesse lorsque la révélation d'un renseignement est autorisée ou imposée par ou en vertu d'une disposition législative, même antérieure à la présente loi.

(3)   L'obligation au secret n'existe pas à l'égard des autorités nationales et étrangères chargées de la surveillance prudentielle du secteur financier si elles agissent dans le cadre de leurs compétences légales aux fins de cette surveillance et si les renseignements communiqués sont couverts par le secret professionnel de l'autorité de surveillance qui les reçoit. La transmission des renseignements nécessaires à une autorité étrangère en vue de la surveillance prudentielle doit se faire par l'intermédiaire de la maison-mère ou de l'actionnaire ou associé compris dans cette même surveillance.

(4)   L'obligation au secret n'existe pas à l'égard des actionnaires ou associés, dont la qualité est une condition de l'agrément de l'établissement en cause, dans la mesure où les renseignements communiqués à ces actionnaires ou associés sont nécessaires à la gestion saine et prudente de l'établissement et ne révèlent pas directement les engagements de l'établissement à l'égard d'un client autre qu'un professionnel du secteur financier.

«Par dérogation à l'alinéa qui précède, l'établissement de crédit ou le PSF faisant partie d'un groupe financier, garantit aux organes internes de contrôle du groupe l'accès, en cas de besoin, aux informations concernant des relations d'affaires déterminées, dans la mesure nécessaire à la gestion globale des risques juridiques et de réputation liés au blanchiment ou au financement du terrorisme au sens de la loi luxembourgeoise.»[118]

(5)   (Loi du 13 juillet 2007) «L'obligation au secret n'existe pas à l'égard des établissements de crédit et des professionnels visés aux articles 29-1, 29-2, 29-3 et 29-4 dans la mesure où les renseignements communiqués à ces professionnels sont fournis dans le cadre d'un contrat de services.»

(5bis) (Loi du 5 novembre 2006) «L'obligation au secret professionnel n'existe pas entre entités appartenant à un conglomérat financier pour les renseignements que ces entités sont amenées à se communiquer entre elles dans la mesure où ces renseignements sont nécessaires à l'exercice de la surveillance complémentaire visée au chapitre 3ter de la partie III de la présente loi.»

«(6)»[119] Sous réserve des règles applicables en matière pénale, les renseignements visés au paragraphe (1), une fois révélés, ne peuvent être utilisés qu'à des fins pour lesquelles la loi a permis leur révélation.

«(7)»[120] Quiconque est tenu à l'obligation au secret visée au paragraphe (1) et a légalement révélé un renseignement couvert par cette obligation, ne peut encourir de ce seul fait une responsabilité pénale ou civile.

---

118   Loi du 12 novembre 2004
119   Loi du 2 août 2003
120   Loi du 2 août 2003

# ATTACHMENT B

## GRAND - DUCHE DE LUXEMBOURG

# CODE PENAL

Version pdf

▶ **Sommaire**

▶ **Table alphabétique**

▶ **Table chronologique**

**Aide**

**Ministère de la Justice  -  Luxembourg**

# CODE PÉNAL

## EN VIGUEUR DANS LE
## GRAND-DUCHÉ DE LUXEMBOURG

ANNOTÉ D'APRÈS
LA JURISPRUDENCE LUXEMBOURGEOISE

———————

LÉGISLATION: JUSQU'AU 1er SEPTEMBRE 2007
JURISPRUDENCE: PASICRISIE LUXEMBOURGEOISE, T. 32

PUBLIÉ PAR LE MINISTÈRE DE LA JUSTICE
Imprimerie Fr. Faber Mersch

# Chapitre VI bis. - De quelques autres délits contre les personnes.

### (L. 19 juillet 1997)

**Art. 458.** Les médecins, chirurgiens, officiers de santé, pharmaciens, sages-femmes et toutes autres personnes dépositaires, par état ou par profession, des secrets qu'on leur confie, qui, hors le cas où ils sont appelés à rendre témoignage en justice et celui où la loi les oblige à faire connaître ces secrets, les auront révélés, seront punis d'un emprisonnement de huit jours à six mois et d'une amende de 500 euros à 5.000 euros.

*- Voir C. pén, art. 149; 150; 309; 460.*

1° La prescription du délit de révélation du secret professionnel court à partir de chaque fait isolé qui réunit les éléments requis pour constituer l'infraction prévue par l'article 458 du Code pénal.

Le délit de révélation du secret professionnel existe dès qu'il y a eu une indiscrétion qui peut causer préjudice, que la révélation a été faite librement, hors les cas où la loi autorise, et qu'elle se réfère à un fait qui était confidentiel de sa nature; le fait que la révélation a eu lieu dans un but scientifique n'est pas élisif du délit, car l'intérêt social qui impose au médecin le secret, prime celui de la science; l'intérêt de la science n'exige du reste nullement que l'auteur d'une oeuvre médicale désigne les malades de façon que le public ne puisse se méprendre sur leur individualité.

Est inadmissible une offre de preuve faite par la partie civile dans une poursuite du chef de révélation du secret professionnel, que le prévenu ne saurait combattre dans la contre-enquête sans violer à nouveau la défense de révéler un secret professionnel. Cour 25 juin 1892, P. 9, 523.

2° La défense de révéler de l'article 458 ne doit pas être restreinte aux faits qu'on a littéralement confiés au médecin, mais elle doit s'étendre à tous ceux qu'il a pu constater ou déduire, à l'insu même de la personne qui a eu recours à ses soins, voire même aux déductions qu'il peut tirer de la femme au mari, des enfants aux parents et réciproquement.

Les faits révélés ne doivent pas être nécessairement vrais; autrement le médecin indiscret qui a reconnu l'état du malade serait punissable, tandis que celui qui, en se trompant dans ses constatations ou déductions, aurait divulgué des faits inexacts, serait à l'abri de la poursuite; on aboutirait à cette conséquence que la victime d'une révélation n'en pourrait porter plainte, sans reconnaître la vérité des faits allégués, ni le ministre public en poursuivre la répression sans en rapporter la preuve, alors que le but de la loi est précisément de couvrir ces faits du silence le plus absolu.

Le délit existe, dès que les faits vrais ou faux, mais intimes de leur nature, se rattachent à une confidence même indirecte faite au médecin en cette qualité. Cass. 20 janvier 1893, P. 3, 20.

3° Aux termes de l'article 458 du Code pénal il ne suffit pas qu'une personne soit devenue confidente d'un secret dans n'importe quel but et de n'importe qu'elle manière pour qu'elle puisse se retrancher derrière le secret professionnel, mais il faut, pour que ce texte lui soit applicable, que par son état et sa profession, elle soit dépositaire des secrets, et que la confidence qu'elle a reçue ait été obligatoire de la part de ceux qui l'ont faite.

Spécialement, l'imprimeur et l'éditeur d'un journal n'exercent aucun état ni profession pour être appelés, à l'exclusion de toutes autres personnes, à recevoir des confidences, et la personne qui lui confie une nouvelle en vue d'être publiée, n'est pas obligée de ce faire. Cass. 26 février 1918, P. 10, 329.

4° L'énumération de l'article 458 du Code pénal, visant les personnes liées par le secret professionnel, n'est pas limitative et les termes «état ou profession» sont assez larges pour embrasser l'exercice d'autres fonctions, lorsque leurs titulaires sont les confidents obligés et nécessaires des secrets qu'on leur confie; il en est ainsi de l'expert, qui est généralement rangé dans la catégorie des personnes visées au prédit article, lorsqu'il s'agit de faits qui ne sont venus à sa connaissance qu'en sa dite qualité et à raison de ses fonctions.

L'expert n'est obligé de communiquer le résultat de ses recherches qu'à l'autorité par laquelle il a été commis, mais lorsqu'il est appelé à déposer dans un autre litige, il reste lié par le secret et n'est pas tenu de révéler les faits qui lui ont été confiés antérieurement en sa qualité d'expert. Cour 17 décembre 1955, P. 16, 409.

5° Les personnes astreintes au secret professionnel peuvent, lorsqu'elles sont citées comme témoins, déposer en justice, mais ne peuvent pas être forcées de le faire.

Pour qu'une personne puisse se retrancher derrière le secret professionnel, il ne suffit pas qu'elle soit devenue confidente d'un secret dans n'importe quel but et de n'importe quelle manière, mais il faut que par son état ou par sa profession elle soit dépositaire de secrets et que la personne qui lui a fait la confidence ait dû recourir à son ministère.

Les journalistes et les directeurs de journaux ne sont pas protégés par le secret professionnel, alors qu'ils ne sont pas investis de fonctions qui permettent de les considérer comme étant par profession ou par état dépositaires des secrets d'autrui; d'autre part, nul n'est obligé de faire des confidences aux journalistes ou aux directeurs de journaux. Cour (Cass.) 21 mars 1957, P. 17, 43.

6° Pour qu'une personne puisse se retrancher derrière le secret professionnel, il faut que par son état ou par sa profession elle soit dépositaire de secrets et que la personne qui lui a fait la confidence ait dû recourir à son ministère.

Les personnes dépositaires par profession de secrets qui leur ont été confiés en raison de leur profession peuvent, si elles sont citées en justice, faire la révélation de ces secrets, mais ne peuvent être contraintes de déposer, si elles croient en conscience être obligées à garder le secret.

# ATTACHMENT C

## Secret bancaire – Violation du secret par des employés de banque – Responsabilité contractuelle de la banque – Obligation au secret – Obligation de résultat accessoire au contrat de dépôt bancaire – Préjudice indemnisable – Préjudice moral – Désagréments issus de l'attente légitime de voir la banque respecter son obligation au secret

*Arrêt de la Cour de cassation du 18 mars 2004*

**Entre:**

la KREDIETBANK S.A. LUXEMBOURGEOISE, en abrégé KREDIETBANK LUXEMBOURG S.A., demanderesse en cassation,

comparant par Maître André Elvinger, assisté de Maître Marc Elvinger, avocats à la Cour,

**et:**

les consorts H et S., défendeurs en cassation, comparant par Maître Dean Spielmann, avocat à la Cour.

**La Cour de Cassation:**

**Sur la recevabilité du pourvoi qui est contestée:**

Attendu que les défendeurs en cassation concluent à la déchéance, sinon à l'irrecevabilité du pourvoi au motif que les actes de signification des huissiers étrangers n'auraient été accomplis qu'après l'expiration du délai de cassation;

Mais attendu que la remise effective de l'acte à son destinataire à l'étranger est un élément extrinsèque aux formalités prévues à l'article 156(2) du Code de procédure civile qui constituent la signification proprement dite et qui en l'espèce ne sont pas contestées en tant que telles;

D'où il suit que le pourvoi est régulier;

**Sur les faits:**

Attendu, selon l'arrêt attaqué, que le tribunal d'arrondissement de Luxembourg, siégeant en matière commerciale, avait débouté les consorts H-S d'une action en dommages-intérêts introduite contre la KREDIETBANK sur base de la responsabilité contractuelle du chef de violation du secret bancaire; que sur appel, les juges du second degré, par réformation partielle, dirent les demandes des consorts H-S fondées pour autant qu'elles portent sur le préjudice moral et condamnèrent la KREDIETBANK au paiement de montants indemnitaires;

**Sur le premier moyen de cassation,**

tiré, **en sa première branche,** «de la violation de l'article 89 de la Constitution et de l'article 249 du Nouveau code de procédure civile, pour défaut de réponse à conclusions, sinon, **en sa deuxième branche,** du manque de base légale au regard des articles 1142 et 1147 du Code civil, et en ordre subsidiaire des articles 1382, 1383 et 1384 du même Code, sinon, **en sa troisième branche,** de la violation des dispositions des articles 1142 et 1147 du Code civil, et en ordre subsidiaire des articles 1382, 1383 et 1384 du même Code, en ce que l'arrêt, réformant le jugement de première instance, a déclaré la demande des défendeurs en cassation, pour autant qu'elle porte sur le préjudice moral, fondée pour le montant de 4 x 25, 000 EUR et a condamné la demanderesse en cassation à payer ce dernier montant aux défendeurs en cassation, et en tant qu'il a condamné la demanderesse en cassation à supporter 4/12 des frais de première instance et d'appel, aux motifs qu'il ressortait des pièces versées que grâce aux renseignements obtenus suite à la violation du secret bancaire, le fisc belge a, en raison des avoirs détenus par les consorts H-S auprès de la demanderesse en cassation, imposé chacun d'eux pour un certain montant; que, si le préjudice matériel invoqué par les défendeurs en cassation était soit légalement inexistant (paiement d'impôts, paiement d'amendes), soit non documenté par pièces (frais de défense), il en allait autrement du préjudice moral, en raison du fait que << les désagréments (...) subis par les consorts H-S (en raison de la violation du secret bancaire imputable à la demanderesse en cassation et ayant amené le fisc belge à exiger des consorts H-S le paiement d'impôts avec intérêts et amendes) leur ont causé un préjudice moral (...) >>, alors que, **première branche,** en ne se prononçant pas sur le moyen tiré par la demanderesse en cassation, suivant conclusions expresses et écrites, de ce que, si préjudice il y avait en dans le chef des défendeurs en cassation, celui-ci était exclusivement imputable à leur propre faute, consistant dans l'omission de faire les déclarations requises à l'attention de l'administration fiscale belge, voire dans la remise de fausses décla-

ration à celle-ci, ce en présence des conclusions d'appel du 3 avril 2002 dans lesquelles la demanderesse en cassation faisait valoir, sous le titre << Défaut de fondement de la demande pour faute de la victime >> ; que c'était à juste titre que les premiers juges avaient, superfétatoirement, jugé la demande non fondée au motif qu'il n'existait pas de relation causale entre le préjudice allégué et la faute reprochée à la banque, la demanderesse en cassation ayant plus spécialement fait valoir qu'il était << indiscutable que c'est une faute commise par les appelants- faute consistant dans l'abstention de faire les déclarations requises à l'attention de l'administration fiscale belge, voire dans le fait d'avoir fait de fausses déclarations à l'attention de celle-ci – qui justifie les redressements fiscaux dont ils ont fait l'objet >> (conclusions, pages 5 et 6), et des conclusions d'appel du 10 juin 2002 dans lesquelles la demanderesse en cassation faisait valoir, sous le titre << Faute de la victime, défaut de lien de causalité et défaut de préjudice >>, que << toute faute de la victime, du moment qu'elle présente un lien de causalité avec le préjudice dont la réparation est recherchée, peut être invoquée par le défendeur à une action en responsabilité civile, la caractéristique de la faute imputable aux appelants, et retenue à leur charge par le tribunal, résidant dans le fait qu'elle se situe en amont de celle qui est alléguée à charge de l'intimée, en ce sens qu'en l'absence de cette faute des appelants, la divulgation des informations les concernant n'aurait pas eu d'incidence sur leurs relations avec l'administration fiscale belge >> et que << en droit, c'est la faute des appelants qui constitue la cause véritable et exclusive du préjudice dont ceux-ci voudraient obtenir réparation>> (conclusions, page 4), et nonobstant le fait que l'arrêt lui-même, à la suite de ces conclusions, en se prononçant sur le moyen tiré par la demanderesse de l'adage nemo auditur, a constaté que << ce moyen (tiré de l'adage nemo auditur) peut être et a d'ailleurs été introduit dans les débats par le biais de l'examen du lien de causalité >> (p. 24 de l'expédition de l'arrêt), la Cour a entaché son arrêt d'un défaut de réponse à conclusions et que, ce faisant, elle a violé les articles 89 de la Constitution et 249 du Nouveau code de procédure civile, alors que, **deuxième branche** (subsidiaire à la première), en statuant ainsi qu'il l'a fait, l'arrêt a omis de rechercher dans quelle mesure la faute des consorts H-S consistant dans la méconnaissance de leurs obligations de déclaration à l'égard du fisc belge (faute invoquée par la demanderesse en cassation dans ses conclusions d'appel du 3 avril 2002, p, 5-6 et ses conclusions du 10 juin 2002, p, 4) avait pu contribuer à la genèse du préjudice dont les défendeurs en cassation poursuivent réparation; qu'en omettant toute constatation pertinente à l'appréciation de l'existence d'une éventuelle faute des victimes et d'un lien de causalité ayant pu exister

entre cette faute et le préjudice, les juges du fond ont mis la Cour de cassation dans l'impossibilité de procéder au contrôle de la légalité de l'arrêt d'appel ; qu'il s'ensuit que l'arrêt encourt la cassation pour manque de base légale, principalement au regard des articles 1142 et 1147 du Code civil (ayant trait à la responsabilité contractuelle), subsidiairement au regard des articles 1382, 1383 et 1384 du même Code (ayant trait à la responsabilité délictuelle pour le cas où, pour la Cour de cassation, la nature de la responsabilité serait délictuelle), et que, **troisième branche** (subsidiaire aux deux premières), dans la mesure où les désagréments allégués par les défendeurs en cassation étaient la conséquence d'une procédure de redressement fiscal trouvant sa cause dans des déclarations fiscales incomplètes déposées par les défendeurs en cassation et où la Cour a retenu la responsabilité de la demanderesse en cassation pour les désagréments dont la cause, en droit, n'était pas la faute reprochée à la demanderesse en cassation, mais une faute imputable aux défendeurs en cassation, la Cour d'appel a violé les dispositions des articles 1142 et 1147 du Code civil (ayant trait à la responsabilité contractuelle), subsidiairement celles des articles 1382, 1383 et 1384 du même Code (ayant trait à la responsabilité délictuelle pour le cas où, pour la Cour de cassation, la nature de la responsabilité serait délictuelle) ; qu'à supposer même que la faute retenue à charge de la demanderesse en cassation puisse être considérée comme l'une des causes du préjudice allégué par les défendeurs en cassation, quod non, la Cour ne pouvait, eu égard à la faute commise par les défendeurs en cassation eux-mêmes, mettre l'intégralité du préjudice à charge de la demanderesse en cassation sans violer les mêmes dispositions légales»;

### Quant à la recevabilité du moyen:

Attendu que les défendeurs en cassation concluent à l'irrecevabilité du moyen pour cause de contradiction intrinsèque;

Mais attendu que le moyen est subdivisé en branches qui en raison de leur caractère subsidiaire peuvent, sans encourir le grief invoqué, fonder sur des prémisses même contraires;

D'où il suit que le moyen est recevable;

### Quant à la première branche:

Mais attendu que cette branche est tirée de la violation des seuls articles 89 de la Constitution et 249 du Code de procédure civile qui sanctionnent l'absence de motifs dont le défaut est un vice de forme;

Qu' en retenant que par la violation du secret bancaire il a été porté atteinte à l'intimité de la vie privée des consorts H-S qui ont été en outre déçus

dans leur attente légitime de voir la banque respecter son obligation de secret et que ces désagréments leur ont causé un préjudice moral, les juges d'appel ont implicitement mais nécessairement répondu aux conclusions de la KREDIETBANK suivant lesquelles la cause exclusive du préjudice serait à rechercher dans la faute des titulaires des comptes ayant enfreint leur devoir de déclaration auprès des autorités fiscales belges ;

D'où il suit que ce grief est à rejeter;

### Quant aux deuxième et troisième branches:

Mais attendu qu'en constatant que la banque a violé une obligation contractuelle de résultat et que cette violation est à l'origine du préjudice des victimes, les juges d'appel, contrairement à l'objectif du moyen, n'avaient à toiser ni sur le plan contractuel ni sur le plan aquilien une éventuelle faute contributive des consorts H-S empêchant de mettre l'intégralité de la réparation du préjudice à charge de la demanderesse en cassation;

D'où il suit que les griefs ne sont pas fondés;

### Sur le deuxième moyen de cassation,

tiré « de la violation de la loi, in specie de l'article 6 du Code civil, ensemble l'article 41 de la loi du 5 avril 1993 relative au secteur financier et de l'adage Nemo auditur propriam turpitudinem allegans (**première branche**) et de la violation des articles 1142 et 1147 du Code civil, et en ordre subsidiaire des articles 1382, 1383 et 1384 du même Code (**deuxième branche**), en ce que, par réformation du premier jugement, la Cour a déclaré l'action des défendeurs en cassation recevable, et, quant à la demande en paiement d'un dommage moral, également fondée, aux motifs -s'agissant de la recevabilité - que << A intérêt légitime juridiquement protégé celui qui peut se prévaloir de la lésion d'un droit >> et que << En faisant grief à la société KREDIETBANK LUXEMBOURG S.A. de lui avoir causé un préjudice par la violation du secret bancaire, les consorts H-S se prévalent de la lésion de leur droit au secret bancaire (...) qui est un droit (...) d'autant plus légitime qu'il est d'ordre public >> et encore que l'adage Nemo auditur n'aurait pas sa place dans un litige en responsabilité civile au motif que la question du comportement de la victime << peut (y) être (...) introduit dans les débats par le biais de l'examen de lien de causalité >> , et -s'agissant du bien fondé de la demande en réparation d'un préjudice moral - que les défendeurs en cassation avaient subi des << désagréments >> leur ayant causé un préjudice moral réparable, alors que, **première branche**, la lésion d'un droit ne confère pas un intérêt légitime à agir, condition de recevabilité de toute action en justice, lorsque, comme en l'occurrence, l'action des défendeurs en cassation a

pour objet la réparation du préjudice que ceux-ci déclaraient avoir subi à la suite d'un comportement (non- déclaration à l'administration fiscale de leur pays de résidence de leurs avoirs auprès de la demanderesse en cassation et des revenus qu'ils en retiraient) qui, dans leur chef était illicite et contraire à l'ordre public et lorsque le préjudice allégué -consistant d'une part dans les montants exposés par eux au titre de leur imposition en vertu de la loi de leur pays de résidence (préjudice matériel) et d'autre part dans les désagréments prétendument subis par l'assujettissement aux procédures d'imposition prévues par la même loi (préjudice moral) - n'était que la conséquence normale et prévisible de pareil comportement illicite et que c'est faire une fausse application de l'article 41 de la loi du 5 avril 1993 que de vouloir en conclure qu'il pourrait conférer des droits contraires à l'ordre public, en méconnaissance à la fois de l'article 6 du Code civil et de l'adage Nemo auditor propriam turpitudinem allegans visé au moyen, adage qui, contrairement à ce que la Cour a jugé, n'est pas étranger au droit de la responsabilité civile, et que, **deuxième branche**, en supposant même que la demande des défendeurs en cassation n'aurait pas dû être déclarée irrecevable, la Cour aurait dû déclarer non fondée la demande en réparation d'un préjudice moral consistant dans des désagréments qui n'étaient que la conséquence normale et prévisible d'un comportement illicite et contraire à l'ordre public dans le chef des défendeurs en cassation et qui, à ce titre, ne constituait pas un préjudice réparable au titre des articles 1142 et 1147 du Code civil (ayant trait à la responsabilité contractuelle), subsidiairement des articles 1382, 1383 et 1384 du même Code (ayant trait à la responsabilité délictuelle pour le cas où, pour la Cour de cassation, la nature de la responsabilité serait délictuelle)»;

### Quant à la première branche:

Mais attendu que dans le cadre de la responsabilité l'incidence du comportement fautif de la victime ne ressortit pas à l'intérêt à agir mais au fond de l'action indemnitaire;

### Quant à la deuxième branche:

Mais attendu que les désagréments reconnus indemnisables par les juges du fond ne sont pas ceux en relation directe avec la dette fiscale, mais ceux issus de l'attente légitime de voir la banque respecter son obligation au secret;

D'où il suit que le moyen ne saurait être accueilli en ses deux branches;

### Sur le troisième moyen de cassation,

tiré « de la violation de la loi, in specie des articles 1142 et 1384 alinéa 3 du Code civil, en ce que l'ar-

rêt attaqué a dit qu'il n'y avait pas lieu de surseoir à statuer sur le fondement de la règle que le criminel tient le civil en état, et a refusé d'admettre l'offre de preuve formulée par la banque, et a prononcé contre celle-ci les condamnations reprises au dispositif de l'arrêt, aux motifs que la responsabilité de la banque ne pouvait être que contractuelle: qu'en conséquence l'article 1384, alinéa 3 du Code civil ne pouvait trouver application; que dans l'exécution des contrats conclus avec ses clients, la banque en tant que personne morale agit à travers ses préposés de sorte que l'acte répréhensible commis par le préposé est à considérer comme acte commis par la personne morale elle-même ; et que le fait que des agissements criminels et délictueux de certains des préposés de la banque étaient à l'origine de la violation du secret bancaire ne pouvait être invoqué par la banque pour s'exonérer, alors que le prétendu fait dommageable, à savoir la divulgation de données par violation du secret professionnel, n'a pas été commis en exécution d'un contrat par la banque en tant que personne morale, ni par les préposés de la banque dans l'accomplissement de leurs fonctions, mais par ces préposés en dehors de leurs fonctions, agissant sans autorisation, à des fins étrangères à leurs fonctions, et que, dès lors que ces agissements se situaient en dehors de tout contrat existant entre la banque et ses clients, la responsabilité de la banque, si responsabilité il y avait, ne pouvait être de nature contractuelle, mais tout au plus délictuelle, et, à ce titre, être une responsabilité du fait des préposés régie par l'article 1384, alinéa 3 du Code civil, et qu'au regard de cette disposition, cette responsabilité n'était pas donnée si ces préposés agissaient en dehors de leurs fonctions et sans autorisation, mais encore à des fins étrangères à ces fonctions, et qu'en décidant, comme il l'a fait, que l'article 1384, alinéa 3, était inapplicable de sorte que la banque ne pouvait s'exonérer suivant les conditions de cette disposition, l'arrêt a violé l'article 1384, alinéa 3, tout comme, en appliquant les règles régissant la responsabilité contractuelle, l'arrêt a violé l'article 1142 qui en est le siège, dès lors que cette disposition était inapplicable»;

Mais attendu qu'en constatant l'existence d'un contrat entre parties les juges du fond ont, en statuant comme ils l'ont fait, correctement appliqué la loi sans encourir le grief invoqué au moyen qui dès lors n'est pas fondé;

### Sur le quatrième moyen de cassation,

tiré « du défaut de base légale et de la violation de la loi, in specie des articles 1142, 1147 et 1932 du Code civil, ensemble de l'article 41 de la loi du 5 avril 1993 relative au secteur financier (**première branche**) et de la violation des articles 1142 et 1147 du Code civil (**deuxième branche**), en ce que

l'arrêt attaqué a écarté l'offre de preuve de la demanderesse en cassation et, par réformation du jugement de première instance, a prononcé contre celle-ci les condamnations reprises au dispositif de l'arrêt, aux motifs que l'obligation au secret de la banque était une obligation de résultat parce qu'il serait << dans le cours normal des choses que les renseignements confiés lors de la conclusion d'un contrat de dépôt avec une banque puissent être gardés secrets >> et qu'il n'y aurait << pas d'aléa particulier que ce résultat, qui entre dans les prévisions des parties au contrat et que le législateur protège par des sanctions pénales, ne soit atteint >> et qu'en conséquence l'offre de preuve par expertise visant à prouver l'absence de faute dans le chef de la banque, telle que formulée par la demanderesse en cassation tant en première instance que dans ses conclusions en instance d'appel du 3 avril 2002, sub no 15, n'était pas pertinente au motif qu' << en cas d'inexécution d'une obligation de résultat, le débiteur est présumé responsable (...) sans que le créancier ait à prouver l'existence d'une faute dans le chef du débiteur >> et que << le débiteur ne peut s'exonérer en prouvant l'absence de faute >> , de sorte qu'en l'occurrence il n'était pas admis à << faire état des mesures et mécanismes mis en place pour protéger le secret bancaire >>, mécanismes qui faisaient l'objet de l'offre de preuve rejetée, alors que, **première branche**, d'une part, aucune disposition légale, autre que l'article 1932 du Code civil qui ne concerne que l'obligation de restitution de l'objet déposé, ne permet de qualifier d'obligation de résultat d'autres obligations découlant du contrat de dépôt, d'autre part, la Cour d'appel n'a pu juger de façon péremptoire et générale que l'obligation au secret qui pèse sur un établissement bancaire n'est affectée d'aucun aléa, dès lors que l'offre de preuve de la demanderesse en cassation avait précisément pour objet de prouver les mécanismes de protection du secret mis en place, et que, si cette preuve avait été rapportée, il en aurait résulté qu'un établissement n'est pas à l'abri d'agissements, criminels ou non, qu'ils soient le fait de tiers à l'établissement ou d'employés de celui-ci, qui pourraient aboutir à la divulgation d'informations qui devaient rester secrètes, et que par conséquent l'aléa dénié par l'arrêt attaqué existe bien; de troisième part, en faisant état de ce que le résultat de l'obligation serait << dans le cours normal des choses >> et entrerait << dans les prévisions des parties >>, l'arrêt attaqué a appliqué, pour déterminer qu'il y avait obligation de résultat, des critères qui y sont étrangers, dès lors que le fait que le résultat d'une obligation rentre dans les prévisions des parties au contrat et le fait que ce résultat est dans le cours normal des choses sont communs aux obligations de moyens et aux obligations de résultat ; enfin, l'existence de sanctions pénales est nécessairement étrangère à la notion d'obligation

de résultat dès lors que les sanctions pénales, autres que certaines contraventions, requièrent le dol dit général et ne s'attachent jamais au seul résultat d'un acte qui pourrait être constitutif d'une infraction, de sorte que la qualification d'obligation de résultat, principalement intervient en violation des dispositions des articles 1142, 1147 et 1932 du Code civil, ensemble de l'article 41 de la loi du 5 avril 1993 relative au secteur financier légales, et subsidiairement manque de base légale au regard des mêmes dispositions, et que, **deuxième branche,** la qualification d'obligation de résultat n'exclut pas l'exonération d'une telle obligation par la preuve des diligences du débiteur, fût-il dépositaire, et de l'absence de faute de sa part, de sorte que la qualification d'obligation de résultat ne justifiait pas le rejet de l'offre de preuve faite par la défenderesse intimée tendant à son exonération par la preuve de son absence de faute, et que l'arrêt attaqué, en rejetant l'offre de preuve au motif que l'obligation en cause était une obligation de résultat, a violé les dispositions des articles 1142 et 1147 du Code civil >>;

### Quant à la première branche:

Mais attendu que d'une part la Cour d'appel n'a pas tiré l'obligation de résultat de la seule disposition de l'article 1932 visant le devoir de restitution de l'objet déposé, mais de l'ensemble des obligations contractuelles s'attachant accessoirement au contrat spécifique de dépôt bancaire;

Que d'autre part la constatation de l'absence d'aléa caractérisant l'obligation de résultat est une vérification factuelle opérée souverainement par les juges du fond et échappant au contrôle de la Cour de cassation;

Que finalement la référence surabondante au «cours normal des choses» et aux «prévisions des parties» ainsi qu'au caractère délictueux des révélations n'a eu lieu que pour renforcer le constat d'absence d'aléa sans en faire des critères spécifiques;

D'où il suit que le moyen ne saurait être accueilli en sa première branche;

### Quant à la deuxième branche:

Mais attendu que la seule preuve de l'absence de faute dans le chef du débiteur est insuffisante à établir le caractère extrinsèque de la cause exonérant de l'obligation d'exécuter;

D'où il suit qu'en refusant la mesure d'instruction proposée, les juges du fond ont correctement appliqué la loi sans encourir le grief formulé au moyen qui dès lors n'est pas fondé;

### Sur le cinquième moyen de cassation,

tiré (**en sa première branche**) «de la violation des articles 1142, 1147 et 1149 du Code civil, et en ordre subsidiaire des articles 1382, 1383 et 1384 du même Code, et (**en sa deuxième branche**) du manque de base légale au regard des mêmes dispositions, en ce que l'arrêt, réformant le jugement de première instance, a déclaré la demande des défendeurs en cassation, pour autant qu'elle porte sur le préjudice moral, fondée pour le montant de 4 x 25.000 EUR et a condamné la demanderesse en cassation à payer ce dernier montant aux défendeurs en cassation, et en tant qu'il a condamné la demanderesse en cassation à supporter 4/12 des frais de première instance et d'appel, aux motifs qu'il ressortait des pièces versées que grâce aux renseignements obtenus suite à la violation du secret bancaire, le fisc belge a, en raison des avoirs détenus par les consorts H-S auprès de la demanderesse en cassation, imposé chacun d'eux pour un certain montant; que, si le préjudice matériel invoqué par les défendeurs en cassation était soit légalement inexistant (paiement d'impôts, paiement d'amendes), soit non documenté par pièces (frais de défense), il en allait autrement du préjudice moral: qu'en effet << par la violation du secret bancaire il a été porté atteinte à l'intimité de la vie privée des consorts H-S; - par cette violation, les consorts H-S ont été en outre déçus dans leur attente légitime de voir la banque respecter l'obligation au secret; - les désagréments ainsi subis par les consorts H-S leur ont causé un préjudice moral que la Cour évalue - compte tenu des éléments d'appréciation à sa disposition - à 4 x 25.000.- (vingt-cinq mille) euros >>, alors qu'en se bornant à affirmer que << par la violation du secret bancaire il a été porté atteinte à l'intimité de la vie privée des consorts H-S >>, l'arrêt ne justifie pas légalement la condamnation qu'il prononce; que la révélation à l'autorité fiscale du pays de résidence d'un contribuable d'avoirs détenus par ce dernier auprès d'une banque ne constitue en effet pas en elle-même une atteinte à l'intimité de la vie privée du contribuable, puisque le contribuable est obligé de déclarer lesdits avoirs à l'autorité fiscale, et que cette autorité a partant un droit légitime d'obtenir les renseignements en question, lesquels ne sauraient être considérés comme relevant de << l'intimité de la vie privée >> du contribuable à l'égard des autorités fiscales ; qu'en s'abstenant d'énoncer, dans leur arrêt, les faits dont il résulterait qu'il y a eu << atteinte à l'intimité de la vie privée des consorts H-S >>, outre la circonstance - inopérante à cet égard- qu'il y a eu révélation des avoirs par eux détenus au fisc de leur pays de résidence, les juges du fond ont mis la Cour de cassation dans l'impossibilité de procéder au contrôle de la légalité de l'arrêt ; que la constatation selon laquelle << par cette violation, les consorts H-S ont été en

outre déçus de leur attente légitime de voir la banque respecter l'obligation au secret >> ne caractérise pas, elle non plus, une atteinte à l'intimité à la vie privée, ni un quelconque préjudice moral; qu'au contraire, elle fait double emploi avec la constatation de la faute qu'aurait commise la banque et par une conséquence, **première branche,** l'arrêt, en constatant sur la base de pareilles considérations des << désagréments >> qu'il a entendu réparer par l'octroi de dommages-intérêts, encourt la cassation pour violation, principalement des articles 1142, 1147 et 1149 du Code civil (ayant trait à la responsabilité contractuelle), subsidiairement des articles 1382, 1383 et 1384 du même Code (ayant trait à la responsabilité délictuelle pour le cas où, pour la Cour de cassation, la nature de la responsabilité serait délictuelle); et que, **deuxième branche,** l'arrêt, qui a constaté sur le fondement de pareilles considérations insuffisantes des << désagréments >> qu'il a entendu réparer par l'octroi de dommages-intérêts, encourt pour le moins la cassation pour manque de base légale, principalement au regard des articles 1142, 1147 et 1149 du Code civil (ayant trait à la responsabilité contractuelle), subsidiairement au regard des articles 1382, 1383 et 1384 du même Code (ayant trait à la responsabilité délictuelle pour le cas où, pour la Cour de cassation, la nature de la responsabilité serait délictuelle)»;

Mais attendu que,

**Quant à la première branche,**

sous le couvert de la violation des articles 1147 et 1149 sinon des articles 1382, 1383 et 1384 du Code civil le moyen ne tend qu'à mettre en discussion devant la Cour de cassation le pouvoir souverain des juges du fond d'apprécier des causes et de l'existence du préjudice; que,

**Quant à la seconde branche,**

en fondant les «désagréments» sur l'atteinte à l'intimité de la vie privée des défendeurs en cassation et sur «leur déception dans leur attente légitime de voir la banque respecter l'obligation au secret», la Cour d'appel a, par ces constatations exemptes d'insuffisance, légalement justifié sa décision sans encourir le grief du manque de base légale;

D'où il suit que le moyen n'est pas fondé en ses deux branches;

**Par ces motifs:**

Rejette le pourvoi;

**Composition:**

Marc THILL, président de la Cour,

Marc SCHLUNGS, conseiller à la Cour de cassation,

Jean JENTGEN, conseiller à la Cour de cassation,

Julien LUCAS, premier conseiller à la Cour d'appel,

Marie-Anne STEFFEN, conseiller à la Cour d'appel,

Martine SOLOVIEFF, avocat général,

# ATTACHMENT D

**IMPORTANT LEGAL NOTICE** - The information on this site is subject to a <u>disclaimer and a copyright notice.</u>

JUDGMENT OF THE COURT

10 December 2002 <u>(1)</u>

(Freedom to provide services - Banking activities - Employee of a credit institution established in a Member State and canvassing for clients in another Member State - National legislation on banking secrecy - Refusal to answer questions and to give evidence in a judicial investigation)

In Case C-153/00,

REFERENCE to the Court under Article 234 EC by the Onderzoeksrechter in de Rechtbank van eerste aanleg te Turnhout (Belgium) for a preliminary ruling in the criminal proceedings before that court against

**Paul der Weduwe,**

on the interpretation of Article 49 EC,

THE COURT,

composed of: J.-P. Puissochet, President of the Third and the Sixth Chambers, acting for the President, M. Wathelet, R. Schintgen and C.W.A. Timmermans (Presidents of Chambers), C. Gulmann, D.A.O. Edward, A. La Pergola (Rapporteur), P. Jann, V. Skouris, F. Macken, N. Colneric, S. von Bahr and J.N. Cunha Rodrigues, Judges,

Advocate General: P. Léger,

Registrar: H.A. Rühl, Principal Administrator,

after considering the written observations submitted on behalf of:

- Mr der Weduwe, by J. Mertens, advocaat,

- the Belgian Government, by A. Snoecx, acting as Agent, and M. van der Woude, P. Callens and T. Chellingsworth, advocaten,

- the Commission of the European Communities, by C. Tufvesson, and T. van Rijn, acting as Agents,

having regard to the Report for the Hearing,

after hearing the oral observations of Mr der Weduwe, represented by B. Poelemans, advocaat; of the Belgian Government, represented by M. van der Woude and T. Chellingsworth; of the Luxembourg Government, represented by N. Mackel, acting as Agent, and by P. Kinsch, avocat, and of the Commission, represented by C. Tufvesson and T. van Rijn, at the hearing on 29 January 2002,

after hearing the Opinion of the Advocate General at the sitting on 23 April 2002,

gives the following

# Judgment

1.    By order of 13 April 2000, received at the Court on 25 April 2000, the Onderzoeksrechter in de Rechtbank van eerste aanleg te Turnhout (investigating judge at the Court of First Instance, Turnhout) (Belgium) referred to the Court for a preliminary ruling under Article 234 EC four questions on the interpretation of Article 49 EC.

2. Those questions were raised in a judicial investigation seeking to determine the criminal liability of Mr der Weduwe, a Netherlands national living in Luxembourg, who is employed by a bank also established in Luxembourg and is accused of a number of offences through canvassing for clients in Belgium between October 1993 and May 1999.

**Legal background**

*Provisions of Belgian law*

3. Article 458 of the Belgian Criminal Code provides:

Medical practitioners, surgeons, health officers, apothecaries, midwives and all other persons who, by reason of their status or profession, are guardians of secrets entrusted to them and who disclose them except where they are called to give evidence in legal proceedings or where the law requires them to do so, shall be liable to imprisonment of between eight days and six months and a fine ranging from one hundred to five hundred francs.

4. According to the case-law of the Belgian courts, the requirement of professional secrecy laid down in Article 458 of the Criminal Code does not apply to employees of credit institutions (Cass. 25 October 1978, *Pas.*, 1979, I, 237).

5. The hearing of witnesses by the investigating judge is governed by Articles 71 to 86 of the Belgian Code of Criminal Procedure. Article 75 of that code provides that the witness is to swear an oath that he will tell the whole truth and nothing but the truth. The refusal of a witness to answer certain questions, even where it has been established that his testimony would be such as to incriminate himself or a third party, is treated as equivalent to a refusal to appear when summoned as a witness, which is punishable under Article 80 of the code (Cass. 10 July 1916, *Pas.*, 1917, I, 195).

*Provisions of Luxembourg law*

6. Under Luxembourg law, professional secrecy is governed by Article 458 of the Luxembourg Criminal Code, the text of which is analogous to Article 458 of the Belgian Criminal Code, save for the amount of the fine, which ranges from LUF 10 000 to 50 000.

7. Article 41 of the Law of 5 April 1993 on the financial sector (*Mémorial A*, 1993, p. 462), as amended, provides:

1. Directors, members of the governing and supervisory boards, managers, employees and other persons employed by the credit institutions and other professions of the financial sector mentioned in Part I hereof shall be required to maintain secrecy in regard to information entrusted to them in the course of their professional business. Disclosure of such information is an offence punishable under Article 458 of the Criminal Code.

2. The duty to maintain secrecy shall cease when disclosure of information is authorised or required by or pursuant to a legislative provision even if it predates the enactment hereof.

...

**The main proceedings**

8. The order for reference shows that Mr der Weduwe, a Netherlands national living in Luxembourg, successively employed by two banks established in Luxembourg, namely Banque UCL and Rabobank, is alleged to have canvassed for clients in Belgium with a view to persuading them to place money in deposits or negotiable securities with his employers. In the course of his activities, in the period from October 1993 to May 1999, Mr der Weduwe allegedly collected money from Belgian clients and took it to Luxembourg. He allegedly also took coupons pertaining to negotiable securities to Luxembourg on behalf of Belgian clients in order to place the proceeds of those coupons with his employer.

9. The national court is conducting a judicial investigation concerning the offences of forgery, use of forged documents, fiscal forgery, use of forged tax documents, money-laundering and failure to declare income as required by Articles 305 to 310 of the Belgian law on income tax. In the course of

the investigation, Mr der Weduwe, the defendant in the case, was questioned by the national court on the manner in which he canvassed for clients in Belgium and the manner in which the negotiable securities were moved to Luxembourg. Mr Marc Troch, a Belgian national living in Luxembourg, who worked for the Banque UCL, where he was responsible for the arbitrage office, investment funds, international credits and private banking, was also questioned as a witness by the Belgian police.

10.     Both Mr der Weduwe and Mr Troch have refused to answer the questions put to them, invoking the obligation of professional secrecy which Luxembourg law imposes on employees in the financial sector.

11.     According to the national court, the Luxembourg provisions on banking secrecy seriously impede the collection of evidence in judicial investigations into activities carried out in Belgium under the freedom to provide services. Employees of banks established in Luxembourg which exercise their right to provide services freely in the territory of another Member State in which a refusal to give evidence is a criminal offence, such as the Kingdom of Belgium, are faced with the dilemma of necessarily having to breach either the laws of the host Member State or the Luxembourg provisions on banking secrecy. That conflict of laws also results in unequal treatment of banks and their clients according to their nationality and place of establishment.

12.     The national court points out that in Case C-384/93 *Alpine Investments* [1995] ECR I-1141 the Court of Justice interpreted Article 59 of the EC Treaty (now, after amendment, Article 49 EC), to the effect that a Member State may not maintain a national rule which impedes trade in services between Member States, unless that rule satisfies all the conditions necessary for it to be deemed to be in the public interest. The national court considers that the extra-territorial application of Luxembourg provisions on banking secrecy constitutes an unreasonable impediment to cross-border banking activities.

### The questions submitted for a preliminary ruling

13.     In those circumstances, taking the view that an interpretation of Article 49 EC was necessary to resolve the dispute before it, the Onderzoeksrechter in de Rechtbank van eerste aanleg te Turnhout decided to stay proceedings and refer the following questions to the Court of Justice for a preliminary ruling:

Must Article 49 EC be interpreted to mean that, where a credit institution authorised in a Member State in which breaches of banking secrecy are a criminal offence operates, under the freedom to provide services, in another Member State where there is no analogous banking secrecy,

(1) that provision of the Treaty does not preclude a legislative provision of the host Member State pursuant to which employees of the credit institution concerned are required to *give evidence* in criminal proceedings concerning services provided by them, under the freedom to provide services, in the territory of the host Member State in circumstances in which employees of credit institutions of the host Member State are under a like obligation to give evidence as witnesses;

(2) that provision does not preclude a legislative provision of the host Member State pursuant to which employees of the credit institution concerned who, when interviewed as *suspects*, choose not to rely on their right to remain silent, may as suspects make a statement in criminal proceedings concerning services provided by them, under the freedom to provide services, in the territory of the host Member State in circumstances in which employees of credit institutions established in the host Member State have the same right to make a statement as suspects, where they do not or do not wish to rely on their right to remain silent;

(3) that provision precludes a legislative provision of the Member State of origin pursuant to which employees of the credit institution concerned may be rendered criminally and civilly liable if, in the context of a criminal investigation conducted in a host Member State (see the first and second questions) (in this case, the Kingdom of Belgium), they *give evidence* concerning services provided by them in the territory of the host Member State under the freedom to provide services;

(4) that provision precludes a legislative provision of the Member State of origin pursuant to which employees of the credit institution concerned may be rendered criminally and civilly liable if, in the context of a criminal investigation conducted in a host Member State (see the first and second questions) (in this case, the Kingdom of Belgium), they make a statement as *suspects* concerning services provided by them in the territory of the host Member State (in this case the Kingdom of Belgium) under the freedom to provide services, whilst at the same time not relying or not wishing

to rely on the right to remain silent?

**Preliminary observations**

14.  By its first and second questions, which can be taken together, the national court is asking essentially whether, where banks established in one Member State have engaged in the cross-border provision of banking services on the territory of a second Member State, Article 49 EC precludes the criminal law and criminal procedural law of the second Member State from, first, requiring employees of those banks to give evidence, under threat of criminal sanctions, where they are called as witnesses in criminal proceedings brought in that Member State in respect of events which occurred on its territory in relation to those cross-border services, and, second, authorising them to disclose information if they are defendants in such criminal proceedings.

15.  By its third and fourth questions, which can be taken together, the national court is asking essentially whether, where banks established in one Member State have engaged in the cross-border provision of banking services on the territory of a second Member State, Article 49 EC precludes the criminal law of the first Member State from prohibiting, under threat of criminal prosecution, employees of those banks from breaching banking secrecy where they are heard as witnesses or defendants in criminal proceedings brought in the second Member State in respect of events which occurred on the territory of that State in connection with those cross-border services.

16.  It is clear from the legal background given in the order for reference that, under Belgian law, Article 458 of the Belgian Criminal Code, which provides that the breach of professional secrecy is a criminal offence, does not apply to the banking sector. Conversely, under Luxembourg law, the criminal sanctions for breach of professional secrecy laid down in Article 458 of the Luxembourg Criminal Code also apply to the banking sector by virtue of Article 41 of the Luxembourg Law of 5 April 1993. Accordingly, unlike Belgian law, Luxembourg law makes the breach of banking secrecy a criminal offence.

17.  Against that legal background, characterised by a difference in the laws on banking secrecy in the two Member States, the obstacle encountered by the national court in the main proceedings is that both the defendant, who has not exercised his right to silence, and the witness have refused to answer questions put to them in the course of the investigation, expressly invoking their need to observe the provisions on professional secrecy applicable in Luxembourg in respect of banking matters. The national court states that it is only the extra-territorial scope of the Luxembourg provisions on banking secrecy which constitutes an impediment to the collection of evidence in the main proceedings.

18.  In addition, the national court considers that the unequal treatment of banks and their clients according to their nationality and place of establishment, which it regards as contrary to Article 49 EC, is likewise the result only of the extra-territorial scope of the Luxembourg provisions in question. The national court maintains, more specifically, that those provisions prohibit employees of banks established in Luxembourg from disclosing information covered by banking secrecy to the judicial authorities of another Member State, by laying them open to criminal prosecution in Luxembourg. In that way, those provisions constitute an unreasonable impediment to cross-border banking activities.

19.  The national court therefore considers that it is the conflict between the extra-territorial scope of the Luxembourg provisions on banking secrecy, as interpreted by it, and the provisions of the Belgian Criminal Code and Code of Criminal Procedure, which alone are applicable in the main proceedings, which constitutes, first, an impediment to the collection of evidence in its judicial investigation and, second, unequal treatment of banks and their clients according to their nationality and place of establishment.

20.  Accordingly, as regards, more specifically, the first and second questions, the national court is seeking to ascertain whether Article 49 EC is incompatible with the obligation of a witness to give evidence and the possibility for a defendant to disclose information, as provided for in the Belgian Criminal Code and Code of Criminal Procedure, only in cases where the witness and the defendant actually risk prosecution in Luxembourg, by virtue of the extra-territorial scope of Luxembourg rules on banking secrecy, on account of evidence given by them in judicial proceedings in Belgium. Similarly, as regards, more specifically, the third and fourth questions the national court is seeking to ascertain whether Article 49 EC precludes the prohibition on breaching banking secrecy laid down in the Luxembourg provisions only where that prohibition also applies, by virtue of the extra-territorial scope of Luxembourg banking secrecy, to a witness or a defendant heard in judicial

proceedings in another Member State.

21. Whether the Luxembourg provisions on banking secrecy have extra-territorial scope depends upon the interpretation given to them.

**Admissibility**

*Observations submitted to the Court*

22. According to Mr der Weduwe, the questions referred by the national court are inadmissible. He claims in particular that, in its order for reference, the national court did not provide adequate concrete factual and legal information to allow the Court to give a useful answer to the questions referred.

23. According to the Belgian Government, the third and fourth questions have a bearing on Community law only in so far as the national court's interpretation of the Luxembourg provisions on banking secrecy is correct.

24. The Belgian Government observes that, according to the legal literature, there is as yet no Luxembourg case-law on the territorial scope of the Luxembourg provisions on banking secrecy. It considers that those provisions are open to two possible interpretations.

25. On one interpretation, they have no extra-territorial scope. Disclosure of information outside Luxembourg territory is therefore not punishable under Luxembourg law.

26. On the other interpretation, those provisions have extra-territorial scope. In that case, however, logic would dictate that that extra-territorial scope should apply both to the principle of banking secrecy and to the exception for evidence given in judicial proceedings, for which Luxembourg law also provides. Bank employees obliged to observe Luxembourg banking secrecy would therefore be authorised to disclose information covered by that secrecy requirement to the judicial authorities of another Member State.

27. The Belgian Government thus considers that the interpretation by the national court to the effect that Luxembourg banking secrecy has extra-territorial scope but the exceptions provided for in Luxembourg law do not, is implausible. However, the obstacle encountered by the national court in the main proceedings, and the difficulties which it might raise in relation to Article 49 EC, exist only if such an interpretation were to be accepted.

28. At the hearing before the Court, the Luxembourg Government indicated that it shared Mr der Weduwe's doubts as to the admissibility of the questions submitted for a preliminary ruling. It considers that the reasoning of the national court is based on a hypothetical interpretation of Luxembourg law. Since that interpretation may not necessarily be the correct one, the questions submitted to the Court are also hypothetical.

29. The Luxembourg Government explains in that regard that factual situations giving rise to the type of dispute in question are too rare and too atypical to have come before the Luxembourg courts, which explains why the question of the extra-territorial scope of the Luxembourg provisions on banking secrecy has not yet been resolved by those courts.

30. According to the Luxembourg Government those provisions do have extra-territorial scope. Moreover, the exemption from criminal liability for witnesses giving evidence in judicial proceedings, provided for in the Luxembourg legal system, also has extra-territorial scope. According to that government, the concept of judicial authority in Article 458 of the Luxembourg Criminal Code covers not only Luxembourg judicial authorities but also those of other Member States. Likewise, a defendant is always entitled to disclose information covered by banking secrecy where that disclosure is made in judicial proceedings.

*Findings of the Court*

31. It is settled case-law that, in the context of the cooperation between the Court of Justice and the national courts established by Article 234 EC, it is solely for the national court before which the dispute has been brought, and which must assume responsibility for the subsequent judicial

decision, to determine in the light of the particular circumstances of the case both the need for a preliminary ruling in order to enable it to deliver judgment and the relevance of the questions which it submits to the Court. Consequently, where the questions submitted by the national court concern the interpretation of Community law, the Court of Justice is, in principle, bound to give a ruling (see, *inter alia*, Case C-415/93 *Bosman* [1995] ECR I-4921, paragraph 59; Case C-379/98 *PreussenElektra* [2001] ECR I-2099, paragraph 38, and Case C-390/99 *Canal Satélite Digital* [2002] ECR I-607, paragraph 18).

32.  However, the Court has also held that, in exceptional circumstances, it can examine the conditions in which the case was referred to it by the national court, in order to assess whether it has jurisdiction (*PreussenElektra*, paragraph 39, and *Canal Satélite Digital*, paragraph 19). The spirit of cooperation which must prevail in preliminary ruling proceedings requires the national court for its part to have regard to the function entrusted to the Court of Justice, which is to contribute to the administration of justice in the Member States and not to give opinions on general or hypothetical questions (*Bosman*, paragraph 60, and C-451/99 *Cura Anlagen* [2002] ECR I-3193, paragraph 26).

33.  Accordingly, the Court can decline to rule on a question submitted by a national court where, for example, the problem is hypothetical, or where the Court does not have before it the factual or legal material necessary to give a helpful answer to the questions submitted to it (see to that effect, *PreussenElektra*, paragraph 39, and *Canal Satélite Digital*, paragraph 19).

34.  Moreover, in order to enable the Court to give a useful interpretation of Community law, it is essential for the national court to explain why it considers that an answer to its questions is necessary for resolving the dispute (see Joined Cases 98/85, 162/85 and 258/85 *Bertini* [1986] ECR 1885, paragraph 6, and Case C-343/90 *Lourenço Dias* [1992] ECR I-4673, paragraph 19).

35.  As to the third and fourth questions, it should be noted, first, that, in the main proceedings, the national court must apply the provisions of Belgian law, particularly those of Belgian criminal law and criminal procedure, and that the national court invokes the Luxembourg provisions on banking secrecy only because it considers them to constitute an obstacle to its investigation.

36.  Secondly, as the Belgian Government has correctly pointed out, it is only on the basis of an asymmetric interpretation of the Luxembourg provisions on banking secrecy that the national court has discerned a potential obstacle which may, in its view, be connected with Article 49 EC, and thus require an interpretation of that provision by the Court. On the one hand, the national court assumes that the provisions, contained in Article 458 of the Luxembourg Criminal Code and Article 41(1) of the Luxembourg Law of 5 April 1993, making the breach of banking secrecy a punishable offence, have extra-territorial scope. On the other hand, it implicitly considers that the exemptions from criminal liability set out in Article 458 of that code in respect of giving evidence in legal proceedings and in Article 41(2) of the Law of 5 April 1993 in respect of the more general case where the authority or duty to disclose information covered by banking secrecy are laid down by law are, by contrast, limited in scope to Luxembourg territory.

37.  As the Advocate General correctly pointed out in paragraph 49 of his Opinion, the interpretation chosen by the national court is hypothetical, since the Luxembourg courts have not ruled on the issue. It is not the only possible interpretation of those provisions. Moreover, the Belgian Government has made it clear in its submissions to the Court that it regards the national court's interpretation as implausible. That interpretation is further challenged by the Luxembourg Government itself, which considers that the banking secrecy prescribed by Luxembourg law cannot be invoked against judicial authorities in other Member States in investigations such as the one being conducted in the main proceedings.

38.  The national court has not in any way explained why it considers the interpretation on which it relies to be the only one possible. The fact that the relevance of the questions raised by the national court rests on a particular interpretation of a national law other than its own made it particularly necessary to state the grounds for the order for reference on that point.

39.  In those circumstances, since the referring court has not provided the Court with all the necessary information to determine whether an interpretation of Article 49 EC would serve a useful purpose in the main proceedings, the third and fourth questions must be held inadmissible.

40.  As regards the first and second questions, in the light of the finding in paragraph 20 of this judgment, and in the absence of any specific reasoning in the order for reference as to why the national court asks whether Article 49 EC must be interpreted as precluding the application of

provisions of the Belgian Criminal Code and Code of Criminal Procedure, those questions are also inadmissible.

**Costs**

41.    The costs incurred by the Belgian and Luxembourg Governments and by the Commission, which have submitted observations to the Court, are not recoverable. Since these proceedings are, for the parties to the main proceedings, a step in the proceedings pending before the national court, the decision on costs is a matter for that court.

On those grounds,

THE COURT,

in answer to the questions referred to it by the Onderzoeksrechter in de Rechtbank van eerste aanleg te Turnhout by order of 13 April 2000, hereby rules:

**The reference for a preliminary ruling by the Onderzoeksrechter in de Rechtbank van eerste aanleg te Turnhout (Belgium), by order of 13 April 2000, is inadmissible.**

Puissochet
     Wathelet
          Schintgen

Timmermans
     Gulmann
          Edward

La Pergola
     Jann
          Skouris

Macken Colneric

von Bahr Cunha Rodrigues

Delivered in open court in Luxembourg on 10 December 2002.

R. Grass

G.C. Rodríguez Iglesias

Registrar

President

---

1: Language of the case: Dutch. </HTML