UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------x
DEBORAH D. PETERSON,                          :
Personal Representative of the Estate         :   Case No. 18 Misc. 8302
of James C. Knipple (Dec.), et al.,           :
                                              :
                        Plaintiffs,           :   (Civil Action Nos. 01-2094 (RCL)
            v.                                :   and 1-2684 (RCL) (D.D.C.))
                                              :
ISLAMIC REPUBLIC OF IRAN, et al.,             :   FILED UNDER SEAL CONTAINS
                                              :   CONFIDENTIAL MATERIAL
                        Defendants.           :   SUBJECT TO PROTECTIVE ORDER
------------------------------------------------------x

## DECLARATION OF LIVIU VOGEL

Liviu Vogel, an attorney licensed to practice law before this Court and the Courts of the State of New York, declares the following under the penalties of perjury:

1. I am one of the attorneys of record for the plaintiffs in this action and I make this declaration in opposition to the motion of Clearstream Banking, S.A. ("Clearstream") to vacate restraints on 19 securities that are restrained by the June 23, 2008 Amended Restraining Notice served on Clearstream and the June 13, 2008 Writ of Execution served on Citibank, N.A.

2. Clearstream and Citibank together moved to vacate the Plaintiffs' writ of execution and restraining notice at a hearing before Judge Koeltl of this Court on June 27, 2008 (the "June 27 hearing"). At that time, Judge Koeltl decided that two of the securities should be released, but the remainder were to remain restrained.[1] At the

---

[1] June 27 hearing Transcript, a copy of which is annexed as Exhibit 3 to Clearstream's Compendium of Exhibits submitted in support of its motion ("Clearstream's Compendium") at 66-68. Throughout plaintiff's opposition papers reference is made to the Clearstream Compendium to reduce the number of documents printed.

136225                              1

conclusion of the June 27 hearing, Judge Koeltl issued a final order to that effect (the "Final Order"), which modified the restraining notice and writ "to the extent of excluding" two securities, but it kept the restraint in place in regard to all other securities that were covered by the original restraining notice.[2] The Judge made it clear in his statements on the record that the restraints in question were to remain in place until the Plaintiffs are able to conduct further discovery and commence a turnover proceeding.[3] Judge Koeltl contemplated the need for further discovery and inclusion of parties with an interest in the assets affected by the restraint including ▮.[4]

3.      Clearstream was served with a subpoena duces tecum by plaintiffs on July 31, 2008. Instead of complying with the subpoena as it initially promised to do, Clearstream made the instant motion thereby thwarting Judge Koeltl's ruling. Plaintiffs are also in the process of obtaining letters under the Hague Convention for discovery through ▮ Courts against ▮ to determine the owner of interest in the restrained securities. Clearstream's counsel was so informed by Plaintiffs' counsel before the instant motion was made.

4.      On October 23, 1983 at the hour or approximately 6:30 a.m., a suicide bomber drove a hijacked water truck, ladened with more than 6 tons of explosive, into the Marines Barracks at the outskirts of the Beirut Airport, which exploded on impact, causing the death of 241 servicemen, consisting of 221 Marines, and the rest, Navy medical personnel and soldiers assigned to the 24th Marine Amphibious Unit. The sentry on station barely had time to chamber a round and shoulder his weapon.

---

[2] A copy of the June 27, 20008 Final Order is annexed to Clearstream's Compendium as Exhibit 17.
[3] June 27 hearing Transcript at 68.
[4] Id.

5.  The Plaintiffs in the consolidated actions are many of the family members and estates of the service men that were killed or injured in the attack. At a bench trial the court found the Republic of Iran liable because it had provided material, financial and logistical support to Hezbollah, the organization that carried out the attack. On September 7, 2007 the District of Columbia District Court Judge ordered that judgment be entered in favor of plaintiffs and against defendants the Islamic Republic of Iran and Iranian Ministry of Information and Security (collectively "Judgment Debtors"), jointly and severally, in the amount of $2,656,944,877.00, and allocated the amount and nature of the damages. Peterson v. Islamic Republic of Iran, 515F. Supp. 25, 60-69 (D.D.C. 2007). The judgment that was entered by the District of Columbia District Court on September 7, 2007, was registered with the United States District Court for the Southern District of New York.

6.  At the time judgment was entered in this case, Iran was generally protected by the Foreign Sovereignty Immunities Act ("FSIA") found at 28 U.S.C. § 1601 et seq., with a number of exceptions, principally centering on assets which were "blocked" and "unblocked". However, on January 28, 2008, President Bush signed into effect legislation which effectively repealed the impediments of the FSIA. The key parts of that new law permitting meaningful collection efforts are found in 28 U.S.C. § 1605A(a)(1) and § 1610 (g)(1), which provide as follows:

§ 1605A.  Terrorism exception to the jurisdictional immunity of a foreign state

(a) In general.
 (1) No immunity. A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of

material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

§ 1610. Exceptions to the immunity from attachment or execution

* * *

(g) Property in certain actions.
   (1) In general. Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A [28 USCS § 1605A], and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--
      (A) the level of economic control over the property by the government of the foreign state;
      (B) whether the profits of the property go to that government;
      (C) the degree to which officials of that government manage the property or otherwise control its daily affairs;
      (D) whether that government is the sole beneficiary in interest of the property; or
      (E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

Accordingly, Iran no longer has the shield of the FSIA, and a Judgment Creditor is free to proceed against Iranian assets, as any other Judgment Debtor, rendering moot detailed discussions and analysis over concepts of whether assets are blocked or otherwise.

   7.   The bill that ultimately enacted into effect 28 U.S.C. Section 1605A and relevant parts of section 1610, was first introduced and passed by the House of Representatives on January 16, 2008. (See Exhibit C submitted herewith). On January 18, 2008, only two days after this important bill was passed, ▮▮▮▮ sent ▮▮▮▮ ▮▮▮▮ to Clearstream marked ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮. The same day, Clearstream acknowledged the opening of ▮▮▮▮ account number ▮▮▮ Prior to that date, ▮▮▮▮ had had only ▮▮▮▮ account at Clearstream for its own use, which was opened in ▮▮▮ (See Exhibit D annexed hereto, marked as Exhibit F at the June 27 hearing; and June 27 hearing

136225                                                    4

transcript at 31:25-33:18.)[5] Thereafter, in a series of ▮ and ▮ instructed Clearstream ▮ ▮ (that are now restrained) ▮ to ▮ account number ▮ at Clearstream. In doing so, the physical location of the bond certificates remained in New York at the DTC or Federal Reserve; but Clearstream now gained the ability to deny knowledge of the identity of the owner of the interest transferred. Nevertheless, the securities that have been restrained are <u>directly traceable</u> through Clearstream's records to ▮ (Clearstream Compendium Exhibit 16, and June 27 hearing transcript at 56:14-59:22). Importantly, the <u>only securities in the United States</u> in ▮ account number ▮ are the very same securities that were transferred by ▮ from its Clearstream account number ▮ (June 27 hearing transcript, 64:22 – 65:2).

    8. Before the restraining orders were served, only two of the securities (hereinafter ▮ and ▮ originally transferred from ▮, having a face value of $▮, were transferred out of ▮ account number ▮ They were transferred ▮ to ▮ account; i.e. ▮ became the ▮ ▮ subsequently transferred ▮ and ▮ in exchange for payment totaling $▮ through Clearstream (see Clearstream Compendium Exhibits 11 and 12). These securities ultimately left the Clearstream system through subsequent transfers and therefore the Plaintiff's restraining

---

[5] It is interesting to note that ▮ which is wholly owned by ▮ which is wholly-owned by ▮ See copies of documents from ▮ website and from ▮ website annexed hereto as Exhibit E.

136225      5

notices previously covering them were modified by the Court on June 27, 2008 to exclude those securities since it was evident that ▮ no longer had an interest in them.

9. Notwithstanding ▮ attempt to secrete its assets by transferring them to ▮, ▮ learned of the existence of the securities in the United States in the custody of Clearstream and Citibank. Thus, on June 12 and 13, 2008, ▮ wrote to plaintiffs' attorney, David Cook, in response to a subpoena, informing plaintiffs of the existence of the securities in which Iran is believed to have an interest. A copy of ▮ letters is annexed hereto as Exhibit A. The restraints at issue herein were served immediately upon receipt of ▮ letters. ▮, since learning of the restraining order affecting the securities, attempted to conduct transactions affecting the securities, but was prevented form doing so by the restrains that Clearstream now seeks to vacate (June 27 hearing at 65:2-5, and 66:3-9).

10. The securities at issue are simple bonds or notes that bear fixed interest and are to pay interest and to be redeemed on dates certain. (June 27 hearing transcript at 20:8-21:21). The bonds are "represented in physical form by a note or certificate that is deposited under the agreements governing the bond issue with the Depository Trust & Clearing Corporation in New York ("DTC") or the New York Federal Reserve Bank." (Clearstream's Memorandum of Law in support of the instant motion ("MOL") at 5; and June 27 hearing transcript at 19:11-22, and Clearstream Compendium Exhibit 16.[6])

---

[6] Creation Online sheets attached as part of Clearstream Compendium Exhibit 16 detail each transfer instruction made by ▮ from its account to ▮ account and reflects the location of the global bond certificate in which an interest was transferred under the heading entitled, "Place of Safekeeping," showing either "FRNYUS . . ." {Federal Reserve in New York} or "DTCYUS . . ." {Depositary Trust and Clearing Corporation in New York}. Clearstream's Executive Vice President, Mr. Gem testified that the Creation Online System is used by its customers, in this case ▮ ▮, to instruct Clearstream to effect transactions in the customer's account. He described the information

136225                                                           6

When payment of principal or interest is made upon these bonds, the money is paid initially to DTC or the New York Federal Reserve Bank, both located in New York, who then distributes the proceeds to institutions having an interest in these bonds as reflected on their books. The foregoing procedure is detailed by most of the issuers of the bonds in prospectuses filed with the S.E.C. Copies of the prospectuses for most of the bonds[7] (together with a brief synopsis of relevant details prepared by Plaintiffs) are annexed hereto as Exhibit B. The prospectuses also confirm, as admitted by Clearstream, that the bonds are indeed located in the custody of DTC or The Federal Reserve or their respective nominees located in New York.

11.  As an example, the bond bearing ISIN ▇▇▇▇▇▇▇▇▇▇▇▇ matured on June 16, 2008, three days after Plaintiffs served a writ of execution on Citibank. The prospectus for that bond provides that it is represented by a single global certificate registered in the name of DTC to be deposited with a custodian for DTC, and that payments of principal and/or interest are made to DTC, who then credits participants' accounts with payments in amounts proportionate to their respective beneficial interests as shown on DTC's records. In this case, Citibank was a participant at DTC. Citibank in turn reflected a beneficial interest in this bond ▇▇▇ on its books in favor of Clearstream, who in turn, held on its books a beneficial interest in the principal sum of $▇▇▇▇ in favor of ▇▇▇▇▇ as a result of a transfer of the interest from ▇▇▇▇▇▇▇. Upon maturity of the bond, because the payment by necessity was



---

reflected in the Creation Online report, including the location where the security is ultimately deposited. See, June 27 hearing transcript, 44:18-46:9, referring to Exhibit H reproduced in Clearstream Compendium as Exhibit 11. The Creation Online reports in Clearstream Compendium Exhibit 16 are the same type of reports described in detail by Mr. Gem.

[7] Missing are prospectuses for bonds bearing ISIN's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and ▇▇▇▇▇▇▇ which Plaintiffs were unable to locate. Citibank, upon whom a subpoena was served to produce copies of the prospectuses has failed to produce same and is in contempt of the subpoena.

made through DTC in New York, and then to Citibank in New York, the Plaintiffs were able to successfully restrain the money before payment out of the United States to ███ ███, who likely holds the bonds as custodian for the benefit of ███████. Indeed, Clearstream's Executive Vice President, Mr. Gem, acknowledged that the proceeds from the redeemed bond ███ including the principal sum of $███ as a result of the restraining notices served by Plaintiffs is ███ (June 27 hearing transcript 57:14-59:6). Each of the bonds that are the subject of the restraining notices and the Court's June 27 restraining order will be redeemed in a similar fashion resulting in money payments made in New York to DTC and from DTC to Citibank. In this case, DTC, the Federal Reserve Bank, Citibank and Clearstream are all parties to a series of agreements whose performance in New York is necessary to effectuate the terms of the bonds and the payment and/or transfer of interests therein. (June 27 hearing transcript at 9:7-18:21).

12. Since the restraints have been in place, Citibank, upon receipt of interest payments on some of the bonds, calculated the portion allocable to the interest of the judgment debtor as described in the restraining notices, and segregated that amount into a separate account, while distributing the balance to the parties owning an interest in the securities. Similarly, when two of the bonds were redeemed, Citibank calculated the judgment debtor's claimed interest in the proceeds and segregated the funds in a separate account. (June 27 hearing transcript at 57:14-59:5 and Clearstream Compendium Exhibit 16, introduced at the June 27 hearing as Exhibit L). The total sum of the redeemed securities and interest as of June 24, 2008 was $███, which Citibank deposited in a segregated account in New York to comply with the restraining notice.

136225                                            8

See June 27, hearing transcript at 51:12-55:5 and Clearstream Compendium Exhibit 14 marked at the June 27 hearing as Exhibit K.

13.   Clearstream has stated that the trades that it performs on these accounts are "not for its own financial interests, but for the accounts held by its customers."[8] Therefore, restraining these accounts should not, and does not, harm Clearstream in any manner. Judge Koeltl recognized Clearstream's lack of standing when he stated that there needs to be further proceedings where "any parties with an interest in those [assets can] come in and [he could] listen to the parties with respect to turn over the [sic] proceeding" which would provide "the opportunity for ▌ for example, to come in and argue that there shouldn't be any further restraint on those funds . . . . But they are not going to be released now."[9]   The true party in interest here is the judgment debtor Islamic Republic of Iran and ▌, neither of which has appeared before this Court nor even attempted to communicate with the Plaintiffs in this case. Clearstream implicitly acknowledged its lack of interest in the securities when its counsel initially contacted Plaintiffs' counsel on June 19, 2008 with a proposed schedule for a hearing at which Clearstream would present live testimony to show Plaintiffs and the Court that a part of the restrained securities could not possibly belong to Iran and should be released. During that telephone conversation between Plaintiffs' attorney, Liviu Vogel, Clearstream's attorney, Frank Panopoulos and Citibank's attorney, Sharon Schneier, Mr. Panopoulos stated that the majority of the securities were properly restrained <u>and</u> that except for the securities in which Iran clearly had no interest, <u>Clearstream will not oppose the Plaintiffs' restraints on the balance of the securities</u>. Indeed, at the June 27, 2008

---

[8] MOL at 3 citing June 27 hearing transcript 14:12-20.
[9] June 27 hearing Transcript at 68:3-8.

136225                                               9

hearing, Clearstream made only a weak argument for release of the balance of the securities stating as follows:



July 27 hearing transcript, 62:13-63:1. The Court decided Clearstream's motion, stating that, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ (June 27 hearing transcript *at* 66:25-67:5).

14. It is apparent that ▇▇▇ has no interest in appearing in this Court to clear the air, presumably because Iran is still the beneficial owner of the securities. Plaintiff's attorney, Liviu, Vogel, telephoned the general manager of ▇▇▇ ▇▇▇, on or about July 22, 2008, inquiring whether ▇▇▇ would cooperate by voluntarily submitting to a deposition. ▇▇▇ replied that he was aware of Plaintiffs' restraint on the securities and wanted to cooperate, but could not do so without ▇▇▇ Court order because of bank secrecy laws. Given the large sums involved one would presume that ▇▇▇ would take the necessary steps to submit evidence pursuant to a protective order (as Clearstream has done) if the securities were

136225

truly owned by innocent third parties. Plaintiff's are in the process of securing a letter of request for discovery against ▮▮▮ by ▮▮▮ Courts pursuant to the Hague Convention.

Dated: October 17, 2008

                                                                                           _____
                                                                                                 Liviu Vogel