**EXHIBIT 22**

# The ABCs of the UCC

## Article 8: Investment Securities

## Second Edition

### Carl S. Bjerre
### Sandra M. Rocks

### Amelia H. Boss
#### Editor
### The ABCs of the UCC series

APR 3 1 2008

Library
Washington, D.C.



ABA Section of
BUSINESS LAW
Practical Resources for the Business Lawyer



Defending Liberty
Pursuing Justice

# CONTENTS

Foreword                                                    vii
Preface                                                       xi

## ▼ CHAPTER 1

### Introduction                                               1
A.  A Brief History                                            1
B.  The Direct and Indirect Holding Systems                    4
    Figure 1.  Direct Holding System                   4
    Figure 2.  Indirect Holding System                 5
C.  Scope of the Two Systems                                   6

## ▼ CHAPTER 2

### Relationship of Issuer to Owner and Transferee             9
A.  Overview of Issuer's Responsibility and Defenses          10
B.  Particular Defects and Defenses                           12
C.  Issuer's Lien and Issuer's Restriction on Transfer        15
D.  Issuer's Right to Disregard Unregistered Owner
    and Duty to Register Transfer                     16
E.  Liability for Wrongful Registration                       17

## ▼ CHAPTER 3

### Transfers in the Direct Holding System                    21
A.  Mechanics of Transfer and Related Matters                 21
    Figure 3.  Transfer of Possession of Certificate  23
    Figure 4.  Change in Registered Owner             23
B.  The Derivation and Negotiability Principles               23

## ▾ CHAPTER 4

### The Indirect Holding System     33

A.   Overview of Securities Entitlements     34
    Figure 5. Typical Acquisition of a Security
         Entitlement     41
B.   Security Entitlement as In Personam Right:
    The Five Core Duties of a Securities Intermediary     41
    1.   Duty to Maintain Financial Assets     42
    2.   Duty to Obtain Payments or Distributions     45
    3.   Duty to Exercise Rights as Directed     46
    4.   Duty to Comply with Entitlement Orders     46
    5.   Duty to Change Position to Other Form of
        Holding     48
C.   Security Entitlement as Property Interest: Rights
    of Entitlement Holder Vis-à-Vis Third Parties     49
    1.   Rights against Securities Intermediary and
        Fellow Entitlement Holders     49
    2.   Rights against Creditors of Securities
        Intermediary     53
    3.   Rights against Purchaser of Financial Asset     59
    4.   Claims against Entitlement Holder or Its
        Transferees     62

## ▾ CHAPTER 5

### Security Interests in Investment Property     67

A.   Introduction to UCC Article 9     67
B.   Creating and Perfecting Security Interests in
    Investment Property     69
    1.   Attachment and Overview of Perfection     69
    2.   Perfection in the Direct Holding System     72
    3.   Perfection in the Indirect Holding System     74
    4.   Commodity Contracts and Commodity
        Accounts     77
    5.   Automatic Creation and Perfection for the
        "Broker's Lien"     78

        6. Perfection of Security Interests in
           Distributions and Other Proceeds                79
   C.  Priorities                                          80
        1. Priority Based on Control or Possession         81
        2. Priority Based on Automatic Perfection          82
        3. Priority Based on the First-in-Time Principle   83
   D.  Remedies                                            85

▼ **CHAPTER 6**

**Choice of Law and Complementary Regimes**                89

   A.  Article 8's Choice of Law Rules                     90
   B.  Article 9's Choice of Law Rules                     92
   C.  Regulations Governing Federal Book-Entry Securities 93
   D.  International Initiatives                            94
        1. The Hague Securities Convention                 94
        2. The UNIDROIT Project                            96

Bibliography                                               99
About the Authors                                          103

# CHAPTER

--------------------------------

# ONE

# INTRODUCTION

## A. A BRIEF HISTORY

Article 8 has undergone important evolutions over the past few decades, and its current framework can be best understood in light of a short historical overview.

During the first half of the twentieth century, property rights in stocks were governed by the Uniform Stock Transfer Act. One important feature of that Act, which remains central to Article 8 today, was the conferring of "negotiable" status on conventional paper stock certificates. Negotiability, as described in detail in Chapter 3.B, enhances the transferability of securities by freeing prospective transferees of concerns stemming from unknown conflicting claims. High levels of transferability enhance securities' value, and the drafting of the first version of UCC Article 8 began in the 1940s and 1950s with the purpose of spreading the benefits of negotiability beyond paper stock certificates to a broader range of securities.

The early versions of Article 8 also began to address another issue that has remained central to the system of property interests in securities: indirect holding. Under the Uniform Stock Transfer Act, the physical delivery of paper certificates (for example, stock certificates) had been a necessary step in any transfer. Whenever

1

securities were traded—whether in person or by phone—the settlement of the trade required that physical certificates be delivered from the seller to the purchaser. Also, when the securities were in registered form (as opposed to bearer form, discussed below), the certificates often had to be indorsed, or accompanied by an executed stock or bond power, or registered in the purchaser's name on the issuer's books. This focus on the physical transfer of certificates was (and remains today) a highly labor-intensive and complicated process. But the first completed versions of Article 8 (approved in the 1950s and not widely enacted) recognized the concept of constructive delivery of securities held in "street name" by brokers. And the 1962 version of Article 8, prompted by a variety of nonuniform amendments proposed by New York, included provisions for the transfer and pledge of securities held within a central depository system or "clearing corporation." With these steps, the importance of physical transfer began to diminish, and the concept of indirect holding began to emerge.

These early provisions did not, however, alleviate the burden of physical transfers associated with the growing pattern of multiple intermediary relationships. By the late 1960s, this continuing burden plus an increased volume of trading activity precipitated a so-called "paperwork crunch": the securities industry's system for processing the settlement of transactions simply became overburdened. One response to this problem came from the U.S. Treasury's Bureau of the Public Debt, which issued regulations in 1967 providing for the issuance and maintenance of Treasury bills, notes, and bonds in completely intangible form. (The current version of these regulations is described in Chapter 6.C.) Another response came in the form of certain revisions to Article 8 itself, adopted by the UCC's sponsoring organizations in 1978. This version of Article 8 sought to reduce the systemic burden of transferring physical certificates by recognizing the role of multiple intermediary relationships (as the earlier versions had not), and also by providing for a system in which issuers would no longer need to issue certificates at all. Instead, a system of *dematerialization* was invented, under which ownership of "uncertificated" securities would be reflected merely by an entry in the records of the issuer in favor of the owner and not by any piece

of paper. Transfers of securities, whether certificated or uncertificated, could be accomplished by transaction confirmations and book entries by intermediaries, instead of by physical delivery.

The system of uncertificated securities provided for by the 1978 amendments was not widely adopted by the marketplace. (One notable exception is the mutual fund market. Transfers of mutual fund shares, however, are uncommon; changes in mutual fund share ownership typically occur through redemption and new issuance.) Instead of dematerialization, an extensive pattern of security *immobilization* and indirect holding has developed. Under this pattern, physical certificates are still issued but tend not to be in the hands of the ultimate beneficial owners. Instead, they are immobilized with a clearing corporation, and registered in the name of the clearing corporation (or, for administrative reasons, the clearing corporation's nominee). The clearing corporation for most publicly traded corporate equity securities, corporate debt securities, and municipal debt securities is The Depository Trust Company (DTC), and DTC's nominee is typically Cede & Co. The certificates are often in "jumbo" form, evidencing for Example,000 or more shares of common stock or $100 million of debt with a single certificate, and the certificates neither move nor change registration despite the high volume of trades affecting them. Instead, the clearing corporation's books indicate the ownership interests of the brokers or banks that are its members, and the records of those intermediaries, in turn, indicate the ownership interests of their customers, i.e., lower-tier intermediaries or, at the bottom of the chain, the actual investors. The identities of the investors need not be, and generally are not, known to the issuer. The 1987 version of Article 8 failed to account for these important realities of the system that it governed.

In 1994, after changes to the system had been urged for several years, the realities of indirect holding were finally recognized in a major revision of Article 8. The Article 8 revision also included conforming amendments to Article 9 governing security interests. In 1999, major revisions of Article 9 itself were also approved, but these revisions left the substance of the 1994 revisions almost completely undisturbed (and, in fact, built on those revisions in related areas such as deposit accounts), with only a few conforming

amendments to Article 8. Both sets of revisions have now been enacted by all fifty U.S. states and the District of Columbia, and the statutes as so revised are the focus of this book.

In the meantime, a revision to UCC Article 1, which sets forth definitions and general principles applicable to the entire Code, has recently been adopted by the Code's sponsors. It remains to be seen how widely this Article 1 revision will be enacted, but the differences between the revision and the version of Article 1 currently on most states' books are not substantial for purposes of this book. When reference to Article 1 is necessary, this book uses the section numberings of the revised uniform version.

## B. THE DIRECT AND INDIRECT HOLDING SYSTEMS

The system of immobilization and of holding through intermediaries, described above, has not completely supplanted the system of uncertificated securities, and neither of those systems has completely supplanted the system of direct possession and delivery of conventional paper certificates. Accordingly, Article 8 now accommodates all three systems. Together, the system of conventional paper certificates and the system of uncertificated securities are known as the *direct holding system*. The system of immobilization and of holding through intermediaries is known as the *indirect holding system*.

In the direct holding system, each investor is registered as the security's owner on the books of the issuer (which are often maintained by a transfer agent), or at least has the right to be so registered. This can be illustrated as in Figure 1.



**Figure 1.  Direct Holding System**

In the indirect holding system, most investors do not and cannot deal directly with the issuer in that way; instead they hold their investment through intermediaries. The indirect holding system is not entirely independent of the direct holding system, though: in the case of securities, the entity at the top of the chain of indirect ownership has a direct holding system relationship with the issuer. This linkage between the two systems, as well as some typical relationships within the indirect holding system, can be illustrated as in Figure 2.



**Figure 2. Indirect Holding System**

For example, if the securities in question (or other financial assets, as discussed below) are shares of stock in Computer Corporation, Investor 1 has a security entitlement to those shares credited to its securities account maintained with Broker 1. Broker 1, in turn, has the same relationship with DTC. And, finally, DTC (or, typically, Cede & Co.) is the registered owner of the shares on the books of Computer Corporation. The same analysis applies whether the Computer Corporation shares registered to DTC are certificated or uncertificated: the indirect holding system is indifferent to how securities are evidenced at the top tier.

Despite their important differences, the two systems have important systemic interests in common. Both systems are devoted to enhancing the liquidity of securities, so that transfers can be processed without disruption or delay. One way of promoting this liquidity is to free prospective transferees in the direct holding system from concerns over the possibility unknown conflicting claims, through the negotiability rules alluded in above and discussed in Chapter 3.B. In the indirect holding system, the concept of transfer plays a much lesser role, but concerns analogous to negotiability remain highly important, and are discussed in Chapter 4.C. A related systemic interest is in enhancing the finality of transactions (that is, providing that consummated transactions cannot be undone). Article 8's rules for the indirect holding system promote this interest by providing that holders of security entitlements generally have no traceable, recoverable property interest in any particular security or even in any particular fungible bulk of securities.

The direct holding system is discussed in detail in Chapters 2 and 3. The indirect holding system is discussed in detail in Chapter 4.

## C. SCOPE OF THE TWO SYSTEMS

The direct holding system applies only to securities, while the indirect holding system applies more broadly to securities and other financial assets. The definition of *security*, set forth in § 8-102 with help from § 8-103, has little to do with the definition of

Case 1:10-cv-04518-LAP   Document 122-2   Filed 11/14/08   Page 12 of 22

security that has developed for purposes of the federal securities laws. Article 8's definition is intended to cover assets that one would normally expect to be bought and sold as securities in today's marketplace. It has essentially four components.

First, the asset must be either an obligation of an issuer (such as a bond, note, or other debt), or a share, participation, or other interest in the issuer or in the issuer's property (such as a share of stock). Chapter 2 discusses Article 8's rules regarding the issuer's obligations to the owner of securities issued by it.

Second, the asset must take one of three forms. It may be in *bearer form*, evidenced by a physical certificate entitling the holder (the bearer) to the rights that constitute the asset. Alternatively, it may be in *registered form*, evidenced by a physical certificate entitling the person registered as the owner on the books of the issuer to the rights that constitute the asset. (It may not be "order" paper, i.e., an obligation payable "to the order" of a payee, such as a check or most other commercial paper.) Or, finally, the asset may be *uncertificated*, that is, evidenced only by an entry in the books of the issuer, as envisioned by Article 8's 1978 version.

Third, the asset must be one of a class or series (or, by its terms, be divisible into a class or series) of shares, participations, interests, or obligations. This requirement assists in distinguishing securities from ordinary negotiable instruments. It does not require that there be more than one item in the class or series; it is also satisfied, for example, by a single certificate representing all of the outstanding shares of stock of a closely held issuer, so long as it is by its terms divisible.

Fourth and finally, the asset must function like a security. It must ordinarily be, or be of a type that is, dealt in or traded on a securities exchange or securities market. Alternatively, this fourth component is satisfied if the asset constitutes a medium for investment and by its terms expressly provides that it is a security governed by Article 8. Thus, the issuer of a medium for investment can "opt in" to the full range of Article 8's coverage of securities.

As more fully discussed in Chapter 4.A, *financial asset* is defined to include securities, other obligations or interests which are (or are of a type) dealt in or traded on financial markets or

considered a medium for investment, and any property held in a securities account which the securities intermediary has expressly agreed to treat as a financial asset. § 8-102(a)(9). For securities, Article 8 provides rules governing the rights and obligations of issuers, purchasers, transferors, and others in the direct holding system, as well as investors and intermediaries in the indirect holding system; but for financial assets that are not securities, Article 8's coverage is much more limited, providing only for the rights and obligations of investors and intermediaries in the indirect holding system. This distinction makes good sense in light of the potentially wide range of assets that can be financial assets, and the distinction's importance is highlighted by § 8-103, which is devoted to classifying certain otherwise potentially difficult cases one way or the other. Shares of stock in any corporation, even a closely held one, are securities, as are similar equity interests issued by business trusts, joint stock companies, and similar entities, whether or not the particular issue is dealt in or traded on a securities exchange or market. By contrast, an interest in a partnership or limited liability company is not a security, unless it is so dealt in or traded, or it is an investment company security, or the instrument's terms expressly provide that the interest is a security governed by Article 8. (Using this last alternative, the issuer of an interest in a partnership or limited liability company can opt into Article 8 under § 8-103 even if the opt-in under § 8-102, discussed above, is unavailable.) If a partnership or LLC interest is not a security, it is nonetheless a financial asset if it is held in a securities account.

Any codification of commercial law faces the risk of becoming obsolete due to future innovations in commercial practice; the uncertificated security system of Article 8's 1978 version is one example of this. But the current version of Article 8 seeks to minimize this risk by building party autonomy into its systems. In the direct holding system, autonomy has been built into the definition of "security" described above. In the indirect holding system, autonomy has been built into the flexibility of the concept of "financial asset" described here, as well as into the relationship between investors and intermediaries (see Chapter 4.A) and the choice of law system (see Chapter 6.A).

# CHAPTER
------------------------------
# FOUR

# THE INDIRECT
# HOLDING SYSTEM

The indirect holding system is, as described in Chapter 1, a pattern of securities ownership and transfer in which investors, the ultimate beneficial owners of securities, have no direct relationship with the issuer; instead, they hold entitlements to securities through a securities intermediary. The current version of Article 8 brings the law of securities transfers into harmony with this vital aspect of commercial practice, and that is Article 8's single greatest accomplishment.

The notion of a *security entitlement* is at the heart of Article 8's rules for the indirect holding system. A security entitlement might be thought of by a nonlawyer simply as rights to a security that an investor holds indirectly (that is, through a broker or other intermediary rather than in a direct relationship with the issuer), but to truly understand Article 8's treatment of the indirect holding system, one must consider a more precise set of rules.

A security entitlement is actually a sui generis form of property interest, a hybrid between property and contract consisting of a bundle of several carefully meshed components. One of these components is a property interest in the underlying security or

other financial asset, if any, held by the intermediary. Other components include rights against third parties, vulnerabilities to rights of third parties, and in personam rights against the securities intermediary. The rights bundled together in a given security entitlement do not necessarily persist stably through time in the way that other items of property such as a certificated security, an uncertificated security or a wristwatch do; instead, the rights may grow and shrink depending on the actions taken by the intermediary toward the entitlement holder or third parties. Article 8's rules for the indirect holding system establish what rights are represented by a given security entitlement at a given time, and for that reason, a complete answer to the question "what is a security entitlement" actually requires a complete examination of all of Article 8's rules for the indirect holding system. The remainder of this Chapter provides that examination, beginning with an overview of securities entitlements in Chapter 4.A. Chapter 4.B then focuses on the related in personam rights against a securities intermediary, and Chapter 4.C focuses on the related property rights vis-à-vis third parties.

## A. OVERVIEW OF SECURITIES ENTITLEMENTS

A security entitlement is a bundle of property rights and contract rights resulting from an undertaking by a *securities intermediary* to provide an *entitlement holder* the rights that constitute a security or other *financial asset*. The entitlement holder acquires the security entitlement in most cases when the securities intermediary credits the financial asset to the entitlement holder's *securities account*.

Article 8's rules for the indirect holding system apply to all financial assets, in contrast to its rules for the direct holding system, which apply only to securities. *Financial asset* is defined to include all securities, and also to include two other groups of assets (each of which echoes a different part of Article 8's definition of "security," discussed in 1.C). The first of these is any share or obligation that "is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued

or dealt in as a medium of exchange"; examples are commercial paper, bankers' acceptances and certificates of deposit. The second is as flexible as the preferences of the financial markets: "any property" held in a securities account that a securities intermediary and an entitlement holder expressly agree to treat as a financial asset is, ipso facto, a financial asset. (As a practical matter, a securities intermediary may be unwilling to agree to treat unusual kinds of property as financial assets, because this can lead to difficulties in satisfying its obligations to the entitlement holder. *See* Chapter 4.B.) In addition, the term financial asset includes interests in partnerships and limited liability companies (even if the issuer does not "opt in" to treatment as a security as discussed in Chapter 1.C) and negotiable instruments, if held in a securities account, and options issued by a clearing corporation to its participants. § 8-103(c), (d), (e). (Clearing corporations are defined as entities registered as clearing agencies under federal securities law, federal reserve banks, and certain other regulated persons that provide clearance or settlement services. § 8-102(a)(5).)

Security entitlements are not themselves generally represented by certificates, and it is important to distinguish between the direct ownership of an uncertificated security and the indirect "ownership" of (actually the security entitlement to) a security, whether certificated or uncertificated. For example, some investors diversify by owning shares issued by mutual funds, which Article 8 treats as direct ownership of uncertificated securities, and other investors diversify by holding shares of numerous issuers through a broker, which Article 8 treats as having a security entitlement to those shares. The distinction between direct and indirect ownership has fundamental legal consequences. The first of these consequences concerns duties to beneficial owners: the issuer of a security has the duties described in Chapter 2, while the creator of a security entitlement has, instead, the duties described in Chapter 4.B. In oversimplified terms, the issuer of a security has primary obligations, and the creator of a security entitlement to that security has obligations to maintain and pass through those primary obligations. Section 8-501(e) reflects these distinctions between security and security entitlement by

providing simply, "Issuance of a security is not establishment of a security entitlement."

The second legal consequence of the distinction between security entitlement and security concerns the basic idea of transfer, which is much less important in the indirect holding system than in the direct holding system. When an entitlement holder acquires a security entitlement, she does not take it over from some predecessor in interest (as purchasers in the direct holding system do); instead, her security entitlement is a new item of property, minted just for her. By the same token, when an entitlement holder liquidates a position with the securities intermediary, the security entitlement is simply extinguished, rather than being transferred to some successor in interest. As the comments to § 8-503 put it, "The idea that discrete objects might be traced through the hands of different persons has no place in the Revised Article 8 rules for the indirect holding system." This principle provides the foundation for Article 8's near-elimination of concerns about finality, first discussed in Chapter 1.B.

The indirect holding system accommodates more than one tier of securities intermediary between the issuer and the ultimate investor. That is, the securities intermediary through which a security entitlement is held might not directly own the security or other financial asset; instead the securities intermediary may, itself, have a security entitlement to that security against a clearing corporation or against another securities intermediary. As a result, there may be two or more intermediaries between the issuer and the entitlement holder, as with the two brokers and the bank in Figure 2 in Chapter 1. Article 8 expresses this idea by providing that a security entitlement may be a financial asset. § 8-102(a)(9). By contrast, in other cases, there may not be even one securities intermediary between the issuer and the ultimate investor, that is, the investor will own a financial asset directly. When a directly owned financial asset is a security, the rules of the direct holding system apply, rather than those of the indirect holding system (see Chapters 2 and 3). But when a directly owned financial asset is not a security, neither the direct nor the indirect holding system's rules apply, and it is legally almost meaningless that

Article 8 happens to call the asset a "financial asset"; the term is significant only for determining whether a security entitlement relationship with respect to that asset can exist (and for a narrow purpose relating to secured transactions; *see* Chapter 5.B.5).

The *securities account*, defined in § 8-501(a), is another conceptual cornerstone of the indirect holding system. A securities account is an account to which a financial asset may be credited under an agreement for the person maintaining the account (the securities intermediary) to treat the person for whom it is maintained (the entitlement holder) as entitled to exercise the rights that comprise the financial asset. Thus, a securities account is the framework for the securities intermediary/entitlement holder relationship and the medium in which an investor in the indirect holding system has rights in a financial asset. (It is analogous, to a limited degree, to a bank account. But the bank depositor typically holds only a contractual right to be repaid, while the entitlement holder has certain property rights to financial assets credited to the account, as discussed in Chapter 4.C. Also, the bank depositor typically cannot insist that the bank keep her money on hand in the vault, but the entitlement holder is entitled to have her securities intermediary maintain financial assets corresponding to each of her security entitlements, as discussed in Chapter 4.B.1 below.)

Many of the other central concepts of Article 8's rules for the indirect holding system are, perhaps unavoidably, defined in an almost circular relationship to one another. An *entitlement holder* is a person identified on the records of a securities intermediary as having a security entitlement against that securities intermediary. (Persons can also become entitlement holders under other limited circumstances discussed below.) A *securities intermediary* is either a person that, in the ordinary course of its business, maintains securities accounts for others and is acting in that capacity (such as a broker, or a bank which acts as a securities custodian) or a clearing corporation (such as DTC, discussed in Chapter 1). And, completing the circle, a security entitlement is composed of the rights and property interest of an entitlement holder with respect to financial assets specified by Article 8's rules for the indirect holding system. § 8-102(a)(7), (14), (5), (17). Each

provision of the rules for the indirect holding system accordingly helps to add crucial content to these concepts.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXAMPLE: Web Browser, Inc. has issued 10,000 shares of common stock in a single jumbo certificate registered in the name of DTC (or more precisely, DTC's nominee, Cede & Co.). On a given day, 6,000 of those shares are credited on DTC's books to Big Broker and the other 4,000 are credited, in varying quantities, to other brokers or banks. At the same time, Big Broker's own books show 3,000 shares as being credited to Investor 1 and 2,000 shares as being credited to other investors. (Big Broker's remaining 1,000 shares are proprietary, that is, held for its own account.)

In this example (which is also illustrated in part of Figure 2 in Chapter 1), Investor 1 has a security entitlement to 3,000 shares of Web Browser, Inc. in a securities account with respect to which Investor 1 is the entitlement holder and Big Broker is the securities intermediary. At the same time, Big Broker has a security entitlement to 6,000 shares of Web Browser, Inc. in a securities account with respect to which Big Broker is the entitlement holder and DTC is the securities intermediary. And finally, at the same time, DTC owns 10,000 shares of Web Browser, Inc. in the direct holding system.

If the facts were changed so that Web Browser, Inc.'s shares were not represented by any certificate, none of this analysis would change; Article 8's rules for classifying ownership as direct or indirect depend on how the property is held, not on how it is evidenced.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Like the inception of a bailor/bailee relationship or the formation of a contract (both of which it resembles in some ways), the inception of a security entitlement is a generally consensual process that generates legally enforceable obligations. There are

two ordinary ways that entitlement holders acquire security entitlements, both depending upon objective events in the securities intermediary's operations. The first is that the securities intermediary "indicates by book entry that a financial asset has been credited to the person's securities account."

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXAMPLE:  Customer instructs Broker to purchase for Customer's account Fast Food Corporation's 6% Notes Due December 31, 2010, in the face amount of $10,000, and Broker notes on its records that that amount of Notes has been credited to Customer. Customer now has a security entitlement to that amount of Notes.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The second ordinary way that a security entitlement is created is that the securities intermediary receives a financial asset from the entitlement holder, or from a third party on the entitlement holder's behalf, and accepts it for credit to the entitlement holder's securities account. § 8-501(b). (Typically, this type of securities entitlement would quickly be transformed into a security entitlement of the book-entry kind described above.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXAMPLE:  In his desk drawer Customer has a security certificate registered in his name representing twenty shares of Steel Corporation. Customer indorses it to Broker or in blank, and delivers it to Broker who agrees to hold it in Customer's portfolio. Customer now has a security entitlement to twenty shares of Steel Corporation.

NOTE: In the rare case where Broker agrees to hold the Steel Corporation security certificate for Customer without an indorsement from Customer to Broker or in blank, Customer would not have a security entitlement, even though the certificate was delivered to Broker. Customer would remain an owner of those twenty shares in the direct holding system. § 8-501(d).

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Security entitlements are also created when an intermediary is required by applicable non-UCC law to credit a financial asset to a person's securities account.

One of the core duties of a securities intermediary, as discussed immediately below, is to maintain enough of the related financial assets to satisfy the security entitlements that it creates in favor of entitlement holders; in other words, maintenance of financial assets is a consequence of, not a cause of, the establishment of a security entitlement. To make this clear, Article 8 provides that a security entitlement is established upon the occurrence of the above trigger events, whether or not the securities intermediary actually holds the related financial asset. § 8-501(c).

------------------------------------------------------------

EXAMPLE: Same facts as in the Fast Food Corporation example above, except that Broker fails to follow Customer's instruction to acquire the Notes. Nonetheless, Customer has a security entitlement to the Notes.

------------------------------------------------------------

A typical acquisition of a security entitlement (together with the corresponding liquidation by another investor) may be illustrated as in Figure 5. Selling Investor instructs its securities intermediary, Broker 1, to sell 100 shares of Issuer, and Buying Investor instructs its securities intermediary, Broker 2, to buy 100 shares of Issuer. Broker 1 and Broker 2 accordingly agree to enter in a buy/sell transaction with each other. When the time comes to settle this transaction, Broker 1 debits Selling Investor's securities account by 100 Issuer shares; it also instructs DTC to debit Broker 1's own securities account held through DTC by 100 Issuer shares and to credit Broker 2's securities account held through DTC with 100 Issuer shares. DTC complies, and Broker 2 credits Buying Investor's securities account with 100 Issuer shares. (Payments, if any, among the parties may take place either concurrently with or independently of the debiting and crediting of shares.) The result is that Selling Investor's security entitlement is reduced by 100 shares and that Buying



**Figure 5.  Typical Acquisition of a Security Entitlement**

Investor's security entitlement is increased by 100 shares. The issuer and its transfer agent have no part in this transaction, unlike in a direct holding system transaction.

## B. SECURITY ENTITLEMENT AS IN PERSONAM RIGHT: THE FIVE CORE DUTIES OF A SECURITIES INTERMEDIARY

Once a security entitlement has been established, the securities intermediary is subject to certain obligations toward the entitlement holder, designed to pass through to the entitlement holder the rights generally associated with direct ownership of the financial asset. These obligations constitute the core of the entitlement holder/securities intermediary relationship and, if breached, they give rise to in personam liability of the securities intermediary.