# EXHIBIT 23



INTERNATIONAL INSTITUTE FOR THE UNIFICATION OF PRIVATE LAW
INSTITUT INTERNATIONAL POUR L'UNIFICATION DU DROIT PRIVE

---

**DIPLOMATIC CONFERENCE TO ADOPT A**
**CONVENTION ON SUBSTANTIVE RULES**
**REGARDING INTERMEDIATED SECURITIES**
Geneva, 1 to 13 September 2008

UNIDROIT 2008
CONF. 11 – Doc. 4
Original: English
February 2008

# EXPLANATORY REPORT

### to the

### DRAFT CONVENTION ON
### SUBSTANTIVE RULES REGARDING INTERMEDIATED SECURITIES

### together with an overview

### (submitted by the UNIDROIT Secretariat)

**OVERVIEW OF THE DRAFT CONVENTION ON
SUBSTANTIVE RULES REGARDING INTERMEDIATED SECURITIES**

**1.      Introduction to the project**

1.      The UNIDROIT draft Convention on Substantive Rules regarding Intermediated Securities (hereinafter: the 'draft Convention') was developed as the first item of a series of UNIDROIT projects relating to transactions on transnational and connected capital markets (Study LXXVIII). The draft Convention is intended as an international instrument to improve the legal framework for securities holding, transfer and collateralisation, in order to enhance the internal stability of national financial markets and their cross-border compatibility and, as such, to promote capital formation.

2.      Over the past fifty years, the practice of holding and disposition of investment securities has changed considerably. Departing from the traditional concept of custody or deposit of physical certificates, a system of holding through intermediaries has been developed for reasons of efficiency, operational certainty, speed and safety. In this system, the greater part of securities is immobilised with a central securities depository. The investor holds securities through a chain of intermediaries that are ultimately connected to the central securities depository. The transfer of securities and the creation of security and other limited interests therein are in practice commonly effected by way of book entries to the securities accounts concerned. The securities themselves are no longer physically moved.

3.      However, in many countries, the legal framework which underlies this modern system of holding through intermediaries still relies on traditional legal concepts first developed for the traditional method of holding and disposition relating to tangible assets held in physical custody. As a result, the legal risk in the area of securities holding and disposition is particularly high. This legal uncertainty is multiplied by the fact that securities are increasingly held and transferred across borders, since domestic legal frameworks are not necessarily compatible with each other. Legal risk can, in times of 'stress', even trigger systemic effects. Additionally, persistent legal risk affects the overall efficiency of the markets, as is easily illustrated by the example of increased transaction costs.

4.      Several international initiatives address this problem, such as the *CPSS/IOSCO Recommendations for securities settlement systems* (2001) and *central counterparties* (2004), the *G30 Plan of Action* (2003), the CPSS *Report on cross-border collateral arrangements* (2006), as well as, on a regional, European level, reports by the *Giovannini Group*. They identify the need for a reliable, smoothly functioning legal framework adapted to the modern system of holding securities through intermediaries, especially in a cross-border context. Such a legal framework is indeed crucial to all participants in the modern capital markets, including, first of all, investors, but also public and private issuers of securities, the securities industry, systems for the clearing and settlement of securities transactions and parties to collateral arrangements involving book entry securities.

5.      A sound legal framework is all the more important in light of the extremely high value of securities held in intermediated systems and the enormous volume of transactions with such securities carried out every day, which continues to increase a pace. The use of securities as collateral in many instances underpins arrangements for high-value cash transfers. Moreover, it is common in central bank monetary policy transactions, and is therefore crucial to the liquidity of the modern financial system as a whole.

6.       Only a few countries have tackled the issue of fundamentally modernising the legal framework for securities holding, transfer and collateralisation, confined, of course, to their domestic legal framework. Cross-border holding, transfer and collateralisation of securities suffers from deficiencies regarding the internal soundness of domestic systems and, furthermore, from a lack of compatibility between different legal frameworks that govern a given situation.

7.       The issue of harmonising the private international law rules regarding securities held with an intermediary is addressed by modernised conflict-of-laws rules in some countries and, at the international level, in the Hague Convention on the Law applicable to Certain Rights in respect of Securities held with an Intermediary (hereinafter: 'Hague Securities Convention'), which was adopted in December 2002 under the auspices of the Hague Conference on Private International Law. However,  by its nature, neither the former nor the latter address issues of substantive law.

8.       On a regional level, the EU Directives on Settlement Finality and Financial Collateral set out a fragmented legal framework for securities holding and disposition in the European Union, with special emphasis on collateral transactions.

9.       Consequently, a framework that comprehensively addresses issues of substantive law in the problem areas identified above is needed, particularly at the global level. Such a framework would be a necessary complement to global efforts, to domestic reform in several countries in Asia and the Americas, and to the EU harmonisation efforts.

10.      The UNIDROIT draft Convention on Substantive Rules regarding Intermediated Securities is intended to fill this gap. The draft Convention aims to promote internal soundness and cross-border system compatibility by providing the basic legal framework for the modern intermediated securities holding system.


## 2.       History

11.      At the outset of the project, a Study Group was convened by UNIDROIT. The Study Group held its first meeting in September 2002. After five such meetings and consultations with practitioners and scholars in 20 countries, on 23 December 2004 the UNIDROIT Secretariat submitted the first version of the preliminary draft Convention to the Governments of UNIDROIT Member States for consideration (UNIDROIT 2004 - Study LXXVIII - Doc. 18), together with a set of Explanatory Notes (UNIDROIT 2004 - Study LXXVIII - Doc. 19).

12.      The preliminary draft Convention served as a basis for an international negotiation process which commenced in May 2005 with the holding of the first session of a Committee of Governmental Experts in Rome. The second session was held in March 2006, during which session the draft text was further developed (UNIDROIT 2006 - Study LXXVIII - Doc. 42). The Secretariat then circulated the Report on the session (UNIDROIT 2006 - Study LXXVIII - Doc. 43). The third session took place in Rome in November 2006, following which a revised text of the preliminary draft Convention and the Report on the session were issued (UNIDROIT 2007 – Study LXXVIII – Docs. 57, 58). Finally, the fourth session of the Committee of Governmental Experts took place in Rome from 21 to 25 May 2007, again resulting in a new text of the preliminary draft Convention and a Report on the session (UNIDROIT 2007 – Study LXXVIII – Docs. 94, 95). In total, 39 UNIDROIT Member States, 2 non-Member States and 17 Organisations participated in the negotiation process.

13.      At its fourth session, the Committee of Governmental Experts concluded that the text of the draft Convention was ready to be submitted to a Diplomatic Conference. The UNIDROIT Governing Council thereupon examined the draft text and authorised it to be transmitted to a

Diplomatic Conference. The status of the text is therefore no longer 'preliminary', and the Diplomatic Conference on the draft Convention will be held in Geneva, Switzerland, from 1 to 13 September 2008.

## 3.      Overarching policy goals

14.      Throughout the project, a number of overarching policy goals have served as points of reference.

15.      A first policy goal has been the *internal soundness* of systems. Key features have been identified which a structure for the holding and transfer of securities through intermediaries must possess if it is to be regarded as sound, taking into account in particular objectives of investor protection and efficiency. Indirect holders of securities should, for example, be confident that their interests are robust and are subject to simple, clear rules and procedures in respect of holding, transfer and realisation. Furthermore, it is clearly essential that the investor's interest should not be exposed to risks such as the insolvency of any intermediary or interference by unrelated third parties.

16.      Moreover, the *compatibility of systems* was considered to be crucial, which means that different legal systems should be able to connect successfully where securities are held or transferred across national borders. In a cross-border context, complicated legal questions may arise in relation to the applicable law, but also due to differing national approaches in respect of substantive property law issues, supervision, company law, taxation, etc. The harmonisation of at least some core issues was considered to be of utmost importance in a cross-border context, in order to enhance predictability, legal certainty and liquidity.

17.      Since both the internal soundness of systems and the compatibility of national legal frameworks were aimed at, it comes as no surprise that both *domestic and cross-border transactions* have been included in the scope of the work on the draft Convention.

18.      A key element in the draft Convention is the recognition of the *central position of book entry accounts* in modern indirect holding and transfer systems. Parties dealing in securities held with an intermediary need to be sure that a credit of securities to their securities account represents a good and effective interest. The importance of secure book entry interests is particularly evident in the common situation where linked transfers of interests take place through different intermediaries and settlement systems, operating under different laws. Any doubt as to the effectiveness of an interest represented by a book entry credit, or about the effectiveness and finality of a transfer made through book entry debits and credits, would give rise to damaging uncertainty and systemic risk.

19.      The draft Convention is based on a *neutral and functional approach* accommodating different legal concepts. Confusion can easily arise from the different traditions and conceptual frameworks of different systems of law. This is why a functional approach was adopted, i.e. an approach using language that is as neutral as possible and which formulates rules by reference to their results. In this respect, a lesson was drawn from the Hague Securities Convention, where it was found unexpectedly difficult to use even common concepts such as 'property' or 'proprietary interest' in a manner which would be understood in the same way in all legal systems. It was therefore deemed prudent to avoid such terms and instead use more neutral language such as 'effects against third parties'.

20.      Generally, a *'minimalist' approach* has been taken, which means that a harmonised rule is regarded as appropriate only if it is clearly required to reduce legal or systemic risk or to promote market efficiency. This approach recognises that, however desirable it is in principle to achieve fully harmonised rules, this is a complex process in practice, requiring technical compatibility and political consensus. In line with this restrictive approach to the scope of harmonisation, *'non-Convention law'* plays an important, complementary role throughout the Convention. This means that where issues have not been covered by the harmonising rules set out in the draft Convention, the rules of the law in force in a Contracting State come into play.

21.      In addition, *compatibility with other relevant instruments* was an important objective, such as recent domestic reform legislation, relevant EU Directives, the Hague Securities Convention, etc. Moreover, work was co-ordinated with the work on developing an UNCITRAL Legislative Guide on Secured Transactions, which at this stage does not cover securities at all.

### 4.      The needs of market participants as a guideline

22.      Throughout the process leading to the current text of the draft Convention, the needs of market participants played a key role. At the outset of the project, in a Position Paper (Unidroit 2003 – Study LXXVIII – Doc. 8), the Study Group identified the following needs of market participants against the background of criteria of systemic risk and market efficiency:

An *account holder* needs to be confident:

(a)      that entries in its accounts with its intermediary represent interests that are good against the intermediary and third parties, even in the event of insolvency of the intermediary;

(b)      that such entries cannot be revoked or reversed once certain clearly identifiable and reasonably simple conditions have been satisfied;

(c)      that it can give instructions to its intermediary in a reasonably simple and convenient form.

An *intermediary* needs to be confident:

(a)      that it can accept instructions from its direct account holder and can ignore purported instructions or other interference from outside parties;

(b)      that, where an account holder has provided securities held in its account as collateral to the intermediary itself, the intermediary can enforce its security in accordance with the terms of the collateral agreement without the need to satisfy any additional conditions or procedural requirements;

(c)      that, where an account holder has provided securities held in its account as collateral to another party, the intermediary can accept instructions from the collateral taker in clearly specified circumstances and without the need to satisfy any additional conditions or procedural requirements;

(d)      that the instructions referred to in (a) and (c) cannot be revoked or reversed once certain clearly identifiable and reasonably simple conditions have been satisfied;

(e)      that such instructions can be given in a reasonably simple and convenient form;

(f)      that, when the intermediary is making entries in the accounts of its account holders on the basis of entries made in accounts which it maintains with a higher-tier intermediary, the entries in those accounts held with the higher-tier intermediary represent interests that are good against the higher-tier intermediary and third parties and are not liable to be reversed or revoked;

(g)      that, to the extent that there are debits and credits to be made to accounts maintained by the intermediary for different account holders, it can effect a net settlement of those debits and credits – that is, it can simply make such entries (if any) as are required to reflect the net overall change in the accounts of its account holders.

A *collateral taker* needs to be confident:

(a)      that it can obtain an interest valid against the collateral provider, the intermediary and third parties by ensuring compliance with a clear, reasonable and simple procedure;

(b)      that if it needs to enforce its security it will be able to give to the intermediary instructions on which the intermediary will be entitled and bound to act, without the need to satisfy any additional conditions or procedural requirements.

23.      In the course of the negotiations during the sessions of the Committee of Governmental Experts, market participants continued to play an important role as observers. In that capacity, they took an active part in the discussions and stressed the need for harmonised rules resulting in internally stable and compatible systems which enhance liquidity, cross-border trade and economic growth.

## 5.      Key issues addressed in the draft Convention

24.      In its Position Paper, the Study Group, on the basis of the needs of market participants, identified a number of key issues to be addressed by the draft Convention. These key issues were subsequently refined and elaborated by the Committee of Governmental Experts. The draft Convention as it stands today largely covers the key issues identified by the Study Group. It regulates the *different methods* for the transfer of intermediated securities, including the establishment of security and other limited interests in respect thereof, such as debits and credits, automatic perfection, designating entries, control agreements and other methods under the non-Convention law. The draft Convention also describes the *rights resulting from the credit* of securities to a securities account. Moreover, it clarifies the rules regarding the *finality* of book entry transfers and the *irrevocability* of instructions by declaring that a book entry is effective when made. It makes it possible to *settle trades on a net basis*. In addition, it protects the *innocent ('good faith') acquirer* of securities and establishes *priority* ranking among competing interests with respect to securities. In line with the recommendations of the Study Group, the draft Convention precludes '*upper-tier attachment*' (i.e. a creditor's ability to attach positions held for its debtor at any level in the chain above its debtor's immediate intermediary) and establishes a regime for *loss allocation* in case of a shortfall of securities. Moreover, it has been determined that the total number of securities credited to account holders' accounts maintained by an intermediary should not *exceed* the total number of securities that the intermediary actually holds or has available for these account holders. In addition, the draft Convention sets out the rights and obligations of the account holder and the intermediary in the event of *insolvency*. In a special Chapter, it also defines the legal relationship between *collateral providers and collateral takers* where intermediated securities are provided as collateral.

### 6.      Inclusion of so-called transparent systems

25.      The draft Convention is neutral as regards the legal basis of the intermediated systems it covers. It aims to set out basic rules for different types of systems for intermediated securities, including systems based on co-ownership rights in fungible pools of securities, systems in which investors have rights in respect of identifiable securities (e.g. registered by number by every intermediary in the chain), and systems based on a trust concept or a *sui generis* approach such as the 'entitlement' notion.

26.      During the negotiation process, concerns were however raised by representatives of so-called transparent systems who argued that the text of the draft Convention did not properly address their systems. In functional terms, transparent systems can roughly be described as systems in which two or more entities in the holding chain share the carrying out of functions relating to the maintenance of a securities account. Four different types of systems with transparent features were identified by a Working Group on the issue, including those in, e.g., the Federative Republic of Brazil, Colombia, the People's Republic of China, the Czech Republic, Greece, Malta, the Nordic Countries, South Africa and the United Kingdom.

27.      During the fourth session of the Committee of Governmental Experts, the issues arising in connection with transparent systems were discussed in detail. As a result, special provisions were added to the text of the draft Convention in order to address the concerns raised and to include transparent systems within its scope.

### 7.      Nature of the instrument

28.      Throughout the project, work was carried out with a binding international law instrument in the shape of a Convention in mind. During the fourth session of the Committee of Governmental Experts, an in-depth discussion of the matter took place and it was agreed that a Convention was indeed the appropriate form for an international law instrument dealing with intermediated securities, in particular because only a Convention can guarantee the legal certainty and predictability needed in the international financial markets.

### 8.      Structure of the draft Convention

29.      The draft Convention is subdivided into seven Chapters. Chapter I contains definitions, sets out the scope of application and gives principles for interpretation. Chapter II describes the rights of the account holder. Chapter III deals with the transfer of intermediated securities, which includes both outright transfers and the establishment of security interests and other limited interests. Chapter IV contains a number of provisions relating to the integrity of the intermediated holding system. Chapter V relates to the position of issuers in such a system. Chapter VI contains specific provisions relating to collateral transactions, while Chapter VII has been reserved for final clauses (see UNIDROIT 2008 – CONF. 11 – Doc. 5).

**DRAFT CONVENTION ON**

**SUBSTANTIVE RULES REGARDING INTERMEDIATED SECURITIES** *

**and**

**EXPLANATORY REPORT**

**CHAPTER I – DEFINITIONS, SCOPE OF APPLICATION AND INTERPRETATION**

*Article 1*
*Definitions*

In this Convention:

(a)    *"securities"* means any shares, bonds or other financial instruments or financial assets (other than cash) which are capable of being credited to a securities account and of being acquired and disposed of in accordance with the provisions of this Convention;

(b)    *"intermediated securities"* means securities credited to a securities account or rights or interests in securities resulting from the credit of securities to a securities account;

(c)    *"securities account"* means an account maintained by an intermediary to which securities may be credited or debited;

(d)    *"intermediary"* means a person who in the course of a business or other regular activity maintains securities accounts for others or both for others and for its own account and is acting in that capacity and includes a central securities depository if and to the extent that it acts in that capacity;

(e)    *"account holder"* means a person in whose name an intermediary maintains a securities account, whether that person is acting for its own account or for others (including in the capacity of intermediary);

(f)    *"account agreement"* means, in relation to a securities account, the agreement between the account holder and the relevant intermediary governing that securities account;

(g)    *"relevant intermediary"* means, with respect to a securities account, the intermediary that maintains the securities account for the account holder;

---

*        Drafting proposals by the UNIDROIT Secretariat to amend the text of the draft Convention appear as marked-up.

(h) *"insolvency proceeding"* means a collective judicial or administrative proceeding, including an interim proceeding, in which the assets and affairs of the debtor are subject to control or supervision by a court or other competent authority for the purpose of reorganisation or liquidation;

(i) *"insolvency administrator"* means a person (including a debtor in possession where applicable) authorised to administer an insolvency proceeding, including one authorised on an interim basis;

(j) securities are *"of the same description"* as other securities if they are issued by the same issuer and:

(i) they are of the same class of shares or stock; or

(ii) in the case of securities other than shares or stock, they are of the same currency and denomination and are treated as forming part of the same issue;

(k) *"control agreement"* means an agreement between an account holder, the relevant intermediary and another person, or, if so provided by the non-Convention law, an agreement between an account holder and another person of which notice is given to the relevant intermediary, which relates to intermediated securities and includes either or both of the following provisions:

(i) that the relevant intermediary is not permitted to comply with any instructions given by the account holder in respect of the intermediated securities to which the agreement relates without having received the consent of that other person;

(ii) that the relevant intermediary is obliged to comply with any instructions given by that other person in respect of the intermediated securities to which the agreement relates in such circumstances and as to such matters as may be provided by the agreement or the non-Convention law, without any further consent of the account holder;

(l) *"designating entry"* means an entry in a securities account made in favour of a person other than the account holder in respect of intermediated securities, which, under the account agreement, a control agreement, the uniform rules of a securities settlement system or the non-Convention law, has either or both of the following effects:

(i) that the relevant intermediary is not permitted to comply with any instructions given by the account holder in respect of the intermediated securities in relation to which the entry is made without having received the consent of that other person;

(ii) that the relevant intermediary is obliged to comply with any instructions given by that other person in respect of the intermediated securities in respect of which the entry is made in such circumstances and as to such matters as may be provided by the account agreement, a control agreement, the uniform rules of a securities settlement system or the non-Convention law, without any further consent of the account holder;

(m)    *"non-Convention law"* means the law in force in the State whose law is applicable under Article 3, other than the provisions of this Convention;

(n)    *"securities settlement system"* means a system which:

(i)    settles, or clears and settles, securities transactions;

(ii)    is operated by a central bank or central banks or is subject to regulation, supervision or oversight by a governmental or public authority in respect of its rules; and

(iii)    has been notified, on the ground of the reduction of risk to the stability of the financial system, as a securities settlement system in a declaration by the Contracting State the law of which governs the rules of the system;

(o)    *"securities clearing system"* means a system which:

(i)    clears, but does not settle, securities transactions through a central counterparty or otherwise;

(ii)    is operated by a central bank or central banks or is subject to regulation, supervision or oversight by a governmental or public authority in respect of its rules; and

(iii)    has been notified, on the ground of the reduction of risk to the stability of the financial system, as a securities clearing system in a declaration by the Contracting State the law of which governs the rules of the system;

(p)    *"uniform rules"* means, in relation to a securities settlement system or securities clearing system, rules of that system (including system rules constituted by the non-Convention law) which are common to the participants or to a class of participants and are publicly accessible.


**Comment**

30.    Article 1 contains a list of definitions that are applied throughout the draft Convention. The draft Convention also contains some definitions for specific purposes, notably in the context of the acquisition of intermediated securities by an innocent person (see Article 14(4)), upper-tier attachment (Article 19(2)) and collateral transactions (Chapter VI). Generally, the definitions set out in the draft Convention are compatible with those in the Hague Securities Convention.

31.    Shares, bonds or other financial instruments or financial assets qualify as *'securities'* if they meet two functional criteria. First, it should be possible to credit them to a securities account. Secondly, they should be capable of being acquired and disposed of in accordance with the provisions of the draft Convention. The definition of securities does not cover cash, e.g. money deposited with a bank, or derivatives such as typical futures or swaps. As soon as securities are actually credited to a securities account, they are *'intermediated securities'*. In other words, rights or interests in securities arise when securities are entered into the intermediated system. The definition excludes physically held certificates and rights registered directly with the issuer, nor does it cover securities which are withdrawn from the intermediated system. The functional wording of the definitions of securities and intermediated securities allows the accommodation of new types of financial instruments in the future.

32.      A *'securities account'* is defined as an account maintained by an intermediary to which securities may be credited or debited. The definition comprises, for example, the account that an investor holds with an intermediary, but also the account of a lower-tier intermediary with a higher-tier intermediary. It does not, however, cover so-called issuer accounts or registers which contain information about securities issued and are commonly maintained by a central securities depository or another person, such as a transfer agent or registrar, for the issuer.

33.      Important actors in the intermediated holding system are the *'intermediary'* (Article 1(d)), the *'account holder'* (Article 1(e)) and the *'relevant intermediary'* (Article 1(g)). An *'intermediary'* is a person who in the course of a business or other regular activity maintains securities accounts for others or both for others and for its own account, such as banks or other financial institutions. The definition makes clear that a central securities depository can be an intermediary. The reference to central securities depositories should be read in connection with Articles 2 and 4 of the draft Convention and reflects the substance, but not the language, of Articles 1(3) and (4) of the Hague Securities Convention. The definition of *'account holder'* encompasses the ultimate account holder in the holding chain (sometimes also referred to as the 'ultimate investor'), as well as a lower-tier intermediary that holds securities with a higher-tier intermediary. For each securities account of an account holder its *'relevant intermediary'* can be identified, i.e. the intermediary closest in the holding chain which maintains the account for that account holder. This latter definition aims at distinguishing the account holder's own intermediary from all other intermediaries that operate between the account holder and the issuer or the account holder and the counterparty to a transaction.

34.      The *'account agreement'* is the contract between the account holder and the relevant intermediary governing the securities account, in which their respective rights and obligations are specified. The draft Convention does not set out formal requirements that such an agreement must meet in order to be effective. This definition corresponds to that of Article 1(e) of the Hague Securities Convention.

35.      The draft Convention contains a broad definition of *'insolvency proceeding'*, which covers collective proceedings, including interim proceedings, aimed at reorganisation or liquidation. In an insolvency proceeding, the assets and affairs of a debtor are subject to control or supervision by a court or another competent authority. An *'insolvency administrator'* is the person who is authorised actually to administer the insolvency proceeding, including the so-called debtor in possession, such as the manager of a company that continues to exercise its tasks as a fiduciary to the insolvent estate. The definitions relating to insolvency are particularly important for Chapter IV on the integrity of the intermediated holding system and for Chapter VI which contains special provisions for collateral transactions.

36.      Securities are *'of the same description'* if they are issued by the same issuer and have the same characteristics. In the case of shares or stock this means they must be of the same class. In the case of other types of securities they must be in the same currency and of the same denomination and treated as forming part of the same issue. Having the same description may be important in the event of netting (see Article 9(5)), split-voting (Article 26(2)) and in instances where equivalent collateral must be provided under collateral transactions (for the definition of 'equivalent collateral' see Article 28(2)(i)).

37.      Both a *'control agreement'* and a *'designating entry'* are methods set out in Article 10 by which an interest in intermediated securities may be granted. The parties to a control agreement and those involved in a designating entry are the account holder, the relevant intermediary and the person to whom the account holder wishes to grant an interest. Whereas a control agreement does not require any book entry, a designating entry means an entry in the same account to which

intermediated securities have already been credited. Both a control agreement and a designating entry may result in 'negative control' or 'positive control' by the other person, typically the collateral taker. In the case of negative control (see Articles 1(k)(i) and 1(l)(i)), the account holder may give instructions to the relevant intermediary, but these can only be carried out if the other person consents. In the case of positive control (see Articles 1(k)(ii) and 1(l)(ii)), the other person itself can give instructions to the relevant intermediary without any consent of the account holder.

38.     In a number of instances, the draft Convention refers to the *non-Convention law'*. The definition of this term expresses that the rules set out in the draft Convention may interact with other, complementary rules applicable in a given State. In a multi-unit State, the non-Convention law can be the rules of that State and/or the rules of law of a particular unit.

39.     Throughout the draft Convention, the *'uniform rules'* of a *'securities settlement system'* and the *'securities clearing system'* play an important role because such rules may, in a number of instances, override rules and standards set out in the draft Convention. The definitions concerned contain a number of requirements that must be met for the uniform rules of securities clearing and settlement systems to be recognised. These relate notably to the supervision or oversight and the notification of systems, as well as to the public accessibility of the rules of such systems. Uniform rules include system rules constituted by non-Convention law, since the rules of some systems derive from legislation rather than contract.

### Article 2
### Declaration concerning certain system operators

**A Contracting State may declare that a person who is the operator of a system for the holding and transfer of securities on records of the issuer or other records which constitute the primary record of entitlement to them as against the issuer is not an intermediary for the purposes of this Convention.**

**Comment**

40.     Article 2 contains a possibility for a Contracting State to opt out by way of a declaration to the effect that a person who is the operator of a system, including a central securities depository, is not an intermediary for the purposes of this draft Convention. Article 2 should be read in connection with Article 1(d) and Article 4 of the draft Convention, and reflects the analysis behind Article 1(5) of the Hague Securities Convention.

### Article 3
### Sphere of application

**This Convention applies where:**

**(a)     the applicable conflict of laws rules designate the law in force in a Contracting State as the applicable law; or**

**(b)     the circumstances do not involve a choice in favour of any law other than the law of a Contracting State.**

**Comment**

41.    Article 3 specifies in which circumstances the draft Convention applies. This provision does not set out conflict of laws rules but presumes that they exist. It follows from section (a) that the draft Convention applies in an international context if the applicable conflict of laws rules point to the law in force in a Contracting State. Section (b) addresses a 'domestic' scenario – assuming that such a scenario is discernable in today's markets and holding patterns. In this case, the draft Convention applies if there are no circumstances that point to the applicability of any law other than that of a Contracting State.

### Article 4
### Central Securities Depositories

This Convention does not apply to the activity of creation, recording or reconciliation of securities conducted by central securities depositories or other persons *vis-à-vis* the issuer of those securities.

**Comment**

42.    Article 4 excludes a number of functions in relation to the issuer of securities which are typically carried out by a central securities depository, a transfer agent or a registrar. In particular, the draft Convention does not cover the activity of creation, recording or reconciliation of securities on the issuer's register.

### Article 5
### Performance of functions of intermediaries by other persons

1.    A Contracting State may declare that under its non-Convention law a person other than the relevant intermediary is responsible for the performance of a function or functions (but not all functions) of the relevant intermediary under this Convention, either generally or in respect of intermediated securities, or securities accounts, of any category or description.

2.    A declaration under this Article shall:

(a)    specify, if applicable, the category or description of intermediated securities or securities accounts, to which the declaration relates;

(b)    identify, by name or description:

i)    the relevant intermediary;

ii)    the parties to the account agreement; and

iii)    the person or persons other than the relevant intermediary who is or are responsible as described in paragraph 1; and

(c)    specify, with respect to each such person, the functions for which it is so responsible and, if applicable, the relevant category or description of intermediated securities or securities accounts.

**3.    Subject to any express provision to the contrary, where a declaration under this Article applies, references in any provision in this Convention to an intermediary or the relevant intermediary are to the person responsible for performing the function to which that provision applies.**

**Comment**

43.    Article 5 is the result of the work done during the fourth session of the Committee of Governmental Experts regarding the inclusion of so-called transparent systems within the scope of the draft Convention. This provision relates to the sharing of functions carried out in respect of a securities account between the relevant intermediary and another person or persons. For example, a book entry order may be received by one person, whereas the actual credit to the securities account concerned is carried out by the relevant intermediary. This provision may apply to all persons who fulfil functions in respect of a certain account, including account operators, intermediaries and central securities depositories. The provision covers the situation in which different persons are responsible towards the account holder for carrying out functions. It should be noted that the provision does not cover the outsourcing of, for example, technical or IT support functions. Moreover, the provision does not attribute liabilities to the relevant intermediary or the other person or persons carrying out functions, which issue is dealt with in Article 25. Besides the general provision of Article 5 on the sharing of functions, Article 19(3) addresses transparent systems by setting out a specific rule for 'upper-tier attachment' in such systems.

44.    The sharing of functions under the draft Convention is possible only if it is made public by way of a declaration by the Contracting State concerned. The main goal of such a declaration is to explain how the sharing of functions works in that Contracting State. The requirements that such a declaration must meet are set out in Article 5(2). Most importantly, it must contain information about the (category or description) of intermediated securities or securities accounts concerned, about the parties involved, including the account holder, its relevant intermediary and the other person or persons carrying out functions, as well as a description of the functions being shared.

45.    Article 5(3) makes clear that functions may be shared in relation to any topic addressed in the draft Convention, unless indicated otherwise. Once a declaration has been made, references in the draft Convention to an intermediary or the relevant intermediary are to the person responsible for carrying out the function concerned.

*Article 6*
*Principles of interpretation*

**In the implementation, interpretation and application of this Convention, regard is to be had to its purposes, to the general principles on which it is based, to its international character and to the need to promote uniformity and predictability in its application.**

**Comment**

46.    Article 6 is a standard provision in modern transnational commercial law instruments. It lists a number of criteria for the implementation, interpretation and application of the draft Convention. The provision refers specifically to the draft Convention's purposes, to the general

principles on which it is based, to its international character and to the need to promote uniformity and predictability in its application. Sources to define these criteria further are the documents prepared in the course of the work on the text of the draft Convention by the initial Study Group and the Committee of Governmental Experts, as well as the future preamble to the Convention.

## CHAPTER II – RIGHTS OF THE ACCOUNT HOLDER

### *Article 7*
### *Intermediated securities*

**1.    The credit of securities to a securities account confers on the account holder:**

**(a)    the right to receive and exercise the rights attached to the securities, including in particular dividends, other distributions and voting rights:**

**(i)    where the account holder is not an intermediary or is an intermediary acting for its own account; and,**

**(ii)    in any other case, if provided by the non-Convention law;**

**(b)    the right, by instructions to the relevant intermediary, to effect a disposition under Article 9 or grant an interest under Article 10;**

**(c)    the right, by instructions to the relevant intermediary, to cause the securities to be held otherwise than through a securities account, to the extent permitted by the law under which the securities are constituted, the terms of the securities, the non-Convention law and, to the extent permitted by the non-Convention law, the account agreement or the uniform rules of a securities settlement system;**

**(d)    unless otherwise provided in this Convention, such other rights, including rights and interests in securities, as may be conferred by the non-Convention law.**

**2.    Unless otherwise provided in this Convention:**

**(a)    the rights referred to in paragraph 1 are effective against third parties;**

**(b)    the rights referred to in paragraph 1(a) may be exercised against the relevant intermediary or the issuer of the securities, or both, in accordance with this Convention, the terms of the securities and the law under which the securities are constituted;**

**(c)    the rights referred to in paragraph 1(b) and 1(c) may be exercised only against the relevant intermediary.**

**3.    Where an account holder has acquired a security interest, or a limited interest other than a security interest, by credit of securities to its securities account under Article 9(4), the non-Convention law determines any limits on the rights described in paragraph 1 <span style="color:red">of this Article</span>.**

**Comment**

47.     Article 7 sets out rights of an account holder which are enforceable against third parties. Only a credit of securities to a securities account in accordance with Article 9 can confer the rights mentioned in Article 7. Article 7 does not relate to rights arising from interests provided under Article 10, but under non-Convention law, similar or identical rights arising from a credit can be conferred in the event of other arrangements such as a designating entry.

48.     Article 7(1)(a) provides for a first category of rights that arise from a credit, i.e. the right to receive and exercise the rights attached to the securities, such as, in particular, dividends, other distributions and voting rights. Under Article 7(2)(b), such rights may be exercised against the relevant intermediary, the issuer of the securities, or both.

49.     Article 7(1)(b) confers the right to dispose of the securities involved in accordance with the methods set out in either Article 9 or 10 by giving an instruction to the relevant intermediary. Article 7(1)(c), in brief, relates to the right to remove securities from the intermediated holding system. Under Article 7(2)(c) the rights set out in paragraphs 1(b) and 1(c) may only be exercised against the relevant intermediary.

50.     A credit may also imply other rights conferred by the non-Convention law, unless the draft Convention provides otherwise (see Article 7(1)(d)).

51.     Article 7(3) determines that if a limited interest effective against third parties has been established by way of the credit method set out in Article 9, the non-Convention law regulates and limits the kind of rights one receives under Article 7 with respect to that interest, by providing, for example, that a collateral provider has a right of redemption or that, upon default, encumbered assets must be sold in a prescribed manner.

*Article 8*
*Measures to enable account*
*holders to receive and exercise rights*

**1.     An intermediary must take appropriate measures to enable its account holders to receive and exercise the rights specified in Article 7(1), but this obligation does not require the relevant intermediary to take any action that is not within its power or to establish a securities account with another intermediary.**

**2.     This Chapter does not affect any right of the account holder against the issuer of the securities.**

**Comment**

52.     Article 8(1) sets limits to the obligations of an intermediary towards account holders. An intermediary must ensure that account holders can receive and exercise the rights set out in Article 7(1). This means, for example, that an intermediary must ensure that it can act adequately upon instructions from its account holders so that they can dispose effectively of their securities. However, the intermediary is not required to take actions that are not within its power. For example, in the light of contractual and regulatory provisions, it may not be required to act against

an issuer which fails to make dividend payments. Moreover, the intermediary is not obliged to open an account with another intermediary in order to enable its account holders to receive and exercise their rights effectively. Note that the English version of Article 8(1) speaks of 'relevant intermediary' where the French version, more generally, speaks of 'intermédiaire'.

53.     Article 8(2) is to be read in close connection with Article 8(1). Its aim is to ensure that the intermediary's obligation to take appropriate measures and the limitations thereto under Article 8(1) do not affect any direct rights of the account holder against the issuer. In the example given above, this means that the account holder itself can initiate legal proceedings against the issuer which failed to make dividend payments, if this is permitted under the non-Convention law.


## CHAPTER III – TRANSFER OF INTERMEDIATED SECURITIES


### *Article 9*
### *Acquisition and disposition by debit and credit*

**1.     Subject to Article 13, intermediated securities are acquired by an account holder by the credit of securities to that account holder's securities account.**

**2.     No further step is necessary, or may be required by the non-Convention law, to render the acquisition of intermediated securities effective against third parties.**

**3.     Subject to Article 13, intermediated securities are disposed of by an account holder by the debit of securities to that account holder's securities account.**

**4.     A security interest, or a limited interest other than a security interest, in intermediated securities may be acquired and disposed of by debit and credit of securities to securities accounts under this Article.**

**5.     Nothing in this Convention limits the effectiveness of debits and credits to securities accounts which are effected on a net basis in respect of securities of the same description.**


**Comment**

54.     Article 9 is the first of three provisions of the draft Convention that relate to the methods that can be used to transfer securities or establish a security interest or other limited interest therein. Article 9 sets out the debit/credit method, which must be available in all Contracting States. Article 10 provides for other methods, in particular automatic perfection, designating entry and control agreement, which can be applied only if a declaration to that end has been made. In addition to these two provisions setting out treaty methods, Article 11 relates to methods available under the non-Convention law.

55.     Paragraphs (1) and (2) of Article 9 provide that an account holder can acquire intermediated securities by way of a credit. No further steps are necessary or may be required under the non-Convention law to ensure the effectiveness of such acquisition against third parties. Paragraph (3) relates to the opposite scenario of an account holder which disposes of intermediated securities by way of a debit to its securities account. It should be noted that Article 9 does not deal with validity or reversibility of credits or debits, and that these matters are dealt with by Article 13.

56.     Paragraph (4) enables parties to create a security or other limited interest in respect of intermediated securities by way of a debit and credit to securities accounts. The types of security and other limited interests that can be created under paragraph (4) are determined by non-Convention law.

57.     Paragraph (5) recognises systems in which debits and credits can be effected on a net basis in respect of securities of the same description, but is not a mandatory provision that would oblige Contracting States to allow debits and credits to be made on a net basis.

### Article 10
### Grant of interests in intermediated securities by other methods

**1.     An account holder grants an interest in intermediated securities, including a security interest or a limited interest other than a security interest, to another person so as to be effective against third parties if:**

**(a)     the account holder enters into an agreement with or in favour of that person; and**

**(b)     one of the conditions specified in paragraph 2 applies and the relevant Contracting State has made a declaration in respect of that condition under paragraph 4,**

**and no further step is necessary, or may be required by the non-Convention law, to render the interest effective against third parties.**

**2.     The conditions referred to in paragraph 1(b) are as follows:**

**(a)     that the person to whom the interest is granted is the relevant intermediary;**

**(b)     that a designating entry in favour of that person has been made;**

**(c)     that a control agreement in favour of that person applies.**

**3.     An interest in intermediated securities may be granted under this Article so as to be effective against third parties:**

**(a)     in respect of a securities account (and such an interest extends to all intermediated securities from time to time standing to the credit of the relevant securities account);**

**(b)     in respect of a specified category, quantity, proportion or value of the intermediated securities from time to time standing to the credit of a securities account.**

**4.     A Contracting State may declare that under its law:**

**(a)     the condition specified in any one or more of sub-paragraphs (a) to (c) of paragraph 2 is sufficient to render an interest effective against third parties;**

**(b)     this Article shall not apply in relation to interests in intermediated securities granted by or to parties falling within such categories as may be specified in the declaration;**

**(c)     paragraph 3, or either sub-paragraph of paragraph 3, does not apply;**

**(d)     paragraph 3(b) applies with such modifications as may be specified in the declaration.**

**5.     A declaration in respect of paragraph 2(b) shall specify whether a designating entry has the effect described in Article 1(l)(i) or Article 1(l)(ii) or both.**

**6.     A declaration in respect of paragraph 2(c) shall specify whether a control agreement must include the provision described in Article 1(k)(i) or Article 1(k)(ii) or both.**

**7.     The non-Convention law determines in what circumstances a non-consensual security interest in intermediated securities may arise and become effective against third parties.**

**Comment**

58.     Article 10 sets out other methods than the debit/credit method provided for in Article 9 in order to create a security or other limited interest in intermediated securities so as to be effective against third parties. This means that the same types of rights and interests can be provided under both provisions, only the method of doing so being different.

59.     A key provision of Article 10 is paragraph (2), which sets out three different ways ('conditions') in which an interest in intermediated securities may be granted. First, such an interest arises automatically where the holder of a securities account grants an interest in favour of the relevant intermediary of that account. The rationale for such self-perfection is that the relevant intermediary has control over the account. Secondly, an interest may be granted by making a designating entry. Thirdly, an interest may arise where a control agreement has been concluded. Definitions of 'designating entry' and 'control agreement' are set out in Article 1(k) and (l).

60.     In order for these three methods to grant an effective interest, paragraph (1) sets out the requirement that there must be an agreement between the account holder and the person to whom it wishes to grant an interest, typically the collateral taker. Such an agreement does not have to meet any formal requirements. Moreover, paragraph (1) makes it clear that the methods set out in paragraph (2) can be applied only if a Contracting State has made a declaration to that end. Such a declaration specifies which of the methods set out in paragraph (2) apply and may also specify categories of parties to which Article 10 does not apply at all (see paragraphs (4)(a) and (b)). Paragraphs (5) and (6) relate to the specific content of the declaration in the case of a designating entry or a control agreement which may, in line with Article 1(k) and (l), result in

'negative control' or 'positive control'. Paragraphs (5) and (6) determine that it is up to each Contracting State – and not to the parties involved – to specify which kind of control must be established for the designating entry to be effective against third parties under the law of that State. Besides the requirement that there must be an agreement and the declaration requirement, no further step is necessary or may be required under the non-Convention law to render an Article 10 interest effective against third parties.

61.     Under paragraph (3), an interest may be granted in respect of a securities account and such an interest, e.g. a floating charge, extends to all intermediated securities credited from time to time to that account. Moreover, an interest may be granted in respect of a specified category, quantity, proportion or value of the intermediated securities credited from time to time to a securities account. Because the types of interest mentioned in paragraph (3) may not be available in all Contracting States, paragraphs (4)(c) and (d) give Contracting States the option to limit the scope of application of paragraph (3) by way of a declaration. In such a declaration, paragraph (3) may be disapplied in part or entirely, while paragraph 3(b) may also be modified.

62.     Paragraph (7) allows non-consensual security interests in intermediated securities under non-Convention law.

### Article 11
### Other methods under non-Convention law

    This Convention does not preclude any method provided by the non-Convention law:

    (a)     for the acquisition or disposition of intermediated securities or of an interest in intermediated securities;

    (b)     for the creation of an interest in intermediated securities and for making such an interest effective against third parties,

    other than the methods provided by Articles 9 and 10.

**Comment**

63.     In addition to the treaty methods set out in Articles 9 and 10, Article 11 allows methods provided by the non-Convention law in order to transfer intermediated securities or to create a security or other limited interest therein.

### Article 12
### Evidential requirements

    The non-Convention law determines the evidential requirements in respect of the matters referred to in Articles 9 and 10.

**Comment**

64.     Article 12 reflects the general approach taken by the draft Convention that evidential requirements are covered by the non-Convention law. Article 12 deals specifically with the matters referred to in Articles 9 and 10. This means, for example, that the non-Convention law determines

how a debit and credit entry (Article 9) as well as an agreement between the parties and a designating entry (Article 10) may be evidenced. The question of whether the absence of a written document leads to invalidity of a right or interest provided, i.e. referring not to a matter of evidence but to a matter of formal validity (formalities), is also covered by the non-Convention law.

### *Article 13*
### *Invalidity and reversal*

**1.    A debit of securities to a securities account or a designating entry is invalid if the relevant intermediary is not authorised to make that debit or designating entry:**

**(a)    by the account holder and, in the case of a debit or designating entry that relates to intermediated securities which are subject to an interest granted under Article 10, by the person to whom that interest is granted; or**

**(b)    by the non-Convention law.**

**2.    Subject to Article[s] 14 [and 15], the non-Convention law and, to the extent permitted by the non-Convention law, an account agreement or the uniform rules of a securities settlement system determine:**

**(a)    subject to paragraph 1(a), the validity of a debit, credit or designating entry;**

**(b)    whether a debit, credit or designating entry is liable to be reversed;**

**(c)    where a debit, credit or designating entry is liable to be reversed, its effect (if any) against third parties and the consequences of reversal;**

**(d)    whether and in what circumstances a debit, credit or designating entry may be made subject to a condition; and**

**(e)    where a debit, credit or designating entry is made subject to a condition, its effect (if any) against third parties before the condition is fulfilled and the consequences of the fulfilment or non-fulfilment of the condition.**

**Comment**

65.    Article 13 addresses three topics: the (in)validity of a credit, debit or designating entry, the reversal of such book entries, and conditional book entries.

66.    Paragraph (1) protects account holders by determining that a debit of securities to a securities account or a designating entry is invalid if the relevant intermediary is not authorised to make that debit or designating entry. Authorisation can be given by the account holder or by a person who has been granted an interest in the securities concerned under Article 10. The relevant intermediary may also be authorised to make a debit or a designating entry by the non-Convention law. As the purpose of paragraph (1) is to protect account holders against unauthorised book entries to their detriment, it does not cover credits.

67.     Validity is also the topic of paragraph (2)(a), which makes it clear that the issue of validity of a debit, credit or designating entry is to be determined under the non-Convention law and, to the extent permitted by the non-Convention law, by an account agreement or the uniform rules of a securities settlement system. This reference to such non-treaty rules is, however, subject to the treaty rule protecting account holders set out in paragraph (1)(a).

68.     Paragraph 2(b) and (c) relate to the question of whether a debit, credit or designating entry is liable to be reversed and, if this is the case, what the consequences of such reversal are, including its effect (if any) against third parties. These issues are also referred to the non-Convention law, or to an account agreement or the uniform rules of a settlement system.

69.     Likewise, such non-treaty rules determine whether and in what circumstances a debit, credit or designating entry may be made subject to a condition, and, if applicable, the effect thereof (if any) against third parties, as well as the consequences of the fulfilment or non-fulfilment of the condition (see paragraph 2(d) and (e)).

70.     The rules set out in Article 13(2) are subject to Article 14 relating to the acquisition of intermediated securities by an innocent person. The square brackets in the heading of Article 13(2) express that it is yet to be determined whether this provision should also be made subject to Article 15.

### *Article 14*
### *Acquisition by an innocent person of intermediated securities*

**1.    Where securities are credited to the securities account of an account holder at a time when the account holder does not know that another person has an interest in securities or intermediated securities and that the credit violates the rights of that other person with respect to that interest:**

**(a)    the account holder is not subject to the interest of that other person;**

**(b)    the account holder is not liable to that other person; and**

**(c)    the credit is not invalid or liable to be reversed on the ground that the interest or rights of that other person invalidate any previous debit or credit made to another securities account.**

**2.    Where securities are credited to the securities account of an account holder, or an interest becomes effective against third parties under Article 10, at a time when the account holder or the person to whom the interest is granted does not know of an earlier defective entry:**

**(a)    the credit or interest is not rendered invalid, ineffective against third parties or liable to be reversed as a result of that defective entry; and**

**(b)    the account holder, or the person to whom the interest is granted, is not liable to anyone who would benefit from the invalidity or reversal of that defective entry.**

**3.**   **Paragraphs 1 and 2 do not apply in respect of an acquisition of securities, other than the grant of a security interest, made by way of gift or otherwise gratuitously.**

**4.**   **For the purposes of this Article:**

**(a)**   **"*defective entry*" means a credit of securities or designating entry which is invalid or liable to be reversed, including a conditional credit or designating entry which becomes invalid or liable to be reversed by reason of the operation or non-fulfilment of the condition [ ;**

**(b)**   **a person knows of an interest or fact if that person:**

**(i)**   **has actual knowledge of the interest or fact; or**

**(ii)**   **has knowledge of facts sufficient to indicate that there is a significant probability that the interest or fact exists and deliberately avoids information that would establish that this is the case; and**

**(c)**   **when the person referred to in <span style="color:red">sub-paragraph</span> (b) is an organisation, it knows of an interest or fact from the time when the interest or fact is or ought reasonably to have been brought to the attention of the individual responsible for the matter to which the interest or fact is relevant ].**

**5.**   **To the extent permitted by the non-Convention law, paragraph 2 is subject to any provision of the uniform rules of a securities settlement system or of the account agreement.**

## Comment

71.    Article 14 provides protection to innocent acquirers of intermediated securities. This provision reflects the general idea that once a person has acquired a right over intermediated securities for value and without notice or constructive notice, no adverse claim can be asserted against that person. Article 14 sets out a 'last-in-time' priority rule that is primarily associated with the debit/credit method.

72.    The text contemplates two different but analogous scenarios. Paragraph (1) ensures the protection of an account holder against any competing claim from another person. In this case, the provision protects the account holder if it does not know that (i) another person has an interest in the securities or intermediated securities and (ii) the credit violates the rights of that other person. If those conditions are met, the account holder is 'immunised', i.e., the account holder (i) is not subject to the interest of the other person; (ii) is not liable to the adverse claimant; and (iii) the credit is not invalid or liable to be reversed.

73.    Paragraph (2), in turn, protects account holders - or holders of an interest under Article 10 - against risks relating to an 'earlier defective entry' (as defined in paragraph (4)(a)). In this case, the innocent acquirer (i.e. the acquirer that is unaware of an earlier defective entry) and its rights over the intermediated securities are also immunised: the credit or interest is not rendered invalid, ineffective against third parties or liable to be reversed, and the acquirer is not liable to anyone who would benefit from the invalidity or reversal of the defective entry. This paragraph is not primarily aimed at protection of the account holder against a particular claimant (as is paragraph (1)), but against reversal by its intermediary based on some defective entry. To the extent

permitted by the non-Convention law, this provision may be subject to the uniform rules of a securities settlement system or of an account agreement (see paragraph (5)).

74.     It follows from Article 14(3) that only innocent acquirers for value are protected, i.e., the protection offered by that provision does not apply in respect of acquisitions of securities made by way of gift or otherwise gratuitously. A security interest granted by one person to secure the obligations of another person should not be considered as gratuitous.

75.     The protection offered by Article 14 is not based on a general clause of good faith, but on a neutral 'test of knowledge or wilful blindness' as elaborated in paragraph (4)(b). A person disqualifies for the protection afforded by Article 14 in two cases:

-    if it has actual knowledge of an interest or fact; or

-    if it has knowledge of facts sufficient to indicate that there is a significant probability that the interest or fact exists and deliberately avoids information that would establish that this is the case. Mere negligence is not enough. The test requires 'wilful blindness', which means that the person (i) is aware of the presence of a certain degree of suspicious circumstance ('a significant probability') and (ii) deliberately avoids actual knowledge.

76.     In addition, Article 14(4)(c) deals with the application of the test of knowledge to an organisation, such as a company, an association, a public entity or the like. To attribute knowledge to an organisation, mere knowledge of any person connected with that organisation is not sufficient. The key element is, rather, that the person responsible for the matter has or ought to have had knowledge.

77.     Article 14(4)(b) and (c) was placed in square brackets during the fourth session of the Committee of Governmental Experts and is currently under discussion by an informal Working Group.

### Article 15
### Priority among competing interests

**1.     This Article determines priority between interests in the same intermediated securities which become effective against third parties under Article 10 or Article 11.**

**2.     Subject to paragraph 5 and Article 16, interests that become effective against third parties under Article 10 have priority over any interest that becomes effective against third parties by any other method provided by the non-Convention law.**

**3.     Interests that become effective against third parties under Article 10 rank among themselves according to the time of occurrence of the following events:**

**(a)     if the relevant intermediary is itself the holder of the interest, when the agreement granting the interest is entered into;**

**(b)     when a designating entry is made;**

**(c)     when a control agreement is entered into, or, if applicable, a notice is given to the relevant intermediary.**

**4.   Where an intermediary has an interest that has become effective against third parties under Article 10 and makes a designation or enters into a control agreement with the consequence that an interest of another person becomes effective against third parties, the interest of that other person has priority over the interest of the intermediary unless that other person and the intermediary expressly agree otherwise.**

**5.   A non-consensual security interest in intermediated securities arising or recognised under any provision of the non-Convention law has such priority as is afforded to it by that law.**

**6.   As between persons entitled to any interests referred to in paragraphs 2, 3 and 4 and, to the extent permitted by the non-Convention law, paragraph 5, the priorities provided by this Article may be varied by agreement between those persons, but any such agreement does not affect third parties.**

**Comment**

78.   Article 15 determines the priority among interests in the same intermediated securities which become effective against third parties under Article 10 or Article 11. Article 15 sets out a first-in-time priority rule and does not apply to the credit method set out in Article 9, since in this case it is primarily the last-in-time priority rule of Article 14 that applies.

79.   Paragraph (2) relates to the scenario where there are two competing interests, one that has been established under Article 10 and another that has been created under non-Convention law (Article 11). In such cases, the interest established under Article 10 has priority irrespective of the time at which it was created.

80.   Paragraph (3) relates to cases of competing Article 10 interests, in which ranking is determined on the basis of a traditional first-in-time rule. The time of occurrence is specified for the following events. Where the relevant intermediary is both the holder of the intermediated securities concerned and the recipient of an interest therein, the relevant moment in time is the time at which the agreement granting the interest is entered into (see Article 10(2)(a)). For a designating entry, the relevant moment is the time at which the entry is made (see Article 10(2)(b)), and for a control agreement the time at which the agreement is entered into, or, where applicable, the time at which notice is given to the relevant intermediary (see Article 10(2)(c)).

81.   Paragraph (4) relates to the special situation of a conflict between an intermediary's interest that has become effective under Article 10 and an interest of another person that has subsequently become effective on the basis of a designating entry made or a control agreement entered into by that same intermediary. In that case, the interest of the other person prevails over that of the intermediary, unless the other person and the intermediary agree otherwise.

82.   Paragraph (5) sets out a special rule for non-consensual security interests, which are also regulated in Article 10(7). The priority of such security interests will be determined under the non-Convention law.

83.     The priorities set out in paragraphs (2), (3) and (4), as well as the priorities of non-consensual interests under paragraph (5), to the extent permitted by the non-Convention law, may be varied by agreement between the parties involved. Such an agreement, however, does not affect the rights of third parties.

### Article 16
### Priority of interests granted by an intermediary

**1.     Except as provided by paragraph 2, this Convention does not determine the priority or the relative rights and interests between the rights of account holders of an intermediary and interests granted by that intermediary so as to be effective against third parties under Article 10.**

**2.     An interest in intermediated securities granted by an intermediary so as to become effective against third parties under Article 10 has priority over the rights of account holders of that intermediary if at the time the interest becomes so effective [the test in Article 14 is satisfied].**

**Comment**

84.     Article 16 provides special rules to establish the priority of rights of account holders of an intermediary and holders of effective interests that have been granted by the intermediary under Article 10 (e.g., typically in a situation where the intermediary exercises a 'right of use' and grants a security interest for its collateral taker). The general approach of Article 16(1) is that this issue is governed by the non-Convention law. However, Article 16(2) provides for one exception: when a holder of an effective interest obtained from an intermediary under Article 10, such as a collateral taker, satisfies the test set out in Article 14 relating to innocent acquisition at the time the interest was provided, that interest prevails over the rights of account holders. The reference to Article 14 in paragraph (2) is placed in square brackets, because Article 14(4)(b) and (c) are in square brackets.

### CHAPTER IV – INTEGRITY OF THE INTERMEDIATED HOLDING SYSTEM

### Article 17
### Effectiveness of rights in insolvency proceedings

**1.     The rights of an account holder under Article 7(1), and an interest that has become effective against third parties under Article 10, are effective against the insolvency administrator and creditors in any insolvency proceeding in respect of the relevant intermediary or in respect of any other person responsible for the performance of a function of the relevant intermediary under Article 5.**

**2.    Nothing in this Convention impairs the effectiveness of an interest in intermediated securities against the insolvency administrator and creditors in any insolvency proceeding where that interest is effective under the non-Convention law.**

**Comment**

85.    The purpose of Article 17 is to guarantee the effectiveness of the rights of account holders in any insolvency proceeding in respect of the relevant intermediary. In line with the definition of 'insolvency proceeding' in Article 1(h), this may be a proceeding with the purpose of reorganisation or liquidation.

86.    Paragraph (1) relates to the effectiveness of rights arising in connection with a credit, as well as to interests that have become effective against third parties under one of the methods set out in Article 10. Such rights and interests are effective against the insolvency administrator and the creditors of the insolvent relevant intermediary, as well as, in the case of a transparent system (cf. Introduction, paragraph (6) and the comment to Article 5), against any other person responsible for the performance of a function of the relevant intermediary.

87.    Paragraph (2) reflects that, as a rule, also interests provided under non-Convention law, which are allowed under Article 11, are effective in the event of insolvency proceedings.

*Article 18*
*Effects of insolvency*

**Subject to Article 24 and Article 33, nothing in this Convention affects:**

**(a)    any rules of law applicable in insolvency proceedings relating to the avoidance of a transaction as a preference or a transfer in fraud of creditors; or**

**(b)    any rules of procedure relating to the enforcement of rights to property which is under the control or supervision of an insolvency administrator.**

**Comment**

88.    Article 18 of the draft Convention, which was inspired by Article 30(3) of the Cape Town Convention on International Interests in Mobile Equipment, determines that the draft Convention does not affect two specific insolvency issues. Paragraph (a) exempts rules of law relating to the avoidance of a transaction as a preference or a transfer in fraud of creditors, while paragraph (b) excludes procedural rules relating to the enforcement of rights to property, such as a security interest, when that property is under the control or supervision of an insolvency administrator. These issues are therefore governed by non-Convention law.

89.    The exemptions referred to are, however, subject to Articles 24 and 33. This implies a prevalence of the rules set out in Article 24 on the effectiveness in insolvency of instructions to make book entries and of the resulting book entries, as well as those of Article 33 relating to the protection of top-up and substitution arrangements in the case of collateral transactions.

### Article 19
### Prohibition of upper-tier attachment

**1.    Subject to paragraph 3, no attachment of intermediated securities of an account holder shall be made against, or so as to affect:**

**(a)    a securities account of any person other than that account holder;**

**(b)    the issuer of any securities credited to a securities account of that account holder; or**

**(c)    a person other than the account holder and the relevant intermediary.**

**2.    In this Article *"attachment of intermediated securities of an account holder"* means any judicial, administrative or other act or process to freeze, restrict or impound intermediated securities of that account holder in order to enforce or satisfy a judgment, award or other judicial, arbitral, administrative or other decision against or in respect of that account holder or in order to ensure the availability of such intermediated securities to enforce or satisfy any future such judgment, award or decision.**

**3.    A Contracting State may declare that under its non-Convention law an attachment of intermediated securities of an account holder made against or so as to affect a person other than the relevant intermediary has effect also against the relevant intermediary. Any such declaration shall identify that other person by name or description and shall specify the time at which such an attachment becomes effective against the relevant intermediary.**


**Comment**

90.    Article 19(1) prohibits so-called upper-tier attachment, which means that a creditor cannot attach positions held for its debtor at any level in the chain above its debtor's immediate intermediary. This approach is based on two important policy considerations. The first reason for a general rule prohibiting upper-tier attachment is that an attachment should not be permitted in circumstances where it undermines the ability of an intermediary to perform its functions. In particular, an attachment order should not block securities accounts of other account holders which have nothing to do with the subject-matter of the attachment. The second reason is that upper-tier attachment is not compatible with the ability of an account holder or someone dealing with an account holder at a lower level in the holding chain to rely on the position as it is apparently stated on the account. If an account at a lower level appears to show the ability of the account holder to transfer or pledge securities credited to that account, then, if in fact these securities are encumbered by an attachment order at a higher tier, the account holder or persons dealing with the account holder at the lower level may, in the absence of information about the attachment order, be misled. This in turn would have a negative impact on the overall integrity of the intermediated securities holding system.

91.    Paragraph (1) reflects that an attachment must be made against, or so as to affect, the account holder or the relevant intermediary and must relate to the account holder's account. This provision leaves room for different procedural approaches. In particular, the formula 'so as to

affect' allows a national general rule under which a technical addressee, for example a State official, receives an attachment order for the account holder or the relevant intermediary. An attachment directed against the issuer of securities credited to a securities account of the account holder concerned is explicitly prohibited.

92.      Paragraph (2) supplies a definition of an 'attachment of intermediated securities of an account holder'.

93.      Article 19(3) contains an exception to the rule set out in Article 19(1) which stems from the discussion during the fourth session of the Committee of Governmental Experts regarding transparent systems. Article 19(3) stands independently from the general provision in Article 5 on the sharing of functions in transparent systems. The purpose of Article 19(3) is to protect the functioning of such systems by envisaging that an attachment order may be served on entities other than the relevant intermediary if a Contracting State makes a declaration to that end. For example, in certain systems a central securities depository is the entity where the attachment is made and whence the information about the order is transferred to the relevant intermediary at a lower level in the chain, or, on the contrary, an account operator receives an attachment order and transfers it to the central securities depository that is the relevant intermediary higher up in the chain. As in paragraph (1), the words 'so as to affect' mean that also in those scenarios technical addressees, such as State officials, are recognised.

94.      Since the time at which the attachment order is served on the entity other than the relevant intermediary may be earlier than the time at which the relevant intermediary is informed thereof, the declaration must specify at which point in time the attachment becomes effective against the relevant intermediary.

### Article 20
### Instructions to the intermediary

**1.      An intermediary is neither bound nor entitled to give effect to any instructions with respect to intermediated securities of an account holder given by any person other than that account holder.**

**2.      Paragraph 1 is subject to:**

**(a)      the provisions of the account agreement, any other agreement between the intermediary and the account holder or any other agreement entered into by the intermediary with the consent of the account holder;**

**(b)      the rights of any person (including the intermediary) who holds an interest that has become effective against third parties under Article 10;**

**(c)      subject to Article 19, any judgment, award, order or decision of a court, tribunal or other judicial or administrative authority of competent jurisdiction;**

**(d)      any applicable provision of the non-Convention law; and**

**(e)      where the intermediary is the operator of a securities settlement system, the uniform rules of that system.**

**Comment**

95.     The general rule set out in Article 20, paragraph 1, is that an intermediary is only bound and entitled to give effect to instructions with regard to intermediated securities of an account holder where these have been given by that account holder.

96.     Paragraph 2 contains a number of exceptions to this general rule in order to accommodate arrangements between the intermediary and the account holder, decisions of courts and other competent authorities, rules of the non-Convention law and the needs of securities settlement systems. More in particular, an intermediary can be bound by and entitled to give effect to instructions given by other persons than the account holder in the following cases:

(a)     where this is provided for in the account agreement (defined in Article 1(f)) or any other agreement between the account holder and the intermediary, or in any other agreement entered into by the intermediary with the consent of the account holder;

(b)     where this follows from the rights of a person (including the intermediary) who has obtained an interest under Article 10, on the basis of automatic perfection, a designating entry or a control agreement;

(c)     where this is set out in any judgement, award, order or decision of a court or other authority of the competent jurisdiction; this exception, however, cannot encroach upon the prohibition of upper-tier attachment set out in Article 19;

(d)     where this follows from an applicable provision of the non-Convention law;

(e)     where the intermediary operates a securities settlement system and the uniform rules of the system contain a provision to that end.

### Article 21
### Holding or availability of sufficient securities

**1.     An intermediary must, for each description of securities, hold or have available for the benefit of its account holders other than itself securities and intermediated securities of an aggregate number or amount equal to the aggregate number or amount of securities of that description credited to securities accounts which it maintains for such account holders.**

**2.     An intermediary may comply with paragraph 1:**

**(a)     by procuring that securities are held on the register of the issuer in the name, or for the account, of its account holders;**

**(b)     by holding securities as the registered holder on the register of the issuer;**

**(c)     by possession of certificates or other documents of title;**

**(d)     by holding intermediated securities with another intermediary; or**

**(e)     by any other appropriate method.**

**3.    If at any time the requirements of paragraph 1 are not complied with, the intermediary must within the time provided by the non-Convention law take such action as is necessary to ensure compliance with those requirements.**

**4.    This Article does not affect any provision of the non-Convention law, or, to the extent permitted by the non-Convention law, any provision of the uniform rules of a securities settlement system or of an account agreement, relating to the method of complying with the requirements of this Article or the allocation of the cost of ensuring compliance with those requirements or otherwise relating to the consequences of failure to comply with those requirements.**

**Comment**

97.    Article 21 relating to the holding or availability of sufficient securities is important from the point of view of the protection of account holders. It determines that an intermediary must hold or have available sufficient securities, e.g. as a holding with another intermediary or in the form of certificates, so that the total number of securities thus held or available equals the total amount of securities credited on the securities accounts of account holders other than the intermediary itself.

98.    Paragraph 2 contains an open-ended list of ways in which an intermediary may comply with the requirement set out in paragraph 1. The intermediary may, for example, ensure a holding of securities on the register of the issuer in its own name or in the name or for the account of its account holders, have certificates or other documents of title in possession, or hold intermediated securities with another 'upper-tier' intermediary.

99.    In accordance with paragraph 3, the non-Convention law determines within which timeframe an intermediary must take action in order to ensure compliance with the requirements set out in paragraph 1.

100.    Provisions of the non-Convention law or, to the extent permitted by the non-Convention law, any provision of the uniform rules of a securities settlement system or of an account agreement may set out rules in respect of two additional issues. First, they may specify the method of compliance with the obligation to hold or have available sufficient securities. For example, the rules of a securities settlement system may permit temporary, intra-day shortages. Secondly, they may determine the allocation of the cost of ensuring compliance and other consequences of a failure to comply with the requirement to hold or have available sufficient securities.

101.    Article 21 not only applies to securities accounts, but also reaches issuer accounts or registers on which a central securities depository or another entity registers information about securities issued, such as the total volume of an issue, the nominal value of separate securities, interest rates, etc. In order to guarantee the integrity of the system, the number of securities registered on the issuer account must coincide with the number of securities registered on securities accounts of account holders by an intermediary. The intermediary is held to correct an imbalance in accordance with paragraphs (2), (3) and (4) of Article 21.

### Article 22
*Allocation of securities to account holders' rights*

**1.    Securities and intermediated securities of each description held by an intermediary as described in Article 21(2) shall be allocated to the rights of the account holders of that intermediary to the extent necessary to ensure compliance with Article 21(1).**

**2.    Subject to Article 16, securities and intermediated securities allocated under paragraph 1 shall not form part of the property of the intermediary available for distribution among or realisation for the benefit of creditors of the intermediary.**

**3.    The allocation required by paragraph 1 shall be effected by the non-Convention law and, to the extent required or permitted by the non-Convention law, by arrangements made by the relevant intermediary.**

**4.    The arrangements referred to in paragraph 3 may include arrangements under which an intermediary holds securities and intermediated securities in segregated form:**

**(a)    for the benefit of its account holders generally; or**

**(b)    for the benefit of particular account holders or groups of account holders,**

**in such manner as to ensure that such securities and intermediated securities are allocated in accordance with paragraph 1.**

**5.    A Contracting State may declare that under its non-Convention law the allocation required by paragraph 1 applies only to securities and intermediated securities that are held by an intermediary in segregated form under arrangements such as are referred to in paragraph 4 and does not apply to securities and intermediated securities held by an intermediary for its own account.**

**Comment**

102.    Article 22 relates to the allocation of securities and intermediated securities. The principal purpose of this provision is to protect account holders by ensuring that enough of an intermediary's securities or intermediated securities are allocated so as to cover these account holders' rights.

103.    For example, an intermediary holds a total of 200 securities and wishes to allocate 100 of them to its account holders and the remaining 100 to itself. However, it maintains securities accounts in which a total of 150 securities are credited to its account holders' accounts. The question is whether part of the securities which the intermediary intended to allocate to itself, that is, 50, should be deemed to be allocated to the account holders. Under Article 22(1), sufficient securities, that is, at least 150, must be allocated to the account holders. Under paragraph 1, the 200 securities held by the intermediary must be allocated to the account holders 'to the extent necessary to ensure compliance with Article 21', which means that 150 out of 200 securities are allocated to the customers. This applies irrespective of whether the 200 securities held by the intermediary are in one account or in two segregated accounts of 100 each.

104.    Paragraphs (2), (3) and (4) relate to the consequences and methods of allocation. Paragraph (2) states that securities or intermediated securities that are allocated to account holders do not form part of the intermediary's property and are not available to the creditors of the intermediary. This provision is, however, subject to Article 16, which means that the priority given in that provision to the intermediary's secured creditors over account holders also applies in insolvency cases.

105.    Paragraphs (3) and (4) relate to methods to comply with the allocation requirement. Paragraph (3) refers in this respect to the non-Convention law and, to the extent required or permitted by that law, to arrangements made by the relevant intermediary. This latter method is elaborated upon in paragraph (4), which specifies two kinds of segregation arrangements: either for the benefit of account holders generally or for the benefit of particular account holders or groups of account holders.

106.    If the law of a Contracting State allows segregation between an intermediary's own and its customer accounts - in the example, 100 and 100 -, paragraph (5) permits the recognition by that State of a rule providing that the 100 securities in the intermediary's own account do not go to customers. In such a jurisdiction, the result is that the intermediary is obliged to rectify the situation with respect to 50 securities in accordance with Article 21. If the intermediary does not rectify the position accordingly and becomes insolvent, a shortfall occurs, in which case the loss allocation rule of Article 23 applies.

### Article 23
### Loss sharing in case of insolvency of the intermediary

**1.     This article applies in any insolvency proceeding in respect of an intermediary unless otherwise provided by any conflicting rule applicable in that proceeding.**

**2.     If the aggregate number or amount of securities <span style="color:red">and intermediated securities</span> of any description allocated under Article 22 to an account holder, a group of account holders or the intermediary's account holders generally is less than the aggregate number or amount of securities of that description credited to the securities accounts of that account holder, that group of account holders or the intermediary's account holders generally (as the case may be), the shortfall shall be borne:**

**(a)     where securities <span style="color:red">and intermediated securities</span> have been allocated to a single account holder, by that account holder;**

**(b)     in any other case, by the account holders to whom the relevant securities have been allocated, in proportion to the respective number or amount of securities of that description credited to their securities accounts.**

**3.     To the extent permitted by the non-Convention law, where the intermediary is the operator of a securities settlement system and the uniform rules of the system make provision in case of a shortfall, the shortfall shall be borne in the manner so provided.**

**Comment**

107.    Articles 23 and 24 take up the issue of insolvency again, which is also the subject of Articles 17 and 18. Article 23 provides for a loss sharing rule in the event of insolvency of an intermediary. In particular, this provision relates to the situation where there is a discrepancy between the aggregate number or amount of securities allocated under Article 22 and the aggregate number or amount of securities actually credited to securities accounts of an account holder, a group of account holders or the intermediary's account holders generally. Article 23 sets out a general standard to address this situation, but this standard is subject to any conflicting, non-Convention rule applicable in the insolvency proceeding.

108.    The general standard regarding shortfalls in insolvency is set out in paragraph 2. Where securities have been allocated to a single account holder, the loss is borne by that account holder. In all other cases, the loss is shared among the account holders to whom the securities concerned have been allocated in proportion to the respective number or amount of such securities credited to their securities accounts.

109.    There are cases where the intermediary operates a securities settlement system, which is governed by uniform rules determining what is to be done in the event of a shortfall. In accordance with paragraph 3, such rules are to be given effect to the extent permitted by the non-Convention law.

110.    Article 23 is limited to insolvency situations. Under normal circumstances, the rules of Article 21 relating to the holding or availability of sufficient securities apply.

### *Article 24*
### ~~*Effect of debits, credits etc. and instructions on i*~~*I*nsolvency of operator
### *or participant in securities settlement system*

**1.    To the extent permitted by the non-Convention law, the following provisions shall have effect notwithstanding the commencement of an insolvency proceeding in respect of the operator of the relevant system or any participant in the relevant system:**

**(a)    any provision of the uniform rules of a securities settlement system or of a securities clearing system in so far as that provision precludes the revocation of any instruction given by a participant in the system for making a disposition of securities, or for making a payment relating to an acquisition or disposition of securities, after the time at which that instruction is treated under the rules of the system as having been entered irrevocably into the system;**

**(b)    any provision of the uniform rules of a securities settlement system in so far as that provision precludes the invalidation or reversal of a debit or credit of securities to, or a designating entry in, a securities account which forms part of the system after the time at which that debit, credit or designating entry is treated as irrevocable under the rules of the system.**

**2.    Paragraph 1 applies notwithstanding that any invalidation, reversal or revocation referred to in that paragraph would otherwise occur under any rule applicable in an insolvency proceeding.**

**Comment**

111.    Article 24 relates to the irrevocability of instructions for making book entries and of resulting debits, credits and designating entries. This provision takes the approach that the uniform rules of securities clearing and/or settlement systems relating to these issues must, to the extent permitted by the non-Convention law, have effect, even if insolvency proceedings have been initiated against the operator of the relevant system or any participant therein.

112.    The rules of a securities clearing or settlement system usually determine at which time instructions, which are given by a participant in the system for making a disposal of securities or for making a payment relating to an acquisition or disposal of securities, have been entered into the system irrevocably. Paragraph 1(a) relates to the effectiveness of such rules.

113.    Paragraph 1(b) deals with the effectiveness of rules of a securities settlement system that preclude the invalidation or reversal of a debit or credit of securities to, or a designating entry in, a securities account which forms part of the system from the moment that such book entries are treated as irrevocable under the rules of that system. Paragraph 1(b) is limited to the rules of securities settlement systems because once a debit, credit or designating entry has been made, i.e. when both clearing and settlement have been completed, the rules relating to securities clearing are no longer relevant.

114.    Paragraph 2 places beyond doubt that the uniform rules of securities clearing and settlement systems mentioned in paragraph 1 are effective even where, in other cases, rules applicable in an insolvency proceeding would have led to invalidation, reversal or revocation.

*Article 25*
*Obligations and liability of intermediaries*

**The obligations of an intermediary under this Convention and the extent of the liability of an intermediary in respect of those obligations are subject to any applicable provision of the non-Convention law and, to the extent permitted by the non-Convention law, the account agreement or the uniform rules of a securities settlement system. If the substance of an obligation of an intermediary under this Convention is the subject of any provision of the non-Convention law or, to the extent permitted by the non-Convention law, the account agreement or the uniform rules of a securities settlement system, compliance with that provision satisfies that obligation.**

**Comment**

115.    One of the main topics addressed in Article 25 is the liability of intermediaries. Under this provision, the liability of an intermediary for obligations under the draft Convention is subject to any applicable provision of the non-Convention law and, to the extent permitted by that law, to the account agreement or the uniform rules of a securities settlement system. The second sentence of Article 25 relates to references in the draft Convention to the non-Convention law. Where the substance of an obligation of an intermediary under the draft Convention is the subject of any provision of the non-Convention law or, to the extent permitted by that law, of the account agreement or the uniform rules of a securities settlement system, compliance with that provision satisfies that obligation. This is to prevent intermediaries being subject to a double standard: a treaty standard and the standard set out or permitted under the non-Convention law.

### CHAPTER V – RELATIONSHIP WITH ISSUERS OF SECURITIES

*Article 26*
*Position of issuers of securities*

**1.    The law of a Contracting State shall permit the holding through intermediaries of securities that are permitted to be traded on an exchange or regulated market, and the effective exercise in accordance with Article 7 of the rights attached to such securities which are so held, but need not require that all such securities be issued on terms that permit them to be held through intermediaries.**

**2.    In particular, the law of a Contracting State shall recognise the holding of such securities by a person acting in its own name on behalf of another person or other persons and shall permit such a person to exercise voting or other rights in different ways in respect of different parts of a holding of securities of the same description; but this Convention does not determine the conditions under which such a person is authorised to exercise such rights.**

**3.    This Convention does not determine whom an issuer is required to recognise as the holder of securities.**

**Comment**

116.    Article 26 addresses a few issues related to the position of the issuer in the intermediated holding system. Article 26(1) sets out a standard that is deemed crucial for tradeable securities, in particular, securities that are permitted to be traded on an exchange or regulated market. It must be possible to hold such securities through intermediaries. Moreover, a Contracting State must, as a principle, permit the effective exercise of the rights attached to the securities held through intermediaries in accordance with Article 7. Nonetheless, a Contracting State may allow that certain (types of) securities may be issued on terms that do not require them to be held through an intermediary.

117.    Article 26(2) addresses systems in which securities may be held by a person who acts in its own name but on behalf of another person or other persons. The purpose of this provision is to ensure the recognition of a so-called nominee system in a cross-border context and, as such, to ensure the interoperability of systems. A Contracting State without a nominee system therefore does not need to introduce such a system in its own law, but should recognise the exercise of rights under such a system in force in another State. Such recognition includes so-called split-voting arrangements, in which the person acting in its own name on behalf of another person or other persons exercises voting rights in different ways in respect of different parts of a holding of securities of the same description. For example, A acts for B, C and D in respect of securities of issuer Z, and may vote differently for B, C and D in Z's annual general meeting, according to the instructions it receives from the three investors. Other rights relating to, for example, income payments such as interest or dividend may also be carried out in different ways in respect of different parts of a holding of securities of the same description. Moreover, Article 26(2) leaves to the non-Convention law the issue of the conditions under which rights may be exercised by a person acting in its own name but on behalf of another person or other persons, such as a requirement to disclose for which shareholders voting or other rights are exercised.

118.    In line with the general approach that the draft Convention does not, in principle, address corporate law issues, Article 26(3) provides that the Convention does not determine whom the issuer should recognise as the holder of securities, i.e. the person who is allowed to exercise corporate rights. In the example given above, this means that the question of whether an issuer must recognise A and/or B, C and D as the holder of securities should be determined under the non-Convention law.

*Article 27*
*Set-off*

**1.    As between an account holder who holds intermediated securities for its own account and the issuer of those securities, the fact that the account holder holds the securities through an intermediary or intermediaries shall not of itself, in any insolvency proceeding in respect of the issuer, preclude the existence or prevent the exercise of any rights of set-off which would have existed and been exercisable if the account holder had held the securities otherwise than through an intermediary.**

**2.    This Article does not affect any express provision of the terms of issue of the securities.**

**Comment**

119.    Article 27 deals with the specific question of whether an account holder which holds certain securities for its own account has a right of set-off against the issuer of those securities in the event of the latter's insolvency. In this respect, the draft Convention takes the approach that there must be no discrimination between non-intermediated and intermediated securities. Consequently, where a right of set-off would have existed and would have been exercisable in a non-intermediated context, it also exists, in principle, and may be exercised where the securities are held through one or more intermediaries. The words 'of itself' signal, however, that set-off may be precluded, e.g. on the basis of the rules of a securities clearing or settlement system, the non-Convention law, etc.

120.    Article 27(2) clarifies that set-off may also be precluded on the basis of the terms of issue of the securities concerned.

**CHAPTER VI – SPECIAL PROVISIONS WITH RESPECT TO
COLLATERAL TRANSACTIONS**

*Article 28*
Scope and ~~interpretation in~~ definitions of Chapter VI

**1.   This Chapter applies to collateral agreements under which a
collateral provider grants a security interest in intermediated securities
to a collateral taker in order to secure the performance of any existing,
~~or~~ future or contingent obligation of the collateral provider or a third
person.**

**2.   In this Chapter:**

**(a)   "collateral agreement" means a security collateral
agreement or a title transfer collateral agreement;**

**(b)   "security collateral agreement" means an agreement
between a collateral provider and a collateral taker providing (in
whatever terms) for the grant of an interest other than full ownership in
intermediated securities for the purpose of securing the performance of
relevant obligations;**

**(c)   "title transfer collateral agreement" means an agreement,
including an agreement providing for the sale and repurchase of
securities, between a collateral provider and a collateral taker providing
(in whatever terms) for the transfer of full ownership of intermediated
securities by the collateral provider to the collateral taker for the
purpose of securing or otherwise covering the performance of relevant
obligations;**

**(d)   "relevant obligations" means any ~~present~~existing, future or
contingent obligations of a collateral provider or a third person;**

**(e)   "collateral securities" means intermediated securities
delivered under a collateral agreement;**

**(f)   "collateral taker" means a person to whom an interest in
intermediated securities is granted under a security collateral
agreement or to whom full ownership of intermediated securities is
transferred under a title transfer collateral agreement;**

**(g)   "collateral provider" means an account holder by whom an
interest in intermediated securities is granted under a security collateral
agreement or full ownership of intermediated securities is transferred
under a title transfer collateral agreement;**

**(h)   "enforcement event" means, in relation to a collateral
agreement, an event of default or other event on the occurrence of
which, under the terms of that collateral agreement, the collateral taker
is entitled to enforce its security or operate a close-out netting
provision;**

**(i)   "equivalent collateral" means securities of the same
description as collateral securities;**

     (j)   **"*close-out netting provision*" means a provision of a collateral agreement, or of a set of connected agreements of which a collateral agreement forms part, under which, on the occurrence of an enforcement event, either or both of the following shall occur, or may at the election of the collateral taker occur, whether through the operation of netting or set-off or otherwise:**

       **(i)    the respective obligations of the parties are accelerated so as to be immediately due and expressed as an obligation to pay an amount representing their estimated current value or are terminated and replaced by an obligation to pay such an amount;**

       **(ii)    an account is taken of what is due from each party to the other in respect of such obligations, and a net sum equal to the balance of the account is payable by the party from whom the larger amount is due to the other party.**

**Comment**

121.    Article 28(1) sets out the scope of Chapter VI, which relates to collateral agreements under which collateral is provided to a collateral taker in order to secure any existing, future or contingent obligations of the collateral provider or a third person. The text of this provision may need to be adapted in order to reflect that both security and title transfer collateral agreements are covered by Chapter VI.

122.    Article 28(2) contains a number of definitions specific to Chapter VI. The definitions of 'collateral agreement', 'security collateral agreement' and 'title transfer collateral agreement' make clear that two types of collateral agreements fall within the scope of Chapter VI: security collateral agreements which envisage the grant of an interest in collateral other than transfer of full ownership, such as a right of pledge, and title transfer collateral agreements in which full ownership is provided.

123.    The definition of 'relevant obligations' specifies that collateral may be provided to secure existing, future or contingent obligations of the provider of the collateral or a third person. According to the definition of 'collateral securities', only intermediated securities as defined in Article 1(b) fall within the scope of Chapter VI. The definitions of 'collateral taker' and 'collateral provider' describe the parties to a collateral agreement. Under Article 34, Contracting States can narrow down the scope of the provisions relating to collateral transactions by way of declarations regarding the types of relevant obligations, collateral securities and parties to a collateral agreement.

124.    The definitions of 'enforcement event' and 'close-out netting provision' are important for Articles 29(2), 30 and 32 which address the situation in which the relationship between the parties is terminated. The definition of 'equivalent collateral' is relevant to determine the collateral taker's obligations under a title transfer collateral agreement (see Article 29) and after it has exercised the 'right of use' under a security collateral agreement (see Article 31).

### Article 29
### Recognition of title transfer collateral agreements

**1.   The law of a Contracting State shall permit a title transfer collateral agreement to take effect in accordance with its terms.**

**2.   If an enforcement event occurs while any obligation of the collateral taker to transfer equivalent collateral under a title transfer collateral agreement remains outstanding, that obligation and the relevant obligations may be the subject of a close-out netting provision.**

**Comment**

125.   The purpose of Article 29(1) is to eliminate the so-called risk of re-characterisation, i.e. the risk that an agreement between parties to transfer collateral is subsequently characterised as an agreement to establish a security interest. Article 29(1) makes it clear that such re-characterisation is not allowed and that a title transfer collateral agreement between the parties can take effect in accordance with its terms.

126.   Article 29(2) is the first provision relating to the occurrence of an enforcement event leading to the termination of the relationship between the parties to a title transfer collateral agreement. This provision states that the relevant obligations of the collateral provider and the collateral taker's obligation to transfer equivalent collateral may be subject to a close-out netting provision set out in the collateral agreement.

### Article 30
### Enforcement

**1.   On the occurrence of an enforcement event, the collateral taker may:**

**(a)   realise the collateral securities provided under a security collateral agreement:**

**(i)   by selling them and applying the net proceeds of sale in or towards the discharge of the relevant obligations; or**

**(ii)   by appropriating the collateral securities as the collateral taker's own property and setting off their value against, or applying their value in or towards the discharge of, the relevant obligations, provided that the collateral agreement provides for realisation in this manner and specifies the basis on which collateral securities are to be valued for this purpose; or**

**(b)   operate a close-out netting provision.**

**2.   Collateral securities may be realised, and a close-out netting provision may be operated, under paragraph 1:**

**(a)   subject to any contrary provision of the collateral agreement, without any requirement that:**

**(i)   prior notice of the intention to realise or operate the close-out netting provision shall have been given;**

**(ii)     the terms of the realisation or the operation of the close-out netting provision be approved by any court, public officer or other person; or**

**(iii)     the realisation be conducted by public auction or in any other prescribed manner or the close-out netting provision be operated in any prescribed manner; and**

**(b)     notwithstanding the commencement or continuation of an insolvency proceeding in respect of the collateral provider or the collateral taker.**

**Comment**

127.     Article 30(1) sets out three different methods by which a collateral taker can enforce an interest in collateral securities. Where such securities are provided under a security collateral agreement, the collateral taker may either sell or appropriate the securities. In the event of a sale, the net proceeds are applied in order to discharge the relevant obligations, while upon appropriation the value of the collateral securities is applied in or towards the discharge of or set off against the relevant obligations. Appropriation, however, is possible only if this has been agreed upon in the collateral agreement and, in addition, if the agreement sets out the basis on which the securities are to be valued for this purpose. A third method of enforcement that applies to all collateral agreements is the operation of a close-out netting provision (see Article 28(2)(j) for a definition thereof).

128.     Article 30(2) guarantees that enforcement can take place in an efficient and timely manner. The law may not require that prior notice of the intention to enforce be given, that the terms of the enforcement be approved by a court, public officer or other person, or that the enforcement take place in a prescribed manner (e.g. by way of public auction). Only the parties themselves may agree that such requirements apply to their relationship. Moreover, according to Article 30(2)(b) the commencement or continuation of insolvency proceedings relating to the collateral provider or collateral taker is not an impediment to enforcement.

129.     It follows from Article 32 that, in all instances, the enforcement must take place in a commercially reasonable manner.

*Article 31*
***Right to use collateral securities under security collateral agreement***

**1.     If and to the extent that the terms of a security collateral agreement so provide, the collateral taker shall have the right to use and dispose of the collateral securities as if it were the owner of them (a *"right of use"*).**

**2.     Where a collateral taker exercises a right of use, it thereby incurs an obligation to replace the collateral securities originally transferred (the *"original collateral securities"*) by transferring to the collateral provider, not later than the discharge of the relevant obligations, equivalent collateral or, where the security collateral agreement provides for the transfer of other assets [following the occurrence of any event relating to or affecting any securities provided as collateral], those other assets.**

**3.    Securities transferred under paragraph 2 before the relevant obligations have been fully discharged:**

**(a)    shall, in the same manner as the original collateral securities, be subject to a security interest under the relevant security collateral agreement, which shall be treated as having been created at the same time as the security interest in respect of the original collateral securities was created; and**

**(b)    shall in all other respects be subject to the terms of the relevant security collateral agreement.**

**4.    The exercise of a right of use shall not render invalid or unenforceable any right of the collateral taker under the relevant security collateral agreement.**

**Comment**

130.    In order to enhance liquidity, Article 31 envisages a general right of disposal for collateral takers under a security collateral agreement. Such a 'right of use' must, however, be explicitly authorised in the collateral agreement in light of the impact of the exercise thereof on the position of the collateral provider, which loses its (proprietary) interest in respect of the collateral securities provided until equivalent collateral is provided by the collateral taker.

131.    The collateral taker's obligation to transfer equivalent collateral to the collateral provider follows from Article 31(2). The obligation arises at the moment when the right of use is exercised and should be fulfilled no later than the moment when the relevant obligations are discharged. Equivalent collateral is defined in Article 28(2)(i) as securities of the same description as the collateral securities. Under certain circumstances, the collateral agreement may provide for an obligation for the collateral taker to transfer other assets, e.g. in the event where, following a merger or take-over concerning the issuing company, securities of the same description are no longer available.

132.    If the collateral taker fulfils its obligation under paragraph 2 by transferring securities before the relevant obligations have been fully discharged, its rights in respect of such securities are upheld. More specifically, paragraph 3 states that the securities transferred are subject to the security interest under the relevant security collateral agreement, in the same manner as the original collateral securities and with retroactive force. Moreover, the securities are also in all other respects subject to the terms of the relevant collateral agreement. This means, for example, that the collateral taker may exercise a right of use in respect of securities transferred under paragraph 2.

133.    Article 31(4) contains a general clause stating that no right of the collateral taker under the security collateral arrangement is invalid or unenforceable as a result of the exercise of the right of use.

### Article 32
#### Requirements of non-Convention law relating to enforcement

Articles 29, 30 and 31 do not affect any requirement of the non-Convention law to the effect that the realisation or valuation of collateral securities or the calculation of any obligations must be conducted in a commercially reasonable manner.

**Comment**

134.    The non-Convention law may contain a standard of commercial reasonableness where a right in respect of securities is enforced or where the obligations between the parties are calculated. Such a standard is upheld under Article 32 of the draft Convention, in the event of close-out netting (see Article 29(2) and Article 30(1)(b)), of enforcement generally (Article 30), and of the calculation of obligations under Article 31.

### Article 33
#### Top-up or substitution of collateral

1.    Where a collateral agreement includes:

(a)    an obligation to deliver additional collateral securities:

(i)    in order to take account of changes in the value of the collateral provided under the collateral agreement or in the amount of the relevant obligations;

(ii)    in order to take account of any circumstances giving rise to an increase in the credit risk incurred by the collateral taker as determined by reference to objective criteria relating to the creditworthiness, financial performance or financial condition of the collateral provider or other person by whom the relevant obligations are owed;

(iii)    to the extent permitted by the non-Convention law, in any other circumstances specified in the collateral agreement.

(b)    a right to withdraw collateral securities or other assets on providing collateral securities or other assets of substantially the same value,

the provision of securities or other assets as described in sub-paragraphs (a) and paragraph (b) of this paragraph shall not be treated as invalid, reversed or declared void solely on the basis that they are provided during a prescribed period before, or on the day of but before, the commencement of an insolvency proceeding in respect of the collateral provider, or after the relevant obligations have been incurred.

2.    A Contracting State may declare that paragraph 1(a)(ii) does not apply.

**Comment**

135.    Collateral agreements in many instances contain provisions regarding 'top-up' collateral and the substitution of collateral. Top-up collateral is referred to where one of the parties to a collateral agreement provides additional collateral or returns a surplus of collateral in order to ensure that the outstanding obligations of the parties are balanced. An imbalance may occur as a result of price fluctuations in the financial markets (see Article 33(1)(a)(i)). An obligation to transfer top-up collateral may also arise in the light of, in brief, changed credit ratings (Article 33(1)(a)(ii)) or other circumstances specified in the collateral agreement (Article 33(1)(a)(iii)).

136.    Substitution takes place when one of the parties to a collateral agreement exercises its right to withdraw collateral securities or other assets and to replace them by collateral securities or other assets of substantially the same value.

137.    The purpose of Article 33 is to protect top-up and substitution arrangements against certain provisions of insolvency law. In particular, they may not be treated as invalid, reversed or declared void solely because they were provided during a prescribed period before, or on the day of, but before the commencement of an insolvency proceeding in respect of the collateral provider. Among other things, this means that a so-called zero hour rule, on the ground of which a declaration of insolvency has retroactive effect to the beginning of the day on which such a declaration is issued, has no effect in this context. Moreover, securities or other assets provided under top-up or substitution arrangements may not be treated as invalid, reversed or declared void on the sole basis that they were provided after the relevant obligations were incurred.

138.    Since the protection of top-up collateral is not undisputed in some jurisdictions if it takes place as a result of, in brief, deteriorated credit ratings, Article 33(2) gives a Contracting State the option to declare that it will not apply Article 33(1)(a)(ii).

### *Article 34*
### *Declarations in respect of Chapter VI*

**1.    A Contracting State may declare that this Chapter shall not apply** ~~under its non-Convention law~~**.**

**2.    A Contracting State may declare that** ~~under its non-Convention law~~ **this Chapter shall not apply:**

**(a)    in relation to collateral agreements entered into by natural persons or persons falling within such other categories as may be specified in the declaration;**

**(b)    in relation to intermediated securities which are not permitted to be traded on an exchange or regulated market;**

**(c)    in relation to collateral agreements which provide for relevant obligations falling within such categories as may be specified in the declaration.**

**Comment**

139.    Article 34 sets out a number of possible declarations that a Contracting State may make in respect of Chapter VI, in addition to the declaration option envisaged in Article 33(2). Under Article 34(1), a Contracting State may declare that it will not apply Chapter VI at all.

140.    Where a Contracting State does wish to apply Chapter VI, it may nonetheless limit its scope in respect of three specific issues mentioned in Article 34(2). First, Article 34(2)(a) makes it possible to exclude natural persons or persons falling within other specified categories. This provision should be read in connection with the definitions of 'collateral taker' and 'collateral provider' in Article 28(2)(f)-(g) that place no limitations upon the market participants to which Chapter VI applies. Secondly, Article 34(2)(b) makes it possible to exclude intermediated securities which are not permitted to be traded on an exchange or regulated market. This provision should be read together with the definition of 'collateral securities' in Article 28(2)(e). Thirdly, Article 34(2)(c) provides for a Contracting State to specify the categories of relevant obligations that fall within the scope of Chapter VI, e.g. only existing obligations. For the definition of 'relevant obligations', see Article 28(2)(d).

- END -