# EXHIBIT 25



# The UNIDROIT Study Group

# on

# Harmonised Substantive Rules Regarding Indirectly Held Securities

Position Paper

August 2003

# UNIDROIT

## The UNIDROIT Study Group

### on

### Harmonised Substantive Rules Regarding Indirectly Held Securities

Position Paper

August 2003

### *Notice*

The members of the UNIDROIT Study Group, whose names are set out in the annex, are each expert in the field of financial markets    law in the legal system of their country with a high degree of practical experience. However, the members of the UNIDROIT Study Group participate in the work of UNIDROIT on a strictly personal basis. The views expressed in this paper are those of the memb ers and do not necessarily reflect those of their institutions.

Comments (in English only) may be sent by post to the        *International Institute for the Unification of Private Law (UNIDROIT), attn. Ph. Paech, Via Panisperna, 28,    I-00184 Rome (Italy)    or by     e-mail to    ph.paech@ unidroit.org.*

Copyright © 2003 by    UNIDROIT. All rights reserved. Excerpts may be reproduced or translated provided the source is stated.

UNIDROIT 2003, Study LXXVIII Doc. 8

## *CONTENTS*

Contents ................................................................. 1

Avant-propos ........................................................... 2

Foreword ............................................................... 3

Summary ............................................................... 5

1   Introduction ....................................................... 7

   1.1   National – regional – global efforts ......................... 8

   1.2   The Hague Convention ...................................... 11

2   The initial discussions at UNIDROIT ............................... 13

   2.1   Internal soundness and compatibility ....................... 13

   2.2   Approach ................................................... 14

   2.3   The needs of principal market participants as guidelines .......... 15

   2.4   Scope of uniform requirements ............................. 16

3   The background .................................................... 18

   3.1   Upper tier attachment ..................................... 18

   3.2   Transfer formalities ....................................... 19

   3.3   Security (collateral) dispositions: rules on the creation and
       realisation of security ..................................... 19

   3.4   Informal dispositions ...................................... 20

   3.5   Good faith acquisition ..................................... 21

   3.6   Net settlement ............................................ 22

   3.7   Finality and irrevocability .................................. 22

   3.8   Possibility of provisional credits ........................... 24

   3.9   Allocation of shortfall ..................................... 26

   3.10  Insolvency protection and other issues where a
       uniform rule may be considered ........................... 27

Appendix 1 – Members of the UNIDROIT Study Group ............................ 29

Appendix 2 – About UNIDROIT ............................................. 30

*The UNIDROIT project on indirectly held securities is supported by:*

**Association of
German Banks**



## *AVANT-PROPOS*

In the second half of 2002,      UNIDROIT embarked upon   a new project entitled *Harmonised substantive rules regarding securities held with an intermediary*.     The Study Group convened by     the Se cretary General of   UNIDROIT to deal   with th e subject, made up of 13 leading experts in the field of the law of securities holding  , held its first meeting   in September 2002.  The challenge it faces  is to  draft an international instrument  capable of improving the world   wide legal framework   for securities holding and transfer, with    special emphasis on cross -border situations. The draft is to be submitted to the Governments of the  UNIDROIT member States  to serve  as a basis for an intergovernmental negotiation process      conducted  under UNIDROIT auspices, culminating in  a diplomatic  Conference and , hopefully, in  the signing of an international convention with respect to the legal framework concerning indirectly held securities*.*

The present *Position Paper* marks the first step of the work of the     UNIDROIT Study Group. It outlines the Group's views on   the scope of the future instrument which will be further refined until it is ready to submit a concrete proposal. The Group felt that it was important to go public at this stage,      in order both to keep   member States and the private   financial sector concerned   informed of  its findings and  to benefit from their response to the *Position Paper*.

Comments are, accordingly, most welcome.

# FOREWORD

by *Sir Andrew Large, Deputy Governor, Bank of England; Chairm an, Group of Thirty Global Clearing and Settlement Project*

The global financial system is only as good as the infrastructure that supports it. The smooth functioning of the system   – and the confidence on which it depends   – will be threatened if its infrast ructure is considered unreliable. This is a particular concern in cross  -border trading of securities because there are very often no common or even consistent structures, standards or operational rules.

It was this concern that motivated the Group of Thirt   y to commission the report, *Global Clearing and Settlement: A Plan of Action* , published earlier this year. And it was the challenge of strengthening the infrastructure for global securities trading to which that report's recommendations are addressed. The        report put forward a strategy with three pillars, aiming to: (1) create a strengthened, interoperable global network by implementing technical and business practice standards intended to improve the connections across borders and systems; (2) mitigate oper     ational and legal risks by introducing a stronger risk management including a solid legal basis for clearing and settlement; and (3) improve governance of market participants by private boards supported by official supervision.

Fully realising these goals  will be an ambitious undertaking, and an important part of achieving them is to identify practical steps to advance the agenda and responsible groups and organisations to undertake them.        UNIDROIT is a worthy partner in this effort. The *Position Paper* that follows is dedicated to the proposition that creating a sound legal basis for internal and cross            -border clearing and settlement activities in national legal systems is a matter of the utmost importance.

This approach is an essential element of the second    G30 pillar and is embodied in several G30 recommendations which point to a number of key legal questions such as: contract legality and enforceability; legal certainty over rights to securities, cash, or collateral; and recognition of support and flexible     valuation and closeout netting arrangements. Recommendation 15 in particular extends the call for improving legal certainty to all market participants. They should be able to determine with certainty and reasonable cost and effort what law defines and governs the rights over their assets and what those rights are. This recommendation encompasses conflict     -of-law rules but extends further to substantive law that would ensure the protection of investor's assets against intermediary insolvency, provide for sim ple and clear rules regarding pledging and realisation procedures, and stipulate the moment when a securities disposition becomes "final"; that is, irrevocable and unconditional.

The G30 Plan of Action concludes that, ultimately, legal certainty in cross      -border transactions will be fully achieved only through enactment of strong, clear, and consistent national and international laws. While efforts like last December's Hague Convention are therefore important, we also welcome the complementary, global efforts being pursued by UNIDROIT to address questions of substantive law that have

been discussed but never tackled on a global level. The present    *Position Paper on harmonised substantive rules regarding indirectly held securities*  pursues resolution of these le gal problems and represents a major step towards the more certain and efficient clearing and settlement environment to which the G30 report aspires.

## *SUMMARY*

Legal certainty and economic efficiency in the global securities market suffer from inconsistencies inherent in the phenomenon of holding of securities through intermediaries. Several international initiatives, such as the *G30 Plan of Action*, the *Giovannini Report* and the *IOSCO/CPSS Recommendations*, address this problem. They identify the need for a reliable, smoothly functioning legal framework, especially in cross-border holding and transfer of secur ities, a need perceived by all those who participate in the capital markets, first of all the investor, but also the collateral taker, public and private i ssuers of securities, the securities industry, and systems for clearance and settlement of securities transactions.

Substantial work has already been undertaken to address legal uncertainty in respect of the indirect holding of securities. For example, the EU *Collateral and Settlement Finality Directives* harmonise key aspects of the laws of EU member States relevant to securities settlement systems and indirectly held securities, while the concerns relating to conflict -of-laws issues are addressed by the December 2002 *Hague Convention on indirectly held securities*.

While important progress has been made , none of these instruments are of themselves enough to cover the full spectrum of concerns identified. EU Directives operate only at the regional lev el, and while it is hoped that the Hague Convention will in due course extend worldwide, it is by its nature confined to conflict -of-laws issues. A clear ide ntification of the applicable law is a huge step forward, but the law thus identified may be uns atisfactory when measured against the standards suggested by the aforementioned international initiatives.

UNIDROIT, a global legal organisation with 59 Member States whose laws include all the key systems of financial law around the world, is an ideal for um for developing a global instrument that addresses questions of substantive law in respect of indirectly held securities. A UNIDROIT project to this effect was launched when a Study Group was first convened to deal with those question s in September 2002 . The Group's preliminary conclusions may be summarised as follows:

It is important to consider the modernisation and harmonisation of key aspects of substantive law relevant to the cross -border holding and transfer of securities held through intermediaries. The issues at stake can be divided into two categories –

-   The first category is ***internal soundness*** , which comprises issues relating to the key fe atures which any structu re for the holding and transfer of securities through intermedia ries must possess if it is to be regarded as sound, bearing in mind in particular the objectives of investor protection and efficiency.

-   The second category is ***compatibility***, which comprises issues affecting the ability of different legal sy stems to connect successfully where securities are held or transferred across national borders.

*Harmonised substantive rules regarding indirectly held securities*

A harmonised rule should be regarded as appropriate if, but only if, it is cle        arly required  to reduce  legal or systemic risk or     to promote   market efficiency. This approach recognises that,     desirable  though it may be    in principle to achieve harmonised rules,  in practice  this is  a complex and difficult process   that requires both technical and political consensus. The difficulty of achieving this, particularly within a reasonable timeframe, strongly  argues in favour of  a restrictive approach to the scope of harm    onisation. Furthermore, a functional approach should be adopted, that is, one which uses language which is as ne utral as possible and which formulates rules by reference to their results.

A key element of the Study Group's approach       was its recognition  of the central position of book entry accounts in modern indirect holding and transfer systems. Parties dealing in secu rities held with an intermediary need to be sure that a credit of securities to their account represents a good and effective interest. Th          e importance of the security of book entry interests is particularly marked in the common situation where linked transfers of interests     take place through different intermediaries and settlement systems, ope  rating under diffe rent laws. Any doubt as to  the effectiveness of an interest represented by a book entry credit, or about the effectiv eness and finality of a transfer made through book entry debits and credits, would give rise to damaging uncertainty and systemic risk.

Against this backg round, the Study Group envisages an  instrument the structure of which reflects, on the one hand , its resolve to concentrate  on a small number of key questions that call for global uniform rules and , on the other hand , its purpose of giving guidance, in particular to those capital markets which at present only have an incomplete set of rules, in establishing a sound legal framework for indirectly held securities. Accordingly, the instr    ument  will in all likelihood be split into a mandatory minimum convention and a non -mandatory annex intended to serve as a "benchmark".

On this basis, the preliminary conclusion regarding the scope of the project, *i.e.* the desirability of a uniform rule, encompasses the following issues:

- Preclusion of "upper tier attachment";

- Role of book entries into a securities account;

- Formalities regarding creation and realisation of collateral;

- Role of non book-entry dispositions over securities;

- Possibility of a provisiona  l credit, which does not correspond to the total number of securities credited to accounts maintained by an intermediary;

- Good faith acquisition;

- Net settlement;

- Finality of book entry transfers and irrevocability of instructions;

- Loss allocation, *i.e.* who bears the risk of a shortfall in securities.

There are other issues where a uniform rule may be considered, especially that of the protection of the client's assets against the claims of general creditors of the (insolvent) intermediary. Here, considerati on may be given either to its inclusion in a mandatory instrument, or to the formulation of "benchmark" criteria.

# 1   INTRODUCTION

It has become widely recognised in recent years that deve lopments in the practice of holding and tran sferring securities have  in a number of respects outrun the traditional legal framework.

The basic rules on the legal nature of securities, the rights of issuers and hol ders and the manner in which securities can be transferred and provided as collateral were formulated in the da ys when securities were transferred individually by physical delivery and when there was a direct relationship     between iss uers and holders. But this direct, two -party model no longer applies to the great majority of securities tran sferred through modern  financial markets. Instead, consider ations of speed, efficiency and economy of settl     ement have led to the evolution of a sophisticated system of inte rmediaries, through which securities can be held and transferred in book entry form, generally by computerised means.[1]

The structural and technical innovations which have made these develo     pments possible were not everywhere matched by a corresponding level of mo dernisation of the law. This is not to say, of course, that the legal framework of the new     arran- gements has not been carefully constructed and doc  umented; but the process has required the use of trad itional tools and concepts adapted from other contexts. To take a prime example, the key concept of custody ge   nerally builds on tradi tional rules defining  the rights and obligations that arise where the owner of a physical object deposits it with another person for safe keeping.   The reason for this is that although securities were originally intangibles, they became certif icated, frequently in bearer form,  and acquired the legal status of  *res mobilia*, which later remained unchanged in most jurisdictions, notwithstanding the fact that in modern computerised systems securities are (again) sometimes not repr        esented or evidenced by certificates.

The application  of the existing legal framework to the evol   ving arrangements for holding and transferring securities through intermediaries gives rise to a number of questions. Concepts such as transfer of possession, or protective proc  edures such as formal notification or   publicity requirements, may need to be extended or adapted, sometimes with inco nvenient results. More seriously, there may be doubt about whether existing legal techniques are effective when a pplied to indirectly held

---

[1]    A.O. AUSTEN-PETERS, *Custody of investments* , Oxford University Press 2000, p. 21     *et seq.*; J. BENJAMIN / M. YATES, *The law of global custody* , 2nd ed., Butterworths 2002, p. 13 *et seq.*; Chr. BERNASCONI, *The law applicable to dispositions of securities held through indirect holding systems*, The Hague Conference of Private International Law, Nov. 2000, available at http://www.hcch.net/e/workprog/coll_sec_pd1.pdf; D. EINSELE, *Wertpapierrecht als Schuld recht*, J.C.B. Mohr 1995, p. 7  *et seq.*; F. NIZARD, *Les Titres Négociables*, Economica 2003, p. 4 *et seq.*; R. GUYNN, *Modernising securities ownership, transfer and pledging laws* , Capital markets forum of the International Bar Association, 1996, p. 28    *et seq.*; R. Potok (ed.),  *Cross border collateral: legal risk and conflict of laws* , Butterworths 2002, p. 7  *et seq.*; J.St. ROGERS, "Policy perspectives on revised U.C.C. Article 8", (1996) *U.C.L.A. L. Rev.*, pp. 1431, 1435 et seq.

*Harmonised substantive rules regarding indirectly held securities*

securities, or about their precise ef fect in the new co ntext.[2] Doubts arise parti - cularly in the case of cross -border hol ding and transfer of securities because, in those cases, different laws, which are sometimes even based on different legal traditions, interact. Parties need to be sure whi ch country's law governs the various legal issues relevant to their rights, and that the applicable substantive rules are legally sound, clear and consistent (see *infra*, 1.2).

The efficient and secure transfer of securities is a ma tter of vital importance to financial markets. The volume and value of securities transferred, both in settlement of ou tright sales and as collateral, are enormous and continue to increase. Moreover, the use of securities as collateral is a key feature of the banking system, in particular underpinning arrangements for high value cash transfers. Thus, the persi stence of inappropriate or outdated legal requirements represents a cost and a drag on the increase in efficiency of the markets; and any significant uncertainty is likely to give rise to systemic risks.[3]

## 1.1 National – regional – global efforts

At national level, some countries have in recent years revised the legal fram ework applicable to the indirect holding of securities in order to reflect the new market reality.

In the United States, Article 8 of the Uniform Comme rcial Code[4] underwent a funda- mental revision in 1994. The previous ve rsion of U.C.C. Article 8 was based on principles of direct holding of secur ities. Revision was put on track after a US stock market crisis in 1987 revealed the insufficiency of the old system. The new feature was the institution of a *securities entitlement*, by virtue of which the investor has a bundle of rights and interests exclusively against his lead -intermediary instead of the traditional property right in his assets.[5]

In Belgium, [6] the investor's interest is defined as a co -proprietary right which consists of a notional portion of a pool of assets of the same type held by the intermediary for all its clients collectively. The investor's ti tle is the book entry and not a physical or dematerialised security. The co -proprietary right is accompanied by personal rights against the intermediary. In the event of insolvency of the intermediary, the investor's interests are superior to the claims of other creditors of

---

[2]   R. GUYNN, *supra* note 1, p. 25 *et seq.*; J.S. ROGERS, *supra* note 1, p. 1436.

[3]   *I.e.*, "the risk that the inability of one institution to meet its obligations when due will cause other institutions to be unable to meet their obligations when due. Such a failure may cause significant liquidity or credit problems and, as a result, might threaten the stability of or confi - dence in ma rkets", IOSCO/BIS, Recommendations for securities settlement systems, November 2001, p. 49; available at http://www.bis.org/publ/cpss46.pdf.

[4]   The American Law Institute/Nationa l Conference of Commissioners on Uniform State Laws, *Uniform Commercial Code, Official Text – 2000 With Comments, Revised Article 8* (1994 Revision), p. 651 *et seq.* (hereinafter: U.C.C. Article 8).

[5]   *Cf.* U.C.C. Art. 8, Part 5; J. S. ROGERS, *Policy perspectives on revised U.C.C. Article 8*, (1996) *U.C.L.A. L. Rev.* pp. 1431, 1456 *et seq.*

[6]   *Cf.* Arts. 10-13 of Belgian Royal Decree No. 62 dated November 10, 1967, as amended, April 7, 1995; R. GUYNN, *supra* note 1, p. 43 *et seq.*

---

the intermediary; he has a so -called right of revindication,   *i.e.* a claim for the return of property enforceable against anyone in possession of it.

In Luxemburg,[7] the law provides for a very similar fram ework. An investor, holding securities through an inter mediary, has a right of (co -)ownership in a given pool of non-individually identified securities of the same type held by the intermediary   on behalf of all owners of the same type of s ecurities. This right of ownership can only be ex ercised against the direct intermediary. There is a right of revindication granted to investors in case of insolvency   of the intermediary . The law precludes the attachment of securities acco unts at the level of secur ities settlement systems. Upper tier attachments are equally precluded.

In France, securities were demateria lised in November 1984. There are no longer any certificates and securities are evidenced by book entries in accounts maintained by autho rised fina ncial intermediaries or by the issuer its elf. Issuers and  interme-diaries in turn have an account with Euroclear France in which  issued securities are evidenced by book entries. The number of      securities appearing in the accounts maintained by issuers and intermediaries must corr espond to the nu mber of secur-ities appearing in the    accounts mai ntained by Euroclear France. If they did not, investors would lose any right to the   securities that appeared in their account with the issuer or their intermediary. In other words, book entries in the accoun ts main-tained by Euro clear France prevail over book entries in the   accounts maintained by intermediaries.[8]

Japan revised the legal framework applicable to bonds and other debt securities, including government bonds, in 2002. The changes became effective      in January 2003. The  financial instruments in question can now be dematerialised; however, the investor has the position of a proprietor. Neither an   intermediary nor a Central Securities Depository (CSD) has any property right in the secur     ities in question , they are merely responsible for making book entries and maintaining accounts. The investor's right is determined by the book entry in his account with the lead intermediary. Japan will change its laws in respect of shares in the same manner by the end of 2003.

In addition, several law reform projects are currently  under way. First, the Uniform Law Conference of Canada is at present preparing a draft of a uniform law on multi -tiered holding systems in Canada. [9] This is intended to harmonise Canadian legis la-tion on this subject and to stay close to the modernised fram    ework in the United States.

Second, in Switzerland, a governmental commission is    reviewing a proposal for a Securities Custody Act launched by the private financial sector. The project is intended to codify the current legal framework, which works well, and to elim  inate some minor inadequacies, in particular by introducing earmarking of encumbered

---

[7]    *Cf.* Arts. 6, 7 and 15 of the Law of 1 August 2001 on the circulation of securities and other fungible instruments.

[8]    Code Monétaire et Financier, Art. L. 431-2; *cf.* F. NIZARD, *supra* note 1, p. 217 *et seq.*

[9]    *Cf.* http://www.law.ualberta.ca/alri/ulc/current/etiered.htm.

*Harmonised substantive rules regarding indirectly held securities*

securities and by providing a sound legal framework for the treatment of so-called *Wertrechte* (non-tangible securities).[10]

Third, in the United Kingdom, a working party is developing proposals for a securities statute, clarifying the property law aspects of indirectly held securities. The aim is to build on the existing English law, and to respond to international law reform initiatives by promoting account finality in securities market dealings.[11]

There have also been numerous consultative initiatives in recent years aimed at drawing the attention of Governments, competent authorities, the private financial sector and the legal profession to the legal and systemic risk and insufficiencies arising from the current system.

In November 2001, the International Organisation of Securities Commissions (IOSCO) together with the Bank for International Settlements (BIS), issued nineteen Recommendations for Securities Settlement Systems.[12] Their main purpose is to give guidance for the reduction of legal and systemic risk in clearing and securities settlement systems. In particular, the recommendations refer to the general need for a sound legal framework for such systems, and to the imperative of protecting customers' securities against the claims of a custodian's general creditors.[13]

The G30 January 2003 Plan of Action[14] concerning global clearing and settlement endorsed these calls, especially in its Recommendations 15 and 16.[15] Particularly important is the fact that G30 identified the solution of conflict-of-laws problems by the Hague "PRIMA" Convention (see infra) as an important first step towards increased legal certainty regarding rights to securities, but the report also pointed to complementary questions of substantive law that needed to be tackled. These include the need for effective protection against the risk of losing assets in the event of the intermediary's insolvency, for reshaping pledging formalities and the realisation procedures relating to collateral, and for harmonised rules of finality of settlement.

At the European level, the second Report by the Giovannini Group[16] of April 2003 expressed the view that insufficiencies as to the legal framework for clearing and

---

[10]     *Ibid.*, Arts. 18, 24.
[11]     Working party of the Financial Markets Law Committee (FMLC), Chairman Sir Roy Goode, Secretariat J Benjamin; *cf.* http://www.fmlc.org.
[12]     IOSCO/BIS, *Recommendations for securities settlement systems*, November 2001, available at http://www.bis.org/publ/cpss46.pdf.
[13]     *Ibid.*, Recommendation 1 ("Securities settlement systems should have a well founded, clear and transparent legal basis in the relevant jurisdiction"); Recommendation 12 ("[...] It is essential that customers' securities be protected against the claims of a custodian's creditor"); Recommendation 19 ("CSDs that establish links to settle cross-border trades should design and operate such links to reduce effectively the risks associated with cross-border settlements"); and other, more detailed recommendations.
[14]     The Group of Thirty, *Global Clearing and Settlement – A Plan of Action*, 2003; summary *cf.* http://www.group30.org/call.htm.
[15]     *Ibid.*, pp. 46 *et seq.*
[16]     The Giovannini Group, *Second Report on EU Clearing and Settlement*, Brussels, April 2003; in this second report the group addresses the question of what actions should be undertaken to eliminate barriers to the integration of the European financial market identified in its first report: The Giovannini Group, *Cross-Border Clearing and Settlement Arrangements in the*

settlement were still among the most serious obstacles to the integration of the EU financial market. The report considered that important legal differences would be removed for most purposes   by the  implementation of the EU Directive on financial collateral  arrangements,[17] but that the que      stion of the absence of a common framework for the treatment of ownership in securities          remained. To tackle this question, the report  advocated the creation of   an EU Securities Account Certainty Project, a proposal also endorsed by the European F inancial Markets Lawyers Group,[18] a pan-European initiative under the auspices of the European Central Bank.

## 1.2  The Hague Convention

Parties need to be sure which countr      y's law governs the var    ious legal issues relevant to their rights, and traditional co  nflict-of-laws rules do not always give a clear answer when applied to modern holding and transfer patterns.[19]

The adoption, in December 2002, of the Hague Convention on   indirectly held secu-rities[20] represented a huge step towards moderni sing and clarifying the law on the indirect holding and transfer of securities. The convention is based on the princ  iple of the applicability of the "PRIMA"  law.[21] Under Article 4 of the Co nvention, the law governing the main proprietary    issues of  indirect securities holding is the law agreed upon as governing the account agreement between the investor and his direct intermediary, provided certain factual conditions are met.

Throughout the discussions at The Hague, delegations were always aware, however, that to solve conflict -of-laws issues would not be enough. While clear ident ification of the applicable law does eliminate an important area of uncertainty, the substantive law thus identifie d may itself be unclear or unsatisfactory. Moreover,

---

*European Union*, Brussels, November 2001. Both reports are available under http://europa.eu.int/comm/economy_finance/giovannini_en.htm.

[17]    *Cf.* Arts. 4, 7 and 9 of Directive 2002/47/EC of 6 June 2002 on financial collateral arrangements ("Collateral Directive") and Arts.  3-5 and 9 of the complementary directive 98/26/EC of 19 May 1998 on settlement finality in pa     yment and securities settlement systems; available at http://europa.eu.int/eur-lex/en/lif/reg/en_register_1040.html. In fact, implement ation of these directives by the EU member States will lead to harmonisation with respect to the following questions: (1) Enforceability of transfer orders and netting against third parties even in case of an insolvency of the intermediary; (2) protection of a collateral taker in case of the insolvency of the collateral provider; (3) formal requirements for the provision of financial collateral; (4) the re-use of financial collateral; (5) enforcement of financial collateral by set off and close -out netting; (6) conflict of laws relating to book entry securities.          *Cf.* K.  LÖBER,  "Die EG -Richtlinie über Finanzsicherheiten", *Zeitschrift für Bank- und Kapitalmarktrecht* 2002, p. 601 *et seq.*

[18]    European Financial Markets Lawyers Group,   *Harmonisation of the legal  framework for rights evidenced by book-entries in respect of certain financial instruments in the European Union*, June 2003.

[19]    For a full discussion of the conflict of laws issues, see Chr. BERNASCONI, *op. cit.*, p. 27 *et seq.*; R. Potok (ed.), *op. cit.*, p. 48 *et seq.* and the various materials there cited.

[20]    *Convention on the Law Applicable to Certain Rights in respect of Securities Held with an Intermediary*, adopted under the auspices of The Hague Convention on Private International Law, The Hague on December 13, 2002; available at www.hcch.net.

[21]    "Place of the Relevant Intermediary Approach";   *cf.* Chr. BERNASCONI / R.  POTOK, "PRIMA Convention brings certainty to cross-border deals", *International Financial Law Review*, 2003, pp. 11, 13.

*Harmonised substantive rules regarding indirectly held securities*

individual laws which operate sa    tisfactorily in isolation may fail to co      mbine effectively in the context of the cross  -border holding and transfer of   securities. A number of instances have been identified   where two or more national substantive laws on contract, property and dealing in securities do not properly interconnect and give rise to inefficiency or legal uncertainty.[22]

---

[22]    They can be classified as problems arising from general legal diversity, from inconsistent or insufficient national rules or from interconnecting of (as such) internally sound systems;   *cf.* Ph. PAECH, "Harmonising substantive Rules for the Use of Securities Held with Interme     diaries as Collateral", *Uniform Law Review / Revue de droit uniforme*     , 2002, pp. 1140, 1154     *et seq.* ; available at http://www.unidroit.org/english/workprogramme/study078/main.htm.

## 2   THE INITIAL DISCUSSIONS AT UNIDROIT

For the above reasons,      UNIDROIT, followin g a request from its Member States'
Governments, instituted a project entitled *Harmonised Substantive Rules Regarding
Securities Held with an Intermediary* , which was given high prio rity. A Study Group
was set up and held its first se ssion in September 2002 . The Group's thinking was
refined during its March 2003 meeting and a third session will be held in November
2003. In light of more detailed consideration of the current position under a number
of legal sy stems, it was agreed that analysis of the underlyi      ng theoretical and
practical issues was required. To this end, the Study Group agreed to conduct fact -
finding interviews in the  interim. Such fact-finding meetings were held with groups
of experts in the United Kingdom, France and Switzerland in the early  part of 2003.
Further missions to the United States and Canada are currently being prepared, and
there are plans for other such meetings in about 10 countries in all continents.

### 2.1  Internal soundness and compatibility

At its September 2002 meeting, the St udy Group concluded that it was important to
consider the modernisation and ha  rmonisation of key aspects of su  bstantive law
relevant to the cross     -border holding and transfer of securities held through
intermediaries. It divided the issues into two categories.

The first category was that of issues relating to the key fe  atures which a structure
for the holding and transfer of secur ities through intermediaries must possess if it
is to be  regarded as sound, taking into account in particular objec  tives of  investor
protection and efficiency. The question is whether indirect holders of securities can
be conf ident that their interests are robust and can be dealt with under simple,
clear rules and procedures for acquisition, holding, transfer (inclu ding both outright
transfer and provision as collateral) and realisation.       [23] Furthermore, it is clearly
essential that the investor's inte  rest should not be exposed to risks such as the
insolvency of any inte  rmediary or interference by unr  elated parties. The Study
Group termed these issues of *internal soundness*.

The second category was that of issues affecting the ability of different legal
systems to connect successfully where secu    rities are held or tran  sferred across
national borders. If the rules of two systems of law, t hough each achieving internal
soundness, produce an unclear or unsati sfactory result in combination, [24] this raises
issues which the Study Group termed issues of *compatibility*.

---

[23]     Establishing that an interest in indirectly held securities is robust involves both legal and
operational issues. Operational issues are beyond the remit of the work of the UNIDROIT Study Group.
[24]     Such issues can arise especially when two or more       national legal systems based on
different concepts interconnect. One example relates to the notion of "securities": in some
countries, certain financial instruments are considered securities, whereas in others they are not
and ther efore do not benefit from    the special protection afforded securities but are treated as

### 2.2  Approach

The Study Group, at its March 2003 meeting, focussed, first, on the       criteria that should govern the question of whether a particular matter needs a harmonised rule. It co ncluded that a rigorous approach should be adopted, and that a harm     onised rule should be regarded as appropriate if, but only if, it is clearly required     for the reduction of legal or sy stemic risk or for the promotion of market efficiency. This approach reco gnises that, however desirable it is in pri        nciple to achieve fully harmonised rules, this is in practice a complex and difficult process requiring both technical and political consensus. The di fficulty of achieving such harmonised rules, particularly within a reasonable timeframe, strongly supports a restrictive a pproach to the scope of harmonisation.

The Study Group also recognised, however, that even in  relation to issues where a uniform, harmonised rule was not thought to be required in accordance with the test su ggested above, it might still be important to set out a clear standard to be achieved. In particular, if it were concluded that el        ements of th  e minimum requirements for internal soundness could be achieved in more than one way and that uniformity was not essential, it might still be highly desirable to promu     lgate standards which systems wishing to be inte   rnationally recognised as sound would need to meet.

Against this background, the Study Group now envisages an            instrument, the structure of which reflects, on the one hand, the decision to concentrate on very few key questions that call for global uniform rules and, on the other hand, the desire to guide the process of establishing a sound     legal fram ework for indirectly held securities, especially in those capital markets which at pr     esent only have an incomplete set of rules. Hence, the instrument will in all likelihood be split into a mandatory minimum convention and a non -mandatory annex intended to serve as a benchmark.

Confusion can easily arise from the different traditions and conce   ptual frameworks of different systems of law. This is why the Study Group co    ncluded that it should adopt a functi onal approach – that is, one which uses la nguage which is as neutral as possible and formulates rules by refe      rence to their results. It drew in this respect on the experience of the Hague Convention, where it was found unexpectedly diff icult to use even co        mmon concepts such as "property" or "proprietary interest" in a manner which would be understood in the same way in all legal systems. The Hague Convention therefore avoided such terms and used instead more neutral language such as "effects against third        parties". The same approach had previously borne fruit in developing innovative and un           iversally acceptable rules in the      UNIDROIT / ICAO Cape Town Co    nvention on equipment financing.[25]

---

mere contractual claims. In case of insolvency of an intermediary situated in such a country, such assets are possibly not protected; *cf.* Ph. PAECH, *supra* note 22, at p. 1156.

[25]    *Cf. infra*, Appendix 2, *About UNIDROIT*.

### 2.3  The needs of principal market participants as guidelines

A key element   of the Study Group's approach is its recogn     ition of the central position of book entry securities   accounts in modern indirect holding and transfer systems. In seeking to identify the nature and extent of the un   iform rules that are desirable, it is useful  to consider the needs of the principal participants against the background of criteria of systemic risk and market efficiency.

An *account holder* needs to be confident -

(a)   that entries in its accounts with its intermediary represent interests that are good ag  ainst the inte  rmediary and third parties, even in case of insolvency of the intermediary;

(b)   that such entries cannot be revoked or reversed once ce      rtain clearly identifiable and reasonably simple conditions have been satisfied;

(c)   that it can give instructions    to its intermediary in a reasonably simply and convenient form.

An *intermediary* needs to be confident -

(a)   that it can accept instructions from its direct     account holder and can ignore purported instructions or other interference from outside parties;

(b)   that, where an account holder has provided secu rities held in its account as collateral to the inte rmediary itself, the intermediary can enforce its security in acco rdance with its terms without the need to satisfy any additional conditions or procedural requirements;

(c)   that, where an account holder has provided secur ities held in its account as collateral to  another party, the intermediary can accept instru  ctions from the collateral taker in clearly specified circu   mstances and without the need to satisfy any additional conditions or procedural requirements;

(d)   that the instructions referred to in (a) and (c) ca      nnot be revoked or reversed once certain clearly identifiable and reasonably simple conditions have been satisfied;

(e)   that such instructions can be given          in a reason   ably simple and convenient form;

(f)   that, when the intermediary is making entries in the accounts of its account holders on the basis of       entries made in accounts which it maintains with a higher tier intermediary, the entries in those    accounts held with the higher tier intermediary repr  esent interests that are good against the higher tier intermediary and third pa  rties and are not liable to be reversed or revoked;

(g)   that, to the extent that there are matching de        bits and credits to accounts maintained   by the interm ediary for different account holders (whether or not in respect of deliveries between those account hol  ders) it can effect a net settlement of those debits and credits – that is, that it need not make precisely matching entries in accounts whi ch it holds with an upper tier intermed iary, but can simply make such entries (if any) as

*Harmonised substantive rules regarding indirectly held securities*

are required to reflect the net overall change in the aggregate balances of its account holders taken together.

A ***collateral taker*** needs to be confident -

(a) that it ca n obtain an interest valid against the co llateral provider, the intermediary and third parties by ensuring compliance with a clear, reasonable and simple procedure;

(b) that if it needs to enforce its security it will be able to give to the intermediary instru ctions on which the intermediary will be entitled and bound to act, without the need to satisfy any additional conditions or procedural requirements.

These concerns are particularly marked in the common situ ation where linked transfers of interests are tak ing place through different intermediaries and settlement systems, operating under different laws. If, for example, there were any doubt about whether an interest represented by a book entry credit made in a securities account governed by the law of one co untry, or a transfer made through book entry debits and credits on such a securities account, would be recognised as effective and final under the law of another country, this would give rise to damaging uncertainty and systemic risk.

## 2.4  Scope of uniform requirements

In the light of the above objectives, the Study Group consi dered a number of issues of importance to the structure and operation of arrangements for the holding and transfer of securities through intermediaries, in order to form prov isional views on what substantive provisions are desirable and whether and to what extent, having regard to the criteria suggested above, those provisions should be set out in uniform rules.

The Study Group reached the preliminary view that the achievement of the objectives set out above implies uniform rules in a number of areas -

(a) There will need to be a rule precluding "***upper tier attachment***".

(b) Any rules imposing special formalities, other than the debiting and crediting of ***book entry accounts***, as a pre-condition of a disposition of securities held with an intermediary taking full effect will have to be disapplied.

(c) There will need to be rules on ***creation and realisation of collateral***, notably regarding formalities with a view to protect the collateral taker.

(d) There will need to be a rule governing the effects of an ***informal disposition*** (*i.e.* a disposition made otherwise than by entries in book entry accounts) over securities.

(e) There will need to be a rule confirming that a person acqui ring an interest in ***good faith*** as a result of the crediting of securities to his securities account acquires an ove rriding title free of the claims of any pe rson who

may be able to challenge the effe ctiveness or propriety of any matching or connected debit or credit on the basis of which the credit was made.

(f)   There will need to be a rule regarding   **net settlement**, confirming that book entries made by an intermediary may reflect the net overall change in the aggregate balance of its account holders taken together.

(g)   There will need to be rule     s confirming the     **finality** of book entry transfers – *i.e.* the non -reversibility of credits to an account   – that also address the irrev ocability of instructions once they have been given to an intermediary.

(h)   There will need to be rules dealing clearly with th       e poss ibility of a **provisional credit**, *i.e.* a credit entered in ci  rcumstances which cause the total number of securities credited to       accounts maintained by an intermediary to exceed the avai lable underlying securities or interests in securities held by the intermediary.

(i)   There will need to be a rule about   **loss allocation** which clearly defines who bears the risk of a shor tfall in securities at the level of the account holder's direct or any other higher tier intermediary.

This set of issues must not be regard ed as complete or defin itive. The Study Group has not yet decided whether certain other issues, especially the protection of account holders from their intermediary's insolvency, require uniform legal rules.

# 3   THE BACKGROUND

## 3.1  Upper tier attachment

The phrase "upper tier attachment" is commonly used to    refer to the risk that a securities account with an interm ediary at a higher tier in the holding pattern may be subject to a l egal claim (typically through court pr oceedings) to freeze or attach the account in order to enforce a claim against a pe rson alleged to hold an interest through an intermediary at a lower tier.

The account maintained with the upper tier intermed        iary will generally be an "omnibus" account, that is, an account in the name of the lower tier intermediary to which are credited all the securities held for the latter, without any attempt to distinguish the interests of particular clients of the lower tier intermediary.      [26] The use of such "omnibus"     accounts is one of the key factors contribu      ting to the efficient operation of the indirect holding system.

The fact that the higher tier intermediary has no knowledge or record of interests other than the interest of the lower tier intermediary as its immediate account holder is generally  regarded as lessening the likelihood of a court's  being prepared to make a freezing or attachment order at the    upper level. On the other hand, it also increases the damage that such an order, if made, would i nflict on the integrity of the system, since the higher t ier intermediary might have no alternative, pending clarification of the position, but to freeze the   *entire* account, thereby interrupting transactions not only of the  underlying investor who is party to the dispute, but of all the other account holders of the lower tier intermediary.

It is obvious therefore that there are strong reasons for ma  king it absolutely clear that no claim for upper tier attachment should be admissible.        [27] Given the inte r-national nature of the multi -tier holding pattern, a rule to th is effect will need to be a uniform rule if it is to give the necessary assurance, not only to intermediaries who may be exposed to claims for        attempted attac hment, but also to other intermediaries and their account holders. Therefore, it would seem highly  desirable to have a free  -standing rule expressly preclu  ding upper tier attachments. This should be the case even under legal systems where the nature of an account holder's interest is such that it is clear that the i nterest exists solely at the level of the account holder's imm ediate intermediary, which should logically preclude any upper tier attachment.

---

[26]    The lower tier intermediary may, however, maintain an account for its own securities separate from the "omnibus" customer securities account (and in many cases this is a regulatory requirement).

[27]    The need for such a rule was emphasised by a number of commentators on the Hague Convention on indirectly held securities    (*cf. supra*, 1.2), though it was recognised that that Convention, being concerned only with conflict of laws, could not itself supply the rule.

The above discussion concentrates on the position of higher tier intermed iaries. The Study Group did, however, note that the same considerations apply     in relation to issuers of securities, and reached the preliminary conclusion that there should be a uniform rule protecting the issuer from a dverse claims from any level in the holding system.

## 3.2   Transfer formalities

If the indirect holding system is to   operate safely and conveniently, the applicable legal rules need to make it clear that –

> (a)   a disposition effected by debiting or crediting a book entry securities account is effective upon, and by virtue of, the making of the necessary book entry or entries;[28]

> (b)   the intermediary which maintains the account is ent   itled to make such debits and credits on the basis of instru ctions in a simple and convenient form, and, in particular, that instru ctions in electronic form, if provided for in the terms on which the rele     vant accounts are     operated, are sufficient.

This means that any existing rules that require add itional formal steps to be taken (for example, rules making writing, signature or formal notice a necessary condition of an effe ctive transfer) will need to be   disapplied, and that, if there is any doubt about whether property interests can be created and disposed of by book entries, this will need to be confirmed.

Clearly, there are powerful     arguments of market efficiency that support the desirability of such a  rule; in the opinion of the Study Group, however, such a rule is also desi rable on systemic grounds, given the scope for legal uncertainty that would be introduced if appa     rently effective debits and credits could be retrospectively impugned on formal grounds.

## 3.3   Security (collateral) dispositions: rules on the creation and realisation of security

Special considerations apply in relation to dispositions made by way of security (collateral dispositions). Such di spositions are commonly the subject of particul  ar procedural requirements (for example in relation to formal notice or public filing as a necessary element in the perfection of a security disp     osition) which have their origins in policy considerations rela    ting to the protection of borrowers and of

---

[28]   The question then arises whether the debit and credit entries are to be regarded as effecting a single transfer of a property right (in which case it may be necessary to define which entry is definitive), or whether the debit ent  ry is analysed as extinguishing an interest, and the credit entry as creating an interest, in a manner such that the two interests need not be regarded as identical. The answer depends mainly on the analysis of the nature of the rights constituted by a credit of securities to a book entry account and will be discussed further by the Study Group (*cf. infra*, 3.9).

*Harmonised substantive rules regarding indirectly held securities*

unsecured creditors and subsequent lenders or pu rchasers against being misled by a false impression of assets being une ncumbered and available for the satisfaction of their claims.

There is a degree of tension between these policy consider ations and the objectives referred to in paragraph 3.2 *supra*. Further discussions will be needed as to how to achieve an appropriate balance, but the Study Group has noted that a number of the regimes for security transactions that have been developed in recent years have included provisions for security disposition to be effective if made by way of book entry transfer to an account of the pledgee or by some kind of  appropriation in the account of the pledgor resulting in the   securities coming under the control of the pledgee, for example by appropria   ting the pledged securities to a "starred" or "escrow" sub-account, or by "earmarking" them. These regimes provide a promising model for a po ssible uniform rule; their exi stence also seems to the Study Group to support the view tha t a simplified regime for colla teral transactions in relation to indirectly held secur ities is justified on grounds of systemic risk and market efficiency.

A similar position applies in respect of the rules on the   realisation by a collateral taker of its  rights upon  default by the collateral provider. Many systems of law impose special restrictions on realisation, such as the   requirement of advance notice, the use of a prescribed method of realisation ( *e.g.* sale by public auction) or the conduct of the process of realisation under court supervision. Where the pledgor is or becomes subject to insolvency proceedings, sp ecial rules of insolvency law will also apply. These may include, in addition to the elements referred to above, the imposition of a mor atorium on enforcement or of further procedural conditions on enforcement. They will also, of course, usually include sp ecial rules relating to the possible invalidation of the security disposition itself as constituting fraud vis  -à-vis other creditors or otherwise contravening mandatory principles of insolvency law.

Further discussion is needed on the extent to which any un        iform rule should impinge on such special restrictions on realisation.


## 3.4  Informal dispositions

The Study Group has considered whether the  rules contemplated in paragraphs 3.2 and 3.3 *supra* should be  exhaustive – that is, whether "informal" dispos itions by account holders which are not effected by book entry transfer or ot herwise recorded in accordance with those rules should be devoid of any effect.

The Study Group's preliminary view is that a provision to that effect would go further than was necessary to achieve the objectives in view, and that, accordingly, such informal dispositions should not be completely precluded, provided that it were clear that an interest arising under such a disposition would not be good against parties other than the account holder, and would therefore be liable to be  defeated by a subsequent disposition by book entry transfer effected by the account holder.

### 3.5  Good faith acquisition

As mentioned above, an account holder (including a lower tier intermediary in relation to securities held by it in an account with a higher tier intermediary) needs to be confident that entries in its accounts with its intermediary represent interests that are good against the intermediary and third parties.

On the face of it, this suggests that what is required is a rule dealing with any case where a previous holder of securities credited to an account seeks to contest the disposition that results in the credit and as a result to claim a title superior to that of the "transferee" account holder – the rule being that the "transferee" account holder, if acting in good faith, will prevail.

The Study Group regards a rule protecting an account holder who receives a credit of securities in good faith as essential to the overall objectives of legal certainty and efficiency. It is, however, debatable whether a rule which focuses on the concept of a good faith *transfer* or *acquisition* is a necessary, or the most desirable, way of achieving the objective. It may well be preferable to have a rule which looks only to the credit of the securities and precludes any attempt to trace a claim by an account holder whose account has been debited into another account to which the corresponding credit has been made.

The possibility of thus tracing claims raises difficult practical and theoretical issues.[29] The two sets of issues are connected, since the limitations on the possibility of tracing in practice, and the random incidence of cases where tracing is possible as against those where it is not, undermine any justification of principle or fairness which might otherwise be adduced in favour of preserving a right to trace.

In the light of these difficulties, there are in the opinion of the Study Group strong grounds for the view that the position of a good faith recipient of a credit of securities will be equally well protected by the rules defining the circumstances (if any) in which credits of securities may be reversed. These will need to be complemented by corresponding rules dealing with the reversal of debits and preserving the intermediary from exposure to claims in cases where it has debited an account in good faith.

One effect of this principle of protecting good faith acquisition (or, as suggested above, good faith credits and debits), to which the Study Group has devoted considerable discussion, is that an unauthorised disposition by an intermediary of securities held by it with a higher tier intermediary (for example, a transfer or pledge of the securities to raise funds for the intermediary's own operations) will result in the intermediary's counter-party receiving a good interest, to the prejudice of the intermediary's underlying account holders. This result follows from the application, at the level of the higher tier intermediary, of the principle of respecting credits and debits made in good faith. The Study Group has concluded that this result is unavoidable if the overall objectives of efficiency and legal

---

[29]   For a characteristically lucid account of the practical difficulties, see J.S. ROGERS, "Negotiability, Property and Identity", *Cardozo Law Review*, 1990, p. 471. For the theoretical difficulties, see Sir Roy GOODE, *Legal Problems of Credit and Security,* 3rd edition (2003), p. 42 *et seq.* and the literature there cited.

*Harmonised substantive rules regarding indirectly held securities*

certainty are to be achieved, and that any resulting     investor protection concerns will need to be addressed as a matter of regulatory policy in deciding what regulatory and disclosure requirements should be imposed on intermediaries.

### 3.6  Net settlement

As noted above, it is important that, to the extent that there are matching debits and credits to accounts maintained by the intermediary for different account holders (whether or not in respect of deliveries between those account holders), it can effect a net settlement of those debits and credits  – that is, that it need not make pr e-cisely matching entries in accounts which it holds with an    upper tier intermediary, but can simply make such entries (if any) as are required to reflect the net    overall change in the aggregate balances of its account holders taken together.

This point has an important bearing on the definition of the nature of the interest constituted by a credit balance on a s ecurities account. A key issue here is whether such a balance is regarded as creating or representing a property right in particular underlying securities which directly or indirectly correspond to the credit balance. If it is so  regarded, it is necessary to consider the conceptual question of how tran s-fers of these underlying property rights can be  effected on a net basis and without identification of the property subject to individual transfers. If, on the other hand, a securities account balance is not so regarded (for    example because it constitutes merely a co -proprietary right or a  *sui generis*  securities entitlement), the analysis of net settlement appears to be somewhat simpler. These questions will need to be examined in more depth as part of the Study Group's further work and consultation.

### 3.7  Finality and irrevocability

If arrangements for the transfer of securities through book entry accounts with intermediaries are to operate effectively -

-    first, where an intermediary is instructed to credit securities to an account of its account holder on the basis  of a corresponding credit made to its own account maintained with a higher tier intermediary, it needs to be confident that the credit to its own account cannot be      reversed. This position arises in every case where an investor transfers securities to another investor who does not happen to maintain a secur  ities account with the same intermediary – an extremely common situation;

-    second, an intermediary needs to be confident that, once instructions to effect an entry on a securities a ccount have been given,  or input into an electronic sy stem, those instructions cannot be      reversed, either as a result of a change of mind or (probably a more serious risk in practice) as a result of the insolvency of the person giving the instructions;

-    third, an account holder     who receives a credit of      securities to his account needs to be confident that the credit is not liable to be reversed as a result of the      insolvency of another account holder from whose account a corresponding debit has been made.

These points are of system ic importance,[30] in particular in the co ntext of securities clearing and settlement systems, where some delay between the receipt and execution of  instructions is inevitable, and transactions are frequently    effected in batches or chains of deliveries, each of which is dependent on a number of others.

Because the risks of reversal or revocation may arise under a var    iety of different laws,[31] and since it will often be very difficult for intermediaries or account holders to identify with conf idence those that  may be relevant, effe ctive protection against these risks requires a uniform international rule with as wide a reach as possible.

The Study Group has therefore considered whether there should be a uniform rule relating to the irrevocability and     finality of  book entry debits and cre     dits of securities. To the extent that questions of finality depend on the rules    defining the moment at which an interest arises as a matter of the ge neral law of property, they will be addressed by the rules suggested above on th  e effectiveness of book entry credits when made. However, questions of finality of transfer also involve issues of insolvency law, and the issue of irrevocabi lity of instru ctions to an intermediary to effect debits and credits on book entry accounts involv        es questions both of insolvency law and of the general law of agency and custody.

The issue relevant to finality of transfer is whether        insolvency law rules which would ordinarily require or permit the reve rsal of a transfer of securities as a result of  the insolvency of the transferor, as for example in the case of a transfer made after co mmencement of the insolvency or within a "suspect" period leading up to the insolvency, should be disapplied. If the relevant rules continue to apply in full, account ho lders' co nfidence in the integrity of the book entry system may be compromised.[32]

A clear rule in relation to revocation of instructions is impo rtant for intermediaries, in particular those which operate clearing or settlement systems, because it is extre- mely difficult in practice, and even if achievable extremely disruptive, for them to give effect to a purported revocation of  authority to act on behalf of an account holder (whether by reason of insolvency or otherwise) while a settlement cycle is in progress.

The importance of these issues is reflected in the fact that the EU Settlement Finality Directive deals with both  finality and irrevocability of instructions, and in each case

---

[30]    See, for example, Arts. 3-5, 7, and 8 of the EU Settlement Finality Directive (*supra*, note 17), which  ensure finality and irrevocability in respect of transfers of securities effected through systems that are recognised under the Directive.

[31]    The obvious relevant laws are the law governi       ng the account agreement, the law governing pro perty issues in relation to interests held in the account (generally the PRIMA law, *supra* note 21) and the law go verning insolvency proceedings in respect of the intermediary and account holders. The last of these will usually be the most important and is also the most difficult to identify, since different account holders will be subject to different systems of insolvency law.

[32]    It is arguable that the possibility of reversal on insolvency law grounds as agai    nst the immediate recipient of a transfer of securities need not be disapplied, provided that there is no possibility of reversal affecting an onward transferee who acted in good faith. This argument rests on the proposition that it is reasonable for parties to bear the risk of insolvency of their immediate transferors, and that the risk does not have systemic implications if it is clear that it cannot infect subsequent transfers. This is a question that may need further discussion.

*Harmonised substantive rules regarding indirectly held securities*

confers extensive protection against the normal operation of inso lvency law rules on settlement systems that are recognised for the purposes of the directive.

### 3.8  Possibility of provisional credits

The total of securities of a particular kind credited by an inte rmediary to securities accounts which it maintains for its custom ers might exceed the aggregate hol dings of securities of that kind maintained by the intermed iary, either directly [33] or indirectly.[34] Such a discrepancy may arise either because the intermediary credits securities to a client's securities account in circumst ances where the credit is not matched by a corresponding increase in the underlying securities held by the intermediary or because securities are debited from the intermediary's holdings without a corresponding debit to customers' securities accounts.

The imbalance may be the result of a deliberate or inadvertent breach by the inter - mediary of its obligations; it may also occur in circumstances expressly permitted by the intermediary's agreements with account holders, in particular where these include provi sions permitting account holders to use newly credited securities to make further deliveries at a time before an incoming credit of underlying securities to which the new credit matches has not been made or has not become final.

The Study Group considered whether there should be uniform rules of law governing the possibility of a prov isional credit, *i.e.* the extent to which, and the conditions under which, the arrangements governing the operation of book entry securities accounts by intermediaries should be permitted to provide for the crediting of an account in circumstances which give rise to an aggregate over-crediting of securities.

The question of whether the arrangements under which book entry accounts are operated should be permitted to  allow the crea tion of provisional cre dits is closely linked with issues of finality, with the allocation of any shortfall of available securities among account holders, and with the formul ation of a rule protecting good faith acquirers. [35] It involves a tension between th e objective of efficiency of settlement and that of security of holding. In order to facilitate efficient and speedy settlement of chains of deliveries, an intermediary, in partic ular if the operator of a settlement system, may wish to put in place arrange ments permitting onward delivery of newly credited securities at a time when a linked d elivery or payment on which the credit is dependent (for   example the completion of a matching cash payment or the making of a corresponding credit of securities with a   different intermediary) have not yet been satisfied.

---

[33]    For example in the fo rm of bearer certificates or balances regi stered with the issuer in the name of the intermediary or its nominee.

[34]    Through interests held by the intermediary with a higher tier intermediary.

[35]    The circumstances in which a credit, and in particular a cred it which gives rise to such aggregate over-crediting, may be reversed, the question if and under which conditions a good faith acquisition is possible and the manner in which any *irreversible* loss resulting from over-crediting, whether or not in accordance    with the applicable arrangements, should be allocated among *intermediaries and* account holders, are dealt with *infra* 3.9.

If an intermediary is permitted to reverse such an onward  delivery in a case where the related conditions are not in the event satisfied, the ability and willingness of account holders and those dealing  with them to rely on a book  entry credit of securities will clearly be compromised, since it will often not be practicable, and may not be possible, [36] for them to di scover whether, and for how long, a credit of securities is su bject to reversal. This suggest s that, while it may be possible for an intermediary to reserve the right to reverse a prov isional credit of excess securities as against the relevant  account holder, such a right of reversal should not affect any subsequent credit which the intermediary  has allowed to be made against a matching debit of the provisional balance.

There is an analogy here with the situation where a bank a llows a customer to draw on an uncleared balance of funds to make a subsequent pa yment. If the uncleared item has to be rev ersed, the customer will be liable to reimburse any una uthorised overdraft that arises as a result, but the subsequent payment will not be affected.

The risks arising from any permitted over-crediting will need to be clearly allocated. If, as the Study Gro up has provisio nally concluded is desi rable (see *infra*), the rule is that such deficiencies, where they cannot be eliminated by the inte  rmediary because it is itself insolvent, will be borne by  account holders in proportion to the credit balances on their  accounts, the  effect is to share the loss among the whole body of account holders.

This result can be avoided if the credit of securities in a d vance of the completion of a linked delivery or payment is permitted only through securities lending arrange  - ments between the intermediary and one or more members of the sy  stem. Under these arrangements, the intermediary agrees with partic  ipating lending members that it has the right to borrow securities from them in order to finance other members' transactions. In  return, the lenders are paid a finan  cing fee and benefit from a personal undertaking by the interm  ediary to return equivalent securities. This arrangement has the attraction of avoiding any ove  r-crediting of securities in the aggregate, while providing a  means of financing  liquidity in the system. An arrangement of this kind would have particular attractions under a substantive law analysis which was based on a concept of ownership of underlying securities and regarded over -crediting as conceptually imposs  ible because it resulted in a "doubling" of title to the same asset. Like the arrangements  described above, this solution results in some members of the system incurring a credit exposure to the intermediary which operates it. The difference is that under  the first  arrangement the risk is borne by the members generally. They may find it difficult to identify the risk, to assess its magn itude, and to be conf ident that they are being rewarded for incurring it. Under an internal lending  arrangement, the credit  risk falls only on certain members (those who participate as lenders), but those members will be paid

---

[36]   In a fast-moving settlement system, a "provisional" credit of securities may be used to fund a number of separate onward transfers . Even in a system which has rules for the tracing of transfers, it may not be possible to identify which of such transfers were funded by the "provisional" credit, since a holding will lose such identity as it possesses when it is credited to an account  which already includes identical securities and therefore becomes merged in a larger balance. If, therefore, two or more onward transfers are made out of the merged balance, it may be impossible to decide which of the onward transfers includes the "suspect" securities.

for incurring the risk and are likely to benefit from protections in addition to the covenant of the intermediary.[37]

There are, therefore, strong argument s in favour of a model under which finan cing to facilitate the settlement of chains of deliveries is provided through lending arran -gements among account holders that do not involve any over  -crediting of securities . However, it is clearly possible for the    legal fram ework for the indirect holding and transfer of securities through book  entry accounts with intermediaries to cover a less restrictive model under which the intermed  iary provides liquidity to the system by creating provisional credits of sec  urities which are backed only by its own credit in securities of this type. The choice    between these two models involves questions of legal and reg  ulatory policy on which different views could reasonably be taken. Further discussion of the su bject would be helpf ul, but the current view of the Study Group is that un iform rules establishing a common framework for the ind irect holding of securities should be broad and flexible enough to accommodate both models.

### 3.9   Allocation of shortfall

The Study Group also consid ered how a shortfall in the secur ities or interests held through an intermediary in   respect of its account holders' entitlements should be allocated.

Shortfalls can arise if provisional credits are pe rmitted and the credited amount is for whatever reason   re-debited but the investor is neither still in possession of these secur ities nor in a position to replace them. Furthe      rmore, even if it were decided that the deliberate creation of "e xcess" credits should never be allowed,[38] a shortfall could still arise    as a result of fraud, inadvertence or accident. A rule governing the consequences of such a shortfall is therefore clearly necessary.

The Study Group came to the provisional conclusion that in the event of shortfall generally, the account holder's (lead) intermediary should be obliged to bear the risk.

If the shortfall cannot be eliminated by the intermed     iary, in particular when the latter is insolvent, the question arises as to who should bear the risk. The Study Group provisionally concluded that in thi s case, the shortfall should be borne by the account holders in proportion to the holdings of the relevant securities.

There are on the face of it attractions to a rule which traces the origin of the shortfall and, where the shortfall can be shown to aris   e from transactions relating to a particular  account holder, shifts the loss to that account holder. Thus, if an account holder's account is credited after its intermediary's account with a higher tier intermediary is credited, and that latter credit is su      bsequently reversed on grounds of fraud or  defect of title, it is superficially attractive to suggest that the particular recipient account holder should bear the loss.

---

[37]   For example, members whose accounts are credited with securities in anticipation of settlement of a matching delivery may give security over their holdings generally in favour of the lending members who have financed the credit.

[38]   Either on policy grounds or because it was conceptually impossible (*cf. supra*, 3.2).

However, closer examination shows that in many cases, the circu mstances in which a shortfall may arise are far more complicated and will make it extremely difficult or impossible to trace particular accounts to which the shortfall should be attributed.[39] The Study Group therefore took the pr ovisional view that there should be a uniform rule to the effect that any shortfall which is not made good by the intermediary (see *supra*) should be borne, in proportion to the balances on their accounts, by all the intermediary's account holders to whose accounts securities of the relevant description are credited.

### 3.10  Insolvency protection and other issues where a uniform rule may be considered

The Study Group also contemplated whether a un iform rule was required for the protection of property representing account holders' interests from the claims of general creditors of the intermediary in the event of the latter's insolvency. It seems clear that such protection is required to satisfy the cr iterion of internal soundness and that uniformity as to the result is desirable. This does not nece s-sarily mean, however, that there must also be uniformity as to the manner in which this is achieved. At present, for example, such protection is co nferred under some systems as part of the rules of inso lvency law and under others through arrange-ments having the effect that the underlying holdings represen ting account holders' entitlements form a separate *corpus* of property not regarded as belon ging to the intermediary at all. The Study Group will welcome views about whether a diversity of mechanisms is acceptable provided the appropriate level of protection is conferred.

Whatever the mechanism by which account holders' interests are protected, intermediaries which are regulated institutions will often be subject to regulatory requirements regarding the separate identifi cation and segregation of unde rlying property representing or corresponding to account holders' interests. The Study Group takes the view that it is not part of its mandate to suggest the scope or content of such regulatory requir ements. Clearly, such requirements will need to be borne in mind in formulating suggestions on uniform rules of substa ntive law, and regulatory and supervisory bodies are and will continue to be among those consulted in relation to this pr oject. The Study Group is not aware that an y of its provisional conclusions are inconsistent with existing regulatory requirements.

Similar considerations apply in relation to —

   (a)   whether, to what extent and subject to which conditions intermediaries should be able to use for their own purposes under lying securities or interests corresponding to account holders' interests;[40]

   (b)   whether intermediaries can transfer other risks or costs to investors, *e.g.* the cost of replacing underlying assets as a result of a credit of "bad" stock.

---

[39]   See paragraph 3.5 and 3.8 above and the literature cited in footnote 29.
[40]   If it is permitted, it will be an additional source of excess credits, raising the issues discussed above.

*Harmonised substantive rules regarding indirectly held securities*

This is because these ar    e matters for public or regulatory po       licy jud gement involving the balancing of considerations such as investor protection, freedom of contract and economic eff  iciency. Consideration may, however, be given to the formulation of "benchmark" safeguards which       could be promulgated as agreed standards. This issue will be explored further by the Study Group.

Further points on which the Study Group has yet to reach a conclusion as to the need for a uniform rule include —

    (a)   the perfection of security interests: whethe  r there should be a uniform procedure for effecting and perfecting sec   urity interests in book entry securities created otherwise than by transfer to a new book entry account;

    (b)   the definition of terms of such as "securities".

## *APPENDIX 1*

## *MEMBERS OF THE UNIDROIT STUDY GROUP*

**Chair**

| | |
|---|---|
| Mr B. SEN (Chairman) | Senior Advocate at the Supreme Court of India *and* Member of the UNIDROIT Governing Council, New Delhi, India |
| Mr Luc THÉVENOZ (Vice Chairman) | Professor of Law, University of Geneva, Switzerland |

**Members**

| | |
|---|---|
| Mr J. Michel DESCHAMPS | Partner, McCarthy Tétrault, Montreal, Canada |
| Mr Philippe DUPONT | Partner, Arendt & Medernach, Luxembourg |
| Ms Dorothee EINSELE | Professor of Law, University of Kiel, Germany |
| Mr Edgar I. JELONCHE | Professor of Law, Buenos Aires University, Argentina |
| Mr Hideki KANDA | Professor of Law, University of Tokyo, Japan |
| Mr LI Rui Qiang | Law Manager, China Securities Depository and Clearing Co. Ltd., Beijing, P.R. China |
| Mr Guy MORTON | Partner, Freshfields Bruckhaus Deringer, London, United Kingdom |
| Mr Frédéric NIZARD | Direction juridique, Crédit Agricole SA Paris, France |
| Mr Richard POTOK | Principal, Potok & Co., Darlinghurst, Australia |
| Mr Curtis R. REITZ | Professor of Law, University of Pennsylvania, USA |
| Mr WU Zhipan | Professor and Vice-President, University of Beijing, P.R. China |

**Secretary**

| | |
|---|---|
| Mr Philipp PAECH | UNIDROIT, Rome, Italy |

The following intergovernmental   Organisations and non  -governmental Organisations are participating in their capacity as observers:  *Hague Conference of Private Int ernational Law, United Nations Commission on International Trade Law* and *Capital Markets Working Group* (a private financial sector initiative which shall co-operate with the UNIDROIT Study Group).

## APPENDIX 2

## ABOUT UNIDROIT

The International Institute for the Unification of Private Law (UNIDROIT)[*] is an independent intergovernmental organisation which has its seat in Rome. Its purpose is to study needs and methods for modernising, harmonising and co-ordinating private, and in particular commercial, law as between States and groups of States. Set up in 1926 as an auxiliary organ of the League of Nations, the Institute was, following the demise of the League, re-established in 1940 on the basis of a multilateral agreement, the UNIDROIT Statute.

UNIDROIT's 59 member States are drawn from the five continents and represent a variety of different legal, economic and political systems as well as different cultural backgrounds. These are: Argentina, Australia, Austria, Belgium, Bolivia, Brazil, Bulgaria, Canada, Chile, China, Colombia, Croatia, Cuba, Cyprus, Czech Republic, Denmark, Egypt, Estonia, Finland, France, Germany, Greece, Holy See, Hungary, India, Iran, Iraq, Ireland, Israel, Italy, Japan, Luxembourg, Malta, Me xico, Netherlands, Nicaragua, Nigeria, Norway, Pakistan, Paraguay, Poland, Port ugal, Republic of Korea, Romania, Russian Federation, San Marino, Se rbia and Montenegro, Slovakia, Slovenia, South Africa, Spain, Sweden, Switzerland, Tun isia, Turkey, United Kingdom, United States of America, Uruguay, Venezuela.

UNIDROIT's basic statutory objective is to prepare modern and, where appr opriate, harmonised rules of private law understood in a broad sense. However, exper ience has demonstrated the need for occasional incursions into public law, especially in areas of the law where hard -and-fast lines of demarcation are difficult to draw. Rules prepared by UNIDROIT are co ncerned with substantive law; they only include uniform conflict-of-laws rules incidentally.

UNIDROIT's independent status amongst intergovernmental Organisations has enabled it to pursue working methods which have made it a particularly suitable forum for tackling more technical and correspondingly less political issues. New technologies, commercial practices, etc. call for new solutions and, where tran sactions tend to be transnational by their very nature, these should be harm onised, widely acceptable solutions. Generally speaking, the eligibi lity of a subject for harmon isation or even unification will to a large extent be conditional on the perception of States' willingness to accept change in their municipal law rules in favour of a new international solution. Legal and other arguments advocating harmon isation must accordingly be weighed carefully against these considerations. Similar co nsiderations will also determine the most appropriate sphere of application for such rules, that is,

---

[*] For detailed information concerning the Institute and its Work Programme, *cf.* www.unidroit.org.

whether they should be    restricted to truly cross -border situations or relations or extended to cover purely internal situations as well.

In keeping with its intergovernmental structure, the rules drawn up by        UNIDROIT have traditionally tended to take the form of *international Conventions*, designed to apply automatically in preference to a State's municipal law upon co mpletion of all the formal requirements of that State's domestic law for their entry into force. However, there are alternatives, including *model laws*, which States may take into consideration when drafting domestic legislation, or   *general principles* addressed directly to judges, arbitrators and co ntracting parties who are, however, left free to decide whether to use them or not. Where a subject is not judged ripe for        the drawing up of un iform rules, another alternative consists in the preparation of *legal guides*, typ ically on new business techniques designed for the use of professional parties in countries unfamiliar with the emerging contractual practice on the subje ct covered.

Once a subject has been included in the  UNIDROIT Work Programme, the Secretariat convenes a   *Study Group* , traditionally chaired by a member of the        UNIDROIT Governing Council, for the preparation of a   *preliminary draft Convention* or one of the alternatives mentioned above. The membership of such study groups, made up of experts acting in their personal capacity, is a matter for the Secr    etariat, which seeks to ensure as balanced a representation as possible of the world's different legal and economic systems and geographic regions.

A preliminary draft instrument prepared by a study group will be laid before the Governing Council for approval and advice as to the most appropriate way forward. Typically, in the case of a preliminary draft Convention        , this will co nsist in its requesting the Secretariat to convene a *Committee of Governmental Experts* for the finalisation of a  *draft Convention* capable of submission to a  *diplomatic Conference* for adoption.

By reason of its expertise in the international        unification of law,  UNIDROIT is, moreover, at times commissioned by other Organisations to prepare co    mparative law stu dies and/or draft conventions designed to serve as the basis for the preparation and/or finalisation of international instruments by those Organisations.

UNIDROIT's ability to obtain up -to-date information on the state of the law in all the various countries is essential to the pursuit of its statutory objectives. This information is sometimes difficult to obtain and        UNIDROIT therefore mai ntains a network of  *correspondents* in both member and non     -member States, who are appointed by the Governing Council amongst academic and practising lawyers.

UNIDROIT has, in the course of time, prepared over 70 studies and drafts. Many of these have result ed in international instruments, including the Institute's latest achievement, the  *Convention on International Interests in Mobile Equipment*   and the related *Protocol on Matters specific to Aircraft Equipment*, which were opened to signature on 16 November   2001 at a diplomatic Conference held in Cape Town under the joint auspices of        UNIDROIT and the International Civil Aviation Organisation (ICAO).