# EXHIBIT 27



INTERNATIONAL INSTITUTE FOR THE UNIFICATION OF PRIVATE LAW
INSTITUT INTERNATIONAL POUR L'UNIFICATION DU DROIT PRIVE

| | |
|---|---|
| UNIDROIT COMMITTEE OF GOVERNMENTAL EXPERTS FOR THE PREPARATION OF A DRAFT CONVENTION ON HARMONISED SUBSTANTIVE RULES REGARDING INTERMEDIATED SECURITIES<br>**Second session**<br>**Rome, 6/14 March 2006** | UNIDROIT 2006<br>Study LXXVIII – Doc. 36<br>Original: English<br>February 2006 |

### COMMENTS BY GOVERNMENTS AND INTERNATIONAL ORGANISATIONS

*(Comments by the Government of the United States of America)*

**DIVERGENCE IN SUBSTANTIVE NATIONAL LAWS AFFECTING THE INTERMEDIATED HOLDING OF SECURITIES**

**Some problems**

The following basic scenario is a simplified version of the scenario set forth in Chapter 2 of Cross border Collateral: Legal Risk and the Conflict of Laws, Richard Potok (ed.), Butterworths, 2002. Results under the Draft Unidroit Convention set out below assume that all countries involved are parties to the Convention. In addition, each example assumes that all relevant countries are parties to the Hague Securities Convention and that applicable law is determined in accordance with that Convention.

The figures are to found in Appendix I-A.

**Basic scenario --** *See* **Figure 1a**

1. Issuer is incorporated in Country A. Issuer has 5,000 shares outstanding.

2. CSD is located in Country B. All of Issuer's shares are held through CSD, which holds physical share certificates for the holding at its headquarters in Country B.

3. ICSD's Sub-Custodian is located in Country B. ICSD's Sub-Custodian is a participant of the CSD. CSD has credited 3,000 shares of the Issuer to ICSD Sub-Custodian's account.

4. ICSD is located in Country C. ICSD's Sub-Custodian. ICSD Sub-Custodian sub-custodies securities for ICSD. ISCD Sub-Custodian has credited 2,500 shares of the Issuer to ICSD's account.

5. Bank is located in Country D. Bank is a participant of ICSD. ICSD has credited 1,200 shares of the Issuer to Bank's account at ICSD.

6. Investor is located in Country E. Investor is a customer of Bank. Bank has credited 500 shares of the Issuer to Investor's account at bank. Bank and Investor have an account agreement governed by the laws of Country D.

Collateral Taker is located in Country F. Collateral Taker is a Customer of Bank. Collateral Taker makes a loan to Investor. Investor pledges 500 shares of the Issuer to Collateral Taker. The pledge is reflected by a transfer from the securities account of Investor at Bank to a securities account of Collateral Taker at Bank.

**Problems**

1.  <u>Upper-tier attachment</u>.

    a.   *See* **Figure 1a.**  A creditor of ICSD obtains a judgment against ICSD in Country B.  Country B permits attachment at the holding tier where securities certificates are physically held.  A court in Country B issues an attachment order against shares of Issuer held by CSD to the extent of ICSD's position in these shares.  CSD does not have a means of identifying the portion of its holdings that it holds on behalf of ICSD, and thus responds to the order by temporarily blocking all transactions in its holdings of Issuer shares.  Consider the effect of that block on transactions in that issue down through the tiers of intermediaries.[1]

**Draft Convention Results:**  Alternative 1: Upper tier attachment is prohibited. The judgment creditor must attach at the level of ICSD's securities account with ICSD's Sub-Custodian in Country B.  Under Alternative 1, CSD never receives an attachment order. Alternative 2: Country B has filed a declaration under the Convention permitting (in its domestic regime) upper tier attachment.  This assumes that the various problems that we have raised with this approach could be worked out including the concerns of market participants about systemic risk.  If the second approach is adopted, it should be subject to conditions that include, but probably will not be limited to, the following:  (i) the declaration may only relate to accounts governed by that nation's law (in our example, Country B) and (ii) that nation's systems and procedures must provide for an objective means of identifying, at the top tier, interests held at a lower tier.  Under Alternative 2, CSD would still receive an attachment order, but would be able to respond to the order without an effect on parties other than ICSD.  Finally, if the accounts are maintained at a custodian governed by the law of Country C, then the Convention rule—no upper tier attachment—applies and the rights of Collateral Taker cannot be affected by an upper tier attachment.

    b.   *See* **Figure 1b.**  In this regard, consider the facts of the attached <u>Fidelity Partners, Inc. v. First Trust Company of New York.</u>  In this case, Philguarantee held an interest in certain Philippine Reduction Interest Bonds or "FLIRB's" through ING Bank of Manila in the Philippines.  ING Bank of Manila, in turn, held its interest in the FLIRB's through the Euroclear system by means of a book-entry credit to a securities account in its name at Morgan Guaranty's Brussels office.  Morgan Guaranty's London office was acting as Morgan Guaranty Brussels' sub-custodian for the bond.  Morgan Guaranty London was the only recorded owner of the FLIRB global bond on the books of the First Trust Company of New York, which served as the fiscal and paying agent, registrar, transfer agent and authenticating agent for the bond on behalf of the issuer, the Republic of the Philippines.

    A U.S. creditor of Philguarantee, Fidelity Partners, sought to attach Philguarantee's interest in the FLIRB's at the level of First Trust Company in the U.S. The New York court held that Fidelity Partners could only attach the interests of Philguarantee at the securities depository, ING Bank, where it had its securities account.  However, assume that the court had concluded that, under U.S. law, the creditor could attach the interest of Philguarantee at the level of First Trust Company.

**Draft Convention Results:**  Same as a.

2.  <u>Insolvency, tracing, and adverse claims</u>.

    *See* **Figure 2.**  Assume that Investor has not made the pledge to Collateral Taker. After Investor has obtained a position in 500 shares of Issuer, Investor delivers 100 additional shares for deposit into Investor's account at Bank.  Investor then enters into a series of transfers of its position in Issuer shares, pursuant to which 50 shares are credited to Alpha's securities account with an intermediary in Country E; then 250 shares are credited to Beta's securities account with an

---

[1]   *See* Philipp Paech, "Harmonising Substantive Rules for the Use of Securities Held with Intermediaries as Collateral:  the UNIDROIT Project," Unif. Law Rev. 2002-4, p. 1140, § 3.2.2.

UNIDROIT 2006 – Study LXXVIII – Doc. 36                                                                                           3.

intermediary located in Country F; then 250 shares are credited to Gamma's securities account with an intermediary located in Country G; and then 50 shares are credited to Delta's securities account with an intermediary located in Country H.  These transfers are effected by directions from Investor to Bank; debits from Bank's account at ICSD; credits to the accounts of the relevant intermediaries at ICSD; and credits to the accounts of Alpha, Beta, Gamma, and Delta at their respective intermediaries.  Pursuant to account agreements between Alpha, Beta, Gamma, and Delta and their respective intermediaries, the laws of Country E, F, G, and H, respectively, apply to each credit in respect of the matters described in Article 2(1) of the Hague Securities Convention.  The validity of the credit of the 100 additional shares is then attacked and sustained.  Upon discovery, ICSD debits Bank's account for 100 invalid shares.  Bank then seeks to recover this amount of shares from its customer, Investor which should be required to deliver replacement securities to its intermediary, Bank.  However, if Investor is insolvent and Bank can not recover these shares, Bank may be responsible for buying replacement shares to cover.  It will have a claim in Investor's insolvency.

Who of Alpha, Beta, Gamma, and Delta has the bad shares?  The answer to this question will depend on a rule of convenience established by the governing law, which will always be arbitrary in some sense.  Under a "first in, first out" presumption, Gamma and Delta will be treated as having 50 each of the bad shares.  Under a "last in, first out" regime, Alpha and Beta will be considered the holders of the bad shares.  Under a *pro rata* sharing regime, Alpha, Beta, Gamma, and Delta will all bear some of the bad shares in proportion.  Further, if there is a good faith purchaser rule, none of Alpha, Beta, Gamma, or Delta may be debited, and Bank will have to find additional shares to balance the books.

Suppose that the laws of Countries E, F, G, and H each choose to apply different rules in this respect:  E has a "first in, first out" rule; F has a "last in, first out" rule; G has *pro rata* sharing; and H has *pro rata* sharing with a good faith purchaser rule.  How will the "bad" shares be allocated? Suppose further that Alpha, Beta, Gamma, and Delta are themselves intermediaries whose holdings of these securities on the books of their intermediaries are actually held for their own customers.  How will the "bad shares" be allocated to those customer accounts?  If each national law has a different method of allocating loss, investors in an equivalent position—*i.e.* a good faith purchaser--could be treated differently: for example, one could take free and another might have to give up his interest.  Consider a further variation where one purchaser has taken free but has assets in a jurisdiction which is a tracing jurisdiction, and those assets are then attached in an attempt to recover the securities.  Moreover, it should be remembered that this example is overly simplified.  In real life, debits and credits are netted, so that one does not know necessarily the identity of the transferor.  Chances are that there would be further credits of "good" securities at a time when some, but not all, of the "bad" securities had been deemed to leave Investor's account, and that Alpha, Beta, Gamma, and Delta would all have engaged in further transactions under which "bad" securities passed or were deemed to pass to other account holders.

**Draft Convention Results:**  One or another version of the innocent acquisition rule (*See* Articles 7 and 11) would protect all qualifying transferees, other than Investor, who have received a credit.  Because not every credit to a securities account derives from an identifiable transferor, it makes sense to reformulate the innocent acquisition rule as an immunity from liability.  Protection should not be denied merely because an innocent acquirer cannot identify a particular transferor.

Investor should be required to deliver good replacement securities to its intermediary, Bank. If Investor is insolvent, its Bank would be left with a claim against Investor in Investor's insolvency proceeding.[2]

---

[2] Under the facts of the example innocent acquirers are protected and Bank bears the risk of the insolvency of its account holder, Investor, from whom it received the flawed securities.  In other situations, however, innocent acquisition protection would be inadequate to protect an innocent intermediary that acts as a "conduit" for securities or intermediated securities and who is not itself an acquirer.  For example, an

3.      Other interconnection problems.

a.      **See Figure 1a.**  Bank's ownership of the shares of Issuer, which are dematerialized, is reflected only by book-entry at ICSD. Country D requires certification as a condition of treating a financial instrument as a "security." Bank requests ICSD to issue a physical security. Country C prohibits ICSD, Bank, and other intermediaries, from certificating securities. Investor becomes insolvent. The law of Country D applies to the perfection of Collateral Taker's security interest. However, lacking certification, Country D does not grant the interests the protections that it otherwise affords to securities, exposing Collateral Taker to insolvency risk.[3]

**Draft Convention Results:**  Under the Convention, Bank would receive all the benefits (*See* Article 5) of the credit of intermediated securities to its account. This would obtain regardless of Country D's certification requirement.

b.      **See Figure 1a.**  Under the law of Country B, transfers are effective only if they are recorded on the books of CSD; the ICSD's Sub-Custodian, and any other intermediary recognized by law, is treated only as a record-keeper. CSD has marked in its books that ICSD has been transferred 2,500 shares of Issuer. The rest of the facts are the same as our basic scenario. ICSD becomes insolvent, and does not have enough shares of Issuer to satisfy its account holders.  Under the law of Country B, Bank's property interest in the securities would not be recognized by the CSD.  The law of Country B would consider Bank to have a contractual claim against ICSD (or no claim) in respect of the shares of the Issuer.  Consider the effect of this on the account holders below Bank, and in respect of the credit under the laws of Country C, D, E, and F.  There are other possible complications. Suppose that ICSD is able to record the interests of its account holders at the level of CSD and does so for only some of its account holders.  Should the account holders of ICSD whose interests are recorded be treated differently from those whose interests are not?

**Draft Convention Results:**   All account holders of ICSD whose account holder rights are not governed by the law of Country B should bear the same intermediary risk and should not be affected by what happens at a higher tier.  Bank would be entitled to its *pro rata* share of Issuer's securities of the same description.  Both Investor and Collateral Taker are entitled to the full number of securities credited (or otherwise transferred in the case of the Collateral Taker), unless Bank's Article 4 duties were limited under the relevant account or other agreement.

c.      **See the variants of Figure 3c.**  Suppose that the laws of Country A impose the following corporate law, regulatory law or contract law restrictions on the holding of shares. Under the corporate law of Country A, shares that are not fully paid are not transferable, and the shares of ABC Corporation have not been fully paid.  Under the regulatory law of Country A, only citizens of Country A can hold the shares of XYZ Corporation, which is engaged in the manufacture of armaments for the military of Country A.  Under the contract law of Country A, a closely held corporation, CHC, organized under the law of Country A, has imposed prior approval requirements on the transfer of its shares.

The shares of ABC Corporation are credited to the account of Investor E on the books of Bank, and then debited and credited to the account of Collateral Taker F.  **See Figure 3c1.**  The shares of

---

intermediary may act on instructions of its account holder to the detriment of a third person, such as the account holder's spouse who claims marital rights, thereby incurring liability to the spouse under the traditional domestic non-Convention law.  Such an innocent intermediary should have immunity from liability. Moreover, this immunity should be available unless the intermediary in fact wrongfully acts in concert with another, such as its account holder, to violate the rights of another, such as the spouse.  For example, the intermediary's mere knowledge that the spouse is asserting a claim should not be sufficient to render it liable. Otherwise, the liquidity of intermediated securities in the financial markets would be compromised. This immunity for intermediaries is an important principle that should be addressed explicitly in the Convention.

See See Philipp Paech, "Harmonising Substantive Rules for the Use of Securities Held with Intermediaries as Collateral:  the Unidroit Project," Unif. Law Rev. 2002-4, p. 1140, § 3.2.2.

XYZ Corporation are credited to account of Investor E, who is not a citizen of Country A.  ***See* Figure 3c2.**  Investor E, who has the shares of CHC Corporation credited to its account, instructs the intermediary to debit its account and credit another account of another investor on the books of Bank.  *See* **Figure 3c3.**

In light of the domestic non-Convention law, do the credits of these securities to the securities accounts of the investors confer Article 4 rights?  Are the credits effective under Article 5?  Can they be reversed under Article 7?

**Draft Convention Results:** The Convention does not specifically treat these issues, but may perhaps indirectly address them in a number of provisions including: Article 4 (3) (rights enforced against the intermediary and where permitted against the issuer, *Cf.* Article 19 (3)); the account holder and intermediary could address these restrictions in their account agreement in version B of Article 4(6); Article 5(2) (no further step necessary other than credit).

Do the corporate, regulatory, and contract law restrictions affect the "authority" of the intermediary to make the debit or credit under Article 7(1) (b), or reversal in Article 7(5)?

**What the Convention should do:** While account holders need to take account of the law of issue, non-commercial law restrictions imposed by the domestic non-Convention law should not render ineffective an otherwise effective credit under the Convention. However, no intermediary should be required to take action that is otherwise prohibited by its own domestic non-Convention law.  The domestic non-Convention law may impose other consequences, such as penalties, freezes, reversals, or other sanctions.  Similarly, no intermediary should be required to take notice of the domestic non-Convention law of another nation and the Convention should protect the intermediary from claims so long as it acts in accordance with applicable regulatory law or duties imposed by other bodies of law.  Another option is to permit declarations or protocols that would exclude the securities of certain types of issuers from the Convention.



APPENDIX 

**Figure 1a**

Basic scenario

**Figure 1b**

Fidelity Partners case

**Figure 2**

Insolvency, tracing, and adverse claims

**Figure 3c1**

Corporate law restrictions

ABC Corp







