UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*216*

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate Of James C. Knipple (Dec.) (see Exhibit A for a Full List of Plaintiffs),<br><br>     Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN; BANK MARKAZI a/k/a CENTRAL BANK OF IRAN; BANCA UBAE SpA; CITIBANK, N.A., and CLEARSTREAM BANKING, S.A.,<br><br>     Defendants. | Case No.: 10 CIV 4518  *BSJ*<br><br>**FILED UNDER SEAL CONTAINS CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER**<br><br><u>**SECOND AMENDED COMPLAINT PURSUANT TO N.Y. C.P.L.R. 5225 AND 5227**</u><br><br>**Plaintiffs demand a trial by jury.** |

The Plaintiffs/Judgment Creditors listed on the attached Exhibit A ("Plaintiffs"), by their attorneys, allege the following claims based upon information and belief, except those allegations concerning Plaintiffs, which they allege based upon their personal knowledge.

## NATURE OF THE CLAIM

1.    Plaintiffs are the victims of the deadly Iran-sponsored 1983 terrorist bombing of the U.S. Marine Barracks in Beirut, Lebanon.  Plaintiffs include the representatives of the estates of the 241 American servicemen killed in that attack, many survivors of the bombing, and the family members, heirs and representatives of the killed and injured servicemen.

2.    By means of this action, Plaintiffs seek to enforce the judgment for $2,656,944,877.00 in compensatory damages (the "Judgment") that they secured against two

181752

defendants, the Islamic Republic of Iran ("Iran") and Iran's Ministry of Information and Security ("MOIS" and, collectively with Iran, the "Judgment Debtors"), in 2007.

3.      Despite the Judgment Debtors' longstanding, determined efforts to evade collection of the Judgment, and other judgments obtained by the victims of Iran's ongoing terror campaign, Plaintiffs succeeded in restraining over $▮▮▮▮ in bonds and cash ▮▮▮▮ held by Iran's supposed "central bank," defendant Bank Markazi ("Markazi").[1] From the time Markazi invested in those bonds (the "Restrained Bonds") through the dates that Plaintiffs succeeded in obtaining the restraints, the Restrained Bonds were present in the United States – or, in the terminology of the securities industry, "immobilized" at the United States Federal Reserve Bank in New York (the "FRBNY") or the Depository Trust Corp. ("DTC"), and "custodized" and "maintained for safekeeping" at Citibank in an account maintained for Clearstream's customers.

4.      Plaintiffs easily satisfy all of the requirements for collecting a portion of their massive Judgment against the Restrained Bonds under federal and common law, including the Foreign Sovereign Immunities Act, 28 U.S.C. Section 1602 *et seq.* (the "FSIA").

5.      Markazi's ▮▮▮▮ ownership of the Restrained Bonds poses no obstacle to collection because Iran dominates and controls Markazi's actions, thereby rendering Markazi a mere alter ego of Iran that follows Iran's directions regarding matters ranging from monetary policy, to financing Iran's continuing acts of international terrorism and efforts to develop weapons of mass destruction ("WMDs"), to evading the enforcement of the Judgment and other judgments secured by the victims of Iran's terrorism. Indeed, Iranian President Mahmoud

---

[1] The assets described in the Plaintiffs' Initial Execution, annexed hereto as Exhibit C, and Plaintiffs' restraining notices annexed hereto as Exhibit D, as modified by this Court's June 27, 2008 Order, annexed hereto as Exhibit E, as well as the cash proceeds collected by Citibank from bonds that comprised those assets and any interest accrued thereon since the assets were restrained, are hereinafter referred to as "Restrained Bonds."

Ahmadinejad has publicly and repeatedly boasted of his ability to control Markazi's actions, and other Iranian officials frequently acknowledge the bank's subjugation to Ahmadinejad's whims.

6.  ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████

7.    In short, five key issues exist regarding Defendants' supposed defenses to Plaintiffs' right to collect against the Restrained Bonds: (a) did Iran waive the immunity that the agencies and instrumentalities of sovereign nations traditionally enjoy against the collection of judgments; (b) did Markazi, acting as Iran's alter ego, engage in "commercial activity" in the United States in relation to the Restrained Bonds; (c) does some interest in the Restrained Bonds exist in this District for Plaintiffs to levy against; (d) is Markazi entitled to the immunity from collection that may apply to a legitimate central bank holding funds "for its own account" under 28 U.S.C. Section 1611(b)(1); and (e) did Markazi successfully evade collection by working with its co-conspirators, Iran, Clearstream and UBAE, ███████████████████████████

████████████████████████████████████

████████████████████████████████████

8.    The relevant facts compel answering the first three of those questions in the affirmative, and the latter two in the negative. Iran has, explicitly and by implication, waived any immunity from collection that would otherwise apply to funds held by its agencies and

instrumentalities, including Markazi.  ██████████████████████████

████████████████████████████.

9.     Clearstream's presence in this District, and the extensive commercial activity that took place here at the direction and through the agents of Iran and Markazi, to maintain the Restrained Bonds for safekeeping, to ████████████ of those securities and to make interest and principal payments to Markazi, leave no doubt that Markazi and its agents engaged in commercial activity in the United States in relation to the Restrained Bonds.  Likewise, the presence of Clearstream, Citibank, the Restrained Bonds and the cash proceeds of those securities in this District renders Defendants' contentions that nothing exists here for Plaintiffs to levy against an exercise in sophistry.

10.    Markazi's assertion that 28 U.S.C. Section 1611(b)(1) protects its assets from collection ignores Iran's waiver of any collection immunity otherwise applicable to its agencies and instrumentalities.  In any event, Markazi cannot demonstrate that it utilized the Restrained Bonds exclusively "for its own account," *i.e.*, solely in connection with legitimate central banking activity, a necessary condition to defeat collection under Section 1611(b)(1).

11.    To the contrary, the U.S. Departments of State and Treasury have recently taken the unprecedented step of designating Markazi as the first supposed central bank subject to restrictions under the Patriot Act's provisions related to jurisdictions of "primary money laundering concern."  Markazi earned that designation by consistently assisting in Iran's financing of terrorism, efforts to promote nuclear weapons proliferation and evasion of U.S. and international sanctions.

12.    As the Treasury Department recognized in announcing the sanctions against Markazi, every transaction in which Markazi engages is inherently suspect, and Markazi has

repeatedly demonstrated its willingness to lie and to deceive to advance Iran's illegal activities. Thus, the Restrained Bonds are properly seen as the tools of Iran's ongoing violations of U.S. sanctions and international law, not – as Markazi suggests – as ordinary "foreign exchange reserves" maintained by a legitimate "central bank" "for its own account"

13.     Finally, the fraudulent conveyances in which Markazi engaged shortly before Plaintiffs succeeded in restraining the Restrained Bonds provide no defense to Plaintiffs' right to levy those assets.  Iran, Markazi, Clearstream and UBAE (the "Conspirators") jointly agreed in ███████████ to move the Restrained Bonds and ██████████████ from an account that Clearstream maintained ██████████ to the ██████████████ that UBAE ████████ to house those assets.

14.     Those transfers bear numerous and obvious indicia of fraud.  The Conspirators embarked on their scheme to transfer the assets just as amendments to the FSIA facilitated the ability of terror victims to collect their judgments against rogue states such as Iran and as other international sanctions threatened Markazi's ability to act freely in the international banking system.

15.     Furthermore, ████████████████████████████████████████████ served no legitimate business purpose.  UBAE is, by any measure, a small bank that can provide little of value to a massive financial institution like Markazi.  From Markazi's perspective, ████████ sole value was its willingness to serve ██████████████ in connection with the bond transactions and thereby impede collection efforts by Iran's creditors and the ability of the U.S. and foreign governments to sanction Markazi and Iran.  Because UBAE was controlled by the regime of Libyan strongman Muammar Gaddafi when the Conspirators initiated their scheme, UBAE was uniquely suited for that role.

16.     Thus, to the extent that some significance attaches to whether Clearstream or UBAE is the proper garnishee in this action, the Court's equitable powers justify reversing Markazi's fraudulent conveyances of the Restrained Bonds, restoring them to Markazi's Clearstream account and permitting Plaintiffs to levy those assets.

17.     Moreover, the foregoing facts easily establish Plaintiffs' right to the turnover of the Restrained Bonds and to the payment of the damages arising from the Conspirators' fraudulent and tortious efforts to impede Plaintiffs' ability to collect the Judgment.

18.     The Court should therefore provide some closure to Plaintiffs' decades-long quest to force Iran to account for its murderous acts on the morning of October 23, 1983 and order Defendants to surrender the Restrained Bonds to Plaintiffs and to pay the damages and punitive damages to which Plaintiffs are entitled.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Sections 1331, 1605(a)(1), 1605(a)(2), 1605(a)(7), 1605A and 1610.  This Court also has jurisdiction under 28 U.S.C. Section 1963 because Plaintiffs obtained their Judgment in the United States District Court for the District of Columbia and subsequently registered the Judgment in the Southern District of New York.  This proceeding arises under Fed. R. Civ. P. 69(a), which incorporates the applicable law of the State of New York and the United States.

20.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4, CPLR Sections 301 and 302, and 28 U.S.C. Sections 1605(a)(1), 1605(a)(2), 1605(a)(7), 1605A and 1610.

21.    As Plaintiffs particularize below, Iran has explicitly and by implication waived any right to immunity against suit and execution that Markazi and Iran's other agencies and instrumentalities might otherwise enjoy from the claims that Plaintiffs assert.

22.    Iran and its alter ego, Markazi, engaged in substantial commercial activity inside and outside of the United States in connection with their investments ██████████████

████████████████████████████████████████████████████████

23.    In particular, Iran, Markazi and the Banking Agent Defendants engaged in commercial activity in the United States by investing in the bonds safeguarded in this country that comprised the Restrained Bonds when Plaintiffs secured their execution and levy upon those assets.

24.    ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.

25.    Iran and Markazi continue to engage in commercial activity in the United States by claiming their entitlement to the Restrained Bonds, which are now principally comprised of cash that Citibank holds in a segregated account ██████████████.

26.    The actions that Markazi and Iran undertook with respect to the Restrained Bonds in Iran, including the investment decisions that they made regarding those bonds, had direct effects in the United States, including ██████████████████████████

███████████████████████

27.    Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(b), (d) and (f).

## PARTIES AND JUDGMENT DEBTORS

28.     Plaintiffs are the victims of the deadly Iran-sponsored 1983 terrorist bombing of the U.S. Marine barracks in Beirut, Lebanon.  Plaintiffs include the representatives of the estates of the 241 United States servicemen killed in that attack, many survivors of the bombing, and the family members, heirs and representatives of the killed and injured servicemen.  All Plaintiffs are United States Citizens residing in the United States, including the State of New York.

29.     Defendant and Judgment Debtor the Islamic Republic of Iran ("Iran") is a foreign sovereign and U.S. government-designated state sponsor of terrorism.  Plaintiffs secured a judgment for $2,656,944,877.00 in compensatory damages against Iran for its role in the murderous Marine Barracks attack that killed and injured Plaintiffs.

30.     The United States Department of State first designated Iran as a state sponsor of terrorism in 1984 and has reiterated that designation every year since 2000 in its Country Reports on Terrorism.[2]  Iran earned that ignominious designation by repeatedly providing support for acts of international terrorism.  In addition to financing and lending non-monetary support to terrorist acts, Iran has also actively pursued the development of weapons of mass destruction ("WMD") in violation of international law.

31.     The Iranian Ministry of Information and Security ("MOIS") is a Judgment Debtor.  MOIS serves as an intelligence organization for the Iranian government.  MOIS acted as a conduit for Iran's provision of funds, training and weapons to Hezbollah, the terrorist organization that assisted Iran in conducting the 1983 Beirut Marine Barracks bombing.  Among other illicit conduct, MOIS provided explosives to Hezbollah and exercised operational control over Hezbollah's attack upon the Marine Barracks.

---

[2] *See* "State Sponsors of Terrorism," U.S. Department of State, August 18, 2011 (http://www.state.gov/s/ct/rls/crt/2010/170260.htm).

32.    Defendant Bank Markazi, a/k/a the Central Bank of Iran ("Markazi"), describes itself as Iran's central bank.  Markazi was formed under the laws of Iran and maintains its principal place of business in Iran, although it conducts its business operations world-wide, including in the United States.

33.    At all relevant times, Markazi served as an agent and instrumentality and alter ego of Iran.  Markazi engaged in all of the conduct and actions that Plaintiffs allege at the direction and for the benefit of Iran and as Iran's alter ego.  Iran directed Markazi to engage in that conduct and supervised Markazi's performance of the tasks that Iran directed.

34.    Because of Markazi's longstanding illegal and deceptive efforts to facilitate Iran's support for global terrorism and pursuit of nuclear and ballistic missile capabilities, the U.S. Departments of State and Treasury took the unprecedented step on November 21, 2011 of applying restrictions applicable to jurisdictions of "primary money laundering concern" to Markazi.[3]  Markazi is the only purported central bank of a sovereign nation to be included within the scope of those restrictions.

35.    As support for its designation of Markazi as a money launderer, the Department of Treasury found that Markazi and other state-owned Iranian banks "willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies."  The Department of Treasury also emphasized that Markazi "provided financing to the UN-sanctioned Khatem al-Anbiya Constructions Headquarters for defense-related projects," *i.e.*, for Iran's nuclear proliferation program.

36.    Defendant Banca UBAE SpA ("UBAE") is a banking corporation organized under the laws of Italy that maintains its principal office in Rome, Italy.

---

[3] http://www.treasury.gov/press-center/press-releases/Documents/Iran311Finding.pdf .
http://www.nytimes.com/2011/11/22/world/middleeast/iran-stays-away-from-nuclear-talks.html

37.   Working as the agent of Iran and Markazi, UBAE caused Clearstream to transfer the Restrained Bonds held for safekeeping in the United States from Markazi's account at Clearstream to the ██████████████████ at Clearstream.  While the Conspirators agreed that the ███████████████ would not bear Markazi's name, █████████ that account exclusively for Markazi's benefit and at the direction of Markazi and Iran.

38.   UBAE ████████████████████████████ Markazi's █████████ ██████████████████ Until Italy's central bank seized control of UBAE in March of 2011 in conjunction with sanctions imposed upon the Libyan regime of the deceased strongman Muammar Gaddafi by the United Nations and the European Union, the Gaddafi regime controlled 67.55% of UBAE's stock.

39.   Among other claims, Plaintiffs assert fraudulent conveyance causes of action against ████████████████████████████████████████ ███████████████████████, UBAE does not qualify as a necessary party.

40.   Defendant Clearstream Banking, S.A. ("Clearstream") is a banking corporation organized under the laws of Grand Duchy of Luxembourg.  Clearstream's web site declares that the company "offers its customers the possibility to use Clearstream Banking as a single point of access for the settlement and custody of internationally traded bonds and equities across 51 markets" and that "[m]ore than 1,100 [Clearstream] employees service customers in Europe, the Americas, Asia-Pacific, the Middle East and Africa from our operational centres in Luxembourg, Germany and Singapore, as well as from representative offices in London, New York, Hong Kong, Dubai and Tokyo."  Clearstream undertakes substantial commercial activity in the County of New York and maintains an office at 55 Broad Street, New York, New York.

181752

41.    Working as the agent of Iran, Markazi, and UBAE, Clearstream invested the Restrained Bonds in the United States and undertook substantial efforts to assist in concealing Markazi's ownership interest in the Restrained Bonds.

42.    Defendant Citibank, N.A. ("Citibank") is a national banking association organized under the laws of the United States of America.  Citibank maintains its main office in New York County. ████████████████████████████████████████

████████████████████████████████████.

## THE FACTS AND CIRCUMSTANCES THAT DEMONSTRATE PLAINTIFFS' ENTITLEMENT TO RELIEF

**A.    Plaintiffs' Judgment against Iran for its Support of Murderous Terrorist Acts**

43.    Plaintiffs hold the unsatisfied Judgment in the total amount of $2,656,944,877.00 against the Judgment Debtors, Iran and MOIS.

44.    The United States District Court for the District of Columbia entered the Judgment on September 7, 2007.  A copy of the Judgment is annexed hereto as Exhibit B.  Plaintiffs registered the Judgment in this Court pursuant to 28 U.S.C. Section 1963 under Docket No. Misc. 18-302 on March 24, 2008.

45.    As the United States District Court for the District of Columbia found before issuing the Judgment, MOIS, acting as Iran's agent, committed the Marine Barracks attack within the scope of that agency.  A MOIS operative carried out the attack with the assistance of the Iranian-funded Hezbollah terrorist group by detonating powerful explosives at the Marine Barracks.

46.    Plaintiffs' judgment was based upon claims brought under 28 U.S.C. Section 1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA").

**B.    Plaintiffs' Successful Efforts to Prevent Defendants
from Disposing of the Restrained Bonds**

47.    In response to a subpoena served in aid of Plaintiffs' efforts to collect upon their

Judgment, Plaintiffs received a June 11, 2008 letter ███████████████████████

████████████████████ That letter stated that █████████████

█████████████████████████████████ Restrained

Bonds ████████████████████████████

████████████████████████.

48.    In response to a later subpoena, Plaintiffs obtained additional information from

████████████ Restrained Bonds in an April 23, 2010 letter.  That letter disclosed that the

Restrained Bonds were ███████████████ The ████ letter

further provided:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

49.    Documents obtained from defendant UBAE by letters rogatory pursuant to the

Hague Convention confirm the facts set forth in ████████ April 23, 2010 letter.

50.    On June 12, 2008, Plaintiffs obtained issuance of an Execution by the Clerk of this

Court (the "Initial Execution") and filed it with the Office of the United States Marshal Service

in this District for execution on the goods and chattels of Iran.  A copy of the Initial Execution is

annexed hereto as Exhibit C.

51.    That Initial Execution specifically identified ███████████████████

████████████████████████████ The United States Marshal's Service served the

Initial Execution on Clearstream on June 9, 2010 and on Citibank on June 13, 2008.

52.    This Court's May 10, 2010 Order extended the Initial Execution and related levy

*nunc pro tunc* through the date of the filing of Plaintiffs' initial Complaint in this action.

53.    On October 27, 2008, the United States Marshal's Service served Clearstream with

an additional Execution on the goods and chattels of Iran (the "Execution").

54.    That Execution specifically identified ████████████████████

██████████████ Plaintiffs filed the Execution with the Office of the United States

Marshal's Service in the Southern District of New York on October 17, 2008.  The October 17,

2008 Execution and levy were extended *nunc pro tunc* through the date of the filing of Plaintiffs'

initial Complaint in this action by this Court's June 11, 2010 Order.

55.    Plaintiffs served Citibank with a restraining notice under CPLR Section 5222 on

June 17, 2008 and with an amended restraining notice correcting a minor defect on June 24,

2008.  Plaintiffs served Clearstream with a restraining notice under CPLR Section 5222 on

June 16, 2008 and with an amended restraining notice correcting a minor defect on June 23,

2008.  Copies of the respective amended restraining notices are annexed hereto as Exhibit D.

56.    On June 25, 2008, the United States District Court for the District of Columbia

issued an order pursuant to 28 U.S.C. Section 1610(c) *nunc pro tunc* from March 10, 2008 that

permitted execution to proceed upon the Judgment.

57.    As the result of an Order to Show Cause submitted by Citibank, the Court held a

hearing on June 27, 2008 regarding Citibank's motion to quash the writ of execution and

restraining notices.  At that hearing, Clearstream delivered documentary and testimonial evidence.

58.   Following that hearing, the Court issued an Order dated June 27, 2008 that vacated the restraints on certain securities valued at $250 million.  Plaintiffs have annexed a copy of that Order as Exhibit E.

59.   By means of a July 13, 2009 Order, the Court extended the restraining notices served upon Citibank and Clearstream, as modified by the Court's June 27, 2008 Order.  Those restraining notices remain in effect pending further Order of the Court.

**C.    Markazi Is Iran's Alter Ego**

60.   Plaintiffs may collect their Judgment against assets owned by Markazi because Markazi is an agency or instrumentality of Iran and Iran's alter ego.

61.   Iran controls Markazi to such an extent that Markazi maintains no independence or free will and, instead, operates as Iran's alter ego and surrogate.  The U.S. Department of Treasury recognizes Markazi's status as Iran's alter ego in § 535.433 of the U.S. Iranian Assets Control Regulations, which state, "The Central Bank of Iran (Bank Markazi Iran) is an agency, instrumentality and controlled entity of the government of Iran for all purposes under this part [*i.e.*, 31 C.F.R. Part 535]."

62.   Iran so extensively controls Markazi that a relationship of principal and agent exists between the two entities.  Iran owns Markazi and effectively controls its operations.  Thus, Markazi engaged in all of the activity that Plaintiffs allege at Iran's direction and for Iran's benefit.

63.   Markazi regularly and systematically conducts commercial transactions on behalf of Iran.  The funds that Markazi maintains in its own name actually belong entirely to the government of Iran.

64.   Iran exercises its control over Markazi by, among other means, dictating the appointment and actions of the bank's management.

65.   Markazi is ostensibly subject to Iran's 1972 Monetary and Banking Law ("MBL"). In practice, however, under the direction of Iranian President Mahmoud Ahmadinejad, Iran exercises day-to-day control over Markazi.  Iran issues direct orders to Markazi and controls its leadership, thereby eliminating Markazi's ability to operate independently from the Iranian government.

66.   The MBL provides for Markazi to be led by a Governor appointed for a five-year term by "Royal Decree," based upon the recommendation of the Minister of Finance and Economic Affairs and subject to approval by the cabinet.  That cabinet is now comprised of the President of Iran and the country's ministers.  The Governor is Markazi's highest executive and administrative authority and is responsible for conducting the bank's business in a proper manner.

67.   Ahmadinejad's government has ignored the MBL's mandatory five-year term for Markazi's Governor, thereby destroying any semblance of Markazi's independence from the government of Iran.

68.   In August 2007, Ahmadinejad forced Markazi's then-Governor, Ebrahim Sheybani, to resign prior to the end of his term.  In 2008, Ahmadinejad also pressured Sheybani's successor, Tahmasb Mazaheri, to resign before the end of his term.  Notwithstanding Mazaheri's

refusal to resign, Ahmadinejad replaced Mazaheri by presidential decree in violation of the MBL.

69.   Moreover, Iran's cabinet regularly votes at its meetings to order Markazi to extend loans to Iran's government for specific purposes.  For instance, on March 15, 2007, the 26th cabinet session of the first Ahmadinejad government ordered Markazi to lend 50 billion rials for marriage, medical treatment, education and housing loans.  On April 20, 2007, the 27th cabinet session ordered Markazi to extend a loan of 150 billion rials for the same purposes.

70.   Ahmadinejad's government has also usurped Markazi's authority to make monetary policy decisions.

71.   All major decisions about monetary policy are made directly by the Iranian government, often personally by Ahmadinejad, without consulting Markazi's Currency and Credit Council ("CCC"), the bank entity supposedly charged with those decisions.

72.   Indeed, in August 2007, Ahmadinejad announced he had dissolved the CCC.  Press reports stated that this action precipitated Sheybani's 2007 resignation as Markazi's Governor.  On July 14, 2009, the semi-official Mehr News Agency announced that the CCC had met for the first time in two years.

73.   Furthermore, in a speech that he delivered on April 16, 2008, Ahmadinejad described orders he had issued to Markazi regarding monetary policy.

74.   The setting of interest rates in Iran provides a telling illustration of Markazi's complete subservience to the Iranian government.  "Interest rates" is a term widely used in discussing Iranian policy, even though an elaborate ruse is used to present the "interest rates" as consistent with a strict interpretation of Islamic law, which bans the imposition or collection of interest.

75.    While running for the Presidency and since assuming office, Ahmadinejad insisted that interest rates be kept low, which he thought would reduce inflation – a viewpoint for which he has been harshly criticized by Iranian economists. To carry out his interest rate policies, Ahmadinejad usurped Markazi's apparent authority regarding interest rate issues by forcing the resignation of one Markazi Governor (Sheybani), dismissing another (Mazaheri), and ordering that the CCC be dissolved.

76.    As a result of the interest rate policies that Ahmadinejad has dictated, Iran has maintained its interest rates well below the inflation rate, with the result that demand for loans is extremely high.  In practice, only individuals and businesses with political connections can obtain loans, a circumstance that facilitates government corruption and solidifies Ahmadinejad's vast power.

77.    The Iranian government's subjugation of Markazi has been widely recognized even in Iran, where many high-ranking officials have complained that Markazi lacks independence from the government.

78.    For example, in a 2006 interview that covered the Iranian government's Fourth Development Plan (a document setting out government economic goals and policies for the next five years), Iran's former Deputy Minister of Economic Affairs and Finance, Mohsen Safa'i-Farahani, praised the Plan because "[t]he Central Bank will be taken out of government control." According to Safa'i-Farahani, "In other words, this will put an end to the interference of the government's economic sectors, such as the Ministry of Finance and Economic Affairs, in the Central Bank."  Notably, Iran did not carry out the reforms envisaged in the 2006 Fourth Development Plan.

181752

79.   A June 10, 2006 report in the newspaper *Siyasat-e Ruz* provides another example of Iran's complete dominion over Markazi.  According to that report, Markazi's then-Governor Sheybani "once again called for more independence for the Central Bank."  The article quoted Sheybani as stating, "An independent central bank can wisely outline and execute monetary policies; otherwise it must be a mere follower of the government."  After Sheybani resigned as Governor in August 2007, Iranian press reports stated that Markazi's loss of independence from the government, as evidenced by the dispute over interest rates, was the main factor in his resignation.

80.   Members of the Iranian Parliament (the Majlis) have also formally complained about Ahmadinejad's violations of law, citing Ahmadinejad for disregarding the provisions of Iranian law and ordering Markazi to transfer funds to government accounts.

81.   Ahmadinejad himself has not been bashful in acknowledging his government's complete control of Markazi.  For example, he has publicly boasted of giving direct "orders" to Markazi to take actions he deems appropriate.  The Iranian press has also quoted Ahmadinejad as stating, "I give the Bank Markazi permission" to use certain funds for a specific purpose.

82.   In response to a question regarding what the relationship between the government and Markazi should be, Ahmadinejad has also stated: "Our constitutional law has made it clear.  The flow of capital and money should be regulated by the government.  This is the law, and the law of the country should therefore be executed."

**D.     The Restrained Bonds Are Held in New York and Reflect Commercial Activity in the United States**

83.   Iran, through its agent and alter ego, Markazi, owns the Restrained Bonds that are the subject of this action.

181752                                        18

84.    At the time that Plaintiffs obtained the Initial Execution, the Restrained Bonds consisted of 21 bonds worth roughly ████████. All but one of the Restrained Bonds were denominated in U.S. dollars and all were immobilized and held for safekeeping in the United States. Those securities provided for the payment of periodic interest and the payment of principal at maturity, ████████████████████████████████████████████████████ ████████████████.

85.    All of the Restrained Bonds were maintained for safekeeping at the United States Federal Reserve Bank in New York (the "FRBNY") or the Depository Trust Corp. ("DTC"), also located in New York.

86.    In order for Markazi to purchase the Restrained Bonds and receive interest and principal payments related to those bonds, the ████████████████ had to undertake substantial commercial activity in the United States ████████████████████████ ████████.

87.    ████████████████, Markazi ordered the ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ ████████████████████████████████████████████.

88.    ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████.

89.    In or about ████████, however, Markazi and Clearstream concluded that Clearstream risked U.S. government sanctions and that Markazi risked the potential seizure of its

assets by Iran's judgment creditors if Clearstream continued to transact business in the United States directly on behalf of Markazi.

90.    Accordingly, Iran, Markazi, Clearstream and UBAE (the "Conspirators") entered a tacit or spoken agreement to funnel Markazi's transactions in bonds, including bonds kept for safekeeping in the United States, through the ██████████ that ████████ at Clearstream exclusively for the purpose of conducting Markazi's business.

91.    ██████████████████████████ in connection with the purchase and sale of those bonds.  Typically, ██████ fees amounted to ██████████ ██████████████ of the trades that ██████ made in the bonds.  In addition, ██████ ████████████████████████████

92.    ████████████████████████████████ ████████████████████. Markazi would have continued to conduct those transactions through its own Clearstream account in the absence of the Conspirators' concerns regarding the seizure and sanctions risks associated with continuing Markazi's direct ownership of a Clearstream account.

93.    Both before and after the Conspirators embarked upon their scheme to hide Markazi's involvement in the trades conducted through Clearstream, Iran and Markazi purchased bonds (including the Restrained Bonds) through Clearstream by providing instructions to their agents to engage in substantial commercial activity through agents located in the United States.

94.    Before the Conspirators elected to insert ██████ into the transaction chain, Markazi delivered the purchase and sale instructions to Clearstream.  After Markazi began to trade through the ████████████████ at Clearstream, Markazi would initially deliver the purchase and sale instructions to ██████ which would then pass them on to Clearstream.

95. ███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████, 

96. ███████████████████████████

███████████████████████████████

███████████████████████████████

██████████

97.  Both before and after ██████████ the ████████████ at Clearstream for the purpose of conducting Markazi's trading, Clearstream – acting as Markazi's agent – would engage in commercial activity in the United States by delivering payment instructions for periodic interest payments, maturity payments and sales proceeds payments to Citibank in New York.

98.  After Citibank received interest and principal payments related to the Restrained Bonds in U.S. dollars, Citibank credited those payments to Clearstream's cash account at Citibank in New York.

99.  Clearstream retained those funds in its cash account in New York pending instructions from its customers (Markazi or ██████, Markazi's agent) to withdraw the funds.

100. ████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████

101. The FRBNY and the DTC held all of the physical global bond certificates for the Restrained Bonds for safekeeping in New York.

102. The Restrained Bonds were issued by sovereigns like the Republic of Italy or "supranationals" such as the European Investment Bank.

103. Each bond was issued in the physical form of one or more global notes that was registered and deposited with the FRBNY, DTC or one of their nominees.

104. The DTC, a limited purpose trust company formed under New York law, is a member of the Federal Reserve System. It acts as a clearing agency created to hold securities of its participants and to facilitate the clearance and settlement of its participants' transactions through book-entry changes in participants' accounts.

105. The legal characteristics of the Restrained Bonds were set forth in prospectuses filed with the S.E.C. The bonds were typically governed by New York law, and investors could enforce their rights as owners of the bonds in the courts of New York.

106. Owners of beneficial interests in global notes typically are not entitled to receive physical certificates evidencing their interest. Instead, the owner's interest is reflected in a book-entry in the records of the financial institution with which the owner has an account.

107. Owners frequently do not have an account at FRBNY or participate at DTC. Those owners must hold their ownership indirectly with financial institutions that have a direct account at FRBNY or participate at DTC, as the case may be, or that have an account with financial institutions that maintain direct relationships with DTC or FRBNY.

108. All financial intermediaries are responsible for keeping account of their holdings on behalf of their customers. Issuers of global notes typically appoint a fiscal or paying agent located in New York to facilitate payments of interest and principal due under the notes.

109.  Typically, upon receipt of payment of interest or principal from the issuer's paying agent, DTC will credit its participants' accounts with payments in amounts proportionate to their respective beneficial interests in the principal amount of the global note as shown on DTC's records.  Payments from DTC participants to owners of beneficial interests in the global notes held through those participants are the responsibility of the participants.  Substantially the same procedure applies for FRBNY.

110.  When Plaintiffs succeeded in obtaining the Initial Execution, over ███████ worth of the Restrained Bonds owned by Markazi were held in New York by DTC and the FRBNY.

111.  ██████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
███████████████

112.  ███████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████.

113.  The Conspirators all recognized when Clearstream purchased the Restrained Bonds on behalf of Markazi and as Markazi's agent that purchasing and owning those bonds would require substantial United States-based commercial activity by Markazi's agents.

114.  Indeed, in a 

115.  Clearstream further confirmed that substantial U.S.-based commercial activity was necessary to complete Markazi's investment in the Restrained Bonds.



116.  Furthermore, the prospectuses for many of the Restrained Bonds have choice-of-law provisions that specifically state that New York law controls the rights associated with the bonds.

117.  Ultimately, purchasing and selling the Restrained Bonds and making interest and principal payments to Markazi required the following entities to engage in substantial commercial activity in New York on Markazi's behalf: the FRBNY; the DTC; multiple paying agents; Citibank as sub-custodian; and one or more correspondent banks located in the U.S.

118.  The account statements that Clearstream provided to Markazi show that

Those account statements served as a monthly reminder to Markazi and Iran that they were

risking the seizure of the Restrained Bonds by engaging in commercial activity in the United States.

119.  Clearstream provided Markazi with additional documents, including Markazi's customer agreements with Clearstream, that specifically identified the securities available for purchase through Clearstream and the identity and location of the sub-custodians that Clearstream used for safekeeping those securities.  After Plaintiffs obtained the Initial Execution, Clearstream reminded ███████████████████████████████████████ ████████████████████████.

120.  Furthermore, because of the sophistication that Iran and Markazi possess regarding bond investing and in evading U.S. sanctions against Iranian entities, Iran and Markazi knew that Clearstream disclosed in various publicly available sources -- including its website – the types of securities that Clearstream held as custodian and the identity and location of each sub-custodian that Clearstream used for safekeeping those securities.

121.  Thus, Iran and Markazi knew that all of the Restrained Bonds would be held for safekeeping in the United States by the FRBNY or the DTC and that those securities were sub-custodized at Citibank.

122.  ████████████████████████████████████████████ ████████████████████████████████████████████████

123.  ███████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████████ ███████████████████████

124.   The foregoing facts demonstrate that the Conspirators purposefully enlisted the services of multiple American banking and financial industry institutions by purchasing, selling, and securing payments related to the Restrained Bonds, most of which have matured and converted to cash.

125.   Moreover, each of the Conspirators derived substantial immediate and prospective financial benefits by engaging in that commercial activity on behalf of Markazi in the United States, and both ███████ Clearstream derive substantial revenue from international commerce.

E.     **Iran and Markazi Conspired with Clearstream and UBAE to Evade the U.S.'s Iranian Transactions Regulations and to Engage in Fraudulent Conveyances Designed to Evade Plaintiffs' Efforts to Collect Upon Their Judgment**

    1.     **Iran, Markazi, Clearstream and UBAE Conspired to Hide Markazi's Ownership of the Restrained Bonds**

126.   Because of the widespread sanctions imposed upon Iran and Markazi by the international community, Iran and Markazi rely heavily upon a small group of financial institutions to assist them in laundering money and in conducting the financial activity related to Iran's substantial international sales of oil.  This same financial network conducts money laundering in support of Iran's support for international terrorism and WMD acquisition and proliferation.

127.   Through its loyalty to Iran in the face of mounting international sanctions related to the funding of terrorism and Iran's efforts to develop WMDs, Clearstream built a substantial business relationship with Iran and Markazi.  In ████████, Markazi had only ████████ invested with Clearstream.  In contrast, by 2008, the Markazi funds invested through Clearstream totaled at least ██████.

128.   By that time, however, Clearstream faced increasing pressure from the U.S. government to discontinue its relationship with Markazi.

129.  In addition, Iran, Markazi and Clearstream recognized in late 2007 that new federal legislation significantly increased the risk that the numerous victims of Iran's terrorist acts would seek to collect their judgments against Markazi, Iran's alter ego.

130.  In December 2007, President George W. Bush vetoed a House of Representatives version of the National Defense Authorization Act for fiscal year 2008 that included legislative amendments that strengthened the rights of American victims of terrorism under the FSIA.

131.  As the press widely reported at the time, President Bush vetoed H.R. 1585 because of his concern regarding the lack of clarity regarding the applicability of the legislation to the new government of the Republic of Iraq.

132.  As a result, the House quickly acted to revise the Bill by adding a waiver provision that explicitly exempted Iraq from the new law's provisions.  Again, the legislative compromise reached between the White House and the House received substantial press coverage.

133.  On January 16, 2008, the House of Representatives first introduced H.R. 4986, the bill that Congress ultimately enacted as 28 U.S.C. Section 1605A and certain additional provisions of 28 U.S.C. Section 1610.

134.  That bill amended the FSIA to provide judgment creditors of state sponsors of terrorism, such as Iran, greater enforcement rights.  The new provisions of the FSIA allow judgment creditors to enforce their judgments against agencies or instrumentalities of the state sponsors of terrorism – including Markazi – without demonstrating that those entities functioned as the alter ego of the terrorist state.  Congress finally passed that bill on January 28, 2008, and President Bush signed it into law the same day.

135.  At the same time that the actions of Congress and President Bush's rare veto focused the press's attention upon these issues, international diplomats were debating the

imposition of sanctions upon Iran at the United Nations. As a result of Iran's intransigence, the United Nations' Security Council ultimately passed Resolution 1803 on March 3, 2008. That Resolution imposed sanctions designed to deter Iran's efforts to proliferate nuclear weapons.

136. These legislative developments and the simultaneous pressure that the U.S. government directed at Clearstream to cut its business ties with Markazi caused Clearstream to develop increased concern in late 2007 and early 2008 that the U.S. government or a creditor of Iran would seize Iranian assets held at Clearstream. Clearstream's concern regarding those issues was intensified by its substantial presence in New York, where Clearstream maintains an office. Clearstream's concern did not arise from a desire to advance the U.S. government's efforts to impede Markazi's money laundering, financing of Iran's illicit weapons program and funding of terrorism. Rather, Clearstream desired to avoid the client relations problems associated with the seizure of Iranian assets by the U.S. government or a judgment creditor of Iran.

137. At the same time, Iran, Markazi and their counsel were closely following the legislative developments in the United States, and were well aware of the impact of the FSIA amendments upon Iran's ability to hide assets from its judgment creditors. Iran has long sought to protect its assets against efforts by victims of terrorism and others to collect upon substantial judgments secured against Iran and its agencies and instrumentalities by maneuvering Iran's funds to evade collection and by defending the collection lawsuits brought by the victims of Iran's terrorism. Thus, Iran, Markazi and their American counsel recognized that the FSIA amendments were aimed largely against Iran and other state sponsors of terrorism.

138. Moreover, Iran has publicly stated through its state-owned news agency that it rejects the legitimacy of Plaintiffs' Judgment and continues to deny responsibility for Plaintiffs'

losses. Thus, well before Iran and Markazi caused Markazi's bond holdings to be transferred to the ███████████████ at Clearstream, Iran and Markazi knew that Plaintiffs and other judgment creditors held large judgments against Iran that they might seek to satisfy against Markazi's assets.

139.  As a result, Iran, Markazi and Clearstream decided in ██████ and ███████ to enlist UBAE in a conspiracy designed to permit Markazi to continue to invest through Clearstream in bonds held for safekeeping in the United States, including the Restrained Bonds, while simultaneously providing Clearstream with the ability to claim that it no longer provided banking services to Markazi.

140.  Consistent with their Agreement, the Conspirators attempted to accomplish that objective by hiding Markazi's continued ownership of all securities previously held in Markazi's Clearstream account by omitting from Clearstream's records any mention of Markazi's connection to the ████████████████████ to hold Markazi's assets.

141.  By inserting ██████ as a middleman, Clearstream attempted to pass its responsibility for performing customer due diligence, Know Your Customer and Anti-Money Laundering procedures regarding Markazi and Iran to the ████████████████.

142.  ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████

143.  By means of that ruse, the Conspirators hoped to place the Restrained Bonds beyond the reach of creditors of Iran in the United States and to hinder, delay and defraud creditors of Iran by concealing its interest in those securities.

181752

144. The Banking Conspirators (*i.e.*, ███████████████) agreed to participate in that conspiracy because they earned substantial immediate and prospective fees for performing banking services as the agents for Iran and Markazi. Markazi serves as a substantial client of both institutions, and ██████ – a small bank with a limited client base -- viewed Markazi as a rich potential source of revenue because Markazi handles vast sums for foreign investment and other purposes.

2. **The Conspirators Implement Their Scheme to Fraudulently Convey the Restrained Bonds and Impede Collection Efforts by the Creditors of Iran and Its Agencies and Instrumentalities**

145. The Conspirators attempted to implement their scheme to immunize the assets of Iran and its agencies and instrumentalities from collection by U.S.-based creditors by having Markazi fraudulently convey the assets held in its name at Clearstream to the ████ ████████████████████ at Clearstream.

146. On ███████████████████████ the introduction of H.R. 4986 in the House, Markazi contacted ██████ and ████████████████████████ to hold the bonds then held in Markazi's Clearstream account.

147. Consistent with the Conspirators' agreement, UBAE sent an ██████████████ to Clearstream marked ████████████████████████████████ ████████████████████████████████████████████ ████████

148. Clearstream ███████████████ the ████████████████████ for ███████ The Conspirators all recognized, however, that the ████████████████████ would house Markazi's assets. ████████████████████████████████ ████████████████████████████ .

149. Pretending to be ignorant of Iran's interest in the bonds held in the account that Clearstream maintained on behalf of Markazi, Clearstream proceeded to induce U.S. financial institutions in New York, acting as Clearstream's agents, to provide financial services for the benefit of Iran in violation of U.S. law, including the Iranian Transaction Regulations.

150. In particular, Clearstream acted in furtherance of the Conspirators' unlawful scheme by executing one or more agreements in New York concerning Clearstream's custodial Omnibus Account at Citibank. In that agreement or agreements, Clearstream represented that the transaction instructions that it delivered to Citibank regarding the custodial Omnibus Account would not violate any applicable law.

151. Nevertheless, in furtherance of the Conspirators' scheme, Clearstream actively concealed the identity of Iran and Markazi as the beneficial owners of the Restrained Bonds custodized at Citibank in New York. ████████████████████████████ ████████████████████████████████████████████████████████ ████████████

152. After the Conspirators had made the preliminary arrangements necessary to facilitate their scheme, they began to make the fraudulent conveyances designed to remove Markazi's assets from the reach of Plaintiffs and other creditors of Iran and its agents and instrumentalities.

153. Specifically, in or about ████████████, Markazi – acting as Iran's ████████ ████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████

154.  Those transfers included transactions undertaken on ███████████ and █ by which Clearstream – acting at Markazi's direction – transferred Markazi's interest in the 21 Restrained Bonds custodized in the United States with a nominal value of approximately ██████████████████. All but one of those bonds were denominated in U.S. dollars, and all were sub-custodized at Citibank in New York.[4]

155.  ██████████████████████

156.  ████████████████████████
███████████████████████████.

157.  The Conspirators completed these fraudulent conveyances by ██████████
███████████████████████████████████
███████████████████████████
████████████████.

158.  At all times, Markazi retained the beneficial ownership of the bonds transferred to the ██████████████.

159.  ██████████████████████████
████████████████████████ leaves no doubt that
███████████████████████████████████
██████. In that email, █████████████████████
███████████████████████.

---

[4] The Conspirators also arranged for the transfer between the same accounts of other bonds denominated in U.S dollars with a nominal value of approximately ██████████. Those bonds were custodized at intermediary banks located ██████████ Because these bonds were denominated in U.S. dollars, U.S. financial institutions or their affiliates would necessarily have provided custodial services for the benefit of Iran and acted either as paying agents, correspondent banks or custodial banks in violation of U.S. law.

160. ███████████████████████ also confirms Clearstream's knowledge of these facts. In that letter, █████████████████████████ ████████████████████████████████████████████████ ██████████████████████" (Emphasis in original).

161. Moreover, the place of custody of the Restrained Bonds did not change during the series of transfers. Hence, at all times, those bonds remained in Clearstream's Omnibus Account located at Citibank in New York.

162. ████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████

163. These fraudulent conveyances served no legitimate financial or banking purpose. Rather, Iran and Markazi made the conveyances solely to disguise the true ownership of the Restrained Bonds in hopes of protecting those assets from Iran's creditors, including Plaintiffs.

164. Despite Clearstream's knowledge of these facts, it stated in testimony delivered to this Court on July 27, 2008 and in numerous briefs and other documents that it had no knowledge of the identity of the beneficial owner of the Restrained Bonds. Those repeated misrepresentations served to further the Conspirators' goal of hindering, delaying or defrauding Iran's creditors, including Plaintiffs.

165. Clearstream made those misrepresentations in furtherance of the Conspirators' plan and agreement and with the prior knowledge and consent of the other Conspirators. Clearstream's own writings confirm those facts. For example, ████████████████████ █████████████, confirming their plan to mislead this Court at the July 2008 hearing, stating:



167.  In furtherance of the Conspirators' plan to insulate Markazi's assets from the reach of the creditors of Iran and its agencies and instrumentalities, the Conspirators arranged in or about ███████ to transfer two U.S. dollar-denominated bonds with a face value of $250 million to two financial institutions affiliated with U.S. financial institutions by means of multiple transactions completed, in part, within the Clearstream clearing system for total consideration of $██████████.

168.  Iran and Markazi implemented the fraudulent conveyance of the Restrained Bonds and the $250 million in U.S. dollar-denominated bonds that the Court released from Plaintiffs' restraints with actual intent to hinder, delay, or defraud Iran's creditors, including Plaintiffs.

169.  By the time that Plaintiffs served their restraining notices and caused the Initial Execution to be served in June 2008, the ██████████████ that the Conspirators agreed to

███████ at Clearstream held roughly $ ██████ of the Restrained Bonds that the Conspirators transferred into that account from Markazi's own Clearstream account in ██████████.

170. The proximity of the Conspirators' transfer of the Markazi assets to the passage of the 2008 amendments to the FSIA, the United Nations debate concerning the imposition of sanctions upon Iran, and the substantial publicity that accompanied those developments demonstrates that the Conspirators engaged in that conduct in furtherance of their scheme to conceal Markazi's ownership of the Restrained Bonds.

171. Iran and its alter ego, Markazi, transferred the Restrained Bonds with actual intent to hinder, delay, or defraud Iran's creditors, including Plaintiffs. Markazi made those conveyances as the agent and alter ego of Iran. Pursuant to the Conspirators' agreement, Clearstream and ██████ knowingly and actively assisted in making those conveyances by ████████████████████████████████████████████.

172. By completing the fraudulent conveyances, the Conspirators violated New York Debtor and Creditor Law Sections 273-a and 276. Those violations of New York law require the piercing of any veil of separation between Markazi and Iran so that Plaintiffs can reach the Restrained Bonds to satisfy the Judgment.

173. As a result, the Court should set aside and annul the fraudulent conveyances of the Restrained Bonds from Markazi's account at Clearstream to the ██████████████ under New York Debtor and Creditor Law Section 278. The Court can implement that remedy by directing Clearstream to make book entries in the respective accounts of Markazi and ██████ to annul the transfer.

F.      **The Restrained Bonds are Not Immune From Execution Under the FSIA**

174. Pursuant to 28 U.S.C. Section 1610(a)(7), the Restrained Bonds are not immune from attachment in aid of execution, or from execution upon the Judgment entered in favor of Plaintiffs, because the Judgment relates to claims against the Judgment Debtors for which they are not immune under 28 U.S.C. Section 1605(a)(7) and/or Section 1605A.

175. Pursuant to 28 U.S.C. Sections 1610(a)(1) and 1611(b), the Restrained Bonds are not immune from attachment in aid of execution, or from execution upon the Judgment because Iran has waived any immunity that might otherwise apply to Markazi and Iran's other agencies and instrumentalities, both explicitly or by implication, and because the immunity provided by the FSIA to legitimate central banks operating for their own account does not apply to Markazi.

176. Markazi does not hold the Restrained Bonds for its "own account," as the funds are not held for normal central banking functions. In fact, Markazi holds those assets for Iran's benefit.

177. Furthermore, contrary to representations that Markazi has made in this litigation, the Restrained Bonds were not utilized by Markazi exclusively for foreign currency reserve purposes.

178. To the contrary, no documents that Plaintiffs have obtained or that Defendants have cited suggest that the Restrained Bonds were maintained in a designated foreign exchange reserve account. Had Markazi utilized the Restrained Bonds solely for foreign currency reserve purposes, the account records would reflect that exclusive use.

179. In fact, Markazi does not segregate its foreign currency reserve funds from money that it: (a) maintains for the benefit of Iran and Iran's agencies and instrumentalities; (b) derives from its role as the commercial banker involved in Iran's sale of oil; or (c) utilizes to facilitate Iran's illicit efforts to develop WMDs and support international terrorism. Thus, Markazi cannot

demonstrate that any of the Restrained Bonds were utilized for a legitimate central banking purpose.

180.   Markazi's inability to pledge any of the assets held in its Clearstream account confirms that it did not hold the Restrained Bonds "for its own account."   On multiple occasions, Markazi ██████████████████████████████████████████████████ ████████████████████████████████████████.

181.   The immunity from execution provided to lawfully operated central banks by 28 U.S.C. Section 1611(b) also offers no protection for Markazi's funds because Markazi operates as a rogue financial institution, rather than a legitimate central bank.

182.   As the U.S. Department of Treasury has recognized, Markazi continually: (a) engages in illicit and deceptive practices to evade U.S. and international sanctions, to finance terrorism and to acquire and spread WMD technology; and (b) encourages Iranian state-owned banks to engage in those illicit practices.

183.   Indeed, on November 21, 2011, the U.S. Departments of State and Treasury announced the U.S. government had designated Iran a jurisdiction of "primary money laundering concern" under Section 311 of the USA Patriot Act.[5]  The State and Treasury Departments also announced that, for the first time, they had imposed the restrictions permitted by Section 311 upon a sovereign's supposed central bank, *i.e.,* Markazi.  The State and Treasury Departments took that extraordinary action as a result of Markazi's long history of engaging in illegal and deceptive actions to evade U.S. sanctions and to assist Iran's illicit conduct.  Plaintiffs have attached a copy of the U.S. Department of Treasury's findings ("Findings") supporting that designation as Exhibit F and incorporate the Findings herein by reference.

---

[5] http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews_wsj

181752                                   37

184. On the same day that the U.S. government designated Iran and Markazi as money launderers, the British government also announced that British financial institutions would cut all financial ties with Iran's banks, including Markazi. The British government's announcement highlighted that its measures represented the "first time the British government has cut an entire country's banking sector off from the UK's financial sector."[6]

185. Canada adopted similar measures sanctioning Iran and Markazi on the same day that the United States and Great Britain implemented their sanctions.[7]

186. The U.S. Department of Treasury's November 18, 2011 Notice of Proposed Rulemaking regarding the designation of Iran a "jurisdiction of primary money laundering concern" highlights the scope of Iran's illicit conduct and the sharp distinctions between Markazi's actions and those of legitimate central banks. The Department of Treasury Notice states:

> Prior regulations that have applied Section 311 special measures to jurisdictions of primary money laundering concern have not included the jurisdiction's central bank within the scope of the regulation. However, in the case of the Islamic Republic of Iran, this inclusion is justified due to the deceptive practices [that Markazi] engages in and encourages among Iranian state-owned banks. This behavior is discussed in the notice of finding that the Islamic Republic of Iran is a jurisdiction of primary money laundering concern published elsewhere today in the Federal Register [*i.e.*, the Findings annexed hereto as Exhibit F.]

187. Similarly, the Department of Treasury's Findings highlight that Markazi's conduct bears no resemblance to the manner in which legitimate central banks conduct their operations. The Findings state:

---

[6] http://www.telegraph.co.uk/news/worldnews/middleeast/iran/8904713/Britain-to-cut-financial-ties-with-Iran-banks-George-Osborne-announces.html
[7] http://www.washingtonpost.com/world/middle-east/canada-joins-us-britain-to-impose-more-sanctions-on-iran-over-nuclear-program/2011/11/21/gIQAOvDfjN_story.html

> As a result of the strengthened U.S. sanctions and similar measures taken by the United Nations and other members of the global community, Iran now faces significant barriers to conducting international transactions. In response, Iran has used deceptive financial practices to disguise both the nature of transactions and its involvement in them in an effort to circumvent sanctions. This conduct puts any financial institution involved with Iranian entities at risk of unwittingly facilitating transactions related to terrorism, proliferation, or the evasion of U.S. and multilateral sanctions. Iranian financial institutions, including [Markazi], and other state-controlled entities, willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies around the world.[8]

188. In announcing the adoption of the sanctions, Treasury Secretary Timothy Geithner also highlighted that Markazi's actions sharply contrast with the conduct of legitimate central banks. Geithner emphasized that the adoption of the sanctions meant that, "[f]or the first time, we are identifying the entire Iranian banking sector – including [Markazi] – as a threat to governments or financial institutions that do business with Iranian banks."[9]

189. Geithner also properly declared that *any* financial transaction involving Markazi presented grave risk of promoting Iran's illicit conduct. He stated, "If you are a financial institution and you engage in any transaction involving [Markazi] or any other Iranian bank operating inside or outside Iran, you are at risk of supporting Iran's illicit activities:  its pursuit of nuclear weapons, its support for terrorism, and its efforts to deceive responsible financial institutions and evade sanctions."

190. Likewise, Geithner accurately emphasized that "[a]ny and every financial transaction with Iran poses grave risk of supporting" the same illicit activities and that "[f]inancial institutions around the world should think hard about the risks of doing business with Iran."

---

[8] http://online.wsj.com/article/SB10001424052970204434040457705106145855708.html?mod=googlenews_wsj
[9] http://www.treasury.gov/press-center/press-releases/Pages/tg1368.aspx

191.  In addition to the illicit activity highlighted by the Department of Treasury, Markazi's rogue conduct includes: (a) acting as the principal financier of the Iranian oil supply chain, which is controlled by and funds the efforts of Iran's Islamic Revolutionary Guard Corps (IRGC) – a sponsor of global terrorism designated by the U.S. Department of Treasury on August 15, 2007 for its role in supporting terrorism and the acquisition and proliferation of WMD[10]; (b) acting as a financial facilitator for at least 22 state-owned Iranian financial institutions that help to fund the terrorist activities of the IRGC; and (c) providing financing to Khatam al-Anbiya ("KAA"), a massive IRGC-controlled conglomerate, which has been sanctioned by the United Nations, the U.S. government and the European Union ("EU") for its role in supporting Iran's WMD proliferation activities.[11]  Indeed, the U.N., the U.S. government, the EU, Canada, Japan and South Korea have designated KAA as a terrorist entity for its role in running Iran's nuclear and ballistic missile programs.[12]

192.  Because Markazi launders the funds that underwrite Iran's sponsorship of terrorism and efforts to acquire WMDs, Markazi plays perhaps the most essential role in those illegal activities.

193.  The extensive efforts that Markazi undertook to hide its ownership of the Restrained Bonds and Iran's control over those assets also disqualify it from the benefits of any protections offered to normal central banks under 28 U.S.C. Section 1611(b).  A legitimate central bank would not engage in that type of willful deception, by which Markazi intended to

---

[10] http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html On August 15, 2007, the U.S. Department of Treasury named the IRGC as a Specially Designated National ("SDN") for the IRGC's role in supporting global terrorism and proliferation of weapons of mass destruction. http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html
[11] http://online.wsj.com/article/SB10001424052970204443404577705106145855557058.html?mod=googlenews_wsj
[12] U.S. Treasury, Executive Order 13382, October 25, 2007; UNSC Resolution 1929, June 9, 2010; EU Commission Regulation No. 532/2010.

181752