EXHIBIT G

THE IMMUNITY WAIVER FOR STATE-CONTROLLED BUSINESS ENTERPRISES IN UNITED STATES COMMERCIAL TREATIES
Author(s): Vernon G. Setser
Reviewed work(s):
Source: *Proceedings of the American Society of International Law at Its Annual Meeting (1921-1969)*, Vol. 55 (APRIL 27-29, 1961), pp. 89-105
Published by: American Society of International Law
Stable URL: http://www.jstor.org/stable/25657519

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at http://www.jstor.org/page/info/about/policies/terms.jsp

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

*American Society of International Law* is collaborating with JSTOR to digitize, preserve and extend access to *Proceedings of the American Society of International Law at Its Annual Meeting (1921-1969).*

http://www.jstor.org

## FOURTH SESSION

### Friday, April 28, 1961, at 2:00 p.m.

PANEL I: CURRENT DEVELOPMENTS IN THE LAW OF SOVEREIGN IMMUNITY

The session reconvened at 2:00 o'clock p.m. in the East Room of the Mayflower Hotel. Mr. Adrian Fisher, Chief Reporter, American Law Institute's Restatement on the Law of Foreign Relations, presided.

The CHAIRMAN, in introduction, stated that the current developments in the field of foreign sovereign immunity have a common point of departure in the so-called Tate letter sent out in 1952 by the Acting Legal Adviser of the Department of State to the Acting Attorney General of the United States. This letter announced *in vacuo* a change in the policy of the Department of State not to issue suggestions of immunity to courts in the United States in suits involving commercial activities by a foreign sovereign. Hitherto there had been no judicial recourse available, but redress was through diplomatic channels. The departure from the normal procedure in making such an announcement *in vacuo* was due to the diplomatic overtones which at the time posed serious problems with respect to certain countries.

## THE IMMUNITY WAIVER FOR STATE–CONTROLLED BUSINESS ENTERPRISES IN UNITED STATES COMMERCIAL TREATIES

BY VERNON G. SETSER [*]

*Bureau of Economic Affairs, Department of State*

In the 1948–1958 decade, the Department of State negotiated fourteen treaties containing a provision obligating each contracting party to waive sovereign immunity for state-controlled enterprises engaged in business activities within the territories of the other.[1] A typical such provision

[*] The views expressed here are personal—in no sense an official statement of the Department of State.

[1] The treaties follow, with the number of the article and paragraph containing the immunity waiver added after the citation. Italy, 1948 (63 Stat. (Pt. 2) 2225, Art. XXIV-6); Uruguay, 1949, not in force (S. Exec. D, 81st Cong., 2d Sess., Art. XVIII-5); Ireland, 1950 (1 U.S. Treaties 785, Art. XVIII-2); Colombia, 1951, not in force (S. Exec. M, 82nd Cong., 1st Sess., Art. XVIII-2); Greece, 1951 (5 U.S. Treaties 1829, Art. XIV-5); Israel, 1951 (5 U.S. Treaties (Pt. 1) 550, Art. XVIII-3); Denmark, 1951 (T.I.A.S., No. 4797; S. Exec. I, 82nd Cong., 2d Sess., Art. XVIII-3); Japan, 1953 (4 U.S. Treaties (Pt. 2) 2063, Art. XVIII-2); Federal Republic of Germany, 1954 (7 U.S. Treaties 1839, Art. XVIII-2); Haiti, 1955, not in force (S. Exec. H, 84th Cong., 1st Sess., Art. XVIII-2); Iran, 1955 (8 U.S. Treaties 899, Art. XI-4); Nicaragua, 1956 (9 U.S. Treaties 449, Art. XVIII-3); Netherlands, 1956 (8 U.S. Treaties 2043, Art. XVIII-2); Korea, 1956 (8 U.S. Treaties 2217, Art. XVIII-2).

90

appears in Article XVIII (paragraph 3) of the Friendship, Commerce and Navigation Treaty with Israel,[2] signed August 23, 1951:

> No enterprise of either Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, manufacturing, processing, shipping or other business activities within the territories of the other Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

Although note has been taken, usually in a favorable sense, in articles appearing in legal publications,[3] of these provisions, no extensive study or comment has been published to date on the question of how the provisions are to be understood and what they represent as concerns United States policy. It must be noted, of course, that the practice of including these provisions in the treaties was discontinued in 1958 for the reason that they were considered objectionable in certain quarters as endangering the ability of the Government to utilize the defense of sovereign immunity in suits in foreign courts against the United States. It is the purpose of the present paper to attempt to deal with the essential purport and policy implications of these provisions.

All of the provisions under consideration appear in the type of instrument generally known as the treaty of friendship, commerce and navigation. As regards the United States, this type of instrument, both in its traditional form and as recently revised and modernized, constitutes a body of assurances for the support of private enterprise. Such commercial treaties were extensively utilized by the United States in the 18th and 19th centuries for the protection of the private trader and his vessel when engaged in foreign trade,[4] generally against navigation laws and other types of interference by foreign nations with free competition on the high

[2] 5 U.S. Treaties (Pt. 1) 570; T.I.A.S., No. 2948.

[3] William W. Bishop, Jr., "New United States Policy Limiting Sovereign Immunity," 47 A.J.I.L. 96 (1953); Robert R. Wilson, "Postwar Commercial Treaties of the United States," 43 A.J.I.L. 272 (note) (1949); Robert R. Wilson, "A Decade of New Commercial Treaties," 50 A.J.I.L. 929 (1956); Herman Walker, Jr., "Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice," 5 A. J. Comp. Law 238 (1956); Jean-Flavien Lalive, "L'immunité de juridiction des états et des organisations internationales," 84 Hague Academy Recueil des Cours 238, 254, 274 (note), 280–281 (1953, III). See also the author's article, "The Immunities of the State and Government Economic Activities," 24 (Part I) Law and Contemporary Problems 299, 312 (1959).

[4] The early period of U.S. commercial treaty policy is covered in Setser, The Commercial Reciprocity Policy of the United States, 1774–1829 (Philadelphia, 1937), but for the period since then, it is necessary to consult numerous individual monographs, or the treaties and diplomatic correspondence. See, however, S. F. Bemis, Diplomatic History of the U.S., Chs. 17, 38 (N.Y., 1950). The most comprehensive work on the international law aspects of commercial treaties is R. R. Wilson, United States Commercial Treaties and International Law (New Orleans, 1960).

91

seas and in the trading ports of the world.   In more recent years, the State Department has developed the commercial treaty primarily as a means of establishing rights for the private enterprise to set itself up and carry on business on foreign territory.[5]

The manner by which the commercial treaty seeks to accomplish its object of supporting private enterprise is by interposing bars to the more usual ways in which governments interfere with free competition by alien-owned concerns under their jurisdiction.   One of the simplest methods of discrimination against the foreign investor, and one of those most commonly practiced, is to bar the entry of foreign enterprises into certain fields. Most of the recent United States commercial treaties limit that device by assuring entry of aliens into definite broad fields of enterprise upon equal terms with domestic enterprises.   Another mode of discrimination is to make the burdens normally imposed by government a little heavier upon the alien than upon the national in certain respects, for example, in the field of taxation.   Many detailed provisions of the treaties have the purpose of preventing this practice.   Perhaps the gravest of all dangers to private enterprise in international investment and trade lies in state occupation of certain fields of economic endeavor.   The treaties seek to provide viable conditions for private enterprise by assuring just compensation for private property when the state nationalizes, and to establish reasonable standards to govern state enterprises when operating in competition with private enterprises.   It is in relationship with the thrust against state trading and state economic enterprise in general that the subject of sovereign immunity enters into the purview of the commercial treaty.

When the Department of State at the end of World War II embarked upon an extensive commercial treaty program, one of the most significant international facts of life to which it had to adjust its treaty projects was the almost universal growth of state activity in the economic field.   The countries of Eastern Europe that had passed into the Soviet orbit, though not yet fully communized, were socializing industry at a rapid pace.[6] Extensive programs of nationalization were also being pursued in Western

[5] Dept. of State Pub. 6565, entitled ''Commercial Treaty Program of the United States,'' January, 1958; Walker, ''Treaties for the Encouragement and Protection of Foreign Investment,'' *loc. cit.*; Setser, ''Treaties to Aid American Business Abroad,'' 40 Foreign Commerce Weekly 3 ff. (U.S. Dept. of Commerce, Sept. 11, 1950).   Although numerous official statements have been made emphasizing the ''private enterprise'' purpose of commercial treaties, the policy statement contained in the Mutual Security Act of 1954, as amended, which is followed by a clause that provides that the President shall ''accelerate a program of negotiation treaties of commerce and trade . . . which shall include provisions to encourage and facilitate the flow of private investments . . .'' is sufficiently illustrative.   22 U. S. C. 1933.

[6] Miriam E. Oatman, ''The Nationalization Program in Czechoslovakia,'' 15 Dept. of State Bulletin 1027–1031 (1946); Leon Goldenberg and Laure Metzger, ''The Polish Nationalization Law,'' 15 Dept. of State Bulletin 651–654 (1946); ''Private Enterprises Nationalized in Yugoslavia'' (Press Release), 15 Dept. of State Bulletin 1150 (1946).

92

Europe, particularly by Great Britain [7] and by France.[8]  The pattern was not localized in Europe, but was in evidence rather generally throughout the world.  The program for treaty-making was obviously intended to be extended to all countries that would consider treaties.  In some cases, however, specific agreements were made to enter into negotiations.  Such agreements were made, for example, with France and Czechoslovakia in 1946.[9]  In formulating treaty provisions for such countries, the Department's specialists could hardly have avoided giving attention to the problem created by the nationalization programs.  Under the governing principle of mutuality, treaty rights for American private enterprises in Czechoslovakia, for example, had to be balanced with reciprocal rights for Czechoslovak enterprises in the United States.  In 1946–48, there were still private enterprises in Czechoslovakia that might establish branches or subsidiaries in this country under the treaty, but what would be the situation as nationalization progressed, and the central enterprises that had established branches and subsidiaries in the United States passed into state control?  Provision for the denial of immunity to such enterprises seemed quite pertinent to the subject matter of the proposed treaties.

A cursory reading of the immunity provision, when taken out of its context in the commercial treaty, may result in identification of it with the "restrictive theory," adoption of which by the Department of State was announced in 1952 in the letter from the Department's Acting Legal Adviser, Tate, to Acting Attorney General Perlman.[10]  The commercial treaty provision (in the Treaty of Friendship, Commerce and Navigation with Italy), however, antedated the Tate letter by four years, and the two documents were designed for different purposes.  The letter declares the policy of the Department to follow the restrictive theory in its own dealing with requests from other governments for a grant of sovereign immunity, the restrictive theory being defined as that under which "the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*)."  The commercial treaty provision, on the other hand, is not at all concerned with the "private acts" of the sovereign generally, but only with establishing a rule to govern in the case of state entities that are counterparts of, and are in competition with, the enterprises to which treaty rights are accorded.

[7] William A. Robson, "The Public Corporation in Britain Today," 63 Harvard Law Rev. 1321–1348 (1950); William N. Loucks, Comparative Economic Systems 277–436 (N.Y., 1957).

[8] Henry P. De Vries and Berthold H. Hoeniger, "Post-Liberation Nationalizations in France," 50 Columbia Law Rev. 629 (1950).

[9] Byrnes-Blum agreement, May 28, 1946, 61 Stat. (4) 4175, 14 Dept. of State Bulletin 997 (1946); U.S.-Czechoslovak agreement relating to commercial policy, 61 Stat. (3) 2431, 15 Dept. of State Bulletin 1005 (1946).  A treaty was not concluded with either country, however.

[10] The text of the Tate letter is in 26 Dept. of State Bulletin 984 (1952).  See also W. W. Bishop, Jr., "New United States Policy Limiting Sovereign Immunity," 47 A.J.I.L. 96 (1953); Michael H. Cardozo, "Sovereign Immunity: the Plaintiff Deserves a Day in Court," 67 Harvard Law Rev. 608 (1954).

93

The treaty provision has a more limited and specific objective than the letter.

The typical United States commercial treaty of the group here under consideration has been developed as an integrated document, and the sovereign immunity provision may not properly be separated from the general context of the instrument.[11]  The provisions having the most important relationship to the meaning of the immunity clause are those having to do with the admission by one party of the business enterprises of the other.[12]  The article containing these may be considered the keystone of the treaty, with many of the succeeding articles related to it.  Its clauses contain significant elements of definition of the principal terms used in the immunity provision.  It sets forth that

> nationals and companies of either Party shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial and other activity for profit (business activities) within the territories of the other Party, whether directly or by agent or through the medium of any form of lawful juridical entity.

The succeeding sentence clarifies what to engage in business activities within the territories of the other Party means:

> Accordingly, such nationals and companies shall be permitted within such territories: (a) to establish and maintain branches, agencies, offices, factories and other establishments appropriate to the conduct of their business; (b) to organize companies under the general company laws of such other Party, and to acquire majority interests in companies of such other Party; and (c) to control and manage enterprises which they have established or acquired.

The concept of "enterprise" is then introduced:

> Moreover, enterprises which they control, whether in the form of individual proprietorships, companies or otherwise, shall, in all that relates to the conduct of the activities thereof, be accorded treatment no less favorable than that accorded like enterprises controlled by nationals and companies of such other Party.

The intended applicability of the waiver is governed by three key terms, or expressions, within the waiver provision itself.  These terms or expressions are "enterprise," "engages in . . . activities within the territories of," and "business activities."  The usage of these and similar terms elsewhere in the treaty and the general context of the treaty affect the conno-

---

[11] There is no better established canon of treaty interpretation than that which requires that a treaty be considered as a whole.  1 Oppenheim, International Law 953 (8th ed., 1955, edited by H. Lauterpacht); McNair, The Law of Treaties 198 (1938); Crandall, Treaties, Their Making and Enforcement 317 ff. (1916); 5 Hackworth, Digest of International Law 222–224.

[12] Art. VII, treaty with Israel.  The development of the terminology of the treaties has been a continuing process since 1946, and, moreover, negotiating problems in the cases of individual countries have necessitated some variation in language from treaty to treaty.  Consequently, not all of the relationships of the various provisions discussed here with reference to the treaty with Israel can be shown as conclusively for every other treaty.  The fundamental rationale does not vary, however.

94

tation of these terms and supply additional interpretative factors of value for the understanding of the provision. These terms are considered in some detail in the succeeding paragraphs.

The term ''enterprise'' and the concept it represents were taken for treaty use from the literature of economics.[13] The borrowing from this source was only natural, since the commercial treaty is primarily concerned with matters in the field of economics. The word is associated with the concept of the *entrepreneur* (enterpriser), whose function is regarded by perhaps the majority of economists as one of the four factors of production (along with capital, labor, and land). The ''enterprise'' is the undertaking in which the *entrepreneur* (enterpriser) invests capital, for which he hires labor, utilizes land, and exercises his managerial skill—all in the hope of making a profit, and at the risk of loss. In treatise after treatise of a professional character, this concept of enterprise is developed, with the meaning easily discernible from the context.[14] In a number of cases, elements of definition of the term are clearly in evidence. The text by Gemmill and Blodgett, for example, contains the following:

> Since some business concerns have hundreds or thousands of part-owners, there are many more enterprisers than enterprises. But there are also, in this country, a great many business *enterprises, in the sense of separate and distinct business units.*[15]

Buchanan delimits his usage of the term in the following passage:

> A characteristic thing about the organization of production in capitalistic economies through the price system is that while the price system is the primary regulator of production the process is typically undertaken by productive combinations or entities called ''firms'' or ''enterprises.'' That is, when we examine the structural organization of production in capitalistic economies we observe at once that it is business enterprises that hire labor, that undertake the production of new commodities, that introduce technological changes, that invest funds in real capital goods, etc. *The way in which production is in fact organized is typically not on a human individualistic basis but rather in somewhat larger producing units, called firms,* within which economic resources are applied in the production of products for sale in more or less well-organized markets.[16]

With reference to the words ''firms'' and ''enterprise'' used in this passage, the author appends the following explanatory footnote:

> The latter terms do not here imply any particular legal form of business entity such as the corporation, the partnership, the single

[13] In the treaty with Israel, for example, the term ''enterprise'' is employed in the following provisions: Art. I; Art. VI, pars. 4, 5; Art. VII, pars. 1, 2, 3, 4; Art. VIII, par. 1; Art. IX, par. 3; Art. XVII, par. 1; Art. XVIII, pars. 1, 2, 3.

[14] Examples are: W. H. Kiekhofer, Economic Principles, Problems and Policies 32 (N.Y., 1951); P. F. Gemmill and R. H. Blodgett, Economic Principles and Problems, Vol. I, p. 79 (2 vols., N.Y., 1948); J. T. Wendzel, the Dynamics of Capitalism 29–31 (N.Y., 1956); Norman S. Buchanan, The Economics of Corporate Enterprise 13 (N.Y., 1940); S. H. Schlichter, Modern Economic Society 134, 144 (N.Y., 1935).

[15] *Op. cit.* 79, italics supplied.     [16] *Op. cit.* 13, italics supplied.

95

proprietorship, etc., but merely refer to all such forms of business ownership organization.  In the succeeding pages, we shall use the words "firm," "enterprise," "business enterprise" as synonyms.

It seems clear from the above, therefore, that the term "enterprise," when employed in a concrete sense in a context where there is reference to economic organization of a capitalistic order, as in the case in the treatises mentioned and in the typical United States commercial treaty, signifies the autonomous unit of economic organization in a free-enterprise economy.[17]

This concept of "enterprise" as developed by the economists has passed over into the vocabularies of writers who are members of the legal profession, a by no means surprising occurrence, since members of both professions must deal with the same phenomena.  Lee Loevinger, in his *The Law of Free Enterprise*, utilizes a general summary of the nature and function of the "enterprise," under the heading "The Forms of Free Enterprise," as one of the bases for his exposition and analysis of the United States anti-trust legislation.  His intended meaning in using the term is made clear in this paragraph:

> In a sense, each business enterprise is a combination of individuals.  However, the term "business combination" commonly means a combination of separate enterprises.  Numerous problems may arise in distinguishing between a single enterprise and a combination.  *The general principle is that an individual legal or economic entity (proprietorship, partnership, association or corporation) constitutes a single enterprise, while business activities with separate formal organizations are separate enterprises.*[18]

In his learned article on "The Theory of Enterprise Entity," A. A. Berle develops in a more technical way the concept of "enterprise" as applicable to a more limited subject matter.  The following quotation is illustrative:

> It is the thesis of this essay:
> That the entity commonly known as corporate entity takes its being from the reality of the underlying enterprise, formed or in formation;
> That the state's approval of the corporate form sets up a prima facie case that the assets, liabilities and operations of the corporation are those of the enterprise;

[17] The various senses of "enterprise" as used in economic writing are discussed by L. M. Fraser in his Economic Thought and Language (London, 1937), at page 318, as follows: "In ordinary language the word has two main meanings.  In the first instance it refers to a thing projected or attempted—particularly if it be of a bold or hazardous nature.  But it may also be used subjectively of the quality or qualities possessed by those who undertake such projects—that is to say, it may be in effect a synonym for 'boldness' or initiative.  Both these meanings are to be found in economic writings, but in addition the word has come to be used in at least two rather more specialized ways.  On the one hand it has become more concrete, standing for the result or objective realization of a project in the economic field—viz. a firm or business unit.  And on the other hand it has become more abstract, being used of the *activities involved* in initiating or running such a project. . . ."

[18] Loevinger, The Law of Free Enterprise 86 (N.Y., 1949).  The statement is in the nature of a definition italicized for purposes of the present paper.

96

But that where the corporate entity is defective, or otherwise challenged, its existence, extent and consequences may be determined by the actual existence and extent and operations of the underlying enterprise, which by these very qualities acquires an entity of its own, recognized by law.

For brevity, this hypothesis is hereafter referred to as the theory of "enterprise entity."

\* \* \*

Whenever "corporate entity" is challenged, the court looks to the enterprise. Where the enterprise as such would be illegal or against public policy for individuals to conduct, that enterprise is equally illegal when carried on by a corporation, and the corporate form is not a protection. This is, in essence, not so much a "disregard of the corporate fiction" as it is a holding that the economic enterprise, whether corporate or non-corporate, is illegal, or criminal, or in violation of public policy, or fraudulent, or otherwise objectionable, as the case may be. The nature of the enterprise determines the result, negativing the corporate personality or any other form or organization of that enterprise.[19]

Again, Kronstein, in his essay on "The Nationality of International Enterprises,"[20] resorted to the term "enterprise" to designate the fundamental entity in the capitalistic business structure:

For the purposes of determining the nationality of a corporation, it is significant that business enterprises often do not coincide with corporate units. Sometimes they exceed the boundaries of corporate units and make corporate units their instrumentalities; or one corporation, or an unincorporated individual or group, may own many business enterprises which may or may not be incorporated. Thus, it may be that a corporation has the nationality of A while the central enterprise with which it is affiliated is deeply entrenched in the economic order of B and some of the constituent permanent establishments are parts of the economic orders of C and D.

The employment of "enterprise" in this same general sense in treaties has not been limited solely to those of the commercial variety. It has long been in use in United States treaties for the avoidance of double taxation.[21] These treaties, being highly technical in character, and perhaps because they may have the effect of directly amending the national revenue laws, carry an extensive list of definitions, among them definitions of "enterprise." A typical definition is that of "United States enterprise" found in the Convention for the Avoidance of Double Taxation between the

[19] A. A. Berle, "The Theory of Enterprise Entity," 47 Columbia Law Rev. 344, 354 (1947).

[20] 52 Columbia Law Rev. 985. Other passages in the article contribute to an understanding of the "enterprise" concept. The fact that Kronstein prefers to employ the term to refer to the major central business units does not affect the bearing of his discussion upon the treaty terminology.

[21] A more universal acceptance of the term is indicated by its use in the same sense in the model income tax convention adopted in 1943 at Mexico City at a conference held under the auspices of the League of Nations Fiscal Committee. League of Nations Fiscal Committee, Model Bilateral Conventions for the Prevention of International Double Taxation and Fiscal Evasion, *passim*, but especially pp. 16, 19 (Geneva, 1943).