UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------- Λ

DEBORAH D. PETERSON,
Personal Representative of the Estate
of James C. Knipple (Dec.), et al.,

                Plaintiffs,

        v.

ISLAMIC REPUBLIC OF IRAN, et al.,

                Defendants.

------------------------------------------------------- X

Case No. 18 Misc. 302 (BSJ)

## DECLARATION OF JAMES S. ROGERS

I, James S. Rogers, declare and state as follows:

1.     I have been asked to give an opinion concerning certain questions of interpretation regarding UCC Article 8, including questions raised by the letter opinion of professor Charles W. Mooney, Jr. to Plaintiffs' counsel dated November 11, 2010, in connection with the above-captioned case in which Plaintiffs seek to enforce a judgment against Iran's central bank, Bank Markazi, by an action in New York federal court against Clearstream Banking, SA ("Clearstream"). I assume for present purposes that Bank Markazi holds security entitlements through Clearstream.

2.     I served as Reporter (drafter) for the Drafting Committee to Revise UCC Article 8, including the provisions in Part 5 which established a new framework for the analysis of securities holdings through central depositories and other intermediaries. Presently, I am a Professor at Boston College Law School. A copy of my curriculum vitae and qualifications to give this opinion is attached as Exhibit A.

3.     For purposes of this opinion I have assumed:

     (a)    That "Creditor" holds a judgment against "Investor."

     (b)    That Investor has a securities account with "Lower-tier Intermediary" and through that account holds a position in a certain quantity of securities issued by ABC.

(c)      That Lower-tier Intermediary has a securities account with "Upper-tier Intermediary" and through that account holds a position in a quantity of securities issued by ABC adequate to satisfy the obligations of Lower-tier Intermediary to Investor and all other investors who hold positions ABC securities through accounts with Lower-tier Intermediary.

(d)      In the circumstances of this case, "Creditor" is Plaintiffs; "Investor" is Bank Markazi; "Lower-tier Intermediary" is Clearstream; "Upper-tier Intermediary" is Citibank, N.A. ("Citibank").

4.      In preparing this opinion, I have examined the documents listed in Exhibit B. I have no information about the nature or extent of contacts between Clearstream and the State of New York, and I express no opinion on any such contacts.

5.      For the purpose of this opinion, I have assumed that Investor is domiciled in Iran, that Clearstream (Lower-tier Intermediary) is domiciled in Luxembourg, and that Citibank, NA (Upper-tier Intermediary) is domiciled in New York. In litigation in a New York court concerning securities held through an intermediary, UCC § 8-110 establishes the conflict of law rules that a court in New York must follow. Under § 8-110(b), the local law of a securities intermediary's jurisdiction governs the rights of a person who holds through a securities intermediary and the duties of the securities intermediary, including whether the securities intermediary owes any duties to a person who asserts a claim to an entitlement holders' rights. Section 8-110(e) specifies the meaning of "securities intermediary's jurisdiction." It is my understanding that the agreement between Clearstream and Investor provides that it is governed by Luxembourg law. Accordingly, under section 8-110(e) the "securities intermediary's jurisdiction" is Luxembourg. Thus, New York's UCC would require a New York court to apply Luxembourg law to determine both the rights that Investor has in its entitlements and against Clearstream, and whether a creditor of Investor can bring an action against Clearstream to enforce a judgment that the creditor has against Investor.

6.      If a court, nonetheless, were to analyze the question of Clearstream's duties to a creditor of one of Clearstream's customers with respect to the entitlements in the Investor's securities account without regard to the UCC's conflict-of-law provisions, then Article 8 would provide the analysis set forth in the balance of this opinion.

7.    Prior to the revision of Article 8 in 1994, Article 8 was based on the idea that all questions concerning securities holding could be addressed by speaking of whether there had been a transfer of "the security." Thus, even if the ultimate investor held through a chain of intermediaries, old Article 8 tried to treat all transactions as transfers of "the security." Other systems of law around the world take a similar approach. That is, they attempt to ignore the chain of intermediaries by using concepts akin to trust or bailment. In such systems, it would be possible to speak of the ultimate investor as being the owner of the security, and of the intermediaries as having possession of a thing that belongs to someone else, that is, the ultimate investor. As applied to the assumed facts above, under the approach of old Article 8 it would be possible to speak of Investor as being the owner of the ABC securities.

8.    Revised Article 8 rejects the approach taken in former law. Revised Article 8 does not describe the ultimate investor as the owner of a security which is held by someone else. Instead, Revised Article 8 uses the concept of "security entitlement" to describe the rights of a person who holds a position in a security through an account with a securities intermediary. Under UCC Art 8, Investor (along with all other customers of Lower-tier Intermediary having positions in the ABC security held through Lower-tier Intermediary) has a security entitlement against Lower-tier Intermediary in respect of the ABC securities. That security entitlement consists of a package of rights that Investor has against Lower-tier Intermediary and property held by Lower-tier Intermediary. Lower-tier Intermediary in turn (along with all other customers of Upper-tier Intermediary having positions in the ABC security held through Upper-tier Intermediary) has a security entitlement against Upper-tier Intermediary in respect of the ABC securities. That security entitlement consists of a package of rights that Lower-tier Intermediary has against Upper-tier Intermediary and property held by Upper-tier Intermediary. The security entitlement that Investor has against Lower-tier Intermediary is not the same item of property as the security entitlement that Lower-tier Intermediary has against Upper-tier Intermediary, nor is the security entitlement that Investor has against Lower-tier Intermediary derivative from the security entitlement that Lower-tier Intermediary has against Upper-tier Intermediary. If Lower-tier Intermediary has made entries on its books showing that a position in ABC securities has been credited to Investor's account with Lower-tier Intermediary, then Investor has a security entitlement against Lower-tier Intermediary. That would be true even if Lower-tier Intermediary

had not taken appropriate action to acquire a position in the ABC securities that it would need to satisfy its obligation to Investor.

9.      A security entitlement is described by § 8-503 as a form of "property" interest. That, however, is a special form of property interest. The content of this special form of property interest is described by the rest of Part 5 of Article 8. The Part 5 sets baseline rules on the rights of an entitlement holder against its securities intermediary and the duties of a securities intermediary to its entitlement holders.

10.     Section 8-503(a) summarizes the package of rights that make up a security entitlement by providing that:

> To the extent necessary for a securities intermediary to satisfy all security entitlements with respect to a particular financial asset, all interests in that financial asset held by the securities intermediary are held by the securities intermediary for the entitlement holders, are not property of the securities intermediary, and are not subject to claims of creditors of the securities intermediary, except as otherwise provided in Section 8-511.

The statement that interests in financial assets held by the securities intermediary that are needed to satisfy claims of its entitlement holders "are not property of the securities intermediary" was included in § 8-503 out of concern that readers might misconstrue Part 5 of Article 8 as meaning that entitlement holders have only a contractual right against the securities intermediary so that assets held by the securities intermediary to satisfy the claims of its entitlement holders might be subject to the claims of general creditors of the securities intermediary.

11.     Significantly, § 8-503(a) does not state that financial assets held by a securities intermediary "are the property of the entitlement holders." Comment 2 to § 8-503 makes it clear that a security entitlement cannot be understood in terms of traditional property law concepts:

> Although this section recognizes that the entitlement holders of a securities intermediary have a property interest in the financial assets held by the intermediary, the incidents of this property interest are established by the rules of Article 8, not by common law property concepts. The traditional Article 8 rules on certificated securities were based on the idea that a paper certificate could be regarded as a nearly complete reification of the underlying right. The rules on transfer and the consequences of wrongful transfer could then be written using the same basic concepts as the rules for physical chattels. A person's claim of ownership of a certificated security is a right to a specific identifiable physical object, and that right can be asserted against any person who ends up in possession of that physical certificate, unless cut off by the rules protecting

4

> purchasers for value without notice. Those concepts do not work for the indirect holding system. A security entitlement is not a claim to a specific identifiable thing; it is a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary. The idea that discrete objects might be traced through the hands of different persons has no place in the Revised Article 8 rules for the indirect holding system.

Thus, while Investor's security entitlement against Lower-tier Intermediary can be described as a "property interest," it would not be accurate to describe the relationship as one in which Investor is the owner of an item of property in the hands of Lower-tier Intermediary.

12.    Under Article 8, the relationship between Lower-tier Intermediary and Upper-tier Intermediary is the same as the relationship between Investor and Lower-tier Intermediary. Lower-tier Intermediary would have a security entitlement against Upper-tier Intermediary. The incidents of that security entitlement are described in Part 5 of Article 8. Financial assets held by Upper-tier Intermediary that are needed to satisfy the claims of Upper-tier Intermediary's entitlement holders, including Lower-tier Intermediary, would not be subject to the claims of Upper-tier Intermediary's creditors. For the reasons noted in the preceding paragraph, it would not be accurate to describe the relationship between Upper-tier Intermediary and Lower-tier Intermediary as one in which Lower-tier Intermediary is the owner of an item of property in the hands of Upper-tier Intermediary.

13.    Although the security entitlement that customers of an intermediary have against that intermediary can be described as a special form of property with respect to the property held by that intermediary, this is not the usual sort of property interest that can be asserted "against the world." As section 8-503(c) makes clear, with exceptions not here relevant, the customer's special form of property interest can be asserted only by exercise of the rights that other sections of Part 5 give an entitlement holder against that entitlement holder's immediate intermediary. There is no circumstance in which customers of an intermediary can assert rights directly against anyone else through whom that intermediary holds a securities position. Thus, in the example here under consideration, Upper-tier Intermediary owes no duties to Investor (a customer of Lower-tier Intermediary), and Investor has no rights that can be asserted directly against Upper-tier Intermediary or property held by Upper-tier Intermediary.

14.    One respect in which a security entitlement differs from other forms of property interests concern rights of creditors of a person who holds a position in a security through an account with

an intermediary.  If traditional property concepts were used to describe an indirect holding arrangement, one might conclude that the intermediary that actually has possession of certificates, or is recorded as the registered owner on the books of the issuer, is holding property that belongs to the ultimate investors. That might mean that a creditor of an investor could attempt to collect a judgment against the investor by initiating legal process on an upper tier intermediary.  In the drafting process that led to revised Article 8, one point that was clear from the outset was that the mere fact that an investor holds through a lower-tier intermediary, and that the lower tier intermediary in turn holds through an upper-tier tier intermediary, should not mean that a creditor of the investor could bring legal process against the upper tier intermediary. Section 8-112(c) embodies this principle by stating that "The interest of a debtor in a security entitlement may be reached by a creditor *only* by legal process upon the securities intermediary with whom the debtor's securities account is maintained." (emphasis added.).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of January, 2011, in Newton, Massachusetts.

James S. Rogers

6

James S. Rogers Declaration Exhibit A

**JAMES STEVEN ROGERS**
Boston College Law School
885 Centre St
Newton, MA  02459
(617) 552-4301   fax (617) 552-2615
james.rogers@bc.edu

Curriculum Vitae  January 1, 2011

## ACADEMIC POSITIONS

1988-present       Professor, Boston College Law School.

1998-99            Interim Dean, Boston College Law School.

1997-2000          Associate Dean for Academic Affairs, Boston College Law School

1983-88            Associate Professor, Boston College Law School.

1980-83            Assistant Professor, Boston College Law School.

Visiting Professor, Harvard Law School, Spring 1990.

Present Courses:   Commercial Law Secured Transactions, Commercial Law Payment Systems, Contracts
Prior Courses:     Corporations, Bankruptcy, Restitution and Remedies, Constitutional Law, History of Commercial Law.


## PUBLICATIONS*

"Unification of Payments Law and the Problem of Insolvency Risk in Payment Systems." 83 *Chicago Kent Law Rev.* 689-720 (2008).

"Restitution for Wrongs and the Restatement (Third) of the Law of Restitution." 42 *Wake Forest L. Rev.* 55-92  (2007).

"The Revision of Canadian Law on Securities Holding Through Intermediaries: Who, What, When, Where, How, and Why." 45 *Canadian Business L. J.* 49-66 (2007).

"Conflict of Laws for Transactions in Securities Held through Intermediaries." 39 *Cornell Int'l L.J.* 285-328  (2006).

"The New Old Law of Electronic Money." 58 *SMU Law Rev.* 1253-1311 (2005).

---

\* Links to most articles can be found at http://www.bc.edu/schools/law/fac-staff/deans-faculty/rogersj.html

"The Basic Principle of Loss Allocation for Unauthorized Checks." 39 *Wake Forest L.Rev.* 453-509 (2004).

With Randall Guynn. "New York Choice of Law." In *Cross Border Collateral: Legal Risk and the Conflict of Laws*, edited by Richard Potok. London, Butterworths, 2002.

Book Review, *Industrializing English Law: Enterpreneurship and Business Organization, 1720-1844*, by Ron Harris. 44 *American Journal Of Legal History* 44 (2000): 314-16.

"Legal Risk in the Securities Settlement System." In International Monetary Fund, *Current Developments in Monetary and Financial Law*, 263-270 (1999).

"Of Normalcy and Anomaly: Thoughts on Choice of Law for the Indirect Holding System." In *The Oxford Colloquium on Collateral and Conflict of Laws*, held at St. John's College, Oxford University , May 1, 1998. (A special supplement to *Butterworths Journal of International Banking and Financial Law* 13 (September 1998): 47-51.)

"Sobre Los Orígenes del Moderno Derecho Inglés de Sociedades." In *Del Ius Mercatorum al Derecho Mercantil*, edited by Carlos Petit, 307-332. Madrid: Marcel Pons, 1997. (translation of paper entitled "On the Origins of English Law of Partnership" presented at a conference in Sitges, Spain, Spring 1992).

*Toward International Harmonization of the Commercial law of the Modern Securities Holding and Transfer System: Some Reflection from the United States Article 8 Revision Project.* In *Modernizing Securities Ownership, Transfer and Pledging Laws.* International Bar Ass'n, Capital Markets Forum (1996).

*Revised Article 8: Investment Securities*, vol. 7A of *Hawkland Uniform Commercial Code Series.* Deerfield, Il: Clark, Boardman, Callaghan, 1996

"Policy Perspectives on Revised UCC Article 8." 43 *UCLA L. Rev.* 1431 (1996).

"An Essay on Horseless Carriages and Paperless Negotiable Instruments: Some Lessons from the Article 8 Revision." *Idaho Law Review* 31 (1995): 689-98.

*The Early History of the Law of Bills and Notes: A Study of the Origins of Anglo-American Commercial Law.* Cambridge: Cambridge University Press, 1995.

"Revised UCC Article 8: Why It's Needed, What It Does." *UCC Bulletin* (December 1994): 1-5.

"Beyond G30: Update: A new approach to the commercial law of securities holding through intermediaries: the proposed revisions of Article 8 of the United States Uniform Commercial Code." *Euroclear Review* (September 1994). Also reprinted in *Securities Operations Letter* (November 1994)

"Behind the Article 8 ball:  The law plays catch-up with indirect securities holding." *Business Law Today* (January/February 1994) 44-49.

"The Problem of Accommodation Bills:  Banking Theory and The Law of Bills and Notes in the Early Nineteenth Century."  In *The Growth of the Bank as Institution and the Development of Money-Business Law*, edited by V. Piergiovanni, 119-55.  Comparative Studies in Continental and Anglo-American Legal History, no. 12.  Berlin: Dunker & Humbolt, 1993.

"UCC Article 8—Investment Securities: The Need for Revision to Accommodate Securities Holding Through Financial Intermediaries." In *Commercial Law Annual 1993*, edited by L. Del Duca and P. Del Duca, 419-52.

"An Overview of the Current Project to Revise UCC Article 8."  *UCC Bulletin* (May 1992): 1-5.

"Negotiability, Property, and Identity." *Cardozo Law Review* 12 (1990): 471-508.

"The Myth of Negotiability." *Boston College Law Review* 31 (1990): 265-334.

"The Irrelevance of Negotiable Instruments Concepts in the Law of the Check-Based Payment System." *Texas Law Review* 65 (1987): 929-61.

"Negotiability as a System of Title Recognition." *Ohio State Law Journal* 48 (1987): 197-224.

"The Impairment of Secured Creditors' Rights in Reorganization: A Study of the Relationship Between the Fifth Amendment and the Bankruptcy Clause." *Harvard Law Review* 96 (1983): 973-1031.

"Contracts and Commercial Law." In *1981 Annual Survey of Massachusetts Law.*

"Contracts and Commercial Law." In *1980 Annual Survey of Massachusetts Law.*

## WORKS IN PROCESS

*Not Negotiable: Rescuing Payments Law from the Past.* Efforts to create a unified body of law
for all payment systems have so far been unsuccessful. Discussions of reform of payment
systems law typically assume that while the existing law works well for the traditional
paper-based system of checks and promissory notes, problems have been created by the
evolution of new technologies. This book argues that this assumption is quite unfounded.
It shows that the law of checks and notes, as set out in Articles 3 and 4 of the Uniform
Commercial Code, is itself anachronistic and all but incoherent. The law of negotiable
instruments developed centuries ago when instruments issued by private parties
circulated as a form of money. While that system has long since passed into history, there
has been no significant rethinking of this body of law. The book shows much of the
current law of checks and notes is the product of nothing more than that historical fluke,
such as odd details of the eighteenth century Stamps Acts. It shows that there is no need

3

for a statute governing promissory notes and that the law of checks would be far simpler if it treated checks simply as instructions to the financial system, akin to debit or credit cards.

"Indeterminacy and the Law of Restitution," article for symposium to be published by *Washington & Lee L. Rev.*

## MAJOR PROFESSIONAL ACTIVITIES

2000-2003    United States Delegate (appointed by U.S. Department of State) to Hague Conference on Private International Law project to negotiate and draft Convention on Choice of Law for Securities Holding Through Securities Intermediaries; Member of Drafting Group for that Convention (appointed by Permanent Bureau of Hague Conference).

1994-96    Member of International Bar Association/ Capital Markets Forum Subcommittee on Legal Certainty for Intermediated Securities, developing international uniformity initiatives on the law of securities holding through intermediaries and related choice of law issues

1996-99    Senior Advisor for a project undertaken by the National Law Center for Inter-American Free Trade, Tucson AZ, on the harmonization of Mexican law with the recent revision of US UCC Article 8.

1991-94    Reporter, Drafting Committee to Revise Article 8, Uniform Commercial Code-- Investment Securities.  Related activities include acting as advisor to SEC Market Transactions Advisory Committee and participant in ABA Task Force of Proposed Treasury TRADE Regulations, as well as numerous meetings with securities industry participants.

1989-90    Participant in deliberations of Drafting Committee to Revise Articles 3 & 4, Uniform Commercial Code.

1995-    Member, American Law Institute

4

PROGRAMS

University of Amsterdam Centre for the Study of European Contract Law. 28 September 2007 .
Presentation on "Modernization and Harmonization of Securities Transfer and
Custody Law."

36th Annual Workshop on Commercial and Consumer Law. October 27-28, 2006. Banff,
Alberta, Canada. Presented paper "The Revision of Canadian Law on Securities
Holding Through Intermediaries: Who, What, When, Where, How, and Why."

International Symposium on Hague Securities Convention. 12 Oct. 2004. Rikkyo University
Tokyo, Japan. Presented paper on "Property and Contract: Toward a Clearer
Understanding of the Hague Convention on the Law Applicable to Certain Rights
in Respect of Securities."

International Legal Symposium on Securities Clearing and Registration. 5 & 6 Nov. 2003.
China Securities Depository, Beijing, China. Presented paper on "Reflections on
the Revision of Article 8 of the United States Uniform Commercial Code."

Canadian Depository for Securities. Toronto, Canada. 31 July 1998. Invited participant at
Colloquium on a project undertaken by the Uniform Law Conference of Canada
on the revision of Canadian law to harmonize with the recent revision of US UCC
Article 8.

International Monetary Fund. Washington, D.C. 11 May 1998. Presented paper on "Legal Risk
in the Securities Settlement System," at Seminar on Current Legal Issues
Affecting Central Banks.

St. John's College, Oxford University. Oxford, England. 1 May 1998. Invited participant at
Colloquium on Collateral and Conflicts of Law

Boston Bar Foundation. Boston, MA. 19 March 1996. Panelist on program on "Revised UCC
Articles 8 & Emerging Issues in Investment Securities Practice."

Massachusetts Continuing Legal Education, Inc. Boston, MA. 18 December 1995. Panelist on
program on "Hot Topics in Secured Lending."

ALI-ABA The Emerged and Emerging New Uniform Commercial Code. New York, NY. 8-10
December 1995. Panelist on several sessions on Revised Articles 8 & 9.

29th Annual Uniform Commercial Code Institute, Washington D.C., 7 October 1995. Speaker
on Security Interests in Investment Securities under Revised UCC Articles 8/9.

"The UCC Article 8 Revision Project: Some Comparative Reflections." Presentation at
symposium on developments in securities clearance and settlement law in the U.S.
and U.K. at Davis, Polk & Wardwell, New York, N.Y., 27 April 1995

American Bar Ass'n, Section of Business Law. Spring Meeting March 1995, San Antonio Texas. Panelist on program on revised UCC Article 8.

Massachusetts Continuing Legal Education, Inc. Boston, MA. 27 February 1995. Panelist on program on "UCC Article 9 Update: Advanced Issues and Current Developments."

Association of American Law Schools. Annual Meeting January 1995 New Orleans, LA. Panelist on program entitled "Computer and Commercial Law: The Impact of New Transaction Forms on Commercial Value, Theory, and Practice."

Massachusetts Continuing Legal Education, Inc. Boston, MA. 15 December 1994. Panelist on program on "Investment Securities--The New UCC Article 8."

ALI-ABA The Emerged and Emerging New Uniform Commercial Code. New York, NY. 8-10 December 1994. Panelist on several sessions on Revised Articles 8 & 9.

International Bar Association Conference, Melbourne Australia. 9-14 October, 1994. Presentations at programs on "Harmonization of Acquisition of Interests & Collateralization in Book-Based Securities" and "Pledge of Securities in a Foreign Country--Substantive Law and Legal Opinions"

New York County Lawyers' Association. Banking Law Committee. New York, N.Y. 14 September 1994. Speaker at program on UCC Article 8 revision.

Boston Bar Foundation. Boston, MA. 20 June 1994. Panelist on program on "Security Interests in Investment Securities, Letters of Credit and Bank Deposits."

ALI-ABA The Emerged and Emerging New Uniform Commercial Code. New York, NY. 9-11 December 1993. Speaker on UCC Article 8 revision.

27th Annual Uniform Commercial Code Institute, Washington D.C., 23 October 1993. Speaker on UCC Article 8 revision.

Ass'n of Commercial Finance Attorneys, New York, N.Y. 14 October 1994. Speaker at program on UCC Article 8 revision.

American Bar Ass'n, Section of Business Law. Spring Meeting April 1993, New Orleans. Panelist on program on secured transactions under proposed revised UCC Article 8.

ALI-ABA The Emerged and Emerging New Uniform Commercial Code. Atlanta, GA. 12-14 November 1992. Speaker on UCC Article 8 revision, panelist on programs on Article 9, Articles 3 & 4, and suretyship.

26th Annual Uniform Commercial Code Institute, Washington D.C., 3 October 1992.  Speaker on UCC Article 8 revision.

American Bar Ass'n, Annual Meeting August 1992, San Francisco, CA.  Speaker at UCC Subcommittee meeting on program on secured transactions under proposed revised UCC Article 8.

25th Annual Uniform Commercial Code Institute, Chicago, IL, 4 April 1992.  Speaker on UCC Article 8 revision.

AALS Annual Meeting January 1991 Washington D.C.  Panelist on program on Revision of UCC Article 3.

University of California at Los Angeles School of Law.  18 January 1991. Presented paper on commercial law history at faculty colloquium.

Cardozo Law School.  Symposium "Beyond Negotiability:  Security Transfers and Stockbroker Regulation" 23 April 1990.  Sponsored by The Cardozo Law Review and The Samuel and Ronnie Heyman Center on Corporate Goverance

## EDUCATION

J. D.  1976,    Harvard Law School, Cambridge MA.  Harvard Law Review; Magna Cum Laude, Fay Diploma.  (The Fay Diploma is awarded to the student who graduates first in class in cumulative G.P.A.)

A. B. 1973,     University of Pennsylvania, Philadelphia, PA.  Summa cum laude; Phi Beta Kappa.

## LEGAL PRACTICE

1977-80         Associate, Sullivan & Worcester, Boston, MA  Areas of practice included corporate and securities law, trademark and unfair competition litigation, commercial litigation, municipal law, and corporate reorganization.

1976-77         Law clerk to the Honorable Bailey Aldrich, United States Court of Appeals for the First Circuit, Boston, MA.

7

# Exhibit B

James S. Rogers Declaration Exhibit B

## Documents Examined in Preparing Declaration

Memorandum of Law of the Peterson Plaintiffs in Opposition to Clearstream
     Banking, S.A.'s Second and Third Supplemental Memoranda to Vacate
     Restraints, dated Nov 11, 2010

Protective Order, dated June 11, 2008

Clearstream General Terms and Conditions, dated July 2008

Clearstream Banking, S.A.'s Memorandum of Law in Support of its Motion to Vacate
     Restraints, dated Sept 4, 2008

Clearstream Banking, S.A.'s Reply in Support of its Motion to Vacate Restraints,
     dated Nov. 14, 2008

Clearstream Banking, S.A.'s Supplemental Brief, dated Dec. 12, 2008

Order of Hon. Barbara S. Jones, dated June 23, 2009

Clearstream Banking, S.A.'s Second Supplemental Memorandum to Vacate
     Restraints, dated July 15, 2010

Letter from Frank Panopoulos to Hon. Barbara S. Jones, dated July 30, 2010

Clearstream Banking, S.A.'s Third Supplemental Memorandum to Vacate Restraints,
     dated Sept. 13, 2010

Letter Opinion of Charles W. Mooney, Jr., dated Nov 11, 2010