

INTERNATIONAL INSTITUTE FOR THE UNIFICATION OF PRIVATE LAW
INSTITUT INTERNATIONAL POUR L'UNIFICATION DU DROIT PRIVE

---

**UNIDROIT COMMITTEE OF GOVERNMENTAL EXPERTS
FOR THE PREPARATION OF A DRAFT CONVENTION ON
HARMONISED SUBSTANTIVE RULES REGARDING
SECURITIES HELD WITH AN INTERMEDIARY
First session
Rome, 9/20 May 2005**

UNIDROIT 2005
Study LXXVIII – Doc. 23 rev.

Original: English/French
August 2005

*FINAL REPORT*

**General Discussion**

1.   The Secretary-General welcomed participants (cf. Appendix 3) in this first meeting of the Committee of governmental experts for the preparation of the draft *Convention on Harmonised Substantive Rules regarding Securities Held with an Intermediary* ("the Committee").

2.   He described the exceptional degree of support for this initiative that UNIDROIT had received from stakeholders - evidenced, for example, by the desire expressed in the course of its work on global clearing and settlement by the Group of Thirty, an international non-governmental organisation - for a body of law that is applicable and workable both globally and on a national level (cf. also UNIDROIT LXXVIII – Docs. 20-22 and Appendix 11).

3.   Some reforms had already been achieved in this field by two directives of the European Union ("the EU"), namely Directive 98/26/EC on settlement finality in payment and securities settlement systems ("the EU Settlement Finality Directive") and Directive 2002/47/EC on financial and collateral arrangements ("the EU Collateral Directive"). The Commission of the EU had begun further work intended to address wider issues within the EU regional area. The draft Convention would, by contrast, be global in scope and thus should both complement, and be coordinated with, the work of the EU.

4.   Further evidence of the need for an international text had emerged from a "brainstorming" session with regulatory agencies and central banks. This had concluded that there was a vacuum and significant "white spots" in the law governing international transactions in capital markets.

5.   The first step towards harmonisation, an appropriate response at the conflict of laws level, was a text adopted under the auspices of the Hague Conference on Private International Law ("the Hague Conference"), the *Convention on the Law Applicable to Certain Rights in Respect of Securities Held with an Intermediary* ("the Hague Securities Convention"). Whilst the Hague Securities Convention satisfied the need for a clear and consistent conflict of laws rule, the harmonisation of substantive law remained necessary. It was now time, with the encouragement, active participation and support of Governments, international institutions,

delegation suggested that the second part of paragraph (3) contained a priority rule, modified by paragraphs (4) and (5). A simple reference to the priority rules of the clearance and settlement system might suffice. Indeed, no special rules might be necessary – a general rule on priority and good faith in acquisition might be all that was needed.

### Article 6

93. The Secretariat then introduced Article 6. Its function was to put beyond doubt that there is a moment in time when book entries become effective. Delegations were not convinced of its need and suggested it be incorporated into Article 5. Though its title implied something more, it simply confirmed the obvious.

### Article 7

94. The Committee considered briefly the provision made by Article 7. Delegations were generally in favour of the principle to which it was intended to give effect, but matters such as the degree and nature of regulation to which future clearing and settlement systems would be subject were, at the EU and at other levels, still far from clear. Delegations agreed that detailed consideration of its content should be deferred.

### Article 8

95. Article 8 was then introduced by the Secretariat. Unlike paragraph (2) (b) of Article 2, which addressed the account holder's rights against the relevant intermediary, Article 8 was concerned with "attachment" against any upper tier intermediary ("attachment" being defined as broadly as possible). An upper tier intermediary could not be expected to have any information regarding the securities a particular investor has. The effect of attempting to freeze securities at the upper tier would have unwarranted consequences for the entire account and indeed, potentially, for the system as a whole.

96. There was broad support for the principle to which the Article was intended to give effect. Omnibus accounts should not be subject to attachment. One delegation described it as a limited, targeted provision which it had never known to be applied in practice. It was, however, accepted that questions of how and whether the Article should be applied to the direct holding system, which might enable identification at the upper tier, required further consideration and possibly some redrafting in consequence. Any exception to the rule made for that system should perhaps not be automatic. Only when accounts were set up systemically so as to ensure transparency should there be an exception. In drafting terms it might be expressed as "Except as otherwise prescribed by law", rather than by reference to a possible identification. However it was pointed out that any redraft must take into consideration the possibility of difficult priority issues which could arise where attachment was permitted at a level other than the relevant intermediary in several scenarios. Further suggestions for re-drafting were made by delegations. These included general matters such as the importance of the cross-border context in which there might be linkages between direct and indirect holding systems and specific matters such as the definition of "attachment".

### Article 9

97. The Secretariat then introduced Article 9. There were compelling reasons for including a priority rule in relation to cross-border transactions. There were interests arising under two different regimes to consider - that for which the preliminary draft Convention would provide and the national systems already in existence. For those arising under Articles 3 and 4, the rule was