**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**

------------------------------------------------------- x

DEBORAH D. PETERSON,                          :
Personal Representative of the Estate          :
of James C. Knipple (Dec.), et al.,            :
                                               :
                          Plaintiffs,          :          Case No. 10 Civ. 4518 (BSJ) (GWG)
                                               :
              v.                               :          **FILED UNDER SEAL**
                                               :
ISLAMIC REPUBLIC OF IRAN, et al.,              :          CONTAINS CONFIDENTIAL
                                               :          MATERIAL SUBJECT TO
                          Defendants.          :          PROTECTIVE ORDER

------------------------------------------------------- x


### CLEARSTREAM BANKING, S.A.'S
### CONSOLIDATED MEMORANDUM OF LAW
### IN SUPPORT OF ITS RENEWED MOTION TO VACATE RESTRAINTS

Nicole E. Erb
Frank Panopoulos
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Tel: (202) 626-3600
Fax: (202) 639-9355

*Counsel for Clearstream Banking, S.A.*

December 22, 2011

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ................................................................................................ 1

PROCEDURAL BACKGROUND....................................................................... 2

FACT BACKGROUND ....................................................................................... 5

I.      BANK MARKAZI'S SECURITIES ACCOUNT WITH CLEARSTREAM ................... 6

II.     CLEARSTREAM'S OMNIBUS ACCOUNT WITH CITIBANK ............................ 8

ARGUMENT ...................................................................................................... 10

I.      APPLICABLE STANDARD ON A MOTION TO VACATE RESTRAINTS ............... 10

II.     THE NATURE OF A SECURITY ENTITLEMENT ......................................... 11

        A.      The Definition Of A Security Entitlement.............................. 12

        B.      Security Entitlements Facilitate The Indirect Holding Of Securities
                Through  A System Of Multi-Tiered Securities Intermediaries ........... 13

        C.      Security Entitlements Are Discrete Rights That Exist With And Can Only
                Be Asserted Against The Immediate Securities Intermediary With Which
                The Entitlement Holder Has Its Securities Account .......................... 15

                1.      Rights In Security Entitlements Cannot Be Asserted Against
                        Upper-Tier Intermediaries ....................................................... 15

                2.      Securities Entitlements Only Exist In The Entitlement Holder's
                        Account With Its Securities Intermediary................................ 17

III.    THIS COURT ALREADY RULED THAT CLEARSTREAM IS NOT A
        PROPER GARNISHEE UNDER UCC § 8-112(C) ....................................... 20

IV.     UNDER THE UCC BANK MARKAZI'S SECURITY ENTITLEMENTS ARE
        LOCATED IN LUXEMBOURG AND THAT IS WHERE THEY MUST BE
        RESTRAINED.................................................................................... 21

        A.      Under UCC § 8-110, Bank Markazi's Rights Arising Out Of Its Security
                Entitlements Are Governed By Luxembourg Law ................................ 22

B. Under Luxembourg Law, Bank Markazi's Property Rights Can Only Be Asserted Against Clearstream In Luxembourg And Do Not Extend To Upper-Tier Intermediaries ..................................................................24

C. Even In The Absence Of Luxembourg Law, Under UCC § 8-503 Bank Markazi's Property Right Is Located In Luxembourg And Does Not Extend To Upper-Tier Financial Intermediaries Like Citibank..........................24

D. Clearstream's Cash Account With Citibank Cannot Be Restrained ....................28

V. COMMON LAW SITUS RULES ARE NOT APPLICABLE AS A BASIS TO RESTRAIN OR TURN OVER THE RESTRAINED ASSETS .......................................30

 A. UCC Article 8 Supplants The Common Law Of Situs For Security Entitlements ........................................................................................30

 B. Under New York Common Law, The Situs Of Bank Markazi's Security Entitlements Is Luxembourg Because That Is The Place Of Performance Under The Account Agreement With Clearstream................................................32

 C. The Common Law Situs Rule In *Harris v. Balk* Is Inapposite ............................35

 D. The FSIA Precludes Application Of The Common Law Situs Rule In *Harris v. Balk*.................................................................................38

VI. *KOEHLER v. BANK OF BERMUDA* IS INAPPLICABLE AS A BASIS TO RESTRAIN AND TURN OVER THE RESTRAINED ASSETS ...................................40

VII. THE RESTRAINED ASSETS ARE NOT "BLOCKED ASSETS" UNDER THE TERRORISM RISK INSURANCE ACT.........................................................................42

VIII. EQUITABLE RELIEF IS UNAVAILABLE TO RESTRAIN AND TURN OVER THE RESTRAINED ASSETS ........................................................................................44

 A. The Common Law "Creditor's Bill" Is Unavailable To Plaintiffs .......................44

 B. UCC § 8-112(e) Is Inapplicable In This Case.......................................................45

CONCLUSION............................................................................................................................47

## TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Af-Cap Inc. v. Republic of Congo,*
    383 F.3d 361 (5th Cir. 2004) ............................................................35, 37

*Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo S.A.,*
    190 F.3d 16 (2d Cir. 1999).............................................................30

*Allied Maritime, Inc. v. Descatrade,*
    No. 09 Civ. 3684(SAS), 2009 WL 4884160 (S.D.N.Y. Dec. 16, 2009)......................34

*Allied Maritime, Inc. v. Descatrade SA,*
    620 F.3d 70 (2d Cir. 2010) .............................................................34, 41

*Aurelius Capital Partner, LP v. Republic of Argentina,*
    No. 07 Civ. 2715, 2010 WL 768874 (S.D.N.Y. Mar. 5, 2010) ........................... *passim*

*Avelar v. J. Cotoia Constr., Inc.,*
    No. 11-cv-2172, 2011 WL 5245206 (E.D.N.Y. Nov. 2, 2011) ...................................11

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.,*
    No. 11 Civ. 3283 (DLC), 2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011)..........28, 42, 44

*Capital Ventures Int'l v. Republic of Argentina,*
    280 F. App'x. 14 (2d Cir. 2008) ........................................................29, 30

*EM Ltd. v. Republic of Argentina,*
    473 F.3d 463 (2d Cir. 2007) .............................................................39

*EM Ltd. v. Republic of Argentina,*
    389 F. App'x 38 (2d Cir. 2010) .........................................................32

*Export-Import Bank of the United States v. Asia Pulp & Paper Co.,*
    609 F.3d 111 (2d Cir. 2010) ............................................................11

*Fidelity Partners, Inc. v. First Trust Co. of N.Y.,*
    58 F. Supp. 2d 52 (S.D.N.Y. 1997) ................................................... *passim*

*Fidelity Partners, Inc. v. First Trust Co. of N.Y.,*
    58 F. Supp. 2d 55 (S.D.N.Y. 1997) .........................................................17

*Fidelity Partners, Inc. v. First Trust Co. of N.Y.*,
    No. 99-7839, 2000 WL 730408 (2d Cir. June 7, 2000) .................................................17

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) .................................................45

*Harris v. Balk*,
    198 U.S. 215 (1905) ................................................. 35-38

*Hausler v. JP Morgan Chase Bank*,
    No. 09 Civ. 10289, 2010 WL 3817546 (S.D.N.Y. Sept. 13, 2010) .............................43

*Karaha Bodas Co. v. Pertamina*,
    313 F.3d 70 (2d Cir. 2002) .................................................23

*Koehler v. Bank of Bermuda Ltd*,
    544 F.3d 78 (2d Cir. 2008) .................................................45

*Macatra B.V. v. Destiny Navigation*,
    No. 08 Civ. 0711, 2010 WL 339774 (S.D.N.Y. Jan. 27, 2010) ............................33, 37

*McCarthy v. Wachovia Bank, N.A.*,
    759 F. Supp. 2d 265 (E.D.N.Y. 2011) .................................................10

*Montague v. Elec. Corp. of Am.*,
    76 F. Supp. 933 (S.D.N.Y. 1948) .................................................46

*Motorola Credit Corp. v. Uzan*,
    288 F. Supp. 2d 558 (S.D.N.Y. 2003) .................................................41, 46

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) .................................................39

*Bank of New York v. Rubin*,
    No. 05 Civ. 4926 (DLC), 2006 WL 633315 (S.D.N.Y. Mar. 15, 2006) .....................43

*SEC v. Credit Bancorp, Ltd.*,
    9 Civ. 11395 (RWS), 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000) ................. *passim*

*Stephens v. National Distillers & Chemical Corp.*,
    9 F.3d 1226 (2d Cir. 1995) .................................................40

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) .................................................46

*Walters v. People's Republic of China,*
    672 F. Supp. 2d 573 (S.D.N.Y. 2009)........................................................................39

*Weinstein v. Islamic Republic of Iran,*
    99 F. Supp. 2d 63 (E.D.N.Y. 2004) ........................................................................43

*Williams v. Taylor,*
    529 U.S. 362 (2000)........................................................................................46

*W.M. Passalacqua Builders, Inc. v. Resnick Dev. S., Inc.,*
    933 F.2d 131 (2d Cir. 1991)...............................................................................45

**Federal Statutes**

28 U.S.C. § 1609.......................................................................................2, 39

28 U.S.C. § 1610.............................................................................2, 39, 42, 43

28 U.S.C. § 1611.......................................................................................2, 39

**Federal Rules of Civil Procedure**

Rule 69(a)...................................................................................................1

**Federal Regulations**

31 C.F.R. § 515.201.......................................................................................43

31 C.F.R. § 515.205.......................................................................................43

31 C.F.R. § 560...........................................................................................42

31 C.F.R. § 560.204.......................................................................................43

31 C.F.R. § 560.410.......................................................................................43

**State Cases**

*ABKCO Industries, Inc. v. Apple Films, Inc.,*
    9 N.Y.2d 670 (1976)..............................................................................32, 33, 34

*Bass v. Bass,*
    528 N.Y.S.2d 558 (App. Div. 1988)..............................................................22, 29

*Bildner v. Malkan,*
    413 N.Y.S.2d 5602 (App. Div. 1979)................................................................10

*Claymont v. Levitt*,
    528 N.Y.S.2d 644 (App. Div. 1988) ............................................................. 11

*Hotel 71 Mezz Lender LLC v. Falor*,
    4 N.Y.3d 303 (2010) ................................................................................. 35-38

*Irving & William H. Stark, Inc. v. Milberg Factors, Inc.*,
    326 N.Y.S.2d 867 (App. Div. 1971) ........................................................... 10

*Koehler v. Bank of Bermuda*,
    2 N.Y.3d 533 (2009) ............................................................................... 40, 41

*Leedpak v. Julian*,
    356 N.Y.S.2d 1011 (Sup. Ct. 1974) ........................................................... 44

*Matter of Mega Pers. Lines, Inc. v. Halton*,
    746 N.Y.S.2d 204 (App. Div. 2002) ........................................................... 10

*Samsun Logix Corp. v. Bank of China*,
    No. 105262/10, 2011 WL 1844061 (N.Y. Sup. Ct. May 12, 2011) ............ 41

*San-Dar Assoc. v. Adams*,
    643 N.Y.S.2d 880 (App. Div. 1996) ........................................................... 10

*Shapiro v. McNeill*,
    92 N.Y.2d 91 (1998) ............................................................................... 29, 30

*Tonelli v. Chase Manhattan Bank, N.A.*,
    41 N.Y.2d 667 (1977) ............................................................................. 29, 30

*Welsbach Electricity Corp. v. Mastec North Am., Inc.*,
    7 N.Y.3d 624 (2006) ................................................................................. 33

## State Statutes

N.Y. C.P.L.R. § 5201 ....................................................................... 2, 20, 22

N.Y. C.P.L.R. § 5222 ................................................................................. 10

N.Y. C.P.L.R. § 5225 ................................................................................. 10

N.Y. C.P.L.R. § 5227 ................................................................................. 10

N.Y. C.P.L.R. § 5239 ............................................................................. 1, 10

N.Y. C.P.L.R. § 5240 .................................................................................................1, 10

N.Y. U.C.C. Law § 8-102 .................................................................................................12

N.Y. U.C.C. Law § 8-110 .............................................................22, 23, 24, 25, 31

N.Y. U.C.C. Law § 8-110 cmt. 1 .................................................................................22

N.Y. U.C.C. Law § 8-110 cmt. 3 .................................................................................22

N.Y. U.C.C. Law § 8-112 ........................................................................................*passim*

N.Y. U.C.C. Law § 8-112 cmt. 3 .......................................................................13, 16

N.Y. U.C.C. Law § 8-317 .................................................................................................16

N.Y. U.C.C. Law § 8-501 .................................................................................................12

N.Y. U.C.C. Law § 8-501 cmt. 5 .......................................................................12, 15, 18

N.Y. U.C.C. Law § 8-503 ........................................................................................*passim*

N.Y. U.C.C. Law § 8-503 cmt. 2 ...............................................................16, 18, 26, 27, 37

## **International Conventions**

UNIDROIT Convention on Substantive Rules Regarding Intermediated Securities,
*adopted and opened for signature* in Geneva, Switzerland on Oct. 9, 2009. .............17

UNIDROIT Committee of Government Experts for the Preparation of a Draft Convention
on Harmonised Substantive Rules Regarding Securities Held With An Intermediary,
Explanatory Notes of preliminary draft Convention  (December 2004). ...................26

UNIDROIT Committee of Government Experts for the Preparation of a Draft Convention
on ...Harmonised Substantive Rules Regarding Securities Held With An Intermediary,
Final Report (August 2005). ......................................................................................26

UNIDROIT Committee of Governmental Experts for the Preparation of a Draft
Convention on Harmonised Substantive Rules Regarding Securities Held with an
Intermediary, Comments by the Government of the United States of America
(February 2006). ......................................................................................................34

**Treatises and Other Authorities**

FEDERAL RESERVE BANK OF NEW YORK, MARKT/G2/D(2005), EU CLEARING AND
   SETTLEMENT LEGAL CERTAINTY GROUP QUESTIONNAIRE (Mar. 6, 2006) ....6, 8, 17, 19

JOANNA BENJAMIN, INTERESTS IN SECURITIES (Oxford University Press 2000) ..............17

CARL S. BJERRE & SANDRA M. ROCKS, ABCs OF THE UCC 3, ARTICLE 8: INVESTMENT
   SECURITIES (Amelia H. Boss, ed., American Bar Association 2004) .................. *passim*

Russell A. Hakes, *UCC Article 8: Will the Indirect Holding of Securities Survive the
   Light of Day?*, 35 LOY. L.A. L. REV. 661 (2002).........................................................17

7A WILLIAM D. HAWKLAND ET AL., HAWKLAND UNIFORM COMMERCIAL CODE
   SERIES § 8-112:01 (2008). .............................................................................................46

Charles W. Mooney, Jr., Sandra M. Rocks & Robert S. Schwartz, *An Introduction
   to the Revised UCC Article 8 and Review of Other Recent Developments with
   Investment Securities*, 49 BUS. LAW. 1891, 1895 (1994).......................................15, 26

James S. Rogers, *Policy Perspectives on Revised UCC Article 8*,
   43 U.C.L.A. L. REV. 1431 (1996) ................................................................15, 18, 31

Joseph H. Sommer, *A Law of Financial Accounts: Modern Payment and Securities
   Transfer Law*, 53 BUS. LAW. 1181 (1998)......................................................15, 17, 19

Luc Thévenoz, *Intermediated Securities, Legal Risk, and the International
   Harmonization of Commercial Law*, 13 STAN. J. L. BUS. & FIN. 384 (2008)..............19

Rick Verhagen, *Book-Entry Securities and the Conflict of Laws: Beyond Lex Situs?
   The Transfer and Pledge of Securities Held in International Multi-
   Tier Securities Holding Systems*, 11 Eur. Bus. L. Rev. 112 (2000)...........................17

## INTRODUCTION

Pursuant to N.Y. Civil Practice Law & Rules ("CPLR") §§ 5239 and 5240, made applicable here by Rule 69(a) of the Federal Rules of Civil Procedure, and the Scheduling Order in this case,[1] Clearstream Banking S.A. ("Clearstream") submits this Memorandum consolidating the arguments in its previous memoranda filed in support of its Motion to Vacate Restraints ("Motion").  That Motion is renewed herein and applies to the restraining notices and writs of execution ("Restraints") served by the *Peterson* Plaintiffs ("Plaintiffs") on Clearstream and Citibank, N.A. ("Citibank"), as well as to any similar process served by the other judgment creditors that have been interpleaded into this action ("Plaintiffs-Respondents").

Plaintiffs are the victims, survivors, and/or estate representatives of U.S. marines killed or injured in the 1983 bombing of the U.S. Marine Corps barracks in Beirut, Lebanon.[2]  In September 2007, Plaintiffs obtained a US$ 2.66 billion default judgment from the U.S. District Court for the District of Columbia against the Islamic Republic of Iran and the Iranian Ministry of Information and Security (collectively "Iran") for allegedly providing material support to the group responsible for the bombing.[3]  Clearstream strongly condemns the 1983 attacks on the U.S. military, and deeply sympathizes with the victims of those attacks and their families. Clearstream is not alleged to have had and did not have any role in the underlying actions and, together with all civilized people, laments acts of terrorism.

Clearstream is an international service provider for the financial industry offering securities settlement and custody-safekeeping services.  Clearstream serves as an intermediary between financial institutions worldwide ensuring that transactions from one bank to another are

---

[1] Scheduling Order, Nov. 28, 2011, ECF No. 157.

[2] Some of the Plaintiffs-Respondents also include representatives of the victims from the 1983 bombing in Beirut, but the majority are representatives of victims from other terrorist acts allegedly connected to Iran.

[3] Judgment, *Peterson v. Islamic Republic of Iran*, No. 01-cv-02904 (D.D.C. Sept. 7, 2007), ECF No. 228.

CONFIDENTIAL

efficiently and successfully completed.  As a post trade services provider currently covering the international and 52 domestic markets, Clearstream has over 2,500 financial institutions from all over the world among its customer base, including the reserve banks of over 60 countries. Clearstream processes around 120 million settlement transactions a year.

Clearstream's role in this proceeding is that of a third-party bank garnishee that appears specially — without waiving and expressly preserving objections to the exercise of personal jurisdiction over it in New York — to defend its legitimate interests.  In an effort to satisfy their judgment, Plaintiffs restrained certain security entitlements held in Clearstream's omnibus securities account with Citibank in New York City ("Omnibus Account").  Clearstream moves to vacate those Restraints because under well-established law codified in Article 8 of the New York Uniform Commercial Code ("UCC") and an international convention, Plaintiffs have restrained the *wrong* property.  The precisely crafted statutory scheme in the UCC is the basis for the indirect holding of securities in New York and the United States.  For the reasons stated herein, the Restraints should be vacated because they violate the provisions of UCC Article 8 and CPLR § 5201, as well as the attachment and execution provisions of the U.S. Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1609-1611.

## PROCEDURAL BACKGROUND

After obtaining their judgment, Plaintiffs registered it in this District and based on confidential information furnished to them by the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC") pursuant to a protective order, commenced enforcement proceedings in June 2008 to satisfy their judgment.[4]  Towards that end, Plaintiffs served their Restraints on Citibank and Clearstream.  The Restraints referenced

---

[4] Registration of Judgment, *Peterson v. Islamic Republic of Iran*, No. M18-302 (S.D.N.Y. Mar. 24, 2008), ECF No. 68; Protective Order, *Peterson v. Islamic Republic of Iran*, No. 01-cv-02904 (D.D.C. June 11, 2008), ECF No. 326.



.[5]   The value of those

interests amounted to approximately US$         .   As discussed in more detail in the

Argument section below, the UCC uses the term "security entitlement" to describe the property

interest of an investor with respect to such securities.[6]

A sealed hearing was held to challenge the Restraints, at which Clearstream presented

extensive  evidence  about  the                          identified  in  the  Restraints.[7]

Among other things, Clearstream explained that at one time Clearstream's


Bank Markazi


, Banca UBAE S.p.A. ("UBAE").[8]  Clearstream

further explained that it did not know whether Bank Markazi

, and that UBAE

Bank Markazi.  The

---

[5] *See* Amended Restraining Notice to Garnishee, dated June 20, 2008; Writ of Execution dated June 12, 2008.  The Restraining Notice and Writ of Execution are attached as Exhibits 5 and 6, respectively, to the Compendium of Exhibits accompanying this Memorandum ("Compendium" or "Comp. Exh."winded).  ISIN is the acronym for International Securities Identifying Number, a unique number given to a security that facilitates global electronic trading in the security.

[6] As discussed in Argument sections II.A and B below, the actual physical manifestation of securities such as bonds (i.e., the securities certificate or physical note) is typically issued in global form — a single global note representing the entire face amount of the bond issue is held at a depository.  Parties who wish to invest in the bonds purchase and hold indirect interests, recorded through book entries, in the bonds, rather than acquiring individual notes in the amount of their investments.  Article 8 of the UCC codifies the rules governing the handling of investment securities and interests in them, and uses the term "security entitlement" to describe the property interest of an investor with respect to such a security.  The property interest is represented by a book-entry credit in the entitlement holder's (e.g., investor's) security account maintained with its securities intermediary (e.g., a securities broker or bank), in an amount equal to its investment in the security.

[7] *See* Hr'g Tr. 19:6-65:2, June 27, 2008, ECF No. 92 ("June 27, 2008 Hr'g Tr.").  An unredacted copy of the transcript filed Under Seal is attached as Comp. Exh. 7.

[8] *Id.* at 56:17-57:11.

CONFIDENTIAL

Clearstream.[9]

At the conclusion of the hearing, the Court (Judge Koeltl) lifted the Restraints with respect to the two security entitlements                    Clearstream, worth US$ 250 million, and kept the Restraints in place with respect to the other 20 security entitlements pending further proceedings.[10] The security entitlements and related cash that remain restrained are denominated in this Memorandum as the "Restrained Assets."

Thereafter, Clearstream moved to vacate the Restraints under the UCC § 8-112(c), because neither Clearstream nor Citibank was the proper garnishee for restraining the security entitlements

. Clearstream further argued that Plaintiffs could not restrain the security entitlements in the Omnibus Account because those entitlements were Clearstream's, not Bank Markazi's. In an Order dated June 23, 2009, Judge Jones held that "[u]nder the plain meaning of NY UCC 8-112(c), Clearstream is not a proper garnishee," but nonetheless "[t]he restraints will remain in place until the Court has determined whether Clearstream is, or could be made, a proper garnishee, assuming" that Plaintiffs could show that the

was a fraudulent conveyance as Plaintiffs had alleged.[11] The parties then briefed whether determination that the            was a fraudulent conveyance would impact the UCC analysis, as well as alternative theories of restraint and turnover raised by Plaintiffs. Clearstream's briefing on its Motion is now consolidated and updated in this Memorandum.

---

[9] *Id.* at 41:14-50:7.

[10] Final Order, June 27, 2008, ECF No. 103.

[11] Order 1-2, June 23, 2009 (Comp. Exh. 8).

CONFIDENTIAL

## FACT BACKGROUND

The threshold and potentially dispositive issues before the Court with respect to the present Motion are primarily legal issues: (1) whether Bank Markazi has a property interest in the Restrained Assets under the UCC that could be restrained and turned over to Plaintiffs; if not (2) whether under New York common law the situs of Bank Markazi's property interest in its security entitlements is Luxembourg or New York; and if Luxembourg (3) whether any of Plaintiffs' alternative theories of turnover, based on purported personal jurisdiction over Clearstream in New York, the Terrorism Risk Insurance Act, and equity, nonetheless allow for restraint and turnover of the Restrained Assets in New York.

To focus these issues for the Court, this Memorandum, like Clearstream's previous supplemental memoranda, assumes solely for the sake of argument that Bank Markazi's

| are set aside as a result of the

Court deeming the                          a fraudulent conveyance, such that the                          entitlements

are                          Bank Markazi's account with Clearstream.  This Memorandum

further assumes solely for the sake of argument that Clearstream is present in this jurisdiction. Thus, Clearstream does not address, and the Court need not consider for purposes of this Motion, Plaintiffs' allegations regarding fraudulent conveyance or Clearstream's alleged knowledge of Bank Markazi's

UBAE.   Although Clearstream denies Plaintiffs' allegations that Clearstream somehow engaged in wrongdoing, those allegations are irrelevant to the issues before the Court concerning ownership of the *res* restrained at Citibank.  Clearstream instead focuses its discussion on only those facts relevant to ownership of the Restrained Assets, namely Bank Markazi's securities account with Clearstream and Clearstream's Omnibus Account with Citibank.

CONFIDENTIAL

## I.  BANK MARKAZI'S SECURITIES ACCOUNT WITH CLEARSTREAM

Clearstream is a Luxembourg corporation that is a bank and provider of international securities settlement services.[12]  Similar to its competitors in the United States (the Depository Trust & Clearing Corporation) and Europe (Euroclear), Clearstream offers custody-safekeeping services and securities settlement services that ensure securities transactions from bank A to bank B are promptly and effectively settled between trading parties.[13]  Clearstream is recognized and regulated by the European system of central banks.[14]  Clearstream's only presence in New York (indeed the entire United States) is a representative office, which is not authorized to conduct banking, settlement or clearing operations or engage in customer transactions.[15]

.[16]  The customer opens a securities account with Clearstream in Luxembourg, in which Clearstream acts as a custodian for the property in the account.

.[17]  The customer's account is governed by a General

---

[12] June 27, 2008 Hr'g Tr. at 7:14-8:7 (Comp. Exh. 7).

[13] *Id.* at 7:19-25, 14:12-18:20.

[14] *Id.*

[15] Barrett ¶¶ 2, 4.

[16] June 27, 2008 Hr'g Tr. at 21:25-22:16 (Comp. Exh. 7).

[17] *Id.* at 32:9-33:13; *see also* FEDERAL RESERVE BANK OF NEW YORK, MARKT/G2/D(2005), EU CLEARING AND SETTLEMENT LEGAL CERTAINTY GROUP QUESTIONNAIRE (Mar. 6, 2006) at 4-5 (Comp. Exh. 9) ("Typically, a broker will maintain 2 accounts at its clearing bank, a 'proprietary account' and a 'customer account.' In its proprietary account, the broker holds its own securities and in its customer account it collectively holds securities for its customers (without identifying the customers).") (hereinafter "N.Y. Fed. Legal Responses").

CONFIDENTIAL

Terms and Conditions agreement between Clearstream and the customer, Article 61 of which provides that Luxembourg law governs the agreement and its interpretation.[18]

Bank Markazi opened a

General Terms and Conditions.[19]  Clearstream's obligations under its account agreement with Bank Markazi are limited to clearance, settlement, custodial, administrative, and other ancillary services as provided in the General Terms & Conditions.[20]  As custodian, Clearstream does not acquire any proprietary rights in the security entitlements in Bank Markazi's account and its obligations as custodian under the agreement are only to transact in the entitlements credited to Bank Markazi's account upon Bank Markazi's instructions.[21] Bank Markazi's account is maintained by Clearstream in Luxembourg, where all transactions are conducted centrally out of Clearstream's Operations Center in Luxembourg.[22]

When performing banking and settlement services, Clearstream acts not for its own financial interests, but on behalf of its customers.[23]  The various banking and settlement services that Clearstream undertakes on behalf of its customers are comprised of one or more debit and credit transactions.  For example, if a customer instructs Clearstream to settle a securities transaction, then Clearstream will credit or debit, as the case may be, the customer's account

---

[18] CLEARSTREAM, GENERAL TERMS AND CONDITIONS art. 61 (2008) (Comp. Exh. 10) ("These General Terms and Conditions shall be governed by and construed in accordance with the laws of the Grand Duchy of Luxembourg. Matters not expressly provided for in these General Terms and Conditions shall be governed by the applicable provisions of Luxembourg law.  The Customer will submit to the non-exclusive jurisdiction of the competent Luxembourg courts for any litigation which may arise.").

[19] June 27 Hr'g Tr. at 31:17-23 (Comp. Exh. 7); Bank Markazi Account Opening Documents at 6-7 (Comp. Exh. 11).

[20] CLEARSTREAM, GENERAL TERMS AND CONDITIONS art. 2 (2008) (Comp. Exh. 10); Legal Memorandum of Arendt & Medernach ¶ 4 (Jan. 7, 2011) (Comp. Exh. 2) ("Arendt II").

[21] Arendt II ¶ 4.

[22] Declaration of Michael Barrett ¶ 4 (Sept. 10, 2009) (Comp. Exh. 3) ("Barrett"); Bank Markazi Account Opening Documents at 3 (Comp. Exh. 11).

[23] June 27, 2008 Hr'g Tr. at 14:15-20 (Comp. Exh. 7).

regarding that security and, if the counterparty also has an account with Clearstream, Clearstream will debit or credit the counterparty's account regarding that security.[24]   The customer might also wish to have the cash transaction related to its securities transaction simultaneously settled through Clearstream.  In that event, Clearstream credits or debits, as the case may be, cash to the customer's account and, if the counterparty also has an account with Clearstream, Clearstream will debit or credit cash to the counterparty's account.[25]

Clearstream's customers either acquire security entitlements through their proprietary accounts as an investment or through their non-proprietary accounts so that they can create security entitlements for their own customers.  In the latter case, unless informed by its customer, Clearstream typically does not know the identity of its customer's customer and that identity typically is not reflected on Clearstream's records.[26]

## II.   CLEARSTREAM'S OMNIBUS ACCOUNT WITH CITIBANK

To maintain security entitlements for its customers in securities whose physical note is "immobilized" with a central depository in the United States, such as the Depository Trust Corporation ("DTC") or N.Y. Federal Reserve Bank, Clearstream maintains its Omnibus Account in which Clearstream acquires its own security entitlements with Citibank.[27]   Through

---

[24] *Id.* at 14:21-15:6, 17:3-18; Clearstream Banking, S.A. Settlement System (Illustrative) at 2, 4 (Comp. Exh. 12).

[25] June 27, 2008 Hr'g Tr. at 17:3-18 (Comp. Exh. 7); Clearstream Banking, S.A. Settlement System (Illustrative) at 4 (Comp. Exh. 12).

[26] June 27, 2008 Hr'g Tr. at 12:13-18 (Comp. Exh. 7); N.Y. Fed. Legal Responses at 4 (Comp. Exh. 9) ("[T]he ultimate investor will almost never be recorded by name on the books of an upper-tier intermediary or the issuer."); *id.* at 5 ("[I]n its customer account [the broker] collectively holds securities for its customers (without identifying the customers).").

[27] An "immobilized" note means the physical note representing the bond issue is reposed and registered with a depository like the DTC and "does not move nor change registration despite the high volume of trades affecting" it. CARL S. BJERRE & SANDRA M. ROCKS, ABCS OF THE UCC 3 (Amelia H. Boss, ed., American Bar Association 2004) (Comp. Exh. 13) ("ABCS OF THE UCC"); *see also* June 27 Hr'g Tr. at 11:21-12:2 (Comp. Exh. 7) (Clearstream's Mr. Gem discussing the illustrative chart that is Comp. Exh. 12 at 1: "[I]f you take this as being an issue on security for total nominal value of 1 billion US dollars, then in this example you could see that we have said at the depository trust incorporation where all the interests in that bond must ultimately be immobilized . . . .").

CONFIDENTIAL

the Omnibus Account, Clearstream ensures that it maintains security entitlements in a security at a value equal to the value of the entitlements acquired in that security by its customers.[28] Clearstream's Omnibus Account has sub-accounts identified by ISIN that reflect the entire amount of security entitlements that Clearstream holds in that ISIN, but that do not reflect the underlying individual security entitlements of Clearstream's respective customers in the ISIN. Clearstream's customers' entitlements are reflected in their accounts with Clearstream in Luxembourg, and not in Clearstream's Omnibus Account at Citibank.[29] As Clearstream's Mr. Gem testified:

> [T]he individual customer accounts are not reflected down the custody stream, but in this omnibus concept, which is generally adopted in the United States market, all of the interests are globalized in single positions cascading down into the ultimate position against the issuer account. . . .

June 27 Hr'g Tr. at 12:13-18, 22:5-8 (Comp. Exh. 7).

Upon redemption of the underlying security, Citibank credits Clearstream's cash account with Citibank in the amount of cash equivalent to Clearstream's security entitlements in the underlying security, plus any final interest payments.[30]

---

[28] June 27, 2008 Hr'g Tr. at 9:9-22, 11:21-13:2 (Comp. Exh. 7).

[29] *Id.* at 11:21-13:2.

[30] *See id.* at 54:19-24, 58:2-22

## ARGUMENT

**I.    APPLICABLE STANDARD ON A MOTION TO VACATE RESTRAINTS**

Because Plaintiffs issued restraining notices pursuant to CPLR § 5222(b) and invoke relief under §§ 5225(b) and 5227, they bear the ultimate burden of proving that Restrained Assets belong to Iran and can be restrained and turned over to satisfy their judgment. *See, e.g., Bildner v. Malkan*, 413 N.Y.S.2d 5602, 5602 (App. Div. 1979) (noting that the court would have vacated a restraining notice where the "Plaintiff had not shown that [the defendant's] counsel held property in which the judgment debtor had an interest"); *Irving & William H. Stark, Inc. v. Milberg Factors, Inc.*, 326 N.Y.S.2d 867, 867 (App. Div. 1971) (holding that: "Petitioner, a judgment creditor of Kinetic International Corp., has not, as a matter of law, sustained its burden of proving that the $7,500 held by appellant belonged to Kinetic, the judgment debtor. Actually the documentary proof seems to indicate otherwise." (citation omitted)); *see generally San-Dar Assoc. v. Adams*, 643 N.Y.S.2d 880, 880-81 (App. Div. 1996) (noting that "[a]s a general rule, the plaintiff bears the burden of proof in a civil case").

In response to Plaintiffs' restraining notices, Clearstream moves to vacate the restraints pursuant to CPLR §§ 5239, 5240. *See McCarthy v. Wachovia Bank, N.A.*, 759 F. Supp. 2d 265, 276 (E.D.N.Y. 2011) ("Both CPLR Sections 5239 and 5240 provide mechanisms for challenging the validity of the Restraining Notice."). CPLR § 5239 provides for a special proceeding to resolve such a motion by a summary procedure that is akin to summary judgment. *See Matter of Mega Pers. Lines, Inc. v. Halton*, 746 N.Y.S.2d 204, 204 (App. Div. 2002) (determining in proceeding commenced pursuant to § 5239 that "[t]he same test that is applied to a motion for summary judgment is used to determine a special proceeding" (internal citations and quotation marks omitted)).

Accordingly, if the evidence in the record, such as affidavits or contracts, is undisputed and supports the motion to vacate, the Court should grant Clearstream's Motion. *See, e.g., Avelar v. J. Cotoia Constr., Inc.*, No. 11-cv-2172, 2011 WL 5245206, at *4–5 (E.D.N.Y. Nov. 2, 2011) (granting motion to vacate restraints based on an affidavit proving that the relevant assets were immune because "[a] sworn statement . . . is sufficient to establish that a bank account is used for diplomatic purposes"); *Claymont v. Levitt*, 528 N.Y.S.2d 644, 644 (App. Div. 1988) (granting defendant's motion to vacate restraining notice based on defendant's affidavit). Thus, the Court correctly noted during the latest status conference that the instant motion may be resolved without the need for discovery: "[N]o one really wants discovery or reasonably expects discovery on the issue of where the accounts were actually opened, *the documents are sort of self-proving, and that anything that flows from that is a legal issue*."[31]

In sum, in deciding this Motion, the Court must apply a summary judgment-type analysis that allows resort to the Parties' affidavits and other documentary evidence.    The Court need not and should not accept Plaintiffs' allegations as true. Where Clearstream's arguments are correct as a matter of law, or where the material documentary evidence is undisputed and supports the Motion, the Court should grant Clearstream's Motion.

## II.    THE NATURE OF A SECURITY ENTITLEMENT

It is well-established that courts generally apply state law when determining interests in or ownership of property. *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 609 F.3d 111, 117 (2d Cir. 2010) ("In the absence of a superseding federal statute or regulation, state law generally governs the nature of any interests in or rights to property that an entity may have."). Here, the UCC governs the property interest at issue.

---

[31] Hr'g Tr. 22:17–20, Oct. 31, 2011 (Comp. Exh. 15) (emphasis added).

### A.    The Definition Of A Security Entitlement

The property interest at issue consists of a security entitlement.  The UCC provides that a security entitlement is acquired when "a securities intermediary . . . indicates by book entry that a financial asset has been credited to the person's securities account."  UCC § 8-501(b)(1).[32]  The UCC defines a security entitlement as a package of rights against the entitlement holder's securities intermediary that are specified in Part 5 of UCC Article 8: "the rights and property interest of an entitlement holder with respect to a financial asset specified in Part 5").  UCC § 8-102(a)(17).[33]  An "entitlement holder" is defined in relevant part as "a person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary."  UCC § 8-102(a)(7).  A "financial asset" is defined to include a security or an interest in a security.  UCC § 8-102(a)(9)(i) and (iii).

UCC § 8-503 further defines the property interest of an entitlement holder.  Under UCC § 8-503(a), "all interests in th[e] financial asset held by the securities intermediary are held by the securities intermediary for the entitlement holder [and] are not property of the securities intermediary."  Under UCC § 8-503(b), an entitlement holder's property interest with respect to a particular financial asset "is a pro rata property interest in all interests in that financial asset held by the securities intermediary."  Under UCC § 8-503(c), an entitlement holder's property interest with respect to a particular financial asset "may be enforced against the securities intermediary only by exercise of the entitlement holder's rights under sections 8-505 through 8-508."

---

[32] *See* ABCs OF THE UCC, at 34 (Comp. Exh. 13 ) ("The entitlement holder acquires the security entitlement in most cases when the securities intermediary credits the financial asset to the entitlement holder's *securities account*.").

[33] *See* UCC § 8-501 cmt. 5 ("A security entitlement is the package of rights that a person has against the person's own intermediary with respect to the positions carried in the person's securities account."); Declaration of Professor James S. Rogers ¶ 8 (Jan. 6, 2011) (Comp. Exh. 4 ) ("Rogers") ("That security entitlement consists of a package of rights that Investor has against Lower-tier Intermediary and property held by Lower-tier Intermediary . . . .").

Notably, the security entitlement *is* the property interest created by the UCC: "If Debtor holds securities through Broker, and Broker in turn holds through Clearing Corporation, Debtor's property interest is a security entitlement against Broker." UCC § 8-112 cmt. 3; *see also* Rogers ¶ 9 ("A security entitlement is described by § 8-503 as a form of 'property' interest. That, however, is a special form of property interest. The content of this special form of property interest is described by the rest of Part 5 of Article 8.").

### B.    Security Entitlements Facilitate The Indirect Holding Of Securities Through A System Of Multi-Tiered Securities Intermediaries

The particular nature of security entitlements is the result of the modern "indirect holding" system of securities. Up until the last quarter of the twentieth century, securities were represented by a physical certificate, such as a stock certificate or a bearer bond. The high cost and greater time involved in negotiating the sale of physical certificates became impractical in modern financial markets and, therefore, securities were "dematerialized;" that is, securities no longer were represented by a physical certificate, but instead took electronic form as book entries on the records of brokers and other financial intermediaries.[34]

Dematerialization also changed the way securities are held by investors. In the case of securities represented by a physical certificate, the investor deals directly with the issuer of the security and directly possesses the security.[35] In the case of dematerialized securities, investors do not deal directly with the issuer; instead, they hold their investment indirectly through banks and brokers that, in turn, hold interests in the securities through tiers of other intermediaries like clearing corporations, in a chain that ultimately reaches back to the issuer.[36] The investor's

---

[34] ABCs OF THE UCC at 2-3 (Comp. Exh. 13).

[35] *Id.* at 4.

[36] *See id.* at 33 ("A security entitlement might be thought of . . . simply as rights to a security that an investor holds indirectly (that is, through a broker or other intermediary rather than in a direct relationship with the issuer) . . . .").

CONFIDENTIAL

ownership interest for the underlying security is called a "security entitlement" and such entitlements are created at each tier of securities intermediary:

> The indirect holding system accommodates more than one tier of securities intermediary between the issuer and the ultimate investor.  That is, the securities intermediary through which a security entitlement is held might not directly own the security or other financial asset; instead the securities intermediary may, itself, have a security entitlement to that security against a clearing corporation or against another securities intermediary.

ABCS OF THE UCC at 36 (Comp. Exh. 13);[37]  Rogers ¶ 12 ("Lower-tier Intermediary would have a security entitlement against Upper-tier Intermediary.").

The security entitlements that Plaintiffs have restrained are entitlements in dematerialized bonds issued by governments or intergovernmental organizations in the amounts of US$ 1 billion or more.[38]  These bonds are represented by a global note that is kept immobilized with a depository in the United States.  An illustrative chart depicting the indirect holding system for the type of bond at issue in this matter, and showing the location of the Omnibus Account, Citibank, and Clearstream in the chain of intermediaries, is attached as the first chart in Compendium Exhibit 12.[39]  As shown on the chart (read from the bottom up), DTC is at the uppermost tier of financial intermediaries between the issuer and ultimate investor.  Citibank and other banks or brokers that participate in the bond issue through their accounts with DTC are in the next tier after DTC.  Clearstream is in the next tier of financial intermediaries via its Omnibus Account with Citibank.

---

[37] *Id.* at 3 ("Instead, the clearing corporation's books indicate the ownership interests of the brokers or banks that are its members, and the records of those intermediaries, in turn, indicate the ownership interests of their customers, i.e., lower-tier intermediaries or, at the bottom of the chain, the actual investors."); *id.* at 4-5 (discussing the direct and indirect holding system for securities).  A diagram of the indirect holding system appears on page 5 of ABCS OF THE UCC.

[38] A list of the bonds covered by the Restraints together with information about the bonds' issue date, maturity date, and interest coupon, is contained in the chart Securities Affected by Writ of Execution and Restraining Notice attached as Comp. Exh. 14 ("Chart of Securities Affected").

[39] *See* June 27, 2008 Hr'g Tr. at 9:9-12:13 (Comp. Exh. 7) (explaining chart).

14

CONFIDENTIAL

C.    **Security Entitlements Are Discrete Rights That Exist With And Can Only Be Asserted Against The Immediate Securities Intermediary With Which The Entitlement Holder Has Its Securities Account**

1.    <u>Rights In Security Entitlements Cannot Be Asserted Against Upper-Tier Intermediaries</u>

As noted above, security entitlements exist only as rights that the holder has against the immediate financial intermediary with whom it has privity, i.e., the intermediary that created the entitlements by book entry credit to the customer's securities account.  UCC § 8-501 cmt. 5 ("A security entitlement is the package of rights that a person has against the person's own intermediary with respect to the positions carried in the person's securities account."); *SEC v. Credit Bancorp, Ltd.*, 99 Civ. 11395 (RWS), 2000 WL 1752979 at *21 (S.D.N.Y. Nov. 29, 2000) ("A security entitlement . . . is a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary.").[40]

Significantly, the entitlement holder's property interest does not extend to and cannot be asserted against other securities intermediaries above the entitlement holder's securities intermediary (i.e., upper-tier intermediaries).  *See* UCC § 8-112 cmt. 3 ("If Debtor holds

---

[40] *See* J.S. Rogers, *Policy Perspectives on Revised UCC Article 8*, 43 U.C.L.A. L. REV. 1431, 1455 (1996) (hereinafter "Rogers, *Policy Perspectives*") ("[A]n entitlement holder's property interest is a bundle of rights that can be asserted directly only against the entitlement holder's own intermediary."); Joseph H. Sommer, *A Law of Financial Accounts: Modern Payment and Securities Transfer Law*, 53 BUS. LAW. 1181, 1204 (1998) (hereinafter "Sommer, *A Law of Financial Accounts*") ("The new law of financial accounts defines parties' roles through privity. Privity is an 'off-the-shelf' legal doctrine but has three special dimensions in the law of financial accounts. First, the obligations at each level are independent of those at the next level. Although holding is tiered and transfers are chained, *every link is discrete*. For convenience, the author refers to this separation of intermediaries as 'vertical' privity. Vertical privity is a construct of the law of financial accounts, applicable to intermediaries and end-parties involved in the same tiered holding or transfer chain." (emphasis added)); *id.* at 1205 ("Strict privity ensures that most (but not all) risk within [the indirect holding] system decomposes into a set of bilateral legal relations."); Charles W. Mooney, Jr., Sandra M. Rocks & Robert S. Schwartz, *An Introduction to the Revised UCC Article 8 and Review of Other Recent Developments with Investment Securities*, 49 BUS. LAW. 1891, 1895 (1994) (hereinafter "Mooney et al., *Introduction to the Revised UCC Article 8*") ("An important and overarching principle embodied in Part 5 is that an entitlement holder, as a matter of private commercial law, can look only to the securities intermediary that it has chosen for the benefits of the financial assets that it claims.").

securities through Broker, and Broker in turn holds through Clearing Corporation, Debtor's property interest is a security entitlement against Broker. Accordingly, Debtor's creditor cannot reach Debtor's interest by legal process directed to the Clearing Corporation."); UCC § 8-503 cmt. 2 ("The entitlement holder cannot assert rights directly against other persons, such as other intermediaries through whom the intermediary holds the positions . . . ."); UCC § 8-112(c) ("The interest of a debtor in a security entitlement may be reached by a creditor only by legal process upon the securities intermediary with whom the debtor's securities account is maintained . . . .").

Thus, in *Fidelity Partners, Inc. v. First Trust Co. of New York* (*Fidelity I*), 58 F. Supp. 2d 52 (S.D.N.Y. 1997), the court rejected a request for turnover from an upper-tier intermediary. The judgment debtor in that case, Philguarantee, held a security entitlement in a bond with ING Bank of Manila, the entity on whose books the interest of Philguarantee was reflected. *Id.* at 54. ING Bank, in turn, held its interest in the bond through its intermediary, Euroclear, where its interest was reflected in a book-entry credit to a securities account maintained by Morgan Guaranty's Brussels branch office. *Id.* Further up the intermediary chain was the bond's fiscal and paying agent in New York, from which the judgment creditor in the case sought turnover. The court held that the paying agent, Morgan Guaranty, and Euroclear were all improper garnishees pursuant to UCC § 8-317 (the predecessor to § 8-112(c)), because none of them was a "firm or corporation which carries on its books an account in the name of the judgment debtor." *Id.* According to the court, under the UCC the judgment creditor only could seek turnover of the judgment debtor's participating interest from ING Bank in Manila, where the judgment debtor's participating interest in the bond was located:

> Philguarantee's interest in the bonds is located in the Philippines, where the debtor resides, and where ING Bank of Manila — upon whose books the debtor's interest is represented — is located. . . . Fidelity's execution efforts with respect to the [bonds must] be

> directed at ING Bank of Manila, upon whose books
> Philguarantee's interest is specifically denominated.

*Id.*; *accord Fidelity Partners, Inc. v. First Trust Co. of N.Y.* (*Fidelity II*), 58 F. Supp. 2d 55, 57

(S.D.N.Y. 1999) (holding same on reconsideration: "Philguarantee held its participation interest

in the FLIRBs through ING Bank of Manila. The only entity on whose books the interest of

Philguarantee was reflected was ING Bank."), *aff'd*, No. 99-7839, 2000 WL 730408, at *1 (2d

Cir. June 7, 2000) (concluding that Fidelity's arguments on appeal "are without merit for the

reasons stated by Judge Stein in his thorough and well-reasoned opinion dated June 14, 1999").[41]

Article 8's scheme of limiting an entitlement holder's recourse to its immediate securities

intermediary is recognized globally. The UNIDROIT Convention on Substantive Rules

Regarding Intermediated Securities ("UNIDROIT Convention") incorporates the principle that

an entitlement holder's interest may only be enforced against the entitlement holder's direct

intermediary,[42] as does English, Dutch, and Luxembourg law, among others.[43]

> 2. **Securities Entitlements Only Exist In The Entitlement Holder's Account With Its Securities Intermediary**

Because security entitlements are property rights created only at the level of the financial

---

[41] *See* Sommer, *A Law of Financial Accounts*, at 1202 ("[M]ultiple tiering does not diminish the privity between each level of the tier. Higher-tier intermediaries, whether banks or brokers, are under no obligation to the customers of their lower-tier account holders."); Russell A. Hakes, *UCC Article 8: Will the Indirect Holding of Securities Survive the Light of Day?*, 35 LOY. L.A. L. REV. 661, 689-90 (2002) ("An entitlement holder is not given any rights against an upper tier intermediary."); N.Y. Fed Legal Responses at 14 (Comp. Exh. 9) (explaining that "[A] creditor's claim against an entitlement holder's security entitlement may be made: only by legal process upon the entitlement holder's securities intermediary. Process directed at an upper-tier intermediary will be ineffective.").

[42] *See* UNIDROIT Convention on Substantive Rules Regarding Intermediated Securities, art. 9, *adopted and opened for signature* in Geneva, Switzerland on Oct. 9, 2009, http://www.unidroit.org/english/conventions/2009intermediatedsecurities/convention.pdf.

[43] *See* JOANNA BENJAMIN, INTERESTS IN SECURITIES 39 (Oxford University Press 2000) (explaining that under English law, interests in securities confer on their holders rights of property "as against the intermediary in whose account the interests in securities are recorded"); Rick Verhagen, *Book-Entry Securities and the Conflict of Laws: Beyond Lex Situs? The Transfer and Pledge of Securities Held in International Multi-Tier Securities Holding Systems*, 11 Eur. Bus. L. Rev. 112, 121 (2000) (explaining that under Dutch law, "it is the broker rather than his client who has acquired title" to an interest in securities held with a central depository, and thus the client has recourse only against its broker (citation omitted)); Arendt II ¶¶ 9-10, 16 (Luxembourg law).

intermediary with which the entitlement holder has its securities account, the property interest is located where the account is maintained. *Fidelity I*, 58 F. Supp. 2d at 54 ("Philguarantee's interest in the bonds is located in the Philippines . . . ."); Rogers, *Policy Perspectives*, at 1460 ("[T]he 'location' of the [security entitlements] is the place where the securities account is maintained"). The holder's securities entitlements cease to exist when the securities account is debited. Thus, by their very nature, securities entitlements are not property that can be transferred, a fact noted more than once in the UCC commentary:

> Securities, in the Article 8 sense, are fungible interests or obligations that are intended to be tradable. The concept of security entitlement under Part 5 is quite different. A security entitlement is the package of rights that a person has against the person's own intermediary with respect to the positions carried in the person's securities account. *That package of rights is not, as such, something that is traded.* When a customer sells a security that she had held through a securities account, her security entitlement is terminated; when she buys a security that she will hold through her securities account, she acquires a security entitlement. In most cases, settlement of a securities trade will involve termination of one person's security entitlement and acquisition of a security entitlement by another person. *That transaction, however, is not a 'transfer' of the same entitlement from one person to another.*

UCC § 8-501 cmt. 5 (emphasis added); UCC § 8-503 cmt. 2 ("The idea that discrete objects might be traced through the hands of different persons has no place in the Revised Article 8 rules for the indirect holding system."); Rogers ¶ 8 ("The security entitlement that Investor has against Lower-tier Intermediary is not the same item of property as the security entitlement that Lower-tier Intermediary has against Upper-tier Intermediary, nor is the security entitlement that Investor has against Lower-tier Intermediary derivative from the security entitlement that Lower-tier Intermediary has against Upper-tier Intermediary.").[44]

---

[44] *See* ABCS OF THE UCC at 36 (Comp. Exh. 13) ("When an entitlement holder acquires a security entitlement, she does not take it over from some predecessor in interest (as purchasers in the direct holding system do); instead, her

The underlying purpose of this scheme of discrete entitlements is promoting the finality of transactions: "[A] systemic interest is in enhancing the finality of transactions (that is, providing that consummated transactions cannot be undone).   Article 8's rules for the indirect holding system promote this interest by providing that holders of security entitlements generally have no traceable, recoverable property interest in any particular security or even in any particular fungible bulk of securities."[45]   A related purpose of the scheme is reducing legal uncertainty in cross-border securities holdings, where the laws of different jurisdictions can create conflicting obligations for intermediaries.[46]   For example, because Clearstream's security entitlements held by Citibank in the Omnibus Account have been restrained, but not Bank Markazi's entitlements held with Clearstream in Luxembourg (as should have been the case), Clearstream remains at risk of owing the benefits of the security entitlements to its customer in Luxembourg, without receiving the benefit of its own entitlements in its Omnibus Account with Citibank.   Creating the risk of such conflicting legal outcomes by restraining the Omnibus Account increases uncertainty for Clearstream and is fundamentally inconsistent with the carefully constructed scheme set forth in the UCC.

---

security entitlement is a new item of property, minted just for her.  By the same token, when an entitlement holder liquidates a position with the securities intermediary, the security entitlement is simply extinguished, rather than being transferred to some successor in interest."); N.Y. Fed. Legal Responses at 11 (Comp. Exh. 9) ("There is no 'object' that is transferred.  A security entitlement is created, and another security entitlement is usually simultaneously extinguished.").

[45] ABCS OF THE UCC at 6 (Comp. Exh. 13).

[46] *See, e.g.,* Sommer, *A Law of Financial Accounts,* at 1206-08 (describing multiple liability due to garnishment of an intermediary present in multiple jurisdictions, a problem "more prominent with financial accounts than elsewhere"); Luc Thévenoz, *Intermediated Securities, Legal Risk, and the International Harmonization of Commercial Law,* 13 STAN. J. L. BUS. & FIN. 384, 398-99 (2008) ("Securities holding patterns that involve more than one jurisdiction . . . create an additional legal risk even when the law applicable for every tier (i.e., every intermediary in the holding chain) is clearly determined and internally sound and consistent" because "their effects may be incompatible . . . .").

CONFIDENTIAL

## III.   THIS COURT ALREADY RULED THAT CLEARSTREAM IS NOT A PROPER GARNISHEE UNDER UCC § 8-112(C)

CPLR § 5201 stipulates the type of debt or property that is subject to enforcement and the proper garnishee. CPLR § 5201(c)(4) provides specifically that "section 8-112 of the uniform commercial code shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement (as defined in article eight of the uniform commercial code) may be reached by garnishment, attachment or other legal process." As discussed in section II.C.1 above, UCC § 8-112(c) in turn provides that creditors may reach a debtor's interest in a security entitlement "only by legal process upon the securities intermediary with whom the debtor's securities account is maintained."

Clearstream argued during the first phase of this Motion, among other things, that it (and, for that matter, Citibank) was an improper garnishee under CPLR § 5201(c)(4) and UCC § 8-112(c) with respect to the security entitlements Bank Markazi                                .
Specifically, the evidence Clearstream produced at the June 27, 2008 hearing clearly and unambiguously established that for the security entitlements

                                        , the "securities intermediary with whom the debtor's securities account is maintained" according to UCC § 8-112(c) was                                      .[47] That is, Clearstream did not "carr[y] on its books an account in the name of the judgment debtor" with respect to those security entitlements. *Fidelity I*, 58 F. Supp. 2d at 54 (internal quotation marks omitted).

---

[47] *See* June 27, 2008 Hr'g Tr. at  61:12-62:5 (Comp. Exh. 7)                                          ; *id.* at
56:2-57:23, 59:13-61:3 (                                 ; *id.* at 33:9-13

).

CONFIDENTIAL

Judge Jones agreed with this analysis, stating in her June 23, 2009 Order that "[u]nder the plain meaning of NY UCC § 8-112(c), Clearstream is not a proper garnishee."[48]  Nonetheless, in light of Plaintiffs' argument that fraudulent conveyance law preempted UCC § 8-112(c), Judge Jones further ruled that "[t]he restraints will remain in place until the Court has determined whether Clearstream is, or could be made, a proper garnishee, assuming a fraudulent conveyance could be shown by Plaintiffs."[49]  Even assuming solely for purposes of argument that Plaintiffs are correct in their fraudulent conveyance argument, that does not change the conclusion that Plaintiffs cannot restrain the securities entitlements held by Bank Markazi at Clearstream by restraining Clearstream's security entitlements in its Omnibus Account at Citibank.

## IV.   UNDER THE UCC BANK MARKAZI'S SECURITY ENTITLEMENTS ARE LOCATED IN LUXEMBOURG AND THAT IS WHERE THEY MUST BE RESTRAINED

Assuming for the sake of argument that Bank Markazi's

were fraudulent conveyances and are set aside so that the

entitlements are                                                                      , Plaintiffs

still have restrained the wrong security entitlements.  Bank Markazi's rights in its security entitlements simply do not extend to the securities intermediary's account with its own securities intermediary (i.e., Clearstream's Omnibus Account with Citibank).  The security entitlements in Clearstream's Omnibus Account are not Bank Markazi's entitlements vis-à-vis Clearstream; they are Clearstream's entitlements vis-à-vis Citibank.  Bank Markazi's entitlements are located in Luxembourg, where its securities account with Clearstream is maintained.

Although under the UCC Clearstream's security entitlements are held ultimately for the benefit of Bank Markazi, Bank Markazi cannot assign, transfer, or otherwise have access to the

---

[48] Order, June 23, 2009, at 1 (Comp. Exh. 8).

[49] *Id.* at 2.

security entitlements in the Omnibus Account.   Therefore, under New York law the security

entitlements in Clearstream's Omnibus Account cannot be restrained by or turned over to

Plaintiffs to satisfy their judgment.  *See* CPLR § 5201(b) ("A money judgment may be enforced

against any property which could be assigned or transferred, whether it consists of a present or

future right or interest and whether or not it is vested . . . ."); *accord Bass v. Bass*, 528 N.Y.S.2d

558, 560-61 (App. Div. 1988).  For the same reasons, Plaintiffs cannot reach the restrained cash

that has resulted from redemptions of and interest payments on the underlying securities.

### A.     Under UCC § 8-110, Bank Markazi's Rights Arising Out Of Its Security Entitlements Are Governed By Luxembourg Law

An analysis of Bank Markazi's rights arising out of its security entitlements begins with

determining the applicable law under UCC Article 8's choice of law provisions, specifically §§

8-110(b) and (e).  The Comment to these sections explains that because a security entitlement "is

a bundle of rights against the securities intermediary with respect to a security, rather than a

direct interest in the underlying security[,] . . . the jurisdiction of incorporation of the issuer of

the underlying security or the location of any certificates that might be held by the intermediary

or a higher tier intermediary, do not determine the applicable law."[50]  The policy underlying §§

8-110(b) and (e) "is to ensure that a securities intermediary and all of its entitlement holders can

look to a single, readily-identifiable body of law to determine their rights and duties."[51]

In this case, the UCC points to Luxembourg law as the law governing Bank Markazi's

rights arising out of its security entitlements.  Specifically, UCC § 8-110(b) provides that various

issues concerning security entitlements are governed by the local law of the "securities

---

[50] UCC § 8-110 cmt. 1.   According to Professor Rogers, Revised Article 8 made previous "choice of law conundrums disappear. . . . The 1994 revision does so by a series of mechanical rules that, in essence, may be regarded as specifying that the 'location' of the [security entitlements] is the place where the securities account is maintained." Rogers, *Policy Perspectives*, at 1460.

[51] UCC § 8-110 cmt. 3.

intermediary's jurisdiction," including the rights and duties of an entitlement holder and its securities intermediary arising out of the security entitlements.[52]  UCC § 8-110(e) provides that the "securities intermediary's jurisdiction" is determined by reference to the rules in that subsection.  Those rules provide in relevant part that if "an agreement between the securities intermediary and its entitlement holder governing the securities account expressly provides that the agreement is governed by the law of a particular jurisdiction, that jurisdiction is the securities intermediary's jurisdiction."  UCC § 8-110(e)(2).

Clearstream's General Terms and Conditions is the agreement between Clearstream and Bank Markazi that governs Bank Markazi's securities account and, thus, the property right or interest created by that account.  As noted, Article 61 of that agreement provides that Luxembourg law governs that agreement.  Accordingly, the "securities intermediary's jurisdiction" is Luxembourg, and Luxembourg law governs Bank Markazi's and Clearstream's rights arising out of the security entitlements Bank Markazi holds with Clearstream.  Rogers ¶ 5.

A judgment creditor seeking to enforce a judgment "'stand[s] in the shoes of the judgment debtor in relation to any debt owed him or property interest he may own.'"  *Karaha Bodas Co. v. Pertamina*, 313 F.3d 70, 83 (2d Cir. 2002) (quoting *Bass*, 528 N.Y.S.2d at 561).  Therefore, because under the UCC Bank Markazi's rights against Clearstream with respect to Bank Markazi's security entitlements are governed by Luxembourg law, Plaintiffs' right to enforce against those security entitlements against Clearstream likewise is governed by Luxembourg law.  *See* Rogers ¶ 5 (noting that UCC § 8-110(e) "would require a New York court to apply Luxembourg law to determine both the rights that Investor has in its entitlements and

---

[52] UCC § 8-110(b)(2) provides: "The local law of the securities intermediary's jurisdiction, as specified in subsection (e), governs: . . . (2) the rights and duties of the securities intermediary and entitlement holder arising out of the security entitlement." *See* Rogers ¶ 5.

against Clearstream, and whether a creditor of Investor can bring an action against Clearstream to enforce a judgment that the creditor has against Investor").

**B.     Under Luxembourg Law, Bank Markazi's Property Rights Can Only Be Asserted Against Clearstream In Luxembourg And Do Not Extend To Upper-Tier Intermediaries**

Under the Luxembourg Securities Act, Bank Markazi has an intangible in rem property right in securities up to the amount credited to its account.  Arendt II ¶ 9.  Clearstream does not own those securities, or the in rem right to them, and does not control them because it is subject to Bank Markazi's instructions with respect to them.  *Id.* ¶¶ 4, 9.  Bank Markazi cannot assert its property right against upper-tier securities intermediaries such as Citibank, but only against Clearstream in Luxembourg.  *Id.* ¶¶ 9-10, 16.  Moreover, the location of Bank Markazi's property right is Luxembourg, not New York, because that is the place of Clearstream's registered office and principal place of business, and where Bank Markazi's securities account is located.  *Id.* ¶ 18.  Further, Clearstream's performance of its obligations under its Terms and Conditions agreement with Bank Markazi is in Luxembourg because under the Luxembourg Securities Act, the situs of Bank Markazi's securities account is in Luxembourg.  *Id.* ¶ 18.

Thus, under Luxembourg law, Plaintiffs — having stepped into the shoes of Bank Markazi — can neither restrain nor seek turnover of the Restrained Assets in the Omnibus Account at Citibank because Bank Markazi does not have any property interest in or enforcement rights against the security entitlements in the Omnibus Account.  Bank Markazi can only assert its property rights against Clearstream in Luxembourg, where its account and entitlements are located.  *Id.* ¶¶ 16, 18.

**C.     Even In The Absence Of Luxembourg Law, Under UCC § 8-503 Bank Markazi's Property Right Is Located In Luxembourg And Does Not Extend To Upper-Tier Financial Intermediaries Like Citibank**

In the absence of UCC § 8-110(b)'s choice of law provisions and the Luxembourg

Securities Act, Plaintiffs still cannot restrain or seek turnover of the Restrained Assets because under UCC § 8-503 Bank Markazi's property right — i.e., its security entitlements — exists in Luxembourg and does not extend to upper-tier securities intermediaries.

As noted in Argument section II.A, UCC § 8-503 further defines the property interest of an entitlement holder, including providing under UCC § 8-503(c) that an entitlement holder's property interest with respect to a particular financial asset "may be enforced against the securities intermediary only by exercise of the entitlement holder's rights under sections 8-505 through 8-508." Moreover, as discussed in Argument section II.C, a security entitlement is a discrete property interest located where the securities account is maintained that exists only as against the securities intermediary that created the entitlement and does not extend to, and cannot be asserted against, other securities intermediaries above the entitlement holder's securities intermediary. According to the Official Comment to § 8-503, limiting the property interest to the entitlement holder's securities intermediary is a fundamental principle of Article 8:

> The fundamental principles of the indirect holding system rules are that an entitlement holder's own intermediary has the obligation to see to it that the entitlement holder receives all of the economic and corporate rights that comprise the financial asset, and that the entitlement holder can look only to that intermediary for performance of the obligations. The entitlement holder cannot assert rights directly against other persons, such as other intermediaries through whom the intermediary holds the positions[.]

UCC § 8-503 cmt. 2.[53] This fundamental principle, that the property interest can only be asserted against the entitlement holder's securities intermediary, was accepted in drafting the UNIDROIT Convention, which specifically had non-attachment of omnibus accounts in mind.[54]

---

[53] *See* Mooney et al., *Introduction to the Revised UCC Article 8*, at 1895 (explaining that the principle that the property interest can only be asserted against the entitlement holder's securities intermediary is the "overarching principle" of Article 8 Part 5).

As noted in Argument sections II.B and C.2, the provisions of UCC § 8-503 apply equally to the securities intermediary's securities account with its own securities intermediary; i.e., Clearstream has the same type of property interest in its Omnibus Account with Citibank that Bank Markazi has in its securities account with Clearstream. *See* Rogers ¶ 8 ("The security entitlement that Investor has against Lower-tier Intermediary is not the same item of property as the security entitlement that Lower-tier Intermediary has against Upper-tier Intermediary . . . ."); *id.* ¶ 12 ("Under Article 8, the relationship between Lower-tier Intermediary and Upper-tier Intermediary is the same as the relationship between Investor and Lower-tier Intermediary. Lower-tier Intermediary would have a security entitlement against Upper-tier Intermediary."); ABCs OF THE UCC, at 36 ("[T]he securities intermediary through which a security entitlement is held might not directly own the security or other financial asset; instead the securities intermediary may, itself, have a security entitlement to that security against a clearing corporation or against another securities intermediary.").

Thus, pursuant to UCC § 8-503(a)-(b) and similar to Bank Markazi's entitlements vis-à-vis Clearstream, Citibank holds the security entitlements in the Omnibus Account for Clearstream. Those entitlements are not property of Citibank, and Clearstream has "a pro-rata property interest" in the securities held at Citibank to the extent of its entitlements.

Plaintiffs relied on the provisions of UCC § 8-503(a) to argue that Bank Markazi's property right extends to all levels of securities intermediary, including Citibank. UCC § 8-

---

[54] *See* UNIDROIT Committee of Government Experts for the Preparation of a Draft Convention on Harmonised Substantive Rules Regarding Securities Held With An Intermediary, Final Report, at 13 (August 2005) (Comp. Exh. 16) ("There was broad support for the principle to which the Article [8] was intended to give effect. Omnibus accounts should not be subject to attachment."); UNIDROIT Committee of Government Experts for the Preparation of a Draft Convention on Harmonised Substantive Rules Regarding Securities Held With An Intermediary, Explanatory Notes of preliminary draft Convention, at 30 (December 2004) (Comp. Exh. 17) (noting that draft Article 8 "prohibits the making of orders, such as so-called 'upper-tier attachment' orders . . . because a higher-tier intermediary . . . will merely operate an omnibus securities account").

503(a) provides that "all interests in th[e] financial asset held by the securities intermediary are held by the securities intermediary for the entitlement holder [and] are not property of the securities intermediary." According to Plaintiffs, Clearstream does not own any security entitlements, and, therefore, Plaintiffs can restrain and obtain turnover of the security entitlements in the Omnibus Account. Plaintiffs' misconstrue § 8-503.

Plaintiffs' fundamental mistake is that they construe § 8-503 according to common law principles such as beneficial ownership. Such a construction is wrong because the property interests created by a security entitlement "are established by the rules of Article 8, not by common law property concepts." UCC § 8-503 cmt. 2;[55] *see also Credit Bancorp*, 2000 WL 1752979, at *24 ("Where, as here, the UCC states specifically that an entitlement holder's property rights over assets held by its securities intermediary are defined by the UCC and not by the common law, and specific UCC provisions are identified as the 'only' mechanism for enforcing those rights, then the common law has been supplanted.").

Nothing in § 8-503 supports Plaintiffs' interpretation that Bank Markazi's property interest is held at every level of securities intermediary and that the UCC recognizes the investor's property interest in the financial asset at every level in the chain of intermediaries. Indeed, Plaintiffs' interpretation contradicts the fundamental principle underlying § 8-503 that the property interest created by a security entitlement exists and can be asserted only against the entitlement holder's immediate securities intermediary. Plaintiffs' argument fails to recognize the unique nature of the property interest in security entitlements. *See Credit Bancorp*, 2000 WL 1752979, at *24 (noting that "[t]he technique used in Revised Article 8 is to acknowledge explicitly that the relationship between a securities intermediary and its entitlement holders is *sui*

---

[55] UCC § 8-503 cmt. 2 provides in relevant part: "Although this section recognizes that the entitlement holders of a securities intermediary have a property interest in the financial assets held by the intermediary, the incidents of this property interest are established by the rules of Article 8, not by common law property concepts."

CONFIDENTIAL

*generis* [one of a kind], and to state the applicable commercial law rules directly, rather than by inference from a categorization of the relationship based on legal concepts of a different era") (internal quotation marks omitted); Rogers ¶ 13 ("Although the security entitlement that customers of an intermediary have against that intermediary can be described as a special form of property with respect to the property held by that intermediary, this is not the usual sort of property interest that can be asserted 'against the world.'").

### D.    Clearstream's Cash Account With Citibank Cannot Be Restrained

.[56] As discussed in Fact section II above, when a bond is redeemed Citibank credits Clearstream's cash account with Citibank in the amount of cash equivalent to Clearstream's security entitlements in the underlying bond, plus any final interest coupon payments. Clearstream then credits in Luxembourg, for each customer having security entitlements in the redeemed bond, its customer's account in the amount of the cash due the customer.

. That cash is not subject to restraint for the following reasons.

First, the cash is derived from security entitlements that cannot be restrained to satisfy Plaintiffs' judgment. That is, if the Court rules that the initial restraints were not effective under the UCC, then the cash is not subject to restraint by and turnover to the Plaintiffs. *See, e.g., Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, No. 11 Civ. 3283 (DLC), 2011 WL 6155987, at *9 (S.D.N.Y. Dec. 7, 2011) (holding that under UCC § 4A-502(4), electronic fund transfers ("EFTs") blocked by an intermediary bank under the North Korean sanctions program

---

56

were not the property of the judgment debtor North Korea, and, therefore, could not otherwise be attached or turned over under the Terrorism Risk Insurance Act).

Second, a judgment creditor cannot restrain the bank account of the judgment debtor's bank with, for example, the New York Federal Reserve Bank or another intermediary bank. As discussed in section IV.A, a judgment creditor stands in the judgment debtor's shoes in relation to any debt owed to or property interest of the judgment debtor. A judgment creditor can restrain the *judgment debtor's* bank on the theory that the bank stands as a debtor to the judgment debtor. *See, e.g., Shapiro v. McNeill*, 92 N.Y.2d 91, 98 (1998) (noting that there is a "contractual debtor/creditor relationship between a bank and its depositor"); *Tonelli v. Chase Manhattan Bank, N.A.*, 41 N.Y.2d 667, 670 (1977) (holding that "[t]he drawee bank stands in a debtor-creditor relationship to its customer"). A judgment creditor, however, cannot restrain the judgment debtor's *bank's* bank because that bank does not owe any debt to the judgment debtor or hold any money in an account belonging to the judgment debtor. Consequently, Bank Markazi does not have an interest in Clearstream's cash account with Citibank that would subject that account, or Citibank, to restraint.

Third, Bank Markazi does not control and cannot assign or transfer the funds in Clearstream's cash account at Citibank. As discussed in the introduction to section IV above, under New York law a money judgment can only be enforced against property which could be assigned or transferred by the judgment debtor. *See Bass*, 528 N.Y.S.2d at 560-61. Moreover, an interest in property cannot be restrained on the basis of a mere possibility of future control. *See Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo S.A.*, 190 F.3d 16, 24 n.8 (2d Cir. 1999) (vacating turnover order of toll road receivables because "it is at least possible that the toll road receivables are neither assignable nor transferrable" by the judgment debtor); *Capital*

*Ventures Int'l v. Republic of Argentina*, 280 F. App'x. 14, 16 (2d Cir. 2008) (holding that excess interest in account cannot be restrained because contractual conditions allowing Argentina to assign or transfer the interest had not yet occurred).

Under New York law, only Clearstream can control and transfer the funds in its cash account, and Citibank must follow Clearstream's instructions. *See Shapiro*, 92 N.Y.2d at 98 (noting that the debtor/creditor relationship between a bank and its depositor "includes an implicit understanding that the bank will pay out a customer's funds *in accordance with its instructions*" (emphasis added)); *Tonelli*, 41 N.Y.2d at 670 (holding that the drawee bank "may make payment on checks drawn against its customer's account only *as directed by the latter*" (emphasis added)).  Bank Markazi only has the ability to assign or transfer the funds that are in *its* account with Clearstream, in Luxembourg.[57]

## V.   COMMON LAW SITUS RULES ARE NOT APPLICABLE AS A BASIS TO RESTRAIN OR TURN OVER THE RESTRAINED ASSETS

In the event Clearstream were to prevail on the UCC arguments, Plaintiffs argued in the alternative that the UCC does not address the situs of Bank Markazi's property interest and that under New York common law, the situs of that property interest is in New York because that is where Clearstream is found and where performance on the underlying securities allegedly takes place.  Plaintiffs' situs argument is without merit.

### A.   UCC Article 8 Supplants The Common Law Of Situs For Security Entitlements

Plaintiffs argued that the UCC does not contain any provision as to the situs of an intangible asset like Bank Markazi's security entitlements, and that the Court should look to the

---

[57] *See* Legal Memorandum by Arendt & Medernach 1 (Sept. 13, 2010) (Comp. Exh. 1) ("Arendt I") ("[T]he custodian bank benefits from the use of the cash and becomes the owner of said cash, but remains subject to an obligation to return the received amount.") (internal quotation marks omitted).

common law to determine the situs of Bank Markazi's property interest.  In fact, the UCC does address the situs of the security entitlements, and according to the UCC, the situs of Bank Markazi's property interest is Luxembourg.

First, as discussed in section III.A above, pursuant to UCC §§ 8-110(b) and (e), Luxembourg law governs the rights and duties of Clearstream and Bank Markazi arising out of Bank Markazi's security entitlements.  Under Luxembourg law, Bank Markazi has an intangible in rem right to the securities.  Arendt II ¶ 9.  The situs of that right is Luxembourg because under Luxembourg's Securities Act, book-entry securities held with a custodian bank are located in the place of the registered office or principal place of business of the custodian, which would be Luxembourg in Clearstream's case.  Arendt II ¶ 18.

Second, as discussed in section II.C, the UCC recognizes that the property interest is located where the securities account entry for the security entitlements is made.  *Fidelity I*, 58 F. Supp. 2d at 54 (holding that "Philguarantee's interest in the bonds is located in the Philippines, where the debtor resides, and where ING Bank of Manila — upon whose books the debtor's interest is represented — is located"); Rogers, *Policy Perspectives*, at 1460 (explaining that the "location" of the security entitlements is the place where the securities account is maintained).

Therefore, Plaintiffs' situs argument based on New York common law is misplaced. Indeed, the Court in *Credit Bancorp* rejected a common law argument with respect to the security entitlements at issue in that case, precisely because UCC Article 8 supplanted the common law.  The parties in that case first argued that under UCC § 8-503, the entitlements they had transferred to the defendant bank as collateral did not belong to the bank and that they had a pro rata interest in the entitlements.  *Credit Bancorp*, 2000 WL 1752979, at *21.  After the Court rejected that argument, the intervening parties argued alternatively that their relationship to the

bank was one of bailor and bailee and, therefore, under the common law of bailments they were entitled to the entitlements they transferred to the bank. *Id.* at *23-24. The Court rejected that argument too, holding that "the common law ha[d] been supplanted" by the UCC with respect to an entitlements holder's property rights and enforcing such rights. *Id.* at *24.

**B.    Under New York Common Law, The Situs Of Bank Markazi's Security Entitlements Is Luxembourg Because That Is The Place Of Performance Under The Account Agreement With Clearstream**

Even if the Court were to consider the situs of Bank Markazi's property interest under the common law, the situs of that interest would be Luxembourg, not New York.

Under New York law, the situs of intangible property such as a beneficial ownership interest is the place of performance under the governing agreement. *See ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 675 (1976) (holding that the situs of intangible property is "the location of the party of whom performance is required by the terms of the contract," and finding that the situs of intangible rights under a licensing agreement was New York, where performance would occur); *see also EM Ltd. v. Republic of Argentina*, 389 F. App'x 38, 44 (2d Cir. 2010) (holding same and finding that the situs of beneficial interests in a trust was New York, where the trustee performed its obligations).

The governing agreement concerning performance related to Bank Markazi's security entitlements is the General Terms and Conditions between Clearstream and Bank Markazi, because Bank Markazi's security entitlements were created pursuant to that agreement and it is that agreement that sets forth Clearstream's performance obligations and, under both the UCC and Luxembourg law, governs Clearstream's and Bank Markazi's rights and duties with respect to Bank Markazi's security entitlements. *See, e.g.*, *ABKCO*, 39 N.Y.2d at 673 (holding that the court's attention must be focused on the licensing agreement creating the intangible rights at issue in the case because "it is that contract and the rights and obligations of the parties under it

32

which must furnish the predicate for attachment if any is to be found"); *see also Macatra B.V. v. Destiny Navigation*, No. 08 Civ. 0711, 2010 WL 339774, at *1 (S.D.N.Y. Jan. 27, 2010) (holding that the situs of a debt was the location where performance was required under the contract creating the debt, and that New York could not be the situs because it had no relation to the underlying transaction).[58]

As discussed above, the General Terms and Conditions agreement between Clearstream and Bank Markazi is expressly governed by Luxembourg law.  Courts in New York enforce the parties' choice of law in a written agreement.  *See, e.g., Welsbach Elec. Corp. v. Mastec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006) (holding that "courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction" and does not violate public policy).  Under Luxembourg law, Clearstream is the obligor for the services it must perform under its agreement with Bank Markazi.  Arendt II ¶¶ 12-13.  The location of that performance is Luxembourg because (1) the situs of the securities account is Luxembourg, and (2) Clearstream performs its obligations in relation to maintaining the securities account in Luxembourg.  *Id.* ¶ 18.  Thus, under the New York common law rule, the situs of Bank Markazi's property interest is Luxembourg.

Plaintiffs argued that New York is the site of performance with respect to Bank Markaazi's security entitlements because the issuer and intermediary banks on the bonds underlying the entitlements have obligations to perform with respect to those bonds in New York.  Plaintiffs' argument is wrong as a matter of law because, even assuming for the sake of argument that all of the activities they allege by these other entities occur in New York, Plaintiffs

---

[58] Plaintiffs distinguish *Macatra* because the garnishee there was located in Chile and thus the court had no personal jurisdiction over that garnishee.  The court's holding, however, had nothing to do with personal jurisdiction: "Because the situs of intangible property is the location where performance is required, New York has no relation to the transaction between Codelco and Bryggen and therefore cannot be the situs of the debt."  *Macatra*, 2010 WL 339774, at *1.

wrongly conflate the performance by others on the underlying bonds with the only performance that is relevant to the situs analysis: Clearstream's performance under its account agreement with Bank Markazi, which performance decidedly is in Luxembourg.

The activities of these other entities are irrelevant to the situs analysis because they do not concern performance under the governing contract creating the rights to Bank Markazi's entitlements, i.e., Clearstream's account agreement with Bank Markazi. *See, e.g., Allied Maritime, Inc. v. Descatrade SA*, No. 09 Civ. 3684(SAS), 2009 WL 4884160, at *3 (S.D.N.Y. Dec. 16, 2009) (holding that the only relevant performance for determining the situs of the debtor's intangible asset was the performance of the originator's bank that had the obligation of performance to the debtor, and not the intermediary bank, which had no obligation to the debtor), *aff'd* 620 F.3d 70 (2d. Cir. 2010).

Just as the Court in *ABKCO* focused on the licensing agreement concerning the intellectual property, the inquiry here is Clearstream's performance under the account agreement governing the security entitlements.  Plaintiffs' litany of bond-related acts in New York is not relevant.  That the global note underlying each bond issue is physically located in New York is not relevant because it does not concern performance by Clearstream, and the physical location of the global note is not a relevant consideration to restraint or turnover.[59]  That the sub-custodian is located in the United States is not relevant because it does not concern performance by Clearstream.  The bonds' designation of the fiscal and paying agents is irrelevant because that designation does not concern performance by Clearstream.  The provisions of the bonds' prospectuses, including New York choice of law and forum provisions, are irrelevant, as is

---

[59] *See* UNIDROIT Committee of Governmental Experts for the Preparation of a Draft Convention on Harmonised Substantive Rules Regarding Securities Held with an Intermediary, Comments by the Government of the United States of America, at 2 (February 2006) (Comp. Exh. 18) (advocating that upper-tier attachment should be prohibited, even if the judgment, attachment, upper-tier intermediary, and share certificates are all in the same country).

**CONFIDENTIAL**

payment by the issuer to the paying agent and payment by the paying agent to intermediaries, because such provisions and payments do not concern performance by Clearstream.   The mechanics of payment to Bank Markazi by correspondent banks is not relevant because

60

### C.    The Common Law Situs Rule In *Harris v. Balk* Is Inapposite

Plaintiffs also argued application of a common law situs rule based on the presence of the garnishee in New York.   In making this argument, Plaintiffs relied on *Harris v. Balk*, 198 U.S. 215 (1905), which held that a judgment creditor could attach the debt owed to a judgment debtor by a third-party present in the jurisdiction of attachment because the debt owed to the judgment debtor clung to the third-party.   *Id.* at 222 ("The obligation of the debtor to pay his debt clings to and accompanies him wherever he goes.").   Plaintiffs also cited *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303 (2010), in which the N.Y. Court of Appeals relied on the rule in *Harris v. Balk* to hold that the situs of the intangible property rights sought to be attached in that case, membership interests in out-of-state limited liability companies, traveled with the defendant garnishee that owned and managed those companies: "[D]efendants' uncertificated ownership interests which defendant Mitchell possesses or has custody over, travel with him, and were attachable in New York based on his presence in this state." *Id.* at 315-16.

It is well-recognized, however, that the situs of intangible property rights is a legal fiction that is context-specific.   *See id.* at 314 ("[T]he situs of intangibles is in truth a legal fiction." (internal quotation marks and citation omitted)); *see also Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 371 (5th Cir. 2004) (explaining that because attaching a situs to intangible property is

---

[60] *See, e.g.*, June 27, 2008 Hr'g Tr. at 58:2-22 (Comp. Exh. 7) (

); Barrett ¶ 4 (discussing that "all transactions are conducted centrally out of Clearstream's Operations Center in Luxembourg").

necessarily a legal fiction, "the selection of a situs for intangibles must be context-specific"). In the context of this case, which involves security entitlements created under UCC Article 8, Plaintiffs' argument based on the common law situs rule in *Harris v. Balk* fails — even assuming for the sake of argument that Clearstream is "present" in New York.

First, as discussed above, under Luxembourg law and the UCC, Clearstream does not own or control Bank Markazi's security entitlements. Arendt II ¶¶ 4, 9; UCC § 8-503(a). Nor does Clearstream control Bank Markazi's security entitlements such that Clearstream can assign or transfer them absent Bank Markazi's instructions. Arendt II ¶ 4. Moreover, as discussed above, under the UCC a security entitlement is not a claim to a specific identifiable thing, or something that can be traded, or a discrete object that can be traced. Thus, Bank Markazi's security entitlements do not "travel" or "cling" to Clearstream, but exist as a package of rights that can only be enforced against Clearstream in the place where the securities account that created them is held and where Clearstream must perform under the account agreement — Luxembourg. *Id.* ¶ 16. Clearstream has *its* entitlements with Citibank in New York, in which, under Luxembourg law and the UCC, Bank Markazi does not have an interest and against which it cannot enforce its property rights. *See* UCC § 8-112(c); § 8-503 cmt. 2; Arendt II ¶¶ 10, 23-24. Thus, there is no intangible right in New York that Bank Markazi — and hence its judgment creditors — can claim against Clearstream.

Second, *Harris*, *Hotel 71*, and *Af-Cap* involved single obligors that were located in the United States. Those cases did not deal with an international bank like Clearstream, with representative offices or branches in several foreign jurisdictions, or with a judgment debtor that was a foreign sovereign. This Court considered these very issues in *Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 Civ. 2715, 2010 WL 768874 (S.D.N.Y. Mar. 5, 2010). In

that case, the plaintiffs argued that New York was the situs of security entitlements held in custodial accounts with a Citibank branch in Argentina because Citibank was located in New York. *Id.* at *2. The Court specifically rejected the situs rule applied in *Hotel 71* and *Af-Cap* in determining the situs of the security entitlements, because those cases "dealt with clearly defined single obligors who were located only in the United States" and not with an international bank like Citibank. *Id.* at *2-3.

After analyzing the security entitlements in context, the Court held that the situs of the security entitlements was Argentina because: "All the dealings of ANSES in setting up the accounts, depositing securities into the accounts (whether electronically or by paper), giving instructions to Citibank regarding the accounts, receiving advice regarding the accounts, directing the sale and purchase of securities — all were made between ANSES and the Citibank branch in Argentina." *Id.* at *4; *see also Macatra*, 2010 WL 339774, at *1 (rejecting attachment of a debt based on garnishee's presence in New York because New York had no relation to the underlying transaction between Chilean and Norwegian companies). The same conclusion should be reached here because, in the language of the Court in *Aurelius Capital*, all the dealings of Bank Markazi in setting up the accounts, acquiring the security entitlements in the accounts, giving instructions to Clearstream regarding the accounts, receiving advice regarding the accounts, directing the sale and purchase of securities, were made between Bank Markazi and Clearstream in Luxembourg.[61]

Third, under Luxembourg law, the law governing the account agreement, Bank Markazi cannot enforce its in rem rights by suing Clearstream in New York, the jurisdiction in which Plaintiffs claim Clearstream is present for purposes of their situs argument. Arendt ¶ 16. Rather,

---

[61] *See* Bank Markazi Account Opening Documents (Comp. Exh. 11); Barrett ¶ 4.

Bank Markazi can only enforce its in rem rights by suing Clearstream in Luxembourg.  The

ability of the garnishee to be sued by its creditor (i.e., the judgment debtor) in the state where the

attachment is ordered was fundamental to the holding in *Harris v. Balk* on situs and relied upon

by the New York Court of Appeals in *Hotel 71*:

> [I]f the garnishee be found in the state, and process be personally
> served upon him therein, we think the court thereby acquires
> jurisdiction over him, and can garnish the debt due from him to the
> debtor of the plaintiff, and condemn it, *provided the garnishee
> could himself be sued by his creditor in that state*. . . . If, while
> temporarily [in the state] *his creditor might sue him there and
> recover the debt*, then he is liable to process of garnishment, no
> matter where the situs of the debt was originally. . . . [The
> garnishee] is as much bound to pay his debt *in a foreign state when
> therein sued* upon his obligation by his creditor, as he was in the
> state where the debt was contracted.

*Hotel 71*, 14 N.Y.3d at 314-15 (quoting *Harris*, 198 U.S. at 222-23) (emphasis added).

Fourth, unlike *Hotel 71*, Plaintiffs' situs argument is precluded by the FSIA, as discussed

immediately below.

### D.    The FSIA Precludes Application Of The Common Law Situs Rule In *Harris v. Balk*

The FSIA precludes the common law situs rule in *Harris v. Balk* because that common

law rule imposes a new rule for restraint and execution of sovereign property that is not in the

FSIA, namely, the restraint and execution of sovereign property located in accounts outside the

United States by means of the presence of a garnishee in the United States.  As noted by the

District Court in *Aurelius Capital*, the situs of a foreign sovereign's property is an issue that

ultimately must be decided under the FSIA.  *See Aurelius Capital*, 2010 WL 768874, at *4 ("[I]t

is necessary to recognize that the ultimate issue arises under the FSIA.")

Under the FSIA, "the property in the United States of a foreign state" shall be immune

from attachment and execution unless one of the specified exceptions to attachment immunity

listed in 28 U.S.C. §§ 1610-11 applies.  28 U.S.C. § 1609.  If the foreign sovereign's property is not "in the United States" and does not fall under any of the exceptions to immunity, then the Court lacks jurisdiction to restrain the property.  *See, e.g., Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) (finding that under 28 U.S.C. § 1610(a), "the property that is subject to attachment and execution must be property in the United States of a foreign state") (internal quotation marks omitted); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007) ("The FSIA protects foreign states' property from attachment and execution . . . except under the conditions set forth in . . . 28 U.S.C. §§ 1610 and 1611."); *Aurelius Capital*, 2010 WL 768874, at *4 ("The question is whether the intangible property, resulting from deposit transactions between ANSES and the Buenos Aires branch of Citibank, can be considered as 'property in the United States . . . .'"); *Walters v. People's Republic of China*, 672 F. Supp. 2d 573, 574 (S.D.N.Y. 2009) ("Under [the FSIA], the property of a foreign state is immune from attachment and execution except as provided in 28 U.S.C. §§ 1610 and 1611.  The FSIA's limited exceptions to sovereign immunity — whether for foreign states or their instrumentalities — extends at most to property located in the United States." (internal quotation marks omitted)); *see also Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1123 n.2, 1131-32 (9th Cir. 2010) (holding that Plaintiffs can only reach property in the United States in which Iran has an interest, and that they could not reach debt obligations of French shipping companies to Iran because the situs of that intangible property was France).

The Second Circuit has further stated that courts cannot create exceptions to immunity not in the statute:

> [T]he FSIA forbids any 'attachment[,] arrest or execution' of a foreign sovereign's property subject only to the exceptions set forth in §§ 1610-1611.  And we are not at liberty to create other exceptions, not in the statute. . . .  The Supreme Court, like every

> circuit that has considered the question, has read the FSIA as
> providing the exclusive means for suing a foreign state, and thus as
> preempting all other laws purporting to set forth rules for suits
> against foreign sovereigns.

*Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1230, 1232 (2d Cir. 1995).

The common law situs rule is precluded by the FSIA because it imposes an exception to attachment and execution immunity that is not in the FSIA. None of the exceptions to attachment and execution immunity in the FSIA include an exception for property located outside the United States that is deemed to be in the United States by virtue of "traveling" or "clinging" to a garnishee that is present in the United States. Plaintiffs, therefore, cannot rely on that common law rule as a basis for restraint and turnover.

## VI.   *KOEHLER v. BANK OF BERMUDA* IS INAPPLICABLE AS A BASIS TO RESTRAIN AND TURN OVER THE RESTRAINED ASSETS

Plaintiffs also relied on *Koehler v. Bank of Bermuda*, 12 N.Y.3d 533 (2009) to argue in the alternative that because the Court purportedly can exercise personal jurisdiction over Clearstream, it can order Clearstream to bring Bank Markazi's property located in Luxembourg into New York for turnover to Plaintiffs. *See id.* at 541 (holding that "a court sitting in New York that has personal jurisdiction over a garnishee bank can order the bank to produce stock certificates located outside New York"). Plaintiffs' reliance on *Koehler* is misplaced. The District Court in *Aurelius Capital* considered and rejected *Koehler* as inapposite to the restraint of the security entitlements in that case, and this Court should do the same. *See Aurelius Capital*, 2010 WL 768874, at *4.

First, *Koehler* did not concern foreign sovereign property located outside the United States, as was the case in *Aurelius Capital* and as is the case here. The holding of *Koehler* perforce is based on the property *not being* in the United States. Consequently, *Koehler* cannot furnish Plaintiffs a basis for turnover because the Court's power to attach and execute against

foreign sovereign property is determined exclusively by the FSIA and must fall within one of the immunity exceptions to attachment and execution as discussed in section V.D above.  None of those exceptions include a *Koehler*-type exception to attachment immunity.

Second, *Koehler* did not consider application of the "separate entity" rule, which under New York law "dictates that each branch of a bank be treated as a separate entity for attachment purposes.  As a result, the debt owed by a branch finds its situs within the territorial jurisdiction of that branch.  Put differently, the mere fact that a bank may have a branch within New York is insufficient to render accounts outside of New York subject to attachment." *Allied Maritime, Inc. v. Descatrade SA*, 620 F.3d 70, 74 (2d Cir. 2010) (holding that defendant's account with a bank in Paris could not be attached by jurisdiction over that bank's branch in New York) (internal quotation marks and citations omitted); *see also Motorola Credit Corp. v. Uzan*, 288 F. Supp. 2d 558, 561 (S.D.N.Y. 2003) (applying the separate entity rule and refusing to permit attachment of a foreign bank account by process served on the bank's New York office); *Samsun Logix Corp. v. Bank of China*, No. 105262/10, 2011 WL 1844061, at *3 (N.Y. Sup. Ct. May 12, 2011) (holding that the decision in *Koehler* "did not affect this principle" of the separate entity rule, and dismissing a turnover proceeding because plaintiff "has not identified any assets of the Judgment debtors located in the branches (or under the control) of the Banks that are parties to this proceeding").

The separate entity rule would apply here because Plaintiffs seek turnover of property in a Clearstream account in Luxembourg based on Clearstream's purported presence in New York through its New York representative office — an office that is not authorized to conduct any banking business in New York and does not have any customer accounts.[62]

---

[62] *See* Barrett ¶¶ 2-3.

## VII.   THE RESTRAINED ASSETS ARE NOT "BLOCKED ASSETS" UNDER THE TERRORISM RISK INSURANCE ACT

Plaintiffs also relied on § 201 of TRIA, 28 U.S.C. § 1610 (2006) note, to argue in the

alternative that the Restrained Assets could be turned over because the Restrained Assets are

"blocked assets" available for execution under TRIA.   Plaintiffs misinterpret TRIA and that

statute does not offer a basis for turnover of the Restrained Assets.

Section 201 of TRIA provides in relevant part:

> Notwithstanding any other provision of law . . . in every case in
> which a person has obtained a judgment against a terrorist
> party . . . for which a terrorist party is not immune under section
> 1605(a)(7) of title 28, United States Code, the blocked assets of
> that terrorist party (including the blocked assets of any agency or
> instrumentality of that terrorist party) shall be subject to execution
> or attachment in aid of execution in order to satisfy such judgment
> to the extent of any compensatory damages for which such terrorist
> party has been adjudged liable.

*Id.*  TRIA § 201(d)(2)(A) defines "blocked assets," with certain limitations, as "any asset seized

or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.

App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act

(50 U.S.C. 1701; 1702)."  TRIA § 201 "requires *both* that the accounts be 'blocked assets' and

that these blocked assets be 'of the terrorist party.'"  *Calderon-Cardona*, 2011 WL 6155987 at

*8.

Plaintiffs' argued that the Restrained Assets are "blocked assets" pursuant to the Iranian

Transactions Regulations ("ITR"), which were promulgated under the International Emergency

Economic Powers Act.[63]   But property and transactions subject to these regulations are not

"blocked assets" because the ITR do not provide for property to be seized or frozen by the

United States (except in cases, not applicable here, where a Specially Designated National has an

---

[63] 31 C.F.R. § 560.

interest in the property). Rather, persons covered by the ITR are prohibited from transacting in the property.[64]  OFAC has explicitly stated that, "the Iranian Transactions Regulations do not contain *any blocking provisions*."[65]  *See Bank of New York v. Rubin*, No. 05 Civ. 4926 (DLC), 2006 WL 633315 *7 (S.D.N.Y. Mar. 15, 2006) (holding that because under the ITR an Iranian bank can close its U.S. bank account and transfer its assets, those funds are not "blocked assets" under TRIA); *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63, 74-75 (E.D.N.Y. 2004) (holding that bank accounts regulated under the ITR "are not 'blocked assets' under the TRIA" and refusing to expand the definition of "blocked assets" to permit execution).[66]

Plaintiffs also relied on the decision by this Court in *Hausler v. JP Morgan Chase Bank, N.A.*, No. 09 Civ. 10289, 2010 WL 3817546 (S.D.N.Y. Sept. 13, 2010), to support their argument.  But that decision is inapposite because it did not involve the ITR.  The Court's decision in *Hausler*, that funds in bank accounts were subject to execution under TRIA, was based on its finding that the funds were blocked assets under the Cuban Asset Control Regulations ("CACR").  *Id.* at *1-2.  Unlike the ITR, the CACR include blocking provisions. *See, e.g.*, 31 C.F.R. §§ 515.201(e) (indicating that "a transaction results in the blocking of funds at a banking institution pursuant to this section"); *id.*, § 515.205(c)(2) (explaining that for such

---

[64] *See, e.g., id.* § 560.204 (providing that "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited"); *id.* § 560.410(a) (providing that the prohibition contained in Sec. 560.204 "applies to services performed on behalf of a person in Iran or the Government of Iran or where the benefit of such services is otherwise received in Iran, if such services are performed: (1) In the United States; (2) Outside the United States by a United States person, including by an overseas branch of an entity located in the United States").

[65] *OFAC Regulations for the Financial Community*, Office of Foreign Assets Control, U.S. Dep't of the Treasury, at 15 (Jun 16, 2010) (emphasis added), *available at* http://www.treasury.gov/resource-center/sanctions/Documents/facbk.pdf (last visited Dec. 18, 2011) (Comp. Exh. 19) (emphasis added).

[66] Plaintiffs admit that the court in *Weinstein* held that assets subject to the ITR "were not blocked for purposes of TRIA" but incorrectly contend that the court failed to consider the legislative history of TRIA when it interpreted the term 'blocked assets' under TRIA.  The court in *Weinstein* specifically addressed the legislative history: "Moreover, although, as plaintiffs assert, there is legislative history to the TRIA indicating that the term 'blocked asset' includes any asset 'regulated' by the Treasury Department, *the seemingly clear statutory text does not reasonably allow that broader interpretation*, nor compel resort to legislative history for interpretation." *Weinstein*, 299 F. Supp. 2d at 75.

transactions "proceeds are held in a blocked account"); *Calderon-Cardona*, 2011 WL 6155987 at

*10 (discussing blocked assets under CACR).

## VIII.  EQUITABLE RELIEF IS UNAVAILABLE TO RESTRAIN AND TURN OVER THE RESTRAINED ASSETS

Plaintiffs also argued that, in the event they did not prevail on any of their arguments,

they should be afforded equitable relief because vacating the Restraints or denying turnover to

them somehow would be unfair.  Plaintiffs relied on an outdated equitable remedy under New

York common law called a "creditor's bill" and the equity reference in UCC § 8-112(e) as the

bases for equitable relief.  Plaintiffs' resort to such equitable relief is without merit.

### A.     The Common Law "Creditor's Bill" Is Unavailable To Plaintiffs

Plaintiffs contend that the equitable remedy of a creditor's bill under New York law is

available to a judgment creditor to reach a judgment debtor's interest in property that is not

subject to execution at law.  According to Plaintiffs, they are entitled to a remedy in equity

against Clearstream simply because the executions they served to enforce their Judgment remain

unsatisfied.  Plaintiffs' argument fails because there is no basis for the Court to use the creditor's

bill remedy to create a property right that can be executed upon.  As discussed above, Bank

Markazi's property interest is created by statute and limited thereby, and equity cannot create a

property right that does not exist under either Luxembourg law or the UCC.

The creditor's bill is an obsolete remedy that has been superseded by Article 8 of the

UCC, which provides the mechanism for enforcing rights against security entitlements.  *See*

*Credit Bancorp*, 2000 WL 1752979 at *24 (holding that the common law has been supplanted

where specific UCC provisions are identified as the only mechanism for enforcing rights in

security entitlements).  Indeed, not a single published New York state court opinion has even

cited the remedy in almost forty years.  *See Leedpak v. Julian*, 356 N.Y.S.2d 1011, 1013 (Sup.

Ct. 1974) (referring, in passing, to the "ancient creditor's bill in equity").[67]   The vast majority of the opinions that *have* referred to the creditor's bill date from the 1800s and early 1900s, long before the advent of the Uniform Commercial Code.

### B.   UCC § 8-112(e) Is Inapplicable In This Case

Plaintiffs rely on the equity reference in UCC § 8-112(e) in their plea for equitable relief. UCC § 8-112(e) provides that: "A creditor whose debtor is the owner of a . . . security entitlement is entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the . . . security entitlement or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process."

Plaintiffs misconstrue § 8-112(e).   The reference to equity in § 8-112(e) cannot be used to trump or vitiate the provisions of § 8-112(c) or the other provisions of Article 8 governing security entitlements.   UCC § 8-112(e) allows a creditor to seek the equitable assistance of a court in doing only what §§ 8-112(a)-(c) state is appropriate: "[§ 8-112(e)] simply makes clear that a creditor is entitled to appropriate aid from courts of competent jurisdiction" and "provides for no relaxation of the requirements of the rest of section 8-112."[68]

Moreover, Plaintiffs' argument violates two well-established principles of statutory construction.   First, the canon of construction that a statute should be interpreted so as not to render one part inoperative contradicts Plaintiffs' claim that UCC § 8-112(e) can trump the

---

[67] The handful of modern federal cases referring to the remedy of creditor's bill under New York law refused to apply the doctrine. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319–21 (1999) ("Respondents do not even argue this point. . . . [R]espondents do not discuss creditor's bills at all. Particularly in the absence of any discussion of this point by the lower courts, we are not inclined to speculate . . . ."); *Koehler v. Bank of Bermuda Ltd*, 544 F.3d 78, 87 (2d Cir. 2008) ("A creditor's bill *was used at common law* . . . . Since Koehler does not assert that he invoked the mechanism of the creditor's bill in his petitions to the district court seeking enforcement of the default judgment, *we have no occasion to decide whether such a remedy was available*." (international quotation marks omitted) (emphasis added)); *W.M. Passalacqua Builders, Inc. v. Resnick Dev. S., Inc.*, 933 F.2d 131, 136 (2d Cir. 1991) (referring to the creditor's bill as an "ancient action").

[68] 7A WILLIAM D. HAWKLAND, ET AL, HAWKLAND UNIFORM COMMERCIAL CODE SERIES § 8-112:01 (2008) (Comp. Exh. 20).   The section is merely a guarantee of judicial assistance in the absence of a relevant "state law" provision and cannot be used to invalidate other provisions of the UCC. *Id.*

express limitations of UCC § 8-112(c) and other provisions of the UCC.  *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (holding that it is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute").  Second, Plaintiffs' argument violates the canon that "the specific governs over the general."  *See Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996); *Montague v. Elec. Corp. of Am.*, 76 F. Supp. 933, 936 (S.D.N.Y. 1948) ("The settled rule of statutory construction is that, where there is a special statutory provision[] affording a remedy for particular specific cases and where there is also a general provision which is comprehensive enough to include what is embraced in the former, the special provision will prevail over the general provision, and the latter will be held to apply only to such cases as are not within the former.").

Further, Plaintiffs do not meet the requirements for equitable relief because they have an adequate remedy at law: they have not exhausted attempts to enforce their judgment in foreign jurisdictions where the property interest at issue is located.  *See Motorola*, 288 F. Supp. 2d at 562 (holding that in order for Motorola to show that it did not have an adequate remedy at law for purposes of obtaining equitable relief, it would "have to show, at a minimum, that its attempts to enforce its judgment against the relevant bank accounts in the countries in which the funds are actually located has proven nugatory").

Finally, Plaintiffs' equitable argument fails because it would violate the provisions of the FSIA for the reasons discussed in section V.D above.  Indeed, § 8-112(e) requires that the equitable relief must come from a court of competent jurisdiction.  If Plaintiffs were unable to restrain and execute on the Restrained Assets by virtue of those assets' immunity under the FSIA, then the Court would not be a court of "competent jurisdiction" under UCC § 8-112(e) because it would lack subject matter jurisdiction over the Restrained Assets.

## **CONCLUSION**

For the reasons discussed above, the Restraints on the Restrained Assets and all such similar process affecting the Restrained Assets by the Plaintiffs-Respondents should be vacated.

Dated:  December 22, 2011

Respectfully submitted,

**WHITE & CASE LLP**

By: _____

Nicole E. Erb
Frank Panopoulos
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Tel: (202) 626-3600
Fax: (202) 639-9355

*Counsel for Clearstream Banking, S.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of December 2011, I caused to be served the

foregoing Memorandum and related motion papers on the following parties, by next business day

delivery:

<i>/s/</i>

Nicholas Nassim

Liviu Vogel, Esq.
Salon Marrow Dyckman Newman &
Broudy LLP
292 Madison Avenue
New York, NY 10017
*Counsel for Peterson Plaintiffs*

Steven R. Perles, Esq.
Perles Law Firm, PC
1146 19th Street 5th Floor
Washington, DC 20036
*Counsel for Peterson Plaintiffs*

James Bonner, Esq.
Stone Bonner & Rocco, LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
*Counsel for Peterson Plaintiffs*

Curtis C. Mechling, Esq.
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
*Counsel for Acosta and Greenbaum
Plaintiffs*

Noel J. Nudelman, Esq.
Heideman Nudelman & Kalik, PC
1146 19th Street, 5th Floor
Washington, DC 20036
*Counsel for Brown, Bland, and Silvia
Plaintiffs*

Thomas Fay, Esq.
Fay Kaplan Law P.A.
777 Sixth Street NW, Suite 410
Washington, DC 20001
*Counsel for Bonk, Khaliq, Owens, and
Valore Plaintiffs*

Keith Martin Fleischman, Esq.
Fleischman Law Firm
565 Fifth Avenue, Seventh Floor
New York, NY 10017
*Counsel for Bonk, Silvia, and Valore
Plaintiffs*

Richard Marc Kremen, Esq.
DLA Piper US LLP
6225 Smith Avenue
Baltimore, MD 21209-3600
*Counsel for Heiser Plaintiffs*

Cary B. Samowitz, Esq.
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
*Counsel for Heiser Plaintiffs*

Suzelle M. Smith, Esq.
Howarth and Smith
523 West Sixth Street, Suite 728
Los Angeles, CA 90014
*Counsel for Levin Plaintiffs*

Sharon Schneier, Esq.
Davis Wright Tremaine LLP
1633 Broadway, 27th Floor
New York, NY 10019-6708
*Counsel for Citibank, N.A.*

Ugo Colella, Esq.
Patton Boggs LLP
2550 M Street, NW
7th Floor
Washington, DC 20037
*Counsel for Banca UBAE Spa*

John J. Zefutie, Jr., Esq.
Patton Boggs LLP
The Legal Center
One Riverfront Plaza
1037 Raymond Blvd.
Suite 600
Newark, New Jersey 07102
*Counsel for Banca UBAE Spa*

David M. Lindsey, Esq.
Chaffetz Lindsey LLP
505 Fifth Avenue, 4th Floor
New York, NY 10017
*Counsel for Bank Markazi*