**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**

-------------------------------------------------- x

DEBORAH D. PETERSON,                           :
Personal Representative of the Estate           :
of James C. Knipple (Dec.), et al.,             :
                                                :
            Plaintiffs,                         :      Case No. 10 Civ. 4518 (BSJ) (GWG)
                                                :
      v.                                        :      **FILED UNDER SEAL**
                                                :
ISLAMIC REPUBLIC OF IRAN, et al.,               :      CONTAINS CONFIDENTIAL
                                                :      MATERIAL SUBJECT TO
            Defendants.                         :      PROTECTIVE ORDER
                                                :
-------------------------------------------------- x


## CLEARSTREAM BANKING, S.A.'S OPPOSITION
## TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT


Nicole E. Erb
Frank Panopoulos
**WHITE & CASE** LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 626-3600
Fax: (202) 639-9355

June 15, 2012                          *Counsel for Clearstream Banking, S.A.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.    TURNOVER RAISES A NON-JUSTICIABLE POLITICAL QUESTION .......... 2

    A.    Assets Corresponding To The Restrained Assets At Citibank Are Frozen At Clearstream In Luxembourg ............................................................... 3

    B.    The Restrained Assets At Citibank In New York And The Frozen Assets At Clearstream In Luxembourg Are Subject To Parallel Blocking Regimes ............................................................................................................. 4

    C.    Plaintiffs' Request For Turnover Raises A Non-Justiciable Political Question ....................................................................................... 6

        1.    There Is A Textually Demonstrable Constitutional Commitment To The Executive ................................................. 7

        2.    There Is A Lack Of Judicially Manageable Standards ................... 8

        3.    The Remaining *Baker* Factors Weigh Strongly Against Adjudication .................................................................. 8

    D.    Plaintiffs' Arguments That A Turnover Order Would Not Raise A Political Question Are Without Merit ............................................... 9

        1.    Plaintiffs Confuse The Property Interests Implicated By The Judicial Restraints And The Property Interests Implicated By The U.S. And EU Blocking Measures ................... 10

        2.    Article 24 Of Council Regulation (EU) 267/2012 Does Not Apply ................................................................ 11

        3.    Plaintiffs Mischaracterize The Political Question As A Conflict Of Law ............................................................ 12

II.    SUMMARY JUDGMENT IS IMPROPER AT THIS TIME ................................ 14

III.    SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THE RESTRAINED ASSETS ARE NOT SUBJECT TO TURNOVER UNDER TRIA AS A MATTER OF LAW ............................................. 17

    A.    The Summary Judgment Standard ......................................................... 18

    B.    TRIA Does Not Preempt The UCC .................................................... 18

        1.    The Methodology For The Court's Preemption Analysis ............. 19

        2.    Bank Markazi's Property Interest Is An Intangible Right To Payment ...................................................................... 21

3.    The Restrained Assets Are Not Assets "Of" Bank Markazi Under TRIA ................................................................22

4.    Congress Did Not Intend TRIA To Benefit Terrorist States At The Expense Of Innocent Third-Parties ...................28

5.    Turnover Under TRIA Must Comply With CPLR § 5225 ............34

C.    EO 13599 And TRIA Do Not Reach Clearstream....................................35

1.    Clearstream Is Not A "United States Person" Under EO 13599 ....................................................................35

2.    TRIA Does Not Apply Extraterritorially ......................................36

D.    New York And Federal Law Prohibit Execution Against The Restrained Assets And Assets Abroad..................................................38

E.    TRIA Requires That A Judgment Against A Foreign State Be Obtained Under 28 U.S.C. § 1605(a)(7) ................................................40

F.    Turnover Pursuant To TRIA Would Constitute An Unconstitutional Taking.................................................................41

1.    There Would Be No Taking For Public Use ...............................41

2.    TRIA Would Work A Per Se Taking .........................................42

3.    TRIA Would Work A Regulatory Taking ...................................43

CONCLUSION................................................................................................44

# TABLE OF AUTHORITIES

**CASES**                                                                                     **Page**

*767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia*,
    218 F.3d 152 (2d Cir. 2000) .............................................................................7

*Allen v. Coughlin*,
    64 F.3d 77 (2d Cir. 1995) ..............................................................................18

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................................18

*Baker v. Carr*,
    369 U.S. 186 (1962)....................................................................................6, 9

*Bank of Tokyo-Mitsubishi, UFJ, Ltd. v. Peterson*,
    No. 12 Civ. 4038 (BSJ) (S.D.N.Y. May 29, 2012).................................35

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
    131 S. Ct. 2188 (2011)..................................................................................24

*Bradford v. Chase Nat'l Bank of City of N.Y.*,
    24 F. Supp. 28 (S.D.N.Y. 1938), *aff'd sub nom. Berger v. Chase Nat'l Bank of City of
    N.Y.*, 105 F.2d 1001 (2d Cir. 1939), *aff'd* 309 U.S. 632 (1940) .............................35

*Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003).................................................43

*Butner v. United States*,
    440 U.S. 48 (1979)........................................................................................20

*Cablevision Sys. Corp. v. FCC*,
    570 F.3d 83 (2d Cir. 2009) ...........................................................................43

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.*,
    No. 11 Civ. 3283, 2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011) ............................25

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989)........................................................................................18

*Chamber of Commerce v. Whiting*,
    131 S. Ct. 1968 (2011)..................................................................................18

*Clark v. Martinez*,
    543 U.S. 371 (2005)......................................................................................41

*DiLaura v. Power Auth. of N.Y.*,
    982 F.2d 73 (2d Cir. 1992) ...........................................................................20

*E. Enters. v. Apfel*,
    524 U.S. 498 (1998)................................................................................43

*Ellis v. United States*,
    206 U.S. 246 (1907)................................................................................24

*Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd. ("Asia Pulp")*,
    609 F.3d 111 (2d Cir. 2010) .............................................................19, 20, 21, 26

*Fid. & Deposit Co. of Md. v. N.Y. Hous. Auth.*,
    241 F.2d 142 (2d Cir. 1957) ....................................................................21

*Flores-Figueroa v. United States*,
    556 U.S. 646 (2009)................................................................................24

*Ford v. Uniroyal Pension Plan*,
    154 F.3d 613 (6th Cir. 1998) ...................................................................20

*Haig v. Agee*,
    453 U.S. 280 (1981)..................................................................................7

*Hausler v. JPMorgan Chase Bank N.A.*,
    740 F. Supp. 2d 525 (S.D.N.Y. 2010) .................................................27-32

*Hausler v. JPMorgan Chase Bank, N.A.*,
    No. 09-10289, 2012 WL 601034 (S.D.N.Y. Feb. 22, 2012) ....................27

*Haw. Hous. Auth. v. Midkiff*,
    467 U.S. 229 (1984)................................................................................41

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986)..................................................................................7

*Kelo v. City of New London*,
    545 U.S. 469 (2005)..........................................................................41, 42

*Koehler v. Bank of Bermuda Ltd.*,
    911 N.E.2d 825 (N.Y. 2009)....................................................................38

*Kurns v. R.R. Friction Prods. Corp.*,
    132 S. Ct. 1261 (2012)............................................................................18

*Levin v. Bank of N.Y.*,
    No. 09 cv 5900, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) .............27, 34

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)..........................................................................41, 44

*Loretto v. Telprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982)...................................................................................................43

*Lucas v. S.C. Coastal Council*,
   505 U.S. 1003 (1992).................................................................................................42

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*,
   556 U.S. 366 (2009)...................................................................................................27

*Mo. Pac. Ry. Co. v. Nebraska*,
   164 U.S. 403 (1896)...................................................................................................42

*Morrison v. National Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010)....................................................................................36, 37, 38

*Nixon v. United States*,
   506 U.S. 224 (1993).....................................................................................................8

*NML Capital, Ltd. v. Banco Central de la Republica Argentina*,
   652 F.3d 172 (2d Cir. 2011) ......................................................................................34

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   631 F.3d 29 (2d Cir. 2010) ........................................................................................37

*Oetjen v. Cent. Leather Co.*,
   246 U.S. 297 (1918).....................................................................................................8

*Pyett v. Pa. Bldg. Co.*,
   498 F.3d 88 (2d Cir. 2007), *rev'd on other grounds*, 566 U.S. 247 (2009).............................25

*Reebok Int'l Ltd. v. McLaughlin*,
   49 F.3d 1387 (9th Cir. 1995) .....................................................................................39

*Rubin v. Islamic Republic of Iran*,
   810 F. Supp. 2d 402 (D. Mass. 2011).........................................................................25

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974).....................................................................................................3

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005).....................................................................................8

*Shaheen Sports, Inc. v. Asia Ins. Co.*,
   No. 98 cv 5951, 2012 WL 919664 (S.D.N.Y. Mar. 14, 2012) ..................................39

*Shapiro v. McNeill*,
   699 N.E.2d 407 (N.Y. 1998)......................................................................................24

*Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.*,
 585 F.3d 58 (2d Cir. 2009) ........................................................................25, 30

*Smith v. Fed. Reserve Bank of N.Y.*,
 346 F.3d 264 (2d Cir. 2003) ...............................................................................27

*Stop The Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,
 130 S. Ct. 2592 (2010)........................................................................................20

*United States v. Causby*,
 328 U.S. 256 (1946)............................................................................................43

*United States v. Craft*,
 535 U.S. 274 (2002)............................................................................................20

*United States v. Rodgers*,
 461 U.S. 677 (1983)............................................................................................24

*United States v. Smith*, 499 U.S. 160, 163-64 (1991)................................................43

*Walters v. Indus. & Commercial Bank of China, Ltd.*,
 651 F.3d 280 (2d Cir. 2011) ...............................................................................38

*Walters v. People's Republic of China*,
 672 F. Supp. 2d 573 (S.D.N.Y. 2009) ................................................................38

*Wasserman Media Group, LLC v. Bender*,
 No. 10 Civ. 8783, 2012 WL 1506181 (S.D.N.Y. Apr. 26, 2012)........................16

*Webb's Fabulous Pharms., Inc. v. Beckwith*,
 449 U.S. 155 (1980)............................................................................................42

*Whiteman v. Dorotheum GMBH & Co.*,
 431 F.3d 57 (2d. Cir. 2005) ..................................................................................9

*Zarmach Oil Serv. v. U.S. Dep't of Treasury*,
 750 F. Supp. 2d 150 (D.D.C. 2010)....................................................................25

*Zherka v. City of New York*,
 459 F. App'x 10 (2d Cir. 2012) ..........................................................................36

## CONSTITUTION                                                                          Page

U.S. CONST. art. I, § 8, cl. 3 .......................................................................................7

U.S. CONST. art. II, § 2, cl.2 .......................................................................................7

U.S. CONST. art. II, § 3 ...............................................................................................7

U.S. CONST. amend. V ...........................................................................................................41

**STATUTES, REGULATIONS, AND RULES**       **Page**

28 U.S.C. § 1605 ...........................................................................................................17, 40

28 U.S.C. § 1605A .........................................................................................................40

28 U.S.C. § 1609 ...........................................................................................................35

28 U.S.C. § 1610 ...........................................................................................................27, 40

28 U.S.C. § 1610 Note .............................................................................................*passim*

50 U.S.C. § 1701, *et seq.* ............................................................................................22

CPLR § 5225 ................................................................................................................34

Exec. Order No. 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012) .....................................*passim*

FED. R. CIV. P. 56(a) ....................................................................................................18

The Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA") (P.L. 106-
    386) § 2002(b) .......................................................................................................32

UCC § 8-505 ...............................................................................................................22, 41, 42

**CONGRESSIONAL RECORD**       **Page**

148 CONG. REC. H8740 (daily ed. Nov. 14, 2002) ...............................................28, 31

148 CONG. REC. H8808 (daily ed. Nov. 14, 2002) ...............................................31

148 CONG. REC. S11524-30 (daily ed. Nov. 19, 2002) ...................................28, 29, 37

148 CONG. REC. S5503-13 (daily ed. June 13, 2002) ........................................33

**OTHER COURT DOCUMENTS**

Brief for the United States as Amicus Curiae, *Bank Melli Iran New York Representative
    Office v. Weinstein*, No. 10-947, 2012 WL 1883085 (U.S. May 24, 2012) ...........40

Brief for the United States as Amicus Curiae in Support of the Appellees, *Rubin v.
    Islamic Republic of Iran*, No. 11-2144 (1st Cir. June 8, 2012) ...................23, 26, 27, 29

*E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*,
    No. 12-mc-00120 (S.D.N.Y. June 1, 2012) .........................................................39

Statement of Interest of United States of America, *Rux v. ABN Amro Bank N.V.*,
No. 08-cv-6588, at 9-10 (S.D.N.Y. Nov. 21, 2008) ...............................................23

Statement of Interest of United States of America in Response to Petitioners' Motion for
Immediate Turnover of Funds, *Rux v. ABN Amro Bank N.V.*, No. 08-cv-6588
(S.D.N.Y. Jan. 12, 2009) ..................................................................................23

## OTHER AUTHORITIES

CARL S. BJERRE & SANDRA M. ROCKS, ABCS OF THE UCC, ARTICLE 8: INVESTMENT
SECURITIES (Amelia H. Boss, ed., American Bar Association 2004).........................3

RESTATEMENT (SECOND) OF JUDGMENTS § 29 (1982)...............................................36

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 441(l)(a)
(1987)...........................................................................................................39

Thomas W. Merrill, *The Common Law Powers of Federal Courts*, 52 U. CHI. L. REV. 1
(1985)...........................................................................................................20

## INTERNATIONAL AUTHORITIES

Council Implementing Regulation (EU) No. 54/2012 of 23 January 2012 ......................5

Council Regulation (EU) No. 267/2012 of 23 March 2012 ...........................................1, 5, 11, 12

Council Regulation (EU) No. 961/2010 of 25 October 2010 .........................................5

CONFIDENTIAL

## INTRODUCTION

Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion" or "Summ. J. Mem.") should be denied outright because Plaintiffs' arguments in support of turnover under Section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA") are wrong as a matter of law. Bank Markazi's intangible right to payment from Clearstream in Luxembourg is not the type of property interest that would allow for turnover under TRIA from the restrained assets in Clearstream's omnibus and cash accounts at Citibank, N.A. ("Citibank") in New York (the "Restrained Assets").

While numerous grounds exist upon which this Court could deny Plaintiffs' Motion, the threshold question of justiciability is paramount in this case. As discussed in Clearstream's Reply Memorandum of Law in Support of Its Renewed Motion to Vacate Restraints ("Clearstream's Reply"), the landscape of this litigation changed fundamentally when earlier this year the European Union and the United States implemented parallel economic sanctions regimes blocking Iranian property and interests in property.

, and Clearstream froze the corresponding assets held in                accounts at Clearstream in Luxembourg pursuant to Council Regulation (EU) No. 267/2012 of March 23, 2012 (the "EU Regulation").[1]  Turnover of the Restrained Assets in New York necessarily would require Clearstream to make a corresponding debit to the

---

[1] *See* Exec. Order No. 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012) ("EO 13599") (Clearstream Exh. 22) and Council Regulation (EU) No. 267/2012 of March 23, 2012 (the "EU Regulation") (Clearstream Exh. 23J);

Clearstream already addressed most of the arguments in Plaintiffs' Motion in Clearstream's Reply. Clearstream hereby reiterates, incorporates by reference, and supplements in this Opposition the arguments Clearstream made in its Reply, excluding the factual assumptions Clearstream made for purposes of its Renewed Motion to Vacate. Because Plaintiffs essentially have reproduced in this Motion the same arguments they already raised in opposition to Clearstream's Renewed Motion to Vacate, Clearstream cites herein to its Compendium of Exhibits submitted with its Renewed Motion to Vacate and corresponding Reply, and submits a third volume of new exhibits.

reciprocal frozen assets in Luxembourg, which would contravene the EU Regulation freezing those assets. Thus, Plaintiffs' request for immediate turnover places the parallel EU and U.S. blocking regimes in competition with one another, frustrating United States foreign policy to coordinate with the EU on an effective international policy toward Iran, and rendering this case non-justiciable.

Moreover, potentially dispositive issues in this case are pending in the Second Circuit in the *Hausler* and *Calderon* appeals. Indeed, Plaintiffs are seeking leave to file an *amicus* brief in the *Calderon* appeal, and the United States has received an extension of time in both appeals within which to file a Statement of Interest if the necessary governmental approval is obtained.[2] This Court would benefit from the Second Circuit's potentially dispositive rulings in these important cases and, therefore, should not consider Plaintiffs' Motion at this time.

In any event, Plaintiffs' Motion is procedurally improper because it undercuts Judge Jones's Stay Order of October 14, 2010, and would require this Court to rule on the merits of turnover before it rules on the pending questions of personal and subject matter jurisdiction raised by Clearstream, UBAE, and Bank Markazi.[3]

## ARGUMENT

## I.    TURNOVER RAISES A NON-JUSTICIABLE POLITICAL QUESTION

Plaintiffs' Motion for turnover under Section 201 of TRIA in light of EO 13599 (Summ. J. Mem. at 2) is fundamentally misconceived and ignores the interplay between the U.S. and EU

---

[2] Motion for Leave to File Amicus Brief, *Calderon-Cardona v. JPMorgan Chase Bank*, No. 12-75 (2d Cir. May 22, 2012), ECF No. 100 (Clearstream Exh. 39); Order, *Calderon-Cardona v. JPMorgan Chase Bank*, No. 12-75 (2d Cir. May 22, 2012), ECF No. 72 (Clearstream Exh. 40); Order, *Estate of Robert Otis Fuller v. Banco Santander S.A.*, Nos. 12-1264, 12-1272 (2d Cir. May 23, 2012), ECF No. 523 (Clearstream Exh. 41).

[3] A copy of the Stay Order can be found at Clearstream Exh. 42. The issue of personal jurisdiction over Clearstream already has been briefed by order of Judge Jones. *See* Letter Brief from L. Vogel to the Hon. B.S. Jones, Aug. 14, 2009, ECF No. 178, and Letter Brief from F. Panopoulos to the Hon. B.S. Jones, Sept. 18, 2009, ECF No. 181; *see also* Order, July 13, 2009, ECF No. 173 (endorsing proposed order in letter submitted by the parties which directed, *inter alia*, that Plaintiffs file a letter brief addressing Clearstream's argument that the Court lacks personal jurisdiction over it, and Clearstream file a letter brief in reply).

CONFIDENTIAL

blocking regimes that apply, respectively, to the Restrained Assets and the reciprocal assets frozen at Clearstream in Luxembourg.  A turnover order would raise sensitive foreign policy questions about the proper application of the EU and U.S. blocking measures in this case that may only be addressed by the United States and its European allies, particularly at this important time in U.S. and European foreign policy toward Iran.  Thus, Plaintiffs' request for immediate turnover under EO 13599 and TRIA presents a non-justiciable political question that the Court lacks constitutional authority to adjudicate.  *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974) (stating that the "case or controversy" requirement of Art. III embodies the political question doctrine, the presence of which "suffices to prevent the power of the federal judiciary from being invoked").

A.      **Assets Corresponding To The Restrained Assets At Citibank Are Frozen At Clearstream In Luxembourg**

As a general matter, when Clearstream receives securities into its Omnibus Account or payment into its cash account at Citibank, Clearstream makes corresponding adjustments to the relevant customer accounts it holds in Luxembourg.[4]  When the security entitlements and cash in Clearstream's omnibus and cash accounts at Citibank were judicially restrained in June 2008, Clearstream

in Luxembourg, consistent with standard practice between financial intermediaries in securities transactions.  *See* Third Legal Memorandum by Arendt & Medernach ¶ 62 (May 16, 2012) ("Arendt III")

---

[4] *See* June 27, 2008 Hr'g Tr. at 17:25-18:20 (Clearstream Exh. 7) (discussing settlement of a securities transaction and describing the crediting and debiting of securities accounts and payments); CARL S. BJERRE & SANDRA M. ROCKS, ABCS OF THE UCC, ARTICLE 8: INVESTMENT SECURITIES 40-41 (Amelia H. Boss, ed., American Bar Association 2004) (Clearstream Exh. 13) (discussing and diagramming a "typical acquisition of a security entitlement (together with the corresponding liquidation by another investor)").

CONFIDENTIAL

(Clearstream Exh. 23) ("The opening by Clearstream of          accounts corresponding to the assets restrained at Citibank is necessary to account for the restrained assets.").[5]

Plaintiffs' judicial restraint of assets at the upper-tier intermediary level at Citibank created two fundamental problems.  *First*, Clearstream was left and remains at risk that turnover in the United States of assets held in its cash account at Citibank would not be recognized in Luxembourg, thereby leaving Clearstream to make up an almost          shortfall that it may be obligated under Luxembourg law to pay out to          .  *Second*, as discussed immediately below, turnover of the Restrained Assets in New York would require Clearstream to debit the corresponding          accounts at Clearstream in Luxembourg in contravention of the EU Regulation pursuant to which such accounts are now frozen.

B.   **The Restrained Assets At Citibank In New York And The Frozen Assets At Clearstream In Luxembourg Are Subject To Parallel Blocking Regimes**

On February 5, 2012, President Obama issued EO 13599, which provides in relevant part that:

> All property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

EO 13599(1)(a).

Plaintiffs disregard the parallel EU sanctions regime pursuant to which the assets directly corresponding to the Restrained Assets are now frozen at Clearstream in Luxembourg under EU and Luxembourg law.  The EU has had a sanctions regime against Iran for a number of years in conjunction with international efforts to prevent that country from acquiring nuclear weapons

---

[5] June 27, 2008 Hr'g Tr. at 27:14-28:1 (Clearstream Exh. 7)          ); *id.* at 29:6-13          ).

CONFIDENTIAL

and engaging in terrorist acts.  Towards that end, on October 25, 2010, the EU issued Council Regulation (EU) No. 961/2010.  Article 16(1)-(3) of the regulation froze "[a]ll funds and economic resources belonging to, owned, held or controlled by the persons, entities and bodies listed in" Annexes VII and VIII to the regulation, and "[n]o funds or economic resources shall be made available, directly or indirectly, to or for the benefit of the natural or legal persons, entities or bodies listed in Annexes VII and VIII."  Arendt III ¶ 51 & Exh. H thereto.

On January 24, 2012, two weeks *prior* to the February 6, 2012 effective date of EO 13599, the EU froze all financial assets of the Central Bank of Iran by passing Council Implementing Regulation (EU) No. 54/2012 of 23 January 2012, Article 1.1 of which added Bank Markazi to the list of persons in Annex VIII to Council Regulation (EU) No. 961/2010. Arendt III ¶ 51 & Exh. I thereto.  The EU subsequently consolidated its previous regulations with respect to Iran with Council Regulation (EU) No. 267/2012 of 23 March 2012, which maintained the freeze on the financial assets of the Central Bank of Iran ("the EU Regulation"). Arendt III ¶¶ 51-52 & Exh. J thereto.  Specifically, Article 23(2) of the EU Regulation freezes "[a]ll funds and economic resources belonging to, owned, held or controlled by" the Central Bank of Iran.  Article 1(k) of the EU Regulation defines "freezing of funds" as "preventing any move, transfer, alteration, use of, access to, or dealing with funds in any way that would result in any change in their volume, amount, location, ownership, possession, character, destination or other change that would enable the funds to be used, including portfolio management."  Arendt III ¶¶ 55-57 & Exh. J thereto; *see also id.* ¶ 60 (describing FATF Recommendations, published in February 2012 indicating that the freezing measures also apply to funds that are "indirectly (i.e., beneficially) owned" by designated parties).

Case 1:10-cv-04518-KBF   Document 261   Filed 07/11/12   Page 15 of 55

CONFIDENTIAL

Consequently, the EU Regulation freezes the accounts at Clearstream that contain assets corresponding to the Restrained Assets blocked at Citibank at the upper tier of the intermediary chain. Arendt III ¶¶ 61-63. Plaintiffs' request for turnover causes these two blocking regimes to compete with each other in this case because any debit to the Restrained Assets in Clearstream's accounts at Citibank, by virtue of turnover or otherwise, would require a corresponding debit in an equal amount to the frozen accounts in Luxembourg. Arendt III ¶ 64. Such a debit would constitute a violation of the EU Regulation as it would constitute a change in the "volume, amount, location, ownership, possession, character, [or] destination" of the frozen assets in Luxembourg. *See id.*

C.    **Plaintiffs' Request For Turnover Raises A Non-Justiciable Political Question**

The U.S. Supreme Court has outlined six independently dispositive factors to determine the existence of a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). Applying these factors here establishes that disposition of the Restrained Assets, through turnover or otherwise, raises a non-justiciable political question because the Court necessarily would be stepping into and deciding between the U.S. and EU blocking regimes, thereby affecting delicate questions of foreign affairs between the United

States and its European allies, particularly at a time of ongoing foreign policy discussions regarding Iran.[6]

1.    There Is A Textually Demonstrable Constitutional Commitment To The Executive

"[T]he dominant consideration in any political question inquiry is whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department." *767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia*, 218 F.3d 152, 160 (2d Cir. 2000) (internal quotation marks omitted); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.").

Here, Plaintiffs' request for turnover implicates both the U.S. and EU blocking regimes such that important foreign affairs questions arise—just as critical U.S. and European diplomatic initiatives toward Iran are unfolding—that are constitutionally committed to the Executive branch. *See* U.S. CONST. art. I, § 8, cl. 3; art. II, § 2, cl.2; art. II, § 3.  It is well settled that matters which strongly implicate foreign relations are beyond the purview of the courts. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("[M]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589

---

[6] *See* Philip Pullella, *Rome Meeting Analyses Iran Oil Embargo*, REUTERS, Dec. 20, 2011 (Clearstream Exh. 24) (reporting on meeting held in Rome between the United States, European Union, and other "liked-minded nations" to "discuss further sanctions against Iran"); U.S. Department of State, Transcript of Daily Press Briefing, Jan. 4, 2012 (Clearstream Exh. 25) ("QUESTION: one more Iran question if you don't mind?  The EU has, in principle, agreed to impose some sanctions to ban the oil imports from Iran.  Do you have anything to say about that? [ANSWER]: Obviously, very good news and the result of lots of consultations among us, between the U.S. and EU countries, within the EU, very, very welcome . . . these are the kinds of steps that we would like to see not just from our close allies and partners in places like Europe . . . .").

CONFIDENTIAL

(1952))); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative— 'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.").

2.   There Is A Lack Of Judicially Manageable Standards

The concept of a lack of judicially discoverable and manageable standards "is not completely separate from" the concept of a textual commitment to the coordinate branches. *Nixon v. United States*, 506 U.S. 224, 228 (1993). Here there is a complete lack of any statutory, administrative or case law guidance to help the Court resolve the issues presented by the parallel EU and U.S. blocking regimes. The issue of parallel blocking regimes is a recent foreign policy phenomenon resulting from the rapid proliferation of coordinated international sanctions regimes impacting the global financial markets, and domestic and international legal systems have yet to develop standards by which to apply such regimes.

3.   The Remaining *Baker* Factors Weigh Strongly Against Adjudication

The remaining *Baker* factors also favor a determination that turnover in this case presents a non-justiciable political question in light of the parallel EU and U.S. blocking measures. For example, it is impossible for the Court to order turnover in this case without deciding in favor of application of the U.S. blocking regime over that of the EU. This is because turnover of the assets from Clearstream's accounts at Citibank in New York would require Clearstream to make an impermissible corresponding debit to the frozen assets held in                accounts in Luxembourg. This is precisely the kind of initial policy determination contemplated by the third *Baker* factor that clearly is for non-judicial discretion. *See Schneider v. Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005) (concluding that the third *Baker* factor counseled against jurisdiction where the court would be forced to pass judgment on a foreign policy-based decision of the executive).

Similarly, it would be impossible for the Court to resolve the question without hampering the Executive's ability to negotiate and coordinate effectively with U.S. allies. *See Whiteman v. Dorotheum GMBH & Co.*, 431 F.3d 57, 72 (2d. Cir. 2005) (finding that an independent judicial resolution of claims that would interfere with the Executive's international negotiations and executive agreement regarding the settlement fund for claims against Austria arising out of World War II, would be impossible "without expressing lack of the respect due the Executive branch" and, therefore, dismissing such claims based on the political question doctrine). Given the ongoing and highly sensitive foreign affairs discussions between the United States and its allies regarding Iran, there also is an unusual need for unquestioning adherence to whatever political decisions are made between the governments regarding the competing blocking regimes in place to "tighten[] the noose on Iran economically."[7]

Lastly, the potential embarrassment that adjudication of the matter by the Court would trigger if the EU blocking regime were set aside or vitiated is more than tangible. *See Baker*, 369 U.S. at 211 ("Not only does resolution of [foreign relations] issues frequently turn on standards that defy judicial application . . . but *many such questions uniquely demand single-voiced statement of the Government's views*." (emphasis added)).

### D.   Plaintiffs' Arguments That A Turnover Order Would Not Raise A Political Question Are Without Merit

Plaintiffs contend that an order for turnover of the Restrained Assets would not raise a political question. *See* Plaintiffs' Sur-Reply Memorandum of Law (June 8, 2012) ("Sur-Reply") at 2-8. Plaintiffs' arguments are without merit.

---

[7] U.S. Department of State, Transcript of Daily Press Briefing, Jan. 4, 2012 (Clearstream Exh. 25).

CONFIDENTIAL

1.   Plaintiffs Confuse The Property Interests Implicated By The Judicial Restraints And The Property Interests Implicated By The U.S. And EU Blocking Measures

Plaintiffs argue that Clearstream's political question argument "contradicts Clearstream's consistent prior position that its potential debt to Markazi in Luxembourg is *not* legally affected by the restraints imposed upon the Blocked Assets in New York." Sur-Reply at 3. Plaintiffs confuse the property interests implicated by the judicial restraints and the property interests implicated by the U.S. and EU blocking measures.

Because EO 13599 and the EU Regulation purport to encompass remote, intangible and even non-legal property interests of Iran, the Restrained Assets and the corresponding assets in the              accounts at Clearstream in Luxembourg have been blocked or frozen under the respective blocking regimes. In other words, the universe of Iran's property interests that EO 13599 and the EU Regulation purport to cover is larger than the limited universe of Iran's property interests that are subject to restraint and turnover under New York law.

Turnover of the Restrained Assets at Citibank would require Clearstream to debit the corresponding assets in the              accounts in Luxembourg, not because Iran's property interest exists in the Restrained Assets, as Plaintiffs erroneously suggest, but because the assets at different tiers of the intermediary structure necessarily correspond to one other. There is nothing inconsistent between Clearstream's position in this regard and Clearstream's arguments that the security entitlements in Clearstream's Omnibus Account and the funds in Clearstream's cash account at Citibank constitute property interests of Clearstream that are not subject to restraint and turnover in New York in satisfaction of a judgment against Iran. Under New York (and Luxembourg) law, Bank Markazi's property interest does not reach the assets held in Clearstream's accounts at Citibank. *See* Clearstream's Reply at 37-78.

CONFIDENTIAL

Moreover, Plaintiffs err in assuming that Clearstream's risk of double liability is extinguished by the required debiting of the          accounts that would occur if this Court orders turnover of the Restrained Assets.  Sur-Reply at 3 n.2.  The two are mutually exclusive.  As discussed in Clearstream's Reply, when cash is credited to Bank Markazi's account in Luxembourg there is no funds transfer because the dollars that back up those credits are located in Clearstream's cash account at Citibank, which serves as a correspondent dollar account for Clearstream to use with respect to all of its customers' dollar transactions.   If funds in Clearstream's cash account at Citibank are turned over to Plaintiffs, Clearstream would bear the risk that it would have to use its own funds to pay Bank Markazi in Luxembourg.  The debits to the          accounts would not relieve Clearstream of its obligation to pay its customers, but would implicate the EU Regulation and, hence, the political question issue

The critical point Clearstream makes that seems to be lost on Plaintiffs is that because the assets in the          accounts are frozen pursuant to the EU Regulation, they are technically at the disposal of the EU (presumably in consultation with the United States), and debiting them as a result of turnover in the United States implicates the EU's interests.   This conundrum is precisely the premise for the political question argument at issue.

2.       Article 24 Of Council Regulation (EU) 267/2012 Does Not Apply

Plaintiffs' argument that the EU Regulation expressly permits Clearstream to debit the frozen accounts in Luxembourg to satisfy a pre-existing judicial lien is incorrect as a matter of law, because only a Luxembourg court could issue a judicial lien as referenced in Article 24 of the EU Regulation and no such lien has been issued.  *See* Fourth Legal Memorandum by Arendt & Medernach ("Arendt IV") (Clearstream Exh. 43) at 1.[8]

---

[8] Sur-Reply at 4.

CONFIDENTIAL

Even assuming for the sake of argument that Article 24 applied, Article 24 states that "competent authorities *may* authorize the release of certain frozen funds." (Emphasis added). With respect to assets frozen in Luxembourg, the Luxembourg Ministry of Finance is the only "competent authority" that may authorize such a release. Arendt IV at 1. Further, the party holding the lien, in this case the Plaintiffs, must request the release from the Ministry of Finance, and even then the Ministry of Finance has discretion to grant or deny the release. Arendt IV at 1. Indeed, the fact that the release of frozen funds must be sought from the Luxembourg Ministry of Finance only *supports* Clearstream's position that turnover would raise a serious non-justiciable political question.

Additionally, Article 24 sets out five conditions which must be met before the Ministry of Finance may consider granting a release, the first four of which are cumulative and apply here. Arendt IV at 1-2. Therefore, the mere fact that a party holds a judicial lien does not mean that such party is entitled to the frozen funds.

### 3.     Plaintiffs Mischaracterize The Political Question As A Conflict Of Law

Plaintiffs mischaracterize Clearstream's political question argument as a question of statutory interpretation and cite case law for the proposition that this Court has the authority to interpret the statutes at issue. Sur-Reply at 4-6. The political question arises, however, not from any conflict of laws (as Plaintiffs suggest), but from the prospect of a turnover order of assets in Clearstream's cash account at Citibank blocked pursuant to EO 13599 in the United States, for which corresponding assets of equal value that ordinarily would be credited to Clearstream's customers' accounts are instead frozen in          accounts in Luxembourg pursuant to the parallel EU Regulation. These frozen assets are now at the disposal of the EU and, as Clearstream discussed in its Reply, the United States and the EU have worked in close cooperation to implement the parallel blocking regimes implicated in this case. *See, e.g.*, Philip

Pullella, *Rome Meeting Analyses Iran Oil Embargo*, REUTERS, Dec. 20, 2011 (Clearstream Exh. 24).  A U.S. court order for turnover of the Restrained Assets would undercut that cooperation by impacting the frozen Iranian assets in the EU through unilateral U.S. judicial intervention.

Plaintiffs further mischaracterize Clearstream's political question argument by addressing the six *Baker* factors with respect to Section 201 of TRIA rather than the U.S. and EU blocking regimes.  Sur-Reply 7-8.  Plaintiffs attempt to misdirect the Court with respect to the first *Baker* factor by arguing that turnover under TRIA was committed to the Judiciary.  The first *Baker* factor, however, concerns *constitutional* commitment *not* legislative competence.  Here, the Executive's constitutionally committed power over foreign affairs is implicated by the interplay between the parallel U.S. and EU blocking regimes at a time of heightened international concerns over Iranian foreign policy.  The policy objectives of the United States and the EU are aligned with respect to the blocking of Iranian assets.  These parallel blocking regimes cover reciprocal assets held in the United States and Luxembourg at different tiers of the intermediary structure.  Therefore, the disposition of these blocked or frozen assets is a question that can be answered by only the U.S. Executive branch and its counterparties in the EU.  The second and third *Baker* factors are therefore met because there is a "lack of judicially discoverable and manageable standards for resolving" the disposal of blocked assets under the parallel blocking regimes, and the Court cannot resolve the turnover issue without making the "initial policy determination" of deciding in favor of one blocking regime over the other.

Plaintiffs argue that the remaining *Baker* factors are not met because a turnover order would not contradict a prior decision by one of the political branches.  Sur-Reply at 8.  Again, Plaintiffs attempt to redirect the Court away from the relevant issues raised by the parallel blocking regimes towards an analysis of Section 201 of TRIA.  The prior decision taken by the

Executive branch to work with the EU to create blocking regimes to freeze all Iranian assets and interests in assets *would* be undermined by an order of turnover that ignored the interplay between these two blocking regimes.

## II.   SUMMARY JUDGMENT IS IMPROPER AT THIS TIME

Plaintiffs' Motion is also procedurally improper and the Court should refrain from considering it on the merits at this time.   In particular, Plaintiffs' Motion raises the same substantive issues already at stake between the parties and briefed for the Court.

Plaintiffs insist that they have a right to reframe the pending dispute from one concerning a motion to vacate restraints to one focused on summary judgment for turnover.[9]   This is improper because Plaintiffs may not back their way into an affirmative judgment on turnover before resolving the critical threshold and jurisdictional issues already pending before the Court. Instead of deciding Plaintiffs' Motion, this Court should resolve these same substantive issues within the proper context of Clearstream's Renewed Motion To Vacate.

Notably, Plaintiffs never obtained a definitive ruling from the Court as to whether they had a basis to file a summary judgment motion at this time.   The Court declined to arrive at any conclusions on this point during the March 1, 2012 hearing: "I'm not going to decide this now . . . . I have not probed this [issue] in any great detail." Hr'g Tr. at 7:21, 12:11.   And the Court specifically contemplated that such a motion may be procedurally improper; it could

---

[9] See letter from Plaintiffs' Counsel to the Court dated February 14, 2012, at 2, ECF No. 194 (stating that the blocking of the Restrained Assets pursuant to EO 13599 "moots the motion of Defendant [Clearstream] to lift the restraints on those assets . . . . any issues raised in Clearstream's motion . . . are no longer threshold issues that would warrant delaying a final determination of whether the Plaintiffs are entitled to turnover of the assets to satisfy their judgments"); Mar. 1, 2012 Hr'g Tr. at 7:10-16 ("The subject matter jurisdiction issue no longer exists and essentially becomes an in rem action. Once the asset is blocked, under this statute, the judgment creditors are allowed to take that asset, whoever has it, it happens to be at Citibank, so it doesn't matter anymore whether Clearstream has it or UBAE has it or whether it's here or it's there . . . .").

prejudice the Defendants; and the Defendants should have the option of contesting the motion before responding to it on the merits:

> [Y]ou don't want to have to brief the response without knowing that you're subject to the Court's jurisdiction . . . . That's some prejudice. . . . Here's my ruling.   Let's have a motion schedule that doesn't slow down your [the Defendants'] motions [to vacate or to dismiss], allows [the Plaintiffs] to file their [summary judgment] motion, if you [the Defendants] want to come back after that, and we'll have you respond.  If, for some reason, the motion isn't what you think it is and it's creating some burden that you think you could make a case to me you shouldn't have to respond to it, I'll let you come back.

Mar. 1, 2012 Hr'g Tr. at 15:7-11, 25:25-26:6.

Clearstream challenges the procedural basis for Plaintiffs' summary judgment motion on the following grounds.  First, Plaintiffs' Motion contravenes Judge Jones's Stay Order dated October 14, 2010, which provides:  "Because the matters raised in the motion to vacate may be dispositive, Defendants' request for a stay of time to file its response to Plaintiff's turnover complaint pending a resolution of the motion to vacate is granted."  Order at 1, Oct. 14, 2010 (Clearstream Exh. 39); *see also* Oct. 31, 2011 Hr'g Tr. 36:21-48:12 (confirming the ongoing validity of the stay order).  Nothing has changed that warrants disregarding the stay.  Clearstream has not responded to the complaint; service, as well as personal and subject-matter jurisdiction issues remain unresolved; and the Court has yet to resolve the core issue that has been pending in this case since 2008 concerning the nature and reach of the underlying property interest at issue.  Plaintiffs erroneously assert that EO 13599, which became effective on February 6, 2012, somehow provides them with a right to contravene the Stay Order and the procedural rules otherwise in place under New York and federal law.  *See* Mar. 1, 2012 Hr'g Tr. at 6:5-8.  The Court should disregard Plaintiffs' false claims of urgency and rule on Clearstream's pending Renewed Motion To Vacate before effectively lifting the stay and moving directly to turnover.

Second, the appropriate time to consider Plaintiffs' Motion is *after* the Second Circuit rules on the same potentially dispositive issues in the *Hausler* and *Calderon* appeals. Those consolidated appeals raise the very same TRIA arguments Plaintiffs raise, and it would serve judicial efficiency if the Court had the benefit of the Second Circuit's ruling when deciding Plaintiffs' Motion.

Third, there are outstanding subject matter and personal jurisdiction issues that the Court would have to decide before reaching the merits of a turnover proceeding and/or ordering turnover, which may be unnecessary and/or moot depending on the Court's disposition of Clearstream's Motion To Vacate.

Plaintiffs' characterization of their turnover request as an "*in rem* proceeding" is disingenuous. Counsel for Plaintiffs asserted during the March hearing that upon filing their summary judgment motion "[t]he subject matter jurisdiction issue no longer exists and essentially [the dispute] becomes an *in rem* action." Hr'g Tr. dated Mar. 1, 2012, at 7:10-12. This is incorrect. Defendant-garnishees like Clearstream may only be ordered to release property after they have been subjected to the jurisdiction of the Court. *Wasserman Media Group, LLC v. Bender*, No. 10 Civ. 8783, 2012 WL 1506181 (S.D.N.Y. Apr. 26, 2012) ("[For turnover under CPLR § 5225(b)], a separate proceeding needs to be brought in order to acquire personal jurisdiction over any non-party garnishees."). Similarly, deciding the merits of Plaintiffs' turnover request before addressing Bank Markazi's threshold subject-matter jurisdiction arguments under the FSIA would be procedurally improper.

In the event the Court disagrees, Clearstream responds to the merits of Plaintiffs' Motion below. But, this response does not constitute a waiver of any of Clearstream's objections to

personal or subject-matter jurisdiction, and Clearstream once again expressly preserves any and all such objections at this time.

**III.   SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THE RESTRAINED ASSETS ARE NOT SUBJECT TO TURNOVER UNDER TRIA AS A MATTER OF LAW**

Section 201(a) of TRIA provides in relevant part that:

> [I]n every case in which a person has obtained a judgment against a terrorist party. . . for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610 Note (2006).

Plaintiffs argue that they must establish four facts in order to prevail on their request for turnover under TRIA:  that "(1) they have obtained judgments for compensatory damages; (2) against a 'terrorist party'; (3) on a claim based upon an 'act of terrorism, or for which a terrorist party is not immune under' 28 U.S.C. § 1605(a)(7); and (4) the Blocked Assets are 'the blocked assets of' Iran or 'the blocked assets of any agency or instrumentality of' Iran."  Summ. J. Mem. at 7.  Plaintiffs, however, misinterpret several questions of law, which they present as questions of fact in their Motion.  For example, Plaintiffs erroneously claim that "EO 13599 blocks *any property* within the possession or control of *any person subject to the jurisdiction of the United States* regardless of the property's location."  Summ. J. Mem at 5 (emphasis in original); *see also* Plaintiffs' Consolidated Rule 56.1 Statement of Facts in Support of Their Motion for Partial Summary Judgment Against All Defendants  ("Plaintiffs' Rule 56.1 Statement") ¶ 21.  Similarly, Plaintiffs claim Bank Markazi has admitted to being the owner of the Restrained Assets.  Summ. J. Mem at 3; *see also* Plaintiffs' Rule 56.1 Statement ¶¶ 1, 12.   For the reasons stated below,

assuming this case is justiciable, the Restrained Assets are not subject to turnover under TRIA as a matter of law.

A.    **The Summary Judgment Standard**

The summary judgment standard is well-articulated: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Thus, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) ("The trial court must, in considering the motion, view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party" (internal quotes and citation omitted)). Plaintiffs fail to meet this standard.

B.    **TRIA Does Not Preempt The UCC**

Absent an express preemption by Congress, a federal law will only preempt state law to the extent the state law actually conflicts with the federal law or if Congress intends the federal law to occupy the field. *Kurns v. R.R. Friction Prods. Corp.*, 132 S. Ct. 1261, 1265-66 (2012); *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989). "[A] high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1985 (2011). Further, when a party seeks preemption of a state law in an area traditionally regulated by the States, that party "must overcome the presumption against finding preemption of state law." *ARC Am. Corp.*, 490 U.S. at 101. To overcome this presumption, the Supreme Court has stated that preemption must be "the clear and manifest purpose of Congress." *Id.* As shown below, no conflict exists between TRIA and state

18

law, nor have Plaintiffs established that preemption of state property law, an area traditionally regulated by states, was "the clear and manifest purpose of Congress."

1.    The Methodology For The Court's Preemption Analysis

The Second Circuit's decision in *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd. ("Asia Pulp")*, 609 F.3d 111 (2d Cir. 2010), sets forth the legal standard and the methodology for the Court's preemption analysis. In *Asia Pulp*, the Second Circuit considered a challenge by intermediary banks to garnishment of electronic funds transfers ("EFTs") under the Federal Debt Collection Procedures Act ("FDCPA"). *Id.* at 113, 116. The language of the statute provided for garnishment of "property in which the debtor has a substantial nonexempt interest." *Id.* at 116 (internal quotation marks and emphasis omitted). The statute defined "property" broadly to include any "present or future interest, whether legal or equitable . . . tangible or intangible, vested or contingent." *Id.* The court explained that "[a]lthough the FDCPA specifically defines the types of 'property' potentially subject to garnishment, the FDCPA does not identify who has a right or interest in that property." *Id.* The court further noted that "[t]here is no evidence, either from the statute's language or legislative history, that the FDCPA *creates* any interests or rights in property." *Id.* at 117 (emphasis in original). The court then noted the well-established rule that "[i]n the absence of a superseding federal statute or regulation, state law generally governs the nature of any interests in or rights to property that an entity may have." *Id.*

The Second Circuit went on to explain that where a statute "creates no property rights but merely attaches consequences, federally defined, to rights created under state law," courts conduct a two-step analysis:

> First, we look initially to state law to determine what rights the [judgment debtor] has in the property the [petitioner] seeks to reach. Second, we then look to federal law to determine whether the judgment debtor's state-delineated rights constitute

a 'substantial . . . interest' in property sufficient to trigger application of the
FDCPA.

*Id.* (internal quotation marks and citations omitted); *see also United States v. Craft*, 535 U.S.
274, 278 (2002) ("[W]e look initially to state law to determine what rights the taxpayer has in the
property the Government seeks to reach, then to federal law to determine whether the taxpayer's
state-delineated rights qualify as 'property' or 'rights to property' within the compass of the
federal tax lien legislation." (internal quotation marks omitted)).   After reviewing the applicable
state law—UCC Article 4-A in *Asia Pulp*—the Second Circuit affirmed the district court's
quashing of the garnishment writs at issue because under the UCC, the judgment debtors did not
have a "substantial interest" in the EFTs.   *Asia Pulp*, 609 F.3d at 121-22.

The rule that in the absence of a superseding federal statute or regulation, state law
determines the nature of interests in or rights to property is grounded in federalism and the
principle that property rights have traditionally been an area of state law.   *See, e.g., Stop The
Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 130 S. Ct. 2592, 2597 (2010)
("Generally speaking, state law defines property interests . . . ."); *Butner v. United States*, 440
U.S. 48, 55 (1979) ("Property interests are created and defined by state law."); *DiLaura v. Power
Auth. of N.Y.*, 982 F.2d 73, 80 (2d Cir. 1992) (agreeing that "the interests of federalism and
comity strongly support" dismissing a supplemental state law negligence claim because
considering the claim would "infringe the traditional jurisdiction of the States in the areas of
property law and tort liability"); *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir.
1998) ("Our review of Supreme Court precedent suggests a strong inclination to adopt state law
as the federal rule of decision when the federal statute is silent on a matter traditionally of state
concern.   This inclination [is] grounded in federalism . . . ."); Thomas W. Merrill, *The Common
Law Powers of Federal Courts*, 52 U. CHI. L. REV. 1, 18 n.74 (1985) (explaining that in the

absence of a relevant and legitimate federal rule "the federalism principle and the Rules of Decision Act compel the court to apply the state-law rule").

Like the statute at issue in *Asia Pulp*, neither TRIA, EO 13599, the Iranian Transaction Regulations ("ITR"), nor the International Emergency Economic Powers Act ("IEEPA")[10] creates or defines a property right or interest; these statutes and regulations identify only which property rights and interests are subject to blocking or prohibition, i.e., they "merely attach[] consequences, federally defined, to rights created under state law." *Asia Pulp*, 609 F.3d at 117; *see also Fid. & Deposit Co. of Md. v. N.Y. Hous. Auth.*, 241 F.2d 142, 144 (2d Cir. 1957) ("State law . . . creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed."). Therefore, the Court must follow the two-step process outlined in *Asia Pulp*: first, the Court must review the applicable N.Y. state law to determine what rights Bank Markazi has to the now-blocked Restrained Assets; second, the Court must look to the federal statute, TRIA, to determine whether Bank Markazi's property right is the kind of property right that triggers the statute, i.e., a property right that can be executed on because it constitutes "blocked assets of the terrorist party."

      2.    <u>Bank Markazi's Property Interest Is An Intangible Right To Payment</u>

Under Luxembourg law, Clearstream is the legal owner of the cash in Bank Markazi's account at Clearstream in Luxembourg, and Bank Markazi's property right is a claim against Clearstream for return of the cash in Bank Markazi's account at Clearstream. *See* First Legal Memorandum by Arendt & Medernach at 1 (Sept. 13, 2010) (Clearstream Exh. 1) ("Arendt I") ("[T]he custodian bank benefits from the use of the cash and becomes the owner of said cash, but remains subject to an obligation to return the received amount." (emphasis and internal quotation

---

[10] 50 U.S.C. §§ 1701-1707 (2006).

marks omitted)). Bank Markazi's property right with respect to the cash it is owed does not extend to the cash at Citibank. Arendt III ¶¶ 29-38 (stating that financial rights attached to securities for payment and distribution can only be asserted against the depository).

Correspondingly, under U.S. law, Bank Markazi's right with respect to cash is only the right to be paid by Clearstream (as its securities intermediary) once Clearstream has received a payment or distribution, which Plaintiffs recognize as an intangible property right. *See* UCC § 8-505; *see also* Plaintiffs' Opposition To Clearstream Banking S.A.'s Renewed Motion To Vacate ("Plaintiffs' Opp.") at 34. Similarly, Bank Markazi's interest in its security entitlements is an intangible property right comprised of the rights under UCC Article 8, as Plaintiffs also admit. *See, e.g.*, Plaintiffs' Opp. at 52; Plaintiffs' Memorandum of Law in Opposition to Clearstream Banking, S.A.'s Second and Third Supplemental Memoranda to Vacate Restraints at 25, Nov. 11, 2010 (referring to security entitlements as "intangible asset[s]"). Neither of these interests reaches Clearstream's accounts at Citibank for purposes of turnover and execution under New York law. As discussed in Clearstream's Reply, Bank Markazi does not have any rights to the funds in Clearstream's cash account at Citibank, or to Clearstream's security entitlements in its Omnibus Account at Citibank.[11] Accordingly, as discussed immediately below, Bank Markazi's intangible right to payment—whether under Luxembourg law or U.S. law—is not the kind of interest in blocked assets that is subject to turnover under TRIA.

3.   The Restrained Assets Are Not Assets "Of" Bank Markazi Under TRIA

Plaintiffs argue that the Restrained Assets are "of" Bank Markazi because Bank Markazi has claimed sole "beneficial ownership" of the assets. Summ. J. Mem. at 12. Bank Markazi's

---

[11] The relative rights of Bank Markazi and Clearstream to the cash and security entitlements in Clearstream's accounts at Citibank are discussed in Argument §§ IV and V of Clearstream's Reply, specifically at pages 40-45 and 60-62.

intangible right to payment, however, is not the type of property interest that allows for execution under TRIA.

Plaintiffs argue TRIA's plain language establishes that "once assets are blocked because a particular terrorist party holds a sufficient property interest in them to justify the blocking, TRIA empowers terror victims to execute upon those assets." Summ. J. Mem. at 13. Plaintiffs incorrectly interpret TRIA because the property interest that can be executed upon under TRIA is not coextensive with the property interest that can be blocked under EO 13599. EO 13599 purports to block any type of property interest, however attenuated that interest might be, while TRIA provides that the property must be "of" the terrorist party, i.e., owned by the terrorist party.

The U.S. government has repeatedly stated that ownership of the blocked assets is required for turnover under TRIA. *See* Brief for the United States as Amicus Curiae in Support of the Appellees, *Rubin v. Islamic Republic of Iran*, No. 11-2144, at 14 (1st Cir. June 8, 2012) (Clearstream Exh. 45) ("TRIA does not, as plaintiffs contend, permit them to attach the [property] if those assets are not owned by Iran."); Statement of Interest of United States of America, *Rux v. ABN Amro Bank N.V.*, No. 08-cv-6588, at 9-10 (S.D.N.Y. Nov. 21, 2008), ECF No. 132 ("*Rux*, U.S. Statement of Interest (Nov. 21, 2008)") (Clearstream Exh. 27) ("[T]he mere fact that assets have been blocked pursuant to the SSR . . . does not show that the assets at issue are *owned* by the Government of Sudan." (emphasis in original)); *see also* Statement of Interest of United States of America in Response to Petitioners' Motion for Immediate Turnover of Funds, *Rux v. ABN Amro Bank N.V.*, No. 08-cv-6588 (S.D.N.Y. Jan. 12, 2009), ECF No. 185 ("*Rux*, U.S. Statement of Interest (Jan. 12, 2009)") (Clearstream Exh. 26), at 9-10 ("The plain meaning of the phrase 'of that terrorist party' clearly requires ownership on the part of the

terrorist party; the statute's text does not support attachment of assets that do not belong to the 'terrorist party' . . . .").

Bank Markazi's intangible right to payment from Clearstream is far short of the ownership interest required by TRIA. Indeed, under Luxembourg (and New York) law Bank Markazi is not even the legal owner of the cash deposited in its account at Clearstream in Luxembourg. *See* Arendt I (Clearstream Exh. 1) at 2; *Shapiro v. McNeill*, 699 N.E.2d 407, 410 (N.Y. 1998) (noting that there is a "contractual debtor/creditor relationship between a bank and its depositor").

Interpreting the preposition "of" in the phrase "blocked assets of the terrorist party" to mean owning the blocked assets follows from the fundamental canon of statutory construction that words should be interpreted according to their ordinary, contemporary, common meaning. This interpretation of "of" finds its roots in a line of Supreme Court cases dating back more than a century. *E.g.*, *Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2196 (2011) ("'[I]nvention owned by the contractor' or 'invention belonging to the contractor' are natural readings of the phrase 'invention of the contractor.'"); *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009) (interpreting as a "matter of ordinary English grammar" the phrase "identification of another person" as meaning identification that "belonged to another person" (internal quotation marks omitted)); *Ellis v. United States*, 206 U.S. 246, 259 (1907) ("[T]he most natural meaning of 'of the United States' is 'belonging to the United States.'"); *see also United States v. Rodgers*, 461 U.S. 677, 692 (1983) (finding it critical that the relevant statute applied not only to property "of the delinquent" but also to property "*in which he has any right, title, or interest*" (emphasis in original)).

Significantly, as noted, the United States interprets the phrase "blocked assets of the terrorist party" in TRIA § 201(a) as meaning the terrorist party must own the assets. This Court also has reached the same conclusion. *See Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, No. 11 Civ. 3283, 2011 WL 6155987, at *9 (S.D.N.Y. Dec. 7, 2011) ("TRIA § 201(a) allows for attachment only of property that is 'of that terrorist party.' Because neither North Korea nor any of its agencies or instrumentalities owns the blocked EFTs, this property is not subject to attachment pursuant to TRIA.").[12] The District Court for the District of Columbia likewise has reached the same conclusion. *See Zarmach Oil Serv. v. U.S. Dep't of Treasury*, 750 F. Supp. 2d 150, 156 n.5 (D.D.C. 2010) ("While TRIA authorizes the attachment of certain blocked assets in which a terrorist party has an actual ownership interest ('blocked assets of that terrorist party,' TRIA § 201(a)), the Sudanese sanctions regime under IEEPA authorizes blocked assets in which the Government of Sudan has *any* interest, even if it falls short of a legally enforceable ownership interest."); *cf. Rubin v. Islamic Republic of Iran*, 810 F. Supp. 2d 402, 404 (D. Mass. 2011) (holding that "[t]here can be no serious dispute that the phrase 'of the defendant'" in the

---

[12] Plaintiffs criticize *Calderon* on a number of different grounds, Summ. J. Mem. at 25-30, none of which are valid. They attempt to distinguish *Calderon* on the basis that that court first found that North Korea did not qualify as a "terrorist party" under TRIA before it analyzed the word "of" within the statute. *Id.* at 25. In doing so, Plaintiffs confuse the concept of alternative holdings with *dicta*. *See Pyett v. Pa. Bldg. Co.*, 498 F.3d 88, 92-93 (2d Cir. 2007), *rev'd on other grounds*, 566 U.S. 247 (2009). Plaintiffs also assert that the *Calderon* facts stand in "stark contrast" to those before this Court because North Korea did not make any admissions of full ownership in *Calderon*. Summ. J. Mem. at 26. But neither has Bank Markazi. As noted in Clearstream's response to Plaintiffs' Statement of Material Facts, in none of the quotes referred to by Plaintiffs did Bank Markazi claim anything more than "beneficial ownership" to the blocked assets. Plaintiffs additionally maintain that the *Calderon* court focused too "myopically" on the word "of." Summ. J. Mem. at 27. This argument fails considering that the Second Circuit has interpreted a mere apostrophe as signifying ownership. *See Shipping Corp. of India, Ltd. v. Jaldi Overseas PTE Ltd.*, 585 F.3d 58, 66-67 (2d Cir. 2009). Plaintiffs insist that the *Calderon* decision enables terrorist states to remain immune from collection under TRIA. Summ. J. Mem. at 27-28. In fact, just the opposite is true. As set forth in Section III.B.4 of this Opposition, Plaintiffs'—not *Calderon*'s—interpretation of TRIA would benefit terrorist states at the expense of innocent third parties. Finally, Plaintiffs assert that *Calderon*'s interpretation of the word "of" must "crumble" when one considers that the same word has two different meanings within TRIA itself. Summ. J. Mem. at 28-29. Clearstream has already referred the Court to relevant Supreme Court precedent on point which addresses alternative definitions and the specific meaning of the word "of." *See* Clearstream's Reply at 27-28.

Massachusetts law allowing attachment by trustee process "means 'belonging to the defendant'").

Plaintiffs' argument conflates the language of TRIA and EO 13599.  TRIA requires the underlying blocked property interest that is subject to execution to be "the blocked assets *of that terrorist party*."  28 U.S.C. § 1610 Note (emphasis added).  In notable contrast, EO 13599 designates for blocking "*[a]ll property and interests in property* of any Iranian financial institution."  EO 13599 § 1(b) (emphasis added).  The gap between the statute and executive order relating to the property they each encompass is wide.  EO 13599 purports to cover any property interest, ranging from complete ownership to partial, beneficial, future, or non-legal interests in property, whereas TRIA more narrowly requires ownership of the property.

In *Rubin v. Islamic Republic of Iran*, the United States described this difference in the context of different blocking regulations: "TRIA does not employ the more expansive terms used not only in the 1979 blocking regulation, but in many other OFAC regulations as well.  Congress was presumably aware of the language used in such regulations, and there is no sound basis for amending the statute to supply the language that Congress omitted."  Brief for the United States as Amicus Curiae in Support of the Appellees, *Rubin v. Islamic Republic of Iran*, No. 11-2144, at 14-15 (1st Cir. June 8, 2012) (citations omitted) (Clearstream Exh. 45); *see also Asia Pulp*, 609 F.3d at 120 (discussing in the context of garnishment under the Fair Debt Collection Procedures Act that "[a]n interest in property is not necessarily synonymous with title to or ownership of property") (internal quotation marks omitted).

Plaintiffs also argue that TRIA's "notwithstanding" clause, together with TRIA's intent to make all assets available for execution, preempt state law.  Summ. J. Mem. 17-18.  Supreme Court and Second Circuit precedent establish that the "notwithstanding" clause does not preempt

all laws related to blocking or turnover. The U.S. Supreme Court noted in *Elahi* that "Congress placed the 'notwithstanding' clause in § 201(a) . . . to eliminate the effect of any Presidential waiver issued under 28 U.S.C. §1610(f) prior to the date of the TRIA's enactment." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009). The Second Circuit further explained that "the 'notwithstanding' clause applies only when some 'other provision of law' conflicts with TRIA." *Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003).

Plaintiffs rely heavily upon *Hausler v. JPMorgan Chase Bank N.A.*, 740 F. Supp. 2d 525 (S.D.N.Y. 2010) ("*Hausler I*"), *Hausler v. JPMorgan Chase Bank, N.A.*, No. 09-10289, 2012 WL 601034 (S.D.N.Y. Feb. 22, 2012) ("*Hausler II*") (collectively "*Hausler*") and *Levin v. Bank of N.Y.*, No. 09 cv 5900, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) to argue that TRIA preempts state law. Summ. J. Mem. at 14, 19-21. However, Clearstream demonstrated in its Reply that the *Hausler* and *Levin* decisions are flawed—a conclusion with which the United States agrees. *See* Clearstream's Reply at 24-31; *see also* Brief for the United States as Amicus Curiae in Support of the Appellees, *Rubin v. Islamic Republic of Iran*, No. 11-2144, at 14 (1st Cir. June 8, 2012) (Clearstream Exh. 45) ("For the reasons discussed here, the analysis in *Hausler* cannot be squared with TRIA's language, and [*Calderon-Cardona*] correctly rejected *Hausler*'s reasoning."); *id.* at 19 ("The interpretation offered by the *Hausler* court also misapprehends the way in which sanctions regimes function."). Moreover, TRIA's legislative history demonstrates that TRIA was not intended to preempt state law regarding ownership of the assets because to do so would benefit the terrorist parties.

4.    Congress Did Not Intend TRIA To Benefit Terrorist States At The
Expense Of Innocent Third-Parties

Plaintiffs argue that the legislative history and policy behind TRIA support turnover.
Summ. J. Mem. at 14-15, 19-20.  Contrary to Plaintiffs' contentions, TRIA did not intend to
provide an economic boon to terrorists by reducing their liabilities out of the assets of innocent
third-parties.

Congress expressed its intent that terrorists, and not innocent third-parties, should be held
responsible for their actions.  *See* 148 CONG. REC. S11527 (daily ed. Nov. 19, 2002) (remarks of
Sen. Harkin) (Clearstream Exh. 29) ("American victims of state-sponsored terrorism deserve and
want to be compensated for their losses *from those who perpetrated the attacks upon them* . . . ."
(emphasis added)).[13]  Congress thus set forth a statutory scheme to allow execution upon the
blocked assets of the terrorists who carried out the attacks, as well as their agencies and
instrumentalities, to punish and deter those terrorists.

> First, paying American victims of terrorism from the blocked and frozen assets of
> these rogue governments and their agents will really punish and impose a heavy
> cost on those aiding and abetting the terrorists.  This tougher U.S. policy will
> provide a new, powerful disincentive for any foreign government to continue
> sponsoring terrorist attacks on Americans, while also discouraging any regimes
> tempted to get into the ugly business of sponsoring future terrorist attacks.

---

[13] *See also* 148 CONG. REC. H8740 (daily ed. Nov. 14, 2002) (remarks of Rep. Bachus) (Clearstream Exh. 46)
("[T]he people that will be held responsible for these attacks that ought to be punished will be the terrorists, not the
American people."); 148 CONG. REC. S11526 (daily ed. Nov. 19, 2002) (remarks of Sen. Harkin)  (Clearstream Exh.
29) ("[T]his conference report . . . will make state sponsors of terrorism and their agents literally pay for the
dastardly attacks . . . ."); *id.* ("[M]ost Americans and their elected representatives understand the importance of
making the rogue governments who sponsor international terrorism pay literally, instead of blithely dunning the
American taxpayer to compensate the victims of their outrageous attacks . . . ."); *id.* ("The opponents of this
legislation apparently want American taxpayers to foot the bill for what could amount to hundreds of millions of
dollars instead of making the terrorists and their sponsors pay."); *id. at* S11527 ("It is these state sponsors of
international terrorism, not the American taxpayer, who must be compelled first and foremost to compensate the
American victims of their inhumane attacks.").

148 CONG. REC. S11527 (daily ed. Nov. 19, 2002) (remarks of Sen. Harkin) (Clearstream Exh. 29).[14] The court in *Hausler* acknowledges this purpose of TRIA, *Hausler II* at *5 ("Additionally, Congress's purpose in enacting the TRIA was to address foreign policy goals such as deterring acts of terrorism and restricting the economic activity of terrorist parties."), but it then proceeds to reward the terrorists at the expense of innocent third-parties, ensuring that terrorists will not be deterred.

        a.        The *Hausler* Decisions Reward Terrorist States At The Expense Of Innocent Third-Parties

The economic reality of the *Hausler* decisions is that they reduce the liabilities of the terrorist state Cuba—the amount outstanding on the judgments against it—without reducing its assets. This perverse economic benefit to the terrorists who committed the acts is the inescapable result of satisfying judgments against terrorists out of assets owned by innocent third-parties. The decisions violate the clear congressional intent to make "the rogue governments who sponsor international terrorism pay literally." 148 Cong. Rec. S11526 (daily ed. Nov. 19, 2002) (remarks of Sen. Harkin) (Clearstream Exh. 29); *see also* Brief for the United States as Amicus Curiae in Support of the Appellees, *Rubin v. Islamic Republic of Iran*, No. 11-2144, at 14 (1st Cir. June 8, 2012) (Clearstream Exh. 45) ("[The choice of the word 'of'] ensures that the terrorist party itself—as distinguished from an innocent third party—will feel the consequences of its terrorist actions.").

---

[14] *See also* 148 CONG. REC. S11527 (daily ed. Nov. 19, 2002) (remarks of Sen. Harkin)  (Clearstream Exh. 29) ("Second, making the state sponsors actually lose billions of dollars will more effectively deter future acts of terrorism than keeping their assets blocked or frozen in perpetuity . . . ."); *id.* ("This new legislation enables American victims to fight back, to hold the terrorists who are responsible accountable to the rule of law, and to make the perpetrators and their sponsors pay a heavy price."); *id.* at S11526 ("Those who sponsor as well as those who commit these inhumane acts must pay a price."); *id.* ("[T]he Senate approved our amendment . . . to mandate that at least $3.7 billion in blocked assets of foreign state sponsors of terrorism and their agents . . . be used—first and foremost—to compensate American victims *of their terrorist acts.*" (emphasis added)).

*Hausler II* describes some of the blocked EFTs at issue and demonstrates that their turnover in no way punishes Cuba or its agencies or instrumentalities. On July 9, 2011, Shanghai Pudong Development Bank initiated an EFT in which Bank of China was to be the beneficiary's bank and Eximbank was the ultimate beneficiary. *Hausler II*, 2012 WL 601034, at *2. Shanghai Pudong Development Bank explained that the assets were blocked because it had mistakenly referred to Banco National de Cuba in the supporting payment order. *Id.* Accordingly, turnover of the EFT would reduce Cuba's liability for its terrorist actions out of assets owned by innocent third-parties, providing Cuba with an economic benefit. This economic benefit is wholly at odds with TRIA's intent to punish terrorists.

In another transaction, Banco Bilbao Vizcaya Argentaria, S.A. initiated an EFT directed to a Dutch company's account at Banco Financiero Internacional, S.A. *Id.* at *3. Because the EFT was blocked at the intermediary bank Bank of America, *id.*, Banco Financiero Internacional's account was never credited, and it never credited its customer's account. *See generally Shipping Corp. of India Ltd.*, 585 F.3d at 61 n.1 (explaining that after the intermediary bank credits the account of the beneficiary bank, the beneficiary bank credits its customer's account). Banco Financiero Internacional is therefore financially ambivalent as to turnover against the EFT, while such turnover would benefit Cuba by reducing its liabilities. By failing to require the plaintiffs to demonstrate that the terrorists owned the blocked assets, *Hausler II* repeatedly rewards the terrorists out of the pockets of innocent parties. *See Hausler II*, 2012 WL 601034, at *3-*4 (describing other EFTs that were to be turned over to satisfy the judgment against Cuba).

Here, Plaintiffs' request for turnover, if granted, would deliver Clearstream's assets at Citibank New York to Plaintiffs while creating a substantial risk that Bank Markazi would *not*

lose any of its assets. Bank Markazi's claim against Clearstream for payment originates from assets located in Luxembourg. Thus Bank Markazi could potentially demand and be awarded payment from Clearstream in Luxembourg for an amount equivalent to the Restrained Assets. *See* Arendt III ¶ 15. Essentially, turnover executed against the Restrained Assets in New York could result in extinguishing Bank Markazi's judgment debt while allowing Bank Markazi to receive full payment from Clearstream in Luxembourg.

The court in *Hausler II* was further wrong in stating that the use of state property law "would generate absurd results," by leading to divergent outcomes when state laws differ. *Id.* at *6. The court's reasoning is inconsistent with customary execution procedure and TRIA's legislative history. *First*, as the court in *Hausler* recognized, state procedures are already used in enforcement actions under Rule 69(a) of the Federal Rules of Civil Procedure. Accordingly, execution will always depend upon particular state laws and will lead to inconsistent results. *Second*, it was Congress's distinct intent when enacting TRIA that state substantive laws would apply. 148 CONG. REC. H8740 (daily ed. Nov. 14, 2002) (remarks of Rep. Bachus) (Clearstream Exh. 46) ("[T]he substantive law of the State or where the attack occurred would be the applicable law."); 148 CONG. REC. H8808 (daily ed. Nov. 14, 2002) (remarks of Rep. Bereuter) (Clearstream Exh. 47) ("[I]t instead allows the state law in which the terrorist act occurred to prevail with respect to punitive damages."). Given that divergent outcomes are inevitable due to the application of state procedures and state substantive laws regarding liability, the *Hausler* court's concern for divergent outcomes was clearly not shared by Congress.[15]

---

[15] The Court in *Hausler II* also surmised that intermediary banks could game the system by placing blocked EFTs in states with favorable ownership laws. *Id.* at *6. This theory ignores that UCC Article 4-A has been enacted in all 50 states. Similarly, UCC Article 8 has been enacted in all 50 states. Thus, adhering to state law with respect to execution on security entitlements will not result in divergent outcomes.

The *Hausler II* court next reasoned that application of state property law would lead to the perpetual blocking of the assets until they would eventually be returned to the terrorist state. Congress and the Executive, of course, remain free to dispose of the blocked assets as they see fit. Indeed, Congress has previously liquidated blocked assets to compensate terror victims. *See* The Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA") (P.L. 106-386) § 2002(b).

Moreover, *Hausler II* is internally inconsistent in first finding that all assets blocked due to Cuban sanctions are available to Cuba judgment creditors and then finding that the plaintiffs were required to prove that the banks were agencies or instrumentalities of Cuba. If all blocked assets were available to the plaintiffs, then there would be no need to prove that the banks were agencies or instrumentalities. The court found that the term "blocked asset" means any asset that is seized or frozen. *Hausler II*, at *9. It then found that "[t]he phrase 'of that terrorist party' provides the necessary, though perhaps perfunctory, instruction that the 'blocked assets' available for execution are only those assets blocked pursuant to the particular regulation or administrative action directed at the particular terrorist-party judgment debtor." *Id.* Under *Hausler II's* reasoning then, because the assets were blocked due to sanctions against Cuba, they could automatically be executed upon by terrorist victims of Cuba. The court goes on, however, to inquire as to whether the Cuban banks are agencies or instrumentalities of Cuba. *Hausler II*, at *13 ("The TRIA permits execution upon only the the [sic] blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party). If the Cuban Banks are not agencies or instrumentalities of Cuba, then the Blocked Funds are beyond the reach of the TRIA." (citation and quotation marks omitted)). This inquiry into whether the

banks are agencies or instrumentalities is entirely inconsistent with the court's earlier finding that all blocked assets could be turned over so long as they were blocked by the relevant sanctions.

> b.   The Legislative History Confirms That Only Assets Owned By The Terrorist State Or Agency May Be Executed Upon

The legislative history confirms that it is only assets owned by terrorists, or their agencies or instrumentalities that may be executed upon.   On June 13, 2002, Senator Allen introduced Amendment 3838 which modified S.2600 to allow execution upon blocked assets of terrorists. 148 CONG. REC. S5510 (daily ed. June 13, 2002) (Clearstream Exh. 48).   Senator Allen's testimony leaves no doubt that the intent of the amendment was to allow execution upon assets owned by terrorists: "I rise to present this amendment, No. 3838, which is a measure that has to do with allowing those who are victims of terrorist acts in the past who have judgments, to collect those judgments *against the assets of the terrorist states or the state-sponsored terrorist states involved in these acts.*"   *Id.* (remarks of Sen. Allen) (emphasis added); *see also id.* ("In these cases where someone has a judgment and where there are assets that have been seized, it is the terrorists and their state sponsors . . . who should be held accountable for these heinous crimes."); *id.* ("I request that we . . . take a stand and allow those folks who have had these injuries and these damages and loss of life, in some cases, to have those judgments satisfied . . . against the assets that have been *seized from* primarily two countries that have been involved—Iran and Iraq." (emphasis added)); 148 CONG. REC. S5511 (remarks by Sen. Smith) ("The only power that [terrorist victim] has is to sue that terrorist nation in court to gain access to *seized assets from terrorist nations.*" (emphasis added)).

Plaintiffs assert that TRIA's legislative history and purpose advocate in favor of turnover. Summ. J. Mem. at 16.   In light of the TRIA's language, the congressional intent to punish and deter terrorists literally, and the financial boon that terrorists would receive under Plaintiffs'

interpretation of the statutory language, Plaintiffs' argument that they are entitled to immediate turnover under TRIA is wrong as a matter of law.

5.    Turnover Under TRIA Must Comply With CPLR § 5225

Plaintiffs' argument that New York procedures no longer apply is belied by one of the very cases they cite: *Levin*. *Levin* followed *Hausler* in erroneously holding that TRIA preempts the UCC. *Id.* at *17. The court in *Levin* nevertheless required the plaintiffs to demonstrate that turnover would comply with CPLR § 5225. *Id.* at *19-*20 ("[T]urnover must comply with N.Y. CPLR § 5225 (b), as required by Fed. R. Civ. P. 69."). The court found that the Plaintiffs must present sufficient evidence "to demonstrate that the entities whose assets have been blocked are agencies and instrumentalities of Iran, *and are entitled to the possession of these funds,* but for the blocked nature of the accounts." *Id.* at *19; *see also* CPLR § 5225(b) (requiring plaintiffs to show that the judgment debtor is "entitled to the possession of such property").

Accordingly, even under *Levin* Plaintiffs must show that Bank Markazi would be entitled to possession of the Restrained Assets were it not for the blocking. Bank Markazi plainly does not have the right to possess the assets held in Clearstream's account at Citibank:

> [T]he best, if not the only, way in which the possession of a chose in action—such as a bank account—can be shown, is by showing in whose name the account stands, for the person in whose name the account stands has absolute control of it and that is all possession of a chose in action can mean.

*Bradford v. Chase Nat'l Bank of City of N.Y.*, 24 F. Supp. 28, 38 (S.D.N.Y. 1938), *aff'd sub nom. Berger v. Chase Nat'l Bank of City of N.Y.*, 105 F.2d 1001 (2d Cir. 1939), *aff'd* 309 U.S. 632 (1940); *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 192 (2d Cir. 2011) (same); *see also* Arendt III ¶¶ 7, 9 (explaining that under Luxembourg law, Bank Markazi has no rights against Citibank, but only against Clearstream). Because Plaintiffs were all parties to Levin, they are estopped from contesting the need to satisfy CPLR § 5225 in a

34

turnover proceeding under TRIA. *See* Clearstream's Reply at 73-74 (establishing that Plaintiffs are estopped from contesting the issues decided in *Levin*).

### C.    EO 13599 And TRIA Do Not Reach Clearstream

####    1.    Clearstream Is Not A "United States Person" Under EO 13599

As discussed in Clearstream's Reply, Clearstream is not a U.S. person under EO 13599.[16] Since filing Clearstream's Reply, Judge Jones confirmed Clearstream's conclusion that the definition of a U.S. person does not apply to foreign corporations such as Clearstream. *See Bank of Tokyo-Mitsubishi, UFJ, Ltd. v. Peterson*, No. 12 Civ. 4038 (BSJ) (S.D.N.Y. May 29, 2012) (Clearstream Exh. 49). Judge Jones specifically rejected the *Peterson* Plaintiffs' argument that Bank of Tokyo-Mitsubishi, UFJ ("BTMU") is rendered a U.S. person under EO 13599 by virtue of having a BTMU branch in the United States. *See id.* at 3 ("The Court does not read the Executive Order so expansively. The Executive Order prohibits the restraint of assets that are (1) held by non-United States persons and (2) located outside the United States. The Japanese branches of a Japanese bank are not United States persons regardless of the existence of a New York branch of the bank."). Judge Jones further stated that "attachment and execution of property that is appurtenant to a foreign state and that is located outside the United States would violate the Foreign Sovereign Immunities Act, 28 U.S.C. § 1609 ("FSIA")." *Id.* at 3-4.

Judge Jones's opinion forecloses any argument by the Plaintiffs that Clearstream is a "United States person" by virtue of its New York representative office, and that assets held abroad by Clearstream are subject to turnover, not only under TRIA but also under New York law. Judge Jones's opinion establishes that assets held abroad by foreign corporations are not subject to turnover under TRIA because such corporations are not U.S. persons under EO 13599.

---

[16] *See* Clearstream's Reply at 31-35.

CONFIDENTIAL

Further, Judge Jones's opinion confirms Clearstream's argument that assets of a foreign sovereign held abroad are immune from attachment under the FSIA. Therefore, Plaintiffs' argument that TRIA trumps the FSIA also fails. *See* Summ. J. Mem. at 18 n.8.

Additionally, because the *Peterson* Plaintiffs were the respondents to Judge Jones's recent opinion, the *Peterson* Plaintiffs are now estopped from arguing that Clearstream, a foreign corporation, is a U.S. person based on the presence of a representative office in New York. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 29 (1982); *Zherka v. City of New York*, 459 F. App'x 10, 12-13 (2d Cir. 2012).

If, notwithstanding the above, the Court were to agree with Plaintiffs' interpretation of the term "United States person," i.e., that the term encompasses persons over which a court in the United States can exercise personal jurisdiction, then the Court necessarily would have to decide the pending issue of whether in fact there is personal jurisdiction over Clearstream. Having to make that determination is sufficient grounds to deny Plaintiffs' Motion. See Clearstream's Rule 56.1 Statement In Opposition To Plaintiffs' Motion For Partial Summary Judgment ¶ 23.

2.    TRIA Does Not Apply Extraterritorially

Even assuming that Plaintiffs' expansive interpretation of "United States person" under EO 13599 is correct such that the reciprocal property interest to the Restrained Assets frozen in accounts at Clearstream in Luxembourg is also blocked under EO 13599, TRIA would not allow Plaintiffs to restrain or execute on that interest abroad because the statute is not extraterritorial.

The Supreme Court held in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010), that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." The *Morrison* Court examined the extraterritorial application of section 10(b) of the Securities Exchange Act of 1934, specifically rejecting both the "effects test" and the "conduct

test" previously followed in the Second Circuit. *Id.* at 2879-81; *see also Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) (acknowledging *Morrison*'s rejection of the conduct and effects tests and holding that because RICO is silent to any extraterritorial application under *Morrison*, RICO does not apply extraterritorially). The Supreme Court in *Morrison*, instead, focused on the language of the statute and found no indication that the statute applies extraterritorially. 130 S. Ct. at 2881-83.

Section 201 of TRIA contains no language that clearly expresses "the affirmative intention" of Congress to give the statute extraterritorial effect. Nor does the "focus" of section 201 extend beyond assets blocked within the United States. Indeed, Senator Harkin's statement that TRIA "establishes, once and for all, that such judgments are to be enforced against any assets *available in the U.S.*," demonstrates Congress's intent that TRIA apply only to assets in the United States. 148 CONG. REC. S11528 (emphasis added) (Clearstream Exh. 29). As in *Morrison*, had Congress intended the extraterritorial application of TRIA, the obvious incompatibility with foreign laws presented by allowing U.S. judgment holders to collect against assets held abroad by foreign entities would have led Congress to address the subject of conflicts with foreign laws and procedures. *See Morrison*, 130 S. Ct. at 2885.

The presence of domestic conduct or activity does not change this result. Specifically, *Morrison* rejected petitioners' attempts to construe their allegations as "no more than domestic application" of section 10(b) based on deceptive acts that occurred within the United States as to foreign securities issuer. *Id.* at 2883-84. The Supreme Court instead recognized that while some contact with the United States often may occur, the "focus" of the statute must occur within the United States in order for application of the act to be domestic. *Id.* at 2884 ("For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United

States.  But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." (emphasis in original)).  Thus, as is the problem here, "[t]he probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application 'it would have addressed the subject of conflicts with foreign laws and procedures.'" *Id.* at 2885 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 256 (1991)).

D.     **New York And Federal Law Prohibit Execution Against The Restrained Assets And Assets Abroad**

Plaintiffs also argue that they may execute against the Restrained Assets under New York law. Summ. J. Mem. at 21-22.  Clearstream has previously responded to Plaintiffs' arguments in its Reply.  Clearstream's Reply at 37-48.

Plaintiffs further contend that they may execute upon sovereign assets located abroad under *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825 (N.Y. 2009).  Summ. J. Mem. at 22-25. Plainly, the Court of Appeals ruling in *Koehler* does not abrogate sovereign immunity. Plaintiffs' arguments focus upon jurisdiction over Bank Markazi.  Summ. J. Mem. at 22-23. Immunity from suit and immunity from execution are two different concepts.  *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011) ("[T]he FSIA's provisions governing jurisdictional immunity, on the one hand, and execution immunity, on the other, operate independently.").  Thus, the ability of Plaintiffs to bring suit against Bank Markazi does not render its assets subject to execution.  Bank Markazi's assets abroad remain immune from execution notwithstanding *Koehler. See Walters v. People's Republic of China*, 672 F. Supp. 2d 573, 574 (S.D.N.Y. 2009) ("The FSIA's limited exceptions to sovereign immunity—whether for foreign states or their instrumentalities—extends at most to property located in the United States.").

Moreover, *Koehler* does not provide a basis for turnover of Bank Markazi's assets located abroad because those assets are held at foreign bank branches. Under the separate entity rule, this Court must have jurisdiction over the specific foreign branch where the assets are held before ordering turnover of those assets. *Shaheen Sports, Inc. v. Asia Ins. Co.*, No. 98 cv 5951, 2012 WL 919664, at *8 (S.D.N.Y. Mar. 14, 2012) ("[W]here that garnishee is a bank, the court must obtain jurisdiction over the specific bank branch holding the asset before it may order any turnover, notwithstanding its general jurisdiction over the banking entity by virtue of its New York branch."). *Koehler* did not abrogate this rule. *See* Clearstream's Reply at 70-73; *see also* Hr'g Tr. at 73:9-11, *E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*, No. 12-mc-00120, (S.D.N.Y. June 1, 2012), ECF No. 71 (Clearstream Exh. 50) ( ruling that the court "must follow the separate entity rule absent direction from the New York legislature, the New York state Courts, or the Second Circuit.").

Finally, Plaintiffs' argument ignores that the assets abroad, which they ask this Court to order Bank Markazi to bring into New York (Motion at 23-24), are frozen under the EU Regulation and thus cannot be moved. Under the foreign sovereign compulsion doctrine, a state may not require a person to do an act in another state that is prohibited by the law of that state or by the law of the state of which that person is a national. RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 441(l)(a) (1987); *see also Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1392 (9th Cir. 1995) (applying the foreign sovereign compulsion doctrine to find that a Luxembourg bank could not be held in contempt for violating an order prohibiting it from transferring its client's funds when that transfer was required by Luxembourg law). Accordingly, this Court may not require Bank Markazi or any of the defendant banks to

bring assets into this jurisdiction because to do so would require it to violate the EU Regulation. *See* Clearstream Reply's at 12.

### E.   TRIA Requires That A Judgment Against A Foreign State Be Obtained Under 28 U.S.C. § 1605(a)(7)

By its terms, TRIA requires a plaintiff to obtain a judgment under 28 U.S.C. § 1605(a)(7) to execute against blocked assets in satisfaction of a judgment against a foreign state. 28 U.S.C. § 1610 Note. But, as Plaintiffs admit, only the *Peterson*, *Greenbaum*, and *Levin* plaintiffs have obtained a judgment under 28 U.S.C. § 1605(a)(7). Summ. J. Mem. at 8. According to Plaintiffs, the *Acosta*, *Heiser*, and *Valore* plaintiffs obtained their judgments pursuant to 28 U.S.C. § 1605A. Summ. J. Mem. at 8-9.

The United States recently clarified that parties who have obtained judgments against foreign states under 28 U.S.C. § 1605A cannot seek to execute against blocked assets under TRIA. *See* Brief for the United States as Amicus Curiae at 19, *Bank Melli Iran New York Representative Office v. Weinstein*, No. 10-947, 2012 WL 1883085 (U.S. May 24, 2012) (Clearstream Exh. 44) ("The repeal of Section 1605(a)(7) in 2008 makes Section 201(a) inapplicable to subsequently entered terrorism-related judgments against foreign states. Plaintiffs in terrorism suits against state sponsors of terrorism after January 2008 must therefore proceed under Section 1605A and seek execution against property of the 'separate juridical entit[ies]' of the foreign state under Section 1610(g)." (alteration in original) (citation omitted)). Thus, this Court should deny Plaintiffs' Motion for Partial Summary Judgment with respect to the *Acosta*, *Heiser*, *Valore* and any other plaintiffs with judgments obtained under § 1605A because they are ineligible to receive an order for turnover under TRIA.

F.     **Turnover Pursuant To TRIA Would Constitute An Unconstitutional Taking**

Turnover pursuant to TRIA would, in this case, violate the Takings Clause of the Fifth Amendment. U.S. CONST. amend. V ("[N]or shall private property be taken for public use, without just compensation."). Turnover would deprive Clearstream of its property interest in the Restrained Assets.

Section 8-505(b) of the UCC provides: "A securities intermediary is obligated to its entitlement holder for a payment or distribution made by the issuer of a financial asset if the payment or distribution is received by the securities intermediary." Thus, Clearstream, as Citibank's entitlement holder, has a legal interest in payments or distributions received by Citibank. Citibank's obligation runs solely to Clearstream because Clearstream is Citibank's entitlement holder. *Id.* TRIA would therefore work a taking of Clearstream's private property, for either a private use, or for a public use without just compensation, thus rendering TRIA unconstitutional as applied. The Court, therefore, should construe TRIA to require ownership so as to avoid the need to adjudicate this constitutional issue. *Clark v. Martinez*, 543 U.S. 371, 380-85 (2005).

1.     <u>There Would Be No Taking For Public Use</u>

The Takings Clause "presupposes that the government has acted in pursuit of a valid public purpose." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). "A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984); *see also Kelo v. City of New London*, 545 U.S. 469, 477 (2005). "[T]ransfers intended to confer benefits on particular, favored private entities, and with only incidental or pretextual public benefits, are forbidden by the Public Use Clause." *Id.* at 490

(Kennedy, J., concurring); *see also Mo. Pac. Ry. Co. v. Nebraska*, 164 U.S. 403, 416-17 (1896) (administrative order directed railroad to allow a "voluntary association" of farmers to build a grain elevator on railroad's land; order held a taking for "private use").

TRIA, if applied as Plaintiffs request, would take Clearstream's private property— Clearstream's right to payment from Citibank under UCC § 8-505(b) for the distributions received by Citibank—and transfer that property directly to private individuals who have "obtained a judgment against a terrorist party." 28 U.S.C. § 1610 Note. Indeed, the transfer would be made for the explicit purpose of paying "compensatory damages" tailored in private civil actions to redress the particular losses of Plaintiffs, as private individuals.

TRIA would thereby work a taking from one private owner directly to another, without even a monetary stop along the way for public ownership, and without even the veneer of public use present in eminent domain cases. *See Kelo*, 545 U.S. at 489 (taking for "economic development" was for a public use, even though taking would benefit private parties). Such a private taking is void. "No amount of compensation can authorize such action." *Lingle*, 544 U.S. at 543.

### 2.   TRIA Would Work A Per Se Taking

Assuming a taking for the public use, TRIA, as interpreted by Plaintiffs, would work a per se taking because turnover would completely appropriate Clearstream's property and deprive it of all economically beneficial use of the Restrained Assets. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992); *Webb's Fabulous Pharms., Inc. v. Beckwith*, 449 U.S. 155, 162-64 (1980) (Florida statute allowed state court to retain interest earned on interpleaded fund; held: interest was private property; statute worked a taking without just compensation, citing per se

taking authority); *see also Loretto v. Telprompter Manhattan CATV Corp.*, 458 U.S. 419, 437-38

(1982) (per se taking by invasion or occupation of property).[17]

3.      TRIA Would Work A Regulatory Taking

Alternatively, TRIA, as interpreted by the Plaintiffs, would work a regulatory taking

under the standard three-factor test.   The courts examine:   (1) the economic impact of the

regulation on the party claiming a taking, (2) the extent to which the regulation interferes with

reasonable, investment-backed expectations and (3) the character of the government action. *See*

*Lingle*, 544 U.S. at 538-39.   Here, first, TRIA's economic impact on Clearstream would be

substantial.   TRIA would, in fact, extinguish Clearstream's property interest.   Second, TRIA

would interfere with reasonable, investment-backed expectations.   Clearstream did not commit

the terrorist act and could not reasonably have expected that its omnibus and cash accounts at

Citibank would be used to compensate Plaintiffs. *See E. Enters. v. Apfel*, 524 U.S. 498, 536-37

(1998) (statute interferes with reasonable, investment-backed expectations where statute is "not

calibrated either to [party's] past actions or to any agreement—implicit or otherwise—by the

[party];" statutory "burden . . . [was] . . . unrelated to any commitment that the [party] made or to

any injury [the party] caused").

Third, TRIA would benefit a private judgment creditor at the direct and personal expense

of Clearstream.   TRIA would thus stand in stark contrast to a regulation that "merely affects

---

[17] *Cablevision Sys. Corp. v. FCC*, 570 F.3d 83, 98 (2d Cir. 2009), suggests that *Loretto* requires "physical occupation" of property.  A statute, however, can work a per se taking without physical occupation.  Thus, *Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003), involved a state statute that transferred interest earned on IOLTA accounts from such accounts to a foundation for legal services to the needy.  The Court treated such a transfer— analogous to a turnover from blocked accounts here—as "more akin to the occupation of a small amount of rooftop space in *Loretto*." *Brown*, 538 U.S. at 235.  The Court assumed without deciding that the transfer constituted a taking. *Webb's Fabulous Pharms.*, furthermore, involved a taking of the interest earned on a bank account.  499 U.S. at 162-64. *Webb's* relied on *United States v. Causby*, 328 U.S. 256 (1946), which involved a per se taking. *See United States v. Smith*, 499 U.S. 160, 163-64 (1991); *Brown*, 538 U.S. at 233-34.

property interests through some public program adjusting the benefits and burdens of economic life to promote the common good." *Lingle*, 544 U.S. at 539.

## CONCLUSION

For all the foregoing reasons and those in Clearstream's Reply in Support of Its Motion to Vacate Restraints, the Court should deny Plaintiffs' motion for partial summary judgment.

Dated: June 15, 2012                         Respectfully submitted,

                                             WHITE & CASE LLP

                                             By: _____
                                                 Nicole E. Erb
                                                 Frank Panopoulos
                                                 Andrew L. Black
                                                 701 Thirteenth Street, N.W.
                                                 Washington, D.C.  20005
                                                 Tel: (202) 626-3600
                                                 Fax: (202) 639-9355

                                             *Counsel for Clearstream Banking, S.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2012, I caused to be served the foregoing

Opposition and related papers on the following parties, by next business day delivery:

_Nicholas G. Nassim_

Liviu Vogel, Esq.
Salon Marrow Dyckman Newman &
Broudy LLP
292 Madison Avenue
New York, NY 10017
*Counsel for Peterson Plaintiffs*

Steven R. Perles, Esq.
Perles Law Firm, PC
1146 19th Street 5th Floor
Washington, DC 20036
*Counsel for Peterson Plaintiffs*

James Bonner, Esq.
Stone Bonner & Rocco, LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
*Counsel for Peterson Plaintiffs*

Curtis C. Mechling, Esq.
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
*Counsel for Acosta and Greenbaum
Plaintiffs*

Noel J. Nudelman, Esq.
Heideman Nudelman & Kalik, PC
1146 19th Street, 5th Floor
Washington, DC 20036
*Counsel for Brown, Bland, and Silvia
Plaintiffs*

Thomas Fay, Esq.
Fay Kaplan Law P.A.
777 Sixth Street NW, Suite 410
Washington, DC 20001
*Counsel for Bonk, Khaliq, Owens, and
Valore Plaintiffs*

Keith Martin Fleischman, Esq.
Fleischman Law Firm
565 Fifth Avenue, Seventh Floor
New York, NY 10017
*Counsel for Bonk, Silvia, and Valore,
Plaintiffs*

Richard Marc Kremen, Esq.
DLA Piper US LLP
6225 Smith Avenue
Baltimore, MD 21209-3600
*Counsel for Heiser Plaintiffs*

Cary B. Samowitz, Esq.
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
*Counsel for Heiser Plaintiffs*

Suzelle M. Smith, Esq.
Howarth and Smith
523 West Sixth Street, Suite 728
Los Angeles, CA 90014
*Counsel for Levin Plaintiffs*

Sharon Schneier, Esq.
Davis Wright Tremaine LLP
1633 Broadway, 27th Floor
New York, NY 10019-6708
*Counsel for Citibank, N.A.*

Ugo Colella, Esq.
Patton Boggs LLP
2550 M Street, NW
7th Floor
Washington, DC 20037
*Counsel for Banca UBAE SpA*

John J. Zefutie, Jr., Esq.
Patton Boggs LLP
The Legal Center
One Riverfront Plaza
1037 Raymond Blvd.
Suite 600
Newark, New Jersey 07102
*Counsel for Banca UBAE SpA*

David M. Lindsey, Esq.
Chaffetz Lindsey LLP
505 Fifth Avenue, 4th Floor
New York, NY 10017
*Counsel for Bank Markazi*