UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate Of James C. Knipple (Dec.), et al.<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN; BANK MARKAZI a/k/a CENTRAL BANK OF IRAN; BANCA UBAE SpA; CITIBANK, N.A., and CLEARSTREAM BANKING, S.A.,<br><br>Defendants. | Case No.: 10 CIV 4518(KBF)<br><br><br><br>**DECLARATION OF LIVIU VOGEL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO WULTZ MOTION TO INTERVENE** |

I, Liviu Vogel, an attorney duly admitted to practice law before the Courts of the State of New York, and this Court, declare under penalties of perjury:

1. I am a member of the firm of Salon Marrow Dyckman Newman & Broudy LLP, attorneys for Peterson Plaintiffs in the above-captioned action. I make this declaration in support of Plaintiffs' opposition to the belated motion to intervene filed by the Estate of Daniel Wultz, Sheryl Wultz, Yekutiel "Tuly" Wultz, and Amanda Wultz (the "Proposed Intervenors").

**A. History of Peterson Plaintiffs' Restraint of the Turnover Assets**

2. This turnover action involves the roughly $1.75 billion in funds comprised of securities and cash (the "Turnover Assets") owned by Defendant Bank Markazi a/k/a Central Bank of Iran ("Markazi") that are *currently* located in a "blocked," interest-

1

214697.1

bearing suspense account at Citibank, N.A. (the "Blocked Account") and which are the subject of restraints (the "Restraints") described below.

3. The Clerk of the United States District Court, Southern District of New York issued to Peterson Plaintiffs a Writ of Execution, dated June 12, 2008, as to the Turnover Assets, which were levied upon by the United States Marshal at Citibank, N.A. ("Citibank") on June 13, 2008. Those actions had the effect of restraining the Turnover Assets under CPLR §5232(a). True and correct copies of the Writ of Execution and the return of service by the United States Marshal evidencing the levy are annexed hereto as Exhibit A.

4. The Clerk of the United States District Court, Southern District of New York issued to Peterson Plaintiffs a Writ of Execution, dated October 17, 2008, as to the Turnover Assets, which were levied upon by the United States Marshal at Clearstream Banking S.A. on October 27, 2008. Those actions had the effect of restraining the Turnover Assets under CPLR §5232(a). True and correct copies of the Writ of Execution and the return of service by the United States Marshal evidencing the levy are annexed hereto as Exhibit B.

5. The Peterson Plaintiffs issued a Restraining Notice regarding the Turnover Assets dated June 16, 2008, and an Amended Restraining Notice dated June 20, 2008, and served the same upon Citibank on June 17, 2008 and June 24, 2008, respectively. True and correct copies of the Restraining Notice and Amended Restraining Notice served on Citibank are attached hereto as Exhibit C.

6. The Peterson Plaintiffs issued a Restraining Notice regarding the Turnover Assets dated June 16, 2008, and an Amended Notice dated June 20, 2008, and served the

same upon Clearstream Banking, S.A. ("Clearstream") on June 16, 2008 and June 23, 2008, respectively. True and correct copies of the Restraining Notice and Amended Restraining Notice served on Clearstream are attached hereto as Exhibit D.

7. When initially entered, the above-mentioned restraints applied to approximately $2 billion worth of assets. However, after Citibank and defendant Clearstream moved to vacate the Restraints, at a hearing on June 27, 2008, this Court modified the Restraints to reflect the fact that Markazi had sold certain bonds with a face amount of $250 million before the Restraints issued. At that time, this Court also ordered that the Turnover Assets remain restrained until further order of the Court. *See* a true and correct copy of the Court's Order of June 27, 2008 attached hereto as Exhibit E. Thus, the total amount of the Turnover Assets with accumulated interest now exceeds $1.75 billion.

8. Pursuant to the Peterson Plaintiffs' application dated May 28, 2009 for leave to serve a second restraining notice or for an order extending the restraining notices previously served upon Clearstream and Citibank, this Court, by way of an Order dated June 23, 2009, continued the restraint of the Turnover Assets until further order of this Court. A true and accurate copy of this Court's Order dated June 23, 2009 is attached hereto as Exhibit F ("The restraints will remain in place until the Court has determined whether Clearstream is, or could be made, a proper garnishee, assuming a fraudulent conveyance could be shown by Plaintiffs.").

9. This Court issued an order on May 10, 2010, a true and correct copy of which is attached hereto as Exhibit G, which continued the restraint and effect of the June 2008 execution and levy of the Turnover Assets. *Id.* ("Plaintiffs' execution issued by

3

this Court on June 12, 2008 and the levy by service of the execution initially made on Citibank on June 13, 2008, are hereby extended *nunc pro tunc* until 30 days after the date of this Order...").

10. On June 11, 2010, the Court again extended the restraint and the October 2008 execution and levy of the Turnover Assets. A true and correct copy of the Court's Order dated June 11, 2010 is attached hereto as <u>Exhibit H</u> ("Plaintiffs' execution issued by this Court on October 17, 2008 and the levy by service of the execution initially made on Clearstream on October 27, 2008, are hereby extended *nunc pro tunc* until 15 days after the date of this Order...").

11. On June 8, 2010, the Peterson Plaintiffs filed their complaint seeking turnover of the Turnover Assets, which had the effect of continuing the restraints on those assets pursuant to CPLR 5232(a) until transfer or payment of the Turnover Assets is made.

12. The Peterson Plaintiffs filed their Amended Complaint on October 20, 2010 and their Second Amended Complaint on December 7, 2011.

13. All of the Plaintiffs have obtained orders permitting the enforcement of their judgments pursuant to 28 U.S.C. § 1610(c), a prerequisite to execution of judgments against sovereigns and their agencies and instrumentalities under 28 U.S.C. § 1610(a) and (b). All of the Plaintiffs secured judgments against Iran based on acts of terrorism. (*See* Declarations of various Plaintiffs' counsel filed on April 4, 2012 in this action at Docket Entries 211, 212, 213 and 214). Most, if not all, Plaintiffs obtained writs of execution that have already been levied upon the Turnover Assets, which total roughly $1.75 billion.

14. By Memorandum and Order, entered June 25, 2008 by the U.S. District Court for the District of Columbia, Judge Royce Lamberth found that: (a) the Court had previously entered Judgment against the Judgment Debtors on September 7, 2007; (b) Plaintiffs completed service of same in accordance with 28 U.S.C. § 1608(e) on January 10, 2008; and, (c) a two (2) month period of time is a reasonable period of time to have allowed the Judgment Debtors to satisfy the Judgment – noting that the Judgment Debtors have never voluntarily paid a judgment entered in any United States court arising out of an act of terrorism. On these grounds, the Court issued an order pursuant to 28 U.S.C. § 1610(c), *nunc pro tunc*, from March 10, 2008, granting the Peterson Plaintiffs the right to proceed with attachment and execution to enforce the Court's September 7, 2007 Judgment. A true and accurate copy of the June 25, 2008 Order is annexed hereto as Exhibit I.

15. Then again, by Order dated February 27, 2012, this Court found that the Peterson Plaintiffs' had satisfied the requirements under 28 U.S.C. § 1610(c). A true and accurate copy of the February 27, 2012 Order is annexed hereto as Exhibit J.

16. On February 5, 2012, by Executive Order 13599 ("E.O. 13599"), President Obama declared "[a]ll property and interests in property of" Iran or Markazi held in the United States or by a "United States person" "blocked" pursuant to the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701. *See* the true and correct copy of E.O. 13599 attached hereto as Exhibit K at § 1.

5

**B. The Peterson Plaintiffs' Judgment**

17. On May 30, 2003, the United States District Court for the District of Columbia issued an opinion, in the consolidated action styled *Peterson v. Islamic Republic of Iran,* 01-cv-2094 (RCL) ("Peterson Action"), finding that (a) the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") legally responsible for providing material financial and logistical support to help carry out the murder of the 241 American servicemen at the United States Marine barracks in Beirut, Lebanon on October 23, 1983 and (b) the surviving family members suffered and would continue to suffer mental anguish and loss of society. A true and accurate copy of the May 30, 2003 Memorandum and Order from the United States District Court for the District of Columbia, which is a public record, is attached hereto as Exhibit L.

18. On September 7, 2007, the United States District Court for the District of Columbia entered a Default Judgment ("Judgment") against Iran and MOIS, jointly and severally, in the Peterson Action, awarding economic and compensatory damages totaling $2,656,944,877.00. A true and correct copy of the September 7, 2007 Memorandum and Judgment from the United States District Court for the District of Columbia, which is a public record, is attached hereto as Exhibit M.

19. The Judgment was entered under 28 U.S.C. § 1605(a)(7) and remains unsatisfied in the amount of $2,656,944,877.00, plus post-judgment interest at the legal rate against Iran and MOIS.

20. On March 24, 2008, the Peterson Plaintiffs registered the September 7, 2007 Judgment with this Court pursuant to 28 U.S.C. § 1963, under case number M18-302, judgment number 080472. A true and correct copy of the September 7, 2007

Judgment as registered with this Court, which is a public record, is attached hereto as Exhibit N.

### C. The Peterson Plaintiffs' Action for Turnover

21. After significant motion practice and discovery (requiring multiple trips by the undersigned to Italy) was conducted in Miscellaneous Action M18-302, the Peterson Plaintiffs commenced this action by filing a Summons and Complaint on June 8, 2010 and an Amended Complaint on October 20, 2010 against Iran, Markazi, Banca UBAE SpA ("UBAE"), Citibank and Clearstream for, among other relief, a turnover of the Turnover Assets.

22. Thereafter, the Peterson Plaintiffs duly served each defendant with Plaintiffs' initial Summons and Complaint and their Amended Complaint.

23. On December 7, 2011, the Peterson Plaintiffs filed their Second Amended Complaint, which continued to seek, among other things, turnover of the Turnover Assets. (*See* Docket Entry 216). That complaint was served on counsel for Defendants Markazi, Clearstream, Citibank and UBAE.

24. The remaining Plaintiffs also have asserted turnover claims related to the Turnover Assets in pleadings filed under seal.

25. On June 27, 2011, after a telephonic conference on April 21, 2011 with counsel for the Peterson Plaintiffs and the defendants, the Court ordered consolidation of Miscellaneous Action M18-302 with this proceeding, required Citibank to file any interpleader complaint by no later than August 8, 2011, and ordered that any further interpleader pleadings had to be filed no later than October 3, 2011. The deadlines for filing interpleader pleadings was established by the Court to address the Peterson

Plaintiffs' concern that continually adding other creditors to the turnover action would unduly delay the action and prejudice the Peterson Plaintiffs. The June 27, 2011 Order is filed under seal.

26. On July 29, 2011, Citibank served its Third-Party Petition Alleging Claims in the Nature of Interpleader on Defendants Clearstream, Markazi and UBAE. *See* a true and correct copy of Citibank's Certificate of Service of its Third-Party Petition Alleging Claims in the Nature of Interpleader <u>Exhibit O</u>.

**D. Plaintiffs' Motion for Summary Judgment**

27. Following the issuance of E.O. 13599, all of the Plaintiffs joined in their April 2, 2012 summary judgment motion, which sought to enforce their rights to turnover of the Turnover Assets pursuant to the Terrorism Risk Insurance Act of 2002 ("TRIA").

28. After Plaintiffs filed that motion, Congress passed 22 U.S.C. § 8772, which eliminated certain of the supposed defenses that defendants Markazi and Clearstream have asserted to turnover. All of the Plaintiffs also joined in the supplemental summary judgment motion that Plaintiffs filed pursuant to § 8772.

29. On February 28, 2013, the Court issued an Opinion and Order (the "Turnover Order") ruling that § 8772 and TRIA entitled Plaintiffs to the turnover of the Turnover Assets from Defendants. [Docket Entry 340 filed under temporary seal]. The Turnover Order followed nearly thirty years of efforts by the Peterson Plaintiffs in various settings to force Iran to pay for the terrorist attack upon the Beirut Marine barracks in October 1983 that killed 241 American servicemen and injured dozens more. All of the other Plaintiffs have also struggled for years (and in some cases, decades) to enforce their judgments against Iran, and all have worked cohesively toward that goal in

214697.1

this action.

### E. Plaintiffs' Enormous Effort to Enforce Their Judgment and Prosecute Their Claims

30. Since the filing of the Peterson Plaintiffs' initial restraints in 2008, the Peterson Plaintiffs, the other Plaintiffs involved in this action and their counsel collectively have worked tirelessly here in New York and elsewhere in an effort to secure the payment of their judgments by Iran or its agencies and instrumentalities. In this Court alone, those efforts have required the expenditure of millions of dollars in legal fees and hundreds of thousands of dollars in expenses.

31. While undertaking those extensive efforts, the Plaintiffs have made countless strategic decisions that were impacted by the identities of the parties in this litigation. Perhaps most importantly, the Plaintiffs struck an agreement that governs their relative interests in any funds ultimately recovered in this litigation.

32. Because the Turnover Assets are far less than the total amount of Plaintiffs' judgments for compensatory damages (which are collectively worth $3,745,106,155), that agreement resolves the priority of the various plaintiffs groups to the Turnover Assets.

33. The Proposed Intervenors were represented by Robert Tolchin in the action pending before the United States District Court for the District of Columbia (the "DC Court") in which they obtained a judgment for $32,068,634 in compensatory damages and $300,000,000 in punitive damages against Iran, the Iranian Ministry of Information and Security, the Syrian Arab Republic, the Syrian Ministry of Defense, the Syrian Military Intelligence, and the Syrian Air Force Intelligence Directorate. Robert Tolchin is also counsel for the Rubin Plaintiffs in this action. Although the Proposed

9

Intervenors' trial counsel knew of the status of this case, he never alerted the other Plaintiffs' counsel that the Proposed Intervenors wished to pursue any relief in this action. In fact, the Proposed Intervenors' trial counsel remained silent regarding the Proposed Intervenors supposed interest in this action even as Plaintiffs' counsel spent months negotiating the terms of the agreement that governs their sharing of the proceeds of their joint efforts in this matter and sought approval of that arrangement from the thousands of Plaintiffs.

34. Counsel for the Proposed Intervenors never contacted me regarding this matter until the Friday before the Court issued its February 28, 2013 Turnover Order regarding Plaintiffs' motion for partial summary judgment. Although I raised with the Proposed Intervenors' counsel the fact that Plaintiffs held priority rights to the Turnover Assets, neither in our conversation nor in their motion papers did the Proposed Intervenors suggest how they could leapfrog Plaintiffs and obtain priority to the assets that the Court awarded to Plaintiffs in the Turnover Order. Nor do the Proposed Intervenors advance any reason why the normal priority rules governing creditors' collection of their judgments are inapplicable here.

35. I have reviewed the docket and certain of the court filings in the Proposed Intervenors' action against Iran in the DC Court. I have attached a true and correct copy of that docket as Exhibit P. The docket and court filings reveal that the Proposed Intervenors: (a) filed an appeal of their summary judgment ruling only to later voluntarily dismiss their appeal, a misguided step that delayed their intervention by seven weeks; (b) waited nearly nine weeks to file their motion for a § 1610(c) order in the DC Court although they acknowledged that precedent in that District indicated that a six-week

10

delay after service upon a foreign sovereign sufficed; and (c) waited more than three weeks after they secured the § 1610(c) order to obtain a certified version of the judgment from the DC Court and an additional eleven days to register the judgment in this District.

36. Since Plaintiffs obtained summary judgment, creditors holding many millions of dollars of judgments against Iran have contacted Plaintiffs' counsel and expressed their desire to share in that recovery.

37. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on March 11, 2013 in New York, New York.

_____
Liviu Vogel