## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON,
Personal Representative of the Estate of James
C. Knipple (Dec.) *et al.*,

             Plaintiffs,

      v.

ISLAMIC REPUBLIC OF IRAN, BANK
MARKAZI a/k/a CENTRAL BANK OF
IRAN, BANCA UBAE SpA, CITIBANK,
N.A., and CLEARSTREAM BANKING, S.A.,

             Defendants.

Case No.: 10 CIV 4518 (KBF)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO MOTION TO INTERVENE BY ESTATE OF DANIEL WULTZ, ET. AL.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

GLOSSARY OF RECORD CITATIONS/ABBREVIATIONS ........................................ iv

INTRODUCTION AND RELEVANT FACTS .................................................. 1

ARGUMENT ........................................................................................ 4

I.    THE PROPOSED INTERVENORS' LONG-DELAYED MOTION DOES
      NOT SATISFY THE REQUIREMENTS FOR INTERVENTION AS OF
      RIGHT UNDER FED. R. CIV. 24(a) OR PERMISSIVE INTERVENTION
      UNDER FED. R. CIV. P. 24(b) ............................................................. 5

      A.  Rule 24's Intervention Requirements ................................................ 5

      B.  The Proposed Intervenors Cannot Satisfy Their Burden of
          Demonstrating That They Possess An Interest Relating To
          The Turnover Assets ................................................................. 6

      C.  The Proposed Intervenors Have Also Failed To Demonstrate
          The Timeliness Of Their Motion .................................................. 11

CONCLUSION ..................................................................................... 19

## **TABLE OF AUTHORITIES**

**Cases**

*Angelo Holding Corp. v. United States,*
  321 Fed. Appx. 28 (2d Cir. 2009) ........................................................................ 13

*Baker v. Hull,*
  250 N.Y. 484 (1929) ............................................................................................. 9

*In re Bank of New York Derivative Litig.,*
  320 F.3d 291 (2d Cir. 2003)................................................................................... 5

*Bernheim v. Damon and Morey, LLP,*
  2007 U.S. App. LEXIS 15530 (2d Cir. June 28, 2007) ........................................ 13

*Butler, Fitzgerald & Potter v. Sequa Corp.,*
  250 F.3d 171 (2d Cir. 2001)............................................................................. 5, 11

*D'Amato v. Deutsche Bank,*
  236 F.3d 78 (2d Cir. 2001).................................................................................. 17

*Dorey v. Perfetti Builder's Hardware, Inc.,*
  241 B.R. 507 (Bankr. W.D.N.Y. 1999) .................................................................. 9

*Hausler v. JPMorgan Chase Bank, N.A.,*
  845 F. Supp. 2d 553 (S.D.N.Y. 2012)................................................................. 7-8

*In re Holocaust Victim Assets Litig.,*
  225 F.3d 191 (2d Cir. 2000)................................................................................ 14

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
  313 F.3d 70 (2d Cir. 2002).................................................................................... 8

*Levin v. Bank of New York,*
  2011 U.S. Dist. LEXIS 23779 (S.D.N.Y. Mar. 4, 2011) .................................. 8, 13

*Liona Corp. v. PCH Assocs.,*
  949 F.2d 585 (2d Cir. 1991).................................................................................. 6

*Mastercard Int'l, Inc. v. Visa Int'l Serv. Ass'n, Inc.,*
  471 F.3d 377 (2d Cir. 2006).......................................................................... *passim*

*NAACP v. New York,*
  413 U.S. 343 (1973)............................................................................................ 11

*Resolution Trust Corp. v. Ruggiero,*
  994 F.2d 1221 (7th Cir. 1993) ............................................................................ 8-9

*"R" Best Produce, Inc. v. Shulman-Rabin Mktg., Corp.*,
    467 F.3d 238 (2d Cir. 2006) ........................................................................................ 5

*Schonfeld v. City of New York,*
    14 Fed. Appx. 128 (2d Cir. 2001) ............................................................................ 17

*State Tax Comm'r v. Shor,*
    43 N.Y.2d 151, 371 N.E.2d 523, 400 N.Y.S.2d 805 (1977) ..................................... 9

*United States v. New York,*
    820 F.2d 554 (2d Cir. 1987) ....................................................................... 11, 15, 17

*United States v. Pitney Bowes, Inc.,*
    25 F.3d 66 (2d Cir. 1994) ................................................................................. 14, 17

**Statutes and Rules**

22 U.S.C. § 8872 ........................................................................................... *passim*

28 U.S.C. § 1606 .................................................................................................... 8

28 U.S.C. § 1608(e) ......................................................................................... 7, 14

28 U.S.C. § 1610(c) .................................................................................... *passim*

50 U.S.C. § 1701 *et seq.* ......................................................................................... 2

Fed. R. Civ. P. 24 ........................................................................................ *passim*

Fed. R. Civ. P. 69 ............................................................................................. 8-9

## GLOSSARY OF RECORD CITATIONS/ABBREVIATIONS

| Citation | Matter Referenced |
|---|---|
| Turnover Assets | The approximately $1.75 billion in cash currently held in a blocked, interest-bearing suspense account at Citibank |
| Citibank | Defendant Citibank, N.A. |
| Clearstream | Defendant Clearstream Banking, S.A. |
| Complaint | Second Amended Complaint filed by Peterson Plaintiffs |
| Conspirators | Clearstream, Markazi and UBAE |
| DC Court | United States District Court for the District of Columbia |
| Defendants | Iran, Citibank, Clearstream and Markazi |
| E.O. 13599 | Executive Order 13599 |
| FSIA | Foreign Sovereign Immunities Act |
| IEEPA | International Emergency Powers Act |
| Iran | Islamic Republic of Iran |
| Markazi | Defendant Bank Markazi also known as Central Bank of Iran |
| Sneider Decl. | Declaration of Jaime Sneider in support of the Wultzes' Motion to Intervene executed on February 22, 2013 |
| TRIA | Terrorism Risk Insurance Act of 2002 |
| Turnover Order | The Court issued Opinion and Order of February 28, 2013 |
| UBAE | Defendant Banca UBAE S.p.A. |
| Vogel Decl. | Declaration of Liviu Vogel dated March 11, 2013 |

All of the judgment creditors in this action (collectively, "Plaintiffs") respectfully submit this joint memorandum of law in opposition to the belated motion to intervene filed by the Estate of Daniel Wultz, Sheryl Wultz, Yekutiel "Tuly" Wultz, and Amanda Wultz (the "Proposed Intervenors") just three days before the Court ordered that Defendants turn over to Plaintiffs the Iranian funds that the Proposed Intervenors seek to execute upon (the "Turnover Assets").

### INTRODUCTION AND RELEVANT FACTS

Plaintiffs are judgment creditors of defendant Iran. *See* Declaration of Liviu Vogel, dated March 11, 2013 ("Vogel Decl.") at ¶¶ 13, 17-19. The total of Plaintiffs' compensatory damages judgments exceeds $3.7 billion. *Id.* at ¶ 32. All Plaintiffs obtained orders permitting the execution of their judgments pursuant to 28 U.S.C. § 1610(c), a prerequisite to execution of judgments against foreign sovereigns and their agencies and instrumentalities under 28 U.S.C. § 1610(a) and (b). Vogel Decl. at ¶ 13. Most, if not all, Plaintiffs obtained writs of execution that have already been levied upon the Turnover Assets, which total roughly $1.75 billion (or roughly 47% of the amount of Plaintiffs' judgments). *Id.* at ¶ 2.

In June 2008, Plaintiffs began their efforts to enforce their judgments against the Turnover Assets. At that time, the Peterson Plaintiffs served restraining notices on defendants Citibank, N.A. and Clearstream Banking, S.A. and caused an execution to be levied upon Citibank by the U.S. Marshal with respect to roughly $2 billion in assets held in the name of defendant Bank Markazi in a Clearstream account at Citibank (the "Restraints"). *Id.* at ¶ 7. After Citibank and Clearstream moved to vacate that order, the Court lifted the Restraints with respect to $250 million in bonds that the Defendants claimed Markazi had sold before the Restraints issued. *Id.* That transfer is the subject of the fraudulent conveyance claims that certain Plaintiffs continue to pursue.

After the Peterson Plaintiffs conducted significant motion practice and discovery in the

Miscellaneous Action that they commenced to obtain the Restraints and otherwise facilitate the

collection of their judgment, they commenced a turnover action on June 8, 2010. *Id.* at ¶ 11.

The Court ordered consolidation of the turnover and miscellaneous proceedings on June 27,

2011. *Id.* at ¶ 25. The other Plaintiffs asserted their own turnover claims related to the Turnover

Assets in the consolidated action. *Id.* at ¶ 24.

While Plaintiffs were pursuing their turnover action, President Obama issued Executive

Order 13599 ("E.O. 13599") on February 5, 2012. Vogel Decl. at ¶ 16. E.O. 13599 declared the

Turnover Assets (and other Iranian assets) "blocked" pursuant to the President's authority under

the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.* Vogel

Decl. at ¶ 16. Following the issuance of E.O. 13599, all Plaintiffs joined in their April 2, 2012

summary judgment motion, which sought to enforce their rights to turnover of the Turnover

Assets pursuant to § 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA").[1] Vogel Decl. at

¶ 27. After Plaintiffs filed that motion, Congress passed 22 U.S.C. § 8772, which eliminated

certain of the supposed defenses that defendants Markazi and Clearstream had asserted to

turnover of the Turnover Assets. Vogel Decl. at ¶ 28. All Plaintiffs also joined in the

supplemental summary judgment brief that Plaintiffs filed on September 14, 2012 with respect to

their rights under § 8772. *Id.*

On February 28, 2013, the Court issued an Opinion and Order (the "Turnover Order")

ruling that § 8772 and TRIA entitled Plaintiffs to the turnover of the Turnover Assets from

Defendants. *Id.* at ¶ 29. The Turnover Order followed nearly thirty years of efforts by the

Peterson Plaintiffs in various settings to force Iran to pay for the terrorist attack upon the Beirut

---

[1] TRIA was adopted as Pub. L. No. 107-297, 116 Stat. 2322 (2002) and is codified at 28 U.S.C.
§ 1610 (Note).

2

Marine barracks in October 1983 that killed 241 American servicemen and injured dozens more. *Id.* at ¶¶ 17, 24. All of the other Plaintiffs have also struggled for years (and in some cases, decades) to enforce their judgments against Iran, and all have worked cohesively toward that goal in this action. *Id.* at ¶ 29.

On May 14, 2012, more than a month after Plaintiffs moved for summary judgment in this action, the Proposed Intervenors obtained a judgment from the United States District Court for the District of Columbia (the "DC Court") for $32,068,634 in compensatory damages and $300,000,000 in punitive damages against Iran, the Iranian Ministry of Information and Security, the Syrian Arab Republic, the Syrian Ministry of Defense, the Syrian Military Intelligence, and the Syrian Air Force Intelligence Directorate. *See* Sneider Decl. at ¶¶ 2-3 and Exs. 2-3. In that action, the Proposed Intervenors were represented by Robert Tolchin, who is also counsel for the Rubin Plaintiffs in this action. Vogel Decl. at ¶ 33. On January 16, 2013, just over a month before the Court issued the Turnover Order, the Proposed Intervenors secured an order from the DC Court pursuant to 28 U.S.C. § 1610(c) that authorized them to pursue efforts to execute upon their judgment pursuant to 28 U.S.C. § 1610(a) and (b).

Although the Proposed Intervenors' trial counsel knew of the status of this case, he never alerted the other Plaintiffs' counsel that the Proposed Intervenors wished to pursue any relief in this action. In fact, the Proposed Intervenors' trial counsel remained silent regarding the Proposed Intervenors' supposed interest in this action even as Plaintiffs' counsel spent months negotiating the terms of the settlement agreement that governs their sharing of the proceeds of their joint efforts in this matter and sought approval of that arrangement from the thousands of Plaintiffs. Vogel Decl. at ¶ 33.

3

Nonetheless, on the eve of the Court's favorable ruling regarding Plaintiffs' summary judgment motion – after Plaintiffs had worked for five years to achieve that result – the Proposed Intervenors' new counsel contacted Plaintiffs for the first time to suggest that the Proposed Intervenors should share in Plaintiffs' recovery. *Id.* at ¶ 34. The Proposed Intervenors' counsel have acknowledged the obvious point that the size of Plaintiffs' compensatory damages judgments far exceeds the amount of the Turnover Assets. *See* Proposed Intervenors' Mem. at pp. 3-4. Moreover, the Proposed Intervenors' counsel have never suggested any reason why the normal rules governing the priority of creditors' judgments are inapplicable here. *See* Vogel Decl. at ¶ 34.

Thus, the Proposed Intervenors concede that Plaintiffs' lien interests in the Turnover Assets are senior to the Proposed Intervenors' claims and that the total amount of the Plaintiffs' senior lien interest in the Turnover Assets significantly exceeds the amount of the Turnover Assets. Predictably, therefore, the Proposed Intervenors fail to advance any suggestion as to how they could obtain any relief in this action, much less after the Court has awarded Plaintiffs summary judgment and turnover.

In light of these facts, the Proposed Intervenors have no cognizable interest in the Turnover Assets. Moreover, unlike many Plaintiffs, the Proposed Intervenors do not assert a fraudulent conveyance claim, or any other cause of action that requires further consideration by the Court. Accordingly, no basis exists for the Court to grant Proposed Intervenors' motion.

**ARGUMENT**

### THE PROPOSED INTERVENORS' LONG-DELAYED MOTION DOES NOT SATISFY THE REQUIREMENTS FOR INTERVENTION AS OF RIGHT UNDER FED. R. CIV. P. 24(a) OR PERMISSIVE INTERVENTION UNDER FED. R. CIV. P. 24(b)

**A.      Rule 24's Intervention Requirements**

The Second Circuit has determined that "substantially the same factors" govern motions

to intervene irrespective of "whether the claim for intervention is 'of right' under Fed. R. Civ. P.

24(a)(2), or 'permissive' under Fed. R. Civ. P. 24(b)(2)." *"R" Best Produce, Inc. v. Shulman-*

*Rabin Mktg., Corp.*, 467 F.3d 238, 240 (2d Cir. 2006) (citing *In re Bank of New York Derivative*

*Litig.*, 320 F.3d 291, 300 n.5 (2d Cir. 2003)). "Intervention as of right under Rule 24(a)(2) is

granted when all four of the following conditions are met: (1) the motion is timely; (2) the

applicant asserts an interest relating to the property or transaction that is the subject of the action;

(3) the applicant is so situated that without intervention, disposition of the action may, as a

practical matter, impair or impede the applicant's ability to protect its interest; and (4) the

applicant's interest is not adequately represented by the other parties." *Mastercard Int'l, Inc. v.*

*Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006); *accord, e.g., Butler, Fitzgerald &*

*Potter v. Sequa Corp.*, 250 F.3d 171, 176 (2d Cir. 2001) (emphasizing that the failure to satisfy

any one of the same criteria mandates the denial of intervention). Rule 24(b), which governs

permissive intervention, provides: "On timely motion, the court may permit anyone to intervene

who: [¶] (A) is given a conditional right to intervene by a federal statute; or [¶] (B) has a claim or

defense that shares with the main action a common question of law or fact." District Courts'

determinations regarding motions to intervene are subject to deferential "abuse of discretion"

review on appeal. *E.g., United States v. City of New York*, 198 F.3d 360, 364 (2d Cir. 1999) ("It

is now well-settled that we review a district court's order denying intervention for abuse of discretion.").

**B.     The Proposed Intervenors Cannot Satisfy Their Burden Of Demonstrating That They Possess An Interest Relating To The Turnover Assets**

Most fundamentally, the Proposed Intervenors' motion fails because they cannot satisfy their burden of demonstrating the second intervention factor highlighted by the Second Circuit, *i.e.,* "an interest relating to the property or transaction that is the subject of the action." *Mastercard*, 471 F.3d at 389.  The Proposed Intervenors' inability to establish that required interest likewise compels the conclusion that they cannot satisfy their burden of demonstrating the third intervention factor, namely that "the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest." *Id.*

The Court recently resolved the issue of who is the rightful owner of the Turnover Assets in connection with Plaintiffs' motion for partial summary judgment.  After Plaintiffs established the validity of their judgments and their priority status as claimants against the Turnover Assets in connection with that motion, the Court awarded those assets to Plaintiffs by means of the February 28, 2013 Turnover Order.

The Court's summary judgment ruling, including its findings with respect to the validity of Plaintiffs' executions, followed exhaustive briefing and is law of the case. *See, e.g., Liona Corp. v. PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) ("Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation.").  Hence, no Iranian assets remain subject to the Proposed Intervenors' execution.  As a result, they have no right to intervene because they

6

possess no interest related to the Turnover Assets, "the property . . . that is the subject of the action." *Mastercard*, 471 F.3d at 389.

      The same conclusion would be true even had the Court not yet resolved the summary judgment motion.  In seeking to intervene at this very late date, the Proposed Intervenors ignore that judgment creditors do not simply obtain a pro rata right to participate in the recovery of a judgment debtor's assets by intervening in an existing turnover action or serving a later execution.  Rather, when multiple judgment creditors serve executions with respect to the same assets, courts must apply the controlling priority rules to determine which creditor is entitled to execute against those assets.  Here, whether one looks to federal or state law for the controlling standards, the conclusion that the Proposed Intervenors have no cognizable interest in the Turnover Assets follows.

      The Proposed Intervenors appear to contend that federal law provides the applicable priority rules because they assert that the Foreign Sovereign Immunities Act ("FSIA") prohibited them from seeking to collect upon their judgment until they obtained an order under 28 U.S.C. § 1610(c) declaring that "a reasonable period of time ha[d] elapsed following the entry of judgment and the giving of any notice required under [28 U.S.C. § 1608(e)]."  Even assuming, for argument's sake, the validity of that contention with respect to claims arising under TRIA and § 8772, the federal standards governing priority issues in cases to which § 1610(c) applies defeat the Proposed Intervenors' contention that they possess a cognizable interest in the Turnover Assets.  In FSIA actions where judgment creditors must obtain § 1610(c) authorization to execute against a judgment debtor's assets, a victim of terrorism obtains a priority lien upon those assets by obtaining a § 1610(c) order and serving a writ of execution upon the party holding the judgment debtor's assets.  *Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d

553, 569 (S.D.N.Y. 2012) (victims of terrorism pursuing recovery under TRIA must obtain

§ 1610(c) orders and writs of execution and, where "multiple holders of judgments against

terrorist entities" exist, "[t]he order in which judgment holders obtain such writs is then an

appropriate determinant of the order of priority among terrorist judgment holders"); *Levin v.*

*Bank of N.Y.*, 2011 U.S. Dist. LEXIS 23779, at *52 (S.D.N.Y. Mar. 4, 2011) (victims of

terrorism who served valid writs of execution after obtaining a § 1610(c) order obtained a

"priority interest" in blocked assets held at banking institutions).

      Plaintiffs demonstrate in Point I.C. that, in addition to failing the "interest" requirement

for intervention, the Proposed Intervenors' motion is untimely because they did not need to

obtain a § 1610(c) order before enforcing their judgment under 22 U.S.C. § 8772. If Plaintiffs

are correct and judgment creditors asserting rights under § 8772 need not obtain § 1610(c) orders

before executing upon the assets of a terrorist state, Fed. R. Civ. P. 69 dictates that the applicable

priority rules are provided by New York, the forum state. *See, e.g., Karaha Bodas Co. v.*

*Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002)

("The FSIA states that when a foreign state is not protected by sovereign immunity, 'the foreign

state shall be liable in the same manner and to the same extent as a private individual under like

circumstances.' 28 U.S.C. § 1606. In attachment actions involving foreign states, federal courts

thus apply Fed. R. Civ. P. 69(a), which requires the application of local state procedures.");

*Levin*, 2011 U.S. Dist. LEXIS 23779, at *50 ("'Rule 69(a) provides that in the absence of an

applicable federal statute the procedure in supplementary proceedings to execute a federal

court's judgment shall be that of the forum state.'") (quoting *Resolution Trust Corp. v. Ruggiero*,

994 F.2d 1221, 1226 (7th Cir. 1993)); Fed. R. Civ. P. 69(a) ("A money judgment is enforced by

a writ of execution, unless the court directs otherwise. The procedure on execution – and in

proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.").

Under New York's priority rules, the first creditor to deliver an execution to the sheriff or U.S. Marshal obtains a priority right to collect the identified assets. *See, e.g., Dorey v. Perfetti Builder's Hardware, Inc.*, 241 B.R. 507, 509 (Bankr. W.D.N.Y. 1999) ("[A] lien is obtained upon the personal property of a judgment debtor . . . when the execution has been actually delivered to the sheriff to be executed. Moreover, the lien upon the personal property arises, not when levy is made, but at the moment when the execution is delivered to the officer."); *State Tax Comm'r v. Shor*, 43 N.Y.2d 151, 157, 371 N.E.2d 523, 526, 400 N.Y.S.2d 805, 808 (1977) ("CPLR 5202 and 5234, governing rights and priorities of judgment creditors in personal property, require delivery of [an] execution to the Sheriff before a creditor may obtain priority in the property"); *Baker v. Hull*, 250 N.Y. 484, 488, 166 N.E. 175, 176 (1929) ("[F]rom the earliest period in our history it was the law of the State that a lien arises, not when a levy is made, but at the moment when an execution is delivered to an officer.").

Hence, under both federal and state priority law, the Proposed Intervenors' efforts to execute upon the Turnover Assets post-dated Plaintiffs' acquisition of priority interests in the Turnover Assets by several years. *See* Vogel Decl. at ¶¶ 2-16.  For example, the Peterson Plaintiffs' compensatory damages award alone vastly exceeds the amount of the Turnover Assets. *See* Vogel Decl. at ¶ 18.  The Peterson Plaintiffs secured their judgment in 2007, served their executions in 2008, and secured 1610(c) orders in both 2008 and 2012.  Vogel Decl. at ¶¶ 3-6, 14-15, 18-19.  In contrast, the Proposed Intervenors did not secure their Amended Judgment until June 4, 2012 (nearly five years after the Peterson Plaintiffs), did not obtain their

§ 1610(c) order until January 16, 2013 (four and one-half years after the Peterson Plaintiffs), and

did not obtain their executions until February 21, 2013 (four and one-half years after the Peterson

Plaintiffs). *See* Sneider Decl. at ¶¶ 2-3 and Exs. 3, 4, and 7. Because of this chronology, the

Proposed Intervenors did not even attempt in their papers (or in their conversations with

Plaintiffs' counsel) to conjure any basis for ruling that they possess a priority interest in the

Turnover Assets.

Furthermore, the Proposed Intervenors cannot claim that they failed to recognize their

need to demonstrate a priority right to collect upon the Turnover Assets. The need for later-

arriving creditors to do so is well established in New York law and in decisions concerning

efforts to enforce judgments against terrorist states. Furthermore, Plaintiffs' counsel specifically

addressed this issue with the Proposed Intervenors' counsel *before* they filed this motion. *See*

Vogel Decl. at ¶ 34. Accordingly, because the Proposed Intervenors have failed to demonstrate

the requisite priority interest, and cannot raise arguments concerning that issue for the first time

on reply, their concession that the amount of Plaintiffs' judgments vastly exceeds the amount of

the Turnover Assets defeats the motion to intervene.[2]

A practical note is also in order here. Plaintiffs recognize that they have produced an

enormous recovery, the Proposed Intervenors are also victims of Iranian terrorism, and Plaintiffs

could allow the Proposed Intervenors to share in the recovery without diluting Plaintiffs'

collections to a great extent. Since Plaintiffs obtained summary judgment, however, creditors

holding many millions of dollars of judgments against Iran have contacted Plaintiffs' counsel

---

[2] The Proposed Intervenors have not asserted any fraudulent conveyance or other common law claims against the Defendants who conspired to assist Iran in avoiding the payment of certain Plaintiffs' judgments. *See, e.g.,* Peterson Plaintiffs' Second Amended Complaint at ¶¶ 210-37, 256-74. Accordingly, the Proposed Intervenors have no interest in the remaining claims in this action.

and expressed their desire to share in that recovery. *See* Vogel Decl. at ¶ 36. Moreover, because

of the scope of the terrorism that Iran has sponsored, many billions of dollars in additional

judgments against Iran remain outstanding. Thus, many more judgment holders, with billions

more in unsatisfied judgments, will also seek to intervene in this action to pursue claims for

which they enjoy no priority if the Court permits the Proposed Intervenors to share in Plaintiffs'

recovery.

**C.    The Proposed Intervenors Have Also Failed To
       Demonstrate The Timeliness Of Their Motion**

As Plaintiffs note above, parties seeking to intervene in ongoing litigation must also

demonstrate the timeliness of their motion. *Mastercard*, 471 F.3d at 389; *Butler*, 250 F.3d at

176. A non-inclusive list of factors that courts may consider in assessing timeliness includes:

"'(a) the length of time the applicant knew or should have known of [its] interest before making

the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to

[the] applicant if the motion is denied; and (d) [the] presence of unusual circumstances militating

for or against a finding of timeliness.'" *Mastercard*, 471 F.3d at 390 (quoting *United States v.*

*New York,* 820 F.2d at 557). The Supreme Court has also recognized that "the point to which the

suit has progressed is one factor in the determination of timeliness," although that factor "is not

solely dispositive." *NAACP v. New York,* 413 U.S. 345, 365-66 (1973). Timeliness "is to be

determined by the court in the exercise of its sound discretion; unless that discretion is abused,

the court's ruling will not be disturbed on review." *Id.* at 366.

Even if the Proposed Intervenors possessed some cognizable interest in the Turnover

Assets that the Court has already awarded to Plaintiffs, the motion to intervene would fail Rule

24's timeliness requirement. The Proposed Intervenors have asserted that they could not have

intervened in this action until they received authorization to execute against Iran's assets under

28 U.S.C. § 1610(c).  The text of that provision provides: "No attachment or execution *referred to in subsections (a) and (b) of this section* [*i.e.,* 28 U.S.C. §1610(a) and (b)] shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter."  (Emphasis added).

The Proposed Intervenors fail to recognize, however, that one of the bases for the Court's Turnover Order – 22 U.S.C. § 8772 – is not set forth in 28 U.S.C. § 1610.  Rather, § 8772 establishes unique requirements for the circumstances in which the specific Turnover Assets at issue in this action "shall be subject to execution or attachment in aid of execution in order to satisfy any judgment to the extent of any compensatory damages awarded against Iran for damages for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, or hostage-taking, or the provision of material support or resources for such an act."  22 U.S.C. § 8772(a)(1).  Thus, by its express terms, § 1610(c) is inapplicable to § 8772, which does not provide for an "execution *referred to in subsections (a) and (b) of this section* [*i.e.,* 28 U.S.C. §1610(a) and (b)]."  28 U.S.C. § 1610(c) (emphasis added).[3]  Rather, § 8772 provides its own rules for executing upon the Turnover Assets.

Moreover, § 8772 expressly provides that the Turnover Assets "shall be subject to execution" "notwithstanding any other provision of law, *including any provision of law relating to sovereign immunity.*"  22 U.S.C. § 8772(a)(1) (emphasis added).  As Plaintiffs discussed in detail in their summary judgment briefs, that "notwithstanding" language operates to preempt any contrary provision of state or federal law, which would include any limitation set forth in

---

[3]  The Greenbaum, Acosta, Beer, Kirschenbaum and Heiser Judgment Creditors hereby make clear their position that this argument does not apply to the Terrorism Risk Insurance Act, or TRIA.

§ 1610(c) regarding the ability of the victims of Iranian terrorism to execute upon the Turnover Assets. *See* Plaintiffs' Mem. of Law in Support of Their Motion for Summary Judgment, dated April 2, 2012, at pp. 17-19; Plaintiffs' Supplemental Reply Mem. of Law in Support of Their Motion for Summary Judgment, dated December 3, 2012, at pp. 31-32.[4]

Thus, the text of § 8772 belies the Proposed Intervenors' contention that their delay in intervening in this action is excused by the supposed need to secure a § 1610(c) order prior to undertaking efforts to execute upon the Turnover Assets. As a result, the Proposed Intervenors had no legitimate reason to delay filing their motion to intervene until six and one-half months after President Obama signed § 8772 into law on August 10, 2012. Given the advanced stage of this litigation at the time the Proposed Intervenors decided to await the issuance of the § 1610(c) order, that delay alone justifies the denial of the Proposed Intervenors' motion. *See, e.g., Angelo Holding Corp. v. United States*, 321 Fed. Appx. 28, 29 (2d Cir. 2009) (denying intervention in post-foreclosure surplus action brought by entity whose predecessor-in-interest forfeited a substantial down payment when it failed to close on a first foreclosure sale involving the foreclosed property where the proposed intervenor filed its motion "fifteen months after the second (successful) foreclosure sale, and eleven months after that sale was formally closed in February 2006"); *Butler,* 250 F.3d at 182 (law firm's one-year delay in seeking to intervene in an ongoing action where it had been discharged as counsel for the purpose of protecting its charging lien weighed heavily against permitting intervention); *Bernheim v. Damon and Morey, LLP,*

---

[4] The Peterson Plaintiffs also argued previously that TRIA's language is at odds with the Proposed Intervenors' contention that judgment creditors pursuing TRIA claims must first obtain a § 1610(c) order. *See* Plaintiffs' Reply Memorandum of Law in Support of Their Motion For Partial Summary Judgment, dated August 3, 2012, at pp. 54-57; *but see Levin*, 2011 U.S. Dist. LEXIS 23779, at *39 (making a contrary determination). Given that § 8772 provided an obvious alternative basis for the Turnover Order (a fact known to the Proposed Intervenors' trial counsel), the Court need not resolve whether plaintiffs pursuing TRIA claims must first obtain a § 1610(c) order to assess the timeliness of the Proposed Intervenors' motion.

2007 U.S. App. LEXIS 15530, at *7-8 (2d Cir. June 28, 2007) ("As Bernheim has failed to

justify his three month delay in filing his motion to intervene, we cannot say that the District

Court abused its discretion in denying that motion as untimely."); *In re Holocaust Victim Assets*

*Litig.*, 225 F.3d 191, 198-99 (2d Cir. 2000) (denying motion to intervene brought by group of

Polish Holocaust survivors who waited eight months before filing their motion); *United States v.*

*Pitney Bowes, Inc.*, 25 F.3d 66, 71 (2d Cir. 1994) (denying intervention where applicant should

have known of potential interest in Superfund litigation from notice filed in Federal Register

eight months prior to the motion).

Furthermore, the fact that the Proposed Intervenors obtained their § 1610(c) order only

two months ago (*see* Sneider Decl. at ¶ 3 and Ex. 4) and their execution only last month (*id.* at

¶ 3 and Ex. 7) actually serves to highlight, rather than excuse, the untimeliness of their motion to

participate in this action. As the Proposed Intervenors concede, they did not obtain their

§ 1610(c) order until *several years after* Plaintiffs obtained their orders. *See* Vogel Decl. at

¶¶ 13-14. Moreover, the Proposed Intervenors moved to intervene nearly *eleven months after*

Plaintiffs moved for summary judgment and just days before Plaintiffs succeeded in obtaining

the Turnover Order following years of hard-fought litigation efforts. As a result, the Proposed

Intervenors' motion fails any reasonable definition of the term timely.

Moreover, even putting aside the § 1610(c) issue, the Proposed Intervenors acted in a

leisurely manner in commencing their efforts to participate in this action after securing their

amended judgment from the DC Court. For example, the Proposed Intervenors: (a) filed an

appeal of their summary judgment ruling only to later voluntarily dismiss their appeal, a

misguided step that delayed their intervention by seven weeks (*see* Vogel Decl. at ¶ 35 and

Ex. P); (b) waited nearly nine weeks to file their motion for a § 1610(c) order in the DC Court

14

although they acknowledged that precedent in that District indicated that a six-week delay after

service upon a foreign sovereign sufficed (*see id.*); and (c) waited more than three weeks after

they secured the § 1610(c) order to obtain a certified version of the judgment from the DC Court

and an additional eleven days to register the judgment in this District, ministerial tasks that could

easily have been achieved in far less time (*see* Proposed Intervenors' Mem. at 2-3).

In these circumstances, the Proposed Intervenors' delay in pursuing their supposed right

to execute against the Turnover Assets weighs heavily against permitting intervention.  A

contrary ruling would encourage judgment creditors to wait for other victims of terrorism to fight

the invariably costly and time consuming battle to collect the assets of terrorist states and then

swoop in following favorable resolutions and claim a right to share in the proceeds of the

litigants' efforts.  Neither TRIA, nor § 8772, nor basic principles of justice permit such an

inequitable result.

Furthermore, the Second Circuit has recognized that "unusual circumstances" may also

"militat[e] for or against a finding of timeliness.'"  *Mastercard*, 471 F.3d at 390 (quoting *United

States v. New York,* 820 F.2d 554, 557 (2d Cir. 1987)).  Here, a host of "unusual circumstances"

weigh heavily in favor of denying intervention.  As noted above, Plaintiffs have been fighting in

this District, tooth and nail, for five years to obtain their victory.  Without the expeditious efforts

of the Peterson Plaintiffs to secure restraints against the Turnover Assets, Markazi, Clearstream

and UBAE would have long ago transferred those assets outside of the United States.  Thus,

there would be no case for the Proposed Intervenors to participate in, and no Turnover Assets for

them to collect upon, had they been left to their own efforts.

It is also significant that the Peterson Plaintiffs have waited nearly thirty years to obtain

some relief for the Beirut Marine barracks attack that killed their loved ones and maimed many

15

more Plaintiffs. *See* Vogel Decl. at ¶¶ 17, 29. Other Plaintiffs have likewise waited many years

with unsatisfied judgments against Iran. *See id.* at ¶ 29. To allow the Proposed Intervenors to

leapfrog all of the Plaintiffs and collect against the Turnover Assets in those circumstances

would be a gross miscarriage of justice. Accordingly, the "unusual circumstances" the Second

Circuit has deemed relevant to the timeliness determination bolster the conclusion that the

Proposed Intervenors' motion was untimely.

The Proposed Intervenors also ignore the prejudice issues that the Second Circuit has

highlighted in making timeliness decisions. *See Mastercard*, 471 F.3d at 390. First, the

Proposed Intervenors incorrectly contend that their intervention at this late date would not

prejudice Plaintiffs. To the contrary, the Peterson Plaintiffs restrained and commenced efforts to

execute upon the Turnover Assets five years ago. *See* Vogel Decl. at ¶¶ 2-7. Since that time,

they and the other Plaintiffs have worked tirelessly here in New York and elsewhere in order to

secure the payment of their judgments by Iran or its agencies and instrumentalities. *See id.* at

¶ 30. In this Court alone, those efforts have required the expenditure of millions of dollars in

legal fees and hundreds of thousands of dollars in expenses. *Id.*

While undertaking those extensive efforts, Plaintiffs made countless strategic decisions

that were impacted by the identities of the parties in this litigation and the status of Plaintiffs'

collection efforts. Perhaps most importantly, Plaintiffs struck an agreement that governs their

relative interests in any funds ultimately recovered in this litigation in order to avoid the delay

and other difficulties inherent in any internal battle to establish priority to the Turnover Assets

among themselves. *Id.* at ¶¶ 31-32.

Thus, the Proposed Intervenors filed their motion only after years of coordinated efforts

by Plaintiffs in this action. Permitting the Proposed Intervenors to intervene at this juncture to

litigate priority issues *after* the Court has resolved the matter would be downright cruel to
Plaintiffs, who have finally secured a meaningful recovery following years of frustration. That
result would further delay justice – at well past the eleventh hour – for victims of terrorism who
have put forth enormous effort at great expense to push this case to a successful result.
Encouraging such delay would also upset the delicate balance that Plaintiffs struck in their
compromise agreement between expediting the resolution of this action and pursuing their
priority claims among themselves. *See id.*

Accordingly, the prejudice to Plaintiffs entailed in the Proposed Intervenors' belated
intervention suffices – even standing alone – to justify a ruling that the motion is untimely. *See,
e.g., Mastercard,* 471 F.3d at 381, 390-91 (denying Visa intervention in an action brought by
Mastercard related to its supposed right to serve as sponsor of soccer's World Cup because
permitting Visa to intervene six months after Mastercard commenced the action and just weeks
prior to a preliminary injunction hearing would prejudice Mastercard); *D'Amato v. Deutsche
Bank,* 236 F.3d 78, 84 (2d Cir. 2001) (finding motion to intervene untimely, in part because
"[a]ppellant offers no explanation for waiting to file his intervention motion until three days prior
to the Fairness Hearing"); *Schonfeld v. City of New York*, 14 Fed. Appx. 128, 131 (2d Cir. 2001)
(denying motion to intervene as untimely where lawsuit had proceeded to summary judgment
stage and delay to accommodate proposed intervenor would therefore prejudice all parties);
*Pitney Bowes*, 25 F.3d at 72 (delay inherent in belatedly adding new party to well-developed
settlement negotiations in CERCLA action constituted prejudice sufficient to justify denial of
intervention); *United States v. New York*, 820 F.2d at 557 (denying intervention by party who
sought admission to state trooper class just one month prior to commencement of classes based

17

upon race discrimination arguments because granting motion would impermissibly prejudice state by requiring it to reassess the membership of the new class).

The Proposed Intervenors also fail to articulate any actual prejudice that they will suffer if the Court denies their motion because, as Plaintiffs demonstrate above, the Proposed Intervenors fail to assert any cognizable interest in the Turnover Assets. *See Mastercard*, 471 F.3d at 390 (highlighting potential prejudice to proposed intervenors as one factor to consider in making timeliness decisions). Undeniably, the recovery of the Turnover Assets represents a significant victory for Plaintiffs, and substantial obstacles exist to the collection upon the remaining portions of Plaintiffs' judgments and the Proposed Intervenors' judgments. However, this action, the *650 Fifth Avenue* case pending before the court, *Levin* and the numerous other enforcement actions in which Plaintiffs are currently participating demonstrate that the impediments to collecting judgments issued against terrorist states are not so substantial as they once were.

Hence, with continued dedicated efforts, Plaintiffs and the Proposed Intervenors can hope one day to collect in full upon their judgments. As a result, any suggestion that this action represents the Proposed Intervenors' sole chance for securing the payment of their judgment is simply incorrect. Iran generates substantial oil revenue throughout the world, and its assets regularly pass through the international monetary system. *See, e.g.,* U.S. Energy Information Administration Analysis of Iran, available at http://www.eia.gov/countries/cab.cfm?fips=IR (noting that "Iran holds the world's fourth-largest proven oil reserves and the world's second-largest natural gas reserves"). The need for the Proposed Intervenors to await another slip by Iran that brings those assets into the American financial system does not amount to the type of

18

prejudice that would justify ignoring the well-established priority rules governing the collection of judgments.

CONCLUSION

For all of the reasons set forth above, the Court should deny the Proposed Intervenors' motion to intervene in this action in all respects.

Dated:  March 11, 2013                    Respectfully submitted,

Liviu Vogel
Salon Marrow Dyckman Newman & Broudy LLP
292 Madison Avenue
New York, NY  10017
(212) 661-7100

                                              – and –

James P. Bonner
Patrick L. Rocco
Stone Bonner & Rocco LLP
260 Madison Avenue, 17th Floor
New York, NY  10016
(212) 239-4340

*Attorneys for Peterson Plaintiffs*

Curtis C. Mechling
James L. Bernard
Benjamin Weathers-Lowin
Monica Hanna
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY  10038
(212) 806-5400

*Attorneys for Greenbaum and Acosta Plaintiffs*

19

Richard Marc Kremen
DLA Piper US LLP (MD)
6225 Smith Avenue
Baltimore, MD 21209
(410) 580-3000

*Attorneys for Heiser Plaintiffs*


Suzelle M. Smith
Howarth and Smith (LA)
523 West Sixth Street,
Suite 728
Los Angeles, CA 90014
(213) 955-9400

*Attorneys for Levin Plaintiffs*


Keith Martin Fleischman
Fleischman Law Firm
565 Fifth Avenue, 7th Floor
New York, NY 10017
(212) 880-9571

*Attorneys for Valore Plaintiffs*