UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
~~~~~~~~~~~~ FILED
DOC #:_____
DATE FILED: FEB 2 8 2013

DEBORAH D. PETERSON, Personal    :
Representative of the Estate of James C. Knipple  :
(Dec.), et al.,    :

                  Plaintiffs,  :

                  -v-  :

ISLAMIC REPUBLIC OF IRAN, BANK MARKAZI  :
a/k/a CENTRAL BANK OF IRAN, BANCA UBAE  :
SpA, CITIBANK, N.A., and CLEARSTREAM  :
BANKING, S.A.,  :

                Defendants.  :
------------------------------------------------------------------X

10 Civ. 4518 (KBF)
OPINION AND ORDER

KATHERINE B. FORREST, District Judge:

      Before this Court are eighteen groups of judgment creditors, comprised of

more than a thousand individuals, who seek assets of the Islamic Republic of Iran

and related entities (collectively "Iran" unless stated otherwise).[1] Each group of

---

[1] The judgment creditor groups are defined as the plaintiffs in this action, as well as the third-party respondents named in defendant Citibank's interpleader petition. This includes the plaintiffs in the following actions: (1) Peterson v. Islamic Republic of Iran ("Peterson action"), No. 10 Civ. 4518 (KBF)(S.D.N.Y.); (2) Greenbaum et al. v. Islamic Republic of Iran, et al. ("Greenbaum action"), 02 Civ. 2148 (RCL)(D.D.C.); (3) Acosta, et al. v. Islamic Republic of Iran, et al. ("Acosta action"), 06 Civ. 745 (RCL)(D.D.C.); (4) Rubin, et al. v. Islamic Republic of Iran ("Rubin action"), 01 Civ. 1655 (RCL)(D.D.C.); (5) Estate of Heiser et al. v. Islamic Republic of Iran et al. ("Heiser action"), 00 Civ. 2329 and 01 Civ. 2104 (RCL)(D.D.C.); (6) Levin v. Islamic Republic of Iran ("Levin action"), 05 Civ. 2494 (GK)(D.D.C.); (7) Valore, et al. v. Islamic Republic of Iran, et al. ("Valore action"), 03 Civ. 1959 (RCL)(D.D.C.); (8) Bonk, et al. v. Islamic Republic of Iran et al. ("Bonk action"), 08 Civ. 1273 (RCL)(D.D.C.); (9) Estate of James Silvia, et al. ("Silvia action"), 06 Civ. 750 (RCL)(D.D.C.); (10) Estate of Anthony K. Brown, et al. v. Islamic Republic of Iran, et al. ("Brown action"), 08 Civ. 531 (RCL)(D.D.C.); (11) Estate of Stephen B. Bland v. Islamic Republic of Iran, et al., ("Bland action"), 05 Civ. 2124 (RCL)(D.D.C.); (12) Judith Abasi Mwila, et al. v. Islamic Republic of Iran, et al. ("Mwila action"), 08 Civ. 1377 (JDB)(D.D.C.); (13) James Owens, et al. v. Republic of Sudan, et al. ("Owens action"), 01 Civ. 2244 (JDB)(D.D.C.); (14) Rizwan Khaliq, et al. v. Republic of Sudan, et al. ("Khaliq action"), 08 Civ. 1273 (JDB)(D.D.C.). By orders dated June 27, 2011 (ECF No. 22) and July 28, 2011 (ECF No. 32), these judgment creditors were added to the consolidated action 10 Civ. 4518. In June 2012, four additional actions by way of supplemental third-party respondents to the Citibank Interpleader were added: (15) Beer et al. v. Islamic Republic of Iran et al. ("Beer action"), 08 Civ.

victims or their estates has obtained judgments against Iran for injury or wrongful death arising from acts of terrorism Iran sponsored, led, or in which it participated. Together, plaintiffs have obtained billions of dollars in judgments against Iran, the vast majority of which remain unpaid. These judgments were – long ago – duly registered in this district. As amongst themselves, plaintiffs have informed the Court that they have reached agreement as to the priority and manner of distribution of any recovery. (See Tr. of Nov. 27, 2012, Status Conf. at 15:19-22, ECF No. 293.)

Each group of plaintiffs seeks turnover of assets currently held at Citibank, N.A. ("Citibank"), as part of efforts to satisfy these outstanding judgments. (Second Am. Compl., ECF No. 160.) Citibank is a stakeholder without interest in the ultimate outcome of this dispute. (Third Party Pet. in Nature of Interpleader ("Citibank Interpleader"), ECF No. 38.) Its interest is in resolution of ownership of funds held in the account so that it may, if and when requested, ensure that the funds are appropriately disbursed. (See Letter of Sharon L. Schneier to the Hon. Katherine B. Forrest, Dec. 14, 2012, ECF No. 300 (noting "Citibank is a neutral stakeholder in this proceeding")).

These actions have been litigated in fits and starts; some of the delays are certainly attributable to the fact that established procedures for obtaining writs of

---

1807 (RCL)(D.D.C.); (16) Kirschenbaum et al. v. Islamic Republic of Iran et al. ("Kirschenbaum action"), 03 Civ. 1708 (RCL)(D.D.C); (17) Arnold et al. v. Islamic Republic of Iran et al. ("Arnold action"), 06 Civ. 516 (RCL)(D.D.C.), and (18) Murphy et al. v. Islamic Republic of Iran et al. ("Murphy action"), 06 Civ. 596 (RCL)(D.D.C.). While these actions came to this Court originally in different procedural postures, they are all seeking collection of judgments with regard to the same assets as set forth herein, and are treated by the Court for ease of reference as "plaintiffs" herein.

attachment, restraining funds and executing judgments thereon are not well suited to large, complex actions such as this.  For instance, for a number of years many of the actions were categorized as "miscellaneous" and were not assigned to any particular judge.  Additionally, litigation against any sovereign inserts legal complexities.  Finally, the basic fact that billions of dollars are at stake virtually insures vigorous litigation.  And without a doubt these actions have been vigorously litigated.  All matters as to each of the eighteen creditor groups have been collected together and proceeded before this Court since December 10, 2012.

Defendants do not dispute the validity of plaintiffs' judgments.  They do, however, dispute that the assets held at Citibank are subject to turnover, and that this Court has jurisdiction over those assets or over certain defendants.  Defendants Bank Markazi, UBAE and Clearstream have also raised issues of state, federal (including a number of constitutional arguments), and international law to oppose turnover.

Currently before this Court are five groups of motions:

First, defendants UBAE S.p.A. ("UBAE") and Clearstream Banking S.A. ("Clearstream") have separately moved to dismiss the claims against them for lack of personal jurisdiction. (ECF Nos. 295, 299, 301.)  Plaintiffs have opposed these motions. (ECF Nos. 302, 306, 313, 323, 324.)

Second, Bank Markazi has moved to dismiss the claims against it for lack of subject matter jurisdiction. (ECF No. 205.)  Plaintiffs have opposed that motion. (ECF No. 219.)

Third, defendant Clearstream has renewed its earlier motion to vacate restraints. (ECF No. 174.)  Plaintiffs oppose this motion.  (ECF No. 199.)

Fourth, all plaintiffs have moved (or joined in the motion) for partial summary judgment for turnover of the assets held at Citibank. (ECF Nos. 209, 307.) Defendants Bank Markazi, UBAE, and Clearstream oppose this motion; defendant Citibank takes no position beyond its reliance on the arguments raised by the other parties. (ECF Nos. 261, 282, 284, 286, 300, 328.)

Fifth, the Bland judgment creditors have moved to authorize execution and/or attachment against assets of Iran.  (ECF No. 305.)

Altogether, these motions and supporting materials consume several thousands of pages.  For the reasons set forth below, this Court denies each of the defendants' motions, grants plaintiffs' motion for partial summary judgment and turnover and grants the Bland plaintiffs' motion to execute.

## I.    FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted. Bank Markazi is the Central Bank of Iran, an agency of the Iranian Government.  By 2008, Bank Markazi had over $2 billion in bonds (the "Markazi Bonds") denominated in U.S. dollars held in an account with defendant Clearstream S.A.  Those bonds have subsequently been split into two groups relevant to this action: first, $1.75 billion in cash proceeds of the bonds are held in an account at Citigroup in New York; these proceeds are subject to restraints imposed by the Court, by Executive Order, and by statute.  The proceeds are the subject of, inter alia, plaintiffs' motion for partial

4

summary judgment and turnover and Clearstream's motion to vacate the restraints. The second group consists of two securities—with a face value of $250 million—that were originally part of the Markazi Bonds.  Following a June 2008 evidentiary hearing in which Judge Koeltl lifted the restraints as to those two securities, they were sold on the open market.  The $250 million are relevant to several of plaintiffs' claims, but are not addressed by the pending turnover motion or the motion to vacate the restraints.

Prior to maturity, each Markazi Bond (from both groups) had been issued in physical form and was registered with either the Federal Reserve Bank of New York ("FRBNY") or the Depository Trust Company ("DTC"), also located in New York.  Accordingly, prior to maturity, the FRBNY and the DTC were the custodians of the Markazi Bonds.

For a period of years, Bank Markazi maintained an account with Clearstream S.A. which, in turn, maintained a correspondent account on its behalf at Citibank to handle funds associated with the bonds, including interest and principal payments.

Clearstream Luxembourg is an "international service provider for the financial industry offering securities settlement and custody-safekeeping services." (See Clearstream Consolidated Mem. of L. in Support of its Renewed Mot. to Vacate Restraints at 1.) "Clearstream serves as an intermediary between financial institutions worldwide to ensure that transactions from one bank to another are efficiently and successfully completed." (Id. at 1-2.) "As a post trade services

provider currently covering the international and 52 domestic markets, Clearstream has over 2,500 financial institutions from all over the world among its customer base . . ." (Id. at 2.)

One of Clearstream's offices is in New York City.  At all times relevant to these motions, the office that Clearstream maintained in New York engaged in sales, marketing and administrative activities relating to Clearstream's international financial services business.  The New York office employed New York-based staff.  Those New York employees had access to facilities supportive of sales and marketing efforts such as office space, telephones, email access and addresses and fax lines.  Clearstream paid its New York staff out of bank accounts maintained in New York.  Since 2002, Clearstream has been registered with New York State to maintain a representative office and conduct certain activities in New York. There is no evidence in the record that Clearstream's New York office was a depository institution.  Nor is there evidence in the record that Clearstream's Luxembourg office attempted to maintain any corporate separation from its New York office. Indeed, based on Clearstream's submissions in this matter, its New York office was intended to act as a sales and marketing arm for its Luxembourg operations. Clearstream Luxembourg used its New York office to seek additional business for its Luxembourg-based financial organization and also used it to ensure seamless service to clients by maintaining points of contact in New York.

Over the years, Citibank has maintained an account in New York for Clearstream, to which the proceeds of the Markazi Bonds were posted.  The parties

dispute the extent to which Clearstream's New York office was involved in activities relating to the account it maintained at Citibank in New York on behalf, first, of Bank Markazi and later on behalf of defendant UBAE—in connection with services provided with respect to the Markazi Bonds. However, as set forth below, the resolution of that factual dispute is unnecessary to resolution of the instant motions.

From time to time, interest was paid on the bonds and posted to Clearstream's account at Citibank. As the bonds matured, the proceeds were credited to that same account.

In 2008, UBAE, a bank located in Italy, opened a new account with Clearstream, its second such account.[2] The record evidence supports UBAE's position that this account was opened at Clearstream's Luxembourg office. Following the opening of that account, Clearstream recorded a transfer of the entirety of the Markazi Bonds from Bank Markazi to UBAE—plaintiffs point to evidence that this transfer was marked "free of payment".

According to UBAE, in 2008, Bank Markazi asked that UBAE close and sell two securities—with a face value of $250 million[3]—held in the new UBAE custodial account located at Clearstream Luxembourg. (Reply Decl. of Biagio Matranga to Pls.' Opp. to Def. UBAE's Mot. to Dismiss ("Matranga Reply Decl.") ¶ 7, ECF No.

---

[2] Plaintiffs urge that the timing of UBAE's actions with respect to opening its account with Clearstream and engagement in various transactions with Bank Markazi demonstrate that Bank Markazi was engaged in efforts to avoid the very turnover now at issue. In resolving these motions, this Court need not and does not refer to that timeline, or any inferences which a finder of fact might draw thereon.

[3] The bonds associated with these transactions were those as to which Judge Koeltl had lifted the restraints following the evidentiary proceeding held in June 2008. One of plaintiffs' claims for fraudulent conveyance relate to the proceeds from those bonds.

308.)  UBAE negotiated a selling price and offered to buy the securities from Bank Markazi at a price slightly lower than the negotiated selling price, the difference representing its fee for the transaction.  (Id. ¶ 8.)  The sale to the third party customers occurred in Luxembourg and customers of Clearstream Luxembourg purchased both securities. (Id. ¶¶ 9-10.)  UBAE concedes that this sale was performed at the request of and for the benefit of Bank Markazi.  (Id. ¶ 13.)

Plaintiffs allege that, despite any allegations that the sale of the $250 million in Markazi Bonds occurred in Luxembourg, the defendants arranged for the transfer of the dollar-denominated bond proceeds from the Citibank account in New York to UBAE.  (SAC ¶ 98.)  Clearstream allegedly instructed Citibank to transfer the cash proceeds of the $250 million from the holding account to Clearstream's cash account.  (Id.)  Next, Clearstream instructed Citibank to make an electronic funds transfer ("EFT") of the cash from Citibank to UBAE's correspondent bank in New York, HSBC. (Id. ¶¶ 100, 214.)  Finally, UBAE, acting on behalf of Bank Markazi, then wired the cash from HSBC to UBAE in Italy.

After the sale of the $250 million, over $1.75 billion in proceeds the Markazi Bonds thus remain in the UBAE / Clearstream account currently at Citibank in New York.  On a number of occasions, Bank Markazi has stated that it owns the Markazi Bonds and all proceeds associated with them (now held in the Citibank account).  It has stated that "Over $1.75 billion in securities belonging to Bank Markazi . . . are frozen in a custodial Omnibus Account at [Citibank]"; that the "Restrained Securities are the property of Bank Markazi, the Central Bank of Iran",

8

that the "aggregate value of the remaining bond instruments, i.e. the Restrained Securities that are the property of Bank Markazi and the subject of the Turnover Action – is thus $1.753 billion"; that the "Restrained Securities are the property of a Foreign Central Bank . . ."; that the "Restrained Securities are presumed to be the property of Bank Markazi"; and "the Restrained Securities are prima facie the property of a third party, Bank Markazi . . . ." (See Bank Markazi's First Mem. of L. in Support of its Mot. to Dismiss the Am. Compl. ("Markazi's First MOL") at 1, 5, 9, 10, 36, ECF No. 18.)  In addition, two officers of Bank Markazi have sworn under penalty of perjury that the Blocked Assets are the "sole property of Bank Markazi and held for its own account." (Aff. of Gholamossein Arabieh ¶ 2, Decl. of Liviu Vogel in Support of Pls.' Mot. for Partial Summ. Judgment ("Vogel Decl."), Ex. J, Oct. 17, 2010, ECF No. 210; Aff. of Ali Asghar Massoumi ¶ 2, Vogel Decl. Ex. K, Oct. 17, 2010, ECF No. 210).  UBAE has similarly asserted that it does not have a "legally cognizable interest in the restrained bonds." (See UBAE Mem. of L. in Opp. to Pls.' Mot. for Summ. J. ("UBAE S.J. Opp. Br.") at 2, ECF No. 328.)

All initial transactions relating to payment of interest and principal for the Markazi Bonds have occurred in New York.  Clearstream's Citibank account has been credited with any such payments.  Prior to the 2008 "free of payment" transfer, Clearstream's procedure was then to credit Bank Markazi's Clearstream account with the appropriate amounts; following the transfer, Clearstream has credited such amounts to UBAE.  UBAE concedes that it has paid interest to Bank Markazi related to the bonds; such interest payments were credited to Bank Markazi's

account with UBAE in Rome.  (See Decl. of Biagio Matranga ("Matranga Decl.")
¶15, ECF No. 95.)  UBAE maintained its correspondent account at HSBC in New
York until at least some time in 2009. (Id. ¶ 5.)

UBAE acknowledges that at the close of each day, and sometimes more than
once a day, its treasurer (located in Italy) arranges for electronic transfers of the
balance of any of its proprietary international U.S. Dollar accounts to its U.S. Dollar
correspondent account at HSBC in New York, where they are pooled and may be
transferred to Italy.  (See Id.)

In 2012, the last of the Markazi Bonds matured.  Clearstream's account at
Citibank currently consists of cash associated with the bonds.[4]

UBAE sold the bonds and Clearstream, on behalf of UBAE, instructed
Citibank New York to transfer the cash proceeds of the sale from Citibank New
York to Clearstream's account at Citibank New York.  As with the $250 million
sale, when UBAE requested a withdrawal, Clearstream instructed Citibank to
make an EFT through Clearstream's correspondent bank, JP Morgan Chase in New
York, to UBAE's correspondent bank in New York, HSBC.

On June 12, 2008, this Court issued a writ of execution as to the Blocked
Assets.  (ECF No. 84.)  This writ was levied upon Citibank as of June 13, 2008.  The
legal effect of levying this writ upon the Markazi Bonds and associated bank
accounts was to restrain those assets.  On October 17, 2008, this Court issued a

---

[4] The cash held in Clearstream's Citibank account is herein referred to as the "Blocked Assets."  The
terms "blocked" and "restrained" have particular legal importance.  As discussed, infra, the Blocked
Assets have been "blocked" pursuant to statute.  The Blocked Assets were "restrained" pursuant to
statute and by the writs of attachment previously obtained by the plaintiffs herein.

second writ of execution, this time against Clearstream Banking S.A.  (ECF No. 118.)  Plaintiffs served Citibank and Clearstream Banking S.A. with Restraining Notices and Amended Restraining Notices later in June 2008.  On June 27, 2008, this Court ordered that the Markazi Bonds and associated accounts (all encompassed within the category of "Blocked Assets") remain restrained until further order.  (ECF No. 103.)  Various extensions of the original restraints were issued by this Court in June 2009, May and June 2010.  (ECF No. 171; Vogel Decl. Ex. G, Order Extending Levy, 18 Misc. 302 (BSJ)(S.D.N.Y. May 10, 2010), ECF No. 210; Id. Ex. H, Order Extending Levy, 18 Misc. 302 (BSJ)(S.D.N.Y. June 11, 2010).)

On June 8, 2010, following two years of legal activity in the Southern District of New York relating to the Blocked Assets (including registering judgments, obtaining restraining orders, and issuing writs of attachment, see generally Vogel Decl. Exs. B, C, D, U), the Peterson plaintiffs filed the original complaint which commenced this action, seeking, inter alia, turnover of the Blocked Assets. This had the legal effect of continuing the restraints on those assets pursuant to N.Y. C.P.L.R. § 5232(a), until transfer or payment in the amount of the Blocked Assets is made.

The First Amended Complaint was filed on October 20, 2010 (ECF No. 3), and the Second Amended Complaint ("SAC"), the operative complaint in this matter, was filed on December 7, 2011.  (ECF No. 160.)  The SAC asserts eight causes of action including (1) a declaration that Bank Markazi is an agent and/or alter ego of Iran, the Restrained Bonds are beneficially owned by Iran and are

11

subject to execution for enforcement of Plaintiffs' judgments, and that the Restrained Bonds are not covered by 28 U.S.C. § 1611(b)(1); (2),(3) rescission of allegedly fraudulent conveyances by Iran, Bank Markazi, and Clearstream under New York Debtor and Creditor Law §§ 276(a) and 273-a; (4),(5) turnover of the Markazi Bonds under N.Y. C.P.L.R. §§ 5225 and 5227; (6) equitable relief against all defendants; (7) tortious interference with collection of money judgment, and (8) prima facie tort against UBAE and Clearstream.

On February 5, 2012, President Obama issued Exec. Order No. 13,599 ("E.O. 13599"), 77 Fed. Reg. 6659.  E.O. 13599 declared that "[a]ll property and interests" in property of Iran and held in the United States, were "blocked" under his authority pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701.

E.O. 13599 had the effect of turning any restrained assets owned by the Iranian government (or any agency or instrumentality thereof) into "Blocked Assets".  As Bank Markazi is the Central Bank of Iran, any of its assets located in the United States as of February 5, 2012, became "Blocked Assets" pursuant to E.O. 13599.

Citibank complied with its obligations under E.O. 13599 by reporting the Clearstream account proceeds to the Office of Foreign Assets Control ("OFAC") and placing proceeds relating to the Markazi Bonds into a segregated interest bearing account (this has been referred to from time to time as the "omnibus" account).

12

That account is maintained in the Southern District of New York. As of April 2012, the Blocked Assets in that Citibank account now consist solely of cash.

## II.   LAW RELEVANT TO ALL MOTIONS

### A.  The Foreign Sovereign Immunities Act

Generally, U.S. law provides that a foreign sovereign is entitled to immunity from legal action in the United States. See Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611.

The FSIA codifies "the restrictive theory of sovereign immunity." Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).  The Supreme Court found that when Congress enacted the FSIA, it intended to ensure that "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec"), 462 U.S. 611, 627, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983).  The "presumption of independent status" is not to be "lightly overcome." Hercaire Int'l, Inc. v. Argentina, 821 F.2d 559, 565 (11th Cir.1987). Such "instrumentalities" include a foreign state's "political subdivisions and agencies or instrumentalities," as set forth in the statute.  See Hester Int'l Corp. v. Federal Republic of Nigeria, 879 F.2d 170, 176 n.5 (5th Cir.1989)(emphasis added).

The property of a sovereign's central bank is immune from attachment under certain circumstances, including if the property is that of a central bank held for its own account. 28 U.S.C. § 1611(b)(1).

The FSIA does, however, provide exceptions to immunity in connection with

legal proceedings seeking attachment to fulfill a judgment:

> (b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States ... if—

> (2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3) or (5) or 1605(b), or 1605A of this chapter ...

28 U.S.C. § 1610 (emphasis added).

Section 1605A, the "Terrorism Exception to the Jurisdictional Immunity of a Foreign State", provides:

> (a) In general—

> (1) No immunity—A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state ...

28 U.S.C. § 1605A.

According to § 1603 of the FSIA, a "foreign state" includes, "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a).  Subsection (b) provides:

> (b) An 'agency or instrumentality of a foreign state' means any entity—

> (1) Which is a separate legal person, corporate or otherwise, and

> (2) Which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

14

(3) Which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

Thus, in order to pierce through the FSIA, including its provision for central bank immunity, the Court must undertake various analyses.   The first question is whether the assets at issue are in fact "Iranian" and the judgments in compensation for acts of terrorism.  This analysis complies with 28 U.S.C. §§ 1603, 1605A, and 1610.  Next, for central bank assets, specifically, the Second Circuit has adopted a functional test that asks whether those assets are used for central bank functions as normally understood, irrespective of their commercial nature.  See NML Capital, Ltd. v. Banco Central de la Republica Argentina, 652 F.3d 172, 194 (2d Cir. 2011).  Under NML, if the property at issue is that of a central bank, to execute against such property, a plaintiff must demonstrate "with specificity that the funds are not being used for central banking functions as such functions are normally understood." Id. at 194.  However, other statutes (as discussed below) provide for alternative ways to reach such assets.

B. TRIA

The Terrorism Risk Insurance Act of 2002 ("TRIA"), codified in a note to the FSIA, allows a plaintiff to execute against "blocked" assets of a terrorist party.  TRIA states, in relevant part:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28 United

> States Code, the blocked assets of that terrorist party . . . shall be subject to execution or attachment in aid of execution in order to satisfy any judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), Pub.L. No. 107–297, Title II, 116 Stat. 2337 (2002)(emphasis added).

TRIA defines the term "terrorist party" as "a terrorist, terrorist organization . . . ., or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C.App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)." TRIA § 201(d)(4). Iran has been designated as a "state sponsor of terrorism" under section 6(j) of the Export Administration Act of 1979 since January 19, 1984. State Sponsors of Terrorism, U.S. Dep't of State, at http://www.state.gov/j/ct/c14151.htm (last visited July 27, 2012). TRIA's broad language—"notwithstanding any other provision of law . . . in every case"—provides one basis pursuant to which a separate "central bank" analysis becomes unnecessary; TRIA trumps the central bank provision in 28 U.S.C. § 1611(b)(2).

C. The IEEPA and E.O. 13599

In 1977, Congress enacted the International Emergency Economic Powers Act ("IEEPA"). 50 U.S.C. §§ 1701, 1702. The IEEPA authorizes the president to take broad-ranging action against the financial assets and transactions of those entities he determines pose an "unusual and extraordinary threat" to the national security of the United States. Id. On February 6, 2012, pursuant to his authority under IEEPA, President Obama issued Executive Order ("E.O.") 13599. E.O. 13599

16

provides that:

> [a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States, that are or hereafter come within the United States, or that hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

Exec. Order No. 13,599, 77 Fed.Reg. 26 (Feb. 6, 2012)(emphasis added).  For purposes of E.O. 13599, the "Government of Iran" is "any political subdivision, agency or instrumentality thereof, . . . and any [individual or entity] owned or controlled by, or acting for or on behalf of, the Government of Iran."  Id.  That definition is similar to the definition promulgated by the Department of Treasury:

> (a) The state and the Government of Iran, as well as any political subdivision, agency or instrumentality thereof; (b) Any entity owned or controlled directly or indirectly by the foregoing; (c) Any person to the extent that such person is, or has been, or to the extent that there is reasonable cause to believe that such person is, or has been, since the applicable effective date, acting or purporting to act directly or indirectly on behalf of any of the foregoing.

31 C.F.R. § 560.304.

Thus, as a matter of law, Bank Markazi's (indisputably the Central Bank of Iran) assets were "blocked" on February 6, 2012.  "Blocking" Bank Markazi's assets located in the U.S.—and, here, in the Southern District of New York—has the effect of restraining them and prevents any transfer or dealing in those assets.  The writs of attachment previously obtained had already restrained Bank Markazi's assets held at Citibank.  However, to the extent UBAE asserts it has any control relating

to those assets, it (as discussed below) simply fits within E.O. 13599's provision for a person acting "directly or indirectly" on behalf of Iran.

The Office of Foreign Assets Control ("OFAC"), operating under the United States Department of Treasury, has determined that "E.O. 13599 requires U.S. persons to block all property and interests in property of the Government of Iran, unless otherwise exempt under OFAC." Frequently Asked Questions and Answers, U.S. Dep't of Treasury (hereinafter "OFAC FAQs"), available at http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx (last visited July 25, 2012); see also 31 C.F.R. § 501.603(a)(1) ("Any person ... holding property blocked pursuant to this chapter must report."). According to the OFAC "Fact Sheet", "[a]mong other things, the E.O. [13599] freezes all property of the Central Bank of Iran and all other Iranian financial institutions, as well as all property of the Government of Iran ...". See OFAC Regulations for the Financial Community, Dep't of the Treasury § V(A) (Jan. 24, 2012); Fact Sheet: Implementation of National Defense Authorization Act Sanctions on Iran, U.S. Dep't of Treasury, available at http:// www.treasury.gov/press-center/press-releases/Pages/tg1409.aspx (last visited July 25, 2012).

OFAC periodically publishes a list of "Specially Designated Nationals and Blocked Persons" (the "SDN list"). The SDN list aids the Court to determine which entities are known to be blocked. That list, however, purports to be neither exhaustive nor exclusive. It cannot be used as a sole reference point in connection with a determination as to whether a particular entity's assets are in fact "blocked"

pursuant to E.O. 13599.  In general, and therefore left to judicial determination, "E.O. 13599 blocks the property and interests in property of any individual or entity that comes within its definition of the term 'Government of Iran' regardless of whether it is listed on the SDN List . . . ."  OFAC FAQs.  The Government of Iran and Bank Markazi are on the SDN list.  Clearstream and UBAE are not.

The SDN list is updated when individuals, entities or the Treasury report assets owned by Iran.   According to OFAC, "E.O. 13599 requires U.S. persons to block all property and interests in property of the Government of Iran, unless otherwise exempt under OFAC." See 31 C.F.R. §501.603(a)(1)("Any person . . . holding property blocked pursuant to this chapter must report.")  In connection with its OFAC reporting obligations, in February 2012—four years after the "free of payment" transfer of the bonds to UBAE—Citibank reported to the U.S. Treasury the account it maintained for Clearstream in connection with the Bank Markazi Bonds.

D. The Newest Act:  22 U.S.C. § 8772

On August 10, 2012, the Iran Threat Reduction and Syria Human Rights Act of 2012 (the "2012 Act") went into effect.  22 U.S.C. §8701, et seq.  The 2012 Act does not eliminate any of the authority and bases for blocking or executing against certain assets as set forth under the FSIA or TRIA.  It does, however, provide a separate and additional basis for execution on assets in aid of fulfilling judgment.  Section 502 of the 2012 Act (22 U.S.C. § 8772) states:

(a) Interests in blocked assets

19

(1) In general

Subject to paragraph (2), <u>notwithstanding any other provision of law, including any provision of law relating to sovereign immunity and preempting any inconsistent provision of State law</u>, a financial asset that is—

    (A) held in the United States for a foreign securities intermediary doing business in the United States;

    (B) a blocked asset (whether or not subsequently unblocked) that is the property described in subsection (b); and

    (C) equal in value to a financial asset of Iran, <u>including an asset of the central bank</u> or monetary authority of the Government of Iran <u>or any agency</u> or <u>instrumentality of that Government</u>, that such foreign securities intermediary or a related intermediary holds abroad,

shall be subject to execution or attachment in aid of execution in order to satisfy any judgment to the extent of any compensatory damages awarded against Iran for damages for personal injury or death...

(2) Court determination required

In order to ensure that Iran is held accountable for paying the judgments described in paragraph (1) and in furtherance of the broader goals of this Act to sanction Iran, prior to an award turning over any asset...<u>the court shall determine</u> whether Iran holds equitable title to, or beneficial interest in, the assets described in subsection (b) and that no other person possesses a constitutionally protected interest in the assets described in subsection (b) under the Fifth Amendment to the Constitution of the United States.  To the extent the court determines that a person other than Iran holds—

    (A) equitable title to, or a beneficial interest in, the assets described in subsection (b)...; or

    (B) a constitutionally protected interest in the assets described in subsection (b),

       Such assets shall be available only for execution or attachment in aid of execution to the extent of Iran's equitable title or beneficial interest therein...

(b) Financial assets described

       The financial assets described in this section are the financial assets that are identified in and the subject of proceedings in the United States District Court for the Southern District of New York in Peterson, et al. v. Islamic Republic of Iran, et al. ...that were restrained by restraining notices and levies secured by plaintiffs in those proceedings...

       ...

       (3) Financial asset; securities intermediary

         ...

         The term "Iran" means the Government of Iran, including the central bank or monetary authority of that Government and any agency or instrumentality of that Government.

22 U.S.C. § 8772 (emphases added).

As the statute relates specifically to the instant action, its interpretation is a matter of first impression.

On its face, the statute sweeps away the FSIA provision setting forth a central bank immunity, 28 U.S.C. § 1611(b)(1); it also eliminates any other federal or state law impediments that might otherwise exist, so long as the appropriate judicial determination is made. 22 U.S.C. § 8772(a)(2). If UBAE is merely an agent acting directly or indirectly on behalf of Iran, then the 2012 Act provides that assets it holds for Iran are subject to execution if its requirements are met; the 2012 Act therefore provides a separate basis—in addition to the FSIA and TRIA—for execution.

### III.   DEFENDANTS' MOTIONS TO DISMISS

Each defendant—Clearstream, UBAE, and Bank Markazi—has filed a separate motion to dismiss.

### A. UBAE and Clearstream Motions to Dismiss

Clearstream and UBAE have moved pursuant to Fed. R. Civ. P. 12(b)(2) to dismiss all claims against them for lack of personal jurisdiction.  It is undisputed that each is a nonresident defendant.  Both Clearstream and UBAE argue that they are based in Europe and have no presence in New York.

### i.   Standard of Review for Personal Jurisdiction

Plaintiffs bear the burden to establish personal jurisdiction as to each defendant.  See MacDermid Inc., v. Deiter, 702 F.3d 725, 727-28 (2d Cir. 2012)(citing Seetransport Wiking Trader Schiffarhtsgellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993)).   Jurisdiction is measured at the time that plaintiffs filed suit. (See Banca UBAE Mem. of L. in Suppt. of Mot. to Dismiss ("UBAE MTD Br.") at 3.) See Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 52 (2d Cir. 1991)  Prior to trial, when a motion to dismiss for lack of personal jurisdiction is based on affidavits and other written materials, a plaintiff need only make a prima facie showing.  See MacDermid, 703 F.3d at 727.  The Court is required to accept the allegations in the complaint as true so long as they are uncontroverted by defendant's affidavits.  Id.

In order for this Court to exercise personal jurisdiction, such jurisdiction must have a statutory basis and comport with the due process clause of the Fifth Amendment.  See Fed. R. Civ. P. 4(k); Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163-65 (2d Cir. 2010); Grand Rivers Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005).

    ii.  Discussion

Plaintiffs argue that Fed. R. Civ. P. 4(k)(1)(A)—which permits this Court to exercise personal jurisdiction to the extent of the applicable New York statutes—provides the basis for personal jurisdiction.  The Court agrees with that assessment, but finds two additional bases on which personal jurisdiction is proper: first, general jurisdiction exists over Clearstream under Rule 4(k)(1)(A).  Second, even if jurisdiction is not proper under the New York long arm statute, Fed. R. Civ. P. 4(k)(2) provides an alternative basis for personal jurisdiction as to UBAE.

As to Rule 4(k)(1)(A)—the sole basis of jurisdiction asserted by plaintiffs—this Court must determine whether either general or specific personal jurisdiction exists under the relevant New York statutes.

    a.  General Jurisdiction under C.P.L.R. § 301

Under N.Y. C.P.L.R. § 301, "general jurisdiction is established if the defendant is shown to have 'engaged in continuous, permanent, and substantial activity in New York.'"  See, e.g., United Mobile Technologies, LLC v. Pegaso PCS, S.A. de C.V., 11-2813-CV, 2013 WL 335965 (2d Cir. Jan. 30, 2013).  For general jurisdiction over a foreign corporation, this requires a showing that the corporation

is "doing business" in New York, "not occasionally or casually, but with a fair measure of permanence and continuity." See, e.g., Gallelli v. Crown Imports, LLC, 701 F.Supp.2d 263, 271 (E.D.N.Y. 2010)(quoting Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985)). The claim over which plaintiffs seek to assert personal jurisdiction over the defendants need not relate to the activity that gives rise to general jurisdiction. See Hoffritz for Cutlery, 763 F.2d at 58.

To determine whether a corporate defendant is "doing business" in New York, courts look factors such as "the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state." See Id.

### b. Specific Jurisdiction under C.P.L.R. § 302(a)(1)

Even in the absence of the systematic presence needed for "doing business" jurisdiction, a plaintiff may properly assert specific jurisdiction based on its "transacting business" in New York—i.e., where a defendant, itself "'or through an agent . . . transacts any business within the state, so long as the plaintiff's 'cause of action aris[es] from' that 'transact[ion].'" See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL (hereinafter "Licci I"), 673 F.3d 50, 60 (2d Cir. 2012); Best Van Lines, Inc. v. Walker, 490 F.3d 239, 240 (2d Cir. 2007).

To establish that an entity or its agent has transacted business within New York, a plaintiff must demonstrate a defendant's purposeful availment of the privilege of conducting business in New York. Licci, 673 F.3d at 61. The central inquiry relates to the "quality" of a defendant's contacts with New York—i.e.,

whether the contacts indicate an intent to invoke the benefits and privileges of New York law.  Id.; see also Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 72 (2006); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).

It is perhaps counterintuitive – but nonetheless well-established – that for purposes of establishing that a defendant has "transacted business" within New York, the defendant or its agent need not have physically entered New York; the question is whether the defendant or its agent engaged in purposeful activities in New York.  See Best Van Lines, 490 F.3d at 249.

Purposeful availment is thus a fact-based inquiry: a single telephone call to place a single order in New York that would be sent to another state or the transitory presence of a corporate official may not be sufficient under certain circumstances.  Licci I, 673 F.3d at 62.  Yet, in another case, Deutsche Bank, the Court found that a sophisticated investor who may use electronic devices to "enter" New York to conclude a substantial transaction, met the "transacting business" requirement.  7 N.Y.3d at 72.

A court is thus required to look at the totality of the circumstances.  See Licci I, 673 F.3d at 62.  Instructive in this regard—especially for this case—is the Second Circuit's recent opinion in Licci I.  In Licci I, the Second Circuit certified to the New York Court of Appeals the question of whether a defendant's maintenance and frequent use of a correspondent bank in New York (to effect international wire transfers) met the requirements of the New York long-arm statute.  Id. at 66.  The

New York Court of Appeals found that, under the circumstances there presented, it did.

In certifying the question, the Second Circuit examined cases in which personal jurisdiction was based on the use of a correspondent bank. It found that in some instances the mere presence of having a correspondent bank account might be insufficient to confer jurisdiction, id. at 63-64, yet in others the use of a correspondent bank account might be sufficient. Id.

For instance, in Amigo Foods Corp. v. Marine Midland-Bank-N.Y., 39 N.Y.2d 391, 394 (1976), an out-of-state bank passed letters of credit through a correspondent New York bank. While the Appellate Division initially dismissed such use as insufficient to meet the requirements of New York's long-arm statute, the Court of Appeals reversed and remanded for jurisdictional discovery. Id. at 396. The Court of Appeals agreed that the mere presence of a correspondent bank in New York was not in and of itself sufficient to confer jurisdiction, but it allowed discovery as to whether there were other facts indicating sufficient use of the correspondent bank account to do so. Id.

In a later case, the Court of Appeals found that use of a correspondent bank in connection with securities transactions was sufficient to meet the requirements of C.P.L.R. § 302(a). See Ehrlich-Bober & Co. v. Univ. of Houston, 49 N.Y.2d 574, 577, 580-82 (1980).

Similarly, the Court of Appeals upheld the exercise of personal jurisdiction over a Russian bank that maintained and used a correspondent bank account

26

through which it engaged in currency-exchange options transactions with the plaintiff. See Indosuez International Finance B.V. v. National Reserve Bank, 98 N.Y.2d 238, 247 (2002).

In addition, the Second Circuit noted in Banco Ambrosiano v. Artoc Bank & Trust, 62 N.Y.2d 65, 72 (1984) that the use of the correspondent account to effect the transactions at issue in the lawsuit was sufficient to meet the requirements of due process for quasi-in rem jurisdiction. Licci I, 673 F.3d at 64. (The holding in that case was based on considerations of due process; the Second Circuit found it nonetheless relevant insofar as statutory and constitutional inquiries in New York have become entangled. Id. at 64 (quoting from Best Van Lines, 490 F.3d at 242.))

Resolving any ambiguities in these cases, the Court of Appeals answered the Second Circuit's certified question in the affirmative; a defendant's maintenance and frequent use of a New York correspondent account can be sufficient for "transacting business" jurisdiction under C.P.L.R. § 302(a). See Licci v. Lebanese Canadian Bank, SAL (hereinafter "Licci II"), 2012 WL 5844997 (N.Y. Nov. 20, 2012).

The facts of Licci II bear certain similarities to those before this Court such that they bear reciting in some detail. There, plaintiffs were several dozen American, Canadian and Israeli citizens who were injured or whose family members were injured or killed in rocket attacks allegedly launched by Hizballah in 2006. Id., at *1. Hizballah had been declared a terrorist organization by the United States Department of State. Id. Plaintiffs commenced a lawsuit in the Southern

District of New York against the Lebanese Canadian Bank, SAL ("LCB"), alleging

that LCB had assisted Hizballah in its terrorist acts by facilitating certain financial

transactions. LCB did not operate branches or offices, or maintain employees in

New York. Its sole "point of contact with the United States was a correspondent

bank account with AmEx in New York." Id., at *2. The complaint alleged that LCB

used the correspondent bank account to transfer funds that enabled, inter alia, the

attacks which killed or injured plaintiffs or their relatives. Id.

In its analysis, the Court of Appeals acknowledged the fact-specific nature of

an inquiry as to whether personal jurisdiction can be based on maintenance and use

of a correspondent bank. Id., at *3. Ultimately the Court found that "complaints

alleging a foreign bank's repeated use of a correspondent account in New York on

behalf of a client – in effect, a 'course of dealing'. . . show purposeful availment of

New York's dependable and transparent banking system, the dollar as a stable and

fungible currency, and the predictable jurisdictional and commercial law of the

United States." Id., at *3. The Court further found that there had to be some

relatedness between the use of the correspondent bank and the claim at issue – the

claim could not be "completely unmoored" from the transaction utilizing the

correspondent account. In that case, the complaint alleged that LCB used the

correspondent account repeatedly to support a terrorist organization. Id. *4.

Under New York law, then, a foreign bank's maintenance and use of a

correspondent account in New York can be sufficient to support personal

jurisdiction, at least where transactions indicate purposeful availment of New York's banking system and those transactions relate to the claim at issue.

c.  Statutory Jurisdiction under Rule 4(k)(2)

Even if personal jurisdiction under the C.P.L.R. is not proper, however, that does not signify that a nondomiciliary entity is automatically outside this Court's jurisdiction.  Assuming, arguendo, that no C.P.L.R.-based jurisdiction exists, to the extent federal questions are at issue—and plaintiffs have asserted such questions here—the Court might still exercise personal jurisdiction under the federal question personal jurisdiction statute, Fed. R. Civ. P. 4(k)(2).

Rule 4(k)(2) subjects a defendant to this Court's personal jurisdiction where plaintiff demonstrates that (1) the claim arises under federal law; (2) the defendant is not "subject to jurisdiction in any state's courts of general jurisdiction"; and (3) the exercise of jurisdiction is "consistent with the United States Constitution and laws" – e.g., it comports with due process.  See Porina v. Marward Shipping Co., Ltd., 521 F.3d 122, 127 (2d Cir. 2008).

As with 4(k)(1)(A) jurisdiction, plaintiff need only raise a prima facie case that 4(k)(2) jurisdiction is proper to survive a Rule 12(b)(2) motion to dismiss.  See, e.g., Catlin Ins. Co. (UK) Ltd. v. Bernuth Lines Ltd., 12-1773-CV, 2013 WL 406273 (2d Cir. Feb. 4, 2013)(stating prima facie standard in context of 4(k)(2) analysis).

d.  <u>Due Process Analysis</u>

If this Court determines that statutory jurisdiction—either under Rule 4(k)(1) or Rule 4(k)(2)—is proper, it must finally ask whether such jurisdiction comports with due process.

1.  <u>Minimum contacts</u>

In doing so, the Court first asks whether sufficient minimum contacts exist between that nonresident defendant and either New York (under Rule 4(k)(1)) or the United States generally (under Rule 4(k)(2)), such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945); <u>Worldwide Volkswtagen Corp. v. Woodson</u>, 444 U.S. 286, 291 (1980).

The minimum contacts necessary to comport with the New York jurisdictional statutes, C.P.L.R. §§ 301 and 302, necessarily comport with the Due Process Clause since New York law requires a greater showing of minimum contacts than would be required by the Due Process Clause alone.  <u>See</u> <u>Licci I</u>, 673 F.3d at 60-61 ("The New York long-arm statute does not extend in all respects to the constitutional limits established by <u>International Shoe</u>.")  Thus, the "purposeful availment" analysis for specific jurisdiction under C.P.L.R. 302(a) satisfies a similar purposeful availment analysis under the Due Process Clause.  <u>See</u> <u>Burger King Corp.</u>, 471 U.S. at 472 (setting forth purposeful availment standard under the Due Process Clause).

In contrast, the "minimum contacts" prong for federal question personal jurisdiction under Rule 4(k)(2) focuses on whether the defendant "has the requisite aggregate contacts with the United States" as a whole. Eskofot A/S v. E.I. Du Pont De Nemours & Co., 872 F. Supp. 81, 87 (S.D.N.Y. 1995). The Second Circuit has held that those contacts may be satisfied by "1) transacting business in the United States, (2) doing an act in the United States, or (3) having an effect in the United States by an act done elsewhere." See Id. at 87 (citing Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1340 (2d Cir.1972)).

### 2.  Reasonableness Factors

Lastly, if the defendant has sufficient minimum contacts, the Court must also determine that the exercise of personal jurisdiction over this defendant is reasonable. Chloe, 616 F.3d at 172-73; MacDermid, 702 F.3d. at 730-31. The Supreme Court has established five factors this Court must consider in order to determine whether the exercise of personal jurisdiction is reasonable:

1.  The burden on the defendant;
2.  The interests of the forum State
3.  The plaintiffs' interests in obtaining relief;
4.  The interstate judicial system's interest in obtaining the most efficient resolution of controversies; and
5.  The shared interest of the Several States in furthering substantive social policies.

Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113-14 (1987); Chloe, 616 F.3d at 172-73.

The mere fact that a defendant is foreign and would have to travel to New York is insufficient to defeat a finding of reasonableness. See MacDermid, 702 F.3d

at 730-31 (holding that the fact that defendant was Canadian was insufficient to defeat minimum contacts; the defendant's act of accessing a computer server located within New York from outside the state satisfied the minimum contacts requirement); <u>Kernan v. Kurz-Hastings., Inc.</u>, 175 F.3d 236, 244 (2d Cir. 1999)(holding that burden on Japanese defendant to defend suit in the United States was insufficient to overcome its minimum contacts – particularly in light of the ease of modern travel and communication).

### e. Personal Jurisdiction over UBAE

UBAE asserts that plaintiffs are unable to make out a prima facie basis for personal jurisdiction. This Court disagrees. Plaintiffs have alleged sufficient facts which, when analyzed against the legal framework set forth above, leave no doubt that either specific jurisdiction over UBAE exists pursuant to C.P.L.R. 302(a)(1) or, in the alternative, that jurisdiction exists under the federal question provision, Rule 4(k)(2).

### 1. Specific Jurisdiction

Plaintiffs base personal jurisdiction as to UBAE on the New York long-arm statute, C.P.L.R. § 302. They suggest that jurisdiction is proper under the "transacting business" provision, § 302(a)(1), as well as the provisions for personal jurisdiction based on tortious acts committed within New York, C.P.L.R. § 302(a)(2), and those committed without New York, C.P.L.R. § 302(a)(3)(ii). The Court need not address the tortious acts basis for specific jurisdiction since plaintiffs clearly make out a prima facie case of "transacting business" jurisdiction.

While the parties do not agree as to how and why certain transactions relating to the bonds were structured and occurred as they did, the allegations in the complaint, UBAE's factual concessions contained in the Matranga declaration (ECF No. 95), and the materials presented in the Vogel Declaration in opposition to UBAE's Rule 12(b)(2) motion (ECF No. 323) are sufficient to meet the standard for "transacting business" in New York.

UBAE admits that a series of acts occurred relating to the Markazi Bonds – but it argues that those acts all occurred outside of the United States, and further, that UBAE has no presence in the United States at all.   (See Matranga Decl. ¶ 3 ("UBAE did not advertise, solicit business, or market its services in New York, or anywhere in the United States.")  In this regard, UBAE asserts that it followed Bank Markazi's directive to sell two of the Markazi Bonds securities with a combined face value of $250 million.  (Matranga Reply Decl. ¶ 7.)  Though the securities were physically held in New York, UBAE would work exclusively from Luxembourg to buy the $250 million in securities from Bank Markazi and negotiate a higher price on the open market.  (Id. ¶ 8.)  It would then pocket the difference between the two as its fee.  (Id.)

While the structure of the transaction did not cause UBAE to send personnel into New York, UBAE ignores the crucial fact that the bonds were physically located in New York at the time of sale; therefore, by definition UBAE engaged in sales transactions for bonds physically located in New York.  In addition, plaintiffs present evidence from UBAE's own sales records that indicate that UBAE

distributed sales proceeds and interest payments from the Markazi Bonds via its correspondent account at HSBC in New York.  (See Decl. of Liviu Vogel in Opp. to UBAE Mot. to Dismiss ("Vogel UBAE MTD Decl.") Exs. C-F.)

This pathway of proceeds through New York is enough to constitute § 302 "transacting business".  N.Y. C.P.L.R. § 302(a)(1).  The fact that UBAE may have been making all of the arrangements relating to the sales outside of the U.S. cannot erase the fact that the bonds and proceeds relating thereto physically transferred in New York.  UBAE used its correspondent account to process the proceeds of the sale because it offered the stability and security of the New York banking laws—purposeful availment analogous to that in Licci II.

Finally, UBAE argues that since it was unaware of plaintiffs' judgment until June 2008, there cannot be any causal connection between its March 2008 actions and trying to avoid that judgment.  This argument also fails. The New York long-arm statute provides that an entity or its agent may engage in conduct which supports jurisdiction.  See, e.g., Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (N.Y. 1988)(finding C.P.L.R. § 301(a)(1) jurisdiction proper where corporation never entered New York, but its agent engaged in "purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent [of the corporation] . . . and that they exercised some control over [the agent].")

Even if UBAE itself was not transacting business in New York, its agents most certainly were.  Plaintiffs have sufficiently alleged, and the facts in the record support, that Bank Markazi and Clearstream were aware of plaintiffs' judgments at

the time that UBAE was engaged to open an account and engage in a sale transaction on behalf of Bank Markazi.  (SAC ¶¶ 13, 15, 24, 37, 41.)  UBAE's own concession that Clearstream was acting on its behalf in the United States and its more recent statements in opposition to plaintiffs' motion for partial summary judgment[5] are sufficient to support an agency relationship.  (See Matranga Reply Decl. ¶¶ 8-10.)

### 2.  Rule 4(k)(2) Jurisdiction

By arguing that it has no presence in the United States and did not engage in transactions in New York sufficiently related to the instant dispute to constitute "transacting business" jurisdiction, however, UBAE has in fact established the necessary predicate for personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2).  It is undisputed that this case raises federal claims—the execution of the judgments obtained by plaintiffs is governed by federal laws FSIA, TRIA, E.O. 13599, and 22 U.S.C. § 8772.  Rule 4(k)(2) applies to just such situations.[6]  UBAE argues strenuously that it has no presence in the United States that would subject it to general personal jurisdiction in any state.  (See Matranga Decl. ¶ 4.)  Provided that exercising jurisdiction over UBAE anywhere in the United States comports with due process, in personam jurisdiction in this Court is proper.  Fed. R. Civ. P. 4(k)(2).

---

[5] In its summary judgment opposition brief, UBAE admits both that it "has not asserted a legally cognizable interest in the restrained bonds" and that "UBAE is not in 'possession' or 'custody' of any of the restrained bonds."  (UBAE SJ Opp. Br. at 2.)

[6] As stated above, Rule 4(k)(2) provides: "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2).

3.  Due Process Analysis

Indeed, under the New York long-arm statute—and thus under the Due Process Clause itself—there are sufficient minimum contacts (under International Shoe and its progeny) between New York / the United States and UBAE to exercise jurisdiction, and doing so would undoubtedly be reasonable.

First, UBAE itself has conceded that it uses the services of its correspondent bank on a daily basis to manage its U.S. dollar holdings.  (See Matranga Decl. ¶¶ 5-6.)  In addition, its actions with respect to the bonds were aimed at New York – and it caused transfers between a number of New York financial institutions in order to complete (e.g. the FBNY, DTC, Citibank, JP Morgan Chase, just to name those as to which even UBAE cannot assert a lack of involvement.)

The Asahi "reasonableness" factors are also met both for jurisdiction pursuant to Rule 4(k)(2) and/or pursuant to New York's long arm statute.  The burden on UBAE of defending this suit is minimal in comparison to the interests of New York and the United States in providing a forum to adjudicate disputes over bond proceeds physically located in New York.  In addition, plaintiffs have a strong interest in—and right to—seek relief from Iran.  That relief would be stymied if UBAE, acting as agent of Bank Markazi, was able to take those precise acts Bank Markazi would have taken with respect to the Blocked Assets present in New York, but evade jurisdiction here.  Likewise, bringing UBAE before this court will enable efficient resolution of plaintiffs' claims as to these assets in a single proceeding,

putting an end to the years of disjointed litigation and delays.  Finally, only by

subjecting UBAE to this Court's jurisdiction will the Court be able to enforce the

policies behind the anti-terrorism provisions of FSIA, TRIA and Section 8772—as

Congress clearly intended.

As the requirements of the Due Process Clause are met with respect to

UBAE, this Court therefore finds that plaintiffs make out a prima facie case of

specific personal jurisdiction under Fed. R. Civ. P. 4(k)(1)(A), incorporating C.P.L.R.

§ 302(a).  In the alternative, Rule 4(k)(2) jurisdiction is proper.  UBAE's Rule

12(b)(2) motion to dismiss is denied.

f.  <u>Analysis regarding Clearstream</u>

Clearstream's motion to dismiss for lack of personal jurisdiction also fails.  As

an initial matter, it is rather remarkable that Clearstream has spent the time to

make such an argument given the existence and persistence of its New York

operations supportive of its overall business.  The Court finds that there are bases

to suggest both general jurisdiction and specific jurisdiction over Clearstream under

Rule 4(k)(1).[7]

Clearstream is clearly doing business in New York and thus subject to

general jurisdiction under C.P.L.R. § 301.  For such a determination it is

unnecessary that Clearstream conduct all of its business in New York – or even that

the specific facts relating to the issues in this case relate to specific acts taken in

New York.  <u>See</u> <u>Gelfand v. Tanner Motor Tours, Ltd.</u>, 385 F.2d 116, 121 (2d Cir.

---

[7] A basis for Rule 4(k)(2) jurisdiction may also exist over Clearstream, but—unlike UBAE—
Clearstream has not alleged that it cannot be subject to general personal jurisdiction in any U.S.
jurisdiction—a prerequisite for 4(k)(2) jurisdiction.

1967)("[A] foreign corporation is doing business in New York 'in the traditional sense' when its New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services."). It is enough that as a general matter it is in fact doing business in New York. This is evidenced by the presence of a Clearstream office in New York, which employs Clearstream employees for the purpose of obtaining and also supporting business for Clearstream Luxembourg from New York. As the evidence demonstrates, Clearstream in New York is not merely soliciting business—it provides support services for its Luxembourg operations and is part of Clearstream's overall strategy to "provide[ ] global services to the securities industry . . . close to its customers in all major time zones". (See Letter of Liviu Vogel to Hon. Barbara S. Jones Ex. 1 at 2, Aug. 14, 2009, ECF No. 178.) These activities demonstrate the "permanence and continuity" required for § 301 general jurisdiction. Cf. Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d at 58 (finding no general § 301 jurisdiction where nonresident defendant lacked an office in New York, did not solicit business in the state and did not have bank accounts, other property or employees in the state).

However, even if this Court were to analyze whether there is a sufficient basis for long-arm jurisdiction over Clearstream Luxembourg, the answer would still clearly – and resoundingly – have to be "yes." Clearstream Luxembourg's contacts with New York relate directly to plaintiffs' allegations regarding the

Markazi Bonds that were maintained at the FBNY and DTC in New York. Even if this Court were to ignore the presence of Clearstream's office on Broad Street in New York, the fact that Clearstream Luxembourg engaged in a series of financial transactions over an extended period of time with regard to these New York based bonds would require a finding of sufficient "transacting business" for long-arm jurisdiction under C.P.L.R. § 302(a)—and, necessarily, also a finding of sufficient minimum contacts to satisfy due process.

That transaction of business is clear from Clearstream's innumerable acts to maintain its New York-based Citibank account. It has repeatedly communicated with Citibank about the Blocked Assets and arranged for various transactions with Citibank. (See, e.g., Decl. of Liviu Vogel in Opp. to Clearstream's Mot. to Vacate Restraints ("Vogel Vacate Restraints Opp. Decl.") Exs. 4, 16, ECF No. 299.). It is irrelevant whether its New York office had anything to do with those actions. It is enough that Clearstream's Luxembourg operations repeatedly had contacts with New York by virtue of its account at Citibank – and that the account has, at all relevant times, been connected with the Blocked Assets. See Licci II, 2012 WL 5844997 ("[T]he 'arise-from' prong [of C.P.L.R. § 302(a)(1)] limits the broader 'transaction-of-business' prong to confer jurisdiction only over those claims in some way arguably connected to the transaction.").

Finally, applying the Asahi factors suggests that exercising personal jurisdiction with respect to Clearstream is reasonable. The interests with respect to Clearstream are nearly identical to those for UBAE. And the burden on

39

Clearstream to defend a suit in this Court is minimal given Clearstream's continuous and systematic contacts with New York.

Clearstream is subject to this Court's general personal jurisdiction and, in the alternative, plaintiff makes out a prima facie case of "transacting business" jurisdiction under the New York long-arm statute.  Clearstream's Rule 12(b)(2) motion to dismiss is denied.

### B. Bank Markazi's Motion to Dismiss

Bank Markazi has moved to dismiss plaintiffs' claims on the basis of a lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1).  Bank Markazi argues that (1) plaintiffs' TRIA § 201 claim raises a non-justiciable political question, (2) that the assets are technically not "of"—i.e., not owned by—Bank Markazi, (3) that the situs of the bonds is outside the jurisdiction of this Court, (4) that execution would violate U.S. obligations under the 1955 Treaty of Amity, Economic Relations and Consular Rights between the United States and Iran ("Treaty of Amity"), Aug. 15, 1955, 8 U.S.T. 899, and finally (5) that the assets are immune central banking assets under FSIA § 1611(b)(1).

### i. Rule 12(b)(1) Standard of Review

Federal district courts are courts of limited jurisdiction.  Challenges to a court's subject matter jurisdiction are challenges to the ability of the Court to entertain an action in the first instance.  The party invoking federal subject matter jurisdiction bears the burden of establishing that jurisdiction exists by a preponderance of the evidence.  See Lujan v. Defenders of Wildlife, 504 U.S. 555,

561 (1992); <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000).

Determining the existence of subject matter jurisdiction is a threshold inquiry; a

case is properly dismissed under Fed. R. Civ. P. 12(b)(1) when the district court

lacks the constitutional power to adjudicate it. <u>See Arar v. Ashcroft</u>, 532 F.3d 157,

168 (2d Cir. 2008).

A defendant may challenge either the legal or factual sufficiency of plaintiffs'

assertion of jurisdiction. <u>Nat. Union Fire Ins. Co. of Pittsburgh v. BP Amoco PLC</u>,

319 F.Supp.2d 352, 371 (S.D.N.Y. 2004).  In determining whether this Court has

subject matter jurisdiction over plaintiffs' actions, it must accept as true all

material factual allegations in the SAC, but because jurisdiction must be shown

affirmatively, this Court must refrain from drawing inferences favorable to the

parties asserting jurisdiction (here, plaintiffs). <u>See APWU v. Potter</u>, 343 F.3d 619,

623 (2d Cir. 2003).  The Court can resolve disputed factual issues by reference to

evidence outside of the pleadings. <u>See Flores v. Southern Peru Copper Corp.</u>, 343

F.3d 140, 161 n.30 (2d Cir. 2003); <u>see also Makarova</u>, 201 F.3d at 113.

## ii.  <u>Analysis as to Bank Markazi</u>

An analysis of the facts regarding the actions and assets of Bank Markazi in

this district leaves no serious doubt that this Court has subject matter jurisdiction.

## 1.  <u>Political Question</u>

Courts lack authority to decide non-justiciable political questions. <u>Zivotofsky</u>

<u>ex rel. Zivotofsky v. Clinton</u>, 132 S. Ct. 1421, 1427, 182 L. Ed. 2d 423 (2012).  Bank

Markazi argues that the European Union's ("E.U.") blocking regime has frozen all

assets of the Central Bank of Iran and thereby created a non-justiciable political question with respect to any action this Court might take under U.S. law that would impact the holders of the Blocked Assets under European law.

In 2010, the E.U. enacted regulations that froze "all funds and economic resources belonging to, owned, held or controlled by the persons, entities and bodies listed in [certain annexes]." See Council Regulation (EU) No. 961/2010, Article 16(1)-(3). These regulations also provide that "no funds or economic resources shall be made available, directly or indirectly, to or for the benefit of the natural or legal persons, entities or bodies listed in [certain annexes]." Id.

Bank Markazi was not listed on the original annexes. However, on January 24, 2012—just prior to the issuance of E.O. 13599 in the United States—it was added. See Council Implementing Regulation (EU) No. 54/2012 of January 23, 2012, Article 1.1 (Annex VIII ¶ 51).

In addition, article 23(2) of an EU regulation passed in March 2012 consolidated previous regulations and explicitly maintained the freeze on assets of the Central Bank of Iran. Council Regulation (EU) No. 267/2012, Arendt III ¶¶51-52 & Exh. J. The freezing of funds prevents "any move, transfer, alteration, use of, access to, or dealing in funds in any way that would result in any change in their volume, amount, location, ownership, possession, character, destination, or other change that would enable the funds to be used, including portfolio management." Id.

42

According to Bank Markazi, the EU regulations change everything.  It argues that, even assuming that the Blocked Assets are assets "of" Bank Markazi (which, as discussed below, it argues is incorrect), the EU blocking regime presents direct competition with E.O. 13599—competition that implicates foreign relations concerns and must be resolved by the political—not judicial—branches of government.  (See Bank Markazi Reply Mem. in Support of Mot. to Dismiss ("Markazi MTD Reply") at 3-4 (adopting Clearstream Reply Memorandum in Support of its Renewed Mot. to Vacate Restraints ("Clearstream Mot. to Vacate Reply") at 9-16, ECF No. 220).)

The facts giving rise to this conflict are both simple and technical: a debit to the Blocked Assets in Clearstream's Omnibus Account at Citibank in New York by virtue of turnover would require a corresponding debit in Clearstream's Luxembourg account – constituting a direct violation of the EU Regulation. [8]

In connection with this motion only, in order to allow the Court to decide the issue, Bank Markazi affirmatively makes the following factual assumptions:  that the underlying beneficial owner of the Blocked Assets is Bank Markazi, that Bank Markazi's transfer to UBAE has been "undone" such that the assets remain in an account between Clearstream and Bank Markazi, that this Court can exercise personal jurisdiction over Clearstream in New York, and that all of the other actions by other banks and issuers occurred in New York. (See Id. at 4-6 (argument adopted by Bank Markazi as explained in Clearstream brief).)

---

[8] Markazi—via Clearstream—argues that the debit would constitute a "change in volume, amount, location, ownership, possession, character, [or] destination" of the Blocked Assets. (See Clearstream Vacate Restraints Reply Br. at 13.)

2.  Political Question Analysis

The E.U. and U.S. blocking regimes are not here in "competition", and they do not create a non-justiciable political question.

Whether or not a question is "political," and therefore non-justiciable, is determined by reference to six factors:

> [(1)] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [(2)] a lack of judicially discoverable and manageable standards for resolving it; or [(3)] the impossibility of deciding without an internal policy determination of a kind clearly for non-judicial discretion; or [(4)] the impossibility of the court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [(5)] an unusual need for unquestioning adherence to a political decision already made; or [(6)] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker v. Carr, 369 U.S. 186, 217 (1962); see also 767 Third Ave. Assocs. V. Consulate Gen. of Socialist Fed. Republic of Yugoslavia, 218 F.3d 152, 160 (2d Cir. 2000).

Bank Markazi argues that the EU and U.S. blocking regimes raise important questions of foreign relations, lack judicially manageable standards, and generally raise Baker v. Carr concerns.  This Court disagrees.

To the extent that the differential treatment of the assets of terrorist states raises foreign relations concerns, the executive and legislative branches have demonstrated a clear intent that not only permits but affirmatively encourages the judiciary to resolve the issues surrounding restraint and turnover of such assets. As set out above, the sheer multitude of statutory and executive pronouncements

directly and unquestionably applicable to the motions before this Court makes any political question argument baseless.

Bank Markazi can point to no aspect of the Constitution that commits the treatment of a hypothetical turnover of U.S.-based assets by a foreign legal system to a "coordinate political department".  Instead, Congress and the President agree that it is the province of the judiciary to determine the effect, if any, of these competing regimes: provisions of the FSIA, as described above, enable courts to enforce judgments against sovereigns when those judgments relate to acts of terrorism; TRIA allows a court to execute against blocked assets of a terrorist party; E.O. 13599 provides that assets of Iran and the Central Bank of Iran are blocked; the SDN list indicates that Iran and Bank Markazi are on the list of blocked terrorist organizations; and finally, the most recent pronouncement,  22 U.S.C. § 8772, specifically provides that the assets at issue <u>in this very lawsuit</u> are subject to execution and attachment in aid of execution.

Nor can there be a suggestion of a lack of judicially manageable standards to resolve the potential friction between the U.S. and E.U. regimes.  Congress enacted 22 U.S.C. § 8772 in <u>August 2012</u> – well after March 2012, when the EU promulgated the last of its blocking Regulations referred to by Clearstream. Congress certainly could have altered the statute in light of the E.U. regulations; it chose not to do so.

Instead, § 8772 gives this Court clear standards to rule on the questions before it with respect to these very assets.  The statute spells out specific

requirements for judicial determinations as to whether a non-Iranian entity has a constitutionally protected interest in the assets, or holds equitable or beneficial title or interest in the assets. See 22 U.S.C. § 8772(a)(2). Together, these various statutes and orders require this Court to find that it should rule on the very questions here presented. In addition, of course, it cannot be that a court must refrain from adjudicating a dispute where the potential exists for a foreign legal regime to impose penalties on a litigant based on the U.S. court's decision. Foreign ramifications alone do not create a non-justiciable political question. And they do not here.

### 3. Ownership of the Blocked Assets

Bank Markazi next argues that the Blocked Assets are not assets "of" Bank Markazi. Bank Markazi states a showing of ownership is required for subject matter jurisdiction under TRIA § 201(a).[9]

Even if Bank Markazi were correct regarding TRIA (and it is not), that does not mean this court lacks subject matter jurisdiction. The 2012 Act, § 8772, specifically trumps "any other provision of law" and specifically permits execution on the assets specifically at issue in this litigation, rendering moot any ambiguity in TRIA. 22 U.S.C. § 8772(a)(1).

Even in the absence of § 8772, however, this Court finds that TRIA provides for subject matter jurisdiction with respect to Bank Markazi. It is true that TRIA authorizes execution of assets "of" a terrorist party. See 28 U.S.C. § 1610 n.

---

[9] Section 201(a) refers to attachment only of the "blocked assets of th[e] terrorist party" (emphasis added).

(2006)("[I]n every case in which a person has obtained a judgment against a terrorist party . . . the blocked assets of that terrorist party . . . shall be subject to execution . . . .")(emphasis added).  In the case of the Blocked as Assets here at issue, Bank Markazi is the only owner.  Clearstream—in whose name the Citibank account is listed—never claims it "owns" the assets.  UBAE argues it has acted with respect to the assets merely on behalf of Bank Markazi. (See UBAE SJ Opp. Br. at 2 (stating UBAE "has not asserted a legally cognizable interest in the restrained bonds" and that "UBAE is not in 'possession' or 'custody' of any of the restrained bonds"); Matranga Reply Decl. ¶¶ 7-10.)  Citibank states that it is a neutral stakeholder. (See Letter of Sharon L. Schneier to the Hon. Katherine B. Forrest, Dec. 14, 2012, ECF No. 300).

Bank Markazi has repeatedly conceded at a variety of times in connection with this litigation—and Clearstream has stipulated for the limited purpose of resolving its motion to vacate the restraints, infra—Bank Markazi is "the" sole beneficial owner of the assets.[10]

---

[10] Bank Markazi has stated that "Over $1.75 billion in securities belonging to Bank Markazi . . . are frozen in a custodial Omnibus Account at [Citibank]"; that the "Restrained Securities are the property of Bank Markazi, the Central Bank of Iran", that the "aggregate value of the remaining bond instruments, i.e. the Restrained Securities that are the property of Bank Markazi and the subject of the Turnover Action – is thus $1.753 billion"; that the "Restrained Securities are the property of a Foreign Central Bank…"; that the "Restrained Securities are presumed to be the property of a third property of Bank Markazi"; and "the Restrained Securities are prima facie the property of a third party, Bank Markazi . . . ." (See Bank Markazi's First Mem. of L. in Support of its Mot. to Dismiss the Am. Compl., May 11, 2011, ECF No. 18 ("Markazi's First MOL"), at 1, 5, 9, 10, 36 (emphases added).)  In addition, two officers of Bank Markazi have sworn under penalty of perjury that the Blocked Assets are the "sole property of Bank Markazi and held for its own account." (Aff. of Gholamossein Arabieh ¶ 2, Vogel Decl. Ex. J, Oct. 17, 2010, ECF No. 210; Aff. of Ali Asghar Massoumi ¶ 2, Vogel Decl. Ex. K, Oct. 17, 2010, ECF No. 210).

Bank Markazi suggests that Judge Cote's decision in <u>Calderon-Cardona v.</u> <u>JPMorgan Chase Bank, N.A., 867 F. Supp. 2d 389, 400 (S.D.N.Y. 2011)</u>, counsels a different result.[11]  This Court disagrees.

The Court in <u>Calderon-Cardona</u> held that electronic funds transfers ("EFTs") allegedly related to North Korea were not subject to attachment under TRIA and the FSIA.  It is distinguishable in several respects: first, the <u>Calderon-Cardona</u> decision related to mid-stream EFTs—rapid funds transfers between a sending and receiving bank, processed by an intermediary bank—rather than the static proceeds of financial instruments.  <u>Id.</u>  A significant question in <u>Calderon-Cardona</u> was whether the EFTs were "owned" by North Korea at the time of the transfers.  <u>Id.</u>  In finding no such ownership, the Court noted Second Circuit precedent holding that— according to New York law— "EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank."  <u>Id.</u> at 400 (<u>citing</u> <u>Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.</u>, 585 F.3d 58, 71 (2d Cir.2009)).  Even if North Korea was the originator or beneficiary, then, it could not be the "owner" of the EFTs for the purposes of TRIA.  <u>Id.</u>  The Court concluded that "[t]he petitioners have pled no facts . . . indicating that North Korea has an interest in any of the blocked accounts that exceeds that of an originator or beneficiary in a midstream EFT."  <u>Id.</u> at 407.

In contrast, here, nearly $2 billion in bond proceeds is sitting in an account in New York at Citibank—there are no fleeting or ephemeral interests like those that

---

[11] As with the political question arguments, Markazi expressly adopted this argument from Clearstream's memoranda in support of its motion to vacate the restraints.  (<u>See</u> Markazi MTD Reply at 5.)

occur in EFTs. The only entity with any financial interest in the funds in the account is Bank Markazi—as it has stipulated for the purposes of this motion, but also as it has repeatedly asserted. Clearstream has no such interest; UBAE's interest is analogous to that of Clearstream (and, as it states, it has no legally cognizable interest). Any possible contrary interpretation under state law is expressly preempted by the express language of § 8772.

Accordingly, on these facts, this Court need not choose whether it is necessary to follow the Calderon-Cardona rationale or those of the other cases in this District involving EFTs. See, e.g., Hausler v. JP Morgan Chase Bank, N.A. (hereinafter "Hausler I"), 740 F.Supp.2d 525 (S.D.N.Y. 2010); Hausler v. JP Morgan Chase Bank, N.A. (hereinafter "Hausler II"), 845 F.Supp.2d 553 (S.D.N.Y. 2012); Levin v. Bank of N.Y., No. 09 Civ. 5900, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011). All of the EFT cases attempt to answer whether transfers between financial institutions that pass through a banking institution within the U.S. are nonetheless "assets of" the terrorist party to whose benefit the transfers may ultimately inure. See, e.g., Hausler I, 740 F.Supp.2d at 526; Hausler II, 845 F.Supp.2d at 558-561; Levin, 2011 WL 812032, at *11. Only one of the cases—Levin—dealt with any proceeds of financial instruments; the Court in Levin issued a turnover order for those assets. See Levin, 2011 WL 812032, at *20-21 (finding no bar under New York law to turnover of non-EFT accounts allegedly owned by instrumentalities of Iran).

### 4. Location of the Blocked Assets and Treaty of Amity

Markazi's remaining arguments—(1) that the bonds are not located in the United States and therefore cannot be executed upon under FSIA and (2) that blocking the assets violates U.S. treaty obligations—fail for the same reason: 22 U.S.C. §8772 obviates any need for this Court to rely on TRIA or the Treaty of Amity for resolution of this motion.

However, even if this Court were to ignore § 8772, the arguments nonetheless fail.

First, Bank Markazi argues that the Markazi Bonds are located in Luxembourg and thus outside this Court's jurisdiction.  (See Markazi MTD Reply Br. at 6.)  They cite this Court's decision in a related case, Bank of Tokyo-Mitsubishi, UFJ, Ltd. New York Branch v. Peterson, No. 12 Civ. 4038 (BSJ), 2012 WL 1963382, at *2 (S.D.N.Y. May 29, 2012), for the proposition that assets held outside the United States are not subject to execution.

This "extra-territoriality" argument assumes that the Blocked Assets are located outside of the United States.  This argument is sophistry: the Blocked Assets are located in a bank account at Citibank in New York (additional assets relating to the now liquidated $250 million in Markazi Bonds do not appear to be in New York, but their location is irrelevant to the resolution of this motion).  It may well be that there are account entries on the books of entities in Europe – such as Clearstream Luxembourg – relating to the Blocked Assets.  But the mere fact that

the account at Citibank is listed under the Clearstream and UBAE names does not alter the fact that those entities are agents of Bank Markazi.  Nor do mere book entries in Luxembourg transform the Citibank New York account into assets located in Luxembourg.[12]

In addition, the Treaty of Amity provides no barrier to subject matter jurisdiction.  Bank Markazi argues that Arts. III.2 and IV.1 of the Treaty entitle it to separate juridical status from Iran and, as such, its assets cannot be seized to satisfy a judgment against the sovereign state. (Markazi MTD Br. at 22.)

The treaty is inapplicable.  First, irrespective of any interpretation of the language of the Treaty, in <u>Weinstein v. Islamic Republic of Iran</u>, 609 F.3d 43, 53 (2d Cir. 2010) the Second Circuit stated that the phrase "notwithstanding any other provision of law" in FSIA effectively trumps any conflicting law.  As to the textual interpretation of the Treaty itself, the <u>Weinstein</u> Court held that the Treaty of Amity provisions cited by Bank Markazi are inapposite; the purpose behind the Treaty of Amity was "simply to grant legal status to corporations of each of the signatory countries in the territory of the other, thus putting the foreign corporations on equal footing with domestic corporations."  <u>Id.</u> at 53.  There is no basis to find that the Treaty was intended to be used or has been used to aid instrumentalities of foreign governments to circumvent congressional acts or authorized legal actions.

---

[12] This is particularly true in light of 22 U.S.C. 8772, its preemption of any contrary law, and its required narrow judicial determinations.

Lest any ambiguity remain, Congress inserted an additional "notwithstanding" clause in 22 U.S.C. § 8772(a)(1). That clause evinces clear Congressional intent to abrogate treaty language inconsistent with FSIA and § 8772. Id. (noting Circuit Courts have interpreted similar "notwithstanding" clauses to abrogate treaty language). To do otherwise would render FSIA a dead letter—something Congress and the President clearly did not intend.

Thus, the plain language of the Treaty of Amity renders it inapplicable to the Blocked Assets and, further, Congress has abrogated any application of the Treaty in the FSIA context.

### 5. Central Bank Immunity

Bank Markazi's final set of arguments assert FISA § 1611(b)(1) immunity from attachment for assets used for central banking purposes. FSIA § 1611(b)(1) provides that "the property . . . of a foreign central bank or monetary authority held for its own account" is entitled to immunity from attachment and execution. The Court only has jurisdiction to hear a turnover action for sovereign assets where a valid exception to FSIA exists; the central banking rule negates any FSIA exception. See Aurelius Capital Partners, LP v. Republic of Argentina, 584 F.3d 120, 129-30 (2d Cir. 2009)(citing FSIA § 1609).

Again, even if the Blocked Assets were, in fact, "held for [the central bank's] own account," TRIA § 201(a), E.O. 13599, and 22 U.S.C. § 8772 expressly preempt any immunity.

Congress is presumed to be aware of its previous enactments when it passes

a new statute.  See Vimar Seguors y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 554 (1995)(citing Cannon v. Univ. of Chicago, 441 U.S. 677, 696-699 (1999)). TRIA's "notwithstanding" clause—enacted well after § 1611(b) was adopted in 1976—thus preempts central bank immunity to the extent it would apply.  TRIA § 201(a).  As the Supreme Court has observed, "a clearer statement" of intent to supersede all other laws than a "notwithstanding clause" is "difficult to imagine" Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993).

Beyond the statutory language, E.O. 13599 suggests that Bank Markazi is not engaged in activities protected by § 1611(b), and thus is not entitled to immunity.  The Order makes a finding that Bank Markazi's assets are blocked "in light of the deceptive practices of [Bank Markazi] and other Iranian banks to conceal transactions of sanctioned parties . . . and the continuing and unacceptable risk posed to the international financial system by Iran's activities . . ." E.O. 13599. This executive determination suggests that the activities of Bank Markazi are not central banking activities that would provide § 1611(b) immunity.  See NML, 652 F.3d at 172 (setting forth functional test for central banking activities).

Finally, § 8772 also applies "notwithstanding any other provision of law, including any provision of law relating to sovereign immunity[.]"  22 U.S.C. § 8772(a)(1)(emphasis added).  Assuming—as the Court finds below—that § 8772 is valid, it must also find no central bank immunity.

In light of the above conclusions, there is no doubt that this Court has subject matter jurisdiction with respect to claims asserted against Bank Markazi. Its motion to dismiss is denied.

## IV.   MOTION TO VACATE RESTRAINTS

### A. Background and Procedural History

As set forth above, in 2008, plaintiffs obtained writs of attachment and execution against an account that Clearstream maintained at Citibank, imposing restraints—restrictions against the transfer or disposal of the assets in that account. That account was used to manage proceeds connected to the Markazi Bonds.

In June 2008, Clearstream challenged the restraints and this Court held an evidentiary hearing. At that hearing, Clearstream presented evidence that "at one time Clearstream's [customer, the Central Bank of Iran ("Bank Markazi"), was the underlying beneficial owner of the securities entitlements identified in the restraints, but that in February 2008] Bank Markazi [transferred all but one of its securities entitlements to the bonds identified in the restraints from its account at Clearstream to an account with another Clearstream customer], Banca UBAE S.p.A." (See Clearstream's Consol. Mem. in Supp. Of Mot. To Vacate Restraints ("Clearstream Vacate Br.) at 3.) At that hearing, a Clearstream employee testified that he did not know whether Bank Markazi remained the beneficial owner of the securities entitlements. (Id.) At the conclusion of the hearing, Judge Koeltl lifted the restraints as to the two bonds that had been sold to customers other than UBAE

(valued at approximately U.S. $250 million).  The restraints were not lifted as to the remaining assets held in Clearstream's Omnibus Account at Citibank.  (Id. at 4.)

At a June 27, 2008, hearing, Clearstream moved again to vacate the remaining restraints – this time pursuant to the Uniform Commercial Code ("UCC"), §8-112(c).  Clearstream argued that neither it nor Citibank was a proper "garnishee" under the provision.  Clearstream further argued that the restraints should be lifted since the securities entitlements were Clearstream's and not Bank Markazi's.  (Id.)

On June 23, 2009, Judge Barbara Jones held that Clearstream was not a proper garnishee under § 8-112(c) of the UCC because all but one of the securities at issue were held at Clearstream in the name of UBAE, rather than Bank Markazi. (See Order, Peterson et al. v. Islamic Republic of Iran et al. (S.D.N.Y. June 23 2009), ECF No. 171.)  Bank Markazi, as an instrumentality of Iran, was the only proper garnishee under UCC § 8-112(c).  The Order noted that it was possible, however, that the transfer of the Bank Markazi securities to the UBAE account was fraudulent and that Bank Markazi therefore remained the true holder of the securities.  (Id.)  She held that the restraints would remain in place pending a further judicial determination as to (1) whether such transfers could be fraudulent as a matter of law, (2) if they were, in fact, fraudulent, and (3) if Clearstream was (or could be made) a proper garnishee.  (Id.)

The parties then briefed whether a judicial determination that the conveyance was fraudulent would alter the UCC analysis and whether Clearstream

could in any event be a proper garnishee.  (See Letter of Frank Panopoulos to Hon. Barbara S. Jones (hereinafter "Clearstream Restraints Br."), Aug. 14, 2009, ECF No. 181; Letter of Liviu Vogel to Hon. Barbara S. Jones (hereinafter "Pls.' Restraints Br."), Sept. 19, 2009, ECF No. 183).  In the same briefing, plaintiffs also raised alternative theories supporting turnover of the same assets.  (Pls.' Restraints Br. at 4-6.)  The Court never issued a subsequent ruling addressing those arguments. Those arguments were then re-briefed and consolidated into Clearstream's motion to vacate now pending before this Court and resolved herein. (See Renewed Mot. To Vacate Restraints, ECF No. 174.)

Clearstream's motion to vacate initially relied upon the following five arguments:

- Clearstream is not a proper garnishee under UCC §8-112(c);
- According to UCC §8-110, Bank Markazi's assets or interests are located in Luxembourg and not this district and must be restrained there;
- Common law "situs" rules are not applicable as a basis to restrain or turnover the assets;
- The restrained assets are not "Blocked Assets" under TRIA;
- Equitable relief is unavailable to restrain and turnover the blocked assets.

In its reply memorandum on this motion, Clearstream adds a sixth argument—that the competing E.U. and U.S. blocking regimes present a non-justicable political question, the same argument the Court rejected, supra, with respect to Bank Markazi's motion to dismiss.

56

In response to this series of arguments, plaintiffs contend that (1) the EU Regulation does not create a non-justiciable political question; (2) the UCC is inapplicable to the questions before this Court because TRIA preempts conflicting state law and the Blocked Assets are therefore subject to both the restraints and to turnover; (3) TRIA and E.O.13599 render the situs argument inapplicable; and (4) that the restrained assets are designated as Blocked Assets.  According to plaintiffs, New York's CPLR permits enforcement of plaintiffs' judgments against the cash held in the Omnibus Account.

### B. Analysis

"Enough is enough" is the reductionist version of plaintiffs' response to Clearstream's motion to vacate.  This Court agrees.

### i.   Political Question

The Court rejected the political question argument with respect to Bank Markazi's motion to dismiss and Clearstream's version of the argument is not materially different.

Clearstream adds only one novel aspect to its political question argument: it argues that a turnover order will subject it to inconsistent obligations in the United States and Europe.  If the plaintiffs were to obtain a turnover order, the resulting debit in the Luxembourg book entry might violate the E.U. blocking regime and Clearstream's obligation to Bank Markazi.

However, even if a change in the Clearstream accounts in the U.S. will cause a book entry in Luxembourg – placing Clearstream at risk of violating of EU

Regulations—that issue is one left to Clearstream to address in the EU.  As stated above, if this Court were required to hypothesize as to the implications of foreign regulations with respect to actions before it, paralysis would result in numerous situations: U.S. courts would no doubt be inundated with such issues brought forward tactically.  There is no such hardline rule, and in a world of transnational commerce there should not be.

    ii.   <u>Remaining Arguments for Vacating the Restraints</u>

The same statute – 22 U.S.C. § 8772 – crucial to resolving Bank Markazi's motion to dismiss also answers the remaining arguments Clearstream has raised in support of its motion to vacate.  Section 8772 specifically preempts "any other provision of law" including "any inconsistent provision of state law."  22 U.S.C. § 8772(a)(1).  Accordingly, this Court need not address the potpourri of UCC-based arguments raised by Clearstream: Section 8772 provides that, so long as the appropriate judicial determinations are made, there is no <u>legal</u> barrier to execution on the Blocked Assets.

Accordingly, the Court denies Clearstream's motion to vacate the restraints.

## V.   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs have moved for partial summary judgment against defendants Clearstream, Bank Markazi, and UBAE[14] on their cause of action for turnover of

---

[14] UBAE did not file substantive opposition to plaintiffs' partial summary judgment motion initially. It argued that it should not be compelled to respond to plaintiffs' motion until its own Rule 12(b)(2) motion to dismiss had been decided.  In the interests of judicial economy, the Court issued an Order on February 14, 2013, directing UBAE to file any opposition to plaintiffs' motion, and directed UBAE to "assume that the Court finds sufficient bases to exercise personal jurisdiction over it." (See Order, Feb. 14, 2013, ECF No. 325.)  UBAE filed its substantive opposition brief on February 22, 2013. (ECF No. 328.)

the approximately $1.75 billion[15] in Blocked Assets, held in the Omnibus Account at Citibank.[16]

The Court has already determined that the assets at issue are properly restrained. The question before the Court is now whether there exist triable issues of fact as to whether those assets are subject to turnover.

While both Clearstream and Bank Markazi raise additional arguments (many of which were already raised in the prior motions), the crux of this motion is really a single question: is there a triable issue as to whether the Blocked Assets are owned by Bank Markazi? In the context of the motion to vacate the restraints, Clearstream had stipulated that UBAE had no beneficial interest and the transfer between UBAE and Bank Markazi was unwound. There is no such stipulation on this motion.

For the reasons set forth below, this Court finds that the record evidence is clear and one-sided: there is no triable issue on this question. No rational juror could find that any person or entity—other than Bank Markazi—has a constitutional, beneficial or equitable interest in the Blocked Assets; plaintiffs are therefore entitled to turnover as a matter of law.

Defendants also argue that turnover would run afoul of certain constitutional rights: first, that the specific statutory provision, 22 U.S.C. § 8772 is an invalid

---

[15] UBAE correctly points out that the two securities with a face value of $250 million it is alleged to have conveyed fraudulently in early 2008 are not at issue in the plaintiffs' motion for partial summary judgment. (See UBAE S.J. Opp. Br." at 2 n.2.) The Court does not resolve any merits issues as regards claims based on this alleged conveyance.
[16] As set forth above, plaintiffs have reached agreement regarding priority, as between themselves, of distribution of the assets. Accordingly, the Court does not address any such questions herein.

legislative act of adjudication that violates Article III; second, that it constitutes an unlawful bill of attainder, U.S. Const. art. I, § 9, cl. 3; third, that turnover would amount to an unconstitutional taking in violation of their due process rights. <u>See</u> U.S. Const. amend. V.  None of these arguments has merit.

A. <u>Legal Standard for Summary Judgment</u>

Summary Judgment, as to all or part of a claim, is warranted if the pleadings, the discovery and disclosure materials, along with any affidavits that are admissible, demonstrate that there is no genuine issue of fact necessitating resolution at trial.  Fed.R.Civ.P. 56(c); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-323 (1986).  A party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists; all reasonable inferences should be drawn in favor of the non-moving party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255; <u>Grady v. Affiliated Cent., Inc.</u>, 130 F.3d 553, 559 (2d Cir. 1997).  The burden then shifts to the non-moving party to come forward with "admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  <u>See</u> <u>Jaramillo v. Weyerhauser Co.</u>, 536 F.3d 140, 145 (2d Cir. 2008).  Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the moving party satisfies its burden on the motion by pointing to an absence of evidence to support an essential element of the non-movant's claim. <u>See</u> <u>Libraire v. Kaplan</u>, CV No. 06-1500, 2008 WL 794973 at *5 (E.D.N.Y. Mar. 24, 2008).  Where it is clear that no rational trier of fact could find in favor of the non-moving party, summary judgment

is warranted. <u>Gallo v. Prudential Residential Servs., Ltd.</u>, 22 F.3d 1219, 1223 (2d Cir. 1994). The mere possibility that a dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party." <u>Anderson</u>, 477 U.S. at 247-48. Mere speculation or conjecture is insufficient to defeat a motion. <u>W. World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir. 1990).

B. <u>Analysis</u>

As stated above, in opposition to this motion, defendants have filled the proverbial kitchen sink with arguments. As the Court has reviewed the thousands of pages of briefing on and in support of these motions, building in a crescendo to the instant motion, it cannot help but be reminded of the grand finale in a Fourth of July fireworks show – all arguments thrown in and set off at once. While this Court has carefully reviewed all of defendants' various arguments, it will not address each of them here.[17] It need not do so because the basic question and the dispositive legal principles do not require descent into those waters—or into that sink, to mix metaphors.

i.     <u>The Blocked Assets are Bank Markazi's</u>

Clearstream argues that there are triable issues as to whether Bank Markazi is the "owner of" the Blocked Assets. As with similar arguments made in the context of the motion to dismiss, the arguments made in support of this assertion are based on laws preempted by 22 U.S.C. § 8772.

---

[17] Defendants' UCC, situs of property and Treaty of Amity arguments, in particular, are mooted by the Court's determination with respect to 22 U.S.C. § 8772.

As noted above, § 8772 requires the Court to determine who—other than an agency or instrumentality of Iran—has a constitutional, beneficial or equitable interest in the assets at issue.  None of the defendants cite authority or facts supporting that any entity other than Bank Markazi has such an interest.

On this record and as a matter of law no other entity could have an equitable or beneficial interest.  A beneficial interest is "[a] right or expectancy in something . . . as opposed to legal title to that thing."  Interest, Black's Law Dictionary (9th ed. 2009).  The key factor is whether "the property benefitted [the beneficial owner] as if he had received the property directly. See Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd., 609 F.3d 111, 120 (2d Cir. 2010)(citing United States v. Coluccio, 51 F.3d 337, 341 (2d Cir.1995)).  Clearstream's only role with regard to the Blocked Assets is as the agent of Bank Markazi.  Even absent the restraints, it fails to proffer any evidence that it has the right to use or move the Blocked Assets held at Citibank without express permission or direction from Bank Markazi.  Nor does Clearstream have equitable title, "a beneficial interest in property [that] gives the holder the right to acquire formal legal title." Lippe v. Genlyte Group Inc., 98 CIV. 8672 (DC), 2002 WL 531010 (S.D.N.Y. Apr. 8, 2002)(citing Black's Law Dictionary 1493 (7th ed.1999)).  Clearstream does not allege—and puts forward no facts—that it has legal title or the right to acquire that title for the Blocked Assets. UBAE disclaims any "legally congnizable interest" in the Citibank proceeds. [18]  They are

---

[18] UBAE admits that it has "no legally cognizable interest" in the restrained bonds.  (UBAE SJ Opp. Br. at 2-3.)  UBAE thus admits that which plaintiffs wish to prove on summary judgment: there is no issue of material fact as to the ownership of the Markazi Bonds with respect to UBAE (and, as the remainder of the above analysis shows, nor does Clearstream have any such ownership interest).

both merely account holders without authority to move or use the assets in the absence of direction.  They simply—like Citibank—maintain that account on behalf of another, Bank Markazi.

In addition, Bank Markazi's arguments that it is immune from pre- or post-judgment attachment depend upon preempted provisions of the FSIA.  <u>See</u> 22 U.S.C. § 8772(a).

Bank Markazi has repeatedly insisted that it is the sole beneficial owner of the Blocked Assets.  As set forth above, but bears repeating in the context of the Court's analysis of this motion, in various submissions Bank Markazi has asserted that "Over $1.75 billion in securities <u>belonging to Bank Markazi</u> . . . are frozen in a custodial Omnibus Account at [Citibank]"; that the "Restrained Securities are the <u>property of Bank Markazi</u>, the Central Bank of Iran", that the "aggregate value of the remaining bond instruments, <u>i.e.</u> the Restrained Securities that are the <u>property of Bank Markazi</u> and the subject of the Turnover Action – is thus $1.753 billion"; that the "Restrained Securities are the <u>property of a Foreign Central Bank</u> . . ."; that the "Restrained Securities are presumed to be the <u>property of</u> Bank Markazi"; and "the Restrained Securities are <u>prima facie the property of a third party, Bank Markazi</u> . . . ." (<u>See</u> Bank Markazi's First Mem. of L. in Support of its Mot. to Dismiss the Am. Compl., May 11, 2011, ECF No. 18 ("Markazi's First MOL"), at 1, 5, 9, 10, 36 (emphases added).)  In addition, two officers of Bank Markazi have sworn under penalty of perjury that the Blocked Assets are the "sole property of Bank Markazi and held for its own account." (Aff. of Gholamossein

Arabieh ¶ 2, Vogel Decl. Ex. J, Oct. 17, 2010, ECF No. 210; Aff. of Ali Asghar Massoumi ¶ 2, Vogel Decl. Ex. K, Oct. 17, 2010, ECF No. 210).

There simply is no other possible owner of the interests here other than Bank Markazi; there is no triable issue of fact.

### ii.  Constitutional Arguments

Bank Markazi and Clearstream urge that, if this Court determines that the assets are subject to turnover pursuant to § 8772, prior to doing so it must consider whether that statute passes constitutional muster. In this regard, their arguments combine both general constitutional arguments with specific arguments directed at 22 U.S.C. §8772. As set forth above, § 8772(a)(5) provides that this Court must make a judicial determination as to whether another person has a constitutionally protected interest in the assets. The Court has made such a determination, and no other person has such an interest.

Clearstream and Bank Markazi's various constitutional arguments are without merit.[19]

### a.  Separation of Powers

First, defendants Clearstream and Bank Markazi argue that, pursuant to Article III of the Constitution, 22 U.S.C. § 8772 is a congressional act violative of the separation of powers. (See Bank Markazi Supp. Mem. of L. in Opp. to Pls.' Mot. for Partial Summ. J. ("Markazi Supp. SJ Br.") at 10-12.) They argue that, in

---

[19] Plaintiffs have asserted that Clearstream does not itself have standing to raise constitutional challenges because it does not own or even have a beneficial interest in the Blocked Assets. Because none of the constitutional challenges has merit – whether raised by Bank Markazi or Clearstream (and they are raised by both of those defendants) – the Court need not and does not reach the standing issue.

passing § 8772, Congress effectively dictated specific factual findings in connection with a specific litigation—invading the province of the courts. (Id.) See U.S. v. Klein, 80 U.S. 128, 146 (1871) (Congress may not prescribe rules of decision). According to Bank Markazi, the statute's requirement of judicial determinations does not save it since those determinations are "legislative fig lea[ves]" that pre-determine a finding that turnover is required. (Markazi Supp. SJ Br. at 12.)

This argument ignores the structure of the statute. The statute does not itself "find" turnover required; such determination is specifically left to the Court. The statute is not a self-executing congressional resolution of a legal dispute, but rather requires the Court to make determinations regarding (1) whether and to what extent Iran has a beneficial or equitable interest in the assets at issue, and (2) whether constitutionally-protected interest holders other than Iran are present. These determinations are not mere fig leaves; it is quite possible that the Court could have found that defendants raised a triable issue as to whether the Blocked Assets were owned by Iran, or that Clearstream and/or UBAE have some form of beneficial or equitable interest. Any such finding of true third party interest could limit—or even eliminate turnover (at least at this time). The statute merely "chang[es] the law applicable to pending cases;" it does not "usurp the adjudicative function assigned to the federal courts[.]" See Axel Johnson, Inc. v. Arthur Andersen & Co., 6 F.3d 78, 81 (2d Cir. 1993). There is frankly plenty for this Court to adjudicate.

### b.  Bills of Attainder and Ex Post Facto Law

Similarly, § 8772 does not violate the constitutional prohibition against bills of attainder or ex post facto laws.  Bills of attainder exist when a congressional act (1) legislatively determines guilt, and (2) and inflicts punishment upon an identifiable individual, (3) without the protections accompanying a trial.  See Nixon v. Adm'r of Gen. Svcs., 433 U.S. 425, 468 (1977).  A critical aspect of a bill of attainder is its retrospective nature – classically, defining conduct which has already occurred (and was legal when it occurred) as illegal.  Consol. Edison Co. v. Pataki, 292 F.3d 338, 349 (2d Cir. 2002).  In short, it is an ex post facto declaration or finding of guilt by legislative act.

Here, there is no retrospective "punishment" enacted against any defendant.  As the Court found above, the financial intermediaries—UBAE and Clearstream— have no constitutional, beneficial, or equitable interest in the assets at issue; thus, it is impossible for seizure of those assets to constitute "punishment" as to them.  As to Bank Markazi, now many years ago plaintiffs obtained default judgments as to liability and damages against the Iranian Government.  Iran's conduct leading to such determinations was based on established common law principles.  Iran's liability and its required payment of damages was therefore established years prior to the 2012 Act.  At issue now is merely execution on assets present in this district, in connection with those judgments.  Prior to the 2012 Act, the FSIA and TRIA, along with the CPLR, supported restraint and execution against those assets.

Section 8772 is thus a legislative act that does not determine "guilt". The law is clear that forbidden legislative punishment is not involved "merely because [the act] imposes burdensome consequences." Nixon, 433 U.S. at 742.

Section § 8772 is therefore also not backward-looking; it did not change the reasonable expectations of parties as to which assets may be subject to attachment and turnover. Indeed, this litigation regarding attachment of the assets at issue was commenced long before the passage of § 8772.

### c. Takings

Nor does the statute effect an unconstitutional taking without just compensation as to either Clearstream or Bank Markazi. The Takings Clause of the Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amdt. V.

Clearstream has no constitutionally protected property interest in the Blocked Assets. It makes a purely legal argument that such an interest arises from its alleged right to payment from Citibank. This argument is without merit. Clearstream is in no different position from Citibank: it is merely a stakeholder without any cognizable interest in the resolution of this dispute on the merits. No doubt it views it necessary for client relations to advocate forcefully against negative impacts to its client's (Bank Markazi) interests, but the fact remains that there is no record evidence that it is acting as anything other than an agent; it does not own the assets at issue.

The cases which Clearstream cites in support of its position do not alter this analysis.  For instance, <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1019 (1992), refers to a taking as extinguishing a property right.  <u>Lucas</u> related to real property. Of course, Clearstream's interest in the Blocked Assets is one of account entry only – it provides services with respect to assets for its clients, UBAE, on behalf Bank Markazi.  Nothing in the record supports that Clearstream could unilaterally choose to use those assets.

The regulatory takings doctrine set forth in <u>Penn Central Transp. Co. v. N.Y.</u>, 438 U.S. 104, 124 (1978), also cited by Clearstream, is similarly inapposite.  There, the Supreme Court found that a regulation—structured in a particular manner— could result in a taking.  When faced with such issues, courts are to ask about (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations . . . and (3) the character of the government action.  Clearstream's only argument in support of such a regulatory taking is that as a stakeholder, if the assets are turned over, it might be exposed to claims from Bank Markazi. That is no different from Citibank's position.  Clearstream does not have distinct investment-backed expectations— indeed, it cannot use these funds itself.  The regulatory structure surrounding turnover provides for ample (and there certainly has been ample) due process in furtherance of an important and reasonable governmental interest in pursuing its national security goals.

Finally, of course, Clearstream's rights and obligations are frankly no different under § 8772 than in the absence of that statute. The statute perhaps allows a court, if it were at the beginning of this process, to weed out baseless arguments. However, the outcome of this matter is neither entirely nor primarily dependent on the existence of § 8772. The combination of the FSIA, TRIA, and E.O. 13599 would lead to the same result. Accordingly, §8772 cannot be an independent "taking" of that to which Clearstream and UBAE are not entitled and Bank Markazi is no longer entitled.

For that reason Bank Markazi's suggestion that the statute effects a taking per se—completely appropriating Markazi's property and depriving it of all economically beneficial use—is incorrect. See Lucas, 505 U.S. at 1019. Markazi has no reasonable expectation in the assets at issue because, as the court held in Hausler II, once assets are blocked, "parties with interests in those assets have no reasonable expectation that their interests will not be diminished or extinguished."

Nor does § 8772 effect a taking for purely private use. Bank Markazi points out that the U.S. government "may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation." Kelo v. Civy of New London, Conn., 545 U.S. 469, 477 (2005). The sole purpose of § 8772, Markazi argues, is to expropriate sovereign property for a purely private purpose. (See Markazi Supp. SJ Br. at 19.)

But the statute does not lack a public purpose. As the Court held in connection with another action seeking turnover of Iranian assets, awarding such

assets does not violate the public use requirement where, as here, the Government seeks to address the "'unusual and extraordinary threat to the national security, foreign policy, and economy of the United States' that . . . Iran poses to the United States." See In re 650 Fifth Ave. and Related Props., 777 F. Supp. 2d 529, 576-77 (S.D.N.Y. 2011)(quoting Exec. Order No. 12957, 60 FR 14615 (March 15, 1995)).

Moreover, even § 8772 requires that this Court make certain judicial determinations prior to ordering turnover: that no party has a constitutional, beneficial or equitable interest in the property at issue. In connection with making these determinations, the Court has allowed many submissions; the many felled trees required for this Court to plow through are evidence of that process.

Finally, Clearstream's argument that turnover would violate Equal Protection also fails.  The law is clear that legislation is presumed valid and will be upheld so long as it is reasonably related to a legitimate state interest. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).  There can be no serious dispute that §8772 furthers the United States' legitimate interest in furthering its foreign policy with respect to Iran.  Clearstream's argument that §8772 unjustly discriminates against foreign intermediaries fails.  The legislation is presumed valid – foreign intermediaries are entitled to no special treatment.

     iii.    UBAE's Arguments

UBAE is in no different a position – it is another layer of stakeholder trying to shield Bank Markazi from turnover.  Nowhere does UBAE assert – nor could it – that it is the true beneficial owner of the Blocked Assets.  Indeed, it disclaims any

legally cognizable interest.  At most, it is a layer in the sandwich built to try and interfere with execution on those assets.  Even if UBAE can control the Blocked Assets, that control is irrelevant; it simply fits within E.O. 13599's provision for a person acting "directly or indirectly" on behalf of Iran.

Nor has the notice given UBAE been deficient; it has been served with all motion papers and its counsel have attended the conferences in this action.  UBAE makes no additional arguments here that could credibly change the outcome of this motion with respect to it, nor to the other defendants.  As a mere agent of Bank Markazi, then, the Blocked Assets held in the name of UBAE are subject to turnover.

### iv.    Defendants' other arguments against turnover

Defendants' final array of arguments in opposition to this motion were already dispensed with on the basis of § 8772.

Defendants argue that (1) if this Court found that the assets are Bank Markazi's, allowing execution thereon would violate the Treaty of Amity; (2) if the assets are those "of" Bank Markazi, then plaintiffs have failed to demonstrate that there is no triable issue as to whether, under the FSIA §1611(b)(1), they are assets used for central bank purposes; (3) that Bank Markazi is immune from pre-judgment and post-judgment attachment and that immunity cannot be waived, and (4) a variety of arguments regarding whether the assets are theoretically located in Luxembourg and not New York.

71

None of these arguments succeed. The Court specifically refers to earlier discussions relating to the arguments above. Section 8772 explicitly states the congressional intent that Iran be held accountable for the judgments against it. Importantly, the statute explicitly refers to those assets at issue in this action. Accordingly, Congress has itself swept aside defendants' final arguments.

On a motion for summary judgment, the Court must determine whether there is a triable issue of fact precluding turnover. As discussed above, there is not. Bank Markazi–the central bank of Iran–has repeatedly asserted it is the sole beneficial owner of the assets. No other party can raise a triable issue as to that, the ultimate question. And on the evidence in this record, no rational juror could find otherwise.

Plaintiffs' motion for partial summary judgment is granted.

## VI.   BLAND MOTION FOR EXECUTION

As a final matter, the Bland judgment creditors present a motion for execution under 28 U.S.C. § 1610.[20] The Bland group already possesses a § 1610 order, issued October 4, 2012, by the U.S. District Court for the District of Columbia. See Order, Estate of Steven Bland, et al, v. Islamic Republic of Iran, et al, 05-cv-2124 (RCL)(D.D.C. Oct. 4, 2012), ECF No. 84. They seek an additional order within this District.

---

[20] The Bland creditors are the plaintiffs in Estate of Steven Bland, et al, v. Islamic Republic of Iran, et al, 05-cv-2124 (RCL)(D.D.C.).

While the Court expresses no opinion as to the necessity of a § 1610(c) order in a TRIA action,[21] the Bland creditors make a sufficient showing for an order of execution under § 1610(c).  That section of FSIA provides for execution of a valid judgment against an instrumentality of a terrorist state where (1) the Court "determine[s] that a reasonable period of time has elapsed following the entry of judgment", and (2) proper "notice required under section 1608(e)" has been given. 28 U.S.C. § 1610(c).  Under § 1608(e), a defaulting foreign sovereign must be served in accordance with one of several methods, including "by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state . . . to the Secretary of State" for transmittal via diplomatic note.  28 U.S.C. §§ 1608(a),(e).

The Bland judgment meets both of the § 1610(c) requirements.  Claimants present a valid default judgment against Iran dated December 12, 2011.  (Bland Mot. for Entry of Order Pursuant to 28 U.S.C. § 1610(c) ("Bland § 1610(c) Mot."), Ex. A, ECF No. 305.)  Service on Iran via the Department of State was completed on July 4, 2012, in accordance with 28 U.S.C. § 1608(a).  See Aff. of Service, Estate of Steven Bland, et al, v. Islamic Republic of Iran, et al, 05-cv-2124 (RCL)(D.D.C. Aug. 13, 2012), ECF No. 82.  The Government of Iran has had more than 100 days as of the date of this Opinion and Order in which to respond to the Bland judgment; it has not.  This period is reasonable for the purposes of § 1610(c).  See, e.g., Gadsby &

---

[21] The Peterson plaintiffs have argued in separate briefing that no § 1610(c) order is required to execute under TRIA. (See Pls.' Summ. J. Reply at 54-57.)  As the Court finds that the requirements of § 1610(c) are met with respect to the Bland creditors, it need not address the order's relevance to TRIA.

Hannah v. Socialist Republic of Romania, 698 F. Supp. 483, 486 (S.D.N.Y. 1988) (two months constitutes a "reasonable period of time" under § 1610(c)); Ferrostaal Metals v. S.S. Lash Pacifico, 652 F. Supp. 420, 423 (S.D.N.Y. 1987) (three months constitutes reasonable time under § 1610(c)).

The Bland creditors' motion for an order of attachment and/or turnover pursuant to 28 U.S.C. § 1610 is granted.  They may proceed to collection of the Bland Judgment by attachment and/or execution, or by any other means permitted by applicable law against the assets of the Islamic Republic of Iran and the Iranian Ministry of Information and Security, in accordance with 28 U.S.C. §§ 1610(a),(b).

## CONCLUSION

For these reasons and set forth more fully above, the following motions are DENIED:

- UBAE's Motion to Dismiss;
- Clearstream's Motion to Dismiss;
- Bank Markazi's Motion to Dismiss;
- Clearstream's Motion to Vacate the Restraints and Renewed Motion to Vacate the Restraints;

For the reasons set forth above, the following motions are GRANTED:

- Plaintiffs' Motion for Partial Summary Judgment;
- The Bland judgment creditors' motion for execution;

The parties shall confer and jointly and, not later than March 15, 2013, submit a proposed schedule to resolve the remainder of the case.  If the parties are

unable to agree, they shall set forth in a letter by the same date the matters and issues which they believe remain to be resolved and each party's proposed schedule.

The Clerk of Court is directed to close the motions at ECF Nos. 174, 205, 209, 295, 299 (under seal), 301, and 305 (under seal).

SO ORDERED.

Dated:     New York, New York
           February 28, 2013

                              KATHERINE B. FORREST
                              United States District Judge