UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON,                  Case No.: 10 CIV 4518 (KBF)
Personal Representative of the Estate of James
C. Knipple (Dec.) *et al.*,

                Plaintiffs,

        v.

ISLAMIC REPUBLIC OF IRAN, BANK
MARKAZI a/k/a CENTRAL BANK OF
IRAN, BANCA UBAE SpA, CITIBANK,
N.A., and CLEARSTREAM BANKING,
S.A.,

                Defendants.


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
FOR AN ORDER PURSUANT TO F.R.C.P 54(b) AND AN ORDER
ESTABLISHING A QUALIFIED SETTLEMENT FUND**

Liviu Vogel
SALON MARROW DYCKMAN
NEWMAN & BROUDY LLP
292 Madison Avenue
New York, New York 10017
Tel:  (212) 661-7100
Fax: (212) 661-3339

May 15, 2013

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ..........................................................................................1

THE RELEVANT FACTS ....................................................................................................3

ARGUMENT .........................................................................................................................4

POINT I. ................................................................................................................................4

    A RULE 54(b) ORDER IS PROPER ..............................................................................4

POINT II. ...............................................................................................................................9

    AN ORDER CREATING A QUALIFIED SETTLEMENT FUND IS PROPER ...................9

POINT III. ............................................................................................................................14

    THIS COURT RETAINS JURISDICTION BECAUSE THE ORDER IS
    NOT APPEALABLE ..........................................................................................................14

        A.  THE ORDER IS NOT A CERTIFIED RULE 54(b) Order.........................................15

        B.  28 U.S.C.§ 1605A(f) INVALIDATES THE NOTICE OF APPEAL.........................16

        C.  THE COLATERAL ORDER DOCTRINE DOES NOT APPLY
            TO  MARKAZI'S APPEAL .................................................................................18

CONCLUSION ....................................................................................................................19

i

## TABLE OF AUTHORITIES

### *Cases*

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*
  106 F.3d 11 (2d Cir. 1997)..................................................................................................6

*Allstate Insurance Company v. Levy*
  478 F. App'x 688 (2d Cir. 2012) ....................................................................................... 18

*American Institute for Mental Studies v. Brinn*
  No. 83 Civ. 6475-CSH, 1985 WL 3486 (S.D.N.Y. Nov. 4, 1985) ...................................... 14, 15

*Ansoumana v. Gristedes Operating Corp.*
  223 F. App'x 69 (2d Cir. 2007)........................................................................................... 12

*Banque Nordeurope S.A. v. Banker*
  970 F.2d 1129 (2d Cir. 1992).............................................................................................. 18

*Bethea v. Sprint Communications Company L.P.*
  3:12-CV-322-CWR-FKB, 2013 WL 228094 (S.D. Miss. Jan. 18, 2013).................................. 12

*Citizens Accord, Inc. v. Town of Rochester*
  235 F.3d 126 (2d Cir. 2000)................................................................................................ 15

*Coopers & Lybrand v. Livesay*
  437 U.S., 463 (1978).................................................................................................... 18, 19

*Cunningham v. Hamilton County, Ohio*
  527 U.S. 198 (1999)............................................................................................................ 18

*Curtiss-Wright Corp. v. General Electric Co.*
  446 U.S. 1 (1980)................................................................................................... 4, 5, 6, 8

*Douglas v. Merck & Co., Inc.*
  456 F. App'x 45 (2d Cir. 2012)........................................................................................... 18

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*
  386 F.3d 485 (2d Cir. 2004)............................................................................................. 4, 9

*Ginett v. Computer Task Group, Inc.*
  962 F.2d 1085 (2d Cir. 1992)........................................................................................... 6, 8

*Gottesman v. General Motors Corp.*
  401 F.2d 510 (2d Cir. 1968)................................................................................................. 6

*Grand River Enterprises Six Nations, Ltd. v. Pryor*
   No. 02 Civ. 5068(JFK), 2004 WL 2480433 (S.D.N.Y. Nov. 3, 2004)...................................... 8-9

*Hageman v. City Investing Company*
   851 F.2d 69 (2d Cir. 1988)......................................................................................................... 15

*Holmes v. National Broadcasting Company, Inc.*
   133 F.3d 907 (2d Cir. 1997)....................................................................................................... 14

*HSW Enterprises, Inc. v. Woo Lae Oak, Inc.*
   No. 08 Civ. 8476(LBS), 2010 WL 1630686 (S.D.N.Y. April 21, 2010)...................................... 9

*Hudson River Sloop Clearwater, Inc. v. Department of the Navy*
   891 F.2d 414 (2d Cir. 1989)................................................................................................. 6, 17

*International Controls Corp. v. Vesco*
   535 F.2d 742 (2d Cir. 1976)....................................................................................................... 15

*Kensington International Limited v. Republic of Congo*
   461 F.3d 238 (2d Cir. 2006)....................................................................................................... 18

*Levin v. Bank of New York*
   No. 09 CV 5900, 2011 WL 812032 (S.D.N.Y. March 4, 2011)................................................. 16

*Lora v. O'Heaney*
   602 F.3d 106 (2d Cir. 2010)....................................................................................................... 18

*McCowan v. Dean Witter Reynolds Inc.*
   889 F.2d 451 (2d Cir. 1989)....................................................................................................... 16

*Mohawk Industries, Inc. v. Carpenter*
   558 U.S. 100 (2009).................................................................................................................... 18

*Patton v. Brilla*
   No. 07-CV-0376, 2009 WL 5224756 (Wis. Cir. May 13, 2009)................................................. 12

*Republic of Iran v. Beatty*
   556 U.S. 848 (2009).................................................................................................................... 16

*Ross v. Thomas*
   09 CIV. 5631 (SAS), 2010 WL 3952903 (S.D.N.Y. Oct. 7, 2010) .............................................. 6

*Sears, Roebuck & Co. v. Mackey*
   351 U.S. 427 (1956)...................................................................................................................... 4

*Simon v. Republic of Iraq*
   529 F.3d 1187 (D.C. Cir. 2008) ................................................................................................. 16

*Weinstein v. Islamic Republic of Iran*
609 F.3d 43 (2d Cir. 2010)..........................................................................................................19

## *Statutes and Rules*

26 C.F.R. § 1.468B-1…………………………...……………………………………......11, 12

26 C.F.R. § 1.468B-1(c)(2)…………...……………………………………………….....11, 12

26 C.F.R. § 1.468B-1(c)(2)(ii)…………………………………………………………………9

26 C.F.R. § 1.468B-2(a)…………………………………………………………………….10

26 C.F.R. § 1.468B-4…………………………………………………………………….10

22 U.S.C. § 8701..........................................................................................................................5

22 U.S.C. § 8711..........................................................................................................................7

22 U.S.C. § 8772(a)(2)..................................................................................................................7

26 U.S.C. § 104(a)(2)................................................................................................................. 10

28 U.S.C. § 1292(b) .................................................................................................................. 17

28 U.S.C § 1601........................................................................................................................ 15

28 U.S.C § 1605(a)(7)…………………………………………………………………...16, 17

28 U.S.C. § 1605A………………………………………………………………….....15, 16

28 U.S.C. § 1605A(f).......................................................................................................... 15,16, 17

28 U.S.C. § 1610........................................................................................................................ 5

Plaintiffs-Judgment Creditors respectfully submit this memorandum of law in support of their motion, pursuant to FED. R. CIV. P. 54(b), for a final and appealable order and judgment, consistent with this Court's Opinion and Order, dated February 28, 2013 (Dkt. Nos. 337 and 367), which, *inter alia*, granted Plaintiffs' motion for partial summary judgment (the "Order").

## PRELIMINARY STATEMENT

A Rule 54(b) order should be entered in this case because: (a) the Order is a final judgment for the turnover of in excess of $1.75 billion (the "Turnover Assets") in partial satisfaction of Plaintiffs' judgments for death and injury caused by terrorist attacks sponsored by the Islamic Republic of Iran ("Iran"); and (b) there is no just reason why payment to the Plaintiffs, all of whom have already waited many years for recovery on their judgments, should be further delayed while the Court resolves the remaining claims in the case that do not relate to the Turnover Assets. The Defendants in this action have feigned concern that payment of the Turnover Assets to the Plaintiffs pursuant to the Order would somehow imperil those assets during the course of Defendants' planned appeal. While Plaintiffs and their counsel see no basis for that supposed concern, Plaintiffs have built significant safeguards into their proposed Rule 54(b) Order (the "54(b) Order") that will insure the safe return of the Turnover Assets to a blocked account in the exceedingly unlikely event that the Court's Order is reversed on appeal.

Specifically, Plaintiffs' 54(b) Order provides for the creation of the type of "qualified settlement fund" (the "QSF") that courts regularly utilize to safeguard funds in connection with the resolution of class actions and mass tort cases in the interim between the time those assets are paid to the plaintiffs and the final resolution of a litigation. Plaintiffs have secured the services of former federal District Court Judge Stanley Sporkin to serve as the trustee of the QSF. In addition, UBS, one of the world's largest financial institutions, will serve as the financial advisor

to the QSF, and will implement its mandate to invest only in U.S. Treasury and U.S. agency securities, thereby guaranteeing the safety of the QSF's principal.

While the dollar amount at issue in this case is large, no reason exists to treat Plaintiffs' funds any differently than money awarded to any other plaintiff in connection with a summary judgment ruling. Thus, the QSF provides a generous level of protection to Defendants (who have refused to post a *supersedeas* bond pending the resolution of their appeal), while at the same time recognizing Plaintiffs' right to exercise dominion over funds that the Court has found to belong to them. The creation of the QSF also prevents the possibility that the payment of the Turnover Assets into the Court Registry could be deemed a constructive payment to the individual Plaintiffs, thus creating an obligation to pay taxes on the earnings generated by the QSF. The IRS regulations recognize that a qualified settlement fund itself, not its beneficiaries, is responsible for paying any taxes owed in connection with the fund's earnings. In light of these facts, the efforts of Defendants – who include a terrorist state and the banking institutions that acted to hide its funds in the United States – to control the destination of Plaintiffs' funds are entirely inappropriate.

Plaintiffs also demonstrate below that the Court's ability to enter the Rule 54(b) Order is not affected by the improper attempt of defendant Bank Markazi, the Central Bank of Iran ("Markazi"), to take an interlocutory appeal from this Court's non-final and non-appealable Order. Entry of a Rule 54(b) order is both necessary and appropriate to enable all parties, including Markazi, to obtain a prompt and procedurally proper appeal of this Court's adjudication of Plaintiffs' rights to the Turnover Assets.

The Court's recent order granting the motion of the Estate of Daniel Wultz, Sheryl Wultz, Yekutiel "Tuly" Wultz, and Amanda Wultz (the "Wultzes") for leave to intervene in this action

-2-

218304.1

(Dkt. No. 398) also provides no impediment to the entry of the Rule 54(b) Order. Just prior to
the issuance of the intervention order, Plaintiffs and the Wultzes had reached a resolution that
moots any need for the Court to resolve the priority issues that Plaintiffs had previously settled
among themselves. As a result, the Wultzes join in Plaintiffs' request that the Court issue the
Rule 54(b) Order and Plaintiffs' letter request (submitted simultaneously with this memorandum)
that the Court withdraw its instruction that Plaintiffs and the Wultzes should brief the priority
issues mooted by the resolution reached between Plaintiffs and the Wultzes.

## RELEVANT FACTS

All of the Plaintiffs have secured federal court judgments against Iran relating to terrorist
attacks orchestrated and actively supported by Iran. Collectively, Plaintiffs hold unpaid
judgments for billions of dollars in compensatory damages against Iran. Order at 1-2.

Some of the groups of Plaintiffs not only seek turnover of the Turnover Assets in partial
satisfaction of their judgments, but also assert other claims against certain of the defendants. The
remaining causes of action include claims for fraudulent conveyance, tortious interference with
collection of a money judgment, and prima facie tort. Those claims relate to the Defendants'
efforts to conceal Iranian assets by transferring outside of the United States an additional $250
million of Markazi assets previously held by defendant Citibank. *Id.* at 4-5. The Order did not
resolve Plaintiffs' claims with respect to those additional assets. Accordingly, the Order directed
the parties to "submit a proposed schedule to resolve the remainder of the case." *Id.* at 74.

In response to that direction, Plaintiffs submitted a proposed schedule for resolution of
the remaining claims and informed the Court that "all parties desire that the Court enter a final
order for turnover under Rule 54(b) in accordance with the Court's February 28, 2013 Opinion

-3-

and Order granting summary judgment."[1]  Endorsed Letter from  Liviu Vogel to Hon. Katherine

B. Forrest, dated March 15, 2013, Dkt. No. 372, at 1.

Plaintiffs now move for entry of their proposed Rule 54(b) Order for turnover of the

Turnover Assets in the form annexed as Exhibit C to the Declaration of Liviu Vogel ("Vogel

Decl.").

**ARGUMENT**

**POINT I**

**A RULE 54(b) ORDER IS PROPER**

Rule 54(b) empowers the Court to "direct entry of a final judgment as to one or more, but

fewer than all, claims" when "the court expressly determines that there is no just reason for

delay." FED. R. CIV. P. 54(b); *see, e.g.*, *Geneva Pharmaceuticals Tech. Corp. v. Barr

Laboratories Inc.*, 386 F.3d 485, 494-95 (2d Cir. 2004) ("Rule 54(b) allows for the entry of a

partial final judgment and thereby permits immediate appeal to avoid injustice."). Thus, in

contrast to Markazi's pending notice of appeal, Rule 54(b) provides a proper procedural device

to permit an appeal.

The Supreme Court has outlined a two-step process for considering the propriety of

issuing Rule 54(b) orders. "A district court must first determine that it is dealing with a 'final

judgment.' It must be a 'judgment' in the sense that it is a decision upon a cognizable claim for

relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim

entered in the course of a multiple claims action.'" *Curtiss-Wright Corp. v. General Elec. Co.*,

446 U.S. 1, 7 (1980) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436 (1956)).

---

[1] Since the time of Plaintiffs' endorsed submission, Markazi has expressed an intent to oppose this motion for a Rule 54(b) order.

218304.1

Here, the Court has fully resolved Plaintiffs' claims under the Terrorism Risk Insurance Act of 2002 ("TRIA"), codified at 28 U.S.C. § 1610 note, and the Iran Threat Reduction and Syria Human Rights Act of 2012, 22 U.S.C. §8701, *et seq.* (the "2012 Act"). No issues related to those claims require further judicial consideration. Thus, this action clearly satisfies the first step of the *Curtiss-Wright* Rule 54(b) analysis.

Once the Court finds finality, it must then "determine whether there is any just reason for delay." *Id.* at 8. The *Curtiss-Wright* Court emphasized that "[i]t is left to the sound judicial discretion of the district court to determine the 'appropriate time' when each final decision in a multiple claims action is ready for appeal." *Id.* The Court's "discretion is to be exercised 'in the interest of sound judicial administration.'" *Id.* (quoting *Mackey*, 351 U.S. at 437).

In deciding whether just reasons exist to delay appellate consideration of a final judgment related to particular claims, "a district court must take into account judicial administrative interests as well as the equities involved." *Id.* The *Curtiss-Wright* Court emphasized that:

> Consideration of the former is necessary to assure that application of the Rule effectively "preserves the historic federal policy against piecemeal appeals." [quoting *Mackey*, 351 U.S. at 438]. It was therefore proper for the District Judge here to consider such factors as whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals.

*Curtiss-Wright*, 446 U.S. at 8. The Court further noted, "We do not suggest that the presence of one of these factors would necessarily mean that Rule 54(b) certification would be improper. It would, however, require the district court to find a sufficiently important reason for nonetheless granting certification." *Id.*

Here, both the "judicial administrative interests" and the "equities" that the *Curtiss-Wright* Court highlighted support the conclusion that the Court should issue the Rule 54(b)

-5-

Order. The claims the Court has resolved present questions of statutory interpretation under TRIA and the 2012 Act. In contrast, the remaining claims solely present state law issues related to fraudulent conveyance, tortious interference with Plaintiffs' ability to collect their judgments and prima facie tort. "When the certified claims are based upon factual and legal questions that are distinct from those questions remaining before the trial court the certified claims may be considered separate claims under Rule 54(b)." *Hudson Riv. Sloop Clearwater, Inc. v. Dept. of Navy*, 891 F.2d 414, 418 (2d Cir. 1989); *see also, e.g., Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1097 (2d Cir. 1992) (affirming Rule 54(b) certification solely as to plaintiff's claim for severance pay because "[t]he claim for severance pay was separable from and independent of the rest of the claims in the case"); *Gottesman v. Gen. Motors Corp.*, 401 F.2d 510, 512 (2d Cir. 1968) (recognizing separate claims and the applicability of Rule 54(b) when "[d]ifferent exhibits, proof and witnesses will be necessary" and "different sets of operative facts will determine the result"); *Ross v. Thomas*, 09 CIV. 5631 (SAS), 2010 WL 3952903, at *4 (S.D.N.Y. Oct. 7, 2010) ("Claims are normally treated as separable ... if they involve at least some different questions of fact and law and could be separately enforced, or if different sorts of relief are sought.") (quoting *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 21 (2d Cir. 1997)). Thus, since the factual record that will be developed during discovery and at trial will have no bearing on the purely statutory issues that an appeal of the Order will involve, entry of the Rule 54(b) Order is appropriate.

The equitable interests cited in *Curtiss-Wright* provide still clearer support for issuing the Rule 54(b) Order. As noted above, many Plaintiffs (including the Rubin, Heiser, Levin, Bonk, Mwila, Owens, Khaliq and Arnold Plaintiffs) are not asserting any claims that remain to be adjudicated. Thus, the Order resolved *all* matters relevant to those Plaintiffs. *See* Vogel Decl. at

218304.1

¶ 4. Putting off the entry of a final judgment with respect to those Plaintiffs would create needless delay without providing any countervailing benefit.

Moreover, as the Court noted in the Order, Plaintiffs are victims of terrorism who have been waiting for compensation for their losses for many years. *See* Order at 2. A large proportion of the Plaintiffs are elderly, and some have already died while waiting for recovery on their judgments. Vogel Decl. at ¶ 7; Declaration of Thomas Fortune Fay ("Fay Decl.") at ¶¶ 4-6. Hence, continued delay in finally resolving this action will prevent many Plaintiffs from ever obtaining any compensation for Iran's terrorist attacks during their lifetimes. *See* Vogel Decl. at ¶ 7. Moreover, because of the substantial delays that have resulted from Iran's efforts to hide its assets from execution, many of the Plaintiffs face difficult financial circumstances and have a significant need for the funds owed to them. *Id.*; Fay Decl. at ¶ 5.

It is also of great significance that, in passing the 2012 Act and TRIA, Congress expressly declared that it intended to induce Iran to abandon efforts to acquire nuclear weapons and to cease other threatening activities by imposing timely and vigorous sanctions. *See* 22 U.S.C. § 8711 ("It is the sense of Congress that the goal of compelling Iran to abandon efforts to acquire a nuclear weapons capability and other threatening activities can be effectively achieved through a comprehensive policy that includes economic sanctions," including "full, timely, and vigorous implementation of all sanctions enacted into law, including sanctions imposed or expanded by this Act"); 22 U.S.C. § 8772(a)(2) (allowing turnover of Iran's assets "in furtherance of the broader goals of this Act to sanction Iran"); 158 Cong. Rec. S3321 (daily ed. May 21, 2012) (statement of Sen. Menendez) ("As someone who authored these provisions, I wanted to be sure that there was understanding on the record that Iran, in addition to stopping its nuclear weapons program, which is is in the national interest and security of the United States,

should not be able to avoid having its assets attached and pursued and executed upon as they
killed Americans and having been part of killing Americans abroad"); 2012 WL 3115284, 158
Cong. Rec. H5552-06 ("[The 2012 Act] sends a clear message that the American people, through
their elected representatives, are fully committed to using every economic and political lever at
their disposal to prevent Iran from crossing the nuclear threshold."); 148 Cong. Rec. S11527
(daily ed. Nov. 19, 2002) (statement of Sen. Harkin) (TRIA creates "tougher U.S. policy [which]
will provide a new, powerful disincentive for any foreign government to continue sponsoring
terrorist attacks on Americans, while also discouraging any regimes tempted to get into the ugly
business of sponsoring future terrorist attacks"). Clearly, entry of the Rule 54(b) Order would
serve those critical legislative purposes because the resolution of Defendants' appeal will result
in the turnover of Iran's funds to Plaintiffs and provide a powerful deterrent to further
sponsorship of terrorism by Iran.

  In light of these facts, one would be hard-pressed to find a matter in which the equitable
interests that the *Curtiss-Wright* Court emphasized weighed more heavily in favor of issuing a
Rule 54(b) order. Permitting the inevitable appeal of the Court's ruling will provide much-
belated justice to families of servicemen who died for their country, as well as hundreds of other
victims of Iranian terrorism. At the same time, bringing the appeal to a swift resolution will
serve the important public policy interests that Congress highlighted in adopting TRIA and the
2012 Act. Courts have found far less compelling equitable interests sufficient to support the
entry of Rule 54(b) orders. *See, e.g.*, *Ginett*, 962 F.2d at 1097 (Rule 54(b) certification was
warranted because delaying appellate review of plaintiff's claim for severance pay "would work
an undue hardship on [plaintiff], as he was fired over three years ago and has yet to receive any
of the severance pay to which he was entitled"); *Grand River Enterprises Six Nations, Ltd. v.*

-8-

*Pryor*, No. 02 Civ. 5068(JFK), 2004 WL 2480433, *2 (S.D.N.Y. Nov. 3, 2004) (granting Rule 54(b) certification to avoid duplicative trials), *aff'd on relevant grounds*, 425 F.3d 158, 164-65 (2d Cir. 2005); *HSW Enterprises, Inc. v. Woo Lae Oak, Inc.*, No. 08 Civ. 8476(LBS), 2010 WL 1630686, *3 (S.D.N.Y. April 21, 2010) (entering Rule 54(b) final judgment to maximize Plaintiffs' ability to collect on a breach of a trademark licensing agreement).

In short, this Court resolved Plaintiffs' distinct causes of action for turnover, and now this Court "may direct entry of a final judgment as to one or more, but fewer than all, claims." FED. R. CIV. P. 54(b). "Rule 54(b) allows for the entry of a partial final judgment and thereby permits immediate appeal to avoid injustice." *Geneva Pharmaceuticals*, 386 F.3d at 494-95. Thus, in contrast to Markazi's supposed appeal, Rule 54(b) provides the proper procedural device to permit an appeal.

## POINT II

### AN ORDER CREATING A QUALIFIED SETTLEMENT FUND IS PROPER

Plaintiffs also request that the Court order the creation of the QSF to hold Plaintiffs' assets until the Defendants' appeal is finally resolved. IRS regulations permit the creation of QSFs to hold funds paid to "resolve or satisfy one or more contested . . . claims that have resulted . . . from an event that has given rise to at least one claim asserting liability . . . arising out of a tort, breach of contract, or violation of law." 26 C.F.R. § 1.468B-1(c)(2)(ii) (2013); *see also* STRUCTURED SETTLEMENTS 2D § 4:24.

The QSF will be known as the "Peterson § 468B Qualified Settlement Fund." Vogel Decl. at ¶ 8. It will remain subject to the supervision of the Court, and will be governed by the terms set forth in the Agreement for the Peterson § 468B Qualified Settlement Fund Pursuant to 26 U.S.C. § 468B (the "QSF Agreement"). *Id.*

-9-

The creation of the QSF provides a more than fair compromise between Plaintiffs' right to exert absolute dominion over funds that the Court has awarded to them and the Defendants' feigned concern that distribution of the funds to Plaintiffs (to be held in trust by Plaintiffs' counsel) will not adequately protect the Turnover Assets in the unlikely event that Defendant succeed on appeal. *Id.*, at ¶¶ 10-11. Of course, Markazi and its co-Defendants could avoid the need to create the QSF by posting a bond equal to the amount of the judgment that Plaintiffs have obtained. Defendants have demonstrated no appetite for taking that step. Rather, they continue to assert that, unlike every other defendant against whom a judgment has been entered, they are entitled to continue to control the custodian of the Plaintiffs' funds while they pursue their meritless defenses on appeal. Particularly given Markazi's role as the central bank of a terrorist state, the will of Congress as set forth in TRIA and the 2012 Act, and the status of Clearstream and UBAE as Iran's banks of choice, the Defendants cannot demonstrate why they are entitled to preferential treatment that would be unavailable to any other litigant.

The creation of the QSF would provide certain benefits to Plaintiffs, while providing more than ample protection of the fund's principal. For example, Treasury Regulations state that the question of whether a distribution from a QSF to a plaintiff is treated as taxable income is determined by reference to the plaintiff's particular claim. 26 C.F.R. § 1.468B-4. Therefore, where a distribution is made in satisfaction of damages for personal injuries, the distribution is excludable from income under 26 U.S.C. § 104(a)(2). *Id.* Moreover, as long as the QSF holds the settlement funds, Plaintiffs will not be treated as having received any taxable income through the QSF, which the IRS recognizes as the sole party liable for taxes on gains recorded by the fund. *See* 26 C.F.R. § 1.468B-2(a); 26 C.F.R. § 1.468B-4. As a result, depositing the Turnover Assets in the QSF pending Defendants' appeal will avoid the nightmare of having every

-10-

individual Plaintiff be responsible for the payment on taxes of gains attributed to them while the funds remain in the control of some other entity, such as the Court Registry.

The IRS has approved the use of qualified settlement funds in situations similar to the case at bar, where assets are being held for distribution to claimants pending appeal. For instance, in one IRS Private Letter Ruling, purchasers and sellers of a product initiated a class action lawsuit against their state, alleging that a sales tax violated the state constitution. IRS Priv. Ltr. Rul. 9503022, 1994 PLR LEXIS 1893 ("*PLR*"), at *1 (October 26, 1994). After the plaintiffs won a preliminary injunction, the taxes were transferred to a fund that was subject to court supervision rather than distributed back to the taxpayers. *Id.*, at *2.

On appeal, the state's highest court reversed the trial court and upheld the constitutionality of the tax. *Id.* at *3-4. The court also ordered the amounts in the fund to be distributed to the state counties. *Id.* at *4. The IRS noted that "had the highest court of State affirmed the trial court, the assets of the Fund would have been used to satisfy claims for refund of unconstitutionally collected taxes." *Id.*

In those circumstances, the IRS ruled that the fund qualified as a QSF under 26 C.F.R. § 1.468B-1. *Id.* at *5. Even though the tax money was ultimately returned to the state, the IRS found that the fund satisfied the QSF requirement that it be "established to resolve or satisfy one or more contested...claims..." 26 C.F.R. § 1.468B-1(c)(2); PLR, at *7. Moreover, the IRS specifically rejected the argument that the fund could not qualify as a QSF because it was established to satisfy only a portion of all potential claims arising out of the tax collection at issue. *PLR*, at *8-9 ("§ 1.468B-1 does not require that a QSF be established to resolve all potential claims resulting from a violation of law").

-11-

Like the plaintiffs in the *PLR*, Plaintiffs here seek to establish the QSF to manage the Turnover Assets pending appeal by the Defendants. As in the *PLR*, the Turnover Assets in Plaintiffs' QSF would be used to satisfy Plaintiffs' claims should the appeal fail, and would revert back to the Court Registry should the appeal succeed. *PLR*, at *4; Proposed Rule 54(b) Order at 6. In addition, Plaintiffs' QSF would be properly established "for the purpose of resolving or satisfying a liability under § 1.468B-1(c)(2)," even if the funds are only used to satisfy those claims which were resolved by the Order. *Id.* at *7. Accordingly, the creation of a QSF to hold the Turnover Assets would satisfy the requirements of 26 C.F.R. § 1.468B-1.

Courts also regularly approve the creation of qualified settlement funds to hold assets of class members and other groups of plaintiffs where appeals or the need to administer settlement funds require a delay in the distribution of funds to the plaintiffs. *See, e.g.*, *Ansoumana v. Gristedes Operating Corp.*, 223 F. App'x 69, 70 (2d Cir. 2007) (leaving district court's creation of a QSF undisturbed); *Bethea v. Sprint Commc'ns Co. L.P.*, 3:12-CV-322-CWR-FKB, 2013 WL 228094 (S.D. Miss. Jan. 18, 2013) (ordering "Defendants [to] deposit the fee-and-expense award approved by the Court into the interest-bearing escrow account—established as a Qualified Settlement Fund within the meaning Treasury Regulation § 1.468B and as a trust under state law—with U.S. Bank in New York, New York"); *Patton v. Brilla*, No. 07-CV-0376, 2009 WL 5224756 (Wis. Cir. May 13, 2009) (Trial Order) (order establishing qualified settlement fund and appointing fund administrator). Indeed, in nearly every class action and mass tort litigation requiring the administration of claimants' claims following payments made by defendants, courts approve the use of qualified settlement funds to hold those assets pending the final resolution of the litigation and the processing of the claims.

Plaintiffs' proposed Rule 54(b) Order also provides more than sufficient protection for the Turnover Assets once Citibank pays those funds into the QSF. Plaintiffs have secured major financial institutions, UBS Wealth Management (Americas) Inc. and UBS Global Asset Management (Americas) Inc. (collectively, "UBS"), to manage the investment of, and provide custody service for, the Turnover Assets. To eliminate all risk associated with the investment of the Turnover Assets, the QSF Agreement limits UBS to investing in U.S. Treasury securities and U.S. Agency securities. *See* Vogel Decl. at ¶ 13 and Exhibit D, ¶ 4.1. UBS commands significant resources and expertise in the Treasury and Agency securities markets that will assist Plaintiffs in maximizing the return on the Turnover Assets between the date those assets are transferred to the QSF and the time they are distributed to Plaintiffs, while eliminating the risk to the QSF's principal. *See* Vogel Decl. at ¶ 12.

Frankly, no basis exists to believe that the Turnover Assets will be any less safe at UBS than they have been at Citibank. Thus, any "concerns" that Defendants voice concerning the safety of the Blocked Assets during the pendency of their meritless appeal lack credibility.

Indeed, every reason exists to believe that the Turnover Assets will be safer at UBS than they have been in Citibank's custody. Plaintiffs have enlisted former District Court Judge Stanley Sporkin to serve as the Trustee of the QSF. *See* Vogel Decl. at ¶ 14. In addition to his many years of service on the federal bench, Judge Sporkin was General Counsel to the Central Intelligence Agency for five years and Director of the Division of Enforcement at the Securities and Exchange Commission for seven years. *Id.* and *id.,* Exhibit F. His integrity is beyond reproach. In addition, UBS will employ its normal extensive security controls to guarantee that the Turnover Assets are not disbursed until the Court issues an order permitting the distribution of the funds to the Plaintiffs. *See* Vogel Decl. at ¶ 13; Rule 54(b) Order at 4.

-13-

Thus, the creation of a QSF will allow Plaintiffs to exert dominion over the funds that the

Court has already awarded to them.  Creating the fund will also allow Plaintiffs to secure the

advice of one of the world's largest financial institutions to invest the Turnover Assets, thereby

maximizing their recovery.  Particularly given the significant safeguards that Plaintiffs propose

to protect the Turnover Assets while they are housed in the QSF, including a requirement that no

Plaintiff receive any distribution from the QSF until Defendants' appeals are resolved and the

Court explicitly orders distribution, no basis exists for denying Plaintiffs' request to manage their

funds in the manner they deem most advisable.

## POINT III

### THIS COURT RETAINS JURISDICTION
### BECAUSE THE ORDER IS NOT APPEALABLE

This Court's power to enter the requested Rule 54(b) order is not impaired by Markazi's

improper notice of an interlocutory appeal.  "The rule [that a timely notice of appeal divests the

district court of jurisdiction over further proceedings in the matter] presupposes that a valid

appeal has been taken from a final order or an appealable interlocutory order." *Am. Inst. for

Mental Studies v. Brinn*, No. 83 Civ. 6475-CSH, 1985 WL 3486, *1 (S.D.N.Y. Nov. 4, 1985).

"The rule in the Second Circuit is that an appeal from a nonappealable order does not divest the

District Court of jurisdiction." *Holmes v. NBC/GE*, 168 F.R.D. 481, 482 (S.D.N.Y. 1996), *aff'd

sub nom., Holmes v. Nat'l Broad. Co., Inc.*, 133 F.3d 907 (2d Cir. 1997) (granting motion for

sanctions against attorney who failed to appear, based on his contention that notice of appeal

divested court of jurisdiction when it did not); *see, e.g., In re Keene Corp.*, 166 B.R. 31, 33

(Bankr. S.D.N.Y. 1994) (recognizing that "a notice of appeal is an event of jurisdictional

significance," but concluding that a district court can ignore an improperly filed appeal and

proceed with the case because otherwise "an aggrieved litigant could stop or hinder lower court

-14-

proceedings simply by filing an unauthorized notice of appeal, [and] interrupt the progress of the proceeding at will"); *Brinn*, 1985 WL 3486, *1-2 (exercising jurisdiction after improper appeal from an interlocutory order was noticed).

Here, the Order is not appealable for three reasons. First, it is a non-final order that resolves fewer than all claims in the case and has not been certified for immediate appeal pursuant to Rule 54(b). Second, the Foreign Sovereign Immunities Act , 28 U.S.C. § 1601 *et seq.* (the "FSIA") prohibits appeals of non-final orders in cases brought under 28 U.S.C. § 1605A except under circumstances not present here. *See* 28 U.S.C. § 1605A(f). Third, Markazi cannot justify its appeal under the collateral order doctrine.

## A.   The Order Is Not a Certified Rule 54(b) Order

The Second Circuit "view[s] strict compliance with Rule 54(b) as a matter of the greatest importance." *Int'l Controls Corp. v. Vesco*, 535 F.2d 742, 747 (2d Cir. 1976); *see also Hageman v. City Investing Co.*, 851 F.2d 69, 71 (2d Cir. 1988) (holding that "when there is a judgment in a consolidated case that does not dispose of all claims which have been consolidated, there is a strong presumption that the judgment is not appealable absent Rule 54(b) certification"). Here, the Order is interlocutory on its face. Indeed, the Court expressly directed the parties to address the schedule for resolving all remaining issues in the case. Order at 75. It follows that, in the absence of a Rule 54(b) certification, the Second Circuit cannot entertain Markazi's appeal. *See Citizens Accord, Inc. v. Town of Rochester*, 235 F.3d 126, 128 (2d Cir. 2000) ("An order that adjudicates fewer than all of the claims remaining in the action, or adjudicates the rights and liabilities of fewer than all of the remaining parties, is not a final order unless the court directs the entry of a final judgment as to the dismissed claims or parties 'upon an express determination

-15-

that there is no just reason for delay'") (citing Rule 54(b)); *McCowan v. Dean Witter Reynolds Inc.,* 889 F.2d 451, 453-454 (2d Cir. 1989).

**B.    28 U.S.C. § 1605A(f) Invalidates the Notice of Appeal**

Markazi's purported appeal is invalid by virtue of § 1605A(f) of the FSIA, which provides: "In an action brought under this section, appeals from orders not conclusively ending the litigation may only be taken pursuant to section 1292(b) of this title." 28 U.S.C. § 1605A(f).

Here, some judgment creditors obtained their underlying judgments pursuant to § 1605A of the FSIA, and others obtained their underlying judgments under § 1605(a)(7). In 2008, Congress repealed § 1605(a)(7) of the FSIA and replaced it with § 1605A. *See* Pub. L. 110-181, Div. A, § 1083, Jan. 28, 2008, 122 Stat. 3 (amending terrorism-related provisions of the FSIA). Like its predecessor, § 1605A provides an exception to foreign sovereign immunity in actions seeking money damages against state sponsors of terrorism for personal injury or death resulting from, *inter alia*, the provision of material support for extrajudicial killings. However, § 1605A differs from § 1605(a)(7) in several important respects, including generally prohibiting interlocutory appeals. *See id.*; *Levin v. Bank of New York*, No. 09 CV 5900, 2011 WL 812032, *8-9 (S.D.N.Y. March 4, 2011) (analyzing distinctions between § 1605A and § 1605(a)(7) claims, including "[f]or instance, [§1605A] precludes a foreign state from filing an interlocutory appeal under the 'collateral order' doctrine" (alteration in original)); *Simon v. Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008) (observing that § 1605A is similar to § 1605(a)(7) "but more advantageous to plaintiffs in several respects"), *rev'd on other grounds sub nom., Republic of Iran v. Beatty*, 556 U.S. 848 (2009)).

Moreover, the legislative history of Section 1605A(f) demonstrates that the statute was designed to prohibit foreign state sponsors of terrorism from filing interlocutory appeals

-16-

premised on the collateral order doctrine. Indeed, the following floor statement of Senator Frank

R. Lautenberg, the principal drafter of subsection (f), demonstrates that the provision's purpose

is to render the collateral order doctrine unavailable to state sponsors of terrorism and their

agencies and instrumentalities, like Markazi, in actions such as this:

> As a general rule, interim court orders cannot be appealed until the court has
> reached a final disposition on the case as a whole. However, foreign states have
> abused a narrow exception to this bar on interim appeals--*the collateral order
> doctrine*--to delay justice for, and the resolution of, victim's suits.
>
> . . .
>
> My provision *will eliminate the ability of state sponsors of terrorism to utilize the
> collateral order doctrine*.

154 Cong. Rec. S54, at S55 (Jan. 22, 2008) (statement of Sen. Lautenberg) (emphasis added).

This statutory bar on appeals from orders "not conclusively ending *the litigation*," 28 U.S.C. §

1605A(f) (emphasis added), should apply to both groups of judgment creditors in a consolidated

action of this nature because piecemeal appeals from a single order which resolved the claims of

both judgment creditors who possessed § 1605A judgments and judgment creditors who had

secured § 1605(a)(7) judgments would be contrary to the governing principles of judicial

economy. *See Hudson Riv. Sloop Clearwater,* 891 F.2d at 418. Although there are some

differences between the claims of judgment creditors who have obtained § 1605A judgments and

those who have obtained § 1605(a)(7) judgments, this Court did not need to address any such

differences in its Order because the issues raised by the resolved motions did not turn on the

nature of those judgments. As a result, the bar from interlocutory appeals in § 1605A(f) should

apply to all judgment creditors, and Markazi's appeal from the Order is in violation of the statute

because this Court has neither certified any issues for appeal under 28 U.S.C. § 1292(b), nor

under Rule 54(b).

-17-

**C.      The Collateral Order Doctrine Does Not
         Apply to Markazi's Appeal**

Markazi's interlocutory appeal is also improper because, in any event, the Order does not

qualify for an immediate appeal under the collateral order doctrine.

Under the collateral order doctrine, an order of a district court is appealable if it:

(1) "conclusively determine[s] the disputed question," (2) "resolve[s] an important issue

completely separate from the merits of the action," and (3) is "effectively unreviewable on

appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S., 463, 468 (1978);

*accord Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). The Second Circuit also

requires that the appeal "present serious and unsettled questions of law." *Banque Nordeurope

S.A. v. Banker*, 970 F.2d 1129, 1131 (2d Cir. 1992); *see also Allstate Ins. Co. v. Levy*, 478 F.

App'x 688, 691 (2d Cir. 2012) (holding collateral order doctrine inapplicable when appellant's

claim rested upon well-established areas of New York law).

"Failure to meet any of these three elements is fatal." *Lora v. O'Heaney*, 602 F.3d 106,

111 (2d Cir. 2010); *see also, e.g.*, *Kensington Int'l Ltd. v. Republic of Congo*, 461 F.3d 238, 240

(2d Cir. 2006) (dismissing an appeal for failure "to satisfy the third prong of the collateral order

doctrine test: The party [] may obtain complete relief on appeal from final judgment.") (internal

citations omitted); *Douglas v. Merck & Co., Inc.*, 456 F. App'x 45, 47 (2d Cir. 2012) ("Douglas

fails to satisfy the separateness and unreviewability prongs of the collateral order doctrine....

Thus . . . the collateral order doctrine does not apply here.") (citing *Cunningham v. Hamilton

Cnty., Ohio*, 527 U.S. 198, 206 (1999) (internal quotations omitted)).

Markazi's Notice of Appeal fails to meet at least two of the *Livesay* requirements as well

as the Second Circuit's "serious and unsettled questions of law" test. The issue raised by

Markazi's supposed appeal is not "completely separate from" the merits of the action (*Livesay*,

218304.1

437 U.S. at 468); whether the Turnover Assets are subject to execution is, in fact, the central issue of the case.  There is, in short, nothing collateral about the Order.

Moreover, this Court's grant of partial summary judgment is not "effectively unreviewable on appeal from a final judgment" because it will unquestionably be subject to review once the Court issues a properly appealable order.  *Id.*  Nor does the case present any unsettled questions of law.  Indeed, the Second Circuit has already ruled that blocked Iranian assets are subject to execution under the terrorism exceptions to the FSIA.  *See Weinsten v. Islamic Republic of Iran*, 609 F.3d 43, 56 (2d Cir. 2010).

For all these reasons, it follows that Markazi's purported appeal is fatally defective and, therefore, this Court retains jurisdiction to enter the requested Rule 54(b) Order.  Indeed, none of the parties can have the prompt appeal from the Order that Markazi and the Plaintiffs desire unless and until the Court issues a Rule 54(b) certification.

## CONCLUSION

For all the reasons set forth above, this Court should: (a) enter a final and appealable order, pursuant to Rule 54(b), in the form annexed as Exhibit C to the Vogel Declaration; (b) approve Plaintiffs' request to create a QSF to house the Turnover Assets during the pendency of Defendant's appeal by entry of an order in the form annexed as Exhibit F to the Vogel Declaration.

218304.1

Respectfully submitted,

Liviu Vogel
Annureet K. Grewal
Salon Marrow Dyckman Newman & Broudy LLP
292 Madison Avenue
New York, NY  10017
(212) 661-7100

– and –

James P. Bonner
Patrick L. Rocco
Stone Bonner & Rocco LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 239-4340

*Attorneys for Peterson Plaintiffs*

Curtis C. Mechling
James L. Bernard
Benjamin Weathers-Lowin
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY  10038
(212) 806-5400

*Attorneys for Greenbaum and Acosta
Plaintiffs*

Richard Marc Kremen
DLA Piper US LLP (MD)
6225 Smith Avenue
Baltimore, MD 21209
(410) 580-3000

*Attorneys for Heiser Plaintiffs*

Suzelle M. Smith
Howarth and Smith (LA)
523 West Sixth Street,

-20-

218304.1

Suite 728
Los Angeles, CA 90014
(213) 955-9400

*Attorneys for Levin Plaintiffs*

Keith Martin Fleischman
Fleischman Law Firm
565 Fifth Avenue, 7th Floor
New York, NY 10017
(212) 880-9571

*Attorneys for Valore Plaintiffs*

-21-