UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON,<br>Personal Representative of the Estate<br>Of James C. Knipple (Dec.) (see Exhibit A<br>for a Full List of Plaintiffs),<br><br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>ISLAMIC REPUBLIC OF IRAN; BANK<br>MARKAZI a/k/a CENTRAL BANK OF<br>IRAN; BANCA UBAE SpA; CITIBANK,<br>N.A., and CLEARSTREAM BANKING,<br>S.A.,<br><br>　　　　　　　Defendants. | Case No.: 10 CIV 4518<br><br><br>**FILED UNDER SEAL CONTAINS<br>CONFIDENTIAL MATERIAL<br>SUBJECT TO PROTECTIVE ORDER** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO BANK
MARKAZI'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 4

A.   Markazi's Role As International Money Launderer And Financier Of Terrorism ............ 4

B.   Markazi Is Iran's Alter Ego .................................................................................. 5

C.   The Blocking Of The Assets Of Iran And Markazi ............................................... 6

D.   Markazi Has Repeatedly Admitted That
     The Blocked Assets Are Its Own Property ........................................................... 7

E.   Markazi's Efforts To Conceal Its Ownership Of The Blocked Assets ...................... 8

F.   Markazi's Use Of The Blocked Assets ................................................................ 9

ARGUMENT ................................................................................................................ 10

I.    The Standard Applicable To Rule 12(b)(1) Motions Under The FSIA ..................... 10

II.   The Blocked Assets Are Subject To Execution And
      Attachment Pursuant To TRIA And New York Law .......................................... 11

      A.   The Plain Language Of TRIA Subjects
           The Blocked Assets To Execution And Attachment ...................................... 12

      B.   The Blocked Assets Are "Blocked Assets Of" Markazi ................................. 13

      C.   Markazi Has Admitted That It Owns The Blocked Assets ............................. 14

      D.   Markazi Owns The Blocked Cash ............................................................. 15

      E.   Markazi Owns The Blocked Security Entitlements ....................................... 17

      F.   The Blocked Assets Qualify As
           The "Blocked Assets Of" Markazi Under TRIA ........................................ 18

III.  The Treaty Poses No Obstacle To Plaintiffs' Claims .......................................... 23

IV.   E.O. 13599 Does Not Impede Plaintiffs' Right To
      Turnover Of The Blocked Assets Pursuant To TRIA ......................................... 25

V.    TRIA Provides An Independent Basis For
      FSIA Subject Matter Jurisdiction Over Plaintiffs' Claims .................................. 29

i

VI.  TRIA Negates All Of Markazi's Arguments That The Blocked Assets Are
     Immune From Attachment And Execution Under 28 U.S.C. § 1611(b)(1) ...................... 31

VII. Even In TRIA's Absence, § 1611(b)(1) Would
     Pose No Obstacle To Plaintiffs' Claims ................................................................. 36

     A.   The Elements Of Markazi's Supposed § 1611(b)(1) Defense ............................ 36

     B.   Markazi Cannot Establish That The Blocked Assets Qualify As
          Assets Of A Legitimate Central Bank "Held For Its Own Account" .................. 37

     C.   Markazi's Supposed § 1611(b)(1) Defense Is Also Defeated By Iran's
          Waiver In The Treaty Of Any Sovereign Immunity Defense To Execution
          That Markazi Would Otherwise Possess ........................................................ 44

VIII. Markazi Has Advanced No Viable Basis For Vacating The Restraints ..................... 48

     A.   Markazi's Request That The Court Vacate The Restraints Ignores TRIA's
          Provisions Regarding The Post-Judgment Attachment Remedies Available
          Against The Agencies And Instrumentalities Of Sovereigns ............................ 48

     B.   Markazi's Request That The Court Vacate The Restraints Ignores The
          Entitlement Of The Plaintiffs Who Secured § 1605A Judgments To
          Restrain The Blocked Assets Under 28 U.S.C. § 1610(g) ................................ 49

     C.   Markazi's Request That The Court Vacate The Restraints
          Also Disregards All Plaintiffs' Entitlement To Maintain
          The Restraints Because Markazi Is Iran's Alter Ego ...................................... 51

CONCLUSION ................................................................................................................ 56

# TABLE OF AUTHORITIES

*Cases*

*Bank of New York v. Norilsk Nickel,*
    14 A.D.3d 140, 789 N.Y.S.2d 95 (1st Dep't 2004)...........................................................16

*Bingham v. Zolt,*
    231 A.D.2d 479, 647 N.Y.S.2d 220 (1st Dep't 1996)................................................43, 52

*Brenntag Int'l Chemicals, Inc. v. Bank of India,*
    175 F.3d 245 (2d Cir. 1999)...............................................................................................30

*Calderon-Cardona v. JP Morgan Chase Bank, N.A.,*
    ___ F. Supp.2d ___, 2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011) ...........................*passim*

*Calgarth Invests., Ltd. v. Bank Saderat of Iran,*
    1996 WL 204470 (S.D.N.Y. Apr. 26, 1996).......................................................45, 47

*Cannon v. Univ. of Chicago,*
    441 U.S. 677 (1979) ..........................................................................................................33

*Capital Ventures Int'l v. Republic of Argentina,*
    443 F.3d 214 (2d Cir. 2006)...............................................................................................17

*Cargill Int'l S.A. v. M/T Pavel Dybenko,*
    991 F.2d 1012 (2d Cir. 1993).......................................................................................10-11

*Cisneros v. Alpine Ridge Group,*
    508 U.S. 10 (1993) ......................................................................................................24, 32

*Clancy v. Office of Foreign Assets Control,*
    559 F.3d 595 (7th Cir. 2009)..............................................................................................28

*Concord Reinsurance Co., Ltd. v. Caja Nacional de Ahorro y Seguro,*
    1994 WL 86401 (S.D.N.Y. Mar. 16, 1994) ......................................................................42

*Conyers v. Rossides,*
    558 F.3d 137 (2d Cir. 2009)...............................................................................................33

*Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co.,*
    2010 WL 1838730 (S.D.N.Y. May 4, 2010)......................................................................16

*Estate of Heisler v. Islamic Republic of Iran,*
    807 F. Supp.2d 9 (D.D.C. 2011) .......................................................................................50

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,*
    462 U.S. 611 (1983) ....................................................................................................53, 55

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
    905 F.2d 438 (D.C. Cir. 1990) ...................................................45, 47

*Gadsby & Hannah v. Socialist Republic of Romania*
    698 F. Supp. 483 (S.D.N.Y. 1988).................................................56

*GP-UHAB Hous. Dev. Fund. Corp. v. Jackson,*
    2006 WL 297704 (E.D.N.Y. Feb. 7, 2006)..............................33, 34

*Hausler v. JP Morgan Chase Bank, N.A.,*
    740 F. Supp.2d 525 (S.D.N.Y. 2010) .....................................*passim*

*Hausler v. JP Morgan Chase Bank, N.A.,*
    ___ F. Supp.2d ___, 2012 WL 601034 (S.D.N.Y. Feb. 22, 2012)............................20-21

*Hill v. Republic of Iraq,*
    2003 WL 21057173 (D.D.C. Mar. 11, 2003).....................31-32, 36

*In re Ionosphere Clubs, Inc.,*
    922 F.2d 984 (2d Cir. 1990)........................................................34

*JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. and Trade, Servs., Inc.,*
    295 F. Supp.2d 366 (S.D.N.Y. 2003) ..................................50, 55-56

*JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. and Trade, Servs., Inc.,*
    306 F. Supp.2d 482 (S.D.N.Y. 2004) .........................................56

*Kensington Int'l Ltd. v. Republic of Congo,*
    2007 WL 1032269 (S.D.N.Y. Mar. 20, 2007) .......................47, 55

*Levin v. Bank of New York,*
    2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) ...........................*passim*

*Liberty Mar. Corp. v. U.S.,*
    928 F.2d 413 (D.C. Cir. 1991) ...................................................33

*McKesson Corp. v. Islamic Republic of Iran,*
    52 F.3d 346 (D.D.C. 1995) .......................................................55

*Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi,*
    556 U.S. 366 (2009) ..........................................................20, 27

*In re Morrissey,*
    717 F.2d 100 (3rd Cir. 1983) ....................................................34

*Nat. Union Fire Ins. Co. of Pittsburgh, P.A. v. BP Amoco P.L.C.,*
    319 F. Supp.2d 352 (S.D.N.Y. 2004) .....................................10, 38

*Nguyen v. U.S.,*
  556 F.3d 1244 (11th Cir. 2009)............................................................................34

*NML Capital Ltd. v. Banco Central de la Republica Argentina,*
  652 F.3d 172 (2d Cir. 2011)..................................................................*passim*

*NML Capital, Ltd. v. Republic of Argentina,*
  ___ F.3d ___, 2012 WL 1059073 (2d Cir. Mar. 30, 2012)..................................46

*North Jersey Savs. & Loan Ass'n v. Fid. & Deposit Co.,*
  125 F.R.D. 96 (D.N.J. 1988)...............................................................................33

*Orkin v. Swiss Confederation,*
  770 F. Supp.2d 612 (S.D.N.Y. 2001) .................................................................11

*In re Oswego Barge Corp.,*
  664 F.2d 327 (2d Cir. 1981)................................................................................32

*Ray v. Jama Productions, Inc.,*
  74 A.D.2d 845, 425 N.Y.S.2d 630 (1st Dep't 1980)...........................................17

*Regalado Cuellar v. U.S.,*
  553 U.S. 550 (2008) ............................................................................................41

*Republic of Argentina v. Weltover,*
  504 U.S. 607 (1992) ............................................................................................46

*Rux v. ABN Amro Bank NV,*
  2009 WL 1403886 (S.D.N.Y. May 19, 2009)...............................................20, 28

*S&S Mach. Co. v. Masinexportimport,*
  706 F.2d 411 (2d Cir. 1983)..........................................................29, 45-46, 49

*Security Pac. Nat. Bank v. Government and State of Iran,*
  513 F. Supp. 864 (C.D. Cal. 1981)................................................................45, 47

*Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE, Ltd.,*
  585 F.3d 58 (2d Cir. 2009).............................................................................30-31

*Smith v. Fed. Reserve Bank of New York,*
  280 F. Supp.2d 314 (S.D.N.Y. 2003) .................................................................31

*Smith v. Fed. Reserve Bank of New York,*
  346 F.3d 264 (2d Cir. 2003)..........................................................................27, 31

*In re South African Apartheid Litig.,*
  617 F. Supp.2d 228 (S.D.N.Y. 2009) .................................................................53

*Sumimoto Shoji America, Inc. v. Avagliano,*
    457 U.S. 176 (1982) ..................................................................................23-24

*In re Terrorist Attacks on September 11, 2001,*
    718 F. Supp.2d 456 (S.D.N.Y. 2010) ....................................................... 10

*Thomas Jefferson Univ. v. Shalala,*
    512 U.S. 504 (1994) ..................................................................................28-29

*Tribes v. U.S.,*
    1996 WL 924509 (D. Or. Oct. 2, 1996)......................................................25

*U.S. v. Dion,*
    476 U.S. 734 (1986) ....................................................................................25

*U.S. v. Hescorp, Heavy Equip. Sales Corp.,*
    801 F.2d 70 (2d Cir. 1986)...........................................................................28

*U.S. v. Holy Land Found. For Relief & Dev.,*
    445 F.3d 771 (5th Cir. 2006)........................................................................31

*U.S. v. Hyde,*
    497 F.3d 103 (1st Cir. 2007) ........................................................................32

*U.S. v. Palestine Liberation Organization,*
    695 F. Supp. 1456 (S.D.N.Y. 1988) .............................................................25

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,*
    515 U.S. 528 (1995) ......................................................................................33

*Weininger v. Castro,*
    462 F. Supp.2d 457 (S.D.N.Y. 2006) ................................................*passim*

*Weinstein v. Islamic Republic of Iran,*
    624 F. Supp.2d 272 (E.D.N.Y. 2009) .........................................................48

*Weinstein v. Islamic Republic of Iran,*
    609 F.3d 43 (2d Cir. 2010)..................................................................*passim*

*Wm. Passalacqua Builders, Inc. v. Resnick Devs. S. Inc.,*
    933 F.2d 131 (2d Cir. 1991)..........................................................................53

*Federal Statutes, Regulations, Rules, Treaties, Executive Orders*

28 U.S.C. § 636 ........................................................................................34

28 U.S.C. § 1605(a)(7) ................................................... 12, 35, 48, 51

28 U.S.C. § 1605A ..............................................................*passim*

28 U.S.C. § 1610 ..............................................................*passim*

28 U.S.C. § 1611 ..............................................................*passim*

28 U.S.C. § 1334c ........................................................................34

31 U.S.C. § 5318A ........................................................................12

50 U.S.C. § 1701 ...........................................................................6

50 U.S.C. App. 5 ..........................................................................26

31 C.F.R. § 501.605 .....................................................................28

31 C.F.R. § 535.433 ..........................................................*passim*

8 U.S.T. 899 (1955) ................................................... 2, 23, 24, 45

Fed. R. Civ. P. 12 .......................................................................10

Executive Order No. 13290, 68 Fed. Reg. 14307 (Mar. 20, 2003) ...........................27

Executive Order No. 13599, 77 Fed. Reg. 6659 (Feb. 8, 2012) ...........................*passim*

1976 U.S. Code Cong. & Ad. News 6604 ........................................42

148 Cong. Rec. H8728 (Nov. 13, 2002) .........................................36

148 Cong. Rec. S11528 (Nov. 19, 2002) .....................................24-25

H.R. Conf. Rep. No. 107-779 (Nov. 13, 2002) ..........................27, 36

H.R. 1450-350 § 1245(a)(3) (Dec. 31, 2011) ................................12

*N.Y. State Statutes*

C.P.L.R. § 5201 ...................................................................................................17

C.P.L.R. § 5222 ..............................................................................................43, 52

C.P.L.R. § 5225 ...................................................................................................17

U.C.C. Article 4-A ......................................................................................16, 20, 32

U.C.C. § 8-505...............................................................................................15-16

*Other Authorities*

Borges, W. (ed.), *New York Practice Series – Enforcing Judgments and
    Collecting Debts in New York* § 7:302 (Oct. 2011)...................................43, 52

Gentile, C.M., *The Market for Odious Debt* 73 Law & Contemp. Probs. 151 (Fall 2010) .....40-41

Levy, S.M., *Federal Money Laundering Regulation: Banking Corporate and
    Securities Compliance* § 7.04 (2012) ...................................................41

Patrikis, E., *Foreign Central Bank Property* U. Ill. L. Rev. 265 (1982)......................................37

Strauss, D.M., *Reaching Out to the International Community: Civil Lawsuits as the
    Common Ground in the Battle Against Terrorism* 19 Duke Journal of
    Comp. & Int'l Law 307 (2009) ...................................................................50

Weinstein, J.B., Korn, H.L., & Miller, A.R., *New York Civil Practice* § 5225.09 (2004)...........17

*Report on the U.S. Foreign Sovereign Immunities Act*, By a Working Group of the
    International Litigation Committee of the Section of International Law and
    Practice of the American Bar Association (April 2001)................................................46

The Plaintiffs-Judgment Creditors listed on the attached Exhibit A ("Plaintiffs")
respectfully submit this Memorandum of Law in opposition to defendant Bank Markazi's
("Markazi") Motion to Dismiss the Second Amended Complaint.[1]

## PRELIMINARY STATEMENT

Markazi arrives in this Court with its hands stained with the blood of countless victims of
the Islamic Republic of Iran's decades-long campaign of terrorism.  While Markazi would have
the Court believe that Markazi operates as a conventional central bank no different than our
Federal Reserve and that it held all of the funds at issue in this action for the purpose of
managing foreign currency reserves, the distorted picture that Markazi attempts to paint bears no
resemblance to the facts that Plaintiffs have alleged in their complaints.  Because the Court must
credit those allegations in connection with this pleading motion, Markazi's disregard for the
complaints' actual content dooms its motion to failure.

Contrary to Markazi's efforts to characterize itself as a conventional central bank, it has
long operated as a criminal enterprise.  Indeed, the U.S. Departments of State and the Treasury
have severely sanctioned Markazi for consistently engaging in illicit conduct designed to
advance Iran's worldwide efforts to launder money, to finance the development of weapons of
mass destruction ("WMDs") and international terrorism, and to evade the myriad international
sanctions associated with that conduct.  By performing those functions, Markazi has contributed
to the misery of the many victims of Iran's international terrorism.

In addition to distorting the relevant facts, Markazi advances a series of meritless legal
arguments in support of dismissing Plaintiffs' claims or vacating the restraints (the "Restraints")
that Plaintiffs secured in 2008 on the roughly $1.75 billion in cash (the "Blocked Assets") that

---

[1]   References to "¶ ___" are to the paragraphs of the Peterson Plaintiffs' Second Amended Complaint,
which Plaintiffs refer to as the "Complaint."  The other Plaintiffs have filed pleadings that assert facts substantially
similar to the Peterson Plaintiffs' allegations.

has since been "blocked" by President Obama pursuant to Executive Order 13599 ("E.O.

13599"). That cash now resides in a suspense account located in this District at defendant

Citibank N.A. ("Citibank"). As Plaintiffs previously demonstrated in their brief in support of

their motion for partial summary judgment ("Plaintiffs' Summary Judgment Brief"), the Court

need look no further than the provisions of the Terrorism Risk Insurance Act of 2002 ("TRIA")

to reject all of Markazi's arguments and conclude that Plaintiffs are entitled to judgment as a

matter of law. TRIA dictates that plaintiffs who secure judgments against state-sponsors of

terrorism – such as Iran – can execute against the blocked assets of the terrorist nation or its

agencies or instrumentalities. Markazi seeks to evade TRIA by claiming that funds qualify as the

blocked assets "of" an agency or instrumentality only if that entity holds titled ownership to the

relevant assets. That contention is both irrelevant and false; irrelevant because Markazi has

repeatedly acknowledged that it "owns" the Blocked Assets, and false because courts have held

consistently that property interests in blocked assets other than titled ownership suffice to

support execution under TRIA. Because Markazi acknowledges that its property interest in the

Blocked Assets suffices to require blocking, case law dictates that Markazi's interest also

supports execution against those assets by Plaintiffs.

Markazi's remaining arguments also should give the Court little pause. As Markazi all

but concedes, the Second Circuit has expressly rejected Markazi's contention that supposed

conflicts between TRIA and the U.S.-Iran Treaty of Amity (the "Treaty") pose an obstacle to

Plaintiffs' claims. Markazi advances a contrary argument only in hopes that the Supreme Court

will someday reverse the Second Circuit's controlling decision. Markazi's contention that E.O.

13599 somehow prohibits Plaintiffs from exercising their right under TRIA to execute against

2

the Blocked Assets makes no sense in light of the fact that Plaintiffs' entitlement to the Blocked Assets under TRIA *arises from* the fact that E.O. 13599 blocked those funds.

Markazi also fails to establish a defense based upon 28 U.S.C. § 1611(b)(1), which immunizes from attachment and execution certain assets held by legitimate central banks for their own account. As Markazi acknowledges, its argument contradicts precedent from this District recognizing that TRIA – which declares broadly that it applies "[n]otwithstanding any other provision of law" – trumps § 1611(b)(1). Markazi's contention also disregards substantial nationwide precedent dictating that "notwithstanding any other provision of law" clauses similar to the one set forth in TRIA uniformly negate the provisions of any contrary statute.

In any event, § 1611(b)(1) protects only legitimate central banks, and, as the sanctions imposed by the Departments of State and the Treasury demonstrate, Markazi is anything but that. Moreover, the Complaint refutes – in great detail – Markazi's wishful contention that it held the Blocked Assets solely "for its own account." In fact, by the time the Restraints issued, Markazi had placed the Blocked Assets in the name of defendant Banca UBAE SpA ("UBAE") in order to conceal the interests that Iran and Markazi held in those assets. Moreover, contrary to Markazi's suggestion, it did not use the Blocked Assets for typical central bank functions, such as managing foreign currency reserves. Rather, Markazi used those funds to advance Iran's illicit activities and thereby forfeited any protections that § 1611(b)(1) might otherwise offer.

Even had Markazi succeeded in demonstrating that Plaintiffs allege facts that would establish a § 1611(b)(1) defense, substantial case law demonstrates that Iran's explicit waiver of that defense in the Treaty would foreclose Markazi's dismissal motion. Accordingly, § 1611(b)(1) has no bearing on this action.

Finally, Markazi advances no viable reason for the Court to vacate the Restraints (and that issue is largely academic anyway in light of Markazi's admission that the Blocked Assets will remain blocked irrespective of the outcome of this matter). Markazi's contrary claims disregard the unequivocal provisions of TRIA and 28 U.S.C. § 1610(g) and well-established principles concerning alter egos' liability for their principals' liabilities. Any one of those three bases would independently justify rejecting Markazi's misguided effort to vacate the Restraints.

## STATEMENT OF FACTS[2]

### A.    Markazi's Role as an International Money Launderer and Financier of Terrorism

Markazi was originally formed as Iran's central bank in 1960. ¶ 32. Markazi is 100% owned by, and serves as an instrumentality of, the government of Iran. ¶¶ 32, 60-82. Even before the time relevant to this action, Markazi had expanded beyond central banking to become an integral component of Iran's worldwide efforts to launder money, to finance the development of WMDs and international terrorism, and to evade the myriad international sanctions associated with that illicit conduct. *See, e.g.,* ¶¶ 11, 34-35, 174-203.

The U.S. Departments of State and the Treasury recently recognized Markazi's rogue status and unconventional practices by designating Markazi as the first supposed "central bank" subject to restrictions under the Patriot Act's provisions related to jurisdictions of "primary money laundering concern." ¶ 11. As support for designating Markazi a money launderer, the Department of the Treasury emphasized that: (a) Markazi and other state-owned Iranian banks "willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions,

---

[2] Plaintiffs summarize their efforts to restrain the Blocked Assets and the heinous acts of Iranian-sponsored terrorism that led to Plaintiffs' judgments at pages 5-15 of their Memorandum of Law in Opposition to Clearstream's Renewed Motion to Vacate Restraints ( "Plaintiffs' Restraints Brief"), filed on March 12, 2012.

and undermine the efforts of responsible regulatory agencies" (¶ 35); and (b) Markazi "provided financing" for Iran's nuclear proliferation program (*id.*).

In announcing these sanctions, Treasury Secretary Timothy Geithner declared that *any* financial transaction involving Markazi presents grave risk of promoting Iran's illicit conduct. ¶ 189. As Secretary Geithner noted, "If you are a financial institution and you engage in any transaction involving [Markazi] or any other Iranian bank operating inside or outside Iran, you are at risk of supporting Iran's illicit activities:  its pursuit of nuclear weapons, its support for terrorism, and its efforts to deceive responsible financial institutions and evade sanctions." *Id.*

Markazi also acts as the principal financier of the Iranian oil supply chain, which is controlled by and funds Iran's Islamic Revolutionary Guard Corps ("IRGC").  The U.S. Department of the Treasury has sanctioned the IRGC because it: (a) supports global terrorism and the proliferation of WMDs; and (b) acts as a financial facilitator for at least 22 state-owned Iranian financial institutions that help to fund the IRGC's terrorist activities.  Because Markazi launders the funds that underwrite Iran's sponsorship of terrorism and efforts to acquire WMDs, Markazi plays perhaps the most essential role in those illegal activities.  ¶ 192.

## B.    Markazi Is Iran's Alter Ego

Markazi has long followed the Iranian government's directives to finance Iran's acts of terrorism and efforts to obtain WMDs.  In fact, Iran controls Markazi's day-to-day operations to such an extent that Markazi maintains no independence or free will and, instead, operates as Iran's alter ego and surrogate.  ¶¶ 60-82.  Thus, Markazi engaged in all of the activity that Plaintiffs allege at Iran's direction and for Iran's benefit.  ¶ 62.  The Department of the Treasury recognizes Markazi's status as Iran's alter ego in 31 C.F.R. § 535.433, which states: "The

Central Bank of Iran (Bank Markazi Iran) is an agency, instrumentality and controlled entity of the government of Iran for all purposes under this part [*i.e.*, 31 C.F.R. Part 535]." ¶ 61.

Iranian President Mahmoud Ahmadinejad has continually taken actions that demonstrate the Iranian government's absolute control over Markazi and subversion of the bank's institutional independence. ¶¶ 65-76. On multiple occasions, Ahmadinejad has replaced Markazi's Governor – the bank's highest-ranking executive – to serve Ahmadinejad's political interests. ¶¶ 67-68. Ahmadinejad also issues direct orders to Markazi's leadership regarding the bank's most significant functions, including monetary policy, interest rates and what borrowers receive loans from Markazi. ¶¶ 69-76. To advance his political agenda, Ahmadinejad dissolved the Markazi committee supposedly responsible for setting fiscal policy. That maneuver caused Markazi's then-Governor to resign in protest over Ahmadinejad's absolute control over the bank's most critical day-to-day functions. ¶ 72. Senior Iranian political figures have also long recognized Markazi's subjugation to the government and Ahmadinejad's willingness to violate Iranian law by ordering Markazi to transfer funds to government accounts. ¶¶ 77-80.

## C.    The Blocking of the Assets of Iran and Markazi

Iran has long been subject to U.S. and international sanctions related to Iran's sponsorship of terrorism and efforts to obtain WMDs. ¶¶ 11-12, 35, 89, 126-27, 135, 161, 183-90. On February 5, 2012, President Obama executed E.O. 13599, which declared "[a]ll property and interests in property of" Iran or Markazi held in the United States or by a "United States person" "blocked" pursuant to the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701. *See* Declaration of David M. Lindsey, dated March 15, 2012, Ex. B at p. 1. The property blocked by means of E.O. 13599 includes all

6

of the Blocked Assets.  Thus, no entity located in the United States or United States person can transfer, pay, export, withdraw, or otherwise deal in those blocked assets.  ¶ 23.

Citibank complied with its obligations under E.O. 13599 by reporting to the Department of the Treasury's Office of Foreign Assets Control ("OFAC") that it placed the Blocked Assets in a Citibank suspense account located in this District (the "Blocked Account").  ¶¶ 24-27.

**D.**      **Markazi Has Repeatedly Admitted that the Blocked Assets Are Its Own Property**

Contrary to Markazi's current revisionist claims, the bank has repeatedly described the Blocked Assets as its own property.  In Markazi's first Memorandum of Law in Support of Its Motion to Dismiss the Amended Complaint for Lack of Subject Matter Jurisdiction, dated May 11, 2011 ("Markazi's First MOL"), the bank admitted its *full ownership*, not just "beneficial" ownership, of the Blocked Assets in no fewer than six different passages.  Markazi's First MOL at pp. 1, 5, 9, 10, 36 ("Over $1.75 billion in securities belonging to Bank Markazi . . . are frozen in a custodial omnibus account at [Citibank]."); ("The Restrained Securities are the property of Bank Markazi, the Central Bank of Iran."); ("The aggregate value of the remaining bond instruments – *i.e.*, the Restrained Securities that are the property of Bank Markazi and the subject of this Turnover Action – is thus $1.753 billion."); ("The Restrained Securities are the property of a Foreign Central Bank. . . ."); ("[T]he Restrained Securities are presumed to be the property of Bank Markazi."); ("[T]he Restrained Securities are prima facie the property of a third party, Bank Markazi. . . .").

Markazi now attempts to retreat from those admissions to bolster its contention that TRIA does not entitle Plaintiffs to execute against the Blocked Assets.  The Complaint and available evidence leave no doubt, however, that the Blocked Assets actually *belong to* and have

always been treated by defendants Clearstream Banking, S.A. ("Clearstream") and UBAE as the "property of" Markazi.  ¶¶ 145-60.

### E.    Markazi's Efforts to Conceal Its Ownership of the Blocked Assets

For 17 years before Congress passed legislation to facilitate the ability of the victims of terrorist attacks to recover against the agencies and instrumentalities of terrorist states, Markazi maintained one account at Clearstream.  By 2008, Markazi's investments through Clearstream totaled at least $4.627 billion (¶ 127), including $2.1 billion in bonds sub-custodized at Citibank in Clearstream's Omnibus Account in New York (¶¶ 3, 259-61).  Before January 16, 2008, Markazi held all of those investments in its own name in its Clearstream account.  ¶ 146-58.

By mid-January 2008, legislative developments demonstrated that Markazi risked the seizure of its assets by Iran's judgment creditors if it continued to transact business in the United States directly through Clearstream.  ¶ 89.  Specifically, on January 16, 2008, the House of Representatives passed a bill that eventually became 28 U.S.C. §§ 1605A and 1610(g).  Those laws assist victims of terrorism to enforce their judgments against agencies and instrumentalities of terrorist states that, like Markazi, hold property in the U.S.  ¶¶ 131-34.

Simultaneously, Clearstream faced increased pressure from the U.S. government to end Clearstream's relationship with Markazi because of Markazi's continued support of Iran's money laundering, sponsorship of terrorism and WMD acquisition efforts.  ¶ 128.  Accordingly, Iran, Markazi, Clearstream and UBAE (collectively, the "Conspirators") hatched a scheme to maintain their lucrative financial relationship by funneling Markazi's transactions in bonds, including those kept for safekeeping in the U.S., through a new UBAE account at Clearstream that the Conspirators used exclusively for conducting Markazi's business (the "UBAE/Markazi

8

Account").  ¶ 90; *see also* ¶¶ 126-143.

The Conspirators initiated their scheme on January 17, 2008, one day after the passage of the House version of the bill that eventually became 28 U.S.C. §§ 1605A and 1610(g).  ¶¶ 146-73.  On that date, Markazi instructed UBAE to open a new account at Clearstream to house the bonds that Markazi was then holding directly through Clearstream, including the Blocked Assets. ¶¶ 15, 146-55.  One day later, UBAE sent an "URGENT" message instructing Clearstream to open the UBAE/Markazi Account for UBAE.  Clearstream opened the account the same day. ¶¶ 146-50.

Between February 7 and 29, 2008, the Conspirators attempted to conceal Markazi's ownership of the Blocked Assets by transferring more than $2 billion in Markazi bond holdings to the UBAE/Markazi Account at Clearstream, *free of payment*.  ¶¶ 153-54.  Those conveyances served no legitimate purpose and were orchestrated solely to disguise the true ownership of the Blocked Assets in hopes of protecting them from Iran's creditors, including Plaintiffs.  *Id.*; ¶ 163. *As a result of that subterfuge, none of the Blocked Assets were maintained in Markazi's name when the Peterson Plaintiffs obtained the Restraints.*  ¶¶ 166-69.

**F.    Markazi's Use of the Blocked Assets**

In an attempt to warp the facts to create misleading parallels to recent precedent, Markazi now claims that it used the Blocked Assets solely to manage foreign currency reserves.  The Complaint refutes that bald assertion and – despite ample opportunity – Markazi has never provided any evidence to support its contention.  Indeed, the Complaint makes clear that Markazi neither held the Blocked Assets for its own account nor utilized those funds for normal central banking functions.  ¶¶ 33-34, 176-203.  Rather, Markazi held the Blocked Assets for Iran's

9

benefit, and utilized those funds to support Iran's efforts to launder money, finance terrorism, finance the Iranian WMD program, and to evade the U.S. and international sanctions directed at Iran. ¶ 176.

**ARGUMENT**

**POINT I**

**THE STANDARD APPLICABLE TO RULE 12(B)(1) MOTIONS UNDER THE FSIA**

On a Rule 12(b)(1) motion, the defendant "may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both, and how the court should resolve the motion to dismiss depends upon whether the motion presents a factual challenge." *Nat. Union Fire Ins. Co. of Pittsburgh, P.A. v. BP Amoco P.L.C.*, 319 F.Supp.2d 352, 371 (S.D.N.Y. 2004) (internal quotations omitted). "Where the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations" – as Markazi purports to do here – "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Id.* (internal quotation omitted); *see also In re Terrorist Attacks on September 11, 2001*, 718 F.Supp.2d 456, 468 (S.D.N.Y. 2010) ("Where no evidentiary hearing has been held, nor have the parties engaged in jurisdictional discovery ... [t]he Court is to accept all averments of jurisdictional facts as true, and construe the pleadings and affidavits in plaintiff's favor.").

Markazi has offered no evidence in support of its motion, and purports to challenge only the legal sufficiency of Plaintiffs' allegations. Thus, Markazi errs when it asserts that Plaintiffs "bear the burden, in opposition to this Motion, of 'going forward with evidence showing that, under the exceptions to the FSIA, immunity should not be granted.'" Markazi's Memorandum of Law in Support of Its Motion to Dismiss the Second Amended Complaint for Lack of Subject Matter Jurisdiction, dated March 15, 2012 ("Markazi Brief") at 9 (quoting *Cargill Int'l S.A. v.*

10

*M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993)). In this procedural posture, Plaintiffs need only assert *allegations* that, when interpreted most favorably to Plaintiffs, suffice to defeat Markazi's purely facial challenge to the Complaint. *See Orkin v. Swiss Confederation*, 770 F.Supp.2d 612, 615-16 (S.D.N.Y. 2001) (plaintiffs may establish subject matter jurisdiction under the FSIA "prior to discovery, with legally sufficient allegations.").

## POINT II

### THE BLOCKED ASSETS ARE SUBJECT TO EXECUTION AND ATTACHMENT PURSUANT TO TRIA AND NEW YORK LAW[3]

Markazi admits it has a property interest in the Blocked Assets and that its interest is the very reason those assets are blocked under E.O. 13599. Those undisputed facts put Markazi in the untenable position of having to argue that a property interest of an agency or instrumentality of a terrorist state sufficient to trigger a Presidential blocking order is somehow insufficient to subject the Blocked Assets to execution and attachment, notwithstanding that TRIA provides that *all* blocked assets of any such agency or instrumentality "*shall be subject to execution or attachment*" to satisfy Plaintiffs' judgments. TRIA § 201(a) (emphasis added).

Markazi's argument defies logic and TRIA's plain language and contradicts Markazi's multiple prior admissions that it owns the Blocked Assets. Markazi ignores applicable law that confirms its ownership interest in the Blocked Assets and that requires the Court to turn over Markazi's admitted interest in the Blocked Assets to Plaintiffs. The principal authority that Markazi cites as purported support for its position is the highly criticized *dicta* in *Calderon-*

---

[3] Plaintiffs previously briefed the issues of TRIA's application to the Blocked Assets and the reasons that the Blocked Assets are subject to execution and attachment under TRIA and New York law. *See* Plaintiffs' Opposition to Clearstream Banking S.A.'s Renewed Motion to Vacate Restraints ("Restraints Brief") at 18-25, 32-63; Plaintiffs' Summary Judgment Brief at 7-30. To avoid unnecessary repetition, Plaintiffs respectfully refer the Court to those briefs and incorporate those arguments by reference in this brief. What follows is a summary of those arguments as they apply to Markazi's motion.

*Cardona v. JP Morgan Chase Bank, N.A.*, __ F.Supp.2d __, 2011 WL 6155987 (S.D.N.Y. Dec.

7, 2011), a case that represents a minority position in this District and that, in any event, is

readily distinguishable.  More fundamentally, Markazi's argument fails because it would lead to

the absurd and inequitable result of blocking the Blocked Assets because of the central roles that

Iran and Markazi play in sponsoring international terrorism but, in contravention of Congress'

stated intent in TRIA, making those assets unavailable to compensate terror victims.

**A.**    **The Plain Language of TRIA Subjects the Blocked Assets
          to Execution and Attachment**

Section 201(a) of TRIA, codified as a note to 28 U.S.C. § 1610, provides in relevant part:

> Notwithstanding any other provision of law, . . . in every case in which a person
> has obtained a judgment against a terrorist party on a claim based upon an act of
> terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of
> title 28, United States Code, *the blocked assets of that terrorist party (including
> the blocked assets of any agency or instrumentality of that terrorist party) shall be
> subject to execution or attachment in aid of execution* in order to satisfy such
> judgment to the extent of any compensatory damages for which such terrorist
> party has been adjudged liable.  (Emphasis added).

Markazi does not deny that TRIA § 201(a) applies to the Plaintiffs and their judgments.

There is no dispute that Plaintiffs hold judgments against a "terrorist party" on claims based

upon "act[s] of terrorism or for which a terrorist party is not immune" under 28 U.S.C.

§ 1605(a)(7) or its successor, 28 U.S.C. § 1605A.  Nor can Markazi dispute that, as the Central

Bank of Iran and an entity wholly owned and controlled by Iran's government, Markazi is an

"agency or instrumentality of" a terrorist party within TRIA's meaning.  Indeed, Markazi was

specifically named by the Financial Crimes Enforcement Network of the Department of the

Treasury in late 2011 as "'posing terrorist financing, proliferation financing, and money

laundering risks for the global financial system.'"  NDAA, H.R. 1540-350, § 1245(a)(3) (Dec.

31, 2011) (quoting Nov. 21, 2011 finding issued under 31 U.S.C. § 5318A by the Secretary of

12

the Treasury).  Most importantly, Markazi itself acknowledges that *"[b]ecause Bank Markazi plainly has an 'interest in' the [Blocked Assets], those assets have been blocked pursuant to"* E.O. 13599.  Markazi Brief at 8 (emphasis added; footnote omitted).[4]

Confronted with TRIA's sweeping language and the statute's clear applicability here, Markazi attempts to escape TRIA by arguing that the Court should create an exception for terrorist parties who claim only to have an "interest in" blocked property.  To that end, Markazi labors to draw some legally significant distinction between ownership "of" the Blocked Assets and Markazi's admitted "interest in" those assets.  *See* Markazi Brief at 10-21.

TRIA, however, makes no such metaphysical distinction between the Blocked Assets themselves and Markazi's "interest in" those assets.  Plaintiffs show below that: (a) Markazi in fact has a cognizable ownership interest in the Blocked Assets; and (b) even were the Court to accept Markazi's version of its purportedly attenuated "interest in" the Blocked Assets, TRIA provides that Markazi's property interest is subject to attachment and execution.

**B.    The Blocked Assets Are "Blocked Assets of" Markazi**

Markazi attempts to avoid the conclusion that TRIA permits Plaintiffs to execute against the Blocked Assets by advocating a wishful interpretation of the word "of" in TRIA § 201(a).  According to Markazi, Plaintiffs cannot execute upon the Blocked Assets because "only assets *actually owned by* Bank Markazi qualify as 'assets of' Bank Markazi under TRIA section 201."  Markazi Brief at 14 (emphasis in original).  While Plaintiffs do not accept this premise (*see* Point

---

[4] *See also, e.g., id.* at 10 ("Accordingly, the Restrained Bonds are now blocked, as Bank Markazi unquestionably has 'an interest' in those assets."); *id.* at 18 (Markazi's beneficial interest in the Blocked Assets "is the very reason why the Restrained Bonds have now been blocked").

II.F., *infra*), the argument is also unavailing because Markazi does have, and has admitted it has, an ownership interest in the Blocked Assets.

## C.    Markazi Has Admitted that It Owns the Blocked Assets

Markazi has repeatedly admitted that the Blocked Assets are "assets of" Markazi. Indeed, as Plaintiffs demonstrate above (at page 7), Markazi proclaimed its full ownership of the Blocked Assets no less than *six* times in its First MOL. First MOL at 1, 5, 9, 10, 36. In *five* of those passages, Markazi describes the Blocked Assets as the property "of" Markazi – the precise term it now highlights as the supposed reason for ruling that TRIA does not entitle Plaintiffs to execute against those assets. Further, in paragraph 30 of the October 17, 2010 affidavit of Ali Asghar Massoumi, the Head of Markazi's Foreign Exchange Negotiable Securities Section, he admitted, "*Today, no party other than Bank Markazi has a legitimate interest in the Restrained Securities or in the assets in the Account.*" (Emphasis added).[5]

Markazi also effectively acknowledges that the Blocked Assets are "assets of" Markazi by claiming that they are immune from attachment pursuant to 28 U.S.C. § 1611(b) because of Markazi's status as Iran's central bank. That immunity can only apply where "*property is that of a foreign central bank or monetary authority held for its own account. . . .*" 28 U.S.C. § 1611(b)(1) (emphasis added). In its original motion to dismiss the Peterson Plaintiffs' Complaint, Markazi devoted more than one-third of its brief to arguing that Markazi was entitled to § 1611(b) immunity precisely because the assets at issue belonged to Markazi as Iran's central

---

[5]  Clearstream, Markazi's admitted intermediary with respect to the Blocked Assets, likewise confirmed that Markazi is the ultimate owner of those assets when Clearstream stated, "As custodian, Clearstream does not acquire any proprietary rights in the securities entitlements in Bank Markazi's account and its obligations as custodian under the agreement are only to transact in the entitlements credited to Bank Markazi's account upon Bank Markazi's instructions." Clearstream's Consolidated Memorandum of Law in Support of Renewed Motion to Vacate Restraints at 7. Clearstream further acknowledges that all of the Blocked Assets "are held ultimately for the benefit of Bank Markazi." *Id.* at 21, 28.

bank and were held by Markazi for its own account. *See* Markazi First MOL. In the wake of

E.O. 13599 and the blocking of the Blocked Assets, Markazi seeks to retreat from these

unequivocal admissions. Yet, even in its new motion to dismiss, Markazi continues to argue

(albeit in the alternative) that the Blocked Assets are "the property of" Markazi and therefore

immune from attachment and execution. Markazi Brief at 26-46.

 The Court should not countenance Markazi's transparent tactic of claiming ownership of

the Blocked Assets when it suits Markazi's purposes and then denying ownership when it does

not. Moreover, Markazi's telling admissions that the Blocked Assets are the property "of"

Markazi lay to rest its contention that TRIA's use of the word "of" requires a form of titled

ownership that prevents Plaintiffs from executing against the Blocked Assets. Markazi should be

bound by its repeated admissions that it owns the Blocked Assets and, for that reason alone, the

Court should deny Markazi's motion to dismiss.

## D.   Markazi Owns the Blocked Cash

 Markazi's continued description of the Blocked Assets as "bonds" and "security

entitlements" ignores that *all* of the former security entitlements underlying the Blocked Assets

have been redeemed and converted to cash. *See* Plaintiffs' Restraints Brief at 28; Declaration of

Liviu Vogel, dated March 12, 2012, in Opposition to Clearstream's Renewed Motion to Vacate

Restraints ("Vogel Restraints Decl."), Ex. 3. Absent the restraints on those funds and the

blocking pursuant to E.O. 13599, that cash would be paid over to Markazi in the ordinary course.

Plaintiffs' Restraints Brief at 9; Vogel Restraints Decl. Ex. 28 (Clearstream General Terms and

Conditions, Arts. 11, 13).

 In their Restraints Brief, Plaintiffs demonstrate that, as a matter of law, the blocked cash

belongs to Markazi. Plaintiffs' Restraints Brief at 34-35. In particular, UCC § 8-505 provides

that Clearstream, Markazi's securities intermediary, "shall take action to obtain a payment or distribution made by the issuer of a financial asset . . ." and is "obligated to [Markazi] for a payment or distribution made by the issuer of a financial asset if the payment or distribution is received by [Clearstream]." *See also* UCC § 8-505 cmt. 1 (securities intermediary's obligation is to "pass through" or actually deliver to the entitlement holder cash payments and distributions); *Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co.*, 2010 WL 1838730, at *4 (S.D.N.Y. May 4, 2010) (securities intermediary has duty under UCC § 8-505 to deliver dividends issued on securities). Accordingly, Markazi does not merely have an abstract "interest in" the blocked cash; it has a direct right *to* that cash. Put simply, the blocked cash is Markazi's cash.

    *Calderon-Cardona* does not undermine that conclusion. Apart from the many other reasons *Calderon-Cardona* is inapposite (*see* Point II.F., *infra*), *Calderon-Cardona* did not concern a cash bank deposit owed to a terrorist party. Rather, it involved an attempt to attach midstream electronic fund transfers ("EFTs") between intermediary parties. Relying on New York property law, particularly Article 4-A of the UCC governing the proper garnishee for an EFT, the *Calderon-Cardona* court concluded that "the interest of an originator or beneficiary in a midstream EFT has been ruled insufficient to allow for attachment" at the level of an intermediary bank. *Calderon-Cardona*, 2011 WL 6155987, at *9. This case, however, does not involve midstream EFTs subject to claims of multiple parties, and Article 4-A of the UCC does not apply to the Blocked Assets.[6] Rather, Markazi holds the entire beneficial ownership of the

---

[6] This distinction also differentiates this case from *Bank of New York v. Norilsk Nickel*, 789 N.Y.S.2d 95 (1st Dep't 2004), another decision involving EFTs that Markazi cites to buttress its reliance on *Calderon-Cardona.* The court in *Norilsk* held only that the assets at issue, unblocked midstream EFTs, were not subject to attachment in New York and were to be returned to the originator of the EFTs. *Norilsk* is also irrelevant here because it did not involve TRIA or blocked terrorist assets.

Blocked Assets.  That ownership interest makes the Blocked Assets the "assets of" Markazi under any reasonable reading of TRIA.

Contrary to Markazi's claim that New York law does not recognize Markazi's ownership interest in the blocked cash (Markazi Brief at 17-20), this state's jurisprudence establishes that Markazi's interest in that cash more than suffices to subject it to attachment and execution under CPLR Article 52.  As Plaintiffs establish in the Restraints Brief (at 36-39), CPLR § 5225(b) expressly permits judgment creditors to bring a special proceeding against "a person in possession or custody of *money or other personal property in which the judgment debtor has an interest* . . ." (emphasis added).  *See also, e.g., Capital Ventures Int'l v. Republic of Argentina,* 443 F.3d 214, 220 n.4 (2d Cir. 2006) (bondholder-creditor could attach foreign sovereign-debtor's reversionary interest in cash collateral put up with respect to underlying bonds because that interest clearly constituted "property that was assignable and transferrable" under CPLR § 5201(b)); *Ray v. Jama Productions, Inc.,* 425 N.Y.S.2d 630, 631 (1st Dep't 1980) ("The fact that a judgment debtor will directly benefit from the payment of [a certain sum of money by the garnishee to another third-party] is sufficient to require the [garnishee] served with the restraining notice to comply [therewith]."); 11 Weinstein, Korn & Miller, *New York Civil Practice,* ¶ 5225.09 at 52-379 (2004) (when seeking to execute pursuant to § 5225(b) against the property of a judgment debtor that is in the hands of a garnishee, "[i]t is not necessary that the judgment debtor have legal title to the property; a beneficial interest is sufficient").

## E.   Markazi Owns the Blocked Security Entitlements

The evidence that Plaintiffs have obtained indicates that all of the bonds that once constituted the Blocked Assets have matured.  *See* Declaration of Liviu Vogel, dated May 15, 2012 ("Vogel Decl.") at ¶ 4.  Thus, the Blocked Assets now consist solely of cash held in the

Blocked Account at Citibank. *Id.* In light of that fact, Plaintiffs will not repeat their demonstration that any bonds or securities entitlements held in the Blocked Account also constitute the property of Markazi. Rather, Plaintiffs respectfully refer the Court to their Restraints Brief (at pages 19-21, 32-70), which: (a) refutes Markazi's incredible contention that securities entitlements held in the Blocked Account do not constitute the "property of" Markazi although the bank has repeatedly acknowledged its ownership of all assets held in that account; and (b) demonstrates that any securities entitlements held in the Blocked Account are subject to attachment and execution under New York law. Accordingly, even were Markazi correct in contending that TRIA § 201(a) only reaches property "actually owned" by a terrorist party, that fact would lack relevance because Markazi's interest in any bonds that remain in the Blocked Account meets that definition and is therefore subject to execution and attachment.

**F.      The Blocked Assets Qualify as the "Blocked Assets of" Markazi Under TRIA**

Regardless of the exact nature of Markazi's ownership interest in the Blocked Assets under state law, the plain language of TRIA and E.O. 13599 read together creates a comprehensive federal statutory scheme that mandates that any asset that is blocked is an asset "of" a terrorist party or its agency or instrumentality. As Plaintiffs established in their Summary Judgment Brief (at 10-21), TRIA and the majority of cases interpreting that statute establish that once assets are blocked because a terrorist party holds a sufficient interest in them to justify blocking, those assets are subject to execution by terror victims. *See Hausler v. JP Morgan Chase Bank, N.A.*, 740 F.Supp.2d 525, 533-34 (S.D.N.Y. 2010) (*"Hausler I"*) (". . . TRIA § 201(d)(2) defines 'blocked assets' to include all assets blocked under [OFAC's regulations regarding sanctions against Cuba], and without further direction from Congress excepting interests in property from the blocked assets subject to execution, the Court is not persuaded that

18

the word 'of' equates to actual ownership or title and thus would operate to so limit the blocked assets subject to turnover proceedings."); *Levin v. Bank of New York*, 2011 WL 812032, at *17 (S.D.N.Y. Mar. 4, 2011) ("This definition of what constitutes a 'property interest' is substantially broader than that found under New York law, and evinces a congressional intent to block even property in which a terrorist entity has only a limited interest.").

E.O. 13599 provides for the blocking of "[a]ll property and interests in property of" Iran or Markazi. As multiple courts in this District have found, that language dictates that, once assets are blocked because a particular terrorist party holds a sufficient property interest in them to justify blocking, TRIA empowers terror victims to execute upon those assets. In light of E.O. 13599's very broad definition of the scope of blocked assets, therefore, "TRIA and the applicable sanctions regulations 'establish a comprehensive statutory scheme that eschews any need for consideration of state definitions of property.'" *Levin*, 2011 WL 812032, at *17 (quoting *Hausler I*, 740 F.Supp.2d at 532). Thus, because any reasonable reading of TRIA yields the conclusion that "the blocked assets of any agency or instrumentality of [a particular] terrorist party" include all blocked assets in which that agency or instrumentality is the "sole beneficial owner," the Court need look no further than the words of TRIA and E.O. 13599 to conclude that Plaintiffs are entitled to the turnover of the Blocked Assets. *Hausler I*, 740 F.Supp.2d at 533 ("The Court thus finds that TRIA's phrase 'blocked assets of that terrorist party' contemplates execution, subject to appropriate turnover proceedings, against all assets blocked pursuant to the [OFAC regulations regarding sanctions imposed upon Cuba], including those in which Cuba possesses an interest in, rather than actual ownership or title to, a blocked asset.").

19

Therefore, even if TRIA somehow conflicted with state law – and Plaintiffs submit that no such conflict exists – the comprehensive federal scheme that TRIA and E.O. 13599 create would preempt state law and require turnover of the Blocked Assets.  As Plaintiffs show in their Restraints Brief (at 20-22), the majority of courts in this Circuit recognize that TRIA preempts any conflicting provisions of law concerning collection, attachment and garnishment of blocked assets.  *See Weinstein v. Islamic Republic of Iran,* 609 F.3d 43, 54 (2d Cir. 2010) (TRIA trumps any conflicting provisions of the Treaty of Amity); *Hausler I,* 740 F.Supp.2d at 535-36 (TRIA preempts provisions of Article 4-A of the UCC); *Levin,* 2011 WL 812032, at *17 (same).

Markazi cannot overcome these authorities by relying on *Calderon-Cardona's* restrictive reading of TRIA.  As Plaintiffs demonstrates in their Summary Judgment Brief (at 25), *Calderon-Cardona's* discussion of TRIA is mere *dicta.*  TRIA did not even apply in that case because the assets in question allegedly belonged to North Korea, a foreign state that is not a "terrorist party" under TRIA.  *Calderon-Cardona* is also inapposite here because: (a) as shown above, it dealt with an attempt to attach midstream EFTs; and (b) unlike Markazi in this case, North Korea never admitted its ownership of the relevant property.[7]

As Plaintiffs emphasize in their Summary Judgment Brief (at 26-30), *Hausler v. JP Morgan Chase Bank, N.A.,* ___ F.Supp.2d ___, 2012 WL 601034 (S.D.N.Y. Feb. 22, 2012)

---

[7]  Markazi's reliance on the Statement of Interest provided by the U.S. government in *Rux v. ABN Amro Bank NV,* 08 Civ. 6588 (AKH) (S.D.N.Y.) (the "*Rux* Statement of Interest") is also unpersuasive.  That document proposed a restrictive reading of TRIA in the context of sanctions against Sudan.  The government's past interpretation of TRIA in a case that did not involve Iran or E.O. 13599 is irrelevant and holds no weight.  Moreover, as Markazi acknowledges (Markazi Brief at 15-16), both *Hausler I* and *Levin* rejected the position advocated in the *Rux* Statement of Interest.  Markazi also conveniently ignores that Judge Hellerstein rejected the government's position in *Rux* itself and ordered the turnover of the blocked Sudanese assets.  *See Rux v. ABN-Amro Bank N.V.,* 2009 WL 1403886, at *1 (S.D.N.Y. May 19, 2009).  Moreover, the significance of the Executive Branch's more restrictive interpretation of TRIA is undermined by the fact that Congress adopted TRIA in part to override the President's prior waiver of statutory remedies to victims of state-sponsored terrorism.  *See Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi,* 556 U.S. 366, 386 (2009).

("*Hausler II*") convincingly rejected *Calderon-Cardona's* interpretation of TRIA. Like Markazi, the garnishees in *Calderon-Cardona* misinterpreted the phrase "blocked assets of that terrorist party" by assigning dispositive significance to the word "of" to the exclusion of developing a rational interpretation of TRIA § 201(a)'s meaning as a whole. *Hausler II*, 2012 WL 601034, at *8-9. As *Hausler II* points out, a better reading of that phrase in context is that it reveals Congress' intention that only the victims of the particular terrorist state whose assets have been blocked may collect against those particular assets. *Id.* at *9. In other words, the phrase "of that terrorist party" dictates that victims of *Syrian* terrorism cannot use TRIA to execute against assets blocked because *Iran* holds an interest in those assets. *Hausler II* therefore concluded that *Calderon-Cardona* "overlooks a very basic aspect of the TRIA" – its applicability to the assets of multiple nations. *Id.* Considering that essential TRIA characteristic demonstrates the misguided nature of *Calderon-Cardona's* analysis of the significance of the word "of."

Calderon-Cardona* also ignored the text from TRIA that directly follows the words that *Calderon-Cardona* found dispositive. Specifically, TRIA § 201(a) provides that "the blocked assets *of that terrorist party* [*i.e.,* the one against which the plaintiff holds a judgment] (including the blocked assets of any agency or instrumentality *of that terrorist party*) shall be subject to execution . . ." (Emphases added). *Calderon-Cardona* concluded that the word "of" in the first emphasized prepositional phrase could only signify a Congressional requirement of titled ownership of the relevant blocked assets. That interpretation crumbles, however, when one considers that the second highlighted prepositional phrase – which is worded *identically* to the first – cannot possibly support *Calderon-Cardona's* construction of the first phrase. That is, the word "of" in the second phrase unquestionably does not indicate a Congressional intention to

21

require plaintiffs to demonstrate that the referenced agency or instrumentality is "owned" by the terrorist party. Accordingly, one need only look one line further in TRIA § 201(a) to find persuasive proof that the word "of" displays far more flexibility than the rigid definition that *Calderon-Cardona* assigned to that term. Similarly, E.O. 13599's title also employs a broader usage of the preposition "of" than *Calderon-Cardona*. Specifically, the Order broadly blocks "[a]ll property and interests in property" held by Markazi and Iran although the Order's title refers to "Blocking Property *of* the Government of Iran and Iranian Financial Institutions."

Markazi's argument not only defies TRIA's plain language, but also seeks to subvert the statute's very purpose. To deny Plaintiffs the ability to execute against blocked assets that an officially designated terrorist party has identified repeatedly as its property would frustrate Congress' expressed intent to make the assets of terrorist parties available to compensate terror victims. The Blocked Assets are undeniably the "assets of" Markazi in any commonly understood meaning of that phrase. If this lawsuit fails, those assets will remain blocked precisely because, as Markazi has admitted on multiple occasions, they are Markazi's assets.

Markazi's apparent strategy is to induce this Court to leave the Blocked Assets suspended in limbo for as long as possible in the hope that changing political tides may someday allow the unblocking of Markazi's cash and the return of those assets to Iran. In the scenario Markazi envisions, Plaintiffs who have been seeking compensation for Iran's terrorist acts for decades will be left empty-handed and TRIA – the statute that Congress enacted to give them redress – will be left a dead letter. This Court should not permit that unjust result. Rather, the Court should apply TRIA as it is written, rule that the Blocked Assets are Markazi's assets within the meaning of the statute and, accordingly, deny Markazi's motion to dismiss.

22

## POINT III

### THE TREATY POSES NO OBSTACLE TO PLAINTIFFS' CLAIMS

As Markazi all but concedes, the Second Circuit has already foreclosed Markazi's argument that the Treaty renders TRIA inapplicable to Markazi. In *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010), the Second Circuit squarely rejected Markazi's contention that the Treaty requires Iranian instrumentalities to be treated as entities distinct and independent from their sovereign. *Id.* at 53 ("There is . . . no conflict between the TRIA and the Treaty" because the purpose of the Treaty was "not to give separate juridical status to instrumentalities of the sovereign entity, but simply 'to give corporations of each signatory legal status in the territory of the other party, and to allow them to conduct business in the other country on a comparable basis with domestic firms.'") (quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 185-86 (1982)).

As a result, Markazi errs when it contends that *Weinstein* can be read as suggesting only that TRIA does not conflict with Articles III.1 and IV.2 of the Treaty – leaving open the possibility that TRIA might conflict with Articles III.2 and IV.1. *See* Markazi Brief at 23 and 23 n.31. The Second Circuit in *Weinstein* made clear that, like the Supreme Court in *Sumitomo*, it did not focus its analysis on the language of any particular provision of the Treaty. Rather, the court's holding that Articles III.1 and IV.2 of the Treaty did not conflict with TRIA rested upon "the intent behind the [Friendship, Commerce, and Navigation] treaties as a whole," which is "simply to grant legal status to corporations of each of the signatory countries in the territory of

23

the other, thus putting the foreign corporations on equal footing with domestic corporations." 609 F.3d at 53 (citing *Sumitomo*, 457 U.S. at 185-86).[8]

Accordingly, it makes no sense for Markazi to attempt to locate particular provisions of the Treaty that conflict with TRIA because the Second Circuit has already harmonized the statute and Treaty. It is unsurprising, therefore, that Markazi fails to articulate how the language of Article III.2 (which provides Iranian nationals and companies with freedom of access to U.S. courts and administrative agencies) or Article IV.1 (which provides for Iranian nationals and companies and their property and enterprises to be given fair and equal treatment) requires Iranian instrumentalities to be treated as distinct from, and independent of, their sovereign. The Second Circuit has already held that Articles III.1 and IV.2 of the Treaty create no such requirement (*Weinstein*, 609 F.3d at 53), and the court's reasoning permits no possibility that any other provision of the Treaty exerts the impact Markazi imagines.

Moreover, as the Second Circuit held in *Weinstein*, even if some conflict existed between TRIA and the Treaty, "TRIA would have to be read to abrogate that portion of the Treaty" because "Section 201(a) of the TRIA expressly states that it permits attachment of the assets of a foreign sovereign's instrumentalities in satisfaction of a terrorism-related judgment against the foreign sovereign '*[n]otwithstanding any other provision of law.*'" 609 F.3d at 53 (emphasis in original) (citing *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) as "noting that the Courts of Appeals have regularly interpreted such 'notwithstanding' provisions to 'supersede all other laws'"). TRIA's legislative history strongly supports that conclusion. *See, e.g., Weinstein*, 609 F.3d at 50 (noting Congress' intention in TRIA to "'deal comprehensively with the problem

---

[8] The Friendship, Commerce, and Navigation Treaties are a series of treaties between the U.S. and various nations that were executed roughly contemporaneously with the Treaty and which largely contain provisions similar to the Treaty's terms.

of enforcement of judgments issued to victims of terrorism in any U.S. court'") (quoting 148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (statement of Sen. Harkin)).

The two cases upon which Markazi relies for the proposition that a notwithstanding clause does not clearly express the intent of Congress to abrogate an earlier treaty are easily distinguishable. In *United States v. Palestine Liberation Organization*, 695 F.Supp. 1456, 1468 (S.D.N.Y. 1988), the court found that the term "notwithstanding any provision of law to the contrary" did not clearly express an intent to supersede a prior treaty because other provisions in the *same statute* referred to "United States law (including any treaty)," thereby indicating that Congress intended to differentiate between precluding a "law" and "any treaty" in the "notwithstanding" language. The treaty at issue in *Tribes v. U.S.*, 1996 WL 924509, at *9 (D. Or. Oct. 2, 1996), was between the U.S. and a Native American tribe. As a result, the court applied a special rule of statutory interpretation established in *U.S. v. Dion*, 476 U.S. 734, 739 (1986), that requires "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." Particularly in light of the Second Circuit's pronouncements in *Weinstein*, neither of these decisions suggests that Plaintiffs cannot rely upon TRIA.

### POINT IV

#### E.O. 13599 DOES NOT IMPEDE PLAINTIFFS' RIGHT TO TURNOVER OF THE BLOCKED ASSETS PURSUANT TO TRIA

Markazi makes the untenable claim that, because E.O. 13599 "by its plain terms . . . provides that all 'property and interests in property' of Bank Markazi in the United States 'may not be transferred, paid, exported, withdrawn or otherwise dealt in[,]'" Plaintiffs must bear some additional burden to establish that the Blocked Assets can be turned over to Plaintiffs

25

"notwithstanding" the language of the Executive Order. Markazi Br. at 24.[9] Markazi has it backwards; it is precisely *because* of E.O. 13599, *not in spite of it*, that the Blocked Assets are subject to execution and turnover in satisfaction of Plaintiffs' judgments pursuant to TRIA.

By its plain terms, § 201 of TRIA provides an exception to foreign sovereign immunity from execution with respect to certain blocked assets, and a "blocked asset" is defined as "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of [IEEPA]," excluding certain property not relevant here. TRIA §§ 201(a) and (d)(2). E.O. 13599, on the other hand, expressly blocks property of the government of Iran, including property of Markazi. The very title of the Order – "Blocking Property of the Government of Iran and Iranian Financial Institutions" – says as much, and the first sentence of E.O. 13599 makes clear that "all property and interests in property of the Government of Iran, including the Central Bank of Iran . . . are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in." E.O. 13599, § 1(a). Put simply, E.O. 13599 blocks particular property, and TRIA provides that the property is subject to execution precisely because it is blocked. Thus, Markazi's argument that the very language needed to trigger TRIA somehow prevents TRIA's application turns logic on its head and misconstrues the true relationship between TRIA and E.O. 13599.

Indeed, Congress enacted § 201 of TRIA expressly to make assets frozen or seized by the President under IEEPA subject to execution by victims of terrorism, even though blocked assets normally may not be transferred. *See, e.g.*, *Levin*, 2011 WL 812032, at *16 ("The language of

---

[9] Cognizant that its argument lacks merit, Markazi does not argue that E.O. 13599 precludes a turnover of the Blocked Assets under TRIA. Instead, Markazi only argues that the Plaintiffs have the "burden" to demonstrate that TRIA overrides the transfer restrictions embodied in E.O. 13599, which, as discussed *infra*, it clearly does.

TRIA is broad, subjecting *any asset* to execution that is *seized or frozen* pursuant to the applicable sanctions schemes. The breadth of this language is unsurprising in light of TRIA's remedial purpose.") (emphasis added); *Hausler I*, 740 F.Supp.2d at 531 (TRIA's "legislative history also evinces a broader Congressional purpose to 'deal *comprehensively* with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction'") (quoting H.R. Conf. Rep. No. 107-779 at 27) (emphasis in original).

TRIA expressly states that it applies "notwithstanding any other provision of law," which includes E.O. 13599's restrictions concerning the alienability of blocked assets. TRIA § 201(a); *see, e.g.*, *Smith v. Fed. Reserve Bank of New York*, 346 F.3d 264, 271 (2d Cir. 2003) (recognizing that TRIA overrides the blocking provisions of Executive Orders)[10]; *Hausler I*, 740 F.Supp.2d at 531-32 (discussing breadth of "notwithstanding" language contained in TRIA). As recognized by the Supreme Court, TRIA's "notwithstanding" language was meant to, among other things, overcome attempts by the President to thwart the efforts of terrorism victims to execute upon foreign sovereign assets. *See Elahi*, 556 U.S. at 386 (noting that the "notwithstanding" clause was inserted "to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of TRIA's enactment"). Thus, *Elahi* refutes Markazi's argument that TRIA somehow impermissibly deprives the President of significant bargaining chips to be used in negotiations with countries like Iran. *See id.* (recognizing that Congress, in enacting TRIA,

---

[10] Markazi's argument also confuses the mere "blocking" of assets with the *confiscation of* assets. *See Smith*, 346 F.3d at 268 (discussing Executive Order 13290, 68 Fed. Reg. 14307 (Mar. 20, 2003), which *confiscated* all frozen Iraqi assets and vested title in them in the Department of the Treasury). In *Smith*, the Second Circuit stated that "[t]here is more than a semantic difference between blocking assets and confiscating them." *Id.* at 272. Thus, under TRIA, the term "blocked assets" "reaches broadly to include any property seized or frozen by the United States. But it does not reach so broadly as to encompass *confiscated* property." *Id.* (emphasis added). When the President confiscates assets pursuant to the IEEPA, the President vests all right, title, and interest in such assets in the U.S. government, and TRIA does not apply to assets owned by the government. *Id.* Here, the Blocked Assets have merely been frozen under E.O. 13599. Thus, they remain subject to execution by Plaintiffs under TRIA.

27

intended to make blocked assets available to victims of terrorism, "notwithstanding" the role such assets may play in the President's negotiations with hostile nations).

Moreover, the U.S. government has consistently stated that TRIA entitles judgment creditors to execute upon blocked assets. For example, in *Weininger v. Castro*, 462 F.Supp.2d 457 (S.D.N.Y. 2006), a matter involving blocked assets regulated by OFAC's Cuban Assets Control Regulations, OFAC submitted a letter to the court stating: "*In the event the Court determines that the funds are subject to TRIA, the funds may be distributed without a license from the Office of Foreign Assets Control.*" *Id.* at 499 (quoting Letter to Judge Victor Marrero from Beth Goldman, Assistant United States Attorney, dated Jan. 6, 2006) (emphasis added));[11] *see also, e.g., Rux* Statement of Interest at 9 n.5 ("Because TRIA Section 201(a) provides, notwithstanding any other provision of law, that certain blocked assets are subject to execution or attachment, it overrides the [Sudanese Sanctions Regulations'] restrictions on transaction with such blocked assets."). OFAC is the administrative agency tasked with overseeing and regulating foreign sovereign assets. Its interpretation of its own regulations is entitled to substantial deference, especially where – as here – OFAC participated in developing those regulations. *See U.S. v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70, 76 (2d Cir. 1986); *Clancy v. Office of Foreign Assets Control*, 559 F.3d 595, 606 (7th Cir. 2009); *see also Thomas*

---

[11] OFAC's position remains unchanged. For example, in *Levin v. Bank of New York*, Civ. No. 09-5900 (SDNY) (RPP) (MHD), judgment creditors of Iran successfully obtained a turnover of IEEPA-blocked Iranian assets under TRIA without an OFAC license. *See Levin*, ECF Dkt. No. 412 ("Order Granting the Levin Plaintiffs and the Greenbaum and Acosta and Heiser Judgment Creditors' Joint Motion for Partial Summary Judgment and Turnover of Phase One Assets and Entering Final Judgment Directing Turnover of Funds and Discharging Garnishee Banks from Liability"). As here, OFAC was served with filings in the *Levin* matter and did not oppose the turnover of the blocked assets. *Levin*, ECF Dkt. No. 409 (Transcript of Proceedings held on June 21, 2011); *see also* 31 C.F.R. § 501.605 (discussing OFAC reporting requirements in litigation involving blocked assets). Similarly, in *Rux v. ABN Amro Bank, N.V.*, Civ. No. 08-6588 (SDNY) (AKH), the court awarded a turnover of assets blocked under the Sudanese Sanctions Regulations to judgment creditors of Sudan pursuant to TRIA without requiring an OFAC license.

*Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations.").

TRIA § 201(a) thus overrides E.O. 13599's prohibition on transferring the Blocked Assets. A contrary interpretation of the interplay between these provisions would disregard TRIA's legislative history, prior decisions of this Court and other federal courts, and the consistent position of OFAC, the agency tasked with overseeing the blocking and regulation of foreign assets.

## POINT V

### TRIA PROVIDES AN INDEPENDENT BASIS FOR FSIA SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS

Markazi advances no rational basis for its curious claim that *Weinstein*, 609 F.3d at 43, "forecloses Plaintiffs' argument that the blocking of the Restrained Bonds obviates the need to determine subject matter jurisdiction in this Turnover Action in accordance with the FSIA." Markazi Br. at 28.[12] In *Weinstein*, the Second Circuit actually found "it clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality itself is not named in the judgment." *Id.* at 50.

Markazi is undeniably an instrumentality of judgment debtor Iran. *See S&S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983) (state-owned central banks are unquestionably agencies and instrumentalities of the foreign state); *Weininger*, 462 F.Supp.2d at 498 (same). Thus, *Weinstein's* unequivocal holding that TRIA provides an independent basis for

---

[12]   Markazi apparently makes this claim in response to Plaintiffs' argument, first made at the March 1, 2012 status conference, that E.O. 13599 eliminates any need to determine whether the Blocked Assets are immune from attachment and execution under 28 U.S.C. § 1611(b)(1). *See* Markazi Br. at 27.

FSIA subject matter jurisdiction over turnover proceedings directly contradicts Markazi's supposed summary of the Second Circuit's holding. *See also, e.g., Weininger*, 462 F.Supp.2d at 490 (". . . TRIA expressly holds [agencies and instrumentalities] liable for the judgment and renders them not immune from execution, and thus provides the independent basis of subject matter jurisdiction in this enforcement proceeding against these entities.").

Markazi raises the red herring that Plaintiffs are "apparently relying on Judge Marrerro's opinion in [*Hausler I*]" to argue that they need not establish a non-TRIA basis for subject matter jurisdiction under the FSIA. Markazi Br. at 28. In *Hausler I*, the Court held that it possessed *in rem* jurisdiction over the blocked assets at issue because those assets had been designated as "blocked" and placed in accounts within the Court's territorial reach. 740 F.Supp.2d at 539. While Plaintiffs agree with *Hausler I's* holding, they need not rely upon it in light of *Weinstein*, which lays to rest the issue of subject matter jurisdiction under TRIA in this Circuit.[13]

Whether the Court views its jurisdiction over the Blocked Assets as *in rem* or *quasi in rem* lacks significance because Plaintiffs have demonstrated both that: (a) the Blocked Assets are located in this District; and (b) those assets are Markazi's property. *See* Point II.; Plaintiffs' Restraints Brief at 32-70. Those facts suffice to establish either *in rem* or *quasi in rem* jurisdiction. *See Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.*, 585 F.3d 58, 69 (2d Cir. 2009) ("for in rem remedies such as forfeitures, ownership of the *res* is irrelevant" whereas the validity of *quasi in rem* "attachment[s] depends entirely on the determination that the *res* at

---

[13] Markazi also errs when it suggests that *Weinstein* contradicts *Hausler I's* holding that TRIA requires only *in rem* jurisdiction over blocked assets. *See* Markazi Br. at 29. Indeed, Markazi's contention that *Weinstein* demonstrates that *Hausler I* is "wrong as a matter of law" (for holding that the Executive Branch's blocking of assets within the Court's jurisdictional reach establishes *in rem* jurisdiction for private plaintiffs' claims under TRIA) is patently incorrect, as *Weinstein* says no such thing. Likewise, *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 253 (2d Cir. 1999), a pre-TRIA decision, does not in any way address the statute's preemptive effect or the impact of "notwithstanding" clauses upon contrary legislation. Markazi Br. at 29.

issue is the property of the defendant at the moment the *res* is attached").

**POINT VI**

**TRIA NEGATES ALL OF MARKAZI'S ARGUMENTS THAT THE BLOCKED ASSETS ARE
IMMUNE FROM ATTACHMENT AND EXECUTION UNDER 28 U.S.C. § 1611(B)(1)**

Markazi ignores TRIA's preclusive effect in arguing that the bank may avail itself of the
attachment and execution immunities that 28 U.S.C. § 1611(b)(1) provides to central banks'
property in certain circumstances. As Plaintiffs demonstrated in their Summary Judgment Brief
(at 7-21), TRIA entitles them to the turnover of any "blocked assets" of Iran or "any agency or
instrumentality of that terrorist party," "[n]otwithstanding any other provision of law."

Ignoring TRIA's sweeping "notwithstanding" clause, Markazi erroneously contends that
TRIA does not alter the supposed requirement that Plaintiffs overcome § 1611(b)(1) to establish
their entitlement to execute upon the Blocked Assets. As Markazi concedes, however, the one
court that considered the interplay between TRIA and § 1611(b)(1) concluded that – by virtue of
TRIA's notwithstanding clause – the statute trumps § 1611(b)(1) and renders it irrelevant in
TRIA actions. *Weininger*, 462 F.Supp.2d at 488-89.

The *Weininger* court held that "the intent of the 'notwithstanding' language in TRIA is
'to target statutory exceptions to immunity,' [*United States v. Holy Land Found. For Relief &
Dev.*, 445 F.3d 771, 787 (5th Cir. 2006)], and 'to the extent that a foreign country's sovereign
immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the
potential conflict.'" *Weininger*, 462 F.Supp.2d at 488-89 (quoting *Smith v. Fed. Reserve Bank of
New York*, 280 F.Supp.2d 314, 319 (S.D.N.Y. 2003), *aff'd*, 346 F.3d 264 (2d Cir. 2003)); *accord,
e.g., Hill v. Republic of Iraq,* 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) ("[B]y its plain
terms, the TRIA overrides any immunity from execution that blocked Iraqi property might

31

otherwise enjoy under the Vienna Convention or the FSIA."). Accordingly, *Weininger* ruled that "TRIA, which was enacted later in time than § 1611, overrides the immunity conferred in § 1611." 462 F.Supp.2d at 499; *see also, e.g., Hausler I*, 740 F.Supp.2d at 531 ("Other courts examining the scope of TRIA § 201(a) have concluded that the Notwithstanding Clause specifically addresses potential conflicts of sovereign immunity.").

Logic and fundamental principles of statutory construction strongly support the conclusion that TRIA negates § 1611(b)(1). In particular, *Weininger* closely parallels substantial case law recognizing the broadly preclusive effect of indistinguishable "notwithstanding clauses" in other statutes. As the Supreme Court emphasized in *Cisneros*, 508 U.S. at 18, "[I]n construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." The *Cisneros* Court also noted that "the Courts of Appeals generally have interpreted similar 'notwithstanding' language . . . to supersede all other laws, *stating that [a] clearer statement is difficult to imagine." Id.* at 18 (emphasis added; citations and internal quotation marks omitted). Countless courts, often citing *Cisneros*, have likewise concluded that the notwithstanding clauses included in TRIA and other statutes supersede the provisions of any contradictory legislation.[14] Moreover, the preclusive effect of notwithstanding clauses applies not only to inconsistent

---

[14] *E.g., U.S. v. Hyde*, 497 F.3d 103, 108 (1st Cir. 2007) (where criminal restitution statute provided that it applied "[n]otwithstanding any other Federal law," that statute negated the Bankruptcy Code's "'fresh start'" policy regarding the retirement of outstanding debts); *In re Oswego Barge Corp.*, 664 F.2d 327, 340 (2d Cir. 1981) (declaration in Federal Water Pollution Control Act that the remedies it provided applied "notwithstanding any other provisions of law" dictated "that the remedies established by the FWPCA are not to be modified by any preexisting law"); *Hausler I*, 740 F.Supp.2d at 531 ("Courts have routinely interpreted such 'notwithstanding' provisions to supersede all other laws, . . . and to indicate preemption . . . Accordingly, the Court finds that, insofar as [U.C.C.] Article 4–A conflicts with TRIA, § 201(a)'s opening phrase weighs in favor of preemption."); *Hill*, 2003 WL 21057173, at *2 (the "'notwithstanding any other provision of law'" language of TRIA's § 201 "means exactly that; it is unambiguous and effectively supersedes all previous laws").

provisions appearing in other statutes, but also to contrary terms set forth in other "sections of the statute in which the notwithstanding clause appears."[15]

In contrast to Markazi's argument, *Weininger* also logically takes note of the temporal relationship between TRIA's adoption in *2002* and the earlier enactment of § 1611(b) in *1976*. "Congress is presumed to know the law" when it acts. *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 554 (1995) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-699 (1979)). Thus, the Court must presume that Congress knew of § 1611(b)(1)'s potential central bank immunity when Congress enacted TRIA and declared that it governed "[n]otwithstanding any other provision of law." Given that chronology and Congress' presumed knowledge of § 1611(b)(1), a straightforward reading of TRIA forecloses Markazi's effort to invoke § 1611(b)(1) as a defense to Plaintiffs' claims. *E.g.*, *North Jersey Savs. & Loan Assoc. v. Fid. & Deposit Co.*, 125 F.R.D. 96, 98-99 (D.N.J. 1988) (where federal Removal Act provided that Magistrates' decisions remanding cases to state court were not subject to review by District Courts and a *later adopted* provision of the Magistrates Act preserved District Court review of non-final Magistrate decisions, "[n]otwithstanding any provision of law to the contrary," the broad "[n]otwithstanding" language and the later adoption of the Magistrates Act compelled the conclusion that District Courts could review remand orders because "Congress knew of the Removal Act's prohibition on review when it added this broadly pre-emptive language").

---

[15] *E.g.*, *Conyers v. Rossides*, 558 F.3d 137, 145 (2d Cir. 2009) (citing *Cisneros*); *accord, e.g.*, *Liberty Mar. Corp. v. U.S.*, 928 F.2d 413, 419 (D.C. Cir. 1991) ("'notwithstanding any other provision of law'" clause in one section of the Merchant Marine Act overrode contrary provision elsewhere in the Act); *GP-UHAB Hous. Dev. Fund Corp. v. Jackson*, 2006 WL 297704, at *8 (E.D.N.Y. Feb. 7, 2006) ("[W]hen Congress uses the language 'notwithstanding any other provision of law' the court must assume that Congress meant what it said, and that the law governs even when it would violate other applicable statutes. Thus, a 'notwithstanding' clause preempts contradictory provisions in the same contract or statute.").

Yet another relevant and well-accepted canon of statutory construction dictates that "when two statutes are in irreconcilable conflict, [courts] must give effect to the most recently enacted statute since it is the most recent indication of congressional intent." *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 991 (2d Cir. 1990); *accord, e.g., Nguyen v. U.S.,* 556 F.3d 1244, 1253 (11th Cir. 2009) ("When subsections battle, the contest goes to the younger one; the canon is that a later enacted provision controls to the extent of any conflict with an earlier one."). That black letter rule also compels the conclusion that TRIA (which Congress adopted in *2002*) trumps any contrary provision of § 1611(b)(1) (which Congress enacted in *1976*).

The fact that § 1611(b)(1) contains its own "notwithstanding" clause does not, as Markazi suggests, undermine that conclusion. The rule favoring the enforcement of later-adopted statutes that conflict with earlier provisions is so well entrenched that courts have applied the more recent legislation "even where the earlier statute contained a 'notwithstanding' clause and the more recently enacted statute did not." *GP-UHAB,* 2006 WL 297704, at *9 (citing *In re Morrissey,* 717 F.2d 100, 103 (3rd Cir. 1983) (the "pervasive applicability" of 28 U.S.C. § 636(c)(1), which allows district courts to designate magistrate judges to conduct all proceedings in civil matters, "notwithstanding any other provision of law," was limited by the subsequently enacted 28 U.S.C. § 1334c, which prohibits magistrates from presiding over bankruptcy actions)). Accordingly, TRIA's unlimited "notwithstanding" clause and its status as the later-adopted statute doubly reinforce the conclusion that § 1611(b)(1) provides no obstacle to Plaintiffs' claims.

The canon of statutory construction that courts should usually enforce more specific statutes over generally applicable provisions provides no basis for a different conclusion. Contrary to Markazi's contention, § 201(a) of TRIA easily qualifies as a more specific statutory

34

provision than the generally applicable § 1611(b)(1).  TRIA applies only in a narrow class of cases in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under 28 U.S.C. §§ 1605(a)(7) (repealed) or 1605A.  *See* TRIA § 201(a).  Moreover, TRIA applies only with respect to the blocked assets of terrorist parties, including a small handful of state sponsors of terrorism, and their agencies or instrumentalities.  *Id.*  Because the assets of only a very limited number of nations qualify for blocking, precious few FSIA cases implicate TRIA § 201(a).[16]

In contrast, § 1611(b)(1) applies broadly to almost all FSIA actions, whether they involve terrorism, a breach of contract, or any other type of claim.  Section 1611(b)(1) also applies irrespective of the identity of the particular judgment debtor or central bank at issue in any given action (unless, of course, the claims arise under TRIA).  Moreover, Congress adopted § 1611(b)(1) as a basic component of the FSIA as originally enacted in 1976, not as part of a narrowly tailored amendment like TRIA, which created special rules applicable to and necessitated by the most reprehensible actions of a limited number of state sponsors of terrorism.  Thus, Markazi errs in characterizing TRIA as a more general statute than § 1611(b)(1), which is universally applicable in actions brought to enforce all categories of judgments described in § 1610(a) and (b).  Hence, all of the potentially relevant canons of statutory construction squarely support the conclusion that TRIA precludes any § 1611(b)(1) defense here.

Finally, while TRIA's words alone compel interpreting the statute in the manner that Plaintiffs advocate, it bears emphasis that TRIA's legislative history fully supports Plaintiffs' position.  "Indeed, any contrary construction of TRIA would frustrate the statutory objective of

---

[16] Only four nations (Iran, Syria, Sudan and Cuba) currently appear on the State Department's list of state sponsors of terrorism.  *See* http://www.state.gov/j/ct/rls/crt/2010/170260.htm.

ensuring that judgments rendered against terrorist states based upon terrorist acts 'are to be enforced.'" *Hill*, 2003 WL 21051173, at *2 (D.D.C. Mar. 11, 2003) (quoting 148 Cong. Rec. H8728 (Nov. 13, 2002) (Conference Report)).[17]

**POINT VII**

**EVEN IN TRIA'S ABSENCE, § 1611(B)(1) WOULD
POSE NO OBSTACLE TO PLAINTIFFS' CLAIMS**

**A.      The Elements of Markazi's Supposed § 1611(b)(1) Defense**

Ignoring the foregoing principles of statutory construction and the relevant case law, Markazi erroneously contends that § 1611(b)(1) – which provides an immunity from attachment and execution to legitimate central banks in certain circumstances – forecloses Plaintiffs' claims. In relevant part, § 1611(b)(1) provides:

> (b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if –
>
> (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution...

Thus, even putting TRIA aside, to avail itself of § 1611(b)(1), Markazi must establish that: (a) the Blocked Assets are the assets of a foreign central bank held for "its own account"; and (b) Iran has not waived any immunity to attachment or execution that Markazi would otherwise possess.  Because Markazi cannot establish either of these essential elements of its

---

[17] *Accord, e.g., Weininger*, 462 F.Supp.2d at 483 ("TRIA § 201 was passed in order to 'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties.  It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced.'") (quoting H.R. Conf. Rep. 107-779, at 27 (2002), *reprinted in* 2002 U.S.C.C.A.N. 1430, at 1434-35); *Hausler I*, 740 F.Supp.2d at 531 ("[T]he Notwithstanding Clause's plain language is not restricted only to issues of immunity and jurisdiction, and TRIA § 201's legislative history also evinces a broader Congressional purpose to 'deal *comprehensively* with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction.'  H.R. Conf. Rep. No. 107–779 at 27 (emphasis added).").

36

supposed § 1611(b)(1) defense, that statute would provide no basis for dismissing Plaintiffs'

claims, even if TRIA did not trump § 1611(b)(1).

**B.   Markazi Cannot Establish that the Blocked Assets Qualify as
     Assets of a Legitimate Central Bank "Held for Its Own Account"**

To qualify as assets held by a central bank for its own account, funds must be "'use[d]

. . . for central banking functions as such functions are normally understood.'" *NML Capital Ltd.*

*v. Banco Central De La Republica Argentina*, 652 F.3d 172, 194 (2d Cir. 2011) (quoting

Patrikis, "Foreign Central Bank Property," 1982 *U. Ill. L. Rev.* 265, 277 (1982)).  Markazi

erroneously suggests that it can satisfy that standard because *NML Capital* noted that, "[w]here

the funds are held in an account *in the name of a central bank* . . . the funds are presumed to be

immune from attachment under § 1611(b)(1)." *Id.* (emphasis added).  For multiple reasons,

however, Markazi cannot invoke the *NML Capital* presumption, which forms virtually the entire

basis for the bank's § 1611(b)(1) arguments.  *See* Markazi Br. at 31-33.

Most obviously, Markazi *did not* hold the Blocked Assets in its own name when the

Peterson Plaintiffs succeeded in restraining those funds.  ¶¶ 55-59, 152-55.  The Conspirators

orchestrated a series of transactions in 2008 by which they hid the ownership interests of Iran

and Markazi in the Blocked Assets.  ¶¶ 52-58.  As a result, UBAE – not Markazi – was the

nominal owner of the Blocked Assets when Plaintiffs' Restraints issued.  ¶¶ 55-59, 152-55.

Accordingly, Markazi cannot satisfy the basic "*in the name of a central bank*" requirement for

invoking *NML Capital's* presumption.  Markazi therefore bears the burden of establishing its

supposed § 1611(b)(1) defense, a burden it cannot satisfy in light of Plaintiffs' allegations.

Markazi also errs when it suggests that *NML Capital* dictates that Plaintiffs must proffer

"evidence" that Markazi did not use the Blocked Assets for central banking purposes.  Markazi

37

Br. at 31.  This contention ignores that Markazi has managed to stave off discovery by insisting

that – even accepting Plaintiffs' allegation as true – Markazi can demonstrate its entitlement to

dismissal as a matter of law.  In contrast, the parties in *NML Capital* proceeded to the Second

Circuit based upon a "detailed account" of stipulated facts regarding the entirely transparent

transactions of Argentina's central bank, BCRA.  *NML Capital*, 652 F.3d at 177.  To defeat this

pleading motion, therefore, Plaintiffs need only advance *allegations* – not *evidence* – that raise a

*question of fact* regarding Markazi's ability to invoke a § 1611(b)(1) defense.  *See, e.g., Nat.*

*Union*, 319 F.Supp.2d at 371 (where "the defendant challenges only the legal sufficiency of the

plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true

and draw all reasonable inferences in favor of plaintiff") (internal quotation omitted).

 Even putting aside the burden issue and UBAE's status as the actual holder of the

Blocked Assets, the Complaint negates any suggestion that Markazi used those assets "'for

central banking functions as such functions are normally understood.'"  *NML Capital*, 652 F.3d

at 194 (citation omitted).  Needless to say, central banks normally do not conduct fraudulent

transfers to hide the assets of terrorist states from their judgment creditors.  *See* ¶¶ 13-15, 145-71,

210-28.  Markazi's efforts to conceal the ownership stakes of Iran and the bank in the Blocked

Assets therefore defeat the supposed § 1611(b)(1) defense.

 In addition, Markazi has long operated principally as a criminal enterprise, rather than the

type of conventional "foreign central bank" that § 1611(b)(1) may insulate.  *See, e.g.,* ¶¶ 11-13,

34-35, 181-92.  By no means are Plaintiffs alone in recognizing Markazi's status as a criminal

enterprise.  In fact, the U.S. Departments of State and the Treasury recently designated Markazi

as the first supposed "central bank" subject to restrictions under the Patriot Act's provisions

related to jurisdictions of "primary money laundering concern." ¶ 11. As the State and Treasury Departments explained in imposing those restrictions, Markazi earned that dubious distinction by engaging in years of efforts to assist Iran's financing of terrorism and nuclear weapons proliferation and evasion of U.S. and international sanctions. *Id.*

Accordingly, as the State and Treasury Departments noted in imposing sanctions on Markazi, *every* transaction in which Markazi engages is inherently suspect. ¶ 12. Moreover, Markazi has repeatedly demonstrated its willingness to lie and deceive to advance Iran's illegal activities. *Id.* As a result, on February 5, 2013, when President Obama issued E.O. 13599 to "block" all assets of Markazi located in the United States or held by United States persons, the President specifically emphasized that he took that step "in light of the deceptive practices of [Markazi] and other Iranian banks to conceal transactions of sanctioned parties, the deficiencies in Iran's anti-money laundering regime and the weaknesses in its implementation, and the continuing and unacceptable risk posed to the international financial system by Iran's activities . . ." E.O. 13599 (Lindsey Decl., Ex. D) at p. 1.

Consistent with the President's findings in E.O. 13599, Plaintiffs have identified numerous additional deceptive acts by Markazi that are irreconcilable with its efforts to depict itself as a legitimate central bank entitled to invoke § 1611(b)(1)'s protections. In particular, Markazi embarked on its fraudulent scheme to hide the true owner of the Blocked Assets just as FSIA amendments facilitated terror victims' efforts to collect judgments against rogue states such as Iran and as other international sanctions threatened Markazi's ability to act freely in the banking system under its own name. ¶¶ 14, 129-39. Moreover, inserting UBAE into the middle of Markazi's bond transactions served no legitimate business purpose. Rather, Markazi and Iran

39

enlisted UBAE solely to conceal the true owner of the Blocked Assets and thereby impede

collection efforts by Iran's creditors and the ability of the U.S. and foreign governments to

sanction Markazi and Iran. ¶ 15. These fraudulent, clandestine acts are irreconcilable with the

notion that Markazi used the Blocked Assets "'for central banking functions as such functions

are normally understood.'" *NML Capital*, 652 F.3d at 194 (citation omitted).

Contrary to Markazi's claims (Markazi Br. at 33), Plaintiffs' allegations that Markazi has

never proffered any evidence that it utilized the Blocked Assets to manage foreign currency

reserves also bolster the conclusion that Markazi cannot invoke § 1611(b)(1). Despite ample

opportunity to submit admissible evidence, Markazi initially sought to support its contentions

with hearsay-filled affidavits from Markazi personnel. Now, having withdrawn those affidavits,

Markazi bases its argument that it used the Blocked Assets for foreign currency reserve purposes

exclusively upon bald assertions that impermissibly contradict Plaintiffs' allegations. *See* ¶ 178.

Markazi's inability to muster any evidence to support its assertions speaks volumes regarding the

credibility of the bank's contentions.

Ultimately, Markazi merely asserts that a legitimate central bank *could* utilize the debt of

sovereigns and supranational organizations to manage reserves. That possibility – which was not

manifested here – proves nothing regarding Markazi's *actual* use of the Blocked Assets because

investors of every size and type purchase the debt of governments and governmental agencies.

*See, e.g.*, Caroline M. Gentile, "The Market for Odious Debt," 73 *Law & Contemp. Probs.* 151,

167 (Fall 2010) ("The investors purchasing an issue of sovereign bonds may be citizens of the

issuer or other countries, as well as financial institutions or single individuals. They include

commercial banks, investment banks, insurance companies, pension funds, mutual funds, and

purchasers in the retail sector.").[18]  Moreover, allegations that span 50 paragraphs of the

Complaint defy Markazi's bald assertion that it used the Blocked Assets exclusively to manage

Iran's foreign currency reserves.  ¶¶ 11-12, 34-35, 61-82, 175-92, 195-200.

Thus, neither logic nor the Complaint suggests that anything about the Blocked Assets

rendered them suitable solely, or even primarily, for managing foreign currency reserves.  That

point is particularly obvious when one considers that, by definition, money laundering

transforms the proceeds of illicit activity into legitimate assets that money launderers can then

utilize as they see fit.  *See, e.g., Regalado Cuellar v. U.S.*, 553 U.S. 550, 558 (2008) ("We agree

with petitioner that taking steps to make funds appear legitimate is the common meaning of the

term 'money laundering.'").  Similarly, terrorist financing typically involves the use of

"legitimate" assets for the illicit purpose of promoting terrorist attacks.  *See, e.g.,* Steven Mark

Levy, *Federal Money Laundering Regulation: Banking, Corporate and Securities Compliance,*

§ 7.04 (2012) ("Unlike money laundering, which involves the use of proceeds derived from past

criminal activity, terrorist financing often involves the use of legitimate funds in perfectly normal

financial transactions for possible future crimes.").  Moreover, when the Conspirators arranged

for Markazi to sell two bonds that Plaintiffs initially restrained, the purchasers were non-

governmental institutions, not central banks.  *See* Vogel Decl., ¶¶ 7-8, Exs. 11-12.  The lists

produced by Clearstream of the other Clearstream customers that held positions in the two bonds

that Markazi sold reveal that few of those entities are central banks.  *See id.,* at ¶ 5 and Ex. 9

(showing that only two of the 94 bondholders were central banks – ███████████ and

---

[18]  The supposed authority that Markazi cites for the proposition that it utilized the Blocked Assets to manage its foreign currency reserves, the hearing testimony of Clearstream's Mark Gem (*see* Markazi Br. at 32), has no relevance in connection with this pre-discovery motion to dismiss.  Furthermore, Mr. Gem undeniably has no personal knowledge regarding the purposes behind Markazi's investments in the Blocked Assets.  Thus, even at trial, Gem's testimony would be inadmissible.

██████████████ ; *id.*, ¶ 6, Ex. 10 (showing that only one of the 134 bondholders was a

central bank – ████████████ ). The fact that Markazi invested in legitimate assets

therefore does not suggest that the Court should refuse to credit Plaintiffs' allegations and rule –

as a matter of law – that Markazi held those assets exclusively as foreign currency reserves, or

that Markazi functioned as a legitimate central bank.

　　　Markazi's also errs when it assigns no significance to its practice of commingling foreign

currency reserves with funds it uses as the commercial banker for sales of Iranian oil and as the

funding source for Iran's illicit efforts to develop WMDs and to support international terrorism.

*See, e.g., Concord Reinsurance Co., Ltd. v. Caja Navional De Ahorro Y Seguro*, 1994 WL

86401, at *2 (S.D.N.Y. Mar. 16, 1994) ("The legislative history of [§ 1611(b)(1)] states that it is

intended to protect funds used or held in connection with central banking activities, as

distinguished from funds used solely to finance the commercial transactions of other entities or

of foreign states. 1976 U.S. Code Cong. & Ad. News 6604, 6630. Since Caja appears to be an

insurance and economic development agency, rather than a central banking agency, it is not

protected absolutely from prejudgment attachment by § 1611(b)."). Facilitating oil sales,

funding the development of WMDs and financing international terrorism all fall well outside of

"'central banking functions as such functions are normally understood.'" *NML Capital*, 652 F.3d

at 194 (citation omitted). Thus, because Markazi indiscriminately commingles whatever funds it

employs for these non-central banking purposes with those that the bank actually uses for foreign

currency reserves (and Plaintiffs do not concede that Markazi actually used *any* of the Blocked

Assets as foreign currency reserve funds), substantial questions of fact remain for trial

concerning Markazi's supposed § 1611(b)(1) defense.[19]

Moreover, contrary to Markazi's suggestion, its inability to pledge the Blocked Assets for any purpose also supports Plaintiffs' contention that the funds actually belonged to Iran itself. *See* ¶ 180. Once the Court credits Plaintiffs' allegations that Markazi merely held the Blocked Assets as a front for Iran, a judgment debtor, Plaintiffs' entitlement to execute upon those assets follows directly. *See, e.g., Bingham v. Zolt*, 647 N.Y.S.2d 220, 221 (1st Dep't 1996) ("Where, as here, the evidence demonstrates that a judgment debtor regularly has used another's bank account as a 'recipient' of the debtor's personal assets or as a source for payment of the debtor's expenses, the account may be restrained under [CPLR 5222]."); Wanda Borges (ed.), *New York Practice Series - Enforcing Judgments and Collecting Debts in New York*, § 7:302 (Oct. 2011) ("If an asset can be proven to belong to the debtor, even if hidden in someone else's bank account, the restraining notice will be applicable to those funds.") (citing *Bingham*).

In light of the foregoing facts, the Blocked Assets are accurately seen as the tools of Iran's ongoing violations of U.S. sanctions and international law, not – as Markazi suggests – as ordinary "foreign exchange reserves" maintained by a legitimate central bank "'for central banking functions as such functions are normally understood.'" *NML Capital*, 652 F.3d at 194 (citation omitted). In § 1611(b)(1)'s words, Markazi is not "a foreign central bank" at all, and it did not maintain the Blocked Assets "for its own account." Rather, Markazi is a criminal, money-laundering enterprise that maintained the Blocked Assets in UBAE's name to conceal the

---

[19] Markazi mistakenly relies on *NML Capital* to argue that its failure to segregate its foreign currency reserves does not impact its ability to invoke a § 1611(b)(1) defense. Markazi Br. at 34. As Markazi acknowledges, however, in *NML Capital*, Argentina's central bank used the relevant funds *solely "for a number of different central banking functions." Id.* at 34 (emphasis added). In contrast, Markazi cannot demonstrate at this juncture that it employed *any* of the Blocked Assets for a legitimate, traditional central banking purpose. *See, e.g.*, ¶¶ 179, 191-94. *NML Capital* therefore negates, rather than supports, Markazi's position.

bank's interest in those assets.  Accordingly, Markazi cannot invoke § 1611(b)(1)'s protections.

*NML Capital* reinforces that conclusion.  Unlike this case, *NML Capital* involved a legitimate central bank (Argentina's BCRA) and funds "'use[d] . . . for central banking functions as such functions are normally understood.'" *NML Capital*, 652 F.3d at 194 (citation omitted). The evidence in *NML Capital* also demonstrated that BCRA, "[l]ike many central banks around the world[,] maintain[ed] a foreign central bank account at the [Federal Reserve Bank of New York ('FRBNY')] in which, among other things, it manage[d] dollar denominated reserve holdings." *Id.* at 177.[20]  This case involves no similar facts.  Moreover, in contrast to Markazi, BCRA maintained its account at the FRBNY in its own name.  *Id.*  Finally, the stipulated facts presented in *NML Capital* demonstrated that all of the transactions that BCRA conducted in the relevant assets related to the management of Argentina's foreign currency reserves and other "paradigmatic central banking functions." *Id.* at 195.  This case presents polar opposite circumstances.

**C.    Markazi's Supposed § 1611(b)(1) Defense Is Also Defeated by Iran's Waiver in the Treaty of Any Sovereign Immunity Defense to Execution that Markazi Would Otherwise Possess**

Plaintiffs demonstrate above that: (a) TRIA precludes Markazi's supposed § 1611(b)(1) defense (Point VI.); and (b) that defense is also foreclosed because the Blocked Assets were not the assets of a legitimate central bank held for its own account (Point VII.B.).  Even if Markazi could overcome those insurmountable obstacles to its motion to dismiss Plaintiffs' claims, Markazi would still need to demonstrate that neither it nor Iran has waived the protections of

---

[20]  As *NML Capital* recognized, the "FRBNY provides accounts in which approximately 250 foreign central banks and monetary authorities manage foreign exchange reserve holdings and other property." *NML*, 652 F.3d at 177 n.7.  Markazi's conspicuous absence from the ranks of those 250 central banks further demonstrates Markazi's rogue status as a money launderer operating outside of traditional central banking parameters.

§ 1611(b)(1).  28 U.S.C. § 1611(b)(1) (an otherwise valid § 1611(b)(1) immunity "from

attachment and from execution" is defeated if a central bank "or its parent foreign government,

has explicitly waived its immunity from attachment in aid of execution, or from execution").

Markazi cannot sustain that burden here because the Treaty contains precisely the type of

waiver that § 1611(b)(1) contemplates. *See* ¶ 175; Lindsey Decl., Ex. D at p. 1.  Specifically,

Article XI.4 of the Treaty provides:

> No enterprise of either High Contracting Party,[21] including corporations,
> associations, and *government agencies and instrumentalities,* which is publicly
> owned or controlled shall, if it engages in commercial, industrial, shipping or
> other business activities within the territories of the other High Contracting Party,
> claim or enjoy, either for itself or for its property, immunity therein from taxation,
> suit, *execution of judgment* or other liability to which privately owned and
> controlled enterprises are subject therein.  (Emphases added).

By means of that passage, Iran waived any sovereign immunity defense to the execution

of a judgment that any of Iran's agencies or instrumentalities that engage in commercial

activities in the United States would otherwise possess.  *See, e.g., Foremost-McKesson, Inc. v.

Islamic Republic of Iran,* 905 F.2d 438, 452 (D.C. Cir. 1990) (Article XI.4 of the Treaty contains

an "express provision for waiver of sovereign immunity" for Iran's agencies and

instrumentalities); *Calgarth Invests., Ltd. v. Bank Saderat Iran,* 1996 WL 204470, at *3

(S.D.N.Y. Apr. 26, 1996) (Article XI.4 of the Treaty "waives the sovereign immunity of

government agencies of either country that engage in commercial activities within the territory of

the other country"); *Security Pac. Nat. Bank v. Government and State of Iran,* 513 F.Supp. 864,

880 (C.D. Cal. 1981) (same).

Plaintiffs demonstrated in their Restraints Brief (at 18-19 n.15) and their Summary

Judgment Brief (at 11) that Markazi is an agency or instrumentality of Iran.  *See also S&S*

---

[21] The Treaty refers to the United States and Iran as the "High Contracting Parties."

45

*Mach.,* 706 F.2d at 414; *Weininger,* 462 F.Supp.2d at 498 (same); ¶¶ 33, 60, 61, 205; Markazi Br. at 30 n.45.

Plaintiffs' Restraints Brief (at 18-19 n.15) also details the extensive commercial activity that Markazi undertook in the United States in connection with the Blocked Assets. *See also* ¶¶ 9, 22-25, 83-125. Those actions – which are indistinguishable from the conduct that any investor might take – easily qualify as "commercial" activity under the Treaty. *See, e.g., Republic of Argentina v. Weltover,* 504 U.S. 607, 614 (1992) ("When a foreign government acts not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's acts are 'commercial' within the meaning of the FSIA."). Indeed, Markazi's conduct appears far more "commercial" than the actions of Argentina that the Supreme Court characterized as "commercial" in *Weltover,* where Argentina issued bonds payable in U.S. dollars as part of efforts to stabilize Argentina's currency. *Id.* at 615-17 (issuance of bonds was "commercial activity" under the FSIA because bonds were garden-variety debt instruments that private parties could purchase and sell in international markets that promised an income stream in U.S. dollars); *accord, e.g., NML Capital, Ltd. v. Republic of Argentina,* __ F.3d __, 2012 WL 1059073, at *4 (2d Cir. Mar. 30, 2012) ("The Supreme Court has held that a state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns.") (internal quotations omitted).[22]

---

[22] *See also, e.g., Report on the U.S. Foreign Sovereign Immunities Act,* By a Working Group of the International Litigation Committee of the Section of International Law and Practice of the American Bar Association, p. 76 (April 2001) ("[T]he legislative history [of the FSIA] stated that commercial activity includes a broad spectrum of endeavors, activities customarily carried on for profit, a contract which might be made by a private person, and activities such as sale of a service or a product, leasing of property, borrowing money, employment or engagement of laborers or agents, *and investment in a security.*") (emphasis added).

In light of those facts, the Treaty constitutes precisely the type of explicit waiver of immunity from execution on behalf of an Iranian agency or instrumentality engaged in commercial activity in the United States that § 1611(b)(1) contemplates. ¶ 175. Markazi's contention that § 1611(b)(1) provides a basis for dismissing Plaintiffs' claims therefore fails for this additional reason. *See, e.g., Foremost-McKesson*, 905 F.2d at 452; *Calgarth Invests.*, 1996 WL 204470, at *3; *Security Pac.*, 513 F.Supp. at 880.

While Markazi criticizes the specificity of Plaintiffs' waiver allegations, the Complaint more than adequately places Markazi on notice of Plaintiffs' contention that Iran and Markazi waived any immunities to execution that Markazi might otherwise enjoy under § 1611(b)(1). In particular, Plaintiffs: (a) identify Markazi as an agency or instrumentality of Iran (¶¶ 8, 31, 60, 61, 205; Markazi Br. at 30 n.46); (b) extensively detail Markazi's commercial and business activity in the United States (¶¶ 22-25, 83-125); and (c) expressly state that Iran has waived any immunities from execution that would otherwise apply in this matter (¶¶ 8, 10, 21, 175).

Those allegations easily suffice to establish a waiver of § 1611(b)(1)'s protections by Iran and Markazi under Rule 8's permissive pleading standard. *Kensington Int'l Ltd. v. Republic of Congo,* 2007 WL 1032269, at *1 (S.D.N.Y. Mar. 30, 2007) (finding that allegations of single paragraph of a complaint sufficed to demonstrate that Congo "explicitly waived any claim to sovereign immunity"). Accordingly, even were § 1611(b)(1) applicable to Markazi – and it is not for the reasons Plaintiffs detail above – Iran's explicit waiver of that defense on behalf of Markazi in the Treaty would defeat Markazi's efforts to dismiss Plaintiffs' claims.

47

## POINT VIII

### MARKAZI HAS ADVANCED NO VIABLE BASIS FOR VACATING THE RESTRAINTS

**A.    Markazi's Request that the Court Vacate the Restraints Ignores TRIA's Provisions Regarding the Post-Judgment Attachment Remedies Available Against the Agencies and Instrumentalities of Sovereigns**

Markazi's request that the Court vacate the Restraints ignores TRIA's provisions regarding the post-judgment attachment remedies available against agencies and instrumentalities of terrorist states. Section 201(a) of TRIA provides that the blocked assets of the terrorist state against which a plaintiff has obtained a judgment based upon an act of terrorism, or for which that terrorist state is not immune under 28 U.S.C. § 1605(a)(7) "(*including the blocked assets of any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of" the plaintiff's compensatory damages. (Emphasis added).

Thus, because TRIA renders § 1611(b)(1) irrelevant in this action (*see* Point VI.), waiver issues play no role in determining the attachment remedies available to Plaintiffs. Rather, under TRIA, Markazi's assets are treated as the assets of Iran, the judgment debtor, because Markazi is an "agency or instrumentality of that terrorist party." TRIA § 201(a); *see* Plaintiffs' Summary Judgment Brief at 10-21. Furthermore, TRIA dictates that Markazi's assets are "subject to execution or attachment in aid of execution" to the same extent that Iran's assets are, *i.e.*, in the amount of Plaintiffs' compensatory damages. TRIA § 201(a); *Weinstein v. Islamic Republic of Iran*, 624 F.Supp.2d 272, 275-76 (E.D.N.Y. 2009) (agreeing with the conclusion of *Weininger*, 462 F.Supp.2d at 484-87, that "the plain language and legislative history of TRIA § 201(a) demonstrate a clear expression to make agencies and instrumentalities substantively liable for the

48

debts of their related foreign governments"), *aff'd*, 609 F.3d 43 (2d Cir. 2010). The Restraints

currently imposed upon the Blocked Assets – or the "attachment in aid of execution" in the

words of TRIA § 201(a)[23] – are therefore entirely appropriate under TRIA.

**B.    Markazi's Request that the Court Vacate the Restraints Ignores the Entitlement of the Plaintiffs Who Secured § 1605A Judgments to Restrain the Blocked Assets Under 28 U.S.C. § 1610(g)**

Markazi's assertion that its waiver arguments justify vacating the Restraints also ignores

28 U.S.C. § 1610(g), which states:

(g) Property in certain actions.--

(1) In general.--Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--

(A) the level of economic control over the property by the government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D) whether that government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

The Valore, Heiser and Acosta Plaintiffs secured judgments against Iran pursuant to

§ 1605A (which relates to claims asserted against state sponsors of terrorism) totaling more than

$2.2 billion. *See* Vogel Decl. at ¶ 2(b), (c) and (e) and Exs. 2, 3 and 5. That sum vastly exceeds

---

[23] *S & S Machinery*, 706 F.2d at 416 n.4 (differentiating "attachment in aid of execution" from prejudgment attachment).

the funds subject to Plaintiffs' Restraints.  Under § 1610(g)(1), the property of any agency or

instrumentality of Iran, including any property that "is an interest held directly or indirectly in a

separate juridical entity, is subject to attachment in aid of execution, and execution."  Moreover,

as subsections (A)-(E) of § 1610(g)(1) make clear, any interest that a terrorist state's agency or

instrumentality has in property is subject to post-judgment attachment and execution irrespective

of the degree of control that the terrorist state exerts over that entity.[24]

Markazi is undeniably an agency or instrumentality of Iran.  *See* pp. 29-30, *supra*; ¶¶ 33,

60, 61, 205; Markazi Br. at 30 n. 46.  It also holds an interest "directly or indirectly" in the

Blocked Assets.  *See* pp. 14-23, *supra*; ¶¶ 48, 158-59, 239, 263; Plaintiffs' Restraints Brief at 32-

70; Plaintiffs' Summary Judgment Brief at 10-30.  Thus, § 1610(a)(1) independently defeats

Markazi's request to vacate the restraints because the statute entitles the Plaintiffs who secured

§ 1605A judgments against Iran to attach Markazi's funds "in aid of execution" and to execute

against those assets.  28 U.S.C. § 1610(a)(1).

*NML Capital* and *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. and*

*Trade, Servs., Inc.*, 295 F.Supp.2d 366 (S.D.N.Y. 2003) do not support a contrary conclusion.

Neither case raised any issue under § 1610(g)(1).  As Markazi acknowledges, *NML Capital*

turned exclusively upon the central bank immunity outlined in § 1611(b), which is inapplicable

---

[24] *See, e.g., Estate of Heiser v. Islamic Republic of Iran,* 807 F.Supp.2d 9, 19 (D.D.C. 2011) ("Section 1610(g) unwinds these limitations, however, by excluding any requirement that the foreign instrumentality be subject to the underlying claim and thus not otherwise immune from liability, . . . and by expressly declaring that property held by an instrumentality is subject to execution 'regardless of the level of economic control over the property by the government of the foreign state.' . . . Thus, the only requirement for attachment or execution of property is evidence that the property in question is held by a foreign entity that is in fact an agency or instrumentality of the foreign state against which the Court has entered judgment.") (citations omitted); Debra M. Strauss, "Reaching Out to the International Community: Civil Lawsuits as the Common Ground in the Battle Against Terrorism," 19 *Duke J. of Comparative & Int'l Law* 307, 332 (2009) (under § 1610(g)(1), "plaintiffs no longer need to show economic control over the targeted property or a revenue stream to a foreign country" in order to collect against the agencies or instrumentalities of a terrorist state).

here for the reasons Plaintiffs outline in Point VI. *See NML Capital*, 652 F.3d at 188. *JSC* did

not involve the FSIA at all. Given Congress' adoption of special rules governing attachment and

execution issues in cases involving terrorist attacks, *JSC* has no relevance here.

**C.     Markazi's Request that the Court Vacate The Restraints
         Also Disregards All Plaintiffs' Entitlement to Maintain
         the Restraints Because Markazi Is Iran's Alter Ego**

In light of the blocking of the Blocked Assets, TRIA's provisions and § 1610(g)(1), the

question of whether the Plaintiffs who secured § 1605(a)(7) (since repealed) judgments against

Iran prior to the adoption of § 1605A are also entitled to the post-judgment attachment of the

Blocked Assets is purely an academic issue. Even putting aside those bases for maintaining the

Restraints, however, Markazi's status as a mere front for Iran or as Iran's alter ego provides an

independent basis for restraining the Blocked Assets under 28 U.S.C. § 1610(a).

> Pursuant to § 1610(a):
>
> The property in the United States of a foreign state, as defined in section 1603(a) of this
> chapter, used for a commercial activity in the United States, shall not be immune from
> attachment in aid of execution, or from execution, upon a judgment entered by a court of
> the United States or of a State after the effective date of this Act, if—....
>
> (7) the judgment relates to a claim for which the foreign state is not immune under
>      section 1605A, regardless of whether the property is or was involved with the act
>      upon which the claim is based.

Both the Plaintiffs who obtained § 1605A judgments and the Plaintiffs who secured

§ 1605(a)(7) judgments asserted claims for which Iran "is not immune under section 1605A,"

which, like the now-repealed § 1605(a)(7), stripped state sponsors of terrorism of immunity for

claims arising from terrorist attacks. Thus, to the extent that the Blocked Assets constitute the

"property in the United States of" Iran, the Plaintiffs who secured § 1605(a)(7) judgments have a

right under § 1610(a) to "attachment in aid of execution," *i.e.*, a post-judgment attachment

remedy, with respect to those assets.

Two interrelated avenues of analysis provide Plaintiffs with this additional entitlement to maintain the Restraints. First, the Blocked Assets actually belong to Iran, not Markazi. ¶¶ 5, 60-82, 83, 222, 235. Iran merely housed those assets in Markazi's hands to facilitate the evasion of sanctions that the U.S., other nations and various international institutions imposed upon Iran. ¶¶ 35, 182-83, 187; *see also* Vogel Decl., Ex. 13 (the Department of Treasury's finding that Markazi and other state-owned Iranian banks "willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies" and provide financing for Iran's nuclear proliferation program); ¶ 189 (Treasury Secretary Geithner's declaration that *any* transaction involving Markazi presents grave risk of promoting Iran's illicit conduct, including: "its pursuit of nuclear weapons, its support for terrorism, and its efforts to deceive responsible financial institutions and evade sanctions").

Because the Court must credit these allegations, the Complaint establishes that the Blocked Assets are actually "the property in the United States of" Iran. *See, e.g., Bingham*, 647 N.Y.S.2d at 221 ("Where, as here, the evidence demonstrates that a judgment debtor regularly has used another's bank account as a 'recipient' of the debtor's personal assets or as a source for payment of the debtor's expenses, the account may be restrained under [CPLR 5222].")"; Wanda Borges (ed.), *New York Practice Series - Enforcing Judgments and Collecting Debts in New York*, § 7:302 (Oct. 2011) ("If an asset can be proven to belong to the debtor, even if hidden in someone else's bank account, the restraining notice will be applicable to those funds.") (citing *Bingham*). Section 1610(a) therefore entitles Plaintiffs to an "attachment in aid of execution" with respect to the Blocked Assets.

Similarly, Markazi's status as Iran's alter ego establishes Plaintiffs' entitlement to a post-judgment attachment remedy under § 1610(a). Of course, the liability of an alter ego parallels the principal's liability.[25] The leading decision regarding the liability of instrumentalities controlled by their sovereign owners is *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"). In *Bancec*, while the Supreme Court concluded that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," the Court also emphasized that the presumption of independent status "may be overcome in certain circumstances." *Id.* at 626-28. Specifically, a corporation need not be considered legally separate from its sovereign owner "where a corporate is so extensively controlled by its owner that a relationship of principal and agent is created." *Id.* at 629.

Here, Iran controls all of Markazi's day-to-day business operations. ¶¶ 61, 62, 65. Markazi acts in the manner directed by Iranian President Mahmoud Ahmadinejad, who unilaterally determines the bank's policies despite the bank's supposed independence from the central government. ¶¶ 70-76. Indeed, Ahmadinejad has publicly acknowledged that he gives Markazi direct "orders" regarding policies that Markazi must adopt and that he provides Markazi with "permission" to use funds for the purposes he prefers. ¶¶ 73, 81-82. Iran also exercises its control over Markazi by appointing the bank's management and directing Markazi to extend loans to the Iranian government. ¶¶ 64-69. The extent of Iran's control over Markazi is so great that 31 C.F.R. Part 535.433 provides, "The Central Bank of Iran (Bank Markazi Iran) is an

---

[25] *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 143 (2d Cir. 1991) (once alter ego status is established, "the *alter egos* are treated as one entity" for purposes of jurisdiction and liability) (emphasis in original); *In re South African Apartheid Litig.*, 617 F.Supp.2d 228, 303 (S.D.N.Y. 2009) ("When a court determines that two companies are alter egos, they may be treated as one unit for all legal purposes.").

agency, instrumentality and controlled entity of the government of Iran for all purposes under this part [*i.e.*, 31 C.F.R. Part 535]." ¶ 61.

Iran's absolute control over Markazi is also evident from the manner in which Iran dictates Markazi's actions regarding monetary policy, including the establishment of interest rates, the most quintessential of central banking functions. ¶¶ 70-73. The Iranian government, and often Ahmadinejad himself, make all major monetary policy decisions without consulting Markazi's Currency and Credit Council ("CCC"), the bank entity nominally charged with setting those policies. ¶ 71. *Id.* In fact, Ahmadinejad's efforts to determine interest rates unilaterally to serve his own political purposes led him to dissolve the CCC in August 2007, force the resignation of one Markazi Governor and dismiss a second Governor. ¶ 72.[26] Unsurprisingly, therefore, even high-ranking members of the Iranian government and the Iranian Parliament have complained that Markazi lacks any independence from the government. ¶¶ 78-80.[27]

Iran also exerts its absolute control over Markazi by directing the bank to finance Iran's acts of international terrorism and the country's efforts to obtain WMDs. ¶¶ 5, 179, 182, 181-83. That misconduct has produced the sanctions that the Departments of the Treasury and State have imposed upon Markazi. ¶¶ 11-12, 35, 182-83, 187. In addition to the illicit activity that the U.S. government highlighted in imposing those sanctions, the misconduct in which Markazi engages at the direction of the Iranian government includes: (a) acting as the financier of the Iranian oil supply chain, which is controlled by and funds the efforts of Iran's IRGC – a sponsor of global

---

[26] Ahmadinejad utilizes the low interest rates that he requires Markazi to maintain as a form of political patronage. ¶ 76. The interest rates are held well below market rates as a result of Ahmadinejad's dictates, and only his supporters can obtain loans at those favorable rates. *Id.*

[27] In that regard, during a 2006 interview, Iran's former Deputy Minister of Economic Affairs and Finance praised proposed economic reforms because "[t]he Central Bank will be taken out of government control." ¶ 78. Importantly, however, the Iranian government did not actually adopt any of the proposed reforms, which left Markazi subject to absolute Iranian government control and Ahmadinejad's whims. *Id.*

terrorism designated by the Department of the Treasury for its role in supporting terrorism and

the acquisition and proliferation of WMDs; and (b) acting as a facilitator for at least 22 state-

owned Iranian financial institutions that fund the IRGC's terrorist activities.  ¶ 199.

In combination, these allegations demonstrate that Iran "so extensively controlled"

Markazi "that a relationship of principal and agent" existed between the two entities.  *See, e.g.,*

*McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351-53 (D.D.C. 1995) (Iran's

extensive involvement in the day-to-day operations of four government instrumentalities and a

dairy corporation controlled by those instrumentalities evidenced principal/agent relationships

that rendered those entities' actions attributable to Iran under *Bancec*); *Kensington*, 2007 WL

1032269, at \*7-12 (an oil company wholly owned by Congo (SNPC) was that nation's alter ego

under *Bancec* where Congo exerted extensive control over SNPC, Congo and SNPC

commingled assets, SNPC exhibited poor internal and accounting controls, and Congo used

SNPC to shield assets from Congo's creditors).

Notably, Markazi has not contested in any fashion the sufficiency of Plaintiffs'

allegations to establish its status as Iran's alter ego, or "agent" in *Bancec's* terminology.  Rather,

Markazi merely argues that the foregoing allegations lack relevance under § 1611(b)(1) and

*NML Capital*.  That contention misses the point, however, because § 1611(b)(1) has no bearing

upon this action for the reasons that Plaintiffs outline in Points VI. and VII.  Accordingly,

Plaintiffs are entitled to the same post-judgment attachment remedy under § 1610(a) against

Markazi – acting in its role as Iran's alter ego or agent – that Plaintiffs could obtain against Iran.

Despite the wealth of New York law ruling that a plaintiff's remedies against an alter ego

parallel those available against the controlling entity, Markazi claims that *JSC*, 295 F.Supp.2d at

366, precludes a post-judgment attachment remedy against an alter ego until a court has actually adjudicated the alter ego issue. *JSC*, however, advances no rationale for its decision. Moreover, substantial authority contradicts the *JSC* court's holding. *E.g., Gadsby & Hannah v. Socialist Republic of Romania,* 698 F.Supp. 483, 486 (S.D.N.Y. 1988) ("The fact that the Romanian Bank is a mere agent or instrumentality of the Romanian government for purposes of claiming immunity and procedural protection under the FSIA would seem to subject the funds of the Romanian Bank to attachment to satisfy the debt of its principal – Romania."). Indeed, in a later proceeding in the *JSC* litigation – *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.,* 306 F.Supp.2d 482, 486 (S.D.N.Y. 2004) – the court granted a pre-judgment motion to attach the assets of the alter ego of a judgment debtor that was attempting to evade collection by means of fraudulent conveyances.

<u>CONCLUSION</u>

For all of the reasons set forth above, the Court should deny Markazi's motion to dismiss in all respects.

Dated: May 15, 2012

Respectfully submitted,

Liviu Vogel
Salon Marrow Dyckman Newman & Broudy LLP
292 Madison Avenue
New York, NY  10017
(212) 661-7100

-and –

56

James P. Bonner
Patrick L. Rocco
Stone Bonner & Rocco LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 239-4340

*Attorneys for Peterson Plaintiffs*

Curtis C. Mechling
James L. Bernard
Judy P. Goodwin
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

*Attorneys for Greenbaum and Acosta Plaintiffs*

Richard Marc Kremen
DLA Piper US LLP (MD)
6225 Smith Avenue
Baltimore, MD 21209
(410) 580-3000

*Attorneys for Heiser Plaintiffs*

Suzelle M. Smith
Howarth and Smith (LA)
523 West Sixth Street,
Suite 728
Los Angeles, CA 90014
(213) 955-9400

*Attorneys for Levin Plaintiffs*

Keith Martin Fleischman
Fleischman Law Firm
565 Fifth Avenue, 7th Floor
New York, NY 10017
(212) 880-9571

*Attorneys for Valore Plaintiffs*

### Exhibit A

"**Peterson Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Deborah D. Peterson, et al. v. Islamic Republic of Iran, et al.,* Civil Action Nos. 01-2094 and 01-2684 (RCL), who seek to enforce their judgment in the amount of $2,656,944,877.00, arising from the deaths of 241 United States Marines, United States Navy medical personnel and soldiers assigned to the 24th Marine Amphibious Unit that resulted from the October 23, 1983 Iran-sponsored terrorist bombing of the United State Marine Barracks in Beirut, Lebanon.

"**Valore Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Valore et al. v. Islamic Republic of Iran, et al.,* Civil Action No. 03-1959 (RCL), who seek to enforce their judgment in the amount of $1,290,291,092.00, arising from the deaths of 241 United States Marines, United States Navy medical personnel and soldiers assigned to the 24th Marine Amphibious Unit that resulted from the October 23, 1983 Iran-sponsored terrorist bombing of the United State Marine Barracks in Beirut, Lebanon.

"**Acosta Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Acosta, et al. v. Islamic Republic of Iran, et al.,* Civil Action No. 06-745 (RCL), who seek to enforce their judgment in the amount of $350,172,000.00, arising from the deaths that resulted from the Iran-sponsored assassination of Rabbi Meier Kahane and the shooting of Irving Franklin and U.S. Postal Police Officer Carlos Acosta on November 5, 1990, in New York.

"**Greenbaum Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Greenbaum et al. v. Islamic Republic of Iran, et al.,* Civil Action No. 02-2148 (RCL), who seek to enforce their judgment in

190019

the amount of $19,879,023.00, arising from the death that resulted from the Iran-sponsored August 9, 2001 suicide bombing of a restaurant in downtown Jerusalem, Israel.

"**Heiser Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Estate of Heiser v. Islamic Republic of Iran, et al.*, Civil Action Nos. 00-02329 and 01-02104 (RCL), who seek to enforce their judgment in the amount of $254,431,903.00, arising from the death of 17 United States Air Force officers killed in the Iran-sponsored June 25, 1996 terrorist bombing of the Khobar Towers in Saudi Arabia.

"**Levin Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Levin v. Islamic Republic of Iran, et al.*, Civil Action No. 05-02494 (GK), who seek to enforce their judgment in the amount of $28,807,719.00, arising from the kidnapping of Jeremy Levin in Beruit on March 7, 1984.

190019