# EXHIBIT 7

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON,<br>Personal Representative of the Estate<br>Of James C. Knipple (Dec.) (see Exhibit A<br>for a Full List of Plaintiffs),<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN; BANK<br>MARKAZI a/k/a CENTRAL BANK OF<br>IRAN; BANCA UBAE SpA; CITIBANK,<br>N.A., and CLEARSTREAM BANKING,<br>S.A.,<br><br>Defendants. | Case No.: 10 CIV 4518<br><br><br>**FILED UNDER SEAL CONTAINS<br>CONFIDENTIAL MATERIAL<br>SUBJECT TO PROTECTIVE ORDER**<br><br>**<u>SECOND AMENDED COMPLAINT<br>PURSUANT TO N.Y. C.P.L.R. 5225<br>AND 5227</u>**<br><br>**Plaintiffs demand a trial by jury.** |

The Plaintiffs/Judgment Creditors listed on the attached Exhibit A ("Plaintiffs"), by their attorneys, allege the following claims based upon information and belief, except those allegations concerning Plaintiffs, which they allege based upon their personal knowledge.

## NATURE OF THE CLAIM

1.     Plaintiffs are the victims of the deadly Iran-sponsored 1983 terrorist bombing of the U.S. Marine Barracks in Beirut, Lebanon.  Plaintiffs include the representatives of the estates of the 241 American servicemen killed in that attack, many survivors of the bombing, and the family members, heirs and representatives of the killed and injured servicemen.

2.     By means of this action, Plaintiffs seek to enforce the judgment for $2,656,944,877.00 in compensatory damages (the "Judgment") that they secured against two

181752

defendants, the Islamic Republic of Iran ("Iran") and Iran's Ministry of Information and Security ("MOIS" and, collectively with Iran, the "Judgment Debtors"), in 2007.

3.     Despite the Judgment Debtors' longstanding, determined efforts to evade collection of the Judgment, and other judgments obtained by the victims of Iran's ongoing terror campaign, Plaintiffs succeeded in restraining over $2 billion in bonds and cash nominally held by Iran's supposed "central bank," defendant Bank Markazi ("Markazi").[1]  From the time Markazi invested in those bonds (the "Restrained Bonds") through the dates that Plaintiffs succeeded in obtaining the restraints, the Restrained Bonds were present in the United States – or, in the terminology of the securities industry, "immobilized" at the United States Federal Reserve Bank in New York (the "FRBNY") or the Depository Trust Corp. ("DTC"), and "custodized" and "maintained for safekeeping" at Citibank in an account maintained for Clearstream's customers.

4.     Plaintiffs easily satisfy all of the requirements for collecting a portion of their massive Judgment against the Restrained Bonds under federal and common law, including the Foreign Sovereign Immunities Act, 28 U.S.C. Section 1602 *et seq.* (the "FSIA").

5.     Markazi's nominal ownership of the Restrained Bonds poses no obstacle to collection because Iran dominates and controls Markazi's actions, thereby rendering Markazi a mere alter ego of Iran that follows Iran's directions regarding matters ranging from monetary policy, to financing Iran's continuing acts of international terrorism and efforts to develop weapons of mass destruction ("WMDs"), to evading the enforcement of the Judgment and other judgments secured by the victims of Iran's terrorism.  Indeed, Iranian President Mahmoud

---

[1] The assets described in the Plaintiffs' Initial Execution, annexed hereto as Exhibit C, and Plaintiffs' restraining notices annexed hereto as Exhibit D, as modified by this Court's June 27, 2008 Order, annexed hereto as Exhibit E, as well as the cash proceeds collected by Citibank from bonds that comprised those assets and any interest accrued thereon since the assets were restrained, are hereinafter referred to as "Restrained Bonds."

Ahmadinejad has publicly and repeatedly boasted of his ability to control Markazi's actions, and other Iranian officials frequently acknowledge the bank's subjugation to Ahmadinejad's whims.

6.      The various technical arguments that Markazi and defendants Clearstream Banking, S.A. ("Clearstream"), Banca UBAE SpA ("UBAE") and Citibank, N.A. ("Citibank") assert for freeing the Restrained Bonds from the restrictions that the Court has imposed (and, presumably, returning them to Iran for use in connection with its continuing efforts to finance international terrorism and to promote nuclear proliferation) also fail to defeat Plaintiffs' right to execute upon the Restrained Bonds.

7.      In short, five key issues exist regarding Defendants' supposed defenses to Plaintiffs' right to collect against the Restrained Bonds: (a) did Iran waive the immunity that the agencies and instrumentalities of sovereign nations traditionally enjoy against the collection of judgments; (b) did Markazi, acting as Iran's alter ego, engage in "commercial activity" in the United States in relation to the Restrained Bonds; (c) does some interest in the Restrained Bonds exist in this District for Plaintiffs to levy against; (d) is Markazi entitled to the immunity from collection that may apply to a legitimate central bank holding funds "for its own account" under 28 U.S.C. Section 1611(b)(1); and (e) did Markazi successfully evade collection by working with its co-conspirators, Iran, Clearstream and UBAE, to move the Restrained Bonds from an account held in Markazi's own name at Clearstream to a new customer account opened by UBAE at Clearstream for the purpose of housing Markazi's bonds (the "UBAE/Markazi Account").

8.      The relevant facts compel answering the first three of those questions in the affirmative, and the latter two in the negative.  Iran has, explicitly and by implication, waived any immunity from collection that would otherwise apply to funds held by its agencies and

instrumentalities, including Markazi.  Defendants' refusal to recognize that fact pervades the supposed defenses that they have advanced to Plaintiffs' claims.

9.    Clearstream's presence in this District, and the extensive commercial activity that took place here at the direction and through the agents of Iran and Markazi, to maintain the Restrained Bonds for safekeeping, to transfer ownership of those securities and to make interest and principal payments to Markazi, leave no doubt that Markazi and its agents engaged in commercial activity in the United States in relation to the Restrained Bonds.  Likewise, the presence of Clearstream, Citibank, the Restrained Bonds and the cash proceeds of those securities in this District renders Defendants' contentions that nothing exists here for Plaintiffs to levy against an exercise in sophistry.

10.    Markazi's assertion that 28 U.S.C. Section 1611(b)(1) protects its assets from collection ignores Iran's waiver of any collection immunity otherwise applicable to its agencies and instrumentalities.  In any event, Markazi cannot demonstrate that it utilized the Restrained Bonds exclusively "for its own account," *i.e.*, solely in connection with legitimate central banking activity, a necessary condition to defeat collection under Section 1611(b)(1).

11.    To the contrary, the U.S. Departments of State and Treasury have recently taken the unprecedented step of designating Markazi as the first supposed central bank subject to restrictions under the Patriot Act's provisions related to jurisdictions of "primary money laundering concern."  Markazi earned that designation by consistently assisting in Iran's financing of terrorism, efforts to promote nuclear weapons proliferation and evasion of U.S. and international sanctions.

12.    As the Treasury Department recognized in announcing the sanctions against Markazi, every transaction in which Markazi engages is inherently suspect, and Markazi has

repeatedly demonstrated its willingness to lie and to deceive to advance Iran's illegal activities. Thus, the Restrained Bonds are properly seen as the tools of Iran's ongoing violations of U.S. sanctions and international law, not – as Markazi suggests – as ordinary "foreign exchange reserves" maintained by a legitimate "central bank" "for its own account"

13.    Finally, the fraudulent conveyances in which Markazi engaged shortly before Plaintiffs succeeded in restraining the Restrained Bonds provide no defense to Plaintiffs' right to levy those assets. Iran, Markazi, Clearstream and UBAE (the "Conspirators") jointly agreed in early 2008 to move the Restrained Bonds and other Markazi assets from an account that Clearstream maintained in Markazi's name to the new UBAE/Markazi Account that UBAE opened to house those assets.

14.    Those transfers bear numerous and obvious indicia of fraud. The Conspirators embarked on their scheme to transfer the assets just as amendments to the FSIA facilitated the ability of terror victims to collect their judgments against rogue states such as Iran and as other international sanctions threatened Markazi's ability to act freely in the international banking system.

15.    Furthermore, inserting UBAE into the middle of Markazi's bond transactions served no legitimate business purpose. UBAE is, by any measure, a small bank that can provide little of value to a massive financial institution like Markazi. From Markazi's perspective, UBAE's sole value was its willingness to serve as a front for Markazi in connection with the bond transactions and thereby impede collection efforts by Iran's creditors and the ability of the U.S. and foreign governments to sanction Markazi and Iran. Because UBAE was controlled by the regime of Libyan strongman Muammar Gaddafi when the Conspirators initiated their scheme, UBAE was uniquely suited for that role.

181752                                           5

16.     Thus, to the extent that some significance attaches to whether Clearstream or UBAE is the proper garnishee in this action, the Court's equitable powers justify reversing Markazi's fraudulent conveyances of the Restrained Bonds, restoring them to Markazi's Clearstream account and permitting Plaintiffs to levy those assets.

17.     Moreover, the foregoing facts easily establish Plaintiffs' right to the turnover of the Restrained Bonds and to the payment of the damages arising from the Conspirators' fraudulent and tortious efforts to impede Plaintiffs' ability to collect the Judgment.

18.     The Court should therefore provide some closure to Plaintiffs' decades-long quest to force Iran to account for its murderous acts on the morning of October 23, 1983 and order Defendants to surrender the Restrained Bonds to Plaintiffs and to pay the damages and punitive damages to which Plaintiffs are entitled.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Sections 1331, 1605(a)(1), 1605(a)(2), 1605(a)(7), 1605A and 1610.  This Court also has jurisdiction under 28 U.S.C. Section 1963 because Plaintiffs obtained their Judgment in the United States District Court for the District of Columbia and subsequently registered the Judgment in the Southern District of New York.  This proceeding arises under Fed. R. Civ. P. 69(a), which incorporates the applicable law of the State of New York and the United States.

20.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4, CPLR Sections 301 and 302, and 28 U.S.C. Sections 1605(a)(1), 1605(a)(2), 1605(a)(7), 1605A and 1610.

181752

21.  As Plaintiffs particularize below, Iran has explicitly and by implication waived any right to immunity against suit and execution that Markazi and Iran's other agencies and instrumentalities might otherwise enjoy from the claims that Plaintiffs assert.

22.  Iran and its alter ego, Markazi, engaged in substantial commercial activity inside and outside of the United States in connection with their investments in the Restrained Bonds, individually and through the Banking Agent Defendants (*i.e.*, UBAE, Clearstream and Citibank).

23.  In particular, Iran, Markazi and the Banking Agent Defendants engaged in commercial activity in the United States by investing in the bonds safeguarded in this country that comprised the Restrained Bonds when Plaintiffs secured their execution and levy upon those assets.

24.  When they engaged in those activities, the Banking Agent Defendants operated within the scope of their agency relationship with Iran and Markazi.  Moreover, Clearstream and UBAE (the "Banking Conspirators") engaged in that commercial activity in furtherance of the conspiracy with Iran and Markazi that Plaintiffs describe in detail below.

25.  Iran and Markazi continue to engage in commercial activity in the United States by claiming their entitlement to the Restrained Bonds, which are now principally comprised of cash that Citibank holds in a segregated account for Markazi's benefit.

26.  The actions that Markazi and Iran undertook with respect to the Restrained Bonds in Iran, including the investment decisions that they made regarding those bonds, had direct effects in the United States, including the payment of substantial interest and principal to Markazi from funds held by Citibank.

27.  Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(b), (d) and (f).

## PARTIES AND JUDGMENT DEBTORS

28.    Plaintiffs are the victims of the deadly Iran-sponsored 1983 terrorist bombing of the U.S. Marine barracks in Beirut, Lebanon.  Plaintiffs include the representatives of the estates of the 241 United States servicemen killed in that attack, many survivors of the bombing, and the family members, heirs and representatives of the killed and injured servicemen.  All Plaintiffs are United States Citizens residing in the United States, including the State of New York.

29.    Defendant and Judgment Debtor the Islamic Republic of Iran ("Iran") is a foreign sovereign and U.S. government-designated state sponsor of terrorism.  Plaintiffs secured a judgment for $2,656,944,877.00 in compensatory damages against Iran for its role in the murderous Marine Barracks attack that killed and injured Plaintiffs.

30.    The United States Department of State first designated Iran as a state sponsor of terrorism in 1984 and has reiterated that designation every year since 2000 in its Country Reports on Terrorism.[2]  Iran earned that ignominious designation by repeatedly providing support for acts of international terrorism.  In addition to financing and lending non-monetary support to terrorist acts, Iran has also actively pursued the development of weapons of mass destruction ("WMD") in violation of international law.

31.    The Iranian Ministry of Information and Security ("MOIS") is a Judgment Debtor. MOIS serves as an intelligence organization for the Iranian government.  MOIS acted as a conduit for Iran's provision of funds, training and weapons to Hezbollah, the terrorist organization that assisted Iran in conducting the 1983 Beirut Marine Barracks bombing.  Among other illicit conduct, MOIS provided explosives to Hezbollah and exercised operational control over Hezbollah's attack upon the Marine Barracks.

---

[2] *See* "State Sponsors of Terrorism," U.S. Department of State, August 18, 2011 (http://www.state.gov/s/ct/rls/crt/2010/170260.htm).

181752                                8

32.    Defendant Bank Markazi, a/k/a the Central Bank of Iran ("Markazi"), describes itself as Iran's central bank. Markazi was formed under the laws of Iran and maintains its principal place of business in Iran, although it conducts its business operations world-wide, including in the United States.

33.    At all relevant times, Markazi served as an agent and instrumentality and alter ego of Iran. Markazi engaged in all of the conduct and actions that Plaintiffs allege at the direction and for the benefit of Iran and as Iran's alter ego. Iran directed Markazi to engage in that conduct and supervised Markazi's performance of the tasks that Iran directed.

34.    Because of Markazi's longstanding illegal and deceptive efforts to facilitate Iran's support for global terrorism and pursuit of nuclear and ballistic missile capabilities, the U.S. Departments of State and Treasury took the unprecedented step on November 21, 2011 of applying restrictions applicable to jurisdictions of "primary money laundering concern" to Markazi.[3] Markazi is the only purported central bank of a sovereign nation to be included within the scope of those restrictions.

35.    As support for its designation of Markazi as a money launderer, the Department of Treasury found that Markazi and other state-owned Iranian banks "willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies." The Department of Treasury also emphasized that Markazi "provided financing to the UN-sanctioned Khatem al-Anbiya Constructions Headquarters for defense-related projects," *i.e.*, for Iran's nuclear proliferation program.

36.    Defendant Banca UBAE SpA ("UBAE") is a banking corporation organized under the laws of Italy that maintains its principal office in Rome, Italy.

---

[3] http://www.treasury.gov/press-center/press-releases/Documents/Iran311Finding.pdf .
http://www.nytimes.com/2011/11/22/world/middleeast/iran-stays-away-from-nuclear-talks.html

37.    Working as the agent of Iran and Markazi, UBAE caused Clearstream to transfer the Restrained Bonds held for safekeeping in the United States from Markazi's account at Clearstream to the new UBAE/Markazi Account at Clearstream.  While the Conspirators agreed that the UBAE/Markazi Account would not bear Markazi's name, UBAE opened that account exclusively for Markazi's benefit and at the direction of Markazi and Iran.

38.    UBAE undertook substantial efforts to assist in concealing Markazi's ownership interest in the Restrained Bonds.  Until Italy's central bank seized control of UBAE in March of 2011 in conjunction with sanctions imposed upon the Libyan regime of the deceased strongman Muammar Gaddafi by the United Nations and the European Union, the Gaddafi regime controlled 67.55% of UBAE's stock.

39.    Among other claims, Plaintiffs assert fraudulent conveyance causes of action against UBAE related to its role as the transferee of Markazi's fraudulent conveyances.  As the transferee of those fraudulent conveyances, UBAE does not qualify as a necessary party.

40.    Defendant Clearstream Banking, S.A. ("Clearstream") is a banking corporation organized under the laws of Grand Duchy of Luxembourg.  Clearstream's web site declares that the company "offers its customers the possibility to use Clearstream Banking as a single point of access for the settlement and custody of internationally traded bonds and equities across 51 markets" and that "[m]ore than 1,100 [Clearstream] employees service customers in Europe, the Americas, Asia-Pacific, the Middle East and Africa from our operational centres in Luxembourg, Germany and Singapore, as well as from representative offices in London, New York, Hong Kong, Dubai and Tokyo."  Clearstream undertakes substantial commercial activity in the County of New York and maintains an office at 55 Broad Street, New York, New York.

41.   Working as the agent of Iran, Markazi, and UBAE, Clearstream invested the Restrained Bonds in the United States and undertook substantial efforts to assist in concealing Markazi's ownership interest in the Restrained Bonds.

42.   Defendant Citibank, N.A. ("Citibank") is a national banking association organized under the laws of the United States of America.  Citibank maintains its main office in New York County.  Working as the agent of Iran, Markazi, UBAE, and Clearstream, Citibank invested and maintained the Restrained Bonds in the United States.

### THE FACTS AND CIRCUMSTANCES THAT DEMONSTRATE PLAINTIFFS' ENTITLEMENT TO RELIEF

**A.    Plaintiffs' Judgment against Iran for its Support of Murderous Terrorist Acts**

43.   Plaintiffs hold the unsatisfied Judgment in the total amount of $2,656,944,877.00 against the Judgment Debtors, Iran and MOIS.

44.   The United States District Court for the District of Columbia entered the Judgment on September 7, 2007.  A copy of the Judgment is annexed hereto as Exhibit B.  Plaintiffs registered the Judgment in this Court pursuant to 28 U.S.C. Section 1963 under Docket No. Misc. 18-302 on March 24, 2008.

45.   As the United States District Court for the District of Columbia found before issuing the Judgment, MOIS, acting as Iran's agent, committed the Marine Barracks attack within the scope of that agency.  A MOIS operative carried out the attack with the assistance of the Iranian-funded Hezbollah terrorist group by detonating powerful explosives at the Marine Barracks.

46.   Plaintiffs' judgment was based upon claims brought under 28 U.S.C. Section 1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA").

181752                                      11

**B.     Plaintiffs' Successful Efforts to Prevent Defendants
          from Disposing of the Restrained Bonds**

47.     In response to a subpoena served in aid of Plaintiffs' efforts to collect upon their

Judgment, Plaintiffs received a June 11, 2008 letter from the U.S. Department of the Treasury's

Office of Foreign Assets Control ("OFAC").  That letter stated that information available to

OFAC demonstrated that "an Iranian government client" maintained an interest in the Restrained

Bonds with a face amount of $2,003,000,000 that were held on Clearstream's books and

"custodized in the United States" in a sub-custodial account with Citibank.

48.     In response to a later subpoena, Plaintiffs obtained additional information from

OFAC concerning the Restrained Bonds in an April 23, 2010 letter.  That letter disclosed that the

Restrained Bonds were "apparently owned by the Central Bank of Iran."  The OFAC letter

further provided:

> Certain of [Markazi's] securities, which were held in custody in Clearstream's
> Citibank account on behalf of [Markazi], were transferred "free of payment" (*i.e.*,
> with no corresponding incoming payment instruction) from [Markazi's] account
> at Clearstream to a separate custodial account at Clearstream held in the name of
> Banca UBAE S.p.A. ("U.B.A.E.") during February 2008.  UBAE, which is
> located in Rome, Italy, in turn has held these assets in an account on its books that
> it has maintained for [Markazi].  Such transfers alone would not affect the place
> of custody of the assets, which continue to be held through Clearstream's account
> at Citibank in the United States.  These transfers did not effect a change in
> beneficial ownership of the transferred assets.

49.     Documents obtained from defendant UBAE by letters rogatory pursuant to the

Hague Convention confirm the facts set forth in OFAC's April 23, 2010 letter.

50.     On June 12, 2008, Plaintiffs obtained issuance of an Execution by the Clerk of this

Court (the "Initial Execution") and filed it with the Office of the United States Marshal Service

in this District for execution on the goods and chattels of Iran.  A copy of the Initial Execution is

annexed hereto as Exhibit C.

181752                                         12

51.    That Initial Execution specifically identified the assets in the custody of Citibank that OFAC listed in its June 11, 2008 letter. The United States Marshal's Service served the Initial Execution on Clearstream on June 9, 2010 and on Citibank on June 13, 2008.

52.    This Court's May 10, 2010 Order extended the Initial Execution and related levy *nunc pro tunc* through the date of the filing of Plaintiffs' initial Complaint in this action.

53.    On October 27, 2008, the United States Marshal's Service served Clearstream with an additional Execution on the goods and chattels of Iran (the "Execution").

54.    That Execution specifically identified assets owned by Markazi that were in Clearstream's custody. Plaintiffs filed the Execution with the Office of the United States Marshal's Service in the Southern District of New York on October 17, 2008. The October 17, 2008 Execution and levy were extended *nunc pro tunc* through the date of the filing of Plaintiffs' initial Complaint in this action by this Court's June 11, 2010 Order.

55.    Plaintiffs served Citibank with a restraining notice under CPLR Section 5222 on June 17, 2008 and with an amended restraining notice correcting a minor defect on June 24, 2008. Plaintiffs served Clearstream with a restraining notice under CPLR Section 5222 on June 16, 2008 and with an amended restraining notice correcting a minor defect on June 23, 2008. Copies of the respective amended restraining notices are annexed hereto as Exhibit D.

56.    On June 25, 2008, the United States District Court for the District of Columbia issued an order pursuant to 28 U.S.C. Section 1610(c) *nunc pro tunc* from March 10, 2008 that permitted execution to proceed upon the Judgment.

57.    As the result of an Order to Show Cause submitted by Citibank, the Court held a hearing on June 27, 2008 regarding Citibank's motion to quash the writ of execution and

restraining notices. At that hearing, Clearstream delivered documentary and testimonial evidence.

58. Following that hearing, the Court issued an Order dated June 27, 2008 that vacated the restraints on certain securities valued at $250 million. Plaintiffs have annexed a copy of that Order as Exhibit E.

59. By means of a July 13, 2009 Order, the Court extended the restraining notices served upon Citibank and Clearstream, as modified by the Court's June 27, 2008 Order. Those restraining notices remain in effect pending further Order of the Court.

## C.    Markazi Is Iran's Alter Ego

60. Plaintiffs may collect their Judgment against assets owned by Markazi because Markazi is an agency or instrumentality of Iran and Iran's alter ego.

61. Iran controls Markazi to such an extent that Markazi maintains no independence or free will and, instead, operates as Iran's alter ego and surrogate. The U.S. Department of Treasury recognizes Markazi's status as Iran's alter ego in § 535.433 of the U.S. Iranian Assets Control Regulations, which state, "The Central Bank of Iran (Bank Markazi Iran) is an agency, instrumentality and controlled entity of the government of Iran for all purposes under this part [*i.e.*, 31 C.F.R. Part 535]."

62. Iran so extensively controls Markazi that a relationship of principal and agent exists between the two entities. Iran owns Markazi and effectively controls its operations. Thus, Markazi engaged in all of the activity that Plaintiffs allege at Iran's direction and for Iran's benefit.

63.    Markazi regularly and systematically conducts commercial transactions on behalf of Iran.  The funds that Markazi maintains in its own name actually belong entirely to the government of Iran.

64.    Iran exercises its control over Markazi by, among other means, dictating the appointment and actions of the bank's management.

65.    Markazi is ostensibly subject to Iran's 1972 Monetary and Banking Law ("MBL"). In practice, however, under the direction of Iranian President Mahmoud Ahmadinejad, Iran exercises day-to-day control over Markazi.  Iran issues direct orders to Markazi and controls its leadership, thereby eliminating Markazi's ability to operate independently from the Iranian government.

66.    The MBL provides for Markazi to be led by a Governor appointed for a five-year term by "Royal Decree," based upon the recommendation of the Minister of Finance and Economic Affairs and subject to approval by the cabinet.  That cabinet is now comprised of the President of Iran and the country's ministers.  The Governor is Markazi's highest executive and administrative authority and is responsible for conducting the bank's business in a proper manner.

67.    Ahmadinejad's government has ignored the MBL's mandatory five-year term for Markazi's Governor, thereby destroying any semblance of Markazi's independence from the government of Iran.

68.    In August 2007, Ahmadinejad forced Markazi's then-Governor, Ebrahim Sheybani, to resign prior to the end of his term.  In 2008, Ahmadinejad also pressured Sheybani's successor, Tahmasb Mazaheri, to resign before the end of his term.  Notwithstanding Mazaheri's

refusal to resign, Ahmadinejad replaced Mazaheri by presidential decree in violation of the
MBL.

69.    Moreover, Iran's cabinet regularly votes at its meetings to order Markazi to extend
loans to Iran's government for specific purposes.  For instance, on March 15, 2007, the 26th
cabinet session of the first Ahmadinejad government ordered Markazi to lend 50 billion rials for
marriage, medical treatment, education and housing loans.  On April 20, 2007, the 27th cabinet
session ordered Markazi to extend a loan of 150 billion rials for the same purposes.

70.    Ahmadinejad's government has also usurped Markazi's authority to make monetary
policy decisions.

71.    All major decisions about monetary policy are made directly by the Iranian
government, often personally by Ahmadinejad, without consulting Markazi's Currency and
Credit Council ("CCC"), the bank entity supposedly charged with those decisions.

72.    Indeed, in August 2007, Ahmadinejad announced he had dissolved the CCC.  Press
reports stated that this action precipitated Sheybani's 2007 resignation as Markazi's Governor.
On July 14, 2009, the semi-official Mehr News Agency announced that the CCC had met for the
first time in two years.

73.    Furthermore, in a speech that he delivered on April 16, 2008, Ahmadinejad
described orders he had issued to Markazi regarding monetary policy.

74.    The setting of interest rates in Iran provides a telling illustration of Markazi's
complete subservience to the Iranian government.  "Interest rates" is a term widely used in
discussing Iranian policy, even though an elaborate ruse is used to present the "interest rates" as
consistent with a strict interpretation of Islamic law, which bans the imposition or collection of
interest.

75.   While running for the Presidency and since assuming office, Ahmadinejad insisted that interest rates be kept low, which he thought would reduce inflation – a viewpoint for which he has been harshly criticized by Iranian economists. To carry out his interest rate policies, Ahmadinejad usurped Markazi's apparent authority regarding interest rate issues by forcing the resignation of one Markazi Governor (Sheybani), dismissing another (Mazaheri), and ordering that the CCC be dissolved.

76.   As a result of the interest rate policies that Ahmadinejad has dictated, Iran has maintained its interest rates well below the inflation rate, with the result that demand for loans is extremely high.  In practice, only individuals and businesses with political connections can obtain loans, a circumstance that facilitates government corruption and solidifies Ahmadinejad's vast power.

77.   The Iranian government's subjugation of Markazi has been widely recognized even in Iran, where many high-ranking officials have complained that Markazi lacks independence from the government.

78.   For example, in a 2006 interview that covered the Iranian government's Fourth Development Plan (a document setting out government economic goals and policies for the next five years), Iran's former Deputy Minister of Economic Affairs and Finance, Mohsen Safa'i-Farahani, praised the Plan because "[t]he Central Bank will be taken out of government control." According to Safa'i-Farahani, "In other words, this will put an end to the interference of the government's economic sectors, such as the Ministry of Finance and Economic Affairs, in the Central Bank."  Notably, Iran did not carry out the reforms envisaged in the 2006 Fourth Development Plan.

79.   A June 10, 2006 report in the newspaper *Siyasat-e Ruz* provides another example of Iran's complete dominion over Markazi.  According to that report, Markazi's then-Governor Sheybani "once again called for more independence for the Central Bank."  The article quoted Sheybani as stating, "An independent central bank can wisely outline and execute monetary policies; otherwise it must be a mere follower of the government."  After Sheybani resigned as Governor in August 2007, Iranian press reports stated that Markazi's loss of independence from the government, as evidenced by the dispute over interest rates, was the main factor in his resignation.

80.   Members of the Iranian Parliament (the Majlis) have also formally complained about Ahmadinejad's violations of law, citing Ahmadinejad for disregarding the provisions of Iranian law and ordering Markazi to transfer funds to government accounts.

81.   Ahmadinejad himself has not been bashful in acknowledging his government's complete control of Markazi.  For example, he has publicly boasted of giving direct "orders" to Markazi to take actions he deems appropriate.  The Iranian press has also quoted Ahmadinejad as stating, "I give the Bank Markazi permission" to use certain funds for a specific purpose.

82.   In response to a question regarding what the relationship between the government and Markazi should be, Ahmadinejad has also stated: "Our constitutional law has made it clear. The flow of capital and money should be regulated by the government.  This is the law, and the law of the country should therefore be executed."

**D.     The Restrained Bonds Are Held in New York and Reflect Commercial Activity in the United States**

83.   Iran, through its agent and alter ego, Markazi, owns the Restrained Bonds that are the subject of this action.

181752                                          18

84.     At the time that Plaintiffs obtained the Initial Execution, the Restrained Bonds consisted of 21 bonds worth roughly $2 billion. All but one of the Restrained Bonds were denominated in U.S. dollars and all were immobilized and held for safekeeping in the United States. Those securities provided for the payment of periodic interest and the payment of principal at maturity, and Citibank made those payments to Markazi and other bond holders from Citibank's offices in New York.

85.     All of the Restrained Bonds were maintained for safekeeping at the United States Federal Reserve Bank in New York (the "FRBNY") or the Depository Trust Corp. ("DTC"), also located in New York.

86.     In order for Markazi to purchase the Restrained Bonds and receive interest and principal payments related to those bonds, the Defendant Agent Banks had to undertake substantial commercial activity in the United States as the agents for, and under the direction of, Markazi.

87.     Prior to February 2008, Markazi ordered the purchase and sale of bonds that, like the Restrained Bonds, were maintained for safekeeping in the United States by requesting that Clearstream purchase the bonds through the account that Clearstream maintained in Markazi's name at Clearstream.

88.     To complete those transactions, Iran and Markazi communicated with Citibank in New York through Clearstream, the agent of Iran and Markazi. Markazi delivered its instructions to Citibank by causing Clearstream to engage in various methods of electronic communication with Citibank's New York operations.

89.     In or about January 2008, however, Markazi and Clearstream concluded that Clearstream risked U.S. government sanctions and that Markazi risked the potential seizure of its

assets by Iran's judgment creditors if Clearstream continued to transact business in the United States directly on behalf of Markazi.

90. Accordingly, Iran, Markazi, Clearstream and UBAE (the "Conspirators") entered a tacit or spoken agreement to funnel Markazi's transactions in bonds, including bonds kept for safekeeping in the United States, through the UBAE/Markazi Account that UBAE opened at Clearstream exclusively for the purpose of conducting Markazi's business.

91. UBAE received substantial fees for serving as Markazi's agent in connection with the purchase and sale of those bonds. Typically, UBAE's fees amounted to approximately four basis points (*i.e.,* .0004%) of the trades that Markazi made in the bonds. In addition, UBAE marked up the monthly fees that Clearstream charged UBAE by 10%.

92. With the exception of hiding Markazi's participation in those trades, UBAE provided no service to Markazi in connection with the transactions. Markazi would have continued to conduct those transactions through its own Clearstream account in the absence of the Conspirators' concerns regarding the seizure and sanctions risks associated with continuing Markazi's direct ownership of a Clearstream account.

93. Both before and after the Conspirators embarked upon their scheme to hide Markazi's involvement in the trades conducted through Clearstream, Iran and Markazi purchased bonds (including the Restrained Bonds) through Clearstream by providing instructions to their agents to engage in substantial commercial activity through agents located in the United States.

94. Before the Conspirators elected to insert UBAE into the transaction chain, Markazi delivered the purchase and sale instructions to Clearstream. After Markazi began to trade through the new UBAE/Markazi Account at Clearstream, Markazi would initially deliver the purchase and sale instructions to UBAE, which would then pass them on to Clearstream.

95.    Once Clearstream received purchase or sale instructions from Markazi directly or from UBAE, Clearstream would act as the agent of Iran and Markazi by communicating Markazi's instructions to Citibank in New York.  Citibank, acting as agent for Markazi, UBAE and Clearstream, in turn implemented Markazi's instructions with respect to the securities in Citibank's custody in New York.

96.    Moreover, once the Banking Agent Defendants implemented Markazi's bond purchases, various entities acting as Markazi's agents had to engage in substantial commercial activity in the United States to enable Markazi to receive interest and principal payments related to its investments.

97.    Both before and after UBAE opened the UBAE/Markazi Account at Clearstream for the purpose of conducting Markazi's trading, Clearstream – acting as Markazi's agent – would engage in commercial activity in the United States by delivering payment instructions for periodic interest payments, maturity payments and sales proceeds payments to Citibank in New York.

98.    After Citibank received interest and principal payments related to the Restrained Bonds in U.S. dollars, Citibank credited those payments to Clearstream's cash account at Citibank in New York.

99.    Clearstream retained those funds in its cash account in New York pending instructions from its customers (Markazi or UBAE, Markazi's agent) to withdraw the funds.

100.  Once Markazi or UBAE, acting on behalf of Markazi, requested a withdrawal, Clearstream would instruct Citibank to make an electronic funds transfer through Clearstream's correspondent bank, JP Morgan Chase in New York, to UBAE's correspondent bank, HSBC in New York.

101.  The FRBNY and the DTC held all of the physical global bond certificates for the Restrained Bonds for safekeeping in New York.

102.  The Restrained Bonds were issued by sovereigns like the Republic of Italy or "supranationals" such as the European Investment Bank.

103.  Each bond was issued in the physical form of one or more global notes that was registered and deposited with the FRBNY, DTC or one of their nominees.

104.  The DTC, a limited purpose trust company formed under New York law, is a member of the Federal Reserve System.  It acts as a clearing agency created to hold securities of its participants and to facilitate the clearance and settlement of its participants' transactions through book-entry changes in participants' accounts.

105.  The legal characteristics of the Restrained Bonds were set forth in prospectuses filed with the S.E.C.  The bonds were typically governed by New York law, and investors could enforce their rights as owners of the bonds in the courts of New York.

106.  Owners of beneficial interests in global notes typically are not entitled to receive physical certificates evidencing their interest.  Instead, the owner's interest is reflected in a book-entry in the records of the financial institution with which the owner has an account.

107.  Owners frequently do not have an account at FRBNY or participate at DTC.  Those owners must hold their ownership indirectly with financial institutions that have a direct account at FRBNY or participate at DTC, as the case may be, or that have an account with financial institutions that maintain direct relationships with DTC or FRBNY.

108.  All financial intermediaries are responsible for keeping account of their holdings on behalf of their customers.  Issuers of global notes typically appoint a fiscal or paying agent located in New York to facilitate payments of interest and principal due under the notes.

109.  Typically, upon receipt of payment of interest or principal from the issuer's paying agent, DTC will credit its participants' accounts with payments in amounts proportionate to their respective beneficial interests in the principal amount of the global note as shown on DTC's records.  Payments from DTC participants to owners of beneficial interests in the global notes held through those participants are the responsibility of the participants.  Substantially the same procedure applies for FRBNY.

110.  When Plaintiffs succeeded in obtaining the Initial Execution, over $2 billion worth of the Restrained Bonds owned by Markazi were held in New York by DTC and the FRBNY.

111.  In addition, at Clearstream's request and for its benefit, Citibank maintained bookkeeping records of the Clearstream customer accounts associated with the settlement of certain trades of assets, including the Restrained Bonds.  Citibank maintained those bookkeeping records in the United States to facilitate Clearstream's internal accounting requirements.  Thus, Citibank regularly communicated with Clearstream from New York concerning Markazi's transactions in the Restrained Bonds that remained custodized in the United States by multiple means, including mail, e-mail, fax, SWIFT banking system communications and other electronic communications.

112.  Moreover, because all of the Restrained Bonds remained custodized at Citibank in New York at all times, Citibank maintained records in the United States that reflected the transfer of Markazi's bonds to the newly established UBAE/Markazi Account.  To enable Clearstream to credit and debit the Markazi account and the UBAE/Markazi Account properly, Citibank honored Clearstream's request to record Clearstream's corresponding customer account numbers in those Citibank account records, which were created and maintained in New York.

113.  The Conspirators all recognized when Clearstream purchased the Restrained Bonds on behalf of Markazi and as Markazi's agent that purchasing and owning those bonds would require substantial United States-based commercial activity by Markazi's agents.

114.  Indeed, in a November 11, 2009 letter from Clearstream to UBAE, Clearstream confirmed that the U.S. sub-custodian for the securities held in the UBAE/Markazi Account was disclosed to UBAE when it opened that account for Markazi's benefit.

115.  Clearstream further confirmed that substantial U.S.-based commercial activity was necessary to complete Markazi's investment in the Restrained Bonds.  The November 11, 2009 letter stated:

> [T]he securities in question are all issued in dematerialized form in the United States of America and consequently the ultimate place of safekeeping, irrespective of the choice of principal and intermediate custodians, is necessarily the United States. . . . [T]he securities in question cannot be held in safe custody without procuring services from US-based persons.

116.  Furthermore, the prospectuses for many of the Restrained Bonds have choice-of-law provisions that specifically state that New York law controls the rights associated with the bonds.

117.  Ultimately, purchasing and selling the Restrained Bonds and making interest and principal payments to Markazi required the following entities to engage in substantial commercial activity in New York on Markazi's behalf: the FRBNY; the DTC; multiple paying agents; Citibank as sub-custodian; and one or more correspondent banks located in the U.S.

118.  The account statements that Clearstream provided to Markazi show that either the DTC or the FRBNY held each of the Restrained Bonds for safekeeping in the United States. Those account statements served as a monthly reminder to Markazi and Iran that they were

risking the seizure of the Restrained Bonds by engaging in commercial activity in the United States.

119.   Clearstream provided Markazi with additional documents, including Markazi's customer agreements with Clearstream, that specifically identified the securities available for purchase through Clearstream and the identity and location of the sub-custodians that Clearstream used for safekeeping those securities.   After Plaintiffs obtained the Initial Execution, Clearstream reminded UBAE that those "Governing Documents" disclosed that the Restrained Bonds were located in the United States.

120.   Furthermore, because of the sophistication that Iran and Markazi possess regarding bond investing and in evading U.S. sanctions against Iranian entities, Iran and Markazi knew that Clearstream disclosed in various publicly available sources – including its website – the types of securities that Clearstream held as custodian and the identity and location of each sub-custodian that Clearstream used for safekeeping those securities.

121.   Thus, Iran and Markazi knew that all of the Restrained Bonds would be held for safekeeping in the United States by the FRBNY or the DTC and that those securities were sub-custodized at Citibank.

122.   After Plaintiffs obtained the Initial Execution, Citibank opened a suspense account in New York to house Markazi's assets.   Initially, that account included the Restrained Bonds.

123.   As time has passed and the Restrained Bonds have matured, however, the investments in the Citibank suspense account have largely transformed into cash.   Citibank continues to maintain the New York suspense account for Markazi, to receive interest and principal payments there on behalf of Markazi, and to account for and safekeep the account assets for Markazi in New York.

124. The foregoing facts demonstrate that the Conspirators purposefully enlisted the services of multiple American banking and financial industry institutions by purchasing, selling, and securing payments related to the Restrained Bonds, most of which have matured and converted to cash.

125. Moreover, each of the Conspirators derived substantial immediate and prospective financial benefits by engaging in that commercial activity on behalf of Markazi in the United States, and both UBAE and Clearstream derive substantial revenue from international commerce.

**E.** **Iran and Markazi Conspired with Clearstream and UBAE to Evade the U.S.'s Iranian Transactions Regulations and to Engage in Fraudulent Conveyances Designed to Evade Plaintiffs' Efforts to Collect Upon Their Judgment**

**1.** **Iran, Markazi, Clearstream and UBAE Conspired to Hide Markazi's Ownership of the Restrained Bonds**

126. Because of the widespread sanctions imposed upon Iran and Markazi by the international community, Iran and Markazi rely heavily upon a small group of financial institutions to assist them in laundering money and in conducting the financial activity related to Iran's substantial international sales of oil. This same financial network conducts money laundering in support of Iran's support for international terrorism and WMD acquisition and proliferation.

127. Through its loyalty to Iran in the face of mounting international sanctions related to the funding of terrorism and Iran's efforts to develop WMDs, Clearstream built a substantial business relationship with Iran and Markazi. In May 1996, Markazi had only $142 million invested with Clearstream. In contrast, by 2008, the Markazi funds invested through Clearstream totaled at least $4.627 billion.

128. By that time, however, Clearstream faced increasing pressure from the U.S. government to discontinue its relationship with Markazi.

181752

129. In addition, Iran, Markazi and Clearstream recognized in late 2007 that new federal legislation significantly increased the risk that the numerous victims of Iran's terrorist acts would seek to collect their judgments against Markazi, Iran's alter ego.

130. In December 2007, President George W. Bush vetoed a House of Representatives version of the National Defense Authorization Act for fiscal year 2008 that included legislative amendments that strengthened the rights of American victims of terrorism under the FSIA.

131. As the press widely reported at the time, President Bush vetoed H.R. 1585 because of his concern regarding the lack of clarity regarding the applicability of the legislation to the new government of the Republic of Iraq.

132. As a result, the House quickly acted to revise the Bill by adding a waiver provision that explicitly exempted Iraq from the new law's provisions. Again, the legislative compromise reached between the White House and the House received substantial press coverage.

133. On January 16, 2008, the House of Representatives first introduced H.R. 4986, the bill that Congress ultimately enacted as 28 U.S.C. Section 1605A and certain additional provisions of 28 U.S.C. Section 1610.

134. That bill amended the FSIA to provide judgment creditors of state sponsors of terrorism, such as Iran, greater enforcement rights. The new provisions of the FSIA allow judgment creditors to enforce their judgments against agencies or instrumentalities of the state sponsors of terrorism – including Markazi – without demonstrating that those entities functioned as the alter ego of the terrorist state. Congress finally passed that bill on January 28, 2008, and President Bush signed it into law the same day.

135. At the same time that the actions of Congress and President Bush's rare veto focused the press's attention upon these issues, international diplomats were debating the

imposition of sanctions upon Iran at the United Nations. As a result of Iran's intransigence, the United Nations' Security Council ultimately passed Resolution 1803 on March 3, 2008. That Resolution imposed sanctions designed to deter Iran's efforts to proliferate nuclear weapons.

136. These legislative developments and the simultaneous pressure that the U.S. government directed at Clearstream to cut its business ties with Markazi caused Clearstream to develop increased concern in late 2007 and early 2008 that the U.S. government or a creditor of Iran would seize Iranian assets held at Clearstream. Clearstream's concern regarding those issues was intensified by its substantial presence in New York, where Clearstream maintains an office. Clearstream's concern did not arise from a desire to advance the U.S. government's efforts to impede Markazi's money laundering, financing of Iran's illicit weapons program and funding of terrorism. Rather, Clearstream desired to avoid the client relations problems associated with the seizure of Iranian assets by the U.S. government or a judgment creditor of Iran.

137. At the same time, Iran, Markazi and their counsel were closely following the legislative developments in the United States, and were well aware of the impact of the FSIA amendments upon Iran's ability to hide assets from its judgment creditors. Iran has long sought to protect its assets against efforts by victims of terrorism and others to collect upon substantial judgments secured against Iran and its agencies and instrumentalities by maneuvering Iran's funds to evade collection and by defending the collection lawsuits brought by the victims of Iran's terrorism. Thus, Iran, Markazi and their American counsel recognized that the FSIA amendments were aimed largely against Iran and other state sponsors of terrorism.

138. Moreover, Iran has publicly stated through its state-owned news agency that it rejects the legitimacy of Plaintiffs' Judgment and continues to deny responsibility for Plaintiffs'

losses. Thus, well before Iran and Markazi caused Markazi's bond holdings to be transferred to the new UBAE/Markazi Account at Clearstream, Iran and Markazi knew that Plaintiffs and other judgment creditors held large judgments against Iran that they might seek to satisfy against Markazi's assets.

139. As a result, Iran, Markazi and Clearstream decided in late 2007 and early 2008 to enlist UBAE in a conspiracy designed to permit Markazi to continue to invest through Clearstream in bonds held for safekeeping in the United States, including the Restrained Bonds, while simultaneously providing Clearstream with the ability to claim that it no longer provided banking services to Markazi.

140. Consistent with their Agreement, the Conspirators attempted to accomplish that objective by hiding Markazi's continued ownership of all securities previously held in Markazi's Clearstream account by omitting from Clearstream's records any mention of Markazi's connection to the new UBAE/Markazi Account opened to hold Markazi's assets.

141. By inserting UBAE as a middleman, Clearstream attempted to pass its responsibility for performing customer due diligence, Know Your Customer and Anti-Money Laundering procedures regarding Markazi and Iran to the nominal account holder, UBAE.

142. In addition, by implementing their scheme, the Conspirators intended to move the Markazi-owned Restrained Bonds sub-custodized at Citibank from an account in an intermediary bank doing business in New York (Clearstream) to an intermediary bank located outside New York (UBAE).

143. By means of that ruse, the Conspirators hoped to place the Restrained Bonds beyond the reach of creditors of Iran in the United States and to hinder, delay and defraud creditors of Iran by concealing its interest in those securities.

144.  The Banking Conspirators (*i.e.*, UBAE and Clearstream) agreed to participate in that conspiracy because they earned substantial immediate and prospective fees for performing banking services as the agents for Iran and Markazi.  Markazi serves as a substantial client of both institutions, and UBAE – a small bank with a limited client base – viewed Markazi as a rich potential source of revenue because Markazi handles vast sums for foreign investment and other purposes.

**2.    The Conspirators Implement Their Scheme to Fraudulently Convey the Restrained Bonds and Impede Collection Efforts by the Creditors of Iran and Its Agencies and Instrumentalities**

145.  The Conspirators attempted to implement their scheme to immunize the assets of Iran and its agencies and instrumentalities from collection by U.S.-based creditors by having Markazi fraudulently convey the assets held in its name at Clearstream to the new UBAE/Markazi Account at Clearstream.

146.  On January 17, 2008, just one day after the introduction of H.R. 4986 in the House, Markazi contacted UBAE and instructed the bank to open a custodial account to hold the bonds then held in Markazi's Clearstream account.

147.  Consistent with the Conspirators' agreement, UBAE sent an electronic message to Clearstream marked "URGENT" one day later that instructed Clearstream to open a new customer account for UBAE (*i.e.*, a custodial account for the benefit of UBAE's customer, Markazi).

148.  Clearstream immediately opened the new customer account, nominally for UBAE. The Conspirators all recognized, however, that the new UBAE/Markazi Account would house Markazi's assets.  For at least 25 years before January 18, 2008, UBAE had maintained only one proprietary account at Clearstream.

149. Pretending to be ignorant of Iran's interest in the bonds held in the account that Clearstream maintained on behalf of Markazi, Clearstream proceeded to induce U.S. financial institutions in New York, acting as Clearstream's agents, to provide financial services for the benefit of Iran in violation of U.S. law, including the Iranian Transaction Regulations.

150. In particular, Clearstream acted in furtherance of the Conspirators' unlawful scheme by executing one or more agreements in New York concerning Clearstream's custodial Omnibus Account at Citibank. In that agreement or agreements, Clearstream represented that the transaction instructions that it delivered to Citibank regarding the custodial Omnibus Account would not violate any applicable law.

151. Nevertheless, in furtherance of the Conspirators' scheme, Clearstream actively concealed the identity of Iran and Markazi as the beneficial owners of the Restrained Bonds custodized at Citibank in New York. By engaging in that misconduct, Clearstream induced Citibank to violate U.S. law by engaging in financial transactions for the benefit of Iran and Markazi.

152. After the Conspirators had made the preliminary arrangements necessary to facilitate their scheme, they began to make the fraudulent conveyances designed to remove Markazi's assets from the reach of Plaintiffs and other creditors of Iran and its agents and instrumentalities.

153. Specifically, in or about February 2008, Markazi – acting as Iran's agent – instructed Clearstream to transfer bonds in the nominal amount of approximately $4,627,000,000.00 (including the Restrained Bonds) from Markazi's Clearstream account to the UBAE/Markazi Account at Clearstream.

154.  Those transfers included transactions undertaken on February 7, 8, 22, 25 and 29 by which Clearstream – acting at Markazi's direction – transferred Markazi's interest in the 21 Restrained Bonds custodized in the United States with a nominal value of approximately $2,000,000,000 to the UBAE/Markazi Account.  All but one of those bonds were denominated in U.S. dollars, and all were sub-custodized at Citibank in New York.[4]

155.  No payment changed hands in connection with those transfers.

156.  Markazi, Clearstream and UBAE communicated among each other on or about March 3, 2008 to reconcile their respective books and records concerning these transfers.

157.  The Conspirators completed these fraudulent conveyances by employing the services of Citibank in New York.  UBAE and Clearstream delivered instructions to Citibank in New York regarding the bond transfers by mail, e-mail, fax, the SWIFT electronic banking system and other electronic communications.

158.  At all times, Markazi retained the beneficial ownership of the bonds transferred to the UBAE/Markazi Account.

159.  A March 3, 2008 email from Ali Massoumi at Markazi to ▇▇▇▇▇▇▇ at UBAE and Robert Tabet, Ammar Brahim and Nadine Saddi at Clearstream leaves no doubt that Clearstream knew that Markazi continued to own the securities transferred to the UBAE/Markazi Account. In that email, Markazi confirms that the new UBAE/Markazi Account is Markazi's account and that any bonds transferred into that account belong to Markazi.

---

[4] The Conspirators also arranged for the transfer between the same accounts of other bonds denominated in U.S dollars with a nominal value of approximately $2,624,000,000.  Those bonds were custodized at intermediary banks located outside the U.S.  Because these bonds were denominated in U.S. dollars, U.S. financial institutions or their affiliates would necessarily have provided custodial services for the benefit of Iran and acted either as paying agents, correspondent banks or custodial banks in violation of U.S. law.

160. An October 26, 2009 letter from UBAE to Clearstream also confirms Clearstream's knowledge of these facts. In that letter, UBAE confirmed that "Clearstream, as it was and it is obliged to under existing banking regulations, has always known the identity of the beneficial owner of the [Restrained Bonds]." (Emphasis in original).

161. Moreover, the place of custody of the Restrained Bonds did not change during the series of transfers. Hence, at all times, those bonds remained in Clearstream's Omnibus Account located at Citibank in New York.

162. As a result, making the U.S. dollar interest and principal payments related to the Restrained Bonds to Markazi necessarily required multiple American financial institutions, including Citibank, HSBC and JPMorgan Chase, to provide services for the benefit of Iran in violation of U.S. law.

163. These fraudulent conveyances served no legitimate financial or banking purpose. Rather, Iran and Markazi made the conveyances solely to disguise the true ownership of the Restrained Bonds in hopes of protecting those assets from Iran's creditors, including Plaintiffs.

164. Despite Clearstream's knowledge of these facts, it stated in testimony delivered to this Court on July 27, 2008 and in numerous briefs and other documents that it had no knowledge of the identity of the beneficial owner of the Restrained Bonds. Those repeated misrepresentations served to further the Conspirators' goal of hindering, delaying or defrauding Iran's creditors, including Plaintiffs.

165. Clearstream made those misrepresentations in furtherance of the Conspirators' plan and agreement and with the prior knowledge and consent of the other Conspirators. Clearstream's own writings confirm those facts. For example, Clearstream wrote to UBAE on June 27, 2008, confirming their plan to mislead this Court at the July 2008 hearing, stating:

> "Clearstream Banking SA has been ordered by US Judge Koeltl to testify in order to disclose the identity of account holders impacted by the restraining notice in order to determine which funds should be released. Clearstream position is that we have no written evidence that there is an Iranian beneficial ownership on the above mentioned assets in relation to your account 13061 [*i.e.*, the UBAE/Markazi account at Clearstream]

166. In part, the Conspirators hid Markazi's continued status as the owner of the Restrained Bonds to induce United States financial institutions to provide services for the benefit of Markazi, as agent for Iran, in violation of 31 C.F.R. Parts 204 and 410 and other applicable U.S. regulations. Because of the U.S. and international sanctions that Iran faces, Markazi could not have consummated its transactions in the Restrained Bonds had the conspirators disclosed Markazi's ownership of those bonds, in part because neither Clearstream, Citibank nor any of the other U.S. financial institutions providing services to Iran possessed an OFAC license to undertake those transactions.

167. In furtherance of the Conspirators' plan to insulate Markazi's assets from the reach of the creditors of Iran and its agencies and instrumentalities, the Conspirators arranged in or about June 2008 to transfer two U.S. dollar-denominated bonds with a face value of $250 million to two financial institutions affiliated with U.S. financial institutions by means of multiple transactions completed, in part, within the Clearstream clearing system for total consideration of $253,767,681.34.

168. Iran and Markazi implemented the fraudulent conveyance of the Restrained Bonds and the $250 million in U.S. dollar-denominated bonds that the Court released from Plaintiffs' restraints with actual intent to hinder, delay, or defraud Iran's creditors, including Plaintiffs.

169. By the time that Plaintiffs served their restraining notices and caused the Initial Execution to be served in June 2008, the UBAE/Markazi Account that the Conspirators agreed to

establish at Clearstream held roughly $1.75 billion of the Restrained Bonds that the Conspirators transferred into that account from Markazi's own Clearstream account in February 2008.

170. The proximity of the Conspirators' transfer of the Markazi assets to the passage of the 2008 amendments to the FSIA, the United Nations debate concerning the imposition of sanctions upon Iran, and the substantial publicity that accompanied those developments demonstrates that the Conspirators engaged in that conduct in furtherance of their scheme to conceal Markazi's ownership of the Restrained Bonds.

171. Iran and its alter ego, Markazi, transferred the Restrained Bonds with actual intent to hinder, delay, or defraud Iran's creditors, including Plaintiffs. Markazi made those conveyances as the agent and alter ego of Iran. Pursuant to the Conspirators' agreement, Clearstream and UBAE knowingly and actively assisted in making those conveyances by enlisting the services of Citibank and other banking institutions in New York.

172. By completing the fraudulent conveyances, the Conspirators violated New York Debtor and Creditor Law Sections 273-a and 276. Those violations of New York law require the piercing of any veil of separation between Markazi and Iran so that Plaintiffs can reach the Restrained Bonds to satisfy the Judgment.

173. As a result, the Court should set aside and annul the fraudulent conveyances of the Restrained Bonds from Markazi's account at Clearstream to the UBAE/Markazi Account under New York Debtor and Creditor Law Section 278. The Court can implement that remedy by directing Clearstream to make book entries in the respective accounts of Markazi and UBAE to annul the transfer.

**F.     The Restrained Bonds are Not Immune From Execution Under the FSIA**

174. Pursuant to 28 U.S.C. Section 1610(a)(7), the Restrained Bonds are not immune from attachment in aid of execution, or from execution upon the Judgment entered in favor of Plaintiffs, because the Judgment relates to claims against the Judgment Debtors for which they are not immune under 28 U.S.C. Section 1605(a)(7) and/or Section 1605A.

175. Pursuant to 28 U.S.C. Sections 1610(a)(1) and 1611(b), the Restrained Bonds are not immune from attachment in aid of execution, or from execution upon the Judgment because Iran has waived any immunity that might otherwise apply to Markazi and Iran's other agencies and instrumentalities, both explicitly or by implication, and because the immunity provided by the FSIA to legitimate central banks operating for their own account does not apply to Markazi.

176. Markazi does not hold the Restrained Bonds for its "own account," as the funds are not held for normal central banking functions. In fact, Markazi holds those assets for Iran's benefit.

177. Furthermore, contrary to representations that Markazi has made in this litigation, the Restrained Bonds were not utilized by Markazi exclusively for foreign currency reserve purposes.

178. To the contrary, no documents that Plaintiffs have obtained or that Defendants have cited suggest that the Restrained Bonds were maintained in a designated foreign exchange reserve account. Had Markazi utilized the Restrained Bonds solely for foreign currency reserve purposes, the account records would reflect that exclusive use.

179. In fact, Markazi does not segregate its foreign currency reserve funds from money that it: (a) maintains for the benefit of Iran and Iran's agencies and instrumentalities; (b) derives from its role as the commercial banker involved in Iran's sale of oil; or (c) utilizes to facilitate Iran's illicit efforts to develop WMDs and support international terrorism. Thus, Markazi cannot

demonstrate that any of the Restrained Bonds were utilized for a legitimate central banking purpose.

180. Markazi's inability to pledge any of the assets held in its Clearstream account confirms that it did not hold the Restrained Bonds "for its own account." On multiple occasions, Markazi explicitly informed Clearstream that Markazi could not pledge any of its assets, even to secure a credit line for Markazi's purchase of securities.

181. The immunity from execution provided to lawfully operated central banks by 28 U.S.C. Section 1611(b) also offers no protection for Markazi's funds because Markazi operates as a rogue financial institution, rather than a legitimate central bank.

182. As the U.S. Department of Treasury has recognized, Markazi continually: (a) engages in illicit and deceptive practices to evade U.S. and international sanctions, to finance terrorism and to acquire and spread WMD technology; and (b) encourages Iranian state-owned banks to engage in those illicit practices.

183. Indeed, on November 21, 2011, the U.S. Departments of State and Treasury announced the U.S. government had designated Iran a jurisdiction of "primary money laundering concern" under Section 311 of the USA Patriot Act.[5]  The State and Treasury Departments also announced that, for the first time, they had imposed the restrictions permitted by Section 311 upon a sovereign's supposed central bank, *i.e.,* Markazi.  The State and Treasury Departments took that extraordinary action as a result of Markazi's long history of engaging in illegal and deceptive actions to evade U.S. sanctions and to assist Iran's illicit conduct.  Plaintiffs have attached a copy of the U.S. Department of Treasury's findings ("Findings") supporting that designation as Exhibit F and incorporate the Findings herein by reference.

---

[5] http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews_wsj

184. On the same day that the U.S. government designated Iran and Markazi as money launderers, the British government also announced that British financial institutions would cut all financial ties with Iran's banks, including Markazi. The British government's announcement highlighted that its measures represented the "first time the British government has cut an entire country's banking sector off from the UK's financial sector."[6]

185. Canada adopted similar measures sanctioning Iran and Markazi on the same day that the United States and Great Britain implemented their sanctions.[7]

186. The U.S. Department of Treasury's November 18, 2011 Notice of Proposed Rulemaking regarding the designation of Iran a "jurisdiction of primary money laundering concern" highlights the scope of Iran's illicit conduct and the sharp distinctions between Markazi's actions and those of legitimate central banks. The Department of Treasury Notice states:

> Prior regulations that have applied Section 311 special measures to jurisdictions of primary money laundering concern have not included the jurisdiction's central bank within the scope of the regulation. However, in the case of the Islamic Republic of Iran, this inclusion is justified due to the deceptive practices [that Markazi] engages in and encourages among Iranian state-owned banks. This behavior is discussed in the notice of finding that the Islamic Republic of Iran is a jurisdiction of primary money laundering concern published elsewhere today in the Federal Register [*i.e.*, the Findings annexed hereto as Exhibit F.]

187. Similarly, the Department of Treasury's Findings highlight that Markazi's conduct bears no resemblance to the manner in which legitimate central banks conduct their operations. The Findings state:

---

[6] http://www.telegraph.co.uk/news/worldnews/middleeast/iran/8904713/Britain-to-cut-financial-ties-with-Iran-banks-George-Osborne-announces.html
[7] http://www.washingtonpost.com/world/middle-east/canada-joins-us-britain-to-impose-more-sanctions-on-iran-over-nuclear-program/2011/11/21/gIQAOvDfiN_story.html

As a result of the strengthened U.S. sanctions and similar measures taken by the United Nations and other members of the global community, Iran now faces significant barriers to conducting international transactions.   In response, Iran has used deceptive financial practices to disguise both the nature of transactions and its involvement in them in an effort to circumvent sanctions. This conduct puts any financial institution involved with Iranian entities at risk of unwittingly facilitating transactions related to terrorism, proliferation, or the evasion of U.S. and multilateral sanctions. Iranian financial institutions, including [Markazi], and other state-controlled entities, willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies around the world.[8]

188.   In announcing the adoption of the sanctions, Treasury Secretary Timothy Geithner also highlighted that Markazi's actions sharply contrast with the conduct of legitimate central banks.  Geithner emphasized that the adoption of the sanctions meant that, "[f]or the first time, we are identifying the entire Iranian banking sector – including [Markazi] – as a threat to governments or financial institutions that do business with Iranian banks."[9]

189.   Geithner also properly declared that *any* financial transaction involving Markazi presented grave risk of promoting Iran's illicit conduct.  He stated, "If you are a financial institution and you engage in any transaction involving [Markazi] or any other Iranian bank operating inside or outside Iran, you are at risk of supporting Iran's illicit activities:  its pursuit of nuclear weapons, its support for terrorism, and its efforts to deceive responsible financial institutions and evade sanctions."

190.   Likewise, Geithner accurately emphasized that "[a]ny and every financial transaction with Iran poses grave risk of supporting" the same illicit activities and that "[f]inancial institutions around the world should think hard about the risks of doing business with Iran."

---

[8] http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews_wsj
[9] http://www.treasury.gov/press-center/press-releases/Pages/tg1368.aspx

191.  In addition to the illicit activity highlighted by the Department of Treasury, Markazi's rogue conduct includes: (a) acting as the principal financier of the Iranian oil supply chain, which is controlled by and funds the efforts of Iran's Islamic Revolutionary Guard Corps (IRGC) – a sponsor of global terrorism designated by the U.S. Department of Treasury on August 15, 2007 for its role in supporting terrorism and the acquisition and proliferation of WMD[10]; (b) acting as a financial facilitator for at least 22 state-owned Iranian financial institutions that help to fund the terrorist activities of the IRGC; and (c) providing financing to Khatam al-Anbiya ("KAA"), a massive IRGC-controlled conglomerate, which has been sanctioned by the United Nations, the U.S. government and the European Union ("EU") for its role in supporting Iran's WMD proliferation activities.[11]  Indeed, the U.N., the U.S. government, the EU, Canada, Japan and South Korea have designated KAA as a terrorist entity for its role in running Iran's nuclear and ballistic missile programs.[12]

192.  Because Markazi launders the funds that underwrite Iran's sponsorship of terrorism and efforts to acquire WMDs, Markazi plays perhaps the most essential role in those illegal activities.

193.  The extensive efforts that Markazi undertook to hide its ownership of the Restrained Bonds and Iran's control over those assets also disqualify it from the benefits of any protections offered to normal central banks under 28 U.S.C. Section 1611(b).  A legitimate central bank would not engage in that type of willful deception, by which Markazi intended to

---

[10] http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html On August 15, 2007, the U.S. Department of Treasury named the IRGC as a Specially Designated National ("SDN") for the IRGC's role in supporting global terrorism and proliferation of weapons of mass destruction. http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html

[11] http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews_wsj

[12] U.S. Treasury, Executive Order 13382, October 25, 2007; UNSC Resolution 1929, June 9, 2010; EU Commission Regulation No. 532/2010.

defraud Plaintiffs and to obscure Iran's investment of funds utilized to sponsor terrorism and Iran's WMD acquisition program.

194. Similarly, conspiring with Clearstream and UBAE to hide Iran's interest in the Restrained Bonds in order to hinder the ability of Iran's creditors to collect their judgments and to circumvent the sanctions imposed against Iran by the United States and other governments demonstrates that Markazi does not qualify as a central bank entitled to the protections of 28 U.S.C. Section 1611(b).

195. The long history of efforts by Iran and Markazi to disguise their illicit activities as legitimate financial transactions further supports the conclusion that neither Iran nor Markazi can claim any entitlement to immunity from execution under the FSIA. Iran and Markazi engage in that deception to circumvent U.S. and international sanctions designed to curtail Iran's sponsorship of global terrorism and WMD acquisition and proliferation.

196. The ongoing participation of Iran and Markazi in those deceptive transactions confirms that: (a) Markazi continues to engage in widespread commercial activity in the United States despite our government's extensive efforts to sanction and discipline Markazi; and (b) Markazi is not a legitimate central bank. That conduct also confirms Secretary Geithner's statement that any transaction involving Iran or Markazi is, by definition, suspect.

197. In recent years, Iran's commercial activity in the United States has produced a number of enforcement actions against the banking institutions that facilitated Iran's activities. For example, in May 2004, the Federal Reserve fined UBS, Switzerland's largest bank, $100 million for sending U.S. dollars to Iran and other sanctioned nations and intentionally hiding the transactions by submitting false monthly reports to the Federal Reserve.

198.  Likewise, in December 2005, U.S. state and federal regulators fined the Dutch bank ABN Amro Bank NV $80 million for actions that included its Dubai branch's modification of payment instructions on wire transfers, letters of credit, and checks issued by Iran's Bank Melli and a Libyan bank in order to hide their involvement in the transactions and enable them to access the U.S. banking system.

199.  Iran has also used deceptive practices to hide the role played in financial transactions by the Islamic Republic of Iran Shipping Lines (IRISL), which was designated as a terrorist entity in September 2008 for its involvement in supporting Iran's missile programs.

200.  To evade those sanctions, IRISL has created an extensive network of front companies and corporate shells and changed the names of its ships.  As an August 29, 2011 *Wall Street Journal* article reported:[13]

> IRISL responded by camouflaging much of its fleet, reflagging and renaming scores of its blacklisted ships.  It parceled out some to newly minted affiliates and created shell companies abroad to serve as nominal owners.  Behind the scenes, IRISL retained control.
>
> The ships themselves remain easy to identify via their unique and permanent hull numbers, or IMO numbers, which the International Maritime Organization issues to all cargo vessels over 300 gross tonnage.  Treasury posts blacklisted or "blocked" IMO numbers on its website.  Treasury's blacklists are the basis for identifying the ships described in this article—all designated by Treasury for their links to IRISL.  But these numbers don't always appear on cargo-shipping documentation, as the Washington-based Wisconsin Project's Iran Watch noted in a report last year.  This can make it difficult for people to understand whom they're doing business with.
>
> This has sparked a game of whack-a-hull.  Treasury over the past year alone has added to its blacklist more than 100 additional IRISL-affiliated individuals, companies and ships, in places ranging from Germany to Malta, the United Arab Emirates, Singapore and Hong Kong.

---

[13] http://online.wsj.com/article/SB10001424053111904875404576529860210045514.html

201. The transfer of the Restrained Bonds into the United States, and any attempted transfer of the Restrained Bonds out of the United States is prohibited, and/or regulated pursuant to 50 U.S.C. Sections 1701-1702 or proclamations, orders, regulations, or licenses issued pursuant thereto, including 73 F.R. 66541, 31 C.F.R. §560.516, and 31 C.F.R. §§ 560.204 and 560.206.

202. By reason of the foregoing, the Restrained Bonds are subject to execution or attachment in aid of execution in order to satisfy the Judgment pursuant to 28 U.S.C. §1610 (f)(1)(A) and Section 201 of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, Title II, §201(a), 116 Stat. 2337 (2002) ("TRIA").

203. Given the deceptive practices employed by Iran, Markazi and their co-conspirator banks to invest the Restrained Bonds in the United States and to structure subsequent transfers in a manner designed to shield the Restrained Bonds from Plaintiffs' collection efforts, Markazi's use of the funds exhibits none of the characteristics of legitimate central banking activity.

## FIRST COUNT
### (Declaratory Judgment Against Markazi)

204. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein at length.

205. Markazi is an agency or instrumentality of Iran, which controls Markazi to such an extent that it has no independence or free will and is, instead, the alter ego of Iran.

206. Markazi has also engaged in fraudulent conveyances in violation of New York Debtor and Creditor Law Sections 273-a and 276, thereby requiring that any veil of separation between Markazi and the Iran be pierced.

207.  Markazi claims that it is legally a separate entity from Iran and that it is a foreign central bank entitled to the benefit of 28 U.S.C. Section 1611(b)(1).  Therefore, an actual controversy exists between Plaintiffs and Markarzi.

208.  Crediting Markazi's claim that it maintains a separate existence from Iran would work a profound fraud and injustice, violate public policy and defeat an important legislative purpose because it would prevent Plaintiffs from enforcing the Judgment and furthering the important U.S. policies expressed in the FSIA's provisions regarding state-sponsored terrorism.  Accordingly, recognizing Markazi's separate existence would: (a) prevent Plaintiffs from receiving the damages awarded them as compensation for Iran's terrorist acts; and (b) thwart Congress's purpose in enacting Section 1605(a)(7) of the FSIA, which Congress adopted to compensate American victims of terrorism and to deter future terrorist attacks against American citizens.

209.  By reason of the foregoing, any presumption of separation between Markazi and Iran is rebutted.  Thus, Plaintiffs are entitled to a judgment pursuant to 28 U.S.C. Section 2201 declaring that: (a) Markazi is the agent and/or alter ego of Iran;(b) the Restrained Bonds are beneficially owned by Iran, and are subject to execution for enforcement of Plaintiffs' Judgment; and (c) the Restrained Bonds are not covered by 28 U.S.C. Section 1611(b)(1).

### SECOND COUNT
**(Against Iran, Markazi and Clearstream for Rescission of Fraudulent Conveyances in Violation of New York Debtor and Creditor Law Section 276(a))**

210.  Plaintiffs' repeat and reallege each of the foregoing paragraphs as if fully set forth herein at length.

211.  Defendants Iran, Markazi, Clearstream and UBAE (*i.e.,* the Conspirators) intentionally engaged in a conspiracy to make fraudulent conveyances designed to avoid Iran's

debt to Plaintiffs and other creditors and to evade the U.S. Iranian Transactions Regulations and other laws.

212. Plaintiffs suffered damages as a proximate result of the Conspirators' conspiracy and agreement.

213. In furtherance of that conspiracy and agreement, the Conspirators committed numerous overt acts, including: (a) the transfers and conveyances in February and March 2008 of the 21 Restrained Bonds identified above from Markazi's account at Clearstream to the UBAE/Markazi Account at Clearstream; (b) the subsequent transfer and conveyance of the two bonds valued at $250,000,000.00 described above from the UBAE/Markazi Account to UBAE's proprietary account at Clearstream; and (c) the subsequent transfer and conveyance of the two bonds valued at $250,000,000.00 from UBAE's proprietary account to third parties.

214. The foregoing transfers and payment of proceeds were made at the direction of Iran and with the active assistance of UBAE and Clearstream as intermediaries.  Those transactions required the services of banks located in New York that acted as the Conspirators' agents, including Clearstream, Citibank, HSBC and JP Morgan Chase Bank.  Citibank, HSBC and JPMorgan Chase Bank received their instructions from UBAE and Clearstream in New York by mail, e-mail, fax, the SWIFT electronic banking system or other electronic communications.

215. The foregoing transfers were made by Iran, through its agent, and/or alter ego, Markazi, in a deliberate attempt to stave off creditors by putting property in such a form and place that the creditors could not reach it.  Markazi made the fraudulent conveyances that Plaintiffs describe as the agent and/or alter ego of Iran and with the actual intent to hinder, delay, or defraud creditors, including Plaintiffs.

216. Markazi made those fraudulent conveyances with the knowing and active assistance of Clearstream and UBAE, which acted in New York through their agents, Clearstream and Citibank.

217. The fraudulent conveyances from Markazi's account at Clearstream to the UBAE/Markazi Account that UBAE opened at Clearstream for Markazi's benefit did not affect the place of custody of the assets in Clearstream's account at Citibank in New York and did not serve any type of financial, banking or other rational purpose other than to cloak the property with UBAE's name. By performing those transactions, the Conspirators intended to impede the ability of Iran's judgment creditors to satisfy their judgments against Iran.

218. All of those above-referenced conveyances involved the Judgment Debtors' assets and were made without fair consideration.

219. At the time of the conveyances, the Judgment Debtors were indebted to Plaintiffs by virtue of the Judgment.

220. The Judgment is a final judgment rendered against the Judgment Debtors that remains unsatisfied.

221. The Conspirators knew that the Judgment Debtors were indebted to Plaintiffs and other U.S. creditors prior to the fraudulent conveyances.

222. Iran is the beneficial owner of the Restrained Bonds notwithstanding any of the transfers and conveyances described above.

223. Markazi's transfers of its property to the UBAE/Markazi Account constitute fraudulent transfers and conveyances that should be voided pursuant to NY Debtor & Creditor Law § 270 *et seq.*, and are recoverable with interest and attorneys' fees.

224. Iran, Markazi, Clearstream and UBAE caused the transfer of the 21 Restrained Bonds identified above with the actual intent to hinder, delay, or defraud Plaintiffs and other creditors of Iran.

225. The fraudulent conveyances of the 21 Restrained Bonds from Markazi's account at Clearstream to the UBAE/Markazi Account should be set aside and annulled under New York Debtor and Creditor Law Section 278.

226. By reason of the foregoing, Plaintiffs are entitled to an Order from the Court: (a) setting aside the conveyances by Markazi to UBAE; and/or (b) directing Clearstream and Citibank to disregard the conveyances and to make book entries required to restore the Restrained Bonds to the account of Markazi that is custodized at Clearstream and sub-custodized at Citibank in New York. That relief will permit Plaintiffs to levy upon Markazi's assets to satisfy their Judgment.

227. Plaintiffs respectfully request that the Court enter a judgment: (a) rescinding all conveyances of the 21 Restrained Bonds from Markazi's account at Clearstream to the UBAE/Markazi Account; and (b)(i) disregarding the fraudulent conveyances and directing Citibank to transfer all of the Restrained Bonds directly to Plaintiffs or (b)(ii) directing Clearstream and Citibank to disregard the conveyances and to make book entries required to restore the Restrained Bonds to the account of Markazi that is custodized at Clearstream and sub-custodized at Citibank in New York, so that it can be levied upon to satisfy Plaintiffs' Judgment.

228. By reason of the foregoing, Plaintiffs are entitled to an award of reasonable attorneys' fees under New York Debtor and Creditor Law Section 276(a).

### THIRD COUNT
**(Against Iran, Markazi and Clearstream for Rescission of Fraudulent Conveyances in Violation of New York Debtor and Creditor Law Section 273-a)**

229. Plaintiffs repeat and reallege each of the foregoing allegations as if set forth in full herein.

230. At the time of the fraudulent conveyances that Plaintiffs describe above, the Judgment Debtors were indebted to Plaintiffs by virtue of the Judgment.

231. The Judgment is a final judgment rendered against the Judgment Debtors.

232. The Judgment Debtors have failed to satisfy the Judgment.

233. The transfers and conveyances of the Restrained Bonds by Iran through its agents were made without fair consideration.

234. At the time of these conveyances, the Judgment Debtors were defendants in the action in which Plaintiffs obtained their Judgment.

235. Iran is the beneficial owner of the Restrained Bonds notwithstanding any of the transfers and conveyances described above.

236. By reason of the foregoing, New York Debtor and Creditor Law Section 273-a dictates that Markazi's conveyances of the Restrained Bonds were fraudulent as to Plaintiffs without regard to the actual intent of Markazi or the Judgment Debtors.

237. By reason of the foregoing, Plaintiffs are entitled to an Order from the Court: (a) setting aside the conveyances of the Restrained Bonds by Markazi to UBAE; and/or (b) an Order directing Clearstream and Citibank (i) to disregard those conveyances and (ii) to make book entries required to restore the Restrained Bonds to the account of Markazi that is custodized at Clearstream and sub-custodized at Citibank in New York, so that Plaintiffs can levy upon them to satisfy Plaintiffs' Judgment.

### FOURTH COUNT
**(Against All Defendants for Turnover Pursuant to CPLR § 5225)**

181752                                48

238.  Plaintiffs repeat and reallege each of the preceding paragraphs as if fully set forth in full herein.

239.  Iran has an interest in the Restrained Bonds held by Defendants Citibank and Clearstream.

240.  Section 5225(b) of the CPLR states:

> **(b)  Property not in the possession of judgment debtor.**  Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.

241.  Plaintiffs' rights in the Restrained Bonds are superior to the rights of Citibank, Clearstream, and UBAE, all of whom are mere stakeholders.

242.  Pursuant to Fed. R. Civ. P. 69(a) and CPLR Section 5225, Plaintiffs hereby request that this Court enforce Plaintiffs' Judgment against Iran by an order: (a) conveying, assigning and directing the payment to Plaintiffs of all rights, title and interest of Iran in the Restrained Bonds as well as any proceeds from the Restrained Bonds; and/or (b) directing the transfer of Iran's rights, title and interest in the Restrained Bonds to a receiver appointed for the benefit of Plaintiffs with the power to collect interest, principal and other proceeds from the Restrained Bonds as they become due under the terms of the underlying securities.

## FIFTH COUNT
### (Against All Defendants for Turnover Pursuant to CPLR § 5227)

243.  Plaintiffs repeat and reallege each of the preceding paragraphs as if set forth in full herein.

244.  By agreement and/or operation of law, Citibank, as sub-custodian of the Restrained Bonds, is obligated to Clearstream, which as custodian of the Restrained Bonds is in turn obligated to Markazi, the agent and alter ego of Iran, for payments of principal and interest made by the issuers of the Restrained Bonds and for payments made in connection with the Restrained Bonds.

245.  The Restrained Bonds include bonds and/or notes that call for the issuers' payment of interest and principal in the United States to those owning an interest in the Restrained Bonds in U.S. dollars on various fixed dates.  In addition, any cash held in the Citibank suspense account that currently holds the cash proceeds collected from the bonds that comprised the Restrained Bonds is payable in U.S. dollars in New York.

246.  By reason of the foregoing, pursuant to CPLR Section 5227, Plaintiffs are entitled to a judgment: (a) requiring Citibank to pay to Plaintiffs the debt that Citibank owes to Clearstream with respect to the Restrained Bonds, and requiring Clearstream to pay to Plaintiffs the debt that Clearstream in turn owes Markazi with respect to the Restrained Bonds, upon maturity, or so much of those debts as is sufficient to satisfy the Judgment, and to execute and deliver any documents necessary to effect such payment; or (b) requiring Citibank and Clearstream to pay to Plaintiffs the sum of the total indebtedness that they owe to Markazi as agent for Iran, *i.e.,* the value of the Restrained Bonds.

### SIXTH COUNT
### (Against All Defendants for Equitable Relief Pursuant to Fed. R. Civ. P. 69(a) and Federal and State Common Law)

247.  Plaintiffs repeat and reallege each of the preceding paragraphs as if fully set forth herein.

248.  The Initial Execution and Execution served on Citibank and Clearstream for enforcement of the Judgment have been returned unsatisfied.  Therefore, Plaintiffs have exhausted their legal remedies.

249.  Pursuant to Fed. R. Civ. P. 69(a), federal and New York state common law, and the inherent equitable power of the Court, Plaintiffs are entitled as an alternative remedy – a Creditor's Bill to reach the equitable interest of the Judgment Debtors in the Restrained Bonds.

250.  Assuming, *arguendo*, that enforcement of the Judgment against the Restrained Bonds is unavailable through remedies at law, the Court should exercise its equitable powers in connection with a Creditor's Bill and otherwise.

251.  Plaintiffs are entitled to a declaration by the Court that the Judgment Debtors have an ownership interest in the Restrained Bonds, including all cash proceeds from any payments of interest and principal on the bonds, that may be reached by the Plaintiffs to enforce the Judgment under the present circumstances.

252.  An objective weighing of the equities underlying the terrorism exception to the FSIA and TRIA, on the one hand, and Article 8 of the U.C.C., on the other, compels the conclusion that the Court should use its equitable powers to allow Plaintiffs to reach the Restrained Bonds to enforce the Judgment.

253.  Exercising the Court's discretion to apply the narrow exception to Article 8 of the U.C.C. is reasonable and equitable here because, among other factors: (a) the Restrained Bonds, which are held in New York by Citibank, were readily traced by Clearstream, as evidenced by the testimony and documents put into evidence by Clearstream at the June 27, 2008 hearing; (b) Iran, a judgment debtor, intentionally disguised and/or secreted its identity as beneficial owner of the Restrained Bonds to hinder, delay or defraud creditors; (c) Clearstream and UBAE

knew, or should have known, that Markazi, as agent of Judgment Debtors, was the beneficial owner of the Restrained Bonds; (d) the Judgment Debtors have intentionally deceived purchasers of the Restrained Bonds to evade U.S. and international sanctions imposed because of Iran's long history of human rights violations, state sponsorship of terrorism against U.S. nationals, and aggressive and illicit efforts to develop WMDs; (e) applying that exception will serve the important policy interests codified in the FSIA, which promotes compensation of the victims of terrorism and the punishment of rogue terrorist nations, while doing no damage to the policies of fostering finality and speed in securities transactions underlying U.C.C. Article 8.

254. Moreover, applying a narrow exception in these circumstances is consistent with U.C.C. 8-112(e), which provides that "[a] creditor whose debtor is the owner of a . . . security entitlement is entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the security entitlement <u>or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process."</u> [Emphasis added].

255. Pursuant to the Court's equitable powers embodied in a Creditor's Bill and otherwise, the Plaintiffs are further entitled to an order directing Clearstream and Citibank to cause the turnover to the Plaintiffs of the Restrained Bonds as partial satisfaction of the Judgment.

**SEVENTH COUNT**
**(Against Clearstream and UBAE for Tortious Interference with**
**Collection of Money Judgment)**

256. Plaintiffs repeat and reallege each of the preceding paragraphs as if set forth in full herein.

257. At all relevant times, Clearstream and UBAE knew or should have known that: (a) Markazi, as alter ego of Iran, was the beneficial owner of the Restrained Bonds and that Iran

was a judgment debtor that owed a substantial money judgment to Plaintiffs; and (b) maintaining the custody of the Restrained Bonds and processing payments due on the Restrained Bonds would require the services of U.S. financial institutions or their subsidiaries, including, but not limited to, Citibank.

258.  Clearstream and UBAE were required by applicable United States law to inform Citibank, a U.S. financial institution, that assets in Citibank's custody were held for the benefit of Markazi, which used Clearstream and UBAE as intermediaries.

259.  In furtherance of the Conspirators' unlawful scheme, Markazi, Clearstream and UBAE intentionally concealed Markazi's status as the beneficial owner of the Restrained Bonds in Citibank's custody in New York.  Markazi, Clearstream and UBAE engaged in that deception to induce Citibank to continue to provide services in connection with the Restrained Bonds owned by Markazi and to assist Iran to hinder, delay or defraud its creditors.

260.  Because of that deception, Citibank remained unaware that it was providing services in New York for the benefit of Iran and Markazi in violation of applicable law, and provided services in or around February and March 2008, that effected the transfer of: (a) the Restrained Bonds to the UBAE/Markazi Account at Clearstream; and (b) Markazi's interests in two bonds with a nominal value of $250,000,000.00 from Clearstream's omnibus account at Citibank in New York to the account of third party purchasers.

261.  The transfer instructions that Markazi, UBAE and Clearstream issued in connection with those transactions required Citibank, *inter alia*: (a) to transfer the $2 billion in Restrained Bonds between Markazi's Clearstream account and the new UBAE/Markazi Account at Clearstream; and (b) to transfer the $250 million in bonds from Clearstream's Omnibus Account in New York to third parties.

262. Markazi received the proceeds paid in exchange for the transfer of the $250 million in bonds after payment of proceeds was effected through correspondent banks located in New York.

263. Citibank was also induced by Markazi, Clearstream and UBAE to implement instructions originating from Markazi, as agent and alter ego of Iran, for collection and payment of interest and other proceeds received from issuers and paying agents in connection with the Restrained Bonds. Markazi beneficially owns the Restrained Bonds as alter ego of Iran, and Citibank holds custody of those bonds in New York. The payments received by Markazi in connection with its sale and ownership of the Restrained Bonds arose from transactions among multiple financial institutions located in New York, including fiscal agents, paying agents, correspondent banks and Citibank.

264. Had Citibank been informed by Markazi, Clearstream or UBAE that the bonds custodized in Clearstream's omnibus account were held for the benefit of Markazi, Citibank would have been bound by law to inform OFAC of that information and to refuse to effect the transfer of the Restrained Bonds. Had Markazi, Clearstream or UBAE informed Citibank of that information, the Restrained Bonds would have remained in Citibank's custody in New York and would be available for enforcement of the Judgment.

265. In furtherance of the Conspirators' scheme, Clearstream and UBAE actively participated in: (a) the transmission and implementation of the instructions that Markazi issued, as Iran's agent and alter ego, regarding the transfer of Markazi's interests in the two bonds valued at $250,000,000.00 that Markazi transferred to third parties; and (b) the collection and payment of interest and other proceeds received from the issuers and paying agents of the Restrained Bonds that Markazi beneficially owned.

266. Clearstream and UBAE directly benefitted from their participation in this unlawful conduct by charging and collecting fees and commissions from Markazi in exchange for services that Clearstream and UBAE provided for Markazi's benefit.

267. By engaging in the foregoing misconduct, Clearstream and UBAE acted knowingly to tortiously interfere with Plaintiffs' collection of the Judgment.

268. By reason of the foregoing, the Plaintiffs were damaged because the assets that Markazi maintained at Citibank in New York were depleted before OFAC disclosed their existence to Plaintiffs, thereby making assets unavailable to Plaintiffs for enforcement of the Judgment.

269. Accordingly, to the extent that the actions of Clearstream and UBAE transferred Markazi's assets out of the reach of Plaintiffs (which Plaintiffs deny), Plaintiffs are entitled to: (a) an accounting of the fees and other benefits that Clearstream and UBAE received by virtue of their active participation in the transfer of Iran's assets; (b) an award of damages in the amount of at least $2 billion; (c) punitive damages in an amount to be determined at trial; and (d) the payment of their attorneys' fees and expenses.

### EIGHTH COUNT
### (Against Clearstream and UBAE for Prima Facie Tort)

270. Plaintiffs repeat and reallege each of the foregoing paragraphs as if set forth in full herein.

271. Clearstream and UBAE intentionally inflicted harm on Plaintiffs by: (a) transferring the interests of Iran and Markazi in the two bonds with a nominal value of $250,000,000.00 from Clearstream's omnibus account at Citibank in New York to the account of third party purchasers; and (b) transferring the Restrained Bonds from Markazi's account at Clearstream to the new UBAE/Markazi Account at Clearstream.

272.  To the extent that the conduct of Clearstream and UBAE transferred the Restrained Bonds out of the reach of Plaintiffs (which Plaintiffs deny), Plaintiffs suffered damages of at least $2 billion, which is the value of the Restrained Bonds that otherwise would have been available to Plaintiffs to satisfy the Judgment.

273.  Defendants Clearstream and UBAE had no excuse or justification for causing the transfer of the Restrained Bonds to the UBAE/Markazi Account.

274.  By reason of the intentional misconduct in which Clearstream and UBAE engaged, Plaintiffs are entitled to: (a) an accounting of the fees and other benefits received by Clearstream and UBAE by virtue of their active participation in the transfer of the Iran's assets beyond Plaintiffs' reach; (b) an award of damages in the amount of at least $2 billion; (c) the payment of punitive damages in an amount to be determined at trial; and (d) the payment of Plaintiffs' expenses and attorneys' fees.

**WHEREFORE**, the Plaintiffs respectfully demand a judgment entered in their favor and against Defendants as follows:

A.  damages in an amount to be determined at trial;

B.  punitive damages in an amount to be determined at trial;

C.  the payment of Plaintiffs' attorneys' fees and expenses;

D.  interest at the legal rate;

E.  the equitable and declaratory relief that Plaintiffs request in each of the foregoing counts; and

F.  such other and further relief as the Court deems appropriate.

Dated: New York, New York,
December 7, 2010

181752                                                                                                56

SALON MARROW DYCKMAN NEWMAN & BROUDY LLP

By: _____

Liviu Vogel
292 Madison Avenue, 6th Floor
New York, NY 10017
Tel: (212) 661-7100


STONE BONNER & ROCCO LLP
James P. Bonner
Patrick L. Rocco
260 Madison Avenue, 17th Floor
New York, NY 10016
Tel: (212) 239-4340


*Attorneys for Plaintiffs/Judgment Creditors*

181752

57