## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON,
Personal Representative of the Estate of James
C. Knipple (Dec.) et al.,

Case No.: 10 CIV 4518 (BSJ) (CWG)

                            Plaintiffs,

**FILED UNDER SEAL CONTAINS
CONFIDENTIAL MATERIAL SUBJECT
TO PROTECTIVE ORDER**

            v.

ISLAMIC REPUBLIC OF IRAN, BANK
MARKAZI a/k/a CENTRAL BANK OF
IRAN, BANCA UBAE SpA, CITIBANK,
N.A., and CLEARSTREAM BANKING, S.A.,

                            Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................1

THE RELEVANT FACTS ..............................................................................................2

A.    Plaintiffs' Judgments Against Iran...............................................................2

B.    Markazi and Its Blocked Assets..................................................................3

C.    E.O. 13599 .................................................................................................4

Argument ........................................................................................................................6

I.     THE SUMMARY JUDGMENT STANDARD....................................................6

II.    PLAINTIFFS ARE ENTITLED TO THE TURNOVER OF THE BLOCKED
ASSETS MAINTAINED BY CITIBANK IN THE BLOCKED ACCOUNT...................7

    A.    TRIA's Requirement For Executing Upon Blocked Assets ....................7

    B.    Plaintiffs Have Obtained Judgments For Compensatory
         Damages Against A Terrorist Party Based Upon
         Claims Involving Acts of Terrorism .......................................................8

    C.    The Blocked Assets Are "The Blocked Assets Of" Iran Or "Any Agency
         Or Instrumentality Of" Iran ..................................................................10

         1.    The Blocked Assets Are "Blocked" Under TRIA ....................10

         2.    Markazi Is An Agency or Instrumentality Of Iran.....................11

         3.    The Blocked Assets Qualify As The
             "Blocked Assets Of" Markazi Under TRIA ..............................12

         4.    Even If New York Law Were Relevant To The Court's
             Determination, Those State Law Principles Would Provide For
             The Turnover Of The Blocked Assets ......................................21

         5.    *Calderon-Cardona* Does Not Support Rejecting Plaintiffs' Efforts
             To Execute Against The Blocked Assets...................................25

CONCLUSION.............................................................................................................30

i

# TABLE OF AUTHORITIES

*Cases*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................6

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002)......................................................................................12, 17

*Bennett v. Islamic Republic of Iran*,
618 F.3d 19 (D.C. Cir. 2010)...........................................................................16

*Board of Trustees of the Leland Stanford Junior University
v. Roche Molecular Systems, Inc.*,
131 S.Ct. 2188 (2011).................................................................................. 29-30

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988).............................................................................6

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.*,
___ F. Supp.2d ___, 2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011)........................... *passim*

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000).......................................................................................17

*Davis v. Michigan Dep't of Treasury*,
489 U.S. 803 (1989).......................................................................................26

*Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.*,
541 U.S. 246 (2004).......................................................................................12

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990).........................................................................................17

*F.D.I.C. v. Great Am. Ins. Co.*,
607 F.3d 288 (2d Cir. 2010)............................................................................6

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982).......................................................................................17

*Geier v. Am. Honda Motor Co., Inc.*,
529 U.S. 861 (2000).......................................................................................17

*Hausler v. JP Morgan Chase Bank, N.A.*,
740 F. Supp.2d 525 (S.D.N.Y. 2010)......................................................... *passim*

*Hausler v. JPMorgan Chase Bank, N.A.*,
   ___ F. Supp.2d ___, 2012 WL 601034 (S.D.N.Y. Feb. 22, 2012) ............................ *passim*

*Heiser v. Islamic Republic of Iran*,
   807 F. Supp.2d 9 (D.D.C. 2011) .................................................................................19

*Hill v. Republic of Iraq*,
   2003 WL 21057173 (D.D.C. Mar. 11, 2003)...............................................................18

*Jeffreys v. City of New York*,
   426 F.3d 549 (2d Cir. 2005)..........................................................................................6

*JW Oilfield Equip., LLC v. Commerzbank AG*,
   764 F.Supp.2d 587 (S.D.N.Y. 2011) ...........................................................................22

*Koehler v. Bank of Bermuda Ltd.*,
   883 N.Y.S.2d 763 (N.Y. 2009) ..........................................................................22, 23-24

*Kulak v. City of New York*,
   88 F.3d 63 (2d Cir. 1996)...............................................................................................6

*Levin v. Bank of New York*,
   2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) ........................................................ *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)........................................................................................................6

*McCarthy v. Wachovia Bank, N.A.*,
   759 F.Supp.2d 265 (E.D.N.Y. 2011) ...........................................................................22

*Ministry of Defense and Support for the Armed Forces of
the Islamic Republic of Iran v. Elahi*,
   556 U.S. 366 (2009)......................................................................................................16

*Mississippi Valley Barge Line Co. v. U.S.*,
   273 F. Supp. 1 (E.D. Mo. 1967), *aff'd*, 389 U.S. 579 (1968) ..........................................24

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947)......................................................................................................17

*Roberts v. Sea-Land Services, Inc.*,
   ___ S. Ct. ___, 2012 WL 912953 (Mar. 20, 2012)................................................. 25-26

*S & S Mach. Co. v. Masinexportimport*,
   706 F.2d 411 (2d Cir. 1983)..........................................................................................11

*U.S. v. New York Tel. Co.*,
   434 U.S. 159 (1977)......................................................................................................24

*Weinstein v. Islamic Republic of Iran,*
   624 F. Supp.2d 272 (E.D.N.Y. 2009), *aff'd*, 609 F.3d 43 (2d Cir. 2010) ................. *passim*

*Weininger v. Castro,*
   462 F. Supp.2d 457 (S.D.N.Y. 2006) ........................................................................ *passim*

*Ying Fong v. Ashcroft,*
   317 F.Supp.2d 398 (S.D.N.Y. 2004) ................................................................................ 24


### Federal Statutes, Regulations, Rules, Executive Orders

8 U.S.C. § 1182(a)(3)(B)(iii) ............................................................................................. 9

28 U.S.C. § 1603 ............................................................................................................. 11

28 U.S.C. § 1605A ........................................................................................................ 2, 9

28 U.S.C. § 1605(a)(7) ............................................................................................. 2, 7, 8-9

28 U.S.C. § 1610 (Note) ........................................................................................... *passim*

50 U.S.C. § 1701 ........................................................................................................... 2, 4

50 U.S.C. § 1702 ............................................................................................................... 5

50 U.S.C. App. 5(b) ........................................................................................................ 10

15 U.S.C.A. § 6701 ........................................................................................................... 9

31 C.F.R. § 501.603(a)(2) ............................................................................................... 18

31 C.F.R. § 535.433 ........................................................................................................ 11

Fed. R. Civ. P. 56 .............................................................................................................. 6

Executive Order No. 13599 of Feb. 5, 2012, 77 Fed. Reg. 6659 (Feb. 8, 2012) ................. *passim*

### N.Y. State Statutes

C.P.L.R. § 5201 ........................................................................................................... 21-22

C.P.L.R. § 5225(b) .......................................................................................................... 21

U.C.C. Article 4-A ...................................................................................................... 18, 27

The Plaintiffs-Judgment Creditors listed on the attached Exhibit A ("Plaintiffs") submit this Memorandum of Law, the Declarations of Liviu Vogel ("Vogel Decl."), Curtis C. Mechling, David B. Misler, Suzelle M. Smith and Keith M. Fleischman, and their Local Rule 56.1 Statement in support of their motion for partial summary judgment against the following defendants (collectively, "Defendants"): the Islamic Republic of Iran ("Iran"); Bank Markazi ("Markazi"); Clearstream Banking S.A. ("Clearstream"); Citibank, N.A. ("Citibank"); and Banca UBAE SpA ("UBAE"). Plaintiffs seek an order requiring Defendants to turn over the roughly $1.75 billion in Markazi-owned funds (the "Blocked Assets") that are currently located in a "blocked," interest-bearing suspense account at Citibank (the "Blocked Account") and which are the subject of restraints (the "Restraints") imposed by service of restraining notices, writs of execution, this Court's June 27, 2008 order and subsequent orders extending the Restraints.[1]

## PRELIMINARY STATEMENT

The undisputed facts of record establish that, pursuant to the Terrorism Risk Insurance Act of 2002 ("TRIA")[2] and applicable New York law, Plaintiffs are entitled to summary judgment awarding them the immediate turnover of the Blocked Assets. Plaintiffs obtained federal court judgments for compensatory damages against Iran by reason of state-sponsored acts of terrorism. Those judgments greatly exceed the amount of the Blocked Assets. TRIA expressly makes Markazi's blocked assets available to Plaintiffs to satisfy their judgments because Markazi, as Iran's central bank, qualifies as an "agency or instrumentality" of the state.

---

[1] Plaintiffs anticipate that, well before they submit their reply brief in support of this motion, they will have reached an agreement governing the precise distribution of the Blocked Assets among all Plaintiffs. Plaintiffs therefore do not request, and the Court need not make, any determination regarding the priority of the various Plaintiffs' claims to the Blocked Assets. In the unlikely event that Plaintiffs fail to consummate that agreement, Plaintiffs will request that the Court order Defendants, pursuant to CPLR § 5228, to turn over the Blocked Assets to a third-party fiduciary with the limited power to hold the Plaintiffs' assets pending either: (a) a subsequent adjudication by the Court regarding the distribution of that property among Plaintiffs; or (b) Plaintiffs' notification to the Court of an agreement regarding the distribution of that property.

[2] TRIA was adopted as Pub. L. No. 107-297, 116 Stat. 2322 (2002) and is codified at 28 U.S.C. § 1610 (Note).

Markazi has repeatedly admitted that it owns the Blocked Assets. On February 5, 2012, by Executive Order 13599 ("E.O. 13599"), President Obama declared "[a]ll property and interests in property of" Iran or Markazi held in the United States or by a "United States person" "blocked" pursuant to the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701. The property blocked by means of E.O. 13599 includes the Blocked Assets. Under TRIA, all such blocked property is available to satisfy Plaintiffs' judgments against Iran.

Accordingly, Plaintiffs respectfully ask this Court to effectuate TRIA's mandate and to order the turnover of the Blocked Assets to Plaintiffs.

THE RELEVANT FACTS

A small number of indisputable facts demonstrate Plaintiffs' entitlement to the turnover of the Blocked Assets.

**A.     Plaintiffs' Judgments Against Iran**

All of the Plaintiffs have secured federal court judgments against Iran pursuant to 28 U.S.C. §§ 1605(a)(7) (since repealed) and 1605A. *See* Plaintiffs' Local Rule 56.1 Statement of Undisputed Facts ("SUF") at ¶¶ 35, 41, 52, 55, 60. Those judgments all relate to terrorist attacks orchestrated by Iran and are based upon specific findings that Iran committed terrorist acts. *Id.* at ¶¶ 30, 33, 41, 45-46, 55, 58.

In total, Plaintiffs have secured over $3.33 billion in unpaid compensatory damages judgments against Iran and its Ministry of Information and Security (collectively, the "Judgment Debtors"), an amount that vastly exceeds the total of the Blocked Assets. *Id.* at ¶¶ 35, 43, 51, 55, 60.[3] Despite Plaintiffs' extensive collection efforts, the overwhelming majority of the Plaintiffs

---

[3] Some Plaintiffs also obtained judgments against the Iranian Islamic Revolutionary Guard Corps.

have not secured any payment from the Judgment Debtors. *Id.* at ¶ 35.

**B.     Markazi and Its Blocked Assets[4]**

Markazi, the central bank of Iran, was formed under Iranian law in 1960.  Markazi is

100% owned by, and serves as an instrumentality of, the Government of Iran.  *Id.* at ¶¶ 14-15;

*see also, e.g.,* Bank Markazi's First Memorandum of Law In Support of Its Motion to Dismiss

the Amended Complaint for Lack of Subject Matter Jurisdiction, dated May 11, 2011

("Markazi's First MOL") (Vogel Decl., Ex. I) at p. 29 ("[I]t is undisputed that Bank Markazi is

the Central Bank of Iran and, as such, is a sovereign instrumentality . . . .  Under the FSIA, Bank

Markazi plainly qualifies as an instrumentality of [Iran].").

Markazi has repeatedly admitted that the Blocked Assets are Markazi's own property.  In

Markazi's First MOL, Markazi admitted its *full ownership*, not just "beneficial" ownership, of

the Blocked Assets in no fewer than six different passages.  SUF at ¶ 12; Markazi's First MOL

(Vogel Decl., Ex. I) at pp. 1, 5, 9, 10, 36 ("Over $1.75 billion in securities belonging to Bank

Markazi . . . are frozen in a custodial omnibus account at [Citibank].");  ("The Restrained

Securities are the property of Bank Markazi, the Central Bank of Iran.");  ("The aggregate value

of the remaining bond instruments – *i.e.*, the Restrained Securities that are the property of Bank

Markazi and the subject of this Turnover Action – is thus $1.753 billion.");  ("The Restrained

Securities are the property of a Foreign Central Bank . . . .");  ("[T]he Restrained Securities are

presumed to be the property of Bank Markazi.");  ("[T]he Restrained Securities are prima facie

the property of a third party, Bank Markazi . . . .").

---

[4] To avoid unnecessary repetition of facts already before the Court, Plaintiffs incorporate by reference the
discussion of the history and nature of the Restrained Assets set forth in their submissions in opposition to
Clearstream's Renewed Motion to Vacate. *See* Plaintiffs' Memorandum of Law in Opposition to Clearstream's
Motion to Vacate Restraints ("Plaintiffs' Restraints Brief") at pp. 6-16.

Markazi now attempts to retreat from those unequivocal admissions in light of the

content of E.O. 13599.  Markazi's Memorandum of Law in Support of Its Motion to Dismiss the

Second Amended Complaint for Lack of Subject Matter Jurisdiction, dated March 15, 2012

("Markazi Second MOL") (Vogel Decl., Ex. Q).  The undisputed documentary evidence,

however, confirms that the Blocked Assets actually *belong to*, and have always been treated by

Clearstream and UBAE as the *property of* Markazi.  *See* SUF at ¶¶ 12-13.  Thus, as Plaintiffs

demonstrated in opposing Clearstream's motion to vacate the Restraints, the Blocked Assets

unquestionably belong to Markazi as a matter of law.  *See* Plaintiffs' Restraints Brief at 33-46.

Undoubtedly, absent the Restraints and E.O. 13599, Clearstream and UBAE would forward

those assets directly to Markazi.

## C.     E.O. 13599

E.O. 13599 recognizes and responds to the critical role that Markazi plays in Iran's

ongoing efforts to conceal and facilitate its evasion of international sanctions and other illegal

conduct.  *See* SUF at ¶ 18; Vogel Decl., Ex. N (E.O. 13599) (highlighting the "deceptive

practices of [Markazi] and other Iranian banks to conceal transactions of sanctioned parties, the

deficiencies in Iran's anti-money laundering regime and the weaknesses in its implementation,

and the continuing and unacceptable risk posed to the international financial system by Iran's

activities").  As a result, E.O. 13599 declares "[a]ll property and interests in property of" Iran or

Markazi held in the United States or by a "United States person" "blocked" pursuant to the

President's authority under IEEPA, 50 U.S.C. § 1701 *et seq.*  SUF at ¶ 16.[5]  Section 7 of E.O.

---

[5] In full, the text of E.O. 13599 that blocked Markazi's assets provides:

> (a)  All property and interests in property of the Government of Iran, including the
> Central Bank of Iran, that are in the United States, that hereafter come within the United
> States, or that are or hereafter come within the possession or control of any United States
> person, including any foreign branch, are blocked and may not be transferred, paid,
> exported, withdrawn, or otherwise dealt in.

13599 further provides that, "[f]or the purposes of this order: (a) the term 'person' means an individual or entity; . . . [and] (c) the term 'United States person' means any . . . entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), *or any person in the United States*." SUF at ¶ 20 (emphasis added).

IEEPA is one of the enabling statutes for E.O. 13599.  Section 1702(a)(1)(B) of IEEPA specifically provides that the President may:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national hereof has any interest *by any person*, or with respect to any property, *subject to the jurisdiction of the United States.*

50 U.S.C. § 1702(a)(1)(B) (emphases added).  Consistent with IEEPA, E.O. 13599 blocks *any property* within the possession or control of *any person subject to the jurisdiction of the United States* regardless of the property's location.  SUF at ¶ 21.

E.O. 13599 transformed the Markazi assets that the Court had previously restrained into "blocked" assets within the meaning of the TRIA.  *Id.* at ¶ 22.  Thus, no entity located in the United States or United States person can transfer, pay, export, withdraw, or otherwise deal in those blocked assets.  *Id.* at ¶ 23.  Citibank complied with its obligations under E.O. 13599 by reporting to the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") that it had placed the Blocked Assets in the interest-bearing Blocked Account.  *See id.* at ¶ 25.  Citibank, a United States person, maintains the Blocked Account in this District.  *Id.* at

---

(b)  All property and interests in property of any Iranian financial institution, including the Central Bank of Iran, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in.

SUF at ¶ 16, 19; Vogel Decl., Exs. N.

¶¶ 24, 27. These Blocked Assets are now subject to collection in partial satisfaction of Plaintiffs'

judgments and the Court should order their turnover.

## ARGUMENT

## POINT I

### THE SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  Although the moving party bears the initial burden of demonstrating the

absence of a genuine issue of material fact, once that showing is made the nonmoving party

"must come forward with specific evidence demonstrating the existence of a genuine dispute of

material fact." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).  Moreover,

while the court must credit the evidence of the nonmoving party and draw reasonable inferences

in its favor, "conclusory statements, conjecture, or speculation . . . will not defeat summary

judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

In other words, the nonmoving party cannot "simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  Rather, the non-movant must point to "specific facts showing that

there is a *genuine issue for trial*" (*id.* at 587 (citation omitted; emphasis in original)) and

"persuasive evidence that his claim is not 'implausible.'" *Brady v. Colchester*, 863 F.2d 205,

211 (2d Cir. 1988) (citing *Matsushita*, 475 U.S. at 587); *accord, e.g., Jeffreys v. City of New

York*, 426 F.3d 549, 554 (2d Cir. 2005) (the non-movant "must offer some hard evidence

showing that its version of the events is not wholly fanciful") (citation omitted).  Only a dispute

over a "material" fact, that is, one "that might affect the outcome of the suit under the governing

law," can "properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  The dispute must be "genuine," *i.e.*, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted).

## POINT II

### PLAINTIFFS ARE ENTITLED TO THE TURNOVER OF THE BLOCKED ASSETS MAINTAINED BY CITIBANK IN THE BLOCKED ACCOUNT

**A.    TRIA's Requirements for Executing Upon Blocked Assets**

Congress enacted TRIA in 2002 as a note to 28 U.S.C. § 1610 in order to facilitate the ability of the victims of terrorist attacks to collect upon their judgments.[6]  In relevant part, TRIA Section 201(a) provides:

> *Notwithstanding any other provision of law* . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28 United States Code, the blocked assets of that terrorist party (*including the blocked assets of any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (emphases added).

Thus, to execute upon the Blocked Assets, Plaintiffs must establish the following facts: (1) they have obtained judgments for compensatory damages; (2) against a "terrorist party"; (3) on a claim based upon an "act of terrorism, or for which a terrorist party is not immune under" 28 U.S.C. § 1605(a)(7); and (4) the Blocked Assets are "the blocked assets of" Iran or "the blocked assets of any agency or instrumentality of" Iran. *See* TRIA § 201(a); *see also Weinstein v. Islamic Republic of Iran*, 624 F.Supp.2d 272, 274 (E.D.N.Y. 2009), *aff'd*, 609 F.3d 43 (2d Cir. 2010); *Weininger v. Castro,* 462 F.Supp.2d 457, 479 (S.D.N.Y. 2006) (listing elements of a TRIA claim).  The record

---

[6]  The placement of the statute as a Note to Section 1610 has no impact on TRIA's enforceability or the statute's application as an independent basis for subject matter jurisdiction over post-judgment execution and attachment. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010).

defeats any suggestion that material issues of fact or law exist regarding any of those four requirements.[7]

**B.      Plaintiffs Have Obtained Judgments for Compensatory Damages Against a Terrorist Party Based Upon Claims Involving Acts of Terrorism**

Plaintiffs anticipate that Defendants will not contest Plaintiffs' ability to establish the first three of the four requirements that Plaintiffs must prove to execute upon the Blocked Assets. First, no doubt exists that all Plaintiffs have obtained judgments for compensatory damages against Iran. SUF at ¶¶ 33, 35, 41, 43, 50, 52, 55, 60; Vogel Decl., Ex. T.

Second, TRIA § 201(d)(4) defines a "terrorist party" as "a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979." The U.S. Department of State first designated Iran as a state sponsor of terrorism under that statute on January 19, 1984, and Iran has maintained its place on that list of terrorist states until the present. SUF at ¶ 63; *see also, e.g., Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48 (2d Cir. 2010) (holding that Iran is a "terrorist party" as defined under TRIA § 201(d)(4)); *Levin v. Bank of New York,* 2011 WL 812032, at *16 (S.D.N.Y. Mar. 4, 2011) ("Iran was designated as a state sponsor of terrorism under the Export Administration Act of 1979, and therefore is a terrorist party within the meaning of TRIA."). Hence, Iran indisputably qualifies as a "terrorist party" under TRIA.

Third, all of the Plaintiffs' judgments relate to claims based upon "act[s] of terrorism, or for which a terrorist party is not immune under" 28 U.S.C. § 1605(a)(7). *See* SUF at ¶¶ 30, 33, 41, 45-46, 55, 58. Indeed, the Peterson, Greenbaum, and Levin Plaintiffs secured judgments against Iran under 28 U.S.C. § 1605(a)(7), and the Acosta, Heiser and Valore Plaintiffs secured

---

[7] Although the Blocked Assets are currently blocked, the Court may award those funds to Plaintiffs without obtaining an OFAC license or other government permission to release those funds. *E.g., Weininger*, 462 F.Supp.2d at 499 ("'In the event the Court determines that the funds are subject to TRIA, the funds may be distributed without a license from the Office of Foreign Assets Control.'") (quoting Ltr. to Judge Victor Marrero from Beth Goldman, Assistant United States Attorney, dated Jan. 6, 2006).

their judgments pursuant to 28 U.S.C. § 1605A, the statutory successor to § 1605(a)(7).

Moreover, subsection 201(d)(1) of TRIA defines an "act of terrorism" as:

> (A) any act or event certified under section 102(1) [Pub.L. 107-297, Title I, § 102(1), Nov. 26, 2002, 116 Stat. 2323, which is set out in a note under 15 U.S.C.A. § 6701]; or

> (B) to the extent not covered by subparagraph (A), any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii))).

All Plaintiffs secured their judgments based upon claims that satisfy TRIA § 201(d)(1)'s

broad definition of an "act of terrorism." *See* SUF at ¶¶ 30, 33, 41, 45-46, 55, 58. Pursuant to 8

U.S.C. § 1182(a)(3)(B)(iii), the statute that TRIA § 201(d)(1)(B) specifically references, the term

"terrorist activity" "means any activity which is unlawful under the laws of the place where it is

committed (or which, if it had been committed in the United States, would be unlawful under the

laws of the United States or any State) and which involves," among other actions, "[t]he use of

any . . . explosive, firearm, or other weapon or dangerous device (other than for mere personal

monetary gain), with intent to endanger, directly or indirectly, the safety of one or more

individuals or to cause substantial damage to property."

Without doubt, all of the attacks that injured Plaintiffs fall squarely within that definition.

For example, the attack underlying the Peterson Plaintiffs' claims involved a massive explosive

that killed 241 people and injured many more. *See* SUF at ¶ 30, 33. All of the other Plaintiffs

were also injured in attacks involving the use of explosives, firearms or other dangerous

weapons. *See id.* at ¶¶ 41, 45-46, 55, 58. Accordingly, no material issue of fact remains for a

jury to resolve with respect to the first three of the four criteria that Plaintiffs must prove to

demonstrate their entitlement to the turnover of the Blocked Assets under TRIA.

**C.     The Blocked Assets Are "the Blocked Assets of"
       Iran or "Any Agency or Instrumentality of" Iran**

**1.     The Blocked Assets Are "Blocked" under TRIA**

To succeed in a turnover action against a terrorist state, TRIA plaintiffs must also prove

that the assets they seek to execute upon constitute the "blocked assets of that terrorist party

(*including the blocked assets of any agency or instrumentality of that terrorist party*)."  TRIA

§ 201(a) (emphasis added).  Section 201(d)(2)(A) of TRIA defines a "blocked asset" as "(A) any

asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act

(50 U.S.C. App. 5(b)) or under sections 202 and 203 of [IEEPA]."  By means of E.O. 13599,

President Obama declared "[a]ll property and interests in property of" Iran or Markazi held in the

United States or by a "United States person" "blocked" pursuant to the President's authority

under IEEPA.  SUF at ¶ 16.  Accordingly, the Restrained Assets meet TRIA's definition of

"blocked assets."

All of the Defendants acknowledge that the Blocked Assets qualify as "blocked" under

E.O. 13599.  In compliance with that Executive Order, Citibank advised this Court on February

14, 2012 "that the restrained funds at issue in this litigation have been designated as blocked

funds and are being held in a Citibank account established in accordance with OFAC

regulations."  SUF at ¶ 25-26.  In its February 17, 2012 letter to this Court, Clearstream stated,

"Citibank has blocked [the Blocked Assets] in accordance with the regulations of [OFAC]."

Markazi's recently filed brief in support of vacating the Restraints acknowledges that, "[b]ecause

Bank Markazi plainly has an 'interest in' the Restrained Bonds, those assets have been blocked

pursuant to" E.O. 13599.  *Id.* at  ¶ 28; Markazi Second MOL (Vogel Decl., Ex. Q) at 8.

Accordingly, no material issue of fact exists with respect to whether the Blocked Assets are

blocked.

**2.    Markazi Is an Agency or Instrumentality of Iran**

Moreover, no doubt exists that Markazi qualifies as an "agency or instrumentality" of

Iran.  Section 1603(b) of the FSIA provides:

> An "agency or instrumentality of a foreign state" means any entity –
> (1) which is a separate legal person, corporate or otherwise, and (2) which
> is an organ of a foreign state or political subdivision thereof, or a majority
> of whose shares or other ownership interest is owned by a foreign state or
> political subdivision thereof, and (3) which is neither a citizen of a State of
> the United States as defined in section 1332(c) and (e) of this title, nor
> created under the laws of any third country.

28 U.S.C. § 1603.  Markazi, Iran's 100% state-owned central bank, falls squarely within this

definition.  *See, e.g., S&S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983)

(ruling that state-owned central banks are covered under the statutory definition); *Weininger*, 462

F.Supp.2d at 498 ("The Second Circuit has stated that state-owned central banks indisputably are

included in the § 1603(b) definition of 'agency or instrumentality'") (citation omitted); 31 C.F.R.

§ 535.433 (the Iranian Assets Control Regulations state that Markazi "is an agency,

instrumentality and controlled entity of the Government of Iran for all purposes under this part");

E.O. 13599, § 7(d) ("the term 'Government of Iran' means the Government of Iran, any political

subdivision,  agency, or instrumentality thereof, including the Central Bank of Iran [*i.e.,*

Markazi]").

Because TRIA § 201(a) expressly permits the judgment creditors of terrorist states to

execute upon the blocked assets of that foreign government's agencies and instrumentalities,

Markazi's liability to Plaintiffs under TRIA extends to the full amount of Plaintiffs'

compensatory damages judgments against Iran.  *See, e.g., Weinstein*, 624 F.Supp.2d at 275-76

(agreeing with the conclusion of *Weininger*, 462 F.Supp.2d at 484-87, that "the plain language

and legislative history of TRIA § 201(a) demonstrate a clear expression to make agencies and

instrumentalities substantively liable for the debts of their related foreign governments").

11

3.    **The Blocked Assets Qualify as the**
      **"Blocked Assets of" Markazi under TRIA**

Thus, the lone remaining matter of law that the Court must resolve is whether the $1.75

billion in Blocked Assets (soon to be all cash) now sitting in the Blocked Account at Citibank in

this District qualify as "the blocked assets of" Markazi under TRIA. *See* TRIA § 201(a); SUF at

¶¶ 27, 29; Vogel Decl., Ex. R.  In light of Markazi's admission that it "*is the sole beneficial*

*owner of the Restrained Securities*" (SUF at ¶ 13), its several additional concessions to the same

effect (SUF at ¶ 12), and its extensive efforts to prevent Plaintiffs from executing upon the

Blocked Assets, Markazi's revisionist claim that the Blocked Assets do not qualify as "the

blocked assets of" Markazi fails.

Of course, the starting place for determining whether the Blocked Assets qualify as "the

blocked assets of" Markazi is TRIA's language itself. *See, e.g., Engine Mfrs. Ass'n v. South*

*Coast Air Quality Management Dist.*, 541 U.S. 246, 252 (2004) ("Statutory construction must

begin with the language employed by Congress and the assumption that the ordinary meaning of

that language accurately expresses the legislative purpose.") (citation omitted); *Weinstein*, 609

F.3d at 49 ("Although Bank Melli points out that Section 201(a) of the TRIA has been codified

as a note to Section 1610 rather than in the sections of the FSIA more directly addressed to

exceptions to jurisdictional immunity, the plain language of the statute cannot be overcome by its

placement in the statutory scheme.").  Moreover, "[a]ny inquiry into the meaning of a statute

generally 'ceases if the statutory language is unambiguous and the statutory scheme is coherent

and consistent.'" *Weinstein*, 609 F.3d at 49-50 (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S.

438, 450 (2002) (internal quotation marks omitted)).

Here, TRIA's plain language compels the conclusion that the $1.75 billion in Blocked

Assets constitute the "blocked assets of" their "sole beneficial owner," Markazi.  TRIA § 201(a);

12

*see* SUF at ¶ 12-13 (Markazi's admissions of ownership).  Again, TRIA expressly provides that, after a plaintiff secures a judgment against a terrorist party, the plaintiff may execute upon "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)."  TRIA § 201(a).

As multiple courts in this District have found, that language dictates that, once assets are blocked because a particular terrorist party holds a sufficient property interest in them to justify the blocking, TRIA empowers terror victims to execute upon those assets.  In other words, courts have consistently concluded that, where the assets of a terrorist party qualify for blocking, they *automatically* become available for execution by the judgment creditor victims of "that terrorist party."  *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F.Supp.2d 525, 533-34 (S.D.N.Y. 2010) ("As noted above, TRIA § 201(d)(2) defines 'blocked assets' to include all assets blocked under [OFAC's regulations regarding sanctions against Cuba], and without further direction from Congress excepting interests in property from the blocked assets subject to execution, the Court is not persuaded that the word 'of' equates to actual ownership or title and thus would operate to so limit the blocked assets subject to turnover proceedings.") ("*Hausler I*"); *Levin*, 2011 WL 812032, at *18 ("The nature and wording of TRIA and FSIA section 1610(f)(1)(A) indicate that Congress intended all blocked assets be available for attachment by victims of terror.  This Court concurs with the *Hausler [I]* Court that in drafting TRIA and 1610(f)(1)(A), Congress was aware of the types of assets that are blocked under the applicable regulations, and therefore understood that by wording the statutes so broadly, it was subjecting all such assets to execution.").

Here, like the OFAC regulations at issue in *Levin* and *Hausler I*, E.O. 13599 provides for the blocking of "[a]ll property and interests in property of" Iran and Markazi.  *See Levin*, 2011 WL 812032, at *17 ("Thus, pursuant to either the proliferation or terrorist sanctions scheme, any

interest in property, of any nature, whatsoever, direct or indirect, held by any of the Iranian

entities linked to the Phase One assets, is blocked.").  In light of E.O. 13599's very broad

definition of the scope of blocked assets, therefore, "TRIA and the applicable sanctions

regulations 'establish[] a comprehensive statutory scheme that eschews any need for

consideration of state definitions of property.'"  *Levin*, 2011 WL 812032, at *17 (quoting

*Hausler I*, 740 F.Supp.2d at 532).  Thus, because any reasonable reading of TRIA yields the

conclusion that "the blocked assets of any agency or instrumentality of [a particular] terrorist

party" include all blocked assets in which that agency or instrumentality is the "sole beneficial

owner," the Court need look no further than TRIA's words to conclude that Plaintiffs are entitled

to the turnover of the Blocked Assets.  *Hausler I,* 740 F.Supp.2d at 533 ("The Court thus finds

that TRIA's phrase 'blocked assets of that terrorist party' contemplates execution, subject to

appropriate turnover proceedings, against all assets blocked pursuant to the [OFAC regulations

regarding sanctions imposed upon Cuba], including those in which Cuba possesses an interest in,

rather than actual ownership or title to, a blocked asset.");  *Levin*, 2011 WL 812032, at *17 ("As

Judge Marrero observed in *Hausler [I]*, TRIA's definition of 'blocked assets' defines which

assets are subject to attachment by reference to the regulations pursuant to which the assets are

blocked, and it is this definition that dictates what interest in property subjects a judgment

debtor's property to attachment.").

    Even if TRIA's plain language were somehow insufficient to resolve this issue, the

statute's legislative history would compel the conclusion that Plaintiffs may execute upon the

Blocked Assets.  Courts have uniformly noted TRIA's broad remedial purpose and Congress'

patent intention to remove all obstacles to the ability of judgment debtors to collect against the

assets of terrorist parties.  *E.g.*, *Weinstein*, 609 F.3d at 50 (any ambiguity in TRIA's language

14

should be "resolved in plaintiff's favor by the legislative history," which emphasizes that the statute is intended to eliminate any obstacles to the ability of terror victims to collect the blocked assets of terrorist states and their agencies and instrumentalities and that TRIA "'establishes once and for all, that such judgments are to be enforced against any assets available in the U.S.'") (quoting 148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (statement of Sen. Harkin)); *Levin*, 2011 WL 812032, at *16 ("The language of TRIA is broad, subjecting *any asset* to execution that is seized or frozen pursuant to the applicable sanctions schemes.  The breadth of this language is unsurprising in light of TRIA's remedial purpose.") (emphasis in original); *Hausler I*, 740 F.Supp.2d at 531 (TRIA's "legislative history also evinces a broader Congressional purpose to 'deal *comprehensively* with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction'") (quoting H.R. Conf. Rep. No. 107-779 at 27) (emphasis in original).

To deny Plaintiffs the ability to execute against blocked assets that Markazi has unequivocally identified as its own would make a mockery of Congress' intent in adopting TRIA.  The Blocked Assets are undeniably the "assets of" Markazi in any commonly understood meaning of that phrase.  If this lawsuit fails, those assets will remain blocked precisely because they belong to Markazi.  *See* SUF at ¶ 25-26 (highlighting Citibank's decision to block the Blocked Assets and to report them to OFAC as blocked); *id.* at ¶ 12-13 (noting the admissions in Markazi's First MOL and supporting affidavits that the Blocked Assets will remain blocked irrespective of the outcome of that motion); E.O. 13599 (Vogel Decl., Ex. N) (mandating the blocking of the Blocked Assets).  Moreover, if the President someday reverses E.O. 13599 and Plaintiffs do not succeed in obtaining the turnover of the Blocked Assets, Clearstream will return those assets to Markazi.

15

Accordingly, the metaphysical notion that the Blocked Assets are not the "blocked assets of" Markazi defies any legitimate interpretation of that phrase. Thus, Markazi cannot escape its statutory responsibility for paying Plaintiffs' judgments by advancing the specious assertion that funds that it has unequivocally identified as its own do not qualify as the bank's assets now that the time has arrived to compensate Plaintiffs for Iran's terrorist acts.

Reading TRIA in this straightforward fashion and with reference to the statute's legislative history and remedial purpose comports with the Supreme Court's reliance upon *Black's Law Dictionary* to assist in interpreting TRIA in *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009). *Id.* at 382 (citing *Black's* in interpreting the meaning of the term "at issue" in TRIA and concluding that "the language of the statute suggests that Congress meant the words 'at issue' to carry the ordinary meaning just described"). In addition, the *Elahi* Court bolstered its conclusions regarding the meaning of the phrase "property that is at issue" by emphasizing that the "statute's purpose leans in the direction of a broader interpretation of the words 'at issue' than that proposed by" the respondent. *Id.* at 383; *see also, e.g., Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010) (utilizing *Webster's Third New International Dictionary* to interpret the meaning of TRIA's language regarding property that "is being used exclusively for diplomatic and consular purposes") (citation omitted). *Elahi* and *Bennett* demonstrate that the Court should provide TRIA a straightforward, common sense meaning, rather than engage in a hypertechnical analysis that mistakenly assigns dispositive meaning to one preposition in the statute's text to the exclusion of Congress' overall purpose for enacting TRIA.

Substantial case law from this District also disposes of any argument by Defendants that, instead of TRIA's plain language, the Court should resort to New York's Uniform Commercial

Code ("UCC") to determine whether Markazi possesses a property right in the Blocked Assets

that suffices to justify execution.  As Plaintiffs demonstrate above, TRIA's language, particularly

when read in context with the statute's legislative history, evidences Congress' unmistakable

intent to enable the victims of state-sponsored terror to access all blocked assets to satisfy their

judgments.  Thus, TRIA's plain meaning forecloses any need to look elsewhere to determine the

statute's significance.  *E.g., Barnhart*, 534 U.S. at 450; *Weinstein*, 609 F.3d at 49-50.

Indeed, because TRIA itself defines the type of property that terror victims may execute

against, the statute preempts any state law principles that in any way conflict with TRIA's

comprehensive scheme for compensating terror victims.  In reaching that conclusion, the court in

*Hausler I*, 740 F.Supp.2d at 530, offered the following summary of the relevant principles

governing federal preemption of state law:

> It is a "fundamental principle of the Constitution ... that Congress has the power
> to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372,
> 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).  Preemption can be achieved by explicit
> statutory language evincing Congressional intent to preempt state law, *see English
> v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), or by
> implied preemption, where state law "stands as an obstacle to the accomplishment
> and execution of the full purposes and objectives of Congress."  *Crosby*, 530 U.S.
> at 372-73, 120 S.Ct. 2288.  Preemption may be inferred (1) because "[t]he scheme
> of federal regulation may be so pervasive as to make reasonable the inference that
> Congress left no room for the States to supplement it," (2) because "the Act of
> Congress may touch a field in which the federal interest is so dominant that the
> federal system will be assumed to preclude enforcement of state laws on the same
> subject," or (3) because "the object sought to be obtained by federal law and the
> character of obligations imposed by it may reveal the same purpose."  *Fidelity
> Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73
> L.Ed.2d 664 (1982) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230,
> 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).  The preemption doctrine applies with
> equal force to Congressional statutes and federal regulations promulgated by
> agencies.  *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 120 S.Ct. 1913,
> 146 L.Ed.2d 914 (2000); *Fidelity Fed. Sav. & Loan Ass'n*, 458 U.S. at 153, 102
> S.Ct. 3014.

Under these principles, TRIA's declaration that it applies "*[n]otwithstanding any*

*other provision of law*," together with the statute's unmistakable intention to make all

blocked assets available for execution by terror victims, preempts any contrary state law

principles regarding collecting, attaching and garnishing "blocked assets" that Defendants

may invoke in opposing this motion.  *See Weinstein*, 609 F.3d at 49 (the

"'[n]otwithstanding any other provision of law'" language of TRIA "mak[es] plain that

the force of the section extends everywhere" and, therefore, TRIA trumps any conflicting

provisions of a treaty between the United States and Iran); *Hausler I*, 740 F.Supp.2d at

535-543 (TRIA preempts the provisions of UCC Article 4-A); *Hausler v. JPMorgan*

*Chase Bank, N.A.*, ___ F.Supp.2d ___, 2012 WL 601034, at *5 (S.D.N.Y. Feb. 22, 2012)

("*Hausler II*") (reaffirming *Hausler I's* conclusion "that TRIA preempts state property

law and, therefore, that the Blocked Funds are available for attachment and execution

under the TRIA"); *Levin*, 2011 WL 812032, at *17 (TRIA preempts UCC Article 4A's

provisions regarding property interests in EFTs because "TRIA's definition of 'blocked

assets' defines which assets are subject to attachment by reference to the regulations

pursuant to which the assets are blocked, and it is this definition that dictates what

interest in property subjects a judgment debtor's property to attachment"); *Hill v.*

*Republic of Iraq*, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (the

"'notwithstanding any other provision of law'" language of TRIA's § 201 "means exactly

that; it is unambiguous and effectively supersedes all previous laws").[8]

---

[8]  By virtue of its "[n]otwithstanding" language, TRIA also trumps the earlier-adopted FSIA provisions set forth in 28 U.S.C. §§ 1610 (a) and (b).  In non-TRIA cases, those subsections prevent judgment creditors from executing against property of the foreign state or its agency or instrumentality that is located outside of the United States. Section 201 of TRIA includes no such geographical limitation.  *See Weinstein*, 609 F.3d at 48 (concluding that TRIA's use of the phrase "notwithstanding any other provision of law" demonstrates a clear intent to abrogate previously adopted conflicting law); *Weininger*, 462 F.Supp.2d at 488 (holding that the 'notwithstanding any other provision of law' language in TRIA operates as an exception to [FSIA] immunity from both jurisdiction and execution"); 31 C.F.R. § 501.603(a)(2) (recognizing that "[p]rimary responsibility for reporting blocked property, however, rests with the actual holder of the property, *or the person exercising control over property located outside the United State*s") (emphasis added).

The very recent decision in *Hausler II* highlights four convincing reasons why TRIA preempts state law regarding the collection of blocked assets. First the Court concluded that TRIA's plain language demonstrates Congress' intent to preempt state law. *Hausler II,* 2012 WL 601034, at *5 (read together, TRIA's language and the regulations adopted to define the scope of Cuban assets subject to blocking under OFAC's direction define the range of Cuban property interests subject to blocking and "TRIA expressly makes those blocked assets available for attachment and execution to satisfy certain judgments"); *accord, e.g., Hausler I,* 740 F.Supp.2d at 532 (in combination, TRIA's "'Notwithstanding Clause'" and the fact that TRIA directs that OFAC's regulations determine what assets are blocked demonstrate that TRIA "establishes a comprehensive statutory scheme that eschews any need for consideration of state definitions of property" and, therefore, preempt inconsistent state law provisions regarding the assets available for execution under TRIA).

Second, *Hausler II* found that TRIA's manifest statutory purpose of facilitating collections by the victims of terrorist attacks supports the conclusion that Congress intended the statute to provide the substantive collections rules applicable to blocked assets. *Hausler II,* 2012 WL 601034, at *5 ("Though Congress contemplated the use of state ***procedural*** law to enforce judgments, . . . TRIA represents Congress's recognition that federal law must provide the substantive rules governing the recovery of terrorism-related judgments.") (emphasis added); *accord, e.g., Hausler I,* 740 F.Supp.2d at 536 (highlighting the remedial purpose of TRIA and the "legislative history indicating that the statutory definition of 'blocked assets' was included to specifically address the frustrations of terrorism victims unable to enforce judgments against terrorist parties") (citing "148 Cong. Rec. S11528 (indicating that H.R. 3210, the version of TRIA passed in 2002, amended earlier versions of TRIA legislation to include a definition of

19

'blocked assets')" and "H.R. Conf. Rep. 107-779, at 27 ('In § 201(d), the Conferees . . . defined

the term blocked assets.'")); *Heiser v. Islamic Republic of Iran*, 807 F.Supp.2d 9, 25 (D.D.C.

2011) ("While it is true that DC law provides the process by which plaintiffs may enforce their

judgment, the substantive basis for their right to execution is not found in DC law, but in

§ 1610(g) of the FSIA – a federal statute.").

Third, the *Hausler II* court recognized that "the use of state property law to dictate the

range of assets that are executable under the TRIA would generate absurd results." *Hausler II*,

2012 WL 601034, at *6. In that regard, *Hausler II* emphasized that TRIA's words and

legislative history foreclose any reading of the statute that permits terrorist states to craftily

structure their transactions to derive the benefits of investing in the United States while

simultaneously frustrating the efforts of the victims of terrorism to execute upon those United

States-based assets. *Id.* ("Even worse, the availability of blocked assets for execution under the

TRIA could be manipulated by intermediary banks such as Respondents, who appear

unconstrained in determining where to locate the accounts created when they block an EFT

pursuant to the CACRs and, therefore, could prevent assets from turnover under the TRIA

simply by placing such accounts in states with favorable property law. Such results are

inconsistent with the creation of this otherwise wholly-federal scheme designed to advance a

foreign policy goal.").

Fourth, *Hausler II* highlighted another logical inconsistency that Defendants' arguments

present. Specifically, while Defendants do not deny that the Blocked Assets are properly

blocked, they assert that nobody can access those assets for any purpose. Thus, as the

respondents unsuccessfully argued in *Hausler II*, Defendants would have the Court rule that the

Blocked Assets should remain suspended indefinitely at Citibank until the United States sees fit

to return them to Iran.  *Id.* ("[T]he application of state property law here would lead to the Blocked Funds remaining as such until unforeseen future events might allow the return of the funds to Cuba, its agencies, instrumentalities or business creditors."); *accord, e.g., Hausler I,* 740 F.Supp.2d at 539 (allowing blocked funds to remain indefinitely in the hands of financial institutions while denying judgment creditors the ability to execute against those assets does not "square[] with the plain remedial purpose of TRIA, by which Congress explicitly promulgated a comprehensive scheme providing that any assets blocked under the CACRs or similar OFAC regulations are to be subject to judgment execution for the benefit of victims of terrorist states"). As *Hausler II* recognized, that "outcome cannot be mandated by the TRIA because it would frustrate its core objective, to satisfy judgments held by victims of . . . terrorism, and would stymie Congress's broader purpose in permitting suits against state sponsors of terrorism by diminishing the costs of doing business with known terrorist states or their agents and instrumentalities." *Hausler II,* 2012 WL 601034, at *6.

### 4.   Even If New York Property Law Were Relevant to the Court's Determination, Those State Law Principles Would Provide for the Turnover of the Blocked Assets

In any event, even were New York's substantive property and collection law relevant here, New York law would dictate that Plaintiffs can execute against the Blocked Assets, which will soon consist solely of cash housed in the Citibank Blocked Account in this District.  SUF at ¶ 29.  Plaintiffs explained in detail in their Restraints Brief why, even under New York law, Plaintiffs can execute against the cash in the Blocked Account.  *See* Plaintiffs' Restraints Br. at 32-47.  So as not to burden the Court with redundant briefing, Plaintiffs incorporate by reference that discussion from Plaintiffs' Restraints Brief and note that, in a TRIA action, CPLR §§ 5201 and 5225(b) provide for "'a person in possession or custody of money or other personal

21

property'" in which a judgment debtor *or* its agencies or instrumentalities "have an interest" to surrender those assets to the judgment creditor. *Weininger*, 462 F.Supp.2d at 499; *accord, e.g., Hausler I*, 740 F.Supp.2d at 540-41 (terrorism victims could execute upon mid-stream electronic funds transfers ("EFTs") blocked and segregated in a domestic bank pursuant to TRIA because those funds were subject to CPLR § 5201's provisions regarding "domestic bank accounts").

Furthermore, no reason exists for disregarding New York's well-established principles regarding the obligation of judgment debtors and garnishees to bring property located outside the state into this jurisdiction to facilitate collection. It is well established that, so long as a New York court maintains personal jurisdiction over a judgment debtor or garnishee, the court can order that entity to bring any of the judgment debtor's property within the state to facilitate collection. *Koehler v. Bank of Bermuda Ltd.*, 883 N.Y.S.2d 763, 769 (N.Y. 2009) ("In short, the principle that a New York court may issue a judgment ordering the turnover of out-of-state assets is not limited to judgment debtors, but applies equally to garnishees."); *McCarthy v. Wachovia Bank, N.A.*, 759 F.Supp.2d 265, 274-75 (E.D.N.Y. 2011) (describing *Koehler*'s holding); *JW Oilfield Equip., LLC v. Commerzbank AG*, 764 F.Supp.2d 587, 591-93 (S.D.N.Y. 2011) (reviewing *Koehler* and concluding that, where a court has personal jurisdiction over a German garnishee bank, the court may order the bank "to turn over funds up to the amount of the judgment, regardless of whether those accounts are held in Germany or New York").

"Pursuant to the FSIA, a court acquires personal jurisdiction over a foreign state or instrumentality of a foreign state where the court has subject matter jurisdiction pursuant to the FSIA and where service has been made on the foreign state or instrumentality as specified by FSIA § 1608." *Weininger*, 462 F.Supp.2d at 470. Here, subject matter jurisdiction clearly exists over Iran under the FSIA because "a foreign instrumentality's waiver of sovereign immunity

'continues through post-judgment discovery and collection of the money judgment,' and thus

'where subject matter jurisdiction under the FSIA exists to decide a case, jurisdiction continues

long enough to allow proceedings in aid of any money judgment that is rendered in the case.'"

*Id.* at 489 (quoting *First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 52, 53-54 (2d

Cir. 2002)).   Moreover, because TRIA makes Markazi's liability to Plaintiffs coextensive with

Iran's liability, once the Court obtained ancillary jurisdiction over Iran to enforce Plaintiffs'

judgments, the Court also obtained subject matter jurisdiction over Plaintiffs' claims against

Markazi.   *See Weinstein*, 609 F.3d at 50 ("[W]e find it clear beyond cavil that Section 201(a) of

the TRIA provides courts with subject matter jurisdiction over post-judgment execution and

attachment proceedings against property held in the hands of an instrumentality of the judgment-

debtor, even if the instrumentality is not itself named in the judgment."); *Weininger*, 462

F.Supp.2d at 490 (". . . TRIA expressly holds [agencies and instrumentalities] liable for the

judgment and renders them not immune from execution, and thus provides the independent basis

of subject matter jurisdiction in this enforcement proceeding against these entities.").

The Peterson Plaintiffs also long ago completed service upon Iran and Markazi pursuant

to 28 U.S.C. § 1608.   SUF at ¶ 37-38.   In addition, Citibank has completed service of the

interpleader petition that joined the other Plaintiffs in this action upon Markazi.   *Id.* at ¶ 64.

*Weininger* therefore dictates that the Court has personal and subject matter jurisdiction over

Markazi.   462 F.Supp.2d at 470.

Given that fact, Plaintiffs may invoke *Koehler's* principles regarding courts' powers to

require judgment debtors and garnishees to bring out-of-state assets within New York to

facilitate Plaintiffs' collection efforts against Markazi.   Accordingly, even if the Court

determines that Markazi's interests in the Blocked Assets are located outside New York, the

Court can order Markazi, which stands in Iran's shoes as a judgment debtor, to bring any

Blocked Assets located outside of New York within the jurisdiction and then fashion an

equitable remedy for any failure by Markazi to comply with that order.  *Koehler*, 883 N.Y.S.2d

at 769; *Miller v. Doniger*, 814 N.Y.S.2d 141, 141 (1st Dep't 2006) (affirming order requiring

judgment debtor to turn over specified out-of-state bank accounts to the New York sheriff).  That

equitable remedy could include requiring Citibank to turn over the Blocked Assets to Plaintiffs.

*See, e.g.*, *U.S. v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly

recognized the power of a federal court to issue such commands under the All Writs Act as may

be necessary or appropriate to effectuate and prevent the frustration of orders it has previously

issued in its exercise of jurisdiction otherwise obtained."); *Ying Fong v. Ashcroft*, 317 F.Supp.2d

398, 404 (S.D.N.Y. 2004) (quoting *Mississippi Valley Barge Line Co. v. U.S.*, 273 F. Supp. 1, 6

(E.D. Mo. 1967), *aff'd*, 389 U.S. 579 (1968) ("It is well settled that the courts of the United

States have inherent and statutory (28 U.S.C. § 1651) power and authority to enter such orders as

may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent

them from being thwarted and interfered with by force, guile, or otherwise."); Plaintiffs'

Restraints Brief at 75-76 (discussing creditor's bill under New York law).

Markazi also stands in a position closely analogous to the garnishee in *Koehler*.  Markazi

concedes that it holds a 100% beneficial interest in the Blocked Assets.  SUF at ¶ 12-13.  It

indisputably maintains the power to bring any of its out-of-state property within this jurisdiction.

In light of *Koehler* and the jurisdictional principles outlined in *Weininger*, therefore, Markazi's

supposed defense that its property interest in the Blocked Assets resides outside of New York

amounts to no defense at all.

24

Thus, as was true with respect to the garnishee in *Koehler*, the Court has ample power to order Markazi to bring within this jurisdiction any Blocked Assets located outside of the state to permit Plaintiffs to execute upon those assets. *See Koehler*, 883 N.Y.S.2d at 769. As a result, even were Markazi's property not located in New York – an absurd assumption given Citibank's possession of $1.75 billion in cash that Markazi has identified as its own – the purported situs of the property outside of New York would not affect the outcome of this motion.

5. ***Calderon-Cardona* Does Not Support Rejecting Plaintiffs' Efforts to Execute Against the Blocked Assets**

Defendants have previously cited the inapposite decision in *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011), as support for their contention that Plaintiffs may not collect the Blocked Assets because Markazi lacks the type of ownership interest in those funds required to permit execution under TRIA. In *Calderon-Cardona*, the court denied the petitioner's motion for turnover because the State Department had removed North Korea from the state sponsor of terrorism list and, therefore, North Korea did not qualify as a "terrorist party" under TRIA. *Calderon-Cardona*, 2011 WL 6155987, at *3-8. That decision alone sufficed to dispose of the petitioner's application, and distinguishes *Calderon-Cardona* from this case, which undeniably involves an existing state sponsor of terrorism. Notably, no New York case involving Iranian blocked assets has ever found those assets unreachable by plaintiffs pursuing TRIA remedies.

Although North Korea's removal from the list of state sponsors of terrorism list sufficed to dispose of *Calderon-Cardona*, the court nevertheless proceeded to find that TRIA did not preempt state property law. Disregarding TRIA's plain meaning, as interpreted by courts like *Hausler I, Levin* and *Hausler II*, the *Calderon-Cardona* court reasoned that the word "of" in the phrase "blocked assets of that terrorist party" demanded ownership, and that ownership could be

25

determined only by recourse to state property law.  To reach that conclusion, *Calderon-Cardona* parsed the phrase "blocked assets of that terrorist party" into two components – "blocked assets" and "of that terrorist party" (*id.* at *8) – although normal rules of statutory interpretation demand a more holistic approach to the statute and Congress' intent in adopting it.  *E.g.*, *Roberts v. Sea-Land Services, Inc.*, ___ S.Ct. ___, 2012 WL 912953, at * 6 (March 20, 2012) ("'It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'") (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

Building upon that flawed foundation, *Calderon-Cardona* concluded that the OFAC regulations regarding the sanctions imposed upon North Korea only assist in interpreting the phrase "blocked assets" and have no relevance in deciphering the phrase "of that terrorist party." 2011 WL 6155987, at *12.  The court then concluded that Congress' use of the word "of" demonstrated its intention that a terrorist party had to have actual ownership of the blocked assets under state law, rather than the type of property interest necessary to justify blocking under TRIA, before a terrorism judgment creditor could execute upon those blocked assets.  *Id.* at *8-9.  Thus, the court concluded that finding preemption based on the definition of "blocked assets" in OFAC's regulations "effectively reads the phrase 'of that terrorist party' out of the statute." *Id.* at *13.

For multiple reasons, *Calderon-Cardona* lacks any persuasive force here.  As an initial matter, the facts of *Calderon-Cardona* stand in stark contrast to those that this dispute presents. Most importantly, in *Calderon-Cardona*, North Korea did not make any admission remotely similar to Markazi's concession that it holds a 100% beneficial ownership interest in the Blocked

Assets.  SUF at ¶ 12-13.  That critical distinction alone renders *Calderon-Cardona* irrelevant to the issue before the Court.

Moreover, rather than cash sitting in a segregated Citibank bank account in this District, *Calderon-Cardona* involved questions concerning whether plaintiffs could execute upon EFTs as those funds briefly passed through domestic banking institutions.  *Id.* at *1-2.  The *Calderon-Cardona* court concluded, albeit incorrectly, that the question before it was controlled by UCC Article 4-A, which specifically addresses EFTs.  *Id.* at *9.  This case, of course, does not present any questions regarding EFTs.  Thus, even if state property law principles were somehow relevant, *Calderon-Cardona* would not apply here.  Rather, the New York collection principles discussed in Point II.C.4. would mandate the turnover of the Blocked Assets to Plaintiffs.

Moreover, *Calderon-Cardona* disregards the reasoning of cases such as *Hausler I, Levin* and *Hausler II*, which concluded that a more natural reading of TRIA § 201(a) takes note of the entire text of that provision, rather than focusing myopically on the word "of."  *See* Point II.C.3. As Plaintiffs demonstrate above, read in context, TRIA § 201(a) does not permit – much less require – an inference that Congress intended to differentiate between blocked assets in which a terrorist state held formal title and those in which it possessed a 100% beneficial interest that justified blocking, but did not quite amount to title under state property law principles.  *See id.*

In contrast, the Defendants would read *Calderon-Cardona* to suggest that it is entirely irrelevant to collectability under TRIA whether: (a) blocked assets in fact provide financial benefits to a terrorist state or its agency or instrumentality; or (b) that terrorist state or its agency or instrumentality has a 100% beneficial interest in the blocked assets.  Indeed, in Defendants' estimation, *Calderon-Cardona* would enable terrorist states to structure their transactions so that they remained immune from collection under TRIA – even as the terrorist states continued to

27

derive vast benefits from investing in the United States – so long as they placed a middleman (such as Clearstream) between themselves and the proceeds of their investments until those funds left the United States.

The recent decision in *Hausler II*, 2012 WL 601034, convincingly rejected *Calderon-Cardona's* single-minded focus on the word "of" in interpreting TRIA § 201(a). *Hausler II* concluded that *Calderon-Cardona* misinterpreted the phrase "blocked assets of that terrorist party" by assigning dispositive significance to the word "of" in that phrase to the exclusion of developing a rational interpretation of TRIA § 201(a)'s meaning as a whole. *Hausler II*, 2012 WL 601034, at *8-9. As *Hausler II* points out, a better reading of that phrase in context is that it exhibits Congress' intention that only the victims of the *particular terrorist state* whose assets have been blocked may collect against *those particular assets*. *Id.* at *9. In other words, the phrase "of that terrorist party" dictates that victims of *Syrian* terrorism cannot utilize TRIA to execute against assets blocked because *Iran* holds an interest in those assets. Thus, as *Hausler II* points out, *Calderon-Cardona* "overlooks a very basic aspect of the TRIA," *i.e.,* its broad applicability to the assets of multiple nations. *Id.* Once one considers that essential element of TRIA, the misguided nature of the *Calderon-Cardona* court's analysis of the significance of the word "of" is manifest.

*Calderon-Cardona's* interpretation of TRIA also ignores the text that directly follows the words *Calderon-Cardona* found dispositive. Specifically, TRIA § 201(a) provides that the "the blocked assets *of that terrorist party* [*i.e.,* the one against whom the plaintiff holds a judgment] (including the blocked assets of any agency or instrumentality *of that terrorist party*) shall be subject to execution . . ." (Emphases added). *Calderon-Cardona* concluded that the word "of" in the first emphasized prepositional phrase could only signify a Congressional requirement of

28

titled ownership of the relevant blocked assets.  That interpretation crumbles, however, when one

considers that the second highlighted prepositional phrase – which is worded *identically* to the

first – cannot possibly support *Calderon-Cardona's* construction of the first phrase.  That is, the

word "of" in the second phrase unquestionably does not indicate a Congressional intention to

require plaintiffs to demonstrate that the referenced agency or instrumentality is "owned" by the

terrorist party.  Accordingly, one need only look one line further in TRIA § 201(a) to find

persuasive proof that the word "of" displays far more flexibility than the rigid definition that

*Calderon-Cardona* assigned to that term.

     *Hausler II* also convincingly distinguished the primary authority upon which *Calderon-Cardona* relied for assigning such great significance to TRIA Section 201(a)'s use of the word

"of" in the phrase "blocked assets of that terrorist party," *Board of Trustees of the Leland*

*Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S.Ct. 2188 (2011).  In *Stanford*, the

Supreme Court concluded that the phrase "invention of the contractor" within a provision of a

patent statute that concerns inventions created in the course of federally-funded research referred

only to inventions owned by the contractor after assignment from the inventor, and not to all

inventions created by employees of the contractor in the course of a federally-funded project.  As

*Hausler II* noted, *Stanford's* "conclusion was based on several characteristics of the patent

statutes at issue there that are materially absent in the TRIA and related statutes."  *Hausler II*,

2012 WL 601034, at *9-10.

     In particular, *Hausler II* noted that the *Stanford* Court rejected the plaintiff's

interpretation of the phrase "invention of the contractor" primarily because that interpretation

would have rendered the prepositional phrase a nullity within the context of the relevant patent

statute.  *Id.* at *9.  In contrast, here the phrase "of that terrorist party" limits judgment creditors'

ability to execute upon blocked assets to only those funds blocked because of the interest held in those assets by the particular terrorist state found liable to the judgment creditor. *Id.* at *8-9.

*Hausler II* also noted that *Stanford* turned upon specific, well-established patent law principles related to the text of the relevant statute that lack any relevance to TRIA. *Id.* at *10. In contrast, *Hausler II* emphasized that the garnishees in that case actually urged the court to do precisely what Defendants suggest here, that is, to subordinate the plain meaning of TRIA to state law principles despite the greater relevance and more recent vintage of the federal statute governing the collection of judgments against terrorist states. *Id.* As *Hausler II* concluded, treating TRIA's language in that manner would both "misconstrue the purposes of the statute" and disregard "the Supreme Court's focus on the pertinent federal statutory context in *Stanford*." *Id.*

## CONCLUSION

For all of the reasons set forth above, the Court should grant Plaintiffs' motion for partial summary judgment in all respects.

Dated: April 2, 2012

Respectfully submitted,

Liviu Vogel
Salon Marrow Dyckman Newman & Broudy LLP
292 Madison Avenue
New York, NY  10017
(212) 661-7100

– and –

James P. Bonner
Patrick L. Rocco
Stone Bonner & Rocco LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 239-4340

*Attorneys for Peterson Plaintiffs*

30

Curtis C. Mechling
James L. Bernard
Judy P. Goodwin
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY  10038
(212) 806-5400

*Attorneys for Greenbaum and Acosta
Plaintiffs*


Richard Marc Kremen
DLA Piper US LLP (MD)
6225 Smith Avenue
Baltimore, MD 21209
(410) 580-3000

*Attorneys for Heiser Plaintiffs*


Suzelle M. Smith
Howarth and Smith (LA)
523 West Sixth Street,
Suite 728
Los Angeles, CA 90014
(213) 955-9400

*Attorneys for Levin Plaintiffs*


Keith Martin Fleischman
Fleischman Law Firm
565 Fifth Avenue, 7th Floor
New York, NY 10017
(212) 880-9571

*Attorneys for Valore Plaintiffs*

## Exhibit A

"**Peterson Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Deborah D. Peterson, et al. v. Islamic Republic of Iran, et al.,* Civil Action Nos. 01-2094 and 01-2684 (RCL), who seek to enforce their judgment in the amount of $2,656,944,877.00, arising from the deaths of 241 United States Marines, United States Navy medical personnel and soldiers assigned to the 24th Marine Amphibious Unit that resulted from the October 23, 1983 Iran-sponsored terrorist bombing of the United State Marine Barracks in Beirut, Lebanon.

"**Valore Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Valore et al. v. Islamic Republic of Iran, et al.,* Civil Action No. 03-1959 (RCL), who seek to enforce their judgment in the amount of $1,290,291,092.00, arising from the deaths of 241 United States Marines, United States Navy medical personnel and soldiers assigned to the 24th Marine Amphibious Unit that resulted from the October 23, 1983 Iran-sponsored terrorist bombing of the United State Marine Barracks in Beirut, Lebanon.

"**Acosta Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Acosta, et al. v. Islamic Republic of Iran, et al.,* Civil Action No. 06-745 (RCL), who seek to enforce their judgment in the amount of $350,172,000.00, arising from the deaths that resulted from the Iran-sponsored assassination of Rabbi Meier Kahane and the shooting of Irving Franklin and U.S. Postal Police Officer Carlos Acosta on November 5, 1990, in New York.

"**Greenbaum Plaintiffs**" refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Greenbaum et al. v. Islamic*

*Republic of Iran, et al.*, Civil Action No. 02-2148 (RCL), who seek to enforce their judgment in the amount of $19,879,023.00, arising from the death that resulted from the Iran-sponsored August 9, 2001 suicide bombing of a restaurant in downtown Jerusalem, Israel.

**"Heiser Plaintiffs"** refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Estate of Heiser v. Islamic Republic of Iran, et al.*, Civil Action Nos. 00-02329 and 01-02104 (RCL), who seek to enforce their judgment in the amount of $254,431,903.00, arising from the death of 17 United States Air Force officers killed in the Iran-sponsored June 25, 1996 terrorist bombing of the Khobar Towers in Saudi Arabia.

**"Levin Plaintiffs"** refer to the plaintiffs identified in the complaint filed in the United States District Court for the District of Columbia entitled *Levin v. Islamic Republic of Iran, et al.*, Civil Action No. 05-02494 (GK), who seek to enforce their judgment in the amount of $28,807,719.00, arising from the kidnapping of Jeremy Levin in Beruit on March 7, 1984.

2