UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEBORAH D. PETERSON
Personal Representative of the Estate
of James S. Knipple (Dec.) et al.,
                              *Plaintiffs*

                v.

ISLAMIC REPUBLIC OF IRAN, et
al.,
                              *Defendants*

Case No. 10 CIV 4518

---

## DECLARATION OF PROFESSOR ANDREAS F. LOWENFELD

1.  I have been asked by Messrs. Chaffetz Lindsey LLP to give my opinion on the effect,

if any, of the provision of the Foreign Sovereign Immunities Act of 1976 (FSIA) on Defendant

Bank Markazi Jomhouri Islamic Iran and assets beneficially owned by said Bank Markazi.[1]  In

particular, I have been asked to give my opinion (1) on the purpose and scope of 28 U.S.C.

§1611(b)(1), the provision of the FSIA granting special protection from attachment and

execution to funds of a foreign central bank; (2) on whether Defendant Bank Markazi qualifies

as a foreign central bank within the meaning of §1611(b)(1); and (3) on whether the property of

Bank Markazi sought by plaintiffs to be subjected to execution is "held for its own account" by

Bank Markazi within the meaning of §1611(b)(1). The issue arises, as I understand it, from the

effort by plaintiffs to subject instruments of value beneficially owned by Bank Markazi to

---

[1] I have not been asked for, or offered my opinion, on the effect, if any, of the sanctions in effect in the United States or elsewhere on Iran or Iranian entities.

jurisdiction of the U.S. District Court by virtue of a custody relationship with a United States institution based in New York (Citibank).[2]

2. For the reasons spelled out hereafter, and subject to facts of which I may not be aware, I conclude that (1) the object and uniform understanding of §1611(b)(1) of the FSIA is to shield property of foreign central banks held for their own account from almost all judicial process in the United States, with the express purpose of preserving the United States as a safe place for foreign monetary authorities to keep some or all of their foreign currency and gold reserves;§§§ (2) Bank Markazi meets all the criteria for a foreign central bank within the meaning of §1611(b)(1); (3) the instruments of value sought to be subjected to the court's jurisdiction in this proceeding are "held for its own account" by Bank Markazi and accordingly are immune from attachment in aid of execution or from execution in a United States court.

Qualifications

3. I am the Herbert and Rose Rubin Professor of International Law Emeritus at the New York University School of Law. I have been a Professor at the New York University School of Law since the fall of 1967. From 1981 until 1994 I held the Charles L. Denison Chair at New York University School of Law, and from 1994 to 2009 I held the Rubin Professorship of International Law. Prior to becoming a Professor of Law, I was engaged for four years in the

---

[2] See *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y. 3d 533, 883 N.Y.S.2d 763 (2009) (on certification from the U.S. Court of Appeals for the Second Circuit.), in which the New York (State) Court of Appeals held (by 4-3) that a court sitting in New York may order a bank subject to its personal jurisdiction to deliver to a judgment creditor in New York securities which it holds for the benefit of a judgment debtor outside of New York. Contra, *Aurelius Capital Partners, LP v. Republic of Argentina*, 2010 WL 768874 (S.D.N.Y. 2010), declining to exercise jurisdiction over assets held in custodial accounts in Argentina by a bank with headquarters in New York (Citibank), on the ground that such assets are not "property of a foreign state used for a commercial activity in the United States" for purposes of the Foreign Sovereign Immunities Act.

private practice of law in the City of New York, and served for more than five years in the Office of Legal Adviser in the United States Department of State, holding the position of Deputy Legal Adviser at the time I left government service.  I am a member of the bar of the State of New York and the United States Supreme Court, as well as of the U.S. District Courts for the Southern and Eastern Districts of New York and of the Court of Appeals for the Second Circuit. I am a graduate of the Harvard College (M.c.L.) and of the Harvard Law School (M.c.L.)

4.   My special fields are International Law, International Economic Transactions, Conflict of Laws, and International Litigation and Arbitration, and I have also taught Torts and Civil Procedure, as well as Aviation Law and Comparative Procedure.  I have twice been a Lecturer at The Hague Academy of International Law, and I have taught as a Visiting Professor in London, Paris, Dublin, Moscow, Warsaw and Sydney.  I am a member of the American Law Institute, the American Bar Association, the Association of the Bar of the City of New York, the American Society of International Law, and the London Court of International Arbitration.  I am also an elected member of the Institut de Droit International and of the Académie Internationale de Droit Comparé, and I have been a frequent participant in international conferences for legal scholars and practitioners.

5.   Since becoming a full-time member of the faculty of law of New York University, I have served as special consultant to several law firms both in the United States and abroad, and as expert witness before courts and arbitral tribunals in the United States and various foreign countries. I have served as arbitrator in numerous cases brought under the rules of the American Arbitration Association, the International Chamber of Commerce, the United Nations Economic Commission for Europe, the Arbitration Institute of the Stockholm Chamber of Commerce, the International Centre for Settlement of Investment Disputes, and ad hoc arbitrations, and I have

been a member of a Disputes Panel under the General Agreement on Tariffs and Trade.  I have also acted as counsel in several cases before the United States Supreme Court dealing with conflict of laws, arbitration, and international controversies, and I have represented the United States before the International Court of Justice and before the Iran-United States Claims Tribunal.

6.   I am the author of some twenty books dealing generally with the subject of international transactions -- public and private.  I have published more than 100 articles and reviews in the Harvard, Columbia, Chicago, and New York University Law Reviews, the American Journal of International Law, the American Journal of Comparative Law, the Journal of Maritime Law and Commerce, and comparable professional journals in the United States and Europe.  I am or have been a member of the Board of Editors of the Journal of Air Law and Commerce, the Journal of Maritime Law and Commerce, the American Journal of International Law, the American Journal of Comparative Law, and the Journal of International Economic Law.  I served for some eight years as Associate Reporter of the American Law Institute's Restatement (Third) of the Foreign Relations Law of the United States (1987), with principal responsibilities in that capacity for Part IV, Jurisdiction and Judgments, and Part VIII, International Economic Law. More recently, I served as Co-Reporter of the American Law Institute's project on Recognition and Enforcement of Foreign Judgments (2006). My most recent books are a case- and text-book, International Litigation and Arbitration (3d ed. West Publ. 2006), a group of essays on International Litigation and the Quest for Reasonableness (Oxford University Press 1996), another group of essays published under the title of Lowenfeld on International Arbitration (Jurisnet 2005) and a Treatise on International Economic Law (Oxford University Press (2d ed. 2008). In 2007 I was awarded the Manley O. Hudson Medal by

the American Society of International Law for a lifetime of scholarship and achievement in international law.

7.   Of particular relevance to the present dispute, I am the author of several articles discussing the situs of intangibles and the locus of bank deposits, as well as several articles and chapters in my books concerning aspects of the Foreign Sovereign Immunities Act. I was actively involved in the drafting of the FSIA, and among my responsibilities as Associate Reporter of the Restatement (Third)  Foreign Relations Law were the sections on sovereign immunity (§§ 451-460), including § 460 referenced  hereafter.

I have no acquaintance with the parties herein, and no interest in the litigation.  A copy of my curriculum vitae is attached as exhibit "A".

Discussion

8.  The basic scheme of the Foreign Sovereign Immunities Act of 1976 is well known to this court.  Any suit or other judicial proceeding against a foreign sovereign must be brought pursuant to the FSIA. See   *Argentine Republic v. Amerada Hess*, 488 U.S. 428 (1989), 28 U.S.C. §1602.  For this purpose, an instrumentality of a foreign sovereignty, such as a railroad, a wheat board, or a central bank, is equated to the state itself, §1603.   A state or a state instrumentality is in the first instance immune from jurisdiction, §1604, but this immunity is not available if one of the exceptions stated in §1605  applies, and jurisdiction may be exercised by the district court pursuant to §1330.

9.  The scheme for attachment and execution is essentially the same.  The property in the United States of foreign state is immune, §1609, except as provided in §1610, the general exceptions section parallel to §1605.  However, an additional section, §1611, provides special

protection – in fact almost absolute immunity -- from attachment and from execution for property of designated international organizations (subsection (a)) as well as for property of foreign central banks (subsection (b)). See Restatement (Third) of the Foreign Relations Law of the United States, § 460, comment c and Reporters' Note 1.

10.   The rationale for the special provision for property of foreign central banks was clear.  Most countries outside what was then the communist bloc maintained their reserves in U.S. dollars, and it was natural and common, though not required by the IMF, to keep the dollar reserves at the Federal Reserve Bank of New York.   Both the U.S. Government and the Congress wanted to preserve that course of conduct, by assuring foreign states and their central banks that enactment of the FSIA would not entail any risk to their reserves.[3]   On the other hand, the exception from attachment and execution should not be used to shield commercial assets or commercial transactions.  While it might not always be easy to determine the origin of purpose of funds held by a foreign central bank in New York, the key test provided in the statute was "Property... held for its own account," i.e., in the words of the House Report, "as distinguished from funds used solely to finance the commercial transactions of other entities or of foreign states."[4]   Another way to make the same point is to conclude that Congress regarded

---

[3] See *Immunities of Foreign States*, Hearing before Subcomm. on Claims and Governmental Relations of House Comm. On the Judiciary, 93d Cong. 1st Sess. On H.R. 3493 (June 7, 1973) p. 46:

> The purpose of the provision is to encourage the holding of dollars in the United States by foreign States, particularly in times when the United States has an adverse balance of payments.   If execution could be levied on such assets, deposits of foreign funds in the United States might be discouraged, thus adversely affecting our balance of payments.

[4] See *Foreign Sovereign Immunities Act of 1976*, House Rept. No. 94-1487, 94th Cong. 2d Sess. (Sept. 29, 1976) p. 31, reprinted in [1976] U.S. Code. Cong. & Ad. News 7036 at 7062.  The Report adds:

> Moreover, execution against the reserves of foreign states could cause significant foreign relations problems.

the principal function of central banks as *de iure imperii*, and hence not subject to legal process under the restrictive theory of sovereign immunity.[5]

     11. Section 1611(b)(1) of the Foreign Sovereign Immunities Act reads in its entirety as follows:

> § 1611.   Certain types of property immune from execution
>
> . . .
>
> (b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if –
>
>> (1)      the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver;...

Pursuant to §1611(b)(1), three conditions must be met in order for immunity to attach:

    (1) The entity must qualify as a central bank or a monetary authority;

    (2) the entity or its parent foreign government has not explicitly waived its immunity from attachment in aid of execution or from execution; and

    (3) the property sought to be attached is held for [the bank's] own account.[6]

---

[5] It should be noted that the U.S. law is consistent with international law and practice. The United Kingdom State Immunity Act, adopted two years after the US Act, 1978 Laws c. 33, provides, in S. 14(4) that

> Property of a State's central bank or other monetary authority shall not be regarded for the purposes of [the provision concerning process in respect of commercial property] as in use or intended for use for commercial purposes....

Belgium, the situs of Euroclear, a major international depositary and clearing house, adopted a law in July 2008 expressly confirming immunity of property of foreign central banks; and Article 21 (c) of the United Nations Convention on Jurisdictional Immunities of States and their Property, 2004, prepared by the International Law Commission (not yet in force) provides likewise.

Is Defendant a Foreign Central Bank?

12.   The question whether a given bank owned by a foreign sovereign meets the requirements of "foreign central bank" under U.S. law has been subject to more litigation than one might expect.[7]   One of the leading cases, in fact, involved Bank Markazi.   In *New England Merchants National Bank v. Iran Power Generation and Transmission Company*, 502 F. Supp. 120 at 125,  (S.D.N.Y. 1980), a proceeding bringing together 96 claims brought by American creditors following the Iranian Revolution, Bank Markazi asserted foreign central bank immunity pursuant to the FSIA.   Judge Duffy was not prepared to accept that assertion without proof, and held that the burden was on the defendant.   However, once the Bank supplied prima facie evidence by affidavit or otherwise of its status as a foreign central bank, the burden would shift to plaintiff to refute the assertion.

13.   I believe that Bank Markazi should have no difficulty in satisfying the criteria for a foreign central bank within the meaning of §1611.   Bank Markazi is listed in the Morgan Stanley Central Bank Directory as the central bank of Iran; its functions, as stated in its web page[8] include all the principal functions of a central bank.   I have read the declaration of Mr. Gholam Hossein Arabieh, Director of the Legal Studies and Research Department of the Bank, and on the basis of his affidavit, I conclude that Bank Markazi meets all the criteria of a foreign central bank within the meaning of §1611(b)(1) of the FSIA.   According to the Declaration,

---

[6] Accord, Ernest T. Patrikis, "Foreign Central Bank Property: Immunity from Attachment in the United States," 1982 U. Ill. L. Rev. 265 at 275.   Mr. Patrikis was formerly General Counsel of the Federal Reserve Bank of New York.

[7] See Paul L. Lee, "Central Banks and Sovereign Immunity," 41 Colum. J. Transnat'l L. 327, esp. 367-94 (2003).

[8] See http://www.cbi.ir/default_en.aspx.

(1)  the Bank is owned by the government of Iran but by law dating from 1960 and in practice both before and after the Iranian Revolution the Bank is an independent juridical entity;

(2)  it is responsible for setting economic and fiscal policy on behalf of the government;

(3)  it issues the currency and monitors the money supply in Iran;

(4)  it supervises Iran's banking system, through setting discount and interest rates, and prescribing capital and reserve requirements;

(5)  it represents Iran at the Bank for International Settlements (the central bankers' bank) and comparable regional institutions as well as at the International Monetary Fund;

(6)  most relevant to the purposes of §1611(b)(1) as described above, Bank Markazi maintains Iran's foreign exchange and gold reserves as well as the exchange rate for Iranian rials by investing foreign exchange proceeds of export transactions purchased from Iranian enterprises. While some national banks perform only some these functions and therefore doubt arises as to their status as central banks, Bank Markazi exercises all of the functions associated with central banks.[9]  **I am clear, accordingly, that Bank Markazi qualifies as a foreign central bank within the meaning of §1611(b)(1) of the Foreign Sovereign Immunities Act of 1976.**

Is the property sought to be attached held for Defendant's own account?

---

[9] See e.g. M.H. de Kock, Central Banking (1974); Hans Aufricht, *Comparative Survey of Central Banks Law* (1965); Rosa Maria Lastra, *Central Banking and Banking Regulations* (1996); Howard Davies and David Green, *Banking on the Future: The Fall and Rise of Central Banking* (2010). See also Patrikis, note 6 supra, at p. 274.

14.   The crucial issue, then, is whether the funds that might be brought under the jurisdiction of the district court but as to which Bank Markazi claims both ownership and immunity are held for its own account.   I have read the Declaration of Mr. Ali Asghar Massoumi, Assistant Director of the International Department of Bank Markazi and formerly Head of the Foreign Exchange Negotiable Securities Section of Bank Markazi, which supports in detail the conclusion that the instruments of value in question are held for Bank Markazi's own account.

15.   Mr. Massoumi describes the source of the securities over which plaintiffs ask the court to exercise jurisdiction as surplus foreign exchange reflecting the difference between the dollars that Bank Markazi has purchased for local currency (rials) from the government or the National Iranian Oil Co., i.e. proceeds from the sale of oil in the international market, and dollars that it has sold for rials in the Iranian interbank market (Masssoumi Declaration, paragraphs 10 and 11).  Bank Markazi, in turn invests this surplus foreign exchange in international as well as domestic markets.  The securities subject of the present motion constitute investments pursuant to this program, held in its own name and according to Bank Markazi, its own account.

16.  I have no independent knowledge of the operations of Bank Markazi in the foreign exchange market, but I have no reason to doubt the description in the declarations of Messrs. Massoumi and Arabieh.  Assuming then, that the declarations of Messrs. Massoumi and Arabieh are substantially accurate, the question is whether the securities at issue are held for Bank Markazi's own account.[10]   I believe, and the legislative history and commentary support my

---

[10] As I understand the issue, for purpose of consistency with §1611(b)(1) of the FSIA, whether the securities are held for the benefit of Bank Markazi by the Luxembourg clearing bank Clearstream, or by the Italian bank UBAE, is not significant.  The critical issue is only whether Bank Markazi is itself a custodian or agent, or whether, as it maintains, it has ownership.

opinion, that the decisive criterion is whether the funds in question are used or held in connection with central banking activities, such as those described in paragraph 13 supra. Whether the funds consist of cash, bonds, or other instruments of value, so long as they are used to manage the country's reserves or the exchange rate of its currency – traditional central bank functions – the assertion by the central bank that the funds are held "for the bank's own account" should be accepted. The fact that the central bank may also hold funds on deposit for the government or the national oil company, or that it may in some instances act as agent for the government, should not affect the conclusions that the funds in question in this case are immune from attachment or execution pursuant to §1611(b) (1). Accord: *EM LTD v. Republic of Argentina*, supra, 473 F.3d at 485.[11] On the basis of the information available to me, **I am clear that the property of Bank Markazi sought to be brought before the jurisdiction of this court is held "for its own account" within the meaning of the Foreign Sovereign Immunities Act of 1976.**

17. It is relevant to add that treating the investment securities of the central bank as held for its own account – and accordingly not for the account of the parent government -- is consistent with the statement of the U.S. Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611 (1983) that "governmental instrumentalities established as juridical entities distinct and independent from their sovereign should normally treated as such," id. at 626-27.[12]

---

[11] Accord Patrikis, note 6 supra, pp. 276-79. For variations of the construction of "property held for its own account," see Lee, note 7 supra, at 17-19. None of the variations would change the conclusion based on the facts set out in paragraphs 13 and 16 above.

[12] See also *Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984), cert. denied , 471 U.S. 1125 (1985), rejecting an effort to enforce a judgment against the Republic by execution against property of the separately incorporated national airline.

<u>Conclusion</u>

On the basis of the information available to me, I am clear that the property of Bank Markazi sought to be brought before the jurisdiction of this court is entitled to absolute immunity from attachment or execution.

Respectfully submitted,

Andreas F. Lowenfeld

Herbert and Rose Rubin Professor
of International Law, Emeritus
New York University School of Law

May ___6___, 2011

12

# EXHIBIT A

**ANDREAS F. LOWENFELD**

Herbert and Rose Rubin Professor of International Law Emeritus
New York University School of Law

CURRICULUM VITAE

A.B. Harvard College (M.c.L.) 1951.
LL.B. Harvard Law School (M.c.L.) 1955.

U.S. Army 1955-57.

Practised Law with Hyde and de Vries, New York, 1958-61.

U.S. Department of State (1961-66) - Special Assistant to
    Legal Adviser 1961-1963; Assistant Legal Adviser for
    Economic Affairs 1963-1965; Deputy Legal Adviser 1965-1966.

Fellow, John F. Kennedy Institute of Politics, Harvard
University, 1966-67.

Professor of Law, New York University School of Law since 1967,
    Charles L. Denison Professor of Law 1981-94.
    Herbert and Rose Rubin Professor of International Law 1994-
    2009; Emeritus 2009-
    Visiting Professor, Stanford Law School - Summer 1969,
    1972.

Lecturer, U.S. Foreign Service Institute - Summer 1973.
    Salzburg Seminar in American Studies - Summer 1974.

Professor, Institute on International and Comparative Law,
    Paris, Summer 1976, 1986; London, Summer 1980;
    Dublin, Summer 1983; Moscow, Leningrad, Warsaw,
    Summer 1991.

Lecturer, Hague Academy of International Law, Summer, 1979.
    General Course in Private Int'l Law, Summer 1994.

Arbitrator, Numerous cases under rules of ICC, LCIA, IATA,
    AAA, UNCITRAL, ICSID, Stockholm Chamber of Commerce,
    Netherlands Arbitration Institute, GATT, and ad hoc
    arbitrations.

Languages: English, French, Spanish, German

Member:     Institut de Droit International
            International Academy of Comparative Law
            American Society of International Law
            American Law Institute

Associate Member: 3 Verulam Buildings, Gray's Inn London

<u>Courses</u>:  International Law and Institutions, Civil Procedure,
            International Economic Transactions, Conflict of Laws,
            International    Litigation,    Torts,    International
            Arbitration, Aviation Law, Comparative Civil Procedure

<u>Organizations</u>:

New York City Bar Association
            Committee on Foreign and Comparative Law
            Committee on Arbitration
            Aeronautics Committee
            International Law Committee
            International Trade Committee

American Bar Association
            Section of International Law
            Section of Dispute Resolution

American Society of International Law
            Panel on Foreign Economic Policy
            Trade Issues Review Group
            Review Group on International Transfer of
             Technology
            Manley O. Hudson Medal for Lifetime Achievement in
             International Law
American Arbitration Association
            Panel on Commercial and International Arbitration
            Arbitration Law Committee, Commercial Section and
             International Law Section

Chartered Institute of Arbitrators (London)
London Court of International Arbitration

Council on Foreign Relations
      Study Group on International Aviation (Chairman)
      Study Group on Internationalization of Banking
      Study Group on International Trade Negotiations
      Study Group on United States-Canada Trade Negotiations
      Study Group on North American Free Trade Agreement

2

International   Chamber   of   Commerce,   Corresponding   Member,
    Academic Council of Institute of International Business Law
    and Practice

United States Chamber of Commerce
    Reporter:  Task Force on International Transfer of
    Technology

American Law Institute
        Associate Reporter, Restatement (Third) of Foreign
    Relations Law (1979-1988).
    Consultant, U.S. Income Tax Treaty Project (1989-91)
    Consultant, Complex Litigation Project (1989-93)
    Co-Reporter, Project on Recognition and Enforcement of
        Foreign Judgments 2003-06)
    Consultant, Restatement (Third)of U.S. Law of
        International Commercial Arbitration

Board of Editors:
    American Journal of International Law
    Journal of Air Law and Commerce
    Journal of Maritime Law and Commerce
    American Journal of Comparative Law
    Air & Space Law (The Netherlands)
    Journal of International Economic Law


**Publications**

**BOOKS**

International   Legal   Process   (with  Abram  Chayes   and   Thomas
Ehrlich)  (Boston, Little Brown, 1968-69).

Expropriation in the Americas:  A Comparative Law Study
    (Editor and part author) (New York, Dunellen 1971).

Aviation Law, Cases and Materials
    (New York, Matthew Bender 1972, 2d Ed. 1981).

International Economic Law -- (New York, Matthew Bender).

    I.    International Private Trade (1975, 2d Ed. 1981; Rev.
          2d Ed. 1988; 3d Ed. 1997).

II.   <u>International Private Investment</u> (1976, 2d Ed. 1982).

III.  <u>Trade Controls for Political Ends</u> (1977, 2d Ed. 1983).

IV.   <u>The International Monetary System</u> (1977, 2d Ed. 1984).

V.    <u>Public Controls on International Trade</u> (1979, 2d
      Ed. 1983)

<u>Conflict of Laws: Federal, State, and International Perspectives</u> (Matthew Bender 1986, LexisNexis Rev. 2d Ed. 2002).

<u>Restatement (Third) of the Foreign Relations Law of the United States</u> (with Louis Henkin, Louis B. Sohn and Detlev F. Vagts) (1987).

<u>International Litigation and Arbitration</u> (St. Paul, West, 1993, 2d ed. 2002, 3d ed. ThomsonWest 2006).

<u>International Litigation and the Quest for Reasonableness</u> General Course on Private International Law, 245 Recueil des Cours, Hague Academy of International Law, (1994-I); (Rev. Ed., Oxford University Press 1996).

<u>Revolutionary Days: The Iran Hostage Crisis and the Hague Claims Tribunal</u>, Ed., with Lawrence W. Newman and John M. Walker, Jr., (New York, Juris Publ. 1999).

<u>The Role of Government in International Trade</u> (London, Cameron May 2000).

<u>The Hague Convention on Jurisdiction and Judgments</u>, Ed., with Linda J. Silberman, New York, Juris Publ. 2001).

<u>International Economic Law</u> (Oxford University Press 2002, 2003, 2d ed. 2008).

<u>Lowenfeld on International Arbitration</u> (New York Juris Publ. 2005).

<u>Recognition and Enforcement of Foreign Judgments: Analysis and Proposed Federal Statue</u> (with Linda Silberman) (The American Law Institute 2006).

## ARTICLES

Public International Law

"How the European Economic Community is Organized," 19 The Business Lawyer 126 (1963) (also 49 Dep't State Bull. 372 (1963).)

"The Sabbatino Amendment - International Law meets Civil Procedure," 59 Am. J. Int'l L. 699 (1965).

"Diplomatic Intervention in Investment Disputes," 1967 Proceedings Am. Soc. Int'l L. 96.

"On Teaching International Law," 1 N.Y.U. J. Int'l L. & Pol. 61 (1968).

"Claims Against Foreign States - A Proposal for Reform of United States Law," 44 N.Y.U. L. Rev. 901 (1969).

"Reflection on Expropriation and the Future of Investments in the Americas," 6 Int'l Lawyer 116 (Jan. 1973).

"Litigating A Sovereign Immunity Claim -- The Haiti Case," 49 N.Y.U. L. Rev. 377 (1974).

"A Tribunal on Iran?"  New York Times, November 29, 1979 (with Robert Glynn).

"Presidential Power to Terminate Treaties," 58 Congressional Digest 187 (1979).

"International Law and the Hostage Agreement," Wall Street Journal, January 27, 1981.

"Sovereignty, Jurisdiction, and Reasonableness: A Reply to A.V. Lowe," 75 Am. J. Int'l L. (1981).

"Analyzing the Applicable Laws in the Achille Lauro Aftermath," New York Law Journal, Nov. 1, 1985 (with Robert Glynn).

"Some Suggestions For Attaching Meaning to the International Responsibility of States For Terrorism", 1987 Int'l Inst. Air Law Proceedings 120.

5

"Agora:  The Downing of Iran Flight 655," 83 Am. J. Int'l L. 318, 336 (1989).

"U.S. Law Enforcement Abroad:  The Constitution and International Law," 83 Am. J. Int'l L. 880 (1989).

"U.S. Law Enforcement Abroad:  The Constitution and International Law, Continued," 84 Am J. Int'l L. 444 (1990).

"Kidnaping by Government Order: A Follow-up," 84 Am. J. Int'l L. 712 (1990).

"Still More on Kidnaping," 85 Am. J. Int'l L. 655 (1991).

"Ahmad: Profile of an Extradition Case," 23 N.Y.U. J. Int'l L. & Pol. 723 (1991).

"Congress and Cuba: The Helms-Burton Act," 90 Am. J. Int'l L. 419 (1996).

"Nationalizing International Law:  Essay in Honor of Louis Henkin," 36 Colum. J. Transnational L. 121 (1997).

"Unilateral versus Collective Sanctions: An American's Perception," in V. Gowlland-Debbas, ed. <u>United Nations Sanctions and International Law</u> (2001).

"Investment Agreements and International Law," 42 Colum. J. Transnational L. 123 (2003).

"Sanctions and International Law: Connect or Disconnect?", 4 Hibernian L.J. 1 (2003).

"Harold Maier, Comity, and the Foreign Relations Restatement", 39 Vand. J. Transnat'l L. (2006).

<u>Max Planck Encyclopedia of Public International Law</u>, Contributor (2008-2011).

International Economic Law

"International Commodity Controls - Some Lessons from the Coffee Agreement," 61 Am. J. Int'l L. 784 (1967).

"`To Have One's Cake ...' The Federal Maritime Commission and the Conferences," 1 J. Mar. L. & Com. 21 (1969).

"U.S. and Soviets: East-West Trade in a New Setting," N.Y. Law Journal, March 26, 1973.

"Opening to the East," New York Times (Week in Review), Sunday, April 15, 1973.

"Doing Unto Others ...' The Chicken War Ten Years After," 4 J. Mar. L. & Com. 599 (1973).

"The Chicken War: A Postscript," 5 J. Mar. L. & Com. 317 (1974).

"Should Investment Capital Remain at Home -- Toward a New Approach to the Wandering Enterprise," 1974 Proceedings, Am. Soc. Int'l L. 27.

"`... Sauce for the Gander': The Arab Boycott and United States Political Trade Controls," 12 Texas Int'l. L. J. 25 (Winter 1977).

-- Technology Transfer, Economic Development and Restrictive Business Practices," 1977 Proceedings of 71st Annual Meeting, Am. Soc. Int'l L. 224 (1977).

"Fair or Unfair Trade:  Does It Matter?"  13 Cornell Int'l. L. J. 205 (1980).

"Bank Secrecy and Insider Trading: The *Banca Della Svizzera Italiana* Case," 15 Rev. of Securities Regulation 942 (March 24, 1982).

"Interface IV:  Countertrade in Economic Relations between East and West - An Introduction," 5 J. Comp. Bus. and Capital Mkt. L. 329 (1983).

"Jurisdiction, Choice of Law, and Conflict Resolution," Symposium on the Internationalization of the Securities Markets, 4 Boston U. Int'l L. J. 91 (1986).

7

"What GATT Says (Or Does Not Say)" in W. Diebold, ed., Bilateralism, Multilateralism and Canada in U.S. Trade Policy (Council on Foreign Relations 1988).

"United States Trade Law: The Tension between the President and Congress," 1988 Yale Law & Policy Review 71.

"Eurodollars, Multinational Banks, and National Laws," (with Peter S. Smedresman), 64 N.Y.U. L. Rev. 733 (1989).

"Binational Dispute Settlement under Chapters 18 and 19 of the Canada-United States Free Trade Agreement," Administrative Conference of the United States (Dec. 1990).

Preface to Pierre Pescatore et al., Handbook on WTO/GATT Dispute Settlement (1991, 1994, 1995).

"Binational Dispute Settlement under Chapter 19 of the Canada-United States Free Trade Agreement: An Interim Appraisal," 24 N.Y.U. J. Int'l L. & Pol. 269 (1991).

"The Free Trade Agreement Meets Its First Challenge: Dispute Settlement and the Pork Case," 37 McGill L.J. 602 (1992).

"New Ideas in Settlement of International Trade Disputes," 1 Korean Forum on International Trade and Business Law 9 (1992).

"Rules of Origin, the Canada-U.S. FTA, and the Honda Case" (with Frédéric P. Cantin), 87 Am. J. Int'l L. 375 (1993).

"Remedies along with Rights: Institutional Reform in the New GATT," 88 Am. J. Int'l L. 477 (1994).

"The USA, the EEC, and GATT: The Road Not Taken," 1 U. Pa. Journal of Int'l Econ. Law 533 (1996).

"Two Achievements of the Uruguay Round: Putting TRIPS and Dispute Settlement Together" (with Rochelle Cooper Dreyfuss), 37 Va. J. Int'l L. 275 (1997).

"Helms-Burton, the U.S., and the WTO," (with John H. Jackson), ASIL Insight March 1997.

"International Decisions and the Task of the Court of International Trade," 85 Federal Rules Decisions 474 (1999).

"The International Monetary System and the Erosion of Sovereignty:  Essay in Honor of Cynthia Lichtenstein", 25 Boston College Int'l and Compl L. Rev. 257 (2002).

"Remembering Bob Hudec", 6 J. Int'l Economic Law 730 (2003).

"Trade Controls for Political Ends: Four Perspectives," 4 Chicago J. Int'l L. 355 (2003).

"The United States and United Nations Sanctions," in Vera Gowlland-Debbas, ed., National Implementation of United Nations Sanctions: A Comparative Study (2004).

"Jurisdiction to Prescribe and the IMF" in C. Picker, I. Dunn and D. Arner, International Economic Law: The State and Future of the Discipline (2008).

"The International Monetary System: A Look Back over Seven Decades," 13 J. of Int'l Economic Law 575 (2010).


Air Law

"The United States and the Warsaw Convention," 54 Dept. State Bull. 580 (1966).

"The United States and the Warsaw Convention," 80 Harv. L. Rev. 497 (1967) (with Allan I. Mendelsohn).

"The Warsaw Convention and the Washington Compromise, A View From America," 70 Journal of the Royal Aeronautical Society 1061 (Dec. 1966)

"Some Comments on Burdell v. Canadian Pacific Airlines," 3 Vanderbilt Int'l. 47 (1969).

"International Control of Aerial Hijacking, A Comment," 65 Am. J. Int'l L. 86 (1971).

"Hijacking, Warsaw, and the Problem of Psychic Trauma," "1 Syracuse J. Int'l L. & Com. 345 (1973).

"A New Takeoff for International Air Transport," 54 Foreign Affairs 36 (1975).

"CAB v. KLM -- Bermuda at Bay," 1 Air Law (The Netherlands) 2 (1975).

"How Well Does the Federal Aviation Act of 1958 Serve the Needs of the Public," in L. Moses, ed., Regulatory Reform and the Federal Aviation Act of 1975, (Report of Fifth Workshop on National Transportation Problems, Transportation Center, Northwestern University, 1976).

"The Air Rules Need a Change," The New York Times, Sunday, August 8, 1976 (Business Section).

"Beyond the Bermuda Agreement," in N. Matte, ed. International Air Transport: Law, Organization, and Policies for the Future, 101 (Proceedings of 25th Anniversary Conference of McGill Institute of Air and Space Law 1976).

"The High Stakes in an Air Pact," The New York Times, Sunday, July 3, 1977 (Business Section).

"The Future Determines the Past: Bermuda I in the Light of Bermuda II," 3 Air Law (The Netherlands) 2, (1977).

"Economics, Politics and Law: Recent Developments in the World of International Air Charters," 44 J. Air L. & Com. 479 (1979) (with Allan I. Mendelsohn).

"Deregulation -- Is It Contagious?" in H.A. Wassenbergh and H.P. van Fenema, eds., International Air Transport in the Eighties (1981).

"Deregulation of Aviation in the United States," in A. Kean, ed., Essays in Air Law (1982).

"Liability of Airlines for Injury Caused by Terrorism," in Masson-Zwaan and Mendes de Leon eds., Air and Space Law: De Lege Ferenda, Essays in Honour of Henri A. Wassenbergh (1992).

10

"The IATA Intercarrier Agreement: A Postscript and Warning," 21 Air & Space Law 187 (1996).

"Liability for Disasters," Journal of Commerce, April 15, 1997 (with Allan I. Mendelsohn).

"The EgyptAir Crash: A First View of the Law," New York Law Journal, December 13, 1999 (with Allan I. Mendelsohn).


Procedure and Conflict of Laws

"Jurisdiction in Personal Actions -- A Comparison of Civil Law Views," 44 Iowa L. Rev. 306 (1959) (with Henry P. de Vries).

"Tempora Mutantur ... Wills and Trusts in the Conflicts Restatement," 72 Colum. L. Rev. 382 (1972).

"In Search of the Intangible: A Comment on Shaffer v. Heitner," 53 N.Y.U. L. Rev. 102 (1978).

"Public Law in the International Arena: Conflict of Laws, International Law, and Some Suggestions for their Interaction," Hague Academy of Int'l Law, 163 Recueil des Cours 311 (1979).

"Extraterritoriality: Conflict and Overlap in National and International Regulation," 1980 Proceedings Am. Soc. Int'l L. 30.

"Choice of Law and the Supreme Court: A Dialogue Inspired by *Allstate v. Hague*," 14 U.C. Davis L. Rev. 841 (1981) (with Linda J. Silberman).

"Renvoi Among the Law Professors: An American's View of the European View of American Conflict of Laws," 30 Am. J. Comp. L. 99 (1982).

"Three Might-Have-Beens: A Reaction to the Symposium on *Allstate Insurance Co. v. Hague*," 10 Hofstra L. Rev. 1045 (1982).

"Discovery-Verfahren und Internationale Rechfshilfe," (Discovery Proceedings and International Judicial Assistance) IPRax (Fed'l Republic of Germany) 1/84, p.51.

"Some Reflections on Transnational Discovery," 8 J. Comp. Bus. & Capital Mkt. Law 419 (1986).

"Conflict of Laws English Style: Review Essay," 37 Am. J. Comp. 353 (1989).

"Enforcement of Foreign Judgments: United States of America," in C. Platto, ed., Enforcement of Foreign Judgments Worldwide (1989), (2d ed. with Silberman 1993).

"Mass Torts and the Conflict of Laws: The Airline Disaster," 1989 U. Ill. L. Rev. 1501 (1989).

"Obligations of a Company belonging to an International Group and their Effect on other Companies of that Group, 65-I Institut de Droit International *Annuaire* 244 (1993).

"Injunctions across National Frontiers: A Tale of Two Cities," 4 Amer. Rev. Int'l Arbitration 3 (Festschrift for Hans Smit) (1993).

"Thoughts about a Multinational Judgments Convention: A Reaction to the von Mehren Report," 57 Law & Contemp. Probs. 289 (1994).

"Conflict, Balancing of Interests, and the Exercise of Jurisdiction to Prescribe: Reflections on the *Insurance Antitrust Case*," 89 Am. J. Int'l L. 42 (1995).

"Jurisdictional Issues before National Courts: The *Insurance Antitrust* Case," in Karl M. Meessen, Ed. Extraterritorial Jurisdiction in Theory and Practice (1996).

"Forum Shopping, Antisuit Injunctions, Negative Declarations, and Related Tools of International Litigation," 91 Am. J. Int'l L. 315 (1997).

"Forum non Conveniens and Antisuit Injunctions: An Update," 92 Am. J. Int'l L. 41 (1998).

12

"A Different Challenge for the ALI: Herein of Foreign Country Judgments, an International Treaty, and an American Statute," (with Linda J. Silberman), 75 Indiana L. J. 635 (2000).

"The Hague Judgments Convention--And Perhaps Beyond," (with Linda J. Silberman), in <u>Law and Justice in a Multistate World: Essays in Honor of Arthur. T. von Mehren</u> (2002).

"Transatlantic Business Transactions: Some Questions for the Lawyers," 26 Houston J. Int'l L. 251 (2004).

"Jurisdiction, Enforcement, Public Policy and Res Judicata: The Krombach Case," in <u>Intercontinental Cooperation through Private International Law: Essays in Memory of Peter E. Nygh</u> (2004).


Arbitration

"The U.S.-Iranian Dispute Settlement Accords: An Arbitrator Looks At the Prospects for Arbitration," 36 Arbitration Journal No. 3, p. 3 (Sept. 1981).

"The Iran-U.S. Claims Tribunal: An Interim Appraisal," 38 Arbitration Journal No. 4, p. 14 (Dec. 1983); repr. in R. Lillich, ed., <u>The Iran-United States Claims Tribunal, 1981-83</u> (1984).

"The Two-Way Mirror: International Arbitration as Comparative Procedure," 7 Mich. Yb. Int'l Legal Studies 163 (1985), repr. in W. Craig, W. Park, J. Paulsson, <u>International Chamber of Commerce Arbitration</u> Vol. 2, App. VII, p. 187 (1986).

"The Mitsubishi Case: Another View," 2 Arbitration International 178 (1986).

"Singapore and the Local Bar; Aberration or Ill Omen?" 5 J. International Arbitration 71 (1988)

"Lex Mercatoria: An Arbitrator's View," 6 Arbitration International 133 (1990); also in T. Carbonneau, Ed., <u>Lex Mercatoria and Arbitration: A Discussion of the New Law Merchant</u>, Ch. 3 (1990).

13

"An Arbitrator's Declaration of Independence," 9 Bulletin de l'Association Suisse de'l'Arbitrage 85 (June 1991).

"The Party-Appointed Arbitrator in International Controversies: Some Reflections," 30 Texas Int'l L. J. 59 (1995),repr. in 11 Mealey's Int'l Arbitration Report #11 (Nov. 1996).

"Can Arbitration Coexist with Judicial Review?  A Critique of *LaPine v. Kyocera,*" 3 ADR Currents No. 3 (Sept. 1998).

"International Arbitration as Omelette: What Goes into the Mix," in S. Frommel and B. Rider, eds. <u>Conflicting Legal Cultures in Commercial Arbitration</u> (1999).

"Why Arbitrate?" in R. Rhoades, D. Kolkey, R.Chernick, <u>The Practioner's Handbook on International Arbitration and Mediation</u> (2d ed. 2007).

"International Arbitration:  Scapegoat or Solution," 13 Amer. Rev. Int'l Arbitration 1 (2002).

"Public Policy and Private Arbitrators: Who Elected Us and What Are We Supposed to Do?" J.E.C. Brierly Memorial Lecture, McGill University (March 30, 2005).

"The Party-Appointed Arbitrator: Further Reflections," in Lawrence W. Newman, and Richard D. Hill, eds. <u>Leading Arbitrators' Guide to International Arbitration</u> (2004. 2d ed. 2008).

"THE ICSID CONVENTION: Origins and Transformation", 1 Revista Internacional de Arbitragem e Conciliaço 37 (2009) 38 Ga. J.Int'l & Comp. L 47 (2009)

"Countermeasures, Diplomatic Protection, and Investor-State Arbitration", Liber Amicorum Bernardo Cremades 2010.

<u>History and Politics</u>

"The Free Germany Committee -- An Historical Study," 14 Rev. Politics 346 (1952).

"Soviet Foreign Policy"; "Soviet Postwar Expansion," in W.W. Rostow et al, The Dynamics of Soviet Society, (1953, 1954).

BOOK REVIEWS

Public International Law

H. de Vries & J. Rodriguez-Novas, The Law of the Americas, 66 Colum. L. Rev. 822 (1966).

L. C. Green, International Law Through the Cases, 65 Am. J. Int'l L. 837 (1971).

L. Henkin, Foreign Affairs and the Constitution, 87 Harv. L. Rev. 494 (1973).

Herbert J. Stern, Judgment in Berlin, 83 Mich. L. Rev. 1000 (1985).

George H. Aldrich, The Jurisprudence of the Iran-United States Claims Tribunal, 92 Am. J. Int'l L. 149 (1998).

International Economic Law

S. Metzger, International Law, Trade and Finance, Realities and Prospects, 77 Harv. L. Rev. 388 (1963).

L. Ebb, International Business: Regulation and Protection, 78 Harv. L. Rev. 1699 (1965).

K. Dam, The GATT: Law and International Economic Organization; J.H. Jackson, World Trade and the Law of the GATT, 65 Am. J. Int'l L. 853 (1971).

S. Pisar, Coexistence and Commerce: Guidelines for Transactions Between East and West, 84 Harv. L. Rev. 1964 (1971).

B. Fisher, The International Coffee Agreement: A Study in Coffee Diplomacy, 5 L. & Pol. Int'l Bus. 347 (1973).

J. Gold, Membership and Nonmembership in the International Monetary Fund, 16 Va. J. Int'l L. 225 (1975).

C. Coombs, The Arena of International Finance; R. Solomon, The International Monetary System, 90 Harv. L. Rev. 1558 (1977).

C. R. Johnson, Law and Policy of International Commodity Agreements, 73 Am. J. Int'l L. 309 (1979).

B. Zagaris, Foreign Investment in the United States, 76 Am. J. Int'l L. 441 (1982).

J. Atwood and K. Brewster, Antitrust and American Business Abroad, 95 Harv. L. Rev. 1976 (1982).

K. Dam, The Rules of the Game: Reform and Evolution in the International Monetary System, 50 U. Chi. L. Rev. 380 (1983).

B. Cohen, In Whose Interest?  International Banking and American Foreign Policy, 101 Harv. L. Rev. 1061 (1988).

B. Carter, International Economic Sanctions, 88 Mich. L. Rev. 1930 (1990).

M. Malloy, Economic Sanctions and U.S. Trade, 86 Am. J. Int'l L. 234 (1992).

R. Hudec, Enforcing International Trade Law: the Evolution of the Modern GATT Legal System, 89 Am. J. Int'l L. 663 (1995).
K.A. Rodman, Sanctions Beyond Bordes: Multinational corporations and U.S. Economic Statecraft, 96 Am. J. Int'l L. 745 (2002).

Procedure and Conflict of Laws

D. Rosenthal and W. Knighton, National Laws and International Commerce, 16 N.Y.U. J. Int'l L. & Pol. 1205 (1984).

M. Hancock, Studies in Modern Choice of Law: Torts, Insurance, Land Titles, 38 Stanford L. Rev. 1411 (1986).

Friedrich K. Juenger, <u>Choice of Law and Multistate Justice</u>, 88 Am. J. Int'l L. 184 (1994).


<u>Arbitration</u>

G. Gaja, <u>International Commercial Arbitration: New York Convention</u>, 34 Arbitration Journal No. 1, p. 38 (March 1979).

S. Schwebel, <u>International Arbitration: Three Salient Problems,</u> 42 Arbitration Journal No. 3, p. 53 (December 1987).

Julian D.M. Lew, <u>The Immunity of Arbitrators</u>, 46 Arbitration Journal No. 2, p. 55 (June 1991).

Pieter Sanders, <u>*Quo Vadis Arbitration?  Sixty Years of Arbitration Practice*</u>, 95 Am. J. Int'l L. 728 (2001).


<u>Air Law</u>

C. Shawcross and K. Beaumont, <u>Air Law</u>, 3d Ed., 8 Harv. Int'l L. J. 408 (1967).

E. McWhinney & M. Bradley, eds., <u>The Freedom of the Air</u>, 15 McGill L. J. 408 (1967).

J. Hildebrand, ed., <u>Noise Pollution and the Law</u>, 37 J. Air L. & Com. 415 (1971).

N. Aggarwala, J. Fenello, G.F. Fitzgerald, <u>Air Hijacking: An International Perspective</u>, 5 N.Y.U. J. Int'l L. & Pol. 419 (1972).

J. Dutheil de la Rochère, <u>La Politique des Etats-Unis en Matiere d'Aviation Civile Internationale</u>, 21 Am. J. Comp. L. 165 (1973)

H. A. Wassenbergh, <u>Public International Air Transportation Law in a New Era</u>, 25 Am. J. Comp. L. 438 (1977).

History and Politics

H. Einsiedel, <u>I Joined the Russians</u>, 15 Rev. Politics 393
(1953).

J. Wheeler-Bennett, <u>The Nemesis of Power: The German Army
in Politics, 1918-1945</u>, The New Leader, Feb. 15, 1954.

Spring 2011

18