UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON,
Personal Representative of the Estate of
James C. Knipple (Dec.) et al.,

                    Plaintiffs,

          v.

ISLAMIC REPUBLIC OF IRAN, et al.,

                    Defendants.

Case No. 10 CIV 4518 (BSJ)

**FILED UNDER SEAL**

**CONTAINS CONFIDENTIAL
MATERIAL SUBJECT TO
PROTECTIVE ORDER**

**DEFENDANT BANK MARKAZI'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR
LACK OF SUBJECT MATTER JURISDICTION**

David M. Lindsey
James M. Hosking
Andreas A. Frischknecht
Yasmine Lahlou

**CHAFFETZ LINDSEY LLP**
505 Fifth Avenue, 4th Floor
New York, NY 10017
Tel. (212) 257-6960
Fax (212) 257-6950
www.chaffetzlindsey.com

March 15, 2012

*Attorneys for Defendant Bank Markazi*

{00111132;v1}

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

PROCEDURAL AND FACTUAL BACKGROUND....................................... 4

    A.    Plaintiffs' Underlying Judgment Against Iran ............................4

    B.    Plaintiffs' Enforcement Proceeding...........................................4

    C.    The Instant Turnover Action......................................................6

    D.    Clearstream's Motion To Vacate the Restraints .........................7

    E.    Blocking Of The Restrained Bonds Pursuant To Executive
           Order No. 13599 .......................................................................7

    F.    Pending Legislation Directed Specifically At This Turnover
           Action.......................................................................................8

ARGUMENT ....................................................................................... 8

    I.    Standard Applicable To This Motion ......................................8

    II.    Plaintiffs' Claim Pursuant To TRIA Section 201 Fails Because The
         Restrained Bonds Are Not "Assets Of" Bank Markazi ....................10

        A.    The Blocking Of The Restrained Bonds Pursuant To The
             Executive Order Transferred *Control*—But Not *Ownership*—Of
             Those Assets To The Executive Branch ....................................12

        B.    The Restrained Bonds Are Not "Assets Of" Bank Markazi .....................13

            1.    The Restrained Bonds Cannot Be Deemed "Assets Of"
                 Bank Markazi Unless the Bank Actually Owns Those
                 Assets .........................................................................14

            2.    New York Law Determines Whether The Restrained
                 Bonds Are "Assets Of" Bank Markazi ...........................17

            3.    As Demonstrated In Clearstream's Motion, The
                 Restrained Bonds Cannot Be Deemed "Assets Of" Bank
                 Markazi Under New York Law, Including the UCC's
                 Choice of Law Provisions..............................................18

    III.    Allowing Plaintiffs To Seize The Restrained Bonds Would Violate The
         Treaty Of Amity Between The United States And Iran.........................22

IV.    It Is Plaintiffs' Burden To Show That TRIA Section 201 Overrides The Executive Order's Prohibition On Any Transfer Of The Restrained Bonds ........................................................................................24

V.    Should The Court Determine That The Restrained Bonds Are "Assets Of" Bank Markazi, Then Those Assets Are Immune From Attachment And Execution Under Section 1611(b)(1) Of The FSIA As "The Property Of" A Foreign Central Bank Held For Its Own Account........................26

    A.    The FSIA Determines Subject Matter Jurisdiction In This Turnover Action..............................................................................26

    B.    Heightened Immunity Of Central Bank Property Under Section 1611(b)(1) Of The FSIA ....................................................29

    C.    Bank Markazi Is The Central Bank Of Iran And The Beneficial Owner Of The Restrained Bonds...............................................30

    D.    Bank Markazi Holds The Restrained Bonds For Its Own Account As An Investment Of The Bank's Foreign Currency Reserves .................................................................................31

        1.    The Restrained Bonds Are Presumptively Immune Under *NML Capital* .................................................31

        2.    By Their Very Nature, The Restrained Bonds Indicate Their Purpose As An Investment Of Bank Markazi's Foreign Currency Reserves....................................32

        3.    The Complaint Alleges No Facts To Rebut The Presumption That Bank Markazi Holds The Restrained Bonds For Its Own Account ..........................33

        4.    Bank Markazi Held The Restrained Bonds For Its Own Account Both Before and After Their Transfer From The Bank's Account With Clearstream To UBAE's Account with Clearstream............................................35

    E.    Plaintiffs' Allegations That Bank Markazi Is An Alter Ego Of Iran And Is Not A "Legitimate" Central Bank Are Irrelevant Under *NML Capital* ....................................................37

        1.    Plaintiffs' Alter Ego Allegations Are Legally and Factually Indistinguishable From The Allegations The Second Circuit Rejected In *NML Capital* .....................37

        2.    Plaintiffs Cannot Avoid Dismissal By Alleging That Bank Markazi Is Not A "Legitimate" Central Bank......................39

F.      The Conclusory Waiver Allegations In The Complaint Fail Because Plaintiffs May Not Attach Bank Markazi's Property Irrespective Of Any Purported Waiver Of Immunity ................................ 40

      1.     Any Waiver Of Immunity From *Post-Judgment* Attachment Would Be Irrelevant Because Plaintiffs Are Not Entitled To That Relief In Any Event .................................... 41

      2.     Section 1611(b)(1) Precludes Any Waiver Of Immunity From *Pre-Judgment* Attachment As A Matter of Law ................. 42

G.      The Special Protection The FSIA Extends To Central Bank Property In Section 1611(b)(1) Overrides TRIA Section 201 ................. 43

CONCLUSION .......................................................................................................... 47

# TABLE OF AUTHORITIES

## Cases

*Amidax Trading Group v. S.W.I.F.T. SCRL,*
   --- F.3d ----, 2011 WL 6317466 (2d Cir. Dec. 19, 2011) ................................................ 41 n.59

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ......................................................................................................... 41 n.59

*Aurelius Capital Partners, LP v. Republic of Argentina,*
   584 F.3d 120 (2d Cir. 2009) ............................................................................................... 26 n.42

*Bank of New York v. Norilsk Nickel,*
   14 A.D. 3d 140 (1st Dep't 2004). ...................................................................................... 15, 17, 21

*Banque Compafina v. Banco de Guatemala,*
   583 F. Supp. 320 (S.D.N.Y. 1984) ................................................................................... 44

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................................. 40

*Bennett v. Islamic Republic of Iran,*
   604 F. Supp. 2d 152 (D.D.C. 2009) .................................................................................. 46 n.66

*Berces v. Debrecen Tartositoipari Kombinat,*
   No. 94 Civ 3381 (KMW), 1995 WL 640486 (S.D.N.Y. Oct. 31, 1995) ........................... 10 n.8

*Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.,*
   --- U.S. ----, 131 S.Ct. 2188 (2011) ................................................................................. 14

*Brenntag Int'l Chemicals, Inc. v. Bank of India,*
   175 F.3d 245 (2d Cir. 1999) ............................................................................................... 29

*Brzak v. United Nations,*
   597 F.3d 107 (2d Cir. 2010) ............................................................................................... 22

*Busic v. U.S.,*
   446 U.S. 398 (1980) ............................................................................................................. 44

*Calderon-Cardona v. JP Morgan Chase Bank, N.A.,*
   --- F. Supp. 2d ----, No. 11 Civ. 3283 (DLC),
   2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011) ................................................................... passim

*Cargill Int'l S.A. v. M/T Pavel Dybenko,*
   991 F.2d 1012 (2d Cir. 1993) ............................................................................................. 9

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979) ............................................................................................................. 16 n.19

*Creque v. Luis,*
   803 F.2d 92 (3rd Cir. 1986) ............................................................................................... 44

*Dames & Moore v. Regan,*
   453 U.S. 654 (1981) ............................................................................................................. 12, 25

*De Letelier v. Republic of Chile,*
   748 F.2d 790 (2d Cir. 1984) ........................................................................ 38

*Dickstein v. Merrill Lynch,*
   685 A.2d 943 (N.J. App. 1996) .................................................................... 20

*Dodd v. U.S.,*
   545 U.S. 353 (2005) ............................................................................ 43 n.64

*EM Ltd. v. Republic of Argentina,*
   473 F.3d 463 (2d Cir. 2007) ................................................. 10, 35 n.52, 41 n.61

*Export-Import Bank of the United States v. Asia Pulp & Paper Co.,*
   609 F.3d 111 (2d Cir. 2010) ........................................................................ 17

*Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp.,*
   921 F. Supp. 1113 (S.D.N.Y. 1996) ........................................................ 12 n.13

*First National City Bank v. Banco Para El Comercio Exterior de Cuba,*
   462 U.S. 611 (1983) ("*Bancec*") ........................................................... passim

*Gabay v. Mostazafan Foundation of Iran,*
   151 F.R.D. 250 (S.D.N.Y. 1993) ............................................................. 10 n.8

*Glen v. Club Méditerranée S.A.,*
   365 F. Supp. 2d 1263 (S.D. Fla. 2005) .................................................... 13 n.14

*Global Relief Foundation, Inc. v. O'Neill,*
   315 F.3d 748 (7th Cir. 2002) ................................................................. 18 n.20

*Hausler v. JPMorgan Chase Bank, N.A.,*
   740 F. Supp. 2d 525 (S.D.N.Y. 2010) ................... 16 & *id.* n. 19, 28, 29 & *id.* n.45

*Hausler v. JPMorgan Chase Bank, N.A.,*
   --- F. Supp. 2d ----, 2012 WL 601034 (S.D.N.Y. Feb. 22, 2012) ..................... 16 n.8

*Holy Land Foundation for Relief and Development v. Ashcroft,*
   333 F.3d 156 (D.C. Cir. 2003) ............................................................... 18 n.20

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.,*
   295 F. Supp. 2d 366 (S.D.N.Y. 2003) .......................................................... 42

*Levin v. Bank of New York,*
   No. 09 CV 5900 (RPP), 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) ............... 16, 43

*Marine Midland Bank v. Murkoff,*
   120 A.D.2d 122 (2d Dep't 1986) ................................................................... 36

*McKesson Corp. v. Islamic Republic of Iran,*
   539 F.3d 485 (D.C. Cir. 2008) ............................................................... 22 n.30

*Medellin v. Texas,*
   552 U.S. 491 (2008) .................................................................................. 22

*Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi,*
   556 U.S. 366 (2009) .................................................................................. 45

*NML Capital, Ltd. v. Banco Central de la República Argentina,*
  652 F.3d 172 (2d Cir. 2011) .......................................................................... passim

*Orkin v. Swiss Confederation,*
  770 F. Supp. 2d 612 (S.D.N.Y. 2011), *aff'd,* 444 Fed. Appx. 469 (2d Cir. 2011) .................. 10

*Peterson v. Islamic Republic of Iran,*
  264 F. Supp. 2d 46 (D.D.C. 2003) ........................................................................ 4

*Peterson v. Islamic Republic of Iran,*
  627 F.3d 1117 (9th Cir. 2010) ................................................................... 27 n.42

*Robinson v. Government of Malaysia,*
  269 F.3d 133 (2d Cir. 2001). ............................................................................ 8

*Rubin v. Islamic Republic of Iran,*
  541 F. Supp. 2d 416 (D. Mass. 2008) ................................................................ 14

*Rubin v. Islamic Republic of Iran,*
  637 F.3d 783, 799 (7th Cir. 2011) ............................................................. 26 n.42

*Shipping Corporation of India Ltd. v. Jaldhi Overseas Pte. Ltd.,*
  585 F.3d 58 (2d Cir. 2009) .............................................................................. 28

*Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York,*
  346 F.3d 264 (2d Cir. 2003) ........................................................................... 12

*Sniado v. Bank Austria AG,*
  No. 00-cv-9123 (AGS), 2001 WL 812236 (S.D.N.Y. July 18, 2001) ............................. 10 n.8

*Trans World Airlines, Inc. v. Franklin Mint Corp.,*
  466 U.S. 243 (1984) ...................................................................................... 24

*Travelers Ins. Co. v. 633 Third Assocs.,*
  973 F.2d 82 (2d Cir. 1992) ............................................................................. 36

*Tribes v. U.S.,*
  No. 96-381 (HA), 1996 WL 924509 (D. Or., Oct. 2, 1996) ................................... 24 n.35

*United States v. Craft,*
  535 U.S. 274 (2002) ...................................................................................... 17

*United States v. Daccarett,*
  6 F.3d 37 (2d Cir. 1993) ................................................................................. 28

*United States  v. Pacheco,*
  225 F.3d 148 (2d Cir. 2000) ...................................................................... 43 n.64

*United States v. Palestine Liberation Organization,*
  695 F. Supp. 1456 (S.D.N.Y. 1988) ............................................................. 24 n.35

*Verlinden B.V. v. Central Bank of Nigeria,*
  461 U.S. 480 (1983). .............................................................................. 9 n.6, 27

*Weininger v. Castro,*
  462 F. Supp. 2d 457 (S.D.N.Y. 2006). ...................................................... 43, 45, 46

*Weinstein v. Islamic Republic of Iran,*
   609 F.3d 43 (2d Cir. 2010) ...................................................................................... passim

*Weston Compagnie de Finance Et D'Investissement, S.A. v. La República del Ecuador,*
   823 F. Supp. 1106 (S.D.N.Y. 1993). ...................................................................................... 42

## Statutes and Rules

28 U.S.C. § 1603(a) ...................................................................................... 26 n.41

28 U.S.C. § 1610(d) ...................................................................................... 42 n.63

28 U.S.C. § 1610(d)(1) ...................................................................................... 42 n.63

28 U.S.C. § 1610(f) ...................................................................................... 45

28 U.S.C. § 1610(f)(1)(A) ...................................................................................... 25

28 U.S.C. § 1611(b) ...................................................................................... 43, 44, 45 n.65

28 U.S.C. § 1611(b)(1) ...................................................................................... passim

50 U.S.C. § 1702(a)(1)(B) ...................................................................................... 13 n.14

Terrorism Risk Insurance Act ("TRIA") § 201,
   Pub. L. No. 107-297, Title II, § 201, 116 Stat. 2337 (2002) ...................................................................................... passim

National Defense Authorization Act for Fiscal Year 2012 ("NDAA"),
   Pub. L. No. 112-81 ...................................................................................... 7, 10, 12 n.14

NDAA § 1245(h)(3) ...................................................................................... 13 n.14

Fed. R. Civ. P. 12(b)(1) ...................................................................................... 1, 8

Fed. R. Evid. 301 ...................................................................................... 32

N.Y. U.C.C. Article 8 ...................................................................................... passim

N.Y. C.P.L.R. § 5201 ...................................................................................... 7

N.Y. C.P.L.R. § 5222 ...................................................................................... 5, 42 n.62

N.Y. C.P.L.R. § 5222(b) ...................................................................................... 41 n.61

## Other Authorities

Treaty of Amity, Economic Relations and Consular Rights between the United States and Iran,
   8 U.S.T. 899 (1955) ...................................................................................... 22 n.29

Executive Order No. 13599 dated February 5, 2012 ...................................................................................... passim

1998 Pub. Papers (Oct. 23, 1998) ...................................................................................... 25 n.39

Presidential Determination No. 2001-03,
   65 Fed. Reg. 66483 (Oct. 28, 2000) ...................................................................................... 46 n.66

Presidential Determination no. 99-1,
   63 Fed. Reg. 59 (Oct. 21, 1998) ...................................................................................... 46 n.66

Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment
in the United States,*
1982 U. ILL. L. REV. 265 (1982) .................................................................................. 31

General Assembly Resolution 59/38, annex, Official Records of the General
Assembly, Fifty-ninth Session, Supplement No. 49 (A/59/49) ........................................ 23 n.33

United Kingdom State Immunity Act,
1978 Laws c. 33 ................................................................................................................. 23 n.33

Defendant Bank Markazi ("Bank Markazi" or "the Bank"), the Central Bank of Iran, respectfully submits this Memorandum of Law in support of its Motion pursuant to Fed. R. Civ. P. 12(b)(1) (the "Motion") to dismiss the Second Amended Complaint dated December 7, 2011 (the "Complaint") and all Cross-Claims asserted by any Third Party Respondent (as defined in the Court's November 29, 2011 Scheduling Order, Dkt. # 157) in this action (the "Turnover Action") for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act (the "FSIA" or the "Act"), 28 U.S.C. §§ 1602-1611.

## PRELIMINARY STATEMENT

At stake in this Turnover Action are over $1.75 billion in assets (the "Restrained Bonds") that have been restrained at Citibank N.A. ("Citibank") in New York since June 2008. The Restrained Bonds consist of security entitlements of Clearstream Banking, S.A. ("Clearstream") with Citibank relating to an investment by Bank Markazi in certain sovereign and supranational bonds. It is undisputed that the Restrained Bonds were held, through Clearstream and UBAE SpA ("UBAE"), for the ultimate benefit of Bank Markazi such that Bank Markazi has a beneficial ownership interest in those assets.

As the Court is aware, President Obama signed an Executive Order on February 5, 2012 blocking all property and "interests in property" of Bank Markazi in the United States. As Bank Markazi unquestionably has an interest in the Restrained Bonds, those assets have now been blocked. Pursuant to the Executive Order, the Executive Branch has *control* of the Restrained Bonds, but the Executive Order had no impact on *ownership* of those assets.

Both Clearstream's pending December 22, 2011 Motion to Vacate the Restraints ("Clearstream's Motion") and the instant Motion raise threshold issues the Court will need to determine before this Turnover Action can proceed, as a matter of law. If the Court grants either

motion, this case will be at an end and the Restrained Bonds will remain exactly where they are now—frozen at Citibank—pending further action by the President.

Clearstream's Motion goes to the issue of ownership.   Specifically, Clearstream demonstrates that under Article 8 of the New York Uniform Commercial Code ("UCC"), the security entitlements that have been restrained (and now blocked) in New York are not attachable because they are not *Bank Markazi's* entitlements vis-à-vis Clearstream, they are *Clearstream's* entitlements vis-à-vis Citibank.  If the Court grants Clearstream's Motion on that basis and determines that no attachable property interest of Bank Markazi is present in the United States, then it need not reach the principal issue addressed in *this* Motion, namely the immunity of the Restrained Bonds from attachment and execution under section 1611(b)(1) of the FSIA.

Plaintiffs have taken the position that the blocking of the Restrained Bonds pursuant to the Executive Order "moots" all of the arguments that Clearstream and Bank Markazi have raised because Plaintiffs now have an automatic right to seize those assets under section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA").  Plaintiffs' position is incorrect for at least three reasons.  *First,* Clearstream's Motion remains dispositive of Plaintiffs' claims in this Turnover Action because TRIA section 201, on its face, applies only to the "blocked *assets of*" Bank Markazi.  Thus, the Court will need to determine whether Bank Markazi actually owns the Restrained Bonds under the UCC—the precise issue addressed in Clearstream's Motion.

*Second,* should the Court conclude, contrary to Clearstream's argument, that Bank Markazi *actually owns* the Restrained Bonds, the Court will then need to determine whether subject matter jurisdiction exists under the FSIA.  More specifically, the Court will need to determine whether the Restrained Bonds are immune from attachment and execution under

section 1611(b)(1) of the FSIA.  As demonstrated in this Motion, the heightened immunity of central bank property under that provision of the FSIA overrides any claim Plaintiffs may have under TRIA section 201.

The United States Court of Appeals for the Second Circuit has determined that where, as here, "funds are held in an account in the name of a central bank or monetary authority, the funds *are presumed to be immune* from attachment under § 1611(b)(1)." *NML Capital, Ltd. v. Banco Central de la República Argentina,* 652 F.3d 172, 194 (2d Cir. 2011) (emphasis added).

The only way Plaintiffs could overcome that presumption is *"by demonstrating with specificity"* that the Restrained Bonds "are not being used for central banking functions as such functions are normally understood." *Id.* (emphasis added).  Not only have Plaintiffs failed to meet that burden here, but the allegations in the Complaint are in fact *consistent with* Bank Markazi's use of the Restrained Bonds as an investment of the Bank's foreign currency reserves—a classic central banking function.

*Third,* Plaintiffs' claim under TRIA section 201 fails for the additional reason that application of section 201 in the circumstances presented here would violate the Treaty of Amity between the United States and Iran.  The United States Supreme Court has instructed that a statute should not be deemed to abrogate existing United States treaty obligations absent a clear expression of congressional intent to override the treaty.  TRIA section 201 evidences no such congressional intent.

For all of these reasons and the additional reasons discussed below, the Complaint must be dismissed.

## PROCEDURAL AND FACTUAL BACKGROUND

A.    Plaintiffs' Underlying Judgment Against Iran

Plaintiffs are judgment creditors with respect to a $2.65 billion default judgment they obtained against the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") in the United States District Court for the District of Columbia.  On May 30, 2003, Judge Royce Lamberth of that court entered judgment on liability against Iran and MOIS pursuant to former section 1605(a)(7) of the FSIA for providing material support to Hezbollah in connection with the bombing of the United States Marine barracks in Beirut, Lebanon on October 23, 1983. *See Peterson v. Islamic Republic of Iran,* 264 F. Supp. 2d 46 (D.D.C. 2003).  Judge Lamberth later entered a September 7, 2007 judgment in favor of Plaintiffs in the aggregate amount of $2,656,944,877.00 and allocated the amount awarded among the individual Plaintiffs.  Compl. Ex. B.

There was never any allegation in the underlying action in the District of Columbia, nor is there any allegation in the present Complaint, that Bank Markazi played any role in the bombing of the United States Marine barracks in Beirut in 1983.

B.    Plaintiffs' Enforcement Proceeding

In response to a subpoena from the Plaintiffs, the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") disclosed to Plaintiffs on June 11, 2008 that it was in receipt of information indicating *inter alia* that "Clearstream has an Iranian government client that has a beneficial ownership interest in assets custodied in the United States," and that "Clearstream has a sub-custodial account in the United States with Citibank[.]"  Compl. Ex. C, at 2.  The assets that were the subject of OFAC's disclosure consisted of U.S. dollar-denominated security entitlements with an aggregate face value of $2.003 billion. *Id.*

As Plaintiffs subsequently learned—and as OFAC confirmed in an April 23, 2010 letter to the Plaintiffs—the "Iranian government client" and beneficial owner of the Restrained Bonds referenced in OFAC's June 11, 2008 letter is in fact Bank Markazi.  Compl. ¶ 48.[1]  As of June 2008, the Restrained Bonds were housed for the benefit of Bank Markazi in an account maintained by defendant Banca UBAE SpA ("UBAE") with Clearstream in Luxembourg.  *See* Compl. ¶ 7.

Following OFAC's initial June 11, 2008 disclosures, Plaintiffs commenced an enforcement proceeding in the Southern District of New York, *Peterson v. Islamic Republic of Iran,* Case. No. 18 Misc. 302 (S.D.N.Y.) (the "Enforcement Proceeding") and, on June 12, 2008, obtained a writ of execution from the Clerk of this court directed at "*goods and chattels of* [sic] *Islamic Republic of Iran* who has an interest in accounts held by Citibank[.]"  Compl. Ex. C (emphasis added).

Plaintiffs subsequently served restraining notices on Clearstream on June 16, 2008 and on Citibank on June 17, 2008.  Compl. ¶ 55.  The purported legal basis for those restraining notices was section 5222 of the New York Civil Practice Law and Rules ("CPLR")—New York's post-judgment attachment statute.  Compl. ¶ 55; *id.* Ex. D.

Shortly thereafter, Citibank moved to quash the writ of execution and the restraining notices in the Enforcement Proceeding.  Compl. ¶ 57.  As a result, Clearstream "delivered documentary and testimonial evidence" during a hearing before Judge John G. Koeltl, acting as Part I judge of this court, on June 27, 2008.  *Id.*  Following that hearing, Judge Koeltl issued an

---

[1]    OFAC's April 23, 2010 letter is attached as <u>Exhibit A</u> to the March 15, 2012 Declaration of David M. Lindsey ("Lindsey Declaration").  A copy of that document was attached as Exhibit G to Plaintiffs' First Amended Complaint.

order vacating the restraints on two securities with an aggregate face value of $250 million. Compl. ¶ 58 & *id.* Ex. E.

The aggregate face value of the remaining security entitlements—*i.e.,* the Restrained Bonds that are the subject of this Turnover Action—is thus $1.753 billion (not including interest accrued since June 2008). In the more than three and a half years that the Restrained Bonds have now been frozen, most of the underlying securities have matured and been redeemed. The proceeds resulting from such redemptions, as well as periodic interest payments since June 2008, are frozen at Citibank. *See* Compl. ¶ 123.

### C.   The Instant Turnover Action

Following OFAC's confirmation on April 23, 2010 that the "Iranian governmental client" and beneficial owner of the Restrained Bonds referenced in OFAC's June 11, 2008 letter is in fact Bank Markazi, Plaintiffs commenced this Turnover Action.[2]

Plaintiffs subsequently filed an Amended Complaint dated October 19, 2010 (the First Amended Complaint"). By motion dated May 11, 2011, Bank Markazi moved to dismiss the First Amended Complaint for lack of subject matter jurisdiction under the FSIA.

However, further briefing on Bank Markazi's May 11, 2011 Motion to Dismiss the First Amended Complaint was deferred pursuant to the Court's June 27, 2011 Order consolidating the Enforcement Proceeding and the Turnover Action and authorizing Citibank to interplead certain other plaintiffs with judgments or claims against Iran (the "Third Party Respondents").

Following Citibank's interpleader of the Third Party Respondents, the Court held a status conference with counsel for the parties on October 31, 2011. During that status conference,

---

[2]   By Order dated June 8, 2010, the Court permitted plaintiffs to file their initial complaint in the Turnover Action under seal and ordered that all subsequent filings in the Turnover Action likewise would be under seal. The June 8, 2010 Order was based on a Protective Order entered by Judge Lamberth on June 11, 2008, which was intended to protect the confidential information disclosed by OFAC.

Plaintiffs expressed their desire to amend their pleading in light of the Second Circuit's opinion in *NML Capital.*

D.     <u>Clearstream's Motion To Vacate the Restraints</u>

By motion dated September 4, 2008 in the Enforcement Proceeding, Clearstream moved to vacate the writ of execution and restraining notices. The extensive briefing on that motion was not completed until April 18, 2011.

As directed by the Court at the October 31, 2011 status conference, Clearstream filed a Renewed Motion to Vacate the Restraints (the "Clearstream Motion") on December 22, 2011 in the now consolidated Turnover Action. The Clearstream Motion demonstrates that the restraints must be vacated because they violate, *inter alia,* the provisions of Article 8 of the New York Uniform Commercial Code and section 5201 of the CPLR as well as the attachment and execution provisions of the FSIA.

E.     <u>Blocking Of The Restrained Bonds Pursuant To Executive Order No. 13599</u>

On December 31, 2011, President Obama signed into law the National Defense Authorization Act for Fiscal Year 2012 ("NDAA"), Pub. L. No. 112-81. Section 1245 of the NDAA is titled "Imposition of Sanctions with Respect to the Financial Sector of Iran."

On February 6, 2012, President Obama issued Executive Order No. 13599 dated February 5, 2012 (the "Executive Order") pursuant to, *inter alia,* section 1245 of the NDAA and the International Emergency Economic Powers Act ("IEEPA").[3] Sections 1(a) and 1(b) of the Executive Order provide for the blocking of "[a]ll property *and interests in property* of . . . the

---

[3]    Executive Order No. 13599 is attached as <u>Exhibit B to the Lindsey Declaration</u>.

Central Bank of Iran, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person . . . ."[4]

Because Bank Markazi plainly has an "interest in" the Restrained Bonds, those assets have been blocked pursuant to the Executive Order.[5]

        F.      Pending Legislation Directed Specifically At This Turnover Action

Plaintiffs have acknowledged publicly that they are working closely with members of Congress to pass legislation directed specifically at this case and designed to preclude the arguments Clearstream and Bank Markazi have raised to date in this Turnover Action.

Legislation to that effect has been introduced in both Houses of Congress—in the Senate as section 503 of Senate Bill S-2101 and in the House as H.R. 4070. If some version of this legislation becomes law, Plaintiffs will undoubtedly race to this Court to declare this case finished in their favor with no further argument needed. Bank Markazi reserves its right to supplement this Memorandum of Law as and when appropriate in the event that S-2101, H.R. 4070, or any other, comparable legislation becomes law and will certainly have substantive arguments against Plaintiffs' evolving positions.

## ARGUMENT

      I.     **Standard Applicable To This Motion**

"In a motion to dismiss [for lack of subject matter jurisdiction] pursuant to Fed. R. Civ. P. 12(b)(1), the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." *Robinson v. Government of Malaysia,* 269 F.3d 133, 140 (2d Cir. 2001).

---

[4]   Executive Order No. 13599, §§ 1(a) & 1(b) (emphasis added).

[5]   *See* Feb. 14, 2012 letter from Citibank's counsel to Hon. Barbara S. Jones and Hon. Gabriel W. Gorenstein ("Citibank wishes to advise the Court that the restrained funds at issue in this litigation have been designated as blocked funds and are being held in a Citibank account established in accordance with OFAC regulations.").

This Motion challenges the legal sufficiency under the FSIA of the subject matter jurisdiction allegations in the Complaint.[6]   As the Court has aptly stated, a movant in Bank Markazi's position will prevail if it "accept[s] whatever it is that the plaintiffs want to allege or say that they might find in discovery" and demonstrates that none of those allegations can overcome the presumption that the Restrained Bonds are immune from attachment and execution under the FSIA. *See* 10/31/11 Hrg. Tr. at 37:5-19.   That is what this Motion does.[7]

To be clear: except where this Memorandum of Law explicitly identifies a specific factual allegation as undisputed, Bank Markazi does not acknowledge the *truth* of the allegations in the Complaint.   Bank Markazi's position is that the allegations in the Complaint are *irrelevant* for purposes of determining whether this Court has subject matter jurisdiction over Plaintiffs' claims in this Turnover Action under the FSIA.   In other words, even assuming that Plaintiffs could establish the truth of their allegations, the Restrained Bonds would still be immune from attachment and execution under the FSIA.

In light of Bank Markazi's *prima facie* showing that the Restrained Bonds are entitled to immunity from attachment and execution under the FSIA, Plaintiffs will bear the burden, in opposition to this Motion, of "going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted[.]"   *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir. 1993) (citation omitted).   Unless Plaintiffs can meet their burden of

---

[6]   Under the FSIA, "both statutory subject matter jurisdiction (otherwise known as 'competence') and personal jurisdiction turn on application of the substantive provisions of the Act." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 485 n.5 (1983).

[7]   In support of its May 11, 2011 Motion to Dismiss the First Amended Complaint, Bank Markazi submitted affidavits from two Bank employees as well as an expert opinion concerning the immunity of foreign central bank property under FSIA section 1611(b)(1).   The May 11, 2011 Motion to Dismiss was filed before the Second Circuit issued its opinion in *NML Capital.*   As demonstrated in this Memorandum of Law, there is no longer any doubt following *NML Capital* that the Restrained Bonds are immune under FSIA section 1611(b)(1).   Accordingly, Bank Markazi has not submitted any extrinsic evidence in support of this Motion.

production, the Complaint will be subject to dismissal as a matter of law.  *See, e.g., Orkin v. Swiss Confederation,* 770 F. Supp. 2d 612, 616 (S.D.N.Y. 2011), *aff'd,* 444 Fed. Appx. 469 (2d Cir. 2011) ("conclusory assertions *of fact or law"* are insufficient to avoid dismissal for lack of subject matter jurisdiction under the FSIA) (emphasis added).

Nor may Plaintiffs forestall dismissal by claiming that they require discovery from Bank Markazi.  Plaintiffs may seek discovery from Bank Markazi *"only* to verify allegations of *specific facts crucial to an immunity determination."*  *EM Ltd. v. Republic of Argentina,* 473 F.3d 463, 486 (2d Cir. 2007) (emphasis added).  Here, however, Bank Markazi's Motion demonstrates that on the face of the Complaint, the Restrained Bonds are immune from attachment and execution under the FSIA.  Accordingly, Plaintiffs are not entitled to any discovery from Bank Markazi.[8]

## II.      Plaintiffs' Claim Pursuant To TRIA Section 201 Fails Because The Restrained Bonds Are Not "Assets Of" Bank Markazi

As previously stated, "[a]ll property *and interests in property"*[9] of Bank Markazi in the United States have been blocked as of February 6, 2012 pursuant to Executive Order No. 13599, which President Obama issued pursuant to his statutory authority under, *inter alia,* the NDAA and IEEPA.  Accordingly, the Restrained Bonds are now blocked, as Bank Markazi unquestionably has an "interest in" those assets.

---

[8]   *See Sniado v. Bank Austria AG,* No. 00-cv-9123 (AGS), 2001 WL 812236, at *1 (S.D.N.Y. July 18, 2001) ("Discovery is not necessary for a party opposing a facial challenge to subject matter jurisdiction."); *Berces v. Debrecen Tartositoipari Kombinat,* No. 94 Civ 3381 (KMW), 1995 WL 640486, at *1 (S.D.N.Y. Oct. 31, 1995) (claims against a sovereign instrumentality "must be dismissed without allowance of even limited discovery" where a "facial attack [on subject matter jurisdiction under the FSIA] succeeds"); *Gabay v. Mostazafan Foundation of Iran,* 151 F.R.D. 250, 255 (S.D.N.Y. 1993) (a plaintiff's claim may be "so legally insufficient that he is precluded from discovery as a matter of law").

[9]   Executive Order, §§ 1(a) & 1(b) (emphasis added).

Bank Markazi's "interest in" the Restrained Bonds, however, is not dispositive under TRIA section 201. Instead, the Restrained Bonds are subject to attachment and execution under TRIA section 201 only if they are "assets of" Bank Markazi. Whether the Restrained Bonds are "assets of" Bank Markazi turns on whether the Bank *owns* those assets. Clearstream's Motion addresses that issue.[10]

Bank Markazi has consistently maintained that it has a *beneficial* ownership interest in the Restrained Bonds. Indeed, it is undisputed that the Restrained Bonds "are held ultimately for the benefit of Bank Markazi."[11] This does not mean, however, that Bank Markazi is the *owner* of those assets.

As Clearstream has demonstrated, Bank Markazi is not in fact the owner of the Restrained Bonds, which are *Clearstream's* security entitlements vis-à-vis Citibank. Bank Markazi's property—in the form of the Bank's security entitlements vis-à-vis Clearstream—is located in Luxembourg. Both under New York law (including Article 8 of the UCC) and Luxembourg law, no property interest *of Bank Markazi* exists in the United States.[12] And Bank Markazi's property interest in Luxembourg is not attachable in any event under the FSIA, which

---

[10]   Importantly, at the time Bank Markazi filed its May 11, 2011 Motion to Dismiss Plaintiffs' First Amended Complaint, the Bank did not yet have access to the filings under seal in the related Enforcement Proceeding, *Peterson v. Islamic Republic of Iran,* Case. No. 18 Misc. 302 (S.D.N.Y.), including Clearstream's arguments in support of its then-pending Motion to Vacate the Restraints. The reason Bank Markazi did not have access to those filings is because *Plaintiffs objected* to the Bank's request for access.

Since it did not have access to, and was not aware of, Clearstream's arguments (or Plaintiffs' arguments in response), Bank Markazi expressly reserved its right to amend or supplement its arguments based on "any newly discovered facts and circumstances" and/or "any additional arguments [by Plaintiffs] purportedly derived from the filings under seal." *See* Bank Markazi's May 11, 2011 Memorandum of Law in Support of Its Motion to Dismiss the Amended Complaint for Lack of Subject Matter Jurisdiction, at p. 7 n.3.

Under these circumstances, any attempt by Plaintiffs to question Bank Markazi's reliance on Clearstream's arguments in *this* Motion would be disingenuous at best and must be rejected.

[11]   Clearstream Br. at 21.

[12]   *See id.* at 30-38.

contains no exception to immunity for the property of a sovereign party located outside the United States.[13]

In sum, as discussed below, the Restrained Bonds are not "assets of" Bank Markazi for purposes of TRIA section 201 because the Bank does not *actually own* those assets under applicable law.  The Complaint must be dismissed.

A.   The Blocking Of The Restrained Bonds Pursuant To The Executive Order Transferred *Control*—But Not *Ownership*—Of Those Assets To The Executive Branch

The freezing or blocking of property by the Executive Branch "transfers *possessory* interest in the property."  *Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York,* 346 F.3d 264, 272 (2d Cir. 2003) (emphasis in original).  However, such freezing or blocking has no impact on *ownership* of the property.  *See id.*  As the United States Supreme Court stated in *Dames & Moore v. Regan,* 453 U.S. 654, 673 (1981), "the congressional purpose in authorizing blocking orders is to put control of foreign assets in the hands of the President[.]"  *Id.* (internal quotation and citation omitted).  In contrast, "the IEEPA does not give the President the power to 'vest' or to take title to the assets."  *Id.* at 672 n.5.

In keeping with the nature and effect of blocking as just described, the Executive Order here provides that all "property and interests in property" of Bank Markazi in the United States "may not be transferred, paid, exported, withdrawn or otherwise dealt in."[14]  As a result, the

---

[13]   *See id.* at 38-40.  *See, e.g., Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp.,* 921 F. Supp. 1113, 1119 (S.D.N.Y. 1996) ("Under the FSIA, assets of foreign states located outside the United States retain their traditional immunity from execution to satisfy judgments entered in United States courts.").

[14]   Executive Order, §§ 1(a) & 1(b).  The Executive Order further provides for the blocking of any property "within the possession or control of any United States person."  *Id.*  The Executive Order defines the term "United States person" to mean "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."  Executive Order, §7(c).  The NDAA includes a separate definition of the term "United States person" as "(A) a natural person who

Executive Branch now has *control* of the Restrained Bonds. The Executive Order, however, does not impact the *ownership* of those assets. In other words, whoever owned the Restrained Bonds as of February 4, 2012—the day before President Obama signed the Executive Order—continues to own those assets today.

> B.    The Restrained Bonds Are Not "Assets Of" Bank Markazi

Section 201 of TRIA, Pub. L. No. 107-297, Title II, § 201, 116 Stat. 2337 (2002) (codified as a note to section 1610 of the FSIA), provides no basis for the seizure of the Restrained Bonds because that provision applies only to "blocked *assets of*" a terrorist party. Subsection (a) of section 201 provides in pertinent part:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the **blocked assets of** that terrorist party (including the **blocked assets of** any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

---

is a citizen or resident of the United States or a national of the United States . . . and (B) an entity that is organized under the laws of the United States or a jurisdiction within the United States." NDAA § 1245(h)(3).

Plaintiffs claim, in opposition to Clearstream's Motion to Vacate the Restraints, that Clearstream must be deemed a "United States person" under the Executive Order because there are purportedly "extensive contacts between Clearstream and the United States." *See* Plaintiffs' March 12, 2012 Opposition to Clearstream's Renewed Motion to Vacate Restraints, at 22-24. On that basis, Plaintiffs claim that Clearstream is "subject to the jurisdiction of the United States" under section 1702(a)(1)(B) of IEEPA, 50 U.S.C. § 1702(a)(1)(B).

Plaintiffs cite no support for this assertion, and it is incorrect as a matter of law. It is undisputed that Clearstream "is a banking corporation organized under the laws of [the] Grand Duchy of Luxembourg" maintaining "operational centres in Luxembourg, Germany and Singapore." Compl. ¶ 40. Therefore, Clearstream is not a "United States person." *See, e.g., Glen v. Club Méditerranée S.A.,* 365 F. Supp. 2d 1263, 1273-74 (S.D. Fla. 2005) (rejecting argument that French corporation having its principal place of business in France was "subject to the jurisdiction of the United States" for purposes of the Cuban Assets Control Regulations and deeming irrelevant plaintiffs' allegation that the French corporation engaged in "substantial business in the United States").

28 U.S.C. §1610, note regarding "Treatment of Terrorist Assets" (emphasis added).[15]

> 1.  The Restrained Bonds Cannot Be Deemed "Assets Of" Bank Markazi Unless the Bank Actually Owns Those Assets

Only assets *actually owned by* Bank Markazi qualify as "assets of" Bank Markazi under TRIA section 201.

> The plain language of TRIA § 201 requires *both* that the [assets in question] be "blocked assets" and that these blocked assets be "of that terrorist party." . . . . The Supreme Court has determined that "the use of the word 'of' denotes ownership." For [a blocked asset] to be attachable, then, [the terrorist party] must actually *own* it.

*Calderon-Cardona v. JP Morgan Chase Bank, N.A.*, --- F. Supp. 2d ----, No. 11 Civ. 3283 (DLC), 2011 WL 6155987, at *8 (S.D.N.Y. Dec. 7, 2011) (emphasis in original) (quoting *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, --- U.S. ----, 131 S.Ct. 2188, 2196 (2011)); *see also Rubin v. Islamic Republic of Iran,* 541 F. Supp. 2d 416, 420 (D. Mass. 2008) ("TRIA permits judgment creditors to levy on blocked assets. . . . Obviously, in order to succeed in the levy, the judgment creditor would have to establish that the property may be taken on execution *because it belongs to* the judgment debtor.") (emphasis added).

The position of the United States Government on this issue is clear: "The plain meaning of the phrase 'of that terrorist party' [in TRIA section 201] clearly requires ownership on the part of that terrorist party; the statute's text does not support attachment of assets that do not belong to the 'terrorist party.'" Statement of Interest of the United States of America in Response to Petitioners' Motion for Immediate Turnover of Funds ("Statement of Interest of the United

---

[15]  By its plain terms, subsection (a) of TRIA section 201 does not allow for the recovery of punitive (as opposed to compensatory) damages. *See id.* (". . . to the extent of any *compensatory damages* for which such terrorist party has been adjudged liable.") (emphasis added).

States"), *Rux v. ABN Amro Bank NV*, 08 Civ. 6588 (AKH) (S.D.N.Y.) (Dkt. # 185, filed on Jan. 12, 2009) at 10-11.[16]  Therefore, "any attempt to attach more than the [terrorist party]'s interest in any particular property would appear to exceed TRIA's scope." *Id.* at 11.

Not only is the Government's position supported by the plain text of section 201, it also avoids the "absurd results" that would ensue if there were no requirement of ownership. *Calderon*, 2011 WL 6155987, at *11.  Indeed, if there were no such requirement, TRIA section 201 would "allow attachment of assets with only the most tangential relationship to [the terrorist state]." *Id.*

Here, the Restrained Bonds have been blocked pursuant to the Executive Order because Bank Markazi has an "interest" in that property.  However, "[t]he terms 'interest' and 'title' are clearly not synonymous." *Bank of New York v. Norilsk Nickel*, 14 A.D. 3d 140, 147 (1st Dep't 2004).  Thus, the Executive Order "block[s] assets based on interests in property and the use to which such property was put, *not based on who own[s] the property in question.*"[17]

Like the executive order and accompanying regulations at issue in *Norilsk Nickel,* the purpose of the Executive Order here is to "impede[] movement" of the Restrained Bonds by requiring that those assets remain exactly where they are now—frozen at Citibank in New York. *Id.* at 146.  It does not follow, however, that the Restrained Bonds are available for distribution to Plaintiffs under TRIA section 201 because "TRIA's plain language dictates that not all 'blocked assets' are attachable." *Calderon*, 2011 WL 6155987, at *14.

Unlike Judge Cote in *Calderon,* two other courts in this district have rejected the United States Government's stated position that attachment and execution under TRIA section 201

---

[16]   The Statement of Interest of the United States is attached as <u>Exhibit C</u> to the Lindsey Declaration.

[17]   *Id.* (discussing executive order and accompanying OFAC regulations providing for the blocking of property and interests in property of certain entities affiliated with the former nation of Yugoslavia) (emphasis added).

requires actual ownership of the assets in question.  Thus, in *Hausler v. JPMorgan Chase Bank,*
*N.A.,* 740 F. Supp. 2d 525 (S.D.N.Y. 2010), the court declined "[t]o treat the Executive Branch's
statutory interpretation of TRIA as controlling" based on a finding that Congress intended TRIA
"to provide terrorism victims with ample avenues to compensation for acts perpetrated by state
sponsors of terrorism."  *Id.* at 537.[18]  *Accord. Levin v. Bank of New York,* No. 09 CV 5900
(RPP), 2011 WL 812032, at *16 (S.D.N.Y. Mar. 4, 2011) (discussing TRIA's "remedial
purpose").

    Respectfully, however, that reasoning is not persuasive.  However "ample" the rights of
judgment creditors under TRIA section 201 may be, they are plainly not without limitations.[19]
Among those limitations is the requirement imposed by the plain text of section 201 that in order
to be attachable, the blocked assets must be "assets of" the terrorist party.

    Indeed, as Judge Cote noted, if Congress had intended to make *all* blocked assets
available for distribution to judgment creditors under TRIA section 201 regardless of ownership,
Congress easily could have done so by providing that "'blocked assets in which that terrorist
party has any property interest' or 'all assets blocked pursuant to OFAC sanctions regulations
targeting that terrorist party'" are subject to attachment and execution.  *Calderon,* 2011 WL
6155987, at *12.  But that is not what section 201 says.  Instead, section 201 "allows for

---

[18]   In another, recent opinion in the same case, Judge Marrero reaffirmed this broad interpretation of the
scope of TRIA section 201.  *See Hausler v. JPMorgan Chase Bank, N.A.,* --- F.Supp.2d ----, 2012
WL 601034 (S.D.N.Y. Feb. 22, 2012).

[19]   The excerpt from a statement by Senator Tom Harkin, the sponsor of TRIA section 201, that the
*Hausler* court cited to support its conclusion that all blocked assets are attachable under TRIA is not
to the contrary.  In his statement, Senator Harkin criticized what he described as the Executive
Branch's policy of "[h]olding the *blocked assets of* state sponsors of terrorism in perpetuity" rather
than making those assets available to "compensate American victims of terrorist attacks." *Hausler,*
740 F. Supp. 2d 525 at 538 n.13 (emphasis added, quoting 148 Cong. Rec. S11528 (Statement of
Senator Harkin)).

In any event, "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing
legislative history." *Chrysler Corp. v. Brown,* 441 U.S. 281, 311 (1979).

attachment only of 'blocked assets *of that terrorist party.'"* *Id.* (quoting TRIA section 201(a),
emphasis in original).

2.    New York Law Determines Whether The Restrained Bonds
Are "Assets Of" Bank Markazi

The Second Circuit has instructed that "[i]n the absence of a superseding federal statute
or regulation, state law generally governs the nature of any interests in or rights to property that
an entity may have." *Export-Import Bank of the United States v. Asia Pulp & Paper Co.,* 609
F.3d 111, 117 (2d Cir. 2010). The key test is whether a federal statute such as TRIA section 201
"itself creates . . . property rights" or instead "merely attaches consequences, federally defined,
to rights created under state law." *Id.* (quoting *United States v. Craft,* 535 U.S. 274, 278 (2002)).
TRIA falls into the latter category.

As Judge Cote found in *Calderon,* "[n]owhere in TRIA is there a definition of 'property'
or 'property ownership,' or any other indication that the statute intends to create a special regime
of federal property interests or rights." *Calderon,* 2011 WL 6155987, at *9. TRIA section 201
thus "provides no guidance for determining *which blocked assets* are 'of that terrorist party.'"
*Id.* at *10 (emphasis added).

Accordingly, "[section 201 of] TRIA does not pre-empt New York law." *Id.* at *9. Nor
does the Executive Order itself pre-empt New York law, as it does not purport to define
"property *ownership." See id.* at *12 (emphasis in original). Nothing in the Executive Order
"impl[ies] that simply because a certain piece of 'property' or 'property interest' is blocked
pursuant to the sanctions regime [against Bank Markazi], it therefore belongs to [Bank
Markazi]." *Id.*

In other words, "federal and state law d[o] not conflict at all; they simply address[]
different issues." *Norilsk Nickel,* 14 A.D. 3d at 147. Thus, "there are no 'conflicting portions' of

state law that TRIA might supersede." *Calderon*, 2011 WL 6155987, at *14. "Rather, . . . state law fills an interpretive gap in TRIA by giving meaning to the phrase 'of that terrorist party.'" *Id.* Accordingly, TRIA section 201 leaves "ample room" for the application of New York law to determine "which subset of 'blocked assets' constitutes those that are 'of that terrorist party' and that should therefore be subject to attachment." *Id.* at *10.

> 3.    As Demonstrated In Clearstream's Motion, The Restrained Bonds Cannot Be Deemed "Assets Of" Bank Markazi Under New York Law, Including the UCC's Choice of Law Provisions

If the Court applies New York law, including the UCC's choice of law provisions, to determine whether the Restrained Bonds are "blocked assets of" Bank Markazi for purposes of TRIA section 201, it will then need to consider the arguments raised by Clearstream in its December 22, 2011 Consolidated Memorandum of Law in Support of Its Renewed Motion to Vacate the Restraints (the "Clearstream Brief").

Bank Markazi expressly adopts and incorporates herein by reference the arguments Clearstream has raised in the Clearstream Brief. Bank Markazi respectfully refers the Court to the Clearstream Brief for the full context and detail of Clearstream's arguments.

Briefly, it is undisputed that Bank Markazi has a *beneficial* interest in the Restrained Bonds. Indeed, that is the very reason why the Restrained Bonds have now been blocked.[20] As demonstrated in the Clearstream Brief, however, that beneficial interest does not make the Bank the *owner* of those assets under New York law (or Luxembourg law, the law governing Bank

---

[20]    *See Global Relief Foundation, Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) (for purposes of determining the interests in property that are subject to blocking, "beneficial rather than legal interests matter"); *accord. Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003) (any "interest" in property may be subject to blocking; "[t]he interest need not be a legally protected one").

Markazi's rights arising out of its security entitlements pursuant to the UCC's choice of law provisions).[21]

It is undisputed that Bank Markazi is not in privity with Citibank and is not Citibank's customer—*Clearstream* is.  *See, e.g.,* Compl. ¶ 87 (referring to "the account . . . in [Bank] Markazi's name at Clearstream"); *id.* ¶ 98 (referring to "Clearstream's cash account at Citibank").[22]  The essence of Clearstream's argument is that Article 8 of the New York Uniform Commercial Code establishes a "carefully constructed scheme" of property rights governing security entitlements such as the Restrained Bonds here.[23]  Under the UCC, however, the security entitlements that have been restrained (and now blocked) in New York "are not *Bank Markazi's* entitlements vis-à-vis Clearstream, they are *Clearstream's* entitlements vis-à-vis Citibank."[24]

The fact that those entitlements "are held ultimately for the benefit of Bank Markazi" does not change the fact that Bank Markazi is not the *owner* of the Restrained Bonds under the UCC.[25]  Thus, "Plaintiffs cannot restrain the securities entitlements held by Bank Markazi at Clearstream [in Luxembourg] by restraining Clearstream's security entitlements in its Omnibus Account at Citibank [in New York]."[26]

Plaintiffs make much of the fact that the bulk of the securities underlying the Restrained Bonds has now matured and been redeemed.  However, as Clearstream has stated, "if the Court

---

[21]  *See* Clearstream Br. at 22-24; N.Y. U.C.C. §§ 8110(b) & (e).

[22]  Of course, this does not take into account the presence of UBAE as an additional intermediary between Clearstream and Bank Markazi.  However, as demonstrated in the Clearstream Brief, the omission of UBAE from the analysis makes no difference under New York law, including the UCC. *See* Clearstream Brief at 21.

[23]  Clearstream Br. at 19.

[24]  *Id.* at 21 (emphasis added).

[25]  *Id.*

[26]  *Id.*

rules that the initial restraints were not effective under the UCC, then the cash [resulting from the redemption of the underlying securities] is not subject to restraint by and turnover to the Plaintiffs."[27]

In opposition to Clearstream's Motion, Plaintiffs argue that even if the restraints on the security entitlements in Clearstream's omnibus account at Citibank were invalid under Article 8 of the UCC when they were first imposed in June 2008, that critical defect was somehow cured by *subsequent* redemptions in the more than three and a half years that the restraints have now been in place. Yet the principal case Plaintiffs rely on simply does not support that proposition.[28] *See Dickstein v. Merrill Lynch,* 685 A.2d 943 (N.J. App. 1996).

The dispute in *Dickstein* revolved around whether a brokerage firm was authorized to use a portion of the balance in a client's cash account to pay tax penalties assessed against the client in compliance with a New York State tax levy. The funds in the cash account resulted from the liquidation of certain securities some *five months previously at the client's request.* Under those circumstances, the New Jersey court's conclusion in *Dickstein* that the funds in the cash account were not subject to Article 8 of the UCC governing security entitlements is unremarkable. *See id.* at 945-46.

Here, by contrast, the restraints on the security entitlements in Clearstream's omnibus account at Citibank were invalid to begin with under Article 8 of the UCC. The subsequent

---

[27] Clearstream Br. at 28. Clearstream demonstrates that Plaintiffs' reliance on the redemption of most of the securities underlying the Restrained Bonds is unavailing for the additional reasons that (1) a judgment creditor cannot restrain the judgment debtor's *bank's* bank because that bank does not owe any debt to the judgment debtor or hold any money in an account belonging to the judgment debtor; and (2) Bank Markazi does not control, and cannot assign or transfer, the funds in Clearstream's cash account at Citibank. *See* Clearstream Br. at 29-30.

[28] *See* Plaintiffs' March 12, 2012 Opposition to Clearstream's Renewed Motion to Vacate Restraints, at 41.

redemption of the underlying securities did not convert those assets into "assets of" Bank Markazi for purposes of TRIA section 201.

Thus, Judge Cote rejected an attempt by the judgment creditors in *Calderon* to execute against the proceeds of blocked electronic fund transfers or "EFTs"—*i.e.,* cash—frozen in New York bank accounts.  *See Calderon*, 2011 WL 6155987, at *1.  Because "the interest of an originator or a beneficiary in a midstream EFT falls short of property ownership" under Article 4-A of the UCC, the court found that the blocked EFTs were not attachable under TRIA section 201.  *Id.* at *8.  Therefore, neither were the blocked *proceeds* of those EFTs in the New York bank accounts.  *See id.* at *16 (denying petition for turnover of blocked funds).

Likewise, the New York Appellate Division, First Department held in *Norilsk Nickel* that the proceeds from an EFT "maintained . . . in a 'call account' in New York" were not attachable because the EFT itself was not attachable under Article 4-A of the UCC.  *Norilsk Nickel,* 14 A.D.3d at 143; *see id.* at 145 ("It is beyond cavil that attachment will only lie against the property of the debtor, and that the right to attach the property is only the same as the defendant's own interest in it.") (internal quotation and citation omitted).

Bank Markazi respectfully submits that the reasoning in *Calderon* and *Norilsk Nickel* is dispositive of the issue presented here.  Accordingly, there is no basis for this Turnover Action to proceed.  The Complaint must be dismissed.

### III.   Allowing Plaintiffs To Seize The Restrained Bonds Would Violate The Treaty Of Amity Between The United States And Iran

The Treaty of Amity[29] is self-executing[30] and accordingly has "the force and effect of a legislative enactment." *Brzak v. United Nations,* 597 F.3d 107, 111 (2d Cir. 2010) (quoting *Medellin v. Texas,* 552 U.S. 491, 505-06 (2008)). Application of TRIA section 201 in the instant case would violate Articles III.1, III.2, IV.1, and IV.2 of the Treaty regarding recognition of Bank Markazi's separate juridical status; full, impartial and equal access to the courts; fair and equitable treatment; and protection and security in no case less than that required under international law, respectively.

Bank Markazi was not a party to, and was never served with process in, the underlying proceedings before Judge Lamberth in the District of Columbia, nor is the Bank alleged to have had any involvement in the acts that gave rise to Plaintiffs' judgment.   Under these circumstances, permitting Plaintiffs to seize the Restrained Bonds would be incompatible with the Treaty provisions identified above.   The United States Supreme Court has made clear that under "principles ... *common to both international law and federal common law,*" "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 623, 626-627 (1983) (*"Bancec"*) (emphasis added).[31]

---

[29]   Treaty of Amity, Economic Relations and Consular Rights between the United States and Iran, 8 U.S.T. 899 (1955) (the "Treaty of Amity" or the "Treaty").   The Treaty is attached as Exhibit D to the Lindsey Declaration.

[30]   *See McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008) ("The Treaty of Amity, like other treaties of its kind, is self-executing.").

[31]   In *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010), the Second Circuit rejected an argument by Bank Melli Iran, a state-owned Iranian Bank and thus an instrumentality of Iran, that application of TRIA section 201 to permit plaintiffs to execute against proceeds resulting from the sale of real property owned by Bank Melli in New York would violate the Treaty of Amity. Specifically, the Second Circuit held that TRIA section 201 must be deemed to have abrogated the decision of the United States Supreme Court in *Bancec. Id.* at 51. The Second Circuit further held

Thus, Bank Markazi's property is entitled to recognition as separate and distinct from the property of Iran, the judgment debtor here, not only under the FSIA, but also *as a matter of international law.*   Indeed, international law and practice—like FSIA section 1611(b)(1)[32]— extend special protection to central bank property and treat such property differently from the property of other government agencies and instrumentalities.[33]   Articles III.1 and IV.2 of the Treaty give effect to those protections under international law.

For the same reason, allowing Plaintiffs to seize the Restrained Bonds would also violate the provision in Article IV.1 of the Treaty requiring the United States to "refrain from applying unreasonable and discriminatory measures" against Bank Markazi's rights and interests.

Bank Markazi respectfully submits that the "notwithstanding" clause in TRIA section 201 is not a sufficiently clear indication of Congress's intent to abrogate *a treaty,* as

---

that "[t]here is . . . no conflict" between TRIA section 201 and Articles III.1 and IV.2 of the Treaty of Amity, including the obligation of the United States pursuant to Article III.1 of the Treaty to recognize the "juridical status" of "[c]ompanies constituted under the applicable laws and regulations [of Iran]." *Id.* at 53.   The Second Circuit did not, however, specifically address Articles III.2 and IV.1 of the Treaty.

Bank Markazi acknowledges that the Second Circuit's holding in this respect is binding on this Court. However, it is Bank Markazi's position that TRIA section 201 did not abrogate the United States Supreme Court's decision in *Bancec.*   Bank Markazi accordingly raises this issue here to preserve it for further review as appropriate.

We note that Bank Melli has filed a Petition for a Writ of Certiorari in *Weinstein* seeking reversal on this very issue that is currently pending before the United States Supreme Court.   *See* Supreme Court Docket No. 10-947.   By Order dated June 13, 2011, the Court invited the Solicitor General to file a brief expressing the views of the United States.   The Solicitor General has not yet filed that brief. Bank Markazi reserves its right to supplement this Memorandum of Law as appropriate if the Supreme Court grants Bank Melli's Petition.

[32]   *See* Point V, *infra.*

[33]   *See* United Kingdom State Immunity Act, 1978 Laws c. 33, section 14(4).   Likewise, Belgium adopted a law in July 2008 expressly providing for the immunity of foreign central bank property. Finally, and most significantly, Article 21(c) of the *United Nations Convention on Jurisdictional Immunities of States and Their Property* adopted by the General Assembly of the United Nations on December 2, 2004 (not yet in force) reflects a broad international consensus concerning the immunity of central bank property.   *See* General Assembly Resolution 59/38, annex, Official Records of the General Assembly, Fifty-ninth Session, Supplement No. 49 (A/59/49).

distinguished from other "provision[s] of law."[34]  "A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed . . . .  Legislative silence is not sufficient to abrogate a treaty."  *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984).  Thus, courts have declined to enforce statutes that are incompatible with existing United States treaty obligations in the absence of an *explicit* statutory abrogation of a treaty to which the United States is a party.[35]

### IV.    It Is Plaintiffs' Burden To Show That TRIA Section 201 Overrides The Executive Order's Prohibition On Any Transfer Of The Restrained Bonds

As stated above, by its plain terms, the Executive Order provides that all "property and interests in property" of Bank Markazi in the United States "may not be transferred, paid, exported, withdrawn or otherwise dealt in."[36]  Therefore, it is Plaintiffs' burden to establish that the Restrained Bonds are available for distribution to them under TRIA section 201 notwithstanding the plain language of the Executive Order.

As the United States Supreme Court explained in *Dames & Moore,* the purpose of a blocking order such as the Executive Order here is to allow the President to use blocked assets as

---

[34]    Apart from the narrow holding concerning Articles III.1 and IV.2 of the Treaty of Amity, the remainder of the discussion of the Treaty in *Weinstein* is *dicta*.  In particular, the Second Circuit's statement that "*even assuming, arguendo,* that there were a conflict between [TRIA and the Treaty], the TRIA would have to be read to abrogate that portion of the Treaty" plainly constitutes *dicta. Weinstein,* 609 F.3d at 53 (emphasis added); *see Calderon-Cardona v. JPMorgan Chase Bank, N.A.* 2011 WL 6155987, *14 (S.D.N.Y. 2011) ("In *Weinstein,* the Second Circuit stated in *dicta* that TRIA would abrogate a conflicting portion of an earlier treaty because the Notwithstanding Clause served to 'expressly state[]' Congress's purpose in superseding earlier laws[.]") (citation omitted).

[35]    *See United States v. Palestine Liberation Organization*, 695 F. Supp. 1456  (S.D.N.Y. 1988) (even where statute requiring closure of the Palestine Liberation Organization's Mission as a Permanent Observer to the United Nations in New York purported to apply "notwithstanding any provision of law to the contrary," statute did not abrogate United Nations Headquarters Agreement); *see also Tribes v. U.S.*, No. 96-381 (HA), 1996 WL 924509, *9 (D. Or., Oct. 2, 1996) (clause providing that statutory provision was to apply "notwithstanding any other provision of law" did not abrogate pre-existing treaty with Native American tribes as it did not constitute "a clear expression" of Congressional intent to abrogate the treaty).

[36]    Executive Order, §§ 1(a) & 1(b).

he deems fit in dealing with the target country in order to resolve a declared national emergency.[37]

> Such [blocking] orders permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency. The frozen assets serve as a "bargaining chip" to be used by the President when dealing with a hostile country.

*Dames & Moore,* 453 U.S. at 673. With respect to Iran, President Obama recently reiterated, at a press conference on March 6, 2012, that the United States is about to resume negotiations concerning that country's nuclear program:

> THE PRESIDENT: (. . .) To resolve this issue [of Iran's nuclear program] will require Iran to come to the table and discuss in a clear and forthright way how to prove to the international community that the intentions of their nuclear program are peaceful. They know how to do that. This is not a mystery. And so it's going to be very important to make sure that, on an issue like this -- there are complexities; it obviously has to be methodical. I don't expect a breakthrough in a first meeting, but I think we will have a pretty good sense fairly quickly as to how serious they are about resolving the issue.[38]

Under these circumstances, Bank Markazi respectfully submits that allowing Plaintiffs to seize the Restrained Bonds under TRIA section 201 would contravene the very purpose for which those assets have been blocked pursuant to the Executive Order. Indeed, as former President Clinton stated in 1998 in connection with a predecessor provision of TRIA section 201, FSIA section 1610(f)(1)(A), distributing blocked assets to private plaintiffs would "effectively eliminate" an "important source of leverage" in negotiations with foreign states.[39]

---

[37]  The Executive Order here provides that it was issued "in order to take additional steps with respect to the national emergency declared in Executive Order 12957 of March 15, 1995[.]" Executive Order, Preamble.

[38]  Remarks of President Obama at March 6, 2012 press conference. The full text of the President's remarks is *available at* http://www.whitehouse.gov/the-press-office/2012/03/06/press-conference-president.

[39]  1998 Pub. Papers, 1843, 1847 (Oct. 23, 1998).

**V.      Should The Court Determine That The Restrained Bonds Are "Assets Of" Bank Markazi, Then Those Assets Are Immune From Attachment And Execution Under Section 1611(b)(1) Of The FSIA As "The Property Of" A Foreign Central Bank Held For Its Own Account**

Should the Court conclude—contrary to Point II above and Clearstream's Motion—that the Restrained Bonds are "assets of" Bank Markazi under applicable law, including the UCC, the Court will then need to determine whether those assets are immune from attachment and execution as "the property of" a foreign central bank held for its own account under section 1611(b)(1) of the FSIA.

In *NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172 (2d Cir. 2011), the Second Circuit held that section 1611(b)(1) of the FSIA establishes a clear presumption that funds held in an account in the name of a foreign central bank are immune from attachment and execution.[40]   Plaintiffs have not alleged any facts to overcome that presumption here.  Therefore, as discussed below, the Complaint must be dismissed as a matter of law for lack of subject matter jurisdiction under the FSIA.

**A.      The FSIA Determines Subject Matter Jurisdiction In This Turnover Action**

Under the FSIA, the property of a foreign state, or of an instrumentality of a foreign state,[41] is presumptively immune from attachment and execution unless one of the specific exceptions to immunity enumerated in the FSIA applies.[42]   Thus, the United States Supreme

---

[40]   In *NML Capital,* the Second Circuit rejected an attempt by holders of defaulted Argentine bonds to seize funds belonging to the Central Bank of Argentina to satisfy nearly $2.4 billion in outstanding judgments against the Republic of Argentina.

[41]   *See* 28 U.S.C. § 1603(a). ("A 'foreign state' . . . includes . . . an agency or instrumentality of a foreign state").

[42]   *See Aurelius Capital Partners, LP v. Republic of Argentina,* 584 F.3d 120, 129-30 (2d Cir. 2009) ("Under section 1609 of the [FSIA], property in the United States of a foreign state is immune from attachment or execution unless the property fits within one of the limited exceptions enumerated in sections 1610 or 1611 of the Act."); *Rubin v. Islamic Republic of Iran,* 637 F.3d 783, 799 (7th Cir.

Court has instructed that *"[a]t the threshold of every action* in a District Court against a foreign state, . . . the court must satisfy itself that one of the exceptions [to immunity enumerated in the FSIA] applies—and in doing so it must apply the detailed federal law standards set forth in the Act." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 493-94 (1983) (emphasis added).

Yet at the March 1, 2012 status conference, Plaintiffs argued—for the first time—that the Executive Order obviates the need to determine whether the Restrained Bonds are immune from attachment and execution under section 1611(b)(1) of the FSIA.  Plaintiffs' apparent argument is that the blocking of Bank Markazi's property pursuant to the Executive Order somehow converted this Turnover Action into an "in rem" action in which the Court purportedly has jurisdiction irrespective of the FSIA based on the presence of the blocked assets in New York.[43]

Plaintiffs' argument fundamentally misapprehends the relationship between the Executive Branch's prerogative to block any property in which Bank Markazi has an "interest" and the continued immunity of Bank Markazi's property from civil claims under the FSIA.  In *Weinstein v. Islamic Republic of Iran,* 609 F.3d 43, 50 (2d Cir. 2010), the Second Circuit made clear that the FSIA determines subject matter jurisdiction where a civil plaintiff asserts claims against the blocked property of a sovereign defendant pursuant to TRIA section 201.

*Weinstein* involved an attempt by judgment creditors of Iran pursuant to TRIA section 201 to seize blocked assets of Bank Melli Iran, a state-owned Iranian bank and thus an instrumentality of Iran, to satisfy their judgments against Iran.  The Second Circuit began its analysis of TRIA section 201 by emphasizing: "Section 1609 [of the FSIA] . . . provides that

---

2011) (the FSIA "cloaks the foreign sovereign's property with a presumption of immunity from attachment and execution unless an exception applies"); *Peterson v. Islamic Republic Of Iran,* 627 F.3d 1117, 1128 (9th Cir. 2010) ("[I]t is the plaintiff's burden to prove that an exception to immunity applies if it is readily apparent that the property at issue belongs to a foreign state.").

[43]   *See* 3/1/12 Hrg. Tr. at 7:10-12.

where a valid judgment has been entered against a foreign sovereign, property of that foreign state is immune from attachment and execution *except* as provided in the subsequent sections, Sections 1610 and 1611." *Id.* at 48 (emphasis in original). As the court added in the very next sentence, TRIA section 201 is "codified as a note to Section 1610 of the FSIA." *Id.*

*Weinstein* thus forecloses Plaintiffs' argument that the blocking of the Restrained Bonds obviates the need to determine subject matter jurisdiction in this Turnover Action in accordance with the FSIA. The apparent basis for Plaintiffs' argument is Judge Marrero's opinion in *Hausler v. JPMorgan Chase Bank, N.A.,* 740 F. Supp. 2d 525 (S.D.N.Y. 2010). There, the court found that the placement of funds blocked pursuant to the Cuban Assets Control Regulations ("CACR") "into accounts located in this District" *ipso facto* gave the Court "jurisdiction over disputes arising out of those funds." *Id.* at 539.

In reaching this novel and unprecedented conclusion, the *Hausler* court purported to rely on *Shipping Corporation of India Ltd. v. Jaldhi Overseas Pte. Ltd.,* 585 F.3d 58 (2d Cir. 2009). In that case, the Second Circuit discussed its prior decision in *United States v. Daccarett,* 6 F.3d 37 (2d Cir. 1993) addressing the ability of "the [United States] government [to] institute civil forfeiture *in rem* proceedings." *Daccarett,* 6 F.3d at 46. In *that* context, the Second Circuit noted in *Jaldhi* that "for *in rem* remedies such as forfeitures, ownership of the *res* is irrelevant, as the court has personal jurisdiction regardless of who owns the *res* at issue." *Jaldhi,* 585 F.3d at 69.

Relying on *Jaldhi,* the *Hausler* court reasoned that "[u]nder both the civil forfeiture statutes and OFAC regulations, ownership of the *res* is irrelevant." *Hausler,* 740 F. Supp. 2d at 540. That much is true: just as the United States Government has the authority under the civil forfeiture statutes to seize property used in criminal activity regardless of ownership, the United

States Government has the authority to block any and all property in which a sanctions target has an "interest," irrespective of ownership.[44]

But it simply does not follow, as the *Hausler* court erroneously concluded, that "Executive Branch determinations to . . . block [a sovereign defendant's] property located within a court's territorial reach results in jurisdiction" over a private plaintiff's claims against the blocked property. *Id.* *Jaldhi* does not support the *Hausler* court's conclusion, and *Weinstein* establishes that it is wrong as a matter of law.[45]

In sum, therefore, notwithstanding the blocking of the Restrained Bonds, those assets remain "immune from attachment and execution *except* as provided in [FSIA] Sections 1610 and 1611." *Weinstein,* 609 F.3d at 48 (emphasis in original); *see also Brenntag Int'l Chemicals, Inc. v. Bank of India,* 175 F.3d 245, 253 (2d Cir. 1999) (the FSIA provisions governing attachment and execution are designed "to prevent *in rem* and *quasi-in-rem* actions from undermining the general principles codified in the FSIA") (discussing immunity of sovereign property used for commercial purposes from pre-judgment attachment, subject to the limited exceptions enumerated in FSIA section 1610(d)).

B.  Heightened Immunity Of Central Bank Property Under Section 1611(b)(1) Of The FSIA

Above and beyond the general presumption of immunity that applies in any action against a foreign sovereign under the FSIA, the property of a foreign central bank in the United States is entitled to heightened immunity under section 1611(b)(1) of the FSIA:

---

[44]   For the avoidance of doubt, while the authority of the Executive Branch under *United States law* to block any property in which a sanctions target has an interest is clear, Bank Markazi does not concede that such blocking is appropriate as a matter of *international law*.

[45]   We note that the Republic of Cuba and the other Cuban defendants in *Hausler* did not enter an appearance in the turnover action there, such that the *Hausler* court does not appear to have had the benefit of full, adversarial briefing on this issue.

### § 1611.  Certain types of property immune from execution

(. . .)

(b)   Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—

> (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution . . . .

28 U.S.C. § 1611.  As the text of section 1611(b)(1) makes clear, there are only two requirements for immunity under that provision: (1) the property in question must be "that of a foreign central bank or monetary authority"; and (2) the property must be "held for [the foreign central bank or monetary authority's] own account."  *Id.*

C.    Bank Markazi Is The Central Bank Of Iran And The Beneficial Owner Of The Restrained Bonds

The first requirement for immunity under section 1611(b)(1) is that the Restrained Bonds must be "the property . . . of a foreign central bank."  28 U.S.C. § 1611 (b)(1).  Bank Markazi is the Central Bank of Iran.  Compl. ¶ 32.[46]  Should the Court determine—contrary to Point II above and the arguments raised in Clearstream's Motion—that the Restrained Bonds are "assets of" Bank Markazi under applicable law, then the Restrained Bonds plainly also would qualify as "the property of" Bank Markazi—and thus the property of a foreign central bank—for purposes of immunity under FSIA section 1611(b)(1).[47]

---

[46]   Bank Markazi is a sovereign instrumentality "formed under the laws of Iran and maintains its principal place of business in Iran."  Compl. ¶¶ 32, 33.

[47]   As previously stated, the nature of Bank Markazi's *beneficial* ownership interest in the Restrained Bonds is undisputed.  As Plaintiffs allege, "[a]t all times, [Bank] Markazi retained the beneficial ownership of the bonds[.]"  Compl. ¶ 158.  OFAC likewise identified "the Central Bank of Iran" or "CBI" as the beneficial owner of the Restrained Bonds in the April 23, 2010 letter on which the Complaint relies.  Compl. ¶ 48; Lindsey Decl. Ex. A.

> D.     <u>Bank Markazi Holds The Restrained Bonds For Its Own Account As An Investment Of The Bank's Foreign Currency Reserves</u>
>
> > 1.     <u>The Restrained Bonds Are Presumptively Immune Under *NML Capital*</u>

The only other requirement for immunity under section 1611(b)(1) is that the Restrained Bonds must be "held for [Bank Markazi's] own account." 28 U.S.C. § 1611 (b)(1). The Second Circuit has adopted a "modified central bank functions test," pursuant to which "property of a central bank is immune from attachment if the central bank uses such property for central banking functions as such functions are normally understood, irrespective of their commercial nature."[48] *NML Capital,* 652 F.3d at 194 (quoting Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States,* 1982 U. ILL. L. REV. 265, 277 (1982)).

Plaintiffs claim that it is Bank Markazi's burden to "demonstrate that it utilized the Restrained Bonds exclusively 'for its own account,' *i.e.,* solely in connection with legitimate central banking activity." Compl. ¶ 10. Plaintiffs are wrong. Under *NML Capital,* precisely the opposite burden of production applies: it is *Plaintiffs'* burden to proffer evidence that Bank Markazi *does not* use the Restrained Bonds for central banking purposes.

The Second Circuit made clear that "[w]here funds are held in an account in the name of a central bank or monetary authority, the funds *are presumed to be immune* from attachment under § 1611(b)(1)."[49] *NML Capital,* 652 F.3d at 194 (emphasis added). Plaintiffs bear "the burden of producing evidence to rebut [that] presumption" because they are "the party against

---

[48]    Under the test adopted by the Second Circuit, Plaintiffs' allegation that Bank Markazi "engage[d] in 'commercial activity' in the United States in relation to the Restrained Bonds" (Compl. ¶ 7) is plainly irrelevant to the immunity of the Restrained Bonds under section 1611(b)(1).

[49]    It is undisputed that at all material times, Bank Markazi's security entitlements with respect to the Restrained Bonds were maintained in an account in Bank Markazi's name with Clearstream and/or an account UBAE maintained with Clearstream for the benefit of Bank Markazi. *See* Compl. ¶ 7 (referring to the transfer of the Restrained Bonds "from an account held in [Bank] Markazi's own name at Clearstream to a new customer account opened by UBAE at Clearstream for the purpose of housing [Bank] Markazi's bonds").

whom [the] presumption is directed." Fed. R. Evid. 301.  In order to rebut the presumption that the Restrained Bonds are immune from attachment and execution under section 1611(b)(1), Plaintiffs must "demonstrat[e] with specificity that the [Restrained Bonds] *are not* being used for central banking functions as such functions are normally understood." *NML Capital,* 652 F.3d at 194 (emphasis added).

Plaintiffs have not even attempted to allege facts which, if true, would suffice to meet their burden here.  On the contrary, as discussed immediately below, the relevant allegations in the Complaint are consistent with Bank Markazi's use of the Restrained Bonds as an investment of the Bank's foreign currency reserves—a classic central banking function.

2.   By Their Very Nature, The Restrained Bonds Indicate Their Purpose As An Investment Of Bank Markazi's Foreign Currency Reserves

The character of the Restrained Bonds as an investment is undisputed.  Plaintiffs expressly allege that "[Bank] Markazi *invested* in those bonds," and that the Bank collected "interest and principal payments related to its investments."  Compl. ¶¶ 3, 96 (emphasis added); *see also* Compl. ¶ 138 (referring to "[Bank] Markazi's bond holdings").  Nor is there any dispute as to the nature of Bank Markazi's investment: "[t]he Restrained Bonds were issued by sovereigns like the Republic of Italy or 'supranationals' such as the European Investment Bank" and are denominated in U.S. dollars.  Compl. ¶¶ 102, 245.

These undisputed facts are all consistent with the presumption that Bank Markazi holds the Restrained Bonds for its own account as an investment of the Bank's foreign currency reserves—a "paradigmatic central banking function[]." *NML Capital,* 652 F.3d at 195.  Indeed, as Clearstream's Executive Vice President and Head of Business Management, Mark Gem, testified during the June 27, 2008 hearing before Judge Koeltl, sovereign bonds are exactly the type of security that would appeal to a foreign central bank as an investment of foreign currency

reserves. *See* 6/27/08 Hrg. Tr., at 22 (these "very high grade securities . . . would all tend to appeal to central banks, for example, as stores of reserve investments").[50]

Not surprisingly, therefore, the Complaint fails to allege any reason why Bank Markazi would acquire and hold such securities for any purpose *other than* to store, and generate a return on, the Bank's foreign currency reserves.

3.   The Complaint Alleges No Facts To Rebut The Presumption That Bank Markazi Holds The Restrained Bonds For Its Own Account

The only other allegations in the Complaint that even arguably relate to whether Bank Markazi holds the Restrained Bonds for its own account are: (i) the purported absence of documentation "suggest[ing] that the Restrained Bonds were maintained in a designated foreign exchange reserve account" (Compl. ¶ 178); (ii) Bank Markazi's purported failure to "segregate its foreign currency reserve funds" from other assets (Compl. ¶ 179); and (iii) the Bank's purported "inability to pledge any of the assets held in its Clearstream account" (Compl. ¶ 180).

None of these allegations is relevant to immunity under section 1611(b)(1). *First,* there is no requirement that foreign currency reserves must be held in a "designated foreign exchange reserve account" to qualify for immunity under section 1611(b)(1). *See NML Capital,* 652 F.3d at 194 (all funds held *"in an account* in the name of a central bank or monetary authority" are presumptively immune) (emphasis added).   Nor can Plaintiffs meet their burden of "demonstrating with specificity that the [Restrained Bonds] are not being used for central banking functions as such functions are normally understood" by claiming they have not seen any documents affirmatively "suggest[ing]" that Bank Markazi holds the Restrained Bonds as part of its foreign currency reserves. *Id.* The Second Circuit established the presumption of

---

[50]   A true and correct copy of the relevant excerpt from the transcript of the June 27, 2008 hearing before Judge Koeltl is attached as Exhibit E to the Lindsey Declaration.

immunity precisely to avoid protracted litigation and discovery where, as here, a plaintiff lacks a factual basis to allege with particularity that a foreign central bank *is not* using the property in question for central banking purposes. *See id.* (the presumption of immunity under section 1611(b)(1) "is consistent with the recognition that FSIA immunity is immunity not only from liability, but also from the costs, in time and expense, and other disruptions attendant to litigation") (internal quotation and citation omitted).

*Second,* nothing in *NML Capital* requires that foreign currency reserves must be "segregated" from a foreign central bank's other assets to qualify for immunity under section 1611(b)(1). Indeed, the Central Bank of Argentina used the funds in the account at issue in *NML Capital* for a number of different central banking purposes, some of which had nothing to do with maintaining foreign currency reserves. *See NML Capital,* 652 F.3d at 177 n.8.[51] Yet the Second Circuit held that *all* of the funds in the central bank's account were immune under section 1611(b)(1). *NML Capital,* 652 F.3d at 195 (the funds in the account were the "property of the [central bank] 'held for its own account'").

*Third,* the Complaint does not even attempt to explain why Bank Markazi's purported inability to pledge the Restrained Bonds is relevant to their immunity under section 1611(b)(1). It is easy to imagine any number of reasons why a foreign central bank might decline to pledge its foreign currency reserves in favor of a third party. Assuming, however, that this allegation is designed to support a claim that the Restrained Bonds are not entitled to immunity under section 1611(b)(1) because Iran has some undefined interest in these assets, that allegation fails as a

---

[51] Those purposes included "transfer[ring] funds on behalf of the Republic [of Argentina] to and from certain international organizations and multilateral fora to which the Republic is a party, to and from Argentine embassies and missions abroad, and to certain foreign business service providers for expenses incurred by the Republic" as well as "mak[ing] payments of U.S. dollar-denominated operational expenses, such as the purchasing of currency paper and [the central bank]'s subscription to Bloomberg news service." *Id.*

matter of law.  The Second Circuit made clear that "traditional activities of central banks" such as "investing reserves" are all "functions which defy any attempt to divide the interest of the central bank from that of the state it serves."  *Id.* at 192-93.  Congress understood "that central bank property could be viewed as the property of a foreign state, *and nonetheless be immune from attachment.*"[52]  *Id.* at 189 (internal quotation and citation omitted, emphasis added).

Accordingly, it makes no difference "whether a given . . . central bank investment is conducted for the 'advantage' of the central bank, or that of its parent state."  *Id.* at 193.  Plaintiffs' argument to the contrary "misunderstands . . . the very purpose of a central bank."  *Id.*

4.   <u>Bank Markazi Held The Restrained Bonds For Its Own Account Both Before and After Their Transfer From The Bank's Account With Clearstream To UBAE's Account with Clearstream</u>

Plaintiffs devote nearly 50 paragraphs in the Complaint to their theory that the transfer of the Restrained Bonds from Bank Markazi's account with Clearstream to UBAE's account with Clearstream in February 2008 (the "February 2008 Transfer") should be deemed a fraudulent conveyance under sections 273-a and 276 of the New York Debtor and Creditor Law.  *See* Compl. ¶¶ 126-173.  On that basis, they seek "to set aside and annul" the February 2008 Transfer.  Compl. ¶ 173.

---

[52]   Accordingly, while a foreign sovereign may be deemed to have an "interest" in assets held by the sovereign's central bank, that interest is not an *attachable* interest.  *See EM Ltd.,* 473 F.3d at 480 (Argentina did not have any "attachable interest" in funds held in the Central Bank of Argentina's account).

Plaintiffs' fraudulent conveyance theory fails as a matter of law.[53]    If the Court determines that the Restrained Bonds are "assets of" Bank Markazi under applicable law—and thus also "the property of" Bank Markazi under FSIA section 1611(b)(1)—then the Restrained Bonds were immune from attachment and execution *before* the February 2008 Transfer for the same reason they were (and are) immune *after* that transfer: because they are the property of a foreign central bank held for its own account.    It is undisputed that "[a]t all times, [Bank] Markazi retained the beneficial ownership of the bonds transferred to the UBAE/Markazi Account." Compl. ¶ 158. Thus, as OFAC has stated, the February 2008 Transfer "did not effect a change in beneficial ownership of the transferred assets." Compl. ¶ 48.

It follows that setting aside the February 2008 Transfer would have no impact on the immunity of the Restrained Bonds from attachment and execution under section 1611(b)(1).[54] "[A] judgment creditor does not gain new rights in property by means of a fraudulent conveyance action." *Travelers Ins. Co. v. 633 Third Assocs.*, 973 F.2d 82, 87 (2d Cir. 1992). Rather, the creditor's "remedy is 'limited to reaching the *property which would have been available . . . had there been no conveyance.'"* *Id.* (quoting *Marine Midland Bank v. Murkoff,* 120 A.D.2d 122, 133 (2d Dep't 1986)) (emphasis added).

---

[53]   As a threshold matter, Plaintiffs fail to allege any basis for the application of New York law to their fraudulent conveyance claim.  Thus, the Complaint alleges that UBAE—an Italian bank—instructed Clearstream—a Luxembourg financial institution—"to open a new customer account for UBAE . . . as a custodial account for the benefit of UBAE's customer, [Bank] Markazi[.]"  Compl. ¶ 147. As Plaintiffs further allege, Clearstream subsequently opened that account (*id.* ¶ 148) and Bank Markazi then instructed Clearstream to transfer its bond investments from the Bank's account with Clearstream to the new UBAE account with Clearstream. *Id.* ¶ 153. If anything, Luxembourg law, not New York law, would appear to govern the transfer under these circumstances.

[54]   Plaintiffs' argument that the February 2008 Transfer "provide[s] no defense" to Plaintiffs' claims against Bank Markazi's property (Compl. ¶ 13) misses the point.  Bank Markazi has never claimed that the February 2008 Transfer "provides a defense" to Plaintiffs' claims.  Rather, the February 2008 Transfer *has no bearing one way or the other* on the immunity of the Restrained Bonds from attachment and execution under section 1611(b)(1).

That basic principle of fraudulent conveyance law controls here.  The Restrained Bonds were never available for seizure by these Plaintiffs to begin with.  On the contrary, the Restrained Bonds were immune from attachment and execution under the FSIA before the February 2008 Transfer, and they remain immune today.  The Complaint must be dismissed.

      E.      Plaintiffs' Allegations That Bank Markazi Is An Alter Ego Of Iran And Is Not A "Legitimate" Central Bank Are Irrelevant Under *NML Capital*

          1.      Plaintiffs' Alter Ego Allegations Are Legally and Factually Indistinguishable From The Allegations The Second Circuit Rejected In *NML Capital*

The law in this Circuit is clear: under section 1611(b)(1) of the FSIA, a plaintiff may not seize the property of a foreign central bank held for its own account to satisfy a judgment against the central bank's "parent state." *NML Capital,* 652 F.3d at 197 (vacating attachment of central bank funds obtained by judgment creditors of Argentina).  Nor can Plaintiffs avoid dismissal by alleging that Bank Markazi is an alter ego of Iran.  That question is no longer open to debate.  Plaintiffs' latest Complaint flies in the face of the holding in *NML Capital* that "[section] 1611(b)(1) immunizes property of a foreign central bank or monetary authority held for its own account *without regard to whether the bank or authority is independent from its parent state*" under the United States Supreme Court's decision in *Bancec.*[55]  *NML Capital,* 652 F.3d at 187-88 (emphasis added).[56]

In *Bancec,* the Supreme Court instructed that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."  462 U.S. at 626-27.  The Court went on to state, however, that "where a corporate entity

---

[55]   *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611 (1983) (*"Bancec"*).

[56]   Plaintiffs' stated basis for amending their complaint was to address the Second Circuit's opinion in *NML Capital.  See* 10/31/11 Hrg. Tr. at 39:20 – 40:5.

is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other." *Id.* at 629.  Under *Bancec,* therefore, a pervasive "abuse of corporate form" may  be "sufficient to overcome the presumption of separate existence" of government instrumentalities.  *De Letelier v. Republic of Chile,* 748 F.2d 790, 795 (2d Cir. 1984).

Under *NML Capital,* however, the *Bancec* analysis does not govern the immunity of central bank property because the FSIA does not treat "foreign central banks . . . as generic 'agencies and instrumentalities' of a foreign state."  *NML Capital,* 652 F.3d at 188.  Instead, section 1611(b)(1) extends "special protections" to foreign central banks "befitting the particular sovereign interest in preventing the attachment and execution of central bank property."  *Id.* (internal quotation and citation omitted).

Following an exhaustive review of the text, history, and structure of the FSIA, the Second Circuit found that "Congress understood the property of a foreign central bank to be deserving of immunity regardless of that bank's independence" from its parent state.  *NML Capital,* 652 F.3d at 190.  Accordingly, the "fact that 'a relationship of principal and agent [has been] created' between the foreign state and its central bank under *Bancec is irrelevant"* to immunity under section 1611(b)(1).  *Id.* at 188 (quoting *Bancec,* 462 U.S. at 629) (emphasis added, second alteration in original).

*NML Capital* unambiguously precludes Plaintiffs' attempt to seize the Restrained Bonds based on a claim that "Iran so extensively controls [Bank] Markazi that a relationship of principal and agent exists between the two entities."  Compl. ¶ 62.  Not only does *NML Capital* foreclose *any* argument on that basis as a matter of law; Plaintiffs' factual allegations here are strikingly similar to the allegations the Second Circuit considered and rejected in *NML Capital:*

| Allegation in the Complaint: | Allegation in *NML Capital* |
|---|---|
| Iran "dictat[es] the appointment" of Bank Markazi's management (Compl. ¶ 64). The President of Iran exerted pressure on two former Governors of Bank Markazi to resign and replaced one of them "by presidential decree" (*id.* ¶ 68). | Argentina "controll[ed] the selection and retention of [the central bank's] officers" (Lindsey Decl. Ex. F, at 41).[57] "[T]he Argentine Executive has exercised total control over [the central bank]'s leadership, firing [central bank] leaders at will" (*id.* at 47). |
| The President of Iran has "usurped [Bank] Markazi's authority to make monetary policy decisions" (Compl. ¶ 70; *see also id.* ¶¶ 71-76). | Argentina "direct[ed] [the central bank]'s monetary policy for the [Argentine] President's own political purposes" (Lindsey Decl. Ex. F, at 41). |
| Iran "has ignored" the Iranian Monetary and Banking Law and "[i]n practice" controls Bank Markazi (Compl. ¶¶ 65, 67, 68). | Argentina "has repeatedly ignored the limits in [the central bank]'s own charter on the government's interference with [the central bank's] policies" (Lindsey Decl. Ex. F, at 48) and "exercise[s] pervasive control over [the central bank] to implement government policy" (*id.* at 49). |
| Iran has ordered Bank Markazi "to extend loans to Iran's government for specific purposes" (Compl. ¶ 69). | Argentina "appropriat[ed] [the central bank]'s assets to make selective payments to Argentina's creditors" (Lindsey Decl. Ex. F, at 41). |

As a matter of law, Plaintiffs cannot maintain this Turnover Action based on allegations that are indistinguishable from the allegations the Second Circuit found to be irrelevant in *NML Capital*. The Complaint must be dismissed.

2.   Plaintiffs Cannot Avoid Dismissal By Alleging That Bank Markazi Is Not A "Legitimate" Central Bank

Nor can Plaintiffs avoid dismissal by claiming that Bank Markazi is not a "legitimate" central bank (Compl. ¶ 181) based on extraneous allegations that the Bank "launders the funds

---

[57]   A true and correct copy of the relevant excerpt from Plaintiffs-Appellees' Brief in *NML Capital* is attached as <u>Exhibit F</u> to the Lindsey Declaration.

that underwrite Iran's sponsorship of terrorism and efforts to acquire WMDs." Compl. ¶ 192. This is a Turnover Action, not a plenary proceeding on liability in which Plaintiffs are free to litigate the merits of any allegation anyone has ever leveled against the Bank (or Iran). *See* Compl. ¶¶ 181-200.

The Second Circuit made clear in *NML Capital* that disapproval of a foreign sovereign's actions or policies is not a basis to disregard the immunity of central bank property under section 1611(b)(1). While the court "share[d] the District Court's understandable irritation   at [Argentina]'s willful defiance of [its] obligations to honor the judgments of a federal court" and "underst[oo]d the frustration of the plaintiffs who are attempting to recover on judgments they have secured," the Second Circuit was unwavering in its conclusion that "we must respect the [FSIA's] strict limitations on attaching and executing upon assets of a foreign state." *NML Capital,* 652 F.3d at 196 (internal quotations and citations omitted, third and fourth alterations in original). That conclusion requires dismissal here.

F. <u>The Conclusory Waiver Allegations In The Complaint Fail Because Plaintiffs May Not Attach Bank Markazi's Property Irrespective Of Any Purported Waiver Of Immunity</u>

The Complaint contains a wholly conclusory allegation that "Iran has, explicitly and by implication, waived any immunity from collection that would otherwise apply to funds held by its agencies and instrumentalities, including [Bank] Markazi." Compl. ¶ 8; *see also* Compl. ¶¶ 10, 21, 175. Plaintiffs allege no facts whatsoever to support their claim of waiver, and it is nothing more than "a legal conclusion couched as a factual allegation."[58] *Bell Atlantic Corp. v.*

---

[58] In paragraph 21 of the Complaint, Plaintiffs state that they "particularize below" their allegation of waiver. Yet nowhere in the Complaint do Plaintiffs allege any factual particulars to support their waiver claim.

*Twombly,* 550 U.S. 544, 555 (2007).   Accordingly, the waiver allegation is not entitled to any weight.[59]

In any event, Plaintiffs' waiver allegation fails as a matter of law.   As demonstrated immediately below, even if Plaintiffs could substantiate their waiver claim, they *still* could not restrain Bank Markazi's property here—neither by means of a *post-judgment* attachment nor by way of a *pre-judgment* attachment.[60]

                1.    <u>Any Waiver Of Immunity From *Post-Judgment* Attachment<br>Would Be Irrelevant Because Plaintiffs Are Not Entitled To<br>That Relief In Any Event</u>

As a matter of law, Plaintiffs may not restrain Bank Markazi's property by way of a *post-judgment* attachment because the Bank is not the judgment debtor here—Iran is.[61]   Bank Markazi has never been found liable for the acts that gave rise to Plaintiffs' judgment against Iran.

Plaintiffs cannot avoid this result by alleging that Bank Markazi is an alter ego of Iran. Not only are Plaintiffs' alter ego allegations irrelevant in any event under *NML Capital* (*see*

---

[59]  *See Amidax Trading Group v. S.W.I.F.T. SCRL,* --- F.3d ----, 2011 WL 6317466, *5 (2d Cir. Dec. 19, 2011) (on a motion to dismiss for lack of subject matter jurisdiction, "[i]t is well established that we need not 'credit a complaint's conclusory statements without reference to its factual context'") (quoting *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1954 (2009)).

[60]  This is by no means the only defect in Plaintiffs' waiver theory.   Thus, section 1611(b)(1) requires that any waiver of immunity as to Bank Markazi's property must be explicit. 28 U.S.C. § 1611(b)(1). Accordingly, there can be no waiver "by implication," as alleged in the Complaint. *See* Compl. ¶ 8. The Second Circuit has instructed that "the . . . question under § 1611(b)(1) is whether there has been an effective waiver of immunity with respect to [the central bank's] property." *NML Capital,* 652 F.3d at 195.   In order to be effective, a waiver of immunity under section 1611(b)(1) "must be clear and unambiguous" and must "specifically embrace[]" the foreign central bank and its property. *Id.* (internal quotation and citation omitted).   The boilerplate allegation of waiver in the Complaint meets none of these requirements.

[61]  New York's post-judgment attachment statute, CPLR 5222, allows a judgment creditor to attach only property in which "*the judgment debtor* or obligor has an interest." CPLR 5222(b) (emphasis added). The judgment debtor here is Iran.   But Iran has no *attachable* interest in the Restrained Bonds. *See EM Ltd.,* 473 F.3d at 480 (rejecting argument that Argentina had "an attachable interest" in funds held in the Central Bank of Argentina's account); *NML Capital,* 652 F.3d at 189 (Congress understood "that central bank property could be viewed as the property of a foreign state, *and nonetheless be immune from attachment"* under section 1611(b)(1)) (emphasis added).   Accordingly, the existing restraints on Bank Markazi's property pursuant to CPLR 5222 (*see* Compl. ¶ 55) are invalid and must be vacated.

---

{00111132;v1}

Point E.1, *supra*), but even in a run-of-the-mill enforcement action not involving a sovereign party, an allegation that a third party is an alter ego of the judgment debtor provides no basis for a *post-judgment* attachment of the third party's property.   *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.,* 295 F. Supp. 2d 366, 393 (S.D.N.Y. 2003) (vacating post-judgment restraining notices pursuant to CPLR 5222 against the assets of third parties alleged to be alter egos of the judgment debtor and allowing only restraining notices directed at the assets of the judgment debtor itself to remain in effect).[62]

2.   Section 1611(b)(1) Precludes Any Waiver Of Immunity From *Pre-Judgment* Attachment As A Matter of Law

Section 1611(b)(1) of the FSIA precludes any waiver of the immunity of the Restrained Bonds from *pre-judgment* attachment as a matter of law.   Section 1611(b)(1) provides only for a waiver of "attachment *in aid of execution*"—it does not provide for or contemplate a waiver of immunity from *pre-judgment* attachment. 28 U.S.C. § 1611 (b)(1) (emphasis added).[63]

Congress had good reason "not to provide for waiver of prejudgment attachment of property of central banks held for their own account, and . . . it did not, in fact do so." *Weston Compagnie de Finance Et D'Investissement, S.A. v. La República del Ecuador,* 823 F. Supp.

---

[62]   As the court explained: "Although the plaintiff may attempt to prove the alter ego liability of [the alleged alter egos] as part of a judgment enforcement proceeding, their assets may not be restrained pursuant to [CPLR] 5222 until their alleged alter ego status has been adjudicated and their liability for the previous judgment determined." *Id.*   In other words, a judgment creditor may not use a restraining notice under CPLR 5222 "as an end-run around the requirements of the prejudgment attachment statutes." *Id.*

[63]   In contrast, section 1610(d) of the FSIA allows sovereign agencies and instrumentalities *other than central banks* to waive the immunity of their property used for commercial purposes in the United States from pre-judgment attachment.   *See* 28 U.S.C. § 1610(d)(1) (a foreign state, including the agencies and instrumentalities of a foreign state, may explicitly waive the immunity of property used for a commercial activity in the United States "from *attachment prior to judgment*") (emphasis added).   However, section 1610(d) does not apply to the property of a foreign central bank because the immunity of central bank property is governed by section 1611(b)(1) *"[n]otwithstanding the provisions of section 1610* [of the FSIA]." 28 U.S.C. § 1611 (emphasis added).

1106, 1111 (S.D.N.Y. 1993).  As a matter of law, therefore, Plaintiffs cannot avoid dismissal of their Complaint by alleging a waiver of immunity under section 1611(b)(1).

> G.    The Special Protection The FSIA Extends To Central Bank Property In Section 1611(b)(1) Overrides TRIA Section 201

Given that the Restrained Bonds are immune from attachment and execution under section 1611(b)(1) of the FSIA, the sole remaining question is whether TRIA section 201 should be deemed to override that immunity now that those assets have been blocked.  Both FSIA section 1611(b) and TRIA section 201 include a "notwithstanding" clause, thereby creating a conflict.  That conflict must be resolved in favor of preserving the heightened immunity of central bank property under FSIA section 1611(b)(1).

Two basic principles of statutory construction support this result.  *First,* section 201 of TRIA must be interpreted in a manner that is consistent with the overall statutory scheme governing sovereign immunity under the FSIA.[64]  *See Levin v. Bank of New York*, No. 09 CV5900 (RPP), 2011 WL 812032, at *10 (S.D.N.Y. Mar. 4, 2011) (TRIA section 201 "must be read in the context of the overarching statutory scheme of the FSIA").

TRIA section 201 does not change the basic statutory framework of the FSIA.  "Section 1609 [of the FSIA] . . . provides that where a valid judgment has been entered against a foreign sovereign, property of that foreign state is immune from attachment and execution *except* as provided in the subsequent sections, Sections 1610 and 1611."  *Weinstein,* 609 F.3d at 48 (emphasis in original).  TRIA section 201 is "codified as a note to Section 1610 of the FSIA." *Id.; accord. Weininger v. Castro*, 462 F. Supp. 2d 457, 498 (S.D.N.Y. 2006) (TRIA section 201

---

[64]    *See Dodd v. U.S.,* 545 U.S. 353, 365 n.4 (2005) ("Our cases make clear that when interpreting a particular section of a statute, we look to the entire statutory scheme rather than simply examining the text at issue.") (citation omitted); *U.S. v. Pacheco,* 225 F.3d 148, 154 (2d Cir. 2000) (courts "must interpret [a] specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part") (internal quotation and citation omitted, alteration in original).

"is appended to [FSIA] § 1610, which provides the sole bases for exceptions to immunity from execution of property").

Second, as the more specific provision extending special protection to the property of a foreign central bank held for its own account, FSIA section 1611(b)(1) must take precedence over TRIA Section 201, which applies generally to the assets of "any agency or instrumentality" of a "terrorist party." *See Busic v. U.S.*, 446 U.S. 398, 406 (1980) ("[A] more specific statute will be given precedence over a more general one, *regardless of their temporal sequence.*") (emphasis added); *Creque v. Luis*, 803 F.2d 92, 95 (3rd Cir. 1986) (more specific statutory provision took precedence over more general provision even where the latter was enacted later in time and purported to apply "notwithstanding any other provision of law").

FSIA section 1611(b) expressly provides that immunity under that provision controls *"[n]otwithstanding the provisions of Section 1610."* 28 U.S.C. § 1611 (b) (emphasis added). As the Second Circuit explained in *NML Capital*, "even if [FSIA] § 1610 would otherwise bring foreign state property within the jurisdiction of a court, §1611(b)(1) overrides [the] exceptions in § 1610." *NML Capital*, 652 F.3d at 186-87 (internal quotation and citation omitted); *accord Banque Compafina v. Banco de Guatemala*, 583 F. Supp. 320, 321 (S.D.N.Y. 1984) ("Section 1610 provides some exceptions to this general rule [of immunity under section 1609], but § 1611(b)(1) overrides these exceptions.").

The heightened immunity of central bank property under FSIA section 1611(b)(1) reflects a Congressional policy determination that central banking assets should receive special protection from attachment and execution. *See NML Capital,* 652 F.3d at 188 (the FSIA does not treat "foreign central banks . . . as generic 'agencies and instrumentalities' of a foreign state" but rather extends "special protections" to central banks "befitting the particular sovereign

interest in preventing the attachment and execution of central bank property") (internal quotation and citation omitted).

While subsection (a) of TRIA section 201 likewise includes a "notwithstanding" clause, providing that it applies "[n]otwithstanding any other provision of law," the legislative history of section 201 "suggests that Congress placed the 'notwithstanding' clause in § 201(a) . . . to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment." *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009).  It is thus clear that Congress's inclusion of a "notwithstanding" clause in subsection (a) of TRIA section 201 was not intended to alter the basic statutory framework of the FSIA whereby the immunity of central bank property under section 1611(b)(1) overrides any exception to immunity pursuant to section 1610.[65]

Plaintiffs nevertheless claim that TRIA section 201 should be deemed to override the heightened immunity of central bank property under section 1611(b)(1) of the FSIA.  In doing so, they rely on a single case from this district, *Weininger v. Castro,* 462 F. Supp. 2d 457 (S.D.N.Y. 2006).  There, Judge Marrero concluded that "TRIA, which was enacted later in time than [FSIA] § 1611, overrides the immunity conferred in § 1611."  *Id.* at 499.

Importantly, however, neither the Central Bank of Cuba nor any of the other sovereign defendants in *Weininger* appeared in that case to contest jurisdiction under the FSIA.  *See id.* at 463 ("None of the judgment debtors has appeared at any stage of these proceedings.").  The

---

[65]   Unlike the *Peterson* Plaintiffs, certain Third Party Respondents purport to have obtained default judgments against Iran pursuant to FSIA section 1605A.  *See, e.g.,* Acosta Judgment Creditors' December 16, 2011 Amended Answer to Third-Party Petition, Counterclaim and Crossclaim, ¶ 60. On that basis, they appear to have taken the position that they are entitled to attach and execute against the Restrained Bonds pursuant to FSIA section 1610(g).  *See id.* ¶ 100.  That argument fails. The heightened immunity of central bank property pursuant to FSIA section 1611(b)(1) overrides any exception to immunity pursuant to FSIA section 1610(g), as FSIA section 1611(b), by its plain terms, affords immunity *"[n]otwithstanding the provisions of Section 1610."*  28 U.S.C. § 1611(b) (emphasis added).

*Weininger* court thus was not presented with, nor did it consider, the arguments Bank Markazi has raised in this Motion.  Indeed, the court addressed the immunity of central bank property under FSIA section 1611(b)(1) only briefly in the course of a lengthy opinion addressing a host of other issues.

Accordingly, *Weininger* is of little, if any, precedential value here.  On the contrary, the *Weininger* court's conclusion TRIA section 201 "overrides the immunity conferred in [FSIA] § 1611" is incompatible with the overall structure of the FSIA and the plain terms of section 1611(b)(1).[66]

The Complaint must be dismissed.  Control of the assets at issue in this case will, of course, remain with the United States Government pursuant to the Executive Order.

---

[66] Finally, Plaintiffs' reliance on section 1610(f)(1)(A) of the FSIA, which purports to subject any property subject to prohibitions or regulations pursuant to the TWEA or the IEEPA to attachment in aid of execution of a terrorism-related judgment, is unavailing.  Pursuant to express Congressional authorization, President Clinton waived the application of section 1610(f)(1)(A).  Presidential Determination no. 99-1, 63 Fed. Reg. 59,201 (Oct. 21, 1998); Presidential Determination No. 2001-03, 65 Fed. Reg. 66483 (Oct. 28, 2000). Therefore, section 1610(f)(1)(A) never became effective and "remains a nullity." *Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 161 (D.D.C. 2009).

## **CONCLUSION**

For all of the foregoing reasons, Bank Markazi respectfully requests that the Court grant

this Motion to Dismiss.

Dated:        New York, New York
              March 15, 2012

                         Respectfully Submitted,

                         _____

                         David M. Lindsey
                         James M. Hosking
                         Andreas A. Frischknecht
                         Yasmine Lahlou

                         **CHAFFETZ LINDSEY LLP**
                         505 Fifth Avenue, 4th Floor
                         New York, NY 10017
                         Tel. (212) 257-6960
                         Fax (212) 257-6950
                         david.lindsey@chaffetzlindsey.com
                         www.chaffetzlindsey.com

                         *Attorneys for Defendant Bank Markazi*

{00111132;v1}