# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
OLIVIA RUX, et al.,                 :
                                    :    08 Civ. 6588 (AKH)
            Petitioners,            :
                                    :    <u>ECF CASE</u>
        v.                          :
                                    :
ABN AMRO BANK N.V., et al.,         :
                                    :
            Respondents.            :
-----------------------------------X

## STATEMENT OF INTEREST OF UNITED STATES OF AMERICA IN RESPONSE TO PETITIONERS' MOTION FOR IMMEDIATE TURNOVER OF FUNDS

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
Attorney for United States of America
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2739/2716

DAVID S. JONES
JOHN D. CLOPPER
Assistant United States Attorneys
—Of Counsel—

The United States of America, by and through its attorney, Lev L. Dassin, Acting United States Attorney for the Southern District of New York, respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517 in response to Petitioners' Motion for Immediate Turnover of Funds (the "Turnover Motion").

## PRELIMINARY STATEMENT

The United States recognizes the extreme hardship suffered by the petitioners, who hold a judgment arising from a heinous terrorist act, the U.S.S. Cole bombing. To the extent petitioners show eligibility to attach any of the funds at issue under the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297, Title II, § 201 (Nov. 26, 2002), codified at 28 U.S.C. § 1610 note, and entitlement pursuant to applicable law governing attachment, the United States does not oppose their application. The United States agrees that petitioners are eligible claimants under TRIA as holders of a "judgment against a terrorist party on a claim based upon an act of terrorism," and that the Government of Sudan ("GOS") is a "terrorist party" within the meaning of TRIA. Further, the United States will have no objection to the release of funds from deposit accounts if and when petitioners make a sufficient showing that the accounts are owned by the Government of Sudan or its agencies or instrumentalities. Blocked wire transfers in which the originator was the Government of Sudan or one of its agencies or instrumentalities may well also be assets "of that terrorist party" as set forth by TRIA, but the permissibility of attachment against any wire transfer raises additional legal issues. As to both deposit and wire transfer accounts, petitioners must present evidence to support their characterization of the GOS's ownership of the asset, and the Turnover Motion presently is unsupported by such evidence.

Specifically, as detailed below, because the blocking of an account can be triggered by

GOS involvement other than as account owner, evidence showing the GOS's ownership interest in the account is necessary to establish that the funds fall within TRIA's terms. This is true of all accounts (both deposit accounts and wire transfers) subject to the Turnover Motion. At least as to deposit accounts, evidence identifying the account's owner should be easy to provide, either from information already in petitioners' possession, or from information that the banks should possess.

Wire transfer accounts present additional issues. In the Turnover Motion, petitioners appear to rely on the mere fact that the wire transfer accounts are blocked under the Sudanese Sanctions Regulations ("SSR") to establish that those assets are property of the GOS or its agencies or instrumentalities. Petitioners' mere showing that assets are blocked, even when coupled with an absence of objection by any party asserting an interest to the funds, is insufficient to warrant attachment, because the SSR block an array of assets significantly wider than property that is "of that terrorist party" as required by TRIA. While the United States takes no position on whether state law restrictions on attachment of wire transfers apply in the present case, there is serious question whether wire transfer accounts, particularly where the GOS is a mere intended beneficiary of, or intermediary bank involved in, the blocked transfer, constitute property "of that terrorist party." At a minimum, for the funds to be eligible for attachment, petitioners must show that each blocked asset that petitioners seek to collect is an asset "of that terrorist party," *i.e.*, of the GOS or its agencies or instrumentalities. *See* TRIA § 201(a). In sum, the Turnover Motion does not present evidence of the role or the nature of ownership interest of the Sudanese entity involved in each of the identified blocked wire transfers, and without such a showing petitioners have failed to establish whether the blocked wire transfer accounts are

subject to attachment pursuant to TRIA.[1]

## BACKGROUND

A.  Applicable Statutory and Regulatory Scheme

This case involves the petitioners' attempt to enforce a judgment, obtained against the Government of Sudan, by attaching assets blocked under the Sudanese Sanctions Regulations and in the possession of the respondent banks. Attachment of a foreign state's property in the United States is governed by the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611. *See Karaha Bodas Company, LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 82 (2d Cir. 2002) (discussing attachment of foreign sovereign's property). The FSIA establishes that, with certain exceptions, property of a foreign state is immune from execution in satisfaction of a judgment. Section 1609 of the FSIA provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of [the FSIA]." 28 U.S.C. § 1609. Section 1610, in turn, creates certain exceptions to the immunity from attachment and execution otherwise conferred by section 1609 (such as, for example, the exemption from immunity for property of foreign states "used for a commercial activity in the United States," *see* 28 U.S.C. § 1610(a)). The FSIA further provides that when a foreign state is not protected by sovereign immunity, "the foreign state shall be liable in the same manner and to the same extent as a

---

[1] On December 23, 2008, petitioners served subpoenas, returnable on December 29, 2008, on four United States agencies seeking information as to whether certain entities at issue in this case are agencies or instrumentalities of the GOS. After petitioners granted only a one-week extension of the return date, the United States sent petitioners letters objecting to the subpoenas on various grounds, including, *inter alia*, that they did not allow sufficient time for a response. If the Court determines that petitioners have made a sufficient showing that the entities at issue are GOS agencies or instrumentalities, the subpoenas will become moot.

3

private individual under like circumstances." 28 U.S.C. § 1606; *see Karaha Bodas Company, LLC*, 313 F.3d at 83 (applying this provision to attachment proceedings).

TRIA – which is codified as a note to Section 1610 – creates an exception to the immunity of a foreign state's assets for the blocked assets of foreign state sponsors of terrorism under certain circumstances. In relevant part, TRIA Section 201(a) provides:

> Notwithstanding any other provision of law, . . . in every case is which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, *the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment* to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (emphasis added), Pub. L. No. 107-297, Title II, § 201 (Nov. 26, 2002), codified at 28 U.S.C. § 1610 note. Thus, TRIA creates a limited exception to the immunity from attachment and execution afforded by the FSIA where the assets of the foreign state constitute the "blocked assets of [a] terrorist party." TRIA also makes those assets potentially eligible for attachment by judgment-creditors notwithstanding the blocking regulations described below. *Id.*; *see, e.g.,* 31 C.F.R. § 538.202(e) ("Unless licensed or authorized pursuant to this part, any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property or interest in property blocked pursuant to § 538.201.").

TRIA Section 201(d)(2) defines "blocked asset" as, with exceptions not pertinent here, "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act or under sections 202 and 203 of the International Emergency Economic Powers Act[.]" TRIA Section 201(d)(4) defines "terrorist party" as "a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. §

4

1182(a)(3)(B)(vi))), *or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979* (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371)" (emphasis added).

Sudan has been designated a state sponsor of terrorism under section 6(j) of the Export Administration Act ("EAA") of 1979. *See* 58 Fed. Reg. 52,523 (Oct. 8, 1993) (Secretary of State designation stating, "In accordance with section 6(j) of the [EAA], I hereby determine that Sudan is a country which has repeatedly provided support for acts of international terrorism."); *see also Owens v. Republic of Sudan*, 531 F.3d 884, 888 (D.C. Cir. 2008) (noting designation of Sudan under section 6(j) of the EAA). Notwithstanding the immunity otherwise extended to a foreign state's assets by the FSIA, under TRIA, the blocked assets "of" the GOS are therefore not immune from attachment and execution.

The United States has blocked a wide range of assets related to – but not necessarily owned by – the Government of Sudan. The United States' actions in blocking this broad class of assets is authorized by the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, *et seq.*[2] *See Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003) (holding that IEEPA permits blocking of more than "traditional legal interests"); *Global Relief Foundation v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) (same). Pursuant to IEEPA, in November 1997, the President declared a national emergency with respect to Sudan, finding that the policies and actions of the Government of Sudan, including continued

---

[2] IEEPA authorizes the President, in times of national emergency originating in whole or substantial part outside the United States as declared by the President pursuant to 50 U.S.C. § 1701, to "investigate, . . . regulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer, withdrawal . . . or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . ." 50 U.S.C. § 1702.

support for international terrorism, ongoing efforts to destabilize neighboring governments, and the prevalence of human rights violations, including slavery and the denial of religious freedom, constituted an unusual and extraordinary threat to the national security and foreign policy of the United States. *See* Exec. Order No. 13067, 62 Fed. Reg. 59989 (Nov. 3, 1997). In turn, the Department of the Treasury promulgated the SSR, published at 31 C.F.R. Part 538, which include a trade embargo and a blocking of all property in the United States or the possession of a United States person in which the Government of Sudan has an interest. The Office of Foreign Assets Control ("OFAC") is responsible for administering the SSR and other economic sanctions programs promulgated pursuant to IEEPA. *See* Declaration of John E. Smith, dated November 21, 2008 ("Smith Decl."), ¶¶ 3-4 (docket no. 132).

In relevant part, the SSR block all property within the United States or in the possession or control of a U.S. person (as defined in the regulations) in which the Government of Sudan has an interest. *See* 31 C.F.R. §§ 538.201, 538.301. In defining what constitutes a blockable interest, the SSR cast a very broad net. The SSR define "property" and "property interest" to include, *inter alia*, ". . . any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 538.310; *see also id.* § 538.307 (defining "interest" in property as "an interest of any nature whatsoever, direct or indirect").

Because the definitions of "property" and "property interest" are so broad and include, for example, interests "of any nature whatsoever, direct or indirect," *see* C.F.R. § 538.307, and property interests "present, future or contingent," *see* C.F.R. § 538.310, a relatively minor and subordinate interest in property of the Government of Sudan can require that an asset be blocked pursuant to the SSR, even where one or more parties unrelated to the Government of Sudan have

6

superior ownership interests in that asset. *See* Smith Decl. ¶ 12; *see also Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d at 162-63; *Global Relief Foundation v. O'Neill*, 315 F.3d at 753. In this case, for example, a number of wire transfers have been blocked pursuant to the SSR because the Government of Sudan, as defined in the SSR, had some "interest," "direct or indirect," "present, future or contingent," in the property that was the subject of the transactions. *See* 38 C.F.R. §§ 538.305, 538.307, 538.310; Smith Decl. ¶¶ 14-15. These interests may include, for example, a future or contingent interest that the GOS may have as the intended beneficiary of a wire transfer that was blocked before reaching the GOS, or a past, present or future possessory interest of a Sudanese bank that merely served as one of a number of intermediaries in a chain of transactions effecting a wire transfer.

B. <u>Procedural History</u>

In this case, petitioners hold a judgment from the United States District Court for the Eastern District of Virginia against the Government of Sudan arising from its role in the terrorist bombing of the U.S.S. Cole. *See Rux v. Republic of Sudan*, No. 2:04cv428 (E.D. Va.) (amended judgment filed Nov. 16, 2007). In November 2007, petitioners sought to collect on their judgment from banks (the "respondent banks") that, when this proceeding was commenced, held funds that were blocked under the SSR. Petitioners initially proceeded by serving writs of attachment against the respondent banks in the Southern District of New York. The respondent banks sought relief from this Court, opposing the writs of attachment pending clarification of the actual ownership of funds they hold.

As part of their post-judgment proceedings, petitioners also issued a third-party subpoena to OFAC, requesting a list of all GOS-related blocked assets. On April 14, 2008, OFAC provided the petitioners with such a list, pursuant to a protective order issued in the United States

7

District Court for the Eastern District of Virginia. *See* Smith Decl. ¶ 16. The list included information about the dollar values and locations of the assets, and also included a field labeled "owner." *See id.* In providing this list, however, OFAC made clear to the petitioners that the "owner" information being provided was simply what the current holders of the blocked assets (*i.e.*, the financial institutions) had reported to OFAC as the "owner" of those assets for administrative purposes. *See id.* ¶¶ 13, 16. When providing the information, OFAC further informed petitioners that the "owner" field does not reflect a determination regarding legal title to the assets, or whether such assets may be attachable by petitioners. *See id.* Indeed, OFAC understands that the information in the "owner" field generally is used by the holders of blocked assets (*i.e.*, reporting financial institutions) for clerical purposes, perhaps merely to indicate the sanctions program under which the assets were blocked or the reason that the assets were blocked, and not indicating any opinion or determination of actual ownership. *See id.* Thus, for example, in the case of wire transfers, the "owner" field may reflect the name of the GOS-owned bank that was processing the wire transfer, although that bank does not hold legal title to the underlying funds that were blocked pursuant to the SSR. *See id.* ¶¶ 12, 16.

On July 29, 2008, this Court entered an order (the "July 29 Order") imposing deadlines for notifying parties with an interest in the funds held by the respondent banks, which petitioners sought to attach, and for those parties to inform the Court if they objected to petitioners' claim to those funds. In addition, the July 29 Order required that the "contested funds" be transferred to the Court registry pending resolution of the matter. Following modifications to the original schedule, certain parties claiming entitlement to some of the funds at issue filed responses in late November 2008. Petitioners thereafter filed the Turnover Motion, seeking immediate release of specified funds.

## DISCUSSION

A.  Petitioners Have Not Established Eligibility to Attach the Assets They Seek Because They Have Failed to Present Evidence Establishing Who Owns Each Account

The Turnover Motion appears unsupported by any evidentiary submission corroborating petitioners' characterization of who owns each account they seek to attach, and, as explained below, the lack of such a showing precludes a finding at this time that they have satisfied TRIA's requirements for attachment. While petitioners attach voluminous exhibits to their motion, petitioners' evidentiary showing appears not to relate to who holds what ownership interest in each asset in question. Rather, their submission appears geared to establishing the independent proposition, also required by TRIA, that the entity is an "agency" or "instrumentality" of the Government of Sudan, if not that Government itself.[3] For example, on pages 8-9 of petitioners' motion, petitioners describe a "wire account" allegedly "held in the name of Sudan's Ministry of Finance" in the amount of $4,400,423.75. Petitioners then cite to an exhibit in support of their contention that the Ministry of Finance is an agency or instrumentality of the Government of Sudan. *See* Turnover Motion at 8-9; *id.* at Ex. D. Petitioners do not, however, offer any citations, exhibits, or other support for their initial assertion that this particular wire account is "held in the name of" Sudan's Ministry of Finance. Such supporting evidence is absent for all eleven entities that petitioners assert own the accounts listed in their motion.

Petitioners cannot establish eligibility to attach the assets they seek, however, unless and until they make a showing that the assets at issue are "of that terrorist party" under TRIA. *See* TRIA § 201(a). The plain meaning of the phrase "of that terrorist party" clearly requires

---

[3] The United States takes no position as to the sufficiency of petitioners' showing that any entity at issue constitutes the Government of Sudan or an agency or instrumentality thereof for purposes of TRIA.

9

ownership on the part of the terrorist party; the statute's text does not support attachment of assets that do not belong to the "terrorist party" – here, the GOS or its agencies or instrumentalities. Moreover, any attempt to attach more than the GOS's interest in any particular property would appear to exceed TRIA's scope.[4]

Petitioners have supported their Turnover Motion with no evidence to corroborate their assertion of GOS ownership of each account at issue. This failure is particularly troubling because petitioners were apparently provided with information by the banks demonstrating that in at least some instances the assets at issue represent wire transfers in which the GOS's interest arises merely from its role as the intended beneficiary of a transfer.[5] Indeed, the Turnover Motion itself states that one wire account involved "Bank of Sudan" as "beneficiary." Turnover

---

[4] One possible interpretation of the statute's ownership interest requirement would be to import, as a matter of federal common law, U.C.C. provisions governing ownership. *Cf. O'Neill v. United States*, 50 F.3d 677, 684 (9th Cir. 1995) ("The Uniform Commercial Code is a source of federal common law . . ."); *United States v. Burnette-Carter Co.*, 575 F.2d 587, 590 (6th Cir. 1978) ("We agree with the reasoning of the Fifth Circuit that the UCC should be adopted as the relevant federal common law.").

[5] The beneficiary of a wire transfer holds no interest subject to attachment under the U.C.C. Under state law, wire transfers appear to be considered owned by their originator – or at least not owned by the beneficiary – until the wire transfer is successfully completed by transmission to the intended beneficiary. *See* N.Y. U.C.C. § 4-A-502(4) ("Creditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer may be served only on the beneficiary's bank with respect to the debt owed by that bank to the beneficiary."); *id.* cmt. 4 ("A creditor of the beneficiary cannot levy on property of the originator and *until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach.* A creditor of the beneficiary that wants to reach the funds to be received by the beneficiary must serve creditor process upon the beneficiary's bank. . . .") (emphasis added). OFAC was sent copies of portions of some document productions made by certain respondent banks to petitioners in this case. These limited materials demonstrate that some number of the assets that petitioners seek to attach consist of wire transfers in which the GOS was an intended beneficiary of the transfer. Those materials are subject to a confidentiality order whose applicability is unknown to the United States as of this writing. These documents could presumably be provided to the Court in full by the banks that produced them or by the petitioners.

10

Motion at 14.

Moreover, the mere fact that the funds at issue are blocked is not sufficient to establish that they are "of that terrorist party" under TRIA. Rather, as explained above, the fact that the assets are blocked establishes only that the Government of Sudan has some blockable "property interest" – as that term is broadly defined by OFAC for purposes of the SSR regime – in the assets. Meanwhile, the entry of "Sudan" or a similar indication in the "owner" field in certain lists likewise does not demonstrate any actual ownership or legal title over the assets; rather, that "owner" information was simply what was used by various financial institutions for clerical purposes. *See* Smith Decl. ¶¶ 13, 16.

Thus, to satisfy TRIA, petitioners must show – and have not shown – that the Government of Sudan has a sufficient ownership interest in each listed asset such that the asset is "of that terrorist party[.]"

B.  The United States Takes No Position as to the Question Whether TRIA Limits the Applicability of State Law Restrictions on Attachment of Wire Transfers

Even if the Court determines that particular assets are "of that terrorist party" under TRIA and hence potentially subject to attachment, there remains significant question whether such a finding, alone, will entitle the petitioners to such assets. Prior case law has found that TRIA – when applicable – authorizes attachment by lifting the foreign sovereign's immunity, but that the attachment is to occur under the procedures of Rule 69, which incorporates state attachment law. *See Weininger v. Castro*, 462 F. Supp. 2d 457, 462, 494-99 (S.D.N.Y. 2006) (plaintiffs sought "turnover" under Rules 13 and 69 and CPLR § 5525; reviewing assets to determine which are attachable under Rule 69 and New York law); *Smith v. Federal Reserve Bank of New York*, 346 F.3d 264, 269 (2d Cir. 2003) (in case where plaintiffs sought to attach funds under TRIA, observing that execution on assets to satisfy a judgment is "govern[ed]" by Rule 69, that there is

11

no federal statute that defeats the application of state law under Rule 69, and that the execution application therefore "would proceed according to New York law").

Among the many possible New York state laws that may govern (via Rule 69) this attachment proceeding, petitioners specifically contend that the N.Y. U.C.C. general prohibition against the attachment of funds that are held at intermediary banks (i.e., funds that are mid-transfer at some point between the originator and beneficiary's banks) is not applicable in this case. *See* Turnover Motion at 22-23. Petitioners' reliance on maritime cases authorizing attachment of funds held by intermediary banks, notwithstanding the U.C.C.'s broad restrictions on such attachment, would allow petitioners to avoid, at most, the U.C.C.'s attachment restrictions, and would have no bearing on TRIA's underlying ownership interest requirement that assets subject to attachment be those "of that terrorist party."[6] The United States takes no position at this time on whether TRIA itself would operate to preempt state law restrictions on the attachment of wire transfers accounts, notwithstanding *Weininger* and *Smith*. However, direct application of the maritime preemption cases appears problematic, because those cases were based on considerations not present here. Maritime law, unlike TRIA, contains a longstanding, detailed, express and fully codified federal attachment procedure that has been developed in response to unique concerns of the maritime industry. *See, e.g., Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 437-444 (2d Cir. 2006); Rule B, Fed. R. Civ. P. - Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Whether or not TRIA gives rise to analogous policy concerns about the desirability of facilitating

---

[6] As previously mentioned, *see* supra at 10 & n.4, TRIA's requirement that the assets subject to attachment be "of that terrorist party" may import certain U.C.C. definitions pertaining to property ownership, such as those which state that the beneficiary of a funds transfer has no attachable property interest in the funds until the transfer is complete.

enforcement of judgments against entities whose assets are otherwise difficult to obtain, *see* Turnover Motion at 23, TRIA contains no comparable attachment scheme. Thus, the legal underpinnings of the maritime preemption cases – which applied a pre-existing federal attachment scheme and held that that scheme governed in the face of inconsistent state-law attachment procedures that were not tailored to the specific concerns addressed by the maritime rules – may not apply in the TRIA context.

## CONCLUSION

For the reasons stated above, the Court should not authorize the requested turnover of funds unless and until petitioners present evidence supporting their assertion of GOS ownership of the assets they seek. The United States respectfully requests that, if the Court enters an order authorizing the release of funds from the Court's registry notwithstanding the United States' views, the order be made effective a sufficient time after its entry so as to allow the United States, prior to the order's effective date, to consider what additional action it may wish to take prior to release of such funds.

Dated: New York, New York
January 12, 2009

          Respectfully submitted,

          LEV L. DASSIN
          Acting United States Attorney
          Attorney for the United States of America

By:    /s/ David S. Jones
          DAVID S. JONES
          JOHN D. CLOPPER
          Assistant United States Attorneys
          86 Chambers Street, 3rd Floor
          New York, New York 10007
          Telephone: (212) 637-2739/2716