# Exhibit F

# 10-1487-cv(L)

10-1488, 10-1493, 10-1507, 10-1510, 10-1524,
10-1529, 10-1545, 10-1603, 10-1629

## United States Court of Appeals for the Second Circuit

EM LTD. and NML CAPITAL, LTD.,

*Plaintiffs-Appellees*,

v.

REPUBLIC OF ARGENTINA and BANCO CENTRAL DE LA REPÚBLICA ARGENTINA,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR PLAINTIFFS-APPELLEES
EM LTD. and NML CAPITAL, LTD.**

David W. Rivkin
John B. Missing
Suzanne M. Grosso
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY  10022
Telephone:   (212) 909-6000
Facsimile:   (212) 909-6836

*Counsel for Plaintiff-Appellee EM Ltd.*

Theodore B. Olson
Matthew D. McGill
Jason J. Mendro
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:   (202) 955-8500
Facsimile:   (202) 467-0539

Robert A. Cohen
Dennis H. Hranitzky
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036
Telephone:   (212) 698-3500
Facsimile:   (212) 698-3599

*Counsel for Plaintiff-Appellee NML Capital, Ltd.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee EM Ltd. states that it is not publicly traded and has no corporate parent and that no publicly held corporation owns 10% or more of its stock.

Appellee NML Capital, Ltd. states that it is not publicly traded and has no corporate parent and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

JURISDICTIONAL STATEMENT ............................................................................4

COUNTER-STATEMENT OF THE ISSUES PRESENTED ....................................5

STATEMENT OF THE CASE....................................................................................7

STATEMENT OF FACTS ..........................................................................................9

SUMMARY OF ARGUMENT ................................................................................20

STANDARD OF REVIEW ......................................................................................22

ARGUMENT.............................................................................................................23

    I.    No Preclusion Doctrine Bars The Alter Ego Attachment Motions..................................................................................................23

        A.    Claim Preclusion Does Not Apply..........................................24

        B.    Issue Preclusion Does Not Apply ...........................................33

    II.    The Finding That BCRA Is Argentina's Alter Ego Is Amply Supported By The Extensive Record ....................................................35

        A.    Argentina Exercises Such Extensive Control Over BCRA That BCRA Has Become The Servant Of Argentina As To Its Funds ...........................................................................36

        B.    Argentina Has Used BCRA As An Instrument Of Fraud And Injustice ............................................................................54

    III.    The FRBNY Account Is Not Immune From Attachment ...................63

        A.    In The Absence Of Juridical Separateness, Assets Held In The Name Of BCRA Are Assets Of Argentina For Which Argentina Has Waived Immunity ...............................64

# TABLE OF CONTENTS
## (continued)

Page

    B.    Section 1611 Does Not Bar Attachment Of The FRBNY Account .......................................................................................... 74

    C.    The FRBNY Assets Were Used For Commercial Activities ................................................................................................ 82

    D.    The Attachments And Restraints Are Valid And Enforceable Under New York Law ...................................................... 92

IV.    Policy Considerations Support An Alter-Ego Finding When Foreign States Abuse The Corporate Form To Perpetrate Fraud And Injustice ..................................................................................................... 94

CONCLUSION .................................................................................................... 98

### 2. The District Court's Alter Ego Finding Was Well Supported By The Record Evidence.

In the district court, EM and NML submitted expert reports by Dr. Alex Cukierman, one of the foremost authorities in the world on the relationship between central banks and their sovereigns. *See* A-II:191 (Declaration of Sept. 25, 2006); A-II:673 (Rebuttal Report of Dec. 5, 2006). Dr. Cukierman brought his decades of experience to bear on the question of BCRA's independence from the Argentine government. He based his analysis in part on application of a legal-independence index that he had developed using various data points that experts in the field ordinarily use to evaluate central-bank independence.[11] He also examined the most critical factors that courts look to in applying the *Bancec* alter-ego test: the government's domination of BCRA's policymaking; the government's use of BCRA's property as its own; and the government's control over BCRA's

---

[Footnote continued from previous page]

    Br. 43). The court's holding in *LNC* was, indeed, based on its evaluation of a host of characteristics that it determined to be "of a typical government instrumentality." *LNC Invs.*, 115 F. Supp. 2d at 366. This Court, of course, did not comment on daily control at all, but rather affirmed "for substantially the reasons stated by the district court." *LNC Invs., Inc. v. Banco Cent. de Nicaragua*, 228 F.3d 423, 423 (2d Cir. 2000).

[11] This index was validated even by Argentina's central banking expert, who wrote (before his retention for this case) that Dr. Cukierman's index is "most notable and comprehensive" and "endures as an indicator of the degree of statutory autonomy enjoyed by a wide variety of central banks around the world." Pierre L. Siklos, *The Changing Face of Central Banking: Evolutionary Trends Since World War II*, 65-66 (2002).

leadership. Based on that analysis, Dr. Cukierman concluded that "BCRA is highly dependent on and controlled by the Argentine state—both in an absolute sense, and relative to most other central banks," a conclusion, he stated, that was "accurate to a degree of certainty reasonable in the economics profession." A-II:203, A-II:214. BCRA is thus not, according to Dr. Cukierman, "typical" of independent central banks. *Bancec*, 462 U.S. at 624-28.

In light of the reports of Dr. Cukierman and the extensive record evidence of Argentina's control over BCRA, the district court concluded under the flexible *Bancec* test that Argentina and BCRA are a single juridical entity because "BCRA was the servant or the agent of the Republic as to its funds, within the meaning of . . . *Bancec*." SPA-62. The district court found that Argentina has repeatedly disregarded BCRA's independence by controlling the selection and retention of its officers (SPA-18-19), directing BCRA's monetary policy for the President's own political purposes (SPA-26), amending BCRA's charter to increase government control over BCRA's activities (SPA-24), and appropriating BCRA's assets to make selective payments to Argentina's creditors (SPA-26-32). Significantly, the district court found that "the Republic could draw on the resources of BCRA *at will*." SPA-61 (emphasis added). Therefore, "the funds of BCRA were in effect the funds of the Republic." SPA-62.

41

The district court's conclusion was correct. Each of the most critical factors that courts have looked to in applying *Bancec*'s first test are present here.

BCRA largely does not dispute the presence of each of those factors. Instead, it argues that the high degree of control that they demonstrate is normal for central banks. According to BCRA, *Bancec* is not satisfied even when a sovereign exercises plenary control over a central bank's monetary policy and leadership and uses its reserves to service its debts.

BCRA is wrong. The factors that the district court relied on satisfy the *Bancec* test.

*First*, there is no serious debate that Argentina has treated BCRA's property as its own—the touchstone of an alter-ego relationship. *See Bridas*, 447 F.3d at 418; *see also Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997). Beginning with the IMF repayment in 2005 and continuing through the Bicentennial Fund of 2009, the Argentine executive branch has repeatedly issued fiats demanding that BCRA's reserves be seized to pay off the government's debts.

The district court cited Decree 1599/2005, which for the first time authorized BCRA's reserves to be used to pay off foreign debt of Argentina, and the simultaneously issued Executive Decree 1601/2005, which permitted payment of excess reserves to the IMF. As a result of these decrees, "more than $8 billion, constituting almost a third of the U.S. dollar reserves held by BCRA, was used to

pay an indebtedness of the Republic [to the IMF] (not, of course, an indebtedness of BCRA)," and "[a]ll that BCRA received in return was a 10-year note," contrary to the provision of BCRA's charter requiring repayment within one year. SPA-28. This fact, which played a critical role in the district court's analysis, was not disputed by either party. The court found it to be a "drastic intrusion into BCRA independence" and something that "demonstrated that the Republic could draw on the resources of BCRA at will." SPA-29, SPA-61.

Laws passed by the Argentine Congress likewise expanded Argentina's ability to tap the reserves of BCRA. One law, for instance, lifted the cap on the amount of BCRA reserves that could be loaned to Argentina. *See* Law 25,562 (Feb. 6, 2002). Moreover, the executive branch has continued to exploit BCRA's reserves to support its fiscal agenda up to the present day, such as through the 2009 Bicentennial Fund and its aftermath.

BCRA argues that the fact that it was ordered by Argentina to accumulate over $8 billion in reserves to pay off an IMF loan—and, presumably, the fact that it has been ordered to accumulate reserves to pay off other loans since—does not tend to show an alter-ego relationship because such control is "inherent in the government-central bank relationship." BCRA Br. 50-52.

BCRA's factual assertion about the nature of independent central banks is simply wrong. Dr. Cukierman, a leading authority on central banks, explained to

43

the district court that "[i]n contrast to a truly independent central bank . . . governments controlling central banks can, and invariably do, use their central banks to achieve other (often politically motivated) objectives like financing government expenditures." A-II:195. Some critical "pillars of independence" are that "[g]overnment borrowing from the central bank is strictly limited or prohibited altogether" and "[t]he central bank alone controls the instruments of monetary policy." A-II:196. BCRA, therefore, with its virtually limitless lending to the Argentine government, is nowhere close to a "typical" independent central bank.

It is true that governments often retain some limited control over the reserves of a central bank in certain circumstances. But, as Dr. Cukierman attested, the degree of control exercised by Argentina is extreme, ranking it dead last among developed nations and in the bottom third of developing countries. That fact takes BCRA far out of the mainstream. *Compare Bancec*, 462 U.S. at 624-28 (focusing on whether *Bancec* was a "typical" government instrumentality in alter-ego analysis); *cf. LNC Invs. v. Republic of Nicaragua*, 115 F. Supp. 2d 358, 364 (S.D.N.Y. 2000), *aff'd sub nom. LNC Invs. v. Banco Central de Nicaragua*, 228 F.3d 423 (2d Cir. 2000) (finding that the Nicaraguan central bank behaved like a "typical" central bank and was thus not an alter ego). Certainly nothing in

44

Argentina's briefs demonstrates that the district court's factual findings with respect to BCRA's lack of independence are clearly erroneous.[12]

*Second*, the Argentine government routinely exercises control over BCRA's monetary policy. As the district court found, BCRA did Argentina's "bidding" in 2005 when it "issued . . . pesos in sufficient amounts to purchase billions of U.S. dollars" in order to acquire sufficient reserves to repay the IMF loan. SPA-61. It was widely reported in reputable publications that the accumulation of the reserves was the policy of President Nestór Kirchner, not BCRA. SPA-26-27. Immediately after the IMF payment, the Argentine government publicly announced that BCRA was required to build back up its reserves by the end of the year so that the government could appropriate the excess reserves again, this time to repay other foreign creditors. Like nearly all of the critical facts in the district court's analysis, these facts were undisputed.

---

[12] BCRA cites a footnote in this Court's decision in *EM I* for the proposition that "it is common for governments to direct their central banks to use reserves for government purposes." BCRA Br. 50-51 (citing 473 F.3d at 485 n.22). Yet the cited footnote explains only that IMF members often use central banks as "fiscal agents" for IMF transactions, not that IMF members regularly raid the fiscal agents' *own reserves* to pay back IMF loans. BCRA's citation (at 57) to an IMF staff recommendation that Argentina have BCRA pay off Argentina's IMF loan is similarly misleading. BCRA's citation omits the IMF staff's conclusion that "[t]o allow international reserves to be used directly to finance Fund repurchases . . . changes in the central bank's charter may be necessary," and that such an amendment could potentially threaten "its independence from government." A-VI:121.

45

BCRA contends, however, that so long as a statute or decree eroding its independence was "duly enacted in accordance with Argentine law," it cannot be the basis for an alter-ego finding. BCRA Br. 57. That theory would gut the entire *Bancec* analysis. On BCRA's view, Argentina could pass a law appointing the President head of the central bank, and that would not create an alter-ego relationship so long as the law was properly enacted. To state the point is to refute it.[13]

BCRA argues that even if a central government *orders* its central bank to increase its reserves to pay off the government's debts, that "would not support an alter ego finding" because "[i]t is common for central banks to coordinate monetary policy with the parent government." BCRA Br. 58-59. Argentina similarly characterizes its laws and executive decrees as "typical of the responses many governments have made to economic crisis," analogizing them to the U.S. Federal Reserve's actions in 2008 and 2009. BCRA Br. 58. That analogy misses the point. To the extent *policies* implemented by the U.S. Federal Reserve and other independent central banks were similar to BCRA's policies—and they were

---

[13] Moreover, EM and NML demonstrated below that BCRA's self-serving view of Argentine law is erroneous. BCRA claims that Argentina's use of BCRA's reserves was "authorized under a statute first passed in 1933." BCRA Br. 52. As appellees' legal expert explained, that 1933 law—much like the "fiscal agent" concept for IMF loans—permits BCRA to act as "an *intermediary agent* that can receive the proceeds deriving from a foreign loan and then transfer said proceeds to the National Treasury." A-II:630. That is not what happened here.

not—they were the *central banks'* policies based on the *independent judgment* of the leaders of these central banks, not by a statutory mandate, as in Argentina. Compulsion is not "coordination." What is critical to the alter-ego analysis is that the government was the ultimate decisionmaker. *See* A-II:198 (Dr. Cukierman: "The legal independence of a central bank refers to the extent to which its parent government is legally constrained from interfering with or controlling the central bank's conduct of monetary policy."). Here, the district court found that BCRA had accumulated reserves "at the express direction of the Republic" and "that BCRA did the Republic's bidding," which was confirmed by President Kirchner's declaration in 2006 that he had discretion as president to set the appropriate level of BCRA reserves. SPA-60-61; A-II:110, A-II:113. Argentina and BCRA point to no evidence that comes close to establishing clear error.[14]

*Third*, the Argentine Executive has exercised total control over BCRA leadership, firing BCRA leaders at will—another key indicator of domination under *Bancec*. *See TMR Energy*, 411 F.3d at 302. Through Executive Decree 1373/1999, the Executive Branch amended BCRA's charter to empower the

---

[14] *LNC Investments* does not aid Argentina's argument. That district court found that the Nicaraguan government exercised only a "generally supervisory role" over the central bank and that the directors and officers of the bank "establish Nicaragua's monetary policy without government supervision or control." 115 F. Supp. 2d at 364. The district court found otherwise in this case. And just as the district court's factual findings in *LNC Investments* were entitled to great deference, so are the district court's findings here.

47

President to make interim appointments of BCRA officials without Senate approval. This change effectively gives both the President and the Senate more political control over BCRA officials. As long as the official's nomination remains pending, he or she is continually subject to rejection in the Senate or withdrawal by the President. A-II:641-42.

These changes have led to an "exceptionally high turnover rate of BCRA's chief officials," as detailed in Dr. Cukierman's analysis. A-II:214. As *The Financial Times* and *Euromoney Institutional Investor* reported, BCRA governors who resigned after exceptionally short tenures had aired disagreements with the Executive branch on monetary policy. SPA-18. Most recently, *The New York Times* reported that President Fernández de Kirchner ousted BCRA's governor Martín Redrado for resisting Argentina's efforts to raid $6 billion of BCRA's reserves. A-IV:490. It is for this reason, as Dr. Cukierman explained, that "[h]igh turnover is generally accepted among economists working in [the] field as a reliable proxy of government control." A-II:675. When the government may replace "senior central bank officials who disagree with [the] government," then "the government exerts substantial control over the policy and operations of the bank." A-II:675.

*Fourth*, Argentina has repeatedly ignored the limits in BCRA's own charter on the government's interference with BCRA's policies. That sort of disregard of

48

"ordinary corporate formalities" further supports an alter-ego finding. *De Letelier*, 748 F.2d at 794; *see also Minpeco, S.A. v. Hunt*, 686 F. Supp. 427, 436-37 (S.D.N.Y. 1988) (declining to find alter-ego relationship where it was "undisputed that Peru never violated [subsidiary's] articles of incorporation or by-laws"). Argentina's use of executive decrees to exercise pervasive control over BCRA to implement government policy flouts BCRA's charter, which provides that "'[a]s regards the preparation and implementation of any monetary and financial policy, BCRA *shall not be subject to any order or instruction given by the National Executive Power*.'" SPA-20-21 (emphasis added) (quoting the BCRA charter). Argentina's exercise of command-and-control authority over BCRA's monetary policy demonstrates that the purportedly separate juridical status of BCRA is a fiction.

### 3. BCRA's Arguments Do Not Show That The District Court's Findings Were Clearly Erroneous.

BCRA argues that this Court must reject the district court's factual findings because they are "based almost entirely on news articles, mostly from the notoriously partisan Argentine press." BCRA Br. 46. That is absolutely false. As demonstrated above, the district court's opinion was based on a wide variety of evidentiary sources, including Argentine legal documents and the expert reports