No. 11-2144

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

JENNY RUBIN, ET AL,
Plaintiffs-Appellants,

v.

THE ISLAMIC REPUBLIC OF IRAN, ET AL,
Defendants.

HARVARD UNIVERSITY, ET AL,
Trustee Process Respondents-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF THE APPELLEES**

Of Counsel:

MATTHEW TUCHBAND
 *Acting Chief Counsel*
 *Office of Foreign Assets Control*
 *U.S. Department of the Treasury*

HAROLD HONGJU KOH
 *Legal Advisor*
 *U.S. Department of State*

STUART F. DELERY
 *Acting Assistant Attorney General*

CARMEN M. ORTIZ
 *United States Attorney*

MARK B. STERN
 (202) 514-5089
SHARON SWINGLE
 (202) 353-2689
BENJAMIN M. SHULTZ
 (202) 514-3518
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7211*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave. NW*
 *Washington, D.C. 20530*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTEREST OF THE UNITED STATES. ......................... 1

STATEMENT OF THE ISSUES. ...................................................................... 3

STATEMENT OF FACTS. ............................................................................... 4

I.      Statutory And Regulatory Background. ....................................................... 4

        A.      IEEPA And The Iranian Assets Control Regulations. ............................... 4

        B.      TRIA. .................................................................................................. 6

II.     Factual Background. .................................................................................. 8

SUMMARY OF ARGUMENT. ....................................................................... 11

ARGUMENT. ................................................................................................. 13

I.      TRIA Authorizes The Attachment Of Only Those Assets
        Owned By The Relevant Terrorist Party. ................................................. 13

II.     An Asset Cannot Be "Contested" For Purposes Of 31 C.F.R. § 535.333
        Unless Iran Itself Claims A Property Interest In The Asset. ...................... 21

CONCLUSION. ............................................................................................. 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                      <u>**Page**</u>

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
    501 U.S. 104 (1991). ................................................................... 17

*Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
    131 S. Ct. 2188 (2011). ............................................................ 15, 16

*Bennett v. Islamic Republic of Iran*,
    618 F.3d 19 (D.C. Cir. 2010). ....................................................... 7

*In re Brauer*,
    452 Mass. 56, 890 N.E.2d 847 (2008). ......................................... 8

*Burlington Indus. v. Ellerth*,
    524 U.S. 742 (1998). ................................................................... 21

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.*,
    __ F. Supp. 2d __, 2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011),
    *appeal docketed*, No. 12-75 (2d Cir.). .................................... 18

*Campuzano v. Islamic Republic of Iran*,
    281 F. Supp. 2d 258 (D.D.C. 2003). ............................................ 8

*Chase Bank USA, N.A. v. McCoy*,
    131 S. Ct. 871 (2011). ................................................................. 25

*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989). ................................................................... 21

*Don v. Gonzales*,
    476 F.3d 738 (9th Cir. 2007). ...................................................... 19

*Ellis v. United States*,
    206 U.S. 246 (1907). ................................................................... 15

ii

*Flores-Figueroa v. United States,*
    556 U.S. 646 (2009). .................................................................................. 15

*Hausler v. JP Morgan Chase Bank, N.A.,*
    740 F. Supp. 2d 525 (S.D.N.Y. 2010). ................................................. 18, 20

*Hausler v. JP Morgan Chase Bank, N.A.,*
    __ F. Supp. 2d __, 2012 WL 601034 (S.D.N.Y. Feb. 22, 2012),
    *appeal docketed*, Nos. 12-1264 & 12-1272 (2d Cir.)............................. 17, 18, 21

*Islamic Republic of Iran v. United States,*
    28 Iran-U.S. Cl. Trib. Rep. 112 (1992)........................................................ 22

*Levin v. Bank of New York,*
    No. 09-cv-5900, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011)....................... 18

*Poe v. Seaborn,*
    282 U.S. 101 (1930). .................................................................................. 15

*Rubin v. Islamic Republic of Iran,*
    456 F. Supp. 2d 228 (D. Mass. 2006). ................................................. 9, 10, 21

*Rubin v. Islamic Republic of Iran,*
    541 F. Supp. 2d 416 (D. Mass. 2008). ..................................................... 10, 24

*Rubin v. Islamic Republic of Iran,*
    810 F. Supp. 2d 402 (D. Mass. 2011). ......................................................... 10

*Rubin v. Islamic Republic of Iran,*
    No. 08- 8020 (1st Cir. Aug. 11, 2008). .................................................... 10, 11

*Sony BMG Music Entmt. v. Tenenbaum,*
    660 F.3d 487 (1st Cir. 2011), *cert. denied*, 2012 WL 526017 (May 21, 2012).............. 17

*Tamara-Gomez v. Gonzales,*
    447 F.3d 343 (5th Cir. 2006)........................................................................ 19

*Textile Workers Union of Am. v. Lincoln Mills of Ala.,*
    353 U.S. 448 (1957). .................................................................................. 21

*United States v. McKeeve,*
   131 F.3d 1 (1st Cir. 1997) ................................................................................................. 4

*United States v. Rodgers,*
   461 U.S. 677 (1983). ....................................................................................................... 16

*United States v. Sperry Corp.,*
   493 U.S. 52 (1989). ....................................................................................................... 4, 5

*Weininger v. Castro,*
   462 F. Supp. 2d 457 (S.D.N.Y. 2006). ........................................................................ 7

**Statutes:**

26 U.S.C. § 7403(a). ....................................................................................................... 16

28 U.S.C. § 1292(b). ................................................................................................. 10, 13

28 U.S.C. § 1605(a)(7) (2000). ....................................................................................... 6

28 U.S.C. § 1605A. .......................................................................................................... 7

28 U.S.C. § 1610. ............................................................................................................. 7

50 U.S.C. App. 5(b). ........................................................................................................ 7

50 U.S.C. §§ 1701-1706. ................................................................................................. 4

Pub. L. No. 107-297, 116 Stat. 2322 (2002) ...................................... 1, 6, 79, 12, 13, 14, 16

Pub. L. No. 110-181 (2008). ........................................................................................... 7

**Regulations:**

31 C.F.R. § 515.201. ...................................................................................... 2, 7, 15, 19

31 C.F.R. § 515.201(b)(2). ............................................................................................ 20

31 C.F.R. § 515.310. ................................................................................................... 2, 7

31 C.F.R. § 515.311. ................................................................................................ 20

31 C.F.R. § 535.201. ............................................................... 2, 5, 7, 12, 14, 20

31 C.F.R. § 535.215 ................................................................................................ 12

31 C.F.R. § 535.215(a)................................................................ 1, 3, 6, 10, 22, 23

31 C.F.R. § 535.310. ............................................................................................ 2, 7

31 C.F.R. § 515.311. ................................................................................................ 20

31 C.F.R. § 535.333. ............................................................... 2, 3, 12, 13, 21, 25

31 C.F.R. § 535.333(a). ...................................................................................... 6, 22

31 C.F.R. § 535.333(c). ...................................................................................... 6, 24

31 C.F.R. § 535.504. ................................................................................................ 23

31 C.F.R. § 538.201. ................................................................................................ 15

31 C.F.R. § 538.307. ................................................................................................ 15

31 C.F.R. § 594.201. ........................................................................................ 2, 8, 15

31 C.F.R. § 594.306. ................................................................................................ 15

31 C.F.R. § 594.312. .......................................................................................... 2, 8

**Rules:**

Fed. R. App. P. 29(a). ................................................................................................ 1

Fed. R. Civ. P. 69(a)(1). ............................................................................................ 8

**Legislative Materials:**

148 Cong. Rec. S11527. ............................................................................................ 17

**Other Authorities:**

50 C.J.S. Judgments § 787 (2012).......................................................................... 16

Declaration of the Government of the Democratic and Popular Republic
    of Algeria, U.S.-Iran, Jan. 19, 1981, 20 I.L.M. 224. ................................. 5, 22

44 Fed. Reg. 65956 (Nov. 15, 1979)....................................................................... 5

66 Fed. Reg. 38553 (July 25, 2001). ...................................................................... 24

68 Fed. Reg. 34196 (June 6, 2003)......................................................................... 19

*Executive Order No. 12170,* 44 Fed. Reg. 65729 (Nov. 14, 1979)........................ 4

*Executive Order No. 12276,* 46 Fed. Reg. 7913 (Jan. 19, 1981). .......................... 5

*Executive Order No. 12277,* 46 Fed. Reg. 7915 (Jan. 19, 1981). .......................... 5

*Executive Order No. 12278,* 46 Fed. Reg. 7917 (Jan. 19, 1981),
    *as amended by* 46 Fed. Reg. 10895 (Feb. 5, 1981)............................................ 5

*Executive Order No. 12279,* 46 Fed. Reg. 7919 (Jan. 19, 1981). .......................... 5

*Executive Order No. 12280,* 46 Fed. Reg. 7921 (Jan. 19, 1981). .......................... 5

*Executive Order No. 12281,* 46 Fed. Reg. 7923 (Jan. 19, 1981). ..................... 5, 6, 22, 23

*Executive Order No. 12282,* 46 Fed. Reg. 7925 (Jan. 19, 1981). .......................... 5

*Executive Order No. 12283,* 46 Fed. Reg. 7927 (Jan. 19, 1981). .......................... 5

*Executive Order No. 12284,* 46 Fed. Reg. 7929 (Jan. 19, 1981). .......................... 5

*Executive Order No. 13599,* 77 Fed. Reg. 6659 (Feb. 8, 2012). .......................... 21

OFAC, *Terrorism: What You Need To Know About U.S. Sanctions,*
    http://www.treasury.gov/resource-center/sanctions/Programs/
    Documents/terror.pdf (last updated May 24, 2012). ................................. 19

No. 11-2144

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

JENNY RUBIN, ET AL,
Plaintiffs-Appellants,

v.

THE ISLAMIC REPUBLIC OF IRAN, ET AL,
Defendants.

HARVARD UNIVERSITY, ET AL,
Trustee Process Respondents-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF THE APPELLEES

## INTRODUCTION AND INTEREST OF THE UNITED STATES

In accordance with Fed. R. App. P. 29(a), the United States submits this *amicus curiae* brief to address two issues of importance to the Government: (1) whether the Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107-297, § 201, 116 Stat. 2322, 2337 (2002), authorizes the attachment of assets that are not owned by a terrorist party; and (2) whether an Iranian property interest can be "contested" within the meaning of the Iranian Assets Control Regulations, *see* 31 C.F.R. §§ 535.215(a),

535.333, when Iran itself has not articulated any claim to the property in question. In the Government's view, the answer to both questions is "no."

The United States emphatically condemns the act of terrorism that grievously injured the plaintiffs, and has deep sympathy for their suffering. The United States remains committed to disrupting terrorist financing and to aggressively pursuing those responsible for committing terrorist acts against U.S. nationals. In addition, however, the United States has a strong interest in ensuring that courts properly interpret TRIA's scope. Normally, unless a person obtains a license from the Treasury Department's Office of Foreign Assets Control (OFAC), that person is barred from attaching assets that are blocked under various sanctions programs, such as the Iranian Assets Control Regulations. *See, e.g.*, 31 C.F.R. §§ 535.201, 535.310; *id.* §§ 515.201, 515.310; *id.* §§ 594.201, 594.312. This licensing system lets the Executive Branch exercise control over access to blocked assets in order to effectuate the United States's broad policy interests. But when a blocked asset comes within TRIA's scope, TRIA generally overrides OFAC's regulations requiring that a license be obtained before the asset is attached. Accordingly, any judicial application of TRIA has important consequences for the Executive Branch's implementation of sanctions regimes in the public interest. Moreover, because TRIA affects foreign states and entities with assets in the United States, judicial interpretations of TRIA can have important consequences for foreign policy.

2

The United States also has a strong interest in the interpretation of the Iranian Assets Control Regulations. Those regulations—which are promulgated and administered by OFAC—implement an international agreement between the United States and Iran. As a result, judicial discussion of those regulations can have important consequences for U.S. foreign policy interests.

## STATEMENT OF THE ISSUES

Plaintiffs hold a judgment against Iran. In an attempt to satisfy that judgment, plaintiffs invoked TRIA to attach artifacts in the possession of various museums. Plaintiffs assert that Iran has either a full ownership interest, or some lesser property interest, in these artifacts.

Against this backdrop, the United States will address solely the following issues:

1) Whether a party can use TRIA to attach assets that are not owned by a terrorist party; and

2) Whether property can be "contested" for purposes of 31 C.F.R. §§ 535.215(a) and 535.333 when only a third-party creditor, and not Iran itself, asserts the existence of an Iranian property interest.

3

# STATEMENT OF FACTS

## I. Statutory And Regulatory Background

### A. *IEEPA And The Iranian Assets Control Regulations*

The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1706, confers "broad and flexible power upon the President to impose and enforce economic sanctions against nations that the President deems a threat to national security interests." *United States v. McKeeve,* 131 F.3d 1, 10 (1st Cir. 1997). The Treasury Department's Office of Foreign Assets Control (OFAC) administers sanctions imposed under the statute.

In 1979, following the seizure of the American Embassy in Tehran and the taking of hostages, President Carter issued an IEEPA-based Executive Order that blocked transactions in "all property and interests in property of the Government of Iran . . . which are or become subject to the jurisdiction of the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States." *Executive Order No. 12170*, 44 Fed. Reg. 65729 (Nov. 14, 1979); *see also United States v. Sperry Corp.*, 493 U.S. 52, 55 (1989).

OFAC implemented the Executive Order through regulations that prohibited transactions in all property in which Iran had "any interest of any nature whatsoever" on or after November 14, 1979, unless the transaction was authorized by an OFAC

license.  *See* 44 Fed. Reg. 65956 (Nov. 15, 1979).  (Relevant statutes and regulations are reproduced in the addendum to this brief.)

Although OFAC's 1979 blocking order remains in place, *see* 31 C.F.R. § 535.201, its effect was substantially modified by the 1981 "Algiers Accords," in which the United States and Iran resolved the hostage crisis.  *See* Declaration of the Government of the Democratic and Popular Republic of Algeria, U.S.-Iran, Jan. 19, 1981, 20 I.L.M. 224; *Sperry Corp.*, 493 U.S. at 55-56.  Among other things, the United States promised to "revoke all trade sanctions" that had been directed against Iran since November 4, 1979, *see* Algiers Accords, 20 I.L.M. at 227, and to arrange "for the transfer to Iran of all Iranian properties which are located in the United States" and which were not otherwise addressed by other parts of the agreement, *see id.*  A series of Executive Orders effectuated these undertakings.[1]

As particularly relevant to this litigation, Executive Order No. 12281 licensed the transfer of certain Iranian properties.  This "Transfer Directive" provided that "[a]ll persons subject to the jurisdiction of the United States in possession or control

---

[1] *See Executive Order No. 12276*, 46 Fed. Reg. 7913 (Jan. 19, 1981); *Executive Order No. 12277*, 46 Fed. Reg. 7915 (Jan. 19, 1981); *Executive Order No. 12278*, 46 Fed. Reg. 7917 (Jan. 19, 1981), *as amended by* 46 Fed. Reg. 10895 (Feb. 5, 1981); *Executive Order No. 12279*, 46 Fed. Reg. 7919 (Jan. 19, 1981); *Executive Order No. 12280*, 46 Fed. Reg. 7921 (Jan. 19, 1981); *Executive Order No. 12281*, 46 Fed. Reg. 7923 (Jan. 19, 1981); *Executive Order No. 12282*, 46 Fed. Reg. 7925 (Jan. 19, 1981); *Executive Order No. 12283*, 46 Fed. Reg. 7927 (Jan. 19, 1981); *Executive Order No. 12284*, 46 Fed. Reg. 7929 (Jan. 19, 1981).

of" certain Iranian properties were "licensed, authorized, directed and compelled to transfer such properties, as directed after the effective date of this Order by the Government of Iran." 46 Fed. Reg. 7923, 7923 (Jan. 19, 1981).

OFAC's implementing regulations directed that "all uncontested and non-contingent liabilities and property interests of the Government of Iran," other than certain kinds of property interests not relevant here, must be transferred "as directed" by the Iranian government. 31 C.F.R. §§ 535.215(a), 535.333(a). The regulations state that a property interest is "contested" only if the property-holder "reasonably believes that Iran does not have title or has only partial title to the asset," and that belief is expressed in writing by a licensed attorney. *Id.* § 535.333(c).

B. *TRIA*

In 2002, Congress passed the Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107-297, 116 Stat. 2322 (2002), which governs post-judgment attachment proceedings in certain cases arising out of terrorist acts. TRIA's section 201(a) provides:

> Notwithstanding any other provision of law . . . , in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7) (2000)], the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory

6

damages for which such terrorist party has been adjudged
liable.

TRIA § 201(a).  TRIA defines the term "blocked asset" to mean "any asset seized or

frozen by the United States" under sections 202 and 203 of IEEPA or section 5(b) of

the Trading With the Enemy Act (50 U.S.C. App. 5(b)).  TRIA § 201(d)(2)(A).[2]

Through this section 201(a), TRIA permits attachment of property in certain

cases where attachment might otherwise have been precluded by principles of

sovereign immunity under the Foreign Sovereign Immunities Act (FSIA).[3]  *See Bennett*

*v. Islamic Republic of Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010); *Weininger v. Castro*, 462 F.

Supp. 2d 457, 483-89 (S.D.N.Y. 2006).  It also permits terrorism victims to attach

blocked assets by allowing them to bypass the usual requirement that a litigant first

obtain a license from OFAC.  *See, e.g.*, 31 C.F.R. §§ 515.201, 515.310 (Cuban Assets

Control Regulations) (requiring a license for attachment); *id.* §§ 535.201, 535.310 (Iran

---

[2] TRIA excludes from the definition of "blocked asset" any property "subject
to a license" issued by the United States "for final payment, transfer, or disposition by
or to a person subject to the jurisdiction of the United States," if the license was
required by a statute other than IEEPA or the United Nations Participation Act of
1945.  *See* TRIA § 201(d)(2)(B)(i).  Certain categories of diplomatic property are also
excluded.  *See id.* § 201(d)(2)(B)(ii).

[3] Six years after TRIA was enacted, Congress amended the FSIA; the
amendments revised the immunity provisions related to terrorist states, created an
express cause of action against state sponsors of terrorism that engaged in terrorist
acts, and created a new execution provision for plaintiffs who hold judgments under
this revised statute.  *See* National Defense Authorization Act for Fiscal Year 2008,
Pub. L. No. 110-181, § 1083(a)(1) & (a)(3)(D) (codified in relevant part at 28 U.S.C.
§§ 1605A and 1610(g)).

Assets Control Regulations) (same); *id.* §§ 594.201, 594.312 (Global Terrorism

Sanctions Regulations) (same).

## II.    Factual Background

1.  The plaintiffs are American citizens injured by a 1997 terrorist attack that

Hamas orchestrated in Jerusalem.  Plaintiffs sued the Islamic Republic of Iran in the

U.S. District Court for the District of Columbia, and the gravamen of their claim was

that Iran was liable for their damages because it had provided material support to

Hamas.  *See Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 261-62 (D.D.C.

2003).  Plaintiffs obtained a default judgment and were awarded more than $71

million in compensatory damages.  DE 3, Exh. A.[4]

In 2005, Plaintiffs registered their judgment in the District of Massachusetts, *see*

DE 1, and they thereafter sought to execute their judgment against a wide variety of

assets in the possession of the Boston Museum of Fine Arts and several museums

owned by Harvard University (collectively, "the Museums").[5]  JA 35.  Plaintiffs

---

[4] Citations to the district court's numbered docket entries will be abbreviated
"DE __."  Citations to the Joint Appendix will be abbreviated "JA __."  Citations to
the appellants' addendum will be abbreviated "Add. __."

[5] Plaintiffs filed a "trustee process" action, the procedure established by
Massachusetts law when a plaintiff seeks to attach a debtor's property in the
possession of a third party.  *See In re Brauer*, 452 Mass. 56, 60 n.4, 890 N.E.2d 847, 852
n.4 (2008); *see also* Fed. R. Civ. P. 69(a)(1) (execution on a money judgment "must
accord with the procedure of the state where the court is located" unless a federal
statute provides otherwise).

asserted "on information and belief" that Persian artifacts possessed by the Museums were the property of the Iranian government, a position they took based on their belief that the artifacts had been exported from Iran in violation of Iranian law.  *Id.*; *see also* DE 123 Exh. 1 at 2-3; DE 128 Exh. 3 at 2-3.

The Museums moved to dissolve the attachments.  Although they denied that any of the artifacts belonged to Iran, they argued that the assets would be immune from attachment under the FSIA even if plaintiffs could demonstrate that they were owned by Iran.  *See* DE 17 at 2-19; DE 39 at 1-13.

The district court agreed that if the artifacts were in fact owned by Iran, they would ordinarily be exempt from attachment under the FSIA.  *Rubin v. Islamic Republic of Iran*, 456 F. Supp. 2d 228, 233-234 (D. Mass. 2006).  It observed, however, that the artifacts might nevertheless be subject to attachment if they fell within the scope of TRIA, which permits the attachment of some blocked assets "notwithstanding any other provision of law."  *Id.* at 234-35; *see also* TRIA § 201(a).  Thus, if the assets in question were currently subject to a blocking order, they could be subject to attachment despite the FSIA's immunity provisions.

The Museums urged that even if the artifacts had been blocked in 1979, they were "unblocked" by the 1981 Transfer Directive and its implementing OFAC regulations.  DE 17 at 18-19; DE 39 at 12-13.  The court rejected the Museums' contention based on its construction of OFAC's regulations.  *See Rubin*, 456 F. Supp.

2d at 235-36.  As noted, those regulations required the transfer of Iranian property as directed by Iran unless the ownership of the property was "contested" (or if Iran's interest was only contingent).  *See* 31 C.F.R. §§ 535.215(a), 535.333.  If the property possessor contested Iran's ownership claim, it was not required to transfer the property, and the asset would thus remain blocked unless it were unblocked under some other legal provision.

The district court acknowledged that Iran had never directed the Museums to transfer the artifacts and had never claimed any interest in the Museums' Persian collections.  *Rubin v. Islamic Republic of Iran*, 541 F. Supp. 2d 416, 420 (D. Mass. 2008); *see also Rubin v. Islamic Republic of Iran*, 810 F. Supp. 2d 402, 406 n.3 (D. Mass. 2011). The court nonetheless found it probative that the plaintiffs, as judgment creditors, were now asserting the existence of an Iranian property interest.  In the court's view, this assertion of an Iranian property interest, and the Museums' denial of that interest, made the artifacts "contested" assets within the meaning of OFAC's regulations.  *See Rubin*, 456 F. Supp. 2d at 235-36.

Recognizing that there were substantial grounds for disagreement with its conclusion, the court certified its ruling for interlocutory review under 28 U.S.C. § 1292(b).  *See Rubin*, 541 F. Supp. 2d at 421.  This Court declined to take jurisdiction over the appeal, explaining that it could resolve the issue, if necessary, after the artifacts' "ownership has been ascertained."  *Rubin v. Islamic Republic of Iran*, No. 08-

10

8020 (1st Cir. Aug. 11, 2008).

The parties proceeded with substantial discovery in the district court, after which the Museums filed new motions to dissolve the attachment. JA 37; JA 1311. The district court granted the motions. It explained that the plaintiffs could not prevail unless they affirmatively established that the artifacts were owned by Iran, the judgment debtor. Add. 2-3. And the court concluded that the Iranian legal sources on which plaintiffs relied did not demonstrate that the mere act of removing artifacts from Iran vested title to those artifacts in the Iranian government. Add. 3-5. Plaintiffs appealed. JA 33.

## SUMMARY OF ARGUMENT

Plaintiffs seek to satisfy a judgment obtained against Iran by attaching Persian artifacts in the Museums' possession. The district court concluded that the artifacts are not owned by Iran and that plaintiffs cannot attach these assets to satisfy their judgment.

The United States takes no position on the question of ownership. We participate as *amicus* to address issues regarding the interpretation of the Terrorism Risk Insurance Act and OFAC blocking regulations at issue in this litigation.

1. TRIA authorizes plaintiffs who have obtained a judgment against a "terrorist party" to execute that judgment by attaching certain assets subject to an OFAC blocking order. Specifically, TRIA's terms permit attachment only of "the

11

blocked assets *of* [the] terrorist party." TRIA § 201(a) (emphasis added). TRIA does does not give judgment creditors a property interest in blocked assets greater than that of the terrorist party itself, and it does not subject property wholly-owned by innocent third parties to attachment.

Plaintiffs thus err when they urge that they can attach artifacts in the Museums' possession that are *not* the property of Iran as long as they can demonstrate that the artifacts were subject to OFAC's 1979 blocking order. The scope of the attachment authorized by TRIA is not coextensive with the scope of the 1979 blocking order and other OFAC blocking regulations. The 1979 regulation applied not only to assets of Iran, but also to property in which Iran had "any interest of any nature whatsoever." *See* 31 C.F.R. § 535.201. Congress used far less expansive language in TRIA, even though it was presumably aware that OFAC regulations, such as the 1979 Iran regulation, often encompass assets in which a foreign state or person only has an "interest." And that choice sensibly ensures that the terrorist party itself—as distinguished from an innocent third party—will feel the consequences of its terrorist actions.

2. In ruling on threshold motions, the district court opined on the scope of a 1981 OFAC regulation requiring that "all uncontested and non-contingent liabilities and property interests of the Government of Iran" be transferred as directed by the Iranian government. 31 C.F.R. § 535.333; *see also id.* § 535.215. The Museums had

argued that even if the artifacts had been subject to the 1979 blocking order, they were no longer blocked because they fell within the scope of OFAC's 1981 regulation directing transfer. The district court rejected that contention on the ground that plaintiffs were now asserting a property interest on behalf of Iran, and so the property interests were therefore "contested" within the meaning of the regulation.

This Court previously declined to review this ruling under 28 U.S.C. § 1292(b), and it may well find it unnecessary to do so now. If the Court does address the issue, however, it should correct the district court's mistaken conclusion that an asset can be "contested" for purposes of 31 C.F.R. § 535.333 when Iran has never directed the transfer of assets and has not asserted an interest in the property. The regulation does not authorize third parties to direct the transfer of Iranian assets and does not require property holders to contest Iran's ownership if they receive third-party demands.

## ARGUMENT

### I. TRIA Authorizes The Attachment Of Only Those Assets Owned By The Relevant Terrorist Party

**1.** TRIA provides that "[n]otwithstanding any other provision of law," a victim of terrorism who has obtained a judgment against a terrorist party may attach "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)." TRIA § 201(a). Thus, under TRIA, if plaintiffs could demonstrate that the artifacts in the Museums' possession are the

13

assets "of Iran," and if those assets were considered "blocked" under an IEEPA

sanctions program, plaintiffs would be able to attach the assets notwithstanding

provisions of the Foreign Sovereign Immunities Act that would otherwise preclude

the attachment.

The district court found that Iran does not, in fact, own the assets in question.

The United States takes no position on the question of ownership. If this Court

affirms the district court's holding, however, that ruling will also preclude attachment

of the assets under TRIA.

TRIA does not, as plaintiffs contend, permit them to attach the artifacts

possessed by the Museums if those assets are not owned by Iran. It would not be

sufficient, as plaintiffs argue, to show that the assets might have been subject to the

1979 OFAC regulation that blocked all property in which Iran has "any interest of

any nature whatsoever," 31 C.F.R. § 535.201. *See* Plaintiffs' Br. 16-19, 23-24; *see also*

*id.* at 28 (arguing that Iran either has "a direct ownership interest" in excavated

artifacts, or "a right to control and supervise" them, such as through export controls).

The language of TRIA § 201(a) does not extend as broadly as the language of

OFAC's blocking regulation. TRIA states that a victim of terrorism who has

obtained a judgment against a terrorist party may attach "the blocked assets *of* that

terrorist party (including the blocked assets *of* any agency or instrumentality of that

terrorist party)." TRIA § 201(a) (emphases added). TRIA does not employ the more

14

expansive terms used not only in the 1979 blocking regulation, but in many other

OFAC regulations as well.  *See, e.g.*, 31 C.F.R. § 515.201 (Cuban Assets Control

Regulations, which apply to property in which Cuba or a Cuban national has had

"any interest of any nature whatsoever"); *id.* §§ 538.201, 538.307 (Sudan sanctions,

which apply to property in which the Sudanese government has "an interest of any

nature whatsoever"); *id.* §§ 594.201, 594.306 (blocking property in which various

specially designated terrorists have "an interest of any nature whatsoever").  Congress

was presumably aware of the language used in such regulations, and there is no sound

basis for amending the statute to supply the language that Congress omitted.

Indeed, assets "of" Iran are a narrower category than assets in which Iran has

"any interest of any nature whatsoever."  The Supreme Court has repeatedly observed

that the "'use of the word 'of' denotes ownership.'"  *Bd. of Trustees of the Leland Stanford

Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2196 (2011) (quoting *Poe v.

Seaborn*, 282 U.S. 101, 109 (1930)); *see also Stanford*, 131 S. Ct. at 2196 (describing

*Flores–Figueroa v. United States*, 556 U.S. 646, 648, 657 (2009), as treating the phrase

"identification [papers] of another person" as meaning such items belonging to

another person (internal quotation marks omitted)); *Ellis v. United States*, 206 U.S. 246,

259 (1907) (interpreting the phrase "works of the United States" to mean "works

belonging to the United States" (internal quotation marks omitted)).  Applying that

understanding in interpreting a disputed provision of patent law, the Court in *Stanford*

15

concluded that "invention owned by the contractor" or "invention belonging to the

contractor" are natural readings of the phrase "'invention of the contractor.'" 131 S.

Ct. at 2196.  In contrast, in *United States v. Rodgers*, 461 U.S. 677 (1983), the Court held

that the IRS could execute against property in which a tax delinquent had only a

partial interest when that the relevant statute permitted execution with respect to "any

property, of whatever nature, *of* the delinquent, *or in which* he has any right, title, or

interest." (emphases added)).  26 U.S.C. § 7403(a); *see also Rodgers*, 461 U.S. at 692-94.

The Court found it important that the statute explicitly applied not only to the

property "of the delinquent," but also specifically referred to property in which the

delinquent "has any right title or interest."  *See Rogders*, 461 U.S. at 692.  TRIA omits

that additional phrase; the statute only applies to the blocked assets "of" a terrorist

party.  *See* TRIA § 201(a).

Plaintiffs' proposed reading would also expand the statute well beyond

common law principles regarding execution of a judgment against property in the

possession of a third party.  As both the majority and the dissent recognized in

*Rodgers*, it "is basic in the common law that a lienholder enjoys rights in property no

greater than those of the debtor himself; . . . the lienholder does no more than step

into the debtor's shoes."  *Rodgers*, 461 U.S. at 713 (Blackmun, J., concurring in part

and dissenting in part); *see also id.* at 702 (majority op.) (implicitly agreeing with this

description of the traditional common law rule); 50 C.J.S. Judgments § 787 (2012).

16

Congress enacted TRIA against the background of these principles, and the legislation should be interpreted consistent with those common-law precepts. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107-10 (1991); *see also Sony BMG Music Entmt. v. Tenenbaum*, 660 F.3d 487, 515 n.27 (1st Cir. 2011) ("Congress is presumed to legislate incorporating background principles of common law rules unless it indicates to the contrary."), *cert. denied*, 2012 WL 526017 (May 21, 2012). The plaintiffs' interpretation runs against these principles because it would let a judgment creditor attach an entire asset, and not just the judgment debtor's interest.

Finally, plaintiffs' broad reading does little to advance TRIA's aim of punishing terrorist entities or deterring future terrorism. Allowing the victims of terrorism to satisfy judgments against the property of a terrorist party "impose[s] a heavy cost on those" who aid and abet terrorists. 148 Cong. Rec. S11527 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin). As Senator Harkin also observed, "making the state sponsors [of terrorism] actually lose" money will be a particularly effective deterrent against future terrorist acts. *Id.* Yet paying judgments from assets that are *not* owned by the terrorist party does not impose a similar cost on the terrorist party. It does, however, impose a heavy cost on innocent property owners.

**2.** Plaintiffs rely heavily on arguments accepted by the district court in *Hausler v. JP Morgan Chase Bank, N.A.*, __ F. Supp. 2d __, 2012 WL 601034, at *5-10 (S.D.N.Y. Feb. 22, 2012), *appeal docketed*, Nos. 12-1264 & 12-1272 (2d Cir.), and

17

*Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 529-41 (S.D.N.Y. 2010).[6]

For the reasons discussed here, the analysis in *Hausler* cannot be squared with TRIA's

language, and a recent decision from the Southern District of New York correctly

rejected *Hausler*'s reasoning.  *See Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, ___ F.

Supp. 2d ___, 2011 WL 6155987, at *8-14 (S.D.N.Y. Dec. 7, 2011), *appeal docketed*, No.

12-75 (2d Cir.).

In its initial opinion, the *Hausler* court did not explain why Congress had used

the narrow phrase "blocked assets of that terrorist party" in section 201(a), and not

the broader phrase "blocked assets."  *See Hausler*, 740 F. Supp. 2d at 533.  In a

subsequent order, responding to criticism of its analysis by the court in *Calderon-

Cardona*, *see* 2011 WL 6155987, at *13, the *Hausler* court suggested that TRIA refers to

assets "of that terrorist party" merely to clarify that a plaintiff can attach only assets

that are blocked under "the particular regulation or administrative action directed at

the particular . . . judgment debtor."  *See Hausler*, 2012 WL 601034, at *9.  In other

words, the *Hausler* court thought that Congress used narrower language in TRIA than

in OFAC's blocking regulations to establish that Iran's judgment creditors can pursue

only assets blocked under an Iran sanctions scheme and cannot pursue assets blocked

under, for example, the Cuba sanctions.  *See id.*  But there is no reason to believe that

---

[6] *Accord Levin v. Bank of New York*, No. 09-cv-5900, 2011 WL 812032, at *14-17
(S.D.N.Y. Mar. 4, 2011).

Congress saw any need to clarify so obvious a proposition.  At bottom, the *Hausler* court impermissibly equates assets "of that terrorist party" with assets "blocked under the sanctions regime associated with that terrorist party."

The interpretation offered by the *Hausler* court also misapprehends the way in which sanctions regimes function.  Some blocking regimes apply not just to a terrorist country itself, but also to any national of that country.  *See, e.g.*, 31 C.F.R. § 515.201 (Cuba sanctions).  That private assets are subject to a blocking regulation directed at a particular country does not necessarily make the private assets the property of that nation.  Moreover, some blocking regimes are not directed at an individual terrorist entity, and are instead directed at certain categories of terrorist entities—many of which have nothing to do with each other.  For instance, hundreds of different terrorist entities and individuals have their assets blocked under Executive Order 13224, which targets terrorist groups across the globe.  *See* 68 Fed. Reg. 34196 (June 6, 2003); OFAC, *Terrorism: What You Need To Know About U.S. Sanctions* (hereinafter "*Terrorism*"), http://www.treasury.gov/resource-center/sanctions/Programs/ Documents/terror.pdf, at 2-24 (last updated May 24, 2012).  Entities currently blocked under this program include such diverse groups as the FARC (a Colombian narco-terrorist organization, *see Tamara-Gomez v. Gonzales*, 447 F.3d 343, 345 (5th Cir. 2006)), the Tamil Tigers (a violent Sri-Lankan rebel group, *see Don v. Gonzales*, 476 F.3d 738, 739 (9th Cir. 2007)), and Al-Qaida.  *Terrorism* at 2, 54.  *Hausler*'s logic would

suggest than an individual with a judgment against one of these entities would be able to attach assets wholly-owned by an entirely separate group, half a world away, whose only connection is that both have their assets blocked under the same broad sanctions regime.  The unlikeliness of such a result counsels against the *Hausler* court's flawed interpretation.

The *Hausler* court was also overbroad in its understanding of the relationship between OFAC sanctions regimes and existing sources of property law, and based on that overbroad understanding concluded that TRIA's reference to OFAC's sanctions had preemptive effect.  *See Hausler* 740 F. Supp. 2d at 530-32.  While we take no position here on TRIA's preemptive force, we note that OFAC's regulations do not attempt to define whether particular assets are "of" or "owned by" a terrorist party. Instead, while OFAC's regulations contain definitions for terms like "property" and "interest," *see, e.g.*, 31 C.F.R. § 515.311; *id.* § 535.311, the purpose of those definitions is to explain the kinds of assets that come within OFAC's various blocking orders—orders that extend beyond assets owned by the relevant sanctions target.  *See, e.g.*, 31 C.F.R. § 515.201(b)(2) (barring transactions in "property" in which Cuba or one of its nationals has had an "interest"); *id.* § 535.201 (barring transactions in "property" in which Iran has an "interest").

Finally, the *Hausler* court mistakenly thought that its conclusion was needed to ensure that the success of a TRIA execution did not depend on which state happened

to be the forum in an attachment proceeding.  *Hausler*, 2012 WL 601034, at *6.  But if

TRIA did preempt state law, and uniformity were a concern, a court could achieve

that uniformity through the development of federal common law.  *See, e.g.*, *Burlington*

*Indus. v. Ellerth*, 524 U.S. 742, 754-55 (1998); *Community for Creative Non-Violence v. Reid*,

490 U.S. 730, 740 (1989); *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S.

448, 457 (1957).  There is no need to force OFAC's regulations into serving a role

they were not intended to perform.

## II.     An Asset Cannot Be "Contested" For Purposes Of 31 C.F.R. § 535.333 Unless Iran Itself Claims A Property Interest In The Asset

Although the district court eventually ruled for the Museums, at an earlier stage

the court rejected their motions to dissolve the attachment.  *Rubin*, 456 F. Supp. 2d at

234-35.  And as part of that ruling, the court concluded that the assets in question

were "contested" for purposes of one of OFAC's regulations, 31 C.F.R. § 535.333,

since the plaintiffs and the Museums did not agree on Iran's relationship to those

assets.  If this Court reaches the issue, it should reject the district court's

interpretation of the regulation.[7]

---

[7] In this brief, the United States expresses no view on whether any of the artifacts qualify as "blocked assets" under TRIA as a result of their status under the Iranian Assets Control Regulations, under the President's February 2012 Iranian asset blocking order, *see Executive Order No. 13599*, 77 Fed. Reg. 6659 (Feb. 8, 2012), or under any other sanctions regime.

As noted above, when the United States entered into the Algiers Accords in

1981, it pledged (among other things) that it would arrange "for the transfer to Iran

of all Iranian properties which are located in the United States" and which were not

otherwise addressed by other parts of the agreement.  *See* Algiers Accords, 20 I.L.M.

at 227.  The Transfer Directive (Executive Order 12281) effectuated that promise,

and that directive was in turn implemented by an OFAC regulation that compelled

the transfer of certain previously blocked properties "as directed after [January 18,

1981] by the Government of Iran."  31 C.F.R. § 535.215(a); *see also* 46 Fed. Reg. at

7923.

Elsewhere, however, OFAC limited the broad language of the regulation:

property was only subject to the Transfer Directive if Iran's interest was "uncontested

and non-contingent."  31 C.F.R. § 535.333(a).  And as the United States later

explained in proceedings before the Iran-U.S. Claims Tribunal, the purpose of this

language was to clarify that "Iran was not entitled to possession of properties owned

by others or if it had only a partial or contingent interest in such property."  *Islamic*

*Republic of Iran v. United States*, 28 Iran-U.S. Cl. Trib. Rep. 112, 127 (1992).  To the

extent disputes arose between Iran and a U.S. property holder, those disputes could

be resolved either in the Tribunal, or in other litigation with Iran if not within the

Tribunal's jurisdiction.  *See* Algiers Accords, 20 I.L.M. at 230-32 (giving the Tribunal

jurisdiction over claims by U.S. nationals against Iran if such claims "were

22

outstanding on [January 19, 1981], whether or not filed in any court, and arise out of
debts, contracts . . ., expropriations or other measures affecting property rights"); 31
C.F.R. § 535.504 (authorizing certain judicial proceedings with respect to properties
in which Iran has an interest, when such disputes are not within the Tribunal's
jurisdiction).

Judged against this backdrop, it is plain that the only contest contemplated by
OFAC's regulations is a contest between Iran and the property-holder.  In the
absence of any claim from Iran that it had an interest in the property at issue, there
would have been no reason for the holder to transfer the property to Iran in 1981,
and hence no need to exempt the property from the Transfer Directive.

The text of the Executive Order and the regulation support this reading.
Under both, transfer directly to Iran is not automatic.  Instead, the transfer must
occur "as directed . . . by the Government of Iran."  46 Fed. Reg. at 7923; 31 C.F.R.
§ 535.215(a).  As a result, the regulation plainly contemplated that the onus was on
Iran to assert a claim, since the absence of any direction from Iran meant that no
transfer to Iran was compelled at all.  It was only after Iran asserted such a claim that
the holder would have a need to either acquiesce to the transfer, or contest Iran's
interest.

The district court acknowledged that OFAC's regulations had never
contemplated the possibility of a third-party entering the picture to assert the

23

existence of an Iranian interest.  *See Rubin*, 541 F. Supp. 2d at 419 ("In the binary case

envisioned by the executive order and regulations, the contest would arise when both

Iran and the holder asserted ownership of the property at issue.").  Nonetheless, the

court apparently thought that its view of the regulations could be justified as an

accommodation with TRIA.  *See id.* at 419-20.  But the relevant regulations were last

amended in 2001—a year *before* TRIA was enacted.  *See* 66 Fed. Reg. 38553 (July 25,

2001).  Looking to the later-enacted TRIA should thus have no bearing on the

meaning of OFAC's regulations.

Nor can the district court's conclusion rest on the theory that the Museums

were obligated to obtain an opinion of counsel if they wanted to withhold the

artifacts from Iran.  *See* 31 C.F.R. § 535.333(c) (explaining that an asset can only be

"contested" after October 23, 2001 if the holder has a written attorney's opinion

stating that Iran does not hold title to the asset); *Rubin*, 541 F. Supp. 2d at 420-21

(appealing to the equitable principle that "a party cannot profit from its own failure to

perform a duty").  As explained above, a property holder can only be obligated to

transfer property to Iran if Iran itself had made such a request.  In the absence of an

Iranian request, the Museums had no obligation to transfer the property to Iran, and

hence no need to obtain an opinion of counsel to exempt themselves from that

transfer.

24

In issuing its ruling, the district court did not have the benefit of OFAC's views. As this brief explains, OFAC's position is that assets can only be "contested" for purposes of 31 C.F.R. § 535.333 if Iran itself is claiming an interest in the asset. As the agency responsible for promulgating and enforcing the regulation, OFAC's interpretation is entitled to deference unless it "is plainly erroneous or inconsistent with the regulation." *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011) (internal quotation marks omitted). As we have shown, OFAC's interpretation is consistent with both the text and purpose of the regulation.

## CONCLUSION

For the foregoing reasons, this Court should hold that the Museums' artifacts cannot be attached under TRIA unless the plaintiffs establish that Iran owns the artifacts. Additionally, if the Court reaches the issue, it should hold that an asset is not "contested" for purposes of 31 C.F.R. § 535.333 unless Iran itself is claiming an interest in the asset.

Of Counsel:

Respectfully Submitted,

STUART F. DELERY
 *Acting Assistant Attorney General*

MATTHEW TUCHBAND
 *Acting Chief Counsel*
 *Office of Foreign Assets Control*
 *U.S. Department of the Treasury*

CARMEN M. ORTIZ
 *United States Attorney*

HAROLD HONGJU KOH
 *Legal Advisor*
 *U.S. Department of State*

MARK B. STERN
 (202) 514-5089
SHARON SWINGLE
 (202) 353-2689
/s/ Benjamin M. Shultz
BENJAMIN M. SHULTZ
 1st Cir. Bar No. 1138158
 (202) 514-3518
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7211*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave. NW*
 *Washington, D.C. 20530*

JUNE 2012

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and (C), I certify

that this brief complies with the type-face and volume limitations set forth in Federal

Rule of Appellate Procedure 32(a)(7)(B) as follows:  the type face is fourteen-point

Garamond font, and the number of words is 6001 (excluding exempt material)

according to the word count of WordPerfect X5.


/s/ Benjamin M. Shultz
Benjamin M. Shultz
Counsel for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of June, 2012, I filed and served the foregoing by uploading it to CM/ECF system. Service will automatically be made on the following CM/ECF participants:

*Counsel for Appellants*:

Robert J Tolchin (rtolchin@berkmanlaw.com)
Joseph S. Berman (jberman@lgllp.com)

*Counsel for Appellee President and Fellows of Harvard College*:

Paul R.Q. Wolfson (paul.wolfson@wilmerhale.com)
Shirley Xiao Li Cantin (shirley.cantin@wilmerhale.com)
Janet Rhiannon Carter (janet.carter@wilmerhale.com)
Mark Christopher Fleming (mark.fleming@wilmerhale.com)

*Counsel for Appellee Museum of Fine Arts*:

Simon J. Frankel (sfrankel@cov.com)
Thomas Paul Gorman (tpgorman@sherin.com)
Robert J. Muldoon Jr. (rjmuldoon@sherin.com)


/s/ Benjamin M. Shultz
Benjamin M. Shultz

**ADDENDUM**

# TABLE OF CONTENTS

Item                                                                 Page

Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107-297,
§ 201 (excerpts). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 1

31 C.F.R. § 535.201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 3

31 C.F.R. § 535.215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 4

31 C.F.R. § 535.333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 5

**Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107-297, § 201 (excerpts)**

(a) IN GENERAL.—Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

* * *

(d) DEFINITIONS.—In this section, the following definitions shall apply:

(1) ACT OF TERRORISM.—The term "act of terrorism" means—

(A) any act or event certified under section 102(1); or

(B) to the extent not covered by subparagraph (A), any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii))).

(2) BLOCKED ASSET.—The term "blocked asset" means—

(A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and

(B) does not include property that—

(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.); or

Add. 1

(ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

(3) CERTAIN PROPERTY.—The term "property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations" and the term "asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations" mean any property or asset, respectively, the attachment in aid of execution or execution of which would result in a violation of an obligation of the United States under the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, as the case may be.

(4) TERRORIST PARTY.—The term "terrorist party" means a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

**31 C.F.R. § 535.201**

No property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States in which on or after the effective date Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized.

**31 C.F.R. § 535.215**

(a) Except as provided in paragraphs (b) and (c) of this section, all persons subject to the jurisdiction of the United States in possession or control of properties, as defined in § 535.333 of this part, not including funds and securities owned by Iran or its agencies, instrumentalities or controlled entities, are licensed, authorized, directed and compelled to transfer such properties held on January 18, 1981 as directed after that day by the Government of Iran, acting through its authorized agent. Such directions shall include arrangements for payment of the costs of transporting the properties, unless the possessors of the properties were required to pay such costs by contract or applicable law on January 19, 1981. Except where specifically stated, this license, authorization and direction does not relieve persons subject to the jurisdiction of the United States from existing legal requirements other than those based upon the International Emergency Economic Powers Act.

(b) Any properties subject to a valid attachment, injunction or other like proceeding or process not affected by § 535.218 need not be transferred as otherwise required by this section.

(c) Notwithstanding paragraph (a) of this section, persons subject to the jurisdiction of the United States, including agencies, instrumentalities and entities controlled by the Government of Iran, who have possession, custody or control of blocked tangible property covered by § 535.201, shall not transfer such property without a specific Treasury license, if the export of such property requires a specific license or authorization pursuant to the provisions of any of the following acts, as amended, or regulations in force with respect to them: the Export Administration Act, 50 U.S.C. App. 2403, et seq., the Aims Export Control Act, 22 U.S.C. 2751, et seq., the Atomic Energy Act, 42 U.S.C. 2011, et seq., or any other act prohibiting the export of such property, except as licensed.

Case 1:14-2436, Document 161, 12/04/2014, 1383468, Page 42 of 42 Case 1:14-2436, Document 161, 05/01/2012, Page 42 of 42 5473047672

**31 C.F.R. § 535.333**

(a) The term properties as used in § 535.215 means all uncontested and non-contingent liabilities and property interests of the Government of Iran, its agencies, instrumentalities, or controlled entities, including debts. It does not include bank deposits or funds and securities. It also does not include obligations under standby letters of credit or similar instruments in the nature of performance bonds, including accounts established pursuant to § 535.568.

(b) Properties do not cease to fall within the definition in paragraph (a), above, merely due to the existence of unpaid obligations, charges or fees relating to such properties, or undischarged liens against such properties.

(c) Liabilities and property interests of the Government of Iran, its agencies, instrumentalities, or controlled entities may be considered contested only if the holder thereof reasonably believes that Iran does not have title or has only partial title to the asset. After October 23, 2001, such a belief may be considered reasonable only if it is based upon a bona fide opinion, in writing, of an attorney licensed to practice within the United States stating that Iran does not have title or has only partial title to the asset. For purposes of this paragraph, the term holder shall include any person who possesses the property, or who, although not in physical possession of the property, has, by contract or otherwise, control over a third party who does in fact have physical possession of the property. A person is not a holder by virtue of being the beneficiary of an attachment, injunction or similar order.

(d) Liabilities and property interests shall not be deemed to be contested solely because they are subject to an attachment, injunction, or other similar order.