UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate Of James C. Knipple (Dec.), et al.<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN; BANK MARKAZI a/k/a CENTRAL BANK OF IRAN; BANCA UBAE SpA; CITIBANK, N.A., and CLEARSTREAM BANKING, S.A.,<br><br>Defendants. | Case No.: 10 CIV 4518(BSJ) (GWG)<br><br>**FILED UNDER SEAL CONTAINS CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER**<br><br>**REPLY DECLARATION OF LIVIU VOGEL IN SUPPORT OF PLAINTIFFS' MOTION FOR PARITIAL SUMMARY JUDGMENT** |

I, Liviu Vogel, an attorney duly admitted to practice law before this Court, declare under penalties of perjury:

1. I am a member of the firm of Salon Marrow Dyckman Newman & Broudy LLP, attorneys for Peterson Plaintiffs in the above-captioned action. I make this reply declaration in support of Plaintiffs' Motion for Partial Summary Judgment.

2. In an effort to locate assets belonging to the Judgment Debtors, the Peterson Plaintiffs served the Office of Foreign Assets Control ("OFAC") with a subpoena, dated March 10, 2008.

3. On, June 11, 2008, in response thereto, the United States Department of Justice, on behalf of OFAC, moved before the United States District Court for the District of Columbia by way of an emergency application for a protective order so that it could disclose to the Peterson Plaintiffs highly confidential information concerning assets of the

Judgment Debtors being held in the United States, which assets were subject to risk of immediate flight from the U.S. A true and accurate copy of the emergency application for a protective order is annexed hereto as **Exhibit 1**.

4. The Court granted the order on June 11, 2008 for a protective order and OFAC disclosed highly confidential information concerning Iranian assets located in the U.S. to the Peterson Plaintiffs. A true and accurate copy of the June 11, 2008 Order is attached hereto as **Exhibit 2**.

5. By motion, dated June 23, 2008, Plaintiffs moved in the U.S. District Court for the District of Columbia that an Order be entered, *nunc pro tunc*, from March 10, 2008, that a reasonable period of time had elapsed under Section 28 U.S.C. § 1610(c) to proceed with any post-judgment enforcement of the Judgment.

6. By Memorandum and Order, entered June 25, 2008, Judge Lamberth found that: (a) the Court had previously entered Judgment against the Judgment Debtors on September 7, 2007; (b) Plaintiffs completed service of same in accordance with 28 U.S.C. § 1608(e) on January 10, 2008; and, (c) a two (2) month period of time is a reasonable period of time to have allowed the Judgment Debtors to satisfy the Judgment – noting that the Judgment Debtors have never voluntarily paid a judgment entered in any United States court arising out of an act of terrorism. On these grounds, the Court issued an order pursuant to 28 U.S.C. § 1610(c), *nunc pro tunc*, from March 10, 2008, granting Plaintiffs the right to proceed with attachment and execution to enforce the Court's September 7, 2007 Judgment. A true and accurate copy of the June 25, 2008 Order is annexed hereto as **Exhibit 3**.

7. By Order dated February 27, 2012, this Court also found that the Peterson Plaintiffs had satisfied the requirements under 28 U.S.C. § 1610(c). A true and accurate copy of the February 27, 2012 Order is annexed hereto as **Exhibit 4**.

8. On June 27, 2008, Clearstream also appeared and testified before this Court in support of its contention that the Peterson Plaintiffs' restraints should be lifted. At the hearing, Clearstream stated that any objection to the Peterson Plaintiffs' restraints arising from the Peterson Plaintiffs' failure to obtain a 28 U.S.C. § 1610(c) order were moot in light of Judge Lamberth's aforementioned June 25, 2008 Order. Clearstream's counsel's statement appears at page 77, lines 18-19 of the hearing transcript attached hereto as **Exhibit 5**. This Court then entered a Final Order dated June 27, 2008, which, among other things, continued the restraints on the Blocked Assets. A true and accurate copy of the June 27, 2008 Final Order is annexed hereto as **Exhibit 6**.

9. Thereafter, by way of Orders dated June 23, 2009, May 10, 2010, and June 10, 2010, this Court further continued the Peterson Plaintiffs' restraints on the Blocked Assets without any objection from the Defendants as to the Peterson Plaintiffs' valid § 1610(c) Order.

10. As a result of E.O. 13599, effective February 6, 2012, the restrained bonds are now blocked. Citibank confirmed the blocking of the restrained bonds in its letter to this Court, dated February 14, 2012. As of the effective date of E.O. 13599 only two of the restrained bonds with a cumulative face value of $160,000,000.00 had not yet matured. True and accurate copies of Clearstream's Exhibits C and D, showing the securities affected by the Peterson Plaintiffs' writ and restraining notices and the summary of positions on Clearstream's Omnibus Account, as produced at the June 27,

2008 Hearing, are attached hereto as **Exhibit 7**. All of the restrained bonds have now matured and are sitting in a blocked account at Citibank New York.

11. The prospectuses for the bonds at issue recognize that the bonds and notes are beneficially owned by the investor. For example, the prospectus for ISIN [redacted], states in relevant part as follows:

> The *global certificates*, which are to be held by . . . DTC, will be issued in registered form in the name of DTC's nominee Cede & Co. and will *represent the notes held by investors* electing to hold notes through financial institutions that are participants in DTC . . . .
>
> *Beneficial interests* in the global certificates will be represented through book-entry accounts at financial institutions acting on behalf of such beneficial owners as direct and indirect participants in DTC. An investor may elect to hold such *beneficial interests* in the global certificates directly through either DTC, Euroclear or CBL [Clearstream], if such investor is a participant in any such system, or indirectly through an organization which is a participant in any such system.
>
> Any noteholder may in any proceedings against us [the issuer] . . . protect and enforce *in its own name* its rights arising under its notes on the basis of (a) a certificate issued by its custodian . . . . [Emphasis added.]

A copy of relevant pages of the prospectus for the bond designated ISIN [redacted] is attached hereto as **Exhibit 8**. Copies of all available prospectuses for the bonds forming the basis of the Blocked Assets are annexed as Exhibit 18 to the declaration of Liviu Vogel in opposition to Clearstream's motion to vacate restraints, dated March 12, 2012.

12. Despite the United States' designation of Iran as a state sponsor of terrorism in 1987 and the Iranian Transaction Regulations, 31 C.F.R. Part 560, which became effective in or about 1985, Clearstream opened account number 80726 for Markazi on December 14, 1994, thereby willingly serving as Markazi's principal banker.

A true and accurate copy of the United States Designation of Iran as a State Sponsor of Terrorism is attached hereto as **Exhibit 9**.

13. Clearstream recognized the risk of doing business with Bank Markazi in various internal correspondence, including the inherent sovereign risk, risk of freezes against Iran, and the risk of Iran being blacklisted for money laundering. True and accurate copies of Clearstream's internal correspondence produced in Court by Clearstream at the hearing on June 27, 2008 are attached hereto as **Exhibit 10**.

14. Prior to December 14, 1994, Markazi "purchased bonds and put those bonds in accounts at Clearstream (or Euroclear), indirectly through the intermediation of European banks[,]" but "[i]n December 1994, Clearstream allowed Bank Markazi to have accounts directly with Clearstream without the need to have another bank to purchase and place the securities with Clearstream on Bank Markazi's behalf." However, in late 2007, "Clearstream informed Markazi that it was being pressured by OFAC not to do business of any kind with Bank Markazi." *See* Plaintiffs' Rule 56.1 Statement ¶ 13, Affidavit of Ali Asghar Massoumi, Head of Markazi's Foreign Exchange Negotiable Securities Section, dated October 17, 2010, at ¶¶ 5, 19-22.

15. As a result of these facts, Markazi was forced to revert to the method by which it indirectly did its banking with Clearstream prior to December 1994, *i.e.,* via a custodial bank. *See* Plaintiffs' Rule 56.1 Statement ¶ 13, Affidavit of Massoumi at ¶ 22-23.

16. On January 17, 2008, Markazi opened an account with UBAE to act as its custodial bank for purposes of continuing its banking indirectly with Clearstream. *See* Plaintiffs' Rule 56.1 Statement ¶ 13, Affidavit of Massoumi at ¶ 23. On January 18,

2008, UBAE sent an electronic message to Clearstream marked "URGENT" instructing Clearstream to open a new customer account for UBAE, *i.e.*, a custodial account for the benefit of UBAE's customers. The same day, Clearstream acknowledged the opening of UBAE's custodial account number 13061. Prior to that date, UBAE had had only one proprietary account at Clearstream for its own use, which was opened in 1973. A true and accurate copy of Exhibit F as produced by Clearstream at the June 27, 2008 Hearing to Clearstream's Compendium of Exhibits is attached hereto as **Exhibit 11.** *See also* Exhibit 5 at 31:25-33:18. Thereafter, in a series of transfers in February 2008, Markazi instructed Clearstream to transfer its interest in securities having a value in excess of $2 Billion (the Blocked Assets) free of payment to UBAE's new customer account number 13061 at Clearstream. *See* Plaintiffs' Rule 56.1 Statement ¶ 13, Affidavit of Massoumi at ¶ 26.

17. At all times however, Markazi treated the now Blocked Assets as assets on its financial statements and no Defendant other than Markazi has an interest in the Blocked Assets. *See* Plaintiffs' Rule 56.1 Statement ¶ 13, Massoumi Affidavit at ¶¶ 29-30.

18. Clearstream has also zealously defended Markazi's interests in the Blocked Assets from the outset of these proceedings. A true and accurate copy of a letter from Clearstream to UBAE, dated October 28, 2008, is attached hereto as **Exhibit 12.** *See also* Exhibit 5 at 31:9-14.

19. Indeed, when Clearstream appeared and testified before this Court on June 27, 2008, it stated to the Court that it did not know who the beneficial owner of the

restrained bonds was, *i.e.*, it did not know UBAE's customer was Markazi. *See* Exhibit 5 at 62:13-63:1.

20. At that hearing, Clearstream falsely led the Court and Plaintiffs to believe that it had no knowledge about the identity of the beneficial owner of the bonds once they were transferred free of payment by Bank Markazi to UBAE's new customer account, and suggested an unkown third party may have purchased the assets and paid consideration outside the Clearstream system. *See* Exhbit 5 at 16:8-10; 62:13-22.

21. As a result of discovery obtained by the Peterson Plaintiffs from UBAE via the Hague Convention, the Peterson Plaintiffs learned that Clearstream had at all times known that the beneficial owner of the restrained bonds was Markazi.

22. In fact, Clearstream had direct knowledge as of March 3, 2008, at the latest, that Markazi was the beneficial owner. A true and accurate copy of Markazi's email to Clearstream and UBAE, dated March 3, 2008 at 12:40PM, is attached hereto as **Exhibit 13**. Nevertheless, Clearstream deceived the Court and Plaintiffs on a number of occasions. True and accurate copies of documents reflecting Clearstream's deception are attached hereto as **Exhibits 14 (A) through (K)** as follows:

14(A). March 3, 2008 email at 8:35AM from UBAE to Central Bank of Iran;

14(B). March 5, 2008 email at 7:20AM from Central Bank of Iran to UBAE;

14(C). March 5, 2008 email at 12:55PM from Central Bank of Iran to UBAE;

14(D). June 27, 2008 SWIFT message from Clearstream to UBAE;

14(E). July 3, 2008 SWIFT message from UBAE to Bank Markazi;

14(F). July 23, 2008 letter from UBAE to Bank Markazi;

1(G). June 5, 2009 letter from Clearstream to UBAE;

1(H). October 26, 2009 letter from UBAE to Clearstream;

14(I). November 11, 2009 letter from Clearstream to UBAE;

14(J). Clearstream's Letter Brief, dated August 14, 2008, to Judge Crotty, at 3; and

14(K). Clearstream's Response to Plaintiffs' Supplemental Memorandum Regarding Discovery, dated December 23, 2008, at 6.

23. Clearstream's continuing fraud delayed the Plaintiffs for over 2 years before they were able to discover that Markazi was the beneficial owner of all of the restrained bonds and Clearstream's active participation in the fraud.

24. In order to obtain the discovery from UBAE, the Peterson Plaintiffs made three applications for a Letter of Request to this Court. Specifically, this Court's November 13, 2009 Order granting the Peterson Plaintiffs' application for a letter request in Section 11, Part 3, requested for UBAE to produce for inspection "[w]ritten agreements between Banca UBAE SpA and Bank Markazi regarding the opening and maintenance of securities trading and/or custodial accounts and the trading of securities on behalf of Bank Markazi, that were in effect during the period from November 1, 2007 and June 30, 2008." A true and accurate copy of the November 13, 2009 Order is attached hereto as **Exhibit 15**.

25. In response to Section 11, Part 3, UBAE's attorney produced a copy of Clearstream's General Terms and Conditions, dated January 2006, and other documents indicating that UBAE adopted the terms of Clearstream's account agreement as UBAE's agreement with Markazi. UBAE's Letter to Markazi, dated February 19, 2008, stated, in pertinent part that, "we have the pleasure to confirm our interest in serving as

intermediary for your bonds related activities . . . . Your aforementioned custody account no. [REDACTED] will be, therefore, subject to the same conditions as the Clearstream Banking S.A. reserves for our institution . . . ." True and accurate copies of all documents produced by UBAE in response to Section 11, Part 3 of Plaintiffs' Letter of Request dated November 13, 2009, together with UBAE's attorney's statement, dated April 13, 2010, are attached hereto as **Exhibit 16.**

26. Clearstream's General Terms and Conditions require, among other things, for Clearstream to collect cash distributable or payable with respect to securities held for Markazi (Art. 20), but imposes no liability for Clearstream's failure to fulfill that obligation unless Clearstream acts negligently (Art. 48). Specifically, Clearstream's obligations to Markazi do not arise until Clearstream actually receives payment in "freely available funds for [its] account at its cash correspondent bank" (Art. 24). *See* Exhibit 16.

27. Clearstream testified at the June 27, 2008 Hearing that it did not receive any corresponding monies from the proceeds of any of the matured bonds since Citibank had been served with the Peterson Plaintiffs' writ and restraining notices. Clearstream further testified that it had actually reversed credits on its books in Luxembourg on the account maintained for the benefit of Markazi, which credits it had made in advance and anticipation of funds to be received from Citibank. *See* Exhibit 5 at 29:6-13, 58:12-18.

28. Since Clearstream has not received the Blocked Assets as freely available funds or otherwise, Clearstream has no obligation to Markazi for the payment of the Blocked Assets at Citibank.

29. Clearstream's General Terms and Conditions insulate Clearstream from liability if the Blocked Assets are turned over to the Judgment Creditors because: (a) Markazi agreed not to hold Clearstream liable for a failure to take an action required by the parties' contract if "such failure arises out of or is caused by events beyond [Clearstream's] reasonable control, including without limitation, . . . law, judicial process, decree, regulation, order or other action of any government, governmental body (including any court or tribunal central bank or military authority) or self-regulatory organization" (Art. 48); and (b) Markazi agreed to indemnify Clearstream for any loss, damage or expense arising from Markazi's failure to comply with any judgments entered by any court (Art. 51). *See* Exhibit 16.

30. Despite Clearstream's continued refusal to provide any discovery to Plaintiff on issues concerning personal jurisdiction, there is uncontroverted evidence that Clearstream conducts extensive and systematic business operations in the State of New York.

31. Clearstream's predecessor, Cedel Bank, S.A., on April 24, 1996, pursuant to the International Banking Act ("IBA"), the Foreign Bank Supervision Enhancement Act of 1991, and Cedel's application thereunder, was approved to maintain a representative office in the State of New York, which resulted in the issuance of a license from the New York State Banking Department. A true and accurate copy of the Declaration of Michael Barrett, dated September 10, 2009, is attached hereto as **Exhibit 17**.

32. Specifically, the "License to Maintain a Representative Office" granted to Cedel Bank, S.A. was issued pursuant to Article V-B of New York Banking Law.

Section 221-a of New York Banking Law, titled "Doing business without license prohibited", provides:

> No person, co-partnership, association, corporation or other entity shall establish, maintain or use one or more offices in this state as the representative of one or more foreign banking corporations unless the foreign banking corporation to be represented has first obtained a license from the superintendent of financial services . . . . Upon receipt of a license, the foreign banking corporation may establish one or more representative offices in this state . . . .

33. Therefore, in order to obtain the license from the New York State Banking Department, which obligated Cedel Bank, S.A. to comply with the New York Banking Law, Clearstream, via its predecessor, availed itself of the laws and benefits of the State of New York.[1]

34. The license was then transferred to Clearstream, which has continued to operate in New York, continued to avail itself of the laws and benefits of this State, and continued to do business in this state.[2] A true and accurate copy of Plaintiffs' Letter Brief, dated August 14, 2009, is attached hereto as **Exhibit 18**.

35. Specifically, Clearstream maintains its representative office in New York City at 55 Broad Street (formerly at 350 Madison Avenue), New York, New York.

---

[1] The New York Banking Law provides that no foreign banking corporation shall be granted a license to establish and maintain a representative office in New York unless the New York Superintendent of Banking shall have found that: (a) the proposed representative office will promote the public convenience and advantage; and (b) the character, responsibility and general fitness of the foreign banking corporation, its principal shareholders, its management and the person(s) designated to represent such foreign banking corporation are such as to command confidence and warrant belief that the business of such foreign banking corporation will honestly and efficiently be conducted in accordance with the intent and purpose of the New York Banking Law. *See* NY Banking § 221-d (2012).

[2] Clearstream further availed itself of the laws and benefits of New York when it requested Judge Koeltl to enter an Order for the purpose of providing testimony before this Court on June 27, 2008 in support of Clearstream's motion to lift the restraints on the Blocked Assets. Although Clearstream now claims that it cannot produce documents and give testimony as a result of "banking secrecy laws", Clearstream managed to do so when it believed providing testimony suited its own interests and utilized the New York federal courts in an attempt to accomplish that objective.

36. Clearstream, although a banking corporation duly organized under the laws of Luxembourg, declares on its website that it "offers its customers the possibility to use Clearstream Banking as a single point of access for the settlement and custody of internationally traded bonds and equities across 51 markets" and that "[m]ore than 1,100 [Clearstream] employees service customers in Europe, the Americas, Asia-Pacific, the Middle East and Africa from [their] operational centres in Luxembourg, Germany and Singapore, as well as their representative offices in London, New York, Hong Kong, Dubai and Tokyo." *See* Exhibit 18.

37. Clearstream's New York office "solicit[s] new customers and provid[es] customer support services"; "Manage[s] the acquisition and retention of [Clearstream] customers"; "Represent[s] Clearstream Banking to market participants and industry groups in the assigned regions"; has the express purpose to "increase Clearstream's market share"; and its "customer base ranges throughout all of North, South and Central America, as well as the Caribbean." *See* Exhibit 17.

38. Clearstream's website as of August 14, 2009 identified Michael J. Barrett as its Director in charge of the New York office and named 12 additional employees working in the New York office with their individual telephone numbers, fax numbers and e-mail addresses. These employees were permanently located in New York to promote Clearstream's interests.[3] *See* Exhibit 18.

39. Clearstream maintains at least two bank accounts at Citibank, N.A., and one account with its correspondent bank, JP Morgan Chase, all in New York City; its

[3] Legal process, including the writ of execution and restraining notices, have been served on Clearstream's New York office multiple times.

website lists a specific telephone and fax number and e-mail addresses for its New York office designated for "general customer support"; Clearstream's New York address and telephone number have been and continue to be published in various telephone directories, including YellowPages.com; and a search of public records through Lexis indicates that Clearstream has been issued Federal Employer I.D. Number 13-3221123. *See* Exhibits 17 and 18.

40. Clearstream also conducts billions of dollars worth of transactions in securities and notes (immobilized in New York) involving payments in U.S. currency through Clearstream's custodial, cash and correspondent bank accounts with New York banks. A true and accurate copy of the Affidavit of Mary Fenoglio, Citigroup's Managing Director of Global Transactions Services Business, dated June 16, 2008, is attached hereto as **Exhibit 19**.

41. In order to purchase the now blocked Blocked Assets on behalf of Markazi through its omnibus account at Citibank, Clearstream communicated with Citibank in New York. In connection with Clearstream's omnibus account at Citibank, Citibank maintained bookkeeping records for "thousands" of Clearstream's customer accounts associated with the settlement of certain trades of assets, included the Blocked Assets now held in a segregated and blocked account at Citibank in New York in accordance with Executive Order 13599. *See* Exhibit 19.

42. Clearstream has admitted as follows concerning the Blocked Assets: "the securities in question are all issued in dematerialized form in the United States of America and consequently the ultimate place of safekeeping, irrespective of the choice of principal and intermediate custodians, is necessarily the United States. It is a necessary

consequence of this fact that the securities in question cannot be in safe custody without procuring services from US-based persons." *See* Exhibit 14(I).

43. Due to the aforementioned facts, this Court has personal jurisdiction over Clearstream pursuant to New York law.

44. The Peterson Plaintiffs elected not to participate in *Levin v. Bank of N.Y.*, No. 09 cv 5900, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) after Citibank filed an interpleader action against the Peterson Plaintiffs. The Peterson Plaintiffs negotiated stipulations of dismissal with counsel for all banks in *Levin* culminating in the filing of Stipulations of Dismissal So Ordered on July 26, 2010 and December 9, 2011, copies of which are attached hereto as **Exhibit 20**.

45. In *Bank of Tokyo-Mitsubishi, UFJ, Ltd. v. Peterson*, No. 12 Civ. 4038 (BSJ) (S.D.N.Y. May 29, 2012), the Peterson Plaintiffs did not have a full opportunity to litigate the issues resolved by the Court because: (a) the Court lifted the restraints on the Japan-based assets before Plaintiffs had *any* opportunity to brief those issues; (b) before vacating the Peterson Plaintiffs' restraints against Bank of Tokyo's Japan-based assets, Judge Jones expressly stated, during a conference call on May 24, 2012 regarding Bank of Tokyo's motion to vacate restraints, that "Clearstream is different" from Bank of Tokyo; and (c) appealing the ruling would have required the Peterson Plaintiffs to post an enormous bond far beyond those individuals' financial means.

46. Attached hereto as **Exhibit 21** is a true and accurate copy of the EU Clearing and Settlement Legal Certainty Group Questionnaire responses from the Federal Reserve Bank of New York.

47. Attached hereto as **Exhibit 22** is a true and accurate copy of the Opinion Letter of Professor Charles W. Mooney, together with his curriculum vitae.

48. Attached hereto as **Exhibit 23** is a true and accurate copy of the Opinion Letter of Karine Vilret and Patrick Scott, Luxembourg Attorneys, dated February 23, 2011.

49. Attached hereto as **Exhibit 24** is a true and accurate copy of the Opinion Letter of Arendt, Clearstream's Luxembourg Attorneys, dated May 16, 2012.

50. Attached hereto as **Exhibit 25** is a true and accurate copy of Council Regulation (EU) No. 267/2012, dated March 23, 2012, Concerning Restrictive Measures Against Iran and Repealing Regulation (EU) No. 961/2010.

51. Attached hereto as **Exhibit 26** is a true and accurate copy of the European Commission, EU Clearing and Settlement Legal Certainty Group Questionnaire dated April 24, 2006.

Dated: New York, New York
August 3, 2012

Liviu Vogel
Salon Marrow Dyckman Newman & Broudy LLP
292 Madison Avenue
New York, New York 10017
Telephone: (212) 661-7100
lvogel@salonmarrow.com