UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON,
Personal Representative of the Estate of
James C. Knipple (Dec.) et al.,

                Plaintiffs,

        v.

ISLAMIC REPUBLIC OF IRAN, et al.,

                Defendants.

Case No. 10 CIV 4518 (BSJ)

**FILED UNDER SEAL**

**CONTAINS CONFIDENTIAL
MATERIAL SUBJECT TO
PROTECTIVE ORDER**

**DEFENDANT BANK MARKAZI'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE SECOND
AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION**

David M. Lindsey
James M. Hosking
Andreas A. Frischknecht
Yasmine Lahlou

**CHAFFETZ LINDSEY LLP**
505 Fifth Avenue, 4th Floor
New York, NY 10017
Tel. (212) 257-6960
Fax (212) 257-6950
www.chaffetzlindsey.com

June 22, 2012

*Attorneys for Defendant Bank Markazi*

{00121670;v1}

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT ............................................................................................................... 3

I.      Plaintiffs' TRIA Section 201 Claim Raises a Non-Justiciable Political Question ................................................................................................3

II.      Even Were the Court to Consider it, the TRIA Section 201 Claim Fails as a Matter of Law ..........................................................................................4

       A.     The Restrained Bonds are Not "Assets of" Bank Markazi Because the Bank is Not the Owner of Those Assets ................................4

       B.     Plaintiffs May Not Execute Upon Bank Markazi's Assets Held at Clearstream in Luxembourg..................................................................6

       C.     Should the Court Determine That the Restrained Bonds *are* "Assets of" Bank Markazi, Application of TRIA Section 201 Here Would Violate the Treaty of Amity ............................................7

III.    Should the Court Determine that the Restrained Bonds *are* "Assets Of" Bank Markazi, then those Assets are Immune from Attachment and Execution under FSIA Section 1611(b)(1) .............................................9

       A.     Plaintiffs Have Not Met Their Burden under *NML Capital* of Alleging with Specificity That Bank Markazi Did Not Use the Restrained Bonds for Central Banking Purposes..........................................9

           1.     Immunity under FSIA Section 1611(b)(1) Extends to All Assets Used for Central Banking Purposes .....................................9

           2.     It is Plaintiffs' Burden to Rebut the Presumption That the Restrained Bonds are Immune by Alleging with Specificity That those Assets *Were Not* Used for Central Banking Purposes........................................................................10

           3.     To the Extent They are Even Relevant, Plaintiffs' Allegations are *Consistent with* Bank Markazi's Use of the Restrained Bonds as an Investment of the Bank's Currency Reserves—a Classic Central Banking Function ..............................................................................13

           4.     Under *NML Capital*, Plaintiffs' Alter Ego Allegations are Irrelevant as a Matter of Law...................................................18

B.   The Special Protection the FSIA Extends to Central Bank
Property in Section 1611(b)(1) Overrides TRIA Section 201 ..................19

IV.   Should the Court Determine That the Restrained Bonds *are* "Assets
Of" Bank Markazi, then it Must Vacate the Restraints Because Bank
Markazi's Property is Immune from both *Pre*-Judgment and *Post*-
Judgment Attachment under FSIA Section 1611(b)(1) ........................................22

A.   Bank Markazi's Property is Immune from *Post-Judgment*
Attachment, and Article XI, Section 4 of the Treaty of Amity
Does Not Waive That Immunity................................................................22

1.   Under New York Law, a Judgment Creditor May Not
Restrain the Property of Even a *Non-Sovereign* Party
Alleged to Be an Alter Ego of the Judgment Debtor By
Means of a *Post-Judgment* Attachment .........................................22

2.   Article XI, Section 4 of the Treaty of Amity Does Not
Waive the Immunity of Bank Markazi's Property from
*Post-Judgment* Attachment..........................................................24

a.   Bank Markazi is Not an "Enterprise" Engaged in
"Commercial, Industrial, Shipping or Other Business
Activities" ..................................................................26

b.   Bank Markazi Conducts No "Business Activities" (Indeed,
No "Activities" of Any Kind) "Within the Territories of"
the United States ...............................................................29

3.   FSIA Section 1610(g) Provides No Basis for a *Post-
Judgment* Attachment of Bank Markazi's Property
Because Section 1611(b)(1) Immunizes Central Bank
Property from Attachment and Execution
"Notwithstanding the Provisions of Section 1610" ......................30

B.   The Immunity of Bank Markazi's Property from *Pre-Judgment*
Attachment Cannot Be (and Has Not Been) Waived................................31

CONCLUSION.......................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

*Alperin v. Vatican Bank,*
    360 Fed. App'x 847 (9th Cir. 2009) ..................................................11

*Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek,*
    600 F.3d 171 (2d Cir. 2010) ......................................................28

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .........................................................11, 17

*Bank of Tokyo-Mitsubishi, UFJ, Ltd. New York Branch  v. Peterson,*
    No. 12 Civ. 4038 (BSJ),
    2012 WL 1963382 (S.D.N.Y. May 29, 2012) .............................6, 13

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .........................................................11

*Berces v. Debrecen Tartositoipari Kombinat,*
    No. 94 Civ. 3381 (KMW),
    1995 WL 640486 (S.D.N.Y. Oct. 31, 1995) ..............................11

*Berkovitz v. Islamic Republic of Iran,*
    735 F.2d 329 (9th Cir. 1984) .............................................29

*Bingham v. Zolt,*
    231 A.D.2d 479 (1st Dep't 1996) ..........................................24

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.,*
    --- F. Supp. 2d ----, No. 11 Civ. 3283 (DLC),
    2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011) ..............................5, 7

*Calgarth Investments, Ltd. v. Bank Saderat Iran,*
    95 civ. 5332 (MBM), 1996 WL 204470
    (S.D.N.Y. Apr. 26, 1996), *aff'd,* 108 F.3d 329 (2d Cir. 1997)................30

*Chicago Bridge & Iron Co. v. Islamic Republic of Iran,*
    506 F. Supp. 981 (N.D. Ill. 1980) ........................................30

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) .........................................................4

*Donaldson v. New York City Dep't of Education,*
    442 Fed. App'x 601 (2d Cir. 2011) .......................................11

*EM Ltd. v. Republic of Argentina,*
     --- F. Supp. 2d ----, No. 03 Civ. 2507 (TPG),
     2012 WL 1028109 (S.D.N.Y. Mar. 28, 2012) ………………………..……………..12, 18

*EM Ltd. v. Republic of Argentina,*
     473 F.3d 463 (2d Cir. 2007) ……………………………………………...………...…10

*EM Ltd. v. Republic of Argentina,*
     720 F. Supp. 2d 273, (S.D.N.Y. 2010),
     *vacated and remanded,* 652 F.3d 172 (2d Cir. 2011) …………………..……………..16

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
     462 U.S. 611 (1983) ………………………………………………………..…….5, 18

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
     905 F.2d 438 (D.C. Cir. 1990) …………………………………………………….29

*Gabay v. Mostazafan Found. of Iran,*
     151 F.R.D. 250 (S.D.N.Y. 1993) ……………………………………...…………..12

*Gadsby & Hannah v. Socialist Republic of Romania,*
     698 F. Supp. 483 (S.D.N.Y. 1988) …………………………………………..…….23

*Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat,*
     713 F. Supp. 2d 267 (S.D.N.Y. 2010) …………………………………..……..24

*Gibbons v Udaras na Gaeltachta,*
     549 F. Supp. 1094 (S.D.N.Y. 1982) …………………………………………27, 28, 29

*GP-UHAB Hous. Dev. Fund Corp. v. Jackson,*
     No. CV-05-4830 (CPS),
     2006 WL 297704 (E.D.N.Y. Feb. 7, 2006) …………………………..………...21, 22

*Gustafson v. Alloyd Co., Inc.,*
     513 U.S. 561 (1995) …………………………………………………...............27

*Independent U.S. Tanker Owners Comm. v. Skinner,*
     884 F.2d 587 (D.C. Cir. 1989) ……………………………………………………7

*JSC Foreign Econ. Ass'n Technostroyexport v.*
     *Int'l Dev. & Trade Servs., Inc.,*
     295 F. Supp. 2d 366 (S.D.N.Y. 2003) ……………………..…………………….23

*JSC Foreign Economic Ass'n Technostroyexport v.*
     *Int'l Dev. And Trade Servs.,*
     306 F. Supp. 2d 482 (S.D.N.Y. 2004) ………………………………….…........23

*Karaha Bodas Co., L.L.C. v.*
   *Perusahaan Pertambangan Minyak Dan Gas Bumi Negar*,
   313 F.3d 70 (2d Cir. 2002) ……………………………………………..…12, 13

*Koehler v. Bank of Bermuda Ltd.*,
   12 N.Y.3d 533 (2009) ……………………………………………...……….23

*LaVoice v. UBS Financial Servs., Inc.*,
   No. 11 Civ. 2308 (BSJ) (JLC),
   2012 WL 124590 (S.D.N.Y. Jan. 13, 2012) ………………………...………….8

*Ministry of Defense & Support of the Armed Forces*
   *of the Islamic Republic of Iran v. Elahi*,
   556 U.S. 366 (2009) ………………………………………….…..……….21

*In re Morrissey*,
   717 F.2d 100 (3d Cir. 1983) …………………………………………..…..22

*NML Capital, Ltd. v. Banco Central de la República Argentina*,
   652 F.3d 172 (2d Cir. 2011) ……………………………………..…..passim

*NML Capital, Ltd. v. Republic of Argentina*,
   --- F.3d ----, 2012 WL 1059073
   (2d Cir. Mar. 30, 2012) …………………………………………….…….28

*O'Connell Machinery Co. v. M.V. Americana*,
   734 F.2d 115 (2d Cir. 1984) …………………………………………..…..31

*Orkin v. Swiss Confederation*,
   444 Fed. App'x 469 (2d Cir. 2011) …………………………………….…10

*Orkin v. Swiss Confederation*,
   770 F. Supp. 2d 612 (S.D.N.Y. 2011),
   *aff'd*, 444 Fed. App'x 469 (2d Cir. 2011) …………………………...10, 11

*Papasan v. Allain*,
   478 U.S. 265 (1986) …………………………………..……………….17

*Pennsylvania Dep't of Corrections v. Yeskey*,
   524 U.S. 206 (1998) ……………………………………………..……….5

*Permanent Mission of India to the United Nations v.*
   *City of New York*,
   551 U.S. 193 (2007) ……………………………..…………………….28

*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) …………………………………………….19, 21

*Republic of Argentina v. Weltover,*
    504 U.S. 607 (1992) ……………………………………...………………………28

*Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.,*
    585 F.3d 58 (2d Cir. 2009) ………………………………………...…………………7

*Sniado v. Bank Austria AG,*
    No. 00-civ-9123 (AGS),
    2001 WL 812236 (S.D.N.Y. July 18, 2001) ………………………………………11

*Sumitomo Shoji Am., Inc. v. Avagliano,*
    457 U.S. 176 (1982) ……………………………………………………………………8

*Trans Commodities, Inc. v. Kazakhstan Trading House and*
    *Rep. of Kazakhstan,*
    No. 96 CIV. 9782 (BSJ),
    1997 WL 811474 (S.D.N.Y. May 28, 1997) …………………..……………………9

*Trans World Airlines, Inc. v. Franklin Mint Corp.,*
    466 U.S. 243 (1984) ……………………………………………………………………9

*United States v. Palestine Liberation Organization,*
    695 F. Supp. 1456 (S.D.N.Y. 1988) ……………………………...……………………8

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes,*
    336 F.2d 354 (2d Cir. 1964) …………………………………………...……………26

*Volkswagenwerk Aktiengesellschaft v. Schlunk,*
    486 U.S. 694 (1988) ………………………………………………...……………25

*Weinstein v. Islamic Republic of Iran,*
    609 F.3d 43 (2d Cir. 2010) ………………………………………...……………7, 8

*Weston Compagnie de Finance Et D'Investissement, S.A. v.*
    *La Republica del Ecuador,*
    823 F. Supp. 1106 (S.D.N.Y. 1993) ………………………………...……………31

**Statutes and Rules**

C.P.L.R. § 5222 ………………………………………………………………………23

C.P.L.R. § 6201(3) ……………………………………………………...……………23

28 U.S.C. § 1605(a)(2) ………………………………………………………………29

28 U.S.C. § 1605(a)(7) ……………………………………………...……………4, 20

{00121670;v1}

28 U.S.C. § 1605A ……………………………………………..……………4, 20, 30

28 U.S.C. § 1609 ………………………………………………………………..9, 20

28 U.S.C. § 1610 …………………………………………………………passim

28 U.S.C. § 1610(f) ……………………………………………………..……………21

28 U.S.C. § 1610(g) …………………………………………………………………..30

28 U.S.C. § 1611 ……………………………………………………..…………20, 21

28 U.S.C. § 1611(b) …………………………………………………………19, 30, 31

28 U.S.C. § 1611(b)(1) ………………………………………………..………passim

Terrorism Risk Insurance Act,
        Pub. L. No. 107-297, Title II, § 201, 116 Stat. 2337 (2002) …………………..……passim


**Treaties**

Treaty of Amity, Economic Relations and Consular Rights,
        U.S.-Iran, Aug. 15, 1955, 8 U.S.T. 899, T.I.A.S. No. 3853 …………………..……passim

Treaty of Friendship, Commerce and Navigation, U.S.-Japan, Apr. 2, 1953,
        4 U.S.T. 2063, T.I.A.S. No. 2863 ……………………………………………...…………8


**Other**

Exec. Order No. 13599,
        77 Fed. Reg. 6659 (Feb. 5, 2012) …………………………………..………4, 5, 15

H.R. REP. No. 94-1487,
        1976 U.S.C.C.A.N. 6604 …………………………………………..……..………21

Ernest T. Patrikis, *Foreign Central Bank Property:*
        *Immunity from Attachment in the United States,*
        1982 U. ILL. L. REV. 265 (1982) ……………………………………………..………10

Vernon Setser, *The Immunity Waiver for State-Controlled*
        *Business Enterprises in United States Commercial Treaties,*
        55 PROC. AM. SOC. INT'L L. 89 (1961) ………………………………………27, 30

Defendant Bank Markazi ("Bank Markazi" or "the Bank"), the Central Bank of Iran, respectfully submits this Reply Memorandum of Law in further support of its Motion pursuant to Fed. R. Civ. P. 12(b)(1) (the "Bank Markazi Motion") to dismiss the Second Amended Complaint dated December 7, 2011 (the "Complaint") and all Cross-Claims asserted by any Third Party Respondent (as defined in the Court's November 29, 2011 Scheduling Order, Dkt. # 157) in this action (the "Turnover Action") for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act (the "FSIA" or the "Act"), 28 U.S.C. §§ 1602-1611.

## PRELIMINARY STATEMENT

Plaintiffs' Opposition to this Motion adds nothing to their existing arguments concerning their TRIA section 201 claim—all of which Bank Markazi and Clearstream have previously rebutted. As Clearstream has demonstrated, the existence of competing blocking regimes in the United States and the European Union presents a non-justiciable political question that the Court lacks constitutional authority to adjudicate. Even were the Court to consider it, however, the TRIA section 201 claim must be dismissed based on Clearstream's showing in this Turnover Action that Bank Markazi is not the owner of the assets restrained, and now blocked, in New York (the "Restrained Bonds").

If the Court grants the Clearstream Motion on either of those grounds, then it need not consider the issue of immunity under FSIA section 1611(b)(1) addressed in this Reply. Should the Court, however, reach the merits of the TRIA section 201 claim *and* should it determine that Bank Markazi is the owner of the Restrained Bonds under applicable law, the Court will then need to consider whether Plaintiffs can overcome the presumption that the Restrained Bonds are immune from attachment and execution as the property of a foreign central bank held for its own account under FSIA section 1611(b)(1) and *NML Capital.*

Plaintiffs could rebut the presumption of immunity under *NML Capital* only by alleging specific facts which (if true) would show that Bank Markazi did not use the Restrained Bonds for central banking purposes.  Given Plaintiffs' evident inability to allege any particularized facts to show that Bank Markazi used the Restrained Bonds for *anything other than* legitimate central banking purposes as an investment of the Bank's currency reserves, Plaintiffs have plainly failed to meet that burden here.

Indeed, Plaintiffs concede that the Restrained Bonds relate to an investment by Bank Markazi in "legitimate assets," namely U.S. dollar-denominated government bonds, and that other foreign central banks were among the entities that invested in these very same securities.  Those facts are all consistent with Bank Markazi's use of the Restrained Bonds as an investment of the Bank's currency reserves.

In an effort to distract from the only relevant inquiry for immunity under FSIA section 1611(b)(1) and *NML Capital*—whether Bank Markazi used these specific assets for central banking purposes—Plaintiffs instead rely almost entirely on generalized allegations that Bank Markazi has engaged in illicit activity.  On that basis, they urge the Court to infer that Bank Markazi *might have* invested in these particular assets for illicit purposes.

Respectfully, that is pure speculation and does not come close to meeting Plaintiffs' burden on this Motion.  Under *NML Capital,* both the nature of the immunity inquiry and the burden Plaintiffs must meet to overcome this Motion are clear.  It is not Bank Markazi's burden, as Plaintiffs contend, to reinforce the existing presumption of immunity by "proving" that the Bank used the Restrained Bonds for central banking purposes.  On the contrary, it is Plaintiffs' burden to rebut that presumption, and they have failed to carry that burden here.

Nor is there any merit to Plaintiffs' contention that Iran waived the immunity of Bank Markazi's property in the Treaty of Amity with the United States. The waiver provision in the Treaty applies only to Iranian state-owned "enterprises" engaged in "business activities" within the territory of the United States. Bank Markazi meets none of these requirements, and the Bank's investment of foreign currency reserves is not subject to the waiver provision in any event because it serves an important governmental purpose—the dispositive question for purposes of determining whether there has been a waiver of immunity under the Treaty.

The fact that the assets at issue in this Turnover Action are now blocked manifestly does not render the ultimate question of whether they are subject to attachment and execution by these Plaintiffs "academic," as Plaintiffs contend. On the contrary, the existing restraints on these assets are invalid under the FSIA as well as the New York C.P.L.R and must be vacated. And the Complaint must be dismissed.

## ARGUMENT

### I.    Plaintiffs' TRIA Section 201 Claim Raises a Non-Justiciable Political Question

As Clearstream demonstrates in its May 18, 2012 Reply Memorandum of Law in Support of the Clearstream Motion[1] (the "Clearstream Reply") and in its June 15, 2012 Opposition to Plaintiffs' Motion for Partial Summary Judgment (the "Clearstream Opposition"), Plaintiffs' TRIA section 201 claim raises a non-justiciable political question that the Court lacks constitutional authority to adjudicate because the Restrained Bonds blocked in New York and the reciprocal assets held in accounts at Clearstream in Luxembourg established at the time of the

---

[1]    Unless otherwise defined herein, all defined terms in this Memorandum of Law are as defined in Bank Markazi's March 15, 2012 Memorandum of Law in Support of the Bank Markazi Motion (the "Bank Markazi Motion Brief").

restraints are subject to competing U.S. and EU blocking regimes.[2]  The existence of this non-justiciable political question, standing alone, precludes Plaintiffs' TRIA section 201 claim.

To avoid duplicative briefing, Bank Markazi will not repeat Clearstream's argument here and instead incorporates, adopts and joins in that argument as though fully set forth herein.[3]

## II. Even Were the Court to Consider it, the TRIA Section 201 Claim Fails as a Matter of Law

### A. The Restrained Bonds are Not "Assets of" Bank Markazi Because the Bank is Not the Owner of Those Assets[4]

As previously demonstrated in the Bank Markazi Motion Brief, the Clearstream Reply, Bank Markazi's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment (the "Bank Markazi Opposition"), and the Clearstream Opposition, the plain wording of TRIA section 201(a) confines the assets that are subject to attachment and execution under that provision to blocked assets that are *owned by* a "terrorist party" (or an agency or instrumentality of a "terrorist party").[5]

---

[2]  *See* Clearstream Reply Br. at 9-16; Clearstream Opposition Br. at 2-14.

[3]  Although not previously raised on *this* Motion, the argument that Plaintiffs' TRIA section 201 claim raises a non-justiciable political question is not new.  Plaintiffs have previously responded to Clearstream's argument on this point in a Surreply Memorandum of Law dated June 8, 2012. Plaintiffs will have a further opportunity to respond to Clearstream's argument in Plaintiffs' Reply on their Motion for Partial Summary Judgment, currently due on July 13, 2012.

[4]  Executive Order 13599 provides that "[a]ll property and interests in property" of Bank Markazi in the United States "may not be transferred, paid, exported, withdrawn or otherwise dealt in." TRIA section 201, by contrast, provides for attachment and execution against a subset of blocked assets by certain judgment creditors and defines the subset of blocked assets available for attachment and execution as "the blocked assets of" a terrorist party.  *See* Executive Order 13599, at §§ 1(a) & 1(b); TRIA § 201(a).  Thus, while the Restrained Bonds are blocked, they are not subject to TRIA section 201 because they are not the "assets of" any "terrorist party."  As a result, control of the Restrained Bonds remains "in the hands of the President" for potential "use in negotiating the resolution of a declared national emergency."  *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981).

[5]  By its terms, TRIA section 201(a) is applicable where "a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, *or for which a terrorist party is not immune under section 1605(a)(7)* of title 28, United States Code" (emphasis added).

It is therefore unclear whether TRIA Section 201 is available to those Plaintiffs who hold a judgment under FSIA *Section 1605A.  See* Bank Markazi Opposition Br. at 8 n.8; Clearstream Opposition at 40.

In opposition to this Motion, Plaintiffs simply repeat the arguments they have previously raised, all of which fly in the face of the plain wording of TRIA section 201, Judge Cote's decision in *Calderon* and the stated position of the United States Government on this issue.[6] Accordingly, to avoid duplicative briefing, Bank Markazi will not repeat here all of the arguments that the Bank and Clearstream, respectively, have previously raised concerning the requirement of ownership under TRIA section 201 and instead expressly adopts and incorporates those arguments by reference as though fully set forth herein.[7]

Clearstream has demonstrated in this Turnover Action that Bank Markazi is not the owner of the Restrained Bonds under applicable law, namely Article 8 of the UCC and Luxembourg law, the law to which the UCC's choice of law provisions refer.[8]  Instead, Bank Markazi's assets are held at Clearstream in Luxembourg.  Even were the Court to consider it, the application of New York common law likewise would establish Luxembourg as the situs of Bank

---

Further, as Bank Markazi has previously noted, Bank Melli Iran, a state-owned Iranian bank, has filed a Petition for a Writ of Certiorari in the *Weinstein* case seeking Supreme Court review, *inter alia*, on the issue of whether TRIA section 201 overrides the Court's holding in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), as well as applicable treaty provisions, by authorizing creditors of a foreign sovereign to execute against assets of the sovereign's juridically distinct instrumentalities.   A decision by the Court on whether to grant certiorari is anticipated in the near future.  *See* Supreme Court Docket, *Bank Melli Iran New York Representative Office v. Weinstein*, No. 10-947.

[6]  The only argument relating to the TRIA section 201 claim Plaintiffs raise in opposition to this Motion that is even arguably "new" consists of yet another, misconceived attempt to avoid the plain meaning of the word "of" in the operative phrase "the blocked *assets of* that terrorist party" in TRIA section 201(a).  Plaintiffs' latest argument is based on a purported discrepancy between the title of Executive Order 13599, which refers to the "property of" Iran and Bank Markazi, and the text of the Executive Order 13599 itself, which refers to "[a]ll property and interests in property" of Iran and Bank Markazi.  *See* Pls.' Br. at 22.  Plaintiffs' argument ignores the basic principle of statutory construction pursuant to which the *title* of Executive Order 13599 cannot limit the plain meaning of the Executive Order's operative *text*.  *See, e.g., Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a statute . . . cannot limit the plain meaning of the text.") (internal quotation and citations omitted, alteration in original).  Thus, Plaintiffs' argument falls of its own weight.

[7]  *See* Bank Markazi Motion Br. at 13-17; Bank Markazi Opposition Br. at 8-17; Clearstream Opposition Br. at 22-27; Clearstream Reply at 20-31.

[8]  Clearstream Opening Br. at 21-38; Clearstream Reply Br. at 32-77; Clearstream Opposition Br. at 21-22.

Markazi's property interest.   Moreover, Clearstream has shown that the redemption of the Restrained Bonds in the ordinary course in the more than four years that those assets have now been restrained has no impact on ownership of the resulting cash.[9]

Finally, as Bank Markazi has previously demonstrated in opposition to Plaintiffs' Motion, Plaintiffs' argument that Bank Markazi should be deemed the owner of the Restrained Bonds for purposes of TRIA Section 201 based on the Bank's purported "admission" that it is the beneficial owner of those assets fails as a matter of law.[10]

Again, so as not to burden the Court with duplicative briefing, Bank Markazi expressly adopts and incorporates by reference as though fully set forth herein all of the arguments previously raised by the Bank and Clearstream, respectively, concerning these issues.

### B.   Plaintiffs May Not Execute Upon Bank Markazi's Assets Held at Clearstream in Luxembourg

As Clearstream and Bank Markazi have demonstrated, Plaintiffs may not restrain or execute upon assets of Bank Markazi held at Clearstream in Luxembourg.[11]   Indeed, this Court has already ruled that Plaintiffs may not restrain or execute upon assets of Bank Markazi held at a foreign financial institution outside the United States.   *Bank of Tokyo-Mitsubishi, UFJ, Ltd. New York Branch v. Peterson*, No. 12 Civ. 4038 (BSJ), 2012 WL 1963382, at *2 (S.D.N.Y. May 29, 2012) ("Bank of Tokyo").[12]

---

[9]   Clearstream Reply Br. at 37-48; Clearstream Opposition Br. at 21-27; *see also* Bank Markazi Motion Br. at 19-21.

[10]   Bank Markazi Opposition Br. at 17-20.

[11]   Clearstream Reply Br. at 77-78;. Bank Markazi Opposition Br. at 20-27; Clearstream Opposition Br. at 35-40.

[12]   In response to Bank Markazi's showing that the blocking of the Restrained Bonds did not convert this Turnover Action into an *in rem* proceeding, Plaintiffs assert a convoluted argument that because TRIA section 201—in cases where it applies—confers subject matter jurisdiction, this Turnover Action *ipso facto* should now be deemed an *in rem* proceeding.   *See* Bank Markazi Motion Br. at 26-29; Pls.' Br. at 29-31.   Plaintiffs' "*in rem* proceeding" argument fails here for the simple reason that the Restrained Bonds *are not* subject to TRIA section 201 in any event because they are not the

To avoid duplicative briefing, Bank Markazi will not repeat its arguments, and Clearstream's arguments, here and instead adopts and incorporates those arguments by reference as though fully set forth herein.

C.  Should the Court Determine That the Restrained Bonds *are* "Assets of" Bank Markazi, Application of TRIA Section 201 Here Would Violate the Treaty of Amity

Plaintiffs implicitly concede that the statement in the Second Circuit's opinion in *Weinstein* that *"even assuming, arguendo,"* the existence of a conflict between TRIA section 201 and one or more of the provisions in the Treaty of Amity, "the TRIA would have to be read to abrogate that portion of the Treaty" is pure *dicta. Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 53 (2d Cir. 2010); *see Calderon-Cardona v. JPMorgan Chase Bank, N.A.,* --- F.Supp.2d ----, No. 11 Civ. 3283 (DLC), 2011 WL 6155987, at *14 (S.D.N.Y. Dec. 7, 2011) ("In *Weinstein,* the Second Circuit stated in *dicta* that TRIA would abrogate a conflicting portion of an earlier treaty because the Notwithstanding Clause served to 'expressly state[]' Congress's purpose in superseding earlier laws.") (citation omitted, alteration in original).[13]

Accordingly, *Weinstein* does not preclude the Court from considering Bank Markazi's argument here that the generic "notwithstanding" clause in TRIA section 201 is not a sufficiently clear statement of Congressional intent to abrogate existing United States treaty obligations.[14]

---

"blocked assets of" any "terrorist party." Further, Plaintiffs cite no authority (other than Judge Marrero's opinion in *Hausler I*, which Bank Markazi addressed at length in its Opening Brief and which Plaintiffs now retreat from, claiming they "need not rely" on it) for the proposition that the blocking of the Restrained Bonds should be deemed to have converted this Turnover Action into an *in rem* proceeding in which "ownership of the *res* is irrelevant" (as opposed to a *quasi in rem* proceeding, in which "attachment depends entirely on the determination that the *res* at issue is the property of the defendant at the moment the *res* is attached"). Pls.' Br. at 30-31 (quoting *Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.,* 585 F.3d 58, 69 (2d Cir. 2009)).

[13] *See also Independent U.S. Tanker Owners Comm. v. Skinner,* 884 F.2d 587, 595 (D.C. Cir. 1989) (the phrase "even assuming *arguendo*" in a court's opinion is indicative of *dicta*).

[14] Bank Markazi acknowledges that the holding in *Weinstein* with respect to Articles III.2 and IV.1 is binding on this Court. However, Plaintiffs' assertion that the Second Circuit purportedly

*See, e.g., LaVoice v. UBS Financial Servs., Inc.,* No. 11 Civ. 2308 (BSJ) (JLC), 2012 WL 124590, at *8 (S.D.N.Y. Jan. 13, 2012) (Jones, J.) (rejecting plaintiff's arguments based on *dicta* in a Second Circuit opinion as "entirely unpersuasive").

Significantly, Plaintiffs cite no case in which a court actually *held* that a statutory "notwithstanding" clause abrogated an existing treaty. Nor is Plaintiffs' attempt to distinguish *United States v. Palestine Liberation Organization,* 695 F. Supp. 1456 (S.D.N.Y. 1988) persuasive. In that case, the court found that a statute purporting to apply "notwithstanding any provision of law to the contrary" did not abrogate the United Nations Headquarters Agreement.

The fact that the statute elsewhere referred to "United States law (including any treaty)" was only one of several factors that led the court in *Palestine Liberation Organization* to conclude that Congress had not given "the clearest of expressions" of its intent to abrogate an international treaty. *Id.* at 1468. The court also relied, *inter alia,* on the fact that "no member of Congress, at any point, explicitly stated that the [statute] was intended to override any international obligation of the United States." *Id.* at 1470.

---

"harmonized" TRIA section 201 with the *entire* Treaty of Amity—including provisions such as Articles III.2 and IV.1 of the Treaty that were not before the court—is inaccurate. *Weinstein* relied on the United States Supreme Court's opinion in *Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176 (1982). *Sumitomo,* however, addressed only the intent behind the *corporation* provisions contained in various friendship treaties (including Article III.1 of the Treaty here)—not the intent behind the treaties as a whole. *See Sumitomo,* 457 U.S. at 185-86. Unlike Article III.1, however, Articles III.2 and IV.1 apply both to Iran's "nationals" and to its "companies." *Sumitomo* accordingly does not support Plaintiffs' expansive reading of *Weinstein.*

Further, the Treaty of Amity's broad and unqualified requirement in Article IV.1 that the United States "at all times accord fair and equitable treatment to nationals and companies of [Iran], and to their property and enterprises," and refrain from discriminatory measures, is absent from many other friendship treaties, which provide only for a limited obligation to accord fair and equitable treatment in relation to the granting of government contracts. *See, e.g.,* Treaty of Friendship, Commerce and Navigation, U.S.-Japan, Apr. 2, 1953, 4 U.S.T. 2063, T.I.A.S. No. 2863. The broad duties of fair and equitable treatment and non-discrimination under the Treaty of Amity were not before the Second Circuit in *Weinstein* or the Supreme Court in *Sumitomo.*

The absence of any indication in the legislative history of TRIA section 201 that Congress intended to override existing international treaty obligations thus militates against interpreting the "notwithstanding" clause in TRIA section 201 as a sufficiently clear indication of Congressional intent to abrogate the Treaty of Amity here. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) ("A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed.") (internal quotation and citations omitted).

### III. Should the Court Determine that the Restrained Bonds *are* "Assets Of" Bank Markazi, then those Assets are Immune from Attachment and Execution under FSIA Section 1611(b)(1)

    A.    <u>Plaintiffs Have Not Met Their Burden under *NML Capital* of Alleging with Specificity That Bank Markazi Did Not Use the Restrained Bonds for Central Banking Purposes</u>

        1.    <u>Immunity under FSIA Section 1611(b)(1) Extends to All Assets Used for Central Banking Purposes</u>

The basic framework for the Court's immunity analysis under the FSIA is not in dispute. Briefly, "a foreign state's property in the United States *is presumed immune* from attachment" under the Act. *Trans Commodities, Inc. v. Kazakstan Trading House,* No. 96 CIV. 9782(BSJ), 1997 WL 811474, at *2 (S.D.N.Y. May 28, 1997) (Jones, J.) (emphasis added). More specifically, unless a foreign sovereign's property in the United States "is subject to one of the exceptions set forth in FSIA § 1610, it is immune from attachment, arrest, and execution pursuant to FSIA § 1609." *NML Capital, Ltd. v. Banco Central de la República Argentina,* 652 F.3d 172, 186-87 (2d Cir. 2011).

Further, "even if § 1610 would otherwise bring foreign state property within the jurisdiction of a court, § 1611(b)(1) overrides [the] exceptions in § 1610" where the property in

question "is that of a foreign central bank or monetary authority held for its own account." *Id.* at 187 (quoting 28 U.S.C. § 1611(b)(1)).[15]

Immunity under FSIA section 1611(b)(1) extends to all assets of a foreign central bank that are used "for central banking functions as such functions are normally understood, irrespective of their commercial nature." *Id.* at 194.[16]   And the "accumulation of foreign exchange reserves to facilitate the regulation of the [currency]" is a "paradigmatic central banking function[]." *Id.* at 195.

2.   <u>It is Plaintiffs' Burden to Rebut the Presumption That the Restrained Bonds are Immune by Alleging with Specificity That those Assets *Were Not* Used for Central Banking Purposes</u>

Where, as here, a sovereign defendant asserts a facial challenge to subject matter jurisdiction under the FSIA, the Court must determine whether the plaintiff has alleged "'specific facts' providing a 'reasonable basis for assuming jurisdiction.'" *Orkin v. Swiss Confederation,* 444 Fed.App'x 469, 471 (2d Cir. 2011) (quoting *EM Ltd. v. Republic of Argentina,* 473 F.3d 463, 486 (2d Cir. 2007)).

Only "*legally sufficient* allegations" can overcome a facial challenge to subject matter jurisdiction; "conclusory assertions *of fact or law*" cannot. *Orkin v. Swiss Confederation,* 770 F. Supp. 2d 612, 615-16 (S.D.N.Y. 2011) (emphasis added), *aff'd,* 444 Fed.App'x 469, 471 (affirming dismissal "for substantially the reasons stated by the district court in its well-reasoned opinion").   At a minimum, the complaint must allege a basis for subject matter jurisdiction under

---

[15]   (further quotation and citation omitted, alteration in original).

[16]   (quoting Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States,* 1982 U. ILL. L. REV. 265, 277 (1982)).

the FSIA "that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547 (2007)).[17]

Further—and importantly, a heightened standard applies where a plaintiff seeks to attach or execute against the property of a foreign central bank. Thus, "[w]here funds are held in an account in the name of a central bank or monetary authority, the funds *are presumed to be immune* from attachment under § 1611(b)(1)" of the FSIA. *NML Capital,* 652 F.3d at 194 (emphasis added). To rebut that presumption of immunity, a plaintiff must "*demonstrat[e] with specificity* that the funds are not being used for central banking functions as such functions are normally understood[.]" *Id.* (emphasis added).

Conceding that they cannot meet their burden under *NML Capital* here, Plaintiffs claim that it should not apply to them because they have not had an opportunity to conduct discovery.[18] That argument fails. As the Second Circuit stated in *NML Capital,* the presumption of immunity under FSIA section 1611(b)(1) "is consistent with the recognition that FSIA immunity is immunity not only from liability, but also from the costs, in time and expense, and other *disruptions attendant to litigation.*" *Id.* (internal quotation and citation omitted, emphasis added).[19]

---

[17]  As the district court noted in *Orkin,* the "plausibility" standard that applies on a Rule 12(b)(6) motion to dismiss for failure to state a claim under *Iqbal* also applies on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction under the FSIA. *See Orkin,* 770 F. Supp. 2d at 616 n.22; *accord. Alperin v. Vatican Bank,* 360 Fed.App'x 847, 849 (9th Cir. 2009) (*Iqbal* standard applies on a motion to dismiss for lack of subject matter jurisdiction under the FSIA); *see also Donaldson v. New York City Dep't of Education,* 442 Fed.App'x 601, 602 (2d Cir. 2011) (to overcome a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "the complaint must contain sufficient factual matter 'to state a claim to relief that is plausible on its face.'") (quoting *Iqbal,* 556 U.S. at 678).

[18]  *See* Pls.' Br. at 38.

[19]  *See generally Sniado v. Bank Austria AG,* No. 00 Civ. 9123 (AGS), 2001 WL 812236, at *1 (S.D.N.Y. July 18, 2001) ("Discovery is not necessary for a party opposing a facial challenge to subject matter jurisdiction."); *Berces v. Debrecen Tartositoipari Kombinat,* No. 94 Civ 3381 (KMW), 1995 WL 640486, at *1 (S.D.N.Y. Oct. 31, 1995) (claims against a sovereign instrumentality "must be dismissed without allowance of even limited discovery" where a "facial attack [on subject matter

Accordingly, where a plaintiff "ha[s] not rebutted the presumption that the funds in [the central bank]'s account were immune from attachment *because there is no indication that they were being used for anything other than traditional central bank functions,*" that plaintiff is not entitled to discovery and may not restrain the central bank's property. *EM Ltd. v. Republic of Argentina,* --- F. Supp. 2d ----, No. 03 Civ. 2507 (TPG), 2012 WL 1028109, at *9 (S.D.N.Y. Mar. 28, 2012) (emphasis added) (denying motion for expedited discovery and vacating restraints on funds held in central bank's account).

Plaintiffs further attempt to avoid their burden under *NML Capital* based on the presence of UBAE as an additional intermediary between Bank Markazi and Clearstream, such that the Restrained Bonds were maintained in an account in the name of UBAE at Clearstream. Therefore, Plaintiffs contend, the presumption of immunity under *NML Capital* should not apply because the Restrained Bonds were not held "in an account in the name of" a foreign central bank.[20]

That argument likewise fails.[21]  The presumption of immunity "[w]here funds are held in an account in the name of a central bank or monetary authority" does not derive from any requirement of the FSIA, but instead simply reflects "the common law of bank deposits," pursuant to which the party whose name is on the account is *presumed to be* the owner of the funds in that account. *NML Capital,* 652 F.3d at 191, 194; *see Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"),* 313 F.3d 70, 86 (2d

---

jurisdiction under the FSIA] succeeds"); *Gabay v. Mostazafan Found. of Iran,* 151 F.R.D. 250, 255 (S.D.N.Y. 1993) (a plaintiff's claim may be "so legally insufficient that he is precluded from discovery as a matter of law").

[20]  *See* Pls.' Br. at 37.

[21]  Indeed, the entire premise for Plaintiffs' argument is fundamentally flawed because it conflates the assets restrained (and now blocked) in *Clearstream's account at Citibank* in New York with the reciprocal assets of Bank Markazi housed in *UBAE's account with Clearstream* in Luxembourg.

Cir. 2002) ("When a party holds funds in a bank account, possession is established, and the presumption of ownership follows.").

Here, if the Court determines that Bank Markazi is not the owner of the Restrained Bonds based on Clearstream's showing that the Bank's property is held at Clearstream in Luxembourg, it must dismiss the Complaint on that basis alone for lack of subject matter jurisdiction under the FSIA. *Bank of Tokyo*, 2012 WL 1963382.[22]  Only if the Court were to determine—contrary to Clearstream's showing in this Turnover Action—that Bank Markazi *is* the owner of the Restrained Bonds would the issue of immunity under FSIA section 1611(b)(1) arise.  In other words, Bank Markazi's argument based on the immunity of central bank property *located in the United States* under FSIA section 1611(b)(1) is contingent on a possible determination by this Court that Bank Markazi is the owner of the assets that have been restrained (and now blocked) in New York—the Restrained Bonds.

As a matter of basic logic, therefore, Plaintiffs' argument that central bank assets should be entitled to *less protection* where a court has conclusively *determined* that the central bank is the owner of the assets than where the central bank is merely *presumed* to be the owner because its name is on the account self-evidently fails.

        3.    <u>To the Extent They are Even Relevant, Plaintiffs' Allegations are *Consistent with* Bank Markazi's Use of the Restrained Bonds as an Investment of the Bank's Currency Reserves—a Classic Central Banking Function</u>

On the dispositive issue for immunity under FSIA section 1611(b)(1)—whether Bank Markazi used the Restrained Bonds for central banking purposes—Plaintiffs' allegations in the Complaint, and in opposition to this motion, fall into two basic categories.

---

[22]  *See* Bank Markazi Opposition Br. at 20-24.

The first category consists of undisputed factual allegations concerning the nature of the Restrained Bonds as an "invest[ment] in legitimate assets."[23] Those allegations are all *consistent with* Bank Markazi's use of these assets as an investment of the Bank's foreign currency reserves—a "paradigmatic central banking function[]." *NML Capital,* 652 F.3d at 195. The second category consists of allegations which—even if assumed to be true for purposes of this Motion—are not probative of whether Bank Markazi used the assets at issue in this Turnover Action for central banking purposes.

Among the key undisputed facts that are entirely consistent with Bank Markazi's use of the Restrained Bonds as an investment of the Bank's foreign currency reserves are the following:

- The Restrained Bonds consisted of debt securities "issued by sovereigns like the Republic of Italy or 'supranationals' such as the European Investment Bank" and are denominated in U.S. dollars.[24]

- "[Bank] Markazi invested in those bonds," and the Bank collected "interest and principal payments related to its investments."[25]

- Other foreign central banks were among the entities that invested in these very same sovereign and supranational bonds.[26]

---

[23]   Pls.' Br. at 42.

[24]   Compl. ¶¶ 102, 245.

[25]   Compl. ¶¶ 3, 96.

[26]   *See* Pls.' Br. at 41-42.  For reasons that are difficult to fathom, Plaintiffs contend that this undisputed fact somehow supports their argument because "few" of the investors in these particular bonds were central banks.  Pls.' Br. at 41.  Yet the testimony of Mark Gem, Clearstream's Executive Vice President and Head of Business Management, that Plaintiffs seek to rebut, was that these "very high grade securities . . . would all *tend to appeal to central banks, for example,* as stores of reserve investments." 6/27/08 Hrg. Tr. (Lindsey Decl. Ex. E), at 22 (emphasis added).  Mr. Gem did not state that central banks are the *only* entities that typically invest in these securities, nor is that relevant. What is relevant is the undisputed fact that *other central banks invested in these very same securities.*

Further, while Plaintiffs contend that Mr. Gem "has no personal knowledge regarding the purposes behind *Bank Markazi's* investment in the [Restrained Bonds]," Plaintiffs do not (and could not credibly) contend that Mr. Gem lacks personal knowledge with respect to central bank investments *generally* in light of his position and professional experience at Clearstream. *See* Pls.' Br. at 41 n.18 (emphasis added).  Indeed, as Mr. Gem testified, "Clearstream's customers are uniquely banks, central banks and financial institutions." 6/27/08 Hrg. Tr.  (Lindsey Decl. Ex. E), at 22.

Having thus conceded that "[Bank] Markazi invested in legitimate assets"[27] by acquiring and holding the Restrained Bonds, Plaintiffs seek to avoid the sole relevant inquiry under FSIA section 1611(b)(1) and *NML Capital*—whether Bank Markazi used the Restrained Bonds for central banking purposes—by leveling a host of other allegations against Bank Markazi that are not probative of the purpose for which the Bank used *these specific assets.*

The following five examples demonstrate that Plaintiffs' allegations are not probative of whether Bank Markazi used the Restrained Bonds as an investment of the Bank's foreign currency reserves:

- Bank Markazi's alleged "inability to pledge" the Restrained Bonds purportedly "supports Plaintiffs' contention that the funds actually belong to Iran itself."[28]

- By "inserting UBAE into the middle of [Bank] Markazi's bond transactions," Bank Markazi purportedly sought to "impede collection efforts by Iran's creditors and the ability of the U.S. and foreign governments to sanction [Bank] Markazi and Iran."[29]

- The U.S. State and Treasury departments have stated that Bank Markazi has "assist[ed] Iran's financing of terrorism and nuclear weapons proliferation and evasion of U.S. and international sanctions."[30]

- Executive Order 13599 was issued "in light of the deceptive practices of the Central Bank of Iran and other Iranian banks to conceal transactions of sanctioned parties, the deficiencies in Iran's anti-money laundering regime and the weaknesses in its implementation, and the continuing and unacceptable risk posed to the international financial system by Iran's activities."[31]

- Bank Markazi purportedly has a "practice of commingling foreign currency reserves with funds it uses as the commercial banker for sales of Iranian oil and as the funding source for Iran's illicit efforts to develop WMDs and to support international terrorism."[32]

---

[27]  Pls.' Br. at 42.

[28]  Pls.' Br. at 43.

[29]  Pls.' Br. at 40.

[30]  Pls.' Br. at 39.

[31]  Pls.' Br. at 39; *see* Executive Order 13599, Preamble (Lindsey Decl. Ex. B), at 1.

[32]  Pls.' Br. at 42.

Even accepted as true for purposes of this Motion, none of these allegations goes to the issue of whether these specific Restrained Bonds constituted an investment of Bank Markazi's currency reserves.  Indeed, only the first two allegations are even directed at these assets, and neither is relevant to the immunity inquiry under FSIA section 1611(b)(1) and *NML Capital*.

*First*, as demonstrated in the Bank Markazi Motion Opening Brief, Plaintiffs' allegation that the Restrained Bonds should be deemed to "belong to Iran itself" is irrelevant as a matter of law under *NML Capital*.  The Second Circuit made clear that "traditional activities of central banks" such as "investing reserves" are all "functions which defy any attempt to divide the interest of the central bank from that of the state it serves." *NML Capital*,  652 F.3d at 192-93. Congress thus understood "that central bank property could be viewed as the property of a foreign state, *and nonetheless be immune from attachment.*"  *Id.* at 189 (emphasis added). Accordingly, it makes no difference "whether a given . . . central bank investment is conducted for the 'advantage' of the central bank, or that of its parent state." *Id.* at 193.

*Second*, Plaintiffs' allegations concerning Bank Markazi's purported efforts to avoid seizure of the Restrained Bonds by private plaintiffs or foreign governments are not relevant to whether the Bank used those assets for central banking purposes.  Indeed, in the underlying district court opinion in *NML Capital*, the court had found that Argentina had engaged in a veritable "shell game" to avoid judgment creditors' efforts to collect on their judgments and described Argentina's behavior as "an exercise of sheer willful defiance of the obligations of the Republic to honor the judgments of a federal court." *EM Ltd. v. Republic of Argentina*, 720 F. Supp. 2d 273, 280, 304 (S.D.N.Y. 2010), *vacated and remanded*, 652 F.3d 172 (2d Cir. 2011).

On appeal, the Second Circuit made clear that it "share[d] the District Court's understandable irritation" and "underst[oo]d the frustration of the plaintiffs who [were]

attempting to recover on judgments they ha[d] secured." *NML Capital,* 652 F.3d at 196.  Yet the Second Circuit was unequivocal that courts "must respect the [FSIA's] strict limitations on attaching and executing upon assets of a foreign state" in any action involving sovereign property. *Id.*

Plaintiffs' remaining allegations identified above are all directed at Bank Markazi (and Iran) generally and do not speak to the issue of whether Bank Markazi used *these specific assets* for central banking purposes.  Instead, Plaintiffs urge the Court to infer from their generalized allegations that Bank Markazi has engaged in illicit activity that the Bank *might have* used the Restrained Bonds for illicit purposes—and to ignore their inability to allege any specific facts to support that theory.[33]

Respectfully, however, it is not Bank Markazi's burden on this Motion to "prove" that it used the Restrained Bonds for central banking purposes as Plaintiffs contend.[34]  Nor can Plaintiffs overcome this Motion by insisting that it is *possible* that Bank Markazi *might have* used the Restrained Bonds for other purposes.  That argument fails to satisfy even the threshold showing of "plausibility" required to overcome any motion to dismiss.  *Iqbal,* 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between *possibility* and *plausibility* of entitlement to relief.").[35]

---

[33]  Plaintiffs' argument that Bank Markazi is not a "legitimate" central bank, and that the Restrained Bonds therefore should not be deemed immune *even if* they meet the statutory criteria for immunity under FSIA section 1611(b)(1) and *NML Capital* is meritless. *See* Pls.' Br. at 43-44.  Nothing in the FSIA nor *NML Capital* limits the scope of immunity under FSIA section 1611(b)(1) in the manner Plaintiffs suggest.

Further, Plaintiffs' "legitimacy" argument is not entitled to the presumption of truthfulness applicable to factual allegations on this Motion. *See Papasan v. Allain,* 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.").

[34]  *See* Pls.' Br. at 40.

[35]  (internal quotations and citation omitted) (emphasis added).

More importantly, the *possibility* that Bank Markazi might have invested in these U.S. dollar-denominated government bonds—which other central banks, whose "legitimacy" Plaintiffs do not question, likewise chose to invest in—for purposes other than as an investment of the Bank's foreign currency reserves does not come close to satisfying Plaintiffs' burden under *NML Capital* of "*demonstrating with specificity* that the funds are not being used for central banking functions as such functions are normally understood[.]" *NML Capital,* 652 F.3d at 194 (emphasis added).

In sum, Plaintiffs "have not rebutted the presumption that the [Restrained Bonds] were immune from attachment because there is no indication that they were being used for anything other than traditional central bank functions." *EM Ltd.,* 2012 WL 1028109, at *9. The Complaint must be dismissed.

4.     <u>Under *NML Capital,* Plaintiffs' Alter Ego Allegations are Irrelevant as a Matter of Law</u>

Plaintiffs do not (and cannot) contest the Second Circuit's unequivocal holding in *NML Capital* that the "fact that 'a relationship of principal and agent [has been] created' between the foreign state and its central bank under *Bancec is irrelevant*" to immunity under section 1611(b)(1). *NML Capital,* 652 F.3d at 188 (quoting *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983) ("*Bancec*")) (emphasis added, second alteration in original).[36]

Yet in direct contravention of this unambiguous, controlling precedent, Plaintiffs still cling to their theory that "Iran 'so extensively controlled' [Bank] Markazi 'that a relationship of

---

[36] As the Second Circuit explained, the *Bancec* analysis does not govern the immunity of central bank property because the FSIA does not treat "foreign central banks . . . as generic 'agencies and instrumentalities' of a foreign state." *NML Capital,* 652 F.3d at 188. Instead, section 1611(b)(1) extends "special protections" to foreign central banks "befitting the particular sovereign interest in preventing the attachment and execution of central bank property." *Id.* (internal quotation and citation omitted).

principal and agent' existed between the two entities."[37]   Plaintiffs' only response to *NML Capital* consists of an entirely circular argument that *NML Capital* should not control here because "[FSIA] § 1611(b)(1) has no bearing upon this action[.]"[38]

Thus, Plaintiffs simply ignore Bank Markazi's showing, in the Bank's Opening Brief and in this Reply, that the Restrained Bonds meet all of the statutory requirements for immunity under FSIA section 1611(b)(1).   Under *NML Capital,* therefore, the Restrained Bonds are *presumed to be* immune from attachment and execution, and Plaintiffs have failed to rebut that presumption.  The Complaint must be dismissed.

> B.   The Special Protection the FSIA Extends to Central Bank Property in Section 1611(b)(1) Overrides TRIA Section 201

As Plaintiffs acknowledge, the conflict between the competing "notwithstanding" clauses in TRIA section 201 and FSIA section 1611(b) must be resolved by applying basic rules of statutory construction.[39]   Application of those rules here confirms that FSIA section 1611(b)(1)—as the more specific provision extending "special protections" to foreign central property "befitting the *particular sovereign interest* in preventing the attachment and execution" of such property[40]—must take precedence over TRIA section 201, which by its plain terms applies generically to the "blocked assets of" a "terrorist party."

The fundamental rule of statutory construction that a newer, but more general, statute does not abrogate an earlier, but more specific, one compels that result.  *See Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153 (1976) ("It is a basic principle of statutory construction

---

[37]   Pls.' Br. at 55.

[38]   Pls.' Br. at 55.

[39]   *See* Pls' Br. at 34.

[40]   *NML Capital,* 652 F.3d at 188.

that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.").

Plaintiffs' argument in opposition that TRIA section 201, rather than FSIA section 1611(b)(1), should be deemed the more specific provision because the former applies only to a narrow category of *claims*—namely "claim[s] based upon an act of terrorism, or for which a terrorist party is not immune under 28 U.S.C. §§ 1605(a)(7) (repealed) or 1605A"—misapprehends the structure of the FSIA's attachment and execution provisions in sections 1609-1611.[41] Those provisions of the FSIA focus principally on the nature of the *property* in question, not the nature of the underlying claim.

Thus, as the heading of FSIA section 1610 indicates, that provision is concerned with "*[e]xceptions to the immunity from attachment or execution*" to which sovereign property is presumptively entitled under FSIA section 1609. And, as the heading of FSIA section 1611 makes clear, the latter provision is concerned with "*[c]ertain types of property immune from execution*" notwithstanding the exceptions to immunity enumerated in FSIA section 1610.

In sum, therefore, section 1611 establishes certain narrowly tailored "exceptions to the exceptions" to immunity from attachment and execution. Accordingly, while TRIA section 201 creates an exception to sovereign immunity with respect to the "blocked property" of a "terrorist party," the immunity of central bank property pursuant to section 1611(b)(1)—an exception to that exception and thus the more specific provision—must control.

Further, Plaintiffs have not even attempted to rebut Bank Markazi's showing in its opening brief that "the [legislative] history suggests that Congress placed the "notwithstanding" clause in [TRIA] § 201(a)" not, as Plaintiffs contend, to override the "exceptions to the

---

[41] Pls.' Br. at 35 (quoting TRIA section 201(a)).

exceptions" to immunity in FSIA section 1611, but instead "to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment." *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009).[42]

Indeed, there is no indication that Congress, when it enacted TRIA section 201, gave any consideration at all to the immunity of central bank property. Thus, Congress cannot be presumed to have intended to abrogate that "exception to the exception," which it carefully considered when it enacted the FSIA.[43] As the United States Supreme Court has explained:

> [W]hen the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all.

*Radzanower*, 426 U.S. at 153 (internal citations omitted). Here, not even Plaintiffs claim, nor could they, that it is "absolutely necessary" for TRIA section 201 to override the limited exceptions enumerated in FSIA section 1611 in order for "its words [to] have any meaning at all." *Id.*

Finally, the cases Plaintiffs cite in opposition do not support their claim that "courts have applied the more recent legislation even where the earlier statute contained a 'notwithstanding' clause and the more recently enacted statute did not."[44] Thus, in *GP-UHAB Hous. Dev. Fund*

---

[42] *See* Bank Markazi Motion Br. at 45.

[43] *See* H.R. REP. No. 94-1487, at 31 (1976) ("Section 1611(b)(1) provides for the immunity of central bank funds from attachment or execution. It applies to funds of a foreign central bank or monetary authority which are deposited in the United States and 'held' for the bank's or authority's 'own account'[.]").

[44] Pls' Br. at 34 (internal quotation omitted).

*Corp. v. Jackson*, No. CV-05-4830 (CPS), 2006 WL 297704 (E.D.N.Y. Feb. 7, 2006) the court

unremarkably applied a *later-enacted statute* containing a "notwithstanding" clause to override

an earlier statute containing no such clause. *GP-UHAB*, 2006 WL 297704, at *9.[45]   And in *In*

*re Morrissey*, 717 F.2d 100 (3d Cir. 1983), the Third Circuit Court of Appeals determined that

the later statute, prohibiting district courts from referring a bankruptcy appeal to a magistrate

judge, prevailed over an earlier statute permitting district courts to generally refer all matters to

magistrate judges.   The Third Circuit "read [the later statute] as an attempt by Congress to

*specifically limit* [the earlier statute's] originally pervasive applicability."   *In re Morrissey*, 717

F.2d at 103 n. 4. (emphasis added).   In contrast, section 1611(b)(1) raises no such issue of

"pervasive applicability."

> ### IV.   Should the Court Determine That the Restrained Bonds *are* "Assets Of" Bank Markazi, then it Must Vacate the Restraints Because Bank Markazi's Property is Immune from both *Pre*-Judgment and *Post*-Judgment Attachment under FSIA Section 1611(b)(1)
>
> > #### A.   Bank Markazi's Property is Immune from *Post-Judgment* Attachment, and Article XI, Section 4 of the Treaty of Amity Does Not Waive That Immunity
> >
> > > #### 1.   Under New York Law, a Judgment Creditor May Not Restrain the Property of Even a *Non-Sovereign* Party Alleged to Be an Alter Ego of the Judgment Debtor By Means of a *Post-Judgment* Attachment

As demonstrated in the Bank Markazi Motion Brief, even in an ordinary enforcement

action not arising under the FSIA and not implicating any sovereign party or property, New York

law does not allow a judgment debtor to restrain the property of a third party alleged to be an

---

[45]   In any event, the court in *GP-UHAB* ruled as it did because Congress *specifically* narrowed the scope of the earlier statute in the later-enacted statute so as to limit the automatic renewal of federal housing funding to a specific category of properties.   *Id.*   Thus, the court reasoned, "had Congress believed that the [the earlier statute] mandated automatic renewal of project based funding for all [Government] owned properties . . . it would not have needed to *specify* that project based funding must be renewed in properties occupied primarily by elderly or disabled families." (emphasis added).

alter ego of the judgment debtor by means of a *post-judgment* attachment pursuant to C.P.L.R. § 5222. *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.*, 295 F. Supp. 2d 366, 393 (S.D.N.Y. 2003) ("*JSC I*").

As Judge Koeltl explained in *JSC I*, "[a]lthough the plaintiff may attempt to prove the alter ego liability of [alleged alter egos] as part of a judgment enforcement proceeding, their assets may not be restrained pursuant to [C.P.L.R. §] 5222 until their alleged alter ego status has been adjudicated and their liability for the previous judgment determined." *Id.* In other words, a judgment creditor may not use a restraining notice under C.P.L.R. § 5222 "as an end-run around the requirements of the prejudgment attachment statutes." *Id.* Yet that is precisely what Plaintiffs have done here.

None of the authority cited by Plaintiffs in opposition is to the contrary.[46] Thus, in *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. And Trade Servs.*, 306 F. Supp. 2d 482 (S.D.N.Y. 2004) ("*JSC II*"), Judge Koeltl granted the judgment creditor's motion for a *pre-judgment* attachment pursuant to C.P.L.R. § 6201(3) against the assets of alleged alter egos of the judgment debtor. *See id.* at 484-85 (attachment pursuant to C.P.L.R. § 6201(3) is a discretionary "provisional remed[y]").[47] *JSC II* is therefore entirely consistent with Judge Koeltl's prior conclusion in *JSC I* that a *post-judgment* attachment is not available against assets of an alleged alter ego.

As for *Gadsby & Hannah v. Socialist Republic of Romania*, 698 F. Supp. 483 (S.D.N.Y. 1988), Judge Preska recently found that the statement by the court there that assets of a state-

---

[46] *See* Pls.' Br. at 56.

[47] *See generally Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 538 (2009) ("[In a C.P.L.R.] article 62 attachment proceeding, . . . a creditor effects the *prejudgment seizure* of a debtor's property, to be held by the sheriff, so as to apply the property to the creditor's judgment if the creditor should prevail in court.") (emphasis added).

owned Romanian bank "would seem" to be attachable to satisfy a judgment against Romania is pure *dicta*. *Id.* at 486; *see Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 275 (S.D.N.Y. 2010) (the *Gadsby* court's "statements regarding the possible attachment of [the Romanian bank]'s assets in the future were mere *dicta*").[48]

        2.        Article XI, Section 4 of the Treaty of Amity Does Not Waive the Immunity of Bank Markazi's Property from *Post-Judgment* Attachment

Plaintiffs contend that Bank Markazi is not entitled to any of the *rights and protections* enumerated in the Treaty of Amity.[49] Yet Plaintiffs purport to rely on a different provision in the same Treaty—Article XI, Section 4—as the basis for their theory that Iran should be deemed to have waived the immunity of Bank Markazi's property from attachment and execution.[50]

Plaintiffs' waiver theory fails. Article XI, Section 4 does not come close to meeting the requirements for an effective waiver of immunity of central bank property from post-judgment attachment and execution under FSIA section 1611(b)(1). In order to be effective, any such waiver of immunity must be *explicit*.[51] Thus, a waiver of immunity under FSIA section 1611(b)(1) "must be *clear and unambiguous*" and must "specifically embrace[]" the foreign central bank and its property. *NML Capital*, 652 F.3d at 195 (internal quotation and citations omitted) (emphasis added).

---

[48]   *Bingham v. Zolt*, 231 A.D.2d 479 (1st Dep't 1996), also cited by Plaintiffs, is inapposite because the judgment creditor in that case did not seek to restrain *the assets of a third party* on an alter ego theory. Further, the restraining notice in *Bingham* was based on actual evidence (not unsubstantiated allegations), including "[d]eposition testimony and documentation."

[49]   Pls' Br. at 24.

[50]   *See* Pls.' Br. at 44-47.

[51]   *See* 28 U.S.C. § 1611(b)(1) (the property "of a foreign central bank of monetary authority held for its own account [is immune] *unless* such bank or authority, or its parent government, has *explicitly waived* its immunity from attachment in aid of execution, or from execution[.]") (emphasis added).

On its face, Article XI, Section 4 meets none of these requirements.  That provision reads as follows:

> No *enterprise* of either High Contracting Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, *if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party*, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.[52]

Even a cursory review of Article XI, Section 4 reveals that it does not contain a "clear and unambiguous*"* waiver that "specifically embraces" Bank Markazi and its property.  As a result, Article XI, Section 4 cannot waive the immunity of Bank Markazi's property from attachment and execution under FSIA section 1611(b)(1).

Further, all of the relevant factors governing the interpretation of a treaty provision such as Article XI, Section 4—the text of the provision itself, the history of the treaty as well as basic rules of construction—unequivocally support the conclusion that Bank Markazi is not subject to Article XI, Section 4.[53]

---

[52]  Treaty of Amity, Economic Relations, and Consular Rights, U.S.-Iran, Art. XI, § 4, Aug. 15, 1955, 8 U.S.T. 899, 909, T.I.A.S. No. 3853 (Lindsey Decl. Ex. D) (emphasis added).

[53]  The United States Supreme Court has provided the following guidance for the interpretation of treaty provisions such as Article XI, Section 4 here:

> When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used.  Other general rules of construction may be brought to bear on difficult or ambiguous passages.  Treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.

*Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699-700 (1988) (internal quotations and citations omitted).

Indeed, Article XI, Section 4 does not purport to waive immunity from execution as to the property of *all* "government agencies and instrumentalities," but instead only as to the property of a *specific subset* of "government agencies and instrumentalities" (along with "corporations" and "associations") that fall within the scope of the provision because they are (1) "enterprise[s] . . . engage[d] in commercial, industrial, shipping or other business activities" (2) "within the territories of the other High Contracting Party," *i.e.,* Iran or the United States.

Bank Markazi is not subject to Article XI, Section 4 because it is not an "enterprise . . . engage[d] in commercial, industrial, shipping or other business activities," nor does it engage in any such business activities "within the territories of" the United States.

a.   Bank Markazi is Not an "Enterprise" Engaged in "Commercial, Industrial, Shipping or Other Business Activities"

As the Second Circuit has explained, the immunity waiver provisions contained in a series of friendship treaties dating back to the 1940s and 1950s—including Article XI, Section 4 here—were designed to waive the immunity of "*state-controlled enterprises engaged in business activities*[.]" *Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes,* 336 F.2d 354, 358 (2d Cir. 1964) (emphasis added).[54] Thus, the immunity waiver provision in Article XI, Section IV is concerned with state-owned *commercial enterprises,* not sovereign instrumentalities that serve a governmental purpose.

---

[54]   As the Second Circuit explained:

> After World War II the United States began to restrict immunity by negotiating treaties obligating each contracting party to waive its sovereign immunity for state-controlled enterprises engaged in business activities within the territory of the other party. Fourteen such treaties were negotiated by our State Department in the decade 1948 to 1958.

*Id.,* 336 F.2d at 357-58.

Among the "business activities" that an "enterprise" within the scope of Article XI, Section 4 might engage in are "commercial, industrial [or] shipping" activities. Thus, the "commercial" activities referenced in Article XI, Section 4 must be comparable in nature to the other types of "business activities" referenced there, namely "industrial" or "shipping" activities.[55] Plainly, central banking activities such as investing currency reserves are not remotely comparable to the "commercial, industrial, shipping or other business activities" that Article XI, Section 4 is concerned with. Rather, central banking activities serve an important *governmental* purpose.

Importantly, the "commercial" activities referenced in Article XI, Section 4 are not to be confused with the "commercial activity" exception to immunity under the FSIA. The FSIA— enacted more than twenty years *after* the Treaty of Amity was negotiated—does not determine the meaning of the immunity waiver provision *in the Treaty*. *See Gibbons v Udaras na Gaeltachta*, 549 F. Supp. 1094, 1107 n.4 (S.D.N.Y. 1982) (the drafters of pre-FSIA immunity waiver provisions "intended that they be interpreted *in accord with the then-prevailing method* for determining the commerciality of a foreign state's activity.") (emphasis added).

Instead, the immunity waiver provisions in the various friendship treaties reflect the drafters' understanding that "immunity would be allowed where the foreign state's activity was designed *to serve an important public purpose,* but denied if the purpose of the foreign state's activity was primarily pecuniary." *Id.* (emphasis added).[56]

---

[55] *See, e.g., Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 575 (1995) (under the "doctrine of *noscitur a sociis," i.e.,* the rule of construction "that a word is known by the company it keeps," courts should "avoid ascribing to one word [in a statute] a meaning so broad that it is inconsistent with its accompanying words").

[56] *See generally* Vernon Setser, *The Immunity Waiver for State-Controlled Business Enterprises in United States Commercial Treaties,* 55 PROC. AM. SOC. INT'L L. 89 (1961). A copy of this article is attached as <u>Exhibit G</u> to the June 22, 2012 Declaration of David M. Lindsey.

Congress later codified a far more expansive definition of non-immune "commercial activity," known as the "restrictive theory" of sovereign immunity, in the FSIA.[57]   The relevant inquiry under the FSIA is "*not* whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives but rather whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek,* 600 F.3d 171, 177 (2d Cir. 2010) (internal quotation omitted, emphasis added).

Thus, the FSIA focuses not on the *purpose* of a sovereign entity's act—*i.e.,* whether that purpose is governmental or commercial—but instead considers only the *nature* of the particular act—*i.e.,* whether it is the type of act a private party engaged in commerce might also take.  As a result, the FSIA "significantly broadened" the scope of activities that are deemed commercial. *Gibbons,* 549 F. Supp. at 1107 n.4.   But the far more expansive definition of "commercial activity" in the FSIA has no bearing on the interpretation Article XI, Section 4 here—an immunity waiver provision in a *treaty* that pre-dates the FSIA by more than 20 years.[58]

Thus, the court in *Gibbons* interpreted a virtually identical immunity waiver provision in the friendship treaty with Ireland in accordance with the substantially narrower definition of "commercial activity" prevailing at the time the treaty was negotiated.  The plaintiffs in *Gibbons*

---

[57]   The "restrictive theory of sovereign immunity . . . recognizes immunity with regard to sovereign or public acts (*jure imperii*) of a state, but not . . . private acts (*jure gestionis*)." *Permanent Mission of India to the United Nations v. City of New York,* 551 U.S. 193, 194 (2007) (internal quotation and citation omitted).

[58]   *Republic of Argentina v. Weltover,* 504 U.S. 607, 614 (1992) and *NML Capital, Ltd. v. Republic of Argentina,* --- F.3d ----, 2012 WL 1059073, at *4 (2d Cir. Mar. 30, 2012), relied on by Plaintiffs, are thus inapposite because both cases speak to the issue of what constitutes "commercial activity" *under the FSIA*—as opposed to "commercial activities," defined as a subset of "business activities," under Article XI, Section 4 *of the Treaty.*

asserted claims against two instrumentalities of the Republic of Ireland engaged in industrial development activities under a joint venture agreement.

Yet *despite* finding that the activities the Irish instrumentalities were engaged in constituted "commercial activity" within the meaning of FSIA section 1605(a)(2), the *Gibbons* court concluded that those activities did not trigger the immunity waiver provision in the friendship treaty because they were "undertaken for an *important governmental purpose* (*i.e.,* the development of Ireland's industrial capacity), and in no sense [we]re engaged in for profit or pecuniary gain." *Gibbons,* 549 F. Supp. at 1107 n.4 (emphasis added).

Applying that analysis here, a central bank's investment of foreign currency reserves plainly serves an "important governmental purpose" and thus does not constitute "commercial" activity under the Treaty.

     b.  <u>Bank Markazi Conducts No "Business Activities" (Indeed, No "Activities" of Any Kind) "Within the Territories of" the United States</u>

In light of the plain language in Article XI, Section 4 limiting the scope of that provision to enterprises engaged in "business activities *within the territories of*" the United States, courts have consistently found that a waiver under Article XI, Section 4 arises only where a state-owned Iranian enterprise is "doing business" in the United States.[59]   As one court noted, the drafters' intent was that the immunity waiver provisions in the various friendship treaties would apply to "foreign state-owned enterprises *expanding their operation into the United States*[.]"

---

[59]   *See Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 452 (D.C. Cir. 1990) (the "limited waiver" in the Treaty of Amity "extends only to enterprises 'doing business' in the United States"); *Berkovitz v. Islamic Republic of Iran,* 735 F.2d 329, 333 (9th Cir. 1984) (waiver provision in Treaty of Amity had "no application to jurisdiction over [a] wrongful death action" where plaintiffs did "not allege[] liability on the part of any Iranian enterprise doing business in the United States").

*Chicago Bridge & Iron Co. v. Islamic Republic of Iran*, 506 F. Supp. 981, 984 (N.D. Ill. 1980) (emphasis added).[60]

The decision by a court in this district in *Calgarth Investments, Ltd. v. Bank Saderat Iran*, 95 civ. 5332 (MBM), 1996 WL 204470, at *3 (S.D.N.Y. Apr. 26, 1996), *aff'd*, 108 F.3d 329 (2d Cir. 1997) illustrates the type of "business activities" in the United States that give rise to a waiver of immunity under Article XI, Section 4.  In that case, Judge Mukasey found that "the conditions of the waiver provision [we]re satisfied" where the defendant, a state-owned Iranian commercial bank, admitted "that it is licensed to do business in New York." *Id.*

Here, by contrast, Bank Markazi plainly is not "doing business" in the United States.  For this reason, too, Plaintiffs' waiver theory fails.

3.  FSIA Section 1610(g) Provides No Basis for a *Post-Judgment* Attachment of Bank Markazi's Property Because Section 1611(b)(1) Immunizes Central Bank Property from Attachment and Execution "Notwithstanding the Provisions of Section 1610"

Plaintiffs fair no better with their argument that the subset of Plaintiffs who have obtained judgments against Iran pursuant to FSIA section 1605A may attach and execute upon the Restrained Bonds under FSIA section 1610(g).[61]  That argument directly contravenes the plain wording of FSIA section 1611(b), which provides that immunity under that provision of the FSIA, including the immunity of central bank property under FSIA section 1611(b)(1), controls "[n]otwithstanding the provisions of section 1610 of this chapter[.]" 28 U.S.C. § 1611(b).[62]

---

[60]  *See* Setser, *The Immunity Waiver for State-Controlled Business Enterprises in United States Commercial Treaties* at 99 (Lindsey Decl. Ex. G) (waiver provisions apply only where a "state-controlled enterprise" is "*present* by reason of its *having an establishment* within the other party's territories") (emphasis added).

[61]  According to Plaintiffs, the *Valore*, *Heiser* and *Acosta* Plaintiffs have obtained such judgments pursuant to FSIA section 1605A.

[62]  The mere fact that FSIA section 1610(g) is a newer provision of the FSIA does not mean that section 1610(g) trumps the plain language of FSIA section 1611(b) providing that immunity under that

B.    The Immunity of Bank Markazi's Property from *Pre-Judgment* Attachment Cannot Be (and Has Not Been) Waived

Plaintiffs do not contest that the immunity of central bank property from pre-judgment attachment pursuant to FSIA section 1611(b)(1) *cannot be waived.*[63]   Nor does Article XI, Section 4 of the Treaty waive immunity from pre-judgment attachment—even as to the "enterprises" engaged in "business activities within the territories of the other High Contracting Party" to which Article XI, Section 4 applies.  *See* Point IV.A.2, *supra.*

Thus, in *O'Connell Machinery Co. v. M.V. Americana,* 734 F.2d 115, 117 (2d Cir. 1984), the Second Circuit held that virtually identical language in a provision contained in the friendship treaty with Italy providing for a waiver of immunity "from suit, from execution of judgment, or from any other liability to which a privately owned and controlled enterprise is subject" did not constitute a waiver of immunity from *pre-judgment* attachment.  *O'Connell Machinery Co.,* 734 F.2d at 117 (describing this holding as "in accord with the great weight of authority").

The Second Circuit's holding in *O'Connell Machinery* is controlling here and precludes any argument that Article XI, Section 4 provides for a waiver of immunity from pre-judgment attachment.

---

provision controls "[n]otwithstanding the provisions of section 1610 of this chapter[.]"  28 U.S.C. § 1611(b).  *See supra,* Point III.B.

[63]    *See* Bank Markazi Motion Br. at 42-43; *Weston Compagnie de Finance Et D'Investissement, S.A. v. La República del Ecuador,* 823 F. Supp. 1106, 1111 (S.D.N.Y. 1993) (Congress had good reason "not to provide for waiver of prejudgment attachment of property of central banks held for their own account, and . . . it did not, in fact do so.").

## CONCLUSION

For all of the foregoing reasons and the reasons previously stated in Bank Markazi's March 15, 2012 Memorandum of Law, Bank Markazi respectfully requests that the Court grant the Bank Markazi Motion and accordingly dismiss the Second Amended Complaint with prejudice.

Dated:        New York, New York
              June 22, 2012

              Respectfully Submitted,

              _____
              David M. Lindsey
              James M. Hosking
              Andreas A. Frischknecht
              Yasmine Lahlou

              **CHAFFETZ LINDSEY LLP**
              505 Fifth Avenue, 4th Floor
              New York, NY 10017
              Tel. (212) 257-6960
              Fax (212) 257-6950
              david.lindsey@chaffetzlindsey.com
              www.chaffetzlindsey.com

              *Attorneys for Defendant Bank Markazi*