# EXHIBIT G



American Society of International Law

THE IMMUNITY WAIVER FOR STATE-CONTROLLED BUSINESS ENTERPRISES IN UNITED STATES COMMERCIAL TREATIES
Author(s): Vernon G. Setser
Reviewed work(s):
Source: *Proceedings of the American Society of International Law at Its Annual Meeting (1921-1969)*, Vol. 55 (APRIL 27-29, 1961), pp. 89-105
Published by: American Society of International Law
Stable URL: http://www.jstor.org/stable/25657519

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.



*American Society of International Law* is collaborating with JSTOR to digitize, preserve and extend access to *Proceedings of the American Society of International Law at Its Annual Meeting (1921-1969)*.

http://www.jstor.org

## FOURTH SESSION

### Friday, April 28, 1961, at 2:00 p.m.

PANEL I: CURRENT DEVELOPMENTS IN THE LAW OF SOVEREIGN IMMUNITY

The session reconvened at 2:00 o'clock p.m. in the East Room of the Mayflower Hotel. Mr. Adrian Fisher, Chief Reporter, American Law Institute's Restatement on the Law of Foreign Relations, presided.

The CHAIRMAN, in introduction, stated that the current developments in the field of foreign sovereign immunity have a common point of departure in the so-called Tate letter sent out in 1952 by the Acting Legal Adviser of the Department of State to the Acting Attorney General of the United States. This letter announced *in vacuo* a change in the policy of the Department of State not to issue suggestions of immunity to courts in the United States in suits involving commercial activities by a foreign sovereign. Hitherto there had been no judicial recourse available, but redress was through diplomatic channels. The departure from the normal procedure in making such an announcement *in vacuo* was due to the diplomatic overtones which at the time posed serious problems with respect to certain countries.

## THE IMMUNITY WAIVER FOR STATE-CONTROLLED BUSINESS ENTERPRISES IN UNITED STATES COMMERCIAL TREATIES

BY VERNON G. SETSER [*]

*Bureau of Economic Affairs, Department of State*

In the 1948–1958 decade, the Department of State negotiated fourteen treaties containing a provision obligating each contracting party to waive sovereign immunity for state-controlled enterprises engaged in business activities within the territories of the other.[1] A typical such provision

---

[*] The views expressed here are personal—in no sense an official statement of the Department of State.

[1] The treaties follow, with the number of the article and paragraph containing the immunity waiver added after the citation. Italy, 1948 (63 Stat. (Pt. 2) 2225, Art. XXIV-6); Uruguay, 1949, not in force (S. Exec. D, 81st Cong., 2d Sess., Art. XVIII-5); Ireland, 1950 (1 U.S. Treaties 785, Art. XVIII-2); Colombia, 1951, not in force (S. Exec. M, 82nd Cong., 1st Sess., Art. XVIII-2); Greece, 1951 (5 U.S. Treaties 1829, Art. XIV-5); Israel, 1951 (5 U.S. Treaties (Pt. 1) 550, Art. XVIII-3); Denmark, 1951 (T.I.A.S., No. 4797; S. Exec. I, 82nd Cong., 2d Sess., Art. XVIII-3); Japan, 1953 (4 U.S. Treaties (Pt. 2) 2063, Art. XVIII-2); Federal Republic of Germany, 1954 (7 U.S. Treaties 1839, Art. XVIII-2); Haiti, 1955, not in force (S. Exec. H, 84th Cong., 1st Sess., Art. XVIII-2); Iran, 1955 (8 U.S. Treaties 899, Art. XI-4); Nicaragua, 1956 (9 U.S. Treaties 449, Art. XVIII-3); Netherlands, 1956 (8 U.S. Treaties 2043, Art. XVIII-2); Korea, 1956 (8 U.S. Treaties 2217, Art. XVIII-2).

appears in Article XVIII (paragraph 3) of the Friendship, Commerce and Navigation Treaty with Israel,[2] signed August 23, 1951:

> No enterprise of either Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, manufacturing, processing, shipping or other business activities within the territories of the other Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

Although note has been taken, usually in a favorable sense, in articles appearing in legal publications,[3] of these provisions, no extensive study or comment has been published to date on the question of how the provisions are to be understood and what they represent as concerns United States policy. It must be noted, of course, that the practice of including these provisions in the treaties was discontinued in 1958 for the reason that they were considered objectionable in certain quarters as endangering the ability of the Government to utilize the defense of sovereign immunity in suits in foreign courts against the United States. It is the purpose of the present paper to attempt to deal with the essential purport and policy implications of these provisions.

All of the provisions under consideration appear in the type of instrument generally known as the treaty of friendship, commerce and navigation. As regards the United States, this type of instrument, both in its traditional form and as recently revised and modernized, constitutes a body of assurances for the support of private enterprise. Such commercial treaties were extensively utilized by the United States in the 18th and 19th centuries for the protection of the private trader and his vessel when engaged in foreign trade,[4] generally against navigation laws and other types of interference by foreign nations with free competition on the high

---

[2] 5 U.S. Treaties (Pt. 1) 570; T.I.A.S., No. 2948.

[3] William W. Bishop, Jr., "New United States Policy Limiting Sovereign Immunity," 47 A.J.I.L. 96 (1953); Robert R. Wilson, "Postwar Commercial Treaties of the United States," 43 A.J.I.L. 272 (note) (1949); Robert R. Wilson, "A Decade of New Commercial Treaties," 50 A.J.I.L. 929 (1956); Herman Walker, Jr., "Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice," 5 A. J. Comp. Law 238 (1956); Jean-Flavien Lalive, "L'immunité de juridiction des états et des organisations internationales," 84 Hague Academy Recueil des Cours 238, 254, 274 (note), 280-281 (1953, III). See also the author's article, "The Immunities of the State and Government Economic Activities," 24 (Part I) Law and Contemporary Problems 299, 312 (1959).

[4] The early period of U.S. commercial treaty policy is covered in Setser, The Commercial Reciprocity Policy of the United States, 1774-1829 (Philadelphia, 1937), but for the period since then, it is necessary to consult numerous individual monographs, or the treaties and diplomatic correspondence. See, however, S. F. Bemis, Diplomatic History of the U.S., Chs. 17, 38 (N.Y., 1950). The most comprehensive work on the international law aspects of commercial treaties is R. R. Wilson, United States Commercial Treaties and International Law (New Orleans, 1960).

seas and in the trading ports of the world. In more recent years, the State Department has developed the commercial treaty primarily as a means of establishing rights for the private enterprise to set itself up and carry on business on foreign territory.[5]

The manner by which the commercial treaty seeks to accomplish its object of supporting private enterprise is by interposing bars to the more usual ways in which governments interfere with free competition by alien-owned concerns under their jurisdiction. One of the simplest methods of discrimination against the foreign investor, and one of those most commonly practiced, is to bar the entry of foreign enterprises into certain fields. Most of the recent United States commercial treaties limit that device by assuring entry of aliens into definite broad fields of enterprise upon equal terms with domestic enterprises. Another mode of discrimination is to make the burdens normally imposed by government a little heavier upon the alien than upon the national in certain respects, for example, in the field of taxation. Many detailed provisions of the treaties have the purpose of preventing this practice. Perhaps the gravest of all dangers to private enterprise in international investment and trade lies in state occupation of certain fields of economic endeavor. The treaties seek to provide viable conditions for private enterprise by assuring just compensation for private property when the state nationalizes, and to establish reasonable standards to govern state enterprises when operating in competition with private enterprises. It is in relationship with the thrust against state trading and state economic enterprise in general that the subject of sovereign immunity enters into the purview of the commercial treaty.

When the Department of State at the end of World War II embarked upon an extensive commercial treaty program, one of the most significant international facts of life to which it had to adjust its treaty projects was the almost universal growth of state activity in the economic field. The countries of Eastern Europe that had passed into the Soviet orbit, though not yet fully communized, were socializing industry at a rapid pace.[6] Extensive programs of nationalization were also being pursued in Western

[5] Dept. of State Pub. 6565, entitled "Commercial Treaty Program of the United States," January, 1958; Walker, "Treaties for the Encouragement and Protection of Foreign Investment," loc. cit.; Setser, "Treaties to Aid American Business Abroad," 40 Foreign Commerce Weekly 3 ff. (U.S. Dept. of Commerce, Sept. 11, 1950). Although numerous official statements have been made emphasizing the "private enterprise" purpose of commercial treaties, the policy statement contained in the Mutual Security Act of 1954, as amended, which is followed by a clause that provides that the President shall "accelerate a program of negotiation treaties of commerce and trade . . . which shall include provisions to encourage and facilitate the flow of private investments . . ." is sufficiently illustrative. 22 U. S. C. 1933.

[6] Miriam E. Oatman, "The Nationalization Program in Czechoslovakia," 15 Dept. of State Bulletin 1027–1031 (1946); Leon Goldenberg and Laure Metzger, "The Polish Nationalization Law," 15 Dept. of State Bulletin 651–654 (1946); "Private Enterprises Nationalized in Yugoslavia" (Press Release), 15 Dept. of State Bulletin 1150 (1946)

Europe, particularly by Great Britain[7] and by France.[8] The pattern was not localized in Europe, but was in evidence rather generally throughout the world. The program for treaty-making was obviously intended to be extended to all countries that would consider treaties. In some cases, however, specific agreements were made to enter into negotiations. Such agreements were made, for example, with France and Czechoslovakia in 1946.[9] In formulating treaty provisions for such countries, the Department's specialists could hardly have avoided giving attention to the problem created by the nationalization programs. Under the governing principle of mutuality, treaty rights for American private enterprises in Czechoslovakia, for example, had to be balanced with reciprocal rights for Czechoslovak enterprises in the United States. In 1946–48, there were still private enterprises in Czechoslovakia that might establish branches or subsidiaries in this country under the treaty, but what would be the situation as nationalization progressed, and the central enterprises that had established branches and subsidiaries in the United States passed into state control? Provision for the denial of immunity to such enterprises seemed quite pertinent to the subject matter of the proposed treaties.

A cursory reading of the immunity provision, when taken out of its context in the commercial treaty, may result in identification of it with the "restrictive theory," adoption of which by the Department of State was announced in 1952 in the letter from the Department's Acting Legal Adviser, Tate, to Acting Attorney General Perlman.[10] The commercial treaty provision (in the Treaty of Friendship, Commerce and Navigation with Italy), however, antedated the Tate letter by four years, and the two documents were designed for different purposes. The letter declares the policy of the Department to follow the restrictive theory in its own dealing with requests from other governments for a grant of sovereign immunity, the restrictive theory being defined as that under which "the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*)." The commercial treaty provision, on the other hand, is not at all concerned with the "private acts" of the sovereign generally, but only with establishing a rule to govern in the case of state entities that are counterparts of, and are in competition with, the enterprises to which treaty rights are accorded.

---

[7] William A. Robson, "The Public Corporation in Britain Today," 63 Harvard Law Rev. 1321–1348 (1950); William N. Loucks, Comparative Economic Systems 277–436 (N.Y., 1957).

[8] Henry P. De Vries and Berthold H. Hoeniger, "Post-Liberation Nationalizations in France," 50 Columbia Law Rev. 629 (1950).

[9] Byrnes-Blum agreement, May 28, 1946, 61 Stat. (4) 4175, 14 Dept. of State Bulletin 997 (1946); U.S.-Czechoslovak agreement relating to commercial policy, 61 Stat. (3) 2431, 15 Dept. of State Bulletin 1005 (1946). A treaty was not concluded with either country, however.

[10] The text of the Tate letter is in 26 Dept. of State Bulletin 984 (1952). See also W. W. Bishop, Jr., "New United States Policy Limiting Sovereign Immunity," 47 A.J.I.L. 96 (1953); Michael H. Cardozo, "Sovereign Immunity: the Plaintiff Deserves a Day in Court," 67 Harvard Law Rev. 608 (1954).

93

The treaty provision has a more limited and specific objective than the letter.

The typical United States commercial treaty of the group here under consideration has been developed as an integrated document, and the sovereign immunity provision may not properly be separated from the general context of the instrument.[11] The provisions having the most important relationship to the meaning of the immunity clause are those having to do with the admission by one party of the business enterprises of the other.[12] The article containing these may be considered the keystone of the treaty, with many of the succeeding articles related to it. Its clauses contain significant elements of definition of the principal terms used in the immunity provision. It sets forth that

> nationals and companies of either Party shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial and other activity for profit (business activities) within the territories of the other Party, whether directly or by agent or through the medium of any form of lawful juridical entity.

The succeeding sentence clarifies what to engage in business activities within the territories of the other Party means:

> Accordingly, such nationals and companies shall be permitted within such territories: (a) to establish and maintain branches, agencies, offices, factories and other establishments appropriate to the conduct of their business; (b) to organize companies under the general company laws of such other Party, and to acquire majority interests in companies of such other Party; and (c) to control and manage enterprises which they have established or acquired.

The concept of "enterprise" is then introduced:

> Moreover, enterprises which they control, whether in the form of individual proprietorships, companies or otherwise, shall, in all that relates to the conduct of the activities thereof, be accorded treatment no less favorable than that accorded like enterprises controlled by nationals and companies of such other Party.

The intended applicability of the waiver is governed by three key terms, or expressions, within the waiver provision itself. These terms or expressions are "enterprise," "engages in . . . activities within the territories of," and "business activities." The usage of these and similar terms elsewhere in the treaty and the general context of the treaty affect the conno-

---

[11] There is no better established canon of treaty interpretation than that which requires that a treaty be considered as a whole. 1 Oppenheim, International Law 953 (8th ed., 1955, edited by H. Lauterpacht); McNair, The Law of Treaties 198 (1938); Crandall, Treaties, Their Making and Enforcement 317 ff. (1916); 5 Hackworth, Digest of International Law 222-224.

[12] Art. VII, treaty with Israel. The development of the terminology of the treaties has been a continuing process since 1946, and, moreover, negotiating problems in the cases of individual countries have necessitated some variation in language from treaty to treaty. Consequently, not all of the relationships of the various provisions discussed here with reference to the treaty with Israel can be shown as conclusively for every other treaty. The fundamental rationale does not vary, however.

94

tation of these terms and supply additional interpretative factors of value for the understanding of the provision. These terms are considered in some detail in the succeeding paragraphs.

The term "enterprise" and the concept it represents were taken for treaty use from the literature of economics.[13] The borrowing from this source was only natural, since the commercial treaty is primarily concerned with matters in the field of economics. The word is associated with the concept of the *entrepreneur* (enterpriser), whose function is regarded by perhaps the majority of economists as one of the four factors of production (along with capital, labor, and land). The "enterprise" is the undertaking in which the *entrepreneur* (enterpriser) invests capital, for which he hires labor, utilizes land, and exercises his managerial skill—all in the hope of making a profit, and at the risk of loss. In treatise after treatise of a professional character, this concept of enterprise is developed, with the meaning easily discernible from the context.[14] In a number of cases, elements of definition of the term are clearly in evidence. The text by Gemmill and Blodgett, for example, contains the following:

> Since some business concerns have hundreds or thousands of part-owners, there are many more enterprisers than enterprises. But there are also, in this country, a great many business *enterprises, in the sense of separate and distinct business units.*[15]

Buchanan delimits his usage of the term in the following passage:

> A characteristic thing about the organization of production in capitalistic economies through the price system is that while the price system is the primary regulator of production the process is typically undertaken by productive combinations or entities called "firms" or "enterprises." That is, when we examine the structural organization of production in capitalistic economies we observe at once that it is business enterprises that hire labor, that undertake the production of new commodities, that introduce technological changes, that invest funds in real capital goods, etc. *The way in which production is in fact organized is typically not on a human individualistic basis but rather in somewhat larger producing units, called firms*, within which economic resources are applied in the production of products for sale in more or less well-organized markets.[16]

With reference to the words "firms" and "enterprise" used in this passage, the author appends the following explanatory footnote:

> The latter terms do not here imply any particular legal form of business entity such as the corporation, the partnership, the single

---

[13] In the treaty with Israel, for example, the term "enterprise" is employed in the following provisions: Art. I; Art. VI, pars. 4, 5; Art. VII, pars. 1, 2, 3, 4; Art. VIII, par. 1; Art. IX, par. 3; Art. XVII, par. 1; Art. XVIII, pars. 1, 2, 3.

[14] Examples are: W. H. Kiekhofer, Economic Principles, Problems and Policies 32 (N.Y., 1951); P. F. Gemmill and R. H. Blodgett, Economic Principles and Problems, Vol. I, p. 79 (2 vols., N.Y., 1948); J. T. Wendzel, the Dynamics of Capitalism 29–31 (N.Y., 1956); Norman S. Buchanan, The Economics of Corporate Enterprise 13 (N.Y., 1940); S. H. Schlichter, Modern Economic Society 134, 144 (N.Y., 1935).

[15] *Op. cit.* 79, italics supplied.  [16] *Op. cit.* 13, italics supplied.

proprietorship, etc., but merely refer to all such forms of business ownership organization. In the succeeding pages, we shall use the words "firm," "enterprise," "business enterprise" as synonyms.

It seems clear from the above, therefore, that the term "enterprise," when employed in a concrete sense in a context where there is reference to economic organization of a capitalistic order, as in the case in the treatises mentioned and in the typical United States commercial treaty, signifies the autonomous unit of economic organization in a free-enterprise economy.[17]

This concept of "enterprise" as developed by the economists has passed over into the vocabularies of writers who are members of the legal profession, a by no means surprising occurrence, since members of both professions must deal with the same phenomena. Lee Loevinger, in his *The Law of Free Enterprise*, utilizes a general summary of the nature and function of the "enterprise," under the heading "The Forms of Free Enterprise," as one of the bases for his exposition and analysis of the United States anti-trust legislation. His intended meaning in using the term is made clear in this paragraph:

> In a sense, each business enterprise is a combination of individuals. However, the term "business combination" commonly means a combination of separate enterprises. Numerous problems may arise in distinguishing between a single enterprise and a combination. *The general principle is that an individual legal or economic entity (proprietorship, partnership, association or corporation) constitutes a single enterprise, while business activities with separate formal organizations are separate enterprises.*[18]

In his learned article on "The Theory of Enterprise Entity," A. A. Berle develops in a more technical way the concept of "enterprise" as applicable to a more limited subject matter. The following quotation is illustrative:

> It is the thesis of this essay:
> That the entity commonly known as corporate entity takes its being from the reality of the underlying enterprise, formed or in formation;
> That the state's approval of the corporate form sets up a prima facie case that the assets, liabilities and operations of the corporation are those of the enterprise;

---

[17] The various senses of "enterprise" as used in economic writing are discussed by L. M. Fraser in his Economic Thought and Language (London, 1937), at page 318, as follows: "In ordinary language the word has two main meanings. In the first instance it refers to a thing projected or attempted—particularly if it be of a bold or hazardous nature. But it may also be used subjectively of the quality or qualities possessed by those who undertake such projects—that is to say, it may be in effect a synonym for 'boldness' or initiative. Both these meanings are to be found in economic writings, but in addition the word has come to be used in at least two rather more specialized ways. On the one hand it has become more concrete, standing for the result or objective realization of a project in the economic field—viz. a firm or business unit. And on the other hand it has become more abstract, being used of the *activities involved* in initiating or running such a project. . . ."

[18] Loevinger, The Law of Free Enterprise 86 (N.Y., 1949). The statement is in the nature of a definition italicized for purposes of the present paper.

96

But that where the corporate entity is defective, or otherwise challenged, its existence, extent and consequences may be determined by the actual existence and extent and operations of the underlying enterprise, which by these very qualities acquires an entity of its own, recognized by law.

For brevity, this hypothesis is hereafter referred to as the theory of "enterprise entity."

* * *

Whenever "corporate entity" is challenged, the court looks to the enterprise. Where the enterprise as such would be illegal or against public policy for individuals to conduct, that enterprise is equally illegal when carried on by a corporation, and the corporate form is not a protection. This is, in essence, not so much a "disregard of the corporate fiction" as it is a holding that the economic enterprise, whether corporate or non-corporate, is illegal, or criminal, or in violation of public policy, or fraudulent, or otherwise objectionable, as the case may be. The nature of the enterprise determines the result, negativing the corporate personality or any other form or organization of that enterprise.[19]

Again, Kronstein, in his essay on "The Nationality of International Enterprises,"[20] resorted to the term "enterprise" to designate the fundamental entity in the capitalistic business structure:

For the purposes of determining the nationality of a corporation, it is significant that business enterprises often do not coincide with corporate units. Sometimes they exceed the boundaries of corporate units and make corporate units their instrumentalities; or one corporation, or an unincorporated individual or group, may own many business enterprises which may or may not be incorporated. Thus, it may be that a corporation has the nationality of A while the central enterprise with which it is affiliated is deeply entrenched in the economic order of B and some of the constituent permanent establishments are parts of the economic orders of C and D.

The employment of "enterprise" in this same general sense in treaties has not been limited solely to those of the commercial variety. It has long been in use in United States treaties for the avoidance of double taxation.[21] These treaties, being highly technical in character, and perhaps because they may have the effect of directly amending the national revenue laws, carry an extensive list of definitions, among them definitions of "enterprise." A typical definition is that of "United States enterprise" found in the Convention for the Avoidance of Double Taxation between the

---

[19] A. A. Berle, "The Theory of Enterprise Entity," 47 Columbia Law Rev. 344, 354 (1947).

[20] 52 Columbia Law Rev. 985. Other passages in the article contribute to an understanding of the "enterprise" concept. The fact that Kronstein prefers to employ the term to refer to the major central business units does not affect the bearing of his discussion upon the treaty terminology.

[21] A more universal acceptance of the term is indicated by its use in the same sense in the model income tax convention adopted in 1943 at Mexico City at a conference held under the auspices of the League of Nations Fiscal Committee. League of Nations Fiscal Committee, Model Bilateral Conventions for the Prevention of International Double Taxation and Fiscal Evasion, *passim*, but especially pp. 16, 19 (Geneva, 1943).

97

United States and the Federal Republic of Germany,[22] signed July 22, 1954:

> The term "United States enterprise" means an industrial or commercial enterprise or undertaking carried on in the United States by a resident (including an individual in his individual capacity or as a member of a partnership) or by a United States corporation or other entity....

It would appear from the writings of authorities in the fields of economics and law, of which the above are examples, and from the precedent of the tax treaties, that there is a settled and consistent usage of the term "enterprise," with a meaning, in connection with economic matters, and especially in relation to the organization of economic activities, which is clear and unequivocal. The "enterprise" is the basic unit in the organization of a capitalistic or "free enterprise" economy. Considering this meaning, the use of the term in the sovereign immunity waiver is significant. The restriction as to immunity contained in the provision can reasonably be construed to apply only to entities of the character of enterprises in a free-enterprise economic system. Logically, there could be included in that class private corporations of which government has acquired control by the acquisition of shares of stock, enterprises established under free enterprise that, through a nationalization program, have passed into government ownership, and entities created by government that are counterparts of the economic units of free enterprise.

The phrase immediately following "enterprise" in the waiver provision, "including corporations, associations, and government agencies or instrumentalities," was apparently made a part of the paragraph as an afterthought. It does not appear in the treaties with Italy, Uruguay, Ireland, or Greece, which are among the earliest in which the immunity provision appears. It makes no substantial contribution to the meaning of the paragraph. It is evident, however, that it had its origin in the desire to assure coverage of the government-controlled enterprise, however disguised. As Lalive points out,[23] the forms of state economic enterprise are myriad.

> But the matter [i.e., with reference to the denial of immunity in the case of a state enterprise having an independent juridical personality] is not always so simple, for state activity in the economic sphere can borrow some very diverse forms. The state can take part itself through the agency of its ministries or departments. It can convert to the public service a designated sector of economic activity (direct administration: railways, the national bank, etc.), allowing it administrative and budget autonomy. It can create special public law juridical persons—public establishments, state enterprises in the narrow sense of the term. It can also establish mixed enterprises having a private law personality.

In any case, the "including" clause merely means that the waiver extends to state enterprises *in the form of* government agencies and instrumentalities, as well as to those in the form of corporations.

---

[22] 5 U.S. Treaties 2768.   [23] *Loc. cit.* 245.

The second key expression in the provision is the phrase "if it engages in . . . activities within the territories of the other party." This is the language employed in the treaty to refer to entry and establishment. Again, for interpretation, reference must be made to the establishment provisions in Article VII.[24] The first sentence of that article states that

> nationals and companies of either Party shall be accorded national treatment with respect to engaging in all types . . . of . . . activity for profit . . . within the territories of the other Party, whether directly or by agent or through the medium of any form of lawful juridical entity.

The concluding phrase, "whether directly or by agent or through the medium of any form of lawful juridical entity," makes clear beyond any possibility of doubt that actual *presence* of the alien enterprise "within the territories" is what is contemplated. The second sentence develops further what is comprehended by "engaging in . . . activity" of the specified class. It states that, pursuant to the general rule of the preceding sentence, the alien nationals and companies shall be allowed to set up and maintain "branches, agencies, offices, factories and other establishments appropriate to the conduct of their business," to form or acquire control of domestic corporations, and "to control and manage enterprises which they have established or acquired."

Similar language is utilized in the treaty's tax provisions:

> . . . nationals and companies of either Party *engaged in* trade or other gainful pursuit . . . within the territories of the other Party, shall not be subject to the payment of taxes . . . more burdensome than those borne by nationals and companies of such other Party.[25]

The phrase "engaged in trade or other gainful pursuit within the territories of the other Party" in this context appears to be equivalent to "engaged in trade or business in such other state through a permanent establishment situated therein" as used in the tax treaties,[26] since both provisions rest upon the same United States tax theory and basic provisions of tax law. The United States obligation to admit alien corporate enterprises is intended to be commensurate with the requirements of the various States respecting the licensing of out-of-State corporations.[27] Within the context of the treaty, then, a state-controlled enterprise of one party is

---

[24] This entry and establishment provision has been properly described as "the heart of the treaty as an investment instrument." Walker, "Treaties for the Encouragement and Protection of Foreign Investment," 5 A. J. Comp. Law 236. It is often the most difficult part of a treaty to negotiate, since its acceptance is fully recognized as establishing a permanent policy of permitting the establishment of the alien enterprise without discrimination.

[25] Art. XI of the treaty with Israel.

[26] See Art. III, U.S.-Germany Convention for the Avoidance of Double Taxation, T.I.A.S., No. 3133.

[27] See Walker, "Provisions on Companies in United States Commercial Treaties," 50 A.J.I.L. 373 (1956). For the interpretation of national treatment as the treatment accorded to out-of-State corporations, see Art. XXII, par. 4, Israel treaty.

subject to denial of its claim to sovereign immunity only if it is *present* by reason of its having an establishment within the other party's territories.[28]

The third expression of major significance for the interpretation of the provision is the term "business activities." It is to be noted that "business activities" is made synonymous with "activity for profit" in Article VII of the treaty with Israel, and with "activity for gain" in a number of other treaties.[29] Its specific meaning as a treaty term is also influenced by the fact that a purpose of its use is to distinguish normal economic activities in the fields of production and distribution from what may be described as eleemosynary or other non-profit activities. The latter types of activities are dealt with separately in most of the commercial treaties.[30] These factors have a proper bearing when it comes to consideration of whether the immunity waiver has any applicability to the normal and traditional activities of government.

The treaty provision goes somewhat further than the recommendations of many of the advocates of a liberal modification of the doctrine of sovereign immunity in that it provides that the state-controlled enterprise shall not claim or enjoy immunity not only from suit, but also from "taxation . . . execution of judgment or other liability to which privately owned and controlled enterprises are subject. . . ."[31] The intent here is obviously to equate the economic unit when it comes within the control of the state completely with the private enterprise as concerns liabilities and burdens imposed by law. As far as taxation is concerned, however, at least in the United States, it may be assumed that the immunity provision is not self-executing to the extent of imposing taxes upon a government enterprise in the absence of a specific provision of law providing for the assessment of such taxes.[32] The certain effect of the clause is to provide a complete defense against claims to immunity in case the tax authorities should find themselves able to assess taxes against such an enterprise under the tax

---

[28] The coverage of the treaty provision is much narrower than that proposed by the experts of the Harvard Research in International Law in Art. II of the Draft Convention on the Competence of Courts in Regard to Foreign States. The latter would not only deny immunity to a state when "it engages in an industrial, commercial, financial or other business enterprise" in another state, but also if "it does an act there in connection with such an enterprise wherever conducted." The latter coverage, of course, is not provided in the commercial treaty. 26 A.J.I.L. Supp. 451, 597 (1932).

[29] Those with Korea, Netherlands and Nicaragua. "Activity for profit" was again used in the treaty with Haiti.

[30] See Art. IX, par. 3 of the treaty with Israel.

[31] Lalive, *loc. cit.* 272-281; B. Fensterwald, "Sovereign Immunity and Soviet State Trading," 63 Harvard Law Rev. 624 (1950); Note, "Execution of Judgments Against the Property of Foreign States," 44 *ibid.* 963 (1931).

[32] There are a number of decisions and opinions that support the view that the language used would not override, for example, Sec. 892 of the Internal Revenue Code, which exempts foreign governments from taxation of income from any source within the U.S. 5 Hackworth 179, 185; 2 Hyde, International Law 1457; Crandall, Treaties 183-199. The principles concerning the taxation of a foreign state are discussed in Charles Fairman and Archibald King, "Taxation of Friendly Foreign Armed Forces," 38 A.J.I.L. 258 (1944).

100

laws. The waiver of immunity with respect to execution of judgment would leave the courts free to use their discretion in the enforcement of their decisions against the property of state enterprises. By the terms of the provision, the waiver extends only to the property of the individual enterprise concerned, and does not subject government property generally to execution.

What is to be expected as to the effect of this provision in its actual application? It is evident, of course, that the development anticipated and feared in 1947–48—the nationalization of foreign firms having establishments in the United States, and the increased entry of state-controlled enterprises—did not transpire. The number of claims to immunity by foreign enterprises in this country does not appear to have substantially increased since World War II. The reason that the situation envisaged by the treaty planners did not materialize is not far to seek. Economic relations with the countries within the Communist orbit have been held down by the Cold War. The conservative reaction in Western Europe checked the nationalization movement before it had penetrated very far into the economic sectors from which branch establishments in the United States are likely to issue.[33] State-controlled aviation and shipping companies are, of course, operating to and within the United States. In the case of the former, waiver of immunity from suit is required by the Civil Aeronautics Board in connection with its issuance of permits to foreign air carriers.[34] In the case of the latter, established precedents seem to be sufficient to make recourse to the commercial treaties unnecessary.[35] No United States court case involving the application of the sovereign immunity waiver has been reported.

What of the application of the immunity waiver to activities of the United States Government in countries with which treaties are in force? Obviously the waiver provision considered as a rule of law can be construed with finality only in connection with the facts of a specific case.[36]

---

[33] The establishment of foreign state-controlled insurance entities in this country was checked by State action. An attempt in 1955 by the Caisse Centrale de Reassurance, a reinsurance company controlled by the French Government, to obtain a license to engage in business in Florida, resulted in the enactment of a law (F.S.A. 631.16) forbidding the licensing in that State of an insurer "owned, controlled, or operated by a foreign government or any agency thereof." Similar action has since been taken by many other States. Such legislation, promoted by the organized private insurance interests, was further stimulated by efforts of a company controlled by an agency of the Province of Saskatchewan, Canada, to expand into some of the Northwestern States.

[34] This is done under authority of 49 U.S.C. 482. See also the special agreement between the U.S. and The Netherlands providing for waiver of immunity of air carriers, June 19, 1953. 4 U.S. Treaties 1610. State-owned air carriers seem to be subjected by Art. 2 of the Warsaw Convention (1929) to liability for the death or injury of passengers and for loss or damage to goods or baggage during transportation, but the U.S. entered a reservation to that article. 4 Treaties (Trenwith) 5250.

[35] 2 Hackworth 436–442; 46 U.S.C. 747.

[36] In addition to its strictly legal character, however, a treaty of the type here considered is essentially a political and diplomatic instrument. By far the greater number of questions of treaty obligation and interpretation are disposed of in the foreign offices and never reach the courts.

But the author of a treaty provision is obliged to guide himself by more general considerations, by broader facts and tendencies. A careful general survey of the manifold operations in which the United States Government is involved in treaty countries has revealed no case of an existing activity coming within the purview of the waiver provision reasonably interpreted, and the evidence is clear that the intent was to exclude such activities. Reconstruction of an entity such as the United States Merchant Fleet Corporation of the 1920's,[37] or an undertaking by the Tennessee Valley Authority to build and operate an electric power utility within a treaty country would, of course, activate the treaty provision with respect to such enterprises. But no such ventures on the part of the United States can now be foreseen. It appears that no question regarding the treaty waiver has ever been raised in any foreign court, nor has any diplomatic approach on the subject been made to the United States.

The commercial treaties do not concern themselves in any very significant way with the regulation of the normal functions of government in its proprietary capacity.[38] The only clause dealing with the matter of government contracts, for example, is the very general rule [39] that government agencies shall make their purchases and sales involving imports and exports in accordance with commercial considerations, and that each treaty party shall accord the nationals and companies of the other "fair and equitable" treatment with respect to purchases and sales and the awarding of contracts. There are weighty arguments indeed that, in furtherance of the rule of law, all "private acts" of governments, including those relating to purchases and sales, to all types of contracts, and torts, should be subject to adjudication in the same way as similar acts of private persons and entities, and without regard to whether the act was performed by a business enterprise within the adjudicating jurisdiction. But it has not been considered the province of the United States commercial treaty to provide the legal basis for establishing jurisdiction over such acts.

Much United States Government activity abroad has to do with the establishment and maintenance of military bases and the supply of military forces stationed abroad. Obviously these activities involve much buying and selling, and numerous acts affecting the rights of private persons. But there is no parallelism between the governmental organizations carrying on these activities and the economic enterprises carrying on business activities for gain which are the subject matter of the commercial treaty. This is the case even when the government agency assesses charges to cover the cost of goods or services furnished in connection with the supply, subsistence, and maintenance of the well-being of military and attached civilian

---

[37] U.S. policy with respect to immunity in the case of this corporation is illustrated by the cases in 4 Hackworth 439–442.

[38] It is a well-settled axiom of treaty interpretation in the United States that treaty rules do not bind a government as to its proprietary activities except to the extent that they specifically stipulate that such activities are covered. Heim v. McCall, 239 U.S. 175 (1915), and the line of cases applying and elaborating the doctrine of that case.

[39] Art. XVIII, pars. 1 and 2, Israel treaty.

personnel.[40] The situation is the same with respect to diplomatic and consular establishments abroad.

Other principal United States Government activities that are concerned with foreign countries are those connected with foreign lending, disposal of surplus commodities, the stockpiling of strategic materials, and the distribution of foreign aid. A significant thing to note in the legislative policy statements regarding most of these activities is the clear intent to avoid replacing or competing with private enterprise. Generally speaking, the governmental establishments are intended to support or reinforce private efforts in the same general field. The law establishing the Export-Import Bank of Washington, which does most of the foreign lending either directly or as fiscal agent for the International Cooperation Administration, states that "it is the policy of the Congress that the Bank in the exercise of its functions should supplement and encourage and not compete with private capital."[41] Public Law 480, in providing for the disposal of surplus agricultural commodities for foreign currencies, requires the President "to take appropriate steps to assure that private trade channels are used to the maximum extent practicable both with respect to sales from privately owned stocks and from stocks owned by the Commodity Credit Corporation."[42] The Strategic and Critical Materials Stock Piling Act merely provides for purchase, storage, processing, and disposal of materials, but the policy of avoiding state competition with private industry is indicated in the provision that the refining or processing of materials is to be handled through "normal commercial channels."[43] Furthermore, barter arrangements under Public Law 480 for strategic or other materials needed by the Government are to be made through private trade channels.[44] Great emphasis is placed by the Mutual Security legislation upon the rôle of free enterprise, not only as concerns utilizing the Mutual Security programs to promote its growth in participating countries, but also with respect to the utilization of private enterprises to the maximum extent for the carrying out of the programs.[45] The provisions of law establishing the Development Loan Fund reiterate these purposes.[46]

The Government instrumentalities concerned with the activities here under discussion do not maintain establishments within the territories of foreign countries for the purpose of carrying on business activities there. The Export-Import Bank makes its loan contracts in the United States. The credits it extends are used to pay for purchases of United States products, and are usually extended to American private firms, although extensive credits are made available to foreign governments and sometimes

---

[40] For an interpretation of the status of military post exchanges, see Standard Oil Co. v. Johnson, 316 U.S. 481. "From all this," said the Court, "we conclude that the post exchanges as now operated are arms of the Government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the Constitution and Federal statutes."

[41] 12 U.S.C. 635.
[42] 7 U.S.C. 1701.
[43] 50 U.S.C. 986.
[44] 7 U.S.C. 1692.
[45] 22 U.S.C. 1933.
[46] Public Law 85-141, 85th Cong.

103

to foreign private firms. Members of its staff make frequent visits to foreign countries to obtain information pertinent to loan applications, but the Bank establishes no branches or field offices abroad.[47]

In the operations necessary for the disposal of agricultural surpluses, the agricultural attachés on the staff of United States diplomatic missions abroad play an important rôle. They engage in many activities to encourage the marketing of American products, but they do not participate in any sales transactions.[48] These transactions are the function of private business concerns. The best-known surplus disposal operations are carried out under the Agricultural Trade Development and Assistance Act of 1954 (P.L. 480). Under this Act, surplus commodities are sold to foreign countries for local currencies at prices generally much below the cost of the products to the Commodity Credit Corporation, distributed abroad for famine relief and other charitable purposes, exchanged for strategic materials and equipment needed in foreign military programs, or in connection with economic aid. Agreements with foreign governments regarding sales are concluded through diplomatic channels, but actual sales take place between the foreign importer and the private American exporter, who obtains his commodities in most cases from the Commodity Credit Corporation. The latter entity does not maintain any establishment within the countries where sales are made.[49]

The widest incidence of United States Government influence in economic matters upon foreign countries occurs in connection with the administration of the Mutual Security policies. Although several agencies participate in this administration, the controlling instrumentality[50] at the present time is the International Cooperation Administration (a semi-autonomous organization within the Department of State). Activities with which this agency is concerned have to do with the distribution of aid funds provided by United States taxpayers to the governments and peoples of foreign countries, either in the form of free grants of money, liberal-term loans, or special services. Although there are many classes of activities involved, including military aid of various sorts, economic development assistance, and technical aid, there is nothing in the organization of I.C.A. or in the methods by which it carries out its responsibilities that suggests in any way

---

[47] Export-Import Bank of Washington, Report to the Congress for the Twelve Months Ending June 30, 1957 (Pts. I and II); Olin S. Pugh, The Export-Import Bank of Washington (Charleston, S.C., 1957); Commission on Organization of the Executive Branch of the Government, Task Force Report on Overseas Economic Operations 373–382 (June, 1955). The legislation establishing the Bank can hardly be considered hostile to the idea of its being subjected in a proper case to foreign jurisdiction, however. It is specifically authorized to "sue and be sued, to complain and to defend in any court of competent jurisdiction." 12 U.S.C. 635.

[48] Dept. of State, The American Agricultural Attaché (1957).

[49] Commission on Organization of the Executive Branch of the Government, Task Force Report on Overseas Economic Operations 317–341; Sixth Semiannual Report on Activities Under Public Law 480 . . . Jan 1 through June 30, 1957.

[50] Designated at different times in the past as Economic Cooperation Administration (to 1952), Mutual Security Administration (1952–1953), and Foreign Operations Administration (1954–1955).

the private enterprise for gain that is the subject matter of the commercial treaties.

The International Cooperation Administration is essentially a financial institution, which makes the financial arrangements required by the legislation, authorizes the allocation of funds, and carries out inspections to assure that funds are expended in accordance with the established policies. It maintains missions (now more or less integrated with the staffs of the United States embassies) in all countries where aid is being accorded. The personnel of these missions help prepare the documentation for aid projects, assist in the end-use inspections, perform administrative work needed in the carrying out of the United States Government's function in the operation, and participate in some of the technical assistance work. Aid is accorded, as a rule, pursuant to agreements negotiated through diplomatic channels. For the most part, orders equipment, materials, or commodities originate with the foreign government or a private firm authorized by it, and are placed with a private firm, usually in the United States. Much of the technical assistance is furnished through private firms or universities whose services are contracted for.[51] The Mutual Security Act of 1957 established a new instrumentality in the field of foreign aid, the Development Loan Fund.[52] In carrying out Mutual Security policies, the Fund may make loans to governments, private corporations, and other entities, and is authorized to take measures to assure repayment. The establishment of the Fund grew out of the desire of Congress to substitute loans on liberal terms for much of the grant aid. There is nothing essentially new in the policy, however, or in the methods projected for carrying it out. Loans made by the Fund are to be administered by the Export-Import Bank in accordance with the general provisions of law governing that agency and those governing its function as fiscal agent for the International Cooperation Administration.[53]

The immunity waiver in the commercial treaties, then, does not constitute any far-reaching fundamental United States policy innovation. It relates to a simple factual situation. If treaty assurances are to be given to foreign economic enterprises, then it is reasonable and appropriate to provide for equalization of the situation in the event that foreign state enterprises become competitors of American or the treaty-protected alien private enterprises. The principle had previously been implemented in part by the Civil Aeronautics Board in requiring a waiver from alien air carriers, and

---

[51] Commission on Organization of the Executive Branch of the Government, Overseas Economic Operations, A Report to the Congress (June, 1955), and Task Force Report on Overseas Economic Operations (June, 1955); Report to Congress on the Mutual Security Program for the Six Months Ended June 30, 1957; Department of State, The Mutual Security Program, Fiscal Year 1958; Jerome Jacobson Associates, The Use of Private Contractors in Foreign Aid Programs (March, 1957), a study prepared at the request of the Special Committee to Study the Foreign Aid Program, U.S. Senate, 85th Cong., 1st Sess.

[52] Public Law 85-141, 85th Cong.; International Cooperation Administration, Development Loan Fund (Dec., 1957).

[53] 22 U.S.C. 1757; Sec. 205, Public Law 85-141, 85th Cong.

105

by the Congress and the Executive in accepting foreign jurisdiction over United States Merchant Fleet Corporation vessels. The commercial treaties merely extend the principle generally to foreign state enterprises established for business purposes. Until the United States abandons its free enterprise philosophy and begins to replace private enterprise in foreign countries with Government-owned enterprises, there would appear to be no basis in reason or in experience for fear that such treaty provisions will result in subjection of United States Government activities to foreign jurisdictional liabilities.

## EXECUTION AGAINST THE FOREIGN SOVEREIGN'S PROPERTY: THE CURRENT SCENE

### BY WILLIAM L. GRIFFIN *

*Office of the Legal Adviser, Department of State*

#### I. THE CONCEPT OF "EXECUTION"

The term "execution" is used here, not in any technical sense, but as generally descriptive of any process of attaching, taking, apprehending or seizing property of a foreign state, or depriving such state of its control over its property, pursuant to a judicial order or ruling for the purpose of, or to aid in, or to induce, carrying into effect a judicial order or ruling on the merits against the sovereign.

The question what is execution is self-evident in the ordinary case in which the plaintiff has obtained a money judgment against a sovereign of which the court has obtained *in personam* jurisdiction. In such case execution is a clearly demarcated step, following entry of a judgment and an order of execution. But when jurisdiction is *in rem*, or when plaintiff seeks specific relief, for example, concerning his claim to a title interest, or injunction against various kinds of torts, enforcement of various kinds of liens, *et cetera*, the question of what is execution may not be initially quite as clear.

With regard to disputed title claims the question of execution does not arise. If the court holds in favor of the sovereign, that is the end of the matter. If the court finds in favor of the adverse party, then the sovereign has no ownership interest to be executed upon. With regard to granting other types of specific relief involving the sovereign's property, the suit may simply terminate with an order on the merits against the sovereign, the carrying out of which would be execution as described above.

Under the foregoing description, execution includes the process variously known as "garnishment," "trustee process" or "attachment execution," when used to describe a post-judgment-on-the-merits process directed against a judgment debtor's property in the hands of a third party. Such

---

* The views expressed herein are the author's in his personal capacity.