UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON, Personal
Representative of the Estate of James C. Knipple
(Dec.) et al.,

                              Plaintiffs,

                 -v-

ISLAMIC REPUBLIC OF IRAN et al.,

                              Defendants.

10-cv-4518 (KBF)

**SPECIAL MASTER'S**
**REPORT & RECOMMENDATION**

KATHLEEN N. MASSEY, SPECIAL MASTER:

The Court has appointed me as Special Master in the above-captioned proceeding

pursuant to Rule 53(a) of the Federal Rules of Civil Procedure to resolve certain disputes that

have arisen in connection with the Peterson § 468B Qualified Settlement Fund (the "QSF" or the

"Fund").  (*See* ECF No. 775.)  To resolve these disputes in an efficient manner, I have divided

them into three separate "tracks," with each track involving common legal or factual issues.[1]

This report addresses the issues assigned to the second of the three tracks, the "Advance

Company Disputes" track.  Specifically, these issues relate to claims by three third-party

financing companies (the "Advance Companies") with whom certain plaintiffs in this action (the

"Assigning Plaintiffs") have entered into financing agreements that the Trustee has improperly

suspended distributions to them from the QSF.  The Advance Companies seek an order requiring

the Trustee "to resume making distributions . . . on account of the Peterson plaintiffs who

---

[1]     The three tracks have been designated the "Trust Administration Disputes" track, the
"Advance Company Disputes" track, and the "Attorney Fee Disputes" track.  (ECF No. 777 at 1–
2.)  This report presumes familiarity with my initial Report & Recommendation relating to the
Trust Administration Disputes track (ECF No. 842), and capitalized terms not otherwise defined
herein have the meanings ascribed to them in my initial report.

assigned portions of their judgments to [an advance company]."  (ECF No. 775 at 3; *see also* ECF No. 777 at 2.)  This report addresses applications for relief by:

    (1)      RD Legal Capital, LLC and related entities ("RD") (ECF No. 726);

    (2)      Cedars Funding LLC ("Cedars") (ECF No. 741); and

    (3)      Specialty Claims Investments ("Specialty") (ECF No. 786).

This report also addresses the threshold issue of whether RD, Cedars or Specialty may intervene for purposes of seeking an order compelling the Trustee to resume distributions.[2]

      As stated in further detail below, I recommend that the Court grant the Advance Companies' requests to intervene.  I further recommend that the Court grant the Advance Companies' requests for an order requiring the Trustee to distribute funds to the Advance Companies pursuant to the terms of their agreements with those Assigning Plaintiffs who have affirmatively consented to such distributions.  With respect to the Assigning Plaintiffs who have neither affirmatively consented nor objected to such distributions, I recommend that the Court direct the Trustee to distribute funds to the Advance Companies to the extent that such Assigning Plaintiffs have received clear notice of the consequences of their failure to raise any objection, but direct the Trustee to make additional efforts to contact other Assigning Plaintiffs who may not have received clear notice before making further distributions.  Finally, with regard to distributions in respect of the Assigning Plaintiffs who have objected to payment being made to an advance company, I recommend that the Court order the Trustee commence one or more

---

[2]     In connection with this Report & Recommendation, I have considered the following submissions on the Court's docket:  460, 461, 651, 704, 710, 726, 736, 741, 743, 760, 761, 775, 777, 786, 787, 842.  I have considered the submissions listed in the attached Appendix A, with each of the documents in Appendix A designated herein as a Special Master exhibit ("SM Ex. __").  In addition, I received significant cooperation from each of the Advance Companies, the Trustee and certain of the plaintiffs' counsel.

interpleader actions, naming the relevant advance companies and objectors as parties, depositing the disputed distribution with the court in which the interpleader is filed, and allowing the advance companies and objectors to resolve their disputes pursuant to the terms of their respective agreements without further intervention of the Trustee.

Part I below sets out the relevant factual and procedural background concerning the Peterson Plaintiffs' agreements with the Advance Companies, the provisions of the CDAs relating to distributions to the Advance Companies, and the status of payments to the Advance Companies. Part II describes the efforts that have been made to resolve and narrow the disputed issues. Part III discusses my recommendations concerning the intervention of the Advance Companies in this action. Part IV discusses my recommendations concerning the Trustee's authority to suspend distributions. Part V discusses my recommendations on the Advance Companies' requests relating to distributions where the Assigning Plaintiffs have affirmatively consented to the Trustee's payment of Advance Companies. Part VI discusses my recommendations on the Advance Companies' requests relating to distributions where the Assigning Plaintiffs have neither consented to nor objected to the Trustee's payment of Advance Companies. Finally, Part VII discusses my recommendation on the Advance Companies' requests relating to distributions where the Assigning Plaintiffs have affirmatively objected to the Trustee's payment of Advance Companies.

## I.      RELEVANT BACKGROUND

### A.      Advance Contracts

As discussed further below, certain of the Peterson Plaintiffs—each of whom holds a judgment against the Islamic Republic of Iran—sought to obtain financing of portions of their judgments prior to the Trustee's commencement of distributions. The Advance Companies have asserted—without dispute from the Trustee—that many of the Peterson Plaintiffs had waited 30

years from the time of the terrorist attacks underlying their judgments to receive compensation and were not certain they would live long enough to receive any payment.  The Advance Companies further report that other Peterson Plaintiffs had pressing financial obligations.  (SM Ex. 1 (Letter from M. Roth dated June 22, 2017) at 2.)

According to records provided by the Trustee, 261 of the Peterson Plaintiffs are known to have entered into agreements with advance companies.  (SM Ex. 2 (Peterson Attorney Report dated Sept. 1, 2017); ECF No. 710 at 4.)  While advance companies other than RD, Cedars and Specialty entered into contracts with a small number of Peterson Plaintiffs, all of the agreements at issue here involve RD, Cedars or Specialty.  (*Id.* at 4, n.8.)  RD began entering into contracts with the Peterson Plaintiffs in late 2012, and ultimately entered agreements with 165 Assigning Plaintiffs.  (*See* ECF No. 726 at 1; SM Ex. 1 (Letter from M. Roth dated June 22, 2017) at 1–2.)  RD subsequently "initiated, and also acted as a broker with respect to all of the Cedars and Specialty transactions."  (SM Ex. 3 (Letter from S. Jacob dated July 12, 2017) at 4.)  Cedars and Specialty did not have direct communications with any of the Assigning Plaintiffs, but they funded certain assignment transactions and acted as the actual counterparties to those transactions.  (*Id.*)  Cedars entered into advance contracts with 74 of the Peterson Plaintiffs beginning in 2014.  (SM Ex. 4 (Letter from J. Anderson dated June 20, 2017) at 2.)  Specialty entered into advance contracts with 18 of the Peterson Plaintiffs.  (SM Ex. 5 (Letter from S. DiCicco dated June 22, 2017) at 1; SM Ex. 2 (Peterson Attorney Report dated Sept. 1, 2017).)

The financial terms of the advance contracts at issue here are relatively consistent from one contract to another:  in exchange for assigning a fixed portion of the proceeds each Assigning Plaintiff was entitled to receive from the default judgment against the Islamic Republic of Iran granted by the U.S. District Court for the District of Columbia in *Peterson v.*

*Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003), the advance company agreed to pay a fixed amount of cash upon the execution of the relevant transaction documents.  (SM Ex. 6 (Sample RD Contract) at 1.)  Based on the advance contracts provided in connection with this proceeding, typically, the up-front cash offered by each advance company amounted to approximately 35% of the assigned judgment proceeds, although for certain contracts the up-front cash advance was as low as 28% of the assigned judgment proceeds.[3]  Certain of the advance contracts also contained a "rebate" feature, in which the Assigning Plaintiff was entitled to additional cash compensation based on when RD received the full amount of the assigned judgment proceeds.  (SM Ex. 6A (Sample Rebate Contract) at 6–14.)  The rebate to which an Assigning Plaintiff was entitled was determined according to a six-year schedule of payments, divided into monthly increments.  (*Id.*)  As explained by RD, this rebate schedule was intended to provide an annual rate of return for the advance company of approximately 18% for the rebate component of the assignment.  (SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 4.)  For example, in one rebate contract, if the Advance Company received payment in September 2015, the plaintiff was entitled to an additional $103,092.33 in cash, while the plaintiff was only entitled to $87,390.33 in additional cash if the Advance Company received payment in September 2016.  (*Id.* at 9–10.)  These "rebate" contracts are not generally at issue here, since the Advance Companies and the Trustee have informed me that they have all been paid.  (SM Ex. 8 (Email from M. Roth dated Aug. 1, 2017).)

Most of the contracts at issue here are referred to as "flat-out" contracts, where the cash received by the Assigning Plaintiff remains constant, and do not contain any rebate provision.

---

[3]     For example, the Assigning Plaintiff in the sample RD contract assigned $960,953.05 of his judgment for a $335,000.00 advance payment.  (SM Ex. 6 (Sample RD Contract) at 1.)

However, some of the contracts at issue contain limited rebate terms because they were entered into to replace prior rebate contracts.  These "rebate replacement" contracts entitled the Assigning Plaintiff to additional up-front cash if the assigned judgment proceeds were received promptly after the execution of the assignment.  (SM Ex. 9 (Sample Replacement Agreement) at 2, 25.)  For all of the advance contracts, both parties agreed that the conveyance of the Assigning Plaintiff's right, title and interest in the Property was made without recourse against the Assigning Plaintiff, except in limited circumstances not relevant here.  (SM Ex. 6 (Sample RD Contract) at 5.)

The advance contracts also have similar non-financial terms.  Based on the advance contracts provided to me, these included the following provisions.

- The plaintiff agreed that the sale of a portion of his, her or its judgment constituted a sale and not a loan, with additional language designed to grant the Advance Company a security interest in, and the right to file a lien on, the plaintiff's judgment in the event the transaction were deemed a loan.  (*Id*. at 1–2.)

- The plaintiff covenanted that he, she or it would promptly execute such additional documents and take such further actions as the Advance Company may determine is reasonably necessary or desirable to perfect the assignment of the amount owed to the company.  (*Id*. at 3.)

- The plaintiff covenanted that he, she or it understood that the agreement constituted a relinquishment of all right, title and interest in the portion of the judgment representing the amount owed to the Advance Company. (*Id*. at 3.)

- Each agreement included a notice to the plaintiff in bold print stating that "[t]his is a complex financial transaction," that the plaintiff was receiving a cash payment significantly less than the portion of the judgment being assigned, and that the plaintiff was strongly encouraged

before signing to consult with an attorney and/or trusted financial advisor who could assist in determining whether the transaction would best fulfill the plaintiff's financial needs and objectives and protect his, her or its interest.  (*Id*. at 6.)

- Each contract was conditioned upon the execution by the plaintiff of a notice of assignment to the Fund administrator that included an instruction from the plaintiff to the administrator requiring the administrator, upon receipt of any funds representing the plaintiff's interest in the judgment, to issue a check to the Advance Company for the amount owed to it by the plaintiff. (*Id*. at 6.)

- All of the contracts are governed by New Jersey law and include a waiver of any right to a jury trial.  (*Id*. at 5–6.)

Starting in or around April 2014, when Cedars began to act as a counterparty for the advance contracts, additional terms were added.  These terms, which are present in all the contracts at issue here that were entered into after April 2014, included:

- a binding arbitration clause (in some cases, optional, while in others, mandatory) (SM Ex. 10 (Sample Cedars Contract) at 7–10);

- a provision permitting the Assigning Plaintiff to cancel the agreement within 5 days of the execution of the transaction documents (*Id.* at 12);

- an express acknowledgement from the Assigning Plaintiff that his, her or its "attorney in the civil action or claim has provided no tax, public or private benefit planning, or financial advice regarding this transaction" (*Id.* at 12); and

- a legend at the top of the first page of the agreement, reading "This is a legal document and should be executed under the supervision of an attorney." (*Id.* at 1)

Based upon my review of the contracts provided to me, all of the advance contracts entered into by RD, Cedars and Specialty entered into after April 2014 contained these provisions.

      **B.**      **Confidential Disbursement Authorization Forms**

The Supreme Court of the United States affirmed the Turnover Judgment on April 20, 2016, in *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016), thus providing the first available source of funds to satisfy the Peterson Plaintiffs' judgments.  By Order dated June 6, 2016, the Court directed the Trustee to "commence distribution of the assets held by the QSF in accordance with the terms of the Cooperation Agreement and in written agreements between the Plaintiffs and other judgment creditors of Iran."  (ECF No. 651 at 3.)

Thereafter, the Trustee began planning for an initial round of distribution of QSF funds to the individual Peterson Plaintiffs, their assignees and their counsel.  As explained in further detail in my Report & Recommendation relating to the Trust Administration Disputes track, the Trustee established an orderly process for this first round of distributions from the QSF to the Peterson Plaintiffs.  In connection with that process, the Trustee prepared, with input from the Peterson Plaintiffs' counsel, individual Confidential Disbursement Authorization forms for each plaintiff, indicating the amount of any distribution to which each was entitled and other information stating whether and the extent to which funds would be paid to an advance company. (ECF No. 706 at 1–2.)  Starting in November 2016, the Trustee began sending individualized CDA forms to each of the Peterson Plaintiffs.  Section 3 of the CDA sets forth, among other things, the amount the Trustee had determined to be payable to each plaintiff and any Advance Companies based on each plaintiff's share of the total amount collected, minus the total amount

owed by the plaintiff to an advance company.  (SM Ex. 11 (Sample CDA) at 7.)[4]  In certain

cases, the CDA indicates that the proposed distribution exceeds the amount owed to an advance

company, in which case the CDA reflects payment to the advance company in full, with the

balance to the plaintiff.  In other cases, however, the CDA indicates that the proposed

distribution is less than or equal to the amount owed to an advance company, in which case the

CDA reflects payment of the entire amount of the distribution to the advance company, with the

plaintiff receiving no payment from the first round of the QSF distribution.  Section 3.1 of the

CDA includes more specific information about the plaintiff's agreement with the advance

company, including the date of the agreement, the amount of the advance, and the amount owed

to the advance company.  (*Id*. at 9–10.)

Sections 3 and 3.1 require the plaintiff to approve the amounts set out with regard to the

advance contract.  (*Id*. at 7–10)  Section 3.1 of the CDA also requests that the plaintiff check a

box stating that the plaintiff either (1) authorizes the Trustee to make a payment to the advance

company or (2) does not authorize the Trustee to make such payment.  (*Id*. at 9–10)  Where a

plaintiff withholds authorization, the CDA requests that he, she or it provide an explanation of

the plaintiff's position and documentation in support of the position.  (*Id*. at 10.)

The CDA provides in Section 3.1 that:

**IF YOU DO NOT SIGN AND RETURN THIS FORM WITHIN 30 DAYS,
OR YOU DO NOT NOTIFY THE TRUSTEE OR THE DISTRIBUTION
ADMINISTRATOR, IN WRITING, OF A LEGITIMATE REASON THAT
PART OR ALL OF THE FUNDS OUTLINED BELOW SHOULD NOT BE
PAID OR REMITTED TO [THE ADVANCE COMPANY] WITHIN 30
DAYS, THE TRUSTEE WILL AUTHORIZE PAYMENT TO [THE
ADVANCE COMPANY] IN ACCORDANCE WITH THE AGREEMENT.**

---

[4]      "CDA No.__" refers to the tracking number of the CDA.  To protect the Assigning
Plaintiffs' personal financial information, use tracking numbers here in place of their names or
other identifying information.

(*Id.* at 9 (emphasis in original).)

> In Section 8, the CDA requests that the plaintiff acknowledge that:

> The Attorneys and Collection Counsel have advised me that they do not provide tax advice, financial advice, income-based government assistance advice, and/or probate/estate advice. I am not relying on the Attorneys or Collection Counsel to provide me with any advice regarding such matters. The Attorneys have advised me to consult with my own attorney, certified public accountant, actuary or other licensed professional with specialized knowledge of tax, income-based government assistance, probate/estate and/or investment matters concerning my receipt of my share of this recovery from the QSF.

(*Id.* at 17.)

### C.    Status of Payments

The Trustee began distributing funds to the Plaintiffs and the advance companies in December 2016.  (*See* ECF No. 704 at 3–4; ECF No. 710 at 5.)  As of March 31, 2017, the Trustee had distributed $56,304,228 to advance companies.  (*Id.*)

However, in February 2017, the Trustee learned that the Consumer Financial Protection Bureau (the "CFPB") and the Attorney General of the State of New York (the "NYAG") had commenced an action against RD, certain of its affiliates and its principal, Roni Dersovitz, in the Southern District of New York (the "CFPB Action") alleging, among other things, that:  (1) RD had made misrepresentations to the individuals with which it had entered into those agreements about whether they were assignment agreements or loans; and (2) certain agreements that RD had entered into with individuals not involved in this litigation were null and void because they violated consumer finance protection and usury laws.  *See* Complaint, *Consumer Financial Protection Bureau et ano. v. RD Legal Funding, LLC, et al.*, No. 1:17-cv-00890 (LAP) (S.D.N.Y. Feb. 7, 2017) ("CFPB Complaint") at 2.

Shortly after learning of the CFPB Action, the Trustee discontinued further distributions to all three of the Advance Companies to allow time to determine whether (i) any of the

allegations made in the RD Action were potentially applicable to the Advance Agreements used in this case, (ii) any of the Advance Companies engaged in misrepresentations similar to those alleged in the RD Action, and (iii) the Plaintiffs who received advances from the Advance Companies were provided with appropriate disclosures before entering into the Advance Agreements.  (*See* ECF No. 710 at 5–6.)  The Trustee also mentioned in his March 31, 2017, report to the Court that (1) his advisors had discovered errors in calculations required by certain advance contracts (*id*. at 5, n.9), and (2) the Securities and Exchange Commission (the "SEC") had commenced an administrative proceeding (the "SEC Proceeding") against RD and its principal, Dersovitz, alleging, among other things, that the respondents had misrepresented to investors in funds managed by RD the nature and risk profiles of the advance contracts in which the funds had invested.  (*Id*. at 6–7.)  *See also* Order Instituting Administrative and Cease-and-Desist Proceedings, *In the Matter of RD Legal Capital, LLC & Roni Dersovitz,* Administrative Proceeding File No. 3-17342 (S.E.C. July 14, 2016) ("SEC Order").

At the same time, the Trustee reported that he had refrained from distributing approximately $83 million on account of Assigning Plaintiffs who owe money to the Advance Companies.  (*See* ECF No. 710 at 4–5.)  The Trustee has not distributed funds the Advance Companies on behalf of approximately 120 of the Assigning Plaintiffs.  (*See* Appendices B–D.)[5] Approximately 76 of the Assigning Plaintiffs returned CDAs that included consents to the distribution of funds to an Advance Company.  (*See* Appendix B.)  Approximately 22 failed to return their CDAs at all or have failed to return completed CDAs clearly authorizing or objecting

---

[5]     Because the Advance Companies and the Trustee have informed me that they been engaged in ongoing efforts to resolve the disputes between them over the payment of QSF distributions and indeed may have resolved such disputes as of the date of this writing, the numbers given here are approximations based on the information provided to date.

to the distribution of funds.  (*See* Appendix C.)  Approximately 22 of the Assigning Plaintiffs returned their CDAs objecting to the distribution of the funds or informed the Trustee's distribution administrator, Epiq, that they object to the distribution of funds.  (*See* Appendix D.)

## II.    EFFORTS TO RESOLVE THE DISPUTES

Shortly after my appointment as Special Master, I held a telephone conference on June 13, 2017 with counsel for RD, Cedars and the Trustee.  During that conference, I attempted to resolve the issues raised by RD and Cedars with regard to the contracts as to which the Assigning Plaintiffs had consented to distribution, but the Trustee remained concerned about distributing funds to the Advance Companies under the circumstances without a court order.

During the June 13 conference, I suggested that, for the sake of efficiency, Specialty may wish to apply to the Court to have any dispute it has with the Trustee referred to me for consideration along with the disputes raised by RD and Cedars.  By letter dated June 21, 2017, Specialty filed a letter application with the Court indicating that it had concerns similar to those raised by RD and Cedars and requested that the Court refer Specialty's disputes to me for consideration along with those of RD and Cedars.  (ECF No. 786.)  By Order dated June 22, 2017 (ECF No. 787), the Court granted Specialty's request and referred its disputes to me for resolution.

On June 20 and 22, 2017, RD, Cedars and Specialty made written submissions to me and provided copies of certain documents discussed further below.  (*See, e.g*., SM Ex. 1 (Letter from M. Roth dated June 22, 2017); SM Ex. 4 (Letter from J. Anderson dated June 20, 2017); SM Ex. 5 (Letter from S. DiCicco dated June 22, 2017.)  On June 28, 2017, the Trustee made a written submission on the issues.  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017).)  Thereafter, I held a telephone conference on June 30, 2017 during which I heard from the

Advance Companies and the Trustee on their respective positions.  During that conference, I attempted to resolve issues regarding how best to handle the distributions where the Assigning Plaintiffs had failed to return completed CDAs authorizing or objecting to distributions and where the Assigning Plaintiffs had objected to distributions.  However, I was unable to obtain a consensus on how best to proceed.

Following the June 30 conference, I invited the parties to make one final round of submissions, including their positions on whether they wished to intervene formally in this action.  The Advance Companies each submitted letters on the merits. (SM Ex. 7 (Letter from M. Roth dated July 12, 2017); SM Ex. 13 (Letter from J. Anderson dated July 12, 2017; SM Ex. 14 (Letter from S. DiCicco dated July 12, 2017).  They also submitted applications to intervene on July 12, 2017.  (SM Ex. 15 (RD Intervention App.); SM Ex. 16 (Cedars Intervention App.); SM Ex. 17 (Specialty Intervention App.).)  The Trustee also provided a letter regarding his position on that date.  (SM Ex. 3 (Letter from S. Jacob dated July 12, 2017).)  As detailed below, the participants in the Attorneys Fee Disputes and Trust Administration Disputes tracks were also given the opportunity to be heard on the Advance Companies' intervention applications.  *See infra* at 16–17.

Since my appointment as Special Master, the Trustee has submitted many documents related to the Assigning Plaintiffs who objected to distributions being made to the Advance Companies and documents related to attempts by the distribution administrator, Epiq, to contact the Assigning Plaintiffs who failed to return completed CDAs, including a declaration providing details of the efforts made.  (*See, e.g.*, SM Ex. 18 (Epiq Commn's Log for CDA No. 1010);[6] SM

---

[6]     Although Epiq uses the format "TN 1010," referring to a tracking number which is the same as a CDA number, we use the "CDA No." format for the sake of consistency.

Ex. 19 (Declaration of Michael O'Connor dated July 12, 2017) ("O'Connor Declaration" or

"O'Connor Decl.").)  In total, the Trustee produced approximately 104 documents related to the

Advance Company dispute.

RD, Cedars and Specialty have provided me with copies of all of the advance contracts

for the objectors.  Cedars has additionally produced all of the underlying contracts for the unpaid

Assigning Plaintiffs that entered into contracts with it.  In total, the Advance Companies

produced more than 300 documents related to this dispute.

Finally, at my request, on September 22 and September 25, respectively, representatives

of Fay and Perles, counsel to the Peterson Plaintiffs in this action, provided me with

correspondence responding to some of the Trustee's allegations concerning the role of the

Peterson Plaintiffs' counsel in the formation of the advance contracts.  (SM Ex. 20 (Email from

C. Fay dated September 22, 2017); SM Ex. 21 (Email from G. Hervey dated September 25,

2017).)

## III.    RECOMMENDATIONS REGARDING INTERVENTION

As a threshold matter and before addressing the parties' substantive concerns, I first

address whether the Advance Companies should be required to intervene in this action to obtain

the relief they seek, and, if so, the extent to which intervention is appropriate.

### A.    Relevant Positions

When Cedars sought relief from the Court (ECF No. 741), and after the Court had

notified the parties of its intent to refer the issues raised by RD and Cedars to a Special Master

for resolution (ECF No. 743), several concerns were raised about my considering the Advance

Companies' applications.  Cedars asserted in its application that there was "no mechanism that

allows Cedars a meaningful opportunity to participate in the process . . . "  (ECF. No. 741 at 3.)

One of the Peterson Plaintiffs' lawyers, Liviu Vogel, argued that Cedars was "seeking priority

resolution of their issues" and that the Court did not yet have jurisdiction over Cedars'

application because Cedars was not a party and had not moved to intervene.  (*See* ECF No. 760

at 1–2.)  The Trustee stated he was "concerned that granting [the Advance Companies' requests

for relief without requiring them to intervene formally] may allow the Advance Companies to

avoid normal procedures designed to protect the rights of persons whose interests may be

affected by the Court's rulings, including the provision of appropriate notice," "especially in

light of the Court's decisions in this case regarding intervention."  (*See* SM Ex. 12 (Letter from

S. Jacob dated June 28, 2017) at 1 n.1.)

　　　RD and Cedars both initially argued they should not be required to intervene to obtain the

relief they seek.  RD stated that it did not believe intervention was appropriate because (1) RD

has contracts with some of the Peterson Plaintiffs and liens on portions of their proceeds, and (2)

"[n]either the Trustee, the Court, nor the Special Master has a case or controversy pending before

it that challenges the [contracts] or the validity of the liens."  (SM Ex. 1 (Letter from M. Roth

June 22, 2017) at 5.)  RD acknowledged, however, that if a plaintiff or other party initiated some

formal process that might affect RD's legal rights, then intervention may be appropriate.  (*Id.*)

Cedars took a similar position, stating that "until either the Court, the Special Master, or the

Trustee formally undertakes to adjudicate the validity of Cedars' interests in the QSF," Cedars

should not be required to intervene.  (SM Ex. 4 (Letter from J. Anderson dated June 20, 2017)

at 1; *see also id*. at 4.)  Cedars further argued that since "no party has sought to invalidate the

agreements," "intervention would have no practical effect on [Cedars'] participation in the

Special Master process."  (*Id*. at 4.)

　　　Given the issues raised by Vogel and the Trustee, the fact that intervention has been and

will likely continue to be an important gating issue in this case, and that the Trustee has raised

concerns about the validity of the Advance Companies' contracts, which RD and Cedars acknowledged would warrant intervention, I invited the Advance Companies to make formal applications to intervene if they wished to pursue their requests for relief before this Court.  On July 12, 2017, the Advance Companies each submitted letters requesting to intervene in this action.  They all argue primarily that they should be allowed to intervene as a matter of right for the limited purpose of having their concerns addressed about the suspension of distributions to the Advance Companies; in the alternative, they argue that permissive intervention should be granted.  (*See* SM Ex. 15 (RD Intervention App.) at 2–6; SM Ex. 17 (Specialty Intervention App.) at 4–5; SM Ex. 16 (Cedars Intervention App.) at 3); *see also* SM Ex. 22 (Letter from M. Roth dated July 14, 2017) at 4 n.1.

The Trustee does not oppose the Advance Companies' applications.  To the contrary, by letter dated July 12, 2017, the Trustee reiterated his "concern[] with the potential ramifications of allowing the Advance Companies to participate without intervening."  (SM Ex. 3 (Letter from S. Jacob dated July 12, 2017) at 4.) Although certain counsel for the Peterson Plaintiffs have weighed in on intervention, none seriously opposes the granting of the Advance Companies' applications.

Fay and Perles submitted a letter opposing the Advance Companies' applications on the ground that the "letters submitted by the advance companies do not appear to be proper motions before the Court pursuant to Fed. R. Civ. P. 24."  (SM Ex. 23 (Letter from Fay and Perles' dated July 21, 2017).)  Additionally, Fay and Perles request that "neither [the Special Master] nor the Court should entertain any of the relief requested by the [the Advance Companies]—i.e., entry of an order directing the Trustee to resume distribution of the assets of the QSF to them—unless and until an order is entered by the Court granting intervention under Fed. R. Civ. P. 24."  (*Id.*)

Case 1:10-cv-04518-LAP   Document 845   Filed 09/29/17   Page 17 of 67

David J. Cook ("Cook"), a participant in the Attorneys' Fee Disputes track, submitted a letter regarding the Advance Companies' applications, stating that he does not "object to the intervention of the Advance Companies," and asserting that "intervention should apply even handedly," meaning that "Cook also should be allowed to intervene." (SM Ex. 24 (Letter from M. Folkenflik dated July 21, 2017).) Jay Glenn, another participant in the Attorneys' Fee Disputes track, submitted a letter largely echoing Cook's arguments. (SM Ex. 25 (Letter from S. Storch dated July 21, 2017) at 1.) Similarly, Colleen Delaney ("Delaney"), another participant in the Attorneys' Fee Disputes track, submitted a letter in support of the Advance Companies' applications, arguing that "all parties should be allowed a limited motion to intervene for the purpose of the QSF, regardless of whether they did not intervene previously in the underlying action. (SM Ex. 26 (Letter from E. Manning dated July 21, 2017) at 1.)[7]

## B. Recommendations

I recommend that the Court construe the applications to intervene by RD, Cedars and Specialty as motions to intervene and that the Court grant those motions insofar as they seek intervention as of right for the limited purpose of seeking an order from the Court compelling the Trustee to resume distributions to the Advance Companies. In the alternative, I recommend that the Court find that the Advance Companies may intervene permissively.

### 1. The Applicable Legal Standards

Pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure, on a timely motion, the court must permit anyone to intervene who "claims an interest relating to the property . . . that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately

---

[7]     Cook's, Glenn's and Delaney's requests to intervene will be addressed along with other the issues assigned to the Attorneys' Fee Disputes track.

represent that interest." Fed. R. Civ. P. 24(a)(2).  Where, as here, an applicant lacks a statutory

right to intervene, to intervene as of right pursuant to Rule 24(a)(2), an applicant must "(1) file a

timely motion; (2) show an interest in the litigation; (3) show that its interest may be impaired by

the disposition of the action; and (4) show that its interest is not adequately protected by the

parties to the action."  *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 197 (2d Cir. 2000).

The failure to satisfy any one of the factors precludes allowing intervention as of right.  *Id*. at

197–98.  If intervention is granted as of right, it "may be subject to appropriate conditions or

restrictions responsive among other things to the requirements of efficient conduct of the

proceedings."  Fed. R. Civ. P. 24 advisory committee note to 1996 amendment.

"On timely motion, the court may permit anyone to intervene who … has a claim or

defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P.

24(b)(1)(B).  In evaluating an application for permissive intervention under Rule 24(b)(2), "[t]he

court considers substantially the same factors" as it does when considering intervention as of

right.  *"R" Best Produce, Inc. v. Shulman-Rabin Mktg., Corp.*, 467 F.3d 238, 240 (2d Cir. 2006).

"A district court has broad discretion under Rule 24(b) to determine whether to permit

intervention on the basis that the intervenor's 'claim or defense and the main action have a

question of law or fact in common.'"  *St. John's Univ., New York v. Bolton*, 450 F. App'x 81, 84

(2d Cir. 2011) (summary order) (quoting Fed. R. Civ. P. 24(b)(2)).

This Court has the ability to grant a motion to intervene for a limited purpose.  Indeed,

this Court has already used its broad discretion to grant the Government's motion to intervene

for the limited purpose of moving to unseal certain filings.  (*See* ECF No. 736.)

### 2.    Timeliness

The Second Circuit has explained that "'[t]he timeliness requirement is flexible and the

decision is one entrusted to the district judge's sound discretion.'"  *Floyd v. City of New York*,

770 F.3d 1051, 1058 (2d Cir. 2014) (per curiam) (citation omitted).  Although the relevant

inquiry is highly fact-specific, the factors courts consider in determining timeliness include:

"'(a) the length of time the applicant knew or should have known of its interest before making

the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to

the applicant if the motion is denied; and (d) the presence of unusual circumstances militating for

or against a finding of timeliness.'"  *Id.* (per curiam) (quotation marks omitted); *see also*

*Peterson v. Islamic Republic of Iran*, 690 F. App'x 744, 746 (2d Cir. May 18, 2017).

"Generally, the court's analysis must take into consideration the totality of the circumstances."

*In re Holocaust Victim Assets Litig.*, 225 F.3d at 198.

       I discuss the relevant factors below.

•      In evaluating the length of time the applicants knew or should have known that their

interests were at risk, the appropriate inquiry is when the applicant became aware that its interest

in the case would no longer be adequately protected by the parties.  *See United Airlines, Inc. v.*

*McDonald*, 432 U.S. 385, 394 (1977).  Here, the Advance Companies made their applications to

intervene within a matter of months after learning that their rights were not being adequately

protected.  The Trustee did not begin mailing out CDAs until November 2016.  (*See* ECF No.

704 at 4.)  Beginning in December 2016, certain of the Peterson Plaintiffs raised objections to the

CDAs.  (*See, e.g.*, SM Ex. 11 (CDA No. 975) (RD contract); SM Ex. 29 (CDA No. 1302)

(Specialty contract); SM Ex. 33 (CDA No. 779) (Cedars contract).)  As of January 13, 2017,

there was some uncertainty as to how the Trustee would proceed with payments to the Advance

Companies insofar as the Trustee reported that there could be delays in paying the Advance

Companies where the plaintiffs had objected to payment or had not returned their CDAs.  (*See*

ECF No. 704 at 4.)  On March 31, 2017, the Trustee reported that he had "suspended further

payments to RD, Cedars and Specialty," citing concerns about the CFPB Action.  (*Id*. at 4–7.)
The Advance Companies sought relief promptly thereafter, with RD filing its application on May
5, 2017, Cedars filing its application on May 15, 2017, and Specialty filing its application on
June 21, 2017.[8]  (ECF No. 726; ECF No. 741; ECF No. 786.)  During a telephone conference on
June 30, 2017, I advised the Advance Companies that they should formally seek intervention if
they wished to have their applications heard.  As requested, they filed their applications twelve
days later, on July 12, 2017.

•      Regarding prejudice to existing parties resulting from the applicant's delay, since there
was no delay to speak of on the part of the Advance Companies, there can be no prejudice
resulting from delay.  RD argues that no party has been prejudiced, because the parties have been
on notice of the Advance Companies' applications and have had reasonable opportunities to
voice any objections to intervention they might have.  (SM Ex. 15 (RD Intervention App.) at 3.)
Although it is not clear that RD's argument is germane, it is supported by the facts.  The
Plaintiffs were made aware of the applications of RD, Cedars and Specialty on May 5, 2017,
May 15, 2017, and June 21, 2017, respectively, when they publicly filed their requests for relief.
On July 14, 2017, counsel for the Peterson Plaintiffs who had expressed an interest in
participating in the Trust Administration Disputes and Attorneys' Fee Disputes tracks were
notified that the Advance Companies had sought to intervene, and they were provided with
copies of the intervention applications that had been made on July 12, 2017.  None of the
lawyers notified indicated that any of the plaintiffs would be prejudiced as a result of the timing
of the Advance Companies' applications.  Perhaps more important, allowing the Advance

---

[8]      This Court has granted intervention for movants who waited "[o]nly six months," which
the Court determined was "not an excessive time frame, given that this litigation has dragged on
for nearly four years."  (ECF No. 398 at 7.)

Companies to intervene would not create any delay in the Assigning Plaintiffs' recoveries.  To the contrary, by allowing the Advance Companies to intervene, the Court will likely be able to resolve the Trustee's concerns about continuing with distributions more quickly than would otherwise be the case.  As a result, granting intervention will likely result in distributions being made to the Assigning Plaintiffs more quickly than if intervention is denied.

• Regarding prejudice to the applicants if their requests to intervene are denied, RD argues that the Advance Companies' interests would be prejudiced if they are not allowed to intervene, because a determination in their absence as to the validity of the advance contracts could impair the Advance Companies' abilities to enforce their rights thereunder.  (SM Ex. 15 (RD Intervention App.) at 3.)  The Advance Companies also assert that they would be prejudiced if funds from the QSF, which are the primary source for satisfying the Peterson Plaintiffs' obligations to the Advance Companies were released to the Assigning Plaintiffs, because that would require the Advance Companies to commence separate actions against the Assigning Plaintiffs to recover from them.  Although a denial of the Advance Companies' applications could impair the ability of the Advance Companies to protect their interests, it would not impede them from doing so, since a decision here on validity does not necessarily preclude the Advance Companies from litigating the issue in separate proceedings against the Assigning Plaintiffs.

• Regarding the presence of unusual circumstances militating for or against a finding of timeliness, RD asserts that "there should be no doubt that this case presents unusual circumstances" because there are no comparable cases.  (*See* SM Ex. 15 (RD Intervention App.) at 3.)  While that is certainly true, it does not necessarily militate for or against a finding of timeliness.  However, circumstances that do militate in favor of a finding of timeliness include the importance of efficiently resolving disputes that are interfering with the timely distribution of

funds in respect of the Plaintiffs' claims, a goal that is well served by allowing the Advance Companies to intervene, since that will facilitate resolving disputes relating to distributions not only to them, but also to the Assigning Plaintiffs who stand to be paid after their obligations to the Advance Companies are satisfied.

In light of the foregoing, I recommend that the Court find the Advance Companies have satisfied the timeliness requirement.

### 3.        The Advance Companies' Interests in this Litigation

To demonstrate they have the requisite level of interest in this action, the Advance Companies must show they have cognizable interests relating to the property or transaction that is the subject of the action that are direct, substantial and legally protectable.  Fed. R. Civ. P. 24(a)(2); *Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 473 (2d Cir. 2010); *Brennan v. N.Y.C. Board of Education*, 260 F.3d 123, 129–32 (2d Cir. 2001).  Here, the Advance Companies argue that they have direct, substantial and legally protectable interests in the Fund since the Advance Companies received assignments of interests in the Fund from certain of the Peterson Plaintiffs.  Therefore, the Advance Companies "stand in the shoes of the Plaintiffs" from whom they acquired portions of their judgment awards.  (*See* SM Ex. 15 (RD Intervention App.) at 4; SM Ex. 16 (Cedars Intervention App.) at 1; SM Ex. 17 (Specialty Intervention App.) at 3).)  This is the sort of direct, substantial and legally protectable interest that clearly satisfies the test.  *See, e.g.*, *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366-67 (3d Cir. 1995); *In re Discovery Zone Secs. Litig.*, 181 F.R.D. 582, 593–94 (N.D. Ill. 1998) (finding that an interest in a settlement fund satisfied the interest test).  Although the Trustee questions the validity of the Advance Companies' interests in the Fund, the merits of the Advance Companies' arguments do not come into play in determining whether the interests are sufficient.

*Brennan*, 260 F.3d at 130.  In light of the foregoing, I recommend that the Court find the Advance Companies have satisfied the interest requirement.

### 4.    Risk of Impairment to the Advance Companies' Interests Without Intervention

The Advance Companies argue that their interests could be affected by a decision as to whether funds should be distributed to them as opposed to the Assigning Plaintiffs, not only insofar as it impacts their ability to be paid in a timely manner but also insofar as a decision could impair their rights to resolve disputes over the advance contracts in accordance with their dispute resolution terms.  As noted above, the QSF is the primary source for satisfying the obligations of the Assigning Plaintiffs to the Advance Companies.  The distribution of funds to the Assigning Plaintiffs could impair the ability of the Advance Companies to recover fully the amounts they assert are owed to them.  Thus, if the Trustee distributes funds to the Assigning Plaintiffs rather than the Advance Companies, it will be more difficult for them to obtain payment.  (SM Ex. 15 (RD Intervention App.) at 4; SM Ex. 17 (Specialty Intervention App.) at 3.)  In addition, since a determination as to validity of the advance contracts needs to be made in order to resolve the Trustee's concerns about resuming distribution, the Advance Companies' rights could be compromised if a decision of invalidity is made without their having had a full opportunity to participate. In light of the foregoing, I recommend that the Court find the Advance Companies have satisfied the requirement of showing a risk of impairment to their interests in the absence of intervention.

### 5.    Protection of the Advance Companies' Interests by Other Parties

The Advance Companies argue that no other parties to this litigation are protecting their interests.  (*See* SM Ex. 15 (RD Intervention App.) at 4; SM Ex. 16 (Cedars Intervention App. at 2; SM Ex. 17 (Specialty Intervention App. at 4).)  Cedars and Specialty further argue that their

interests will not be protected in their absence because they have exclusive title to the assets that

they acquired and are therefore uniquely situated.  (SM Ex. 16 (Cedars Intervention App.) at 2;

SM Ex. 17 (Specialty Intervention App.) at 4.)  Insofar as the Trustee has suspended distributions

to the Advance Companies, he is clearly not protecting their interests.  Although some of the

Assigning Plaintiffs have consented to the distribution of funds to the Advance Companies, none

of those Assigning Plaintiffs is advocating on behalf of the Advance Companies in an effort to

restart distributions.  To the extent certain of the Assigning Plaintiffs have made objections to the

Trustee's distribution of funds to the Advance Companies, those plaintiffs are directly

challenging the Advance Companies' interests, not protecting them.  In light of the foregoing, I

recommend that the Court find the Advance Companies have satisfied the requirement of

showing that no other parties to this litigation are protecting their interests.

      In addition, I recommend that the Court find the Advance Companies may intervene as of

right since they have satisfied all of the relevant requirements for doing so.

### 6.      Common Questions of Law or Fact

      To the extent there is any question about whether the Advance Companies may intervene

as of right, I recommend that the Court exercise its discretion to allow them to intervene

permissively.

      RD argues that its request for relief shares questions of law and/or fact in common with

the Assigning Plaintiffs insofar as they all seek resolution to some extent of the question as to

who is the proper recipient of the judgment proceeds.  (*See* SM Ex. 15 (RD Intervention App.) at

5 n.3.)  Cedars and Specialty argue that their interests in the disposition of the QSF are sufficient

to warrant permissive intervention and further assert that intervention will not unduly delay or

prejudice the adjudication of the rights of the other parties.  (SM Ex. 16 (Cedars Intervention

App.) at 3; SM Ex. 17 (Specialty Intervention App.) at 4.)  Considering the existence of common

questions and the factors discussed above, I recommend that the Court find the Advance

Companies satisfy the requirements for permissive intervention.

Finally, whether intervention is granted as of right or permissively, I recommend that the

Court limit the scope of the Advance Companies' intervention to allow them to be heard on their

applications to compel the Trustee to resume distributions to them.[9]

## IV.     RECOMMENDATIONS ON THE TRUSTEE'S AUTHORITY TO SUSPEND DISTRIBUTIONS

As discussed above (*see supra* at 10–11), after the Trustee started to distribute funds, the

Trustee learned of the CFPB Action and suspended further payments to the Advance Companies

so he could "evaluat[e] whether further investigation and/or legal action is appropriate." (ECF

No. 710 at 6.) The Trustee then developed additional concerns about RD and the advance

contracts more generally, and he argues that those concerns further justify his holding off on

distributions to the Advance Companies. (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017)

at 2–4.)

RD argues that the Trustee should be compelled to restart distributions to the Advance

Companies because the Court ordered that "'the Trustee of the QSF shall distribute the assets of

the Fund' without further order from the Court." (ECF No. 726 at 2 (citing ECF No. 651 at 3).)

In support of its position, RD notes that the "Court appointed the Trustee to administer the QSF

---

[9]     Insofar as Fay and Perles argue that an application for intervention requires a formal
motion, I recommend that the Court reject that argument.  A court may entertain argument by a
non-party by construing a submission as a motion to intervene.  *See Mastercard International
Inc. v. Visa International Service Assoc., Inc.*, 471 F.3d 377, 382 (2d Cir. 2006).  Where, as here,
the movants' positions are clear and no party will be prejudiced by allowing the applications to
be granted without the applicants filing formal pleadings, the Court has flexibility as to the
technical requirements for intervention.  *See id.*; *Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 393
n. 8 (S.D.N.Y. 2002).

in accordance with the Fund Agreement and any Orders issued by the Court." (*Id.* at 3 (citing ECF Nos. 460 and 461).)

RD objects to the Trustee's taking time to evaluate whether to make distributions in light of the CFPB Action, stating that the Trustee did "not include any explanation as to what authority the Trustee has to perform such an evaluation, what the evaluation will entail, or when it will be completed." (ECF No. 726 at 2.) RD added that the Court "did not authorize the Trustee to evaluate or investigate potential claims that have not been asserted but which the Trustee believes might theoretically exist, especially where the ostensible basis for the investigation—the Enforcement Action—involves unrelated transactions and makes no mention of the *Peterson* contracts at all." (*Id.* at 3–4.) According to RD, "any party that seeks to prevent a specific distribution (including any government agency) should be required to file a separate action and move for an injunction," so that objections can "be addressed in an appropriate forum and in accordance with the requirements of Due Process." (SM Ex. 1 (Letter from M. Roth dated June 22, 2017) at 5.)

Cedars and Specialty take similar stances. Cedars argues that the Trustee's suspension of distributions "contravenes the Court's June 6, 2016 order" and asserts, without support, that his action "is at odds with core principles of due process and equity." (ECF No. 741 at 1.) In addition, Cedars asserts that "the Trustee has no standing to consider objections . . . ." (*Id.*; *see also id.* at 3; SM Ex. 4 (Letter from J. Anderson dated June 20, 2017) at 1 (arguing that the "Trustee's determination to withhold distributions is fundamentally inconsistent with principles of due process and equity").) Specialty argues that "there is no legal basis to interfere with" Specialty's advance contracts; and that "the Court did not empower the Trustee to investigate unasserted claims." (SM Ex. 5 (Letter from S. DiCicco dated June 22, 2017) at 2–3.)

In response to the Advance Companies' challenges to his authority, the Trustee notes that his enumerated powers set forth in Section 5 of the QSF Agreement "do not in any way 'limit the power and discretion conferred upon the Fund Trustee by the other provisions of the Fund Agreement or by law.'"  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 1 (quoting ECF No. 461 (QSF Agreement) ¶ 5).)  The Trustee also points out that paragraph 5.8 of the QSF Agreement provides that he "can perform 'any other acts which it deems proper to effectuate the purpose'" of the Fund.  (*Id.* (quoting ECF No. 461 (QSF Agreement) ¶ 5.8.)

The Court's Orders relative to distribution do not include any express direction about how the Trustee is to handle payments to the Advance Companies under the present circumstances.  Pursuant to the Court's Order dated July 9, 2013, the Court directed that "the Fund shall be administered by the Fund Trustee in accordance with:  (i) the terms of the Fund Agreement, [and] (ii) the terms of this Order and any subsequent Orders issued by the Court …."  (ECF No. 460 at 3.)  The Fund or QSF Agreement states in paragraph 3.1.3 that "the Fund Trustee . . . shall, in a reasonably timely manner and pursuant to an order by this Court, distribute the funds from the QSF Account in accordance with . . . the terms of the Plaintiffs' [Sharing Agreement] and in written agreements between the Plaintiffs and other judgment creditors of Iran . . . ."  (ECF No. 461 (QSF Agreement) ¶ 3.1.3.)  Although the QSF Agreement authorizes the Trustee to pay attorneys' liens in accordance with agreements between the Plaintiffs and their respective attorneys and to pay "an assignment company to fund structured settlements and periodic payments for the Plaintiffs, as the Plaintiffs may instruct" (*id.*), the agreement does not expressly authorize or direct the Trustee to pay assignment companies or other third-party financing companies to satisfy obligations owed by the Plaintiffs to such companies in respect of cash advances.  Nor does the Court's Order dated June 6, 2016 address this issue; it simply

"authorized [the Trustee] to commence distribution of the assets held by the QSF in accordance with the terms of the [Sharing Agreement] and in written agreements between the Plaintiffs and other judgment creditors of Iran," and directed the "Trustee of the QSF [to] distribute the assets of the Fund . . . by making payments to the Plaintiffs and other judgment creditors of Iran that have written agreements with any of the Plaintiffs to share in the distribution of the Fund, and their respective attorneys in accordance with paragraph 3.1.3 of the QSF" and states that "no further order from the Court shall be required to make such distributions." (*Id.*)

Notwithstanding the foregoing, the Trustee has exercised the discretion afforded him under paragraphs 5 and 5.8 of the QSF Agreement to distribute portions of the Plaintiffs' shares of the Fund to third-party financing companies in satisfaction of obligations on the part of the Plaintiffs to those companies.  There have apparently been no objections to the Trustee's making those distributions.  Indeed, as noted above, as of March 31, 2017, the Trustee had distributed more than $56 million to advance companies at the direction of the Assigning Plaintiffs.  (ECF No. 710 at 5.)

Under the circumstances, the Advance Companies' argument that the Trustee has no discretion to suspend distributions to them in order to evaluate whether it is appropriate to continue to make such distributions is not persuasive.  If the Trustee continued to make distributions while having legitimate concerns about whether it was appropriate to do so, there would likely be claims that the Trustee failed to fulfill his duties.  However, even when a "trust instrument vests the trustee with broad discretion to make decisions regarding the distribution of trust funds, a trustee is still required to act reasonably and in good faith in attempting to carry out the terms of the trust . . . ."  *In re Estate of Wallens*, 9 N.Y.3d 117, 123 (2007) (citations omitted).

– 28 –

While the Trustee has discretion to suspend distributions to ensure they are made appropriately, this discretion is not without limit. Here, the Trustee's concerns about continuing with distributions were motivated by a good-faith belief that RD may have misled the Assigning Plaintiffs about the nature of the advance contracts. It was also reasonable for the Trustee to question whether potentially vulnerable plaintiffs had entered into contracts that might not be enforceable for other reasons. However, after appropriate consideration of the bases for the Trustee's concerns, I recommend that the Court find the Trustee has failed to show that there is a reasonable basis at this time for him to continue to withhold distributions to the Advance Companies, and that the Court order the Trustee to take the actions described below in Parts V–VII.

## V.    RECOMMENDATIONS ON DISTRIBUTIONS WHERE THE ASSIGNING PLAINTIFFS HAVE AFFIRMATIVELY CONSENTED

### A.    Relevant Positions

The Advance Companies seek distributions with respect to approximately 76 Assigning Plaintiffs (the "Consenting Plaintiffs") who have completed CDAs reflecting their consent to such distributions. (ECF No. 726 at 4; ECF No. 741 at 4; ECF No. 786 at 2.) As discussed further below, the Trustee has raised a variety of concerns about continuing with distributions to the Advance Companies, even where the Assigning Plaintiffs have consented. (*See* ECF No. 710 at 4; SM Ex. 12 (Letter from S. Jacob dated June 28, 2017).) In his report dated March 31, 2017, the Trustee cited the CFPB Action as the driver of his decision to suspend distributions, reporting to the Court that the CFPB Action had caused him to evaluate whether RD had made misrepresentations to the Assigning Plaintiffs about the nature of the advance contracts. (ECF No. 710 at 6.) With regard to the CFPB Action, the Trustee has also indicated that he was

concerned that the Assigning Plaintiffs who had consented to his making distributions to the Advance Companies had likely done so without having known about the CFPB Action.

   With the help of the Fay Group, the Trustee's last concern has been resolved.  By letter dated April 3, 2017, a representative of the Fay Group notified all of the Peterson Plaintiffs (even those who had not entered into advance contracts) about the CFPB Action.  (SM Ex. 31 (Letter from C. Fay to Peterson Plaintiffs dated April 3, 2017).)  The letter informed the Peterson Plaintiffs that the CFPB and the NYAG had alleged "RD Legal is guilty of fraud, deceptive and abusive practices under the Consumer Financial Protection Act, in violation NY Civil Usury Laws and other NY State Laws which protect consumers."  (*Id.* at 1.)  The Fay Group's letter told the Peterson Plaintiffs that "any person with a complaint against RD Legal Fund, or any other legal funding company, should file an official complaint with the CFPB," and provided information about how to complete such a complaint.  (*Id*. at 1–2.)  If any of the Peterson Plaintiffs wanted to object to the distribution of funds to any of the Advance Companies in light of the CFPB Action, they had the opportunity to do so.  Thus, any concern the Trustee had about the Peterson Plaintiffs' knowledge of the CFPB Action has been resolved.

   Notwithstanding the foregoing, the Trustee continues to have concerns about:

- whether RD made misrepresentations to the Assigning Plaintiffs of the sort at issue in the CFPB Action;

- whether RD failed to disclosed that it had breached its advance contracts with certain of the Peterson Plaintiffs;

- the roles the lawyers representing the Assigning Plaintiffs in this litigation played in connection with facilitating communications between them and RD about the possibility of their entering into advance contracts;

- whether those lawyers had undisclosed conflicts of interest since they also had advance contracts with RD;

- whether the Assigning Plaintiffs received advice from any other lawyers when they entered into the advance contracts;

- whether the contracts were standardized documents that were not subject to individual negotiation;

- whether the financial terms of the contracts violate applicable law; and

- whether statements made by RD during the course of the SEC Proceeding call into question the enforceability of the advance contracts.

(SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 2.)

RD has argued primarily that the CFPB Action and the SEC Proceeding are unrelated to the contracts here and do not justify the withholding of funds to the Advance Companies. (ECF No. 726 at 2–3; SM Ex. 1 (Letter from M. Roth dated June 22, 2017) at 4–5; SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 1–3; *see also* ECF No. 741 at 3 (Cedars arguing that the CFPB action against RD "lacks any factual or legal nexus to the Peterson case or to Cedars"); SM Ex. 5 (Letter from S. DiCicco dated June 22, 2017) at 3–4) (Specialty arguing the same).) RD also disputes that it breached any of the advance contracts. (SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 3–4.) In addition, the Advance Companies all argue that the Trustee's other concerns are not supported by the facts and do not justify withholding payment to the Advance Companies. (*See id.* at 3–6; SM Ex. 4 (Letter from J. Anderson dated June 20, 2017) at 3–4; SM Ex. 5 (Letter from S. DiCicco dated June 22, 2017) at 4–5).)

Counsel for the Peterson Plaintiffs have provided factual input to address some of the Trustee's assertions about their roles relative to the advance contracts. (SM Ex. 20 (Email from C. Fay dated September 22, 2017); SM Ex. 21 (Email from G. Hervey dated September 25, 2017).) Counsel have otherwise not taken positions regarding the Trustee's particular concerns about the Advance Companies or the distribution of funds to the Advance Companies.

### B.    Recommendations

At the outset of my analysis of the Trustee's concerns, I note that the Trustee is essentially trying to disregard the terms of contracts entered into between the Advance

Companies, on the one hand, and the Assigning Plaintiffs, on the other hand.  Under New Jersey

law, "[c]ourts normally examine challenges to the validity of contracts by first recognizing the

parties' freedom to contract and by applying the principle that the execution of a contract

manifests an intent to be bound by all its terms."  *Sitogum Holdings, Inc. v. Ropes*, 352 N.J.

Super. 555, 561 (Ch. Div. 2002).  However, as discussed below, courts will find a contract

unenforceable if it is the product of fraud, is unconscionable or violates public policy.  Thus, for

organizational purposes, I group the Trustee's concerns into those relating to the possibility of

finding the advance contracts unenforceable for reasons relating to:  (1) fraudulent inducement;

(2) unconscionability; and (3) public policy.

### 1.       Fraudulent Inducement

Under New Jersey law, a court may grant rescission of a contract where there is proof of

a material misrepresentation of a presently existing or past fact, upon which another party relies

to his detriment.  *See Jewish Ctr. of Sussex Cnty v. Whale*, 432 A.2d 521,524 (N.J. 1981).

Although the Trustee has not sought to frame any of his arguments under the fraudulent

inducement rubric, he appears to raise two arguments that the advance contracts are subject to

rescission due to fraudulent inducement.  One relates to the Trustee's concerns about possible

misrepresentations of the sort at issue in the CFPB Action.  The other relates to concerns about

RD's alleged failure to disclose breaches of the advance contracts.

### a)       The CFPB Action

As mentioned above, the Trustee suspended distributions to the Advance Companies

upon learning of the CFPB Action.  In his report of March 31, 2017, the Trustee stated that he

intended to evaluate whether (i) the allegations in CFPB Action relate to the contracts entered

into by the Peterson Plaintiffs, (ii) the Advance Companies engaged in the same type of

misrepresentation at issue in the CFPB Action, and (iii) the Advance Companies provided

"appropriate disclosures" to the Assigning Plaintiffs.  (ECF No. 710 at 6.)  The Trustee reiterated

his concerns about the CFPB Action in his letter of June 28, 2017.  (*See* SM Ex. 12 (Letter from

S. Jacob dated June 28, 2017) at 4–5.)

      The Trustee has expressed concerns about certain allegations "regarding how RD Legal

conducted its business" made in a complaint filed in the Southern District of New York by the

CFPB and the NYAG against RD, certain of its affiliates and its principal.  (*See* SM Ex. 12

(Letter from S. Jacob dated June 28, 2017) at 4; *see also* SM Ex. 32 (CFPB Complaint).)  The

Trustee has also referred to communications he has had with representatives with the CFPB, the

NYAG and at least one other state attorney general regarding whether they intend to take action

against RD relative to its dealings with the Peterson Plaintiffs.  (ECF No. 710 at 6.)

      RD argues that the Trustee should not be allowed to suspend distributions "based on

unsubstantiated allegations in an unrelated lawsuit," which "[o]n its face" "has nothing to do

with the *Peterson* transactions . . . ."  (ECF No. 726 at 1.)  That is especially so, according to RD,

since the CFPB and the NYAG are aware of the advance contracts at issue here and have not

taken any legal action relating to them.  (*Id*. at 3; *see also* SM Ex. 1 (Letter from M. Roth dated

June 22, 2017) at 4.)[10]  To the extent that the Trustee has based his decision to suspend

---

[10]     In response to RD's arguments that inferences in RD's favor should be drawn from the
fact that the CFPB and the NYAG have not challenged the advance contracts at issue here, the
Trustee asserts that the CFPB and the NYAG have advised the Trustee they have not "cleared"
RD of wrongdoing in connection with the Peterson transactions.  (SM Ex. 12 (Letter from S.
Jacob dated June 28, 2017) at 5.)  Whether or not the CFPB or the NYAG has "cleared" RD, the
fact remains that they have not taken legal action against RD relative to its dealings with the
Peterson Plaintiffs or the advance contracts at issue here.  There is no dispute that the CFPB and
the NYAG received and had ample opportunity to review copies of the advance contracts RD
entered into with the Peterson Plaintiffs.  (SM Ex. 7 (Letter from M. Roth dated July 12, 2017)
at 2.)  Nor is there any dispute about the fact that the CFPB and the NYAG are aware of the
Advance Companies' applications to the Court and my request that interested parties seek to
intervene if they wished to be heard on the relevant issues.  Yet, neither the CFPB nor the NYAG
has sought to prevent the Trustee from distributing funds to RD or to intervene.

distributions on *ex parte* communications with representatives of the CFPB and the NYAG, RD also argues that such "behind-the-scenes, extra-judicial conduct" is improper.  (ECF No. 726 at 4; *see also* ECF No. 761 at 1–2.)  Cedars and Specialty echo RD's concerns about the Trustee's communications with the CFPB and the SEC.  (ECF No. 741 at 1–3; SM Ex. 5 (Letter from S. DiCicco dated June 22, 2017) at 3–5.)

The CFPB and the NYAG allege, *inter alia*, that RD engaged in deceptive and abusive practices in violation of the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5564 (the "CFPA") by mischaracterizing certain financing arrangements as assignments rather than loans, and that RD violated New York usury laws by charging interest rates in excess of the maximum allowable rates.  (*See* SM Ex. 32 (CFPB Complaint) at ¶¶ 6–8, 20–43, 55–59, 99–110; *see also* ECF 710 at 5–6.)  At issue in the CFPB Action are advance contracts that RD entered into with two groups of counterparties:  (1) individuals who were injured as a result of serving as first responders in response to the terrorist attack on September 11, 2001 in New York and who have been approved to receive compensation from a fund referred to as the Zadroga Fund; and (2) former NFL players diagnosed with various neurodegenerative diseases and who are eligible to receive proceeds from the settlement of class action litigation in *In re Nat'l Football League Players' Concussion Injury Litigation*, No. 2:12-MD-02323-AB (E.D. Pa.).  (*See* SM Ex. 32 (CFPB Complaint) ¶¶ 20–23.)  The CFPB and the NYAG allege that although RD calls the contracts at issue assignments (*id.* ¶ 40), they are not in fact assignments for three reasons.  First, the NFL settlement agreement provides that any assignment of a class member's rights is void. (*Id.* ¶ 35.)  Second, the statute that created the Zadroga Fund authorizes payment only to claimants, defined as individuals filing claims for compensation, and the Zadroga Fund's policies prohibit RD from receiving payment directly from that fund.  (*Id.* ¶ 36.)  Third, assignments of

personal-injury claims violate New York law and contravene public policy.  (*Id.* ¶ 60.)  The CFPB and NYAG plead that, because the agreements at issue in their case are not assignments, they are properly considered loans subject to New York's usury laws.  (*Id.* ¶¶ 38–43, 53, 55–56.)  They also argue that, given the effective interest rates charged by RD, the agreements violate those laws.  (*Id.* ¶ 57–59.)[11]

Although the allegations in the CFPB Action describe transactions similar in nature to those entered into by certain of the Peterson Plaintiffs, the allegations do not refer to the advance contracts at issue in this case.  The Trustee has not provided any basis for concluding that the issues about RD's actions relative to other advance contracts call into question any of RD's actions relative to the advance contracts in this matter.  He has not shown that the Peterson Plaintiffs were in any way prohibited from assigning portions of their expected proceeds from their judgments against Iran.  Nor has he established that the advance contracts here were, in fact, loans.

---

[11]      RD has moved to dismiss the CFPB Action on numerous grounds, and the CFPB and the NYAG have opposed the motion.  *See* Def.'s Mot. to Dismiss, *Consumer Financial Protection Bureau et ano. v. RD Legal Funding, LLC, et al.*, No. 1:17-cv-00890 (LAP) (S.D.N.Y. May 15, 2017), ECF No. 30; Opposition to Defendant's Motion to Dismiss, (June 12, 2017), ECF No. 36; Reply in Support of Defendant's Motion to Dismiss (June 26, 2017), ECF No. 37; Defendant's Motion to Dismiss (June 29, 2017), ECF No. 40.  Co-Lead Class Counsel for the plaintiff settlement class certified in the multidistrict *In re Nat'l Football League Players' Concussion Injury Litigation*, No. 2:12-MD-02323-AB (E.D. Pa.), filed a brief as *amicus curiae* in the CFPB Action on the question of whether the plaintiffs could lawfully enter into assignment contracts with funding companies.  Proposed Amicus Brief, *Consumer Financial Protection Bureau et ano. v. RD Legal Funding, LLC, et al.*, No. 1:17-cv-00890 (LAP) (S.D.N.Y. July 25, 2017), ECF No. 45-1.  The judge presiding over the CFPB Action has referred the question to the judge presiding over *In re Nat'l Football League Players' Concussion Injury Litigation* in the U.S. District Court for the Eastern District of Pennsylvania.  Order, *Consumer Financial Protection Bureau et ano. v. RD Legal Funding, LLC, et al.*, No. 1:17-cv-00890 (LAP) (S.D.N.Y. Sept. 8, 2017) (ECF No. 59).

Based on my review of the allegations and issues in dispute in the CFPB Action, I recommend that the Court find that the Trustee has not established that the allegations in the CFPB complaint support a finding that RD has made material misrepresentations to the Assigning Plaintiffs about the advance contracts at issue here.[12]

> b)      Breaches of the Advance Contracts

The Trustee argues that RD failed to disclose to the Assigning Plaintiffs that it breached its agreements and that RD's "failure to inform the Plaintiffs may have adversely affected their ability to make informed decisions in responding to the CDA forms."  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 3.)  To establish a breach of contract under New Jersey law, "a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007).[13]  The Trustee asserts that RD breached the terms of its rebate contracts by "by overcharging [some of the plaintiffs] a total of approximately $500,000."  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 3; *see also* SM Ex. 3A (Memorandum from A. Katz dated July 12, 2017, annexed to Letter from S. Jacob dated July 12, 2017) at 1.)

---

[12]      Although Cedars and Specialty argue that the CFPB Action has no relevance to them since they were not named as defendants or mentioned therein, the Trustee asserts that "as RD Legal essentially acted as broker on the transactions with Cedars and Specialty, their transactions may have been tainted by any misrepresentations that may have been made by RD Legal."  (SM Ex. 12 (Shalom Jacob Letter dated June 28, 2017) at 5.)  While the Trustee's reasoning on this point is compelling, since the Trustee has not demonstrated that RD engaged in wrongful conduct relative to the Peterson Plaintiffs, it is not necessary to resolve whether the CFPB Action is relevant or not to Cedars and Specialty.

[13]      I apply New Jersey law since the advance contracts are all governed by New Jersey law (*see, e.g.*, SM Ex. 6 (Sample RD Contract) at 5), and there has been no suggestion that the law of any other jurisdiction is relevant.

In support of his position, the Trustee states that certain of the Assigning Plaintiffs who had entered into rebate contracts with RD informed the Trustee that they believed RD was charging them for funding before the funding had actually been provided.  (*Id.*)  The Trustee asserts that he sought reassurances from RD that this was not the case, and that RD confirmed repeatedly that it was not overcharging.  (*Id*.)  After some back and forth over the terms of a confidentiality agreement that RD insisted upon (*id*. at 1–2), RD ultimately provided information to the Trustee's accountants about how RD had been doing its calculations.  (*Id*. at 2–3.)  According to the Trustee, RD was less than forthcoming throughout the process.  (*Id*. at 1–3.)  However, the Trustee asserts that RD eventually agreed it had charged certain plaintiffs before they had received funding and that the overcharges amounted to approximately $500,000.  (*Id*. at 3.)  Ultimately, RD agreed that the Trustee could withhold approximately $750,000 from his distribution to RD to cover that amount and to reimburse the Trustee for the costs incurred. (*Id*. at 3.)

RD argues that the Trustee's assertion of breach "is simply inaccurate."  (SM Ex. 7 (Letter from M. Roth dated July 12, 2016) at 3.)  According to RD, the Trustee's allegation that RD overcharged any of the plaintiffs is incorrect since RD does not charge the plaintiffs at all.  (*Id*. at 4.)  RD asserts that "there was no contractual term that was breached" and that RD only agreed to allow the Trustee to withhold $750,000 from a distribution "to avoid dispute."  (*Id*.)  Given that RD agreed to forego $750,000 in December 2016 and that the Trustee "continued to make distributions to RD" thereafter, RD states that it is "at a loss as to why the Trustee" raised the issue in June 2017 "to justify suspending further distributions."  (*Id*.)

Although there is a dispute between the Trustee and RD as to whether RD breached any of its advance contracts, and it is debatable whether there could be a claim for breach where, as

here, there are no damages, it is not necessary to resolve those questions.  It is undisputed that if there was a breach, it concerned RD's rebate contracts.  Since we are concerned here only with the Advance Companies' flat-out contracts and certain replacement contracts, even if RD had breached the rebate contracts and failed to disclose such breaches, I recommend that the Court find the Trustee has failed to establish that the failure would have been material to the Assigning Plaintiffs whose contracts are at issue here when they provided their consents to distribution.

<strong>2.  Unconscionability</strong>

The Trustee states he has "concerns as to whether some or all of [the advance contracts] were unconscionable."  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 2, 4.)  He also asserts that "the 'fairness' or potential unconscionability' of the Purchase Agreements is to some extent a function of whether the discounts for the transferred judgments were justified by real litigation risk."  (SM Ex. 3 (Letter from S. Jacob dated July 12, 2017) at 1.)  RD disputes the Trustee's positions.  (SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 3–6).)

Under New Jersey law, the doctrine of unconscionability can be applied to a broad variety of contracts.  It has been described as "overreaching or imposition resulting from bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person acting under compulsion or out of necessity would accept its terms."  *Howard v. Diolosa*, 241 N.J. Super. 222, 230 (App. Div. 1990).  When addressing unconscionability, courts consider two factors:  (1) whether there was unfairness in the formation of the contract, referred to as "procedural unconscionability", and (2) whether there are excessively disproportionate terms, referred to as "substantive unconscionability."  *Delta Funding Corp. v. Harris*, 912 A.2d 104, 111 (N.J. 2006) (*citing Sitogum Holdings, Inc. v. Ropes*, 352 N.J. Super. 555, 565–66 (Ch. Div. 2002)).  Procedural unconscionability "can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract

– 38 –

terms, bargaining tactics, and the particular setting existing during the contract formation process." *Sitogum Holdings, Inc v. Ropes*, 352 N.J. Super. 555, 564 (Ch. Div. 2002). Substantive unconscionability "suggests the exchange of obligations so one-sided as to shock the court's conscience." *Id*. at 565. "Courts generally have applied a sliding-scale approach to determine overall unconscionability, considering the relative levels of both procedural and substantive unconscionability." *Delta Funding Corp.*, 912 A.2d at 111. The decision as to whether a particular agreement is unconscionable is fact-sensitive, but it can be made by a court if the key factual contentions are not in dispute. *Sitogum Holdings, Inc*, 352 N.J. Super. at 568.

"[T]he essential nature of a contract of adhesion is that it is presented on a take it or leave it basis, commonly in standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." *Rudbart v. N. Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 353 (1992). If a contract fits the definition of a contract of adhesion, a court must still determine whether the contract is unenforceable. *Id*. at 354. In doing so, "[a] sharpened inquiry concerning unconscionability is necessary . . . ." *Muhammad v. Cty. Bank of Rehoboth Beach*, 912 A.2d 88, 97 (2006). In conducting such an inquiry, courts consider: "the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract." *Id.* at 356; *see also Muhammad*, 912 A.2d at 97. Contracts that have been found to meet the foregoing criteria have generally concerned "common and necessary adjunct[s] of daily life" where the purchaser has no real alternative but to agree to a term that deprives him or her of a right deemed important to the public interest. *See, e.g.*, *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 404 (1960) (finding that contract of sale for a car was unenforceable insofar as it included a disclaimer of an implied waiver of an implied warranty). However, contracts of

adhesion concerning investments in public notes have been found not to satisfy the foregoing criteria, because they do not concern a consumer necessity, the more dominant party lacked monopolistic power over the subject of the contract and the less dominant party had other options. *Rudbart,* 127 N.J. at 353.

The Trustee suggests that he views the advance contracts as contracts of adhesion insofar as he describes them as "standardized documents" and "not subject to individual negotiation (except for the amount of the judgment assigned and, in certain cases, whether the Plaintiff selected a flat-out or rebated transaction)." (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 2.) RD disagrees, stating that the "contracts were not form contracts of adhesion, they evolved over time, and in some instances were negotiated." (SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 5.)[14] While it is true that the contracts evolved over time and were negotiated in certain instances, given the uniformity of the terms, there is some support for a finding that the agreements are form agreements that were presented on a take-it-or-leave-it basis. However, because the Trustee does not suggest that the financing was a consumer necessity or that the Advance Companies were the only providers offering financing to the Peterson Plaintiffs, I would recommend that the Court find the Trustee has not provided a sufficient basis for characterizing the advance contracts as contracts of adhesion. *See Rudbart*, 127 N.J. at 353.

---

[14]      In at least one of RD's agreements, RD included on the first page of the contract a disclosure schedule not included in the other agreements that clearly set forth: the total amount paid to the plaintiff under the terms of the agreement; the amount of the award that RD was purchasing; and the total dollar amounts paid to RD in case the full amount of the award was recovered, along with the "annual percentage rate of return (compounded monthly)" that RD would recover on its investment, in case it received the full amount of any award at different points in time over the three-year period following execution of the contract, stated in six-month intervals. (*See* SM Ex. 30 (Sample RD Contract 2) at 1.) Similar disclosure schedules were not included in any of the other contracts in dispute.

Even if they were, however, I recommend that the Court find the contracts are not unconscionable.  Focusing on procedural unconscionability, or the formation of the contracts, the Trustee seems to argue that the particular setting that existed during the process was problematic. In particular, he suggests that the Assigning Plaintiffs were lured into agreeing to the terms of complex contracts by their trial counsel who had financial incentives for doing so, which they failed to disclose, and then left their clients to fend for themselves without legal counsel. Plaintiffs' counsel and RD dispute the Trustee's position and identify facts that are inconsistent with the Trustee's theory.

The Trustee asserts that "[i]t was the attorneys for the Peterson Plaintiffs who introduced RD Legal to [them]."  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 3.)  He also states that it is his "understanding that the Peterson Plaintiffs' attorneys facilitated the Advance Companies' solicitation of the Plaintiffs by arranging for the formation of a small group of the Plaintiffs to consider the Advance Companies' proposal, providing the Advance Companies with a list of their clients, and mailing the offering materials."  (*Id*. at 2.)  There is no dispute that counsel for the Peterson Plaintiffs facilitated RD's provision of solicitation materials to the Peterson Plaintiffs.  According to a representative of the Fay Group, counsel did so by forming a committee of the Peterson Plaintiffs, at the request of some who were interested in the possibility of obtaining advances, to consider whether and how to proceed relative to RD.  (SM Ex. 20 (Email from C. Fay dated September 22, 2017.)  Perles states that he brought RD's proposal to "the national spokesperson of the leadership committee . . . ."  (SM Ex. 21 (Email from G. Hervey dated September 25, 2017).)  However, it does not appear there was anything nefarious about the role counsel played.  Although the Fay Group agreed to mail solicitations from RD to the Peterson Plaintiffs, at RD's expense, counsel has informed me that they did not provide RD

with a list of their clients or inform them that counsel had approved of RD's proposal.  (*Id.*; *see also* SM Ex. 21 (Email from G. Hervey dated September 25, 2017).)

The Trustee suggests that counsel for the Peterson Plaintiffs may have given their stamp of approval to RD's solicitation materials.  In support of his position, the Trustee notes that in an exhibit introduced in the SEC Proceeding, a draft cover letter that appeared intended to be sent by Plaintiffs' counsel to the Peterson Plaintiffs stated that "'your leadership counsel has approved this letter and the attached' solicitation from RD Legal."  (SM Ex. 3 (Letter from S. Jacob dated July 12, 2017) at 4.)  Counsel for the Peterson Plaintiffs vehemently deny having approved RD's solicitation materials or having given the impression of such approval to the plaintiffs.  (SM Ex. 20 (Email from C. Fay dated September 22, 2017); SM Ex. 21 (Email from G. Hervey dated September 25, 2017).)[15]

The Trustee states that it is his "understanding that, prior to the advances made to the Plaintiffs, some of the Peterson attorneys also entered into substantial financing arrangements with RD Legal" and that he "does not know if the Peterson Plaintiffs were made aware of, or consented to, these transactions."  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 2–3.)  The Trustee asserts that "it is not known whether counsel's arrangements with RD Legal affected the terms of their clients' deals."  (*Id*. at 3.)  While it is correct that certain of the

---

[15]    The Trustee also suggested that RD may have engaged in improper conduct in its solicitations, and cited to the testimony of one of the Assigning Plaintiffs given during the SEC Proceeding.  At most, the testimony offered by the Assigning Plaintiff established that he was under the mistaken impression that his counsel in the Peterson Action, Fay, had "vetted" the advance company agreements.  (SM Ex. 34 (SEC Transcript dated March 28, 2017) at 1780:17–25, 1802:18–23.)  He never alleged that RD used inappropriate tactics in getting him to enter into an advance contract.  Rather, he testified that, when he entered into the advance contracts, his attorneys "weren't saying [the case] was going to settle," that the case was "going back and forth between court and court and court," and that the case "wasn't looking promising."  (*Id.* at 1774:1–7.)  RD "convinced [him], just by [their conversation], not saying . . . you must do this, but just the dialogue we had back and forth about the case might not settle."  (*Id.* at 1774:8–12.)

Peterson Plaintiffs' counsel had financing contracts with RD, there is no evidence that the terms of counsel's arrangements affected the terms of their clients' deals and no evidence that counsel received any financial incentives to refer any of the Peterson Plaintiffs to RD.  Certainly the agreements counsel had with RD reflect no such incentives.  (SM Ex. 35 (RD Agreement with Fay dated August 22, 2008); SM Ex. 36 (RD Agreement with Perles dated May 28, 2010).)  Moreover, counsel for the Peterson Plaintiffs vehemently denies having received any financial incentives for referring their clients to RD.  (SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 4–5.)  And RD, which is in a position to know whether any such incentives were paid, asserts that counsel were not provided with any financial incentives to refer Plaintiffs to RD.  (*Id.* at 4.)

The Trustee asserts that the Peterson Plaintiffs' counsel "made the deliberate decision to have no substantive involvement in advising their clients with respect to the Purchase Agreements" and did not review the solicitation materials or the Purchase Agreements . . . ." (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 2; SM Ex. 3 (Letter from S. Jacob dated July 12, 2017) at 4.)  There is no dispute that counsel for the Peterson Plaintiffs in this action did not represent the Assigning Plaintiffs in connection with their advance contracts.  As the Trustee notes, when counsel was contacted by the Peterson Plaintiffs seeking advice in connection with the contracts, counsel advised them to seek independent counsel.  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 2.)  RD asserts that the Peterson Plaintiffs' counsel "did exactly what they were required to do to avoid a potential conflict: they did not represent Plaintiffs in their transactions with RD Legal."  (SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 5.)

The Trustee states that "while each of the Advance Companies was represented by counsel, to the Trustee's knowledge, Plaintiffs were not," resulting in the Assigning Plaintiffs

being deprived of counsel in connection with complex agreements.[16]  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 4.)  There is no dispute that the advance contracts are complex in many respects.  As discussed above, the contracts themselves state prominently and repeatedly that they are complex documents and that plaintiffs considering them were advised to seek independent legal and financial advice before agreeing to the terms thereof.  (SM Ex. 6 (Sample RD Contract) at 6.)  RD notes that the "certain Plaintiffs were in fact represented by counsel and negotiated their contracts," and provides an example of a plaintiff that was represented by counsel.  (SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 5.)  RD also notes that the majority of the Plaintiffs "had the opportunity to receive free credit counseling services from GreenPath—a national company that provides credit and debit counseling—before assigning their judgment proceeds to RD Legal."  (Id.)[17]

Although the Trustee asserts that the Assigning Plaintiffs "likely were entering the Purchase Agreements because of pressing financial needs (id. at 4), I do not have any evidence of the individual circumstances faced by each of the Assigning Plaintiffs when they entered into the advance contracts with the Advance Companies.  I do know, however, that the plaintiffs had other options for obtaining funding and that at least some of them had entered into arrangements with other financing companies before financing from RD became available and then elected to

---

[16]    In fact, at least one of the Assigning Plaintiffs was represented by counsel to review the advance contracts.  (See SM Ex. 37 (Letter from M. Porges dated July 2, 2014).)

[17]    During the SEC testimony given by an Assigning Plaintiff discussed above, see supra at 42 n.15, the Assigning Plaintiff initially testified that he could not recall receiving credit counseling prior to entering into his advance contract, but his testimony established that he most likely did receive credit counseling through GreenPath, and that Cedars required him to complete this credit counseling before it would fund his advance contract.  (SM Ex. 34 (SEC Transcript dated March 28, 2017) at 1812:4–16.)

replace their original financial arrangements with funding from RD, presumably on more favorable terms. (SM Ex. 20 (Email from C. Fay dated September 22, 2017).)

In light of the foregoing, and considering the undisputed facts, I recommend that the Court find the Trustee has not established procedural unconscionability.

With regard to substantive unconscionability, the Trustee states that "the assigned portion of the judgments were purchased by the Advance Companies at a discount of approximately 65% on 'flat-out' transactions, and 72% on 'rebated' transactions. In practical terms, in return for assigning a one million dollar share in a judgment, it appears that a Plaintiff would receive approximately $347,000 on flat out transactions and approximately $287,000 on rebated transactions," resulting in the Advancing Companies receiving "significantly more money than the victims of the Beirut terrorist attacks and their families." (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 2.) The Trustee also asserts that the "substantial discount the Advance Companies paid for the judgments might be viewed as unconscionable" [i]f there was no real risk that the Advance Companies would not be paid. (SM Ex. 3 (Letter from S. Jacob dated July 12, 2017) at 1.)

According to RD, the "effective rate of return for [a Plaintiff RD uses as an example] is approximately 27% and decreases monthly to the detriment of RD Legal and its investors." (SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 6.) RD also stated that the return rates on the transactions were not relevant to "determine whether the funds should be distributed," and claimed that the Trustee "overlooks the benefit provided by RD Legal—immediate access to funds—and fails to account for the costs associated with the significant passage of time between RD Legal's payment to the Plaintiffs and the distribution of funds to RD Legal. (*Id*. at 5.) RD

also highlights that RD only purchases a portion of the Plaintiff's judgments and that the Trustee is holding a large reserve that is an additional source of funds to the plaintiffs.  (*Id*. at 6.)

The amounts of the cash advances paid to the Assigning Plaintiffs were certainly significantly less than the amounts of the judgments sold in exchange for such advances.  (*See* SM Ex. 6 (Sample RD Contract) at 1 (assigning $183,360.95 for advance of $52,500); SM Ex. 10 (Sample Cedars Contract) at 2 (assigning $585,500 for advance of $205,000).)  However, those figures cannot be looked at in a vacuum.  The financial terms of the advance contracts need to be viewed in context, taking into account the risks that the Advance Companies took in entering into the transactions.  As mentioned above, RD began entering into contracts with the Peterson Plaintiffs in late 2012.  (*See* ECF No. 726 at 1; SM Ex. 1 (Letter from M. Roth dated June 22, 2017) at 2.).  Cedars entered into advance contracts with the Peterson Plaintiffs beginning in 2014.  (SM Ex. 4 (Letter from J. Anderson dated June 20, 2017) at 2.)  All of the advance contracts were entered into before the Supreme Court affirmed the Turnover Judgment. *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016).  Thus, there was considerable risk that the Advance Companies might never have been paid.  Given the complexity of this litigation, there was also risk that, even if the Advance Companies were paid, payment might not be made for many years after the contracts became effective.

The Trustee states that it is his "understanding that RD Legal testified there was no risk to its investors in connection with the Peterson transactions.  If true, this may be inconsistent with RD Legal's position here that it was at risk with respect to the Peterson Purchase Agreements (a necessary element in establishing the enforceability of the Purchase Agreements)."  (SM Ex. 12 (Letter from S. Jacob dated June 28, 2017) at 4.)

The Trustee's concern about RD's testimony in the SEC Proceeding fails to support a conclusion that the advance contracts presented no risk to RD for two reasons. First, the testimony cannot reasonably be construed as a statement by RD that it faced no risk whatsoever in entering into the advance contracts.  The gravamen of the SEC's charge against RD is that it "marketed [its] funds as opportunities to invest in receivables backed by law firms relating to settled litigation," but that it had at various times invested in "unsettled cases, cases unaffiliated with any law firm, and other cases for which collection was still subject to litigation risk."  SEC Order ¶ 2.  The SEC identified RD's investments in "certain receivables relating to" this litigation (including judgment proceeds and attorney advances) as having risk of the sort that was different from the risks RD told its investors it would be taking.  *Id.* ¶¶ 19–21, 55, 57–58. Although RD has offered testimony that it assumed "zero" litigation risk in the advance contracts with Peterson Plaintiffs, there was no question in the proceeding that RD assumed geopolitical, duration, and credit risk by entering into the contracts.  SEC Admin. Proceeding No. 3-17342, SEC Pre-Hr'g Br. at 2 (May 9, 2017); SEC Admin. Proceeding No. 3-17342, SEC Post-Hr'g Reply Br. at 8 (Aug. 28, 2017).

Second, even if RD stated in the SEC Proceeding that it did not assume risk when it entered into the advance contracts, the undisputed facts discussed above show the contrary.

In light of the foregoing, I recommend that the Court find the Trustee has not established substantive unconscionability.  In addition, I recommend that the Court find that, based on all of the undisputed facts discussed above, the Trustee has failed to provide sufficient support for a finding that the advance contracts are unenforceable as unconscionable.

### 3.      Public Policy

Courts applying New Jersey law can decide that a contract is unenforceable as against public policy when one party "seeks to shield itself from all civil liability, based on a one-sided

contractual arrangement that offers no countervailing or redeeming societal value." *Walters v. YMCA*, 437 N.J. Super. 111, 119–20 (App. Div. 2014).  "Contracts have been declared invalid because they violate statutes, promote crime, interfere with the administration of justice, encourage divorce, violate public morality or restrain trade." *Vasquez v. Glassboro Serv. Ass'n, Inc.*, 83 N.J. 86, 99 (1980); *see also 400 Blair Rd. Realty Holdings, LLC v. Wells Fargo Bank Minnesota, N.A.*, No. A-3816-05T2, 2007 WL 1518309, at *7 (N.J. Super. Ct. May 25, 2007); *Gamble v. Connolly*, 399 N.J. Super. 130, 144 (2007).

Here, the Trustee suggests that the advance contracts may be unenforceable usurious loans by suggesting the advance contracts at issue here suffer from the infirmities alleged in the CFPB Action and by describing the agreements as reflecting "a discount of approximately 65% on 'flat out' transactions, and 72% on 'rebated' transactions."  (SM Ex. 12 (Letter from S. Jacobs dated June 28, 2017) at 2.)

To establish a usury claim under New Jersey law, a plaintiff must show that there was "(1) a loan of money, (2) an absolute obligation to repay the principal and (3) the exaction of a greater compensation than that allowed by law for the use of the money.  *Dopp v. Yari*, 927 F. Supp. 814, 820 (D.N.J. 1996).  "[W]hen the terms of the agreement are subject to two constructions, one of which will render it lawful and one of which will render it usurious, in the absence of evidence requiring the contract to be construed as usurious, courts will give the contract a construction that will render the agreement lawful." *Id.* at 821.[18]

---

[18]    New Jersey's civil usury statute makes it illegal to charge an interest rate higher than 16% for a loan.  N.J. Stat. Ann. § 31:1-1.  New Jersey's criminal usury statute makes it illegal to charge an "interest rate which exceeds 30% per annum" on a loan.  N.J. Stat. Ann. § 2C:21-19(2).

As discussed above, each advance contract was called an "Assignment and Sale Agreement," and pursuant to the agreements, each Assigning Plaintiff sold and assigned a portion of his, her or its judgment to an Advance Company for a cash payment. The advance contracts each state that the "this transaction shall constitute a true sale and transfer of the Property to Assignee, thereby providing Assignee with the full risks and benefits of ownership of the property." (SM Ex. 6 (Sample RD Contract) at 1).)

The Trustee has not offered any argument as to why the advance contracts should be construed as loans. To the contrary, RD and Specialty have provided extensive authority for the proposition that the advance contracts should not be viewed as loans given, among other considerations, the plain language of the agreements discussed above (*supra* at 6–7), including that they do not include any references to amounts borrowed, maturity dates or interest. They also highlight, perhaps most significantly, that the transactions were on a non-recourse basis (SM Ex. 1 (Letter from M. Roth dated June 22, 2017) Ex. A at 2–6); SM Ex. 5 (Letter from S. DiCicco dated June 22, 2017) at 4–5).

Courts interpreting New Jersey law have held that financing agreements similar to the advance contracts should not be considered loans and are not subject to New Jersey usury law. *See In re Petersburg Regency LLC*, 540 B.R. 508, 538–39 (Bankr. D.N.J. 2015) (holding that the New Jersey usury laws did not apply to an agreement pursuant to which the assignee was entitled to no recovery at all if the lawsuit from which payment was to be made was unsuccessful; the court viewed the agreement as a "participation in the interest in the recovery from the Lawsuit"); *Dopp*, 927 F. Supp. at 820, 823–24 (stating that "New Jersey would adopt" the view that the collection of interest in excess of the lawful rate is not usurious if collection of the entire interest

is at risk and holding that a litigation financing agreement was not a loan because if there had been no recovery in the litigation, there would have been no return).

However, even if the advance contracts were to be construed as loans rather than assignments, they would not be usurious because they contain language that would expressly limit any interest payments to the Advance Companies to the "maximum interest allowed by law." (SM Ex. 6 (Sample RD Contract) at 2.) In other words, if the difference in value of the purchase price and the assigned property were construed as a form of "interest" rather than a form of "risk premium" paid to the Advance Company, no Advance Company would be entitled to interest at a usurious rate. In light of the foregoing, I recommend that the Court find the Trustee has failed to establish that the advance contracts are unenforceable as against public policy or as being in violation of New Jersey's usury laws.

## VI.   RECOMMENDATIONS ON DISTRIBUTIONS WHERE THE ASSIGNING PLAINTIFFS HAVE NOT CLEARLY CONSENTED OR OBJECTED

### A.   Relevant Positions

The Advance Companies seek an order compelling the Trustee to make distributions to them where the Assigning Plaintiff has either failed to return a CDA or has returned a CDA without clearly indicating whether he, she or it objects or consents to the distribution of funds to the Advance Companies (the "Non-Responding Plaintiffs"). Although the Trustee has provided certain information about the extent and nature of the efforts made to contact the Non-Responding Plaintiffs, he has not taken any position on how they should be treated that differs from his position on distributions where the Assigning Plaintiffs expressly consented.

Each of the Advance Companies maintains that, simply by entering into advance contracts, the Non-Responding Plaintiffs consented to the immediate payment of any distribution of QSF funds to the appropriate advance company. While vague on which specific contract

terms support this position, the Advance Companies appear to rely on the terms of the advance contracts requiring that an assigning party "promptly execute . . . additional documents and take such further actions as [the Advance Company] may determine is reasonably necessary or desirable to perfect the assignment of the Property," and to "giv[e] up all [Assigning Plaintiff's] right, title and interest in the "assigned judgment proceeds."  (SM Ex. 6 (Sample RD Agreement) at 3.)  They also appear to rely on certain letters executed by each of the Assigning Plaintiffs in connection with their assignment transactions that are addressed to the "Fund Administrator" and state that any such administrator is "instructed that, promptly following receipt of funds representing the [Assigning Plaintiff's interest in the *Peterson* judgment], you are to issue a check to [the Advance Company] in the sum of the [amount owed to the Advance Company]" pursuant to the advance contract.  (SM Ex. 42 (Sample Notice of Assignment and Sale Letter) at 1.)

In addition to their arguments about consent through the advance contract transaction documents, the Advance Companies argue that each Non-Responding Plaintiff's failure specifically to object after receiving the CDA form from the Trustee indicates implied consent to a distribution, given the CDA form's warning that:

> IF YOU DO NOT SIGN AND RETURN THIS FORM WITHIN 30 DAYS, OR YOU DO NOT NOTIFY THE TRSUTEE OR THE DISTRIBUTION ADMINISTRATOR, IN WRITING, OF A LEGITIMATE REASON THAT PART OR ALL OF THE FUNDS OUTLINED BELOW SHOULD NOT BE PAID OR REMITTED TO [AN ADVANCE COMPANY] . . . WITHIN 30 DAYS, THE TRUSTEE WILL AUTHORIZE PAYMENT TO [THE ADVANCE COMPANY] IN ACCORDANCE WITH THE AGREEMENT.

(SM Ex. 11 (Sample CDA Form) at 9.)  RD argues that this language "expressly informed Plaintiffs that the[ir] failure to respond would result in the Trustee distributing the funds," and that, by failing to respond, each Non-Responding Plaintiff has "tacitly acknowledged RD Legal's right to receive funds from the QSF."  (SM Ex. 1 (Letter from M. Roth dated June 22, 2017)

at 3.)  Specialty and RD appear to be in general agreement with RD's arguments.  (*See* SM Ex. 4

(Letter from J. Anderson dated June 20, 2017) at 1–2, 4; SM Ex. 5 (Letter from S. DiCicco dated

June 22, 2017) at 1–2.)

Notwithstanding their positions that the agreements themselves, coupled with each Non-

Responding Plaintiff's failure to provide a completed and signed CDA, provide sufficient

consent for the Trustee to make payments to each Advance Company from the QSF, Cedars and

RD both appear to recognize that, at least with respect to certain of the Non-Responding

Plaintiffs, some further inquiry into whether they actually received CDA forms or have

objections to the Trustee's distributing funds to the Advance Company is warranted.  Cedars has

proposed that the Trustee and his counsel make additional efforts "to contact [such] Plaintiffs,

facilitate their completion of CDAs, and respond to any of their concerns," and that "[i]f the

Trustee does not receive a completed CDA within thirty days of contacting [each Non-

Responding Plaintiff in this category], amounts attributable to the Plaintiff's claim should be

distributed immediately thereafter."  (SM Ex. 4 (Letter from J. Anderson dated June 20, 2017)

at 4.)[19]

### B.   Recommendations

The Advance Companies' arguments that the Non-Responding Plaintiffs consented to

allowing the Trustee to distribute QSF funds in respect of their judgments to the Advance

Companies when they entered into advance contracts is well taken.  However, since the Trustee

---

[19]     Specialty appears to hold firm in its position that each Non-Responding Plaintiff has
already given sufficient consent to warrant the Trustee's making distributions in connection with
its advance contracts.  (SM Ex. 14 (Letter from S. DiCicco dated July 12, 2017) at 2–3.)  For the
reasons discussed below, I recommend that the Court reject Specialty's argument that the Trustee
should make distributions in respect of Non-Responding Plaintiffs without any consideration of
whether they actually received a CDA or have any objections to distribution.

has exercised his discretion to require CDAs to be sent to each Plaintiff and to allow each Plaintiff a reasonable opportunity to consent or object to a distribution before it is made, it is important to ensure that the Plaintiffs actually received their CDAs and that they have had a reasonable opportunity to consent or object before simply going ahead with the distribution.

Through the CDA process, the Trustee has obtained certain relevant information bearing on whether distributions to the Advance Companies are appropriate at this time. In particular, the documents and information provided by the Trustee concerning his professionals' efforts to contact the Non-Responding Plaintiffs demonstrate that some of the Non-Responding Plaintiffs have effectively waived any opportunity to object to the Trustee's distribution of funds to the Advance Companies (the "Group A Non-Responding Plaintiffs"). On the other hand, the documents and information offered by the Trustee do not conclusively show that all of the Non-Responding Plaintiffs (the "Group B Non-Responding Plaintiffs") have had a full and fair opportunity to indicate whether they consent or object.

In response to my request for information about the Trustee's attempts to contact Non-Responding Plaintiffs, the Trustee provided a declaration from Michael O'Connor, a senior director at Epiq, and copies of Epiq's communication logs with each Non-Responding Plaintiff. According to the declaration and relevant documents and information, there appears to be a total of 22 Non-Responding Plaintiffs at this point in time.[20] Of these 22, there is no dispute that the

---

[20]    The O'Connor Declaration states that there were "25 individuals, all of whom made assignments to advance companies, who have not responded (or responded only very recently)." (SM Ex. 19 (O'Connor Decl.) ¶ 4.) The communications logs provided by Epiq indicate that there is one additional plaintiff (associated with CDA No. 555) who should have been included on that list. (SM Ex. 38 (Comm'ns Log for CDA No. 555.) However, there are two plaintiffs on Epiq's list (associated with CDA Nos. 403 and 406) who, based on Epiq's description of their communications and on other documents provided by the Trustee, should be properly categorized as having objected to any payment to an advance company. (SM Ex. 39 (Comm'ns Log for CDA No. 403); SM Ex. 40 (Comm'ns Log for CDA No. 406); SM Ex. 41 (Letter from

Group A Non-Responding Plaintiffs (*see* Appendix C) have all received their CDAs, which include adequate notice of the consequences of their failure to raise a timely objection to the Trustee's distribution of funds to the relevant Advance Company.  For each Group A Non-Responding Plaintiff, Epiq transmitted a CDA form by mail and had some subsequent conversation with the plaintiff, with no indication by the plaintiff that he, she or it has any objection to the distribution the Trustee proposed to make in the CDA form.  For example, the plaintiff associated with CDA No. 64 clearly indicated that she had received her CDA and was "still working on it" as of January 16, 2017, but has inexplicably failed to return her CDA.  (SM Ex. 43 (Comm'ns Log for CDA No. 64) at 1.)  For the Group B Non-Responding Plaintiffs, however, Epiq has apparently not made contact since the mailing of the relevant CDA form (SM Ex. 44 (Comm'ns Log for CDA No. 1148) at 1), or Epiq's efforts have revealed that the plaintiff has concerns or questions about the terms of any distribution to the advance companies (SM Ex. 45 (Comm'ns Log for CDA No. 1122) at 1).

Given the unambiguous language of the 30-day provision in Section 3.1 of the CDA and the documents and information provided by the Trustee confirming that each Group A Non-Responding Plaintiff has received a CDA form, has had an adequate opportunity to object and has not objected, I recommend that the Court order the Trustee to distribute funds in respect of the Group A Non-Responding Plaintiffs, effectively treating them as having consented to the distribution set forth in the CDA Form transmitted to them by Epiq.  *See supra* Part V.  On the

---

CDA No. 406).)  There are also two plaintiffs on Epiq's list (associated with CDA Nos. 67 and 876) who had returned CDAs as of the date of the O'Connor Declaration and should therefore be categorized as consenters.  (SM Ex. 19 (O'Connor Decl.) ¶¶ 4(d), 4(q).)

other hand, because there are questions about whether the Group B Non-Responding Plaintiffs have received adequate notice of the consequences of failing to object, I recommend that the Court find additional efforts are necessary to ensure that such plaintiffs have received effective notice that their failure to object will result in a distribution to the advance company with whom the plaintiff has entered into an advance contract.  As Cedars has proposed, I recommend that the Court order the Trustee to engage in additional efforts to contact each Group B Non-Responding Plaintiff by re-sending copies of the Trustee's CDA form to them by certified mail with return-receipt requested or by other means providing proof of delivery, with copies to his, her, or its trial counsel.  I further recommend that the Court order the Trustee to: (1) treat all such Group B Non-Responding Plaintiffs who either consent to the distribution of funds or who fail to respond within 30 days as Consenting Plaintiffs, who are discussed in Part V above; and (2) to treat all such Group B Non-Responding Plaintiffs who state a clear objection to the distribution of funds proposed in the CDA form as Objecting Plaintiffs, who are discussed in Part VII below.

## VII.   RECOMMENDATIONS ON DISTRIBUTIONS WHERE THE ASSIGNING PLAINTIFFS HAVE AFFIRMATIVELY OBJECTED

### A.   Relevant Positions

In addition to suspending distributions to the Advance Companies where the Assigning Plaintiffs have affirmatively consented to the distributions and to holding off on distributions where the Assigning Plaintiffs have failed effectively to respond to requests for consent, the Trustee has suspended distributions to Advance Companies where the Assigning Plaintiffs have affirmatively objected to the distribution (the "Objecting Plaintiffs").  Based on the information provided to date, it appears that 22 of the Assigning Plaintiffs (listed in Appendix D) have affirmatively objected to the Trustee's making any payment to the Advance Company.

For his part, the Trustee has not taken any position on the merits of the objections that have been raised. His concerns about the advance contracts are directed generally to all of the contracts, without regard to whether they are Consenting Plaintiffs, Non-Responding Plaintiffs or Objecting Plaintiffs.

For their part, the Advance Companies argue primarily that the Court should order the Trustee to make the distributions he was prepared to make when he transmitted the CDAs to the Assigning Plaintiffs, regardless of any objections. RD notes that the Objecting Plaintiffs should not be allowed to prevent payment to the Advance Companies, since they gave "prior consent to the distribution of a portion of their judgment proceeds" in the transaction documents reflecting their assignment transactions. (SM Ex. 1 (Letter from M. Roth dated June 22, 2017) at 3.) The Advance Companies suggest that the Trustee should not be overly concerned about the objections, arguing that they do not raise legitimate concerns. (*See, e.g.*, ECF No. 741 at 3; SM Ex. 1 (Letter from M. Roth dated June 22, 2017) at 3–4; SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 6–7.) However, the Advance Companies do not want the objections to be adjudicated if there is a risk they would be found meritorious. Instead, they argue that the Trustee should simply distribute the funds to the Advance Companies in the first instance and require the Objecting Plaintiffs to file separate claims against the Advance Companies to challenge the payment pursuant to the dispute resolution terms of their advance contracts. (ECF No. 741 at 3; SM Ex. 7 (Letter from M. Roth dated July 12, 2017) at 7; SM Ex. 4 (Letter from J. Anderson dated June 20, 2017) at 3–4; SM Ex. 5 (Letter from S. DiCicco dated June 22, 2017) at 2–3.)

### B.      Recommendations

The Advance Companies' arguments that the Trustee should simply make distributions to them over the Assigning Plaintiffs' objections are not compelling.  Contrary to the positions of the Advance Companies, distributing the funds to the Advance Companies in the first instance and then requiring the Objecting Plaintiffs to pursue separate actions against them to recover disputed funds could impair the Objecting Plaintiffs' abilities to pursue any valid claims against the Advance Companies.

Given that the advance contracts all contain dispute resolution provisions and further given that all of the Advance Companies insist that those provisions should govern the resolution of the Assigning Plaintiffs' objections, I recommend that the Court find that the objections must be resolved pursuant the relevant dispute resolution provisions.  Accordingly, rather than distributing the funds in dispute to the Advance Companies (or the Objecting Plaintiffs), I recommend that the Court order the Trustee to commence, in any court of competent jurisdiction, statutory interpleader actions with respect to each of the distributions as to which an objection has been interposed and to deposit any funds in dispute with such court.  By naming the relevant Advance Company and Objecting Plaintiff as defendants and leaving them to resolve any objections concerning the distribution of funds to the Advance Company or the Assigning Plaintiff, the rights held by the Advance Companies and the Assigning Plaintiffs will be preserved during the pendency of the resolution of their disputes, while obviating the need for the Trustee's continued involvement in the disputes.  To the extent that any Advance Company or Objecting Plaintiff wishes to seek a stay of an interpleader action pending the resolution of an arbitration proceeding that that entity or person may be entitled to compel, the Trustee's

commencement of an interpleader action will not prevent it, him or her from doing so.  When an award is rendered by the appropriate court or arbitral tribunal in either the Advance Company's or the Objecting Plaintiff's favor, the court in which the interpleader action has been commenced will be in a position to release the distribution to the appropriate recipient.  At the same time, the Trustee will have discharged his obligation to make appropriate distributions of the funds of which he is currently in possession.[21]

## **CONCLUSION**

For all the foregoing reasons, I recommend that the Court:

(1)     grant the Advance Companies' requests to intervene as of right, or in the alternative permissively, for the limited purpose of seeking an order from the Court compelling the Trustee to resume distributions to the Advance Companies;

(2)     grant the Advance Companies' requests for an order compelling the Trustee to distribute funds to the Advance Companies according to the terms of the advance contracts entered into by the Consenting Plaintiffs and the Group A Non-Responding Plaintiffs, as listed in Appendices B and C, respectively;

(3)     direct the Trustee and his professionals to make additional efforts, as described above, *supra* at 54–55, to contact the Group B Non-Responding Plaintiffs, as

---

[21]     Without intending to limit the Trustee's discretion concerning the appropriate forum for any such interpleader action, I note that 28 U.S.C. § 1335(a)(1) provides that the district courts shall have original jurisdiction of any civil action of interpleader filed by any person having in his custody money of the value of $500 or more, if two or more adverse claimants of diverse citizenship are claiming to be entitled to such money, and if the person having custody of the money deposits it into the registry of the court.  The Trustee would have the flexibility to commence such an interpleader action in the jurisdiction in which either the relevant Advance Company or the relevant Objecting Plaintiff resides, so long as the Advance Company and Objecting Plaintiff are not citizens of the same state.  *See* 28 U.S.C. § 1397; *see also* 28 U.S.C. § 2361.

listed in Appendix C, and for any Group B Non-Responding Plaintiffs who consent or fail to raise an objection within 30 days, to distribute funds according to the terms of their advance contracts; and

(4)     order the Trustee to commence one or more interpleader actions to resolve the disputes between the Advance Companies and the Objecting Plaintiffs, as listed in Appendix D, or any Group B Non-Responding Plaintiffs who affirmatively object to payment to the Advance Companies, within 30 days.

To the extent the Trustee or an Advance Company believes that an Assigning Plaintiff has been incorrectly designated herein as a Consenting Plaintiff, a Group A Non-Responding Plaintiff, a Group B Non-Responding Plaintiff or an Objecting Plaintiff, they are directed to bring any such incorrect designation to my attention within five business days of the filing of this Report & Recommendation.

To the extent the Trustee or an Advance Company has raised any arguments not explicitly addressed above, I have considered them and recommend that the Court reject such arguments for lack of merit.

Finally, because it contains and refers to potentially confidential and sensitive personal information, I will file this Report & Recommendation, along with the exhibits attached hereto, with the Court under seal contemporaneously with service on the participants in the Advance Company Disputes track.  I direct the participants to inform me of any requested redactions no later than noon on Friday, September 29, 2017.  Thereafter, a redacted version of this Report &

Recommendation and its exhibits will be filed on the public docket reflecting the parties'

reasonable proposed redactions.

Dated:      New York, New York
            September 28, 2017

                                              _____
                                              Kathleen N. Massey
                                              Special Master

## APPENDIX A

| Exhibit # | Description |
|:---------:|-------------|
| 1 | Letter from Michael Roth to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated June 22, 2017 |
| 2 | Peterson Weekly Attorney Report dated September 1, 2017 |
| 3 | Letter from Shalom Jacob to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated July 12, 2017 |
| 3A | Memorandum from Alan Katz to Kathleen Massey regarding "Peterson Fund: Chronology for Repayment of Overcharges," dated July 12, 2017 |
| 4 | Letter from James Anderson to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated June 20, 2017 |
| 5 | Letter from Susan DiCicco to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran; Advance Company Disputes," dated June 22, 2017 |
| 6 | Assignment and Sale Agreement dated August 14, 2013 |
| 6A | Assignment and Sale Agreement dated December 26, 2012 |
| 7 | Letter from Michael Roth to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran" dated July 12, 2017 (exhibits omitted) |
| 8 | Email from Michael Roth to Kathleen Massey and Paul Kingsbery regarding "Peterson v. Islamic Republic of Iran," dated August 1, 2017 |
| 9 | Assignment and Sale Agreement dated May 2, 2014 |
| 10 | Assignment and Sale Agreement dated April 23, 2014 |
| 11 | Confidential Disbursement Authorization Form No. 975 |
| 12 | Letter from Shalom Jacob to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated June 28, 2017 |
| 13 | Letter from James Anderson to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated July 12, 2017 |
| 14 | Letter from Susan DiCicco to Kathleen Massey regarding "Advance Company Disputes and Request for Intervention," dated July 12, 2017 |
| 15 | Letter from Michael Roth to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated July 12, 2017 |
| 16 | Letter from James Anderson to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated July 14, 2017 |
| 17 | Letter from Susan DiCicco to Kathleen Massey regarding "Advance Company Disputes and Request for Intervention," dated July 12, 2017 |
| 18 | Epiq Report for Tracking No. 1010 |

**APPENDIX A**

| Exhibit # | Description |
|---|---|
| 19 | Declaration of Michael O'Connor dated July 12, 2017 |
| 20 | Email from Caragh Fay to Paul Kingsbery regarding "Peterson v. Islamic Republic of Iran-Request for Special Master," dated September 22, 2017 |
| 21 | Email from Geoffrey Hervey to Kathleen Massey and Paul Kingsbery regarding "Peterson v. Islamic Republic of Iran-Request from Special Master; RD Legal Questions," dated September 25, 2017 |
| 22 | Letter from Michael Roth to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated July 14, 2017 |
| 23 | Letter from Fay and Perles to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran" dated July 21, 2017 |
| 24 | Letter from Max Folkenflik to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated July 21, 2017 |
| 25 | Letter from Steven Storch to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated July 21, 2017 |
| 26 | Letter from Edward Manning to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran," dated July 21, 2017 |
| 29 | Confidential Disbursement Authorization Form No. 1302 |
| 30 | Assignment and Sale Agreement dated June 5, 2017 |
| 31 | Letter from Caragh Fay to Beirut Marines Family regarding "RD Legal Funding Lawsuit Information," dated April 3, 2017 |
| 32 | Complaint, *Consumer Financial Protection Bureau v. RD Legal Finding, LLC et al.*, No. 1:17-cv-00890 (LAP) (S.D.N.Y. Feb. 7, 2017) |
| 33 | Confidential Disbursement Authorization Form No. 779 |
| 34 | SEC Hearing Transcript, *In the Matter of RD Legal Capital, LLC and Roni Dersovitz*, for Testimony on March 28, 2017 |
| 35 | RD Master Assignment and Sale Agreement with Fay Law, PA dated August 22, 2008 |
| 36 | RD Master Agreement with The Perles Law Firm dated May 28, 2010 |
| 37 | Letter from Matthew Porges to Roni Dersovitz regarding "Assignment and Sale Agreement for S. Maitland dated 6/5/14," dated July 2, 2014 |
| 38 | Epiq Report for Tracking No. 555 |
| 39 | Epiq Report for Tracking No. 403 |

**APPENDIX A**

| Exhibit # | Description |
|---|---|
| 40 | Epiq Report for Tracking No. 406 |
| 41 | Confidential Disbursement Authorization Form No. 403 |
| 42 | Notice of Assignment and Sale dated June 25, 2014 |
| 43 | Epiq Report for Tracking No. 64 |
| 44 | Epiq Report for Tracking No. 1148 |
| 45 | Epiq Report for Tracking No. 1122 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON, Personal
Representative of the Estate of James C. Knipple
(Dec.) et al.,

Plaintiffs,

-v-

ISLAMIC REPUBLIC OF IRAN et al.,

Defendants.

10-cv-4518 (KBF)

**APPENDIX B TO SPECIAL
MASTER'S REPORT &
RECOMMENDATION**

### CONSENTING PLAINTIFFS

| | | | |
|---|---|---|---|
| 1. | CDA No. 9 | 17. | CDA No. 227 |
| 2. | CDA No. 13 | 18. | CDA No. 236 |
| 3. | CDA No. 48 | 19. | CDA No. 238 |
| 4. | CDA No. 54 | 20. | CDA No. 243 |
| 5. | CDA No. 67 | 21. | CDA No. 245 |
| 6. | CDA No. 100 | 22. | CDA No. 247 |
| 7. | CDA No. 102 | 23. | CDA No. 261 |
| 8. | CDA No. 106 | 24. | CDA No. 272 |
| 9. | CDA No. 110 | 25. | CDA No. 329 |
| 10. | CDA No. 123 | 26. | CDA No. 340 |
| 11. | CDA No. 128 | 27. | CDA No. 411 |
| 12. | CDA No. 140 | 28. | CDA No. 415 |
| 13. | CDA No. 159 | 29. | CDA No. 437 |
| 14. | CDA No. 160 | 30. | CDA No. 439 |
| 15. | CDA No. 215 | 31. | CDA No. 449 |
| 16. | CDA No. 220 | 32. | CDA No. 539 |

| | | | | |
|---|---|---|---|---|
| 33. | CDA No. 578 | | 55. | CDA No. 1042 |
| 34. | CDA No. 588 | | 56. | CDA No. 1045 |
| 35. | CDA No. 589 | | 57. | CDA No. 1051 |
| 36. | CDA No. 592 | | 58. | CDA No. 1053 |
| 37. | CDA No. 642 | | 59. | CDA No. 1054 |
| 38. | CDA No. 661 | | 60. | CDA No. 1055 |
| 39. | CDA No. 662 | | 61. | CDA No. 1059 |
| 40. | CDA No. 681 | | 62. | CDA No. 1074 |
| 41. | CDA No. 728 | | 63. | CDA No. 1094 |
| 42. | CDA No. 773 | | 64. | CDA No. 1102 |
| 43. | CDA No. 791 | | 65. | CDA No. 1107 |
| 44. | CDA No. 813 | | 66. | CDA No. 1121 |
| 45. | CDA No. 855 | | 67. | CDA No. 1124 |
| 46. | CDA No. 861 | | 68. | CDA No. 1147 |
| 47. | CDA No. 868 | | 69. | CDA No. 1154 |
| 48. | CDA No. 876 | | 70. | CDA No. 1156 |
| 49. | CDA No. 884 | | 71. | CDA No. 1178 |
| 50. | CDA No. 927 | | 72. | CDA No. 1180 |
| 51. | CDA No. 935 | | 73. | CDA No. 1181 |
| 52. | CDA No. 968 | | 74. | CDA No. 1182 |
| 53. | CDA No. 994 | | 75. | CDA No. 1210 |
| 54. | CDA No. 1037 | | 76. | CDA No. 1281 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON, Personal
Representative of the Estate of James C. Knipple
(Dec.) et al.,

                                        Plaintiffs,

                    -v-

ISLAMIC REPUBLIC OF IRAN et al.,

                                        Defendants.

10-cv-4518 (KBF)

**APPENDIX C TO SPECIAL
MASTER'S REPORT &
RECOMMENDATION**

## <u>NON-RESPONDING PLAINTIFFS</u>

| <u>Group A</u> | <u>Group B</u> |
|---|---|
| 1. CDA No. 6 | 1. CDA No. 218 |
| 2. CDA No. 56 | 2. CDA No. 441 |
| 3. CDA No. 64 | 3. CDA No. 555 |
| 4. CDA No. 442 | 4. CDA No. 1010 |
| 5. CDA No. 477 | 5. CDA No. 1120 |
| 6. CDA No. 478 | 6. CDA No. 1122 |
| 7. CDA No. 481 | 7. CDA No. 1148 |
| 8. CDA No. 533 | 8. CDA No. 1179 |
| 9. CDA No. 625 | |
| 10. CDA No. 653 | |
| 11. CDA No. 811 | |
| 12. CDA No. 999 | |
| 13. CDA No. 1096 | |
| 14. CDA No. 1123 | |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON, Personal
Representative of the Estate of James C. Knipple
(Dec.) et al.,

Plaintiffs,

-v-

ISLAMIC REPUBLIC OF IRAN et al.,

Defendants.

10-cv-4518 (KBF)

**APPENDIX D TO SPECIAL
MASTER'S REPORT &
RECOMMENDATION**

## OBJECTING PLAINTIFFS

| | | | | |
|---|---|---|---|---|
| 1. | CDA No. 150 | | 12. | CDA No. 776 |
| 2. | CDA No. 401 | | 13. | CDA No. 779 |
| 3. | CDA No. 403 | | 14. | CDA No. 797 |
| 4. | CDA No. 405 | | 15. | CDA No. 844 |
| 5. | CDA No. 406 | | 16. | CDA No. 865 |
| 6. | CDA No. 420 | | 17. | CDA No. 975 |
| 7. | CDA No. 425 | | 18. | CDA No. 977 |
| 8. | CDA No. 433 | | 19. | CDA No. 978 |
| 9. | CDA No. 436 | | 20. | CDA No. 979 |
| 10. | CDA No. 575 | | 21. | CDA No. 1275 |
| 11. | CDA No. 684 | | 22. | CDA No. 1302 |