# Exhibit 22



BOIES
SCHILLER
FLEXNER

<u>**VIA EMAIL**</u>

**DAVID K. WILLINGHAM**
dwillingham@bsfllp.com
**MICHAEL D. ROTH**
mroth@bsfllp.com

July 14, 2017

Kathleen M. Massey, Esq.
Special Master
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797

Re:   *Peterson v. Islamic Republic of Iran*, No. 1:10-cv-4518-KBF

Dear Ms. Massey:

   We write on behalf of RD Legal Capital, LLC and various related entities ("RD Legal") in response to the Trustee's July 12, 2017 letter (the "Trustee 7.12.17 Letter") and to supplement our prior submissions.  Specifically, we ask that the Trustee's letter *not* be publicly disseminated in connection with the motions to intervene, as it contains inflammatory statements that are factually and legally incorrect, and takes no position whatsoever on the propriety of intervention.  We have repeatedly protested about the Trustee's brainstorming and speculation regarding issues that might be raised should someone formally object to the distributions to the advance companies.  The Trustee's most recent letter, however, goes a step further—relying on a statute that was never enacted and floating unsupportable suggestions of misappropriation—and should not be tolerated.

   A.      **New Jersey Law**

   As the Trustee well knows, the Assignment and Sale Agreements are governed by New Jersey law, yet he has *never* identified any New Jersey authority that might call into question the agreements' validity.  For that reason alone, the vast majority of the Trustee's issues should be rejected outright.

   Perhaps in recognition that his objections have no support in the law, the Trustee states that "the New Jersey legislature did adopt the 'Consumer Litigation Funding Act' on March 16, 2015."  That statement, however, is wrong, and even a perfunctory investigation would have revealed that the statute was never enacted.  The bill was introduced to the New Jersey Assembly on September 18, 2014 and referred to the Regulated Professions Committee.  (Exhibit A; http://www.njleg.state.nj.us/bills/BillView.asp.)  On March 16, 2015, it was reported out of committee and given a second reading by the state Assembly, but there was no subsequent action.  (*Id.*)  A simple Google search for a legislative tracker would have shown that the bill was "introduced" and is "dead."  (Ex. B; https://legiscan.com/NJ/research/A3699/2014.)  It did not make it through the Assembly, let alone the State Senate, and certainly did not go to the



Kathleen M. Massey, Esq.
July 14, 2017
Page 2

Governor for signature or veto.  Accordingly, it is improper to rely on the proposed legislation to in any way cast aspersions on the validity or fairness of the underlying transactions.

**B.      The Securities and Exchange Commission Administrative Proceeding**

Just as the Trustee mischaracterizes New Jersey law, he also misconstrues the SEC administrative proceeding.  The SEC trial lasted more than a month, has a transcript that is more than 7,000 pages long, and involved more than 2,600 exhibits.  That the Trustee thinks it is appropriate either to (1) pull isolated quotations from testimony and documents; or (2) spend the time and money necessary to actually understand the proceeding (which he has not done and which would quickly have revealed its irrelevance), is outrageous.  Indeed, the Trustee's assertions regarding the SEC proceeding badly misconstrue the issues.

**1.  The Risk Issues in the SEC Proceeding Have Nothing to Do with the Distribution of Funds from the Qualified Settlement Fund**

As we have repeatedly explained, the SEC action concerned whether RD Legal misrepresented the *degree* and *type of risk* to its investors relating, in part, to the *Peterson* proceedings.  There is no issue in this proceeding that implicates similar issues.

The Trustee's ongoing suggestion that RD Legal is taking an inconsistent position regarding risks and contract enforcement shows a fundamental misunderstanding of those issues.  Specifically, in the SEC administrative proceeding, RD Legal representatives repeatedly explained that the primary risks to its investors had to do with duration and collection.  Below are a just a few examples of that testimony:

> [S]ince the receivable is essentially cash that remains to be paid, the risks that one has to be paid are the obligor who is paying the settlement and the duration of the collection (how long before cash is actually transferred).

(Dersovitz Tr. 5834:8-12.)

> Question:  The two prime – the two primary risks, what were those?  . . .
>
> Answer:  Duration and, control of cash.

(Markovic Tr. 6701:22-25.)

In contrast to the disclosures regarding the *degree* and *type of risks* that were at issue in the SEC case, as explained in our July 12, 2017 letter at page 5, a "true sale" analysis requires looking at the *allocation of risk*.  In the non-recourse transactions at issue here, the full risk of prolonged duration and collection was transferred to RD Legal and the other



Kathleen M. Massey, Esq.
July 14, 2017
Page 3

advance companies, and nobody has challenged the transactions under the "true sale" doctrine.  Indeed, the risk associated with the duration of this process, along with the risk of insufficient funds in the QSF, are being born by the advance companies, and there is no basis for anybody to suggest otherwise.

### 2.  The Trustee Has No Authority to Assert a Position for the SEC

Additionally, the Trustee should not be asserting any position for the SEC—and certainly should not promote speculation from an unidentified SEC employee with a supposed concern about whether RD Legal's investors will receive the proceeds of the QSF that are due to them.  (Trustee 7.12.2017 Letter at 3.)

*First*, there was never an allegation in the SEC proceeding of any missing money or misappropriation of funds.  As the SEC is well-aware, RD Legal's investors profited handsomely from their investments, including because RD Legal has made many millions of dollars in distributions to its investors from the *Peterson* proceeds.  Moreover, any distribution of assets from the QSF to RD Legal will pass through the company's independent third-party administrator and then be distributed in accordance with the controlling documents—*i.e.*, an independent party already controls the disposition of funds that are collected by RD Legal—and the SEC knows those facts.  Indeed, even after the SEC decided to pursue RD Legal, it told RD Legal's investors that this was not a case of missing funds, as one investor contemporaneously reported:

> I just spoke with Michael Bundaun (sp?) and Jorge Teneiro at the SEC in NYC.
>
> Good news – ***no money is missing and investors may do quite well.***
>
> Not so good- the SEC has initiated an enforcement action.

(Ex. C (Resp. Ex. 2928_0001) (emphasis added).)

*Second*, if the SEC agreed with the Trustee and wanted to intervene in this process to assert a position regarding the distributions, it could have done so at any time.  The SEC certainly knows that its enforcement proceeding was one of the causes for the Trustee to suspend distributions.  In fact, the SEC introduced the Trustee's March 31, 2017 letter to the Court (*i.e.*, the letter stating he was suspending distributions) in the SEC proceeding.  (Ex. D (Div. Ex. 625-1).)  The Trustee should not be permitted to refuse to act because of baseless accusations from alleged anonymous sources within the SEC.

*Finally*, as we have argued previously, the Trustee is acting beyond his authority.  While we understand that in certain circumstances the Trustee is empowered to investigate certain issues when they are formally raised, here, the Trustee has gone much further and assumed the role of an advocate for the SEC, the Consumer Financial Protection Bureau and



Kathleen M. Massey, Esq.
July 14, 2017
Page 4

the New York Attorney General, and the Plaintiffs. Where, as here, the individual Plaintiffs have sold and assigned a portion of their interests to RD Legal, the Trustee is not tasked with advocating (or speculating) on anyone's behalf regarding the enforceability of those assignment and sale agreements.[1]  And the Trustee was certainly never tasked with making arguments for the SEC (or any other government agency) that the SEC itself has not asserted.

### C.  The Trustee's Other Positions Do Not Warrant Withholding Distributions

The remaining positions asserted in the Trustee 7.12.2017 Letter are equally meritless.  As explained in our July 12, 2017 submission, there is no basis for the Trustee to speculate that:  (1) there was any impropriety on the part of the lawyers in the underlying action; (2) there were any misrepresentations by RD Legal that could be imputed to Cedars Funding and Specialty Claims Investment; or (3) that there was something "unfair[]" about transactions that provided immediate liquidity to Marines and their families who had been waiting more than 20 years to receive any compensation for their injuries and losses. (*See* Trustee 7.12.2017 Letter, at 4.)

Finally, although the Trustee has on several occasions expressed his concern "with the potential ramifications of allowing the Advance Companies to participate without intervening" (Trustee 7.12.2017 Letter, at 4), he has not stated whether he supports or opposes the advance companies' applications to intervene.  Given this non-stance on intervention, combined with the incorrect but inflammatory statements in the Trustee 7.12.2017 Letter, RD Legal respectfully requests that the Special Master refrain from publicly distributing the Trustee 7.12.2017 Letter in connection with the applications of the advance companies to intervene.

Sincerely,

MICHAEL D. ROTH

cc:    Paul Kingsbery

---

[1]  Despite the Trustee's protests to the contrary (Trustee 7.12.2017 Letter at 4), it is black letter law that, as assignees, the advance companies "stand[] in the shoes" of the Plaintiff-assignors. *Diesel Props S.r.l v. Greystone Business Credit II LLC*, 631 F.3d 42, 55 (2d 2011).

# EXHIBIT A

**New Jersey State Legislature**

home    site map    what's new    faq    links    help    contact us

**GENERAL INFO**
Our Legislature
Legislative Process
Legislative Initiatives
Historical Info
Public Info Assistance
Kids' Page
Capitol Complex
   Parking
**MEMBERS**
Find your Legislator
Legislative Leadership
Legislative Roster
Seating Charts
**DISTRICTS**
Districts by Number
District Map
Municipalities Index
**BILLS**
Bills 2016-2017
Prior Sessions
**COMMITTEES**
Senate Committees
   - Committee Aides
Assembly Committees
   -Committee Aides
Joint Committees
Committee Groups
Legislative
   Commissions
Senate Nominations
**LAWS and
CONSTITUTION**
Statutes
Chapter Laws
Constitution
**RULES**
Senate
General Assembly
**ETHICS**
Conflicts of Interest
   Law
Code Of Ethics
Financial Disclosure
   Termination or
   Assumption of
   Public Employment
   Form
Formal Advisory
Opinions
Contract Awards
Joint Rule 19
Ethics Tutorial
**CONTINUING LEGAL
EDUCATION
for LEGISLATIVE
ATTORNEYS**
CLE Registration
   Form
Certification for
   CLE Ethics Credit
CLE Presentation
   Schedule
**LEGISLATIVE
PUBLICATIONS**
Legislative Calendar
Legislative Digest
Legislative LDOA
Budget and Finance
Audit Reports

## Bills 2014-2015

**A3699 Acs (ACS) "Consumer Litigation Funding Act."**
**2nd Reading in the Assembly**

Identical Bill Number: S2541

McKeon, John F.   as Primary Sponsor
Lagana, Joseph A.   as Primary Sponsor
Pinkin, Nancy J.   as Co-Sponsor

9/18/2014 Introduced, Referred to Assembly Regulated Professions Committee
3/16/2015 Reported from Assembly Comm. as a Substitute, 2nd Reading

Introduced - 6 pages PDF Format   HTML Format
Statement - ARP 3/16/2015 - 3 pages PDF Format   HTML Format
Assembly Committee Substitute - 8 pages PDF Format   HTML Format

**Committee Voting:**
ARP  3/16/2015 -  r/ACS  -  Yes {9}  No {0}  Not Voting {0}  Abstains {0}  -  Roll Call

**home | back** to NJ State Legislature Bill Search

**Legislative Reports**
**Public Hearing**
  **Transcripts**
**Glossary**
**Summary of**
  **Enactments**

**Disclaimer/**
  **Privacy Policy**



**Submit an OPRA request**



Document Formats Used on this Site • email for Legislative info • email Webmaster
©2002 New Jersey Office of Legislative Services

# EXHIBIT B



# Legislative Research: NJ A3699 | 2014-2015 | Regular Session
## New Jersey Assembly Bill 3699 *(Prior Session Legislation)*

## Other Sessions

| Session | Title/Description | Last Action |
|---|---|---|
| 2016-2017 Regular Session (Introduced) | Directs DOT and NJT to construct rail station at Atlantic City International Airport.* <br> [A3699 2016 Detail]    [A3699 2016 Text]    [A3699 2016 Comments] | **2016-06-06** Reported out of Asm. Comm. with Amendments, and Referred to Assembly Appropriations Committee |
| 2014-2015 Regular Session (Introduced - Dead) | "Consumer Litigation Funding Act." <br> [A3699 2014 Detail]    [A3699 2014 Text]    [A3699 2014 Comments] | **2015-03-16** Reported from Assembly Comm. as a Substitute, 2nd Reading |
| 2012-2013 Regular Session (Introduced - Dead) | Requires managed care plans to disclose allowed amounts for out-of-network health care services under certain circumstances. <br> [A3699 2012 Detail]    [A3699 2012 Text]    [A3699 2012 Comments] | **2013-01-17** Introduced, Referred to Assembly Financial Institutions and Insurance Committee |
| 2010-2011 Regular Session (Engrossed - Dead) | Prohibits burial of Petty's Run archaeological excavation site. <br> [A3699 2010 Detail]    [A3699 2010 Text]    [A3699 2010 Comments] | **2011-06-02** Referred to Senate Budget and Appropriations Committee |

## References Online

| Search Phrase | Web | News | Financial | Encyclopedia | Biography |
|---|---|---|---|---|---|
| [New Jersey A3699] | Google Web | Google News | | | |
| [Representative John McKeon NJ] | Google Web | Google News | FollowTheMoney | Ballotpedia | VoteSmart |
| [Representative Joseph Lagana NJ] | Google Web | Google News | FollowTheMoney | Ballotpedia | VoteSmart |
| [Representative Nancy Pinkin NJ] | Google Web | Google News | FollowTheMoney | Ballotpedia | VoteSmart |

## Legislative Citation

**APA**
NJ A3699 | 2014-2015 | Regular Session. (2015, March 16). LegiScan. Retrieved July 14, 2017, from https://legiscan.com/NJ/bill/A3699/2014

**MLA**
"NJ A3699 | 2014-2015 | Regular Session." LegiScan. LegiScan LLC, 16 Mar. 2015. Web. 14 Jul. 2017. <https://legiscan.com/NJ/bill/A3699/2014>.

**Chicago**
"NJ A3699 | 2014-2015 | Regular Session." March 16, 2015 LegiScan. Accessed July 14, 2017. https://legiscan.com/NJ/bill/A3699/2014.

**Turabian**
LegiScan. NJ A3699 | 2014-2015 | Regular Session. 16 March 2015. https://legiscan.com/NJ/bill/A3699/2014 (accessed July 14, 2017).

## Subjects

2nd Reading in the Assembly

## Same As/Similar To

| Bill | Relationship | Date | Title | Last Action |
|------|-------------|------|-------|-------------|
| S2541 | Same As | 2014-10-27 | Regulates litigation funding providers. | Introduced in the Senate, Referred to Senate Commerce Committee |

## New Jersey State Sources

| Type | Source |
|------|--------|
| Summary | http://www.njleg.state.nj.us/bills/BillView.asp?BillNumber=A3699 |
| Text | http://www.njleg.state.nj.us/2014/Bills/A4000/3699_I1.HTM |
| Roll Call | http://www.njleg.state.nj.us/bills/BillView.asp |

# EXHIBIT C

# Email

*Mailbox: Ballentine Partners*

**Msg. Date (Eastern)** Thu Jul 28, 2016 3:11PM ET
    **From** rballentine@ballentinepartners.com
      **To** "Kyle Schaffer" <kschaffer@ballentinepartners.com>, "Austin Poirier" <apoirier@ballentinepartners.com>
      **Cc** "Will Braman" <wbraman@ballentinepartners.com>, "Drew McMorrow" <dmcmorrow@ballentinepartners.com>, "Edith Miller"
         <emiller@ballentinepartners.com>
  **Subject** SEC investigation of Legal Fund

I just spoke with Michael Bundaun (sp?) and Jorge Teneiro at the SEC in NYC.

Good news - no money is missing and investors may do quite well.

Not so good - the SEC has initiated an enforcement action.

Our "To Dos":

1. Preserve everything, including handwritten notes.

2. Kyle and Austin should not discuss this matter. No one wants a situation later where there might be questions later about one coaching the other.

3. While you are not prohibited from reading the complaint, it might be best not to so - at least for now.

4. Sometime in the next few weeks, we will be contacted by the SEC to arrange an interview of Kyle and Austin individually. Each interview will last about 2 hours. They are willing to do interviews in either Boston or New York. This is an interview, not a deposition.

That's it for now.

Roy C. Ballentine, ChFC, CLU, CFP(r)
Ballentine Partners, LLC
55 Mill Street
P O Box 1860
Wolfeboro, NH 03894-1860
rballentine@ballentinepartners.com<mailto:rballentine@ballentinepartners.com>

Main: 603-569-1717
Direct: 603-737-1220
Cell: 603-498-3321
Fax: 603-515-2127
www.ballentinepartners.com<http://www.ballentinepartners.com/>

*Report Generated 10/10/2016 8:59 AM ET by Edie Miller*

SEC-BALLENTINE-E-0000255
SECLIT-EPROD-001337506
**RESP. EX. 2928_0001**

# EXHIBIT D



Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281
Telephone: 212-415-8600
Fax: 212-303-2754
www.lockelord.com

Shalom Jacob
Direct Telephone: (212) 415-8618
sjacob@lockelord.com

March 31, 2017

**BY ECF:**

Honorable Katherine B. Forrest
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York  10007-1312

      Re:    <u>Peterson v. Islamic Republic of Iran, 10 Civ. 4518 (KBF)</u>

Dear Judge Forrest:

We represent Retired Judge Stanley Sporkin, who was appointed by Your Honor as Trustee of the Peterson § 468B Fund pursuant to 26 U.S.C. § 468B (the "Peterson Fund").  Pursuant to Your Honor's instruction, we are writing to provide the Court with a further update on the status of the Peterson Fund's distributions and other recent developments.

    A.  <u>Summary of Distribution Status</u>

As explained below, the Peterson Fund has made distributions and payments in excess of $1.3 billion to Plaintiffs, attorneys and other parties.

The initial distributions to the non-Peterson plaintiffs entitled to share in approximately 13 percent of plaintiff recoveries pursuant to the Litigation Cooperation and Settlement Agreement, dated June 1, 2012 (referred to as the "13% Plaintiffs") are almost complete.  The Trustee continues to hold certain funds that are the subject of a pending dispute.

In the Peterson cases, initial distributions have been made to, or for the benefit of, approximately 85 percent of the Peterson Plaintiffs.  As explained below, however, certain payments to advance companies and attorneys that the Trustee had anticipated would be paid during the first quarter of 2017 have not yet been made.

**Div. Ex. 625-1**

Honorable Katherine B. Forrest
March 31, 2017
Page 2

As we noted in our letter to the Court dated January 13, 2017 (the "January 13, 2017 Letter"), according to the Trustee's estimates, total payments to Plaintiffs in this initial round of distributions constitute approximately 93 percent of the total amounts that the Trustee anticipates will be available for payment to the Plaintiffs. The remaining funds have been held as various reserves (the "Reserves") established by the Trustee pursuant to this Court's June 6, 2016 Order Authorizing Distribution of Funds ("ECF 651").[1] As explained below, the Trustee anticipates making a second distribution to the 13% Plaintiffs during the second quarter of 2017 and to the Peterson Plaintiffs during the third quarter of 2017.

**B. Distributions to the 13% Plaintiffs**

As of this date, initial distributions totaling $205,180,560 to all 113 of the 13% Plaintiffs have been completed. This amount includes payments of fees and costs to attorneys for the 13% Plaintiffs but does not include approximately $22,963,316 held by the Trustee as the result of a dispute between certain parties.[2]

The Trustee currently anticipates that, barring any unexpected developments, most of the funds set aside as Reserves allocated specifically for the 13% Plaintiffs will be made available for distribution to the 13% Plaintiffs prior to June 30, 2017.

**C. Distributions to the Peterson Plaintiffs**

CDA's have been mailed to 1,390 of the total 1,417 Peterson Plaintiffs. As of this date, 1,339 of these CDA's have been returned to Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Trustee's claims administrator. Payments in the aggregate amount of $790,324,444 have been made to, or for the benefit of, the Peterson Plaintiffs on account of 1,212 of these CDA's, representing approximately 85 percent of the amounts payable to the Peterson Plaintiffs in the initial distribution. It is anticipated that initial distribution payments to, or for the benefit of, the Peterson Plaintiffs will continue in the ordinary course.[3]

As we explained in our January 13, 2017 letter to the Court, payments to certain of the Peterson Plaintiffs have proceeded at a slower pace as a result of individual

---

[1] The Trustee estimates that the funds held in the Reserves constitute approximately 6 or 7% of the total amount that will eventually be distributed to most of the Plaintiffs, assuming that substantially all of the funds held in the Reserves become available for distribution.

[2] This dispute is pending before the New York State Supreme Court, Nassau County. At the present time, it is not clear who is entitled to these funds.

[3] The largest group of CDA's that have not been paid are 94 CDA's for Plaintiffs who received advances, as explained below.

**Div. Ex. 625-2**

Honorable Katherine B. Forrest
March 31, 2017
Page 3

issues that must be resolved as to these Plaintiffs.  Substantial progress has been
made in most of the areas identified in our previous letter to the Court.  Specifically,

> i.    <u>Incomplete CDA's</u>.   Epiq, the Plaintiffs and
> their counsel have worked together to promptly correct
> deficient CDA submissions, clearing the way for payments to
> Plaintiffs whose initial CDA submissions were incomplete. At
> one time or another, Epiq has sent defect letters to 509 of
> the Plaintiffs who have submitted CDA's; some of these
> Plaintiffs have been sent multiple defect letters. At the
> present time, fewer than five of the returned CDA's are
> incomplete.

> ii.    <u>Estates</u>.   More than 400 of the Peterson
> Plaintiffs are estates of victims of the Beirut bombing or
> estates of relatives of the victims who have died since
> becoming Plaintiffs in these actions.[4]   CDA's have been
> mailed to approximately 381 estates and have been returned
> by 361 estates.  As of this date, 334 of these estates have
> received payment of their initial distributions.  The Trustee
> anticipates that estates will continue to receive their initial
> distribution payments in the ordinary course.[5]

> iii.    <u>Bankruptcy Filings</u>.   Approximately 60 of the
> Peterson Plaintiffs have sought bankruptcy relief at some
> time, and most of these Plaintiffs did not list a judgment or
> claim for damages relating to the Beirut bombing as an asset
> of their bankruptcy estate (and may not have realized that
> they may have had an obligation to do so).  Under applicable
> bankruptcy laws, all or part of these Plaintiffs' distributions
> are or were potentially subject to a claim by the trustee in

---

[4] As noted in our previous letter, the distributions to estates involve certain unique issues and
complications arising from the passage of time and the different probate rules that govern each
jurisdiction, including the lack of qualified personal representatives, inadequate estate documents,
difficulties in identifying the appropriate payee(s) where estates are intestate and limitations imposed by
law on the authority of personal representatives to receive funds.  Additionally, North Carolina, in which
the largest number of estates are located, has rules governing the disposition of wrongful death proceeds
that are different and more complicated than most other jurisdictions.  The Trustee has placed special
emphasis on estates in order to make sure that these payments are made correctly.

[5] The Trustee is working with the appropriate parties to address outstanding issues that must be resolved
before payment of initial distributions to the remaining estates.  The Trustee may, at some point,
determine that it is necessary that he appear and/or participate in proceedings in order to expedite
resolution of these or other issues.

**Div. Ex. 625-3**

Honorable Katherine B. Forrest
March 31, 2017
Page 4

their respective bankruptcy cases that their distribution is the property of their bankruptcy estate.  As of this date, more than 50 of these Plaintiffs' initial distributions have been largely or entirely resolved and released to the respective Plaintiffs and/or bankruptcy trustees.[6]

iv.    Disputes.    Several Plaintiffs are involved in family or other disputes which have resulted in their distributions being withheld pursuant to court orders or other pending issues.  The Trustee has responded to requests from certain parties involved in these disputes to make sure that any amounts not genuinely subject to dispute are made available for distribution.

In sum, distributions to the Peterson Plaintiffs are continuing on a weekly basis and, as noted above, the Trustee anticipates continued further progress.

D.  **Status of Advance Company Payments**

As explained in the January 13, 2017 Letter, approximately 264 of the Peterson Plaintiffs assigned specified portions of their judgments to (or entered into similar transactions with) one or more of approximately six advance companies (collectively, the "Advance Companies") in exchange for cash advances.  The company which provided the largest number of advances to the Plaintiffs is RD Legal Funding, LLC ("RD").[7]  A substantial number of advances were also provided by Cedars Funding LLC ("Cedars") and Specialty Claim Investments LLC ("Specialty").[8]

As explained below, approximately $83 million of distributions on account of approximately 94 of the CDA's for Plaintiffs who received advances currently remains unpaid because the Trustee has temporarily suspended further payments to RD, Cedars and Specialty.

As explained in the January 13, 2017 Letter, the agreements that govern the Plaintiffs' assignments to the Advance Companies (the "Assignment Agreements") provide that one or more of the Advance Companies has priority to receive payment on

---

[6] It may at some point become necessary for the Trustee to formally appear in bankruptcy proceedings in order to assist the relevant Plaintiffs in resolving obstacles to receiving their distributions.

[7] RD and/or one of its affiliates also provided substantial financing and/or advances to certain attorneys in the Peterson cases.  To the best of the Trustee's knowledge, these advances were refinanced and subsequently have been repaid.

[8] The other companies that provided advances and/or financing to Plaintiffs were involved in only a limited number of transactions and, to the best of the Trustee's knowledge, have been fully paid.

Div. Ex. 625-4

Honorable Katherine B. Forrest
March 31, 2017
Page 5

account of each assignor's judgment until the amount owed to the respective Advance Company (or companies) has been fully satisfied. In certain cases, the Plaintiff's distribution exceeds the amount owed to the respective Advance Company (or companies) and therefore must be divided between that Advance Company and the Plaintiff assignor. In many cases, however, the amount owed to an Advance Company exceeds the amount of the respective Plaintiff's initial distribution.

In order to prepare the CDA's for the Plaintiffs who entered into Assignments Agreements, the Trustee's advisors reviewed the complex agreements underlying each of the Assignment Agreements and recalculated and verified the Advance Companies' calculations for each Plaintiff who received an advance.[9] These calculations served as the basis for supplemental schedules that were added to the CDA's sent to the Plaintiffs who received advances that explained the impact of the assignments upon each such Plaintiff's distribution and requested that each such Plaintiff confirm the amount owed to his or her Advance Company (or companies) and either consent to payment thereof or provide the basis for any objection to payment.

Approximately 237 CDA's have been returned to Epiq by Plaintiffs who assigned their claims, and distributions to and/or for the benefit of such Plaintiffs commenced on or about December 15, 2016. The Trustee has paid approximately $108,524,237 on account of approximately 143 CDA's. Of this amount, Plaintiffs have received $52,219,009 and the Advance Companies have received $56,305,228. Of the remaining 94 returned CDA's that have not been paid, approximately 79 of the CDA's contain a consent to payment of the respective Advance Companies. The remaining returned CDA's contain an objection to payment and/or do not authorize payment.[10] Approximately 27 CDA's have not yet been returned to Epiq. Pursuant to the Assignment Agreements relating to the unpaid CDA's, any remaining payments would be payable in their entirety to the Advance Companies.

### E. Recent Regulatory Actions Against RD

On or about February 7, 2017, the Trustee became aware that the Attorney General of the State of New York (the "AG") and the Consumer Financial Protection Bureau (the "CFPB") commenced an action against RD, certain of its affiliates and its principal, Roni Dersovitz, in the Southern District of New York (the "RD Action") alleging, among other things, that (i) the assignment agreements that RD entered into with certain persons with claims against the Zadroga Fund established by the James

---

[9] To date, these calculations and the verification process have resulted in credits being made to or available for Plaintiffs of almost $1 million, including a credit for overcharges to certain of the Plaintiffs.

[10] The Advance Companies have advised the Trustee that they may commence judicial or arbitration proceedings to assert their contractual rights in connection with the objections asserted by Plaintiffs. The Trustee's participation in any such proceedings may be necessary in order to foster an expeditious resolution.

Honorable Katherine B. Forrest
March 31, 2017
Page 6

Zadroga 9/11 Health and Compensation Act of 2010 or the fund established in the settlement agreement approved by the court in the class action concerning brain injuries brought by retired NFL players violated usury and consumer finance protection laws and are null and void and (ii) RD also made misrepresentations to certain of such persons.[11]

Upon learning of the RD Action, the Trustee discontinued further distributions to the Advance Companies[12] in order to re-evaluate whether (i) any of the allegations made in the RD Action are potentially applicable to the Assignment Agreements that the Advance Companies entered into with Peterson Plaintiffs in this case, (ii) any of the Advance Companies engaged in the type of misrepresentations alleged in the RD Action, and (iii) all of the Peterson Plaintiffs who received advances from the Advance Companies had been provided appropriate disclosures when they entered into the Assignment Agreements.

The Trustee has been in communication with the AG, the CFPB and at least one other state attorney general located outside of New York in order to determine whether any of these agencies intends to take similar action in connection with the Assignment Agreements that the Advance Companies entered into in these cases. The AG and CFPB have asked the Trustee to provide certain information including, among other things, any written objections to payment to the Advance Companies that Plaintiffs have asserted in this case. The Trustee has been and intends to continue cooperating with these agencies. The Trustee is currently evaluating whether further investigation and/or legal action is appropriate before resuming payments to the Advance Companies on account of the CDA's that do not assert objections to such payments.

In addition to the RD Action, the Securities & Exchange Commission has commenced an administrative proceeding against RD and its principal, Roni Dersovitz, alleging, among other things, that RD violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder and that Mr. Dersovitz aided and abetted such violations. On or about March 22, 2017, RD and Mr. Dersovitz served a subpoena upon the Peterson Fund seeking to elicit

---

[11] Shortly before the AG and the CFPB filed the RD Action, RD commenced separate actions against the AG and the CFPB, seeking judgments declaring that, inter alia, the AG is exceeding its jurisdiction with regard to non-New York claimants, the CFPB is exceeding its statutory jurisdiction, and the subject assignment agreements are true sales, not loans or extensions of credit, are not subject to the Consumer Financial Protection Act or the Truth in Lending Act, do not violate New York law and are not otherwise unlawful. These actions are also pending before this Court.

[12] On or about February 27, 2017, in connection with an Assignment Agreement under which the amount owed to RD was subject to monthly increases, the Trustee authorized one further payment to RD, upon the written request of the Plaintiff's representative, to prevent the amount owed from increasing further.

Honorable Katherine B. Forrest
March 31, 2017
Page 7

testimony at a trial being conducted by the Securities & Exchange Commission in the administrative proceeding.[13]

## F. Second Distribution to Peterson Plaintiffs

The Trustee currently anticipates that the second round of distributions to the Peterson Plaintiffs will commence during the third quarter of 2017. The Trustee is in the process of analyzing the amounts that should be released from the Peterson Reserves in order to fund this distribution.

## G. Further Payments to Attorneys for the Peterson Plaintiffs

As noted in our January 13, 2017 Letter, during the fourth quarter of 2016 the Trustee approved and substantially completed payment in the aggregate amount of $250 million to attorneys who provided services, directly or indirectly, to the Peterson Plaintiffs (the "Peterson Attorneys"). This payment constitutes almost 50 percent of the contingency fees payable to the Peterson Attorneys on the amounts being distributed in the initial distribution. The Trustee received the consent of the attorneys to remit this payment to all of the Peterson Attorneys on a pro rata basis.

As we previously advised the Court, the fees owing to the Peterson Attorneys are governed by more than 1,400 engagement agreements. Numerous other agreements were also entered into among certain of the Peterson Attorneys that provide for payment and/or sharing of attorneys' fees. Many of these agreements have been the subject of intense factual and legal disputes between certain attorneys arising from, among other things, alleged ambiguous provisions, partially unexecuted agreements, missing engagement agreements, amounts owed to certain attorneys who were terminated, referral fee provisions that are in certain cases allegedly unclear and may not be enforceable, alleged conflicts of interest, and disagreements concerning which attorneys' fees are protected by attorneys' liens. In addition, there appears to be a question whether certain attorneys had authority to enter into certain agreements, which may raise ethical issues.[14]

---

[13] The Trustee anticipates filing a motion in this Court, pursuant to Section 5.6 of the Fund Agreement, for authority to initiate, defend or participate in litigation and/or other proceedings to the extent that he may deem it advisable to do so in connection with any matters pertaining to the Advance Companies.

[14] As we previously advised the Court, certain Peterson Plaintiffs have informed the Trustee that one of the trial counsel in the Peterson cases has undertaken another representation that allegedly constitutes a conflict of interest with his role in the Peterson case and has requested that the Trustee withhold some of such attorney's and his firm's fees in this case until this matter can be resolved. In addition, in February 2017, an attorney formerly employed by this attorney's firm commenced an action seeking $10 million from the fees payable to this attorney and his firm in this case pursuant to a termination agreement that allegedly provides for such payment. This former employee also purports to have an attorneys' lien on the funds in the Peterson Fund.

Honorable Katherine B. Forrest
March 31, 2017
Page 8

The parties to these disputes have held settlement and other discussions both with and without the participation of the Trustee. Most of the disputes and issues remain largely unresolved. However, the Trustee continues to discuss with the attorneys various potential options to resolve the fee disputes and other related issues. Most recently, on March 28, 2017, the Trustee convened a conference call with many of the Peterson Attorneys and presented several new options that, if implemented, would allow for another substantial payment of attorneys' fees within the next 30 to 60 days. During this call, the attorneys resolved to provide certain information and communications to the Trustee and to re-convene as soon as possible in April, after the Trustee has had an opportunity to further explore the options that were discussed. The Trustee is cautiously optimistic that these latest efforts can lead to a resolution of at least certain of the issues and/or an agreement to arbitrate or mediate some of these issues.

H. **Other Payments**

The Trustee has also made payments of approximately $74,113,776 to lobbyists and investigators and for expenses incurred by attorneys who performed work for the Peterson Plaintiffs in connection with these cases. The Trustee anticipates that payment of these obligations will continue as appropriate.

\*     \*     \*     \*     \*     \*

The Trustee is generally pleased with the progress of the distributions and payments to date, and anticipates continued progress in the coming weeks and months as he prepares for a second round of distributions to the Plaintiffs. The Trustee is working diligently to resolve the issues that have resulted in the delay of distributions on account of Plaintiffs who received advances and the attorneys fee disputes.

If the Court has any questions regarding any of the foregoing issues, the Trustee will of course respond expeditiously in order to assist the Court in addressing such issues.

Respectfully submitted,

Shalom Jacob

SJ:ma

NY:1006545/00002:842809v7

**Div. Ex. 625-8**