UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.) et al., | 10-cv-4518 (KBF) |
| Plaintiffs, | **SPECIAL MASTER'S REPORT & RECOMMENDATION** |
| -v- | |
| ISLAMIC REPUBLIC OF IRAN et al., | |
| Defendants. | |

KATHLEEN N. MASSEY, SPECIAL MASTER:

The Court has appointed me as Special Master in the above-captioned proceeding

pursuant to Rule 53(a) of the Federal Rules of Civil Procedure to resolve certain disputes that

have arisen in connection with the Peterson § 468B Qualified Settlement Fund (the "QSF" or the

"Fund"). (*See* ECF No. 775.) To resolve these disputes in an efficient manner, I have divided

them into three separate "tracks," with each track involving common legal or factual issues.[1]

This report addresses issues assigned to the third of the three tracks, the "Attorneys' Fee

Disputes" track.[2] Specifically, these issues primarily relate to disputes among counsel

---

[1]    The three tracks have been designated the "Trust Administration Disputes" track, the "Advance Company Disputes" track, and the "Attorneys' Fee Disputes" track. (ECF No. 777 at 1–2.) This report presumes familiarity with my Reports & Recommendations relating to the Trust Administration Disputes track (ECF No. 842) and the Advance Company Disputes track (ECF Nos. 845, 852), and the Court's order adopting the Trust Administration Disputes track Report & Recommendation (ECF No. 853). Capitalized terms not otherwise defined herein have the meanings ascribed to them in my prior reports.

[2]    In connection with this Report & Recommendation, I have considered the following submissions on the Court's docket: ECF Nos. 38, 103, 153, 402, 460, 461, 462, 466, 475, 535, 536, 538, 608, 609, 617, 620, 621, 625, 626, 631, 633, 634, 637, 638, 643, 644, 647, 648, 649, 650, 651, 653, 654, 655, 656, 657, 662, 663, 681, 682, 683, 687, 689, 691, 704, 706, 710, 727, 735, 735-5, 737, 738, 740, 744, 753, 755, 762, 763, 764, 770, 773, 774, 775, 776, 777, 782, 788, 842, 845, 852, 853 and 860. I have also considered all the submissions from the participants in the Attorneys' Fee Track. The submissions cited herein are listed in the attached Appendix A,

concerning their entitlement to payment of attorneys' fees from the QSF as a result of their representation or claimed representation of certain plaintiffs in this action and related actions in the U.S. District Court for the District of Columbia in which plaintiffs obtained judgments against the Islamic Republic of Iran for its involvement in the 1983 terrorist attack on the U.S. Marine barracks in Beirut, Lebanon (the "Peterson Plaintiffs" or the "87% Plaintiffs").  (*See* ECF No. 775 at 3; ECF No. 777 at 2.)  The QSF was established by the Court to satisfy those and other specified judgments against Iran and was funded with approximately $1.75 billion in cash held in a blocked account at Citibank, N.A. as of July 9, 2013 (the "Clearstream Assets").  (ECF No. 460 at 1–2.)  Towards the end of 2016 and continuing into 2017, the Honorable Stanley Sporkin, the Trustee of the QSF, made partial distributions of funds to most of the Peterson Plaintiffs and their counsel, but disputes among the various attorneys have prevented the Trustee from making further distributions to them out of concern that the QSF's assets are not sufficient to satisfy all of the claims made for payment of attorneys' fees.  (*See* ECF No. 710 at 2–4, 7–8; SM Ex. 52 (Nov. 8, 2017 Conf. Tr.) at 83:19–84:18 (Trustee's counsel, stating that "for the moment, absent an order from Judge Forrest directing that we are not constrained by the lien [, o]ur position is we cannot make a distribution while these claims are pending").)

The disputes addressed in this Report & Recommendation comprise:

(1)     a motion by Thomas Fortune Fay ("Fay") and his firm, Fay Law Group, P.A. ("Fay Group") for an order compelling the Trustee to disburse the balance of the attorneys' fees owed to him and other counsel for the Peterson Plaintiffs (*see* ECF Nos. 727, 735, 782);

---

with each of the documents in Appendix A designated herein as a Special Master exhibit ("SM Ex. __").  To facilitate the Court's review of this Report & Recommendation, with the Court's leave, I will also submit under seal a full copy of all submissions received by the participants in this track (including submissions not cited herein).

(2)     applications by Fay Group, the Perles Law Firm, P.C. (the "Perles Law Firm"),

the Rothenberg Law Firm, Anthony LaSpada, Esq. (with Fay Group, the Perles Law Firm, the

Rothenberg Law Firm, and LaSpada referred to herein collectively as the "Litigation

Attorneys"), the Law Offices of Dan Gaskill, LLC ("Gaskill"), Wise & Donahue, PLC

("Donahue"), Joseph Peter Drennan, Esq., Karr & Allison PC ("Karr,"[3] and with Gaskill,

Donahue and Drennan referred to herein collectively as the "Follow On Attorneys") and

Heideman Nudelman & Kalik, P.C. ("HNK," and with the Litigation Attorneys and the Follow

On Attorneys referred to herein collectively as the "Retained Attorneys") for the payment of

contingent-fees pursuant to retainer agreements between each of those attorneys or firms and

certain of the Peterson Plaintiffs and fee-sharing agreements with other Retained Attorneys (*see,

e.g.*, SM Ex. 31 (Letter from C. Fay dated Oct. 26, 2017));[4]

(3)     applications by LaSpada, Gaskill, Drennan, Karr and Bond & Norman Law (the

"Damages Attorneys") for the payment of contingent-fees pursuant to uncontested fee-sharing

agreements with the Retained Attorneys for representing certain of the Peterson Plaintiffs to

establish their entitlement to damages in proceedings before the U.S. District Court for the

District of Columbia (*see, e.g.*, SM Ex. 27 (Letter from D. Gaskill dated Oct. 27, 2017));[5] and

---

[3]     As stated above, references to Karr are intended to be to the firm of Karr & Allison PC. I am aware that attorney John Karr himself passed away in 2016 and that Theodore Allison is pursuing relief pursuant to an agreement with Karr's estate. (SM Ex. 28 (Letter from T. Allison dated Oct. 27, 2017) at Decl. ¶ 8.)

[4]     The terms used in this Report & Recommendation are for the purpose of convenience only, and are not intended to reflect my agreement or disagreement with any of the participants' characterizations of any attorney's or firm's efforts in this case.

[5]     In addition to attorneys' fees, Karr seeks payment of $18,725 in expenses relating to its representation of certain of the Peterson Plaintiffs. (SM Ex. 28 (Letter from T. Allison dated Oct. 27, 2017) at 2.) Because the parties have not provided any information about the basis of any dispute concerning the request for reimbursement, I decline to make a recommendation at this time concerning the payment of expenses to Karr. Instead, I recommend that, if the Court adopts this Report & Recommendation, the Court order the Trustee to notify all attorneys who

– 3 –

(4)     applications by Salon Marrow Dyckman Newman & Broudy LLP ("SMD"),

Stone Bonner & Rocco ("SBR") and the Fleischman Law Firm ("Fleishman," and with SMD and

SBR referred to herein collectively as the "Enforcement Attorneys") for the payment of

contingent-fees pursuant to fee-sharing agreements with certain Retained Attorneys for judgment

enforcement work performed on behalf of the Peterson Plaintiffs (*see, e.g.*, SM Ex. 23 (Letter

from L. Vogel dated Oct. 27, 2017)).[6]

While there appears to be no dispute about certain of these applications, others are

contested by the participants in these proceedings.  There are four major disputes concerning the

payment of attorneys' fees.  Specifically,

(1)     attorney David J. Cook and Cook Collection Attorneys, P.L.C. (jointly, "Cook")

claim to possess a lien on $200 million of the funds in the QSF payable to any other attorneys for

the Peterson Plaintiffs, and argues that the Trustee should reserve that amount pending resolution

---

may seek to claim any entitlement to reimbursement of expenses that such claims and supporting
documents must be submitted within 30 days of the Court's adoption of this Report &
Recommendation, and that any claims not received by that deadline will be rejected by the
Trustee as untimely.  To the extent that Karr or any other attorney seeking expense
reimbursement is unable to resolve any dispute with the Trustee concerning the payment of
expenses, it should submit a letter brief to me (no longer than three pages) setting forth the
attorney's and the Trustee's positions on the dispute.

[6]     In connection with these proceedings, I have also received an application from Loraine
A. Ray, Esq., requesting an order authorizing the Trustee to pay fees and expenses for her service
as a special master in connection with certain of the underlying District of Columbia actions.
(SM Ex. 24 (Letter from L. Ray dated Oct. 27, 2017)).  Because Ray's claim for payment of fees
and expenses raises factual and legal questions distinct from the disputes between and among the
attorneys who represented or claim to have represented the Peterson Plaintiffs, I will address her
request separately in a forthcoming Report & Recommendation, if necessary.  Because some of
the participants in this track appear to be pursuing an alternative means of resolving her request,
I direct Ray to provide an update on the status of her ongoing discussions with counsel for the
Retained Attorneys and the Trustee no later than two weeks from the filing of this Report &
Recommendation.

of an arbitration between Cook and the Litigation Attorneys (*see, e.g.*, SM Ex. 37 (Letter from M. Folkenflik dated Oct. 27, 2017));

(2)     attorney Jay Glenn claims to possess a lien on $21.7 million of the funds in the QSF payable to Fay and Perles for contingent-fees owed in respect of his representation of 103 of the Peterson Plaintiffs as a damages attorney and additional contingent-fees pursuant to an oral agreement between Glenn and Fay for the referral of 40 of the Peterson Plaintiffs to the "Fay and Perles FSIA Litigation Partnership" (ECF Nos. 625, 637, 648, 649, 650, 663; SM Ex. 25 (Letter from S. Storch dated Oct. 27, 2017));[7]

(3)     attorney Colleen Delaney claims to possess a lien on $53.4 million of the funds in the QSF otherwise payable to the Fay Group, the Perles Law Firm and the Rothenberg Law Firm pursuant to an oral fee-sharing agreement she purports to have entered into with Rothenberg Law Firm principal Allen Rothenberg for services rendered and the referral of clients to Fay, Perles and Rothenberg (SM Ex. 34 (Letter from E. Manning dated Oct. 27, 2017)); and

(4)     the Perles Law Firm contends that the Follow On Attorneys and HNK are entitled to fees of just 3% of the total recoveries of the Peterson Plaintiffs whom they represented, rather than the fees owed to them pursuant to their retainer agreements with their clients and disputed fee-sharing agreements, on the grounds that Fay and Perles actually represented all of the Peterson Plaintiffs and that the Follow On Attorneys and HNK did no more work representing their clients than the work performed by the "Damages Attorneys" (SM Ex. 13 (Letter from G.

---

[7]     Glenn also claims that the Trustee has failed to reimburse certain expenses he incurred in connection with the damages hearings before the U.S. District Court for the District of Columbia.  (SM Ex. 8 (Letter from S. Storch dated June 9, 2017) at 2; SM Ex. 25 (Letter from S. Storch dated Oct. 27, 2017) at 2.)

Hervey dated June 22, 2017)), and alternatively on the ground that he and Fay are entitled to fees under a "common fund" theory (SM Ex. 60 (Letter from R. Weigel dated Nov. 20, 2017) at 1).[8]

The Trustee has taken no position with respect to the attorneys' competing claims. Instead, "[t]he Trustee's position has been that if any party came forward with a claim that they had a lien . . . [the Trustee was] not going to make the determination as to whether or not their lien was valid, but rather would respect the claim until such time as a judicial determination was made."  (SM Ex. 52 (Nov. 8, 2017 Conf. Tr.) at 83:20–84:3.)  The Trustee has, however, expressed concern that "the total amounts claimed by counsel . . . exceed one-third of the approximately $1.65 billion gross amount that the Trustee has been distributing in his initial distribution," with one-third being the share of the total set aside for attorneys' fees, and that if all the claims by the attorneys were allowed at face value, the total amount of attorneys' fees payable by the Peterson Plaintiffs could be "as high as approximately 46% of the gross distribution amount."  (SM Ex. 51 (Letter from S. Jacob dated Nov. 7, 2017) at 5.)  The Trustee contends that "payments of additional fees to attorneys must await judicial resolution of the unresolved issues and the Court's entry of orders directing the Trustee as to whom and how much he should pay."  (*Id.* at 7.)  Essentially, the Trustee has avoided acting as a tribunal for the

---

[8]     Former Fay Group employee Annie Pennock Kaplan, Esq. filed a partial opposition to Fay's motion based on her claim to possess a lien against funds held by the QSF pursuant to a separation agreement with the Fay Group—essentially arguing that the Trustee should withhold payment to Fay in the amount of her claimed lien pending resolution of her breach of contract suit based on the separation agreement, *Kaplan v. Fay Law Group, P.A.*, No. 2017 CA 000296 B (D.C. Super. Ct. filed Jan. 17, 2017).  (*See* ECF Nos. 753, 788; SM Ex. 32 (Letter from C. Sethi dated Oct. 27, 2017); SM Ex. 44 (Letter from C. Sethi dated Nov. 3, 2017).)  Kaplan has withdrawn her partial opposition based on a settlement with the Fay Group, and now both Kaplan and Fay agree that Kaplan should be paid the first $3.4 million payable to Fay himself from the QSF.  (ECF No. 860; SM Ex. 52 (Nov. 8, 2017 Conf. Tr.) at 104:5–106:14; SM Ex. 42 (Letter from C. Fiebig dated Nov. 3, 2017) at 1; SM Ex. 58 (Letter from C. Sethi dated Nov. 13, 2017) at 1–2.)

resolution of the attorneys' disputes against each other and awaits direction from the Court as to how to proceed in light of the competing claims to attorneys' fees from the QSF.

As set forth in further detail below, I recommend that Fay's motion for disbursement of funds be granted in part and denied in part, and that the Court order the Trustee to distribute funds from the QSF as follows:

First and foremost, none of the attorneys claims to possess a lien against any of the funds earmarked for the Peterson Plaintiffs individually.  Because none of the attorneys claims a fee in excess of that to which each of the Peterson Plaintiffs agreed when he, she or it entered into contingent-fee agreements with the Retained Attorneys, I recommend that the Court order the Trustee to complete distribution from the QSF in respect of claims by the Peterson Plaintiffs as soon as reasonably practicable, with reasonable and appropriate reserves for anticipated expenses and contingencies, but no reserves for attorneys' fees exceeding one-third of the total funds available for distribution.

Second, I recommend that the Court deny the applications of Cook, Glenn and Delaney to obtain liens against the QSF.  The Court has already rejected the attempts of Cook and Glenn to intervene in this case.  The U.S. Court of Appeals for the Second Circuit affirmed the Court's Order denying Cook's motion to intervene, and Glenn withdrew his appeal of the same Order. Delaney's belated attempt to disrupt the orderly process of distribution based on a claim to possess a lien under Rhode Island law suffers from many of the same defects that caused the Court to reject Cook's and Glenn's motions to intervene.  To the extent they have viable claims for breach of contract or otherwise against any of the other attorneys for the Peterson Plaintiffs, Cook and Glenn may continue to pursue their claims in their ongoing arbitration and litigation proceedings, and Delaney may pursue her claims, to the extent viable, in an appropriate forum.

Third, I recommend that the Court reject the Perles Law Firm's arguments that it is entitled to a fee for representing all of the Peterson Plaintiffs based on the theory that the retainer agreements the Follow On Attorneys and HNK entered into with their clients should be disregarded or based on the Perles Law Firm's claimed role in creating a "common fund." Similarly, I recommend that the Court reject the Perles Law Firm's argument that the Follow On Attorneys and HNK are entitled to fees of only 3% of the recoveries by the Peterson Plaintiffs who retained them directly.  Perles has not established an entitlement to a lien on funds otherwise payable to the Follow On Attorneys or HNK.  In addition, these arguments are inconsistent with the Court's prior Orders establishing the QSF and are untimely.  To the extent that the Perles Law Firm claims that any of the Follow On Attorneys or HNK has any obligation to make additional payments to the Perles Law Firm or Fay Law Group, such claims may be pursued in an appropriate judicial forum or through arbitration, and need not prevent distribution at this time.

Fourth, I recommend that the Court order the Trustee to pay the Retained Attorneys according to the terms of their contingent-fee agreements with their clients, as contemplated by the plain terms of the QSF Agreement, as well as the fee-sharing agreements between or among the Retained Attorneys, and that the Court order the Trustee to pay the Damages Attorneys and the Enforcement Attorneys according to the terms of their fee-sharing agreements with the Retained Attorneys, subject to appropriate reserves for reasonable expenses and contingencies, but no reserves based on the claims advanced by Cook, Glenn, Delaney or Perles in connection with these proceedings.

I.      **The Peterson Plaintiffs' Efforts To Obtain and Enforce the Judgments Against Iran Arising from the Beirut Attack**

      A.      **The Litigations Before the U.S. District Court for the District of Columbia**

The procedural history of this case began on October 3, 2001, when Fay and Perles filed a suit in the U.S. District Court for the District of Columbia against the Islamic Republic of Iran and the Iranian Ministry of Information and Security (jointly, "Iran") on behalf of certain victims of the 1983 terrorist attack on the Marine barracks in Beirut, Lebanon (the "Beirut Attack"), and certain personal estates and family members of victims of the attack.  Complaint at 1–17, *Peterson v. Islamic Republic of Iran*, No. 1:01-cv-02094 (D.D.C. filed Oct. 3, 2001), ECF No. 3. In total, there were 811 plaintiffs in that case.  The complaint alleged that the attack had been carried out by the terrorist group Hezbollah at the direction of agents of Iran.  *Id.* ¶¶ 5–8. Plaintiffs alleged that the defendants were liable, under the common law, the laws of the District of Columbia, and United States federal law, for the deaths of victims killed in the attack, for the substantial physical and emotional injuries inflicted on other victims, and for the emotional injuries inflicted on the family members of victims.  On December 28, 2001, Fay and Perles filed a separate action in the U.S. District Court for the District of Columbia raising similar claims on behalf of seven additional estates of victims of the Beirut Attack.  *See Boulos v. Islamic Republic of Iran*, No. 1:01-cv-02684, slip op. at 2–3 (D.D.C. filed May 30, 2003), ECF No. 16.  The *Peterson* and *Boulos* actions were consolidated for all purposes before U.S. District Judge Royce C. Lamberth.  Hereinafter, I will refer to both cases jointly as the "*Peterson* Action."

      To prosecute the *Peterson* Action and other terrorism-related cases, Fay and Perles formed a partnership called the "Fay and Perles FSIA Litigation Partnership" (the "FSIA Partnership") in February 2001.  (SM Ex. 12 (Letter from G. Hervey dated June 22, 2017) Attach. (hereinafter referred to as the "Letter from D. Bregman and G. Hervey dated May 1,

2017") Ex. 2; SM Ex. 31 (Letter from C. Fay dated Oct. 26, 2017) at 1, 77–81.)  It is undisputed that the FSIA Partnership undertook significant investigative work to collect evidence linking Iran to the Beirut Attack.  (*See* SM Ex. 12 (Letter from D. Bregman and G. Hervey dated May 1, 2017) at 3–4.)  After developing the factual evidence necessary to support claims that Iran sponsored the Beirut Attack and commencing the *Peterson* Action, the FSIA Partnership served the complaints on Iran through diplomatic channels on May 30 and July 17, 2002.  *See Peterson*, slip op. at 1–2 (D.D.C. Dec. 18, 2002), ECF No. 18; *Boulos*, slip op. at 2 (D.D.C. Dec. 18, 2002), ECF No. 13.  When Iran failed to answer or respond to the complaints, the FSIA Partnership obtained a finding of default against Iran on December 18, 2002.  *Peterson*, slip op. at 4–6 (D.D.C. Dec. 18, 2002), ECF No. 18.  In holding that Iran had defaulted, Judge Lamberth determined that "where the members of the United States armed services are able to demonstrate that they sustained injuries from a terrorist act while noncombatants, operating under peacetime rules of engagement, they are eligible to recover damages under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act." *Id.* at 7.

Subsequently, Judge Lamberth held a two-day evidentiary hearing on the question of Iran's liability for the 1983 terrorist attack on March 17 and 18, 2003.  During that hearing, the *Peterson* Action plaintiffs were represented primarily by Fay, who served as lead counsel, as well as by attorneys Perles, Rothenberg and LaSpada.  Gaskill, who was associated with Fay's firm at the time, assisted with the preparation for the hearing, and it was Fay and Gaskill who actually introduced evidence and questioned witnesses at the hearing.  *See* Mar. 17, 2003 Hr'g Tr. at 20:2–90:12, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed Apr. 1, 2003), ECF No. 23. Several other attorneys, including Attorneys' Fee Disputes track participants Glenn, Drennan, and Ferris Bond and Jane Norman of Bond & Norman, also attended the evidentiary hearing.

*See id.* at 1–4.  Fay introduced these additional attorneys as having been retained to assist Fay and Perles in the preparation of the case.  *Id.* at 5:14–7:8.  On May 30, 2003, Judge Lamberth issued his findings of fact and conclusions of law, and based on the evidence presented at the hearing, determined that the plaintiffs had carried their burden of proof under the Foreign Sovereign Immunities Act ("FSIA") and entered a default judgment as to liability against the defendants.  *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 47, 59–64 (D.D.C 2003).

While the motion for entry of default against the defendants was *sub judice*, the FSIA Partnership filed a motion for the appointment of "special masters for the purpose of taking testimony as to damages" in *Peterson*.  *See* Motion Requesting Appointment of Special Masters at 1, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed Oct. 22, 2002), ECF No. 15.  The FSIA Partnership argued that a trial on the plaintiffs' damages would "require 155 to 175 court days" and that "the use of court appointed special masters" was the only practical method of obtaining damages determinations "within a reasonable period of time."  *Id.* at 1–2.  When Judge Lamberth entered the default judgment as to liability, he also granted the motion for appointment of special masters to conduct evidentiary hearings on damages.  Order at 26, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. entered May 30, 2003), ECF No. 24.  Two months later, Judge Lamberth entered an Administrative Plan Governing Appointed Special Masters, which addressed the qualifications, compensation, powers, and reporting requirements for the special masters appointed to hear evidence as to each plaintiff's damages.  Am. Administrative Plan Governing Appointed Special Masters and Order ("Administrative Plan") at 2–3, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. entered July 30, 2003), ECF No. 29.  Pursuant to the Administrative Plan and Rule 53 of the Federal Rules of Civil Procedure, Judge Lamberth appointed 15 attorneys as special masters to make reports and recommendations on the *Peterson* Action plaintiffs'

– 11 –

damages between August 1 and November 13, 2003.  *See e.g.*, Order Appointing J. Swanson as special master, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed Aug. 1, 2003), ECF No. 30; Order Appointing C. Dunham as Special Master, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed Nov. 14, 2003), ECF No. 46.  Judge Lamberth also appointed two additional attorneys as Special Masters in 2006.  *See* Order Appointing A. Pennock Kaplan as Special Master, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed May 26, 2006), ECF No. 144; Order Appointing A. Balaran as Special Master, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed Dec. 6, 2006), ECF No. 221.  Between November 2005 and April 2007, the special masters appointed by Judge Lamberth conducted evidentiary hearings on damages with respect to each of the plaintiffs in the *Peterson* Action and issued reports and recommendations on their findings.  *See, e.g.*, Report & Recommendations of Special Master P. Saeta, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed Nov. 8, 2005), ECF No. 51; Report & Recommendation of Special Master J. Swanson, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed Apr. 25, 2007), ECF No. 225.

The FSIA Partnership represented each of the *Peterson* Action plaintiffs pursuant to contingent-fee agreements with their clients, but retained several other attorneys (referred to herein as "damages attorneys") to assist with preparing and presenting the evidence for the evidentiary hearings before the court-appointed special masters.  (SM Ex. 12 (Letter from D. Bregman and G. Hervey dated May 1, 2017) at 5–6; SM Ex 27 (Letter from D. Gaskill dated Oct. 27, 2017) at 1.)  Several of the damages attorneys, including LaSpada, Gaskill, Drennan, Bond and Norman, had appeared at the March 2003 evidentiary hearing.  Other of the damages attorneys, including Donahue and Karr, had not previously appeared in the *Peterson* Action. Each of the damages attorneys was retained in the *Peterson* Action pursuant to a fee-sharing agreement with the FSIA Partnership, sometimes referred to as an "Associate Counsel

Agreement."  Under the terms of these agreements, each damages attorney was "responsible for preparation of all witnesses for hearing, presentation of all evidence to the Court or Special Master and presentation of all records and medical reports to the Court" for specified *Peterson* Action plaintiffs.  (SM Ex. 27 (Letter from D. Gaskill dated Oct. 27, 2017) Ex. A at 1.)  In exchange, each would receive "3% of the gross amount collected . . . with respect to compensatory damages as to each client referred" to the damages attorney, as well as reimbursement of the attorney's "necessary expenses incurred . . . in the preparation, prosecution and administration of the case," contingent upon collection .  (*Id.* at 2.)[9]

Judge Lamberth held an omnibus hearing with respect to the special masters' findings on September 7, 2007, and entered judgment on behalf of the majority of the *Peterson* Action Plaintiffs for the compensatory damages determined to be appropriate by each of the special masters, totaling to $2,656,944,877.00.  Judgment at 1–20, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. entered Sept. 7, 2007), ECF No. 228; *Peterson*, 515 F. Supp. 2d 25, 60–69 (D.D.C. 2007).  However, not all of the *Peterson* Action plaintiffs were held to have viable claims.

The plaintiffs in the *Peterson* Action had brought their claims pursuant to the FSIA, which at the time stated, subject to certain exceptions, that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605(a)(7) (2002).  However,

---

[9]     While damages attorneys other than LaSpada, Gaskill, Drennan, Bond, Norman, Karr and Donahue have not participated in these proceedings or requested payment from the QSF, there appears to be no dispute that they seek payment along the same lines as the Damages Attorneys who are participating.  Thus, the general discussions herein concerning Damages Attorneys applies equally to those on equal footing who are not participating.

because the FSIA did not "itself provide a cause of action" and merely acted "as a pass-through to substantive causes of action against private individuals that may exist in federal, state or international law," each plaintiff was required to establish a valid cause of action under the law of the state of his, her or its domicile. *Peterson*, 515 F. Supp. 2d at 38 (quotations omitted).

Accordingly, Judge Lamberth dismissed the claims of certain plaintiffs who were family members of victims of the attack because the jurisdictions in which they were domiciled at the time of the attack—Louisiana and Pennsylvania—did not recognize causes of action for intentional infliction of emotional distress for those who were not physically present at the time of the "outrageous conduct" that gave rise to the injuries alleged. *Id.* at 44–45.  Judge Lamberth also dismissed the claims of plaintiffs who did not qualify as members of the "immediate family" of a victim, those who failed to establish their domicile at the time of the attack, and those "could not be located or who were unable to present evidence . . . to establish a valid claim for damages." *Id.* at 40 n.5, 45–51.  Finally, Judge Lamberth dismissed the claim of a plaintiff who had already obtained a judgment for the same injury. *Id.* at 49.[10]

After Judge Lamberth entered the default judgment as to liability in the *Peterson* Action, fourteen additional actions on behalf of Beirut Attack victims and estates or family members of such victims were filed in the U.S. District Court for the District of Columbia between 2003 and 2012.

- On September 16, 2003, the Donahue Law Firm (through attorneys Donahue and Gaskill) filed a complaint against Iran on behalf of 48 additional plaintiffs.  *See* Compl. at 1–8, 61,

---

[10]     As explained in detail below, *see infra* at 17, certain of these plaintiffs were able to file new actions and obtain judgments after Congress passed legislation establishing a federal cause of action for the family members of victims of international terrorism.  *See, e.g.*, Compl. at 11, *Bonk v. Islamic Republic of Iran*, No. 1:08-cv-1273 (D.D.C. filed July 24, 2008), ECF No. 1; Order and Judgment at 5, *Bonk v. Islamic Republic of Iran*, No. 1:08-cv-1273 (D.D.C. filed Mar. 31, 2008), ECF No. 23.

*Valore v. Islamic Republic of Iran*, No. 1:03-cv-1959 (D.D.C. filed Sept. 16, 2003), ECF No. 3 (the "*Valore* Action").

- On October 30, 2005, HNK (through attorney Richard D. Heideman), with Fay and Perles serving in "Of Counsel" capacities, filed a complaint against Iran on behalf of 86 additional plaintiffs.  *See* Compl. at 1–14, 99–100, *Bland v. Islamic Republic of Iran*, No. 1:05-cv-02124 (D.D.C. filed Oct. 30, 2005), ECF No. 2 (the "*Bland* Action").

- On March 10, 2006, Fay and Drennan filed a complaint against Iran on behalf of eight additional plaintiffs.  *See* Compl. at 1–7, 14, *Arnold v. Islamic Republic of Iran*, No. 1:06-cv-0516 (D.D.C. filed Mar. 10, 2006), ECF No. 3 (the "*Arnold* Action").

- On March 31, 2006, Karr (through attorneys John Karr and Theodore Allison) filed a complaint against Iran on behalf of four additional plaintiffs.  *See* Compl. at 1–7, 15, *Murphy v. Islamic Republic of Iran*, No. 1:06-cv-00596 (D.D.C. filed Mar. 31, 2006), ECF No. 1 (the "*Murphy* Action").

- On April 17, 2006, Drennan filed a complaint against Iran on behalf of 16 additional plaintiffs.  *See* Compl. at 1–6, 12, *O'Brien v. Islamic Republic of Iran*, No. 1:06-cv-0690 (D.D.C. filed April 17, 2006) (the "*O'Brien* Action"), ECF No. 3.

- On April 24, 2006, HNK (through Heideman), with Fay and Perles serving in "Of Counsel" capacities, filed a complaint against Iran on behalf of two additional plaintiffs. *See* Compl. at 1–2, 9, *Spencer v. Islamic Republic of Iran*, No. 1:06-cv-0750 (D.D.C. filed Apr. 24, 2006), ECF No. 3 (the "*Spencer I* Action").

- On July 23, 2007, Fay and Caragh Glenn Fay filed a complaint against Iran on behalf of seven additional plaintiffs.  *See* Compl. at 1–6, 11, *Davis v. Islamic Republic of Iran*, No. 1:07-cv-1302 (D.D.C. filed July 23, 2007), ECF No. 1 (the "*Davis* Action").

- On March 27, 2008, HNK (through Heideman) filed a complaint against Iran on behalf of 181 additional plaintiffs.  *See* Compl. at 1–70, 80, *Brown v. Islamic Republic of Iran*, No. 1:08-cv-0531 (D.D.C. filed Mar. 27, 2008), ECF No. 1 (the "*Brown* Action").

- On March 27, 2008, Drennan, Gaskill, Donahue and Fay filed a complaint against Iran on behalf of six additional plaintiffs.  *See* Compl. at 1–6, 10, *Anderson v. Islamic Republic of Iran*, No. 1:08-cv-0535 (D.D.C. filed Mar. 27, 2008), ECF No. 3 (the "*Anderson* Action").

- On July 24, 2008, the Perles Law Firm (through Perles) and the Fay Group (through Fay and Caragh Glenn Fay) filed a complaint against Iran on behalf of 50 additional plaintiffs. *See* Compl. at 1–10, 20–21, *Bonk v. Islamic Republic of Iran*, No. 1:08-cv-1273 (D.D.C. filed July 24, 2008), ECF No. 1 (the "*Bonk* Action").

- On April 22, 2010, the Fay Group (through Fay and Joseph W. Fay) filed a complaint against Iran on behalf of two additional plaintiffs.  *See* Compl. at 1–2, *Fain v. Islamic Republic of Iran*, No. 1:10-cv-0628 (D.D.C. filed Apr. 22, 2010), ECF No. 1 (the "*Fain* Action").

- On May 20, 2010, Donahue, Drennan, Gaskill and the Fay Group (through Fay) filed a complaint against Iran on behalf of 44 additional plaintiffs.  *See* Compl. at 1–7, 15–16, *Taylor v. Islamic Republic of Iran*, No. 1:10-cv-0844 (D.D.C. filed May 20, 2010), ECF No. 3 (the "*Taylor* Action").

- On January 10, 2012, Drennan and David J. Kiyonaga, P.L.L.C. filed a complaint against Iran on behalf of 34 additional plaintiffs.  *See* Compl. at 1–8, 23, *Spencer v. Islamic Republic of Iran*, No. 1:12-cv-0042 (D.D.C. filed Jan. 10, 2012), ECF No. 3 (the "*Spencer II* Action").

- On December 28, 2012, Fay Group (through Fay and Caragh Glenn Fay) and the Perles Law Firm (through Perles) filed a complaint against Iran on behalf of 28 additional plaintiffs.  *See* Compl. at 1–8, 34–35, *Worley v. Islamic Republic of Iran*, No. 1:12-cv-2069 (D.D.C. filed Dec. 28, 2012), ECF No. 1 (the "*Worley* Action").

Each of the cases listed above was assigned to Judge Lamberth as related to the *Peterson* Action.

Prior to Judge Lamberth's dismissal of the claims of certain of the *Peterson* Action plaintiffs for the reasons discussed above, the Litigation Attorneys apparently had anticipated his ruling and engaged lobbyists to pursue the enactment of legislation to grant individuals a private right of action against foreign sovereigns for terrorist acts under federal law.  In June 2004, Fay, Perles, LaSpada, Rothenberg and other attorneys hired Sheldon Kamins, Wayne Berman, the Federalist Group, LLC, and Michael Bregman as lobbyists to persuade Congress to pass proposed legislation.  (SM Ex. 1 (Kamins Agreement) at 2.)  In July 2007, Fay, Perles and Rothenberg hired Morris J. Amitay, P.C., McGuire Woods Consulting, and Gibson, Dunn & Crutcher, LLP as lobbyists to advance legislation "to clarify that persons may bring private rights of actions against foreign states for certain terrorist acts, and for other purposes."  (SM Ex. 2 (Amitay Agreement) at Ex. A; SM Ex. 4 (McGuire Woods Agreement) at Ex. A: SM Ex. 3 (Gibson Dunn Agreement) at Ex. A.)

These lobbying efforts were successful.  On January 28, 2008, Congress passed the National Defense Authorization Act for Fiscal Year 2008 (the "2008 NDAA").  *See* Pub. L. 110-81, § 1083, 122 Stat. 3 (2008).  Section 1083 of the 2008 NDAA repealed 28 U.S.C.

§ 1065(a)(7) and enacted a new section of the FSIA that granted a federal private right of action to U.S. nationals, members of the armed forces, employees of the federal government, and the legal representatives of such persons "for personal injury or death caused by acts [previously within the scope of 28 U.S.C. § 1605(a)(7)]," and expressly permitted plaintiffs to recover "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). The plaintiffs in the *Brown*, *Anderson*, *Bonk*, *Fain*, *Taylor*, *Spencer II* and *Worley* Actions sought relief under 28 U.S.C. § 1605A, and based on this new legislation, plaintiffs whose claims had previously been asserted in the *Peterson* Action but dismissed by Judge Lamberth because they were not recognized as causes of action under state law were permitted to renew their suits. *See Peterson v. Islamic Republic of Iran*, 224 F. Supp. 3d 17, 22 (D.D.C. 2016).

Over the years, the attorneys who were directly retained by the plaintiffs in each of these actions formed a complicated network of fee-sharing agreements. For example, as noted above, Fay and Perles, as partners of the FSIA Partnership, were retained directly by the plaintiffs in the *Peterson* Action, as well as the *Davis*, *Bonk*, *Fain* and *Worley* Actions, and served as lead counsel in those actions. In the *Peterson* Action, Fay, Perles and Rothenberg entered into engagement agreements with certain of the plaintiffs that granted Fay, Perles and Rothenberg a contingent-fee of "33⅓% of the total gross recovery before deduction of any fees, liens or charges of [an]y type," to be "distributed to each of Fay, Perles and Rothenberg in an equal share." (SM Ex. 31 (Letter from C. Fay dated Oct. 26, 2017) Ex. 1.A at 2.) Similar agreements were entered into with plaintiffs in the *Bonk* Action. (*Id.* Ex. 1 at 1.) In addition, Fay and Perles agreed to share portions of their fees for certain clients in the *Peterson* and *Bonk* Actions with LaSpada as an additional Litigation Attorney. (*See id.* at Ex. 1, Contract 2.) Fay and Perles also

entered into fee-sharing agreements with the Damages Attorneys retained to represent individual plaintiffs in connection with the proceedings before the special masters.  (*See, e.g.*, SM Ex. 29 (Letter from F. Bond dated Oct. 27, 2017) Ex. C at 1–2.)  HNK served as lead counsel to the plaintiffs in the *Bland*, *Spencer I* and *Brown* Actions, and entered into contingent-fee engagement agreements directly with the clients and fee-sharing agreements with Fay and Perles, who served in "Of Counsel" capacities (SM Ex. 38 (Letter from R. Zuckerman dated Oct. 27, 2017) at 2–3), although Perles disputes whether those fee-sharing agreements are binding (*see* SM Ex. 12 (Letter from D. Bregman and G. Hervey dated May 1, 2017) at 16–18).  Drennan, who served as a Damages Attorney in the *Peterson* Action, was retained directly by plaintiffs in the *Arnold* and *O'Brien* Actions, and entered into fee-sharing agreements with Fay, who served in an "Of Counsel" role with respect to those actions.  (SM Ex. 40 (Letter from J. Mook dated Oct. 27, 2017) Aff. of Joseph Peter Drennan at 2–3.)  Drennan, Fay, Donahue and Gaskill entered into contingent-fee agreements with the plaintiffs in the *Valore*, *Anderson*, and *Taylor* Actions, agreeing to share the contingent-fees in four equal shares, while in *Spencer II*, this same group of attorneys and HNK entered into contingent-fee agreements with the plaintiffs and entered into a fee-sharing agreement to allocate the attorneys' fees from the case.  (*Id.* at 3–5.)  Karr represented the plaintiffs in the *Murphy* Action and entered into contingent-fee agreements with those clients directly (SM Ex. 28 (Letter from T. Allison dated Oct. 27, 2017) at 2–4), but also does not dispute the Fay Group's contention that Karr agreed with Fay to pay a portion of the fees earned in the *Murphy* Action to the FSIA Partnership (SM Ex. 31 (Letter from C. Fay dated Oct. 26, 2017) Ex. 1 at 1).  As noted above, Karr also served as a Damages Attorney in connection with the *Peterson* Action.  (*Id.*)

The Retained Attorneys in the *Valore*, *Bland*, *Arnold*, *Murphy*, *O'Brien*, *Spencer I*, *Davis*, *Brown*, *Anderson*, *Bonk*, *Fain*, *Taylor* and *Spencer II* Actions approached those matters in a way similar to the procedures employed in the *Peterson* Action, although Perles disputes the roles the Follow On Attorneys and HNK played in these matters.  After the filing of a complaint against Iran, counsel would serve the complaint, move for entry of a default after Iran failed to respond, and then present evidence in support a default judgment against Iran.  *See, e.g.,* Complaint, *Valore*, No. 03-cv-1959 (D.D.C. Sept. 16, 2003), ECF No. 3; Motion for Default Judgment, *Valore*, No. 03-cv-1959 (D.D.C. June 22, 2006), ECF No. 15.  After Judge Lamberth determined whether the plaintiffs in each case had met their burden to establish Iran's liability— typically, based on the record from the liability hearing held in the *Peterson* Action—he would appoint special masters to conduct hearings on damages, and would enter a default judgment against Iran after reviewing and adopting the special masters' proposed findings of fact with respect to each plaintiff's specific compensatory damages.  *See, e.g.*, Order, *Valore*, No. 1:03-cv-1959 (D.D.C. Mar. 30, 2007), ECF No. 26.  Following this same basic framework, judgments against Iran were entered—either pursuant to 28 U.S.C. § 1605(a)(7) or 28 U.S.C. § 1605A—in these cases between March 2010 and April 2016.[11]

---

[11]    *See* Order and Judgment, *Valore*, No. 1:03-cv-1959 (D.D.C. filed Mar. 31, 2010), ECF No. 60 (consolidated order and judgment for *Valore*, *Arnold*, *Spencer I* and *Bonk*); Revised Order and Judgment, *Valore*, No. 1:03-cv-1959 (D.D.C. filed Sept. 20, 2010), ECF No. 71 (same); Order and Judgment, *Murphy*, No. 1:06-cv-0596 (D.D.C. filed Sept. 24, 2010), ECF No. 66; Order and Judgment, *Bland*, 1:05-cv-2124 (D.D.C. Dec. 21, 2011), ECF No. 70; Order and Judgment, *O'Brien*, No. 1:06-cv-0690 (D.D.C. filed Mar. 28, 2012), ECF No. 41; Order and Judgment, *Anderson*, No. 1:08-cv-0535 (D.D.C. filed Mar. 20, 2012), ECF No. 43; Order and Judgment, *Davis*, No. 1:07-cv-1302 (D.D.C. filed Mar. 30, 2012), ECF No. 123; Order and Judgment, *Brown*, No. 1:08-cv-0531 (D.D.C. filed July 3, 2012), ECF No. 57; Order and Judgment, *Fain,* No. 1:10-cv-0628 (D.D.C. July 31, 2012), ECF No. 35; Order and Judgment, *Taylor*, No. 1:10-cv-0844 (D.D.C. filed Aug. 2, 2012), ECF No. 26; Order and Judgment, *Spencer II*, No. 1:12-cv-0042 (D.D.C. filed Oct. 14, 2014), ECF No. 51; Order and Judgment,

### B.        Enforcement Proceedings Before this Court

After the entry of judgment in the *Peterson* Action on September 7, 2007, the FSIA

Partnership and its co-counsel began attempts to enforce that judgment against Iran.  As part of

these efforts, on March 5, 2008, the FSIA Partnership retained the services of attorney Cook to

"undertake . . . to effect a collection of the amounts due" to the plaintiffs in the *Peterson* Action.

(ECF No. 620-1 (Agreement dated Mar. 5 and 6, 2008, hereinafter referred to as the "Cook Fee-

Sharing Agreement") at 3.)  The agreement states that Cook would be "working with Thomas

Fortune Fay, Esq., Fay Law, PA, Steven R. Perles, Esq., Perles Law Firm, P.C., Allen

Rothenberg, Esq., the Law Offices of Allen Louis Rothenberg and Anthony LaSpada, Esq.," and

these attorneys and firms were defined in the agreement as the "Litigation Attorneys."  (ECF No.

620-1 (Cook Fee-Sharing Agreement) at 1.)  The agreement provides that Cook would be

entitled to a "contingency fee of 10% on any net recovery as received.  Net recovery is defined

as the total recovery less costs of enforcement incurred by [Cook]."  (*Id.* at 4.)  The retainer

agreement provides that Cook would bear "no responsibility in the prosecution of the underlying

cases or claims, but required Cook to use his "best judgment and discretion in the identification

of assets and selection of the most appropriate remedy to effectuate collection."  (*Id.* at 2, 6.)  It

also permitted Cook to "assign a percentage of [his] fees to local counsel as compensation, if

necessary, without the consent of" Fay, Perles and their co-counsel.  (*Id.* at 4.)  The agreement

required arbitration in the event of any dispute and provided that "[i]n the event of any dispute

and ensuing arbitration . . . the laws of the District of Columbia shall apply."  (*Id.* at 6.)

---

*Worley*, No. 1:12-cv-2069 (D.D.C. filed Mar. 31, 2016), ECF No. 71; Amended Order and
Judgment, *Worley* (D.D.C. filed Apr. 18, 2016), ECF No. 74.

The parties dispute the extent of Cook's contribution to the overall efforts under the Cook Fee-Sharing Agreement, but certain facts are not in dispute. For example, it is uncontested that on March 10, 2008, Cook served a subpoena on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"). *See* OFAC Mot. for Protective Order, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed June 11, 2008), ECF No. 325. After obtaining information from OFAC pursuant to the subpoena suggesting that assets of Iran were located in New York, Cook had the judgment registered in the Southern District of New York and engaged SMD as local counsel to represent the plaintiffs in the *Peterson* Action in connection with collection efforts. (*Id.* at 2; SM Ex. 23 (Letter from L. Vogel dated Oct. 27, 2017) at 1.)

The initial agreement between SMD and Cook dated June 12, 2008, provided that SMD would be paid its hourly rates for assisting Cook with his collection efforts. (SM Ex. 23 (Letter from L. Vogel dated Oct. 27, 2017) at 1–3; SM Ex. 57 (Letter from L. Vogel dated Nov. 10, 2017) Ex. D at 1–2 (hereinafter referred to as the "Original Cook-SMD Agreement").) Cook and SMD later agreed that, in lieu of its hourly rates, SMD would receive 3.25% of "money recovered" as a result of the judgment registered in New York. (SM Ex. 23 (Letter from L. Vogel dated Oct. 27, 2017) at 1–3; SM Ex. 57 (Letter from L. Vogel dated Nov. 10, 2017) Ex. D at 3–6, 16 (hereinafter referred to as the "Revised Cook-SMD Agreement").)

In June 2008, SMD obtained a writ of execution as to the Clearstream Assets, and served restraining notices to prevent the Clearstream Assets from being moved out of the jurisdiction. *Peterson v. Islamic Republic of Iran*, No. 1:10-cv-4518, 2013 WL 1155576, at *5 (S.D.N.Y. Mar. 13, 2013), *aff'd*, *sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016). The Court ordered the restraint of the Clearstream Assets and denied motions to vacate the restraining order. (ECF No. 103.) On June 8, 2010, with the Clearstream Assets still restrained, SMD

commenced the Turnover Proceeding by filing a complaint and serving it on Iran, which failed to respond or appear.  (ECF No. 153; SM Ex. 57 (Letter from L. Vogel dated Nov. 10, 2017) at 2.)

In October 2011, Fay and Perles terminated Cook.  (SM Ex. 48 (Letter from J. Norman dated Nov. 3, 2017) at 2.)  There is a factual dispute about whether the termination was justified. Cook hypothesizes that he was terminated "on transparently pretextual grounds" for the purpose of avoiding the fee that Fay and Perles had agreed to pay him because they "were confident that the money found and restrained by Cook would ultimately be turned over to the Plaintiffs."  (SM Ex. 37 (Letter from M. Folkenflik dated Oct. 27, 2017) at 3.)  Fay and Perles argue that Cook was terminated for cause due to his "negligent performance."  (SM Ex. 20 (Letter from J. Vail and D. Bregman dated June 28, 2017) at 2–3.)  Fay and Perles also contend that Cook breached the Cook Fee-Sharing Agreement by failing to pay certain expenses necessary for successful pursuit of enforcement of the *Peterson* Action judgment.  (SM Ex. 48 (Letter from J. Norman dated Nov. 3, 2017) at 1–3.)

Soon after Cook's termination, Fay and Perles retained SMD directly on substantially the same terms as set forth in the Revised Cook-SMD Agreement, with SMD promised a contingent fee of 3.25%.  (SM Ex. 23 (Letter from L. Vogel dated Oct. 27, 2017) at 1, Ex. B (hereinafter referred to as the "FP/SMD Fee Sharing Agreement") §§ 3–5.)  Fay and Perles also retained SBR to assist with enforcement of the judgment.  (SM Ex. 36 (Letter from J. Bonner dated Oct. 27, 2017) Ex. B (hereinafter referred to as the "FP/SBR Fee Sharing Agreement") at 1.)  According to the FP/SBR Fee Sharing Agreement, SBR was entitled to receive 1.5% of the recovery it obtained on behalf of the *Peterson* Action plaintiffs.  (*Id.* Ex. B at 2; *see also id.* at 1).  After Cook was terminated, SMD and SBR drafted "all of the papers submitted by the Peterson Plaintiffs in the District Court and Second Circuit," including an ultimately successful motion for

partial summary judgment in the Turnover Proceeding. (SM Ex. 23 (Letter from L. Vogel dated

Oct. 27, 2017) at 2; SM Ex. 57 (Letter from L. Vogel dated Nov. 10, 2017) at 2.)

 In addition to pursuing litigation in this Court, Fay and Perles again retained lobbyists to

obtain legislation that would facilitate their ability to collect on their clients' judgments against

Iran.  On February 15, 2012, Fay and Perles entered into a contract with Andrew Cochran to

"advocate, communicate, and present to the United States Congress and the members and staff

therein, certain proposed FSIA Changes and other changes which might be necessary to aid and

assist Attorneys in the enforcement of the Judgment against Iran."  (SM Ex. 5 (Cochran

Agreement dated Feb. 15, 2012) at 1.)[12]  Again, these lobbying efforts were apparently

successful.  On August 10, 2012, Congress enacted the Iran Threat Reduction and Syria Human

Rights Act of 2012 (the "Iran Threat Reduction Act").  Iran Threat Reduction Act § 502, 126

Stat. 1258 (codified as 22 U. S. C. § 8772).  Section 8772 provides that, if a court makes

specified findings, "a financial asset . . . shall be subject to execution . . . in order to satisfy any

judgment to the extent of any compensatory damages awarded against Iran for damages for

personal injury or death caused by" the acts of terrorism enumerated in the FSIA's terrorism

exception. 22 U.S.C. § 8772(a)(1).  Section 8772(b) defines as available for execution by holders

of terrorism judgments against Iran "the financial assets that are identified in and the subject of

proceedings in the United States District Court for the Southern District of New York in Peterson

et al. v. Islamic Republic of Iran et al., Case No. 10 Civ. 4518 (BSJ) (GWG), that were restrained

by restraining notices and levies secured by the plaintiffs in those proceedings."  *Id.* § 8772(b).

---

[12] Fay and Perles claim that Cook had previously retained Cochran to conduct these
lobbying efforts, and that Cook had "contractually assigned .375% of his fees to" him.  (SM
Ex. 48 (Letter from J. Norman dated Nov. 3, 2017) at 2.)  Cook has not disputed this claim.

After each of the *Valore*, *Bland*, *Arnold*, *Murphy*, *O'Brien*, *Spencer I*, *Davis*, *Brown*, *Anderson*, *Bonk*, *Fain*, *Taylor* and *Spencer II* Actions proceeded to judgment, the counsel in each case also engaged in judgment enforcement efforts.  While the Turnover Proceeding was pending, the *Valore*, *Bonk*, *Spencer I*, *Brown* and *Bland* Action plaintiffs all raised competing claims to the Clearstream Assets and were served, along with the *Peterson* Action plaintiffs, as respondents to an interpleader petition filed by Citibank to resolve the competing claims.  (ECF No. 38 ¶¶ 9, 27–39.)  In addition, counsel in the *Valore*, *Arnold*, *Spencer I* and *Bonk* Actions retained the Fleischman Law Firm to pursue additional enforcement efforts, agreeing to pay "a fee equal to 3.5% of any gross amount collected as compensatory damages for the Valore judgment creditors from the assets under attachment in the *Peterson* litigation."  (SM Ex. 26 (Letter from K. Fleischman dated Oct. 27, 2017) at 2, Ex. B (Agreement dated September 22, 2011, hereinafter referred to as the "Fleischman Fee Sharing Agreement") at 3.)

Because the *Peterson* Action plaintiffs were the first to restrain the Clearstream Assets, the other 87% Plaintiffs who held judgments or pending claims against Iran based on the 1983 terrorist attack—including those represented by the FSIA Partnership—may not have been able to share in any recovery from the Clearstream Assets unless the *Peterson* Action plaintiffs' restraint on the Clearstream Assets was held to be invalid.  In addition, the 87% Plaintiffs were not the only plaintiffs who held judgments against Iran relating to its role as a state sponsor of terrorism.  Unsurprisingly, after counsel in the *Peterson* Action had attached more than $1.7 billion in assets traceable to Iran, other judgment creditors of Iran sought to obtain portions of the Clearstream Assets.  (ECF No. 38 ¶¶ 27–39.)  Because counsel for the *Peterson* Action plaintiffs wanted to resolve the Citibank interpleader petition and avoid a costly and protracted legal battle with the other 87% Plaintiffs and other terrorism-related judgment creditors of Iran

that may have threatened their ability to obtain a turnover order for the Clearstream Assets,
counsel to the *Peterson* Action plaintiffs made efforts to reach a settlement that would permit a
broader group of Iran terrorism victims to share in the *Peterson* Action plaintiffs' recovery.

On February 21, 2012, counsel for the plaintiffs in the *Peterson*, *Valore*, *Arnold*,
*Spencer I*, *Bonk*, *Murphy*, *Bland, Davis*, *Taylor*, *Brown* and *Fain* Actions entered into an
agreement "providing for distribution of the [Clearstream Assets] in a manner so as to afford
partial collection to all judgment creditors joining in [that] agreement."  (SM Ex. 6 (the "Marine
Barracks Agreement") at 2.)  Specifically, each "judgment creditor group" agreed to refrain from
"seeking to obtain a ruling from the Court that the writ or other claim to the assets asserted by
any other creditor group joining in this Agreement is invalid."  (*Id.* at 3.)  They further agreed
that, "[t]he total amounts collected by each of the judgment creditor groups, less the total
expenses paid out to those parties . . . shall . . . be divided and the percent distributed to each
judgment creditor group which the judgment amount of that group bears to the total for all of the
judgment creditor groups entering into this Agreement."  (*Id.*)  The parties "authorize[d] Thomas
Fortune Fay and Steven R. Perles as their agents and attorneys in fact to enter into such further
agreements with other groups holding judgments which have issued execution with respect to the
[Clearstream Assets] to divide the amounts recovered . . . in proportion to the compensatory
damage award component of the final judgments held by such groups."  (*Id.* at 4.)  Nothing in
the Marine Barracks Agreement suggested that any of the attorneys for the 87% Plaintiffs were
waiving their claims for contingent-fees based on their clients' recoveries or agreeing to share
fees with other attorneys, and none of the attorneys entered into revised retainer agreements
establishing new attorney-client relationships with plaintiffs whom they had not previously
represented.

On June 1, 2012, the plaintiffs and counsel in the *Peterson*, *Valore*,[13] *Murphy* and *Bland* Actions entered into the Sharing Agreement with each other and counsel and plaintiffs in other cases brought by victims of Iran-sponsored terrorism unrelated to the Beirut Attack.[14]  Under the terms of that agreement, if the Clearstream Assets were eventually held to be available to satisfy the judgment of the *Peterson* Action plaintiffs, all of the plaintiffs and their counsel agreed to share in the Clearstream Assets *pro rata* according to each individual plaintiff's judgment amount for compensatory damages.  (SM Ex. 60 (Letter from R. Weigel dated Nov. 20, 2017) Ex. 3 (hereinafter referred to as the "Sharing Agreement") at 1–2.)  It is uncontested that the Sharing Agreement was entered into to resolve claims and potential claims to the Clearstream Assets that could have threatened the *Peterson* Action plaintiffs' ability to recover on their judgments, and that this settlement was an outgrowth of the efforts by victims of Iran-sponsored terrorism to present a "united front" to facilitate passage of the Iran Threat Reduction Act.  (*Id.* ¶ R-6; SM Ex 60 (Letter from R. Weigel dated Nov. 20, 2017) Ex. 3 at 2 (advising clients of Fay and Perles that, "Presenting a united front will . . . assist us in presenting our claim the Court, the public and Congress, where we are working hard to have a law passed that will help us collect money from the Iranians.  The court hasn't ruled yet on whether we can collect the Iranian assets in New York.  While it is still possible that the Court could reject our arguments and give the

---

[13]     The *Valore*, *O'Brien*, *Anderson*, *Taylor* and *Spencer II* Actions were all consolidated before Judge Lamberth for trial purposes.  Accordingly, I understand that the reference to "*Valore*" in the Sharing Agreement refers to the plaintiffs in all five of these cases.

[14]     The other cases were:  *Greenbaum v. Islamic Republic of Iran*, No. 1:02-cv-2148 (D.D.C.), *Acosta v. Islamic Republic of Iran*, No. 1:06-0745 (D.D.C.), *Rubin v. Islamic Republic of Iran*, No. 1:01-cv-1655 (D.D.C.), *Heiser v. Islamic Republic of Iran*, Nos. 1:00-cv-2329 and 1:01-cv-2104 (D.D.C.), *Levin v. Islamic Republic of Iran*, No. 1:05-cv-2494 (D.D.C.), *Kirschenbaum v. Islamic Republic of Iran*, Nos. 1:03-cv-1708 and 1:08-cv-1814 (D.D.C.), and *Beer v. Islamic Republic of Iran*, Nos. 1:06-cv-0473 and 1:08-cv-1807).

money back to Iran, this Agreement ensures that this will not happen as a result of infighting among the various Creditor Plaintiff groups.").)

On March 13, 2013, the Court granted partial summary judgment in favor of the Peterson Plaintiffs and other judgment creditors who are parties to the Sharing Agreement in the Turnover Proceeding based on, *inter alia*, the Iran Threat Reduction Act.  *Peterson*, 2013 WL 1155576, at *2.  That decision was ultimately affirmed by the U.S. Supreme Court in 2016.  *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1329 (2016).  In ruling as it did, the Court expressly noted that all of the judgment creditors had "reached agreement as to the priority and manner of distribution of any recovery."  (*Id.* at *1.)

### C.    The Establishment of the QSF and Disputes Concerning the Distribution of Funds

Following entry of partial summary judgment in favor of the Plaintiffs in the Turnover Proceeding, on May 15, 2013, SMD and SBR filed a motion "for entry of a final turnover judgment under FRCP Rule 54(b) and for the creation of the QSF."  (SM Ex. 57 (Letter from L. Vogel dated Nov. 10, 2017) at 2.)  The motion proposed terms for the administration of the QSF, including that the Clearstream Assets would be paid in "partial satisfaction of claims" held by the Peterson Plaintiffs and that the funds from the QSF would be distributed "to pay attorney's fees, costs and liens, in accordance with the [Sharing Agreement] and the agreements between the Plaintiffs and their respective attorneys."  (*See* ECF No. 402-7 at 2–3.)  None of the participants in these proceedings opposed the motion for the creation of the QSF or made any objection to the proposed terms of the QSF Agreement.

On July 9, 2013, the Court granted the motion for the creation of the QSF.  (ECF No. 460.)  The Court directed that the Clearstream Assets be turned over to the QSF, appointed the Honorable Stanley Sporkin as the Trustee of the QSF, and directed the Trustee to administer the

QSF in accordance with the terms of the Agreement for the Peterson § 468B Fund Pursuant to 26 U.S.C. § 468B (the "QSF Agreement").  (ECF Nos. 460–61.)  As previously proposed by SMD, the Court-approved QSF Agreement expressly recognized that the Clearstream Assets would be distributed according to the terms of the Sharing Agreement.  (ECF No. 461 ¶ 3.1.3.)  Thus, the QSF was established for the benefit of all of the 87% Plaintiffs, as well as the other judgment creditors who had entered into the Sharing Agreement, with the understanding that each plaintiff would receive a recovery from the Clearstream Assets based on his, her or its *pro rata* share of the overall compensatory damages awarded against Iran in the participating cases.  (*Id.*; SM Ex. 60 (Sharing Agreement) ¶ 2.2)  Additionally, the Court expressly directed that the payment of attorneys' fees would comport with the Sharing Agreement and the agreements between the Plaintiffs and their respective attorneys.  At that time, Bank Markazi, which claimed ownership of the Clearstream Assets, had indicated it would pursue an appeal of the Court's Order granting partial summary judgment.  (ECF No. 475.)  Accordingly, under the terms of the QSF Agreement, the Trustee was required to hold the Clearstream Assets during the pendency of Bank Markazi's appeal.  (ECF No. 460 at 2.)

From the time that the Court established the QSF until after the Supreme Court affirmed the Court's grant of partial summary judgment in favor of the Plaintiffs in the Turnover Proceeding, with the exception of attorney Loraine Ray, who served as a Special Master in the *Peterson* Action, none of the participants in the Attorneys' Fees Track ever challenged the QSF Order or any term therein.  After the Supreme Court's affirmance, the Court directed the parties to submit letters informing the Court of any issues that might need to be resolved.  (ECF No. 608.)  SMD filed a letter motion in response requesting expedited consideration of an order authorizing distribution of funds from the QSF.  (*See* ECF Nos. 609, 617).  As described in

further detail below, thereafter, Cook, Glenn and others sought to intervene and requested that the Court deny the request for an order permitting distribution of funds from the QSF insofar as the proposed order interfered with their claimed rights. *See infra* at 46–54. On June 6, 2016, the Court denied the requests to intervene of Cook and Glenn for failure to "adequately establish the elements required in Fed. R. Civ. P. 24" and because "[e]ach of the proposed intervenors have sat on their alleged rights to intervene for years." *Peterson v. Islamic Republic of Iran*, No. 1:10-cv-4518, 2016 WL 9447953, at *2 (S.D.N.Y. June 6, 2016). The Court also wrote that "[n]either Glenn nor Cook, two attorneys who claim that they are entitle[d] to a share of the attorneys' fees from the plaintiffs . . . had advanced a proper basis for enforcing any charging lien under N.Y. Jud. Law § 475." *Id.*

   That same day, the Court ordered the Trustee to distribute the assets of the QSF to the Plaintiffs and their counsel in accordance with the Sharing Agreement and "written agreements between the Plaintiffs and other judgment creditors of Iran," and in a manner consistent with his duties under the QSF Agreement. (ECF No. 651 (the "QSF Distribution Order") at 3.) The QSF Agreement provides that the Trustee shall distribute funds from the QSF to Plaintiffs in partial satisfaction of their claims for compensatory damages and pay attorneys' fees and costs in accordance with the agreements between the Plaintiffs and their respective attorneys. (ECF No. 461 at 4–5.) The Sharing Agreement provides in relevant part that "the payment of any attorneys' fees, costs and/or expenses incurred by their respective counsel with regard to the Litigation and/or any work performed pursuant to [the Sharing Agreement] will be governed by each Creditor Plaintiff's agreement with its respective counsel." (*See* SM Ex. 60 (Sharing Agreement) §§ 2.2, 2.2.1, 2.5.)

By letter dated August 31, 2016, the Fay Group informed the Court that it believed some issues concerning the distribution of attorneys' fees had developed since the entry of the QSF Order, and requested an emergency hearing "to bring clarity to the issues at hand." (*See* ECF No. 683.) The Trustee responded to Fay's letter the next day, and stated that the issues concerning attorneys' fees were not sufficiently identified and that the issues were "not yet ripe for any determination or hearing and may be the subject of an arbitration clause agreed to between counsel." (*See* ECF No. 681 (Letter from S. Jacob dated Sept. 1, 2016) at 2.)

By letter to the Court dated November 7, 2016, Fay again raised concerns about the Trustee's not having paid any attorneys' fees, asserting that "154 days after [the Court's] Order of June 6, 2016, none of the trial attorneys have been paid any amount . . . ." (ECF No. 687 at 2.) Fay stated that he had provided the Trustee with a proposed plan of distribution of attorneys' fees but that "[n]o action was taken by the Trustee." (*Id*.) Fay requested an order directing the Trustee to set forth the reasons why he had not paid such fees or directing him to disburse all amounts due to the trial lawyers. (*Id*. at 2–3.) By Order entered November 14, 2016, the Court "require[d] counsel for the [T]rustee and any other interested party to respond to the . . . letter . . . ." (*See* ECF No. 687 at 3.)

In accordance with the Court's Order, the Trustee filed a letter on November 18, 2016, providing detailed information about the actions the Trustee and his professionals had taken to prepare for distributions to Plaintiffs, their assignees and their counsel. (ECF No. 689.) With regard to the payment of attorneys' fees, the Trustee's counsel explained that there were difficult issues that had yet to be resolved, in part due to the existence of: more than 1400 agreements between the Plaintiffs and their respective attorneys; numerous other agreements between lawyers relating to the payment of attorneys' fees; disputes among the attorneys regarding the

terms and enforceability of those agreements; and a lack of transparency on the part of certain of the attorneys.  (*Id*. at 3–4.)  The Trustee's counsel also asserted that Fay and the other trial attorneys had previously "opposed, and repeatedly sought the Trustee's commitment *not* to pay, *any* partial payment of attorneys' fees until all of the foregoing disputes among the attorneys have been resolved."  (*Id*. at 3 (emphasis in original).)  Notwithstanding the foregoing, the Trustee's counsel indicated that he was "prepared to make a substantial partial distribution of attorneys' fees payable in the in the immediate term," that he had "circulated a proposal to the attorneys," and was "awaiting their comments."  (*Id*. at 4.)  By Order entered November 21, 2016, the Court thanked the Trustee's counsel for his "detailed letter," and stated that the Court would not take action at that time except to request another report from the Trustee on the status of distributions by January 15, 2017.  (ECF No. 691 at 5.)

Pursuant to the Court's Order of November 21, 2016, the Trustee filed a report on January 13, 2017, providing updated information to the Court about the status of distributions. (*See* ECF No. 704.)  As of that date, the Trustee had approved and had "substantially completed payment" of $250 million to attorneys who had provided services, directly or indirectly, to the Peterson Plaintiffs—an amount that constituted almost 50 percent of the fees then payable to such attorneys, taking into account reserves.  (*Id*. at 6.)  However, "significant issues remain[ed] unresolved" regarding the payment of fees.  (*Id*.)  By Order entered January 18, 2017, the Court directed the Trustee to provide an additional status report by March 31, 2017.  (ECF No. 706 at 8.)  In accordance with that Order, the Trustee filed an additional update on March 31, 2017. (ECF No. 710.)  The status of the payments was unchanged.  (*Id*. at 7.)  Although the list of issues to be resolved before additional payments could be made was longer than it had been, the Trustee reported that, in view of discussions concerning a potential settlement, it was possible

that "another substantial payment of attorneys' fees" could be made "within the next 30 to 60 days." (*Id*. at 8.)

The distribution of $250 million in attorneys' fees referred to above was made by the Trustee in accordance with a plan for an "Interim Attorney Fee Payout." (*See* SM Ex. 7 (Executed Acknowledgments Regarding Interim Distribution of Attorneys' Fees dated as of Nov. 21, 2016) Ex. A (hereinafter referred to as the "Interim Payment Schedule").) The plan was prepared based on assumptions offered by the Fay Group about the attorneys' respective entitlement to shares of the fees available for distribution. (*Id*. at 1.) I understand the shares were determined based on the retainer agreements and fee-sharing agreements generally accepted by the potential distributees. The notes to the Interim Payment Schedule describe the various assumptions made, without referring to all of the disputed claims described above. (*Id*. at 2.) Thus, the proposed distributions did not include amounts claimed by Cook, suggested that certain amounts claimed by Glenn should be held pending resolution of disputes concerning his claims, did not address the disputed amounts claimed by Perles, and did not refer to any amount claimed many months later by Delaney. The Trustee required each attorney receiving an interim distribution to execute an acknowledgment that, among other things, the distribution was "subject to adjustment" and was "not [to] be construed to prejudice or adversely affect any rights or legal positions of any person . . . ." (*Id*. at 1 ¶1.) Based on these acknowledgments, the Trustee made an interim distribution of attorneys' fees in December 2016 (ECF No. 706 at 2; ECF No 710 at 7–8), but no additional attorneys' fees have been paid since then. (*See* SM Ex. 59 (Trustee Schedule of Interim Distribution of Attorneys' Fees).) The Trustee halted further distributions given the disputes among the attorneys over payments of fees. (ECF No. 710 at 7–8.)

– 32 –

Dissatisfied with the Trustee's decision to halt further payments of attorneys' fees, Fay moved in May 2017 for an order compelling the Trustee to pay additional attorneys' fees. (ECF No. 727, 735.)  Cook opposed the motion (ECF No. 737), and Fay replied to Cook (ECF No. 738).[15]  At that point, the Court determined that the appointment of a special master was necessary and appropriate to resolve the issues raised by the foregoing filings, among other issues (ECF No. 753), and then appointed me to resolve such disputes (ECF No. 775).

## III.    Efforts To Clarify and Narrow the Issues

Shortly after my appointment as Special Master, I held a telephone conference on June 20, 2017, with the participants in the Attorneys' Fee Disputes track (and/or their counsel) and with counsel for the Trustee.  During the call, I sought to obtain clarity about the participants' positions and about how best to proceed with resolving the numerous disputes between and among them.  I also sought to understand how the Trustee had been handling the competing claims for payment of attorneys' fees.  Since two of the participants had had their motions to intervene denied, I requested that they provide me with any authority they had in support of the proposition that an attorney may seek to enforce a charging lien in a federal court in New York when he or she has not been permitted to intervene.  As discussed below, counsel responded to my request to some extent.

Following the call in June, the participants in the Attorneys' Fee Disputes track submitted numerous additional submissions on their own positions and in response to others' positions.  In addition to reviewing those submissions, I sought and received greater clarification of the

---

[15]    After Fay's motion was filed, numerous additional filings were made, in support of and in opposition to Fay's motion, in further response to Cook's position, and on related topics. (*See, e.g.*, ECF Nos. 744, 753, 762, 763, 764, 770.)  The participants' respective positions set forth in those filings and in additional filings made since I was appointed are discussed in further detail below.

participants' positions through further discussion with certain of them and/or their counsel and with the Trustee's counsel and his accountants.  By letter dated October 20, 2017 (SM Ex. 22), I also requested that all of the participants submit additional briefing on a discrete set of issues by October 27, 2017, that any participant wishing to respond to those submissions do so by November 3, 2017, and that the Trustee respond to the submissions by November 3, 2017 as well.[16]

I held a telephone conference on November 8, 2017, which included all of the participants and/or counsel who wished to participate.  (SM Ex. 52 (Nov. 8, 2017 Conf. Tr.).) During that call, the participants agreed on certain key points, including that they do not and will not assert claims for payment of attorneys' fees that would exceed the attorneys' collective entitlement to one third of the Peterson Plaintiffs' recoveries from the Fund; that there is no objection to the Trustee's payment of fees to certain of the damages attorneys who have not participated in the Attorneys' Fee Disputes track proceedings; and that no participant is seeking a pre-judgment attachment on funds in the QSF.  (*Id.* at 13:22–16:7.)  Since there were certain issues some of the participants had not addressed in their papers and could not address during the call, I allowed them to submit short briefs on those issues by November 10, 2017.  In response to those submissions, a few participants submitted additional briefs, though I had not requested or authorized those submissions.  One participant submitted an *ex parte* letter brief on November 20, 2017, through counsel who had not previously submitted any papers to me, raising arguments

---

[16]     Almost all of the participants adhered to the deadlines, though a limited number of short extensions were granted where the circumstances warranted.

that that party, through other counsel representing him in these proceedings, had not previously briefed.[17]

All told, I have received and reviewed more than 100 submissions by or on behalf of the participants (other than those that were filed on the Court's docket, and not including attachments).

## IV.   Governing Law

All of the attorneys who applied for relief from the Court relative to attorneys' fees or who oppose the granting of such relief have had ample opportunity to identify the legal theories on which they rely and to provide any legal authority that might support their theories. I set forth below the broad legal principles that are relevant to the applications generally and conduct a more detailed analysis, as necessary, in connection with my recommendations as to the various requests for relief.

### A.      Intervention

As an initial matter, Cook, Glenn and Delaney all seek relief from the Court, but they are not currently representing any of the parties in this action (if they ever did). Cook and Glenn previously moved to intervene, but the Court denied their motions, the Second Circuit affirmed the Court's denial of Cook's motion, and Glenn failed to perfect his appeal. Delaney has not previously sought to intervene.

As discussed in detail in my Report and Recommendation on the Advance Company Disputes (ECF No. 845), the Court must permit anyone to intervene as of right pursuant to Federal Rules of Civil Procedure 24(a)(2) who, on a timely motion, "claims an interest relating

---

[17]     Shortly after the November 8 conference call, I was informed that the dispute between Kaplan and Fay was amicably resolved, obviating the need to address the issues raised in Kaplan's motion here. *See supra* at 6 n.8.

to the property . . . that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a)(2).  Where, as here, an applicant lacks a statutory right to intervene, an applicant seeking to intervene as of right must "(1) file a timely motion; (2) show an interest in the litigation; (3) show that its interest may be impaired by the disposition of the action; and (4) show that its interest is not adequately protected by the parties to the action."  *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 197 (2d Cir. 2000).[18]  The failure to satisfy any one of the factors precludes allowing intervention as of right.  *Id.* at 197–98.

"On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  In evaluating an application for permissive intervention under Rule 24(b)(2), "[t]he court considers substantially the same factors" as it does when considering intervention as of right.  *"R" Best Produce, Inc. v. Shulman-Rabin Mktg., Corp.*, 467 F.3d 238, 240 (2d Cir. 2006).  "A district court has broad discretion under Rule 24(b) to determine whether to permit intervention on the basis that the intervenor's 'claim or defense and the main action have a

---

[18]      The Second Circuit has explained that "[t]he timeliness requirement is flexible and the decision is one entrusted to the district judge's sound discretion."  *Floyd v. City of New York*, 770 F.3d 1051, 1058 (2d Cir. 2014) (per curiam) (quotation and citation omitted).  Although the relevant inquiry is highly fact-specific, the factors courts consider in determining timeliness include:  "(a) the length of time the applicant knew or should have known of its interest before making the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusual circumstances militating for or against a finding of timeliness."  *Id.* (quotation marks omitted); *see also Peterson v. Islamic Republic of Iran*, 690 F. App'x 744, 746 (2d Cir. 2017) (summary order).  "Generally, the court's analysis must take into consideration the totality of the circumstances."  *In re Holocaust Victim Assets Litig.*, 225 F.3d at 198.

question of law or fact in common.'"  *St. John's Univ., New York v. Bolton*, 450 F. App'x 81, 84 (2d Cir. 2011) (summary order) (quoting Fed. R. Civ. P. 24(b)(2)).

### B.    Liens

New York Judiciary Law Section 475 "governs charging liens in federal courts sitting in New York."  *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448–49 (2d Cir. 1998).  Section 475 provides that an "attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a[n] . . . award, settlement, judgment or final order in his or her client's favor."  N.Y. Jud. Law § 475.  The statutory charging lien is recognized as "a device to protect counsel against the knavery of his client, whereby through his effort, the attorney acquires an interest in the client's cause of action. . . . The lien is predicated on the idea that the attorney has by his skill and effort obtained the judgment, and hence should have a lien thereon for his compensation . . . ." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 178 (2d Cir. 2001) (quotation marks and citations omitted).

Courts have interpreted "attorney who appears for a party" to mean that a charging lien is available for the benefit of an "attorney of record" only.  *Itar–Tass*, 140 F.3d at 450.  It is not enough for an attorney to show he or she has been retained to be considered an attorney of record.  *Rodriguez v. City of New York*, 498 N.Y.S.2d 351, 353 (1985).  The Second Circuit has held that the appearance requirement is satisfied where an attorney has "signed and submitted numerous papers and letters to the court, and appeared at trial" as an attorney for a party.  *Itar–Tass*, 140 F.3d at 451.  Similarly, the New York Court of Appeals has held that an attorney must show that she appeared on the pleadings, motion papers or affidavits in the case at issue. *Rodriguez*, 498 N.Y.S.2d at 353; *see also Ebert v. New York City Health & Hosp. Corp.*, 210 A.D.2d 292, 292–93 (2d Dept. 1994).

In addition to satisfying the appearance requirement, an attorney asserting a charging lien under Section 475 must establish that his or her own actions on behalf of the client contributed to bringing about the judgment.  "[T]he statutory provision has limited such lien rights to outcomes where 'proceeds' have been obtained 'in a client's favor . . . .'  In other words, the litigation or settlement must result in more than the mere entry of a judgment on behalf of a client:  there must be proceeds from the litigation upon which the lien can affix."  *Banque Indosuez v. Sopwith Holdings Corp.*, 98 N.Y.2d 34, 43–44 (2002) (quoting Judiciary Law § 475; other internal citations omitted).  An attorney cannot assert a lien against a fund where his or her actions did not create it.  *See Chadbourne & Parke, LLP v. AB Recur Finans*, 18 A.D.3d 222, 223 (1st Dep't 2005).

If an attorney appears for a client in one action and a recovery is obtained in an action other than the one in which the services were rendered, the attorney is entitled to a lien "where the recovery is in an action which is a logical sequence of a prior action in connection with which the services were rendered."  *Neimark v. Martin*, 7 A.D.2d 934, 935 (2d Dep't 1959); *see also Cohen*, 81 N.Y.2d at 658.  An attorney seeking to enforce a charging lien "need not be counsel of record at the time the judgment . . . is created in order to be entitled to the lien afforded by" Section 475.  *Klein v. Eubank*, 87 N.Y.2d 459, 462 (1996).  Notwithstanding the foregoing, when an attorneys representation has been terminated, a lien is available only when "there has been no misconduct, no discharge for just cause and no unjustified abandonment by the attorney . . . ."  *Klein*, 87 N.Y.2d at 464; *see also EMC Iron Works, Inc. v. Regal Const.*

*Corp.*, 7 A.D.3d 366, 367 (1st Dep't 2004); *Sacco and Fillas, LLP v. David J. Broderick, P.C.*, 133 A.D.3d 862, 863 (2d Dep't 2015).[19]

### C.    Attachment

Although none of the participants claims to seek an attachment, an examination of the relief actually being requested indicates that Cook, Glenn, Delaney and Perles all effectively seek prejudgment attachments.  An attachment is available in a federal court sitting in New York under the law of New York.  Fed. R. Civ. P. 64.  Under New York law, the requirements for obtaining a pre-judgment attachment to secure an anticipated recovery are set out in Sections 6201 and 6212 of the New York Civil Practice Law and Rules.  Under Section 6201(1), an order of attachment may be granted in an action for money damages where the nonmovant "is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state."  CPLR § 6201(1).  Among the purposes of an attachment under Section 6201(1) is to secure a judgment against a nondomiciliary.  *ITC Entertainment, Ltd. v. Nelson Film Partners*, 714 F.2d 217, 220 (2d Cir. 1983).  Pursuant to Section 6212(a), a movant seeking an order of attachment must show by affidavit and other written evidence that may be submitted "that there is a cause of action, that it is probable that the [movant] will succeed on the merits, that one or

---

[19]      Certain attorneys claim they have liens under the laws of the District of Columbia or Rhode Island and seek enforcement of those liens here.  I have asked counsel to provide me with legal authority for the proposition that the Court is obligated to apply the law of any state other than New York when being requested to take action relative to a lien when the lien has not been recognized or quantified by another court.  Cook and Glenn provided authority on the law of the District of Columbia on liens.  (SM Ex. 56 (Letter from M. Folkenflik dated Nov. 10, 2017) at 1); SM Ex. 55 (Letter from S. Storch dated Nov. 10, 2017) at 2.)  Delaney has provided authority on the law of Rhode Island on liens.  (SM Ex. 54 (Letter from E. Manning dated Nov. 10, 2017) at 3.)  Both Glenn and Delaney have suggested that New York choice of law rules require the application of laws of other jurisdictions, relying on *Istim, Inc. v. Chem. Bank*, 78 N.Y.2d 342, 349 (1991).  However, as discussed further below, the law they have provided does not support the proposition that this Court is required to take action relative to the liens they claim under the laws of the District of Columbia or Rhode Island.

more grounds for attachment provided in Section 6201 exist, and that the amount

demanded from the [party opposing the motion] exceeds all counterclaims known to the

[movant]." CPLR § 6212(a).  The movant is required to give an undertaking in an amount to be

fixed by the Court (CPLR § 6212(b)), and is liable to the non-movant "for all costs and damages,

including reasonable attorney's fees, which may be sustained by reason of the attachment if . . . it

is finally decided that the plaintiff was not entitled to an attachment . . . ."  CPLR § 6212(e); *see*

*also Capital Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 218–19 (2d Cir. 2006).

 "In addition to establishing that a [non-movant] subject to the court's personal

jurisdiction meets the statutory requirements for an attachment, the party seeking attachment

must demonstrate an identifiable risk that the defendant will not be able to satisfy the judgment."

*VisionChina Media Inc. v. Shareholder Representative Services, LLC*, 109 A.D.3d 49, 60 (1st

Dep't 2013).  That risk "should be real" and will not be satisfied without a showing that the non-

movants "lack sufficient assets, or that they will choose to hide or otherwise dispose of their

assets." *Id.* at 60, 62.

 Due to the "harsh nature of this remedy," the statute should be construed . . . strictly in

favor of those against whom it may be employed."  *Penoyar v. Kelsey*, 150 N.Y. 77, 80 (1896).

Whether to grant a motion for an order of attachment rests within the discretion of the court.

*VisionChina Media Inc.*, 109 A.D.3d at 59.

## IV. Recommendations Concerning Fay's Motion

 On May 8, 2017, Fay moved for, among other things, an order compelling the Trustee to

complete the distribution of all funds payable to counsel for the Peterson Plaintiffs.  (*See* ECF

No. 727 at 4; ECF No. 735-5; ECF No. 755 at 2.)[20]  In support of this motion, Fay provided the

---

[20] As discussed in my first Report & Recommendation, Fay also moved for an order
requiring the Trustee to make additional disclosures to the Peterson Plaintiffs' counsel.  (ECF

Court with a proposed schedule of distributions.  (*See* ECF No. 735-5 at 3–5.)  This schedule is identical to the Interim Payment Schedule referred to above insofar as the numbers and shares are concerned.  (*Compare* ECF No. 735-5 at 3–4 *with* SM Ex. 7 at Ex. A (Interim Payment Schedule) at 1–2.)  Based on the foregoing, it appears that Fay is requesting an order requiring the Trustee to distribute another $250 million of attorneys' fees in the same proportions the Trustee used when making the interim payment of fees.[21]  While Fay's motion is not opposed by Rothenberg, LaSpada, the Follow On Attorneys, HNK, the Damages Attorneys or the Enforcement Attorneys, Cook, Glenn Delaney and Perles have all challenged Fay's proposal for the final distribution of attorneys' fees.[22]  For the reasons discussed below, I recommend that the Court decline to entertain the objections of Cook, Glenn and Delaney because they are not proper parties to this action; reject the arguments of Perles; and grant Fay's motion to the extent he seeks an order compelling the Trustee to distribute attorneys' fees from the QSF in the shares set forth on Fay's Revised Schedule A.[23]

---

No. 842 at 2, 9–12.)  That aspect of Fay's motion was fully addressed in my first Report & Recommendation (*see id.* at 21–25), and is not addressed further herein.

[21]     In the version of the payment schedule filed in support of Fay's motion, the notes are slightly different from those set forth in the Interim Payment Schedule.  (*Compare* ECF No. 735-5 at 4–5 *with* SM Ex. 7 (Interim Payment Schedule), Ex. A at 2–2.)  The Fay Group subsequently provided me with a corrected version of the schedule by email dated August 10, 2017.  The numbers and shares are the same in the corrected version as they were in the Interim Payment Schedule and the schedule filed in support of Fay's motion, but the notes are somewhat revised.  (*See* SM Ex. 21 (Exhibit from C. Fay submitted Aug. 10, 2017, referred to herein as "Fay's Revised Schedule A").)

[22]     To the extent Fay's proposal suggests that payment to Karr should be held pending the determination of a claim by Perles against Karr over an alleged conflict of interest, Karr also takes issue with the proposal.

[23]     While I recommend that the Court should order the Trustee to distribute attorneys' fees generally in the shares set forth in Fay's Revised Schedule A, I do so with two qualifications relating to notes in the schedule proposing to reserve and withhold payment to Karr and Glenn.  For the reasons stated below, *see infra* at 73–79, I believe that the "conflict of interest" issue referred to in note 5 of Fay's Revised Schedule A does not warrant withholding the payments to which Karr is entitled, and because I find that Glenn is not entitled to intervene in this action, *see*

In his May 8, 2017, motion, Fay also sought an order from the Court directing the Trustee to "set[ ] forth a schedule for disbursement of the remaining funds being held in the QSF [to the Peterson Plaintiffs] . . . , not to exceed 60 additional days from the date of receipt by the Court" of the proposed schedule.  (ECF No. 727 at 4.)  In my Report & Recommendation on the Trust Administration Disputes dated September 12, 2017, I noted that "the Trustee has distributed significant funds to or for the benefit of the Peterson Plaintiffs and their counsel," and recommended, given "the substantial progress that the Trustee has made in distributing the Fund's assets to date, and the complexities involved with ensuring the distributions are being made in accordance with numerous agreements and other legal requirements," that the Court deny this aspect of Fay's motion.  (ECF No. 842 at 26.)  However, certain developments since the issuance of my September 12, 2017 Report & Recommendation have removed some of the "complexities" that previously prevented further distributions.  Specifically, in the course of these proceedings, the attorneys claiming fees for their representation of the Peterson Plaintiffs have unambiguously clarified that they are not seeking any payment of fees that would cause an individual plaintiff to pay more than 33⅓% of his, her or its recovery from the QSF.  (SM Ex. 52 (Nov. 8, 2017 Conf. Tr.) at 14:2–15:3.)  Accordingly, while I do not recommend that the Court set an "artificial deadline" for the distribution of all assets from the QSF (*see* ECF No. 842 at 26–27), I recommend that the Court order the Trustee to distribute any remaining funds to which the individual Peterson Plaintiffs are entitled under the terms of the QSF Agreement and QSF Order, subject to reasonable reserves for expenses and contingencies other than for the disputed

---

*infra* at 61–64, the Trustee should not maintain reserves for payments to Glenn as proposed in note 6.

fees claimed by Cook, Glenn, Delaney and Perles and further subject to the Trustee's good-faith exercise of discretion.

**V.      The Court Should Disregard the Objections Raised by Cook, Glenn and Delaney.**

The oppositions to Fay's motion raised by Cook, Glenn and Delaney, which effectively seek to block certain distributions from the QSF, raise the threshold question of whether they are proper parties to these proceedings. For the reasons stated below, I recommend that the Court hold that each is not a proper party to or participant in this litigation, because the issue was decided already as to Cook and Glenn, and because Delaney's application is untimely. To the extent Glenn, Cook or Delaney have viable claims against other participants in this proceeding, nothing in this Report and Recommendation should be contained to impair any rights they may have to pursue such claims in the appropriate judicial or arbitral forum.

**A.      Glenn and Cook**

Attorneys Cook and Glenn are similarly situated in this litigation in several material respects. Rather than affirmatively seeking payment from the Trustee, both appear to be using this proceeding to obtain what are, in effect, prejudgment attachments of funds to satisfy potential recoveries on claims that they are presently arbitrating or litigating in other proceedings. While this is not, standing alone, a reason sufficient to warrant rejection of their claims, both Cook's and Glenn's attempts to intervene and oppose distribution have already been considered by this Court and rejected as untimely. In particular, the Court has denied both Cook and Glenn leave to intervene in this action. Because the Court has held that Cook and Glenn are not proper parties to this action, because there is no legal avenue by which either may seek reconsideration of this Court's prior decisions, and because both have available legal remedies elsewhere, I recommend that the Court reject their renewed requests to intervene and their

objections to Fay's motion for an order requiring further distribution of attorneys' fees from the QSF.

### 1.      The Objections Raised by Glenn and Cook

Cook seeks permissive intervention pursuant to Rule 24(b) of the Federal Rules of Civil Procedure, and cites as support for his intervention request "arguments and legal authorities . . . found in" the briefs he submitted to the U.S. Court of Appeals for the Second Circuit on his appeal from the Court's order denying his prior motion to intervene.  (SM Ex. 37 (Letter from M. Folkenflik dated Oct. 27, 2017) at 4.)  As with his prior motion to intervene filed on June 1, 2016, Cook opposes Fay's motion and seeks an order preventing the Trustee from making distributions to all of the other attorneys for the Peterson Plaintiffs until his claim for attorneys' fees is resolved in the above referenced arbitration proceeding.  (*See* ECF Nos. 737, 762, and 770.)  Cook's opposition is based on his claimed contractual right to a "10% contingent-fee, from the approximately $2 Billion that was identified and recovered because of [his] efforts . . . ."  (SM Ex. 37 (Letter from M. Folkenflik dated Oct. 27, 2017) at 1, 4.)  Cook's request for a restraint on distribution is based on liens he claims to possess under Section 475 of the New York Judiciary Law and under the law of the District of Columbia.  (SM Ex. 37 (Letter from M. Folkenflik dated Oct. 27, 2017) at 3.)  The Litigation Attorneys oppose Cook's request to intervene and assert liens again given the Court's prior rulings; and they dispute that he is entitled to any payment on the ground primarily that Cook breached the Cook Fee-Sharing Agreement; and Rothenberg and LaSpada specifically contend that they are not bound by the agreement because they were not parties to it.  (*See* SM Ex. 20 (Letter from J. Vail and D. Bregman dated June 28, 2017) at 1–3; SM Ex. 39 (Letter from P. Buckley dated Oct. 27, 2017)

at 2; SM Ex. 48 (Letter from J. Norman dated Nov. 3, 2017).)[24]   The Enforcement Attorneys also dispute Cook's claims on the merits.  (*See, e.g.*, ECF No. 763; SM Ex. 23 (Letter from L. Vogel dated Oct. 27, 2017) at 2.)  In addition, to the extent they seek a final distribution on terms similar to those set forth in the Interim Payment Schedule, the submissions of the Follow On Attorneys, HNK and the Damages Attorneys are all incompatible with Cook's claimed lien rights.  (*See, e.g.*, SM Ex. 15 (Letter from J. Mook dated June 22, 2017) at 4; SM Ex. 30 (Letter from S. Reed dated Oct. 27, 2017) at 1–2.)

Glenn does not expressly seek reconsideration of the Court's prior denial of his request to intervene, but instead claims that he "should not have to intervene to be entitled to be paid what he is owed" and that the Court has "recognized" this argument by "referring Glenn's entitlement to attorneys' fees to [me] even after denying his motion to intervene as a party."  (SM Ex. 25 (Letter from S. Storch dated Oct. 27, 2017) at 5–6.)  Glenn opposes Fay's motion based on his claim that he is owed approximately $21.7 million of the funds in the QSF.  (*Id*. at 1–3.)  He claims that Fay and Perles owe him $9.3 million for contingent-fees in respect of his representation of 103 of the 87% Plaintiffs as a damages attorney pursuant to a written agreement, and $12.4 million for the payment of additional contingent-fees for the referral of 40 of those plaintiffs to the FSIA Partnership pursuant to an alleged oral agreement.  (ECF No. 625 at 1; SM Ex. 8 (Letter from S. Storch dated June 9, 2017) at 2; SM Ex. 16 (Letter from S. Storch dated June 23, 2017) at 2; SM Ex. 25 (Letter from S. Storch dated Oct. 27, 2017) at 2–4.)  Like Cook, Glenn is also pursuing his claims for fees as a damages attorney and for his referral of clients to the FSIA Partnership in another forum.

---

[24]     Those contract issues are the subject of an ongoing arbitration proceeding in which a hearing on the merits commenced on November 28, 2017.  (SM Ex. 37 (Letter from M. Folkenflik dated Oct. 27, 2017) at 4.)

Certain of the Litigation Attorneys oppose Glenn's application on various grounds.  As an initial matter, Fay and LaSpada object to any attempt on the part of Glenn to intervene or assert a charging lien in this Court on the grounds that these issues were previously and finally decided against him.  (*See* SM Ex. 49 (Letter from F. Bond dated Nov. 3, 2017) at 2.)  Fay, LaSpada and Perles also oppose Glenn's requests for payment, on the grounds that he is not entitled to any fees for his work as a damages attorney since he did not perform as he was required to, and that he is not entitled to any fees for referring clients to the FSIA Partnership since there is no agreement to pay him such fees and he did not refer all of the plaintiffs he claims to have referred.  (*See id.* at 1–2; SM Ex. 47 (Letter from D. Bregman and G. Hervey dated Nov. 3, 2017) at 6; SM Ex. 61 (Letter from D. Bregman and G. Hervey dated Nov. 21, 2107).)

### 2.     Prior Attempts To Block Distribution

Cook and Glenn have tried on numerous occasions to prevent the Trustee from distributing funds to the Plaintiffs and their attorneys, in several fora, and under a range of different theories.  Each attempt has been rejected.

### a.     Cook

On May 19, 2016, Cook filed a notice of his claimed charging lien, in the U.S. District Court for the District of Columbia and under the laws of the District of Columbia, "for the purposes of securing the fee claim of 10% of the gross proceeds guaranteed under that certain written contract dated April 5 and 6, 2008 by and between the Cook Law Firm, on the one hand, and the Plaintiffs, on the other hand."  *See* Notice of Attorney's Charging Lien for Fees ("Cook Notice of Lien"), *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed May 19, 2016), ECF No. 525 at 1.  On June 2, 2016, Fay and Perles moved to quash Cook's lien.  *See* Pls.' Emergency Motion to Quash, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed June 2, 2016), ECF No. 539.  In

support of their motion to quash, Fay and Perles argued that Cook was not entitled to a lien against the *Peterson* Action plaintiffs' recoveries from the QSF or against the funds earmarked to be paid to counsel for the *Peterson* Action plaintiffs, because, *inter alia*, Cook had failed to satisfy the requirements for a lien under the law of the District of Columbia. *See id.*; Mem. in Supp. of Pls.' Emergency Motion to Quash, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed June 2, 2016), ECF No. 539-1 at 4–6. Cook opposed that motion to quash and filed a cross-motion seeking, among other things, "an Interim Order staying distribution of 10% of the QSF Trust Funds from the attorneys' share only pending" arbitration of his dispute. *See* Cook Mot. To Compel Arb. and for an Interim Order, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. June 16, 2016), ECF No. 544; Cook Mem. in Supp., *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed June 16, 2016), ECF No. 544-1 at 1–5.

On December 6, 2016, Judge Lamberth granted the motion to quash Cook's lien and denied Cook's motion to stay distribution of funds from the QSF. *See Peterson v. Islamic Republic of Iran*, 220 F. Supp. 3d 98, 108–10 (D.D.C. 2016). The court found that Cook had failed to establish he had a lien against the plaintiffs' interests in the QSF since he did not meet the requirements for such a lien under the law of the District of Columbia. *Id*. This decision is currently on appeal before the United States Court of Appeals for the District of Columbia. *See* Notice of Appeal, *Peterson*, No. 1:01-cv-02094-RCL (D.D.C. filed Jan 4, 2017), ECF No. 570.

On May 23, 2016, shortly after filing the Cook Notice of Lien in the District of Columbia, Cook commenced an arbitration proceeding against certain plaintiffs, Fay, Perles, Rothenberg and LaSpada captioned *Cook v. Fay*, under the auspices of JAMS (the "Arbitration Proceeding"). (*See* SM Ex. 37 (Letter from M. Folkenflik dated Oct. 27, 2017) Ex. 3 at 188–198.) Cook claims, among other things, that all of the respondents breached the Cook Fee-

Sharing Agreement.  (*Id*. at 8–10; *see also* ECF No. 620-1 (Cook Fee-Sharing Agreement).)  In terms of relief, Cook seeks payment pursuant to the terms of the agreement or under the doctrine of *quantum meruit*, and an injunction preventing the Trustee from distributing any of the funds in the QSF to the Plaintiffs or the Litigation Attorneys.  (*Id*. at 9–11.)  As mentioned above, the Litigation Attorneys oppose Cook's claims on the ground, among others, that Cook failed to perform his obligations under the Fee-Sharing Agreement.  (*See* ECF No. 735 at 2–5; *see also* SM Ex. 20 (Letter from J. Vail and D. Bregman dated June 28, 2017) at 2–3.)

Throughout the course of the Arbitration Proceeding, the arbitrator has made certain rulings of relevance here.  In that regard, Cook moved at the outset of the proceeding for an interim award preventing any funds in the QSF from being distributed pending a final determination of his claims.  (*See* SM Ex. 20 (Letter from J. Vail and D. Bregman dated June 28) Ex. A at 1.)  On October 28, 2016, the arbitrator denied Cook's motion insofar as he sought relief against the *Peterson* Action plaintiffs because they had not been joined in the arbitration.  (*Id*. at 3.)  The arbitrator also denied the motion insofar as Cook sought an award directing the Litigation Attorneys to instruct the Trustee not to disburse any funds from the QSF.  (*Id*. at 1–4.)  The arbitrator expressly stated that the "first and foremost reason for denying" Cook's motion was "that [he] already sought the same relief in the United States District Court for the Southern District of New York," discussed further below, and "lost there . . . ."  (*Id*. at 4.)  The arbitrator also found that that the likelihood of Cook's prevailing on the merits of his claims was in "serious doubt," Cook had failed to demonstrate he would suffer irreparable harm in the absence of such relief, and it would be inequitable to prevent the *Peterson* Action plaintiffs and their counsel from receiving distributions.  (*Id*. at 4–5.)

Most important, on May 24, 2016, after filing the Cook Notice of Lien and commencing arbitration, the Plaintiffs moved this Court "for an order authorizing the distribution of the funds in the QSF Account."  (ECF No. 617 at 1.)  On May 25, 2016, in response to that motion and a number of filings related to the anticipated commencement of distributions, including one from Cook opposing Plaintiffs' request (ECF No. 620), the Court ordered that "[a]ny party wishing to respond to any recent filing in this action must do so no later than June 1, 2016."  (ECF No. 621.)

On May 27, 2016, Cook opposed Plaintiffs' request for an order authorizing the distribution of funds on the grounds that "[t]he Proposed Order, if signed, would violate Cook's rights under a written retainer agreement, his right to a charging lien in this action, and his rights under a lien filed in [the *Peterson* Action]."  (ECF No. 626 at 2; *see also* ECF No. 620.)[25]  Cook asserted that he had a dispute with the *Peterson* Action plaintiffs and their counsel over whether he is entitled to an attorney's fee, that he was pursuing a resolution of that dispute in an arbitration proceeding, and that absent a settlement agreement, a "delay in distribution of a portion of the recovery to the *Peterson* Plaintiffs and their Counsel will be required in an amount to cover the contractual obligations that the *Peterson* Plaintiffs and Counsel agreed to."  (ECF No. 626 at 2.)  He indicated that he would be filing a motion to intervene and stated his belief that the issues concerning his entitlement to a lien or restraint on distribution were not for the Trustee or this Court to decide but that they were to be decided in the Arbitration Proceeding. (ECF No. 626 at 1–2, 4.)

On June 1, 2016, Cook filed a motion to intervene in this action.  (*See* ECF Nos. 631, 633, and 634; *see also* ECF Nos. 620 and 626.)  In support of his motion, Cook asserted that

---

[25]     Cook had previously provided the Court with a copy of the Cook Notice of Lien.  (ECF No. 620 Ex. B.)  He did not assert in his May 25 or his May 27 submission that he was entitled to a lien under Section 475 of New York Judiciary Law.  (*See* ECF Nos. 620 and 626.)

granting the relief sought by Plaintiffs would interfere with his rights "to money owed to him by *Peterson* Plaintiffs and their Counsel to be secured by, and to be paid out of, the assets of a trust, referred to in this action as QSF Trust."  (ECF No. 634 at 1.)  In the course of arguing that he was entitled to intervene as of right, Cook asserted that he had an equitable charging lien against the Fund under the law of the District of Columbia and that he sought to ensure that funds were not distributed "in violation of the lien he had filed in the [*Peterson* Action]."  (ECF No. 634 at 2, 5, 10–11, 14. 19; ECF No. 633 at 3, ¶ 6; *id.* at 9 ¶ 27; *id.* Ex. D.)  Cook reiterated his belief that any dispute about his entitlement to a lien on the assets of the QSF was for the arbitrator, not the Court, to decide.  (ECF No. 634 at 14.)

Also on June 1, 2016, the Peterson Plaintiffs opposed Cook's efforts "to obstruct the distribution" of funds.  (ECF No. 638 at 1.)  In support of their position, the Peterson Plaintiffs argued, *inter alia*, that Cook had failed to establish any entitlement to a lien under New York Judiciary Law Section 475, and that he had failed to provide any basis for his argument that this Court is obligated to enforce a claimed lien filed in the District of Columbia.  (*Id.* at 3.)

By letter dated June 3, 2016, Cook wrote to the Court to provide a status update on the *Peterson* Action concerning his claim to a lien under the law of the District of Columbia, noting that Fay and Perles had filed motions to quash Cook's lien on June 2, 2016.  (ECF No. 643 at 1–2.)  Cook did not address the Peterson Plaintiffs' arguments that he had failed to establish an entitlement to a lien under Section 475. *Id.*  Instead, he essentially requested leave to submit additional filings.  *Id.*

By Order entered on June 6, 2016, the Court denied Cook's motion to intervene, holding that he had not "adequately establish[ed] the elements required in Fed. R. Civ. P. 24," with a particular emphasis on Cook's failure to seek intervention in a timely manner.  *Peterson*, 2016

WL 9447953, at *2.  In addition, the Court stated that an attorney seeking to enforce "a charging lien in federal courts in New York . . . must meet the requirements of N.Y. Jud. Law § 475," and held that Cook had not "advanced a proper basis for enforcing any charging lien under Judiciary Law § 475."  *Id.* at 2 (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 450 (2d Cir. 1998)).

Cook declined to challenge the Court's finding that he did not have a lien under Section 475 and did not suggest that he had been deprived of an adequate opportunity to respond to the Peterson Plaintiffs' submission of June 1, 2016, by filing a motion for reconsideration pursuant to Local Civil Rule 6.3, by filing a motion for relief from judgment under Rule 60(b) of the Federal Rules of Civil Procedure, or otherwise.  Instead, on July 6, 2016, Cook appealed to the United States Court of Appeals for the Second Circuit.  (*See* ECF No. 662.)  On May 18, 2017, the Second Circuit affirmed the Court's denial of Cook's motion to intervene, stating that it "agree[d] with the District Court that the motion was untimely."  *Peterson v. Islamic Republic of Iran*, 690 F. App'x 744, 746 (2d Cir. 2017) (summary order).  The Second Circuit stated that it was not undertaking to "decid[e] whether Cook's alleged interests are valid and sufficient to support intervention of right . . . ."  *Id.*

### b.    Glenn

Glenn too has sought unsuccessfully to enforce his claimed lien rights.  In 2010, Glenn filed an action against Fay, Perles, Rothenberg and LaSpada in the Southern District of New York seeking a declaration that they were obligated to pay him for his work as a damages attorney and for referring certain matters to the FSIA Partnership.  *See* Compl., *Glenn v. Fay*, Case No. 10-cv-8287 (S.D.N.Y. filed Nov. 30, 2010), ECF No. 1.  That action was dismissed on July 29, 2011 for lack of jurisdiction and improper venue.  *See* July 29, 2011 Oral Arg. Tr., *Glenn v. Fay*, Case No. 10-8287 (S.D.N.Y. filed Nov. 30, 2010), ECF No. 34; *see also* ECF No.

625 at n.1.  In 2011, Glenn sought to intervene in a proceeding related to this action to secure

funds to satisfy any judgment he may have obtained in the litigation he brought in the District of

Columbia, but that application was denied.  (*See* ECF No. 462*; see also* ECF No. 625 at n.2; SM

Ex. 25 (Letter from S. Storch dated Oct. 27, 2017) at 5.)

On May 26, 2016, Glenn filed a Notice of Charging Lien in the United States District

Court for the District of Columbia.  (ECF No. 625 at 3.)  He filed an Amended Notice of

Charging Lien (the "Glenn Charging Lien") on June 1, 2016.  Am. Notice of Charging Lien,

*Peterson*, No. 1:01-cv-2094 (D.D.C. filed June 1, 2016), ECF No. 538.  In his notices of lien,

Glenn asserted an attorney charging lien against the proceeds of any judgment received by the

103 plaintiffs he represented as a damages attorney, including any amounts paid directly to Fay,

Perles, Rothenberg or LaSpada for the purpose of securing his fee claims.  (ECF No. 625 at 3–6;

Am. Notice of Charging Lien at 3–5, *Peterson*, No. 1:01-cv-2094 (D.D.C. filed June 1, 2016),

ECF No. 538.  On June 2, 2016, Fay and Perles moved to quash Glenn's lien.  *See* Pls.'

Emergency Motion to Quash, *Peterson*, No. 01-cv-02094-RCL (D.D.C. filed June 2, 2016), ECF

No. 539-1.  On December 6, 2016, Judge Lamberth granted the motion to quash, finding that

Glenn had failed to establish an entitlement to a lien under the law of the District of Columbia.

*Id.* at ECF No. 564.  That decision is on appeal.  *Peterson*, slip op. at 1 (D.D.C. Dec. 6, 2016).

On June 1, 2016, Glenn moved to intervene and for an order directing the Trustee to

refrain from distributing to the Peterson Plaintiffs or their counsel funds sufficient to satisfy the

Glenn Charging Lien.  (*See* ECF Nos. 635, 636, 637.)  Although Glenn asserted that he was

entitled to a lien under the laws of the District of Columbia and New York, he did not discuss the

requirements that must be satisfied for establishing a lien under Section 475 or explain how he

might satisfy them.  (*See* ECF No. 648-1 at 6 ¶ 21; ECF No. 650 at 9.)

The *Peterson* Plaintiffs opposed Glenn's motion for reasons similar to those asserted in opposition to Cook's motion to intervene, including that Glenn had failed to establish an entitlement to a lien under Section 475.  (ECF No. 638 at 3.)  By Order entered on June 6, 2016, the Court denied Glenn's motion to intervene for the same reasons it denied Cook's motion, including that Glenn had failed to seek intervention in a timely manner and had failed to establish an entitlement to a lien under Section 475.  *Peterson*, 2016 WL 9447953, at *2. Although Cook filed a notice of appeal (ECF No. 663), he did not perfect his appeal, and it was dismissed.  (ECF No. 686.)  Like Cook, Glenn asserts that the resolution of his claims should be resolved elsewhere, in his case in the U.S. District Court for the District of Columbia.  (SM Ex. 8 (Letter from S. Storch dated June 9, 2017) at 2; SM Ex. 16 (Letter from S. Storch dated June 23, 2017) at 2).

On July 14, 2016, Glenn filed an action seeking a declaratory judgment that Fay and Perles were required to pay Glenn an amount to be determined immediately upon their receipt of any payment from the QSF.  (See SM Ex. 43 (Letter from S. Storch dated Nov. 3, 2017) at 1–2.) Judge Lamberth dismissed the complaint *sua sponte* without prejudice on the ground, among others, that the action would not likely resolve the disputes among the parties.  (*See id*. at 3); *Glenn v. Fay*, No. 1:16-cv-1452, slip op. at 1 (D.D.C. Dec. 6, 2016).

On December 22, 2016, Glenn filed a new complaint against Fay and Perles in the United States District Court for the District of Columbia alleging, among other things, that they were in breach of Glenn's Associate Counsel Agreement and the alleged oral referral agreement and seeking payment pursuant to the terms of those agreements or in accordance with the *quantum meruit* doctrine.  (SM Ex. 8 (Letter from S. Storch dated June 9, 2017), Ex. A; *see also* See SM Ex. 43 (Letter from S. Storch dated Nov. 3, 2017) at 2.)  On February 17, 2017, Fay and Perles

moved to dismiss the complaint on the ground, among others, that the claims are barred by the applicable statute of limitations. The motion has not yet been decided.  (SM Ex. 25 (Letter from S. Storch Oct. 27, 2017) at 4 and Exs. D & E.)

### 3.     Cook and Glenn Cannot Be Heard To Object to Distribution of Funds from the QSF.

As discussed above, more than a year ago, Cook moved to intervene as of right (see ECF Nos. 620, 626, 631, 633, and 634).  He now seeks permissive intervention.  In evaluating Cook's application for permissive intervention under Rule 24(b)(2), the Court is required to consider "substantially the same factors" as it did when it considered his application to intervene as of right.  *See "R" Best Produce, Inc. v. Shulman-Rabin Mktg., Corp.*, 467 F.3d 238, 240 (2d Cir. 2006).  However, the Court has "broad discretion under Rule 24(b) to determine whether to permit intervention . . . ."  *St. John's Univ., New York v. Bolton*, 450 F. App'x 81, 84 (2d Cir. 2011) (summary order).

When it denied Cook's prior motion to intervene, the Court found that he had not "adequately establish[ed] the elements required in Fed. R. Civ. P. 24," with a particular focus on the fact that he had "sat on [his] alleged rights to intervene for years."  *Peterson*, 2016 WL 9447953, at *2.  In affirming the Court's ruling, the Second Circuit stated that it "agree[d] with the District Court that the motion was untimely."  *Peterson*, 690 F. App'x at 746.  The Second Circuit also held that "permitting intervention now would, among other things, prejudice existing parties and further delay compensation to victims of terrorism," and that "denial of intervention would not unduly prejudice Cook, who is attempting to enforce a charging lien 'in a separate lawsuit,' and who has initiated an arbitration proceeding to recovery attorney's fees."  *Id.* (quotations omitted).  Given that Cook's current request to intervene is even more untimely than his previous request and further given that he has failed to provide any legal or factual basis for

distinguishing his current application from his previous one, I recommend that the Court deny

Cook's current request for intervention for the same reasons the Court denied his prior request.

*See Mastercard Int'l Inc. v. Visa Int'l Svc. Ass'n*, 741 F.3d 377, 389–91 (2d Cir. 2006) (affirming

district court's denial of intervention as of right and permissive intervention on timeliness

grounds).

Cook asserts that even if he is not allowed to intervene, he still has the right to seek

enforcement of his lien in this Court.  (SM Ex. 11 (Letter from M. Folkenflik dated June 21,

2017) at 1 (citing N.Y. Jud. L. §475).)  In support of his position, Cook asserts that a lien under

Section 475 of the New York Judiciary Law "is created as a matter of law, upon the appearance

of an attorney in an action which resulted in a judgment.  It is self-effectuating, and its validity

does not in any respect depend on a filing, or a prior court ruling, or intervention in any

proceeding."  (*Id.*)  While some of Cook's assertions are undisputed, there is no authority for the

critical proposition that a lien may be enforced in federal court without intervention.

I requested that counsel provide me with legal authority for the proposition that an

attorney is entitled to seek relief from the Court when or she has not intervened.  Cook cites

*Cohen v. Grainger, Tesoriero & Bell*, 81 N.Y.2d 655 (1993), and *Butler,* 250 F.3d 171 (2d Cir.

2001), in support of his argument.  However, *Cohen* does not have anything to do with whether

an attorney is entitled to enforce a charging lien in federal court without intervening.  81 N.Y.2d

655.  And *Butler* actually undercuts Cook's argument and makes clear that a discharged attorney

with a charging lien is *not* entitled to enforce a charging lien in federal court without being

allowed to intervene.  250 F.3d 171.  Butler was an attorney discharged without cause who

sought leave to intervene in the underlying action to enforce an undisputed charging lien.  *Id.* at

174–75.  The district court denied Butler's motion to intervene on the grounds that Butler had

failed to satisfy three of the four required elements for intervention—filing of a timely motion; claiming an interest relating to the property or transaction that is the subject of the action; and showing that the interest is not already adequately represented.  *Id*. at 176.  The Second Circuit affirmed the district court's decision on two of the three grounds (timeliness and adequacy of representation), but declined to resolve what it characterized as a "close question" of "whether a discharged attorney's charging lien is a sufficient interest to support intervention as of right into a client's underlying action."  *Id*. at 176, 179–83.  In affirming the district court's denial of Butler's motion to intervene without determining whether his lien was the sort that is protectable under Rule 24, the Second Circuit makes clear that intervention can be denied even where there is no dispute about whether the movant has a charging lien.  The Second Circuit's decision in *Butler* also confirms that a district court may exercise its discretion to deny a lienholder's motion to intervene on the grounds of timeliness alone, even if the other requirements of Rule 24 have been met.  *Id*. at 181–83.  Accordingly, I recommend that the Court find that Cook is not entitled to seek enforcement of his lien in this Court since he has failed to establish a right to intervene as of right or permissively.[26]

In addition, even if Cook were allowed to intervene or have his claimed lien rights protected without intervening, I would recommend that the Court deny Cook's request for an order vacating the Court's prior Order finding that he failed to establish an entitlement to a lien under Section 475.  (*See, e.g.*, ECF Nos. 762, 770.)  In support of his position, Cook argues that "the Court's ruling is in error as a matter of fact and law" and "was issued without [his] having the opportunity to respond to the Section 475 lien argument" made by the *Peterson* Action

---

[26]     Notwithstanding the foregoing, "[u]nder New York law, the attorney still has an avenue to recover legal fees owed via a plenary action . . . ."  *Id*. at 179.

plaintiffs on June 1, 2016.  (ECF No. 770 at 2; *see also* ECF No. 762 at 2–3; SM Ex. 11 (Letter

from M. Folkenflik dated June 21, 2017) at 2–3.)  Cook does not cite any legal authority in

support of his request for an order vacating the Court's prior Order.  However, I note that Local

Civil Rule 6.3 requires motions for reconsideration to "be served within fourteen (14) days after

the entry of the Court's determination of the original motion . . . ."  Parties that file motions for

reconsideration after fourteen days should justify the delay with adequate reasons such as new

information."  *See Snall v. City of New York*, 242 F.3d 367, at *3 (2d Cir. 2000) ("Courts will

enforce this time limit absent adequate justification for ignoring it.") (internal citation omitted)*;

see also Ferrand v. Credit Lyonnais*, 292 F. Supp. 2d 518, 520 (S.D.N.Y. 2003)

("[r]econsideration of a court's previous order is an extraordinary remedy to be employed

sparingly in the interests of finality and conservation of scarce judicial resources") (internal

citation omitted), *aff'd*, 110 F. App'x 160 (2d Cir. 2004).  Construing Cook's request as a motion

for reconsideration, I recommend that the Court find that Cook fails to satisfy the requirements

of Local Civil Rule 6.3, because Cook did not seek relief from the Court's prior Order within 14

days after its entry and fails to provide any justification for his delay.

      Cook's request could also be construed as a request for relief from the Court's prior

Order under Rule 60(b) of the Federal Rules of Civil Procedure, which provides in relevant part:

> [o]n motion and just terms, the court may relieve a party . . . from a[n] . . . order
> . . . for the following reasons:
>> (1) mistake, inadvertence, surprise, or excusable neglect;
>> . . . or
>> (6) any other reason that justifies relief."

Pursuant to Rule 60(c), a motion under Rule 60(b) must be made "within a reasonable time . . . ."

Fed. R. Civ. P. 60(c).  "The decision whether to grant a party's Rule 60(b) motion is committed

to the 'sound discretion' of the district court . . . ."  *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir.

2012).

Cook suggests that the Court's prior Order should be vacated for two reasons, because the Court supposedly made a mistake when it found he had failed to establish an entitlement to a lien under Section 475, and because he did not have an adequate opportunity to litigate that issue, with the former falling under Rule 60(b)(1) and the latter falling under Rule 60(b)(6). The Court of Appeals for the Second Circuit has held that "Rule 60(b)(1) and Rule 60(b)(6) are 'mutually exclusive,' such 'that any conduct which generally falls under the former cannot stand as a ground for relief under the latter.'" *Stevens*, 676 F.3d at 67 (citations omitted). The Second Circuit has also held that "if the reasons offered for relief from judgment can be considered in one of the more specific clauses of Rule 60(b), such reasons will not justify relief under Rule 60(b)(6)." *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391–92 (2d Cir. 2001). Thus, where "the alleged grounds for relief under Rule 60(b) . . . concern[] mistake, only Rule 60(b)(1) is applicable." *United States v. Erdoss*, 440 F.2d 1221, 1223 (2d Cir. 1971). In light of the foregoing, since Cook's motion is premised on grounds fairly classified as mistake, I recommend that the Court find his request is foreclosed to the extent he seeks relief under Rule 60(b)(6). *Stevens*, 676 F.3d at 67.[27]

---

[27] Even if the Court were to consider Cook's argument concerning his claimed lack of opportunity to be heard on Section 475, I would recommend that the Court reject the argument. As discussed above, the Cook Fee-Sharing Agreement was terminated in October 2011. *See supra* at 22. At the time, enforcement proceedings were already underway in this Court. *See supra* at 20–22. The Court issued its Turnover Order in March 2013; the Second Circuit affirmed in July 2014; the Supreme Court affirmed in April 2016; and the Second Circuit issued its Mandate in May 2016. (ECF 616.) Before the Mandate issued, the Court requested that parties submit letters addressing any anticipated issues for the Court's consideration by May 4, 2016. (ECF No. 608.) Although the Court issued an Order on May 25, 2016 requiring any parties who wished to respond to then-recent filings seeking the distribution of funds from the QSF to do so by June 1, 2016 (ECF No. 621), the Order cannot have come as a surprise. Cook had had more than four years before then to determine whether and how to protect his claim for payment. Given how well established it is that Section 475 governs requests for liens in federal courts sitting in New York, *Itar-Tass*, 140 F.3d at 450, Cook cannot be heard to argue he could not have identified the applicable standard before June 1, 2016, and addressed it in his motion to

"Rule 60(b)(1) motions to reopen based on district court mistakes are generally deemed untimely if made after the deadline for filing a notice of appeal." *Niederland v. Chase*, 425 F. App'x 10, 12 (2d Cir. 2011); *see also Schildhaus v. Moe*, 335 F.2d 529, 531 (2d Cir. 1964).  As the Second Circuit explained in *Niederland*, "[o]ne of the reasons for not permitting Rule 60(b)(1) motions to correct court errors after the deadline for appeal is to prevent the rule from becoming a vehicle to assert an otherwise time-barred appeal."  425 F. App'x at 12.  Here, there is no dispute that Cook's current application was filed long after the deadline for filing a notice of appeal.  As discussed above, the Court found Cook had failed to establish an entitlement to a lien under Section 475 by Order entered June 6, 2016.  *Peterson*, 2016 WL 9447953, at *3. After the Court entered its Order, Cook appealed to the Second Circuit.  (ECF No. 662.)  Prior to appealing, Cook opted not to seek relief from the Court's prior Order or to inform the Court otherwise that he believed the Court had erred.  Instead, he attempted to pursue his arguments through an appeal.  While many of the cases addressing the timeliness of Rule 60(b)(1) motions arose in situations where a party moving for relief under that rule failed to file a timely notice of appeal, the reasoning of those cases applies *a fortiori* where a litigant has made the decision to challenge a district court's order by filing an appeal.  In seeking reconsideration after his appeal was unsuccessful, Cook is improperly attempting to use Rule 60(b)(1) as a "vehicle" to re-assert the arguments he raised on appeal.  Given Cook's delay in seeking relief from the Court's Order from this Court and his apparent attempt to use Rule 60(b)(1) to re-litigate issues decided by the

---

intervene.  Given that the Court had set June 1, 2016, as the deadline for submissions, without providing a subsequent date for responsive papers, it was incumbent upon Cook to anticipate the potential arguments that could have been made in opposition to his motion.  His failure to do so does not justify relief from the Court pursuant to Rule 60(b)(6) or support his claim to have been deprived of a fair opportunity to be heard.

Second Circuit on his appeal, I recommend that the Court find Cook's request for an order vacating the Court's prior Order fails under Rule 60(c).

Even if Cook could satisfy the timeliness requirement of Rule 60(c), I would still recommend that the Court deny Cook's request for an order vacating this Court's prior Order because he failed to argue previously before this Court that he was entitled to a lien under Section 475.  In the papers he filed with the Court in May and June 2016, Cook relied exclusively and repeatedly on the fact that that he had filed a lien in the *Peterson* Action under the law of the District of Columbia.  (*See* ECF No. 620 at 2; ECF No. 626 at 2; ECF No. 633 ¶ 3; ECF No. 634 at 10–11.)  Although, as discussed above, it is well established that federal courts sitting in New York apply Section 475 to determine whether an applicant has a lien, *see Itar-Tass*, 140 F.3d at 450, Cook did not argue that he was entitled to a lien under Section 475.  (*See* ECF No. 620 at 2; ECF No. 631; ECF No. 633 at 9–10; ECF No. 634 at 5; ECF No. 643 at 1.)  By acknowledging that "[h]e did not raise the Section 475 lien" (SM Ex. 11 (Letter from M. Folkenflik dated June 21, 2017) at 2), Cook effectively concedes he failed to establish an entitlement to a lien under Section 475.  Cook does not provide any legal support for the proposition that he is entitled to relief from an order finding he failed to establish a particular entitlement when he did not in fact even try to establish such an entitlement. Accordingly, I recommend that the Court find Cook waived any right to argue that the Court erred.  *See Ynoa v. New York-Presbyterian Univ. Hosps. of Columbia & Cornell*, 215 F. App'x 47, 48 (2d Cir. 2007) (affirming the district court judgment where defendant claimed the court erred for failing to

address an issue, but the court found that the "issue was not raised before the district court and, because there are no extraordinary circumstances, it is deemed waived").[28]

In his current application, Glenn again seeks an order preventing the Trustee from distributing funds from the QSF.  Acknowledging that the Court previously denied his motion to intervene, Glenn asserts without any legal support that he "should not have to intervene to be entitled to be paid what he is owed."  (SM Ex. 25 (Letter from S. Storch dated Oct. 27, 2017) at 5.)  However, Glenn does not provide any legal authority for the proposition that he can seek relief from the Court without intervening.  As discussed above, *supra* at 56, the case law is to the contrary.  *See Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 174–76, 179–83 (affirming denial of motion to intervene by attorney with undisputed charging lien on grounds of timeliness and adequacy of representation).  Accordingly, I recommend that the Court find Glenn is not entitled to seek relief from the Court.

---

[28]     Even if Cook had attempted to establish an entitlement to a Section 475 lien, he would not have been able to satisfy the relevant requirements.  Cook argues that the Court should have considered his activities in connection with the D.C. Action when deciding whether he established an entitlement to a Section 475 lien.  However, none of those activities constitutes an appearance as an attorney of record on behalf of a client where his efforts contributed to the creation of the Fund.  *See supra* at 38.  It is undisputed that Cook was not admitted to practice in the District of Columbia.  His service of a subpoena on OFAC and the filing of that subpoena by another attorney does not rise to the level of what the Second Circuit and the New York Court of Appeals have considered adequate to satisfy the appearance requirement.  *See Itar-Tass*, 140 F.3d at 451 (finding requirement met where attorney "signed and submitted numerous papers and letters to the court, and appeared at trial as 'attorney for the plaintiffs'"); *Rodriguez*, 498 N.Y.S.2d at 353 (stating that attorney's name must appear on "the pleadings, motion papers, affidavits, briefs or record . . . .").  Cook's filing of various writs of attachment that did not result in the identification of any funds for the benefit of the plaintiffs also fails to satisfy the requirement that an attorney's actions create the fund against which the lien is asserted.  *See Chadbourne & Parke*, 18 A.D.3d at 223.  Cook's activities in connection with this action also fall short of the mark.  Cook has provided no authority to support the proposition that his registration of the *Peterson* Action judgment in the Southern District of New York, his retention of counsel to conduct enforcement proceedings in this District, or his non-substantive utterances at two hearings being handled by such counsel satisfies the appearance requirements of Section 475.

Even if Glenn could intervene or seek relief without doing so, he fails to establish a basis for relief.  Glenn takes inconsistent positions about whether he has or claims to have a lien, saying he filed a lien in the *Peterson* Action, he does not claim a lien on the QSF, but he does claim a lien on funds in the QSF otherwise payable to Fay and Perles.  (ECF No. 625 at 2; SM Ex. 25 (Letter from S. Storch dated Oct. 27, 2017) at 4.)  Glenn also takes conflicting positions on what sort of lien he might have, arguing that "his lien, if any, is governed by District of Columbia law," but asserting that the Court erred in finding that he had failed to establish an entitlement to a lien under Section 475.  (See SM Ex. 25 (Letter from S. Storch dated Oct. 27, 2017) at 4.)

In that regard, Glenn argues that the Court erred in finding that he had failed to establish an entitlement to a lien under Section 475.  (SM Ex. 16 (Letter from S. Storch dated June 23, 2017) at 1.)  In the alternative, he asserts that the Court's comments about his entitlement to a lien under Section 475 were "nonbinding dicta."  (*Id*. at 2.)  Glenn also contends that it would be error to permit the Trustee to distribute funds from the QSF without reserving an amount sufficient to cover Glenn's claims.  (*Id*.)

Glenn provides no legal or factual basis to support his assertion that the language in the Court's prior Order about Glenn's failure to establish an entitlement to a lien under Section 475 was mere *dicta*.  Glenn had sought to intervene in this action on the ground that he had a direct interest in the QSF by virtue of charging liens he claimed to hold under New York law (citing Judiciary Law § 475) and the law of the District of Columbia.  (*See* ECF No. 636 at 9.)  The Court clearly rejected his argument when it held that Glenn had not "advanced a proper basis for enforcing any charging lien under Judiciary Law § 475 . . . ." *Peterson*, 2016 WL 9447953, at *2.

Like Cook, Glenn also fails to provide any legal or factual authority to support his request for reconsideration of or relief from the Court's prior Order. However, if the Court were to consider his application under Local Civil Rule 6.3, I recommend that the Court deny the application, because it was made more than 14 days after the entry of the Court's Order determining his original motion and Glenn fails to justify his delay. *See supra* at 57. Further, if the Court were to construe Glenn's request as one for relief under Rule 60(b) of the Federal Rules of Civil Procedure, I would recommend that the Court consider the request as one being made under Rule 60(b)(1), since Glenn asserts that the Court erred, and that the Court deny the request on the grounds that it was not made within a reasonable time after entry of the Order and that Glenn waived any right to complain that the Court erred.

With regard to timeliness, the Order Glenn claims to be erroneous was entered on June 6, 2016. (ECF No. 647 at 3-4.) Before appealing, Glenn did not submit anything to the Court to inform it that he believed there was an error in the Court's ruling that Glenn had failed to establish an entitlement to a lien under Section 475. Because Glenn did not seek relief from the Court before his time to appeal from the Order had expired, I recommend that the Court deny his request for relief as untimely. *Niederland*, 425 F. App'x at 12. Although Glenn mentioned to the Court in his original motion papers that he sought a lien under New York's statute, Glenn did not inform the Court of the relevant standard or provide the Court with any explanation as to how he satisfied it. While Glenn did subsequently file an appeal, he later withdrew the appeal voluntarily. Thus, like Cook, Glenn should not be permitted to use either a motion for reconsideration under Local Civil Rule 6.3 or a motion for relief from judgment as a "vehicle" to raise issues that he could have raised through a timely appeal. Given his failure to pursue relief through proper procedural mechanisms that were available to him, Glenn cannot now be heard to

complain that the Court erred and I recommend that the Court deny Glenn's request insofar as it

seeks reconsideration of or relief from the Court's prior Order on the grounds of waiver.[29]

### B.        Delaney

On May 11, 2017, Delaney notified the Trustee that she was asserting a lien against

certain funds in the QSF.  (SM Ex. 10 (Letter from E. Manning dated June 16, 2017) at 1.)  She

claims that she was one of the four original attorneys in the *Peterson* Action, along with Fay,

Perles and Rothenberg."  (*Id*.)  Even though Delaney was a recent law school graduate when she

was introduced to Rothenberg in 2001, she asserts that she formed a limited partnership with

Fay, Perles and Rothenberg and that they agreed orally to pay her one-third of all of the

attorneys' fees they collected in the *Peterson* Action and related cases for marketing research,

location of potential plaintiffs, legal research and case management.  (SM Ex. 10 (Letter from E.

Manning dated June 16, 2017); *see also* SM Ex. 14 (Letter from E. Manning dated June 22,

2017).)  On October 27, 2017, Delaney stated that she seeks to intervene on a limited basis and

that she is entitled to a lien under the law of Rhode Island.  (SM Ex. 34 (Letter from E. Manning

dated Oct. 27, 2017) at 1, 4–7 & Ex. 2; SM Ex. 54 (Letter from E. Manning dated Nov. 10,

2017).)

Rothenberg opposes Delaney's claims to a share of attorneys' fees and to a lien on any

share of the QSF's assets.  While he does not dispute that Delaney worked for him and provided

some services in connection with the *Peterson* Action, he asserts that he paid her for the services

she rendered and denies that there was an oral contract pursuant to which Delaney would be

---

[29]      As alternative grounds for denying Cook's and Glenn's applications, I recommend that
the Court find they are effectively seeking pre-judgment attachments but fail to establish an
identifiable risk that the individuals against whom they seek payment will be unable to satisfy
any judgment.  *See supra* at 40.

entitled to a share of attorneys' fees.  (SM Ex. 18 (Letter from P. Buckley dated June 27, 2017) at 1–2; SM Ex. 50 (Letter from P. Buckley dated Nov. 7, 2017) at 2, Ex. 2 ¶ 11.)

### 1.    Intervention

As discussed above, intervention as of right requires the applicant to file a timely motion, among other requirements.  *See supra* at 35–36.  Permissive intervention also requires a timely motion and affords the Court broad discretion in determining whether intervention is appropriate.

> Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be "timely."  If it is untimely, intervention must be denied.

*NAACP v. New York*, 413 U.S. 345, 365 (1973).  For the reasons discussed below, because Delaney fails to satisfy the timeliness requirement for intervention as of right or permissively, I recommend that the Court deny her request to intervene.

Focusing on the length of time Delaney knew or should have known of her claimed interest before making the motion, *see Floyd*, 770 F.3d at 1058, the undisputed facts demonstrate that Delaney knew or should have known of her claim for years before moving to intervene, notwithstanding her assertion that she did not know until June 19 or 20, 2017, that her claim to additional compensation was in jeopardy.  Delaney claims to have performed work in 2001. (SM Ex. 10 (Letter from E. Manning dated June 16, 2017) at 2–4.)  She acknowledges that she was paid approximately $7,400 between February and September 2001.  (SM Ex. 19 (Letter from E. Manning dated June 27, 2017) Ex. 1.)  Although Delaney apparently sent Rothenberg an email on December 22, 2006, stating "I trust when the money comes in my efforts will be rewarded per our verbal agreements" (SM Ex. 34 (Letter from E. Manning dated Oct. 27, 2017), Ex. 5), Delaney offers no support whatsoever to suggest that Rothenberg responded to confirm his agreement.  At that time, if not sooner, Delaney should have known her claim to a share of the contingent-fees was in doubt.

The passage of time without any communication from Rothenberg about her anticipated compensation should have raised additional questions about whether Delaney would be able to collect pursuant to her claimed oral agreement. As discussed above, the Court issued its Turnover Order in 2013 and the Supreme Court affirmed the decision in April 2016. By that time, there was no question that funds would be distributed to the Plaintiffs and their counsel. However, Delaney does not contend that between 2007 and 2016 she sought or obtained confirmation that she would be paid.

Delaney did not take any action to clarify her right to payment either at a time when it would be reasonable to expect someone with a claim to do so. By Order dated April 22, 2016, the Court directed the parties to submit letters addressing any anticipated issues for the Court's consideration by May 4, 2016. (ECF No. 608.) By Order entered May 25, 2016, the Court directed that "[a]ny party wishing to respond to any recent filing [with regard to the distribution of funds from the QSF] must do so no later than June 1, 2016." (ECF No. 621 at 1.) It is undisputed that Delaney failed to make any submission in response to either Order indicating that she believed she was entitled to be paid out of the Fund. Indeed, she waited for more than a year after the Court authorized the Trustee to commence distributions before she requested intervention on October 27, 2017. (*See* SM Ex. 34 (Letter from E. Manning dated Oct. 27, 2017) at 5–7.)

With regard to the remaining factors bearing on timeliness, it is clear that there would be significant prejudice to the existing parties if Delaney were allowed to intervene notwithstanding her delay. The Trustee has already distributed approximately $250 million in attorneys' fees. The Retained Attorneys, the Damages Attorneys and the Enforcement Attorneys have all been waiting for years to be paid in full for their undisputed services. It would be unfair to them to

allow Delaney to intervene at this late date since her intervention would cause further delay in

the Trustee's distribution of payments to them.  Delaney herself would not suffer any significant

prejudice if she were not permitted to intervene, since she remains free to pursue her claims, if

she wishes, in separate litigation against Rothenberg, Fay and Perles.  As discussed further

below, Delaney also fails to show an interest in the litigation sufficient to support intervention.

Moreover, there are no unusual circumstances militating for intervention.  To the contrary, given

how long the attorneys who have appeared for the Peterson Plaintiffs have been waiting to be

paid and the advanced stages of this action, the circumstances militate strongly against

intervention.  Under circumstances similar to those present here, the Court has denied motions to

intervene.  (*See, e.g.*, ECF Nos. 586, 647.)  The Second Circuit has also affirmed this Court's and

other courts' denials of motions to intervene under analogous circumstances.  *See, e.g.*, *Peterson*,

690 F. App'x at 746; *United States v. Pitney Bowes*, *Inc*., 25 F.3d 66, 71 (2d Cir. 1994)

(affirming district court's decision to deny a motion to intervene when the intervenor waited

fifteen months to file the motion); *Floyd*, 770 F.3d at 1058–62 (affirming denial of motion to

intervene where applicants had constructive knowledge of their interests from public filings and

news media reports made less than nine months before they moved to intervene).  Accordingly, I

recommend that the Court deny Delaney's request to intervene in this action.

## 2.    Liens

Since Delaney fails to satisfy the requirements for intervention, it is not necessary to

reach her claim to have a lien enforceable by the Court.  However, even if Delaney were

permitted to intervene, I would recommend that the Court find she fails to establish an

entitlement to a lien.

Delaney asserts that "New York Judiciary Law Section 475 is inapplicable" to her.  (*See*

SM Ex. 34 (Letter from E. Manning dated Oct. 27, 2017) at 2.)  Since it is well established that

Section 475 governs attorneys' charging liens in federal courts sitting in New York, *Itar-Tass*, 140 F.3d at 448–49, and Delaney has opted not to address whether she satisfies the requirements under Section 475, she clearly fails to establish that she is entitled to a Section 475 lien enforceable in this Court.  However, even if Delaney were to have attempted to establish an entitlement to a lien under Section 475, she would be unable to do so, because, at a minimum, she does not assert that she was ever an attorney of record in this action or in a prior action that logically relates to this one.  *See id.* at 450; *Cohen*, 81 N.Y.2d at 658.  It has long been recognized that an attorney charging lien is not available to secure payment of salary or for general services rendered that did not give rise to a client's recovery.  *See In re Heinsheimer*, 214 N.Y. 361, 365–68 (1915).

Rather than engaging with Section 475, Delaney asserts that she possesses a lien under Rhode Island law. (SM Ex. 34 (Letter from E. Manning dated Oct. 27, 2017) at 4–5; SM Ex. 54 (Letter from E. Manning dated Nov. 10, 2017).)  In support of her position, Delaney brought five cases to my attention.  (See SM Ex. 54 (Letter from E. Manning dated Nov. 10, 2017) at 1.)  None of the cases takes into account the long-standing rule that "New York Judiciary Law §475 governs attorneys' charging liens in federal courts sitting in New York."  *Itar-Tass*, 140 F.3d at 442.  Although three of the cases concern choice of law approaches used by New York state courts, only one, *Istim, Inc. v. Chem. Bank*, 78 N.Y.2d 342, 349 (1991), discusses the application of the governing approach to the question as to which state's statutory law governs attorney charging liens.

Notwithstanding Delaney's argument that *Istim* requires the Court to apply the law of Rhode Island when determining whether she has a lien against the QSF, the case, to the extent applicable here, actually supports the Court's application of New York law.  Under the "interests

analysis," the *Istim* court considered, *inter alia*, the fact that, like here, there was a turnover

proceeding brought in a New York court under New York law seeking funds located in New

York.  78 N.Y.2d at 347–49.  The court also considered the purposes of the state statutes, noting

that the purpose of Section 475 is "to ensure that attorneys have the means to enforce the right to

their fees."  *Id.* at 348.  By her own admission, Delaney has never appeared as counsel for the

Peterson Plaintiffs, but she claims a lien that would give her priority to receive attorneys' fees

over liens under Section 475 held by other attorneys who have appeared in this proceeding or

related proceedings.  (*See* SM Ex. 34 (Letter from E. Manning dated Oct. 27, 2017) at 2.)

Assuming that Rhode Island law does not have an appearance requirement, as Delaney herself

contends (SM Ex. 54 (Letter from E. Manning dated Nov. 10, 2017) at 3), application of Rhode

Island law would arguably allow Delaney to assert a lien over funds in the QSF that are

otherwise payable to attorneys who have appeared in this action, which would be in derogation

of New York's interest in assuring that counsel of record be paid the fees that are owed.

Accordingly, insofar as *Istim* applies here, I recommend that the Court find that the case would

require the application of Section 475 to Delaney's claim and further recommend that, for the

reasons discussed above, the Court find that even if Delaney were allowed to intervene, she fails

to establish an entitlement to a lien under Section 475.[30]

---

[30]     As an alternative ground for denying Delaney's application, I recommend that the Court
find she is effectively seeking pre-judgment attachments but fails to establish an identifiable risk
that the individuals against whom she seeks payment will be unable to satisfy any judgment.  *See
supra* at 40.

**VI.**     **Recommendations on the Applications of the Retained Attorneys, Damages Attorneys, and the Enforcement Attorneys**

**A.**     **The Retained Attorneys Are Entitled to be Paid According to the Terms of Their Retainer Agreements with their Clients and the Fee-Sharing Agreements Between and Among Them.**

As discussed above, the Retained Attorneys were engaged by the Peterson Plaintiffs to represent them from the outset of their respective suits pursuant to contingent-fee agreements. Fay, Perles, Rothenberg and LaSpada, referred to herein as the Litigation Attorneys, were the first of the Retained Attorneys.  Gaskill, Donohue, Drennan and Karr, referred to as the Follow On Attorneys, and HNK were retained subsequently by different clients.  There is no dispute that these attorneys have liens under Section 475 that are enforceable in this Court.  However, as discussed further below, notwithstanding the fact that the Follow On Attorneys and HNK have contingency agreements with their clients and assert there are binding fee-sharing agreements that include Fay and Perles, Perles argues, among other things, that their contingent-fee agreements should not be enforced in accordance with their terms and that any fee-sharing agreements are not binding.

**1.**     **The Retained Attorneys' Entitlement to Fees Under Their Agreements with Plaintiffs and Fee-Sharing Agreements**

The Fay Group claims it is entitled to receive attorneys' fees owed to the FSIA Partnership in connection with the *Peterson*, *Valore*, *Bonk*, *Arnold*, *Murphy*, *Davis*, *Taylor*, *O'Brien*, *Anderson*, *Bland*, *Brown*, *Fain*, *Spencer I*, *Spencer II* and *Worley* actions pursuant to contingent-fee agreements with clients and fee-sharing agreements with other attorneys.  (SM Ex. 31 (Letter from C. Fay dated Oct. 26, 2017) at 1, Ex. 1.)  In support of its position, the Fay Group asserts that it has contingent-fee agreements with plaintiffs in the *Bonk*, *Davis*, *Fain* and *Worley* Actions and fee-sharing agreements with the plaintiffs in the *Valore*, *Arnold*, *Murphy*, *Taylor*, *O'Brien*, *Anderson*, *Bland*, *Brown* and *Spencer I* Actions.  (*Id.* Ex. 1, Retainers A–Q;

Contracts 1–5.)  The specific fee that the Fay Group claims varies from case to case, depending on the particular terms of each fee-sharing agreement with the other Retained Attorneys.  There is no dispute that the Fay Group is entitled to fees for its work in the cases on which it has contingent-fee agreements.

Perles agrees with the Fay Group as to the FSIA Partnership's share of fees in the *Peterson*, *Bonk*, *Davis*, *Fain* and *Worley A*ctions pursuant to the terms of contingent-fee agreements between the FSIA Partnership and the plaintiffs in those actions.  (*See* SM Ex. 35 (Letter from D. Bregman dated Oct. 27, 2017) at 2.)  In addition, Perles asserts the FSIA Partnership is entitled to 97% of the fees earned in connection with the cases as to which the Follow On Attorneys and HNK have contingent-fee agreements.  (*Id*.)

Rothenberg entered into contingent-fee agreements with clients as co-counsel to the FSIA Partnership.  He claims he is entitled to one third of the "net attorneys' fee resulting from damages awarded" to 101 of the plaintiffs in the *Peterson* Action, as outlined in an agreement with Fay and Perles dated November 7, 2007.  (SM Ex. 39 (Letter from P. Buckley dated Oct. 27, 2017) Ex. B at 1–4.)[31]  Neither Fay nor Perles contests Rothenberg's claim of entitlement to fees pursuant to that agreement.

Like Rothenberg, LaSpada entered into contingent-fee agreements with plaintiffs as co-counsel to the FSIA Partnership.  He claims that he is owed one third of the attorneys' fees payable by the *Peterson* Action plaintiffs listed in his letter to Fay dated May 28, 2014.  (SM Ex. 33 (Letter from C. Fay on Behalf of LaSpada dated Oct. 26, 2017) Ex. 1 at 1–4.)  Again, like Rothenberg's claim, LaSpada's claim to fees is not disputed.

---

[31]     While Perles refers to Rothenberg's claim for these fees as seeking "referral fees," there is no dispute that Rothenberg is entitled to these fees, either by virtue of this agreements with the clients or his fee-sharing agreement with Fay and Perles.

The Follow On Attorneys and HNK have different fee-sharing arrangements, but like the Litigation Attorneys, they also claim to be entitled to fees based on their contingent-fee agreements with plaintiffs and fee-sharing agreements the Follow On Attorneys and HNK entered into with others.  Specifically:

Gaskill claims to be entitled to portions of the attorneys' fees earned on the recoveries of plaintiffs in the *Valore*, *Anderson*, *Taylor* and *Spencer II* Actions, based on contingent-fee agreements with certain plaintiffs in the *Valore* and *Anderson* Actions, and fee-sharing agreements with Drennan, Donahue and Fay in the *Taylor* and *Spencer II* Actions.  (SM Ex. 27 (Letter from D. Gaskill dated Oct. 27, 2017) at 1–2, Ex. C ¶ 4.)

Donahue claims to be entitled to portions of the attorneys' fees earned on the recoveries of plaintiffs in the *Valore*, *O'Brien*, *Anderson*, *Taylor* and *Spencer II* Actions, based on contingent-fee agreements with certain plaintiffs in the *Valore*, *Anderson*, *Taylor* and *Spencer II* Actions and fee-sharing agreements with Drennan with respect to certain plaintiffs in the *O'Brien*, *Taylor* and *Spencer II* Actions.  (SM Ex. 30 (Letter from S. Reed dated Oct. 27, 2017) at 1–2, Ex. 1 ¶¶ 4–5.)

Drennan claims to be entitled to portions of the attorneys' fees earned on the recoveries of certain plaintiffs in the *Valore*, *Arnold*, *O'Brien*, *Taylor*, *Anderson* and *Spencer II* Actions, based on contingent-fee agreements with plaintiffs in *Arnold*, *O'Brien*, *Taylor* and *Spencer II* Actions, and fee-sharing agreements with Gaskill, Donahue and the FSIA Partnership with respect to certain plaintiffs in the *Valore*, *Taylor, Anderson* and *Spencer II* Actions.  (SM Ex. 40 (Letter from J. Mook dated Oct. 27, 2017) at 6–10; SM Ex. 41 (Letter from J. Mook dated Oct. 31, 2017) at 1.)

Karr claims to be entitled to the attorneys' fees on the recoveries of the plaintiffs in the *Murphy* action based on contingent-fee agreements with each of the plaintiffs in that action. (SM Ex. 46 (Letter from T. Allison dated Nov. 3, 2017) at 2–4.)

HNK claims to be entitled to portions of the attorneys' fees earned on the recoveries of certain plaintiffs in the *Bland*, *Spencer I*, *Brown* and *Spencer II* Actions, based on contingent-fee agreements with the plaintiffs in each of those actions. (SM Ex. 38 (Letter from R. Zuckerman dated Oct. 27, 2017) at 2–3.)

The Follow On Attorneys, HNK and Fay all appear to agree that, pursuant to the fee-sharing agreements between and among them, the Retained Attorneys should all permitted to receive the attorneys' fees listed in Fay's Revised Schedule A, and that this document correctly reflects the contingent-fee agreements and fee-sharing agreements which entitle them to fees. (SM Ex. 27 (Letter from D. Gaskill dated Oct. 27, 2017) Ex. B; SM Ex. 28 (Letter from T. Allison dated Oct. 27, 2017) Ex. 1; SM Ex. 30 (Letter from S. Reed dated Oct. 27, 2017) Ex. 1.B; SM Ex. 40 (Letter from J. Mook dated Oct. 27, 2017) Ex. G; Ex. 41 (Letter from J. Mook dated Oct. 31, 2017) at 1; SM Ex. 38 (Letter from R. Zuckerman dated Oct. 27, 2017) at 7.) Perles appears to be the only one of the Retained Attorneys who takes issue with the foregoing fee-sharing arrangements, and the presumptive rights of the Follow On Attorneys and HNK to receive fees pursuant to the written agreements they have with their clients.

### 2. Perles's Challenge to the Payment of Attorneys' Fees to the Follow On Attorneys and HNK

Perles argues that the Follow On Attorneys' and HNK's contingent-fee agreements should be disregarded and that the FSIA Partnership is entitled to all but 3% of the fees owed in respect of the matters covered by those agreements. In support of his position, he makes a number of arguments, which have shifted over time.

For example, Perles contends that the FSIA Partnership is entitled to attorneys' fees for "represent[ing] all of the plaintiffs in all of the cases." (SM Ex. 35 (Letter from D. Bregman dated Oct. 27, 2017) at 2.) As discussed above, *see supra* at 17–19, the FSIA Partnership certainly has contingent-fee agreements with many of the Peterson Plaintiffs. However, Perles seems to overlook the incontrovertible fact that the Follow On Attorneys and HNK have contingent-fee agreements with certain of the plaintiffs.

Perles also argues that the agreements between the Follow On Attorneys and HNK, on the one hand, and their clients, on the other hand, should not be enforced pursuant to their terms for a variety of reasons. In particular, Perles asserts the Follow On Attorneys and HNK did not do any original thinking in connection with the complaints they filed or the strategies they pursued for their clients but that they simply copied work that the FSIA Partnership had done in the *Peterson* Action. (SM Ex. 12 (Letter from D. Bregman and G. Hervey dated May 1, 2017) at 9–11.) He argues that the Follow On Attorneys and HNK did not do any more work than that which was required of the Damages Attorneys and claims that they did not participate meaningfully in the enforcement phase of the case. (*Id.* at 1, 9, 18–19.) He also claims that the Follow On Attorneys and HNK wrongfully appropriated from the FSIA Partnership opportunities to represent the plaintiffs with whom they signed retainer agreements since the Follow On Attorneys and HNK supposedly represented Perles or the FSIA Partnership and/or owed implied fiduciary duties to refrain from misappropriating their clients or litigation opportunities. (*Id.* at 19–21; (SM Ex. 47 (Letter from D. Bregman and G. Hervey dated Nov. 3, 2017) at 2–4.)[32]

---

[32] Perles also asserts that Karr's contingent-fee agreements should not be enforced due to an alleged conflict of interest relating to Karr's representation of Fay against Perles many years ago, which Perles claims precluded Karr from representing plaintiffs in the *Murphy* Action (and from

The Follow On Attorneys and HNK dispute Perles's characterization of their representations of the Peterson Plaintiffs who retained them and not the FSIA Partnership. They argue that they are presumptively entitled to the payment of attorneys' fees under the written agreements with their clients, and that Perles can only recover the portions of the fees they agreed to pay to the FSIA Partnership in their fee-sharing agreements. (*See* SM Ex. 38 (Letter from R. Zuckerman dated Oct. 27, 2017) at 5–7; SM Ex. 45 (Letter from D. Gaskill dated Nov. 3, 2017) at 1–2.) Karr also argues, *inter alia*, that it never had an attorney-client relationship with the FSIA Partnership or Perles, and that Perles's attempts to disqualify Karr based on its purported representation of the FSIA Partnership have failed repeatedly. (SM Ex. 46 (Letter from T. Allison dated Nov. 3, 2017) at Decl. ¶¶ 14, 21.)

After the briefing deadline had passed, Perles advanced several new arguments that he had not previously made before the Court or me. In that regard, Perles asserts that the FSIA Partnership is entitled to additional compensation for the efforts of Fay and Perles in helping to obtain recoveries on behalf of all of the Peterson Plaintiffs (not just the plaintiffs who retained them) under the "common fund" doctrine. (SM Ex. 60 (Letter from R. Weigel dated Nov. 20, 2017) at 6–8.) In Perles's view, the FSIA Partnership's "work to create the Peterson Fund for the benefit of all of the [Peterson Plaintiffs]" warrants an additional fee, separate and apart from the fees each plaintiff agreed to pay the Follow On Attorneys and HNK when he, she or it entered into contingent-fee agreements with them. (*See id.* at 7.) Perles also suggests that the

---

serving as a Damages Attorney). (SM Ex. 47 (Letter from D. Bregman and G. Hervey dated November 3, 2017) at 4; SM Ex. 12 (Letter from D. Bregman and G. Hervey dated May 1, 2017) at 14 n.9.)

FSIA Partnership "should recover its attorney's fees for work performed for all Marine Plaintiffs because it had express or implied contracts with those plaintiffs for their representation."[33]

I recommend that the Court refrain from entertaining Perles's arguments for several reasons. First, Perles is essentially asserting that he has a lien against funds otherwise payable to the Follow On Attorneys and HNK, but he has not established an entitlement to such a lien. Perhaps recognizing that fact, during a conference call on November 8, 2017, Perles's counsel stated emphatically that "[w]e are not claiming a lien" relative to the Follow On Attorneys or HNK. (*See, e.g.*, SM Ex. 52 (Nov. 8, 2017 Conf. Tr.) at 110:18–111:9.) However, counsel subsequently asserted that "[w]hether it's technically a lien or not," it is the position of Perles that funds sufficient to cover his claims against the Follow On Attorneys and HNK should remain in the QSF until the claims are resolved. (*Id*. at 119:10–120:17.) Only on November 20, 2017, did Perles assert that his firm "has an attorney's charging lien on the assets in the Peterson Fund under N.Y. Judiciary Law § 475 . . . ." (SM Ex. 60 (Letter from R. Weigel dated Nov. 20, 2017) at 8.)

Although there is no question that Perles has a lien under Section 475 on the QSF for fees earned in connection with the *Peterson* Action and other matters for which he was retained and in which he appeared on behalf of his actual clients, there is no authority for the proposition that an attorney such as Perles has a lien under Section 475 on funds awarded to parties the attorney did not represent and for whom he did not appear. The authorities cited in support of Perles' eleventh-hour assertion of a lien do not suggest otherwise. (*See id.*) Accordingly, I recommend

---

[33]     I note that this letter was submitted to me on an *ex parte* basis on November 20, 2017, by a lawyer for Perles other than the two who had previously submitted briefing on his behalf. Because these arguments have not been presented in a timely fashion, and for other reasons discussed below, I have not requested that any of the other participants respond to this letter.

that the Court find that Perles does not have a lien on any funds awarded to the plaintiffs that

retained the Follow On Attorneys and HNK or earmarked for payment to those attorneys.

Second, Perles is effectively seeking reconsideration of or relief from the Court's Orders

establishing the QSF (ECF No. 460) and directing that the Trustee make distributions pursuant to

the terms of the QSF Agreement (ECF No. 651), but his attempts to do so are untimely.  In the

Sharing Agreement, all of the parties agreed to a *pro rata* division of the Clearstream Assets to

settle their competing claims and expressly included provisions stating that "the attorneys' fees

and/or costs will be apportioned consistent with" that *pro rata* distribution and that "the payment

of any attorneys' fees, costs and/or expenses incurred by their respective counsel with regard to

the Litigation and/or any work performed pursuant to this Agreement will be governed by *each*

*Creditor Plaintiff's agreement with its respective counsel*."  (SM Ex. 60 (Sharing Agreement

§§ 2.3, 2.5) (emphasis added).  The QSF Agreement directs the Trustee to make payments for

"attorney's fees . . . in accordance with the executed [Sharing] Agreement and the agreements

between the Plaintiffs and their respective attorneys."  (ECF No. 461 at 5.)  At no point in the

Sharing Agreement or the QSF Agreement is it ever stated that the FSIA Partnership would be

entitled to a special fee based on its supposed role as counsel for all of the Plaintiffs or its efforts

to create a "common fund."  Despite Perles's attempt to re-cast the efforts of the Follow On

Attorneys and HNK as wholly derivative of the FSIA Partnership's own contributions, the

Sharing Agreement clearly reflects Perles's agreement to the distribution of fees based on, at

least as an initial matter, the particular contingent-fee agreements into which the individual

plaintiffs entered with their chosen counsel.

If Perles had wanted to assert claims for additional compensation pursuant to the

common fund doctrine, he could have attempted to do so well before the Trustee had

commenced distributions.  After the Court's entry of partial summary judgment in favor of the

Peterson Plaintiffs, SMD moved for the creation of the QSF and specifically requested that the

Clearstream Assets be deposited into the QSF for the purpose of later distribution under the

terms of the QSF Agreement.  (ECF No. 617 at 1.)  Given that Perles "supervised the drafting of

nearly all the papers filed in the Litigation to collect the Clearstream Assets" (SM Ex. 60 (Letter

from R. Weigel dated Nov. 20, 2017) at 6), by his own admission, he was clearly on notice that

SMD was proposing a distribution of the Clearstream Assets in accordance with the proposed

QSF Agreement and that there was no provision for any special "bonus" to the FSIA Partnership

for its role in making those assets available to satisfy the judgments held by clients of the Follow

On Attorneys and HNK.  When the Court heard argument on SMD's motion for approval of the

QSF, Perles was himself in attendance.  (ECF No. 466.)  During that conference, the Court asked

whether there were any objections to placing the Clearstream Assets in the QSF on the terms that

SMD had proposed (*id.* at 11:9–14), and Perles never raised an objection or suggested that his

interests were not adequately protected.

Following the Supreme Court's affirmance of the Court's grant of partial summary

judgment in favor of the Plaintiffs and prior to the Court's issuance of the Distribution Order, the

Court directed the parties to submit letters addressing any anticipated issues for the Court's

consideration by May 4, 2016.  (ECF No. 608.)  The Court also ordered the parties to file

responses to a motion by SMD for an order requiring the Trustee to commence distributions in

accordance with the Court's prior Orders.  (ECF No. 621)  Perles did not respond to the Court's

Orders, object to the proposed order or suggest that the QSF Agreement did not adequately

protect his interests.[34]  In light of the foregoing, I recommend that that the Court reject Perles's

requests for relief from its prior Orders and the terms of the Sharing Agreement and QSF

Agreement.  If Perles believes he possesses some valid cause of action against the Follow On

Attorneys or HNK as a result of their alleged misconduct, Perles is free to pursue such claims in

an appropriate judicial or arbitral forum, rather than holding up further distributions to other

counsel from the QSF.[35]

### B.    The Damages Attorneys Are Entitled to be Paid Fees According to the Terms of their Fee-Sharing Agreements with Fay and Perles.

In addition to fees payable to the Retained Attorneys, Fay's motion also seeks an order

requiring the Trustee to make payments to the Damages Attorneys.  The Damages Attorneys

support Fay's motion, and seek payment of attorneys'-fees pursuant to fee-sharing arrangements

with Fay and Perles in connection with their representation of certain *Peterson* Action Plaintiffs

during the Special Master proceedings to determine damages.  Specifically:

- LaSpada seeks a fee of 3% of the "gross amount collected from [Iran] with respect to each" of the *Peterson* Action plaintiffs whom he represented as a damages attorney pursuant to a fee-sharing agreement with Fay and Perles, less $1,728,531 he received

---

[34]     Even if Perles had argued previously that he is entitled to additional compensation pursuant to the common fund doctrine, there are serious questions about whether he would have been successful.  The cases he cites in support of his position are readily distinguishable from this one, because, among other reasons, they did not involve funds earmarked for the payment of attorneys' fees pursuant to written retainer agreements or attorneys who had already been paid more than $50 million and stood to be paid even more, but instead involved a claim for the payment of attorneys' fees from an unclaimed portion of a fund, and questions about whether courts had abused their discretion in awarding attorneys' fees where there were no agreements in place governing the payment of such fees.

[35]     As an alternative ground for denying Perles's arguments, I recommend that the Court find he is effectively seeking pre-judgment attachment but fails to establish an identifiable risk that the individuals against whom he seeks payment will be unable to satisfy any judgment.  *See supra* at 40.  Insofar as Perles threatens to assert claims against Fay in the event that the contingent-fee agreements and fee-sharing agreements involving the Follow On Attorneys and HNK are enforced, Perles is also free to pursue such claims in an appropriate forum if he believes they are viable.

from the Trustee's initial distribution of fees.  (SM Ex. 33 (Letter from C. Fay on Behalf of LaSpada dated Oct. 26, 2017) at 1.)

- Gaskill seeks a fee of 3% of the "gross amount collected from [Iran] with respect to each" of the *Peterson* Action plaintiffs whom he represented as a damages attorney pursuant to a fee-sharing agreement with Fay and Perles, less $1,278,156 he received from the Trustee's initial distribution of fees.  (SM Ex. 27 (Letter from D. Gaskill dated Oct. 27, 2017) at 1.)

- Drennan seeks a fee of 3% of the "gross amount collected from [Iran] with respect to each" of the *Peterson* Action plaintiffs whom he represented as a damages attorney pursuant to a fee-sharing agreement with Fay and Perles, less $1,274,020 he received from the Trustee's initial distribution of fees.  (SM Ex. 40 (Letter from J. Mook dated Oct. 27, 2017) at 2.)

- Karr seeks a fee of 3% of the "gross amount collected from [Iran] with respect to each" of the *Peterson* Action plaintiffs whom Karr represented as a damages attorney pursuant to a fee-sharing agreement with Fay and Perles, less $838,929.70 the firm has received from the Trustee's first distribution of fees. (SM Ex. 28 (Letter from T. Allison dated Oct. 27, 2017) at 1.)

- Bond & Norman seek a fee of 3% of the "gross amount collected from [Iran] with respect to each" of the *Peterson* Action plaintiffs whom the firm represented as damages counsel pursuant to a fee-sharing agreement with Fay and Perles, less $2,180,543 the firm has received from the Trustee's initial distribution of fees.  (SM Ex. 29 (Letter from F. Bond dated Oct. 27, 2017) at 4.)[36]

Although they appear to have used different methods to calculate the precise dollar amounts claimed in their submissions to me, generally speaking, each of the Damages Attorneys "seek[s] payment directly from the QSF as was done with the first interim payment and authorized by Fay & Perles and the Peterson Plaintiffs." (*See* SM Ex. 29 (Letter from F. Bond dated Oct. 27, 2017) at 2); SM Ex. 33 (Letter from C. Fay on Behalf of LaSpada dated Oct. 26, 2017) at 1; SM Ex. 9

---

[36]    Based on Fay's proposed payment schedule and the submission of the Trustee's counsel, it appears that there were other attorneys who have not participated in these proceedings but who have similar fee-sharing agreements with Fay and Perles for legal work they performed.  (SM Ex. 51 (Letter from S. Jacob dated Nov. 7, 2017) at 3.)  These are Donald Clower, Fredric Einhorn, Robert Feeney, Tuna Mecit, Alan Nuta, Charles Parsons and Barbara Pattin.  (*Id.*) Given that no participant in this proceeding has disputed their entitlement to receive fees, *see supra* at 32, I recommend that the Trustee consider them as "Damages Attorneys" entitled to receive fees pursuant to their fee-sharing agreements with Fay and Perles.

(Letter from P. Donahue dated June 21, 2017) at 1; SM Ex. 17 (Letter from D. Gaskill dated June 26, 2017) at 1; SM Ex. 40 (Letter from J. Mook dated Oct. 27, 2017) at 2.)  There is no dispute that each of the Damages Attorneys is entitled to fees for work on behalf of the plaintiffs he, she or it represented in connection with the proceedings before the Special Masters in the *Peterson* Action.

Aside from the challenges raised by Cook, Glenn and Delaney, which I have recommended that the Court reject for the reasons outlined above, *see supra* at 7–8, none of the parties hereto challenges the right of each of the Damages Attorneys to receive a fee of 3% of the gross amount collected from Iran by the *Peterson* Action plaintiffs whom they represented as damages counsel pursuant to the fee-sharing agreements with Fay and Perles.[37]  Perles has expressly stated that he does not dispute the entitlement of Donahue, Drennan, Gaskill or Karr to their claimed fees as Damages Attorneys, and has raised no objection to the claims of Bond & Norman. (SM Ex. 47 (Letter from D. Bregman and G. Hervey dated Nov. 3, 2017) at 2–4.) Similarly, for his part, Fay has not stated any objection to the claims any of the Damages Attorneys.  (SM Ex. 53 (Letter from T. Fay dated Nov. 8, 2017) at 1–4; SM Ex. 48 (Letter from J. Norman dated Nov. 3, 2017) at 1–4 (objecting only to the claims of Cook); SM Ex. 49 (Letter from F. Bond dated Nov. 3, 2017) at 1–3 (objecting only to the claims of Glenn).)  Nor have any

---

[37]   The Trustee has noted that there were "small errors" in the calculation of the claims of Bond and Norman, who may not have applied the correct "collection percentage" to reflect that their fees should be based on the "gross amount collected" by the plaintiffs they represented as Damages Attorneys.  (SM Ex. 51 (Letter from S. Jacob dated Nov. 7, 2017) Ex. A at 3–4.) While this may be, as the Trustee has stated, a "calculation error," for the avoidance of doubt, I recommend that the fees for Bond & Norman should be calculated by the Trustee to take into account the actual recoveries of the *Peterson* Action plaintiffs pursuant to the Sharing Agreement.

of the Enforcement Attorneys raised any objections to the claims of any of the Damages

Attorneys.

Because no other proper party to this action has raised any objection to their claims for

fees, I recommend that the Court order the Trustee to distribute attorneys' fees to the Damages

Attorneys according to the terms of their Associate Counsel Agreements with the FSIA

Partnership, with reasonable and appropriate reserves.

### C.   The Enforcement Attorneys Are Entitled to Be Paid According to the Terms of their Fee-Sharing Agreements with the Retained Attorneys.

The Enforcement Attorneys seek payment of contingent-fees pursuant to fee-sharing

agreements with certain Retained Attorneys for judgment enforcement work performed on behalf

of plaintiffs.

- SMD seeks $28,755,814.38, and has already received $24,375,000 in the Trustee's first distribution of fees. (SM Ex. 23 (Letter from L. Vogel dated Oct. 27, 2017) at 3.)

- SBR seeks $12,369,356.39, and has already received $10,484,943 in the Trustee's first distribution of fees. (SM Ex. 36 (Letter from S. Bonner dated Oct. 27, 2017) at 4.)

- Fleischman seeks $2,105,968.53, and has received $1,785,133 in the Trustee's first distribution of fees. (SM Ex. 26 (Letter from K. Fleishman dated Oct. 27, 2017) at 2.)

Here, there is no dispute that that the Enforcement Attorneys are entitled to fees for work on

behalf of the plaintiffs they represented or that they have liens under Section 475 that are

enforceable in this Court. All of the Retained Attorneys have agreed to share their fees *pro rata*

with the Enforcement Attorneys, and no other proper party to this action has raised any objection

to their claims for fees. Accordingly, I recommend that the Court order the Trustee to distribute

attorneys' fees to the Enforcement Attorneys on the terms proposed by Fay.

### D.   Clarification of Trustee's Objections To Pay Attorneys' Fees

Pursuant to the Court's Order of July 9, 2013 (ECF No. 460), the Court's Order of June

6, 2016 (ECF No. 651), and paragraph 3.1.3 of the QSF Agreement (ECF No. 461 at 4–5), the

Trustee was directed to distribute the funds from the QSF in a reasonably timely manner, including to pay attorney's fees, costs and liens in accordance with the agreements between the Plaintiffs and their respective attorneys, reserving a reasonable amount for expenses and contingencies.  To date, the Trustee has distributed approximately $250 million to attorneys who provided services, directly or indirectly to the Peterson Plaintiffs.  (*See* ECF Nos. 704 at 6.) However, the Trustee suspended distributions to Plaintiffs' attorneys and to other attorneys retained by Plaintiffs' attorneys due to the assertion of competing claims for payment and related concerns about whether the claimants have valid liens, among other reasons.  (*See* SM Ex. 51 (Letter from S. Jacob dated Nov. 7, 2017) at 5.)

Fay, the Follow On Attorneys, HNK, the Damages Attorneys and the Enforcement Attorneys have pressed the Trustee to resume making payments to counsel, arguing that the claims of Cook, Glenn, Perles and Delaney do not justify the Trustee's suspension of payments to other attorneys.  (*See, e.g.*, ECF No. 727 at 4; ECF No. 735 at 2–8; ECF No. 744 at 2; SM Ex. 47 (Letter from D. Bregman and G. Hervey dated Nov. 3, 2017) at 2, 6.)  Other attorneys have asserted that the Trustee is legally required to hold funds in reserve to cover potential recoveries in separate litigation and arbitration.  (*See, e.g.*, SM Ex. 25 (Letter from S. Storch dated Oct. 27, 2017) at 6.)  Indeed, Fay noted that Cook "has threatened to sue the Trustee if the Trustee pays over to the Marines, soldiers, and sailors in this action, or their Counsel, what is due them." (ECF No. 735 at 4.)

The Trustee has explained that "the total amount counsel have claimed potentially exceeds the remaining funds [earmarked for attorneys' fees] by approximately $256,002,136," and has stated that "in light of the shortfall of available funds, the Trustee cannot make further distributions to counsel without an order from the Court that effectively reconciles counsel's

claims so that they do not exceed the available funds."  (SM Ex. 51 (Letter from S. Jacob dated

Nov. 7, 2017) at 4.)  In other words, the Trustee desires to complete the distribution of funds

payable to the 87% Plaintiffs and their counsel, but "cannot make a distribution while these

claims are pending."  (SM Ex. 52 (Nov. 8, 2017 Conf. Tr.) at 84:16–18.)

      In light of the Court's prior Orders and the QSF Agreement, and for the reasons discussed

above, I recommend that the Court order the Trustee to resume distributions to the attorneys for

the Peterson Plaintiffs, subject to appropriate reserves for expenses and contingencies, but not for

any potential claims by Cook, Glenn or Delaney or for Perles's claims with respect to the Follow

On Attorneys.  Assuming that the Court adopts this Report & Recommendation, I further

recommend that the Court reject any claim by any participant in this proceeding that the

Trustee's distribution in accordance with the Court's Orders would violate his fiduciary duties to

the Trust or any liens claimed by any participants in this proceeding.

## <u>CONCLUSION</u>

      For all the foregoing reasons, I recommend that the Court grant Fay's motion to the

extent he seeks further distributions to the Peterson Plaintiffs and to the Retained Attorneys, the

Damages Attorneys and the Enforcement Attorneys, but deny Fay's motion to the extent that the

payment schedule offered in support of his motion (or the corrected version thereof) is

inconsistent with this Report & Recommendation.  More specifically, I recommend that the

Court:

      (1)     order the Trustee to complete a second distribution from the QSF in respect of

               claims by the Peterson Plaintiffs as soon as reasonably practicable, with

               reasonable and appropriate reserves for anticipated expenses and contingencies,

               but no reserves for attorneys' fees exceeding one-third of the total funds available

               for distribution;

(2)     reject the applications of Cook, Glenn and Delaney to intervene in this action to assert liens against the QSF or to obtain any other requested relief from the Court;

(3)     reject Perles's claims in respect of the fees owed to the Follow On Attorneys and HNK;

(4)     order the Trustee to pay attorneys' fees to the Retained Attorneys according to the terms of their contingent-fee agreements with their clients, as contemplated by the plain terms of the QSF Agreement, as well as the fee-sharing agreements between or among the Retained Attorneys, including those agreements challenged by Perles, and subject to appropriate reserves for reasonable expenses and contingencies, but no reserves based on the claims advanced by Cook, Glenn, Delaney or Perles in connection with these proceedings;

(5)     order the Trustee to pay the Damages Attorneys and the Enforcement Attorneys according to the terms of their fee-sharing agreements with the Retained Attorneys, subject to appropriate reserves for reasonable expenses and contingencies, but no reserves based on the claims advanced by Cook, Glenn, Delaney or Perles in connection with these proceedings; and

(6)     order the Trustee to notify all potential attorneys who may seek to claim any entitlement to reimbursement of expenses that such claims and supporting documents must be submitted within 30 days of the Court's adoption of this Report & Recommendation, and that any claims not received by this deadline will be rejected by the Trustee as untimely.

In making the recommendations above with respect to the Retained Attorneys, Damages Attorneys, and Enforcement Attorneys, I note once more that all of these participants, with the

exception of Perles, have generally agreed that Fay's Revised Schedule A correctly reflects the contingent-fee agreements and fee-sharing agreements that entitle them to fees. However, as stated above, there is no basis for withholding the payment of attorneys' fees to Karr or for continuing to hold any reserve for the payment of attorneys' fees to Glenn. I expect that the Trustee, the Retained Attorneys, the Damages Attorneys and the Enforcement Attorneys will be able to confer on the final calculations for the appropriate distributions and reach agreement within 7 days of the service of this Report & Recommendation on the participants. To the extent the participants are unable to reach agreement on final calculations, the Trustee should submit a report to me concerning the outstanding disagreements no later than 10 days after the service of this Report & Recommendation on the participants. Additionally, to the extent that any attorney seeking expense reimbursement is unable to resolve any dispute with the Trustee concerning the payment of expenses, it should submit a letter brief to me (no longer than three pages) setting forth the attorney's and the Trustee's positions on the dispute. Finally, I direct attorney Lorraine A. Ray, Esq. to provide an update on the status of her ongoing discussions with counsel for the Retained Attorneys and the Trustee regarding her request for an order authorizing the Trustee to pay fees and expenses for her service as a special master in damages proceedings before the U.S. District Court for the District of Columbia no later than two weeks from the filing of this Report & Recommendation.

For the avoidance of doubt, nothing herein is meant to foreclose or prejudice any participant's right to pursue relief against any participant other than the Trustee or the Peterson Plaintiffs by commencing or continuing to pursue a separate litigation or arbitration.

To the extent any participant in the Attorneys' Fee Disputes track has raised any arguments not explicitly addressed above, I have considered them and recommend that the Court reject such arguments for lack of merit.

Finally, because it contains and refers to potentially confidential and sensitive personal information, I will file this Report & Recommendation, along with the exhibits attached hereto, with the Court under seal contemporaneously with service on the participants in the Attorneys' Fee Disputes track.  I direct the participants to inform me of any requested redactions no later than noon on Friday, December 1, 2017.  Thereafter, a redacted version of this Report & Recommendation and its exhibits will be filed on the public docket reflecting the parties' reasonable proposed redactions.

Dated:    New York, New York
        November 29, 2017

                                  Kathleen N. Massey
                                  Special Master

**APPENDIX A**

| Exhibit # | Description |
|:---:|:---|
| 1 | Kamins Agreement dated June 9, 2004 |
| 2 | Amitay Agreement dated July 1, 2007 |
| 3 | Gibson Dunn Agreement dated July 1, 2007 |
| 4 | McGuire Woods Agreement (undated) |
| 5 | Cochran Agreement dated February 15, 2012 |
| 6 | Marine Barracks Agreement dated February 21, 2012 |
| 7 | Executed Acknowledgments Regarding Interim Distribution of Attorneys' Fees dated Nov. 21, 2016 |
| 8 | Letter from Steven Storch to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated June 9, 2017 |
| 9 | Letter from Patrick Donahue to Kathleen Massey regarding "Order Appointing Special Master Scheduling Order – Third Track – Attorneys' Fee Disputes – Peterson, et al. v. Islamic Republic of Iran, et al., Case No. 1:10-cv-4518-KBF (S.D.N.Y.)," dated June 21, 2017 |
| 10 | Letter from Edward Manning to Kathleen Massey regarding "Colleen Delaney, Allen Rothenberg, Thomas Fay and Steven Perles," with exhibits, dated June 16, 2017 |
| 11 | Letter from Max Folkenflik to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated June 21, 2017 |
| 12 | Letter from Geoffrey Hervey to Kathleen Massey regarding "Scheduling Order – Third Track – Attorneys' Fee Disputes – Peterson, et al. v. Islamic Republic of Iran, et al., No. 1:10-cv-4518-KBF (S.D.N.Y.)," dated June 22, 2017<br><br>Enclosing Letter from Douglas Bregman to Shalom Jacob regarding "Peterson – Marine Barracks Cases," dated May 1, 2017 |
| 13 | Letter from Geoffrey Hervey to Kathleen Massey regarding "Scheduling Order – Third Track – Attorneys' Fee Disputes – Peterson, et al. v. Islamic Republic of Iran, et al., No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated June 22, 2017 |
| 14 | Letter from Edward Manning to Kathleen Massey regarding "Scheduling Order – Third Track – Attorneys' Fee Disputes – Peterson, et al. v. Islamic Republic of Iran, et al., Case No. 1:10-cv-4518-KBF (S.D.N.Y.)," dated June 22, 2017 |
| 15 | Letter from Jonathan Mook to Kathleen Massey regarding "Order Appointing Special Master, Peterson, et al. v. Islamic Republic of Iran, et al., Case No. 1:10-cv-4518-KBF (S.D.N.Y.), before the United States District Court for the Southern District of New York," dated June 22, 2017 |

## APPENDIX A

| Exhibit # | Description |
|:---:|:---|
| 16 | Letter from Steven Storch to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, No. 1:10-cv-4518-KBF (S.D.N.Y.)," dated June 23, 2017 |
| 17 | Letter from Dan Gaskill to Kathleen Massey regarding "Order Appointing Special Master, Peterson, et al. v. Islamic Republic of Iran, et al., Case No. 1:10-cv-4518-KBF (S.D.N.Y.), before the United States District Court for the Southern District of New York," dated June 26, 2017 |
| 18 | Letter from Peter Buckley to Kathleen Massey regarding "Peterson v. Iran 10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated June 27, 2017 |
| 19 | Letter from Edward Manning to Kathleen Massey regarding "Scheduling Order – Third Track – Attorneys' Fee Disputes – Peterson, et al. v. Islamic Republic of Iran, et al., No. 1:10-cv-4518-KBF (S.D.N.Y.)," dated June 27, 2017 |
| 20 | Letter from John Vail and Douglas Bregman to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated June 28, 2017 |
| 21 | Caragh Fay's "Revised Schedule A" submitted August 10, 2017 |
| 22 | Letter from Special Master Kathleen Massey regarding "Peterson v. Islamic Republic of Iran - Request for Briefing in Attorneys' Fee Disputes Track," Concerning Peterson Qualified Settlement Fund, dated October 20, 2017 |
| 23 | Letter from Liviu Vogel to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated October 27, 2017 |
| 24 | Letter from Loraine A. Ray to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated October 27, 2017 |
| 25 | Letter from Steven Storch to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, 1:10-cv-4518-KBF (S.D.N.Y.) (the "Turnover Action)," with exhibits, dated October 27, 2017 |
| 26 | Letter from Keith Fleischman to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, Case No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated October 27, 2017 |
| 27 | Letter from Dan Gaskill to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, et al., Case No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated October 27, 2017 |
| 28 | Letter from Theodore Allison to Kathleen Massey regarding "Peterson, et al. v. Islamic Republic of Iran, et al., Case No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated October 27, 2017 |
| 29 | Letter from Ferris Bond to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated October 27, 2017 |

**APPENDIX A**

| Exhibit # | Description |
|---|---|
| 30 | Letter from Stanley Reed to Kathleen Massey regarding "Peterson et al. v. Islamic Republic of Iran, et al. Case No. 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated October 27, 2017 |
| 31 | Letter from Caragh Fay to Kathleen Massey regarding Attorney Fee Dispute Track and Third Report & Recommendation, Peterson et al. v. Islamic Republic of Iran, et al. Case No. 1:10-cv-4518 (KBF), dated October 26, 2017 |
| 32 | Letter from Chanakya Sethi to Kathleen Massey regarding Peterson v. Islamic Republic of Iran (10-cv-4518) (KBF)" with exhibits, dated October 27, 2017 |
| 33 | Letter from Caragh Fay to Kathleen Massey on behalf of Tony LaSpada regarding Attorney Fee Dispute Track and Third Report & Recommendation, dated October 26, 2017 |
| 34 | Letter from Edward Manning to Kathleen Massey regarding "Special Master's Request for More Information," with exhibits, dated October 27, 2017 |
| 35 | Letter from Douglas Bregman and Geoffrey Hervey to Kathleen Massey regarding "Peterson, et al. v. Islamic Republic of Iran, et al. No 1:10-cv-4518-KBF (S.D.N.Y.)," dated October 27, 2017 |
| 36 | Letter from James Bonner to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, No. 1:10-cv-4518 (KBF)," with exhibits, dated October 27, 2017 |
| 37 | Letter from Max Folkenflik to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated October 27, 2017 |
| 38 | Letter from Roger Zuckerman, William J. Murphy to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated October 27, 2017 |
| 39 | Letter from Peter Buckley to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran – Attorneys' Fee Disputes Track," dated October 27, 2017 |
| 40 | Letter from Jonathan Mook to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran et al, Case No. 1:10-cv-4518-KBF (S.D.N.Y.)," dated October 27, 2017 |
| 41 | Letter from Jonathan Mook to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran et al, Case No. 1:10-cv-4518-KBF (S.D.N.Y.)," dated October 31, 2017 |
| 42 | Letter from C. Fiebig to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, No. 10-cv-4518 (S.D.N.Y.) (KBF), dated Nov. 3, 2017 |

**APPENDIX A**

| Exhibit # | Description |
|:---:|:---|
| 43 | Letter from Steven Storch to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.) (the "Turnover Action")," dated November 3, 2017 |
| 44 | Letter from Chanakya Sethi to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," dated November 3, 2017 |
| 45 | Letter from Dan Gaskill to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, Case No.10-cv-4518-KBF (S.D.N.Y.), Attorneys' Fee Dispute" with exhibits, dated November 3, 2017 |
| 46 | Letter from Theodore Allison to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, Case No.10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated November 3, 2017 |
| 47 | Letter from Douglas Bregman and Geoffrey Hervey to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated November 3, 2017 |
| 48 | Letter from Jane Carol Norman to Kathleen Massey regarding "Opposition to David Cook's Request for a Lien and for Intervention," with exhibits, dated November 3, 2017 |
| 49 | Letter from Ferris Bond to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.), Opposition to the Claim filed by Jay Glenn" dated November 3, 2017 |
| 50 | Letter from Peter Buckley to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran –Attorneys' Fee Disputes Track," with exhibits, dated November 7, 2017 |
| 51 | Letter from Shalom Jacob to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated November 7, 2017 |
| 52 | Transcript of Teleconference of Attorneys' Fees Call, dated November 8, 2017 |
| 53 | Letter from Thomas Fay to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," dated November 8, 2017 |
| 54 | Letter from Edward Manning to Kathleen Massey regarding "Special Master Request – Third Track – Attorneys' Fee Disputes, Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," dated November 10, 2017 |
| 55 | Letter from Steven Storch to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran, No. 1:10-cv-4518-KBF (S.D.N.Y.) (Claim of Jay Glenn)" dated November 10, 2017 |
| 56 | Letter from Max Folkenflik to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated November 10, 2017 |

APPENDIX A

| Exhibit # | Description |
| --- | --- |
| 57 | Letter from Liviu Vogel to Kathleen Massey "Peterson v. Islamic Republic of Iran 1:10-cv-4518-KBF (S.D.N.Y.)," with exhibits, dated November 10, 2017 |
| 58 | Letter from Chanakya Sethi to Kathleen Massey regarding "Peterson v. Islamic Republic of Iran 1:10-cv-4519-KBF (S.D.N.Y.)," dated November 13, 2017 |
| 59 | Attorneys' Fee First Interim Distribution as of November 16, 2017 |
| 60 | Letter from Robert Weigel to Kathleen Massey regarding "Peterson, et al. v. Islamic Republic of Iran, et al., No. 10-cv-4518 (KBF); Attorneys' Fee Disputes Docket," dated November 20, 2017 |
| 61 | Letter from Douglas Bregman, Geoffrey Hervey to Kathleen Massey regarding "Peterson, et al. v. Islamic Republic of Iran, et al., No. 1:10-cv-4518-KBF (S.D.N.Y.)," dated November 21, 2017 |